# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF ALABAMA

| | | |
|---|---|---|
| JOHNCO MATERIALS, INC., | ) | |
| | ) | |
|     Plaintiff, | ) | |
| | ) | Civil Action No. |
| vs. | ) | 2:06cv993-ID |
| | ) | |
| CONRAD YELVINGTON | ) | |
| DISTRIBUTORS, INC., | ) | |
| | ) | |
|     Defendant. | ) | |

## PLAINTIFF'S DESIGNATION
## OF EXPERT WITNESSES

Comes now Johnco Materials, Inc., the plaintiff in this cause, and pursuant to FED.R.CIV.P. 26(a)(2), designates the following experts and topics:

I.

    J. Lester Alexander, III, CPA
    Accounting, Economics & Appraisal Group, LLC

1

        2 North 20th Street
        Suite 1400
        Birmingham, Alabama 35203

It is anticipated that the general nature of the subject matter on which Mr. Alexander is to testify is the damages sustained by the plaintiff because of the defendant's acts and omissions. Mr. Alexander is expected to provide expert opinion concerning the areas and quantum of lost profits, incidental expenses suffered by plaintiff, and the value of the total loss to the plaintiff by reason of defendant's acts and omissions.

Mr. Alexander is expected to testify, consistent with the Rule 26 Report ("Summary Report of Accounting, Economics & Appraisal Group, LLC") filed as an Attachment to this Disclosure and served on defendant, as follows:

    A.    That the plaintiff invested a significant amount of money in the establishment of a mining facility and the related rail siding as

specified in the Supply Agreement. Mr. Alexander is expected to testify that in reliance on the Supply Agreement, the plaintiff purchased land with a cost in excess of $1.6 million, proceeded to purchase depreciable plant and rail car loading equipment at a cost of over $1.2 million, hired that would be needed in order to meet the obligations as agreed, and hired and trained employees needed to operate the mining facility to a production capacity. He is expected to testify that the plaintiff invested in excess of $2.8 million to meet its obligations under the Supply Agreement.

    B.    Mr. Alexander is expected to testify that while the plaintiff produced sufficient gravel, the defendant failed to purchase the quantities specified in the Supply Agreement.

    C.    Mr. Alexander is expected to testify that the plaintiff suffered lost profits and incidental costs attributable to the failure of the defendant to perform under the Supply Agreement. He is expected to testify that the plaintiff had expectations of generating gross revenue in excess of $7.4

million from the sale of No. 67 gravel to the defendant, and an additional $2.1 million from the sale of production by-products. He is expected to testify that this gross revenue figure should be reduced by production cost in the amount of $4.16 per ton sold, resulting in a net lost profit of $4,473,873 due to the failure of the defendant to perform. Finally, because plaintiff was ready to perform as of March 2006 and defendant did not take the initial deliver until May 11, 2006, Mr. Alexander is expected to testify that the incidental costs incurred by the plaintiff during the intervening period and attributable to the defendant's delay in initial delivery are in the amount of $75,342.

The basis and reasons for Mr. Alexander's opinions are stated in the Rule 26 Report, as are the data and other information considered; exhibits to be used as a summary of or support for these opinions; Mr. Alexander's qualifications and compensation in this case; and a listing of other cases in which he has testified as expert the preceding four years; all of which are adopted by incorporation into the disclosure made by this Designation.

4

II.

The plaintiff may call to testify as expert witnesses in this case any and all custodians of records for any and all records in question, who may testify as to the authenticity of any and all such records, and whose records will serve as their written reports. None of these expert witnesses have been specifically retained by the plaintiff.

III.

The plaintiff reserves the right to call to testify or question any and all experts or representatives that have been or may be designated by or called by any other party to this lawsuit regarding the matters in the complaint, answer, counterclaim or reply to counterclaim. These individuals have not been specifically retained by the plaintiff, and the plaintiff does not necessarily adopt or concede the accuracy of their fact opinions or conclusions.

IV.

