IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA

JOHNCO MATERIALS, INC.,                          CASE NO.: CV-06-2:06CV993-10

      Plaintiff,

vs.

CONRAD YELVINGTON
DISTRIBUTORS, INC.,

      Defendant.

_____/

### DEFENDANT'S RULE 26(a)(2) DISCLOSURE OF EXPERT WITNESSES

In accordance with Rule 26(a)(2) of the Federal Rules of Civil Procedure and Section 7 of this Honorable Court's Scheduling Order dated January 12, 2007, and as amended by the Court's order of September 11, 2007, defendant, CONRAD YELVINGTON DISTRIBUTORS, INC., by and through its undersigned counsel, hereby designates the following to give expert testimony in the above matter:

    1.      David Borden, CPA, ABV
             Aldridge Borden & Company
             74 Commerce Street
             Montgomery, AL 36104

Mr. Borden is a certified public accountant and is expected to testify as to those matters encompassed within his Rule 26 report which is attached hereto as Exhibit A.  Mr. Borden's curriculum vitae and compensation in this case are also incorporated within Exhibit A.

2.      M. Eugene Hartley
        President
        Industrial Mining Consulting, Inc.
        769 Lake Crest Drive
        Birmingham, AL 35226

Mr. Hartley is a registered professional geologist and is expected to testify as to those matters encompassed within his Rule 26 report which is attached hereto as Exhibit B.  Mr. Hartley's curriculum vitae and compensation in this case are also incorporated within Exhibit B.

Cobb & Cole

By:    /s/ Thomas J. Leek
       **THOMAS J. LEEK**
       FLA. BAR NO. 0116408
       150 Magnolia Avenue
       Post Office Box 2491
       Daytona Beach, FL 32115-2491
       Telephone:  (386) 255-8171
       Facsimile:   (386) 323-9255
       E-mail: Tom.Leek@CobbCole.com
       CO-COUNSEL FOR DEFENDANT

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to the following on this 25th day of September 2007, to:

H. Gregory Pearson, Esquire
Charles E. Harrison, Esquire
Junkin, Pearson, Harrison, & Junkin, L.L.C.
601 Greensboro Avenue
Suite 600, Alston Place
Tuscaloosa, AL 35401

Angela R. Rogers
Bradley Arant Rose & White LLP
The Alabama Center for Commerce
401 Adams Avenue, Suite 780
Montgomery, AL 36104

/s/ Thomas J. Leek
Attorney

Charles E. Harrison, Esquire

Junkin, Pearson, Harrison, & Junkin, L.L.C.
601 Greensboro Avenue
Suite 600, Alston Place
Tuscaloosa, AL 35401

Angela R. Rogers

Bradley Arant Rose & White LLP
The Alabama Center for Commerce
401 Adams Avenue, Suite 780
Montgomery, AL 36104

**JOHNCO MATERIALS, INC.,**

**Plaintiff**

**vs.**

**CONRAD YELVINGTON DISTRIBUTORS, INC.,**

**Defendant.**

**Civil Action No. CV-06-2:06CV993-10**

**Report of
Dave G. Borden, CPA/ABV
Aldridge Borden & Company, P.C.
September 25, 2007**

**EXHIBIT**

A

## TABLE OF CONTENTS

<u>Page</u>

INTRODUCTION                                                  3

QUALIFICATIONS                                               3

DOCUMENTS RELIED UPON IN FORMING OPINION                     4

BACKGROUND                                                   4

ANALYSIS OF PRODUCTION AND SALES                             8

REVIEW OF ALEXANDER REPORT                                   9

CONCLUSION                                                   16

CONTINUING NATURE OF WORK                                    17

EXHIBIT 1 – ADDITIONAL BIOGRAPHICAL INFORMATION

EXHIBIT 2 – TESTIMONY LAST FOUR YEARS

EXHIBIT 3 – DOCUMENTS RELIED UPON IN FORMING OPINION

EXHIBIT 4 – ANALYSIS OF JMI PRODUCT SALES

# REPORT OF DAVE G. BORDEN, CPA/ABV

## INTRODUCTION

I have been retained by the law firm of Cobb & Cole as an expert witness in the case of Johnco Materials, Inc ("JMI") v. Conrad Yelvington Distributors, Inc ("CYDI") (Civil Action No. CV-06-2:06CV993-10). I have been engaged to review and provide expert testimony regarding the expert report of J. Lester Alexander, III ("Alexander") relative to alleged damages suffered by JMI in the above styled case.

## QUALIFICATIONS

I am the Chairman of Aldridge Borden & Company, P.C. in Montgomery, Alabama. We are a CPA firm practicing primarily in the State of Alabama. Our firm provides a wide range of specialized services, including management consulting, strategic planning, litigation consulting, business valuation, mergers and acquisitions consulting, tax planning, compliance, auditing, and information technology consulting.

My own areas of expertise include business valuation, strategic planning, mergers and acquisitions, and litigation consulting. I have extensive experience in a wide range of business valuations, business acquisitions, mergers, and sales, and have been qualified as an expert in state and federal courts in Alabama and Florida in numerous instances involving a broad range of commercial and economic matters. I am a Certified Public Accountant (CPA) and, in addition, hold the Accredited in Business Valuation (ABV) Certification from the American Institute of Certified Public Accountants.

In the course of my consulting practice both in connection with the mergers, acquisitions, and sales practice and the business valuation practice, I am required on a regular basis to research and analyze industry trends and practices and assess the subject company and its strengths and weaknesses relative to a particular industry. This research and analysis includes, but is not limited to, markets for sale of products, customers, competition, capital expenditure requirements necessary for the business, and financial performance.

Exhibit 1 to this report contains additional biographical information including articles that I have authored. Exhibit 2 contains my four-year deposition or trial testimony. I am being compensated at an hourly rate of $305 per hour.

Additional firm employees have assisted in the review of information relating to this matter. Rates for those employees range from $65 to $240 per hour.

3

## DOCUMENTS RELIED UPON IN FORMING OPINION

Exhibit 3 contains a list of documents upon which I have relied in reaching my opinions.

## BACKGROUND

### The Supply Agreement

In April 2004, JMI and CYDI entered into a supply agreement ("Supply Agreement").[1] Under the terms of the Supply Agreement, JMI was required to construct a mining facility to mine and classify sand and gravel. In addition to the mining facility, JMI was required to construct rail siding sufficient to load/handle a minimum of fifty-two (52) open, or covered, hopper railcars on a regular shipment basis.[2] Construction of the mining facility was scheduled to be completed within twelve months of the execution of the Supply Agreement.[3] The term of the Supply Agreement was for five years, and it was scheduled to end on the fifth anniversary of the first shipment of the product.

In addition to the requirements to construct the mining facility, the terms of the Supply Agreement called for CYDI to purchase #67 concrete gravel in minimum quantities of 150,000 tons annually. The initial purchase price was $5.25 per ton, and included a price increase of 5% beginning in year three, April 28, 2006, and additional price increases of 2.5% beginning in years four and five.

### Overview of the Aggregate Market

The aggregates industry is a mature and cyclical business, and demand for products is dependent on construction activity. Primary end users include public infrastructure and commercial and residential construction markets.    First Research reports that "Construction material use is seasonal, with nearly two-thirds of US cement consumption between May and October.[4]

---

[1] JMI was formed by Ben and Pep Johnston. After entering into the Supply Agreement with CYDI, the Johnstons determined they did not have the financial capacity to obtain the necessary financing to purchase the property and construct the mining facility as called for in the Supply Agreement. As a result, they admitted a third shareholder, Clatus Junkin ("Junkin"). As a result of admitting Junkin, JMI was able to obtain the necessary financing to purchase the land and construct the mining facility.

[2] The Supply Agreement indicates that railcars would be loaded on a weekly schedule (approximately 5,200 tons per week) subject to rail car availability and supply. According to his deposition testimony, Junkin claims that it was his expectation that a train would pickup material every week. However, Pep Johnston, who negotiated the Supply Agreement on behalf of JMI, stated in his deposition that his understanding was that JMI had to be prepared to load 5,200 tons when the train got to JMI (page 106 deposition testimony). Pep Johnston's expectation is similar to Gary Yelvington ("Yelvington") who negotiated the Supply Agreement on behalf of CYDI. According to his deposition testimony, Yelvington indicates that JMI had to be able to load 5,200 tons per week when the train was at JMI.

[3] The Supply Agreement was signed by CYDI on April 16, 2004, and it was signed by JMI on April 28, 2004.

[4] First Research, Inc. Industry Profile, August 6, 2007. Note that the largest users of 67 stone are concrete producers. Concrete producers use cement mixed with aggregates to make concrete.

Construction spending in the public sector is generally more stable than private construction spending as governmental appropriations and expenditures are typically less sensitive to interest rate fluctuations than private-sector spending. As such, commercial and residential construction activity is affected by economic cycles and local conditions.

Due to the relatively low value of aggregates compared to their weight, producers typically locate plants in close proximity to the end use market. Transportation to the market can be accomplished by truck, rail or barge. Generally, shipping by truck is limited to locations within 45 miles of the plant site. If annual tonnage requirements exceed 20,000 tons or the distance exceeds 45 miles, shipping by rail is more economical.[5]

The aggregates market in the southeast was significantly impacted by the destruction caused by Hurricane Katrina in 2005. The Federal Reserve Board, in November 2005, reported strong demand for construction related manufacturers, and further, that while clean up efforts had begun, full-scale rebuilding was not scheduled to get underway until early 2006.[6]

Demand for construction materials in the southeast market drove up prices for aggregates. Martin Marietta reported aggregate price increases in the Southeast of 11.5% and 11.0% for 2006 and 2005,[7] respectively, compared to only a 3.9% increase in 2004.[8] Further, Martin Marietta reports that increases in aggregate pricing have continued into 2007.

