IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

JOHNCO MATERIALS, INC.,                    CASE NO.: CV-06-2:06CV993-10

       Plaintiff,

vs.

CONRAD YELVINGTON
DISTRIBUTORS, INC.,

       Defendant.

_____ /

**NOTICE OF FILING DOCUMENTS IN SUPPORT OF
DEFENDANT, CONRAD YELVINGTON DISTRIBUTORS, INC.,
MOTION FOR PARTIAL SUMMARY JUDGMENT**

Defendant, CONRAD YELVINGTON DISTRIBUTORS, INC., by and through its undersigned counsel, hereby gives notice of filing the following documents, attached hereto, in support of its Motion for Partial Summary Judgment

1.     Excerpts from the deposition testimony of Presley Morgan Johnston taken on July 24, 2007, and Exhibit 5.

2.     Excerpts from the deposition testimony of James Benjamin Johnston taken on July 24, 2007.

3.     Excerpts from the deposition testimony of Clatus Junkin taken on July 25, 2007.

4.     Plaintiff's Designation of Expert Witness, dated August 8, 2007, attaching Expert Report of J. Lester Alexander.

*COBB & COLE*

By: ___/s/ Thomas J. Leek_____
THOMAS J. LEEK
FLA. BAR NO. 0116408
150 Magnolia Avenue
Post Office Box 2491
Daytona Beach, FL 32115-2491
Telephone: (386) 255-8171
Facsimile: (386) 323-9255
E-mail: Tom.Leek@CobbCole.com
CO-COUNSEL FOR DEFENDANT

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY I HEREBY CERTIFY that on the 15th day of October, 2007, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system, which will send a notice of electronic filing to:

H. Gregory Pearson, Esquire
Charles E. Harrison, Esquire
Junkin, Pearson, Harrison, & Junkin, L.L.C.
601 Greensboro Avenue
Suite 600, Alston Place
Tuscaloosa, AL 35401

Angela R. Rogers
Bradley Arant Rose & White LLP
The Alabama Center for Commerce
401 Adams Avenue, Suite 780
Montgomery, AL 36104

___/s/ Thomas J. Leek_____
Attorney

2

{034542-058 : KKOBY/KKOBY : 00535533.DOC; 1}

# FREEDOM COURT REPORTING

Page 1

1   IN THE UNITED STATES DISTRICT COURT

2   FOR THE MIDDLE DISTRICT OF ALABAMA

3   CASE NUMBER

4   CV-06-2:06CV993-10

5

6   JOHNCO MATERIALS, INC.,

7          PLAINTIFF,

8   VS.

9   CONRAD YELVINGTON

10   DISTRIBUTORS, INC.,

11          DEFENDANT.

12

13          DEPOSITION OF:

14   PRESLEY MORGAN JOHNSTON

15

16          S T I P U L A T I O N

17   IT IS STIPULATED AND AGREED by and

18   between the parties through their

19   respective counsel, that the deposition of

20   PRESLEY MORGAN JOHNSTON, may be taken

21   before Donna Winters, Commissioner and

22   Notary Public, State of Alabama at Large,

23   at the law offices of Junkin, Pearson,

## FREEDOM COURT REPORTING

Page 2

1   Harrison & Junkin, 600 Greensboro Avenue,

2   Suite 601, Tuscaloosa, Alabama 35401, on

3   the 24th day of July 2007 commencing at

4   9:00 a.m.

5   DEPOSITION OF:   PRESLEY MORGAN JOHNSTON

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

# FREEDOM COURT REPORTING

Page 3

1      IT IS FURTHER STIPULATED AND AGREED

2   that the signature to and the reading of

3   the deposition by the witness is reserved,

4   the deposition to have the same force and

5   effect as if full compliance had been had

6   with all laws and rules of Court relating

7   to the taking of depositions.

8      IT IS FURTHER STIPULATED AND AGREED

9   that it shall not be necessary for any

10   objections to be made by counsel as to any

11   questions, except as to form or leading

12   questions, and that counsel for the

13   parties may make objections and assign

14   grounds at the time of the trial, or at

15   the time said deposition is offered in

16   evidence or prior thereto.

17      IT IS FURTHER STIPULATED AND AGREED

18   that notice of filing of this deposition

19   by the Commissioner is waived.

20

21

22

23

**FREEDOM COURT REPORTING**

Page 12

1    you understood that he had authority to do

2    what he was doing for Yelvington; is that

3    correct?

4    A.    I assumed that he did.

5    Q.    All I'm trying to do there is tie a

6    link between Mr. Holladay and Yelvington.

7    A.    Sure.

8    Q.    So you understood that Mr. Holladay

9    was working on behalf of Yelvington; is

10   that right?

11   A.    Right.  I did that, yes.

12   Q.    Who is Ben Johnston?

13   A.    Ben Johnston is my brother, and

14   initially was half-owner of the Johnco

15   Materials Corporation.

16   Q.    Who is Clatus Junkin?

17   A.    Clatus Junkin became a stockholder

18   in Johnco Materials when the financing was

19   put in place to begin performing the

20   contract.  Well, before that, he became a

21   stockholder in Johnco Materials before we

22   entered into the contract with Yelvington.

23   Q.    Tell me what Johnco Materials is.

## FREEDOM COURT REPORTING

Page 13

1    A.    It's a corporation.

2    Q.    Is that the corporation that is a

3    plaintiff in this lawsuit, if you know?

4    A.    I've been told that.  They sued

5    Yelvington.

6    Q.    Fair enough.

7    A.    I haven't seen any documentation of

8    that, but I've been told that.

9    Q.    Johnco Materials is a gravel and

10   sand mine, is that correct, or was?

11   A.    Yes, it is.

12   Q.    Are there any other corporate

13   entities associated with Johnco, that

14   you're aware of?

15   A.    There were no corporate

16   stockholders.  There were only individual

17   stockholders.  And at the time Ben and I

18   sold our interest, it was sold to Clatus

19   Junkin.  What has happened since then, I

20   don't know.

21   Q.    Fair enough.  Does Johnco have any

22   subsidiaries or affiliates that you're

23   aware of?

# FREEDOM COURT REPORTING

Page 16

1   Q.    This is all I'm looking for.  I want

2   to put together the evolution of Johnco

3   Materials.

4   A.    Oh, okay.  Sometime in 2002 my

5   brother, Ben, and I were trying to begin a

6   sand and gravel producing business.  I

7   retired from the district attorney's

8   office in January of 2001, so we had been

9   talking about it that year.  Ben

10  remembered that there was a sand and

11  gravel deposit that my dad and he had

12  looked at in Lowndes County in 1958; and

13  he went down there to see if it was still

14  there, and it was.  We began to talk to

15  the owner of the property, Don Freeman,

16  about a lease.  He didn't want to lease

17  it; he wanted to sell it.  So we

18  organized, ultimately took an option on

19  the property and began to see where there

20  might be a market.

21  Q.    Can I stop you for just a second?

22  A.    Yes.

23  Q.    At what point did you contact

## FREEDOM COURT REPORTING

Page 17

1   Mr. Freeman, what year; do you recall?

2   A.    It was late 2001, early 2002.

3   Q.    At what point did you take the

4   option on the property?