The plaintiff hereby designates and supplies expert witness information to counsel of record; has met all the requirements of FED.R.CIV.P. 26(a)(2); and has fully complied with Section 7 of this Honorable Court's Scheduling Order of January 12, 2007, as amended by this Court's Order of August 1, 2007.

        s/ H. Gregory Pearson (PEA017)

        Charles E. Harrison (ASB-9408-N70C)

*OF COUNSEL:*

JUNKIN, PEARSON, HARRISON
   & JUNKIN, L.L.C.
601 Greensboro Avenue
Suite 600 Alston Place
Tuscaloosa, Alabama 35401
Telephone: (205) 366-0111
Telecopier: (205) 391-4780

## **CERTIFICATE OF SERVICE**

Pursuant to LR 5.4, I do hereby certify that I have on this the 8th day of August 2007 served a copy of the foregoing Designation on:

>Charles A. Stewart III, Esq.
>Angela R. Rogers, Esq.
>BRADLEY ARANT ROSE & WHITE LLP
>The Alabama Center for Commerce
>401 Adams Avenue, Suite 780
>Montgomery Alabama 36104
>
>Thomas J. Leek, Esq
>COBB & COLE
>150 Mognolia Avenue
>Post Office Box 2491
>Daytona Beach, FL 32115-2491

who is registered with this Court as a Filing User, by electronically filing a copy of said document through the Court's transmission facilities in the manner authorized by the Court's General Order regarding Electronic Case Filing Policies and Procedures.

*/s/ Charles E. Harrison*
Charles E. Harrison (ASB-9408-N70C)

**Summary Report of Accounting, Economics & Appraisal Group, LLC**

By:  J. Lester Alexander, III

**Johnco Materials, Inc. v.
Conrad Yelvington Distributors, Inc.
As of August 8, 2007**

**CV-06-2:06cv993-ID**

This report and the attached appendices is a summary of my findings and opinions to date in the above referenced matter.

I am a Certified Public Accountant and a Certified Fraud Examiner with approximately twenty-eight years of professional experience performing audit, tax and consulting services. I am the co-founder and the Managing Principal of Accounting, Economics and Appraisal Group, LLC ("AEA"). I hold a Bachelor of Science in Accounting from the University of Alabama.  I am a former partner of Pricewaterhouse Coopers, LLP and former Southeastern practice leader of one of its legacy firm's consulting practices.  In recent years, I have concentrated my practice in the areas of financial investigation, forensic accounting and valuation consulting services. I have been recognized as an expert in Alabama and other state and federal courts. I reserve the right to supplement and amend my opinions for information learned up to and throughout trial. Furthermore, I intend to develop and make available prior to trial additional charts and aides designed to make the financial and economic concepts addressed in my report more understandable to lay persons.

In regard to this matter, I was assisted by members of my firm who worked under my direction. AEA's billing rates for this engagement range from $55 to $290 per hour.

**SCOPE AND METHODOLOGY**

Counsel for Johnco Materials, Inc. ("JMI") retained me as expert witness to review and analyze documentary and oral evidence related to the Supply Agreement dated April 16, 2004 between JMI and Conrad Yelvington Distributors, Inc. ("CYDI") for the supply of Number 67 concrete gravel and any financial/economic facts and circumstances occurring during and after the dates covered under Supply Agreement.

In performing my work, I read and analyzed the Supply Agreement, related sales invoices, federal tax returns, financial statements and other information produced in this matter.  I utilized certain case pleadings and the depositions of Ben Johnston, Pressley Morgan ("Pep") Johnston, and Clatus Junkin.  I have studied industry data, financial research and industry trends regarding profits and other information. A complete listing of information considered is included as an appendix to this report.  As a result of this work, I have developed the following findings and opinions.

**FINDINGS AND OPINIONS**

**JMI invested a significant amount of money in the establishment of a mining facility and the related rail siding as specified in the Supply Agreement.**

In April 2004, JMI and CYDI entered into a Supply Agreement for No. 67 concrete gravel. This Agreement called for the construction of a mining facility to mine and classify sand and gravel.[1] Upon completion of this facility, CYDI was to begin purchasing the specified size of gravel on a weekly schedule at an approximate volume of 5,200 tons per week representing an annual volume of 260,000 tons per year. The cost per tonnage price would increase after the first two years at a small percentage increment.[2]

JMI purchased land with a cost in excess of $1.6 million. JMI then proceeded to purchase depreciable plant and rail car loading equipment with a cost of over $1.2 million that would be needed in order to meet the obligations as agreed. In addition, JMI incurred other costs to prepare the mining facility to produce at least 5,200 tons per week.[3] The amount invested by JMI to meet their obligations under the Supply Agreement was more than $2.8 million.