## JMI

Subsequent to the execution of the Supply Agreement, JMI purchased the property in Lowndes County, Alabama. The purchase price for the property was approximately $1,680,000, and approximately $1,000,000 of this price was allocated to the gravel reserves.[9] [10]

While there are no documents available to me, to support JMI's estimated gravel reserve, an email from Philip Holladay ("Holladay") to Yelvington indicates discussion of gravel reserves at the Lowndes County location of approximately 2.5 million tons. Using this information, JMI's cost per ton or depletion of gravel would be approximately $0.40.

---

[5] Quarryology 101. www.pitandquarry.com
[6] The Beige Book Summary for Atlanta District November 2005.
[7] Vulcan Materials also reported increases in aggregate prices in 2005 and 2006. However, the data was not segmented by geographic region.
[8] Martin Marietta Annual Report for 2006.
[9] 2004 Federal Income tax return for JMI.
[10] Based on Pep Johnston's deposition testimony (p. 87), the property was purchased in August 2004. However, the 2004 JMI Federal Tax return indicates the property was purchased in May 2004.

After the property was acquired, JMI began pricing and purchasing equipment for the plant. The basic components of the plant included a pump box, steel bins to hold the sifted gravel, a sand classifying screen shaker and a de-watering screw radial stacking conveyor.[11]

In addition, Ben Johnston built a dredge, the load-out bins and conveyor and belt weighing system. Ben Johnston also built the roads for hauling from the plant to the load-out bins.[12] By the end of 2004, JMI had invested in excess of $400,000 in equipment relative to the operations of the facility.[13] [14]

In addition to the plant, JMI also constructed a load-out facility which included the rail siding. M&B Railroad ("M&B") assisted in the design of the track layout for the load-out facility. In addition to the costs incurred by JMI, M&B incurred costs of approximately $300,000 in the construction of the rail siding.[15]

JMI entered into a Rail Services Agreement with M&B for the financing of the rail siding. Under the terms of the Rail Services Agreement, JMI agreed to pay, in addition to M&B's normal charges, an additional charge of $0.25 per ton on the first 1,500,000 tons of aggregate, sand or other product shipped from the facility.[16]

The load out facility was completed around March 2006.[17] [18] Although JMI began limited operations in 2005, according the Ben Johnston, the facility did not begin producing quality gravel until February 2006.[19] Although Ben Johnston testified JMI began producing quality gravel in February 2006, Holladay testified that it was not until around the end of April 2006 that JMI had enough material on the ground to load a unit train.[20]

From May 2006 through September 2006, CYDI purchased approximately 32,000 tons of #67 gravel from JMI. In addition, CYDI purchased approximately 3,300 tons of #4 oversized gravel from JMI in June 2006.[21]

While there are no documents available to me establishing the overall geology of the JMI site, Ben Johnston represented the mineral content mix to be 55% sand,

---

[11] Pep Johnston deposition testimony page 84.
[12] Pep Johnston deposition testimony page 85.
[13] 2004 Federal Income tax return of JMI.
[14] Tax returns subsequent to 2004 have not been produced as of the date of my report. I reserve the right to supplement my report upon production of such records.
[15] Pep Johnston deposition testimony pages 45-46.
[16] DX 11 to Pep Johnston deposition testimony.
[17] Ben Johnston deposition testimony page 103.
[18] Although the Agreement required the rail siding to handle 52 rail cars, it could actually handle 70 to 75 plus two engines. Ben Johnston deposition testimony page 108.
[19] Ben Johnston deposition testimony page 47.
[20] Holladay deposition testimony page 34.
[21] See Exhibit 4 to my report.

36% #67 gravel, and 9% oversized #4 gravel.[22] Prior to commencing operations at the facility, JMI did not have any definitive marketing plans for either the sand or the oversized gravel.[23] JMI's only marketing plan was to sell the 150,000 tons of #67 gravel to CYDI.[24] [25]

In late 2005 or early 2006, JMI was approached by Lafarge, a ready-mix company with headquarters in Ohio, about buying some of the JMI sand. However, this deal did work out, and although JMI considered sand to be a by-product of the production process, sand was creating a problem for JMI.[26] In a meeting with Yelvington, Pep Johnston inquired if CYDI could take some sand, "if you could take some sand, we need you to do that."[27] JMI's problem with sand was also discussed in an email dated March 6, 2006 from Holladay, a CYDI consultant, to Yelvington. In the email, Holladay informed Yelvington that Pep Johnston had indicated JMI may have to shut down if JMI could not move the sand.[28] Junkin indicated that one way to solve the sand problem was to pump the sand back into the pit.[29]

Around May 2006, Junkin, the financial investor in JMI, purchased Ben and Pep Johnston's interest in JMI, and became the sole owner of JMI. Ben Johnston remained as an employee of JMI, and managed the mining facility in Lowndes County.

Around October 2006, Junkin went to CYDI's office in Daytona to request that the Supply Agreement be terminated. Junkin had been approached by a potential buyer, Rinker, for the mining facility, but Rinker would not purchase the facility as long as the Supply Agreement with CYDI was in place. The Supply Agreement was not terminated, and in November 2006, JMI ceased mining operations at the Lowndes County facility.

Although, mining operations at the facility ceased, JMI continued to sell products that were previously mined. These sales included #67 gravel as well as sand. JMI sold between 12,000 and 15,000 tons of sand subsequent to November 2006.[30]

Around April 2007, JMI resumed mining operations at the Lowndes County facility producing #67 gravel. However, around June 2007, JMI shifted focus and began

---

[22] Ben Johnston deposition testimony page 39.
[23] Junkin deposition testimony page 65 and 70, and Ben Johnston deposition testimony page 42.
[24] Ben Johnston deposition testimony page 39.
[25] JMI believed that the sale of 150,000 tons per year to CYDI would pay for the debt service and expenses of JMI, and if JMI was able to sell sand and oversized, most of that would have been profit. See Pep Johnston deposition testimony at page 61.
[26] Philip Holladay deposition testimony page 25.
[27] Pep Johnston deposition testimony page 113.
[28] DX 8 to Pep Johnston deposition.
[29] Junkin deposition testimony page 170.
[30] Ben Johnston deposition testimony page 29.

producing #57 gravel. The #57 gravel was shipped to Dunn Construction in Mississippi, and the product is being tested for use in asphalt production.

## ANALYSIS OF PRODUCTION AND SALES

JMI did not maintain records with respect to actual production. However, it is possible to estimate production in total (for the entire period of operation vs. each week or month) by using the sales volumes of minerals provided by Alexander from the books and records of JMI, the estimated mineral composition represented by plaintiffs, and testimony of plaintiffs regarding the amount of mineral inventories available for sale at either the beginning of the shut down period (November, 2006) or the beginning of the second start –up of production (April of 2007). I have included, as Exhibit 4 to my report, a table that sets forth JMI's sales activity based on sales to CYDI and sales to other buyer based on Appendix 3 and 4 of Alexander's report.

Alexander's report indicates that JMI sold approximately 40,028 tons of #67 gravel during the period January 2006 through June 2007. Further, Ben Johnston testified that JMI sold all of the #67 gravel it had produced prior to the shut down[31] or during the period of the shut-down, and it began producing #67 again around April 2007 to fill sales orders for #67 gravel.[32] Therefore, it is correct to assume that the 40,028 tons of #67 gravel represents all, if not more than all, of the gravel produced by JMI during its entire period of operation prior to its shut down in November of 2006.

Both Junkin and Ben Johnston testified that JMI was producing gravel prior to March 2006[33], and further, there were no mechanical issues that would affect JMI's ability to meet the requirements under the Supply Agreement.[34] In addition, Alexander represented, in his report, that in the months of March, May, June, July and August 2006, JMI was "staffed to meet the delivery requirements specified in the supply agreement (which he interprets as being 260,000 tons of #67 gravel annually) as of the first week of March 2006." Alexander also explains that the expenses he used for establishing incremental costs of JMI's operations were from these same months. His report states "Using the costs from mining operations at production capacity for JMI during the period March 2006 and May 2006 through August 2006..." In further explanation there is a footnote supporting the preceding statement that contains the following reference: Footnote 5 to Alexander report – "Per deposition testimony of Clatus

---

[31] All of JMI's sales of #67 gravel did not occur prior to the shut down. Ben Johnston testified that JMI had sales of #67 gravel, which were produced prior to shut down, during the period of shut down.
[32] Ben Johnston deposition testimony page 24.
[33] Ben Johnston deposition testimony page 47 and Junkin deposition testimony page 43.
[34] Ben Johnston deposition testimony page 57.

Junkin, these months are an accurate representation of costs associated with the mine running at production capacity."[35]

Since production records relative to JMI's mining operations have not been produced, for purposes of my production analysis, I have conservatively assumed that all of the #67 gravel sold by JMI was produced during the months of March, May, June, July and August 2006.[36] Using the five months as an indicator of JMI production capacity indicates that JMI's monthly production of #67 gravel averaged only 8,006 tons per month or annual production capacity of only approximately 96,000 tons per year. This production level is significantly less than the production required under the Supply Agreement of 150,000 tons per year.

Using JMI's product mix as represented by Ben Johnston in his deposition testimony, during this five month period, JMI would have produced approximately 61,150 tons of sand. On an annualized basis, JMI's historical production of sand would be approximately 146,700 tons annually.

## REVIEW OF ALEXANDER REPORT

Alexander was retained by JMI's counsel to review and analyze evidence related to the Supply Agreement, and as a result of his work, Alexander has provided a calculation of alleged damages in the amount of $4,549,215. These alleged damages consist of lost profits of $4,473,873 and incidental costs of $75,342.

While it is my understanding that CYDI will deny any liability related to the damage claims, I have reviewed Alexander's calculations and methodology, and noted a number of issues that result in the calculation lacking adequate foundation and not conforming to the facts and circumstances in this matter.