5   A.    We took an option in August of 2002.

6   Q.    So at this point you've taken an

7   option on the property.  What happens next

8   in the evolution of Johnco?

9   A.    I think through Elmore Sand and

10  Gravel, we got information about

11  Yelvington's involvement in the market in

12  that area.  Ben and I went down to see

13  Gary.

14  Q.    Do you remember when you got the

15  information from Elmore?

16  A.    I don't, I sure don't.  I'm not

17  absolutely sure it came from him.  From

18  some source, we became aware that

19  Yelvington was involved in purchasing

20  quantities of gravel in that area.  Ben

21  and I went to see Gary, and Gary and his

22  father and a pilot came to Whitehall to

23  see the property.  I can't remember

**FREEDOM COURT REPORTING**

Page 18

1  whether we went down there before he came

2  up, whether we talked to him on the phone

3  and he came up, and then we went to see

4  him.  I don't know how that time sequence

5  is or was.  The option was for some period

6  of time.

7          Over in April, I think it is, of

8  2003, Gary notified us that the quantity

9  of material he could purchase was, like,

10  50,000 tons a year; and his price was in

11  the four-fifty, four-seventy-five range.

12  We took an extension on the option and

13  pretty much decided that this business

14  wasn't going to go at that rate.  Later,

15  and I haven't been able to pinpoint a

16  time, but at some point he called.  Gary

17  called me and said that he thought they

18  could handle quite a bit more of supply if

19  we were interested; and I asked him if

20  there had been any price appreciation, and

21  he said that he thought they could pay

22  five-twenty-five, with some increases in

23  price over some kind of time frame.  So

Page 19

1  then we began to negotiate the contract

2  that we finally arrived at.

3  Q.    Let me ask you this.  At what point

4  in time did you incorporate Johnco?

5  A.    I don't remember.  We incorporated

6  Johnco after we began the discussions

7  about the increased quantity and before we

8  purchased the property.

9  Q.    So before you exercised the option?

10  A.    Right.  I didn't look at those

11  documents before I came up here.  Of

12  course, they're on record in Pickens

13  County.

14  Q.    You gave me a date of April of '03

15  when you first talked to Mr. Yelvington,

16  where he expressed some quantity and price

17  that they could take?

18  A.    Well, actually the discussion --

19  right, in April of '03.  That's right.

20  Q.    Then you told me that later Mr.

21  Yelvington contacted you and said that he

22  could take more?

23  A.    Right.

## FREEDOM COURT REPORTING

Page 26

1  he made; so whatever that comes to.

2  Q.    What other parts of your production

3  plan did you have?

4  A.    We told the bank what we thought it

5  would cost.  We knew what it would cost to

6  buy the property, and we told them what we

7  thought we could buy various pieces of

8  equipment for, that kind of thing.

9  Q.    Did you have to present that to them

10  in writing, some kind of cost analysis?

11  A.    I'm sure we did.  I don't recall the

12  details of it, but I'm sure we did.

13  Q.    What about the sand, what was your

14  plan with regard to the sand?

15  A.    Well, initially we thought we

16  wouldn't have a market for the sand.

17  After we were set up, Lafarge in

18  Atlanta -- well, Keith Bodiford works for

19  them, came by and wanted to know if we

20  would sell some sand, and we made him a

21  price and took some samples over there.

22  It never did materialize, though.

23  Q.    Just so I'm clear here, initially

**FREEDOM COURT REPORTING**

1    when you seek financing, you don't have a

2    plan to sell the sand; is that correct?

3    A.    We thought there were several

4    possibilities for sand; but we did not

5    have a market for it, no.

6    Q.    What possibilities did you think you

7    had for sand?  Again, we're talking about

8    the time that you're going to get

9    financing.

10    A.    Well, there was a new block plant

11    opening on the west side of Montgomery

12    that we talked to.

13    Q.    What was their name; do you know?

14    A.    I don't.  One of the ready-mix

15    places on the west side of town was

16    interested, if we could supply them

17    gravel.  Of course, we were committed to

18    Gary for the 150,000 tons, and we couldn't

19    guarantee that we would supply both.  So

20    that was just a possibility.

21    Q.    At the time that you're seeking

22    financing?

23    A.    Right.

**FREEDOM COURT REPORTING**

Page 51

1  A.    Well, it seems to me that there were

2  sixty or seventy cars there, and first

3  train.  They came in and said, "We want

4  them all done today.  You don't have two

5  days."  So they started early that morning

6  and got through at 10 o'clock or so that

7  night, so I'm told.

8  Q.    Were you involved with Johnco at

9  that time?

10  A.    Clatus and I had agreed that he was

11  going to buy us out.

12  Q.    When was that?

13  A.    I don't remember.  It was early

14  2006.

15  Q.    And at the point that you and Mr.

16  Junkin had agreed that Mr. Junkin was

17  going to buy you out, did you stop your

18  roles with Johnco?

19  A.    Pretty much, yes.  Of course, I

20  talked to Ben occasionally and said, "How

21  are you doing," and so forth, you know.  I

22  would like for them to do well if they

23  could.

## FREEDOM COURT REPORTING

Page 101

1   love to sell some sand.  I thought it

2   would be great to sell sand, you know.  I

3   didn't tell anybody that we were going to

4   shut down if we couldn't sell it.

5   Q.    Did you tell anybody that Johnco

6   would have to shut down if it couldn't

7   sell the oversize gravel?

8   A.    No, I don't think so.  I don't

9   remember doing that at all.  My answer

10  would be I didn't do that.

11  Q.    Did you ever have the impression

12  that Johnco would have to shut down if it

13  couldn't sell the oversize gravel?

14  A.    No, because, really, we were selling

15  the oversize gravel.  I don't know whether

16  we had sold oversize gravel when I got out

17  or not.  Ben said that he had a customer

18  who was buying oversize gravel, by truck

19  hauling it to Montgomery and shipping it

20  into Florida or somewhere.  I don't know

21  whether that occurred before I got out or

22  not.  The oversize, in my mind, was a

23  product that would move at some point, you

## FREEDOM COURT REPORTING

Page 102

1   know.

2   Q.     Just so I can close the loop here,

3   do I understand correctly that you weren't

4   involved with the first load taken by

5   Yelvington in May of 2005?

6   A.     That's right.

7   Q.     Excuse me.  Was that May of 2006?

8   A.     It was '06, I think.

9   Q.     Thank you.

10      MR. LEEK:  For your purposes, we'll

11  just keep these numbered consecutively.

12  Is that okay?

13      MR. PEARSON:  Yes.

14       (Whereupon, Defendant's Exhibit

15  Number 1 was marked for identification, a

16  copy of which is attached to the original

17  of the transcript.)

18  Q.     Mr. Johnston, I have handed you what

19  has been marked as Defendant's Exhibit 1,

20  which I'll represent to you is our answer

21  to this Complaint.  The reason I'm using

22  the answer is because it contains both the

23  factual allegations and the responses.