**Although sufficient gravel was produced by JMI, CYDI failed to purchase quantities specified in the Supply Agreement.**

Although CYDI was aware that JMI commenced mining operations during March 2006, CYDI did not schedule the initial delivery until May 11, 2006, approximately 9 weeks after mining operations commenced. After the initial delivery on May 11, 2006, CYDI failed to schedule weekly deliveries and only scheduled sporadic shipments during June 2006, August 2006, and September 2006. The total amount delivered by JMI to CYDI during this seven month time frame was approximately 32,000 tons.

**JMI suffered lost profits and incidental costs attributable to the failure of CYDI to take deliveries of No. 67 concrete gravel anticipated under the Supply Agreement.**

Based on the quantities and prices as set forth in the Supply Agreement, I have determined that JMI would have generated gross revenue in excess of $7.4 million from the sale of No. 67 gravel to CYDI and an additional $3.1 million from the sale of the production by-products.[4] This level of gross revenues is reasonable in light of the substantial investment made by the owners of JMI

---

[1] Paragraph 2.1 of the Supply Agreement states: "Seller shall construct a mining facility to mine and classify sand and gravel on the Plant Site. In addition to the mining facilities to be constructed on the Plant Site, this contract is contingent on Seller's ability to construct … sufficient rail siding to load/handle a minimum of fifty-two (52) open, or covered, hopper railcars on a regular shipment schedule.

[2] Paragraph 3.1 of the Supply Agreement states: "After Seller commences mining and grading of sand and gravel, Seller shall sell and deliver to Buyer, No. 67 concrete gravel in minimum quantities of 150,000 tons annually for a price equal to … ($5.25) per ton, F.O.B. Buyer's rail cars loaded on the rail siding on the Plant Site, on a weekly schedule (i.e. approximately 5,200 tons per week), and buyer shall purchase an accept from Seller said Product at the price and in the quantities specified …"

[3] Per deposition testimony of Clatus Junkin.

[4] See Appendix 2 for the calculation of expected gross revenue at 5,200 tons of No. 67 concrete gravel produced and sold per week.

to place the mine into operation. The loss of expected gross revenues through CYDI's failure to purchase the contractual quantities of No. 67 concrete gravel resulted in significant financial harm to JMI.

Using the costs from mining operations at production capacity for JMI during the period March 2006 and May 2006 through August 2006 [5], the gross revenue expected should be reduced by a cost to produce of $4.16 per ton sold. This results in a net lost profit of $4,473,873 due to the failure of CYDI to uphold their contractual obligations, before present value discounting and pre-judgment interest.[6] The lost profit amounts have not been reduced to their net present value as of the date of trial nor have they been increased for pre-judgment interest through the date of trial. It is my opinion that the impact of discounting of the net lost profits would be substantially offset by statutory pre-judgment interest considering the estimated date of trial verses the time frame of the lost profits determinations.

In addition to these costs, JMI has informed me that they had commenced mining operations and were staffed to meet the delivery requirements specified in the supply agreement as of the first week in March 2006. However, CYDI did not take the initial delivery until May 11, 2006. We have determined the incidental costs incurred by JMI during the intervening period attributable to CYDI's delay in the initial delivery to be $75,342, before pre-judgment interest.

**OTHER CONSIDERATIONS**

My report is issued in accordance with the Management Consulting Standards of the American Institute of Certified Public Accountants. This report is to be used solely in connection with proceedings related to the above referenced matter and should not be used for any other purpose. Outside distribution of this report to others is not permitted without the written consent of AEA Group, LLC. The information in this report is based on information learned through August 8, 2007. Discovery in the captioned litigation is ongoing as is my review and analysis of the facts and circumstances of the case. As such, I reserve the right to consider any additional information that is presented to me. Further, I reserve the right to supplement and amend my opinions for information learned up to and throughout trial.

Very truly yours,

By: *[signature: J Lester Alexander, III]*
    J. Lester Alexander, III, CPA

---

[5] Per deposition testimony of Clatus Junkin, these months are an accurate representation of costs associated with the mine running at production capacity.
[6] See Appendix 1 for the calculation of profits lost by JMI.