### Lack of Foundation

At this point in discovery, neither detailed production records nor comprehensive geological assessment and testing data are available for my review of Alexander's lost profits calculation. Both of these foundational records, along with marketing plans for the sale of the sand, are necessary for a proper calculation of lost profits, particularly for a start-up business with no significant production and sales history such as JMI.    The following are foundational components not

---

[35] It is possible that in the month of March 2006, the plaintiffs will contend that the mine was staffed and attempting to operate at production capacity, but not actually producing at that level. However, starting in May of 2006, Alexander's lost profits calculation (discussed subsequently) asserts that the mine was capable of actually producing at 260,000 tons of #67 gravel annually.
[36] There was gravel produced in some of the other months. However, for purposes of my calculation I have aggregated all production in the five-month period, thus overstating the actual production level Johnco was achieving during this period.

established that in my experience are required for a proper analysis, all of which have substantial impact on the calculation of lost profits:

1. Comprehensive assessment of the geology of the site, including geological testing results and approximate locations, depth, thickness, and content of the mineral deposits, depth of water table, and over burden thickness and composition. This assessment of the geology would provide meaningful information not only about the content and value of the mineral deposit, but also the likely difficulty and cost of mining the deposit. There apparently were test borings done of the site, but documentation of this geological study is not available to me at the date of this report.

2. Basic production records from production on the site showing dates, volumes and mineral content (particularly mix of sand to gravel, and size of gravel) of production experience on the property. Mining production records, while relevant primarily to only the portion of the site currently mined, would at least provide an indicator of the mineral content, cost of mining, and future performance of the mine assuming similarity of the deposit.

3. Establishment of market for sales of sand assumed by Alexander of 146,200 tons annually, despite JMI having no marketing plan for the sale of the sand and selling only a small portion of the sand produced by the mine. It is undisputed that JMI had no marketing plan for the sale of the sand produced at the mine, and the evidence indicates major problems sustained in disposing of the sand. Sand sales for the entire period of the mine's existence resulted in sale of only a small fraction of the sand produced, substantially less in scope than is contemplated by Alexander in the lost profits calculation.

**Revenue Assumption Not Consistent with Plaintiff Deposition Testimony**

One of the fundamental assumptions underlying Alexander's lost profits calculation is that CYDI was obligated, under the terms of the Supply Agreement, to purchase 260,000 tons annually of the #67 gravel.

As set forth in the Supply Agreement, CYDI's minimum obligation was 150,000 tons annually. Further, Pep Johnston, Ben Johnston and Junkin all testified that the minimum requirement under the Supply Agreement was 150,000 tons annually.[37] As a result, Alexander's calculation erroneously reflects a gross revenue component of $7,417,800 equal to the sale of 260,000 tons of #67 gravel. Alexander's gross revenue component relative to sales of #67 gravel is overstated by approximately $3.1 million.

---

[37] See Junkin deposition testimony page 40, Pep Johnston deposition testimony page 106 and Ben Johnston page 57 and page 84.

**JMI Historical Annual Production only 96,000 Tons of #67 Gravel**

As discussed previously, during the five month period March, May, June, July and August 2006, JMI's annualized production of #67 gravel was at most approximately 96,000 tons. The following chart compares JMI's historical, annualized production of #67 gravel to the requirements under the Supply Agreement and Alexander's calculation of 260,000 tons annually. Alexander asserts in his lost profits calculation that JMI was incurring costs and capable of producing at 260,000 tons of #67 gravel annually. The only adjustment made by Alexander to incremental costs for the additional volume above this five month period is the cost of fuel and oil "which would escalate to power equipment to load rail cars specified as the shipping method by the Supply Agreement. For analytical purposes, actual Fuel and Oil cost has been escalated to equivalent cost necessary to produce and rail car load 5,200 tons of #67 Concrete Gravel per week".



## JMI
## Annualized Production of #67 Gravel
## Produced in March, May – August 2006

As reflected in the chart, JMI's historical production at the plant was not adequate to meet the annual requirements of the 150,000 tons of #67 gravel, much less the 260,000 tons as outlined in the Alexander lost profits calculation. However, assuming for sake of argument, that the mine could have produced at either 150,000 tons or 260,000 tons, it is my opinion, the incremental operating expenses in Alexander's calculation (in addition to fuel and oil) would have significantly increased (discussed subsequently) with this almost three-fold increase in volume.

11

Further, Ben Johnston testified that the _maximum_ production for the facility was 120 tons per hour of #67 gravel.[38] At this rate, the facility would have to operate _at maximum output_ for a minimum of 43 hours per week to produce 260,000 tons or 5,200 tons of #67 gravel per week.[39] Assuming 80% efficiency would require operating the plant for almost 54 hours per week.[40] At operations extending beyond one shift, or alternatively requiring overtime pay, operating costs for labor would have been significantly increased.[41]

### Lost Profits Calculation Assumes Sales of 146,200 Tons of Sand

Alexander's lost profit calculation also contains an assumption that JMI suffered lost sand sales revenue on 146,200 tons of sand. This component accounts for $1,242,700 of alleged lost revenue and lost profit.[42]

As discussed above, JMI did not have a marketing plan for the sale of sand, and had incurred major problems in selling the sand. JMI was even considering pumping sand back into the production pit. Further, Holladay testified that even if JMI had given CYDI the sand (for no cost to CYDI), CYDI could not be profitable selling the sand because of the transportation cost.[43] While JMI was able to sell all of the #67 gravel and apparently most of the #4 oversized gravel it produced, JMI was only able to sell a small portion of the sand it produced, even at production volumes that were only approximately 1/3 of the production volumes Alexander assumes in his lost profits calculation. Yet Alexander calculates alleged lost sand sales of 146,200 tons _annually_ of sand, over 6.5 times the 22,506 tons of sand JMI had sold during its entire seventeen-month period of existence from March of 2006 (asserted production capability) to July of 2007. See Chart Below.

---

[38] Ben Johnston deposition testimony page 48.

[39] Due to the lack of production records, it is uncertain whether the facility ever operated at this capacity, even for brief periods of time.

[40] Alexander's calculation assumes the facility would be producing 50 weeks a year. As such, Alexander's calculation fails to allow for maintenance, either reactive or preventive, related shut down. Ben Johnston testified that the mine could not run all the time because there are going to be problems, and at one point the plant was shut down for a week while equipment was being repaired. See Ben Johnston deposition testimony at page 48.

[41] Upon production of JMI payroll records, I will review payroll and overtime pay to determine if this is considered in Alexander analysis.

[42] Alexander classifies these products as by-products and as such does not attribute any production costs to these items.

[43] Holladay deposition testimony page 87.

### Actual Sand Sales Compared to Alexander Lost Profits Calculation of Sand Sales



Alexander's calculation of sand sales is inconsistent with JMI's operational sales history and fails to consider the problems JMI was incurring selling the sand, not to mention JMI's lack of a marketing plan at the outset for the sale of the sand. In my opinion, it is not reasonable to assume that JMI could sustain the level of sand sales as set forth in the Alexander calculation, particularly without any incremental sales and marketing costs associated with this effort.

**Fails to Consider all Incremental Cost**

Alexander's calculation of alleged lost profits includes a component for incremental costs that JMI would avoid by not producing the products. His calculation is based on JMI's operating results for selected months during the period March 2006 through August 2006, and an assumption that JMI was operating at full production capacity during these months.[44] Alexander's calculation omits the months of April and September 2006, and based on Plaintiff's lack of production records, it is uncertain as to the activity that occurred during these omitted months.

There are numerous costs of operating the mine that it appears Alexander fails to consider in his analysis. I reserve the right to modify this report after full production of the financial records of JMI. However, the following are costs that are apparently not considered in his lost profits analysis:

---

[44] Actually, Alexander's assumption is for production beyond 150,000 tons of #67 stone established in the Supply Agreement. Alexander states in his report that "Operating costs incurred by Johnco Materials, Inc. during the March 2006 through September 2006 period of operations under the Supply Agreement represent staffing and operating costs necessary to produce 5,200 tons of #67 Concrete Gravel per week, with the exception of Fuel and Oil, which would escalate to power equipment to load rail cars specified as the shipping method by the Supply Agreement".

1. Essentially, Alexander assumes all of the operating expenses of the mine (with the exception of fuel and oil) incurred during the base period (March 2006 and May – August 2006) were fixed (would not increase with additional production) at the levels incurred during those months. This is despite the fact that the volume asserted in the lost profits calculation (260,000 tons annually of #67 gravel) were almost triple the volumes experienced during the base period (only 96,000 tons of #67 gravel annually). In my opinion, it is not reasonable to assume all of these costs would remain fixed in these circumstances.
2. Depletion on minerals mined from the property. As discussed above, depletion would have been approximately $0.40 per ton.
3. Transportation costs related to railroad transportation agreement between JMI and M&B Railroad. These additional costs would have approximated $0.25 per ton.
4. Depreciation on equipment used in the production of sand and gravel, or alternatively capital expenditures and replacements required in the operation at the production level assumed. According to its 2004 Federal Tax return, JMI had already invested approximately $400,000 in equipment relative to operating the mining facility. Additional equipment would have likely been purchased in subsequent years as well. Production would result in wear and tear on the equipment from production hours.
5. Reclamation costs – It is unclear what the reclamation plan was with respect to the property. However, there is no evidence that these costs were considered.
6. Over burden removal costs. Apparently, over burden removal was sub-contracted to other providers. It appears that this cost was incurred prior to Alexander's cost of production base period calculations beginning in March of 2006. Future discovery of JMI financial records will hopefully clarify if these costs were considered.
7. Engineering testing for production purposes and compliance
8. Costs associated with the marketing and sales effort to market sand of 146,200 tons annually.
9. Legal and accounting costs
10. Telephone, computers, and other office cost requirements

In addition, Alexander makes assumptions regarding incremental fuel consumption "which would escalate to power equipment to load rail cars specified as the shipping method by the Supply Agreement." The details of these calculations are not replicated in the report, and it is not possible to determine the fuel consumption assumptions or the pricing considered in his analysis. Further there may be costs included in Alexander's base period calculations that JMI continued to incur during the shut down period. If the Alexander calculation was corrected for the above items (1 – 10), then consideration should be given as an offset for the costs included in the base period that were not avoided by JMI during the shut down period.