**From:** Philip Holladay [corridor10@bellsouth.net]
**Sent:** Thursday, March 31, 2005 4:33 PM
**To:** 'Gary Yelvington'
**Subject:** Whitehall gravel FYI -- no action required

Ben Johnston gave me the following info on their material:


55% sand -- can make two products-concrete sand and coarse "golf course" sand
45% gravel -- 20% (9% of total production) will be oversized (>1" <2-1/2"). They have a buyer for the larger material who will pay $10/ton, but they would sell to us. The balance of the gravel would be #67 for us. I will get samples and gradations once they begin production. These figures were based on core samples and test pits, so there could be some variation in actual production.


Based on this information, their production would be about 420,000 tons. If they have 2.5 million tons of gravel reserves, this production rate would run them out in 13 years.

|  | Annual Tons | % |
|---|---|---|
| sand | 229,167 | 0.55 |
| #67 | 150,000 | 0.36 |
| Oversize | 37,500 | 0.09 |
| Total production | 416,667 |  |



DEFENDANT'S EXHIBIT
5 pep Johnston

Page 1

1        IN THE UNITED STATES DISTRICT COURT

2        FOR THE MIDDLE DISTRICT OF ALABAMA

3                CASE NUMBER

4            CV-06-2:06CV993-10

5

6    JOHNCO MATERIALS, INC.,

7            PLAINTIFF,

8    VS.

9    CONRAD YELVINGTON

10   DISTRIBUTORS, INC.,

11           DEFENDANT.

12

13           DEPOSITION OF:

14       JAMES BENJAMIN JOHNSTON

15

16        S T I P U L A T I O N

17       IT IS STIPULATED AND AGREED by and

18   between the parties through their

19   respective counsel, that the deposition of

20   JAMES BENJAMIN JOHNSTON, may be taken

21   before Donna Winters, Commissioner and

22   Notary Public, State of Alabama at Large,

23   at the law offices of Junkin, Pearson,

# FREEDOM COURT REPORTING

Page 2

1  Harrison & Junkin, 600 Greensboro Avenue,

2  Suite 601, Tuscaloosa, Alabama 35401, on

3  the 24th day of July 2007 commencing at

4  2:30 p.m.

5  DEPOSITION OF:   JAMES BENJAMIN JOHNSTON

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

## FREEDOM COURT REPORTING

Page 3

1        IT IS FURTHER STIPULATED AND AGREED

2    that the signature to and the reading of

3    the deposition by the witness is reserved,

4    the deposition to have the same force and

5    effect as if full compliance had been had

6    with all laws and rules of Court relating

7    to the taking of depositions.

8        IT IS FURTHER STIPULATED AND AGREED

9    that it shall not be necessary for any

10   objections to be made by counsel as to any

11   questions, except as to form or leading

12   questions, and that counsel for the

13   parties may make objections and assign

14   grounds at the time of the trial, or at

15   the time said deposition is offered in

16   evidence or prior thereto.

17       IT IS FURTHER STIPULATED AND AGREED

18   that notice of filing of this deposition

19   by the Commissioner is waived.

20

21

22

23

Page 39

1    that Johnco has prepared, at any point in

2    time?

3    A.    The only marketing plan we had,

4    basically, was a contract with Conrad

5    Yelvington Distributing Company to buy

6    150,000 tons of gravel a year, number 67

7    gravel a year.

8    Q.    Do you know what Johnco anticipated

9    the product mix would be at the time that

10   they entered into that supply agreement

11   with Yelvington?

12   A.    Approximately the figures that I

13   gave you.

14   Q.    I'm trying to remember what those

15   are now.

16   A.    45 percent gravel, 55 percent sand;

17   and of the 45 percent gravel, some 80 -- I

18   believe I said 80 percent.  80 to 85

19   percent of the 45 percent would be 67

20   gravel.

21   Q.    What was Johnco's plan with regard

22   to disposing of the sand when it entered

23   into the supply agreement?

**FREEDOM COURT REPORTING**

1    A.    Well, we were trying to sell it to,

2    one was an outfit, Lafarge, a ready-mix

3    company.

4    Q.    What ready-mix company?

5    A.    Lafarge.

6    Q.    Oh, Lafarge is the ready-mix company

7    you're talking about?

8    A.    Lafarge, L-A-F-A-R-G-E.

9    Q.    I understand.  I just wanted to make

10   sure that Lafarge and the ready-mix

11   company you're talking about are one and

12   the same.

13   A.    Yes, sir.

14   Q.    And you had planned to do that at

15   the time that Johnco entered the supply

16   agreement; is that correct?

17   A.    I don't know at what point.  We just

18   had plans to try to sell some sand.  Sand

19   was not a big part of our plans at all.

20   Q.    But it's 55 percent of what you

21   produce; correct?

22   A.    Yes, sir.

23   Q.    So you had to make some plans for

## FREEDOM COURT REPORTING

Page 42

1  handled Lafarge.  I may have talked to

2  somebody else.  I don't know.

3  Q.     Do you recall any other customers to

4  whom you tried to sell sand between the

5  time that you entered the supply agreement

6  and the shutdown?

7  A.     No, sir.

8  Q.     What about the oversize gravel, what

9  was Johnco's plan to deal with the

10 oversize gravel at the time it entered the

11 supply agreement?  Sir, it may be that you

12 don't know; and if it is, just tell me

13 that, and I'll stop asking the questions.

14 But if you do, let me know what you know.

15 A.     I don't think we had a plan, as

16 such.  We did wind up selling some of it.

17 Q.     Did you make the decision to shut

18 down the plant?

19 A.     No, sir.

20 Q.     Did you ever tell Phillip Holladay,

21 or anyone at Yelvington, that if Johnco

22 couldn't sell some sand, they would have

23 to shut down?

# FREEDOM COURT REPORTING

1    IN THE UNITED STATES DISTRICT COURT

2    FOR THE MIDDLE DISTRICT OF ALABAMA

3    CASE NUMBER

4    CV-06-2:06CV993-10

5

6    JOHNCO MATERIALS, INC.,

7    PLAINTIFF,

8    VS.

9    CONRAD YELVINGTON

10    DISTRIBUTORS, INC.,

11    DEFENDANT.

12

13    DEPOSITION OF:

14    CLATUS JUNKIN

15

16    S T I P U L A T I O N

17    IT IS STIPULATED AND AGREED by and

18    between the parties through their

19    respective counsel, that the deposition of

20    CLATUS JUNKIN, may be taken before Donna

21    Winters, Commissioner and Notary Public,

22    State of Alabama at Large, at Freedom

23    Court Reporting, 367 Valley Avenue,

## FREEDOM COURT REPORTING



Page 2

1  Birmingham, Alabama 35209, on the 25th day

2  of July 2007 commencing at 10:00 a.m.

3  DEPOSITION OF:   CLATUS JUNKIN

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

# FREEDOM COURT REPORTING

Page 3

1    IT IS FURTHER STIPULATED AND AGREED

2  that the signature to and the reading of

3  the deposition by the witness is reserved,

4  the deposition to have the same force and

5  effect as if full compliance had been had

6  with all laws and rules of Court relating

7  to the taking of depositions.