**INDEX OF APPENDICES**

Appendix 1 -   Lost Profits @ 5,200 Tons Per Week

Appendix 2 -   Gross Revenue @ 5,200 Tons Per Week

Appendix 3 -   Sales Volume Assumptions

Appendix 4 -   Cost Per Ton @ 5,200 Tons Per Week

Appendix 5 -   Incidental Costs

Appendix 6 -   Resume of J. Lester Alexander, III

Appendix 7 -   Trial, Deposition and Arbitration Testimony in Last Four Years

Appendix 8 -   List of Information Considered

Appendix 1

## Lost Profits @ 5,200 Tons Per Week

|  | Cumulative | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 |
|---|---|---|---|---|---|---|
| Gross Revenue (Appendix 2 and 3) | $ 10,513,500 | $ 2,051,740 | $ 2,088,140 | $ 2,124,540 | $ 2,124,540 | $ 2,124,540 |
| Incremental Costs (Appendix 4): |  |  |  |  |  |  |
|   Anticipated Tons [1] |  | 260,000 | 260,000 | 260,000 | 260,000 | 260,000 |
|   Cost Per Ton (Appendix 4) |  | $ 4.16 | $ 4.28 | $ 4.41 | $ 4.54 | $ 4.68 |
|   Incremental Costs | $ 5,738,200 | $ 1,081,600 | $ 1,112,800 | $ 1,146,600 | $ 1,180,400 | $ 1,216,800 |
| Lost Profits | $ 4,775,300 | $ 970,140 | $ 975,340 | $ 977,940 | $ 944,140 | $ 907,740 |
| (Less): Actual Gravel and Sand Sales [2] | (301,427) | (275,668) | (25,759) |  |  |  |
| Net Lost Profits | $ 4,473,873 | $ 694,472 | $ 949,581 | $ 977,940 | $ 944,140 | $ 907,740 |

[1] Source: Section 3.1 of Supply Agreement dated April 16, 2004 between Johnco Materials, Inc. and Conrad Yelvington Distributors, Inc.

[2] Source: Johnco Materials, Inc. Profit and Loss Statements for the period May 2006 through June 2007.

Appendix 2

## Gross Revenue @ 5,200 Tons Per Week

|  | Cumulative | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 |
|---|---|---|---|---|---|---|
| *# 67 Concrete Gravel* | | | | | | |
| Contracted Quantity [1] | 1,300,000 | 260,000 | 260,000 | 260,000 | 260,000 | 260,000 |
| Price Per Ton [1] | | $ 5.51 | $ 5.65 | $ 5.79 | $ 5.79 | $ 5.79 |
| Gross Revenue | $ 7,417,800 | $ 1,432,600 | $ 1,469,000 | $ 1,505,400 | $ 1,505,400 | $ 1,505,400 |
| *# 4 Oversize Gravel* | | | | | | |
| Anticipated Quantity [2] | 218,000 | 43,600 | 43,600 | 43,600 | 43,600 | 43,600 |
| Price Per Ton [3] | | $ 8.50 | $ 8.50 | $ 8.50 | $ 8.50 | $ 8.50 |
| Gross Revenue | $ 1,853,000 | $ 370,600 | $ 370,600 | $ 370,600 | $ 370,600 | $ 370,600 |
| *Sand* | | | | | | |
| Anticipated Quantity [2] | 731,000 | 146,200 | 146,200 | 146,200 | 146,200 | 146,200 |
| Price Per Ton [4] | | $ 1.70 | $ 1.70 | $ 1.70 | $ 1.70 | $ 1.70 |
| Gross Revenue | $ 1,242,700 | $ 248,540 | $ 248,540 | $ 248,540 | $ 248,540 | $ 248,540 |
| Total Gross Revenue | $ 10,513,500 | $ 2,051,740 | $ 2,088,140 | $ 2,124,540 | $ 2,124,540 | $ 2,124,540 |

[1] Source: Section 3.1 of Supply Agreement dated April 16, 2004 between Johnco Materials, Inc. and Conrad Yelvington Distributors, Inc., based on 50 weeks per year production.

[2] Source: Anticipated quantity for # 4 Oversize Gravel and Sand calculated based on historical relationship between tons of # 67 Concrete Gravel, # 4 Oversize Gravel, and Sand sold during the period January 2006 through June 2007 (see Appendix 3).