14

Upon production of fuel and other internal financial records of JMI, I reserve the right to modify this section of my report.

### Failure to Discount to Present Value

In his report, Alexander states that he did not discount his future lost profits calculation to present value at the date of the liability event or to the trial because, in his opinion, the effect of discounting would be offset by pre-judgment interest. I have been instructed by counsel that pre-judgment interest is not an appropriate element of damages in the calculation of lost profits in this matter. However, even assuming pre-judgment interest is applicable, Alexander's opinion with respect to the offsetting effects of pre-judgment interest and discounting of future profits is incorrect.

First, pre-judgment interest, if applicable, would accrue from the point of alleged breach, either March or May of 2006 in this case, to the point of trial, or less than 24 months. However, the discount rate would span the time from the point of the alleged breach or date of trial through the future lost earnings period, or up to 60 months in this case. As a result, the time period covered by the discount rate is greater than the time period covered by the pre-judgment interest period.

In addition, an appropriate risk adjusted discount rate would be higher than the pre-judgment interest rate. The discount rate incorporates two elements: 1) the time value of money and 2) risk – the higher the risk, the higher the discount rate.

Based on JMI's operating history and all of the issues previously discussed, it is my opinion that there is a significant risk associated with JMI's ability to perform as Alexander's model projects. These factors indicate that not only is discounting future lost profits to present value appropriate, but a risk adjusted discount rate should be used in discounting to present value.

For these reasons, in my opinion, the effect of pre-judgment interest (even if it were applicable in this circumstance) would not offset discounting of future lost profits to present value.

### Incidental Cost Calculation

In addition to his lost profits calculation, Alexander also computes alleged incidental damages resulting from CYDI's failure to pick up #67 in March 2006 when JMI was allegedly ready for CYDI to begin moving product. The costs included in Alexander's calculation are the costs that JMI incurred for operating the facility in the months of March and April 2006.

15

While there is conflicting testimony as to when JMI had enough product on the ground to supply a trainload of #67 gravel,[45] there is no requirement under the Supply Agreement whereby CYDI was obligated to pick up #67 gravel on a specified date.

However, even in the event the jury should find that CYDI was obligated to begin loading gravel as of March 1, 2006 and JMI had sufficient quantity of such gravel available on that date, Alexander's calculation overstates the alleged damage JMI suffered.

JMI ultimately received a benefit of the costs incurred in that it produced and ultimately sold the product which it produced. As a result, JMI did not incur unnecessary costs, but rather at the most it was delayed in realizing the benefit of those costs. To consider these costs as an additional measure of damages is duplicative of the lost profits calculation which considers the value of these products sold. As such, the proper measure for this component of alleged damages is the interest incurred or adjustment for the time value of money as a result of the delay.

Based on JMI's interest rate with West Alabama Bank & Trust, the approximate amount of damages JMI would have suffered would have been less than $1,000.

### Failure to Consider Mitigation

In addition to the discrepancies outlined above, Alexander also fails to consider fully the effects of mitigation. While Alexander did reduce his alleged damages by the amount of sales JMI recognized through June 2007, he has not considered any mitigation JMI could undertake or should have reasonably undertaken over the period of the Supply Agreement.

JMI has the ability to produce either #67 or #57 gravel at its mining facility in Lowndes County. Further, JMI resumed mining operations in April 2007, and around June 2007, JMI began producing #57 gravel. JMI is currently having the #57 gravel tested by a potential buyer, Dunn Construction, for use in asphalt production. Yet Alexander fails to consider this potential mitigating impact as well as any other reasonable mitigating efforts that JMI could undertake.

### CONCLUSION

In my opinion JMI's actual historical production of #67 gravel for the period March 2006 and May – August 2006 was substantially less than the 150,000 ton minimum volume requirement as set forth in the Supply Agreement, and approximately one-third of the 260,000 tons asserted by Alexander in his lost profits calculation.

---

[45] Holladay testified that JMI was not ready to ship until late April 2006. See Holladay deposition at page 34.

At this point in discovery, neither detailed production records nor comprehensive geological assessment and testing data are available for my review of Alexander's lost profits calculation. In my opinion, both of these foundational records are necessary for a proper calculation of lost profits, particularly for a start-up business with no significant production and sales history such as JMI. Further, the lost profits calculation assumes volume requirements in excess of the minimum requirement called for in the Supply Agreement, assumes production and sales levels JMI has historically not attained during its period of existence, fails to consider all incremental costs associated with production operations, and fails to discount the future lost profits to present value. Lastly, the incidental cost calculation is duplicative of lost profits and no consideration is given for mitigation.

## CONTINUING NATURE OF WORK

It is my understanding that discovery is ongoing. Further, as of the date of my report, financial records and production records related to the operation of JMI have not been produced by the Plaintiff. Therefore, I reserve the right to modify and supplement this report pending such additional discovery.

Dave G. Borden, CPA/ABV

September 25, 2007
Date

EXHIBIT 1

## Dave G. Borden, C.P.A., A.B.V.

Dave G. Borden is chairman of the Board of Aldridge, Borden & Company, P.C., in Montgomery, Alabama. He graduated from the University of Alabama in 1972 with a B.S. degree in Accounting.

He has previously served as an officer and member of the Alabama State Board of Public Accountancy, the Advisory Board for the University of Alabama School of Accountancy, and past president of the Montgomery Chapter of CPA's. He currently is a member of the Alabama Society of CPA's Political Action Committee Board of Directors. In 2002, Dave was awarded the Lifetime Achievement Award for services to the Alabama Society of Certified Public Accountants.

Dave has been a frequent instructor for the Alabama Society of CPA's and other state societies dealing with numerous tax related matters. His area of expertise is the merger and acquisitions consulting services area with a focus on the purchase, sale, reorganization, liquidation, and valuation of the corporate business. He also practices in the litigation consulting area and strategic planning area for business enterprises. Dave is a Certified Public Accountant and, in addition, holds the Accredited in Business Valuation (ABV) Certification.

He is past president of the Central Alabama Community Foundation, Leadership Montgomery, Montgomery Area United Way, St. Margaret's Hospital, and past Chairman of the Montgomery County Board of Education. He has been active in many civic endeavors in Montgomery and has been recognized by the following organizations for his efforts: Montgomery YMCA as the City of Montgomery's 1997 Man of the Year, the Montgomery Area United Way as its Alexis de Tocqueville Society Award recipient for volunteerism to the Montgomery in 1998, the Montgomery Advertiser as its Citizen of the Year in 2005, and Leadership Montgomery as its Leader of the Year in 2006.

EXHIBIT 1

Currently Dave serves the local Montgomery and State of Alabama community in the following capacities:

A+ Education Foundation Board of Directors and Executive Committee

Member Board of Control for Chamber of Commerce Committee of 100

President, Montgomery Education Foundation

Greil Memorial Foundation Board of Directors, Treasurer

Envision Montgomery 2020 Board of Directors

Member Alabama Committee for Accountability and Accelerated Student Learning

Member of Alabama Nature Conservancy Board of Directors

**EXHIBIT 2**

Dave G. Borden, C.P.A., A.B.V.
September 25, 2007
Testimony Last 4 Years

| Plaintiff(s) | Defendant(s) | Law Firm | Attorney |
|---|---|---|---|
| Stewart Lubricants & Service. Co. & SLS West Inc. | Castrol Industrial North America, Inc. | Lightfoot Franklin & White | John Johnson |
| Charoen Pokphand USA, Inc. | David Hicks And Associates, Inc. | Balch Bingham | Joe McCorkle |
| Pamela Ashworth et al | Compass Bank et al | Lightfoot Franklin | Sam Franklin |
| Chatham Oil Company, Inc.; Bill G. Trull; Harry L. Vice And SouthLamar 1-Stop, Inc. | Hunt Refining Company, Inc. Tri-Co Oil Company, Inc. Benjamin Fair & Emmette Langdon | Bradley Arant | Richard Monk |
| Key Machinery Co., Inc. | Case Corporation, et al | Lightfoot Franklin | Lee Hollis |
| Whitfield Foods, Inc. | Fogg Filler Company; White Cap, Inc.; KHS, Inc.; HK Systems, Inc., Billy Weldon, et al | McDermott, Will & Emery Clark & Scott, P.C. | Robert S. O'Meara James C. Ayers, Jr. |
| Phoenix Energy Corporation | Alabama Gas Corporation | Benton & Centeno | Doug Centeno |
| John G. Hudson, et al | The Golf Channel, et al | Baxley, Dillard, Dauphin | David McKnight |
| GTT, Inc. and Esfeller Construction Co., Inc. | Kiefel Technologies | Devine Millimet | Alex Walker |
| United States of America | McWane, Inc., et al | Maynard Cooper | Fournier J. Gale |
| Vulcan Lands, Inc | State of Alabama, et al | Slate Kennedy | Susan Kennedy |