8    IT IS FURTHER STIPULATED AND AGREED

9  that it shall not be necessary for any

10  objections to be made by counsel as to any

11  questions, except as to form or leading

12  questions, and that counsel for the

13  parties may make objections and assign

14  grounds at the time of the trial, or at

15  the time said deposition is offered in

16  evidence or prior thereto.

17    IT IS FURTHER STIPULATED AND AGREED

18  that notice of filing of this deposition

19  by the Commissioner is waived.

20

21

22

23

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

**FREEDOM COURT REPORTING**

Page 127

1    Complaint?

2    A.    Generally, it was adding up the

3    costs of the -- you have the land cost,

4    and then the construction of the plant

5    cost, and the construction of the railroad

6    spur which just got all out of hand, way

7    beyond what was initially planned.  Then,

8    again, adding this up, I think there were

9    two loaders that were listed somewhere

10   separately and not with the other

11   equipment that may have gotten overlooked.

12   Q.    These are all costs that were

13   necessarily incurred for Johnco to operate

14   a mining facility; is that correct?

15   A.    Yes.

16   Q.    And these are all costs that are

17   necessarily incurred for Johnco to operate

18   a mining facility today; isn't that

19   correct?

20   A.    The costs are still there.

21   Q.    The costs are still there; right?

22   A.    Yes.

23   Q.    Johnco, as I understand it, is

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA

| | | |
|---|---|---|
| JOHNCO MATERIALS, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Civil Action No. |
| vs. | ) | 2:06cv993-ID |
| | ) | |
| CONRAD YELVINGTON | ) | |
| DISTRIBUTORS, INC., | ) | |
| | ) | |
| Defendant. | ) | |

## PLAINTIFF'S DESIGNATION OF EXPERT WITNESSES

Comes now Johnco Materials, Inc., the plaintiff in this cause, and pursuant to FED.R.CIV.P. 26(a)(2), designates the following experts and topics:

I.

J. Lester Alexander, III, CPA
Accounting, Economics & Appraisal Group, LLC

1

2 North 20th Street
Suite 1400
Birmingham, Alabama 35203

It is anticipated that the general nature of the subject matter on which Mr. Alexander is to testify is the damages sustained by the plaintiff because of the defendant's acts and omissions. Mr. Alexander is expected to provide expert opinion concerning the areas and quantum of lost profits, incidental expenses suffered by plaintiff, and the value of the total loss to the plaintiff by reason of defendant's acts and omissions.

Mr. Alexander is expected to testify, consistent with the Rule 26 Report ("Summary Report of Accounting, Economics & Appraisal Group, LLC") filed as an Attachment to this Disclosure and served on defendant, as follows:

A.   That the plaintiff invested a significant amount of money in the establishment of a mining facility and the related rail siding as

2

specified in the Supply Agreement. Mr. Alexander is expected to testify that in reliance on the Supply Agreement, the plaintiff purchased land with a cost in excess of $1.6 million, proceeded to purchase depreciable plant and rail car loading equipment at a cost of over $1.2 million, hired that would be needed in order to meet the obligations as agreed, and hired and trained employees needed to operate the mining facility to a production capacity. He is expected to testify that the plaintiff invested in excess of $2.8 million to meet its obligations under the Supply Agreement.

B.    Mr. Alexander is expected to testify that while the plaintiff produced sufficient gravel, the defendant failed to purchase the quantities specified in the Supply Agreement.

C.    Mr. Alexander is expected to testify that the plaintiff suffered lost profits and incidental costs attributable to the failure of the defendant to perform under the Supply Agreement. He is expected to testify that the plaintiff had expectations of generating gross revenue in excess of $7.4

3

million from the sale of No. 67 gravel to the defendant, and an additional $2.1 million from the sale of production by-products. He is expected to testify that this gross revenue figure should be reduced by production cost in the amount of $4.16 per ton sold, resulting in a net lost profit of $4,473,873 due to the failure of the defendant to perform. Finally, because plaintiff was ready to perform as of March 2006 and defendant did not take the initial deliver until May 11, 2006, Mr. Alexander is expected to testify that the incidental costs incurred by the plaintiff during the intervening period and attributable to the defendant's delay in initial delivery are in the amount of $75,342.

The basis and reasons for Mr. Alexander's opinions are stated in the Rule 26 Report, as are the data and other information considered; exhibits to be used as a summary of or support for these opinions; Mr. Alexander's qualifications and compensation in this case; and a listing of other cases in which he has testified as expert the preceding four years; all of which are adopted by incorporation into the disclosure made by this Designation.

Case 2:06-cv-00993-ID-SRW   Document 22   Filed 08/06/2007   Page 5 of 7

## II.

The plaintiff may call to testify as expert witnesses in this case any and all custodians of records for any and all records in question, who may testify as to the authenticity of any and all such records, and whose records will serve as their written reports. None of these expert witnesses have been specifically retained by the plaintiff.

## III.

The plaintiff reserves the right to call to testify or question any and all experts or representatives that have been or may be designated by or called by any other party to this lawsuit regarding the matters in the complaint, answer, counterclaim or reply to counterclaim. These individuals have not been specifically retained by the plaintiff, and the plaintiff does not necessarily adopt or concede the accuracy of their fact opinions or conclusions.

Case 2:06-cv-00993-KOB-SRW   Document 22   Filed 08/06/2007   Page 6 of 7

IV.

The plaintiff hereby designates and supplies expert witness information to counsel of record; has met all the requirements of FED.R.CIV.P. 26(a)(2); and has fully complied with Section 7 of this Honorable Court's Scheduling Order of January 12, 2007, as amended by this Court's Order of August 1, 2007.


s/ H. Gregory Pearson (PEA017)


Charles E. Harrison (ASB-9408-N70C)

*OF COUNSEL:*

JUNKIN, PEARSON, HARRISON
    & JUNKIN, L.L.C.
601 Greensboro Avenue
Suite 600 Alston Place
Tuscaloosa, Alabama 35401
Telephone: (205) 366-0111
Telecopier: (205) 391-4780

## CERTIFICATE OF SERVICE

Pursuant to LR 5.4, I do hereby certify that I have on this the 8th day of August 2007 served a copy of the foregoing Designation on:

> Charles A. Stewart III, Esq.
> Angela R. Rogers, Esq.
> BRADLEY ARANT ROSE & WHITE LLP
> The Alabama Center for Commerce
> 401 Adams Avenue, Suite 780
> Montgomery Alabama 36104
>
> Thomas J. Leek, Esq
> COBB & COLE
> 150 Mognolia Avenue
> Post Office Box 2491
> Daytona Beach, FL 32115-2491

who is registered with this Court as a Filing User, by electronically filing a copy of said document through the Court's transmission facilities in the manner authorized by the Court's General Order regarding Electronic Case Filing Policies and Procedures.

Charles E. Harrison (ASB-9408-N70C)

## Summary Report of Accounting, Economics & Appraisal Group, LLC

### By: J. Lester Alexander, III

### Johnco Materials, Inc. v.
### Conrad Yelvington Distributors, Inc.
### As of August 8, 2007

### CV-06-2:06cv993-ID

This report and the attached appendices is a summary of my findings and opinions to date in the above referenced matter.