[3] Source: Price per ton for delivery of 3,329.866 tons to Conrad Yelvington Distributors, Inc. during June 2006 (Bates Johnco Materials 00058 to 00059) and for multiple deliveries totaling ~ 3,400 tons to Maddox Stone & Gravel during the period March 2006 through October 2006, based on detailed analysis of sales invoices for the period January 2006 through June 2007.

[4] Source: Average price per ton for deliveries during the period January 2006 through June 2007, based on detailed analysis of sales invoices for the period January 2006 through June 2007.

Appendix 3

## Sales Volume Assumptions

### Actual Sales History January 2006 Through June 2007

|  | # 67 Concrete Gravel | # 4 Oversize Gravel | Sand | Combined |
|---|---|---|---|---|
| Tons Sold [1] | 40,028.63 | 6,729.35 | 22,505.63 | 69,263.61 |
| % of Sales | 57.8% | 9.7% | 32.5% | 100.0% |

[1] Source: Detailed analysis of sales invoices for the period January 2006 through June 2007.

### Anticipated Tons @ 5,200 Tons Per Week

|  | # 67 Concrete Gravel | # 4 Oversize Gravel | Sand | Combined |
|---|---|---|---|---|
| Tons Sold | 260,000 | 43,600 | 146,200 | 449,800 |
| % of Sales | 57.8% | 9.7% | 32.5% | 100.0% |

Appendix 4

## Cost Per Ton @ 5,200 Tons Per Week

|  | Cumulative | Actual Operating Costs [1] | | | | |
|---|---|---|---|---|---|---|
|  |  | March 2006 | May 2006 | June 2006 | July 2006 | August 2006 |
| Tons # 67 Concrete Gravel Sold [2] | 21,863.12 | 135.00 | 5,953.04 | 3,241.59 | 189.13 | 12,344.36 |
| Salaries | $ 99,623 | $ 16,913 | $ 18,771 | $ 23,734 | $ 18,366 | $ 21,839 |
| Insurance-Workers' Comp. | 4,165 | - | - | - | - | 4,165 |
| Life Insurance | 6,628 | 1,657 | - | 1,657 | 1,657 | 1,657 |
| Payroll Tax | 10,219 | 1,834 | 1,409 | 2,661 | 2,030 | 2,285 |
| Contract Labor | 1,625 | - | - | 1,625 | - | - |
| Training | 150 | - | - | 150 | - | - |
| Fuel and Oil | 52,551 | 7,782 | 6,700 | 18,854 | 9,137 | 10,078 |
| Repairs | 25,040 | 8,270 | 1,518 | 5,680 | 3,305 | 6,267 |
| Equipment Rental | 19,063 | 2,044 | 5,141 | 4,098 | - | 7,780 |
| Insurance | 6,110 | 1,517 | 2,783 | 1,810 | - | - |
| Supplies | 8,893 | 395 | 1,119 | 5,545 | 980 | 854 |
| Hauling Charges | 1,830 | - | - | 180 | - | 1,650 |
| Small Tools | 1,091 | 429 | - | 454 | - | 208 |
| Miscellaneous Expenses | 769 | 74 | 695 | - | - | - |
| Utilities | 5,264 | 512 | 735 | 1,245 | 1,374 | 1,398 |
| Total Operating Costs | $ 243,021 | $ 41,427 | $ 38,871 | $ 67,693 | $ 36,849 | $ 58,181 |
| Escalate Variable Fuel and Oil Cost from Average Cost Per Actual Ton Sold to Cost for 5,200 Tons Per Week [3] | 207,844 | 44,297 | 45,379 | 33,225 | 42,942 | 42,001 |
| Total Equivalent Operating Costs | $ 450,865 | $ 85,724 | $ 84,250 | $ 100,918 | $ 79,791 | $ 100,182 |
| Anticipated Tons # 67 Concrete Gravel [4] | 108,335 | 21,667 | 21,667 | 21,667 | 21,667 | 21,667 |
| Cost Per Ton | $ 4.16 | $ 3.96 | $ 3.89 | $ 4.66 | $ 3.68 | $ 4.62 |

| | Cost Per Ton Escalated for Inflation [5] | | | | |
|---|---|---|---|---|---|
| | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 |
| Cost Per Ton | $ 4.16 | $ 4.28 | $ 4.41 | $ 4.54 | $ 4.68 |

[1] Source: Johnco Materials, Inc. Statements of Operations for the March 2006 through September 2006 period of operations under the Supply Agreement. April 2006 and September 2006 operating costs were excluded from analysis due to effect of cost avoidance reduction in work force by Johnco Materials, Inc., resulting in operating costs not comparable to months of fully-staffed production.