1

# EXHIBIT 2

| Plaintiff(s) | Defendant(s) | Law Firm | Attorney |
|---|---|---|---|
| State of Alabama, Department Of Conservation and Natural Resources, M. Barnett Lawley, et al., | Exxon Corporation | Lightfoot Franklin | Chris King |
| Madison Oslin, Inc | International Paper | Cabaniss, Johnston, Gardner, Dumas & O'Neal | Sandy Robinson |
| Lyncor Limited | John Newcomb | Wright, Lindsey & Jennings | Claire Hancock |
| Sebastian Jones and Vanessa Lewis | Mutual Savings Life Insurance Company, Roy Williams, et al | Hill, Hill, Carter | Robert Bradford |
| The Geneva County Healthcare Authority | Quorum Health Resources, Inc., et al | Beasley Allen | Scarlotte Tuley |
| Serra Chevrolet, Inc. | General Motors Corporation | Lightfoot Franklin | Terry McCarthy |
| Ray Dunlap | J.K. Harris & Company, et al. | Hill, Hill, Carter | John Bradwell |
| McCord Properties, Ltd, et al | Orkin Exterminating Co, Inc, et al | Lightfoot Franklin | Mike Bell |
| Kelmor, LLC, et al. | Alabama Dynamics, Inc., et al. | Maynard Cooper | Tom Thaggard Lee Huffaker |
| Marketron International, Inc. | OneDomain, Inc., et al. | Lightfoot Franklin | Robin Hinkle |
| Aeropower, Ltd. And Kama International | Steve Matherly; SM& T Aircraft, Inc et al | Bradley Arant | Charles A. Stewart |
| Cook Publishing | CVS | Lightfoot Franklin | Mac Moore |

# EXHIBIT 2

| | | |
|---|---|---|
| Lee L. Saad Construction Company, Inc. | International Service Group Inc. 2WR/Holmes Wilkins Architects, et al. | Rushton Stakely |
| Dean Chitwood | David J. Adair, et al. | Lightfoot Franklin |
| Israel Berger, et al. | Vesta Insurance Group, et al. | Baxley, Dillard, Dauphin McKnight & Barclift |
| | | Dennis Bailey |
| | | Sam Franklin |
| | | Chuck Dauphin |

3

EXHIBIT 3

## DOCUMENTS RELIED UPON

Complaint
Supply Agreement
Depositions and related Exhibits of
     Ben Johnston
     Pep Johnston
     Clatus Junkin
     Gary Yelvington
     Philip Holladay
     Mark Klebe
First Research Industry Profile Report for Cement, Concrete and Construction Material
Quarryology 101 – www.pitandquarry.com
The Federal Reserve Board's Beige Book Summaries for the Atlanta District for the
months of
     October 2005
     November 2005
     March 2006
     June 2006
Annual Reports of Vulcan Materials, Inc and Martin Marietta, Inc for 2005 and 2006
2004 Federal Income Tax return for JMI
Expert Report of J. Lester Alexander, III

JMI
Analysis of Product Sales

EXHIBIT 4

| Buyer | Date | | Price | #67 Gravel Units | Total | Price | #4 Oversized Gravel Units | Total | Price | Sand Units | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|
| CYDI | 5/11/2006 | (1) | 5.51 | 5,953.04 | 32,801.25 | | | | | | |
| CYDI | 6/27/2006 | (1) | 5.51 | 2,721.13 | 14,993.43 | | | | | | |
| CYDI | 8/8/2006 | (1) | 5.51 | 5,964.91 | 32,864.65 | 8.50 | 3,329.86 | 28,303.78 | | | |
| CYDI | 8/21/2006 | (1) | 5.51 | 6,158.44 | 33,933.00 | | | | | | |
| CYDI | 9/7/2006 | (1) | 5.51 | 5,199.66 | 28,650.13 | | | | | | |
| CYDI | 9/25/2006 | (1) | 5.51 | 6,031.39 | 33,232.96 | | | | | | |
| | | | | | | | | | | | |
| Total CYDI | | | | 32,028.57 | 176,475.42 | | 3,329.86 | 28,303.78 | | - | - |
| | | | | | | | | | | | |
| Unidentified | March 2006 | (2) | | 135.00 | | | | | | | |
| Unidentified | June 2006 | (2) | | 520.46 | | | | | | | |
| Unidentified | July 2006 | (2) | | 189.13 | | | | | | | |
| Unidentified | August 2006 | (2) | | 221.01 | | | | | | | |
| | | | | | | | | | | | |
| Unidentified | Unknown | (3) | | 6,934.46 | | | 3,399.49 | | | 22,505.63 | |
| | | | | | | | | | | | |
| Total JMI Sales | | (4) | | 40,028.63 | | | 6,729.35 | | | 22,505.63 | |

(1) Sales obtained from JMI invoices to CYDI per DX 3 - DX8 to Yelvington deposition.
(2) Sales identified by Alexander in Appendix 4 which were not sold to CYDI.
(3) Based on total sales per Alexander's Apprendix 3 less specific sales to CYDI and less specific sales identified in Alexander Appendix 4.
(4) Totals agree to Alexander's Appendix 3.

# Evaluation of the Johnco Materials Sand and Gravel Operation

White Hall area, Lowndes County, Alabama
By M. Eugene Hartley, Economic Exploration Geologist
Register Professional Geologist AL #1157
September 25, 2007

## Abstract

Johnco Materials, Inc. is located west of Montgomery, Alabama and is a recent start-up sand and gravel mine and plant. It has a circular rail loop, but is on a short line railroad, not on a main rail line such as CSX. Johnco did not have a truck market since it is further from the main metropolitan market, Montgomery, than its main competitors. Rail-wise and truck-wise Johnco probably has a $1.50 to $2 disadvantage to some producers closer to and on main rail on the east side of Montgomery. Most production was from April to October 2006. Johnco lacked a formal written plan. Also, unlike most producers, Johnco was almost entirely dependant upon a single customer for only one of its products. Johnco was not able to sell much sand, the main product by volume. Sand may have been choking the plant and stockpile area. Unsold sand product would have a big financial impact on Johnco. Such factors attributed to the closure by November 2006.

## Introduction

Johnco Materials is a fairly new producer of sand and gravel. The company was conceived and founded in the period 2002 to 2004 by brothers Ben and Pep Johnston. A partner, Clatus Junkin, was added a short while later. In 2006 Junkin became the sole owner... A supply agreement was signed between Johnco Materials, Inc. with Conrad Yelvington Distributors, Inc. in April 2004 after which a plant was built by Johnco. Hereinafter, Johnco Materials, Inc. will be termed "Johnco" and Conrad Yelvington Distributors, Inc. will be termed "Yelvington" as they are typically called in the business. In other documents Yelvington may be termed by their initials, CYDI. Production began at Johnco in March of 2006. The first shipment was made in May 2006. The plant was closed in October or November of 2006. Legal action between Johnco and Yelvington began during the fall of 2006.

I was hired by Yelvington's attorneys at Cobb & Cole to do an evaluation of the operation. Over the course two weeks I have done my evaluation based on the information provided. This is presented after the signature line. The documents I relied upon are listed on the last page of this report.

## Writer's Qualifications

I am qualified to do a minerals and mining company evaluation. I am a registered professional geologist in the State of Alabama, PG AL #1157. Furthermore, I have done work related to aggregates and other construction materials in several states including several sites in Alabama. Most of my work was for large mining companies or for companies that I owned or co-owned. I am now partially retired and do not work exclusively for any one company. Unlike many geologists I have also been involved in designing several rail spurs in Alabama and Tennessee, for aggregates mines. In total, I have over 30 years experience as an economic and exploration geologist. A copy of my vita is attached.



**EXHIBIT**

B

## Location

Johnco is located near and east of the small town of White Hall in rural Lowndes County in central Alabama. The site is about 20 straight-line miles west of Montgomery. The deposit is now about two miles south of the Alabama River which was important to concentrating the coarse sand and gravel many years ago. Geologically the area is similar to the parts of Montgomery, Elmore and Macon counties that are typically mined for sand and gravel. Those mines are typically closer to truck markets and main rail lines. Location-wise those deposits probably have a $1.50 to $2 transportation advantage than would a deposit in the White Hall area. This is due to the added truck haul distance or the added costs typically associated with having to involve two rail lines. In this case a short line, M&B, originates the haul and switches to CSX in Montgomery.

## Geology

Geology and geologic processes are important in understanding the sand and gravel deposits of central Alabama. This is important for the exploration for the better and often the few very economic deposits remaining.

This area is part of the geologic and physiographic Coastal Plain Province. Most of this part of the Coastal Plain is composed of sedimentary rock strata of Cretaceous Age that are now exposed as weathered and partially weathered soft material. The dominant underlying sedimentary geologic unit is the Selma Group which is chalk-rich. The Selma Group is marine in origin, *i.e.* ocean-deposited sediments were deposited offshore over 60 millions ago in the Cretaceous Age, a geologic time unit at the end of the dinosaur's reign. The sediments for the Selma Group were later compacted and lithified into sedimentary rock layers. These sedimentary layers sit upon a much older base or a basement complex of metamorphic and igneous rocks. The top of the basement is typically over 1,000 feet down from the present surface. The basement complex ranges from about 700 feet to over 3,000 feet. Some of these basement rock units would probably make a superior quality coarse aggregate to sediment gravel, but they are much too deep to be mined economically.

The sand and gravel deposits sit upon all of the above and are relatively close the surface. They are not close enough to be easily located, however. Soil and other overburden typically hide them. The deposit of sand and gravel is not a simple layer. They have a complicated origin and exist in irregular shapes, often as lens that taper out laterally, change in composition laterally, and abruptly begin and end on their top and bottom.

The original sources for the sand and gravel material were rocks mostly in central and northern Alabama and some of the sedimentary rocks of the Coastal Plain. The parent rocks to the north weathered (rotted) into material such as silt and clay, the dominant components of mud. Most weather-resistant rocks and minerals where silica-rich. These formed the major part of the desirable coarse sand and gravel deposits. The best gravel is composed of mostly of quartz and chert. This pre-ore mix was transported to the sea in rivers and stream s as mud containing a little gravel.

The originally deposited sediments from the north were much to rich in clay, silt and fine sand to be economic for today's aggregate products. It took reworking, perhaps multiple times, by streams and rivers to winnow out or segregate out part of the clay, silt and fine sand to leave local economically minable concentrations of the more desirable coarse sand and gravel. Unfortunately the irregular streams and meandering rivers left irregular, highly variable deposits and shapes, not uniform layers.