I am a Certified Public Accountant and a Certified Fraud Examiner with approximately twenty-eight years of professional experience performing audit, tax and consulting services. I am the co-founder and the Managing Principal of Accounting, Economics and Appraisal Group, LLC ("AEA"). I hold a Bachelor of Science in Accounting from the University of Alabama. I am a former partner of Pricewaterhouse Coopers, LLP and former Southeastern practice leader of one of its legacy firm's consulting practices. In recent years, I have concentrated my practice in the areas of financial investigation, forensic accounting and valuation consulting services. I have been recognized as an expert in Alabama and other state and federal courts. I reserve the right to supplement and amend my opinions for information learned up to and throughout trial. Furthermore, I intend to develop and make available prior to trial additional charts and aides designed to make the financial and economic concepts addressed in my report more understandable to lay persons.

In regard to this matter, I was assisted by members of my firm who worked under my direction. AEA's billing rates for this engagement range from $55 to $290 per hour.

## SCOPE AND METHODOLOGY

Counsel for Johnco Materials, Inc. ("JMI") retained me as expert witness to review and analyze documentary and oral evidence related to the Supply Agreement dated April 16, 2004 between JMI and Conrad Yelvington Distributors, Inc. ("CYDI") for the supply of Number 67 concrete gravel and any financial/economic facts and circumstances occurring during and after the dates covered under Supply Agreement.

In performing my work, I read and analyzed the Supply Agreement, related sales invoices, federal tax returns, financial statements and other information produced in this matter. I utilized certain case pleadings and the depositions of Ben Johnston, Pressley Morgan ("Pep") Johnston, and Clatus Junkin. I have studied industry data, financial research and industry trends regarding profits and other information. A complete listing of information considered is included as an appendix to this report. As a result of this work, I have developed the following findings and opinions.

## FINDINGS AND OPINIONS

### JMI invested a significant amount of money in the establishment of a mining facility and the related rail siding as specified in the Supply Agreement.

In April 2004, JMI and CYDI entered into a Supply Agreement for No. 67 concrete gravel. This Agreement called for the construction of a mining facility to mine and classify sand and gravel.[1] Upon completion of this facility, CYDI was to begin purchasing the specified size of gravel on a weekly schedule at an approximate volume of 5,200 tons per week representing an annual volume of 260,000 tons per year. The cost per tonnage price would increase after the first two years at a small percentage increment.[2]

JMI purchased land with a cost in excess of $1.6 million. JMI then proceeded to purchase depreciable plant and rail car loading equipment with a cost of over $1.2 million that would be needed in order to meet the obligations as agreed. In addition, JMI incurred other costs to prepare the mining facility to produce at least 5,200 tons per week.[3] The amount invested by JMI to meet their obligations under the Supply Agreement was more than $2.8 million.

### Although sufficient gravel was produced by JMI, CYDI failed to purchase quantities specified in the Supply Agreement.

Although CYDI was aware that JMI commenced mining operations during March 2006, CYDI did not schedule the initial delivery until May 11, 2006, approximately 9 weeks after mining operations commenced. After the initial delivery on May 11, 2006, CYDI failed to schedule weekly deliveries and only scheduled sporadic shipments during June 2006, August 2006, and September 2006. The total amount delivered by JMI to CYDI during this seven month time frame was approximately 32,000 tons.

### JMI suffered lost profits and incidental costs attributable to the failure of CYDI to take deliveries of No. 67 concrete gravel anticipated under the Supply Agreement.

Based on the quantities and prices as set forth in the Supply Agreement, I have determined that JMI would have generated gross revenue in excess of $7.4 million from the sale of No. 67 gravel to CYDI and an additional $3.1 million from the sale of the production by-products.[4] This level of gross revenues is reasonable in light of the substantial investment made by the owners of JMI

---

[1] Paragraph 2.1 of the Supply Agreement states: "Seller shall construct a mining facility to mine and classify sand and gravel on the Plant Site. In addition to the mining facilities to be constructed on the Plant Site, this contract is contingent on Seller's ability to construct ... sufficient rail siding to load/handle a minimum of fifty-two (52) open, or covered, hopper railcars on a regular shipment schedule.

[2] Paragraph 3.1 of the Supply Agreement states: "After Seller commences mining and grading of sand and gravel, Seller shall sell and deliver to Buyer, No. 67 concrete gravel in minimum quantities of 150,000 tons annually for a price equal to ... ($5.25) per ton, F.O.B. Buyer's rail cars loaded on the rail siding on the Plant Site, on a weekly schedule (i.e. approximately 5,200 tons per week), and buyer shall purchase an accept from Seller said Product at the price and in the quantities specified ..."

[3] Per deposition testimony of Clatus Junkin.

[4] See Appendix 2 for the calculation of expected gross revenue at 5,200 tons of No. 67 concrete gravel produced and sold per week.

to place the mine into operation. The loss of expected gross revenues through CYDI's failure to purchase the contractual quantities of No. 67 concrete gravel resulted in significant financial harm to JMI.

Using the costs from mining operations at production capacity for JMI during the period March 2006 and May 2006 through August 2006 [5], the gross revenue expected should be reduced by a cost to produce of $4.16 per ton sold. This results in a net lost profit of $4,473,873 due to the failure of CYDI to uphold their contractual obligations, before present value discounting and pre-judgment interest.[6] The lost profit amounts have not been reduced to their net present value as of the date of trial nor have they been increased for pre-judgment interest through the date of trial. It is my opinion that the impact of discounting of the net lost profits would be substantially offset by statutory pre-judgment interest considering the estimated date of trial verses the time frame of the lost profits determinations.

In addition to these costs, JMI has informed me that they had commenced mining operations and were staffed to meet the delivery requirements specified in the supply agreement as of the first week in March 2006. However, CYDI did not take the initial delivery until May 11, 2006. We have determined the incidental costs incurred by JMI during the intervening period attributable to CYDI's delay in the initial delivery to be $75,342, before pre-judgment interest.

## OTHER CONSIDERATIONS

My report is issued in accordance with the Management Consulting Standards of the American Institute of Certified Public Accountants. This report is to be used solely in connection with proceedings related to the above referenced matter and should not be used for any other purpose. Outside distribution of this report to others is not permitted without the written consent of AEA Group, LLC. The information in this report is based on information learned through August 8, 2007. Discovery in the captioned litigation is ongoing as is my review and analysis of the facts and circumstances of the case. As such, I reserve the right to consider any additional information that is presented to me. Further, I reserve the right to supplement and amend my opinions for information learned up to and throughout trial.

Very truly yours,

By: _Sherlin Alexander, III_
J. Lester Alexander, III, CPA

---

[5] Per deposition testimony of Clatus Junkin, these months are an accurate representation of costs associated with the mine running at production capacity.
[6] See Appendix 1 for the calculation of profits lost by JMI.