[2] Source: Detailed analysis of sales invoices for the period January 2006 through June 2007.

[3] Source: Operating costs incurred by Johnco Materials, Inc. during the March 2006 through September 2006 period of operations under the Supply Agreement represent staffing and operating costs necessary to produce 5,200 tons of # 67 Concrete Gravel per week. Actual operating costs incurred by Johnco Materials, Inc. for operation producing less than contracted quantities delivered to Conrad Yelvington Distributors, Inc. are equivalent to costs necessary to produce 5,200 tons of # 67 Concrete Gravel per week, with the exception of Fuel and Oil, which would escalate to power equipment to load rail cars specified as the shipping method by the Supply Agreement. For analytical purposes, actual Fuel and Oil cost \has been escalated to equivalent cost necessary to produce and rail car load 5,200 tons of # 67 Concrete Gravel per week.

[4] Production of # 4 Oversize Gravel and Sand are byproducts of the production of # 67 Concrete Gravel; tons of # 4 Oversize Gravel and Sand are not included in the Anticipated Tons for purposes of calculating Cost Per Ton.

[5] Cost Per Ton escalated 3.0% for inflation, comparable to 2.4% increase from June 2006 to June 2007 in Consumer Price Index published by the Bureau of Labor Statistics of the U.S. Department of Labor for comparable geographic and demographic areas, specifically for South region, Size D Nonmetropolitan area size (less than 50,000) (www.bls.gov/news.release/cpi.t03.htm).

## Incidental Costs

|  | March 2006 [1] | April 2006 [1] | Combined |
|---|---:|---:|---:|
| Salaries | $ 16,913 | $ 7,084 | $ 23,997 |
| Insurance-Workers' Comp. | - | 3,892 | 3,892 |
| Life Insurance | 1,657 | 1,657 | 3,314 |
| Payroll Tax | 1,834 | 699 | 2,533 |
| Training | - | 70 | 70 |
| Fuel and Oil | 7,782 | 5,397 | 13,179 |
| Repairs | 8,270 | 3,052 | 11,322 |
| Equipment Rental | 2,044 | 7,952 | 9,996 |
| Insurance | 1,517 | 1,822 | 3,339 |
| Supplies | 395 | 1,555 | 1,950 |
| Small Tools | 429 | 64 | 493 |
| Miscellaneous Expenses | 74 | 64 | 138 |
| Utilities | 512 | 607 | 1,119 |
|  | $ 41,427 | $ 33,915 |  |
| Incidental Costs |  |  | $ 75,342 |

[1] Source: Johnco Materials, Inc. Statements of Operations for March 2006 and April 2006.

**Resume of J. Lester Alexander, III**  Appendix 6

**Professional Experience**

Mr. Alexander is co-founder and the Managing Principal of Accounting Economics & Appraisal Group. He is a former partner of PricewaterhouseCoopers LLP and former southeastern practice leader of one of its legacy firm's consulting practices. Mr. Alexander has practiced for more than twenty-eight years performing audit, tax and consulting services. In recent years Mr. Alexander has concentrated his practice in the areas of fraud investigation, forensic accounting and valuation consulting services. Mr. Alexander holds a Bachelor of Science in Accounting from the University of Alabama and is a Certified Public Accountant and a Certified Fraud Examiner.

Mr. Alexander has provided services and, from time to time, expert testimony in various courts and in situations involving alternative dispute resolution. He has provided services in connection with contract disputes, security issues, insurance coverage issues, non-compete agreements, lost profits, business valuation and various other matters. He has testified in connection with class action certification hearings and class action fairness hearings. Mr. Alexander's experience includes testimony about customary practices and standards of care in auditing, operating and controlling business activities. Mr. Alexander has concentrated experience in a variety of industries including real estate, contracting, manufacturing insurance, and healthcare.