Many are lens; some are long strips. Many of these irregular shapes now occur in the river terraces south, but within a few miles of the present location of the Alabama River. Three main terraces are recognized in several counties along the Alabama River. The exploration goal is to find large enough deposits with the least amount of overburden, clay, silt, and fine sand. The flat nature of much of the land surface and the occurrence of soil and other overburden typically hides the deposits. Drilling is necessary to evaluate most deposits.

## Johnco Pit Size, Mining and Processing Methodology

Unlike many deposits in central Alabama the ore at Johnco's site is mined by a dredge. Dredging is a typical sand and gravel mining method, however. A starter pond is created and a floating dredge mines the material. The object is to get the material flowing as suspended solids in pumped water. This is accomplished with a cutter head extended from the barge to loosen the ore. The ore slurry is then pumped through pipes to a nearby plant where further processing occurs. The material must often be washed and sorted. Sorting is done by a stack of vibrating screens that carry the wet ore. Some washing is done by the dredging action and on the wet screens but more washing is often necessary if a clay coating remains on the gravel. The wet products are then stacked into piles nearby with conveyors. A radial stacker is often used to build several product stock piles in an arc beside the plant. Johnco is not located close enough to local markets to have a truck market, so most of the product is transported to their rail loadout facility. Truck markets, if available, could be supplied directly from the initial stockpiles. The distance to the rail load out shown in a map photocopy indicates that Johnco has to transport the gravel product with a truck or other vehicle. They appear to have a typical rail stockpile and conveyor belt system to load standard 100-ton open hopper rail cars. A ramp was also built to allow loading by a front end loader to speed the process and to backup the conveyor in case of breakdown.

## A Plan for Most New Mining Operations

In recent years the declining amount of easy-to-find aggregates ore deposits especially those close to market and increased competition has necessitated most companies to do a fairly rigid plan before starting a mining operation. This is similar to a business plan modified for the mining industry. A written plan is often done to outline the steps to be taken. These are handy to provide evidence to the owner, to convince potential partners or buyers and to sources of financing. Some of the key steps to a written plan are as follows:

1. Table of Contents
2. Description of Business
3 The Company
4. The Property
4a Geology of the Property
4b Exploration Plan
4c Results including Product Quality and Reserves
4d Permits and Permitability
5 The Industry and Competition
6. The Market
7. Expertise
7a Geology and Mining Engineer Expertise

7b Business Expertise
7c Operations: Mine, Plant, Transportation, Lab, Scales and Office.  Processing Methodology
8 Personnel and Management
8a Management & Staffing
8b Administration Issues
9 Financial Issues
9a DCF or other feasibility analysis
9b Funding
9c Budget

The steps in some plans vary.  Most of these steps above are like the links of a chain.

A step before making any formal plan would be a cursory visit to the site.  Many operations I have examined fail in my opinion before any formal plan after an initial cursory visit that reveals obstacles that probably may be uneconomic to overcome.  From what I now know I think Johnco may have successfully passed the cursory visit stage, but with some reservations about location.

### Comments about Johnco's Plan

The testimonies of the principals indicate that Johnco did not have a formal written plan.  The following comments are based on my reading of depositions and related to above suggested plan numbers:

4. The Property.  The property is not located on the better east side of Montgomery.

4a Geology of the Property.  The geology of the property may have not been well known.  Much of this may be partly academic in nature and not important to the miner's success, but the potential existence of an irregular ore body should have been.

4b Exploration Plan.  The testimonies of the principals indicate that Johnco did not have a formal exploration plan.  However, I saw one mention of the word borings.  I do not know the nature of these and if they were thorough.  Detailed drilling or representative sampling by other means is important.

4c Results including Product Quality and Reserves.  This is critical, but I saw no evidence that this was determined to any great extent.  Results should provide evidence of several features.  This includes the following:

   1. Quantity of ore and shape of the orebody
   2. The composition of the ore.  This includes the amount and mix of fines, sand and gravel.
   3. The expected composition and mix of the dredged ore sent to the plant.
   4. The expected composition and mix of the plant produced products
   5. Reserves, no detailed information was provided about the reserves.

4d Permits and Permitability.  Various permits are needed by a mining operation.  This includes local permits and certain environmental permits.  The main environmental permits are for air and water.  These are EPA-mandated rules are managed by the state authority, ADEM in Montgomery.  I contacted ADEM about the permits being held by Johnco.  Such sand and gravel operations operating in a wet environment are usually exempt from air permits since the material is wet and not often dust-

producing. This is subject to change if there are complaints from neighbors or if crushing is done. Johnco did not do any crushing. They wanted more coarse material and not just for #67 product. Some producers get a premium price for product bigger than #57, also termed "oversize".

ADEM's Jenifer Leach said that Johnco Materials, Inc. has Storm Water Permit #AL0076422. The five-year permit was issued on July 9, 2004 and expires on July 30, 2009. Typically they are renewable.

ADEM's Aaron Peters handles 401 permits for ADEM after the initial application is made to the US Army Corps of Engineers. He said that dredging operations over one acre should fall into his department. In the ADEM data base he found the Storm Water Permit noted above but no 401 or dredging-type application or permit for Johnco. As a cross reference he also searched the names Johnston and Junkin, even Ju* (wildcard) with no hits. Therefore, he did not think that Johnco or the Johnston's had a 401-type permit for a dredging operation.

Reclamation: Unless required by local authority Alabama does not have a state-required reclamation plan.

Zoning. Zoning is a local issue. I did not check it. Many rural counties do not have widespread zoning. I am not sure about Lowndes County.

5 The Industry and Competition. The principals had some familiarity with the sand and gravel business and probably knew who the competition was. I am not certain to what extent they understood the industry.

6. The Market. I do not think the principals had a good understanding of the market, especially the sand market. They had no competitive truck market. Also, they refer to Lafarge as a potential sand buyer, but did not know that Lafarge was actively seeking (and is usually successful) in having its own sand deposit on the m better located east side of Montgomery on a main rail line of CSX.

Also, most buyers protect themselves by having several potential suppliers. Most producers protect themselves by having several potential buyers. Dependency upon a single buyer is a disaster waiting to happen.

7. Expertise. Johnco demonstrated that it had the expertise to open a business and produce a product.

7a Geology and Mining Engineer Expertise. Many companies like this cannot afford to have these technical personnel on the payroll, but they typically use them to get started. Many are available on a consulting basis. This was not noted in the testimonies.

7b Business Expertise. The Johnston's were able to get the business going, but had trouble in obtaining sufficient financing to endure the typical extra costs associated with startup problems. Also, it took them twice as long to get started as they expected.

7c Operations: Mine, Plant, Transportation, Lab, Scales and Office Facilities and Processing Methods. The equipment was capable to produce products.

8 Personnel and Management. They were staffed at minimal levels, but over time, were able to produce aggregates products.

9 Financial Issues. Any business plan relying upon a single customer for financial viability fails to account for the variability of the industry.

9a DCF or other feasibility analyses. The testimonies of the principals indicate there were no written studies for discounted cash flow analysis, internal rate of return analysis or other feasibility analysis.

9b Funding. The principals had difficulty with funding. This is a red flag. Outside funding would have been made easier to obtain with a formal written plan or business plan including a feasibility analysis.

9c Budget. Pep Johnston testified that he did not remember a written budget being prepared.

{End of comments and report.}

Report signed this 25the day of September 2007 by

M. Eugene Hartley, P.G. AL 1157

Prior expert testimony and publication information required by Rule 26.

1. None of my 17 publications were produced in the past tens years.
2. I do not believe I have provided expert witness in a trial in the past four years.
I have given one deposition in early 2006 in the case of University of Montevallo Foundation v Middle Tennessee Land Development in Shelby County Alabama Circuit Court.
3. My compensation for this project as a consultant or expert witness is as follows:
$700 per day for exploration and travel, $150 per hour for research and report writing, $200 per hour for court time and reasonable expenses.



Industrial Minerals Consulting, Inc.

M. Eugene Hartley, President
769 Lake Crest Drive; Birmingham, Alabama 35226  Tel. 205-988-9933  Fax 205-988-3278
Mobile Telephone 205-266-0991    E-Mail: limerock@bellsouth.net
Registered Professional Geologist including TN 4961, GA 435,AL 1157
IMC Tax Number (EIN) 58-2136710

## Vita of M. Eugene Hartley

**Classification**: Economic geologist specializing in high cal limestone, aggregates and other industrial minerals exploration, evaluation and development.  Also experienced in mining company acquisitions and PC applications.

**Degrees**:       BS (1968) and MS (1972). Geology, University of Georgia, Athens, GA.

**Experience**:    Over 30 years.  Exploration, evaluations and valuations since 1973.  Located, acquired and started several mines and quarries, mainly aggregates.  Also, property, mine and plant evaluations in many states and several foreign countries as noted below.  Experience includes managing five offices in Nevada (5 years), Washington State (3 years), and Georgia (10 years) and Alabama (since 1994).  For the past few years my consulting work has concentrated on Tennessee and Georgia mainly on limestone for aggregates and industrial minerals uses including the scarcely available high calcium limestone for use as cement ore, lime feed and power plant scrubber rock.  Currently I am assisting in the opening of a large high calcium limestone mine in Tennessee and evaluating several industrial mineral deposits in other states.

## Career Highlights:

1.       I have started several limestone quarries for aggregates and industrial mineral uses.  The last big discovery was the giant greenfield limestone site in central Birmingham, Alabama that was sold to Lafarge in July 2003.  It started production in April 2005 and is becoming a major limestone mine in Alabama.  My ownership interests in other Alabama limestone and dolomite sites were sold to my ex-partners in the summer of 2004.