## INDEX OF APPENDICES

Appendix 1 -  Lost Profits @ 5,200 Tons Per Week

Appendix 2 -  Gross Revenue @ 5,200 Tons Per Week

Appendix 3 -  Sales Volume Assumptions

Appendix 4 -  Cost Per Ton @ 5,200 Tons Per Week

Appendix 5 -  Incidental Costs

Appendix 6 -  Resume of J. Lester Alexander, III

Appendix 7 -  Trial, Deposition and Arbitration Testimony in Last Four Years

Appendix 8 -  List of Information Considered

Appendix 1

# Lost Profits @ 5,200 Tons Per Week

| | Cumulative | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 |
|---|---|---|---|---|---|---|
| Gross Revenue (Appendix 2 and 3) | $ 10,513,500 | $ 2,051,740 | $ 2,088,140 | $ 2,124,540 | $ 2,124,540 | $ 2,124,540 |
| Incremental Costs (Appendix 4): | | | | | | |
| Anticipated Tons [1] | | 260,000 | 260,000 | 260,000 | 260,000 | 260,000 |
| Cost Per Ton (Appendix 4) | | $ 4.16 | $ 4.28 | $ 4.41 | $ 4.54 | $ 4.68 |
| Incremental Costs | $ 5,738,200 | $ 1,081,600 | $ 1,112,800 | $ 1,146,600 | $ 1,180,400 | $ 1,216,800 |
| Lost Profits | $ 4,775,300 | $ 970,140 | $ 975,340 | $ 977,940 | $ 944,140 | $ 907,740 |
| (Less): Actual Gravel and Sand Sales [2] | (301,427) | (275,668) | (25,759) | | | |
| Net Lost Profits | $ 4,473,873 | $ 694,472 | $ 949,581 | $ 977,940 | $ 944,140 | $ 907,740 |

[1] Source: Section 3.1 of Supply Agreement dated April 16, 2004 between Johnco Materials, Inc. and Conrad Yelvington Distributors, Inc.

[2] Source: Johnco Materials, Inc. Profit and Loss Statements for the period May 2006 through June 2007.

Appendix 2

## Gross Revenue @ 5,200 Tons Per Week

| | Cumulative | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 |
|---|---|---|---|---|---|---|
| **#67 Concrete Gravel** | | | | | | |
| Contracted Quantity [1] | 1,300,000 | 260,000 | 260,000 | 260,000 | 260,000 | 260,000 |
| Price Per Ton [1] | | $ 5.51 | $ 5.65 | $ 5.79 | $ 5.79 | $ 5.79 |
| Gross Revenue | $ 7,417,800 | $ 1,432,600 | $ 1,469,000 | $ 1,505,400 | $ 1,505,400 | $ 1,505,400 |
| **#4 Oversize Gravel** | | | | | | |
| Anticipated Quantity [2] | 218,000 | 43,600 | 43,600 | 43,600 | 43,600 | 43,600 |
| Price Per Ton [3] | | $ 8.50 | $ 8.50 | $ 8.50 | $ 8.50 | $ 8.50 |
| Gross Revenue | $ 1,853,000 | $ 370,600 | $ 370,600 | $ 370,600 | $ 370,600 | $ 370,600 |
| **Sand** | | | | | | |
| Anticipated Quantity [2] | 731,000 | 146,200 | 146,200 | 146,200 | 146,200 | 146,200 |
| Price Per Ton [4] | | $ 1.70 | $ 1.70 | $ 1.70 | $ 1.70 | $ 1.70 |
| Gross Revenue | $ 1,242,700 | $ 248,540 | $ 248,540 | $ 248,540 | $ 248,540 | $ 248,540 |
| **Total Gross Revenue** | $ 10,513,500 | $ 2,051,740 | $ 2,088,140 | $ 2,124,540 | $ 2,124,540 | $ 2,124,540 |

[1] Source: Section 3.1 of Supply Agreement dated April 16, 2004 between Johren Materials, Inc. and Conrad Yelvington Distributors, Inc., based on 50 weeks per year production.

[2] Source: Anticipated quantity for # 4 Oversize Gravel and Sand calculated based on historical relationship between tons of # 67 Concrete Gravel, # 4 Oversize Gravel, and Sand sold during the period January 2006 through June 2007 (see Appendix 3).

[3] Source: Price per ton for delivery of 3,329,866 tons to Conrad Yelvington Distributors, Inc. during the period March 2006 through October 2006, based on detailed analysis of sales invoices for the period January 2006 through June 2007, totaling ~ 3,460 tons to Madden Stone & Gravel during the period January 2006 through June 2007, based on detailed analysis of sales invoices for the period January 2006 through June 2007.

[4] Source: Average price per ton for deliveries during the period January 2006 through June 2007, based on detailed analysis of sales invoices for the period January 2006 through June 2007.

Appendix 3

# Sales Volume Assumptions

| | Actual Sales History  January 2006 Through June 2007 | | | |
|---|---|---|---|---|
| | # 67 Concrete Gravel | # 4 Oversize Gravel | Sand | Combined |
| Tons Sold [1] | 40,028.63 | 6,729.35 | 22,505.63 | 69,263.61 |
| % of Sales | 57.8% | 9.7% | 32.5% | 100.0% |

[1] Source: Detailed analysis of sales invoices for the period January 2006 through June 2007.

| | Anticipated Tons @ 5,200 Tons Per Week | | | |
|---|---|---|---|---|
| | # 67 Concrete Gravel | # 4 Oversize Gravel | Sand | Combined |
| Tons Sold | 260,000 | 43,600 | 146,200 | 449,800 |
| % of Sales | 57.8% | 9.7% | 32.5% | 100.0% |

Appendix 4

## Cost Per Ton @ 5,200 Tons Per Week

|  | Cumulative | Actual Operating Costs [1] | | | | |
|---|---|---|---|---|---|---|
|  |  | March 2006 | May 2006 | June 2006 | July 2006 | August 2006 |
| Tons # 67 Concrete Gravel Sold [2] | 21,863.12 | 135.00 | 5,953.04 | 3,241.59 | 189.13 | 12,344.36 |
| Salaries | $ 99,623 | $ 16,913 | $ 18,771 | $ 23,734 | $ 18,366 | $ 21,839 |
| Insurance-Workers' Comp. | 4,165 | - | - | - |  | 4,165 |
| Life Insurance | 6,628 | 1,657 |  | 1,657 | 1,657 | 1,657 |
| Payroll Tax | 10,219 | 1,834 | 1,409 | 2,661 | 2,030 | 2,285 |
| Contract Labor | 1,625 | - | - | 1,625 | - | - |
| Training | 150 | - | - | 150 | - | - |
| Fuel and Oil | 52,551 | 7,782 | 6,700 | 18,854 | 9,137 | 10,078 |
| Repairs | 25,040 | 8,270 | 1,518 | 5,680 | 3,305 | 6,267 |
| Equipment Rental | 19,063 | 2,044 | 5,141 | 4,098 | - | 7,780 |
| Insurance | 6,110 | 1,517 | 2,783 | 1,810 | - |  |
| Supplies | 8,893 | 395 | 1,119 | 5,545 | 980 | 854 |
| Hauling Charges | 1,830 | - | - | 180 | - | 1,650 |
| Small Tools | 1,091 | 429 | - | 454 | - | 208 |
| Miscellaneous Expenses | 769 | 74 | 695 | - | - |  |
| Utilities | 5,264 | 512 | 735 | 1,245 | 1,374 | 1,398 |
| Total Operating Costs | $ 243,021 | $ 41,427 | $ 38,871 | $ 67,693 | $ 36,849 | $ 58,181 |
| Escalate Variable Fuel and Oil Cost from Average Cost Per Actual Ton Sold to Cost for 5,200 Tons Per Week [3] | 207,844 | 44,297 | 45,379 | 33,225 | 42,942 | 42,001 |
| Total Equivalent Operating Costs | $ 450,865 | $ 85,724 | $ 84,250 | $ 100,918 | $ 79,791 | $ 100,182 |
| Anticipated Tons # 67 Concrete Gravel [4] | 108,335 | 21,667 | 21,667 | 21,667 | 21,667 | 21,667 |
| Cost Per Ton | $ 4.16 | $ 3.96 | $ 3.89 | $ 4.66 | $ 3.68 | $ 4.62 |