He is experienced in the areas of business valuation, acquisition due diligence, investment advisory, tax advisory and cost accounting advisory services. He has evaluated the value of ownership interests in businesses in connection with acquisitions, disposals and disputes. He has performed suitability studies in connection with investment transactions in a wide range of financial instruments. In addition, he has performed incremental cost studies, contribution margin studies and other applications of cost accounting for clients in connection with new products, acquisitions, patent valuations and evaluation of trademarks. This experience includes making projections of incremental revenues and costs in connection with profitability analysis of proposed business ventures, new products and other profitability analysis for companies.

Throughout his career Mr. Alexander has advised governing bodies, committees and members on their role in overseeing the activities of companies and senior management.  His clients have included publicly-traded companies, privately-held companies, governmental entities and tax-exempt companies. He has advised governing bodies overseeing companies in the start-up/growth, mature and restructuring phases of operational development. He has performed these services for governing bodies overseeing companies operating in the insurance, reinsurance, manufacturing, healthcare, technology, financial services, real estate, contracting, and retail industries.

Mr. Alexander has performed determinations of solvency; investigated potentially fraudulent transfers made by debtors; analyzed preferential payments to creditors; analyzed the course of dealings between debtor/creditor; and valued the consideration received when a debtor transfers assets. Mr. Alexander has testified in court as an expert witness concerning solvency, fraudulent transfers, preference payments, ordinary course of business, reasonably equivalent value, cash/collateral tracing, lost profits, business valuation and records reconstruction.

Further, Mr. Alexander has been appointed Trustee of both Chapter 11 and Chapter 7 Bankruptcy Estates, where he pursued recoveries (including adversary proceedings in Federal and State courts), made solvency determinations and performed the routine duties of both a Chapter 11 and Chapter 7 Bankruptcy Trustee. Creditors and Trustees have engaged Mr. Alexander to investigate insider transactions, value businesses and to evaluate loan collateral. Mr. Alexander has served as a lead advisor for various financial institutions in connection with their underwriting and credit/investment evaluation activities. In addition, Mr. Alexander has conducted auctions and assisted others in evaluating competitive bids received in auction.

**Resume of J. Lester Alexander, III**                                                Appendix 6

## Professional/Business/Community Affiliations

Lecturer on Documentation and Demonstration of Extra Work Costs on Construction Projects - 2006, Birmingham, Alabama

Lecturer on Financial Damages - 2004 Cumberland Law School Continuing Education Seminar, Birmingham Alabama

Lecturer on Financial and Business Fraud Schemes - 2004 Corporate Counsel Seminar, Birmingham Alabama

Lecturer on Detecting Fraud Schemes - Fall Bankruptcy Seminar, 2003, Alabama Bar Continuing Education Series, Birmingham Alabama

Lecturer on Accountant's View of Sarbanes Oxley - 2003 Seminar, Alabama Bar Continuing Education Series, Birmingham Alabama

Lecturer on Online Fraud Prevention - 2002 Institute of Management Accountants, Birmingham, Alabama

Lecturer on Forensic Computer Investigation - 2001 Discovery Seminar, Alabama Bar Continuing Education Series, Birmingham, Alabama

Lecturer on Online Business & Financial Research Methods - 2001 Federation of Insurance & Corporate Counsel's Internet University, Napa, California

Lecturer on Identifying and Investigating Fraud - 2001 Institute of Management Accountants, Birmingham, Alabama

"Expert Witness Research Post Kumho Tire", presented at the American Bar Association's 2000 Annual Meeting, New York, New York

Lecturer on Online Discovery - Defense Research Institute's 2001 Annual Meeting of Young Lawyers, Miami, Florida

Lecturer on Online Expert Witness Research - 2001 Louisiana State Bar 17th Summer School for Lawyers, Destin, Florida

Panelist on Consumer Fraud Issues - Coopers & Lybrand 1997 National Banking Conference, Washington, DC

Former National Practice Leader - Coopers & Lybrand's Financial Services Consumer Dispute Resolution Practice

Former Regional Service Line Leader - Coopers & Lybrand's Litigation Consulting Services Southern Region

Former Practice Leader for Dispute Analysis and Investigations - PricewaterhouseCoopers LLP, Birmingham, Alabama

Former Member - Banking and Insurance Industry Groups - PricewaterhouseCoopers LLP

American Institute of Certified Public Accountants

Alabama Society of Certified Public Accountants

Florida Institute of Certified Public Accountants

Association of Certified Fraud Examiners

Associate Member-American Bar Association

Past Regional Director - Exchange Club of Alabama, Past President, Secretary, Director and Treasurer - Birmingham Breakfast Exchange Club