2.       I have done acquisition, exploration, zoning, reserves, mine design and permitting supervision of 17 sites that became quarries.  This includes several aggregate and industrial minerals quarries in Alabama, Georgia, Tennessee and Utah since 1994.  Between 1994 and the summer of 2001 I owned the following corporations that were involved in starting limestone quarries: Red Mountain Corporation, Bradley Stone, Inc., and Bama Crushed Inc., and Western Aggregates.  These quarries are now operated by Oldcastle, Geneva Rock, Vulcan and/or Martin Marietta.  Initially they were sold to Southern Ready Mix, Inc. or US Aggregates, Inc.  Most were limestone but two operations were involved sand in Tennessee.  I also did the discovery, acquisition and initial engineering of three new rail sites for limestone.  This included the unit-train site loop at Saginaw for loadout on ChemLime property, the loadout spurs at Alabaster and the only multiple spur loadout yard on the east side of Memphis, TN.  I worked closely with both NS and CSX railroad engineers, rail installation contractors and did rate negotiations with NS.  In addition, I was involved in the mine planning at Chemical Lime's O'Neal mine for lime-grade and aggregates grade limestone.

2.       I have done due diligence for dozens of sites or company acquisitions involving limestone, granite, marble, cement raw materials, and kaolin clay.  This includes assisting Blue Circle Cement for cement raw materials and in acting as lead in the $148.5 million acquisition of Georgia Marble Company, Aggregates Division (1989).  I assisted RTZ / U.S. Borax in their attempted acquisition of Georgia Kaolin Co. in 1990.  I also negotiated a successful deal with an Italian-owned cement mill and local environmental land trust to extend a limestone mine lease in TN.

3.     I have had several greenfield site ore deposit discoveries involving marble in Georgia, limestone in Alabama and Utah, granite in Georgia, cement clay in Georgia and South Carolina, silica sand in Georgia, and barite in Washington State. I also re-started abandoned limestone and sand quarry sites in Tennessee.

4.     For eight years I was chief geologist for Combustion Engineering, C-E Minerals, Inc. Tasks included establishing and managing their exploration offices in Georgia, Nevada and Washington State and evaluating mines and mineral deposits worldwide. Successful mineral trading for equipment was begun in China during the Nixon presidency. My interest in scrubber-grade limestone began while at Combustion Engineering. C-E (now ABB) was the major producer of coal-fired power plants, and equipment including Tyler screens and Raymond roller mills..

5.     Co-founder and President of successful Exploration Resources, Inc., (a minerals and water exploration, environmental, computer, and CAD applications company), 1984 to 1994 when sold to partners.

6.     Chairman of Industrial Minerals Session, Northwest Mining Assoc., Spokane. Annual Meeting 1983.

7.     Author or co-author of 17 geological publications including discounted cash flow valuation methods.

8.     Various Russian marble, granite and cement ventures, primarily in Urals and Siberia, 1991-94 resulting in  co-ownership of Koelga, largest marble quarry in the world. Acquisition of marble processing equipment was done in northern Italy. In 1994, the local government and unrealistic partners in the Urals made the project unfeasible.

**Project Experience**: Since 1973 Hartley has directed field exploration, mine evaluation, or brokering of the following commodities listed with their general locations:  AGGREGATES (crushed stone, sand and gravel): Alabama, Arizona, California, Colorado, Florida, Georgia, Maine, Mississippi, Utah, Nevada, New Jersey, New York, South Carolina, Tennessee, Utah, eastern Canada, Antigua, Barbados, Switzerland; ANDALUSITE: Spain, Nevada, Washington; BARITE: Nevada, Washington, South Carolina, Arkansas, Georgia, Idaho, Montana, California, Canada; BAUXITE and BAUXITIC KAOLIN: Peoples Republic of China, Shanxi Province, and Georgia; BENTONITE CLAY: Oregon; MINERAL FILLERS: U. S.; CEMENT RAW MATERIALS: U.S. and Canada; CHROMITE: North Carolina, California; CORUNDUM: North Carolina; DIMENSION STONE (marble and granite): Eastern U.S., northern Italy, Ukraine, Russia incl. Siberia; DOLOMITE: Eastern U.S. and Canada; FELDSPAR (including feldspar from granites, anorthosites, and feldspathic sands): Georgia, Oklahoma, Missouri, New Jersey, Idaho, Washington; FLUORITE: Kentucky, Illinois, Nevada; FOUNDRY SANDS: Nevada, North Carolina, Tennessee; GLASS RAW MATERIALS: various states in U.S.; DISSEMINATED GOLD: Washington, Nevada, Georgia, Colorado, South Carolina; GRAPHITE Alabama, Nevada; HEAVY MINERALS: Georgia, Wyoming, New Jersey; GROUNDWATER: Georgia, Utah, Alabama; KAOLIN CLAY: South Carolina, Georgia; KYANITE: Georgia, North Carolina, Virginia, Idaho, Spain; LIMESTONE: California, Florida, Georgia, Washington, Alabama, Tennessee, Utah, Arizona, Nevada, western Canada and Newfoundland; MAGNESITE AND BRUCITE: Nevada, Washington, Texas, and Mexico; MARBLE: California (Lucerne Valley), Georgia, Vermont, Alabama, Tennessee, Russia incl. Siberia; MICA: southeastern U.S., Idaho; PAPERMAKING MATERIALS: U.S.; RAW MATERIALS FOR OIL AND GAS DRILLING FLUIDS: U.S.; OLIVINE: North Carolina, Georgia, Canada; PUMICE: Lesser Antilles - southern Caribbean islands; REFRACTORY RAW MATERIALS: U.S., China, Mexico and Spain; RUTILE: Georgia, North Carolina, Colorado; SILICA (including quartz crystal, high purity glass sands, and quartzite): Nevada, Arkansas, Oklahoma, Georgia, Washington, Idaho, North Carolina, New Jersey; SILLIMANITE: Georgia, Colorado, Idaho; TALC: Georgia, North Carolina, Idaho; TOPAZ: Colorado; VOLCANOGENIC BASE METALS: Georgia, South Carolina; WOLLASTONITE: California. The above is to show experience only. Much of the data is confidential.

**Type of Experience**: Most of Hartley's work has been for major mining companies. He provides exploration and services to mining companies, investors, attorneys and property owners. This includes exploration planning and management, information searches, cursory (brief) examinations with recommendations, expert witness, advisory roles, land acquisition, preliminary market and competitor analysis (including aerial photography),

complete evaluations, valuations including discounted cash flow valuations, assistance in engineering, marketing, metallurgical problems and mine permitting. Experience has included zoning battles mostly with wins, but there have been three zoning loses.

**Personal Information**: Born: Sep. 23, 1945 in Savannah, Georgia. Health: Good. Size: Height: 5' 9", Weight: 190 lbs. Race: Caucasian. Religion: Baptist. Children: none. Divorced, was married 1967-88 and 1994-March 2002. Permanent resident of Alabama since 2002. Arrests or drug usage: None. Hobbies: European train travel, collecting travel books and DVD movies, tool and fastener collecting, wood working, tool making, personal computing, dancing, tennis, aerial photography, and gardening. Passport and citizen: USA. I keep an overseas roller bag packed.

**Personal Leadership Roles**: 1. President, Graduate Student Council, University of Georgia, 1972-73. 2. President, Forest Heights Community Association (large homeowners association), Athens, GA, 1976. 3. Program Chairman, Carrollton, GA Jaycees, 1972. I started the *Work To Cleanup Town* to locally replace the less productive *Walk For Mankind* yearly fund-raising project.

**Professional Memberships**: American Institute of Mining Engineers / Society of Mining Engineers. Much of my working career I was a member of The Northwest Mining Association (Spokane), Georgia Geological Society, and until recently, Georgia Mining Association and TAPPI (the industrial papermaking association).

**Clients List**: Lafarge, Blue Circle, Asarco, Hecla, Vulcan Materials, Cowan Stone (Tabsum), Placer, Huber, Cominco, Combustion Engineering, duPont, RTZ / U.S. Borax, Tate [marble] Estate (estate of Ga Marble founders), Southern Ready Mix, and USDOJ Antitrust Division (kaolin clay only, never others), U.S. Aggregates, and various attorneys and several accounting firms. I get along well with all of the aggregate mining companies except Martin Marietta, a result from bitter competition and litigation for adjacent properties. Yet, Martin Marietta enjoys operating a quarry I started (Alabaster) and another very successful site that I helped acquire and expand (Vance).

**Employment, Present and Past**:
Current: President and sole owner of Industrial Minerals Consulting, Inc., a one-man aggregates and industrial minerals exploration and evaluation company. The 2003 Lafarge buy-sell agreement does not allow me and/or IMC to do exploration for aggregates or limestone including lime and cement grade in most of a five-county area around Birmingham, Alabama for a five-year period. As of Jan. 2007 I am opening a limestone mine in Tennessee for a client and exploring elsewhere.
June 2002 to July 2003: Governor and co-owner of Birmingham Aggregates, LLC: Lakeshore (Wenonah) Quarry discovery.
    This green field quarry site was sold out to Lafarge on July 2, 2003. This site is now in production as Lafarge Lakeshore.
2002 – 2004 (varies): Officer and co-owner of Will, LLC; Calhoun Rock, LLC; and Woodstock Aggregates LLC
Aug. 1994 to 2002: Owner of Red Mountain Corp, Bama Crushed, Bradley Stone and Western Aggregates.
Aug. 1994 to present: President and sole owner of Industrial Minerals Consulting, Inc.
Aug. 1992 to 1995: Pres. and Co-owner of Marble and Industrial Minerals, Inc. for doing business in Russia.
1983 to Aug. 1994: Co-founder, Partner, President and/or Chairman of the Board of Exploration Resources (ExR) a closely-held corporation with 75 employees (by 1994) in Athens, GA and Aiken, SC. Other two partners acquired my interest in 1994. The divisions are or were Geology, Technical Editing / Business Computer Sales and Service, and Environmental. The Environmental Division specializes in groundwater data management. Monitoring and mapping for the world's largest nuclear facility, Westinghouse/DOE's Savannah River Site. ExR co-authors SRS' environmental reports. This includes chemical analyses compilation, editing, map-making, camera-ready copy production. The Geology Division specialized in industrial minerals exploration, acquisitions and valuations and hardrock groundwater exploration. ExR started as Exploration Software partnership with an early IBM PC in 1984.