|  | Cost Per Ton Escalated for Inflation [5] | | | | |
|---|---|---|---|---|---|
|  | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 |
| Cost Per Ton | $ 4.16 | $ 4.28 | $ 4.41 | $ 4.54 | $ 4.68 |

[1] Source: Johnco Materials, Inc. Statements of Operations for the March 2006 through September 2006 period of operations under the Supply Agreement. April 2006 and September 2006 operating costs were excluded from analysis due to effect of cost avoidance reduction in work force by Johnco Materials, Inc., resulting in operating costs not comparable to results of fully-staffed production.

[2] Source: Detailed analysis of sales invoices for the period January 2006 through June 2007.

[3] Source: Operating costs incurred by Johnco Materials, Inc. during the March 2006 through September 2006 period of operations under the Supply Agreement represent staffing and operating costs necessary to produce 5,200 tons of # 67 Concrete Gravel per week. Actual operating costs incurred by Johnco Materials, Inc. for operation producing less than contracted quantities delivered to Conrad Yelvington Distributors, Inc. are equivalent to costs necessary to produce 5,200 tons of # 67 Concrete Gravel per week, with the exception of Fuel and Oil, which would escalate to power equipment to load rail cars specified as the shipping method by the Supply Agreement. For analytical purposes, actual Fuel and Oil cost has been escalated to equivalent cost necessary to produce and rail car load 5,200 tons of # 67 Concrete Gravel per week.

[4] Production of # 4 Oversize Gravel and Sand are byproducts of the production of # 67 Concrete Gravel; tons of # 4 Oversize Gravel and Sand are not included in the Anticipated Tons for purposes of calculating Cost Per Ton.

[5] Cost Per Ton escalated 3.0% for inflation, comparable to 2.4% increase from June 2006 to June 2007 in Consumer Price Index published by the Bureau of Labor Statistics of the U.S. Department of Labor for comparable geographic and demographic areas, specifically for South region, Size D Nonmetropolitan area size (less than 50,000) (www.bls.gov/news.release/cpi.t03.htm).

Appendix 5

# Incidental Costs

|  | March 2006 [1] | April 2006 [1] | Combined |
|---|---|---|---|
| Salaries | $   16,913 | $   7,084 | $   23,997 |
| Insurance-Workers' Comp. | - | 3,892 | 3,892 |
| Life Insurance | 1,657 | 1,657 | 3,314 |
| Payroll Tax | 1,834 | 699 | 2,533 |
| Training | - | 70 | 70 |
| Fuel and Oil | 7,782 | 5,397 | 13,179 |
| Repairs | 8,270 | 3,052 | 11,322 |
| Equipment Rental | 2,044 | 7,952 | 9,996 |
| Insurance | 1,517 | 1,822 | 3,339 |
| Supplies | 395 | 1,555 | 1,950 |
| Small Tools | 429 | 64 | 493 |
| Miscellaneous Expenses | 74 | 64 | 138 |
| Utilities | 512 | 607 | 1,119 |
|  | $   41,427 | $   33,915 |  |
| Incidental Costs |  |  | $   75,342 |

[1] Source: Johnco Materials, Inc. Statements of Operations for March 2006 and April 2006.

**Resume of J. Lester Alexander, III**                                          Appendix 6

## Professional Experience

Mr. Alexander is co-founder and the Managing Principal of Accounting Economics & Appraisal Group. He is a former partner of PricewaterhouseCoopers LLP and former southeastern practice leader of one of its legacy firm's consulting practices. Mr. Alexander has practiced for more than twenty-eight years performing audit, tax and consulting services. In recent years Mr. Alexander has concentrated his practice in the areas of fraud investigation, forensic accounting and valuation consulting services. Mr. Alexander holds a Bachelor of Science in Accounting from the University of Alabama and is a Certified Public Accountant and a Certified Fraud Examiner.

Mr. Alexander has provided services and, from time to time, expert testimony in various courts and in situations involving alternative dispute resolution. He has provided services in connection with contract disputes, security issues, insurance coverage issues, non-compete agreements, lost profits, business valuation and various other matters. He has testified in connection with class action certification hearings and class action fairness hearings. Mr. Alexander's experience includes testimony about customary practices and standards of care in auditing, operating and controlling business activities. Mr. Alexander has concentrated experience in a variety of industries including real estate, contracting, manufacturing, insurance, and healthcare.

He is experienced in the areas of business valuation, acquisition due diligence, investment advisory, tax advisory and cost accounting advisory services. He has evaluated the value of ownership interests in businesses in connection with acquisitions, disposals and disputes. He has performed suitability studies in connection with investment transactions in a wide range of financial instruments. In addition, he has performed incremental cost studies, contribution margin studies and other applications of cost accounting for clients in connection with new products, acquisitions, patent valuations and evaluation of trademarks. This experience includes making projections of incremental revenues and costs in connection with profitability analysis of proposed business ventures, new products and other profitability analysis for companies.

Throughout his career Mr. Alexander has advised governing bodies, committees and members on their role in overseeing the activities of companies and senior management. His clients have included publicly-traded companies, privately-held companies, governmental entities and tax-exempt companies. He has advised governing bodies overseeing companies in the start-up/growth, mature and restructuring phases of operational development. He has performed these services for governing bodies overseeing companies operating in the insurance, reinsurance, manufacturing, healthcare, technology, financial services, real estate, contracting, and retail industries.

Mr. Alexander has performed determinations of solvency; investigated potentially fraudulent transfers made by debtors; analyzed preferential payments to creditors; analyzed the course of dealings between debtor/creditor; and valued the consideration received when a debtor transfers assets. Mr. Alexander has testified in court as an expert witness concerning solvency, fraudulent transfers, preference payments, ordinary course of business, reasonably equivalent value, cash/collateral tracing, lost profits, business valuation and records reconstruction.