**Trial, Deposition & Arbitration Testimony in Last Four Years**     Appendix 7

Intergraph Corporation v. Bentley Software Systems, Inc (Circuit Court of Madison County, Alabama)

HydroPower Inc v. Eaton Manufacturing (Circuit Court of Jefferson County Alabama)

The Utilities Board of the City of Daphne v. City of Spanish Fort et al (Federal District Court, Southern District of Alabama)

Compass Bank v. Blitz Media, Inc., et al. (United States District Court, Northern District of Alabama, Southern Division)

Steward Machine v. White Oak, et al. (United States District Court, Connecticut)

Refrigerated Construction Services v. Coldmatic Building Systems, Inc, et al (United States District Court, Northern District of Alabama, Southern Division)

ABB Automation, Inc. v. DeVries, et al. (Circuit Court of Jefferson County)

Proliance, Inc. v. City of Huntsville (Circuit Court of Madison County, Alabama)

Steve Jamison, et al. v. Kerr-McGee Corporation, et al. (State Court, Mississippi)

Mason Dillard et al v Bellsouth Advertising et al (Circuit Court of Jefferson County, Alabama)

Terry Manufacturing Co., Inc. v. The Peoples Bank et al. (United States Bankruptcy Court, Middle District, Alabama)

Terry Manufacturing Co., Inc. v. Bonifay Manufacturing Inc. et al. (United States Bankruptcy Court, Middle District, Alabama)

Terry Manufacturing Co., Inc. v. HLC Industries (United States Bankruptcy Court, Middle District, Alabama)

Terry Manufacturing Co., Inc. v. N.D. Horton et al (United States Bankruptcy Court, Middle District, Alabama)

Terry Manufacturing Co., Inc. v. Albright, et al (United States Bankruptcy Court, Middle District, Alabama)

Pemco World Air Services, Inc v. GE Capital Aviation Services, Inc (Circuit Court of Dale County, Alabama

Terry Manufacturing Co., Inc. v. Delong & Caldwell (United States Bankruptcy Court, Middle District, Alabama)

Terry Manufacturing Co., Inc. v. J Martin & Associates (United States Bankruptcy Court, Middle District, Alabama)

AHAT, et al v. Gen Re, et. al. (Circuit Court of Montgomery County, Alabama)

Amason and Associates, Inc.  v Silver Beach Condominium Owners Association, et. al (Circuit Court of Baldwin County, Alabama)

Campbell & Sons Oil Co. Inc, et al v. Merrill Lynch Business Services, Inc, et. al. (Circuit Court of Madison County, Alabama)

**List of Information Considered**                                          Appendix 8

Complaint and relevant pleadings.

Depositions of Ben Johnston, Presley Morgan ("Pep") Johnston, and Clatus Junkin.

Supply agreement dated April 16, 2004 between Johnco Materials, Inc. and Conrad Yelvington Distributors, Inc.

Various documents regarding and/or related to the Supply Agreement with Conrad Yelvington Distributors, Inc.

Johnco Materials, Inc. monthly profit and loss statements for the period January 2006 through June 2007.

Johnco Materials, Inc. Schedule of Sales and Other Income for the period January 2004 through February 2006.

Johnco Materials, Inc. Invoice Registers for the period January 2006 through April 2006.

Johnco Materials, Inc. Sales and Sales Tax Registers for the period May 2006 through June 2007.

Johnco Materials, Inc. sales invoices, including invoices from Johnco Materials, Inc. to Conrad Yelvington Distributors, Inc.

Income tax returns of Johnco Materials, Inc. for the period January 1, 2005 through December 31, 2006.

Payroll records of Johnco Materials, Inc. for the period January 1, 2006 through December 31, 2006.

Johnco Materials, Inc. Schedule of White Hall Set Up Costs dated March 15, 2006.

Johnco Materials, Inc. Schedule of Loan Activity for loans identified as WABT 4471844, WABT 4471921, and WABT 4481194, for the period May 4, 2004 through February 27, 2006.

Johnco Materials, Inc. Schedule of Loan From Clatus Junkin for the period June 1, 2006 through July 31, 2007.

Bureau of Labor Statistics (www.bls.gov)