Hartley co-founded Exploration Resources in his previous home in Athens, Georgia. During the first two years he did some software and data base development for mining, legal, and government agencies. This includes "GlyDict", (a PC computer word processor dictionary for the mining industry), "DEDITOR", a chemical dilution and environmental (fish protection) program for duPont and the SRS at the world's largest nuclear military production facility, and co-author of "DCF" (a discounted cash flow valuation program for the mining industry). Much of the time Hartley has served as a consultant to the mining industry. Services offered included exploration planning and project management, drilling management, sampling, information searches, cursory (brief) examinations with recommendations, advisory roles, land acquisition, preliminary market and competitor analysis, complete evaluations, computer valuations by discounted cash flow methods, assistance in metallurgical problems, assistance in regulatory permitting and development, and AutoCAD and other PC computer consulting.

Fall 1983 - Winter 1984 Quarters: Half-time faculty member, lecturer. Geology Department, University of Georgia. Introductory course instruction. Assisted with lectures and exercises of Geology 631 "Economic Geology of Metallic Ore Deposits" Reference: Dr. G. O. Allard, Professor, and Dr. Norm Herz,(ret.) Geology Dept.

November 1975 to January 1983: Chief Geologist. Combustion Engineering, C-E Minerals, Inc. Managed offices in NV, WA, and GA. Duties: exploration and evaluation of industrial mineral ore deposits in the U. S. and a few foreign countries. Although successful, the entire department was abolished on 12-31-82 as C-E experienced difficult times during the oil crisis. Reference: ABB, C -E, Long Ridge Rd, Stamford, CT

September 1973 to November 1975: Geologist. Applied Exploration Consultants (now Carpenter Minerals). Geologic mapping and petrology for Conoco's volcanogenic base metals exploration program in the Slate Belt of Georgia and South Carolina. Reference Dr. Robert H. Carpenter, Carpenter Minerals Exploration Co., P.O. Box 998, Roanoke Rapids, NC 27870, tel. 919-536-3574.
September 1971 to August 1973: Instructor. West Georgia College. Reference Dr. Sumner Long, Head, West Georgia College, Carrollton, GA 30117 Tel 706-834-1250.
College Quarters 1968 to 1971: Teaching Assistant, freshman labs. University of Georgia.
August to September 1969: Land surveyor. Also surveying for geophysical stations.
Summer 1969: Summer field assistant. Geochem stream sediment sampling. Dr. V.J. Hurst.
Summer 1966: Summer assistant. Miscellaneous duties. Huber Kaolin Co., Wrens, GA.
Summer 1964: Lab technician. Clay ore and product testing. Thiele Kaolin Co., Sandersville, GA

**Education:** Grades 1-12 (1951-63): Louisville Academy, Louisville, Georgia; B.S.1968 (Geology) UGA
M.S. 1971 (Geology); UGA, Ph.D. (incomplete, "ABD" = all finished but dissertation).

**References**
1. Dr. William H. McLemore (Bill), formerly State Geologist of Georgia 1979-2005, Jasper, GA tel. 404-395-5032
2. Dr. Robert Cook (Bob) Head, Geology Department, Auburn University, Auburn, AL tel. 334-844-4282
3. Dr. Robert H. Carpenter (Bob), exploration geologist, consultant, former major professor on Hartley's M.S. and Ph.D. programs at UGA. Retired in North Carolina. Tel. 252-235-4075

## Publications of M. Eugene Hartley

1. Hartley, M. E., III, 1971, "Ultramafic and related rocks in the vicinity of Lake Chatuge, Clay County, N. C. and Towns County, Ga." (Abs.) Geol. Soc. America, 5th Annual Meeting, SE Section, Blacksburg, Va., 1971, p. 317.
2. Hartley, M. E., III, 1973, "Ultramafic and related rocks in the vicinity of Lake Chatuge" Ga. Geol. Survey Bulletin 85, 61p.
3. Hartley, M. E., III, and Penley, H. Michael, 1974, "The Lake Chatuge Sill outlining the Brasstown Antiform" Ga. Geol. Survey, Guidebook 13, 27p. (Co-leader 1974 Ga. Geol. Soc. field trip).
4. Hartley, M. E., III; Walker, R. L.; and Jones, L. M., 1971, "Strontium isotope composition of the ultramafic and related rocks in the vicinity of Lake Chatuge, Clay County, N. C. and Towns County, Ga." (Abs.) Geol. Soc. America, 5th Annual Meeting, SE Section, Blacksburg, Va., 1971, p. 316-317.
5. Jones, L. M.; Hartley, M. E., III; and Walker, R. L., 1973, "Strontium isotope composition of alpine-type ultramafic rocks in the Lake Chatuge district, Georgia-North Carolina" Contr. Mineral. and Petrol., v.38, p.321-327.
6. O'Conner, B. J.; Carpenter, R. H.; Paris, T. A.; and Hartley, M. E., III, 1974, "Recently discovered faults in the Central Savannah River Area" (abs.) Georgia Academy of Science, 51st Annual Meeting, Valdosta, Ga., 1974, p. 15.
7. Hartley, M. Eugene, 1976, "Graves Mountain" in Chowns, T. M. (ed.), Stratigraphy, structure, and seismicity in the Slate Belt rocks along the Savannah River Guidebook Ga. Geol. Soc., 11th Annual Meeting, p. 42-52. (Co-leader of 1976 Ga. Geol. Soc. field trip).
8. Whitney, James A.; Paris, T. A.; Carpenter, R. H.; and Hartley, M. E., III, 1977, "Petrology and geochemistry of the southwestern extension of the Slate Belt near Lincolnton, Georgia and McCormick, South Carolina" (abs.) Geol. Soc. America, SE Section, Winston-Salem, North Carolina, p.196.

9.  Whitney, James A.; Paris, T. A.; Carpenter, R. H.; and Hartley, M. E., III, 1978, "Volcanic evolution of the southern Slate Belt of Georgia and South Carolina A primitive oceanic island arc." Jour. Geol., v.86, p. 173-192.

10. Carpenter, R. H.; Odom, A.; and Hartley, M. E., III, 1978, "Geochronology of the southern portion of the Slate Belt" (abs.) Geol. Soc. America, SE Section, Annual Meeting, Chattanooga, TN., p.164.

11. Carpenter, R. H.; Odom, A.; and Hartley, M. E., III, 1982, "Geochronological investigation of the Lincolnton metadacite, Georgia and South Carolina" in Bearse, D.N., Black, W.W., Kish, S.A. and Tuff, J.F., eds., Tectonic studies in the Talladega and Carolina slate belts, southern Appalachian orogen Geol. Soc. America Special Paper 191, p. 145-152.

12. Hartley, M. Eugene, 1983, "Usage of a personal computer in the valuation of an industrial mineral deposit" Northwest Mining Assoc., 89th Annual Conv., Spokane, WA., Dec. 2, 1983.

13. Hartley, M. Eugene, 1983, "Non-metallic minerals in the Northwest - recent developments and the outlook for new markets" Northwest Mining Assoc., 89th Annual Conv., Spokane, WA., Dec. 3, 1983.

14. Hartley, M. Eugene, 1984, "Mining project valuation by the DCF method, discounted cash flow Mineral Exploration on Industrial Timberlands" Univ. of Ga. Timberlands Conference, Georgia Center, Athens, Ga., April 3, 1984.

15. Hartley, M. Eugene, 1985, "Valuation of Mineral Deposits", Georgia Association of Assessment Officials, Seminar (for credit), University of Georgia, Continuing Education Center, Univ. of GA, April 22, 1985.

16. Hartley, M. Eugene, 1988, 'Use of PC Computers in Mining', Geological Society of America, Annual Meeting, SE Section, Columbia, SC, April 4-10, 1989.

17. Fay, William M., Bentley, Samuel J. and Hartley, M. Eugene, (1993), "Estimating the Ground Water Resource of the Upper Oconee River Basin", Ga. Water Resources Conf. 1993.

**Feel-Good Deeds** (win-win situations with mining and conservation groups) 1. Clean water pumping at large quarry to ensure stream water supply water for Buck Creek, Alabaster, AL; 2. Fish protection computer program for Savannah River Site, Aiken, SC; 3. Florida Black Bear and animal preserve mining valuation of a high calcium limestone site for Florida DNR acquisition; and 4. The pristine Little Cedar Mountain on Tennessee River saved from disturbance while negotiating long-term high calcium limestone cement rock mining lease extension on other site while working as consultant for The Tennessee River Gorge Trust. The trust acquired the mountain and a nominal royalty needed to continue their operation. The cement mill (Signal Mountain Cement) got a long lease ensuring survival of the Chattanooga mill and its jobs. The mill recently modernized and expanded. I am strongly pro-mining but feel great when it is also in the public's interest.

**Consulting Rates:** 1. Exploration and travel is $700 per day. 2. Research and report compilation is $150 per hour. 3. Courtroom time is $200 per hour. Rates are in addition to reasonable expenses – none have been rejected in 35 years Please note if you have special billing requirements before engaging.    **Retainer Required:** $2,000 from new clients.



M. Eugene Hartley

**Document Relied Upon By Hartley**

Complaint
Answer
Reply to Counterclaim
Supply Agreement
Index of documents produced by Conrad Yelvington in response to request for production
Index of documents produced by Johnco Materials, Inc. in response to request for production
Index of documents produced by West Alabama Bank & Trust in response to non-party subpoena
Transcripts of depositions of Gary Yelvington, Mark Klebe, Philip Holladay with exhibits
Transcripts of depositions of James B. Johnston, Presley M. Johnston, and Clatus Junkin with exhibits