Further, Mr. Alexander has been appointed Trustee of both Chapter 11 and Chapter 7 Bankruptcy Estates, where he pursued recoveries (including adversary proceedings in Federal and State courts), made solvency determinations and performed the routine duties of both a Chapter 11 and Chapter 7 Bankruptcy Trustee. Creditors and Trustees have engaged Mr. Alexander to investigate insider transactions, value businesses and to evaluate loan collateral. Mr. Alexander has served as a lead advisor for various financial institutions in connection with their underwriting and credit/investment evaluation activities. In addition, Mr. Alexander has conducted auctions and assisted others in evaluating competitive bids received in auction.

**Resume of J. Lester Alexander, III**                    Appendix 6

## Professional/Business/Community Affiliations

Lecturer on Documentation and Demonstration of Extra Work Costs on Construction Projects - 2006, Birmingham, Alabama

Lecturer on Financial Damages - 2004 Cumberland Law School Continuing Education Seminar, Birmingham Alabama

Lecturer on Financial and Business Fraud Schemes - 2004 Corporate Counsel Seminar, Birmingham Alabama

Lecturer on Detecting Fraud Schemes - Fall Bankruptcy Seminar, 2003, Alabama Bar Continuing Education Series, Birmingham Alabama

Lecturer on Accountant's View of Sarbanes Oxley - 2003 Seminar, Alabama Bar Continuing Education Series, Birmingham Alabama

Lecturer on Online Fraud Prevention - 2002 Institute of Management Accountants, Birmingham, Alabama

Lecturer on Forensic Computer Investigation - 2001 Discovery Seminar, Alabama Bar Continuing Education Series, Birmingham , Alabama

Lecturer on Online Business & Financial Research Methods - 2001 Federation of Insurance & Corporate Counsel's Internet University, Napa, California

Lecturer on Identifying and Investigating Fraud - 2001 Institute of Management Accountants, Birmingham, Alabama

"Expert Witness Research Post Kumho Tire", presented at the American Bar Association's 2000 Annual Meeting, New York, New York

Lecturer on Online Discovery - Defense Research Institute's 2001 Annual Meeting of Young Lawyers, Miami, Florida

Lecturer on Online Expert Witness Research - 2001 Louisiana State Bar 17th Summer School for Lawyers, Destin, Florida

Panelist on Consumer Fraud Issues - Coopers & Lybrand 1997 National Banking Conference, Washington, DC

Former National Practice Leader - Coopers & Lybrand's Financial Services Consumer Dispute Resolution Practice

Former Regional Service Line Leader - Coopers & Lybrand's Litigation Consulting Services Southern Region

Former Practice Leader for Dispute Analysis and Investigations - PricewaterhouseCoopers LLP, Birmingham, Alabama

Former Member - Banking and Insurance Industry Groups - PricewaterhouseCoopers LLP

American Institute of Certified Public Accountants

Alabama Society of Certified Public Accountants

Florida Institute of Certified Public Accountants

Association of Certified Fraud Examiners

Associate Member-American Bar Association

Past Regional Director - Exchange Club of Alabama, Past President, Secretary, Director and Treasurer - Birmingham Breakfast Exchange Club

**Trial, Deposition & Arbitration Testimony in Last Four Years**          Appendix 7

Intergraph Corporation v. Bentley Software Systems, Inc (Circuit Court of Madison County, Alabama)

HydroPower Inc v. Eaton Manufacturing (Circuit Court of Jefferson County Alabama)

The Utilities Board of the City of Daphne v. City of Spanish Fort et al (Federal District Court, Southern District of Alabama)

Compass Bank v. Blitz Media, Inc., et al. (United States District Court, Northern District of Alabama, Southern Division)

Steward Machine v. White Oak, et al. (United States District Court, Connecticut)

Refrigerated Construction Services v. Coldmatic Building Systems, Inc, et al (United States District Court, Northern District of Alabama, Southern Division)

ABB Automation, Inc. v. DeVries, et al. (Circuit Court of Jefferson County)

Proliance, Inc. v. City of Huntsville (Circuit Court of Madison County, Alabama)

Steve Jamison, et al. v. Kerr-McGee Corporation, et al. (State Court, Mississippi)

Mason Dillard et al v Bellsouth Advertising et al (Circuit Court of Jefferson County, Alabama)

Terry Manufacturing Co., Inc. v. The Peoples Bank et al. (United States Bankruptcy Court, Middle District, Alabama)

Terry Manufacturing Co., Inc. v. Bonifay Manufacturing Inc. et al. (United States Bankruptcy Court, Middle District, Alabama)

Terry Manufacturing Co., Inc. v. HLC Industries (United States Bankruptcy Court, Middle District, Alabama)

Terry Manufacturing Co., Inc. v. N.D. Horton et al (United States Bankruptcy Court, Middle District, Alabama)

Terry Manufacturing Co., Inc. v. Albright, et al (United States Bankruptcy Court, Middle District, Alabama)

Pemco World Air Services, Inc v. GE Capital Aviation Services, Inc (Circuit Court of Dale County, Alabama

Terry Manufacturing Co., Inc. v. Delong & Caldwell (United States Bankruptcy Court, Middle District, Alabama)

Terry Manufacturing Co., Inc. v. J Martin & Associates (United States Bankruptcy Court, Middle District, Alabama)

AHAT, et al v. Gen Re, et. al. (Circuit Court of Montgomery County, Alabama).

Amason and Associates, Inc.  v Silver Beach Condominium Owners Association, et. al (Circuit Court of Baldwin County, Alabama)

Campbell & Sons Oil Co. Inc, et al v. Merrill Lynch Business Services, Inc, et. al. (Circuit Court of Madison County, Alabama)

**List of Information Considered**                                    Appendix 8

Complaint and relevant pleadings.

Depositions of Ben Johnston, Presley Morgan ("Pep") Johnston, and Clatus Junkin.

Supply agreement dated April 16, 2004 between Johnco Materials, Inc. and Conrad Yelvington Distributors, Inc.

Various documents regarding and/or related to the Supply Agreement with Conrad Yelvington Distributors, Inc.

Johnco Materials, Inc. monthly profit and loss statements for the period January 2006 through June 2007.

Johnco Materials, Inc. Schedule of Sales and Other Income for the period January 2004 through February 2006.

Johnco Materials, Inc. Invoice Registers for the period January 2006 through April 2006.

Johnco Materials, Inc. Sales and Sales Tax Registers for the period May 2006 through June 2007.

Johnco Materials, Inc. sales invoices, including invoices from Johnco Materials, Inc. to Conrad Yelvington Distributors, Inc.

Income tax returns of Johnco Materials, Inc. for the period January 1, 2005 through December 31, 2006.

Payroll records of Johnco Materials, Inc. for the period January 1, 2006 through December 31, 2006.

Johnco Materials, Inc. Schedule of White Hall Set Up Costs dated March 15, 2006.

Johnco Materials, Inc. Schedule of Loan Activity for loans identified as WABT 4471844, WABT 4471921, and WABT 4481194, for the period May 4, 2004 through February 27, 2006.

Johnco Materials, Inc. Schedule of Loan From Clatus Junkin for the period June 1, 2006 through July 31, 2007.

Bureau of Labor Statistics (www.bls.gov)