# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA

| | | |
|---|---|---|
| **JOHNCO MATERIALS, INC.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **Civil Action No.** |
| **vs.** | ) | **2:06cv993-ID** |
| | ) | |
| **CONRAD YELVINGTON** | ) | |
| **DISTRIBUTORS, INC.,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT

Comes now Johnco Materials, Inc., the plaintiff in the above-styled cause, and, pursuant to FED.R.CIV.P. 56, respectfully submits the following response in opposition to the motion of the defendant Conrad Yelvington Distributors, Inc. for partial summary judgment:

1. Evidence Filed In Opposition
2. Narrative Summary Of Facts In Dispute
3. Memorandum Of Law

## Evidence Filed In Opposition

The plaintiff submits the following items of evidence in opposition

to Summary Judgment, excerpts from which are attached as Exhibits to this

Opposition:

1.    Deposition of Gary Yelvington [Exhibit 1].[1]
2.    Deposition of Mark Klebe [Exhibit 2].
3.    Deposition of P. M. Johnston [Exhibit 3].
4.    Deposition of Ben Johnston [Exhibit 4].
5.    April 16, 2004 Supply Agreement [Exhibit 5].
6.    Deposition of Philip Holladay [Exhibit 6].
7.    Deposition of Clatus Junkin [Exhibit 7].

## Narrative Summary of Facts In Dispute

Conrad Yelvington Distributors, Inc. ("CYDI") is a Florida

corporation with its headquarters in Daytona Beach, Florida.  It has been

a distributor of construction materials, including crushed stone, aggregate,

---

[1]This Brief utilizes the convention of referring to items of evidence first by exhibit number, and then by page number, and then by line number.  Hence, a reference to page 20, lines 13-17 of Gary Yelvington's deposition would be annotated "[1:20, ll.13-17]".

sand, gravel, sod [1:8, ll.17-21] since 1960 [1:8, l.16].  Gary Yelvington is the president of CYDI and is in charge of all day-to-day business [1:10, ll.12-16].

In 2003 [3:19, ll.14-23], CYDI began negotiating with Johnco for Johnco to construct and operate a mining facility to supply CYDI with No. 67.  No. 67 gravel is gravel that is a certain grade, viz: 3/4" to 3/8" in size [1:39, ll.13-20].  Johnco[2] is an Alabama corporation, and was formed "for the purpose of purchasing a tract of property to establish a mining operation with [CYDI] to produce sand and gravel and sell it to them" [7:14, l.21 to 7:15, l.3; *see* 3:13, ll.9-11].  CYDI sought to purchase a supply of No. 67 gravel to re-sell to customers for use in ready-mix concrete [1:39, ll.13-25 to 1:40, ll.1-3; *see* 4:14, ll.1-23].

---

[2]Johnco was incorporated by P.M. Johnston, Ben Johnston and Clatus Junkin in 2003 [3:41, l.13 to 3:42, l.10; 3:43, ll.2-7].  The Johnstons and Junkin were shareholders in Johnco [7:14, ll.12-19].  In 2006, the Johnstons conveyed their interest in Johnco to Junkin [3:51, ll.8-14; 3:73, ll.3-10; 7:75, ll.11-20], with Ben remaining as general manager of the Johnco operation.

Mark Klebe, the Chief Financial Officer of CYDI [2:6, l.22], testified that he negotiated extensively with P. M. "Pep" Johnston of Johnco in 2003 to work out the terms of the Supply Agreement [2:8, ll.1-15; *see* 3:11, ll.4-7; 3:77, ll.15-22]. Klebe and Johnston exchanged at least a half dozen drafts before reaching final agreement [2:15, ll.24-25 to 2:16, ll.1-2]. Klebe stated that Johnco wanted CYDI to assist in construction of the Johnco facility, and that these were part of discussions [2:17, ll.8-13].

On or about April 16, 2004, CYDI entered into a Supply Agreement with Johnco Materials, Inc. ("Johnco"), to purchase No. 67 gravel from Johnco [1:9, ll.6-25 to 1:10, ll.1-2; 1:39, ll.13-16]. The Supply Agreement called for CYDI to take a minimum of 150,000 tons of No. 67 gravel per year a year [1:46, ll.16-25 to 1:47, ll.1-6]:

> After Seller commences mining and grading of sand and gravel, Seller shall sell and deliver to Buyer, No. 67 concrete gravel in minimum quantities of 150,000 tons annually for a price equal to Five and Twenty-Five One Hundredths Dollars

4

> ($5.25) per ton, F.O.B. Buyer's rail cars loaded on the rail
> siding on the Plant Site, on a weekly schedule (i.e.,
> approximately 5,200 tons per week).... The price per ton
> established herein for the Product shall remain fixed at $5.25
> per ton for gravel for the first twenty-four months (i.e., 2
> years) of this Agreement.  The price will increase by five
> percent (5%) at the beginning of year three, and two and one-
> half percent (2.5%) at the beginning of years four and five.

[Exhibit 5, p. 2, §3.1; *see* 1:110-11, ll.1-23].  Klebe testified that Johnston

always indicated that Johnco would like CYDI to take as much product as

CYDI could, but that CYDI "limited the amount that we would be able to

commit to" [2:38, ll.3-5].  Clatus Junkin testified that Johnco projected that

CYDI could take perhaps 200,000 to 250,000 tons annually under the

Supply Agreement [7:40, ll.18-23].

Despite limiting its obligations to take gravel, however, CYDI

required Johnco to give it a right of first refusal on all No. 67 gravel

produced by Johnco above that minimum [1:47, ll.3-10]:

5

> Seller hereby grants Buyer a right of first refusal to purchase, at the price established in Section 3.1 above, any and all No. 67 concrete gravel produced by Seller in excess of the quantity required to meet Buyer's tonnage commitment. Upon notification from Seller of the availability of excess Product, Buyer will have fifteen (15) days to respond with its intent to exercise or waive this right of first refusal.

[Exhibit 5, p. 2, §3.3; *see* 1:55, ll.1-17].   The right of first refusal was a last-minute term negotiated into the contract, and Johnco was reluctant to grant the right of first refusal [3:78, ll.10-22], but  Gary Yelvington told Johnco that CYDI wished to buy more gravel than the 150,000 tons stated as a contractual minimum [1:55, ll.2-21].  Johnco would have been a viable concern on the basis of the sale of the 150,000 tons per year contract, even without the sale of other product [3:61, l.8 to 3:62, l.12; 7:67, l.19 to 7:68, l.6].

Additionally, the gravel was to be shipped by rail in "unit train" quantities, meaning that on a given run Johnco would be loading a 52-car train [1:67, ll.23-25 to 1:68, ll.1-2].  The Supply Agreement was made

expressly contingent upon Johnco's "ability to construct, or obtain rights to, sufficient rail siding to load/handle a minimum of fifty-two (52) open, or covered, hopper railcars on a regular shipment schedule" [Exhibit 5, p. 2, §2.1]. Gary Yelvington explained that this provision was required by CYDI because this was a "long-term supply agreement," and CYDI wanted to ensure that Johnco had the infrastructure for immediate loading on regular shipment schedule [1:108, ll.17-25 to 1:109, ll.1-9].

On the basis of the Supply Agreement, Johnco purchased real property in Lowndes County, Alabama ("Whitehall"), closing on the property in August 2004 [3:86, ll.20-21]. Also on the basis of the Supply Agreement, Johnco constructed a loop railroad track at the Whitehall facility [3:45, ll.1 to 3:48, ll.23]. Gary Yelvington testified that CYDI understood Johnco was going to be required to build the Whitehall facility to go forward in order to supply CYDI [1:118-19, l.18 to 1:19, 1.5]. The capitalization of Johnco's construction and start-up based on the Supply Agreement was $3.2 million [3:66, ll.14-19].

Johnco commenced mining and grading at Whitehall, beginning to produce by fall 2005 [3:86, l.22 to 3:87, l.8; 3:87, l.21 to 3:88, l.6] and becoming fully operational by February 2006 [4:47, ll.21-23] on a regular, consistent basis [4:48, ll.6-8]. By February 6, 2006, Johnco had run and submitted samples to CYDI [1:70, ll.20-25 to 1:71, ll.22-25]. Gary Yelvington admitted that this means that Johnco was either mining or was far enough along to have a representative sample [1:72, ll.20-23].[3] Pep Johnston stated that at the point he sold his interest in late 2005 or early 2006 [3:108, ll.1-3] there was accumulated material to make shipments [3:75, ll.3-5]; he described it as "a substantial quantity of gravel" [3:107, ll.21-23] and "substantially more than" 5,200 tons [3:108, ll.4-8]. He stated that Johnco "certainly should have been able to" produce 5,200 tons "every week" [3:120, ll.12-19].

---

[3]Philip Holladay of CYDI stated that when he visited the site in January 2006 he did not believe there was enough No. 67 gravel stockpiled to load a unit train. He did not visit the Johnco facility between January 2006 and late April 2006, when he estimated approximately 6,000 tons of No. 67 stockpiled [6:33, l.24 to 6:34, l.13; 6:35, ll.1-9; 6:56, ll.1-16].

Ben Johnston testified that the Johnco mine and plant was capable of producing approximately 120 tons of No. 67 gravel an hour, and approximately 20 tons of oversize gravel an hour [4:48, ll. 13-17]. He estimated that after the plant became operational it was capable of easily producing 300,000 tons of No. 67 annually [4:49, ll.8-18]. Ben stated that the Johnco facility ran continuously from that point until it shut down in November 2006 [4:63, ll.4-13].

The mining of No. 67 gravel necessitates by-product in the nature of sand and oversize gravel. Ben Johnston, general manager of Johnco, testified that production at Whitehall produces a mix that is 45 percent gravel, 55 percent sand, and 3 percent oversize gravel [4:14; 4:39, ll.16-20; 4:114, ll.7-12]. He testified that 80 to 85 percent of the gravel production would be No. 67 gravel [4:39, ll.16-20]. Pep Johnston testified to similar figures, stating that the initial screen analysis showed 47 percent gravel, 53 percent sand, with 40 percent of the total production being No. 67 gravel [3:98, ll.12-21; 3:136, ll.6-14].

CYDI knew that the sand and oversize gravel is a necessary and sizeable byproduct of gravel production, and that sand is a salable commodity [1:120, ll. 2-3; 1:149, l.25 to 1:150, ll.1-5]. While CYDI overestimates the amount of sand at 60 to 70 percent of Johnco's production [1:52, ll.5-7], it was aware that Johnco had a significant supply of sand for possible sale [1:52, l.5 to 1:53, l.10], and that Johnco intended to sell the sand to market [1:119, ll. 16-25].

In this connection, CYDI looked at different avenues for distribution of Johnco's sand production, exploring moving the sand to Jacksonville [1:52, ll.8-9, 18-19] and Atlanta [1:147, ll.4-12]. Yelvington testified that he got in touch with Hanson in Atlanta, and that Hanson sent someone to Whitehall to look over the sand [1:147, ll.4-12], but Hanson ultimately declined to purchase the sand [1:149, ll.5-9]. Pep Johnston testified that CYDI offered to help find a buyer for Johnco's sand but did not do so [3:118, ll.3-10]. He stated that CYDI considered opening several

10

distribution centers around Atlanta, which is a substantial market for sand [3:118, l.17 to 3:119, l.4].

Morever, CYDI discussed purchasing the sand directly from Johnco [3:60, ll.9-12; 3:116, ll.3-6; 3:144, ll.12-20]. There were discussions about CYDI buying the sand at $2.50 per ton [1:53, ll.12-13]. Ultimately, CYDI determined that it couldn't assist Johnco with purchase of the sand [1:38, ll.2-4; 1:66, ll.9-11]. It knew that Johnco was talking with Lafarge and others about sale of the sand [1:120, ll. 5-8; 1:138, ll.24-25 to 1:39, ll.1-2].

Ben Johnston testified that Johnco's business plan under the Supply Agreement with respect to the sand produced during mining operations was to sell it [4:41, l.14; 4:118, ll.16-19]. Johnco planned to put the sand in specifications and sell it [3:98, l.22 to 3:99, l.2]. Junkin testified that when Johnco started the operation there was hope that the sand would sell [7:65, l.6-9].

11

Pep Johnston testified there were several possibilities for sale of the sand from the conception of the company, although no formal market existed at that time [3:27, ll.3-5]. In this regard, Johnston referenced a new block plant that had opened on the west side of Montgomery [3:27, ll.10-12; 3:59, ll.8-15], and interest shown by a ready-mix concrete plant on the west side of Montgomery in sand and gravel [3:27, ll.14-17]. These possible markets for sand existed from the time that the Johnstons conceived Johnco and began seeking financing [3:27, ll.21-23].

The major overture for sale of the sand came in 2005 with exploration of sale possibilities to Lafarge, an Atlanta-based ready-mix company [4:40, ll.1-3]. Lafarge sent a buyer to Whitehall to inquire as to sale of sand [3:26, ll.17-20; 3:59, ll.16-18; see 1:53, ll.5-7]. Lafarge discussed quantities of perhaps 200,000 tons per year [3:140, ll.3-17]. Johnco gave samples and offered a price [3:26, ll.20-21]. The Lafarge deal never materialized [3:26, ll.22] due to freight rates [[3:61, ll.4-7] and the

fact that Lafarge had stocked up on sand [3:143, ll.7-22]. Johnco also talked with USA Materials in Dothan about sand or gravel [3:60, ll.1-8].

Both Pep and Ben Johnston denied telling CYDI that Johnco would have to shut down operation if the sand could not be sold [3:100, ll.16-20; 3:143, l.23 to 3:144, l.11; 4:42, ll.20 to 4:43, ll.5].

Another necessary byproduct of gravel production known to CYDI was Johnco's production of oversize, or metallurgic, gravel. Oversize gravel or metallurgical gravel is gravel from an inch in size up, typically up to about three inches [3:57, ll.20-23]. About 15 percent of the gravel at Johnco was oversize [3:25, ll.21-23].

The Johnstons testified that Johnco sold some of its oversize gravel [3:101, ll.11-23; 4:42, l.16]. Pep Johnston talked to several metallurgical people about the sale of oversize, or metallurgical, gravel [3:57, ll.11-16], including a smelter at Selma, and a smelter in Ohio who expressed interest

[3:52, ll.5-17; 3:58, ll.8-23].  Johnston said that a rise in diesel costs made shipping to the Ohio smelter unfeasible [3:52, ll.12-16].

Gary Yelvington admitted that CYDI knew Johnco was intending to sell its oversize gravel to the metallurgic and oversize market [1:119, ll.16-25].  Johnco asked CYDI for assistance in transporting oversize gravel to metallurgic purchasers [1:119, ll.18-20], and Yelvington stated that it "would have been a high priority" for Johnco to establish that market [1:120, ll. 2-3].  Moreover, CYDI purchased a trainload of No. 4 gravel from Johnco entirely apart from the Supply Agreement [1:38, ll.5-7], stating that it did so at a fair price and that it made a profit out of the purchase [1:39, ll.1-7].

Despite Johnco's earlier commencement of mining and production in February 2006, CYDI did not order its first train load of gravel until May 11, 2006 [1:65, ll.7-12; 3:50, ll.14-17; 3:102, ll.2-8; 4:87, ll.10-15; 7:121, l.23 to 7:122, l.5].  At that time, Johnco had stockpiled three full

14

train loads of gravel at the rail loading site [4:87, ll.16-23; 4:91, ll.18 to

4:92, ll.13]. Ben Johnston testified that after the CYDI train was loaded,

there were two more train loads remaining stockpiled [4:92, l.20 to 4:93,

l.3].

Including the initial load on May 11, 2006, CYDI ordered only five-

and-a half trainloads of No. 67 gravel, amounting to a total of only 32,000

tons of gravel, in the first nine months of production. CYDI ordered trains

on the following dates:

1.   May 11, 2006: No. 67 gravel [1:98, ll.1-4; *see* Plaintiff's Exhibit 3 to deposition of Gary Yelvington; 1:126, ll. 14-21].

2.   June 27, 2006: Only 27 cars of No. 67 gravel [1:99, ll. 1-8; 1:130, l.25 to 1:131, ll.1-8; 1:133, ll.7-21], or a half-load, was ordered; most of the load was oversize gravel outside the Supply Agreement [1:98, ll.19-25; 1:133, ll.7-21]. *See* Plaintiff's Exhibit 4 to Deposition of Gary Yelvington.

3.   August 8, 2006: No. 67 gravel [1:99, ll.15-24 to 1:100, ll. 1-5]. *See* Plaintiff's Exhibit 5 to Deposition of Gary Yelvington.

15

4.    August 21, 2006: No. 67 gravel [1:100, ll.6-16].
      *See* Plaintiff's Exhibit 6 to Deposition of Gary
      Yelvington.

5.    September 7, 2006:  52 cars of No. 67 gravel
      [1:100, ll. 23-25 to 1:101, ll.1-8].  *See* Plaintiff's
      Exhibit 7 to Deposition of Gary Yelvington.

6.    September 25, 2006: No. 67 gravel [1:101, ll.9-
      16].  *See* Plaintiff's Exhibit 8 to Deposition of
      Gary Yelvington.  This was the last shipment of
      gravel taken by CYDI [1:81, ll.22-25; 1:124,
      ll.16-23].

Ben Johnson testified that from the time Johnco was operational in
February 2006, CYDI took only one complete trainload load of No. 67
gravel in the next six months [4:94, ll.3-8].  Yelvington admitted that, as
of November 10, 2006 — seven months after the first train load was taken,
and nine months after commencement of mining and grading — CYDI had
taken only 32,000 tons of its 150,000 tons annual requirement [1:84, ll.7-
13].  Ben Johnston testified that Johnco had No. 67 gravel stockpiled on
the rail loading site, waiting for CYDI to take delivery [4:63, l. 8 to 4:64,
l.11].

CYDI admits that Johnco was a typical new business, in that it was slow or delayed in getting started [1:31, ll.18-22], with typical start up issues [1:115, ll.21-24].  CYDI defends its irregular taking of gravel by stating that it "intended" to take gravel on a regular schedule [1:47, ll.19-22], that it was interested in seeing that Johnco maintain consistency of production [1:69, ll.4-6], and that it wanted to make sure the railroad didn't "lose confidence" [1:45, ll.15-18].   Gary Yelvington testified that he believed CYDI was "getting in the groove" of taking gravel by August 2006 [1:48, ll.1-3].

Johnco attempted on numerous occasions to arrange for more shipment of gravel to CYDI:

- In early 2006 [4:81, l.12], Ben Johnston told Philip Holladay on at least three or four occasions [4:81, l. 20 to 4:82, l.1] that Johnco "needed to get some gravel moved" [4:81, ll. 2-10].

- In late 2005, Pep Johnston told Gary Yelvington and Philip Holladay that Johnco "really need[s] to ship some material" [3:112, l.22 to 3:113, l.10], to which Yelvington replied he would "think about it" [3:113, l.10].

- After Junkin assumed the Johnston's interest in Johnco in May 2006 [7:111, ll.1-5], he determined to "raise hell until [CYDI] bought some gravel" [7:79, ll.9-14]. Junkin met with Gary Yelvington and Philip Holladay in Calera, Alabama and told them that CYDI had to take more gravel [7:79, l.14 to 7:80, l.14; 7:106, l5 to 7:107, l.8; *see* 1:50, ll.5-18]. Junkin testified that Yelvington and Holladay put him off with a series of excuses [7:81, l.3 to 7:84, l.5].

- Early in the fall, Junkin flew to Daytona to meet with Yelvington and Klebe [7:93, ll.7-22]. Junkin stated that he told Yelvington, "You've got to do something. You haven't

18

taken the gravel that you agreed to under the contract" [7:94, ll.5-9]. Klebe testified that Junkin discussed needing CYDI "to try to see if we could move more product," meaning No. 67 gravel [2:23, ll.15-19].

On October 19, 2006, Johnco notified CYDI that CYDI was in breach of the Supply Agreement, and that Johnco was forced to terminate production. Junkin testified that Johnco ceased operation because CYDI did not come and buy the gravel it had contracted to buy [7:143, ll.1-5]. Johnco operated through the first of November 2006 [4:17, ll.17-20; 4:63, ll.1-3; 7:112, ll.1-19; 7:142, ll.3-10], and then ceased mining operations until March 2007 [7:113, ll.20-21]. Johnco did not produce No. 67 after the shut down in November [4:17, ll.1-10]. Ben Johnston stated that at the time Johnco shut down, it had up to 10,000 tons of No. 67 gravel stockpiled on the rail loading site [4:70, ll.3-6].

J. Lester Alexander, an economist retained by Johnco, states that he projects CYDI's breach of contract over the life of the Supply Agreement will cost Johnco $1,242,700 in lost revenues for sale of sand, and $1,853,000 in lost revenue for the sale of oversize gravel [Doc. 33-5, p.13].

## **Memorandum of Law**

## I.    **STANDARD OF REVIEW**

Summary judgment is proper only when there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. Peterson v. Baker, — F.3d —, 2007 WL 3104915 (11th Cir. 2007)

Under FED.R.CIV.P. 56, this Court must construe the record before it, including all evidence and factual inferences, in the light most favorable to Johnco as the nonmoving party. *See* Skop v. City of Atlanta, Georgia, 485 F.3d 1130, 1136 (11th Cir.2007).  The evidence presented by Johnco

must be taken as true, and all justifiable inferences must be drawn in its favor.

## II.    PARTIAL SUMMARY JUDGMENT SHOULD BE DENIED BECAUSE THERE IS AT LEAST A DISPUTE OF FACT AS TO WHETHER JOHNCO IS ENTITLED TO RECOVER CONSEQUENTIAL DAMAGES.

CYDI first argues that Johnco is not entitled to recover certain consequential damages in the nature of "expectation" damages for sale of sand and oversize gravel.  Because there is a dispute of material fact on this question, partial summary judgment is precluded.

### A.    Damages Under The Uniform Commercial Code

CYDI's breach by failing to take timely installment shipments of No. 67 gravel  according to a "regular schedule" is a breach to the whole

21

contract. *Ala. Code* § 7-2-612 ("'Installment Contract'; Breach") [4] states

in pertinent part:

> (1) An "installment contract" is one which requires or
> authorizes the delivery of goods in separate lots to be
> separately accepted, even though the contract contains a
> clause "each delivery is a separate contract" or its equivalent.
>
> * * * *
>
> (3) Whenever nonconformity or default with respect to one or
> more installments substantially impairs the value of the whole
> contract there is a breach of the whole....

Because CYDI's breach is as to the contract as a whole, Johnco is entitled

(among other remedies) to recover damages for loss of its profit for

CYDI's nonacceptance under *Ala. Code* §7-2-708, together with incidental

damages. *See Ala. Code* § 7-2-703(e).

---

[4] Alabama law governs this action. Section 9 of the Supply Agreement
("Applicable Law") states: "This Agreement shall be construed, interpreted, and
enforced in accordance with and governed by the laws of the State of Alabama,
without giving effect to such state's conflict of laws principles. *See* Exhibit 5, p.3,
§9.

Section 7-2-708(2) states:

If the measure of damages provided in subsection (1) is inadequate to put the seller in as good a position as performance would have done then the measure of damages is the profit (including reasonable overhead) which the seller would have made from full performance by the buyer, together with any incidental damages provided in this article (Section 7-2-710), due allowance for costs reasonably incurred and due credit for payments or proceeds of resale.

## B.    <u>Consequential Damages</u>

In addition to profit damages under §7-2-708, Alabama common law permits recovery of consequential damages (as CYDI acknowledges in its brief).

Johnco is entitled to consequential damages for prospective profits on the sale of sand and oversize gravel that it was caused to lose by reason of CYDI's breach. When a contract does not fix the amount of damages in the case of its breach, the damages that accrue by reason of the breach are

23

those that are the natural and proximate consequences of the breach and reasonably have been contemplated by the parties as a probable result of the breach. <u>Alford v. Jones</u>, 531 So. 2d 659 (Ala. 1988); <u>Shiver v. Barrow</u>, 45 Ala. App. 495, 232 So. 2d 676 (Civ. App. 1970). Consequential damages thus are those damages which are the natural and necessary consequence of the breach, and which flow directly and naturally and in the due course of things from the breach, and are within the contemplation of the parties. <u>Alabama Chemical Co. v. Geiss</u>, 143 Ala. 591, 39 So. 255, 256 (Ala. 1905).

CYDI admits in its motion that Alabama's Uniform Commercial Code does not absolutely prohibit Johnco's right to recover consequential damages in this case, as Alabama's common law permits the recovery of consequential damages in cases involving commercial code sales. Under *Ala. Code* § 7-2-719(1)(b), remedies at law are cumulative unless expressly limited in the contract. *See* <u>Gaylord v. Lawler Mobile Homes, Inc.</u>, 477

So. 2d 382 (Ala. 1985).  The cumulative nature of available remedies includes consequential damages.

Instead, CYDI argues only that Johnco is not entitled to "expectation damages" for sale of sand and oversize gravel because (it contends) the sole expectation the parties had in this case involved the sale of No. 67 gravel.  CYDI maintains that because it was obligated to purchase only No. 67 gravel under the Supply Agreement, Johnco has no expectation of sale or profit of such by-products as sand or oversize or metallurgical gravel, and cannot seek recovery for these items due to CYDI's breach.

It is clear from the evidence before that both CYDI and Johnco expected sale of by-product would be a significant aspect of Johnco's performance under the Supply Agreement.  As a result, a factual question is presented as to whether such damages flow directly and naturally and in due course from CYDI's breach, and whether they were within the contemplation of the parties.

25

The evidence before the Court is that the parties entered a contract whereby Johnco was to construct a sand and gravel mining facility for the purpose of supplying No. 67 gravel to CYDI.  It is impossible to mine No. 67 gravel without producing by-product in the nature of sand and oversize gravel.  At Whitehall, the evidence is that a mix of 45 percent gravel, 55 percent sand, and 3 percent oversize gravel was produced [4:14, ll.1-5; 4:39, ll.16-20; 4:114, ll.7-12; *see also* 3:98, ll.12-21; 3:136, ll.6-14].

The necessity of this by-product production was certainly known to CYDI and within its contemplation.  CYDI was aware that Johnco had a significant supply of sand for possible sale [1:52, ll.8-25 to 1:53, ll.1-5], and that Johnco intended to sell the sand to market [1:119, ll.11-15; *see also* 1:120, ll.2-8; 1:149, l.23 to 1:150, l.5].   CYDI even testified that it pegged the amount of necessary sand production at 60 to 70 percent of Johnco's total production [1:52, ll.5-7].

Not only was CYDI aware of the necessity of Johnco's producing sand in the process of producing No. 67 gravel, but it is also aware that sand is a salable commodity and not merely waste product.

All three of Johnco's principals testified that as to the fact that the plan was to sell sand as markets for sale developed. Ben Johnston testified that Johnco's business plan under the Supply Agreement with respect to the sand produced during mining operations was to sell it [4:41, l.14; 4:118, ll.16-19]. Pep Johnston testified that Johnco planned to put the sand in specification and sell it [3:98, l.22 to 3:99, l.2]. Likewise, Clatus Junkin testified that when Johnco started the operation there was hope that the sand would sell [7:65, ll.6-9].

Pep Johnston identified several possibilities for sale of the sand dating from the conception of the company [3:27, ll.3-5], testifying to a new block plant in west Montgomery [3:27, ll.10-12; 3:59, ll.8-15], a ready-mix concrete plant in west Montgomery [3:27, ll.14-17], and USA

Materials in Dothan [3:60, ll.1-8]. He and Ben also testified as to extensive negotiations with Atlanta-based ready-mix company Lafarge over the sale of 200,000 tons of sand annually [3:26, ll.17-21; 3:59, ll.16-18; 3:61, ll.4-7; 3:140, ll.3-17; 3:143, ll.7-22; 4:40, ll.1-3].

CYDI was aware of the salable nature of the sand produced in conjunction with the No. 67 gravel. CYDI in fact discussed purchasing the sand directly from Johnco [3:60, ll.9-12; 3:116, ll.3-6; 3:144, ll.12-20], with some evidence that a figure of $2.50 per ton was discussed [1:53, ll.18-23]. While CYDI ultimately determined that it would not purchase the sand from Johnco [1:38, ll.2-7], it knew not only knew that Johnco was talking with Lafarge and others about sale of the sand [1:120, ll.4-8; 1:138, l.24 to 1:139, l.1] but actively investigated other markets for sale of the sand [3:118, ll.3-10]. CYDI explored moving the sand to Jacksonville and Atlanta [3:118, l.17 to 3:119, l.4; 1:52, ll.8-14; 1:66, ll.8-9]. It contacted Atlanta-based Hanson to send someone to look into the possibility of purchasing the sand [1:147, ll.4-25; 1:149, ll.1-6].

The same is true of the production of oversize, or metallurgic, gravel. This gravel, which made up about 15 percent of the gravel production at Johnco was oversize [3:25, ll.21-23], is a necessary concomitant of production of No. 67 gravel.

There was testimony that Johnco sold some of its oversize gravel [3:101, ll.11-23; 4:42, l.16]. Pep Johnston contacted several metallurgical outlets regarding sale of the oversize gravel, including smelters in Selma, Alabama and Ohio [3:52, ll.5-17; 3:58, ll.8-23].

Again, the undisputed testimony is that CYDI knew that Johnco intended to sell the oversize gravel. Gary Yelvington testified he knew CYDI knew Johnco intended to sell oversize gravel to the metallurgic and oversize market [1:119, ll.8-15], and stated that it "would have been a high priority" for Johnco to establish the metallurgic market for oversize gravel [1:120, ll.2-3]. Moreover, Johnco asked CYDI to assist in transport of

oversize gravel [1:119, ll.18-20].   Finally, CYDI purchased a trainload of

No. 4 gravel from Johnco separate from the Supply Agreement [1:38, ll.9-

18; 1:39, ll.1-14].

The salable nature of the commodity of oversize gravel was well

known to CYDI.  Indeed, the *necessity* of establishing a viable market for

byproducts of sand and oversize gravel is well known to CYDI.

Yelvington testified that it would be "difficult to be successful" in the sand

and gravel business one doesn't sell sand, as (he contends) sand is 60-65

percent of what is produced [1:149, l.25 to 1:150, ll.1-5].

Consequential damages must be "the natural and proximate

consequences of the breach and such as may *reasonably* be supposed to

have been within the contemplation of the parties at the time the contract

was made."  Aldridge v. Dolbeer, 567 So. 2d 1267, 1269-70 (Ala.1990).

*See also* HealthSouth Rehabilitation Corp. v. Falcon Management Co., 799

So. 2d 177, 183 (Ala. 2001) (tenant could recover consequential damages

for accelerated improvements rent).   What is "reasonable" is ordinarily a question of fact for the trier of fact, <u>Al Sarena Mines, Inc. v. SouthTrust Bank of Mobile</u>,  548 So. 2d 1356, 9 U.C.C. Rep. Serv.2d 1290 (Ala. 1989), and precludes summary judgment.

Here, there is undisputed evidence that CYDI knew both of the necessity of the byproduct production of sand and oversize gravel in conjunction with the No. 67 gravel, and of the commercial desirability of establishing a market for sale of these products.  Indeed, there is evidence that CYDI felt the sale of these byproducts to be essential to maintaining the commercial viability of the enterprise.  As such, at the very minimum a factual question is presented as to whether the sale of the sand and oversize gravel was within the contemplation of the parties.

CYDI argues that Johnco's damages in this regard are not "capable of ascertainment with reasonable, or sufficient certainty," and that there is no "basis on which a reasonable estimate of the amount of the [damages]

can be made." Motion for Partial Summary Judgment, p. 6, quoting

Goolesby v. Koch Farms, LLC, 955 So. 2d 422, 428 (Ala. 2006).

CYDI's assertion is belied by is own reference to the Summary

Report of Accounting, Economics & Appraisal Group, LLC by J. Lester

Alexander, which report is attached as an exhibit to CYDI's Motion for

Partial Summary Judgment [Doc. 33-5, Exhibit 4 to Motion for Partial

Summary Judgment], and which Johnco adopts in opposition to CYDI's

Motion.

Alexander determined that, based on the quantities and prices stated

in the Supply Agreement, Johnco reasonably stood to lose a profit of $3.1

million in lost sales of oversize gravel and sand [Doc. 33-5, p. 9].

Alexander based this opinion on anticipated quantities of oversize gravel

(218,000 cumulative tons over the life of the Supply Agreement) and sand

(731,000 cumulative tons) "calculated based on the historical relationship

between tons of No. 67 Concrete Gravel, #4 Oversize Gravel, and Sand

sold during the period  January 2006 through June 2007" [Doc. 33-5, p.

13].  Alexander likewise calculated a per ton rate of $8.50 per ton for sale

of the oversize gravel  based on actual sales price of oversize gravel to

CYDI in June 2006 and for sales to Maddox Stone & Gravel in 2006, and

$1.70 per ton of sand "based on average price per ton for deliveries during

the period January 2006 through June 2007, based on detailed analysis of

sales invoices" [Doc. 33-5, p. 13].

CYDI presents nothing to contradict the reasonableness of

Alexander's expert opinion or assumptions.  At the very least, a genuine

dispute of fact exists as to whether the sale of sand and oversize gravel was

reasonably within the contemplation of the parties, and whether there is a

basis on which a reasonable estimate of the amount of the damages can be

made.  Partial Summary judgment is inappropriate as to "expectation

damages."

**III.    PARTIAL SUMMARY JUDGMENT SHOULD BE DENIED BECAUSE THERE IS AT LEAST A DISPUTE OF FACT AS TO WHETHER JOHNCO IS ENTITLED TO RECOVER RELIANCE DAMAGES.**

Alternatively, and in lieu of "expectation damages," Johnco may elect at trial to pursue "reliance damages."

In <u>Goolesby v. Koch Farms, LLC</u>, 955 So. 2d 422 (Ala. 2006), the Alabama Supreme Court for the first time differentiated between "expectation damages" and "reliance damages."   The plaintiffs had built some chicken houses in order to comply with a supply agreement with the defendant.   At trial, plaintiffs contended they were entitled to both traditional compensatory damages for benefit of the bargain, and for damages for expenses paid toward construction of the chicken houses and related items.   Rejecting the recovery of both elements of damages, the Court stated:

34

The Goolesbys also argue that they were entitled to recover damages for their expenses in preparing to perform under the contract-including the cost of purchasing additional land, building the henhouses, and hiring additional workers. Such damages, referred to as "reliance damages," are generally awarded in lieu of, not in addition to, expectation damages. If allowed to recover both the lost contract income and reliance damages, the Goolesbys would be placed in a better economic position than if there had been full performance of the grower contract. This is not the purpose of contract damages, and the trial court was correct in excluding reliance damages from its calculations... "[T]he injured party is not to be put in a better position by a recovery of damages for the breach than he would have been in if there had been performance...."

*Id*. at 428-29 (citations omitted).  The <u>Goolesby</u> opinion is the only time the concepts of "expectation damages" and "reliance damages" make explicit appearance in Alabama jurisprudence.

The treatment of "reliance damages" in <u>Goolesby</u> is regrettably brief, and no real guidance is given by the Alabama court as to the precise contour of these damages, or when they might be permitted in lieu of "expectation damages."  It is apparent that Alabama law embraces the

35

recovery of "reliance damages" in the proper situation, and it is clear that the two types of damages are alternative, exclusive claims of damage and not cumulative, but it is not clear from <u>Goolesby</u> — or from any other authority cited by defendant, for that matter — when one type of damages is appropriate and when it is not. The law in this regard certainly is not so clear as to warrant summary judgment in this case, partial or otherwise, as to one claim of damages at the expense of the other.

Other authorities have grappled with the distinction between the two types of potential recovery. The *Restatement (Second) of Contracts*, for instance, speaks in terms of "expectation damages" and "reliance damages" as serving to protect one or more of the following interests of a promisee:

(a)     An "expectation interest," which is a litigant's interest in having the benefit of his bargain by being put in as good a position as he would have been in had the contract been performed, or

(b)     A "reliance interest," which is a litigant's interest in being reimbursed for loss caused by reliance on the

contract by being put in as good a position as he would
have been in had the contract not been made.[5]

In <u>Fishkin v. Susquehanna Partners, G.P.</u>, 2007 WL 560703 (E.D.

Pa. 2007), the District Court for the Eastern District of Pennsylvania

recently explained:

> Although expectation damages are the usual and preferred
> remedy for breach of contract, an injured party may
> alternatively seek reliance and restitution damages. Such
> damages are typically resorted to when "recovery based on
> traditional notions of expectation damages is clouded," as it
> is here, "because of the uncertainty in measuring the loss in
> value to the aggrieved contracting party." Reliance damages
> seek to put the injured party in the position that it would have
> had, if the contract had never been made and are usually
> measured by the expenditures made in performance of the
> contract. Restitution damages, in contrast, seek to prevent one
> party from being unjustly enriched and are measured by the
> benefit received by the party subject to restitution. Id. The
> purpose of restitution damages, like that of reliance damages,
> "is to return the plaintiff to the position it held before the
> parties' contract." 24 RICHARD A. LORD, *Williston on
> Contracts* § 64:2 (4th ed. 2006).

---

[5]The Restatement (Second) of Contracts also speaks in terms of a third type
of damages, that of "restitution damages," which protects a litigant's interest in
having restored to him any benefit that he has conferred on the other party.

*Id*. (citations omitted).  *See also* <u>Smith Transport, Inc. v. Truck and Bus</u>
<u>Wash, Inc</u>., 2007 WL 1228022 (W.D. Pa. 2007) (where recovery based on
traditional notions clouded because of uncertainty in measuring loss in
value, reliance damages return parties to the positions enjoyed prior to
contracting).

In this case, it is exceedingly likely that traditional compensatory
damages — what were labeled "expectation damages" by the <u>Goolesby</u>
court — are insufficiently certain to give Johnco true value and restore it
to the position it occupied pre-contract.[6]  It is clear, for instance, that
Johnco  purchased real property, purchased equipment, build a railroad
line, and constructed a mining facility and plant to supply CYDI.  It may
well be "expectation damages" based on the benefit of the bargain will be

---

[6]The election of "reliance damages" over "expectation damages" in the
proper situation accords with Alabama's Uniform Commercial Code.  *See Ala.*
*Code* § 7-2-701 ("Remedies for Breach of Collateral Contracts Not Impaired"),
which states: "Remedies for breach of any obligation or promise collateral or
ancillary to a contract for sale are not impaired by the provisions of this article."
There will always be cases, even in UCC sales cases, where damages based on
benefit of the bargain fails to protect the interests of the parties.

insufficiently certain of putting Johnco back in the position it occupied before CYDI's breach.

Johnco should be permitted in such instance to elect to proceed on "reliance damages" in lieu of "expectation damages" at trial.  In this light, the motion for partial summary judgment is an improper and premature attempt to force the plaintiff into an election.

## Conclusion

For the foregoing reasons, the defendant's Motion for Partial Summary Judgment is due to be DENIED, and this matter retained on the Court's calendar for trial of all issues and damages.

Respectfully submitted,


s/ H. Gregory Pearson
H. Gregory Pearson (ASB-4733-S81H)
Attorney For Plaintiff
email: greg@jphj.net


Charles E. Harrison (ASB-9408-N70C)
Attorney For Plaintiff
email: chuck@jphj.net

*OF COUNSEL:*

JUNKIN, PEARSON, HARRISON
    & JUNKIN, L.L.C.
601 Greensboro Avenue
Suite 600 Alston Place
Tuscaloosa, Alabama 35401
Telephone: (205) 366-0111
Telecopier: (205) 391-4780


## CERTIFICATE OF SERVICE

Pursuant to FED.R.CIV.P. 5(e) and the Administrative Procedures For Filing, Signing, And Verifying Pleadings and Documents In The District Court Under the Case Management/Electronic Case Files (CM/ECF) System In Civil Cases [General Order No. 2:04-mc-3164], I do hereby certify that I have on this the 30th day of October 2007 electronically filed the foregoing Plaintiff's Response In Opposition to Defendant's Motion for Partial Summary Judgment with the Clerk of the Court by uploading

same to the Court's CM/ECF web site at http://www.almd.uscourts.gov, which will send notification of such filing to the following:

> Charles A. Stewart III, Esq.
> Angela R. Rogers, Esq.
> BRADLEY ARANT ROSE & WHITE LLP
> The Alabama Center for Commerce
> 401 Adams Avenue, Suite 780
> Montgomery Alabama 36104
>
> Thomas J. Leek, Esq
> COBB & COLE
> 150 Magnolia Avenue
> Post Office Box 2491
> Daytona Beach, FL 32115-2491

and I hereby certify that I have mailed by United States Postal Service, properly addressed and first-class postage prepaid and affixed this document to the following non-CM/ECF participants:

> [none]

and additionally that I submit and mail a paper courtesy copy of this Response in Opposition and accompanying exhibits to the chambers of the Court, as directed in its Order of October 16, 2007.

Charles E. Harrison (ASB-9408-N70C)



1

```
 1         IN THE UNITED STATES DISTRICT COURT
           FOR THE MIDDLE DISTRICT OF ALABAMA
 2
           CIVIL ACTION NO. 2:06cv993-ID
 3
 4    JOHNCO MATERIALS, INC.,
 5         Plaintiff,
 6    vs.
 7    CONRAD YELVINGTON
      DISTRIBUTORS, INC.,
 8
           Defendant.
 9
10
      **************************************************
11    DEPOSITION OF:    GARY YELVINGTON
12    DATE TAKEN:    July 5, 2007
13    TIME:         COMMENCED AT 9:46 a.m.
                    CONCLUDED AT 3:05 p.m.
14
      PLACE:        150 Magnolia Avenue
15                  Daytona Beach, Florida
16    STENOGRAPHICALLY
      REPORTED BY:   SANDRA NARUP
17          REGISTERED PROFESSIONAL REPORTER &
            FLORIDA PROFESSIONAL REPORTER
18    **************************************************
19
20
21         VOLUSIA REPORTING COMPANY
           432 SOUTH BEACH STREET
22         DAYTONA BEACH, FLORIDA 32114
           386-255-2150
23
24
25
```

2

```
 1    Appearing for the Plaintiff
 2    H. GREGORY PEARSON, ESQUIRE
      CHARLES E. HARRISON, ESQUIRE
 3    Of Junkin, Pearson, Harrison & Junkin, L.L.C.
      601 Greensboro Avenue
 4    Suite 600 Alston Place
      Tuscaloosa, Alabama 35401
 5    205-366-0111, FAX-205-391-4780
 6
 7    Appearing for the Defendant
 8    THOMAS J. LEEK, ESQUIRE
      Of Cobb & Cole
 9    150 Magnolia Avenue
      Daytona Beach, Florida 32114
10    386-255-8171, FAX-386-248-0323
11
12    ALSO PRESENT:
13    CLATUS JUNKIN, Corporate Representative for Johnco
14
15
16
17
18
19
20
21
22
23
24
25
```

3

```
 1              I N D E X
                                   PAGE
 2
 3    DIRECT EXAMINATION BY MR. PEARSON          4
 4    CERTIFICATE OF OATH              163
 5    CERTIFICATE OF REPORTER         164
 6    READ AND SIGN LETTER            165
 7    ERRATA SHEET                    166
 8         INDEX OF EXHIBITS
 9    PLAINTIFF'S EXHIBIT NUMBER 1 (Brochure)     13
10    PLAINTIFF'S EXHIBIT NUMBER 2 (2/6/06 E-mail)    70
11    PLAINTIFF'S EXHIBIT NUMBER 3 (Invoice)      95
12    PLAINTIFF'S EXHIBIT NUMBER 4 (Invoice)      95
13    PLAINTIFF'S EXHIBIT NUMBER 5 (Invoice)      95
14    PLAINTIFF'S EXHIBIT NUMBER 6 (Invoice)      95
15    PLAINTIFF'S EXHIBIT NUMBER 7 (Invoice)      95
16    PLAINTIFF'S EXHIBIT NUMBER 8 (Invoice)      95
17    PLAINTIFF'S EXHIBIT NUMBER 9 (Supply Agreement)   104
18    PLAINTIFF'S EXHIBIT NUMBER 10 (Answer to complaint) 117
19
20         ------
21         Stipulations
```
```
22         It is hereby agreed and so stipulated by and
23    between the parties hereto, through their respective
24    counsel, that the reading and signing of the transcript
25    are expressly reserved by the Deponent.
```

4

```
 1         COURT REPORTER: Would you please raise your
 2    right hand?
 3         Do you solemnly swear that the testimony you're
 4    about to give in this cause is the truth, the whole
 5    truth and nothing but the truth, so help you God?
 6         THE WITNESS: I do.
 7    THEREUPON
 8              GARY YELVINGTON
 9    Was called as a witness and, having first been duly
10    sworn, testified as follows:
11         DIRECT EXAMINATION
12    BY MR. PEARSON:
13    Q.  Mr. Yelvington, I'm Greg Pearson. We just met
14    for the first time this morning. And I'm an attorney
15    representing Johnco in the litigation between Johnco
16    Materials, Inc., versus Conrad Yelvington Distributors,
17    Inc.
18         And we are here to take your deposition. And I
19    guess the first question I want to ask you, Gary -- and
20    can I call you Gary, because I --
21    A.  Absolutely.
22    Q.  Obviously, you were at the University of
23    Alabama at the same time I was, and so I sort of knew
24    you differently then. You haven't changed a whole lot.
25    You're still big and strong.
```

93f7f9bb-1dbb-4811-8553-35dc8ec418c9

**5**

1    But if I ask you a question in the deposition,
2  and it's quite possible, and it's just not a good
3  question or you don't understand it, go ahead and
4  interrupt me and just say, look, I don't understand
5  that, could you rephrase it. I'd appreciate that. And
6  then that way, we can get on the same page, because
7  nobody is trying to trick anybody here. We just want to
8  try to answer the questions.
9    A.  I understand.
10   Q.  And then we will move through.
11     First of all, have you ever given a deposition
12  before?
13   A.  Yes, sir.
14   Q.  And when was the most recent time you've done
15  that?
16   A.  I really don't recall. Probably in the last
17  five years or so.
18   Q.  Was it a matter related to the business that
19  you're in, litigation related to the business?
20   A.  Yes.
21   Q.  Okay. And were you a party in that lawsuit?
22   A.  Yes, I believe I was.
23   Q.  When I say you, I'm speaking of Conrad
24  Yelvington Distributors, Inc.
25   A.  Yes.

**6**

1    Q.  Is that the case here, the Yelvington company
2  was the party in the lawsuit?
3    A.  Yes.
4    Q.  Were you individually a party in the lawsuit?
5    A.  I really don't recall. I don't believe I was.
6    Q.  Have you individually, yourself, ever been a
7  party in a lawsuit, plaintiff, defendant, in the last
8  ten years?
9    A.  I don't specifically recall any.
10   Q.  Okay. Is that information that you could get
11  if we asked for it? Not sitting here at the table
12  today, but if we ask an interrogatory, could you come up
13  with that information?
14   A.  I guess I could. I'd have to get some folks to
15  help me.
16   Q.  How many times do you think you've given a
17  deposition in a case, Gary?
18   A.  Probably less than five times in my life. And
19  that's a guess. I specifically don't remember, so not
20  that many times.
21   Q.  The litigation that you've given deposition in
22  most recently, the first time, you said, within about
23  the last five years, is that a contractual dispute type
24  of case? Or, do you remember what kind of case it was?
25   A.  I don't remember.

**7**

1    Q.  Okay. Was it here in Florida?
2    A.  Yes.
3    Q.  Okay.
4    A.  I believe it was.
5    Q.  Was it a state court case in Florida?
6    A.  I don't recall. I really don't recall what it
7  was about. I might have to answer that after I think
8  about it a while.
9    Q.  Well, obviously, that's another caution I'll
10  give you. If something comes to you at some point that
11  you remember later on, just interrupt me and tell me and
12  we'll get it taken care of now.
13   A.  Okay.
14   Q.  You've been identified in this case as a person
15  who will testify as a representative of Conrad
16  Yelvington Distributors, Inc. And as we move through
17  the deposition, I will try to be careful to discuss your
18  testimony as being as that representative. Obviously,
19  if you have knowledge of something, I want to know about
20  it.
21     But at the same time, you are going to be
22  testifying as to certain matters that relate to the
23  transactions and agreements and contractual disputes
24  between Johnco and Conrad Yelvington. So when I ask you
25  a question, those will be the kinds of questions that

**8**

1  I'm asking you because I'm taking your deposition as a
2  corporate rep.
3    But first, let me get a little personal
4  information. When did you go to Alabama, Gary?
5    A.  I was there from '71 to '75.
6    Q.  Did you graduate?
7    A.  Yes.
8    Q.  Okay. And what was your degree in?
9    A.  Business.
10   Q.  And tell me something about your family
11  business. And I'm just calling it a family business
12  because it's named for your dad, Conrad Yelvington. Is
13  that correct?
14   A.  That's correct.
15   Q.  How long has that business been in existence?
16   A.  I believe it was incorporated in 1960.
17   Q.  Okay. And tell me what you all do.
18   A.  We're distributors of construction materials.
19   Q.  When you say construction materials, tell me
20  what you're talking about.
21   A.  Crushed stone, aggregate, sand, gravel and sod.
22   Q.  Sod?
23   A.  Uh-huh.
24   Q.  Okay. Aggregate. You know, for somebody who's
25  a little bit more naive, tell me what aggregate is. Is

9

1  it all kind of crushed stone, all kind of rock, or is it
2  a specific thing?
3      A.  I think that's a general term.  At least my
4  definition of aggregate would be rocks, sized, washed
5  and graded or unwashed.
6      Q.  And what -- the contract with Johnco that
7  Yelvington had with Johnco, that related to a Number 67
8  gravel.  Now, would you also consider Number 67 gravel
9  under the larger heading of aggregate?
10      A.  Yeah.
11      Q.  Okay.  Do you all -- when I say you all, does
12  Yelvington have any mining operation of its own?
13      A.  No, sir.
14      Q.  No ownership in no other company?
15      A.  No, sir.
16      Q.  Okay.  So how would you describe, then, what
17  you do, what your business does?
18      A.  We distribute and we buy and sell materials.
19      Q.  Okay.  And do you buy for specific customers,
20  or do you buy and inventory it and then sell it to
21  customers as they come to you?
22      A.  Both.
23      Q.  The contract with Johnco, was that a
24  contract -- and we're going to put it in here, but was
25  that generally where Conrad Yelvington Distributors,

10

1  Inc. was going to buy the gravel and inventory it for
2  use?
3      A.  Yes.
4      Q.  It wasn't for a specific customer?
5      A.  No.  It was for multiple customers.
6      Q.  All right.  Tell me a little bit about the
7  structure of Conrad Yelvington Distributors, Inc., who's
8  in charge and what offices do they hold and those kinds
9  of things.
10      A.  My father is the chief executive.
11      Q.  And then what position do you hold?
12      A.  I'm the president.
13      Q.  And as the president, what are your duties?
14  Are you generally in charge of all the day-to-day
15  business?
16      A.  Yes.
17      Q.  And what kind of business decision would invoke
18  your father's input at this point?
19      A.  A major financial decision.
20      Q.  Is the supply agreement that we're going to
21  talk about today with Johnco, is that considered a major
22  financial, or is that something that Gary Yelvington, as
23  president, would have authority to enter into?
24      A.  I would have the authority to enter into.
25      Q.  Who else is in the Yelvington Distributors,

11

1  Inc., in your family?
2      A.  My wife.  My mother.
3      Q.  So it's basically you and your dad and your two
4  wives are who owns it?
5      A.  And my sister.
6      Q.  And your sister's involved, too.  Does she have
7  an office?  Is she an officer of the company?
8      A.  Yeah.
9      Q.  What does she do?
10      A.  She's a shareholder, as well.
11      Q.  Right.  And does she work at the company every
12  day?
13      A.  Yeah.
14      Q.  What does she do?
15      A.  Well, she's involved in whatever her family
16  needs her to do.
17      Q.  Okay.  But does she hold a corporate office?
18      A.  She has an office at the company.
19      Q.  Well, I'm more talking about like a president,
20  vice president, secretary, treasurer type of corporate
21  office.
22      A.  No, I don't believe she does.
23      Q.  Okay.  So --
24      A.  She's a shareholder.
25      Q.  Right.  And your father is the CEO.  And then

12

1  does your mother have -- is she an officer of the
2  company?
3      A.  My mother?
4      Q.  Yes.
5      A.  Yeah.
6      Q.  Do you know what her office is?
7      A.  I'm not sure if she's secretary or treasurer.
8      Q.  Is she actively involved, still?
9      A.  Yes.
10      Q.  What's your mother's name?
11      A.  Margaret.
12      Q.  And your wife, does she have an office?
13      A.  Yes.  She's over our human resources.
14      Q.  Okay.  And she's also a shareholder in the
15  company, as well?
16      A.  No.  She doesn't hold any shares.  There's just
17  my father, myself and my sister.
18      Q.  Okay.  All right.  If I could, I'd like to, I
19  think, start -- because I got a brochure that Conrad
20  Yelvington Distributors, Inc., I guess, gave to Johnco
21  at some point.  I'm not sure when.  I think it's, you
22  know, into the supply agreement period.  But I think it
23  might help me if I give you a copy of it and then talk
24  about some of the specifics of that.
25          MR. PEARSON:  Could I get this marked as

13

1 Plaintiff's Exhibit 1 to this deposition, please.
2 (Thereupon said document was received and marked as
3 Plaintiff's Exhibit 1.)
4 BY MR. PEARSON:
5     Q. Gary, what we've marked as Plaintiff's Exhibit
6 1 to your deposition, you're looking at it. It's a
7 bates-numbered document and, you know, it's bates number
8 Johnco Materials 73 through -- I guess the last page
9 number is 000107. And do you recognize that document?
10     A. Yes.
11     Q. Tell me what it is.
12     A. It's just a representation of the company's
13 distribution outlets.
14     Q. And when you say distribution outlets, why
15 don't you tell me a little bit about what a distribution
16 outlet is.
17     A. It's a piece of real estate with a railroad
18 track adjacent to it and equipment to unload various
19 types of stone and store it in piles or bins for
20 redistribution by truck to customers or end users of the
21 product.
22     Q. Okay. So would it be fair to say, then, most
23 of the materials that you bring to these terminals come
24 to those terminals by rail?
25     A. Yes.

14

1     Q. Does any of your material that you buy to
2 inventory come other than by rail?
3     A. A small amount.
4     Q. Okay. And how do you get it there?
5     A. Truck it.
6     Q. Okay. Do you have any barge business?
7     A. Not regular. We have done some barge business,
8 but not regularly.
9     Q. Okay. And how many different producers of the
10 gravel and the aggregate do you buy from? When I say
11 you, I'm talking about Conrad Yelvington --
12     A. Conrad.
13     Q. -- the distributor. Yeah, the company.
14     A. Uh-huh. -- you want a specific number
15 or approximately? Less than ten, I would say.
16     Q. Less than ten?
17     A. Yeah. Ten or fifteen.
18     Q. Ten or fifteen?
19     A. Probably.
20     Q. And where are these producers or mining
21 operations located, generally?
22     A. Well, we have terminals up in Michigan, so
23 those are obviously different than the ones here in
24 Florida.
25     Q. The Michigan operation that your company has

15

1 acquires its product from mining or producing of
2 quarries that are more local to that area?
3     A. Yes.
4     Q. And then the operation that you have in the
5 southeast, and correct me if I'm wrong, I think you have
6 terminals in Alabama, Mississippi and Florida.
7     A. That's right.
8     Q. Do you have them in Georgia and Tennessee?
9     A. No.
10     Q. So do you have them in any other states other
11 than Alabama, Mississippi and Florida?
12     A. Not currently.
13     Q. Okay. But you have in the past?
14     A. We've had -- we had one in North Carolina in
15 the past that we shut down.
16     Q. How long ago did you shut that down?
17     A. Five or seven years ago.
18     Q. In Alabama, how many mining operations or
19 producers of gravel or aggregate do you buy from?
20     A. Well, buy from, handle for?
21     Q. Yes. I mean, we can --
22     A. Yeah. Probably less than ten.
23     Q. And when you distinguish buy from and handle
24 for, tell me -- I think I understand buy from. That's
25 where you literally make a contract and you buy the

16

1 product that's produced in whatever quantities, and you
2 ship it and store it at your terminals for resale. Is
3 that right?
4     A. Right.
5     Q. The handle for, tell me what that would
6 include.
7     A. Using our facilities, our rail cars, our
8 relationships, our relationship with the railroad to
9 move their product from their production point to our
10 terminals, and then they market the product instead of
11 us.
12     Q. So when it gets to your facilities, is it the
13 same terminals that you're storing your products --
14     A. Uh-huh.
15     Q. -- that you buy?
16     A. Uh-huh.
17     MR. LEEK: Is that a yes?
18     THE WITNESS: Yes. Sorry.
19 BY MR. PEARSON:
20     Q. That's another thing, Gary.
21     A. Yes and no.
22     Q. I'm bad about that myself, and I have to
23 apologize. But the court reporter probably needs a
24 verbal response --
25     A. Okay.

17

1    Q. -- in the English language to be able to get
2    this done.
3        Getting back to that, now, when you handle it,
4    you make some sort of deal with a company that has the
5    product, and you actually ship it for them. Right? And
6    you charge them some rate based on the use of your cars
7    and the railroad track to ship their product?
8    A. Right. Yes.
9    Q. And then when you -- right is fine, too.
10   A. Okay.
11   Q. Then when you get it to your various terminals,
12   then do you charge them to store it for them?
13   A. That's all in the same price. Whatever price
14   we gave -- give them includes the storage.
15   Q. Okay. And then if it gets distributed from
16   that terminal, are you involved in that ultimate
17   distribution to an end user?
18   A. Occasionally.
19   Q. Okay. What percentage of your business is the
20   handled -- is the handled for type of business?
21   A. It's not the majority.
22   Q. So the majority of your business is when you,
23   the company, buys the product and then keeps it in
24   inventory in its various terminals?
25   A. Yes.

18

1    Q. In this Plaintiff's Exhibit 1 brochure, it --
2    there's some bullet points, for lack of a better word,
3    some little paragraphs where you talk about it being a
4    family-owned business. And at the time of this
5    particular brochure, which there's something down in the
6    lower left-hand corner of the various pages that -- if
7    you could tell me what that is. Does that indicate it's
8    in April '05?
9    A. I'm not sure what that is.
10   Q. Okay. Could you look at this brochure and
11   see -- well, I think I might be able to clue you in a
12   little bit. It appears, from looking at the bates
13   numbered page 77, that you talk about carloads being
14   moved, and you actually have the year 2005 included on
15   there. So would that indicate to you, then, that this
16   brochure was done at some point in time when you had the
17   information to put in there for the year 2005?
18   A. I would assume that.
19   Q. So would this be something that your company
20   would produce annually, this type of brochure?
21   A. Yes.
22   Q. Okay. And this, then, would probably be the
23   one that you produced in 2006 if it's got 2005
24   production?
25   A. Yeah. I would assume that.

19

1    Q. Well, these numbers where it shows carloads
2    moved, and that's on the Johnco bates numbered page 77,
3    they're rather specific numbers of carloads that are
4    referenced. That wouldn't be estimate, would it?
5    A. No. I think we probably got those carload
6    numbers from the railroad. That would be everything
7    that the company handled.
8    Q. Okay. Now, the tonnage that you put on there
9    is ten million tons of materials per year, and all of
10   that is material that you have handled, one way or the
11   other, either bought it and shipped it or handled it for
12   someone else?
13   A. Yeah, by rail or by truck. Whether we bought
14   it and resold it and it didn't come through the
15   terminal, we're in the distribution business.
16   Q. All right. Let's say that you take a load of
17   gravel from somewhere and, you know, it's 60 cars, so
18   it's 6,000 tons of material based on about a hundred
19   tons per rail car, and you move it to a terminal. If
20   you then sell it to end users and move it by truck at
21   the rate of, what, 25 tons a truckload or whatever is in
22   the back of a dump truck, do you count it twice? Is
23   that ten million including moving it to your terminal
24   and then re-moving it to somebody else when you sell it?
25   A. No.

20

1    Q. Okay. So it doesn't matter how many times you
2    move it. If you shift it to from terminal to terminal
3    to terminal, you don't count it three times?
4    A. We don't generally make a practice of doing
5    that. We do move some products by truck to our terminal
6    and then by rail from the terminal. And we do move some
7    product by rail to a terminal and then move it again.
8    So since these numbers were given to us probably by the
9    railroad, there could be some of them.
10   Q. But by and large, you try to move it one time
11   to a terminal?
12   A. Yes.
13   Q. And that's what you're counting as your tonnage
14   in your cars moved here?
15   A. (Nods head.)
16   Q. It talks about the number of distribution
17   terminals, Gary, that the company has. And in the
18   brochure, again, on the bates numbered page 75, it talks
19   about 25 operating distribution terminals. How many do
20   you -- how many does the company have now?
21   A. I believe it's just under 30. I'm not sure
22   we're at 30 yet. But we've added some since '05.
23   Q. All right. And I noticed there's a
24   parenthetical up there in the second paragraph on that
25   bates numbered page 75. It says, with several more

21

1  under development at the time this brochure is done. Is
2  that the additional distribution terminals that you're
3  referring to?
4      A.  Yes.
5      Q.  Tell me which ones, if you remember, that are
6  the most recent ones that would have been under
7  development at this time.
8      A.  Under development could mean under -- being
9  permitted or planned. And the ones I recall since --
10  let's see. Had one at Mulberry, one at Milton, Florida.
11  Dothan.
12      Q.  Those would be the newer ones?
13      A.  Yes, sir. Dothan is still under development.
14  It's being constructed now. But some of these take a
15  long time to get the right approvals and zoning and so
16  forth. I'm just trying to look and see if there's any
17  others on here. I don't see any others.
18      Q.  When you say, to get approvals, when you put a
19  terminal in and it's near a railroad track, is that your
20  criteria, mainly, it's got to be next to a railroad
21  track?
22      A.  Yeah. All our terminals are rail served.
23      Q.  All right. Does it matter who owns the
24  railroad where you put your terminal?
25      A.  Does it matter who owns it?

22

1      Q.  Well, I noticed that you indicate that you have
2  a relationship -- you're linked to CSX Transportation's
3  computer for up-to-date on rail shipments and car
4  locations, and I'm assuming that CSX owns railroad
5  tracks. Do you put --
6      A.  Yes.
7      Q.  -- most of your -- and I don't know how it
8  works. Do most of your terminals go next to CSX tracks?
9      A.  Most of them do, but we have some that are
10  adjacent to other railroads.
11      Q.  And you work with those other railroads --
12      A.  Yes.
13      Q.  -- as well?
14      A.  Uh-huh.
15      Q.  What goes into permitting, generally?
16      A.  Well, you have to find a piece of real estate.
17  It has to have the proper zoning. You have to deal with
18  any wetland issues in the development of it. You have
19  to get some air permits. There's quite a bit of time
20  and planning to develop these terminals because of the
21  amount of cars that land there each day, or each day
22  that they receive cars.
23      So there's interaction with sometimes the
24  Department of Transportation based on crossing the
25  highway. Just a lot of planning for each and every

23

1  terminal because of the amount of cars that have to
2  arrive.
3      Q.  What is -- what would a normal terminal
4  facility include?
5      A.  An unloading pit, a concrete pit that you build
6  underneath the track structure or the siding. We call
7  it the siding, not the main line. The railroad uses the
8  main line to deliver the train, but then you have to
9  construct the siding or the track that's in the property
10  or along the property.
11      And then you have to construct a concrete pit
12  with a steel hopper in the pit, which the product drops
13  out the bottom of the car, goes up a conveyer. And then
14  a radial stacker is what we use commonly to stockpile
15  the various sizes in the various conical piles around
16  that radius. And then we also haul some of the product
17  and put it into bins that are not on that radius.
18      And then we load it out with front-end loaders
19  into trucks, scale it across the scale, give them a
20  ticket. And that's pretty much the way we distribute
21  the products.
22      Q.  Is there usually some type of office facility,
23  a building, trailer?
24      A.  It's usually a modular building. Twelve by
25  sixty is pretty common for what we've done. We mount

24

1  that beside the truck scale.
2      Q.  And who staffs a terminal facility? How many
3  people would you have staffing on --
4      A.  You know, different terminals, different
5  amounts, but there are generally approximately five or
6  six people.
7      Q.  And they receive the product and do the various
8  things related to -- now, when it comes in, does it come
9  in on -- and I'm going to use this term loosely and
10  we'll explore it a little more, but your rail cars, rail
11  cars that you've got leased and control of?
12      A.  Yes. Most of them are our cars.
13      Q.  Okay. And that's what I want to explore. Your
14  brochure, again, going back to this, says you lease over
15  1815 hopper cars. And does all of the product come on
16  hopper cars?
17      A.  Not all the product. We lease -- let me see.
18  Hopper cars. I mean, this number changes some with the
19  leases and when they expire. But we also have gondola
20  cars that are not bottom drop cars that are generally
21  used for larger stone that you unload with a backhoe.
22      Q.  How does the backhoe get it out of there? Does
23  it just reach over the top and get it out?
24      A.  Reaches over the top and scoops it out and
25  places it next to the rail siding or in a truck.

93f7f9bb-1dbb-4811-8553-35dc8ec418c9

25

1    Q.   Now, and that's called a gondola?
2    A.   Gondola car.
3    Q.   Gondola car.
4    A.   Uh-huh.
5    Q.   And does it look different?  Is it just open
6    all the way across the top, or can a hopper also be
7    open?
8    A.   They're both open across the top.  The hopper
9    has doors out the bottom.  The gondola has a flat bottom
10   without doors.
11   Q.   I got you.
12       And then there are another type of hopper car
13   that would be a closed-top hopper car?
14   A.   A covered hopper car.
15   Q.   A covered hopper car.
16   A.   Uh-huh.
17   Q.   And do you move product in those?
18   A.   Yes, we do.
19   Q.   Do you lease some of those, as well?
20   A.   Yes, we do.
21   Q.   Now, the 1815 hopper cars, more or less, that
22   you've got here -- and I may have missed it.  You may
23   have said it.  Does it include, then, generally, the
24   gondola cars, as well?  Would that number be included in
25   there, or are those additional cars?

26

1    A.   The way it reads, it says hopper cars.  That
2    would be opened or covered hopper cars.
3    Q.   So gondola cars would be in addition to that,
4    probably?
5    A.   Probably.
6    Q.   In the year 2006, do you know how many cars,
7    approximately, you had moving product?
8    A.   Not exactly.
9    Q.   Would it be a lot different from the 1815 that
10   you had in this brochure, on page 75?
11   A.   Probably not.
12   Q.   And where are most of those cars on any given
13   day?
14   A.   Running back and forth between origins that are
15   active in shipping to supply our terminals.
16   Q.   Do they ever sit anywhere for any length of
17   time?
18   A.   We hope not.
19   Q.   And if they do sit somewhere for a few days,
20   why is that?  Give me some of the reasons that they
21   might sit somewhere.
22   A.   The biggest reason they sit is, the railroad
23   sometimes doesn't have the locomotives or the power to
24   pull them.  That's one reason.
25       The other reason they're sitting is, we've just

27

1    unloaded them or we're fixing to start unloading them,
2    or we have more cars than we might need in order to have
3    enough cars.  Sometimes you have to have too many cars.
4    Q.   So that --
5    A.   So the demand and supply.  Supply and demand.
6    Q.   All right.  And do those -- if you have more
7    than you need, those would be sitting empty, and they
8    would be on your siding at your terminals?
9    A.   Well, we haven't had to sit them empty.  We try
10   to have enough cars but not too many cars.
11   Q.   Who do you lease them from?
12   A.   Various leasing companies that specialize in
13   rail car leases.
14   Q.   And what would be the length of term of a lease
15   for one of these hopper cars?
16   A.   Three to ten years.
17   Q.   And —
18   A.   Some short term.  I mean, some are month to
19   month.  Very few, but some are month to month.
20   Q.   Do you take the cars that you lease -- by the
21   way, do you own any cars?  Does Yelvington actually own
22   its cars?
23   A.   No.
24   Q.   Okay.  So all of them are a lease arrangement
25   or a long-term lease arrangement?

28

1    A.   Yes, sir.
2    Q.   All right.  Now, do you turn around and lease
3    those cars out to anybody else on a sublease basis?
4    A.   Not recently.
5    Q.   Okay.  Did you used to do that?
6        I'm sorry.  Go ahead.
7    A.   We have a particular move where we do allow
8    another producer to use our cars and we use their cars,
9    because they're all in one particular pool, moving from
10   one origin to various destinations.  And when they use
11   our cars, we charge them so much a day.  When we use
12   their cars, they charge us so much a day.  And that's
13   just because it's easier to use the whole pool of cars
14   and not have to make sure that it's only our cars or not
15   their cars.  I mean, it's too much switching around,
16   trying to -- so we just kind of count them all as one
17   group of cars.
18   Q.   And you say that's one particular producer?
19   A.   Yes.
20   Q.   Which producer is that?
21   A.   It's Rinker in Miami.
22   Q.   Rinker.  So Yelvington and Rinker have some
23   sort of business arrangement with each other?
24   A.   On the cars.
25   Q.   On the cars.  What does Rinker do?  You said

93f7f9bb-1dbb-4811-8553-35dc8ec418c9

29

1 one particular producer, and that word has meaning to
2 you, and you then said Rinker is that producer. What
3 does that mean, a producer?
4     A.   A producer of crushed stone.
5     Q.   Okay.  That's what I'm asking.  What does
6 Rinker do?
7     A.   They produce the product at a particular quarry
8 where we have a substantial amount of cars and they have
9 smaller amount of cars, and we use each other's cars
10 based on that being the easiest way to load trains in
11 and out of the facility that produces the stone which
12 they own.
13     Q.   And how long has that relationship between
14 Yelvington and Rinker existed?
15     A.   Twenty-five years.
16     Q.   And does Yelvington buy a substantial amount of
17 Rinker's product that it produces from its quarry?
18     A.   Yes.
19     Q.   And where are Rinker's quarries, or is it one
20 quarry?
21     A.   Well, it's one quarry that we have this
22 arrangement, and that's their quarry in Miami, called
23 The Chrome Aggregate Quarry.
24     Q.   And what do they produce there?
25     A.   Limestone.

30

1     Q.   And then it's crushed and used for something?
2     A.   Ready mix concrete, block, and whatever we sell
3 it to other people for.  Pipe bedding, site work,
4 utilities.
5     Q.   If you need to move product and, you know, I
6 mean, you need a trainload of product, if the need came
7 up and you needed to move it, how long would it take you
8 to get a train and get it over somewhere to get it moved
9 if you needed a trainload of product?
10        MR. LEEK:  Let me object to form, but you can
11     answer the question.
12        THE WITNESS:  Okay.  If it's something we're
13     doing on a regular basis, the cars are naturally
14     flowing back and forth.  If it's something that's
15     new or hasn't been done before, it takes a little
16     longer to arrange the transportation.
17 BY MR. PEARSON:
18     Q.   But it's simply a matter of making the
19 arrangements for the transportation.  Would that be
20 fair?
21     A.   Well, that's the matter.  Sometimes it's simple
22 and sometimes it isn't.
23     Q.   And in particular with the Johnco supply
24 agreement, what was Yelvington's shipment schedule
25 relative to moving that product in 2006?

31

1     A.   What was our -- you have to clarify the
2 question.
3     Q.   Did Yelvington have a regular shipment schedule
4 to move product from Whitehall, the Johnco facility in
5 Whitehall, in 2006?
6     A.   We didn't have a regular schedule.
7     Q.   At all?
8     A.   No.
9     Q.   Why is that, Gary?
10     A.   Well, Johnco had to bring the production up to
11 supply the material.  We had to arrange the railroad to
12 take the cars out there to the loading point.
13     Q.   Go ahead.
14     A.   There was -- due to the Katrina activity, there
15 was quite a bit of business on the line from the
16 Montgomery yard, out to -- out past the Johnco quarry on
17 a Short Line Railroad.
18        It was a new business that was talked about
19 several years prior, but it was slow or delayed in
20 getting started.  So it was a typical new business where
21 both parties, in my opinion, were trying to initiate the
22 start of something that would have been good for us.
23     Q.   Do you know of any instance where Johnco
24 scheduled a train into Whitehall that they didn't load
25 it immediately, within the allowable time?

32

1     A.   Well, I know that --
2     Q.   Prior to the filing of the lawsuit that we're
3 taking your deposition in today.
4     A.   Well, we had some -- we had somebody
5 interacting with Johnco, Philip Holladay, who I believe
6 you will take a deposition from, that was cueing me in
7 on the availability and his understanding of what was
8 going on out there.
9     Q.   What was Mr. Holladay cueing you in?  Exactly
10 what was he saying?
11     A.   Just keeping up with, you know, how they were
12 doing, did it look like they were going to be able to
13 supply the material, you know, moving the cars out
14 there, getting both CSX and Short Line, which I believe
15 is the M & B Railroad, to coordinate to make the handoff
16 from one railroad to the other, making sure the cars
17 got -- there was some other cars and obligations that
18 the railroad had with each other on other business that
19 they had to coordinate.
20     Q.   Going back to my first question, are you aware
21 of any time in '06, prior to the filing of this lawsuit,
22 where a train came to Whitehall that you all sent over
23 there that didn't get timely loaded completely --
24     A.   We wouldn't send it out there if they couldn't
25 load it because we were busy with our cars.

33

1 Q. Well --
2 A. We wouldn't have just sent it out there unless
3 we knew they were ready. In fact, we had to send our
4 people to operate the locomotive the first time they
5 loaded.
6 Q. And when you say you sent somebody and you --
7 was there a problem with you sending somebody to operate
8 the locomotive?
9 A. That's not generally how we operate. We don't
10 generally send our people to load trains for producers
11 that load product for us. But it was -- we were glad to
12 provide that in order to test the -- test the facility
13 out.
14 Q. And you're talking about the first load that
15 you took. And do you remember when that was?
16 A. No, I don't remember. I believe it was the
17 first one, whichever date that was.
18 Q. But you never sent anybody again to do that on
19 any other loads?
20 A. I don't believe we did. I'm not sure how they
21 worked that out after that.
22 Q. Okay. Now, again, do you know of any time when
23 Johnco refused or failed to load a train that Yelvington
24 sent to them?
25 A. No. I don't think we would have sent it, had

34

1 they been ready, and then it didn't get loaded.
2 Q. All right. And you keep qualifying that
3 answer. All right. Who, other than Philip Holladay,
4 told you that Johnco wasn't ready to load the product?
5 A. No one.
6 Q. So Philip Holladay is your source of
7 information that Johnco couldn't supply the material?
8 A. Couldn't supply, or we were trying to work it
9 with all the things that we were trying to do.
10 Q. Did -- at any point after March 1st of '06, did
11 Philip Holladay tell you that at all points in time from
12 that point forward, that Johnco had more than a
13 trainload of your gravel on the ground at all times?
14 A. Well, specifically, I just remember they had
15 problems with the dredge. They had some problems out
16 there, and it's kind of like, you know, are they really
17 ready. Are they really ready. Okay. You know, and
18 then trying to coordinate with the two railroads to get
19 started.
20     I believe they had changed, you know, some of
21 the folks out there, and -- I don't really remember all
22 the circumstances. We were real busy at the time,
23 trying to get the cars available to send out there, with
24 all the other things we had going on.
25     We just wanted to make sure that when we went

35

1 out there, that things were going to happen and happen
2 properly, and the cars were going to get not delayed,
3 but moved.
4 Q. Was there ever a delay when you sent your cars
5 out there in 2006 to the Whitehall plant?
6 A. You know, I really would -- specifics of all
7 that, as I think about it, I think Mr. Holladay would be
8 better to answer to that.
9 Q. All right. Do you know of any specific delays,
10 yourself, from any source, that Yelvington suffered when
11 they sent a train to be loaded at Whitehall?
12 A. Only the time that it took -- that the
13 coordination of the two railroads, trying to get them
14 out there, trying to get them back, trying to make sure
15 that, you know, with all the business on that line,
16 that, you know, that the railroad didn't want to start
17 backing out of trying to supply the material. We wanted
18 to make sure that it went well, it went proper, so . . .
19 Q. And, again, did Johnco ever fail to -- because
20 as I understand it, the supply agreement -- we'll look
21 at it here in a little bit, Gary. But as I understand
22 it, it was to be free on board, FOB, rail side at
23 Whitehall. That was what Johnco's responsibility was
24 under the supply agreement.
25 A. Right.

36

1 Q. Okay. Now, did they ever fail to load those
2 cars timely?
3 A. When we sent the cars out there, I don't
4 believe they did.
5 Q. Okay. And did you ever --
6 A. Delayed, but not failed.
7 Q. All right. Now, when you say delayed --
8 A. Uh-huh.
9 Q. -- if there is a delay in loading those cars,
10 doesn't Yelvington suffer a demurrage charge?
11 A. No.
12 Q. Not there?
13 A. They're our cars.
14 Q. Excuse me?
15 A. They're our cars. I mean, the delay of the
16 cars would be the cost of the cars sitting there and not
17 being moved.
18 Q. Well, you say there was delay, then, in them
19 loading. Can you give me any example or tell me where
20 you come by that information?
21 A. The cars had to be -- the cars would have to be
22 dropped in Montgomery. Okay. The CSX had limited
23 storage for the cars in their yard. They had problems
24 in their yard, so we were trying to coordinate getting
25 the cars dropped when the other railroad, the Short Line

37

1  Railroad, could come over and take the cars and move
2  them back to Whitehall.
3      We were trying to make sure we didn't just drop
4  any train by there. We had a lot of trains going
5  through there. We had to try to coordinate it so that
6  when we dropped a train in Montgomery, that there wasn't
7  delay, that it didn't sit in the yard. They already had
8  issues in the yard, so we didn't want that to happen.
9      We wanted this to be a smooth start. We wanted
10  everybody to kind of understand and make it a good
11  transition so that we wouldn't have the railroad, you
12  know, pushing back on, you know, this isn't working
13  right, you know. We were careful to start this
14  properly. Wanted to make sure that product was
15  available. Wanted to make sure that they had somebody
16  that could load it. I mean, we were cautious and
17  anxious to move forward with the opportunity.
18      Q.  What knowledge do you have that Johnco did not
19  have the product available?
20      A.  I guess, the fact that they were late starting,
21  in our opinion, my opinion, late getting started, over a
22  year, year and a half. Obviously, they had some issues
23  with equipment. Had never done this before, didn't have
24  sales for some of the products, especially sand. We
25  were trying to work with them, trying to move the

38

1  product.
2      There's just some things we couldn't do. We
3  didn't have a place to take the sand. I know they
4  wanted to move sand and it was a burden for them, but we
5  didn't have a place that we could take sand. We did
6  take some other gravel, Number 4 gravel, because they
7  apparently had a large pile of that, so we took that.
8  And --
9      Q.  The Number 4 gravel, Gary, that you talk of,
10  that is a larger diameter gravel?
11      A.  Yes.
12      Q.  And that was not under the contract, the supply
13  agreement contract?
14      A.  No, but we took it. We had a place to move it,
15  and we took that.
16      Q.  But that's not part of the supply agreement
17  contract?
18      A.  It wasn't in the contract. No.
19      Q.  And are you indicating in any way that you
20  considered that you were doing a favor for Johnco by
21  taking that?
22      A.  We were working with them any way we could to
23  try to get this thing started out properly. We had good
24  intentions. We had -- we thought it was a great
25  opportunity.

39

1      Q.  The Number 4 that you moved, that you indicate
2  you were trying to work with them, did you buy that
3  gravel at a fair price?
4      A.  Yes.
5      Q.  And could you resell that gravel and make a
6  profit out of it?
7      A.  Yes.
8      Q.  And were there any problems with Johnco
9  supplying that to you when you asked them for it?
10      A.  No. We had Philip look at the material and we
11  got a sample of it. They needed to move it. We had a
12  place to move it, so we made that part of a train.
13      Q.  The gravel that was under the supply agreement,
14  as I understand it, is called Number 67.
15      A.  Yes.
16      Q.  And what -- describe what Number 67 gravel is,
17  just generally.
18      A.  Generally, it's a -- basically, it's a
19  three-quarters to three-eighths size material most
20  commonly used for ready mix concrete.
21      Q.  Was that what you were buying it to use it for?
22      A.  Primarily.
23      Q.  And you would then sell it to somebody who
24  would use it for that?
25      A.  Yes.

40

1      Q.  Did you have customers that used Number 67 for
2  that?
3      A.  Yes. We had potential customers for that --
4      Q.  And --
5      A.  -- product.
6      Q.  For that product?
7      A.  Yes.
8      Q.  Excuse me for interrupting.
9      And did you buy Number 67 gravel from any other
10  producers?
11      MR. LEEK: Object to form. You can answer the
12  question.
13      MR. PEARSON: Let me -- I agree.
14  BY MR. PEARSON:
15      Q.  Prior to the Johnco supply agreement, did you
16  buy Number 67 gravel from other suppliers?
17      A.  Prior to the agreement?
18      Q.  Prior to the agreement.
19      A.  Yes.
20      Q.  Now, who did you buy that from?
21      A.  I believe we bought some from Elmore Sand &
22  Gravel, I believe.
23      Q.  And where would they be located?
24      A.  They're in -- they're just north of Montgomery.
25      Q.  How did you move that?

93f7f9bb-1dbb-4811-8553-35dc8ec418c9

41

1   A.  By rail.
2   Q.  And what kind of agreement did you have with
3  Elmore Sand & Gravel? Was it a long-term supply type of
4  arrangement there? Was it a --
5   A.  It wasn't as long as the Johnco agreement.
6   Q.  But it was a term contract where you would --
7   A.  It was a term price.
8   Q.  Okay. In other words, they would supply you
9  with this gravel at a certain price?
10   A.  If they had it, that was the price that it
11  would be. It was a term price contract agreement.
12   Q.  Did they have any obligations to any particular
13  quantities of this gravel during the term?
14   A.  I don't believe they did.
15   Q.  What was the length of that term, Gary?
16   A.  I don't recall specifically.
17   Q.  Was it more than a year?
18   A.  I believe it was.
19   Q.  Okay. Was it more than two years?
20   A.  I don't think so.
21   Q.  So you think the agreement was a two-year
22  term --
23   A.  Probably.
24   Q.  -- or less?
25   A.  Yes.

42

1   Q.  And that time frame would have immediately
2  preceded the agreement with Johnco? Or, do you remember
3  the time frame that you had this agreement with Elmore?
4   A.  No.
5   Q.  All right.
6   A.  I think was before, but I'm not sure.
7   Q.  All right. And how much were you having to pay
8  for the gravel?
9   A.  I believe it was 450 a ton.
10   Q.  All right. And why did you want to not do that
11  contract with Elmore anymore? Is 450 a good price?
12   A.  Yes.
13   Q.  Okay. Why did you not continue that
14  arrangement, then, with Elmore?
15   A.  Lack -- lack of -- I'm trying to make sure I
16  remember it. Elmore was -- had difficulty in, you know,
17  getting the material to us. So when we needed it, we
18  didn't have a lot of confidence.
19       If I could just interject that the gravel, the
20  sand and gravel suppliers in the Montgomery area are
21  generally smaller companies, and sometimes they desire
22  to do more than they're able to ultimately perform and
23  do. So you have to be kind of be careful not to
24  over-commit yourself when you're taking on customers
25  that are going to depend on you and you have a high

43

1  amount of credibility, in order to remain a good,
2  credible supplier, so your credibility has to be good.
3  So, you know, we just have to be careful.
4       And Elmore was one of those operations where
5  they had other customers, metallurgical customers that
6  bought gravel from them. And it was -- they did well,
7  but, you know, we couldn't always count on getting our
8  cars. The railroad didn't always spot the cars out
9  there to their location. They did pretty well, but we
10  needed -- in order to take on some more business, we
11  needed a little more credibility in whoever was going to
12  supply us on a regular basis.
13   Q.  All right. Now, after you entered this supply
14  agreement with Johnco which, you know, we'll look at
15  specifically, but for purposes of yours and my
16  conversation at this point, we'll say it was entered
17  into sometime at the end of April of 2004. Did you
18  continue to take Number 67 gravel from any other
19  producer?
20   A.  No. Not that I'm aware of.
21   Q.  All right. And the next Number 67 that you
22  then bought and moved and shipped would have been
23  Johnco's Number 67 gravel?
24   A.  I believe it was.
25   Q.  And that was -- and I know we have some

44

1  invoices here and we'll look at them, but I believe it
2  was in May of '06, May 11th of '06, that you took the
3  first shipment from Johnco. Do you know how long in
4  advance of May 2006 Johnco had been up and mining and
5  ready to load you up and produce Number 67 to you?
6   A.  Not specifically.
7   Q.  Well -- and, again, I'll show you this later,
8  and I'm not -- I'll represent to you that the allegation
9  in the complaint when we filed the lawsuit was that we
10  were ready to produce gravel to you, ready to go March 1
11  of '06. And the answer that came back to us was that
12  Yelvington had no knowledge of that. Thus, they deny
13  it.
14       Now, with that preface, I'm trying to find out
15  if Gary Yelvington has any source of knowledge that
16  Johnco was unable to produce the gravel as of March 1st,
17  2006.
18   A.  I don't understand exactly what you're trying
19  to ask me.
20       We got a train out there and we started on a
21  certain date, and it was a trial to see if they could
22  load it. There was some communication going on between
23  Ben Johnson and Philip Holladay. There was
24  communication going on between us and the railroad as
25  far as coordinating this move.

45

1    And as far as being ready on a certain date,
2  you know, I don't specifically remember that.
3    Q.  Okay.
4    A.  And if you were ready on a certain date, would
5  you be able to continue to ship that product.  I mean,
6  it was a -- we were kind of feeling our way into getting
7  this thing started.  We had a very high interest in
8  getting it done.
9    Q.  So would it be fair, then, to characterize what
10  you're saying, Gary, and I'm trying to listen to you.
11  Would it be fair to characterize what you're saying is
12  that Yelvington wasn't sure -- and I'm talking about
13  your company.  Yelvington wasn't sure whether or not
14  Johnco could do it, so they were taking it really slow?
15    A.  We were being cautious for a couple of reasons.
16  We wanted to make sure the railroad, since this was a
17  long-term deal, didn't lose confidence that this thing
18  wasn't going to work.  We wanted to make sure that we
19  could get the cars out there on a regular basis.  And
20  then handoff of those two -- between those two railroads
21  and getting the cars to land in Montgomery at a time
22  that's compatible with the service from Montgomery out
23  to Whitehall.
24    We were being cautious.  Our credibility as a
25  supplier and the utilization of our equipment is

46

1  important to us to keep that balance.
2    Q.  Was your credibility as a purchaser and a party
3  to the contract with Johnco also important to you?
4    A.  Absolutely.
5    Q.  And do you -- did Johnco -- I mean, excuse me.
6  Does Yelvington have an understanding of the contract
7  that they were obligated to purchase this gravel and
8  ship it on a regular basis?
9    A.  Yes.  We had a volume that we knew we could
10  move.
11    Q.  Okay.  But you didn't come get that volume or
12  attempt to come get that volume from Whitehall.  Would
13  that be fair?
14    A.  Yeah.  We would move the volume that we were
15  committed to.
16    Q.  When you were committed to move it, are you
17  speaking of committed to Johnco, or committed to one of
18  your customers, which one, when you say you were
19  committed to?
20    A.  We were -- we would have been in a position to
21  take the material from Johnco over the commitment of the
22  agreement.  What we committed to in the agreement, we
23  would have been able to do.
24    Q.  What was your understanding of that?
25    A.  A hundred and fifty thousand tons a year.

47

1    Q.  And that's a minimum?
2    A.  That's a minimum.
3    Q.  Did you ever consider that you would be taking
4  more than that minimum?
5    A.  We could.  We had an option, I believe, in the
6  contract to take excess.
7    Q.  In fact, didn't Yelvington require that Johnco
8  be able to load 5200 tons or 52 open hopper cars per
9  week?
10    A.  On the weeks that we sent the train in, yes.
11    Q.  Okay.  So you had no understanding that you
12  would -- they had to be able to do 52 open hopper cars
13  or closed hopper cars a week.  You had no understanding
14  of --
15    A.  Well, clarify a week.  The week that we sent it
16  out there, yes, but not every week.
17    Q.  Not every week?
18    A.  Not every week.  Do the math.
19    Q.  Now, from -- was there any point in time when
20  Yelvington intended, then, to take the gravel on some
21  regular schedule?
22    A.  Yes.
23    Q.  All right.  What was the regular schedule that
24  Yelvington intended to take Number 67 gravel from
25  Whitehall?

48

1    A.  Well, I believe we were getting in the groove
2  of taking it beginning in August.  We started running
3  two trains a month.
4    Q.  Was there anything in the contract that said
5  two trains a month was what you're supposed to run?
6    A.  It didn't say.  Two trains a month would have
7  met the volume commitment.
8    Q.  Was there any problem with loading -- when you
9  sent the two trains in August and the two trains in
10  September, did Johnco have any problem loading those,
11  getting them out of there for you?
12    A.  I don't recall any problems.
13    Q.  Okay.  You didn't send any trains in October,
14  though.  You scheduled no trains in October of '06.
15    A.  Well, I believe, at some point, Mr. Junkett
16  (sic) came down and -- or, at some point, they sent us a
17  letter, shutting down the operation.
18    Q.  And have you got a copy of the letter where
19  they send it, shutting down the operation?
20    A.  I don't have it.
21    Q.  You don't have it?
22    A.  Not with me, no.
23    Q.  Okay.  But that is a letter that Junkin sent
24  you, shutting down the operation?
25    A.  I don't know if he sent a letter or told Philip

49

1   Holladay or faxed us or something.
2      Q.   Saying that the Whitehall operation had shut
3   down?
4      A.   Yes.  I had had several conversations with Mr.
5   Junkett.
6      Q.   All right.  Tell me about those, Gary.
7      A.   Well, he was -- first of all, I didn't know Mr.
8   Junkett was involved in it until sometime in the summer
9   of 2006.
10     Q.   All right.  What was your first knowledge that
11  he was involved in it?
12     A.   I forget how I found out, but I found out, I
13  think, through Philip Holladay that he was involved and
14  wanted to meet me.
15     Q.   And when did you all meet?
16     A.   I'm not sure.  Maybe July.  I'm not sure
17  exactly, but I remember eating lunch with him at the
18  Golden Rule barbecue place in --
19     Q.   Calera?
20     A.   Calera.  Yes, sir.
21     Q.   All right.  Is that when you flew up to Calera?
22     A.   I was up there on business, and he came and met
23  me.
24     Q.   Who was with you that trip, Gary?
25     A.   Well, I think Philip Holladay was there.  I

50

1   believe he was.  I'm not sure -- my father would have
2   been with me, I'm sure.
3      Q.   Was Mark Kiebe there at that meeting?
4      A.   I don't recall.
5      Q.   Did you have discussions that day in Calera at
6   the Golden Rule barbecue with Mr. Junkin about the
7   Whitehall gravel operation and Yelvington's plans for
8   it?
9      A.   Yeah, we talked briefly.  I met him.  I've
10  known him before as a gravel producer up in Fayette,
11  Alabama, I believe.
12     Q.   And what did you all talk about that day in
13  Calera?
14     A.   He wanted to ship material, and he wasn't real
15  happy with, you know, what had happened, you know, with
16  Ben Johnson's performance out at the mine.  They had
17  some issues out there, and that he intended to make it
18  better.
19     Q.   So Junkin was -- Mr. Junkin was apologizing to
20  you for something?
21     A.   Well, just, I guess, really trying to reassure
22  me that they were going to make this thing work, that
23  there had been some issues that they had some -- they
24  were going to make the gravel, that his son was in the
25  business and understood the business and --

51

1      Q.   Did you offer any reasons to Mr. Junkin why you
2   all hadn't been taking the gravel to that point?
3      A.   You know, I don't really remember specifically.
4   There was not a lot of real heavy discussion or anything
5   at that time.  It was more of a meet him and, you know,
6   this is who is financially responsible, which, you know,
7   I had not known.  I don't know if I knew it prior to
8   that.  I probably did, but I had a -- I don't believe I
9   ever met Mr. Junkett before.
10     Q.   Did you have any discussion with Mr. Junkin
11  about going to Atlanta to get permission to move a
12  75-car unit train in north Florida during that meeting?
13     A.   A 75-car unit train to north Florida?
14     Q.   Through north Florida.
15     A.   Through north Florida?
16     Q.   Any conversation whatsoever.  I could be wrong.
17  I don't know.  Did you have a conversation with Mr.
18  Junkin that you yourself were headed to Atlanta to meet
19  with CSX to get some sort of permission to move at least
20  75 cars in some sort of unit train arrangement?
21     A.   Well, we move unit trains.
22     Q.   Okay.
23     A.   So that sounds familiar that we would have been
24  talking about unit trains.
25          I think, at the time, and I'm -- I don't know.

52

1   Maybe I shouldn't even answer it, because I don't recall
2   exactly.  But I do know that there was a problem with
3   excess sand, and we wanted to try to move sand or help
4   them.  We wanted to help them.  We wanted to get this
5   thing going.  And I know sand was something that they
6   were piling up because it's 60 or 70 percent of the
7   production.
8          And we had looked at maybe trying to move sand
9   into Jacksonville to see if that would be a way to help
10  them with that excess product, since they had
11  probably -- you know, I don't know that they ever had
12  a -- anybody lined up to buy that portion of the
13  product, but that's the majority of what they produce
14  out there.
15          So I don't know what happened, didn't ask, I
16  don't believe, that -- what happened to the customer for
17  the sand.  But we were anxious to move product for them,
18  if we could do it.  But we couldn't move it to
19  Jacksonville cost effectively.  We couldn't sell it.
20     Q.   Why are you under the impression at all that
21  there was a customer for the sand?
22     A.   Why am I under the impression?
23     Q.   Yes.  Where is your source of information that
24  you don't know what happened -- I'm quoting what you
25  just said.

53

1    A. Yeah.

2    Q. I don't know what happened to their customer

3 for the sand. What is your understanding about some

4 customer for the sand?

5    A. Well, in -- I guess, over the various meetings

6 with the Johnsons, they had hopes of moving the sand to

7 Lafarge, I guess, was mentioned to me. And then when

8 something happened to that, then they started producing

9 the gravel for us.

10        There was a significant amount of sand that was

11 piling up that they had to move and wanted to know if we

12 could move it. And they offered it to us for $2.50 a

13 ton. But where our current terminals were, even at that

14 price, we couldn't move it cost effectively and be

15 competitive in the markets that we were in. Sand is

16 locally available in a lot of the markets that we're in

17 with our terminals, so we couldn't move sand.

18    Q. And is it your understanding or did somebody

19 tell you that unless they could sell that sand to you or

20 somebody for 2.50 a ton, they couldn't produce their

21 gravel? Your gravel, to you, under the contract?

22    A. I just knew that they had a problem with a lot

23 of sand. They weren't selling the sand.

24    Q. They didn't have a contract with you to sell

25 you the sand?

54

1    A. No. No.

2    Q. Okay. And you had somehow come to the

3 understanding in your own mind that the sand was a

4 problem. Was it a problem for Yelvington under the

5 supply agreement?

6    A. No, because we didn't have it in our supply

7 agreement. But we did have a desire for Johnco to be

8 successful. And if we could have moved it, helped them

9 out, it would have given them an opportunity to sell

10 something that they had not been successful, up until

11 that point, selling.

12        I mean, we didn't expect to be in a lawsuit

13 with Johnco. We expected to have a relationship with

14 them, take what we told them we'd take, help them with

15 products like Number 4 or other products, if we could,

16 to make sure that they were a viable supplier.

17    Q. Okay. Now, Gary, did you have the

18 understanding at the outset that you were going to be

19 their number one customer?

20    A. Well, number one in what sense?

21    Q. Number one in the --

22    A. In volume?

23    Q. Well, in any sense you want to talk about it,

24 did you consider that Conrad Yelvington Distributors,

25 Inc. was the most important customer that Johnco would

55

1 have?

2    A. Well, what we were going to buy was 150,000

3 tons.

4    Q. You never told them you'd buy more?

5    A. I told them there was a possibility and that we

6 wanted the right to buy more.

7    Q. And you actually put that in the contract, did

8 you not?

9    A. It was in the contract.

10    Q. You had a right of first refusal. When I say

11 you, I'm talking about the company.

12    A. That's right.

13    Q. Had a right of first refusal --

14    A. That's right.

15    Q. -- for all Number 67 in excess of 150,000 tons

16 a year.

17    A. That's right.

18    Q. What other --

19    A. I don't believe they ever called us and told us

20 they had excess. They never notified us as having any

21 excess gravel.

22    Q. Exactly what do you mean by calling and

23 notifying you they had excess? They called you and told

24 you that they had a potential buyer for the mine. They

25 wanted a release from you so that they could sell the

56

1 mine. Is that correct?

2    A. Yes. Mr. Junkett came down and tried to get a

3 release.

4    Q. And you did not give it to him. Is that

5 correct?

6    A. I wanted to see if there was a way that we

7 could be included in whatever he was trying to do so

8 that we could still get the product.

9        MR. LEEK: Mr. Pearson, I apologize. At some

10 point in time, could we get a two-minute break? I

11 appreciate it.

12        MR. PEARSON: Let's do it now. We'll go off

13 right now.

14 (Thereupon, at 11:00 a.m., a recess was taken in the

15 proceedings, after which, at 11:16 a.m., the proceedings

16 were reconvened and the following proceedings were had:)

17 BY MR. PEARSON:

18    Q. We were talking about the status of Yelvington

19 as Johnco's primary customer, and you talked about them

20 having the right of first refusal on all the quantities

21 above 150,000.

22        You mentioned Philip Holladay earlier. And I

23 meant to ask you and I'll just go ahead and ask you now.

24 What position does Philip Holladay have with Yelvington?

25    A. Philip lives in Daphne, Alabama, and he

57

1  formerly worked for Vulcan Materials, in sales. And he
2  was very familiar with the aggregate industry and
3  business. He also helps us in developing new terminals.
4  He's kind of the fellow that has the pulse of that area
5  for us as far as customers and market forces, and sharp
6  guy. Got his head on his shoulders.
7      And we kind of assigned him to interact with
8  Johnsons, the Johnsons, or mostly Ben, I guess, and kind
9  of give us the pulse of, you know, when Johnco was going
10  to be ready and had the right material and kind of had
11  it all going in the right direction, compatibility with
12  the trains.
13      We didn't want to lose any time out there, so
14  he was communicating, stopped by, talked to Ben, looked
15  at the material, kind of give us an idea that they are
16  ready, they can do it. So he was involved on a regular
17  basis. And I believe that he talked to Ben, mostly, on
18  operational side.
19      Q. So Yelvington wouldn't have taken a load prior
20  to Philip Holladay telling them that Johnco was ready,
21  yeah, they can do it?
22      A. I mean, if Philip -- he would have been part of
23  the decision to, you know, yeah, they're ready and, you
24  know, let's get this going. Or I mean, he was
25  communicating with Ben, maybe not -- and you better ask

58

1  him all this. Obviously, you will. When they were
2  ready, what their issues were, why they weren't ready or
3  when they were going to be ready or who had to buy the
4  sand or who they didn't have to buy the sand, which we
5  felt like could affect what they were able to do with
6  us.
7      Q. The sand, you keep bringing it up over and over
8  and over again.
9      A. Uh-huh.
10      Q. And I'm not aware that the sand was any part of
11  Johnco's contract with Yelvington.
12      A. Well, it's not. But it's 60 percent or more of
13  the production, so not moving it, it becomes a problem,
14  and we --
15      Q. For who?
16      A. Well, for Johnco, which could indirectly affect
17  us.
18      Q. Did it affect you?
19      A. Well, no, but we didn't want it to affect us.
20  I mean, we wanted to -- in discussions that Philip was
21  having with me is, you know, they got this sand, is
22  there anything we can do to help them move the sand, you
23  know, that, apparently, Lafarge -- a Lafarge deal didn't
24  go through, they're not moving the sand, can we help
25  them move it. And, you know, we wanted to try to do

59

1  that.
2      Q. But that would have been totally outside of the
3  supply agreement to --
4      A. Yeah.
5      Q. -- move the Number 67 product?
6      A. Yeah. We weren't concerned about the supply
7  agreement and the fact that we could move the gravel.
8      Q. Okay.
9      A. We were concerned about them as a viable,
10  continuing operation if they didn't have some help
11  moving the sand. We were concerned about that.
12      Q. Did you communicate that to Mr. Junkin?
13      A. Well, he communicated it to both Mr. Holladay
14  and myself, that could we help him move the sand, and we
15  had plans of developing some terminals in Atlanta.
16      Q. Well, that wasn't my question.
17      A. Okay.
18      Q. My question was, did you communicate to Mr.
19  Junkin and Mr. Johnson -- Pep, I'm speaking of, or Ben
20  or either, because there's two Mr. Johnsons -- did you,
21  Gary Yelvington, communicate to either one of them that
22  Yelvington was concerned about them being a viable
23  operation because they couldn't get rid of the sand, and
24  that was going to affect your ability to take --
25      A. No.

60

1      Q. -- Number 67?
2      A. I don't believe we did. I think it was just
3  something that we had in the back of our mind.
4      Q. Okay. Now, we started off -- I understand the
5  description of what you say Philip Holladay does for
6  you, but who does Philip Holladay -- who is his
7  employer? Is he a contract or is he an actual employee
8  of Yelvington?
9      A. Well, at that time, he was paid as a
10  consultant. And right now, he is a salaried employee.
11      Q. Okay. And during that time, did he have --
12  what authority would he have had to bind Yelvington? I
13  mean, was there authority given to him to bind
14  Yelvington into these dealings with the Johnsons and to
15  Johnco?
16      A. To bind us?
17      Q. In other words, could he order a shipment?
18      A. No. He could only give us his opinion of their
19  ability to do what we needed to be done.
20      Q. So during the year 2006 and during this time
21  frame of the supply agreement, prior to the lawsuit, you
22  know, being filed or during that time, Philip Holladay
23  wasn't the guy that would have ever ordered any gravel,
24  scheduled a shipment and ordered it?
25      A. He was part of the decision of -- his input

15 (Pages 57 to 60)

93f7f9bb-1dbb-4811-8553-35dc8ec418c9

61

1 meant a lot to our team as far as positioning trains
2 there based on conversations he was having with Ben
3 Johnson.
4 **Q. So he was reporting back to you?**
5 A. Reporting back to me? He was in discussions
6 with Jean Norton, who monitors our trains.
7 **Q. And who is Jean Norton?**
8 A. She's an employee of the company that tracks
9 the trains.
10 **Q. And if you hadn't had your concerns -- and I'm**
11 **talking about Yelvington, the company. If it hadn't had**
12 **its concerns about the ability of Johnco to produce --**
13 **and those concerns, you've stated them all through the**
14 **deposition. If you didn't have those concerns, would**
15 **there have been any issue about going out there and**
16 **picking up those trainloads of gravel in the quantities**
17 **that you had agreed to in the contract?**
18 A. We had full confidence that we could meet our
19 commitment in the contract.
20 **Q. But I'm saying, there wasn't any problem in**
21 **going out there and getting it if, on Tuesday, Gary**
22 **Yelvington says, these guys, they're ready to go, you**
23 **could send a train and start scheduling them, however**
24 **much you needed to schedule them to get that product**
25 **moved?**

62

1 A. We would have moved to the contract -- the
2 contracted amount or more.
3 **Q. Okay. But because of your concerns, you did**
4 **not?**
5 A. I think, because of concerns, because it was a
6 start-up operation, because we did have concerns that
7 they were producing a significant amount of gravel,
8 since the focus turned more away from our ability to
9 move the gravel to, can you help us move the sand, that
10 did concern us. And we had wanted to see if we could
11 help, even though it wasn't part of our commitment. We
12 wanted Johnco to be a viable long-term supplier.
13 **Q. And I can appreciate that. But let me ask you**
14 **this. Did anybody at Johnco communicate to you, we**
15 **can't produce this gravel that we've got contracted for**
16 **you to buy?**
17 A. I don't believe it was put in that context, but
18 it was certainly put in the context that, can you help
19 us move this sand.
20 **Q. Okay. And that's something different than the**
21 **supply agreement.**
22 A. Yes.
23 **Q. You and I both agree to that.**
24 A. That's right. But it's something that would
25 have an indirect effect on their ability to produce, in

63

1 our opinions.
2 **Q. But that was not communicated -- we established**
3 **that earlier -- by Yelvington to Johnco. Your concern**
4 **about their long-term ability was not communicated --**
5 A. No, because, you know, that was their
6 responsibility.
7 **Q. I understand.**
8 A. We just desired to help them, if we could.
9 **Q. All right. How did shipments get scheduled,**
10 **Gary? Who says, go get us a trainload?**
11 A. Well, I believe everybody, everybody meaning,
12 you know, Ben Johnson and Philip Holladay and all
13 decided, all right, let's try one. And one was sent out
14 there and loaded, I guess, May the 11th.
15 **Q. All right. And yeah, you're right. We do have**
16 **an invoice, and we'll put those in in a minute.**
17 But Ben Johnson, before May 11th, wouldn't have
18 said, I got three trainloads on the ground for you right
19 now on March 1? I mean, he never communicated that to
20 you?
21 A. Well, I wasn't talking to Ben on a regular
22 basis.
23 **Q. Okay.**
24 A. Philip was.
25 **Q. Okay. And I really need to -- once you got the**

64

1 supply agreement and it was in place and they're up and
2 they're building the plant, did you have communications
3 with Ben Johnson after that point in time?
4 A. Yeah. I mean, I went out there one day -- I
5 don't remember when it was -- and kind of looked at it.
6 He was dredging. Nobody else in the Montgomery area
7 that I was aware of dredged. In conversation with other
8 producers, the other producers kind of had a -- kind of
9 wondered how he was going to do it that way.
10 And I don't know the difference because I'm not
11 a producer. But it wasn't my concern. They had a
12 supply agreement with us that was attractive to us, that
13 would have been profitable for us to utilize.
14 **Q. And when you went out there, was that -- had**
15 **you already taken a shipment by the time you went out**
16 **there?**
17 A. I don't recall. I don't recall if that was
18 before or after.
19 **Q. Okay. But Ben was actually dredging product?**
20 A. He was out there -- yeah. I mean, I don't
21 recall. I mean, I remember seeing a dredge. I'm not
22 sure if it was in the hole or out on the ground, but I
23 think it was earlier on. I'm not sure.
24 **Q. Okay. During the construction phase of the**
25 **plant?**

65

1 A. Well, I'm not sure if it was during the
2 construction. When was the construction phase, I guess,
3 is the question. Two years, apparently, from the time
4 the agreement was signed until anything was loaded. So
5 whether it was in that two-year period or after, I'm not
6 sure.
7 Q. Did you all order any loads of gravel before
8 May 11th of 2006 and schedule any shipments of any
9 gravel from Johnco's plant?
10 A. I don't believe we did. They were having
11 start-up issues, so we wouldn't have wanted to start
12 anything and not continued it.
13 Q. Well, when you say they had start-up issues,
14 specifically what start-up issues are you talking about?
15 A. I think they had a problem with the dredge,
16 keeping it running. They had -- you know, Mr. Holladay
17 could probably give you more detail. He was out there
18 on a more regular basis.
19 Q. But your knowledge of that comes through Mr.
20 Holladay?
21 A. Yes. His communications --
22 Q. Not directly from Ben? Ben didn't tell you
23 that?
24 A. I didn't talk to Ben that much, so I don't
25 recall specifically talking to --

66

1 Q. Did Pep Johnson ever tell you they had problems
2 and couldn't produce the gravel?
3 A. I don't recall exactly. I know that they
4 wanted to move sand. I know that that was something
5 that they had in the back of their mind. And a lot of
6 the conversations after May 11th was about sand with Mr.
7 Holladay.
8 And, actually, Mr. Junkett mentioned trying to
9 move sand. We tried to see if we could get rates that
10 would move sand to places that we had terminals. And we
11 weren't able to do that.
12 Q. Did Mr. Johnson, Pep Johnson, ever talk to you
13 about coming and moving some gravel?
14 A. You mean coming just to move the gravel?
15 Q. Yeah. Can you come get some loads of gravel --
16 A. I don't recall ever hearing from anybody that,
17 hey, you got to hurry up and come out here, we got all
18 this gravel and you're not taking it. Never did I hear
19 that. I'll tell you that.
20 Q. And so in your meetings with Pep Johnson --
21 didn't you all fly to Montgomery one time and meet with
22 Pep?
23 A. Seems like we did. I don't recall when that
24 was. It seems like we did.
25 Q. What do you remember about that meeting?

67

1 A. You know, I really don't remember anything
2 significant in that meeting.
3 Q. They didn't indicate to you that they needed to
4 be moving some gravel and for Yelvington to come get it?
5 A. I don't recall ever -- ever feeling like we
6 were letting them down, ever.
7 Q. And that's just -- you just don't recall
8 feeling that way yourself?
9 A. Well, nobody called me and said, listen, we are
10 up here producing all this gravel, and you're not taking
11 it. Come get it.
12 The stuff we were hearing is, we've had
13 problems moving the sand and we don't have Lafarge to
14 take the sand, can you move sand. I think everybody
15 assumed that we were going to move gravel. We had a
16 supply agreement to move gravel.
17 This was a start-up operation. Okay. Any
18 start-up operation, you have, with a new operation,
19 little things you have to work out. It started in May,
20 and by August, we were taking two trains a month. I
21 don't even know -- you know, it doesn't -- it doesn't
22 seem logical that we were part of the problem, to me.
23 Q. When, in your understanding, Gary, would you
24 have been required, under the contract, to take gravel?
25 A. When we took gravel, we were to take unit train

68

1 quantities. So in a particular week, we would take a
2 52-car train.
3 Q. And it was not that good of a question, and I
4 apologize.
5 At what point in time was Yelvington obligated
6 to begin to take gravel?
7 A. At what point in time? When, I guess, they
8 were prepared to ship it on a regular basis, when they
9 had kind of ironed out any issues they had with
10 production or equipment or the people to load it in a
11 timely manner. Just when everybody was comfortable, but
12 hey, we're in the groove right here. Now let's kind of
13 keep moving. We're able to do this. That was my
14 opinion of when they were prepared to do it.
15 Q. And having between 15 and 20,000 tons on the
16 ground at the load-out facility by the rail cars at the
17 first of March, ready to load onto your trains, that
18 would not have been a time when you would have been
19 obligated to come get your gravel?
20 MR. LEEK: Object to form. You can answer the
21 question.
22 THE WITNESS: Fifteen to twenty thousand tons,
23 I mean, was that all 67 gravel?
24 BY MR. PEARSON:
25 Q. Well --

17 (Pages 65 to 68)

93f7f9bb-1dbb-4811-8553-35dc8ec418c9

69

1    A.  Or was that gravel or was that gravel and sand?
2    I don't recall anybody telling me we got 15 to 20,000,
3    or 16, whatever you just said, tons of gravel here,
4    ready.  What I wanted to hear was not how much you had,
5    but are you consistent in your production of that.
6    That's kind of what I was wanting to hear.
7    Q.  And so when did you hear that?
8    A.  Specifically?  I guess Mr. Junkett would have
9    come up and said, hey, we got this operation now.  I'm
10   involved.  We've been in the gravel business.  We want
11   to move -- we want to move gravel.  Can you help us move
12   sand?  Mr. Junkett mentioned he'd like to move sand, can
13   we do that.  We had some ideas that maybe we could move
14   sand --
15   Q.  Did Mr. --
16   A.  -- successfully.
17   Q.  Did Mr. Junkin's conversation, hey, I'm
18   involved, we need you to move some gravel -- forget the
19   sand part of it, just for purposes of this question.
20   Was that the trigger point that then they're ready to go
21   and you took your May 11th load?
22   A.  Well, I don't believe I -- I don't remember
23   when I met Mr. Junkett.  I'd have to go back and --
24   maybe you can tell me.
25   Q.  You think it was in the summer?  You think

70

1    you'd already taken a load?
2    A.  I don't know for sure if it was before or after
3    that.
4    Q.  Okay.  Kim Johnson, who is she?
5    A.  Kim Johnson?
6    Q.  Yeah.
7    A.  I don't know.
8    Q.  Well, got a -- it's not a trick question.  I
9    don't know who she is either.
10   (Thereupon said document was received and marked as
11   Plaintiff's Exhibit 2.)
12   BY MR. PEARSON:
13   Q.  Look at that one, if you would.
14   A.  Kim Thompson?
15   Q.  Thompson.  I'm sorry.  I apologize.
16   A.  I didn't know Kim Johnson.
17   Q.  Let me correct it to Kim Thompson.
18   A.  Kim Thompson is in sales and quality control
19   for us.
20   Q.  I've given you what we've marked as Plaintiff's
21   2, which appears to be an E-mail from Kim Thompson to
22   Pep on February the 6th of '06.  Would that be -- tell
23   me what this E-mail is.  It's got attachments to it,
24   several attachments, and explain to me what those are.
25   A.  Looks like gradation reports.

71

1    Q.  What would be the purpose of Kim sending those
2    to Pep?
3    A.  What he was wanting to do is get the gradation
4    of the product that Pep was producing, gradation meaning
5    particle size analysis.
6    Q.  Is Kim a man or a woman?
7    A.  A what?
8    Q.  Is Kim a man or a woman?
9    A.  A man.
10   Q.  Okay.  Kim Thompson works for Johnco?
11   A.  No.  He works for us.
12   Q.  Excuse me.  Works for --
13   A.  Yelvington, yes.
14   Q.  -- Yelvington.  Excuse me.
15   And in February of '06, he's writing this
16   E-mail to Pep, and he goes, here you go, exclamation
17   point.  It was nice talking to you.  I'm sure we'll be
18   talking more in the future as we have plans to move a
19   lot of volume with your product.
20   What is -- I mean, tell me what that means to
21   you.
22   A.  Well, Kim is -- I was probably -- probably made
23   Kim aware that we had a supply agreement to move this
24   product, and that I wanted him to contact Mr. Johnson
25   and get samples so that we could run them in our lab to

72

1    determine the product meeting the Number 67
2    specifications.
3    Q.  Did you all do that?
4    A.  I believe we did.
5    Q.  Did the product that was produced at Whitehall
6    by Johnco meet your specifications?
7    A.  I believe they did at a point, which, at this
8    point, I can't tell you when that was.  But at some
9    point, they did.
10   Q.  Have you ever tested product there that didn't
11   meet your specifications that they produced?
12   A.  I can't answer that without asking someone.
13   Q.  Do you have any knowledge -- I mean, any
14   knowledge whatsoever in your mind that that occurred?
15   A.  I don't know.
16   Q.  All right.  Would the necessity for you going
17   on and sending this, would that indicate to you that you
18   knew they're mining Number 67, they're washing it, and
19   now you need the specs on it?
20   A.  Well, that they were either mining it or were
21   far enough along in the mining that they would, at some
22   point, have a sample that would be a representation of
23   what they could produce.
24   Q.  All right.  After the supply agreement was
25   entered into, at any point subsequent to that, have you

73

1 bought Number 67 gravel from anybody but Johnco?
2   A.  After the supply agreement?
3   Q.  Yes.
4   A.  You mean in April of '04?
5   Q.  At any point subsequent to April '04, have you
6 bought number --
7   A.  Can I ask a question?
8   Q.  Absolutely.
9   A.  Are you saying after Johnco was ready to
10 produce or after the supply agreement, which was two
11 years prior to that?
12   Q.  I am very interested in all the Number 67
13 gravel that Yelvington bought subsequent to April of
14 '04.
15   A.  Before April of '04?
16   Q.  Subsequent to April of '04.
17   A.  Oh, after?
18   Q.  Yes.  You told me that before --
19   A.  Yeah, we bought some from Elmore.  I just don't
20 know when.
21   Q.  We talked about that.
22   A.  Yeah.
23   Q.  And you told me that that was a two-year term
24 deal, the best you recollected, at 450 a ton.
25 Quantities weren't expressed.  Just whatever you bought,

74

1 that's what you paid for.
2   A.  Right.
3   Q.  But my understanding from our prior
4 conversation in the deposition, and you correct me,
5 please, if I'm wrong, was that the Elmore contract ended
6 sometime prior to the supply agreement in April of '04.
7   A.  I don't know when the price agreement for
8 Elmore ended specifically and whether it was before
9 April of '04 or before -- I know it ended before Johnco
10 was -- before May 11th.  I'll say that.
11   Q.  Okay.  All right.  So now back to my question.
12 After April of '04, after you entered into the supply
13 agreement, did you buy Number 67 gravel from anybody
14 else other than Johnco?
15   A.  I don't know.  I don't know specifically.  I
16 can't recall specifically.  I know we bought 57 or 67
17 gravel, but I can't tell you what year or month.
18   Q.  Who did you buy it from?
19   A.  If we bought it, it would have been from
20 probably Martin Marietta or Elmore or -- who else is out
21 there?  The Concrete Company or one of the other
22 Montgomery producers, had we bought any after April 28th
23 or 16th, whatever the date is, of '04.
24   Q.  Would the fact that you don't really have a
25 recollection of it indicate that you didn't buy much

75

1 volume of it?
2   A.  Not necessarily.
3   Q.  Okay.  What would it mean, you didn't have
4 anything to do with it?
5   A.  No.  It's just that I don't keep up with, you
6 know, all the volumes and when we bought them
7 specifically.  I'm looking at a broader picture.  I
8 assume we bought products.  I don't think we bought
9 anything of that type after May 11th.
10   Q.  Until when?
11   A.  Well, after May 11th, 2006, you know, I would
12 have thought we would have brought it from Johnco.
13   Q.  And I don't disagree with you.  I don't know
14 what you bought.  I don't know who you bought it from.
15 I don't know what you paid for it.  And I am asking
16 you -- I know what you bought from Johnco and I know
17 what you paid Johnco, so that, I'm fine with that
18 volume.
19   A.  Okay.
20   Q.  I want to know who else you bought the Number
21 67 size concrete gravel from other than Johnco.
22   A.  Like I said, the only ones that it could have
23 been 67 gravel, which is water-worn round aggregate,
24 would have been either The Concrete Company, Elmore Sand
25 & Gravel, or Martin Marietta or Wade Sand & Gravel.

76

1 They're the other gravel suppliers that have rail
2 sidings in the Montgomery area.
3   Q.  Okay.  And that's a good point.  Would any
4 Number 67 gravel that Yelvington bought have come from
5 the Montgomery area?
6   A.  Yes.
7   Q.  Okay.  And did you have a contract with any of
8 these other people that would be any kind of long-term
9 contract?
10   A.  No.
11   Q.  Okay.  The Concrete Company, I've jotted that
12 name down.  I don't know, is that the actual name of the
13 company?
14   A.  Yeah.
15   Q.  The Concrete Company?
16   A.  Yeah.
17   Q.  And they're in the Montgomery area?
18   A.  Yes, sir.
19   Q.  All right.  And they would have loaded you out
20 on a train that you sent to their facility?
21   A.  No, they don't -- they wouldn't have been able
22 to load a train.
23   Q.  Okay.  How would you have acquired gravel from
24 them?
25   A.  Just in small lots.

77

1    Q.  Like in -- how would you have transported it?
2    A.  By rail.
3    Q.  Okay.  And how would it have gotten into the
4 rail car?
5    A.  They would have loaded it.
6    Q.  How would they have loaded it, like at their
7 siding at their place?
8    A.  Yes.
9    Q.  And you would have sent how many cars?  What
10 could they handle?
11    A.  What could they handle?  Not unit trains.
12    Q.  Something less than how many?
13    A.  Probably 20.  I mean, less than -- I would only
14 be guessing, so maybe I shouldn't guess.
15    Q.  Well, I won't hold you to it, but they couldn't
16 handle 52 cars, 60 cars?
17    A.  No.
18    Q.  So if you sent something to them, you would
19 have been buying it in lesser numbers of cars?
20    A.  Yes.
21    Q.  And then where would you move that product to?
22 Where were your customers for that?
23    A.  You know, the only customers for that product
24 primarily would be the gulf coast terminals, which would
25 be Panama City, DeFuniak, Pensacola, Bay Minette,

78

1 Theodore, Gautier, or Long Beach.
2    Q.  You didn't mention Milton.
3    A.  Milton just opened in November.
4    Q.  Okay.  So it wasn't really available to move
5 gravel to during this time frame?
6    A.  Which time frame?
7    Q.  The '06 time frame, when you were actually
8 taking gravel from Johnco.
9    A.  Johnco shut down just before Milton opened.
10    Q.  Well, and let's talk about the shut down.  What
11 knowledge do you have that they shut down?
12    A.  I believe -- I'm not sure how that knowledge
13 came to me, whether it was through Jean Norton or the
14 railroad or Mr. Junkett or Ben Johnson.  I'm not sure,
15 but --
16    Q.  You think Ben Johnson may have called you?
17    A.  Well, not me.  I don't believe he talked to me.
18 I'm not sure how that came about.  But I know that in
19 October, early October, the operation was shut down.
20    Q.  You believe it was early October?
21    A.  I believe it was early October.
22    Q.  So there would have been no reason for you to
23 order any cars after that?
24    A.  Right.
25    Q.  Could you explain to me why, then, Philip

79

1 Holladay would call Clatus and order a trainload, and
2 why Mark Klebe would write a letter to Clatus and say he
3 wanted immediate shipment?  Can you explain why, if you
4 knew that they were supposedly shut down?
5    MR. LEEK:  Object to form, but you can answer
6 the question.
7    THE WITNESS:  Well, I lost track of the
8 question.
9    MR. LEEK:  Yeah.  And my only objection is
10 timing of the phone calls or letter.
11 BY MR. PEARSON:
12    Q.  Okay.  If you know -- if Yelvington knows that
13 Junkin or believes that Junkin has shut down, Johnco, in
14 early October of 2006, what would have been the reason
15 that Philip Holladay would call Junkin on the telephone
16 after November the 1st and order a load of gravel?  What
17 would be the reason that Mark Klebe, likewise, would
18 write a letter dated November the 10th of 2006 and ask
19 for an immediate trainload of gravel?  What would be the
20 reason if they know that it's shut down?
21    A.  Well, you know, maybe if there was inventory at
22 the yard that they could sell -- I mean, we anticipated and
23 wanted to pull gravel out of there.  Just because they
24 shut down the operation, was there gravel still left
25 that they wanted to sell.

80

1    Q.  Well, do you know why, then, you wouldn't have
2 made that order October the 1st?
3    A.  Well, no, I don't know why.
4    Q.  Or October the 8th?
5    A.  You're getting specific on dates, and no, I
6 don't know why.
7    Q.  Okay.  But the same reason would hold true on
8 those earlier dates if it holds true in November.  If
9 there's product on the ground and that's the reason
10 you're ordering it --
11    A.  No, not necessarily, because in August, we took
12 two trains.  In September, we took two trains.  So in
13 October, we were kind of reaching a stride.
14    Q.  You didn't take any in October.
15    A.  Well, you know, I don't recall all the dates,
16 but I know that Mr. Junkett came down to see me and
17 wanted to do something and then retracted what he wanted
18 to do with us.  And then shortly after that, and I don't
19 recall when that was, it shut down.
20    Q.  And you're saying that you didn't order any
21 more gravel in October because they shut down?
22    A.  Well, I'm not saying that, because I don't know
23 specifically.  I can't remember what exactly I was doing
24 the first of October or what our inventory was like or
25 what their operation was going through.

20 (Pages 77 to 80)

**81**

1     There was discussions with Mr. Junkett. He
2 came to see me, and we discussed something and there was
3 some dialogue going there. And then we found out by
4 letter that he's retracting that --
5     Q. We'll get to that.
6     A. -- what he wanted to do.
7     Q. We'll get to that. You seem to be a little bit
8 angry with me, but I'm trying to get an answer to my
9 question. I'm not trying to argue with you.
10     A. Okay.
11     Q. I'm not trying to be impolite. I really am
12 not. I'm trying to find out --
13     A. I get a little defensive when I feel like
14 somebody's trying to put words in my mouth.
15     Q. Okay. Well, I would like for you to use your
16 own words, but at the same time, those words should be
17 in response to the question I pose to you.
18     A. Okay.
19     Q. And I'll make that deal with you if you'll do
20 that.
21     A. Okay.
22     Q. All right. September 25th, I'll represent to
23 you, is going to be the last date that you took a
24 shipment.
25     A. Okay.

**82**

1     Q. All right. Now, you said something about
2 inventory on the ground. Are you talking about your
3 inventory or are you talking about inventory at Johnco's
4 Whitehall facility?
5     A. Johnco's Whitehall facility. You told me that
6 Philip Holladay ordered a train. I don't recall --
7     Q. I asked --
8     A. -- specifically that he ordered a train. If he
9 ordered a train, it was probably because we wanted to
10 receive a train.
11     Q. Okay. And I'll represent to you that the
12 evidence in this case is going to be that Philip
13 Holladay called Clatus Junkin sometime in the first ten
14 days of November of '06 and ordered a train.
15     Now, my question related to that is, why would
16 he do that? Why would he do that?
17     A. Well, you'd have to ask him that.
18     Q. And I will. But you're the president of
19 Yelvington, and you say you didn't take any product
20 after September the 25th or after September because they
21 shut down. And I'm telling you, your guy ordered gravel
22 in November, after we filed the lawsuit. And I want to
23 know what reason he would have to order it if you didn't
24 order it because they're shut down or you believe
25 they're shut down.

**83**

1     A. I don't recall specifically. We were going to
2 take 150,000 tons of gravel. Whether it was October or
3 November, whether it was two trains a month, whether it
4 was one train a month, whether it was two trains a week,
5 we were going to take the volume. Okay? The operation
6 shut down, and we were unable to take the volume.
7 That's as clear as I can be.
8     Q. The volume you were going to take did not have
9 to be, in Yelvington's mind, on any regular shipment
10 basis, though.
11     A. It would become regular. It would become
12 regular. But, you know, some weeks, like it rains.
13 Okay? Customers don't use product as fast during those
14 weeks. Sometimes there's hurricanes. There's all kinds
15 of things and that ebb and flow the supply and demand of
16 materials.
17     At the end of a year, we would have taken
18 150,000 tons of materials.
19     Q. Okay. And the customers don't take gravel when
20 it rains and hurricanes occur and they don't take it
21 then, and what you're talking about is Yelvington's
22 customers that you're going to resell the gravel to. Is
23 that correct?
24     A. That's right. And, you know, since we do move
25 ten million tons a year, nine to ten million tons a

**84**

1 year, there are problems. There are problems with the
2 producer. There are problems sometimes with the
3 railroad. There are problems sometimes with the
4 customers or weather-related problems. There's problems
5 that everybody has that change the way the schedule
6 moves.
7     But at the end of the year, Conrad Yelvington
8 Distributors would have taken 150,000 tons minimum from
9 Johnco.
10     Q. But as of November the 10th, November the 10th
11 of 2006, as of that date --
12     A. Well, what's --
13     Q. -- you had only taken 32,000, approximately.
14     A. But what's significant about November 10th?
15     Q. That's the date of the letter that Mark Klebe
16 wrote, saying he wanted a train.
17     A. Well, I don't know the significance of that,
18 where that fits with, you know, our need for material or
19 our inventory or your inventory or --
20     Q. Does your need -- and I'm saying Yelvington's
21 need. Does Yelvington's need for material have anything
22 to do with the minimum volumes being shipped on a
23 regular basis?
24     A. Our need for material?
25     Q. Yes. Does the need for material have any

93f7f9bb-1dbb-4811-8553-35dc8ec418c9

85

1  impact on whether you take the 150,000 tons minimum over
2  a regular shipment schedule over the year?
3      A.  I think that generally, when you start any of
4  these operations -- or, I can only say this from all the
5  other things that we've started, that as they start out,
6  they start out slow, and they get into a routine at some
7  point.  And these other issues that I brought out,
8  hurricanes, weather --
9      Q.  Customers' needs.
10     A.  -- production problems, customer issue, quality
11 problems, either our problems at the terminal or the
12 problems at the mine, those tend to settle out.  That's
13 all I'm saying.
14     MR. PEARSON:  All right.  If you don't mind,
15 let's take a break and get a bite.
16     MR. LEEK:  Sure.
17     MR. PEARSON:  We'll just go off for now, and
18 then we'll resume this.  And make it easy on
19 yourself.  You know, one o'clock?
20 (Thereupon, at 11:56 a.m., a recess was taken in the
21 proceedings, after which, at 1:05 p.m., the proceedings
22 were reconvened and the following proceedings were had:)
23 BY MR. PEARSON:
24     Q.  I think when we left, we had started talking
25 just a little bit about companies that Yelvington

86

1  sold -- excuse me.  Companies that Yelvington purchased
2  Number 67 gravel from subsequent to April of 2004.  You
3  mentioned four companies, one being Elmore, one being
4  The Concrete Company, one being Martin Marietta and one
5  being Wade Sand & Gravel?
6      A.  Uh-huh.
7      Q.  All right.  Now, on all of those companies --
8  we talked a little bit about The Concrete Company and
9  Elmore.  Were all four of those companies producers that
10 did not have the capability to give you the whole
11 trainload at a time, or were any of those people that
12 could give you the big loads?
13     A.  Well, first, let me clarify that the reason I
14 mentioned those, those are predominantly the ones in the
15 Montgomery area that ship by rail.
16     Q.  Okay.
17     A.  Since I specifically don't remember which or if
18 any of them that we bought that product from, with the
19 exception of Elmore, I listed those.
20     Q.  All right.  Do you know of other companies that
21 you've bought Number 67 from, you know, any time since,
22 you know, April of 2004?  Do you know other companies?
23     A.  I don't recollect any.  Those are predominantly
24 the ones up there.  Not all the sand, gravel producers
25 in that area have rail, so we wouldn't have bought much

87

1  from anybody that didn't have rail capabilities.
2      Q.  Now, did you have a particular customer that
3  you were servicing with the Number 67 gravel you were
4  acquiring from Johnco?
5      A.  That we were acquiring?
6      Q.  Yeah.  I mean, you got a certain amount of
7  gravel from Johnco.  I mean, did that go to a particular
8  customer?
9      A.  We shipped it to -- let me see.  We shipped it
10 primarily to Gautier, Mississippi.  And we shipped it
11 to, I believe, Mallet.  Mallet bought it at Gautier, and
12 Metro ready mix or concrete.  I don't know which way
13 they go by.  And then -- I forget.  We hauled some, I
14 believe, to -- we shipped some to Long Beach,
15 Mississippi, I believe.
16     Primarily, the gravel went to Long Beach,
17 Gautier, Pensacola, DeFuniak, and maybe Panama City,
18 primarily.  And then, you know, would have gone to
19 Milton quite extensively.
20     Q.  After Milton got up and running, which you said
21 really didn't occurred until after the --
22     A.  I don't know when they got up and running.  I
23 think we took our first train there in early November.
24     Q.  Okay.  Where did you get that trainload in
25 early November?  Where did you get that train?

88

1      A.  For Milton?
2      Q.  And only if it has to do with --
3      A.  Oh, I don't think --
4      Q.  -- Number 67 gravel.
5      A.  I don't know that we ever shipped any Number 67
6  to Milton.  I think they might have shut down, or we
7  might have heard that they were going to shut down
8  before Milton got open.
9      Q.  Okay.  The -- I think, probably after
10 November -- you know, I mean, after the lawsuit is
11 filed -- well, actually, the last load -- we'll put
12 these things in.  The last load you all took,
13 September 25th is the date of the invoice.  But
14 subsequent to that time -- well, I say September 25th of
15 2006, now.
16     A.  Okay.
17     Q.  Subsequent to that time, have you all bought
18 Number 67 from anybody?
19     A.  Subsequent being after?
20     Q.  Yes.
21     A.  67 or 57?
22     Q.  67.
23     A.  We're buying some gravel now, but I'm not sure
24 if it's 67.  I believe it's 57.
25     Q.  Where are you buying that from?

89

1    A.  Martin Marietta.

2    Q.  And what's -- is 57 bigger?

3    A.  A little bigger.  Yeah.

4    Q.  Is it used for some different purpose?

5    A.  Mostly the concrete business.  Some people like

6    57 and some like 67.

7    Q.  And are you buying any 67?

8    A.  I'm not sure if what we're buying is 57 or 67.

9    Q.  Okay.  What are you having to pay for the 57?

10    A.  Right now?

11    Q.  Yes.

12    A.  I believe it's more than $7 a ton.

13    Q.  And when did you start buying that from Martin

14    Marietta?  And is that who you principally buy it from

15    is Martin Marietta?

16    A.  I think they're the only ones that can take a

17    trainload quantity on a limited basis.

18    Q.  What's a limited basis?

19    A.  Only on the weekends.  And it has to be kind of

20    coordinated with when we have trains coming back.  So if

21    it doesn't look like the coordination is going to be

22    right, we can't take it.

23    Q.  And that is the Martin Marietta around

24    Montgomery?

25    A.  Yeah, they're east of Montgomery.

90

1    Q.  How close is their pit, mine, quarry, whatever

2    you call it, operation to Whitehall?

3    A.  I think they're maybe ten miles on the east

4    side on Montgomery, and Whitehall is --

5    Q.  Twenty miles?

6    A.  -- 15 or 20 miles on the west side of

7    Montgomery.  Whitehall is served by Meridian Bigby

8    railroad, Short Line, and Martin Marietta is served

9    directly by the CSX.

10    Q.  The cars that you leased, who do you -- who do

11    you lease them from?  Do you lease them from CSX?

12    A.  No.

13    Q.  Okay.  From --

14    A.  Independent leasing companies.

15    Q.  Did you ever use -- like me, I don't own any

16    cars, I don't lease any cars.  If I was to want to ship

17    something, could I pick up the phone and call CSX and

18    get a car?

19    A.  A car?

20    Q.  Well, you know what I'm saying.  Could I get

21    cars from them?

22    A.  Yeah.  They're limited, and they're becoming

23    more and more limited on the availability of cars.  So

24    in order to ship any significant quantities and know

25    that you're going to be able to have the product when

91

1    you need it, you pretty much have to be in -- pretty

2    much have to have your own cars, whether you own them or

3    lease them.

4    Q.  Back in 2006, before the lawsuit is filed,

5    November the 1st of '06, before that time, did you have

6    customers that were buying large volumes of Number 67

7    gravel?

8    A.  Prior to November?

9    Q.  Uh-huh.

10    A.  Prior to November 1st of '06?

11    Q.  Right.

12    A.  Or prior to November of '04?  Or what was it,

13    March of '04 or April of '04?  Prior to the supply

14    agreement or prior --

15    Q.  During the supply agreement.

16    A.  During the supply agreement?

17    Q.  Yes.

18    A.  Well, we wouldn't have had any customers,

19    significant customers, after we started -- you know,

20    mid, I'd say, June of '06.  You know, we wouldn't

21    have -- we would have tended to get that product from

22    Johnco, so we wouldn't have been buying it from somebody

23    else, I don't believe, after June or so, when we started

24    shipments from them.

25    Q.  And you misunderstood my question.

92

1    A.  Oh, I'm sorry.

2    Q.  It might be fair that I may not have said it

3    well.

4    Customers, did you -- who you're selling the

5    product to, once you buy it and inventory it at your

6    facility, did you have customers that were taking large

7    volumes of 67?

8    A.  Well, remember that I told you that at those

9    terminals in the gulf coast, we have an arrangement with

10    Vulcan where Vulcan does the selling, but that's crushed

11    stone, not gravel.  Okay?  We have the right to sell

12    gravel, bring it in and sell it.

13    But we weren't selling -- Conrad Yelvington

14    wasn't selling a product which included the

15    transportation and handling, terminal costs, car costs.

16    We were not selling it directly to large users that I

17    recall.

18    Q.  Okay.  All right.

19    A.  You're talking about after we started shipments

20    from Johnco.

21    Q.  Johnco.

22    A.  Right.

23    Q.  So the loads that you were taking, you were

24    sending them to specific places, based on specific needs

25    at that time?

93

1    A.  Needs, or we were sending -- I mean, there's --
2    I guess there's business that you -- when you run this
3    business, just to tell you how we run it, there's
4    business that we have that we supply on a regular basis.
5    There's business that we want but can't supply because
6    we don't have the product, number one, or we don't have
7    the right pricing structure.  So there's potential
8    business and there's business.
9    Q.  Okay.  And so your business for the Number 67
10   was mostly still potential business during the time you
11   were buying from Johnco?
12   A.  It was potential business that, when we felt
13   like we were going to be able to get the Johnco product,
14   we felt confident that we could secure that business and
15   sell that product.
16   Q.  Well, since you had the Johnco product locked
17   up price-wise and volume-wise, any vagaries related to
18   your ability to sell it within a pricing structure had
19   to be coming from the shipment costs or the terminal
20   costs or some other costs that would be added on top of
21   the 525 or 550 that you were paying.
22   A.  Ask that again.  Any -- I didn't hear what
23   any --
24   Q.  You said some of the problems of getting the
25   potential business related to your ability to fit within

94

1    whatever pricing structures were required to service
2    that customer.  Since the Johnco gravel that you were
3    contracted to buy was a fixed price -- you know, 525,
4    then it shifts up five percent to, you know, around 550,
5    that isn't what was causing any issues about getting the
6    potential business, that price.  It would be whatever it
7    cost you to move it or store it or whatever the handling
8    costs would have been, what that would have --
9    A.  We felt confident that we would move the
10   product.  There was a market out there for it.  The
11   customers may have been buying crushed stone, not
12   gravel, but we were confident that we could move the
13   product.
14       We would like to make certain margins.  If
15   those margins aren't available in the market for
16   whatever reason, then we make adjustments and maybe take
17   less than we would like to.  But we were confident that
18   we could move the product, the commitment that we made
19   to them.
20   Q.  Okay.
21   A.  Can we take a break while you do that.
22       MR. PEARSON:  Sure.
23   (Thereupon, at 1:19 p.m., a recess was taken in the
24   proceedings, after which, at 1:21 p.m., the proceedings
25   were reconvened and the following proceedings were had:)

95

1    (Thereupon said document was received and marked as
2    Plaintiff's Exhibits 3 through 8.)
3    BY MR. PEARSON:
4    Q.  All right.  Gary, I've given you what I've
5    marked as Plaintiff's Exhibit 3 to your deposition and
6    Plaintiff's Exhibit 4, 5, 6, 7, and 8.  And I'll
7    represent to you that I understand these to be the
8    invoices from Johnco Materials to Conrad Yelvington
9    Distributors, Inc., for the gravel that was shipped from
10   Whitehall to Conrad Yelvington facilities.  Is that
11   correct, or is there a different description of these
12   documents?
13   A.  That's what it looks like.
14   Q.  On Plaintiff's Exhibit 3, it's the only one of
15   these six exhibits that has attachments to it which
16   appear to be -- honestly, there's what's called a
17   conductor switch list attached to it, and then there are
18   some, for lack of a better term, tickets that are --
19   now, these are all bates numbered.  The conductor switch
20   list is bates numbered 46 and 7, and the, I guess, load
21   tickets are Johnco 48 bates numbered, or Johnco
22   Materials 48 through Johnco Materials 57.
23       Now, are these -- the conductor switch list, do
24   you know where that comes from?
25   A.  No.  It's not anything that -- it says Rail

96

1    Link at the top.
2    Q.  Uh-huh.
3    A.  And I believe Rail Link is one of the companies
4    associated with that Short Line Railroad.
5    Q.  Okay.  And it appears to be, if you look at the
6    attachment, Johnco Materials bates numbered 46 and 47,
7    they appear to be stapled in almost reverse order from
8    where they should be.  But it looks like number -- you
9    know, number 40 -- on page 47, bates number 47, there's
10   cars that are sequenced from 1 through 38.  And then if
11   you go back to page 46, they're sequenced from 39
12   through 60.  And that appears to match up with serial
13   numbers of the cars on the various load tickets.
14   A.  Uh-huh.
15   Q.  All right.  So are those your cars, the Conrad
16   Yelvington cars?
17   A.  Yeah.  The 1 through 60 look like our lease
18   cars.  I recognize the prefix.
19   Q.  Okay.  And who do you lease those from?  Or can
20   you tell from looking at it?
21   A.  Well, yeah.  We have -- the HCSX cars, we lease
22   from Helm.
23   Q.  Okay.  The CYDX?
24   A.  That would either be the Anderson's, the CYDX.
25   Q.  Uh-huh.

97

1    A.  And then the CYXX, I believe we lease those
2  cars from First Union.
3    Q.  Okay.
4    A.  The MBKX cars, I believe we lease those cars
5  from Mitsui Capital.  They may have another name now.
6  But those are all individual leasing companies that I
7  just gave you.
8    Q.  Right.  And Conrad Yelvington, these are part
9  of that fleet of hopper cars that you all leased that we
10  discussed earlier in this deposition, the 1800 plus
11  hopper cars that you all leased?
12    A.  Yeah.
13    Q.  Okay.  Now, if you go on over to the next bates
14  numbered pages which are attached, which appear to be
15  load tickets, is that something that is -- who creates
16  those load tickets?  Is that something Johnco created?
17  And I'm asking you because I don't know.
18    A.  I don't know.  That's the first time I've seen
19  these.
20    Q.  All right.  All right.  But the invoice, if you
21  look back on the first page of the invoice of
22  Plaintiff's Exhibit 3, which is Johnco Materials, and
23  it's bates numbered page 44, even though mine's sort
24  of --
25    A.  Yeah.

98

1    Q.  Okay.  This appears to be an invoice dated 5/11
2  of 2006, for the first 60 -- excuse me, 58 cars or 60
3  cars that was -- that you all sent up there to be loaded
4  out.
5    A.  Okay.
6    Q.  Is that what it looks like to you?
7    A.  Looks like to me, yes, sir.
8    Q.  However many cars it is, that's -- I noticed
9  that the last two cars on the list just say no load for
10  whatever reason.  And I don't know what that reason is.
11    A.  Yeah.
12    Q.  Do you assign any significance to the fact that
13  the last two cars say no load?
14    A.  No.  I mean, they -- I don't know why they
15  wouldn't have been loaded.
16    Q.  Okay.
17    A.  They might have forgot them, or they might have
18  not got there at the same time or -- I don't know.
19    Q.  If you look at Plaintiff's Exhibit 4, it
20  appears to be -- now, the tickets are not attached and
21  none of the attachments are on any of the rest of these
22  plaintiff's exhibits.  But Plaintiff's Exhibit 4 appears
23  to be a summary invoice that is dated on June 27th of
24  '06.  Is that right?
25    A.  It looks like it.

99

1    Q.  Okay.  Now, when I'm looking at this invoice,
2  if you'll go to the second page of the invoice, which is
3  the bates number at the bottom, Johnco Materials 59, it
4  appears that the -- starting in the third line down on
5  the listing of the individual cars, those -- the last 27
6  cars or so on that page, or however many that turns out
7  to be, is what was loaded with 67 gravel.  Right?
8    A.  Yes, sir.
9    Q.  And the other cars up to that point show to be
10  loaded with Number 4 oversize.
11    A.  That's right.
12    Q.  And that Number 4 oversize, we've already
13  established, isn't part of the contract gravel.  Right?
14    A.  That's right.
15    Q.  Okay.  Go to Plaintiff's Exhibit 5.  It appears
16  to be another invoice, and it's dated August 8th of '06.
17  That seems to comport with your memory of when the
18  shipment was made?
19    A.  I don't remember it, but it's in one of those
20  lists which --
21    Q.  Right.  And, again, this appears to be
22  individualized cars, how much tonnage they were loaded
23  with --
24    A.  Yes.
25    Q.  -- and all of that kind of stuff, and then an

100

1  invoice, and it's dated August 8th of '06.  Right?
2    A.  Yes.
3    Q.  All right.  And this is all Number 67 gravel on
4  this one?
5    A.  Yes, sir.
6    Q.  All right.  Then if you look at Plaintiff's
7  Exhibit 6, that's the next invoice, and it's dated
8  August 21st of 2006?
9    A.  Uh-huh.
10    Q.  Okay.
11    A.  Yeah.  Okay.
12    Q.  August 21st of '06?
13    A.  Yeah.
14    Q.  All right.  And it again appears to be all
15  Number 67 gravel, however many cars it is.
16    A.  Yeah.
17    Q.  Okay.  Then we'll go ahead -- we can go back
18  over them if you need to look at them.
19    A.  No.  I was just trying to look and see if they
20  were in order.
21    Q.  I attempted to hand them to you in order, so if
22  I didn't, it's my mistake.
23      Plaintiff's Exhibit 7 appears to be an invoice
24  that was sent to you for moving Number 67 gravel.  And
25  I'll represent to you that I quickly counted those cars

101

1  and I believe there's like 52 of them but, you know, I'm
2  not going to swear to it. It's however many it is, but
3  I think it's 52.
4      A.  It's a trainload quantity.
5      Q.  Yeah, it's a trainload quantity of --
6      A.  Yes, sir.
7      Q.  And that one's dated September the 7th of '06.
8      A.  Yes, sir.
9      Q.  All right. And then Plaintiff's Exhibit 8,
10  which is the last one, is dated September the 25th of
11  '06. Is that right?
12     A.  Yes.
13     Q.  And, again, it appears to be a trainload
14  quantity of Number 67 that has been shipped to
15  Yelvington.
16     A.  Yeah.
17     Q.  Then going backwards on them, just real
18  quickly, tell me -- you know, it looks like the
19  September 25th shipment, it's got written on there, ship
20  to Gautiay (phonetic), Mississippi. This that --
21     A.  Gautier.
22     Q.  Gautier? Is that how you say that?
23     A.  Yes.
24     Q.  All right. Spelled G-A-U-T-I-E-R.
25     A.  Right.

102

1      Q.  And Plaintiff's Exhibit 7, it says, shipped to
2  Florida. Can you tell --
3      A.  I don't know where, but --
4      Q.  Yeah. What it says --
5      A.  It's not specific.
6      Q.  Okay. The Plaintiff's Exhibit 6, again, is
7  Gautier --
8      A.  Yes, sir.
9      Q.  -- Mississippi?
10     A.  Uh-huh.
11     Q.  Plaintiff's Exhibit 5, Theodore, Alabama?
12     A.  Yes, sir.
13     Q.  Now, do you all have -- other than the one that
14  says Florida, generally, but do you have -- do you have
15  a terminal in Gautier?
16     A.  Yes, sir.
17     Q.  Okay. You have a terminal in Theodore?
18     A.  Yes, sir.
19     Q.  And you've got numerous terminals in Florida.
20  We just don't know which one that might have gone to --
21     A.  Right.
22     Q.  -- right now.
23        Plaintiff's Exhibit 4, I don't show where that
24  was shipped to. Do you have any way to tell from
25  looking at that?

103

1      A.  No, but that's the one with the oversized
2  gravel, so I think it went to Jacksonville.
3      Q.  Okay. And then Plaintiff's Exhibit 3, which is
4  the May 11th, the first load, that shows Pensacola.
5      A.  Uh-huh.
6      Q.  Is that where that would have gone to?
7      A.  That's what it looks like.
8      Q.  Okay. Now, other than these six loads which
9  are invoiced on Plaintiff's 3 through Plaintiff's 8, is
10  there any other loads of gravel that Yelvington took
11  under the supply agreement, that you're aware of?
12     A.  If they're not on that list, I'm not aware of
13  any.
14     Q.  And when you say the list, you're talking
15  about --
16     A.  There was a list in some of the stuff that I've
17  got that outlined, you know, the shipments that we took.
18     Q.  Well, I'll represent to you, just for ease of
19  this, and I'll let your attorney correct me, but we had
20  put those dates in those -- of those shipments in the
21  complaint, and you agreed that those were those ones.
22  Is there any reason to say that's not them now?
23     A.  I don't believe so. Are these -- all of those
24  are here. Right?
25     Q.  Yes. Those are the ones that are here.

104

1      A.  Yeah.
2      Q.  Now, the next thing I want to do -- let me ask
3  you a question. The supply agreement which I'm going to
4  mark and put in now, basically, I'll represent to you
5  that it says that you get -- that you all pay within
6  30 days, or you pay 30 days after the invoice.
7         Now, is there any reason to believe that these
8  were not invoiced at or very near the time that these
9  trains were loaded and shipped out? Do you have any
10  knowledge of that at all?
11     A.  I wouldn't know that.
12     Q.  Okay.
13  (Thereupon said document was received and marked as
14  Plaintiff's Exhibit 9.)
15        MR. LEEK:  Could we go off the record for just
16  a second?
17        MR. PEARSON:  Yeah.
18  (Thereupon there was a conference off the record.)
19  BY MR. PEARSON:
20     Q.  I've given you what's been marked as
21  Plaintiff's Exhibit 9, Gary. And do you recognize what
22  that document is?
23     A.  Yeah, I recognize it. It was a version of the
24  supply agreement.
25     Q.  Is it the -- is it the final version that is in

105

1 **force in this instance, to the best of your knowledge?**
2 A. I would probably have to ask Mark Klebe to
3 verify that. I know there was several versions of this
4 thing that we were trying to get it right for both
5 parties.
6 **Q. Well, did you sign more than one?**
7 A. I don't believe I did.
8 **Q. Okay. Well, look and see --**
9 A. Each page isn't signed. I mean --
10 **Q. Look on Plaintiff's 9, though, and see if your**
11 **signature exists and is notarized on Plaintiff's**
12 **Exhibit 9.**
13 A. Yeah.
14 **Q. Okay.**
15 A. That page does look appropriate, because Kathy
16 is my secretary, and my signature, I recognize.
17 **Q. Okay. And it appears that Klebe is the actual**
18 **person notarizing your signature?**
19 A. Yes.
20 **Q. Or Mr. Klebe, Mark Klebe.**
21 A. Yes, sir.
22 **Q. And he's your chief financial officer?**
23 A. Yes.
24 **Q. Is he a stockholder in the company, too?**
25 A. No.

106

1 MR. PEARSON: All right. For our purposes
2 sitting here today, talking about it, do you all
3 agree that this is the supply agreement that's in
4 force? Do you know of another one that would be in
5 force?
6 MR. LEEK: I don't know of any other agreement
7 that would be in force besides this one.
8 BY MR. PEARSON:
9 **Q. Gary, do you know of one that would be in force**
10 **other than the one I've handed you as Plaintiff's**
11 **Exhibit 9?**
12 A. No. I don't know of any.
13 **Q. Okay. All right. Let me call your attention**
14 **just for a second to 2.2 of Plaintiff's Exhibit 9.**
15 **That's a paragraph numbered 2.2.**
16 A. Yeah.
17 **Q. Tell me -- read that and tell me what -- you**
18 **know, in your mind, what you're talking about there.**
19 A. Well, let's see. Okay.
20 **Q. If you don't mind, just because it will make it**
21 **easier for everybody when they read it, read 2.2 out**
22 **loud and --**
23 A. Right to use siding. Right to use rail siding.
24 Buyer and the rail cars it provides for shipment of
25 product it purchases have priority over any other

107

1 customer of seller and shall have the unrestricted use
2 of the rail siding.
3 You want to know why that point was put in
4 there?
5 **Q. Well, yeah. I would like to know why that's in**
6 **there.**
7 A. Okay. You want me to answer that now?
8 **Q. Yeah, please.**
9 A. The reason that's in there is because this is
10 unit train service. And when we have 52 cars, 52 or 60
11 or a trainload of empty cars come up -- come out there,
12 they need to be able to get in and get off the main line
13 so as not to interrupt the railroad, the local railroad
14 tracks, main line tracks. So --
15 **Q. And under --**
16 A. -- as we developed this agreement, we wanted to
17 make sure that Johnco knew that, you know, this is the
18 way we were going to ship the product, in trains. And
19 that when the trains came out there, they had to
20 basically drop what they were doing and load those
21 trains so that the railroad wasn't disturbed or
22 impacted.
23 But especially because those cars -- there's 52
24 of them -- we lease them by the month, so the cars need
25 to move. And we didn't want somebody getting two or

108

1 three cars to interfere and cost us significant amounts
2 of money by delaying our cars to be loaded.
3 **Q. Okay. And I appreciate you telling me how that**
4 **got in there.**
5 **2.1, if you look at paragraph 2.1 of**
6 **Plaintiff's Exhibit 9 to your deposition, Gary, it talks**
7 **about the plant facility and it being built. And the**
8 **last part of that paragraph discusses that -- the last**
9 **sentence says, in addition to the mining facilities to**
10 **be constructed on the plant site, this contract is**
11 **contingent on seller's ability to construct or obtain**
12 **rights to sufficient rail siding to load/handle a**
13 **minimum of 52, and then there's a parenthesis, 52**
14 **number, parenthesis closed, open or covered hopper rail**
15 **cars on a regular shipment schedule.**
16 A. Right.
17 **Q. Now, did you have that put in there?**
18 A. Yeah. We wanted to make sure that when this
19 long-term supply agreement was put into effect, that
20 they would have the infrastructure out there at the
21 plant so that they knew that they were handling unit
22 trains, and that those cars would have to come in there
23 and be taken immediately and loaded immediately, and it
24 would become on a regular shipment schedule.
25 **Q. Okay.**

93f7f9bb-1dbb-4811-8553-35dc8ec418c9

109

1    A. Or could become on a regular shipment schedule.

2    **Q. Now, but you're not reading, could become on a**

3    **regular shipment schedule. You're not reading that in**

4    **the contract, are you?**

5    A. Well, it's on a regular shipment schedule. In

6    other words, this is a long-term agreement.

7    **Q. And that is what the contract says, on a**

8    **regular shipment schedule.**

9    A. On a regular shipment schedule.

10   **Q. Let me ask you just a minute about the open or**

11   **covered hopper rail cars. That's what we discussed**

12   **earlier in the deposition, isn't it, about the covered**

13   **hopper cars?**

14   A. Uh-huh.

15   **Q. And did Johnco have the capability of handling**

16   **those covered hopper cars at their load-out facility at**

17   **the plant in Whitehall?**

18   A. Let me see. They loaded out with a conveyer.

19   MR. LEEK: Let me object to form just as to

20   frame time. You can answer the question.

21   THE WITNESS: I believe we put that in there

22   because we have covered hopper cars, as well. And

23   since the cars are, you know, a high-value

24   commodity, we want to be able to use whatever cars

25   we can put in there.

110

1    But I can't answer the question specifically

2    that they could load the covered cars. But with

3    minimum modification, I'm sure they could

4    accommodate that.

5    BY MR. PEARSON:

6    **Q. Okay. And if you look at -- if you look at**

7    **number -- again, on Plaintiff's Exhibit 9, paragraph**

8    **3.1. And you're talking about the products, the price,**

9    **the quantities, et cetera. That's what it's entitled.**

10   **But would you read the text of that, please, for me?**

11   **I'm just --**

12   A. Read number 3.1?

13   **Q. Yeah. Let's talk about it.**

14   A. Okay. 3.1, products, price, quantities --

15   products, price, quantities. After seller commences

16   mining and grading of sand and gravel, seller shall sell

17   and deliver to buyer Number 67 concrete gravel in

18   minimum quantities of 150,000 tons annually for a price

19   equal to five and 25/100ths per ton, FOB buyer's rail

20   cars, loaded on rail siding on the plant site on a

21   weekly schedule, approximately 5200 tons per week, and

22   buyer shall purchase and accept from seller said product

23   at the price and the quantity specified.

24   However, notwithstanding the foregoing, buyer

25   shall have the right to reject any such product that

111

1    does not meet the above-named classification or buyer

2    specifications, and seller and buyer acknowledge that

3    the tonnage specified above will be subject to rail car

4    supply and availability.

5    The price per ton established herein for the

6    product shall remain fixed at 525 per ton for the first

7    24 months, i.e., two years of this agreement. The price

8    will increase by five percent at the beginning of year

9    three and two and a half percent at the beginning of

10   years four and five.

11   **Q. Now, up there on the -- up there on the top of**

12   **that second page that you just read from, again, it**

13   **talks about on a weekly schedule and specifically uses**

14   **the words, on a weekly schedule. And then it says,**

15   **approximately 5200 tons per week. Now, listening to**

16   **you, you know, give me your testimony in deposition**

17   **today, you disagree that you had to be on a weekly**

18   **schedule to comport with this contract?**

19   A. Yeah. I mean, what -- I think if we had to

20   draw this deal again, based on this, the week meant the

21   week that the train was there, not every week, because

22   if you did the math on this, it would be not double, but

23   close to double the amount that we said we would buy.

24   **Q. And you also recognize that it says twice in**

25   **3.1, weekly schedule, and the other time, per week. But**

112

1    **then back over in 2.1, we talked about loading and**

2    **shipping on a regular shipment schedule.**

3    A. Well, in 2.1, it also says the plant would be

4    built in 12 months. So, I mean, you know, if you want

5    to talk about what each one of these say specifically,

6    we can maybe clarify that, too.

7    **Q. All right. At any time, Gary, did Yelvington**

8    **notify Johnco that it was in breach of the contract at**

9    **any time prior to filing your counter-claim in this**

10   **lawsuit?**

11   A. I don't recall either Johnco telling us or us

12   telling them. I thought we were working with them to

13   move this product like we said we would with this supply

14   agreement.

15   **Q. Okay. And under 3.2 of this contract, I'm**

16   **reading it, and it appears that you are to get**

17   **possession of title to the gravel as soon as it's in**

18   **your possession when the product is loaded onto your**

19   **rail cars, and then it says, or other transportation**

20   **vehicles. So did this contract contemplate other**

21   **vehicles other than just rail cars?**

22   A. Title to any product delivered shall pass to

23   buyer when it is placed in buyer's possession by loading

24   the product upon rail cars or other transportation

25   vehicles delivered to plant site and provided by buyer.

93f7f9bb-1dbb-4811-8553-35dc8ec418c9

113

1    I think that was placed in there such that if
2    there were issues at the plant, that we could still pick
3    it up by truck.
4    Q.  Okay.  And that's fair.  I don't have a problem
5    with that.
6    A.  Okay.
7    Q.  You weren't required to only get it by rail,
8    you could have gotten it another way?
9    A.  If we needed to.  That was to protect us to get
10   the product that we needed to sell to the customers that
11   we committed to sell.
12   Q.  And would 3.4 say the same thing?
13   A.  Rail cars.  Buyer shall supply the rail cars
14   and other means of transporting any product purchased by
15   buyer from seller under this agreement.
16   Q.  Again, expanding from rail cars to any other
17   kind of transportation?
18   A.  Right.
19   Q.  Now, both 3.1 and 3.5 talk just a little bit
20   about the specifications, the quality.  You know, they
21   both touch on it a little bit.  And I just want to
22   confirm, Gary, because this is my deposition with you.
23   Do you have any knowledge -- whether you have been told
24   by somebody or read something, do you have any knowledge
25   that Johnco's product for Number 67 gravel did not meet

114

1    your specifications, ever?
2    A.  Well, initially, and I didn't say when
3    initially was, but early on, prior to May 11th, there
4    was some issues with too much sand in the product, and
5    we just held off until they got that straightened out.
6    Q.  Okay.  How do you have that information?
7    A.  I just remember vaguely, as they started
8    producing, as Ben Johnson started producing, that he was
9    getting some sand in the gravel and was going to clean
10   it up, and ultimately did.
11   Q.  Okay.  But you don't have any knowledge of
12   exactly when that occurred?
13   A.  No.
14   Q.  Okay.  Now, how do you have that knowledge?
15   You say you remember vaguely.  You remember it from
16   talking directly to Ben or from talking to Philip or
17   who?
18   A.  I'm not sure who.  It was probably one of those
19   two.
20   Q.  And you only went to the plant site once.  Is
21   that correct?
22   A.  I went out there before they ever started.
23   Q.  Okay.  So more than once, then?  Once after --
24   A.  Yeah, once -- yeah, when they first
25   contemplated this, and then maybe once -- I'm not sure

115

1    how many times after that.  Once, maybe twice after
2    that.
3    Q.  Do you remember who was with you when you went
4    out each of those times, Gary?
5    A.  Well, I remember Philip was with me the last
6    time I believe I was out there.  And that was -- Ben
7    Johnson was out there at that time.
8    Q.  And had Philip -- was this an introduction of
9    Philip to the plant, or had he been there on-site
10   several times?
11   A.  Yeah.  I'm not sure about that.
12   Q.  Okay.  Well, do you remember when you sent
13   Philip up to start going to the plant site in Whitehall?
14   A.  No, not specifically, no.  It was early on.
15   Q.  Did Philip go from place to place, or did he
16   spend a hundred percent of his time in Whitehall?
17   A.  Oh, no.  He did a lot of things for us.
18   Q.  After whatever vague memory you might have of
19   too much sand in the gravel -- is that a washing
20   problem?  Do you know what --
21   A.  It had something to do with the dredge.  I
22   think they had some dredge problems.  Just setting up,
23   just typical start-up issues that would not alarm
24   anybody, but would be expected of any new operation.
25   Q.  But once they started putting product up there

116

1    for you to take, as far as you know, there wasn't any
2    issues with the specs?
3    A.  I don't believe we had any issues of the
4    initial shipment as far as the quality of it.  I think
5    there were, you know, some concern that they could
6    maintain a steady production.  They had some old
7    equipment.
8        I'm not sure, and even Mr. Junkett told me that
9    Ben had, you know, made some mistakes and had some
10   issues.  Obviously, the start-up was well delayed.  And
11   I'm not sure that -- I don't think Mr. Junkett had much
12   confidence in him.  Obviously, I think, at some point,
13   he was relieved of some responsibility and Mr. Junkett
14   got involved.  And so there's -- obviously, there was
15   some problems out there, but we still expected and
16   wanted it to be successful.
17   Q.  And you're talking about your meeting with
18   Clatus Junkin that occurred sometime early in the summer
19   of '06?  Is that what you're talking about?
20   A.  Yeah.  We talked --
21   Q.  Is that the Calera meeting that you're talking
22   about?
23   A.  I would assume.  I think that's the first time
24   I met him was that meeting.
25   Q.  All right.  And we'll put this down here for a

93f7f9bb-1dbb-4811-8553-35dc8ec418c9

117

1  minute. We may come back to it if it's necessary.
2     I'm going to mark this, if you don't mind.
3  (Thereupon said document was received and marked as
4  Plaintiff's Exhibit 10.)
5  BY MR. PEARSON:
6     Q. Gary, I'm going to go ahead and preface this
7  with, I've marked a pleading that's been filed in this
8  federal court case by your lawyers on behalf Conrad
9  Yelvington Distributors, Inc., and I want to know --
10     MR. PEARSON:  And we've marked it as
11  Plaintiff's --
12     COURT REPORTER:  10.
13     MR. PEARSON:  -- 10.
14  BY MR. PEARSON:
15     Q. And I want to know if you've ever seen that
16  before.
17     A. Yes.
18     Q. Okay. The reason that I marked it and gave it
19  to you is, it might make it more expeditious for us to
20  talk about a couple things out of it.
21     If you'll flip over to page two of ten numbered
22  pages and look at number -- paragraph number five. And
23  I'll represent to you that the first text that's in the
24  unbold text is the -- is out of the complaint that we
25  filed, which you all repeat. And then the bold that

118

1  follows the word answer is whatever you answered to to
2  that allegation.
3     And one of the things is is that the, on or
4  about the 28th day of April, the plaintiff and defendant
5  entered into a contract, which is the supply agreement.
6  You and I looked at the supply agreement. And if you go
7  back and look at it again just for a second, it's dated
8  effective, at the top of the first page, April the 16th
9  of 2004. But if you look at the signatures on the back,
10  it appears that you signed it first on April the 16th,
11  and then it was signed by Pep Johnson on April the 28th.
12     Do you have any reason to disagree that that
13  April 28th date would have come from that? There's not
14  another agreement that's dated effective April 28th.
15  It's just simply, we picked up the date that it was
16  signed last.
17     A. Yeah. Okay.
18     Q. All right. Did you understand, when you got
19  into this deal, Gary, with Johnco, when Yelvington got
20  into the deal with Johnco, they were going to be
21  required to build this mining facility in order for
22  everything to go forward?
23     A. That they were going to have to build the
24  mining facility?
25     Q. Right, in order for this agreement to go

119

1  forward.
2     A. Well, for them to supply us with what we were
3  going to buy from them, they would have had to.
4     Q. Okay. And you don't disagree that they
5  actually did that, do you?
6     A. Yeah. I think the only thing I disagree on is
7  that they did it just for us.
8     Q. Well, do you know of any other customer they
9  had that they had a supply agreement with that required
10  them to build a facility?
11     A. Yeah. I know that they were intending on
12  selling to the metallurgic market, the oversize product.
13  And they were intending on selling the sand. In order
14  to be successful, you really need to sell all the
15  products that you produce.
16     Q. Do you know who their customers were in that
17  that you say you know this?
18     A. Well, they had asked me about, you know,
19  helping them transport product to some of the
20  metallurgic people, the oversized product.
21     That's generally -- as I've looked at being
22  involved in a mining operation but never have done it,
23  the most valuable product is the higher -- the larger
24  product, the bigger gravel. And that generally sells in
25  the metallurgic market. And because it gets a higher

120

1  price, it makes your average selling price of all the
2  products higher. So that, to me, would have been a high
3  priority for them to establish a metallurgic market.
4     And then since the sand is the cheapest
5  commodity that you produce, but the most volume, they
6  would have needed to have a sand customer that could
7  have taken the sand. And I believe they were talking to
8  Lafarge, maybe others, about the sand.
9     Q. All right.
10     A. I don't think they -- I never thought that they
11  went in business to only produce one product and just
12  pile up the rest. That's not a very good business plan.
13     Q. Let's talk about that, you know, because I
14  think it comes up in here. I think you use the term,
15  business model. Have you ever seen a written business
16  model from Johnco? I'm asking, have you got one? Have
17  you ever seen one?
18     A. No. I've just been in this business 25 years,
19  so I know, from talking to -- actually, got involved in
20  some negotiations to buy another gravel operation and
21  became somewhat familiar with, you know, the priorities
22  of selling your products and the average selling price
23  and what it takes to produce products.
24     Q. Would cash flow be important in a successful,
25  you know, sand and gravel operation?

30 (Pages 117 to 120)

93f7f9bb-1dbb-4811-8553-35dc8ec418c9

121

1    A.  I think cash flow is important in any
2  operation.
3    Q.  **Okay.  You would need it to be successful?**
4    A.  Yeah.  You need cash flow, but you also need to
5  be funded when you go into any operation, any business
6  operation.  And it's important that you have employees
7  that know what they're doing.  It's important, if it's
8  your money, to be involved on a day-to-day basis to make
9  sure things go like you want them to go.
10   Q.  **And would it also be important for people who**
11  **are parties to a contract to buy product, that they**
12  **actually perform under that contract?**
13   A.  Yeah.  And we were prepared to do that.
14   Q.  **But you will agree that you only took six loads**
15  **of gravel during the entire time that you took anything**
16  **from Johnco?**
17   A.  The agreement says that we'll take 150,000 tons
18  a year.
19   Q.  **Do you think that, under your scenario, that**
20  **Yelvington can take that entire 150,000 tons in one**
21  **week?**
22   A.  No, because they couldn't load it all in one
23  week.
24   Q.  **Well, how about two weeks?**
25   A.  They couldn't load it in two weeks.

122

1    Q.  **How about one month?**
2    A.  Could they load it in six months, yes.
3    Q.  **They could do it in six months?**
4    A.  I believe they could.
5    Q.  **So you believe --**
6    A.  That's 25,000 tons a month.  That would be a
7  train every week.
8    Q.  **And so you think, at 150,000 tons, that you**
9  **could not buy anything for six months under this supply**
10  **agreement, and buy all of it in the last six months?**
11   A.  Well, again, you're trying to put words in my
12  mouth --
13   Q.  **No, I'm not.  I'm trying to listen to what**
14  **you're saying.**
15   A.  Okay.  What you need to understand is, this is
16  a start-up operation.  It's a new company that doesn't
17  have proper equipment, that's maybe under-financed, that
18  didn't necessarily have customers for the other products
19  that need to be sold.  And doesn't have a local truck
20  market to help subsidize the rail market, which both the
21  sand and all the products have to go out on.  And, you
22  know, those are some of the issues and the problems with
23  this operation.
24   Q.  **But would you disagree with me that had**
25  **Yelvington been buying a trainload a week, that that**

123

1  **particular cash flow would have been very helpful to a**
2  **start-up operation?**
3    A.  I wasn't privy to the cash flow or the funding
4  of the company.  I didn't even know Mr. Junkett was in
5  the company.  I only dealt with Mr. Johnson, Pep and
6  Ben.  Didn't even know Mr. Junkett.  I didn't know him,
7  number one.  Didn't know his financial resources, number
8  two.
9        It's only that I became aware of that when he
10  came to me and said that, you know, they'd had some
11  problems down there and made some changes and that he
12  was involved and he had taken the other two people out,
13  and he was going to get this thing straightened out.
14   Q.  **Well, did he --**
15   A.  And he had a sand problem, and could we help
16  him.
17   Q.  **All right.  Now, you describe this conversation**
18  **over and over, Gary, that you had with Mr. Junkin, and**
19  **I'm assuming you're talking about the conversation you**
20  **had at the Golden Rule in Calera.  Correct?**
21   A.  Well, conversations at the Golden Rule, and
22  conversations with him that we may have talked on the
23  phone about.  I'm not sure -- I think it would have been
24  after the Golden Rule.
25   Q.  **Well, what did you tell -- I mean, and one of**

124

1  **the things that seems to be missing from your**
2  **description of all your conversations that you had with**
3  **Clatus Junkin, what seems to be missing, to me, is any**
4  **description of what Yelvington was going to do to**
5  **fulfill its obligations under the contract and take**
6  **Number 67 gravel.  I haven't heard you mention that.**
7  **Did you have any conversations with Clatus, Clatus, I**
8  **believe Yelvington can help you by going ahead and**
9  **taking some loads of gravel under our contract?  Did you**
10  **ever have that conversation?**
11   A.  Well, in fact, we did take gravel that we
12  weren't even under the contract.
13   Q.  **Okay.**
14   A.  So that's one indication that we wanted to do
15  that.
16   Q.  **Okay.  But what about the contract gravel?**
17   A.  Okay.  What about it?  It was an annual
18  commitment of 150,000 tons, of which, in August and
19  September, we took two trains.
20   Q.  **But you didn't take any after September 25th.**
21   A.  No.  And after September 25th, that train
22  actually arrived sometime the first, probably, of
23  October.  And shortly after that -- I'm not sure if it
24  came from Mr. Junkett directly, because unfortunately,
25  my memory is not good enough to remember who it came

31 (Pages 121 to 124)

93f7f9bb-1dbb-4811-8553-35dc8ec418c9

125

1  from, I was told the operation was going to shut down.

2  Q. Did -- Mr. Junkin actually came to Daytona and

3  met with you, didn't he?

4  A. That's right.

5  Q. You all went to Picadilly?

6  A. Yes, sir. And he actually got -- somebody ran

7  into him, I think, after lunch. I specifically remember

8  that, unfortunately.

9  Q. All right. That aside, during that meeting,

10  did you offer to Mr. Junkin, on behalf of Yelvington, to

11  fulfill this contract? Did you order some gravel under

12  the contract?

13  A. I don't recall ordering any gravel at that

14  meeting. The meeting was mostly about --

15  Q. Needing to move some gravel?

16  A. -- letting him out of the contract because he

17  wanted to sell the operation.

18  Q. Well, you didn't want to let him out of the

19  contract. Correct?

20  A. Well, I wanted to let him out of the contract.

21  In fact, I specifically told him, look, I have no reason

22  to hurt you in this contract, but I'd like to have a

23  little input into who you might be wanting to sell it

24  to, because we have very high hopes of moving that

25  product.

126

1  Q. Did you order any more gravel after

2  September 25th, to your knowledge?

3  A. At that time, I don't recall.

4  Q. So between March 1 and May 11th of 2006, you

5  didn't take any gravel. Is that right?

6  A. March 1 and May -- what's March -- what's

7  March 1 have to do with it?

8  Q. Well, there was gravel on the ground, ready for

9  you to pick up on March 1.

10  A. But were they ready to sustain shipments

11  March 1? Can you answer that? I can't, but can you?

12  Q. Well, the question is, did you order any gravel

13  from March 1 to May 11th?

14  A. Well, specifically, I can't remember when the

15  gravel was ordered. There was a pulse required of the

16  operation and how it was going to move forward.

17  Q. So by May 11th, the pulse was that they would

18  be able to sustain?

19  A. Well, I don't know that they were really able

20  after May 11th. May 11th, they shipped, and it took

21  them longer than 24 hours to load the train, so --

22  Q. How do you know that --

23  A. And May 11th, I know specifically, they didn't

24  have anybody to run the locomotive. We sent a person up

25  there to run the locomotive.

127

1  Q. All right. And I want to ask you something,

2  Gary, because you're saying things that are very

3  definitive, and I want know, personally, knowledge, did

4  you go up there when they loaded the train on May the

5  10th or May the 11th? Did you go up there? Did you see

6  that?

7  A. I did not personally do that, but I sent Philip

8  Holladay to do it.

9  Q. And, again, I know that you are testifying on

10  behalf of Yelvington, and I'm not arguing with you.

11  A. That's right.

12  Q. But is the basis of your knowledge that they

13  didn't load that train within 24 hours, is the basis of

14  that knowledge from Philip Holladay?

15  A. Philip Holladay or the fellow we had running

16  the locomotive.

17  Q. Who was that?

18  A. I don't remember which one. We have a lot of

19  certified engineers, so we sent one of them up there.

20  Q. Okay. Well, who requested that you send a

21  certified engineer up there?

22  A. All I recall is, they didn't have anybody that

23  could run the locomotive, so we sent our guy up to run

24  it.

25  Q. And you're positive that Johnco didn't have

128

1  anybody to run the locomotive?

2  A. Well, they didn't have anybody qualified to run

3  the locomotive. You really need to be qualified to run

4  one of those. Somebody might get hurt.

5  Q. But do you remember who requested it? You are

6  talking to me -- let me preface it and see if we can

7  clean it up. You're prefacing your answers to me as,

8  you seem to be disturbed, from Yelvington's perspective,

9  that you had to send somebody up there to help them get

10  it loading. It seems to be bothersome to you.

11  A. Yeah. I'm disturbed about the lawsuit in

12  general, if you want to know what I'm disturbed about.

13  Q. All right. And you are aware that somehow,

14  that it didn't get loaded in 24 hours on that first one.

15  And I'm trying to figure out if you sent your guy up

16  there, who's supposed to know what he's doing --

17  A. All our guy did was run the locomotive. He can

18  only load the train as fast as the trucks had to haul it

19  to the load-out facility, the loading ramp.

20  Q. Okay. So --

21  A. They had start-up problems.

22  Q. Well, let me ask you something. You were up

23  there, and you know that that gravel wasn't already at

24  the load-out facility?

25  A. They still had to -- they had to move it from

32 (Pages 125 to 128)

93f7f9bb-1dbb-4811-8553-35dc8ec418c9

129

1  where it was into a hopper and get it into the rail car.
2      Q.   And you think the trucks did that?
3      A.   Well, trucks or loaders. I mean, you got --
4  you can't move it by hand.
5      Q.   Well, obviously, you have to get it up there,
6  but --
7      A.   That's right.
8      Q.   -- but your guys told you that the trucks
9  didn't get it up there? I mean, what did he tell you
10 specifically, Gary?
11     A.   They weren't able to load it within 24 hours.
12     Q.   And you don't remember --
13     A.   Now, that could have been -- it could have been
14 weather. I don't know. They just didn't load it in
15 24 hours.
16     Q.   But your guy was up there and he was moving the
17 train and he's telling you this, but who is he? What's
18 his name?
19     A.   Well, it was either Philip Holladay or the
20 fellow -- and I don't recall his name. He works at our
21 Pensacola yard. I know the guy that went up there. I
22 can't recall his name right now.
23     Q.   But he still works for you?
24     A.   Yes, he does.
25     Q.   Okay. So --

130

1      A.   In fact, he trains our locomotive operators.
2  He's a very experienced person up there.
3      Q.   Okay. So he's still an employee of Yelvington?
4      A.   Yes, he is.
5      Q.   Okay. And have you talked to him since he
6  loaded that shipment? That would have been something
7  over a year ago.
8      A.   Yeah, I've talked to him, but, I mean --
9      Q.   About the inability --
10     A.   No, not about Johnco.
11     Q.   Okay. Ever talk to him about Johnco since
12 then?
13     A.   I don't recall in specific, anything specific.
14 I'm sure I have, but specifically what it was about, no,
15 I don't know.
16     Q.   Okay. Now, you could produce to your lawyer
17 this man's name so that we could take his deposition --
18     A.   Sure.
19     Q.   -- or whatever we need to do?
20     A.   All right. Philip may know his name. Right?
21     A.   Yeah. Definite.
22     Q.   I think I'll, you know, talk to him, probably
23 tomorrow and we'll figure out his name.
24     A.   Yeah.
25     Q.   Between the loading of the first train on May

131

1  the 11th, by that time, apparently, you were satisfied,
2  because you ordered a train, that they were going to be
3  able to comply with the contract, but something --
4  you're saying they couldn't load it in 24 hours, so now
5  you're not satisfied anymore. When did you take the
6  next load? I think it's in there. It's, like,
7  June 27th --
8      A.   Yeah.
9      Q.   -- 5th, late in June.
10     A.   Yeah. I think Philip Holladay's going to give
11 you a better timeline than me. Okay. I only heard, you
12 know, some of the issues. Okay. May 11th, they were
13 not ready to start running, May 11th, on a regular
14 basis. I do specifically recall that.
15     Q.   But you recall that coming from your people,
16 from Philip Holladay?
17     A.   Yeah. I mean, I wasn't communicating with Ben
18 or Pep Johnson.
19     Q.   Or Clatus?
20     A.   Well, I didn't even know he worked there at
21 that time.
22     Q.   Okay.
23     A.   I don't even think I knew he was part of the
24 operation or organization.
25     Q.   So it's nobody from Johnco's side that's

132

1  telling you, we can't produce it?
2      A.   It's nobody from Johnco's side that told me
3  that they couldn't produce or that they had so much
4  material on the ground and why weren't we coming to get
5  it. That's the right answer right there. Nobody told
6  me either way that they couldn't produce or had plenty
7  there and needed me to move it as soon as possible, that
8  they were having financial problems and would
9  consider --
10     Q.   Well, would it only be financial problems,
11 Gary, that would motivate you to come get the gravel
12 that was under that contract? I mean, does somebody
13 have to tell you to come get it because we're having
14 problems?
15     A.   You know, here's the thing that irritates me
16 about the discussion, because I don't want to be
17 painted -- my credibility is very important to me, and I
18 don't want to be placed in a position where I did
19 something that I knew was contrary to what it was.
20         What I was hearing from the people that I had
21 confidence in that was involved in the day-to-day -- or,
22 involved in Johnco's operation was, look, they did okay.
23 You know, they got some bugs to work out, they've had
24 this problem or that problem. And the pulse of all that
25 was coming from Mr. Holladay.

33 (Pages 129 to 132)

93f7f9bb-1dbb-4811-8553-35dc8ec418c9

133

1 Q. Now, you took the second load, and I think --
2 whatever date it was. I think it's --
3 MR. LEEK: June 27th.
4 MR. PEARSON: Yeah, June 27th.
5 THE WITNESS: Okay.
6 BY MR. PEARSON:
7 Q. Now, between May 11th and June 27th, as far as
8 you were concerned, they must have worked things out
9 because you took another load?
10 A. Well, actually, I think if you -- June 27th,
11 most of that load was large gravel.
12 Q. Okay. But it didn't bother you whether they
13 could load that on time?
14 A. Well, I was told that they had a lot of this
15 big gravel and could we help them move that, so we took
16 a load of that to Jacksonville.
17 Q. But you needed the big gravel. I mean --
18 A. Well, I needed it, but, I mean, it was mutually
19 beneficial.
20 Q. You made a profit off of it. Right?
21 A. Yeah, absolutely. Absolutely.
22 Q. Now, on the second load, that's, what, 46 or
23 47 days between the first load and the second load.
24 A. Uh-huh.
25 Q. Is there any reason you waited that long?

134

1 A. I think it was because there was some tweaking
2 of what they had to do there, some, you know, need to
3 improve their ability to load faster. And maybe Mr.
4 Holladay can give you more details on that.
5 Q. And, again, you're basing what you think on
6 what Mr. Holladay has said?
7 A. Yeah.
8 Q. Okay. Did Mr. Klebe have any input into that,
9 waiting 47 days between the first one and the second
10 one?
11 A. No, no. No, I don't think he would be involved
12 in that.
13 Q. Would it be fair -- and I'm asking because I'm
14 going to see Mr. Klebe in just a little while. Is it
15 fair to say Mr. Klebe was involved a great deal in the
16 contractual part that led up to the supply agreement,
17 but once it was an operational type of situation, was he
18 less involved? Or, is he still --
19 A. Yeah. I mean, Mark is -- Mark is somebody at
20 the company that -- because he's -- he and I work
21 closely together on a lot of things, financial things
22 and operational things, he is somebody that if I'm tied
23 up or busy or not there or travelling, that he would get
24 involved and communicate with me about it and maybe get
25 back to the person if I couldn't. But Mark is a very

135

1 instrumental part of the business.
2 Q. So your meeting with Clatus Junkin occurs in
3 Calera -- now, this is not the Daytona meeting. This is
4 the Calera meeting. And you all go to the Golden Rule,
5 and you recall him complaining about Ben's inadequacies?
6 A. At some point. Whether it was a telephone
7 conversation or that meeting that day, I don't recall.
8 But I know that that was specifically pointed out to me.
9 Q. All right. Let me ask you. And, you know,
10 we've danced all around this all day, but I just got to
11 know. You can elaborate after you answer it. But did
12 Clatus Junkin ever tell you, I need Yelvington to come
13 get the gravel that they've contracted to get because I
14 need you all to do it for my cash flow, I need you to do
15 it, and I need you to do it now?
16 A. I don't specifically recall that.
17 Q. Okay. Do you recall anything from Clatus
18 Junkin that in any way would relate to him saying, I
19 need Yelvington to take some gravel?
20 A. I don't recall any of the -- any depth into our
21 conversation in Calera that day.
22 Q. How about a single sentence to that effect?
23 A. I don't recall -- what I recall from that was
24 kind of a, hey, I'm Clatus Junkett. I'm now the one
25 that -- I bought my two partners out. It was more of a

136

1 kind of get acquainted. There was no depth to that
2 meeting. In fact, there was other people at the
3 meeting. I believe we had lunch -- you can ask Mr.
4 Junkett -- and there was other people there, maybe
5 from -- maybe from our operation there at Calera or from
6 Vulcan. I'm not sure.
7 Q. And just because I want to make sure, you do
8 know the last name is Junkin with a --
9 A. Well, I never have really understood how --
10 Q. Name is Junkin. J-U-N-K-I-N, Junkin.
11 A. Okay.
12 Q. Just, you know, since he's sitting here,
13 listening to his name, sometimes it's more polite to say
14 it in the correct way.
15 A. Okay. Well, maybe we can pronounce the first
16 one. Is it Clatus?
17 Q. Clatus.
18 A. Clatus Junkin?
19 Q. Yes.
20 A. Okay. Thank you.
21 Q. Did Pep Johnson ever tell you, you need to come
22 get some gravel, we're ready, we've been mining it,
23 we're producing it, we need you to come get some gravel?
24 A. I don't recall anybody placing any urgency on
25 that.

34 (Pages 133 to 136)

93f7f9bb-1dbb-4811-8553-35dc8ec418c9

137

1    Q.  All right.  And I'm specifically talking now
2    specifically about the trip where you flew into
3    Montgomery and met with Pep and Ben in Montgomery, at
4    the airport, when they came over to see you.  Did they
5    say anything to you about, we need you to take some
6    gravel, meaning Yelvington, your company?  Did they talk
7    to you about that?
8        A.  Like I have said before, as far as any urgency,
9    the urgency appeared to me to be, can you help us move
10   the sand.  And by the way, we've got this large gravel,
11   can you help us move that.
12       Q.  Okay.
13       A.  Can you help us do those kind of things.
14       Q.  But nothing about moving any of the contract
15   Number 67 gravel?
16       A.  We were going to move what we committed to
17   move.
18       Q.  But I'm not asking that question.  You've
19   stated that over and over and over.
20       A.  Right.
21       Q.  Did Pep say anything or did Ben say anything,
22   we need Yelvington to move its -- to move the gravel.
23   Did they state that to you?
24       A.  I think that was -- I mean, I knew that they
25   wanted to sell gravel.  They had other issues that they

138

1    were asking us for help on.
2        Q.  And you were trying to help them get the sand
3    moved?
4        A.  I was trying to do a lot of things.  I moved
5    the big gravel for them, or helped them move.  They had,
6    at some point, a substantial amount of that big gravel.
7    Couldn't move the sand, unfortunately.
8        Q.  Would you be planning to move the sand in the
9    rail cars, too?  Would that be the way you would move
10   that sand?
11       A.  It's the only way we could move it because we
12   only have terminals that are rail served.  And there's
13   really not a local market for the sand in Whitehall.
14       Q.  How much sand did they have out there to move?
15       A.  I don't know who told me this, but it was like
16   a 60 percent sand and 40 percent gravel, one versus the
17   other.
18       Q.  But as far as what had been mined and piled up,
19   do you know how much they were telling you?  Did anybody
20   ever tell you --
21       A.  How much sand?
22       Q.  Yeah, they needed to move.
23       A.  No.  They just said they produced a lot of
24   sand, could we help them move it.  And I know
25   specifically that they've tried to get various folks to

139

1    try to help them move the sand.  And I wish we could
2    have moved it because that's the business we're in.
3        Q.  I want -- if you go back to what, again, we
4    marked as Plaintiff's Exhibit 10, if you would now for
5    me, Gary.
6            I want to -- I want to go over to -- if you
7    look over on page six of ten of that document.  These
8    are affirmative defenses.  And I'm not going to try
9    to -- you know, not go over what affirmative defenses
10   are.  But these are things that are being pled or
11   contended by Yelvington in this instance.  Are you
12   familiar with, like, what an affirmative defense would
13   be?
14       A.  Not really.
15       Q.  Okay.  Do you know what failed to sufficiently
16   mitigate means in plaintiff's second affirmative
17   defense?
18       A.  No.
19       Q.  Okay.  So you didn't have any input that you
20   know of into that and don't have anything to offer
21   there?
22       A.  It looks like legal.
23       Q.  Okay.  And I don't disagree.  I'm just asking
24   if you have anything further to add here.
25           Third affirmative defense, plaintiff -- do you

140

1    understand the plaintiff is Johnco here?
2        A.  Yeah.
3        Q.  All right.  Plaintiff breached agreement prior
4    to any purported breach by defendant.  And you realize
5    that Conrad Yelvington Distributors, Inc. is the
6    defendant in that sentence?
7        A.  Plaintiff was unable --
8        Q.  No, read number three.
9        A.  Oh.  Plaintiffs breached the agreement prior to
10   any purported breach by the defendant.  I wouldn't know
11   what -- I don't know what that means.
12       Q.  You don't know of anything that you had to
13   offer other than what you've already told me today about
14   that?
15       A.  Well, what did I tell you today about that?  I
16   mean, what is that?
17       Q.  Okay.  All right.  That's obvious, you didn't
18   have a whole lot of input into it.
19           The fourth affirmative defense, Gary.  And I
20   specifically -- you know, I'm going to ask you, in the
21   part of this sentence where it says that the plaintiff
22   was unable to produce the amount of aggregate required
23   by the agreement.  You see that in that sentence?
24       A.  Plaintiff was unable to perform its obligation
25   under the agreement because it was unable to produce the

35 (Pages 137 to 140)

141

1 amount of required by the agreement (sic).

2 **Q.  Now, I'm not going into the estopped and all of**
3 **that stuff, but I'm specifically talking about --**

4 A.  I understand that.

5 **Q.  -- the inability to produce the amount of**
6 **aggregate.**

7 **Now, have you told me everything that you know**
8 **of about Johnco's inability to perform under the**
9 **agreement?**

10 A.  Well, they shut down, so they didn't never --
11 we never reached a calendar year of production.  Not
12 only were they two years getting production, they
13 were -- they never finished a year of production, so
14 they breached it.

15 **Q.  Let me ask you a question.  You say they shut**
16 **down.  And I'm not speaking to whether they did or**
17 **didn't, but I'm asking, what's the basis of your**
18 **knowledge that they shut down?**

19 A.  I believe that -- I'm not -- I can't remember
20 if it was Mr. Junkin or who told me that they were shut
21 down sometime in October or shortly after that.  I was
22 either told they were going to shut down or found out
23 they had shut down.  But in October, the operation
24 ceased.  Or October or early November or some point.

25 **Q.  Okay.  And, again, I take you back to the**

142

1 **Daytona meeting at Picadilly, and that's when you met**
2 **with Clatus Junkin.  And did you have any other**
3 **conversations with Clatus in October of '06?**

4 A.  Well, I don't remember when he came down.
5 Maybe you can help me, when he came down.

6 **Q.  I'll represent to you, it was in October.**

7 A.  It was October?  Okay.  Well, I mean, if it was
8 October, I mean, I felt like he either told me, or
9 somebody told me that they were shutting down.

10 **Q.  That's a pretty big event in a five-year type**
11 **of contract, or six-year, seven-year, whatever it was.**
12 **But you don't really remember whether Clatus is the one**
13 **that told you or not?**

14 A.  Well, it would have had to have been him, but I
15 don't specifically remember whether it was on the phone
16 or whether he told me he was going to have to shut it
17 down because he couldn't move the sand.

18 **Q.  Would you agree with me that, I'm going have to**
19 **shut it down if, is not the same thing as, I have to**
20 **shut it down?**

21 A.  Well, I think he did shut it down.  I mean, you
22 ought to be able to prove that.

23 **Q.  But did you say, Mr. Junkin, let me get to**
24 **ordering some gravel here?  Did you do that?  Did you**
25 **order any when you met with him down there?**

143

1 A.  Did I order any gravel, no.  He came down to
2 talk about letting him out of the supply agreement
3 because he wanted to sell it to one of numerous
4 companies, and he said that they wouldn't buy it as long
5 as we had the agreement on the gravel.

6 **Q.  What companies did you understand he was going**
7 **to be selling --**

8 A.  He told me he had talked to Rinker and Lafarge.
9 And I'm not sure -- he said some other people, but I
10 don't know that he was specific.  I know he was specific
11 about Rinker.

12 **Q.  Did you tell Mr. Junkin that you had had a**
13 **25-year relationship with Rinker, and maybe you could be**
14 **involved in that somehow?**

15 A.  Did I tell him that?  I don't recall that.

16 **Q.  In the fifth affirmative defense on page six,**
17 **Gary, it says that -- again, you're talking about that**
18 **the -- Johnco was unable to maintain this operation for**
19 **reasons unrelated to any action by the defendant, which**
20 **again, is Johnco.  Now, is -- I mean, that's pretty**
21 **plain.  You understand what's being said there.  Right?**
22 **And I want to know if you have anything else to offer**
23 **that you hadn't said --**

24 A.  Unable to perform its obligations under the
25 agreement as it was unable to maintain its operation for

144

1 reasons unrelated to any action of the defendant, and
2 plaintiff chose to cease operation.  As such, plaintiff
3 waived its right to enforce --

4 **Q.  I'm not getting into whether, you know, we**
5 **waived or didn't waive.  I'm just saying, I'm looking**
6 **specifically to evidence or basis that you didn't have**
7 **input into the inability of Johnco to maintain its**
8 **operations for reasons that are unrelated to Yelvington.**

9 A.  Well, I don't believe he ceased his operations
10 because of reasons against or from us.  I never have
11 agreed with that.

12 **Q.  And the basis for that is, you just don't**
13 **believe it?**

14 A.  Believe what?

15 **Q.  You just don't believe that's true.**

16 A.  I don't believe that's true, because we never
17 experienced the opportunity to take what we told him we
18 would buy.

19 **Q.  Between March the 1st and May the 11th, how**
20 **many opportunities did you have to order a trainload of**
21 **gravel?**

22 A.  March the 1st and May the 11th?

23 **Q.  Yes.  How many days is that?**

24 A.  What's relative about that?

25 **Q.  Seventy-three days of their -- 73 opportunities**

145

1  to pick up the phone and order gravel during those days?
2      A.  I mean, I don't know that March the 1st he was
3  ready to ship gravel.  Obviously --
4      Q.  Well, what knowledge do you have, again, that
5  he's not, other than you --
6      A.  I told you that I had a person involved in
7  that.
8      Q.  Only through Philip Holladay.
9      A.  Philip Holladay was going out there, talking to
10  them, and getting information from Ben Johnson, who was
11  later let go for inability to operate the thing
12  properly.  That's what I'm saying.
13      Q.  What is the basis for Ben Johnson being -- your
14  saying Ben Johnson's been let go?
15      A.  Well, I think I read that he was no longer out
16  there in the spring.  He was something, let go or
17  relieved as a shareholder or -- I know that Mr. Junkin
18  told me that Ben, you know, wasn't making the right
19  decisions, and that's why he got involved.
20          It was financially something that he was used
21  to a smaller, more profitable, smaller operation where
22  he got larger amounts of money for specialty, niche-type
23  gravels, and this was a larger operation that had low
24  prices, lots of volume, and he was having trouble
25  selling sand.  And some of the things that he was trying

146

1  to do, he was not successful doing.
2      Q.  Okay.  And, Gary, I marvel at your -- the
3  detail with which you recall these conversations that
4  you had with Clatus, except for the one part where,
5  apparently, you have zero recall of any discussion about
6  Yelvington taking gravel from Johnco under the supply
7  agreement.  You have yet to agree that there's ever been
8  any discussion with Pep or Ben or Clatus that any of
9  them stated or asked that Yelvington take gravel from
10  Yelvington (sic) under the supply agreement.  Now, did
11  that occur or not occur?
12      A.  Well, when you say -- clarify what you mean by
13  that first.  That I don't remember anything?
14      Q.  No.  You've had --
15      A.  I think it's because there was no urgency that
16  I sensed from Mr. Johnson, Ben or Pep.  That is the
17  reason --
18      Q.  The only urgency that you sensed from them had
19  nothing to do with Johnco (sic) not taking Number 67
20  gravel, it only had to do with, they wanted Johnco --
21  they wanted Yelvington to take some sand?
22      A.  I was made aware from them about their issues
23  about sand.  They had a lot of sand.  They had this
24  oversized -- things weren't working out on their sand
25  deal with Lafarge.  Things apparently hadn't worked out

147

1  on the metallurgic, could I -- I think it was assumed by
2  Mr. Johnson, both Ben and Pep, that we were going to
3  take the 150,000 tons.  That's what I'm saying.
4      Q.  Okay.  Well, let me ask you.  You said you sent
5  somebody out there, you know, to look at the sand, some
6  guy named -- and you haven't said his name, but is Frank
7  Howard from Atlanta, is that a name that you -- is that
8  somebody you recognize?  Is that somebody?
9      A.  Frank Howard from Atlanta.  I did get in touch
10  with -- let me see who I -- I sent somebody out there.
11  And, again, the urgency of moving the sand, I sent
12  somebody out there from Hanson --
13      Q.  Okay.
14      A.  -- to talk to --
15      Q.  Clatus.
16      A.  -- Mr. Junkin about sand.
17      Q.  Okay.
18      A.  And I thought this was a company -- for two
19  reasons, I sent them out there.  One, this was a company
20  that understood mining operations.  This was a company
21  that had assets in Atlanta, Georgia, that had rail
22  infrastructure, that we were actually talking to about
23  setting up a terminal there and needed their mutual
24  agreement for us to come in and set up a terminal.  So I
25  was anxious to see if they could go out there and maybe

148

1  help --
2      Q.  Okay.
3      A.  -- them with this operation.  They had a
4  problem with sand.
5      Q.  All right.  Now, would Yelvington have been
6  involved in moving that sand over to Hanson?
7      A.  Potentially, because Yelvington has rail cars
8  and relationships and equipment needed, necessary to do
9  this.
10          I mean, producing gravel in Whitehall means
11  nothing.  It's like having uranium on the moon.  If you
12  can't get it somewhere, it has no value.  Whitehall is
13  not attached to a local market.  It's removed from a
14  local market.  It's disadvantaged by other materials
15  that are closer for the products that are produced.
16      Q.  All right.  The sand that you're speaking of,
17  that would have been moved by rail through your cars
18  over there, if everything had worked out from a pricing
19  standpoint?
20      A.  We could have participated in that, had it
21  worked out.  There was no guarantee.  I was just trying
22  to offer some help because I wanted to see the
23  facility --
24      Q.  Did you ever --
25      A.  -- continue.

37 (Pages 145 to 148)

93f7f9bb-1dbb-4811-8553-35dc8ec418c9

149

1    Q.  Did you ever get any feedback from anybody at
2    Hanson as to why they didn't order any sand?  I mean,
3    you said you contacted --
4    A.  Yeah.
5    Q.  They went out there.
6    A.  Yeah.
7    Q.  What was -- what came back to you from that?
8    A.  I believe the guy's name is John.  I forget his
9    last name.  I can get it.  But I think when he came back
10   to me and just said that, you know, the operation
11   just -- there was some issues out there, that they
12   didn't think they could participate.
13   Q.  Somebody from Hanson comes back and says that
14   they --
15   A.  I asked him later, at a later date, you know,
16   whatever happened, does it look like there's any
17   potential out there, you know, to move that sand.
18   Q.  And he said?
19   A.  No.  It just -- he was vague, but it just,
20   didn't look like they would want to participate.
21   Q.  And it had nothing to do with any kind of
22   price?
23   A.  Well, I think like -- like, maybe Pep and Ben
24   might have should have recognized early on, apparently,
25   is, if you're going to create a sand and gravel

150

1    operation, if you don't have a place to take your sand
2    and the other products that you produce, not just the
3    67, but all the products that you produce, it's going to
4    be very difficult to be successful, since sand is 60 or
5    65 percent of what you produce.
6    Q.  Well, when -- and this is something you know.
7    I mean, you know this information.  Right?
8    A.  I know it just from being around the sand and
9    gravel business.
10   Q.  For 25 plus years, or your whole lifetime?
11   A.  Just -- yeah.  Never produced any.  I haven't
12   produced one pound of gravel, sand or anything.  Never
13   crushed anything, never screened anything.
14   Q.  When you were talking to Pep and Ben, when did
15   you first start talking to Pep or Ben?
16   A.  Well, I don't know.  I know when they first
17   came to me with this idea, I tried to discourage them.
18   Q.  And how long ago was that?
19   A.  How long ago?  I don't know specifically.
20   Q.  And how did you try to discourage them?
21   A.  I just tried to discourage them because I felt
22   like because of where it was, there was some operational
23   issues, you know, going out there.  At the time, CSX was
24   the only railroad involved.  In fact, I think -- I
25   believe, when that supply agreement was put together, it

151

1    was just CSX all the way.  CSX ran from Montgomery to
2    Myrtlewood, and then it was the M & B Railroad that took
3    it from Myrtlewood on to the east.
4    But prior to Katrina, the M & B Railroad
5    negotiated some type of lease or some kind of track deal
6    and made a deal with CSX to actually take over the
7    railroad from Montgomery to Myrtlewood for CSX.
8    Q.  Okay.  Back to Ben and Pep.
9    A.  Uh-huh.
10   Q.  Are we talking about the 2000, 2001, 2002?
11   What year are we talking about?
12   A.  I don't remember.  It was when they first had
13   the idea.
14   They called me up, and I vaguely remember they
15   wanted to come and talk to me about the sand and gravel
16   business.  I listened to them.  I think I went up there
17   and looked at it.  I noticed there was some -- I think
18   they call it iron pyrite, in some of the gravel that was
19   out by the street.  In fact, I asked a railroad train
20   master or yard master at that time to go out there to
21   that meeting.
22   And, you know, after kind of talking with CSX
23   about it, you know, I just kind of tried to discourage
24   them, look, I'd be real cautious about setting it up out
25   there because --

152

1    Q.  Did you tell Pep that you would be willing to
2    take some gravel from that operation, give him a
3    quantity and a price you might be willing to pay?
4    A.  I might have given him a ballpark of what it
5    could be purchased at.
6    Q.  Do you recall what that is?
7    A.  No, not now.
8    Q.  How about the volumes?
9    A.  No.
10   Q.  Okay.  Did -- well, what was the next time you
11   talked to Ben and Pep?
12   A.  I don't recall.  I mean, I talked to them early
13   on in -- I mean, they seemed kind of determined to do
14   this thing.  And, like I said, at first, I tried to
15   discourage them.
16   And then it appeared that the market was
17   starting to get pretty good, the housing market and
18   everything, and then I felt like, you know, it was
19   probably a good idea.  I think we can move the product,
20   but you got to sell the other stuff.  I mean, we had no
21   market for anything except maybe that concrete
22   aggregate.
23   Q.  Okay.
24   A.  We did -- we do have markets for products, but
25   the way Ben wanted to produce the product out there with

153

1  a dredge -- I mean, basically, he only made three
2  products, oversize, the middle size, which is the 67s,
3  and sand. And we don't move -- I mean we buy a lot of
4  gravel. Number 7, Number 5, Number 4s, number -- we buy
5  a lot of different products.
6      But the way he wanted to mine this deposit was,
7  you know, just three sizes. And, really, the only one
8  of those three sizes that we could sell, that I had
9  confidence we could sell, was the one size that we have
10  in the supply agreement.
11      Q.  Okay. But who initiated the conversation that
12  resulted in the 150,000 tons a year at that price? Who
13  initiated that?
14      A.  Who initiated it?
15      Q.  Yeah. Did you initiate it, or did Pep initiate
16  that?
17      A.  I would say he probably initiated it.
18      Q.  And what do you recall that he would have said
19  to you?
20      A.  Well, he was just probably trying to make sure
21  he could sell material.
22      Q.  Well, how did you come to -- I mean, what
23  was -- what was the 150,000 tons? Where did the number
24  come from? Did you say, I can take 150,000 tons. Or
25  did he say, the only way I can do this is if you take

154

1  150,000 tons?
2      A.  I don't remember which way it was. I mean, I
3  don't know where we came up with the 150.
4      Q.  You don't?
5      A.  No, not specifically. I mean, to me, 150 was a
6  couple trains a month, you know, and I felt pretty good
7  that we could do that.
8      Q.  But you made sure, though, that you -- just in
9  case you could do more, you got the right --
10      A.  Right.
11      Q.  -- to take more?
12      A.  Right. There was a -- just like I said, when I
13  first went out there, I saw some iron pyrite, which is
14  kind of a weird looking material that sometimes is in
15  the gravel. And because it's got iron in it, if they
16  put it on walls or something, it will leech and it will
17  cause rust stains. And that kind of concerned me,
18  seeing that out there with just the gravel around the
19  entrance of the property. Made me think, well, maybe
20  that's in the gravel.
21      Q.  Is that why you discouraged them is because you
22  saw that?
23      A.  Well, not really that was the reason why I
24  discouraged them. I just -- at the time, there was
25  plenty of gravel and it was pretty cheap. And it was on

155

1  CSX right there in the Montgomery area. And for CSX to
2  go out to Whitehall and then come back to Montgomery
3  would cost them more, so the transportation would be
4  higher.
5      Q.  Did the iron pyrite turn out to be a problem
6  with this gravel?
7      A.  No. I mean, I hadn't seen it initially with
8  what we got from him.
9      Q.  And you've tested that?
10      A.  Well, we didn't test for it. But, I mean, we
11  didn't see it in the gravel that we were getting from
12  them. So that could have been just some gravel that
13  might have been delivered from somebody else that was
14  out on the driveway, going into the property when I
15  first went out there for the first time.
16      Q.  So the iron pyrite is something that occurred a
17  long time ago and has never reoccurred?
18      A.  Right.
19      Q.  It was initially one of the reasons you were
20  like, this isn't going to work. But it turns out it
21  really wasn't a reason?
22      A.  Yeah. I mean, I just didn't want to encourage
23  them to start this operation initially. So I actually
24  told them that I -- you know, if they got going, that
25  we'd try to buy some materials from them.

156

1      Q.  Gary, the $7 -- if you look at page eight of
2  ten of your counter-claim, as you know, you have counter
3  claimed against --
4      A.  Yeah.
5      Q.  -- against Johnco, and I'm specifically looking
6  at paragraph number nine.
7      A.  Uh-huh.
8      Q.  And it's talking about damages that Conrad
9  Yelvington Distributors, Inc. has been caused. And I
10  want to know what you know about the damages that Conrad
11  Yelvington has been caused.
12      A.  Uh-huh.
13      Q.  So can you tell me what you know about that?
14      A.  Well, you know, back when we started buying
15  this gravel, like I said, it was CSX origin. And now
16  it's a Meridian and Bigby origin with a CSX connection
17  at Montgomery. And we have to buy the material at
18  $5.25, or 5.50, to kind of offset some of the costs
19  associated with getting it off one railroad to the
20  other.
21      Okay. The gravel prices have gone up in the
22  Montgomery area, east Montgomery area, which is where
23  all the gravel operations are.
24      So we're buying material at a higher price now
25  than we could have brought it from Johnco, had they

93f7f9bb-1dbb-4811-8553-35dc8ec418c9

157

1  stayed with what they said they would do in this supply
2  agreement.
3      Q.  Who are you buying it from at the higher price?
4      A.  I think we're buying it from Martin Marietta.
5  We're buying some from Martin Marietta right now.
6      Q.  Is this the gravel you told me about earlier in
7  the deposition, the number 57?
8      A.  It's 57 or 67.  It's used for the same purpose,
9  concrete.
10     Q.  Well, my question is, are you buying 67 gravel
11 from Martin Marietta?
12     A.  I'm not sure if it's 57 or 67.
13     Q.  All right.
14     A.  But, you know, I'm selling them for the same
15 use, to make concrete out of.  If they had 67, I would
16 buy 67.  Since they may not make 67, then their option
17 is to make --
18     Q.  So you don't really know if you're buying 57 or
19 67?
20     A.  As I speak to you today, no.  If you want me
21 to, I'll step out of the room and confirm it.
22     Q.  I think that it would be something that I'm
23 going to want to know before we end.
24     A.  Okay.
25     Q.  I mean, I don't need to -- we can stop anytime

158

1  and do it.
2      But when did you start buying this?
3      A.  What, 57?
4      MR. PEARSON:  Okay.  Then now may be a good
5  time.  Let's just go off the record.  We'll take a
6  quick break.
7  (Thereupon, at 2:45 p.m., a recess was taken in the
8  proceedings, after which, at 2:55 p.m., the proceedings
9  were reconvened and the following proceedings were had:)
10 BY MR. PEARSON:
11     Q.  When we left, we took a break, you were going
12 to make a call to find out something about --
13     A.  Jennifer Hoffman, who handles all that for us,
14 is out all week, so I wasn't able to find out.
15     Q.  Okay.  All right.  Let's just examine what you
16 do know, then.
17     The price that you're buying whatever gravel
18 you're buying from Martin Marietta -- is that who you're
19 buying it from?
20     A.  Uh-huh.
21     Q.  Is what?
22     A.  Higher.
23     Q.  Do you know -- I mean --
24     A.  No.
25     Q.  In the complaint, it says $7.50.  But do you

159

1  know what you're paying?
2      A.  I think when that question was asked of us to
3  determine that, that's what it was at that time.
4      Q.  All right.  Who are you buying it from?  Who
5  are you buying this more expensive gravel from?
6      A.  I believe it's Martin Marietta.
7      Q.  Okay.  Is there anybody else?
8      A.  Maybe The Concrete Company.  Those are the only
9  two I'm aware of.
10     Q.  And how are you moving it?
11     A.  By rail.
12     Q.  Okay.  And are these the larger trains?
13     A.  Only from Martin Marietta, and it's only -- can
14 only be on the weekends.  So it's difficult to schedule,
15 because the trains have to be just in the right spot to
16 be compatible with their loading.  They only have one
17 day they can do it.
18     Q.  Okay.  What are the rail costs to move it from
19 the Martin Marietta, The Concrete Company's -- I mean,
20 are the rail costs different than moving it from
21 Whitehall?
22     A.  Yeah.
23     Q.  Okay.  Tell me how.
24     A.  It's just a -- it's a different deal.  I mean,
25 the Whitehall deal was an old deal that the railroad

160

1  would have lived up to.  And the Martin Marietta deal is
2  kind of a new deal, and the railroad now has a lot of
3  different cost increases recently with new business that
4  are charging a whole lot more now than they used to.
5      Q.  Where are you moving it to?
6      A.  Just to our gulf coast terminals relative to
7  this.  I mean, we move it from there to all kinds of
8  places, all our terminals except Michigan.  But
9  specifically what we're talking about here, just to the
10 gulf coast terminals.
11     Q.  Who is going to testify on behalf of Yelvington
12 about these damages?  Do you know?
13     A.  We probably have to figure out exactly what
14 they are currently and what they -- how they change as
15 prices and so forth goes up.  So it would probably be --
16 Mark Klebe would probably do that.
17     Q.  Okay.  But he's not going to have that
18 information today, either.
19     A.  I doubt it.  You can ask him.
20     Q.  Well, I will.  But to the extent, Gary, that
21 you're going to testify that at some point in the
22 future, I'm going to want to be able to reconvene and
23 ask you about the damages, since that is part of the
24 lawsuit.  And, you know, my opportunity to ask them
25 is -- you know, I'm not getting to get that opportunity

161

1  today because you don't have information available to
2  you.
3      MR. PEARSON: Tom, are you going to have any
4  problem with that?
5      MR. LEEK: I don't expect. I want to take a
6  look at the 30B6 notice, because I don't think it
7  referenced anything to do with the damages here, but
8  I don't expect --
9      MR. PEARSON: But I'm going to take a 30B6 from
10 somebody on damages.
11     MR. LEEK: Right. Sure. Not a problem.
12     MR. PEARSON: Okay. I mean, you all can tell
13 me who it is. I'm not saying it has to be Gary.
14     MR. LEEK: Sure.
15     MR. PEARSON: I'm sure Gary is sick of me.
16     THE WITNESS: No, I'm sick of you asking me
17 stuff I don't know the answer to.
18     MR. PEARSON: All right. If you all will give
19 me just a minute and let me walk out, and then I
20 might be done here. But just give me just a minute,
21 and I'll be back in a second.
22 (Thereupon, at 2:59 p.m., a recess was taken in the
23 proceedings, after which, at 3:04 p.m., the proceedings
24 were reconvened and the following proceedings were had:)
25     MR. PEARSON: Tom, are we using the usual

162

1  stipulations related to depositions where you object
2  to form and reserve all the other objections?
3      MR. LEEK: Yes. And when you say usual
4  stipulations, I don't know what the usual
5  stipulations are. But assuming they're the same as
6  ours, you shouldn't expect a problem from me
7  on that.
8      MR. PEARSON: Okay. Gary, at this time,
9  subject to my earlier comments relative to damages
10 testimony and if you're going to be designated to
11 give testimony related to the damages, then I'm done
12 at this point.
13     THE WITNESS: With me?
14     MR. PEARSON: Yeah. And I appreciate you
15 sitting and putting up with this all day.
16     MR. LEEK: You have the opportunity to read the
17 transcript if it's ordered to make sure that she's
18 taken down things correctly, or you can waive that
19 right. I'm comfortable with you waiving it. I'm
20 confident Sandy's going to take down things
21 correctly.
22     THE WITNESS: Fine with me.
23 (Thereupon the deposition was concluded at 3:05 p.m.)
24
25

163

1      CERTIFICATE OF OATH
2
3  STATE OF FLORIDA   )
4  COUNTY OF VOLUSIA  )
5
6      I, Sandra Narup, Registered Professional Reporter
7  and Florida Professional Reporter, the undersigned
8  authority, certify that GARY YELVINGTON personally
9  appeared before me and was duly sworn on July 5, 2007.
10
11     WITNESS my hand and official seal this 12th day of
12 July, 2007.
13
14
15
16
17     _____
18     Sandra Narup
       Registered Professional Reporter
       and Florida Professional Reporter
19
       Notary Public, State of Florida
20     My Commission No.: DD 472186
       Expires:  January 15, 2010
21
       (This signature is valid only
22     if signed in blue ink.)
23
24
25

164

1      CERTIFICATE OF REPORTER
2
3  STATE OF FLORIDA   )
                       )
4  COUNTY OF VOLUSIA   )
5
6      I, SANDRA NARUP, Registered Professional Reporter,
7  Florida Professional Reporter and Notary Public, do
8  hereby certify that I was authorized to and did
9  stenographically report the deposition of GARY
10 YELVINGTON, that a review of the transcript was
11 requested; and that the foregoing transcript is a true
12 record of my stenographic notes.
13     I further certify that I am not a relative,
14 employee, attorney, or counsel of any of the parties,
15 nor am I a relative or employee of any of the parties'
16 attorneys or counsel connected with the action, nor am I
17 financially interested in the action.
18
19     DATE this 12th day of July, 2007.
20
21
22
       _____
23     SANDRA NARUP
       Registered Professional Reporter &
       Florida Professional Reporter
24
       (This signature is valid only
25     if signed in blue ink.)

165

1  Volusia Reporting Company
   432 S. Beach Street
2  Daytona Beach, Florida 32114
   386-255-2150
3
4  July 12, 2007
5  THOMAS J. LEEK, ESQUIRE
   Of Cobb & Cole
6  150 Magnolia Avenue
   Daytona Beach, Florida 32114
7
8
   Re: Johnco v Conrad Yelvington
9
10 Dear Mr. Leek:
11 Attached please find your copy of the deposition of GARY
   YELVINGTON, which was taken in the above-styled cause on
12 July 5, 2007.  Also attached is the Deponent's errata
   sheet to be completed by the deponent when reading your
13 copy of the deposition.  This form is self-explanatory.
14 After the deponent has completed this form, please
   return it to our office for inclusion in the original
15 transcript.
16 If the reading and signing is not completed within 30
   days, we shall conclude that the witness has failed to
17 exercise his/her right to read and sign the transcript.
   If this is not ample time, please contact our office.
18
   Thank you for your cooperation.
19
20                                  . .
   Sincerely,
21
22
   Sandy Narup
23 Registered Professional Reporter &
   Florida Professional Reporter
24
   H. GREGORY PEARSON, Esquire
25 THOMAS J. LEEK, Esquire

166

1              ERRATA SHEET
2      IN RE:  Johnco v Conrad Yelvington
3    DEPOSITION OF GARY YELVINGTON, TAKEN July 5, 2007
4  PAGE NO. LINE NO. CHANGE          REASON
5   _____ _____ _____ _____
6   _____ _____ _____ _____
7   _____ _____ _____ _____
8   _____ _____ _____ _____
9   _____ _____ _____ _____
10  _____ _____ _____ _____
11  _____ _____ _____ _____
12  _____ _____ _____ _____
13  _____ _____ _____ _____
14  _____ _____ _____ _____
15  _____ _____ _____ _____
16  _____ _____ _____ _____
17  _____ _____ _____ _____
18  _____ _____ _____ _____
19  _____ _____ _____ _____
20  _____ _____ _____ _____
21  _____ _____ _____ _____
22
       Under penalties of perjury, I declare that I have read
23  the foregoing and that the facts stated in it are true.
24
    _____
25  DATE            GARY YELVINGTON

42 (Pages 165 to 166)

# EXHIBIT 2

1

1    IN THE UNITED STATES DISTRICT COURT
     FOR THE MIDDLE DISTRICT OF ALABAMA
2
     CIVIL ACTION NO. 2:06cv993-ID
3
4    JOHNCO MATERIALS, INC.,
5       Plaintiff,
6    vs.
7    CONRAD YELVINGTON
     DISTRIBUTORS, INC.,
8
        Defendant.
9
10
     *******************************************************
11   DEPOSITION OF:    MARK KLEBE
12   DATE TAKEN:      July 5, 2007
13   TIME:       COMMENCED AT 3:10 p.m.
                 CONCLUDED AT 4:06 p.m.
14
     PLACE:        150 Magnolia Avenue
15                 Daytona Beach, Florida
16   STENOGRAPHICALLY
     REPORTED BY:     SANDRA NARUP
17              REGISTERED PROFESSIONAL REPORTER &
                FLORIDA PROFESSIONAL REPORTER
18   *******************************************************
19
20
21        VOLUSIA REPORTING COMPANY
          432 SOUTH BEACH STREET
22        DAYTONA BEACH, FLORIDA 32114
          386-255-2150
23
24
25

---

2

1    Appearing for the Plaintiff
2    H. GREGORY PEARSON, ESQUIRE
     CHARLES E. HARRISON, ESQUIRE
3    Of Junkin, Pearson, Harrison & Junkin, L.L.C.
     601 Greensboro Avenue
4    Suite 600 Alston Place
     Tuscaloosa, Alabama 35401
5    205-366-0111, FAX-205-391-4780
6
7    Appearing for the Defendant
8    THOMAS J. LEEK, ESQUIRE
     Of Cobb & Cole
9    150 Magnolia Avenue
     Daytona Beach, Florida 32114
10   386-255-8171, FAX-386-248-0323
11
12   ALSO PRESENT:
13   CLATUS JUNKIN, Corporate Representative for Johnco
     GARY YELVINGTON, Conrad Yelvington Distributors, Inc
14
15
16
17
18
19
20
21
22
23
24
25

---

3

1              I N D E X
                                    PAGE
2
3    DIRECT EXAMINATION BY MR. PEARSON          4
4    CERTIFICATE OF OATH              48
5    CERTIFICATE OF REPORTER            49
6    READ AND SIGN LETTER             50
7    ERRATA SHEET                51
8
9
10         INDEX OF EXHIBITS
11   PLAINTIFF'S EXHIBIT NUMBER 11 (11/10/06 Letter)   29
12         ------
13         Stipulations
14       It is hereby agreed and so stipulated by and
15   between the parties hereto, through their respective
16   counsel, that the reading and signing of the transcript
17   are expressly reserved by the Deponent.
18
19
20
21
22
23
24
25

---

4

1        COURT REPORTER:  Would you please raise your
2    right hand?
3        Do you solemnly swear that the testimony you're
4    about to give in this cause is the truth, the whole
5    truth and nothing but the truth, so help you God?
6        THE WITNESS:  I do.
7    THEREUPON
8            MARK KLEBE
9    Was called as a witness and, having first been duly
10   sworn, testified as follows:
11          DIRECT EXAMINATION
12   BY MR. PEARSON:
13       Q.  Mr. Klebe, I introduced myself just prior to
14   you sitting down. I'm Greg Pearson. I represent Johnco
15   in the litigation that we're here to take your
16   deposition on today. We've been going sort of all day,
17   so we're -- everybody's starting to get a little tired
18   in here. I'm sure you are, too, just waiting around.
19       But as we move through this deposition, if you
20   need to take a break, you know, just tell me and we'll
21   take a break.
22       And if you don't understand a question that I
23   ask you, which in this particular instance, could happen
24   at any given time, just tell me and I'll rephrase the
25   question. I'll reask it so -- I like to ask you one

---

1 (Pages 1 to 4)

bf3a6cb9-d0b5-4dc1-b439-ddb6c0fa437f

**5**

1    that you can actually understand so that when we answer
2    it, we'll know what it is. Is that okay with you?
3        A.    Fine with me.
4        Q.    All right. Would you just state your name for
5    the record, please?
6        A.    Mark Klebe.
7        Q.    And tell me, where are you employed, Mr. Klebe?
8        A.    Conrad Yelvington Distributors, Inc.
9        Q.    How long have you worked there?
10       A.    Since -- roughly, eight years.
11       Q.    Okay. And where are you from before that?
12    Daytona?
13       A.    You mean originally? How far --
14       Q.    Well, I mean, before -- eight years ago, you
15    came to work for Conrad Yelvington. And what did you do
16    before that?
17       A.    Before that, I was a public accountant.
18       Q.    So do you have an accounting degree from a
19    university?
20       A.    I do.
21       Q.    Which university?
22       A.    University of Central Florida.
23       Q.    Okay. And when did you graduate?
24       A.    1981.
25       Q.    Okay. Are you a CPA?

**6**

1        A.    I am.
2        Q.    And did you work as a CPA?
3        A.    I did.
4        Q.    Who did you work for?
5        A.    Two different firms.
6        Q.    Who are they?
7        A.    One was Brent Millikan & Company in New Smyrna
8    Beach, Florida. And the other one was Granville &
9    Associates in Ormond Beach, Florida.
10       Q.    Okay. And you live in Daytona now?
11       A.    I do not. I live in Port Orange.
12       Q.    That's not far from here? Or, is it a long way
13    from here? I don't know.
14       A.    It's within five miles, I would say. It's
15    contiguous to the area.
16       Q.    Okay. So Tuscaloosa, you could be from North
17    Port and it's just across the river, so I didn't know if
18    it was the same down here.
19           Tell me, do you hold an office with Conrad
20    Yelvington Distributors, Inc.? I mean, do you hold like
21    a named office?
22       A.    My title is chief financial officer.
23       Q.    Okay. And tell me what you do. What are your
24    responsibilities as the chief financial officer?
25       A.    Well, I guess I work probably more closely with

**7**

1    Gary in structuring some of the deals that we work with.
2    Ultimately, would oversee the financial operations and
3    interact with our auditors, our relationships with other
4    outside entities.
5        Q.    Okay. The lawsuit and the matter that we're
6    here on today involves a supply agreement with Johnco up
7    in Whitehall in Alabama. What was the first time you
8    had any knowledge of or involvement with Pep Johnson or
9    Ben Johnson in regard to that Whitehall plant?
10       A.    I couldn't say when the first actual meeting or
11    interaction was. I think 2003 was probably when I
12    recall a correspondence or some notes.
13       Q.    And when you say notes, you have your notes of
14    some sort of correspondence? Or, what notes are you
15    referring to?
16       A.    I was looking back at either drafts of
17    contracts, or I think there was even a question list
18    that Pep had proposed to us once, which I presume came
19    out from late '03, when he was looking at this deal.
20       Q.    What kind of questions?
21       A.    Whether or not, you know, we could help with
22    the rail infrastructure, building it, whether or not
23    we'd be able to take some material. I'd have to refer
24    to the actual memo to go -- or, question list to know
25    further.

**8**

1        Q.    Okay. So the earliest time that you can
2    remember having a contact with Pep is in 2003?
3        A.    Yes.
4        Q.    Do you believe there was a time earlier than
5    that that you just don't have any memory of, or is
6    that -- pretty much, you figure that's going to be when
7    it starts?
8        A.    That would probably be when it starts, as far
9    as I'm aware of.
10       Q.    Okay. And how did you get involved with that?
11    I mean, how did you come to be aware of it to start
12    with?
13       A.    Well, we were trying to work up some agreement
14    for us to do business together, so the natural course of
15    things, I get involved with that.
16       Q.    Okay. So Pep's first contacts, I think, may
17    have been with Gary. And so did Gary then bring you
18    into the fold so that you would start having contacts
19    directly with Pep?
20       A.    I would say yes, to the best of my
21    recollection. There's no other way I really would have
22    known.
23       Q.    Do you maintain a file on your early
24    communications with Johnco?
25       A.    I do have some information, yes.

bf3a6cb9-d0b5-4dc1-b439-ddb6c0fa437f

9

1  Q.  And how many -- I mean, if you just had to hold
2  your fingers up as to how thick that file is that you've
3  got, how thick is that?
4  A.  Probably about two inches.
5  Q.  Okay.  And is that something that could be
6  copied and reproduced?
7  A.  Most of it's your correspondence relative to
8  this lawsuit, so you have it.
9  Q.  Okay.
10  A.  The balance, yes.
11  Q.  Okay.  Then would you try to go through and
12  like pull out stuff, I mean?  Or, could you just copy
13  the whole thing?
14  A.  Well, assume we would copy the whole thing.  I
15  don't know what we would pull out.
16  Q.  Okay.  Well, I'm not interested in any
17  communications you might have had with your attorneys,
18  but any other communications that are in that file, do
19  you have any problem getting them to Tom and let him get
20  them to me?
21  A.  No.  I presume you don't want copies of your
22  correspondence, or do you want that, too?
23  Q.  Yes.  I want copies of whatever you got in your
24  file.
25  A.  Okay.

10

1  Q.  I sure do, if you don't mind.
2     And would that file include printed E-mails?
3  A.  No.
4  Q.  Okay.  Do you have an E-mail folder that's
5  electronically maintained?
6  A.  Not specific to this project.
7  Q.  Can you put together the E-mail correspondences
8  that Johnco -- well, first of all, that Mark Klebe has
9  had with Pep or Clatus or Ben or Johnco, anybody at
10  Johnco, can you retrieve that?
11  A.  Any that's available, yes.
12  Q.  And it would not be available because it's been
13  deleted or not be available for what reason?
14  A.  Either it's archived or I'm not sure who may
15  have sent -- Pep, I don't recall ever corresponding via
16  E-mail.  I've never talked to Ben.
17  Q.  You've never spoken with Ben?
18  A.  Correct.
19  Q.  And have you ever corresponded in writing with
20  him?
21  A.  No.
22  Q.  Well, that makes that part of this deposition
23  real short.  I appreciate that.
24     But Pep, you have had some communications with?
25  A.  Yes, sir.

11

1  Q.  Okay.  And that's the file that you're saying
2  went back and forth between you and Pep that's two
3  inches thick?
4  A.  That contains some of the information, as I
5  said.  The balance is primarily correspondence relative
6  to your proceedings.
7  Q.  To these proceedings?
8  A.  Correct.
9  Q.  Okay.  Obviously, I am not interested in any of
10  the pleadings, except what occurred that we may have
11  sent you right up until the time.  Once Mr. Leek and
12  Cobb & Cole are involved and anything that they
13  forwarded on to you that's a pleading, you know, no, I
14  don't need that.  But up until they were involved, I'm
15  interested.
16  A.  That's fine.
17  Q.  Mark, what else did you do other than look at
18  that file to prepare for this deposition today?
19  A.  I had a conversation with counsel.
20  Q.  Okay.  Did you talk to Gary about what we were
21  going to be talking about in here?
22  A.  Prior to today, I've had one conversation.
23  Couple today, because I've seen him in the hallway.  The
24  conversation we had with counsel was our primary --
25  Q.  Well --

12

1  A.  -- conversation relative to this.
2  Q.  But just let me caution you.  I am not looking
3  for your conversations with your counsel.
4  A.  Understood.
5  Q.  I mean, you feel free to volunteer what you
6  want, but I'm not asking -- no question that I ask you
7  is intended for you to tell me about your conversations
8  with your counsel.
9     But conversations with Gary, I'm interested in.
10  If you've had conversations with Gary about the
11  deposition, I'd like to know what that -- you know, what
12  you all talked about.
13  A.  The only conversation I recall with Gary at the
14  deposition is, he asked me for copies of our meeting
15  with counsel with some notes that he had made.
16  Q.  Okay.  The -- the man whose name's come up a
17  good bit today is a man named Philip Holladay.  Have you
18  had a bunch of dealings with Philip Holladay in regard
19  to the Whitehall gravel operation, Johnco's Whitehall
20  gravel operation?
21  A.  Certainly had conversations.
22  Q.  When did those -- when do you remember those
23  starting, Mark?
24  A.  I really couldn't pin down a date, because we
25  deal quite a bit in a lot of different ongoing things.

13

1    **Q. Okay. Well, would Philip Holladay routinely**
2    **have been involved in the Johnco Whitehall gravel**
3    **operation prior to the time that you all had a signed**
4    **contract or supply agreement?**
5    A. No.
6    **Q. So we can sort of limit your contact with**
7    **Philip about Whitehall till after April the 28th of '04,**
8    **when the contract was fully signed. Would that be fair?**
9    **And if it's not, correct me.**
10   A. As far as a date, the contract is dated what,
11  April the 16th?
12   **Q. It's signed by Gary on April the 16th, which**
13  **you notarized, and it's signed by Pep on April the 28th,**
14  **which is notarized on that date. So it was fully signed**
15  **on April the 28th of '04.**
16   A. Okay. There could have been some
17  communications prior to that with Philip, but I don't
18  know.
19   **Q. Nothing that you can recall right now?**
20   A. No.
21   **Q. Okay. After the supply agreement was signed,**
22  **and I know you've probably -- have you looked at it for**
23  **purposes of getting ready for this deposition?**
24   A. Yes, I reviewed it.
25   **Q. Okay. Well, it's been marked as an exhibit to**

14

1   **the deposition, and I think it's Exhibit 9 to this**
2   **deposition. Right there (indicating).**
3     **What was your involvement, Mark, in the**
4   **document that results in both sides signing it, the**
5   **supply agreement, which is Plaintiff's Exhibit 9?**
6   A. Well, just out of question, this is different
7  than my copy. I never had one with two signatures on
8  the same page.
9   **Q. We have been over that, and I'm -- do you have**
10  **yours here?**
11   A. No, I do not have it here with me.
12   **Q. I saw that you have a copy of one like that.**
13    MR. PEARSON: I'll be more than happy to mark
14  it as an exhibit to this deposition, and we'll copy
15  it and mark it.
16    MR. LEEK: I don't think there's any need to,
17  but if I could --
18    MR. PEARSON: Well, I'll be happy to --
19    MR. LEEK: -- see this real quickly, I can
20  determine.
21    THE WITNESS: I recall we signed it in
22  counterparts.
23    MR. LEEK: Right.
24    THE WITNESS: In fact, this is a copy of my
25  copy, because those are my notes.

15

1    MR. LEEK: Yeah. I don't see that this -- the
2  one that ended up with two sets of initials on it is
3  any different than the one that was signed in
4  counterparts.
5    THE WITNESS: Okay.
6    MR. LEEK: Yeah.
7  BY MR. PEARSON:
8   **Q. Mark, are you comfortable with Plaintiff's**
9  **Exhibit 9 --**
10   A. Yes.
11   **Q. -- being the final copy of it?**
12   A. Yes.
13   **Q. All right. And the reason that you say it was**
14  **different is because you remember one being signed in**
15  **counterpart. Is that pretty much correct?**
16   A. Right. I don't recall one with both signatures
17  on the same page --
18   **Q. I want you to --**
19   A. -- or initials.
20   **Q. -- if you don't mind, put in your own words**
21  **your involvement in the events and conversations and**
22  **negotiations that led up to the signing of what's**
23  **Plaintiff's Exhibit 9, the supply agreement.**
24   A. My main involvement was working with Pep to put
25  together the various drafts of this agreement, from the

16

1  beginning through the time that we had the final
2  document.
3   **Q. Where did the actual draft originate? Did it**
4  **originate down in the Yelvington office or through**
5  **Yelvington's attorney's office? Where did the draft**
6  **that's Plaintiff's Exhibit 9, the supply agreement,**
7  **where did that come from?**
8   A. This particular agreement originated with Pep.
9   **Q. With Pep?**
10   A. (Nods head.)
11   **Q. And you're sure of that?**
12   A. Right, because the drafts that were prior to
13  that were not in this format.
14   **Q. Okay. And the original one that was -- how**
15  **many drafts did you go through?**
16   A. Probably at least half a dozen, or more.
17   **Q. Do you have copies of all of those?**
18   A. I do.
19   **Q. Okay. And are those going to be --**
20   A. At least the number I'm aware of.
21   **Q. Okay. Are those going to be in that file that**
22  **you're going to copy and get to me?**
23   A. Yes.
24   **Q. Okay. What do you recall being the -- as we**
25  **move through the negotiations, what did we get to here**

bf3a6cb9-d0b5-4dc1-b439-ddb6c0fa437f

17

1  that you didn't start with there? I'm just curious as
2  to how the negotiations unfolded.
3      A.  Initially started with a blank page.  At that
4  point, Pep had some questions, because he was concerned
5  about us being able to assist him in moving concrete
6  gravel.
7      Q.  Okay.
8      A.  That was -- beyond that, we moved from that
9  point to, also, he wanted us to assist him in
10  construction of the facility.  At least that was part of
11  the discussions at one point.
12      Q.  Did, ultimately, it result that Yelvington
13  assisted in the construction?
14      A.  I believe we provided some metal materials to
15  the railroad that built it, but I don't recall us
16  helping him directly.  That, I'd have to look back into.
17  I don't recall how we did that.
18      Q.  Right.  And the actual building of the facility
19  would have occurred after the supply agreement was
20  signed, the one that's Plaintiff's Exhibit 9.  Is that
21  right?
22      A.  To the best of my knowledge, yes.
23      Q.  Have you ever been to Whitehall, to the
24  facility?
25      A.  I have not.

18

1      Q.  Okay.  Were you on the plane that landed in
2  Montgomery, where Ben and Pep met the plane in
3  Montgomery, when Mr. Conrad Yelvington was, I think,
4  there, and I think Gary was there?  I don't remember who
5  else was there.  Were you on that plane that time when
6  they came to Montgomery?
7      A.  No.  As I said, I've never met Ben.
8      Q.  Never met Ben?  Never spoken to Ben?
9      A.  Nope.
10      Q.  Okay.  Now, have you ever met Mr. Junkin
11  before?
12      A.  Yes.
13      Q.  Tell me when you met him.
14      A.  During a visit he made to Daytona Beach.
15      Q.  Okay.  And do you recall when that visit was?
16      A.  I would make a supposition, it was around
17  September to early October of '06.
18      Q.  And what was your involvement in meeting with
19  Clatus at that time?
20      A.  He came and asked us to work with him, I guess.
21  Or, I guess what I really recall is, he was concerned
22  about the operations at Whitehall and had asked us to
23  release him from honoring what he had -- what had been
24  agreed to by Johnco in this agreement.
25      Q.  When you say your memory is that Clatus Junkin

19

1  was concerned about the operations, are those his words
2  or your words, or what --
3      A.  Those would have to be mine.  I would not be
4  able to recall that conversation verbatim.
5      Q.  Well, and I'm not asking you to, because I
6  realize it's difficult to recall conversations verbatim.
7  But specifically, in your own words, what were his
8  concerns about the operation?
9      A.  I think he was concerned about the ability to
10  continue his operations.  I don't recall exactly what
11  all his concerns revolved around.  My sense is that he
12  wasn't able to move all the product they planned to move
13  from there.  Specifically, the sand.
14      Q.  So when Clatus -- how long did you meet with
15  Clatus while he was here?
16      A.  Maybe three hours, four hours, somewhere in
17  there.  I know it was over a lunch.  It was a little bit
18  longer.
19      Q.  So was at the lunch?
20      A.  Myself, Gary Yelvington and Clatus Junkin.
21      Q.  And then after lunch, did the meeting continue
22  just with Clatus, or did Mr. Yelvington stay with you
23  all the whole three hours?
24      A.  I was never alone with Clatus.
25      Q.  Well, I understand that.  Did Mr. Yelvington

20

1  stay with --
2      A.  He was with us.  Yes.
3      Q.  The whole three hours?
4      A.  Yes.  Or however long it actually was.  I don't
5  recall the actual time frame.
6      Q.  Where did you all have lunch?
7      A.  Probably Picadilly.
8      Q.  Do you recall it, or just, you went there so
9  much --
10      A.  That's typically where we go and come out
11  quick, but I don't really recall for sure.
12      Q.  Okay.  Well, when you were done at the
13  Picadilly -- the Picadilly part of the meeting, is that
14  the beginning of the meeting or the end of the meeting?
15      A.  Probably in the middle a little bit.
16      Q.  Okay.  So Clatus arrived at your facility in
17  the morning?
18      A.  I believe so.
19      Q.  And were you expecting him?
20      A.  I was not.  But I think -- no, I was not.
21      Q.  So how did you come to be involved in the
22  meeting?
23      A.  Gary would have invited me to the meeting.
24      Q.  Do you remember Gary inviting you to the
25  meeting?

bf3a6cb9-d0b5-4dc1-b439-ddb6c0fa437f

21

1    A.   No, but I don't think I would have known about
2    it otherwise.
3        Q.   Okay.  And then after lunch, did you all meet
4    at your office somewhere here in Daytona?
5        A.   Yes.
6        Q.   And I think you all have a facility maybe near
7    the airport?
8        A.   Correct.
9        Q.   Is that where you met?
10       A.   Yes.
11       Q.   And did you meet in your office?
12       A.   No.
13       Q.   Conference room?
14       A.   No.  Gary Yelvington's office.
15       Q.   Met in Gary's office.  That was the before
16   lunch meeting?
17       A.   (Nods head.)
18       Q.   What about the lunch -- after lunch, when you
19   got back?
20       A.   I don't recall, but I presume it probably would
21   have been the same location.
22       Q.   You don't really recall where you met, but you
23   know Gary was with you the whole time?
24       A.   Uh-huh.
25           MR. LEEK:  Is that yes?

22

1           THE WITNESS:  Yes.
2    BY MR. PEARSON:
3        Q.   And during this three hours, you remember
4    Clatus Junkin being concerned about Johnco's ability to
5    continue operations, and specifically about their
6    ability to move product, specifically sand?
7        A.   I believe it was sand.
8        Q.   Okay.  Did -- any time during that three-hour
9    meeting, Mark, do you recall Mr. Junkin asking or
10   mentioning or commenting on Yelvington's obligation to
11   take gravel under the contract and that perhaps they
12   needed to take more gravel?
13       A.   No.
14       Q.   Never came up?
15       A.   No.
16       Q.   Okay.  Well, the basis of his concern about the
17   ability to continue operations, was there any financial
18   reasons discussed?
19       A.   Yes.
20       Q.   What were they?
21       A.   He indicated that he was into this, again, in
22   my words, fairly deep.  And it was pulling him under,
23   and that he needed to try to see if we could move more
24   product.
25       Q.   When you say, we need to see if we can move

23

1    more product, meaning Yelvington?
2        A.   Correct.
3        Q.   And the product that Yelvington needed to be
4    moving was what?
5        A.   We were under an agreement with him to move
6    Number 67 gravel, and any other products, I believe,
7    that we could have moved.
8        Q.   Okay.  And, again, I'm -- it may just be you
9    and I not quite jean and hailing (phonetic) here on the
10   communication, but I am interested in any conversations
11   that you recall during that time with Clatus Junkin
12   about moving specifically Number 67 gravel under the
13   supply agreement.  Did that come up in the meeting?
14       A.   Yes.
15       Q.   Okay.  What do you recall about that?
16       A.   He asked if we would be able to move additional
17   product, more than we were moving now, more than we had
18   indicated we would move, in order to help his operation
19   continue.
20       Q.   Okay.  And what was your response?
21       A.   You know, I don't recall.  I think we just -- I
22   don't remember.
23       Q.   Well, as a result of the meeting in Daytona
24   with Clatus, did Yelvington schedule a shipment of
25   Number 67 gravel under the supply agreement?

24

1        A.   Not to my knowledge.
2        Q.   You didn't have anything -- you didn't do it?
3        A.   I didn't order the trains.  No, I did not.
4        Q.   You don't order the trains?
5        A.   No.
6        Q.   Who does order the trains, Mark?
7        A.   Those are ordered either through our rail
8    department or in conjunction with requests placed by
9    Gary, I guess, for them to order.
10       Q.   Okay.  Who, Mark, would I ask how that gets
11   done?  Who's the best person to know how a train gets
12   ordered to schedule a shipment up there at Whitehall to
13   carry the Number 67 gravel?  Are you him?
14       A.   I would ask Gary Yelvington.
15       Q.   Okay.  Well, I've done that, so -- but you
16   don't have anything to do with it?
17       A.   With ordering trains of material?
18       Q.   All right.  What do you have to do with, in any
19   way, getting a train to come to Whitehall to pick up
20   product and move it --
21       A.   Nothing.
22       Q.   -- Number 67 gravel.  Nothing?
23       A.   Nothing.
24       Q.   All right.  Do you have anything to do with
25   processing, though, the invoices or any of the stuff

25

1  that result from a train coming to Whitehall?

2     A.  No.

3     Q.  Okay.  So you don't have any -- you don't even

4  know anything about what's moved or what hasn't been

5  moved.  Right?

6     A.  That's not correct.

7     Q.  Okay.  How do you know what's been moved or

8  hasn't been moved?

9     A.  As with any system in any company, we have a

10  reporting system.  I could certainly look at the reports

11  and see how much material's moved.

12     Q.  All right.  Was it part of your

13  responsibilities at Yelvington to look at the report to

14  see if Yelvington was complying with the terms of the

15  contract that you were involved in negotiating with Pep

16  Johnson?

17     A.  Not directly.

18     Q.  Okay.  If it's not directly, is it indirectly?

19     A.  Well, as the CFO, I would be indirectly

20  responsible for looking at anything related to our

21  financial activities.

22     Q.  Okay.  Did anybody ever ask you to look at

23  what's been shipped out of Whitehall to see if it

24  comports with the requirements under the contract?

25     A.  Only at the time that we became aware of the

26

1  lawsuit.

2     Q.  Okay.  And when was that?

3     A.  We were actually notified of the lawsuit or

4  became aware of it in November --

5     Q.  Okay.

6     A.  -- of '07.  Or '06.  Excuse me.

7     Q.  Do you remember -- and I'm sure it's in your

8  file, but do you remember writing a letter to Clatus to

9  talk about scheduling an immediate shipment on November

10  the 10th of '06?

11     A.  I remember writing a letter.

12     Q.  Is that one of the documents that's in your

13  two-inch thick file?

14     A.  Yes.

15     Q.  Okay.  And if you're not involved in ordering

16  the shipment or scheduling the shipment, why would you

17  write a letter that discusses getting an immediate

18  shipment of gravel?

19     A.  We were following up into his correspondence to

20  us from our firm, one.  Apparently, there was a letter

21  at that time -- I've seen it since then -- that

22  indicated he wanted to enter into a release agreement,

23  as I recall you called it, relative to some

24  negotiations, although there were no negotiations, to my

25  knowledge.

27

1       Then there was a letter subsequent to that that

2  said he was terminating that.  So I wrote him back,

3  saying I was not aware of getting that letter.  I

4  believe it was October 19th that that came out.

5       Secondly, reiterated the fact that we were

6  still interested in doing business with him.  And also

7  reiterating the fact that we had understood, from our

8  prior conversation, that he was concerned about his

9  ability to stay in business and maybe shutting down

10  operations, and to the point at that time, I asked him

11  if he was or not still in operation.

12     Q.  Did somebody instruct you to write that letter

13  of November the 10th, 2006?

14     A.  Not that I specifically recall.

15     Q.  So you did that totally on your own

16  recognizance?  Nobody told you what to do on that?

17     A.  I would have drafted the letter on my own.

18     Q.  All right.  Then what happened to the letter

19  after you drafted it?

20     A.  I mailed it.

21     Q.  Okay.  Did you get it approved before you sent

22  it?

23     A.  Not that I recall.

24     Q.  You sent it to somebody with an esquire at the

25  end of their name.  You cc'd somebody with an esquire.

28

1  Is that an attorney?

2     A.  That is.

3     Q.  Who is that?

4     A.  Joshua Pope.

5     Q.  And he's an attorney at this firm?

6     A.  With Cobb & Cole.

7     Q.  He's with Cobb & Cole?  Why did you copy him?

8     A.  It was relative to our contracts and to these

9  release of claims, so I had asked him about those at

10  that time.

11     Q.  You had asked him about them?  So --

12       MR. LEEK:  I don't want you to discuss any

13  conversations you had with lawyers in this firm, me

14  or anyone else.

15       THE WITNESS:  Okay.

16  BY MR. PEARSON:

17     Q.  Do you routinely copy attorneys on your

18  correspondence to somebody?

19     A.  No.

20     Q.  Okay.

21     A.  Or I guess I would have to say it depends on

22  the subject matter.

23       MR. LEEK:  For purposes, can we keep these

24  consecutively numbered?

25       MR. PEARSON:  Yes, we are going to do that.

29

1    And she can put that on the record, but we're just
2    going to -- this will be Number 11.
3        Mr. Leek and I decided that the best way to do
4    is to continue to number the exhibits sequentially
5    as we move through the depositions of the various
6    parties and persons so that the first exhibit to Mr.
7    Klebe's deposition will be the next sequential
8    number. I think it's Plaintiff's Exhibit 11,
9    because I think we used 10 in the Gary Yelvington
10   deposition.
11       THE WITNESS:  Okay.
12   (Thereupon said document was received and marked as
13   Plaintiff's Exhibit 11.)
14   BY MR. PEARSON:
15       Q.  Mr. Klebe, what I've marked as Plaintiff's
16   Exhibit 11 is a letter dated 11/10 of '06 from you to
17   Clatus Junkin, as president of Johnco.  Is that the
18   letter -- do you recognize, is that the letter that you
19   sent to Clatus on November the 10th?
20       A.  It is.
21       Q.  Okay.  And I see where you copied Gary
22   Yelvington on that letter, as well.  Do you typically
23   copy Mr. Yelvington on letters?
24       A.  Yes.
25       Q.  Okay.

30

1        A.  Or it's not infrequent that I do.
2        Q.  I understand.
3            Were you instructed by Mr. Yelvington to send
4    this letter?
5        A.  Not that I recall.
6        Q.  Okay.  Were you instructed by Mr. Yelvington to
7    seek legal advice before sending the letter?
8        A.  Not that I recall.
9        Q.  Did Mr. Yelvington know you were sending this
10   letter before you sent it?
11       A.  I believe he may have.
12       Q.  And what was his involvement with that?
13       A.  Well, certainly, we may have discussed that we
14   were concerned at the time of this release.  And as I
15   recall at this time, we had understood that there might
16   be some concern or some suit being filed by Johnco, but
17   I was -- we were not aware of it or had not been
18   notified of that at that point.
19           So we certainly had some discussions about the
20   releases, where those stood, and what our status was
21   under this agreement.
22       Q.  If you look down there on the Plaintiff's
23   Exhibit 11, which is a letter, the first sentence of the
24   third paragraph reads, in the meantime, we would like to
25   send a train into your facility for immediate loading.

31

1        Now, is that what that sentence says?
2        A.  It does.
3        Q.  Okay.  Now, with respect to that, Mark, is
4    that -- is that the only time that you ever ordered a
5    train or told anybody from Johnco that Yelvington wanted
6    to take a trainload of gravel?
7        A.  I guess I'll need to rephrase your question to
8    the point where I don't consider this ordering a train.
9        Q.  Okay.
10       A.  All right.  This indicates we have a desire to
11   get material.  But you'll also note that I asked him to
12   contact our rail department to schedule a train if they
13   were operational.  So I did not order a train.
14       Q.  Is that how it would normally be done?  All
15   Johnco has to do is pick up the phone and contact the
16   rail department to schedule a train?
17       A.  They could do that, I'm sure.
18       Q.  Well, in this particular instance, you're
19   instructing them to do that.  Had you ever instructed
20   Johnco, before this letter --
21       A.  No.
22       Q.  -- to call the rail department and schedule a
23   train?
24       A.  No.
25       Q.  Did you have any involvement in scheduling or

32

1    ordering a train of May the 11th of 2006?
2        A.  Not to my knowledge.
3        Q.  How about the load that was taken on June 27th
4    of 2006?
5        A.  Not to my knowledge.
6        Q.  Did you have any involvement in ordering that
7    train?
8        A.  No.
9        Q.  Did you talk to Clatus or Pep about ordering
10   that train?
11       A.  No.
12       Q.  Tell them to call the rail department to
13   schedule it?
14       A.  No.
15       Q.  Tell them what to load on it?
16       A.  No.
17       Q.  How about the load that was later taken, the
18   next load on August the 8th of 2006?  Did you have any
19   involvement in scheduling or ordering that train?
20       A.  No.
21       Q.  The load of August the 21st, Mark, did you have
22   any involvement in ordering or scheduling that train?
23       A.  No.
24       Q.  How about the September 7th, 2006 train, did
25   you have any involvement in telling Johnco to schedule

33

1 that train, call your rail department, order it?
2  A. No.
3  Q. How about the train of September the 25th,
4 2006, did you have any involvement in ordering that
5 train?
6  A. No.
7  Q. But after September the 25th, when Clatus is
8 down there, meeting with you in Daytona for three hours,
9 telling you that he needed you to move some product
10 under the supply agreement, did you --
11  A. Excuse me. Could you restate your question?
12  Q. All right. You said that you met with Clatus
13 for three hours.
14  A. Okay.
15  Q. He had operational concerns that there was not
16 enough product being moved.
17  A. Okay.
18  Q. Did you order a train from Clatus at that time?
19  A. No.
20  Q. Johnco?
21  A. No.
22  Q. Okay. And that was in October?
23  A. Correct. Well, I don't know. September or
24 October.
25  Q. Okay. Well, you had just gotten a train

34

1 September the 25th. Right?
2  A. I'll take your word for that.
3  Q. I'll represent to you that there's an invoice
4 to you. The last load that Yelvington ever took was
5 invoice dated September the 25th. Do you have any other
6 knowledge that's different than that?
7  A. No.
8  Q. Okay. Do you have any authority to suggest
9 that Johnco schedule a train unless you get that
10 instruction from Gary Yelvington, the president?
11  A. No.
12  Q. So would it be fair to say that Gary Yelvington
13 told you to write that letter and schedule that train?
14  A. By that correlation, I guess it would be yes.
15 I don't recall specifically how this came about.
16  Q. In your life, have you ever ordered a train to
17 be -- and told people to order a train to contact the
18 rail department? Have you ever done that before?
19  A. No.
20  Q. And you recognize, when Clatus was visiting
21 with you for those three hours, that he had concerns
22 that Yelvington was not moving the product under the
23 supply agreement?
24  A. No.
25  Q. You did not have recognition of that?

35

1  A. According to the way you phrased that, no.
2  Q. Tell me what --
3  A. We were moving product under the supply
4 agreement.
5  Q. Okay. All right. How about that he had
6 concerns that you weren't taking enough product under
7 the supply agreement, did he express those concerns to
8 you?
9  A. Yes.
10  Q. Did you have conversations with Gary after
11 Clatus Junkin left the Daytona meeting? Did you have
12 any conversations with Gary Yelvington about what you
13 needed to do about that?
14  A. Not that I recall.
15  Q. Did you have any conversations with anybody at
16 Yelvington about what needed to be done about that?
17  A. Following our meeting with Clatus, not that I
18 recall.
19  Q. I'm going to take you back, Mark, for a second,
20 please, to a meeting that occurred in the summer of '06.
21 And when I say summer, I think Gary said it was June or
22 July, to the best of his knowledge. He couldn't
23 remember exactly when. I'm not going to represent to
24 you that I know when it was, either.
25    But, apparently, you and Gary and Mr. Conrad

36

1 Yelvington and maybe some others came to Calera, and you
2 all had lunch with Clatus at the Golden Rule. Were you
3 there on that flight that day?
4  A. I was not.
5  Q. You weren't there. Okay.
6    Do you remember that at all? I mean, do you
7 have any recollection of them going up there and having
8 a meeting with Clatus?
9  A. Only after the fact did they mention they had
10 met with him.
11  Q. Okay. Do you recall when that was?
12  A. I do not.
13  Q. Okay. And what do you recall that they said
14 about that?
15  A. That they had met with Clatus. That's it.
16  Q. And as just an aside, did any -- I mean, just,
17 that's what we did? I mean, was it noteworthy in any
18 other way, other than, we met Clatus Junkin?
19  A. I don't even think I was aware of it at the
20 time that it happened. I think that came to my
21 attention later on.
22  Q. When -- and I may have asked you this, and I
23 apologize if I have. When was the first time you
24 actually met Clatus Junkin? Was that in the Daytona
25 meeting?

bf3a6cb9-d0b5-4dc1-b439-ddb6c0fa437f

37

1    A.  That was at the Daytona meeting.

2    Q.  When was the first time you ever talked with

3  Clatus Junkin?

4    A.  I believe it was at the same meeting.

5    Q.  Okay.  So you never had a telephone

6  conversation or a face-to-face meeting with Clatus,

7  ever, before the Daytona, that you know of?

8    A.  Not that I remember.

9    Q.  Okay.  What about Pep Johnson, from the time of

10  the supply agreement -- you know, it's a fully-executed

11  supply agreement, you know, at the end of April '04.

12  Tell me what communications you had with Pep Johnson

13  after September -- after, excuse me, April 28th of '04.

14    A.  I don't honestly remember anything specific

15  that I would have had conversations with him on.

16    Q.  Do you think you had any conversations with him

17  at all?

18    A.  Not that I specifically recall, but may have.

19    Q.  What is your recollection, Mark, on the volume

20  of or quantities of materials that were Number 67 gravel

21  specifically that Yelvington intended to move?

22    A.  We agreed to take 150,000 tons a year.

23    Q.  I don't -- I understand what the contract says,

24  and it says what it says.  And I'm not speaking to

25  anything admissible or inadmissible.  I'm just asking

38

1  you, was there ever conversations about taking more

2  product than that with Ben?  Excuse me, with Pep?

3    A.  I would think Pep has always indicated he would

4  like us to take as much as we could, but we limited the

5  amount that we would be able to commit to.

6    Q.  Okay.  And I understand that.  But Mark Klebe,

7  himself, chief financial officer, did you ever give Pep

8  any indication or have any communications with Pep that

9  it's your understanding that Yelvington would like to

10  take a lot more than 150,000 tons a year?

11    A.  Not that I specifically recall.

12    Q.  Okay.  But it could have occurred, you just

13  don't recall it?

14    A.  Certainly could have.

15    Q.  Okay.  Do you have any understanding -- I mean,

16  did you all have enough rail cars to move this stuff?

17  Do you all have supply availability of rail cars to move

18  the product you agreed to in the supply agreement?

19    A.  I know we have a good supply of rail cars.  As

20  to what service they're scheduled and what time, that,

21  I'm not familiar with.

22    Q.  Do you have any involvement in that, Mark?

23    A.  Involved in --

24    Q.  The scheduling or any of that stuff of the rail

25  cars?

39

1    A.  No.

2    Q.  You know you got a bunch of rail cars.  The

3  brochure says 1815, the one we put that's, you know, the

4  one through 2005.  Do you know how many rail cars you

5  all actually have?

6    A.  Right now, no, because we returned some and had

7  some destroyed, but a little over 1800.

8    Q.  Is that another story, the some destroyed?

9    A.  Pardon me?

10    Q.  Is that another story, the some that are

11  destroyed?

12    A.  I'm not sure I understand your question.

13    Q.  You said you returned some and had some

14  destroyed.  I'm just wondering if there's another story

15  that goes with destroying the rail cars.

16    A.  Not relative to what we're talking about.

17    Q.  Okay.  Yeah.  In 2006, how many rail cars did

18  you all have?  Was it --

19    A.  Roughly, 1800.  A little more.

20    Q.  Okay.  All right.  Well, that's consistent with

21  what Gary's, you know, testified to.  I just wondered if

22  you had a better -- would that be on something that you

23  look at, like in a financial --

24    A.  We keep a schedule of our rail cars.  All our

25  cars are leased, so we know how many are out there

40

1  pretty much all the time.  We do have a schedule, yes.

2    Q.  How many of those cars are in Michigan at any

3  given time?

4    A.  That, I do not know for sure.

5    Q.  Do you all not break it down that way?

6    A.  It is, but I can't tell you the number right

7  now.

8    Q.  I mean, do you have an approximation of what it

9  usually is?

10    A.  No.

11    Q.  Do you have any knowledge of the contracts that

12  Yelvington has for buying gravel that's -- buying the

13  gravel that's occurred since Johnco quit delivering

14  gravel to Yelvington?  Do you have any knowledge of

15  those contracts to buy that gravel?  Martin Marietta or

16  any of the others?

17    A.  To answer your question, there are no

18  contracts.

19    Q.  Okay.  Meaning there are no written contracts?

20    A.  I would say there are no contracts within how I

21  understand them.  So written, right, there's no written

22  contract.

23    Q.  Okay.  But you all have bought gravel from time

24  to time since then from Martin Marietta?

25    A.  I understand we have.

bf3a6cb9-d0b5-4dc1-b439-ddb0c0fa437f

41

Q. But you don't have any involvement with that?

A. No. Not in the ordering of it.

Q. Well, how about the knowledge that it has occurred?

A. Again, knowing where our products come from, yes.

Q. Okay. Do you know how much, then, that you've bought from Martin Marietta?

A. That, I do not know.

Q. Okay. Do you know how long you've been buying it?

A. No, I don't.

Q. Do you know where it's gone?

A. To the Panhandle, is all I would be aware of. Specific locations, no.

Q. Okay. But when you say, to the Panhandle, to your terminal facilities at the Panhandle?

A. Yes. That would be my presumption. That's normally where we move gravel.

Q. After Philip Holladay comes into the picture, which you and I have, I guess, tacitly determined probably mostly occurred after the supply agreement was actually fully executed.

A. Okay.

Q. How does that work with Philip going up there

42

and checking on that operation or involving himself in whatever's going on? What's your knowledge of that?

A. I don't have any direct knowledge.

Q. What would be your occasion to speak with Philip about anything that's going on up at Whitehall?

A. Only if I were to overhear a conversation or be in the room if he was having a conversation, I guess, with Gary.

Q. Okay. So you really don't have any responsibility to know what's going on in that regard?

A. No.

Q. Okay. At what point do you come back into the Whitehall Johnco gravel operation with any responsibility for knowing what's going on up there?

A. Once I guess Clatus came down was the next time I was familiar with anything really going on up there.

Q. And as you recall it, Gary involved you at that point and asked you to come in and be involved in it?

A. Yes.

Q. Okay. And are you involved in any other kinds of situations that involved troubled contracts that -- is that something you'd routinely be involved in? If Yelvington has contractual things going on with other people, is that when you're brought in?

A. Yes.

43

Q. And what would be your responsibilities, Mark, in that regard? What were you supposed to do when Gary brings you in to meet with Clatus there in Daytona and you all spend three hours and go to Picadilly and those kinds of things? What were you supposed to do?

A. I don't think I was tasked with anything specific at the time, other than just to be with Gary to meet with him. And I was familiar with the original agreement.

Q. Do you recall what you told Clatus at that meeting?

A. No.

Q. Did you do any talking at that meeting?

A. I'm sure I did.

Q. And but you didn't have a particular responsibility and don't remember what you said?

A. No. Correct.

MR. PEARSON: Let's take a break for a second.

(Thereupon, at 3:55 p.m., a recess was taken in the proceedings, after which, at 4:03 p.m., the proceedings were reconvened and the following proceedings were had:)

BY MR. PEARSON:

Q. Mr. Klebe, we took a break and you've been out of the room for a few minutes, and you've come back in and said you want to clarify something. What is it you

44

want to clarify?

A. I want to clarify two points. First of all, I've been reminded that perhaps I was not at that lunch meeting. Gary Yelvington didn't recall me being there and, in fact, indicated that there was an accident at the time, which I don't recall. So I must be mistaken. I was not at that meeting.

Q. Okay. What else?

A. The second thing, I just want to clarify something relative to this letter of November 10th. You had asked me if I had been directed to write this letter, and the answer to that is no, I was not directed to write this letter.

However, this letter did come about from a discussion that occurred collectively between Gary Yelvington, myself, and I believe, Philip Holladay. At that time, we were concerned about these requests for releases. We wanted to make sure that Mr. Junkin understood that we were ready and able to take material, should they be able to ship it. And that's really what promulgated the writing of this letter.

Q. On the October the 10th?

A. Right. I drafted this letter on my own. I was not directed to put this particular verbiage in there. We just wanted to get across that point, that we were

11 (Pages 41 to 44)

bf3a6cb9-d0b5-4dc1-b439-ddb6c0fa437f

45

1  ready at any time to take it. And I did not understand
2  whether or not Johnco had, in fact, ceased operations,
3  so if not, they needed to understand that we were ready
4  and willing to take material if they were able to supply
5  it.
6     Q.  Now, I appreciate the clarification. And that
7  came from you being reminded by whom?
8     A.  By nobody. I asked our attorney about this,
9  too. I said, because I was --
10    MR. LEEK: You got to be careful here. I'm not
11  terribly worried about it, but for the sake of
12  protecting our privilege here, don't talk about
13  conversations you had with me. You can talk about
14  facts, how you came to remember these things, but
15  don't talk about the specific communications with
16  me.
17    THE WITNESS: Okay. Well, I was concerned
18  about our conversation earlier on this, and I wanted
19  to clarify that I was not directed to actually write
20  this letter.
21  BY MR. PEARSON:
22    Q.  Okay.
23    A.  Or actually requested to load -- to order
24  material. What we collectively decided was that we
25  would find out whether or not we would be able to take

47

1  knowing the whole story.
2     MR. LEEK: Sure.
3     You have the right to read this deposition if
4  it's transcribed, or you can waive that right. The
5  purpose of reading is to make sure that Sandy's
6  taken down everything correctly. I have every
7  confidence that she has, but it is your right to
8  read or waive.
9     THE WITNESS: I'd like to read it.
10    MR. LEEK: Okay. What will happen, you can
11  send the notice to me. Then we'll make sure that he
12  gets it.
13    MR. YELVINGTON: I'd like to read mine, too.
14  (Thereupon the deposition was concluded at 4:06 p.m.)
15
16
17
18
19
20
21
22
23
24
25

46

1  material from Johnco.
2     Q.  Everything else, though, you testified to is
3  accurate?
4     A.  Yes.
5     MR. PEARSON: Okay. Well, that concludes the
6  deposition, from my point of view.
7     MR. LEEK: Okay.
8     MR. PEARSON: And, again, for purposes -- and I
9  don't know if we put it on the record, but if we
10  haven't, we're going to do a Rule 26 disclosure
11  relative to damages. And from there, we will decide
12  what testimony we may need relative to damages. You
13  all have depositions coming up, and we'll go from
14  there.
15    MR. LEEK: Allow me to suggest this before you
16  conclude today. I know that Mark has more
17  information about the Number 67 gravel being
18  purchased. Now, it may not be as specific as you're
19  ultimately going to want, but to the extent I'll
20  help you craft whatever it is you need to later on,
21  that's fine. Or if you want to wait the rule --
22    MR. PEARSON: I think I'll just wait on the
23  Rule 26 and we'll figure that out, Tom. I
24  appreciate it. I don't think there's any way that I
25  could get through what I need to get through without

48

1                  CERTIFICATE OF OATH
2
3  STATE OF FLORIDA    )
4  COUNTY OF VOLUSIA   )
5
6     I, Sandra Narup, Registered Professional Reporter
7  and Florida Professional Reporter, the undersigned
8  authority, certify that MARK KLEBE personally appeared
9  before me and was duly sworn on July 5, 2007.
10
11    WITNESS my hand and official seal this 12th day of
12  July, 2007.
13
14
15
16
17
                     _____
18                   Sandra Narup
                     Registered Professional Reporter
19                   and Florida Professional Reporter

                     Notary Public, State of Florida
20                   My Commission No.: DD 472186
                     Expires:  January 15, 2010
21
                     (This signature is valid only
22                   if signed in blue ink.)
23
24
25

49

CERTIFICATE OF REPORTER

1

2

3  STATE OF FLORIDA    )
                       )
4  COUNTY OF VOLUSIA   )

5

6      I, SANDRA NARUP, Registered Professional Reporter,

7  Florida Professional Reporter and Notary Public, do

8  hereby certify that I was authorized to and did

9  stenographically report the deposition of MARK KLEBE,

10  that a review of the transcript was requested; and that

11  the foregoing transcript is a true record of my

12  stenographic notes.

13      I further certify that I am not a relative,

14  employee, attorney, or counsel of any of the parties,

15  nor am I a relative or employee of any of the parties'

16  attorneys or counsel connected with the action, nor am I

17  financially interested in the action.

18

19      DATE this 12th day of July, 2007.

20

21

22

         SANDRA NARUP
23       Registered Professional Reporter &
         Florida Professional Reporter

24

         (This signature is valid only
25       if signed in blue ink.)

---

50

1  Volusia Reporting Company
   432 S. Beach Street
2  Daytona Beach, Florida 32114
   386-255-2150
3
4  July 12, 2007
5  THOMAS J. LEEK, ESQUIRE
   Of Cobb & Cole
6  150 Magnolia Avenue
   Daytona Beach, Florida 32114
7
8  Re: Johnco v Conrad Yelvington
9
10  Dear Mr. Leek:
11  Attached please find your copy of the deposition of MARK
    KLEBE, which was taken in the above-styled cause on July
12  5, 2007.  Also attached is the Deponent's errata sheet
    to be completed by the deponent when reading your copy
13  of the deposition.  This form is self-explanatory.
14  After the deponent has completed this form, please
    return it to our office for inclusion in the original
15  transcript.
16  If the reading and signing is not completed within 30
    days, we shall conclude that the witness has failed to
17  exercise his/her right to read and sign the transcript.
    If this is not ample time, please contact our office.
18
    Thank you for your cooperation.
19
20
    Sincerely,
21
22
    Sandy Narup
23  Registered Professional Reporter &
    Florida Professional Reporter
24
    H. GREGORY PEARSON, Esquire
25  THOMAS J. LEEK, Esquire

---

51

1            ERRATA SHEET

2      IN RE:  Johnco v Conrad Yelvington

3      DEPOSITION OF MARK KLEBE, TAKEN July 5, 2007

4  PAGE NO. LINE NO. CHANGE        REASON

5  ___ ___ _____ _____

6  ___ ___ _____ _____

7  ___ ___ _____ _____

8  ___ ___ _____ _____

9  ___ ___ _____ _____

10  ___ ___ _____ _____

11  ___ ___ _____ _____

12  ___ ___ _____ _____

13  ___ ___ _____ _____

14  ___ ___ _____ _____

15  ___ ___ _____ _____

16  ___ ___ _____ _____

17  ___ ___ _____ _____

18  ___ ___ _____ _____

19  ___ ___ _____ _____

20  ___ ___ _____ _____

21  ___ ___ _____ _____

22  ___ ___ _____ _____

    Under penalties of perjury, I declare that I have read
23  the foregoing and that the facts stated in it are true.

24

    _____    _____
25  DATE                MARK KLEBE



# FREEDOM COURT REPORTING

Page 1

1    IN THE UNITED STATES DISTRICT COURT
2    FOR THE MIDDLE DISTRICT OF ALABAMA
3                CASE NUMBER
4    CV-06-2:06CV993-10
5
6    JOHNCO MATERIALS. INC.,
7        PLAINTIFF,
8    VS.
9    CONRAD YELVINGTON
10   DISTRIBUTORS. INC.,
11       DEFENDANT.
12
13       DEPOSITION OF:
14   PRESLEY MORGAN JOHNSTON
15
16       S T I P U L A T I O N
17   IT IS STIPULATED AND AGREED by and
18   between the parties through their
19   respective counsel. that the deposition of
20   PRESLEY MORGAN JOHNSTON, may be taken
21   before Donna Winters, Commissioner and
22   Notary Public. State of Alabama at Large.
23   at the law offices of Junkin. Pearson.

Page 2

1    Harrison & Junkin, 600 Greensboro Avenue.
2    Suite 601, Tuscaloosa, Alabama 35401. on
3    the 24th day of July 2007 commencing at
4    9:00 a.m.
5    DEPOSITION OF: PRESLEY MORGAN JOHNSTON
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

Page 3

1    IT IS FURTHER STIPULATED AND AGREED
2    that the signature to and the reading of
3    the deposition by the witness is reserved.
4    the deposition to have the same force and
5    effect as if full compliance had been had
6    with all laws and rules of Court relating
7    to the taking of depositions.
8        IT IS FURTHER STIPULATED AND AGREED
9    that it shall not be necessary for any
10   objections to be made by counsel as to any
11   questions. except as to form or leading
12   questions, and that counsel for the
13   parties may make objections and assign
14   grounds at the time of the trial. or at
15   the time said deposition is offered in
16   evidence or prior thereto.
17       IT IS FURTHER STIPULATED AND AGREED
18   that notice of filing of this deposition
19   by the Commissioner is waived.
20
21
22
23

Page 4

1                E X H I B I T S
2    EXHIBIT PG DESCRIPTION
3    DX-1   102 ***
4    DX-2   125 Johnco Materials, Inc.
5    Whitehall site photograph
6    DX-3   128 Johnco Materials, Inc.
7    Whitehall site photograph with labels
8    DX-4   130 ***
9    DX-5   134 ***
10   DX-6   137 ***
11   DX-7   137 1-12-06 e-mail
12   DX-8   141 ***
13   DX-9   146 ***
14   DX-10  149 ***
15   DX-11  150 ***
16   DX-12  151 ***
17   DX-13  154 ***
18   DX-14  161 ***
19   DX-15  165 ***
20   DX-16  169 ***
21
22
23

1 (Pages 1 to 4)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 5

INDEX

EXAMINATION BY:    PAGE NUMBER

Mr. Leek          7 - 183

APPEARANCES:

MR. THOMAS J. LEEK, Attorney at Law,
150 Magnolia Avenue, Daytona Beach,
Florida 32115-2491, appearing for the
Plaintiff.

JUNKIN, PEARSON, HARRISON & JUNKIN,
by Mr. H. Gregory Pearson, Alston Place,
600 Greensboro Avenue, Suite 601,
Tuscaloosa, Alabama 35401, appearing for
the Defendant.

ALSO PRESENT: Phillip Holladay.

Page 6

1    I, Donna Winters, a Court Reporter
2    of Birmingham, Alabama, acting as
3    Commissioner, and a Notary Public for the
4    State of Alabama at Large, certify that on
5    this date, as provided by Rule 30 of the
6    Alabama Rules of Civil Procedure, and the
7    foregoing stipulation of counsel, there
8    came before me, PRESLEY MORGAN JOHNSTON,
9    witness in the above cause, for oral
10   examination, whereupon the following
11   proceedings were had:
12
13        PRESLEY MORGAN JOHNSTON,
14   having been first duly sworn, was examined
15   and testified as follows:
16
17        COURT REPORTER: Usual stipulations?
18        MR. PEARSON: Yes, there will be
19   usual stipulations. Pep, I usually handle
20   this upfront. You can read and sign the
21   deposition if you choose to, or you can
22   waive the right to read and sign the
23   deposition. I would just as soon you read

Page 7

1    it, but that's up to you.
2        THE WITNESS: You would like for me
3    to read it?
4        MR. PEARSON: Yes.
5        THE WITNESS: I'll read it.
6        MR. PEARSON: One thing I wanted to
7    handle on the record beforehand is you
8    noticed three depositions individually;
9    and then you sent me on Friday, which we
10   got it just after noon, 30(b)
11   designations. We objected to that as
12   being untimely, but this is what I intend
13   for you to do. You go ahead and ask all
14   of your questions, they can answer them
15   out of any kind of personal knowledge they
16   have. We're not necessarily waiving our
17   objections, it may handle it. The biggest
18   thing that I wanted to preserve it for is
19   because, you know, the damages thing. I
20   have not decided who we're going to
21   ultimately designate. Certainly you can
22   ask your questions, but we may have
23   another witness, I don't know yet, on the

Page 8

1    damages issue. So that's why we objected.
2        MR. LEEK: That works. I certainly
3    understand that.
4
5    EXAMINATION BY MR. LEEK:
6    Q.    Good morning, Mr. Johnston.
7    A.    Good morning.
8    Q.    Can you state your full name for the
9    record for me, please?
10   A.    Full name?
11   Q.    Yes.
12   A.    My full name is Presley Morgan,
13   M-O-R-G-A-N, Johnston.
14   Q.    Do I understand you go by Pep?
15   A.    Right.
16   Q.    I'm going to call you Mr. Johnston
17   here.
18   A.    Mr. Johnston, or whatever you would
19   like.
20   Q.    That's fine. Mr. Johnston, let me
21   make sure I have my memory correct here.
22   Do I understand that you're an attorney?
23   A.    Right.

2 (Pages 5 to 8)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 9

1 Q. I think you said you were with the
2 district attorney's office?
3 A. Well, I retired as district attorney
4 in 2001.
5 Q. Excellent. Well, then I'm going to
6 dispense with a lot of the deposition
7 instructions I normally give, with the
8 understanding that you have been an
9 attorney. How long were you an active
10 attorney?
11 A. Well, I prosecuted criminal cases
12 for 38 years before I retired, but I
13 pretty much got away from civil practice
14 during that time.
15 Q. The only thing I'm going ask you to
16 do is to wait until I finish the question
17 before you give me your answer. That way,
18 it will just make for a cleaner record.
19 If anything else comes up, we'll go along
20 the way there.
21 A. Sure.
22 Q. I want to cover a couple of basics
23 here, just to make sure we're talking

Page 10

1 about the same people. I'm going to call
2 out a name or an entity to you, and if you
3 could just tell me what your definition of
4 who that person or entity is in
5 relationship to this lawsuit. Conrad
6 Yelvington Distributors, Inc.?
7 A. They were a party to a gravel supply
8 contract with Johnco Materials.
9 Q. Gary Yelvington?
10 A. I'm not sure whether he's the
11 president or the manager. He's the
12 general person in authority at Yelvington
13 Distributors.
14 Q. That's a good point. We're going to
15 refer to Conrad Yelvington Distributors,
16 Inc. as many things along the way;
17 Yelvington, Yelvington Distributors, et
18 cetera. So you understand when I say
19 "Yelvington" or "Yelvington Distributors,"
20 I'm actually referring to the company. Is
21 that fair?
22 A. That's fair.
23 Q. Mark Klebe?

Page 11

1 A. Mark Klebe is a person in, I
2 understood, the Accounting Department,
3 maybe, in Daytona Beach. I'm not sure
4 what his title is. He was somebody that
5 we were referred to, to iron out details
6 in the supply contract.
7 Q. And you understood that Mr. Klebe
8 worked for Yelvington; is that correct?
9 A. Yes.
10 Q. Phillip Holladay?
11 A. Mr. Holladay here, Phillip, I don't
12 know what his position is, frankly. At
13 some point after we had a contract, that
14 is after Johnco had a contract with
15 Yelvington, Phillip would come by the
16 plant and discuss matters with us about
17 supplying gravel, where it was going, who
18 it might go to, where it might be shipped.
19 I didn't know whether he was an agent or
20 employee. I just assumed he had the
21 authority to do what he was doing. That's
22 about as far as it got.
23 Q. Just so I can close that loop there,

Page 12

1 you understood that he had authority to do
2 what he was doing for Yelvington; is that
3 correct?
4 A. I assumed that he did.
5 Q. All I'm trying to do there is tie a
6 link between Mr. Holladay and Yelvington.
7 A. Sure.
8 Q. So you understood that Mr. Holladay
9 was working on behalf of Yelvington; is
10 that right?
11 A. Right. I did that, yes.
12 Q. Who is Ben Johnston?
13 A. Ben Johnston is my brother, and
14 initially was half-owner of the Johnco
15 Materials Corporation.
16 Q. Who is Clatus Junkin?
17 A. Clatus Junkin became a stockholder
18 in Johnco Materials when the financing was
19 put in place to begin performing the
20 contract. Well, before that, he became a
21 stockholder in Johnco Materials before we
22 entered into the contract with Yelvington.
23 Q. Tell me what Johnco Materials is.

3 (Pages 9 to 12)

# FREEDOM COURT REPORTING

Page 13

1   A.   It's a corporation.
2   **Q.   Is that the corporation that is a**
3   **plaintiff in this lawsuit, if you know?**
4   A.   I've been told that.  They sued
5   Yelvington.
6   **Q.   Fair enough.**
7   A.   I haven't seen any documentation of
8   that, but I've been told that.
9   **Q.   Johnco Materials is a gravel and**
10  **sand mine, is that correct, or was?**
11  A.   Yes, it is.
12  **Q.   Are there any other corporate**
13  **entities associated with Johnco, that**
14  **you're aware of?**
15  A.   There were no corporate
16  stockholders.  There were only individual
17  stockholders.  And at the time Ben and I
18  sold our interest, it was sold to Clatus
19  Junkin.  What has happened since then, I
20  don't know.
21  **Q.   Fair enough.  Does Johnco have any**
22  **subsidiaries or affiliates that you're**
23  **aware of?**

Page 14

1   A.   No.
2   **Q.   Fair enough.  Can you tell me your**
3   **current address, please?**
4   A.   120 Third Avenue Northeast,
5   Aliceville, Alabama 35442.
6   **Q.   How long have you lived there?**
7   A.   I've lived in Aliceville since 1937.
8   **Q.   How long have you lived at this**
9   **address, the 120 address?**
10  A.   That is actually my office address.
11  My residence address is 608 Country Club
12  Lane, same town, same zip code.  We have
13  lived there for about fifteen years.
14  **Q.   You say you have an office now.  Are**
15  **you currently employed?**
16  A.   I have an office that I go down and
17  visit every day.  I have a little bit of a
18  law practice, not much.
19  **Q.   Thank you.  And you said, "We have**
20  **lived there for about fifteen years."  Who**
21  **else lives with you at 608?**
22  A.   My wife.  Her name is Shelby.
23  **Q.   Anyone else?**

Page 15

1   A.   That's all.
2   **Q.   Thank you.  Are you currently**
3   **involved in any other lawsuits besides the**
4   **one here, as plaintiff or defendant?**
5   A.   No.  I'm not involved in this one.
6   **Q.   Are you involved in any lawsuits as**
7   **a witness, other than the one that we have**
8   **here?**
9   A.   No.
10  **Q.   Now, you said that you're not**
11  **involved in this one.  Why is it that you**
12  **think you're not involved in this one?**
13  A.   I'm not a stockholder, and I haven't
14  been sued.  I'm not a plaintiff.  That's
15  my definition of involvement.
16  **Q.   Sure.  Fair enough.  Walk me**
17  **through, if you would, please, the status**
18  **of your relationship with Johnco**
19  **Materials, and try to give me a chronology**
20  **as best you can.**
21  A.   Relationship chronology.  Maybe you
22  could clarify that.  I'm not sure where
23  you're coming from.

Page 16

1   **Q.   This is all I'm looking for.  I want**
2   **to put together the evolution of Johnco**
3   **Materials.**
4   A.   Oh, okay.  Sometime in 2002 my
5   brother, Ben, and I were trying to begin a
6   sand and gravel producing business.  I
7   retired from the district attorney's
8   office in January of 2001, so we had been
9   talking about it that year.  Ben
10  remembered that there was a sand and
11  gravel deposit that my dad and he had
12  looked at in Lowndes County in 1958; and
13  he went down there to see if it was still
14  there, and it was.  We began to talk to
15  the owner of the property, Don Freeman,
16  about a lease.  He didn't want to lease
17  it; he wanted to sell it.  So we
18  organized, ultimately took an option on
19  the property and began to see where there
20  might be a market.
21  **Q.   Can I stop you for just a second?**
22  A.   Yes.
23  **Q.   At what point did you contact**

4  (Pages 13 to 16)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 17

1  Mr. Freeman, what year; do you recall?
2  A.  It was late 2001, early 2002.
3  Q.  At what point did you take the
4  option on the property?
5  A.  We took an option in August of 2002.
6  Q.  So at this point you've taken an
7  option on the property.  What happens next
8  in the evolution of Johnco?
9  A.  I think through Elmore Sand and
10 Gravel, we got information about
11 Yelvington's involvement in the market in
12 that area.  Ben and I went down to see
13 Gary.
14 Q.  Do you remember when you got the
15 information from Elmore?
16 A.  I don't, I sure don't.  I'm not
17 absolutely sure it came from him.  From
18 some source, we became aware that
19 Yelvington was involved in purchasing
20 quantities of gravel in that area.  Ben
21 and I went to see Gary, and Gary and his
22 father and a pilot came to Whitehall to
23 see the property.  I can't remember

Page 18

1  whether we went down there before he came
2  up, whether we talked to him on the phone
3  and he came up, and then we went to see
4  him.  I don't know how that time sequence
5  is or was.  The option was for some period
6  of time.
7       Over in April, I think it is, of
8  2003, Gary notified us that the quantity
9  of material he could purchase was, like,
10 50,000 tons a year; and his price was in
11 the four-fifty, four-seventy-five range.
12 We took an extension on the option and
13 pretty much decided that this business
14 wasn't going to go at that rate.  Later,
15 and I haven't been able to pinpoint a
16 time, but at some point he called.  Gary
17 called me and said that he thought they
18 could handle quite a bit more of supply if
19 we were interested; and I asked him if
20 there had been any price appreciation, and
21 he said that he thought they could pay
22 five-twenty-five, with some increases in
23 price over some kind of time frame.  So

Page 19

1  then we began to negotiate the contract
2  that we finally arrived at.
3  Q.  Let me ask you this.  At what point
4  in time did you incorporate Johnco?
5  A.  I don't remember.  We incorporated
6  Johnco after we began the discussions
7  about the increased quantity and before we
8  purchased the property.
9  Q.  So before you exercised the option?
10 A.  Right.  I didn't look at those
11 documents before I came up here.  Of
12 course, they're on record in Pickens
13 County.
14 Q.  You gave me a date of April of '03
15 when you first talked to Mr. Yelvington,
16 where he expressed some quantity and price
17 that they could take?
18 A.  Well, actually the discussion --
19 right, in April of '03.  That's right.
20 Q.  Then you told me that later Mr.
21 Yelvington contacted you and said that he
22 could take more?
23 A.  Right.

Page 20

1  Q.  Do you recall how much later that
2  was?
3  A.  I don't.
4  Q.  Was that within the same year?
5  A.  I don't know.
6  Q.  Tell me a little bit more about your
7  discussion with Mr. Yelvington regarding
8  his ability or Yelvington's ability to
9  take more.  Do you recall where that
10 conversation took place?
11 A.  My recollection is, he gave me those
12 quantity figures over the phone when he
13 recontacted us.
14 Q.  What quantity figures did he give
15 you?
16 A.  150,000 tons a year.
17 Q.  And did he give you a rate?
18 A.  I'm thinking it was
19 five-and-a-quarter.  I believe that's what
20 it was.
21 Q.  What happens next in the evolution
22 of Johnco here?
23 A.  Well, going back a little bit, I had

5  (Pages 17 to 20)

# FREEDOM COURT REPORTING

Page 21

1  talked to Clatus initially about the
2  prospect down there. He had a sand and
3  gravel business himself, and I asked him
4  if he would be interested in it. Then I
5  went back to him after the letter I got
6  from Gary about the reduced quantity, and
7  told him I thought the thing wasn't going
8  to fly. After Gary called us back, Ben
9  and I began to try to line up financing,
10  and finally decided that we couldn't
11  sustain it by ourselves, and I went back
12  to Clatus. The two of us arranged the
13  financing for it.
14  **Q.   Let's talk about financing for a**
15  **second. You said that you and Ben tried**
16  **to arrange financing initially; is that**
17  **correct?**
18  A.   Right.
19  **Q.   Is that after Mr. Yelvington**
20  **contacted you and said that he could take**
21  **an increased tonnage?**
22  A.   Right.
23  **Q.   What did you do to try to arrange**

Page 22

1  **financing?**
2  A.   We talked to a bank here in
3  Tuscaloosa.
4  **Q.   Which bank was that?**
5  (Off-the-record discussion.)
6  A.   It was Regions Bank.
7  **Q.   And the individual you talked to was**
8  **named what?**
9  A.   We didn't talk to him. I just
10  remember him being there.
11  **Q.   Do you know who you spoke to at**
12  **Regions?**
13  A.   No.
14  **Q.   Did you fill out an application?**
15  A.   Yes, we did.
16  **Q.   Was Johnco incorporated at the time**
17  **that you sought financing through Regions?**
18  A.   I don't remember.
19  **Q.   I'm sorry, I forget your answer.**
20  **Did you tell me you did fill out an**
21  **application at Regions?**
22  A.   Yes.
23  **Q.   Do you recall what you submitted to**

Page 23

1  **Regions with regard to your application?**
2  A.   I gave them a financial statement.
3  **Q.   Did you give them anything other**
4  **than your financial statements?**
5  A.   I told them what we planned to do
6  and what we thought we could produce, what
7  we thought would be generated by selling
8  that much gravel at that price.
9  **Q.   Did they require you to give them a**
10  **business model, a written business model?**
11  A.   No.
12  **Q.   Did they require that you give them**
13  **a written business plan?**
14  A.   I typed up what I thought we could
15  do. If that is a business plan, that's
16  what it is.
17  **Q.   Fair enough. Did you submit that**
18  **with your application?**
19  A.   I think so, yes.
20  **Q.   Do you still have that document?**
21  A.   I don't know.
22  **Q.   Where would you have it if you had**
23  **it?**

Page 24

1  A.   It would be in my office in
2  Aliceville if I have it.
3  **Q.   Do you maintain any Johnco files or**
4  **files relating to Johnco personally,**
5  **outside of Johnco company?**
6  A.   I don't have any files remaining
7  there after Clatus bought us out. I don't
8  have any.
9  **Q.   Did you take your files with you,**
10  **then? For instance, you just told me you**
11  **have some information at your office.**
12  A.   Yes.
13  **Q.   So did you take your files from**
14  **Johnco with you?**
15  A.   Well, that's where Johnco's office
16  was. I didn't take them anywhere.
17  Whatever I had is still in the same place.
18  **Q.   Fair enough. But you maintain**
19  **possession of those records; is that**
20  **correct?**
21  A.   I have some records of when we
22  applied for the loan with Regions Bank.
23  **Q.   Do you have any other records**

6  (Pages 21 to 24)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 25

1  relating to Johnco?
2  A.  I don't think so, no.
3  Q.  Do you recall what the production
4  plan was that you put together for
5  Regions?
6  A.  Well, we were going to sell 150,000
7  tons a year at whatever that is,
8  five-and-a-quarter.
9  Q.  That's number 67 gravel; correct?
10  A.  Right.  There was to be a market
11  for, we thought for metallurgical gravel,
12  which was the oversize.
13  Q.  How much of that did you intend to
14  produce?
15  A.  Well, the deposit itself, according
16  to Ben's testing, has anywhere from 40 to
17  47 percent gravel, depending on what area
18  you're testing.
19  Q.  Is that both number 67 and
20  oversized?
21  A.  That's all the gravel.  About 15
22  percent of the gravel would have been
23  oversize, according to the screen analysis

Page 27

1  when you seek financing, you don't have a
2  plan to sell the sand; is that correct?
3  A.  We thought there were several
4  possibilities for sand; but we did not
5  have a market for it, no.
6  Q.  What possibilities did you think you
7  had for sand?  Again, we're talking about
8  the time that you're going to get
9  financing.
10  A.  Well, there was a new block plant
11  opening on the west side of Montgomery
12  that we talked to.
13  Q.  What was their name; do you know?
14  A.  I don't.  One of the ready-mix
15  places on the west side of town was
16  interested, if we could supply them
17  gravel.  Of course, we were committed to
18  Gary for the 150,000 tons, and we couldn't
19  guarantee that we would supply both.  So
20  that was just a possibility.
21  Q.  At the time that you're seeking
22  financing?
23  A.  Right.

Page 26

1  he made; so whatever that comes to.
2  Q.  What other parts of your production
3  plan did you have?
4  A.  We told the bank what we thought it
5  would cost.  We knew what it would cost to
6  buy the property, and we told them what we
7  thought we could buy various pieces of
8  equipment for, that kind of thing.
9  Q.  Did you have to present that to them
10  in writing, some kind of cost analysis?
11  A.  I'm sure we did.  I don't recall the
12  details of it, but I'm sure we did.
13  Q.  What about the sand, what was your
14  plan with regard to the sand?
15  A.  Well, initially we thought we
16  wouldn't have a market for the sand.
17  After we were set up, Lafarge in
18  Atlanta -- well, Keith Bodiford works for
19  them, came by and wanted to know if we
20  would sell some sand, and we made him a
21  price and took some samples over there.
22  It never did materialize, though.
23  Q.  Just so I'm clear here, initially

Page 28

1  Q.  Did you seek financing from any
2  other person or entity other than Regions?
3  I'm talking about the time that you and
4  Ben sought financing.
5  A.  We kicked around ideas.  We didn't
6  actually apply to anybody else.
7  Q.  Did you talk to anybody else?
8  A.  Well, we talked to somebody with the
9  Department of Agriculture, some kind of
10  government loan program, and they wanted a
11  whole bunch of information.  We ultimately
12  did not apply to them.  We just kicked
13  that idea around.
14  Q.  Why didn't you apply with them?
15  A.  We had pretty much decided that Ben
16  and I couldn't handle it.
17  Q.  Did Regions process your
18  application, to the point where you got a
19  determination?
20  A.  Well, they turned us down.
21  Q.  Fair enough.  Did you talk to
22  anybody else besides Regions and the
23  Department of Agriculture about financing?

7  (Pages 25 to 28)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 29

1  **Again, I'm focusing on that period of time**
2  **when it was just you and Ben.**
3  A.    I talked to my own bank in
4  Aliceville about it.
5  **Q.    What is the name of that bank?**
6  A.    First National Bank of West Alabama.
7  **Q.    Do you recall who you talked to**
8  **there?**
9  A.    Ken Bailey.
10  **Q.    Did you actually submit an**
11  **application to them?**
12  A.    I just told him what we had in mind,
13  and he said he would kind of run it by the
14  board. They decided that we weren't
15  strong enough to make that kind of loan
16  with them.
17  **Q.    Did you give any information to Mr.**
18  **Bailey to take to the board in writing?**
19  A.    I don't know. I don't remember
20  that.
21  **Q.    Again, in the same time period, did**
22  **you discuss financing with any person or**
23  **entity other than Regions, the Department**

Page 30

1  **of Agriculture, and the First National**
2  **Bank of West Alabama?**
3  A.    I don't think so.
4  **Q.    So at this point in time you decided**
5  **that you and Ben aren't going to be able**
6  **to get the financing on your own; is that**
7  **correct?**
8  A.    Right.
9  **Q.    So what do you do next?**
10  A.    Well, from the beginning I had
11  decided in my own mind that I wouldn't
12  mortgage any of my personal assets to
13  finance it. By that time we had an
14  appraisal on the property. We could buy
15  it for $1,680,000, I believe is what it
16  was. We had an appraisal for
17  two-million-seven-something. So my
18  thinking was that we could finance it with
19  that property, and none of the financial
20  people we talked to were willing to do
21  that. They didn't see it that way. So I
22  finally decided that I probably would have
23  to mortgage some of my assets, and that's

Page 31

1  what I did. And Clatus, he and I both put
2  up $600,000 and borrowed -- I'm not sure
3  how much we borrowed. It ended up being
4  something over two million dollars. At
5  that point we had the contract with Gary
6  as part of the presentation to the bank,
7  our putting up $1,200,000, borrowing this
8  on the land, and showing them the contract
9  that we had with Gary.
10  **Q.    Which bank?**
11  A.    West Alabama Bank & Trust.
12  **Q.    Is that the same bank you talked to**
13  **before?**
14  A.    No.
15  **Q.    So this is a new one, West Alabama**
16  **Bank & Trust?**
17  A.    Right.
18  **Q.    Where are they located?**
19  A.    Aliceville. Well, the main bank is
20  in Reform, but they have a branch in
21  Aliceville.
22  **Q.    Who was your point of contact with**
23  **that bank?**

Page 32

1  A.    He's the president of the bank.
2  He's located in Reform. His name escapes
3  me right now. I'll get it for you.
4  **Q.    Which banks did you talk to about**
5  **financing the purchase of the property**
6  **with the equity in the property, or**
7  **financing the company, I guess, with the**
8  **equity in the property?  The same ones**
9  **we've already mentioned?**
10  A.    I borrowed the $600,000 on my
11  property from First National Bank. West
12  Alabama Bank financed the purchase of the
13  gravel property in Lowndes County.
14  **Q.    I guess I'm a little confused. You**
15  **said that at some point in time you wanted**
16  **to finance the deal with the equity in the**
17  **property because you had an option, I**
18  **think you said for one-six, and an**
19  **appraisal for two-plus?**
20  A.    Right.
21  **Q.    But the banks didn't see it that**
22  **way?**
23  A.    Well, they didn't think that they

8  (Pages 29 to 32)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 33

1  could loan enough money to buy the
2  property and finance the equipment we
3  needed to begin the sand and gravel
4  business.
5  **Q.   Sure.  Which banks didn't see it**
6  **that way?**
7  A.   First National and Regions.
8  **Q.   So you went back to them again after**
9  **the initial application process; is that**
10 **correct?**
11 A.   I didn't come back to Regions.  When
12 we talked to Regions, we didn't present
13 any offer for Clatus and myself to put up
14 any money at all.  We tried to get all the
15 financing from First National, Ben and I.
16 They weren't willing to finance it.  I did
17 go back to First National and mortgage
18 some of my property and borrowed $600,000
19 to invest in this venture.  Clatus did the
20 same thing.  The business itself was
21 financed by West Alabama Bank & Trust, and
22 their funds were used to close on the
23 property and to purchase the equipment and

Page 34

1  meet the expenses as we went along.
2  **Q.   At any point in time, up to the**
3  **point that you get financing, did you have**
4  **a written business model?**
5  A.   Well, what we presented to West
6  Alabama Bank & Trust was what we thought
7  it would cost.  I presented my financial
8  statement to them.  We showed them the
9  option on the property.  We showed them
10 the contract with Gary; we showed them his
11 brochure about the volume and location of
12 his various distribution points and --
13 **Q.   Cost analysis?**
14 A.   I'm not sure exactly.
15 **Q.   The reason I ask is because**
16 **everything you have identified to me at**
17 **this point has to do with the income side**
18 **of it.  My experience with them is they**
19 **also want to know how much it's going to**
20 **cost you.**
21 A.   Well, we knew it was going to cost a
22 million-six-something to buy the property.
23 I'm sure we had figures of the different

Page 35

1  pieces of equipment that we thought we
2  would need, and what they would cost.
3  **Q.   And who came up with those figures?**
4  A.   Ben did, for the most part.
5  **Q.   And do you know where those figures**
6  **are kept or notes of those figures are**
7  **kept?**
8  A.   I don't.
9  **Q.   Do you know if any notes of those**
10 **figures exist?**
11 A.   Well, I know that there are lots of
12 figures for what we purchased.
13 **Q.   You mean the equipment and the land?**
14 A.   Yes, after the fact, I understand:
15 but there are numerous invoices for
16 equipment we bought.  I'm thinking all of
17 that is with the Johnco records that we
18 turned over to Clatus.
19 **Q.   How about the figures relating to**
20 **the operation of the sand and gravel mine?**
21 A.   I'm not sure what you're asking me.
22 **Q.   There are figures relating to**
23 **start-up costs with regard to purchasing**

Page 36

1  **equipment, purchasing the land, et cetera;**
2  **then there's also operational costs.**
3  **Typically, in my experience, banks want to**
4  **know about the operational costs,**
5  **particularly where you're relying on**
6  **income from a contract that's regarding**
7  **the operations of the mine.  So do you**
8  **know of any figures that were presented to**
9  **the bank relating to the operation costs?**
10 A.   Well, I certainly don't want to be
11 evasive, but we talked a lot about how
12 many months or weeks it would take to get
13 up and going, about how many people we
14 would need to get these various parts of
15 the thing put together, who we would hire,
16 how many weeks Ben thought we would need
17 to get that done.  How many of those and
18 how much of that detail actually went to
19 the bank, I don't remember at this point.
20 Of course, we did talk about that a lot.
21 **Q.   Did you record any of that in**
22 **documents, whether you presented them to**
23 **the bank or not?**

9  (Pages 33 to 36)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 37

1  A.   Well, for the most part, Ben and I,
2  he would say, you know, "We can buy this
3  or this," and he would make me some notes;
4  and I would go down there, and we would
5  look at that and add it up and see how we
6  thought that was meshing with what we
7  thought it would cost. We did not have a
8  formal accounting department, I guess you
9  would say, as a sizeable business would
10 have, to say "This is our budget. This is
11 what we said we were going to do with this
12 money. We've got to make this report to
13 the bank," that we spent this number of
14 dollars for the security we offered to
15 give the bank. We did not have that.
16 Q.   Did you make a budget at any point
17 in time?
18 A.   Yes. We talked a lot about what it
19 was going to cost and how we were spending
20 it.
21 Q.   Did you prepare a written budget?
22 A.   I don't remember there being a
23 written budget, as you talk about it.

Page 38

1  Q.   Did the bank require you to report
2  back to them periodically with regard to
3  how the operations of the company was
4  going, or the loan, in any way?
5  A.   They didn't.
6  Q.   The reason I ask is, some banks,
7  when they loan money to start-ups, they
8  have reporting requirements; "Let us know
9  that you're meeting these steps."
10 A.   Well, we had this loan approved, and
11 it was a draw arrangement. When we had
12 spent X number of dollars, our bank
13 account had got to whatever point, we
14 would call the bank and say, "We want to
15 draw an additional fifty or hundred
16 thousand dollars to put in this account."
17 Q.   Did they require you to do anything
18 to substantiate the need for the draw?
19 A.   No.
20 Q.   So you could just ask for it, and
21 they would give it to you?
22 A.   Well, the loan had been approved.
23 They didn't give it to us.

Page 39

1  Q.   Sure.
2  A.   They loaned it to us and charged us
3  well for it.
4  Q.   Did you have any accounting
5  software, like QuickBooks or anything like
6  that?
7  A.   We made out statements on what we
8  had spent each month. Yes, we did that.
9  Q.   You did make out statements?
10 A.   Yes.
11 Q.   And who did you give those to?
12 A.   Well, they were kept in the office
13 in Aliceville until Clatus bought the
14 remaining interest, and then they were
15 turned over to him.
16 Q.   And did you do that through a
17 software program?
18 A.   Our secretary at the time prepared
19 those. It was a program; it was not
20 QuickBooks. I don't remember that.
21 Q.   Peachtree; you just don't recall?
22 A.   I don't recall the name of the
23 program.

Page 40

1  Q.   What was your secretary's name?
2  A.   Her name is Susan Papania,
3  P-A-P-A-N-I-A.
4      (Whereupon, at this time a short
5  break was taken.)
6  Q.   We've just taken a break, and you
7  made a phone call for us and identified
8  the bank president at West Alabama Bank &
9  Trust as Rob Finney; is that correct?
10 A.   Right.
11 Q.   Then you also identified the
12 software that Ms. Papania was using as CBS
13 Client something. What was that?
14 A.   Client Bookkeeping Solutions. It's
15 licensed from our CPA.
16 Q.   Who is your CPA?
17 A.   Eubank & Latham.
18 Q.   Where are they located?
19 A.   They're located in Aliceville.
20 Q.   Are they your personal CPA?
21 A.   Yes.
22 Q.   Are they Johnco's CPA, or were they?
23 A.   Not now.

10 (Pages 37 to 40)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 41

1  **Q.   Were they Johnco's CPA?**
2  A.   They were.
3  **Q.   Did they assist you in preparing any**
4  **of the documents that you submitted to any**
5  **of the financial institutions for funding?**
6  A.   I don't know. I don't remember.
7  **Q.   Is there one particular CPA over**
8  **there you work with?**
9  A.   Virginia Latham.
10 **Q.   Was that true during the times of**
11 **Johnco, or your involvement with Johnco?**
12 A.   Yes.
13 **Q.   One thing I need to clear up here**
14 **is, if you could explain to me a little**
15 **more specifically how Clatus Junkin comes**
16 **to the Johnco -- I don't know if it's a**
17 **company yet, but comes to this business**
18 **deal.**
19 A.   You mean how did he first get into
20 it?
21 **Q.   Yes.**
22 A.   Well, it became apparent to Ben and
23 myself that we couldn't finance it by

Page 42

1  ourselves. I had talked to Clatus earlier
2  about his coming in. When we had the
3  offer of the larger quantities that
4  Yelvington would purchase, and the offer
5  of the increased price, I went back and
6  talked to him, and he agreed to come into
7  the business.
8  **Q.   So you approached him; is that**
9  **correct?**
10 A.   Yes.
11 **Q.   Did you provide him any documents**
12 **regarding what was going to happen with**
13 **the company?**
14 A.   I showed him the option, showed him
15 the appraisal, showed him the literature
16 and brochures from Yelvington, told him
17 about our discussions with Gary. He
18 apparently was familiar with Gary from
19 some source, I don't know what. I don't
20 know whether they had done business in the
21 past or he knew of Gary's business, or
22 what. I suggested that if we each put up
23 the amount of money we did put up, that I

Page 43

1  thought the business would be viable.
2  **Q.   Had Johnco been incorporated at that**
3  **point?**
4  A.   Yes.
5  **Q.   Who were the initial shareholders of**
6  **Johnco?**
7  A.   Ben Johnston and myself.
8  **Q.   And subsequently you made a change**
9  **to add Clatus Junkin; is that correct?**
10 A.   Right.
11 **Q.   Let's go from the point of**
12 **incorporation. What was the ownership**
13 **interest by percentage, if you recall,**
14 **between you and Ben?**
15 A.   50-50.
16 **Q.   And did it remain that way until Mr.**
17 **Junkin came in?**
18 A.   Yes.
19 **Q.   What was the percentage of ownership**
20 **at the point that Mr. Junkin comes into**
21 **Johnco?**
22 A.   Well, Mr. Junkin thought that -- the
23 percentage of ownership ended up being 40

Page 44

1  percent in Clatus, 40 percent in myself,
2  and 20 percent in Ben; and then I assigned
3  another 10 percent to Ben. So it ended up
4  being 30 in myself, 30 in Ben, and 40 in
5  Clatus.
6  **Q.   Why was it that Ben was going to**
7  **take less of a percentage than you and**
8  **Clatus?**
9  A.   Why wasn't he?
10 **Q.   No. Why was he going to get 20**
11 **percent where you two were going to get**
12 **40?**
13 A.   He didn't have any money to put in.
14 **Q.   Fair enough. We're at the point now**
15 **that you got your financing. Let me step**
16 **back a second. After incorporation, what**
17 **was your role with regard to the operation**
18 **of Johnco?**
19 A.   I was trying to sell a little bit,
20 trying to see what the prospects were for
21 additional customers. I was trying to
22 watch what was spent to do the various
23 things we were doing down there, talking

11 (Pages 41 to 44)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 45

1  to the railroad about the track that we
2  needed to build.
3  **Q.    You're talking about the loop track?**
4  A.    Well, we first began talking to CSX
5  Railroad about the design of a track.
6  They did give us a design. The design at
7  the time was a Y coming off the main line,
8  with a straight track going into the
9  property on the east side. The discussion
10  with Yelvington was that the trains would
11  come in, and we would have two days to
12  load them. Our plan was that we would
13  load half of them, they would switch half
14  of them out onto a side track which was
15  adjacent to the property, and then we
16  would load the other half. At some point
17  here CSX sells the line to --
18  **Q.    M&B?**
19  A.    -- M&B. At that point Doug Davis is
20  the man with M&B that I began to talk
21  with. He designed four or five different
22  track configurations to do what we needed
23  to do. They agreed to lease us an engine.

Page 46

1  We went through all these different
2  designs and studies, and we were talking
3  about what it was going to cost, and I was
4  trying to get it done as cheap as I could.
5  The prices ranged all the way from almost
6  a half-million dollars at one point, down
7  to -- I think we ultimately got it built
8  for $300,000. We did most of the grading
9  work on that.
10      I was talking back and forth to Doug
11  Davis about when it could get done. I'm
12  not sure how it went through Doug Davis,
13  but Gary was going to furnish part of it.
14  At one time Gary wanted to finance part of
15  the railroad himself; we were going to pay
16  him so much a car. We arranged enough
17  financing, we thought, that we didn't need
18  that. Gary did, I understand, furnish the
19  rail for the siding that we finally built.
20  Somehow he traded that out with M&B
21  Railroad. I think he got paid for all
22  that. I don't know whether he got a
23  freight concession, or how he was paid.

Page 47

1  **Q.    Let me ask you about that for a**
2  **second. You said at some point in time**
3  **Mr. Yelvington was going to finance the**
4  **track build-out?**
5  A.    He talked about financing part of
6  the track.
7  **Q.    Why was that?**
8  A.    Why did he do that?
9  **Q.    No. Why would he be the one**
10  **financing that?**
11  A.    Well, he did not end up financing.
12  He talked about doing that if we needed
13  it.
14  **Q.    So he would do that for Johnco if it**
15  **was needed?**
16  A.    Yes, if we would pay him back by the
17  car, a reduced price per ton of gravel, or
18  something like that.
19  **Q.    So he was going to front the money**
20  **and then get paid in some way, either**
21  **through services or cash; is that correct?**
22  A.    Yes.
23  **Q.    And you said that Yelvington**

Page 48

1  **provided some of the materials; is that**
2  **correct?**
3  A.    He provided the steel. We did all
4  the grading for this track, and we paid
5  for that. He furnished the steel. I
6  don't know whether he furnished the
7  balance, that is the stone, the subgrade
8  for the actual ties or not. I don't know
9  whether he did that or not. Anyway, we
10  ended up having a lease payback on the
11  railroad of $300,000; and Gary was paid, I
12  understand, through the railroad somehow.
13  **Q.    Let me make sure I understand this.**
14  **Yelvington provided some of the materials,**
15  **and Johnco ended up with an obligation to**
16  **the railroad?**
17  A.    Right.
18  **Q.    For $300,000?**
19  A.    Right.
20  **Q.    Do you know who paid Yelvington?**
21  A.    Doug Davis said they had been
22  compensated. I don't know how that was
23  done.

12  (Pages 45 to 48)

# FREEDOM COURT REPORTING

1  Q.   Do you know whether Mr. Yelvington,
2  or Yelvington, provided those materials at
3  a reduced rate for Johnco?
4  A.   I don't.
5  Q.   Could Johnco have built out the
6  track if the costs were $500,000,
7  $600,000, that Johnco had to incur itself?
8  A.   In hindsight, I doubt seriously we
9  could have.
10 Q.   To your knowledge, did Johnco ever
11 pay the railroad the $300,000 that it owed
12 for the build-out?
13 A.   No, it didn't.
14 Q.   Has it paid anything to the railroad
15 for that?
16 A.   I don't know.
17 Q.   During the time that you were at
18 Johnco, why didn't Johnco pay the railroad
19 the $300,000 that was owed on the
20 build-out?
21 A.   The payback was at so much a car
22 shipped over the railroad; so if no
23 shipments were going out, the railroad

1  A.   Well, it seems to me that there were
2  sixty or seventy cars there, and first
3  train. They came in and said, "We want
4  them all done today. You don't have two
5  days." So they started early that morning
6  and got through at 10 o'clock or so that
7  night, so I'm told.
8  Q.   Were you involved with Johnco at
9  that time?
10 A.   Clatus and I had agreed that he was
11 going to buy us out.
12 Q.   When was that?
13 A.   I don't remember. It was early
14 2006.
15 Q.   And at the point that you and Mr.
16 Junkin had agreed that Mr. Junkin was
17 going to buy you out, did you stop your
18 roles with Johnco?
19 A.   Pretty much, yes. Of course, I
20 talked to Ben occasionally and said, "How
21 are you doing," and so forth, you know. I
22 would like for them to do well if they
23 could.

1  wasn't getting compensated. If Gary
2  didn't ship out on this track, the
3  railroad had no income that we were
4  obligated to pay.
5  Q.   And during the time that you were at
6  Johnco, were there any shipments made?
7  A.   No.
8  Q.   Do you know whether shipments were
9  made after you left Johnco?
10 A.   I understand they were. As a matter
11 of fact, I talked to Ben the night the
12 first train came in down there. Everybody
13 was excited.
14 Q.   About May 2006; is that your
15 recollection?
16 A.   Yes, I understand that's when it
17 was.
18 Q.   What did Mr. Johnston say in that
19 conversation?
20 A.   He said, "You got them all loaded,"
21 and I said, "I don't know how you did it."
22 Q.   Why did you say, "I don't know how
23 you did it"?

1  Q.   Well, let's close the loop on your
2  roles here. We got off on the loop track,
3  and I'm not sure we ever finished the list
4  of what your roles were with Johnco.
5  A.   Well, as I say, I was trying to
6  sell. There were several metallurgical
7  people that I talked to, and at one time
8  had at least encouragement from. There's
9  a smelter over at Selma, but our material
10 doesn't meet their specs. It has too much
11 iron in it. There's one up in Ohio that
12 was most encouraging. It turned out the
13 freight differential, when the diesel
14 rates went up, it didn't turn out that we
15 could sell it up there for what we thought
16 it was worth. So that's some of the
17 things I was doing.
18 Q.   Let's see if we can go through
19 those. You said you were selling to
20 additional customers, and I think you just
21 listed me a couple here; you had oversight
22 of spending?
23 A.   Well, I had oversight of paying.

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 53

1  Q.   Spending and paying.
2  A.   Not spending, because I wasn't
3  spending a lot.
4  Q.   And you were also talking with the
5  railroad to get the track built out?
6  A.   Right.
7  Q.   Any other functions that you served
8  for Johnco while you were there?
9  A.   No. While I was there, you know, I
10  went out and looked to see what it was
11  doing.
12  Q.   Did you have your law practice at
13  this time as well? By "this time," I mean
14  the time that you were with Johnco.
15  A.   The law practice was pretty much on
16  hold at that point.
17  Q.   So were you working at Johnco
18  full-time then?
19  A.   I wouldn't say full-time, no.
20  Q.   How many hours a week would you say
21  you were investing?
22  A.   I don't know.
23  Q.   Can you ballpark it for me?

Page 54

1  A.   I would say I was spending half my
2  time.
3  Q.   Is it fair to call that twenty
4  hours, on average?
5  A.   Yes, I guess so.
6  Q.   Do you recall the additional
7  customers you were trying to sell, what
8  their names were? You said a smelter in
9  Selma.
10  A.   Well, we talked to Hodgson Concrete
11  there in Montgomery.
12  Q.   Was that Hodgson?
13  A.   H-O-D-G-S-O-N, I believe. We talked
14  to the block plant, whose business name I
15  don't recall, being put up in Montgomery;
16  the smelter up in Ohio; Lafarge, I did
17  talk to Lafarge. His name was Keith
18  Bodiford. I think I told you that.
19  Q.   Thank you.
20  A.   If there are any others, I can't
21  think of them right now.
22  Q.   Let's step back for a second. Can
23  you tell me what your experience in the

Page 55

1  sand and gravel mining business or
2  producing business was, at the point that
3  you set out to create Johnco?
4  A.   I worked at my father's sand and
5  gravel plant in 1946, when I was about
6  fifteen years old.
7  Q.   What was the name of that plant?
8  A.   Aliceville Sand and Gravel Company.
9  Q.   Is it still in operation today?
10  A.   No. I was in the Army, and then I
11  went to school. I worked in the summers
12  there and at his lumber mill. After I got
13  out of the Army, we had a sand and gravel
14  operation in Gainesville, Alabama, where
15  we supplied sand for the Warrior Lock and
16  Dam on the Warrior River and the
17  Gainesville Lock and Dam on the Tombigbee.
18  Q.   How long did you do that?
19  A.   I did that for about four years.
20  Then I decided I wanted to practice law,
21  and that was the early sixties.
22  Q.   In what roles did you serve at these
23  operations for your father?

Page 56

1  A.   Well, I did just about everything
2  there was there. I ran a dredge, crane,
3  loader, ran sample specs.
4  Q.   Did you ever manage a facility?
5  A.   Yes.
6  Q.   Where did you manage a facility
7  besides Johnco?
8  A.   Gainesville.
9  Q.   What did you do? Were you the top
10  guy at the facility?
11  A.   Well, there was three of us there.
12  Q.   Fair enough. Were you the top guy
13  there?
14  A.   I was the head flunky, I guess you
15  would say.
16  Q.   What do you have to do to manage a
17  facility?
18  A.   What do you have to do? Well, at
19  that point we could sell almost everything
20  we made. We did have a sand classifier
21  there that I learned how to run, you know;
22  and fixed up when it gets broken, try to
23  keep your workers coming to work on time,

14 (Pages 53 to 56)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 57

1 trying to keep customers happy. We had a
2 little ready-mix plant there, and we ran
3 that too.
4 **Q. Do you have any degrees or**
5 **certifications that would relate to the**
6 **sand and gravel production business?**
7 A. No, I don't.
8 **Q. And I'm talking about geotechnical,**
9 **engineering degrees, anything like that?**
10 A. None at all.
11 **Q. Let's go back to the additional**
12 **customers you were trying to sell while**
13 **you worked for Johnco. What were you**
14 **trying to sell the smelter at Selma, what**
15 **product?**
16 A. Metallurgical gravel.
17 **Q. Is that number 67; right? You'll**
18 **have to forgive my ignorance here, because**
19 **I don't know all the specifications.**
20 A. The gravel in Whitehall has what, to
21 us, is a large size range, ranging
22 anywhere from a quarter-of-an-inch up to
23 three inches, we'll say. 67 gravel, for

Page 58

1 the most part, is below an inch, part of
2 it below three-quarters of an inch. So
3 metallurgical gravel is the larger portion
4 of that sieve analysis, from an inch up to
5 whatever. What they do with it is melt
6 it, actually melt the gravel and make
7 various products out of it.
8 **Q. And that's what you were trying to**
9 **sell the smelter in Selma; is that**
10 **correct?**
11 A. Right. Well, the one in Ohio
12 actually melts this gravel and uses it in
13 manufacturing zinc, which is an alloy.
14 I'm not sure what function the gravel
15 plays, unless it's flux, maybe. But,
16 anyway, that material is worth more money
17 than concrete gravel.
18 **Q. Just so I'm clear here, you were**
19 **trying to sell the smelter in Selma**
20 **oversize gravel, and you were also trying**
21 **to sell the smelter in Ohio oversize**
22 **gravel; is that correct?**
23 A. Right.

Page 59

1 **Q. What were you trying to sell Hodgson**
2 **Concrete, what product?**
3 A. Sand and gravel.
4 **Q. Oversize gravel?**
5 A. No.
6 **Q. Number 67 or concrete gravel?**
7 A. 67.
8 **Q. What were you trying to sell the**
9 **block plant in Montgomery?**
10 A. It's a particular grade of sand that
11 they would manufacture blocks with. I'm
12 not sure of the screen analysis of that.
13 It's basically concrete sand, but it can't
14 have any sizeable pebbles in it of any
15 kind.
16 **Q. And what were you trying to sell**
17 **Lafarge?**
18 A. We were trying to sell Lafarge sand.
19 **Q. You have given me a list of five**
20 **additional customers you were trying to**
21 **sell products to. Are there others that**
22 **you just can't remember?**
23 A. There could be. I'm trying to think

Page 60

1 when USA Materials. if I'm not mistaken,
2 they had bought out a plant down around
3 Dothan, and they came by and expressed an
4 interest in sand or gravel, one. I don't
5 know that I talked to them. Maybe Ben
6 talked to them. But I was aware that, you
7 know, they had been by. and we talked to
8 them.
9 **Q. Did you ever try to sell sand to**
10 **Yelvington?**
11 A. We asked Gary if he could take some
12 sand, yes.
13 **Q. Just so I can complete our list**
14 **here, that takes us up to potentially**
15 **seven. Are there any other additional**
16 **customers that you tried to sell to?**
17 A. I can't think of any. Of course,
18 we're talking about rail delivery here.
19 From time to time people would come by and
20 want a load of something, you know, on a
21 truck.
22 **Q. Sure. But these would have been**
23 **large sales; right?**

15 (Pages 57 to 60)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 61

1  A.   We hope so.
2  Q.   Did any of these sales ever come
3  through for you?
4  A.   No.  Lafarge at one time said,
5  "We're interested, and we'll buy
6  so-and-so," and I think the freight rates
7  finally killed that proposition.
8  Q.   The numbers that you had worked up
9  and put together regarding the operation
10 of Johnco, could Johnco have survived on
11 the sale of number 67 gravel to Yelvington
12 alone, at the rate specified in the supply
13 agreement?
14 A.   We believe so, yes.
15 Q.   What makes you believe that?
16 A.   Well, 150,000 tons a year at
17 five-and-a-quarter is whatever it is.  We
18 thought that with any additional sales of
19 anything, we thought that that amount of
20 revenue per year would pay our expenses
21 and debt service; and that if we did sell
22 sand and oversize, or whatever, most of
23 that would have been profit.

Page 62

1  Q.   So the 150,000 would have covered
2  the expenses, would have broke you even;
3  is that correct?
4  A.   Well, we would have made some money
5  at that.  You have to understand that by
6  extending the time at which we could begin
7  revenue to begin repaying what we
8  invested, by that time, all that time
9  interest is accumulating.  When you can
10 begin at a much later date to retire your
11 debt, then that is substantially
12 increasing costs.
13 Q.   Now, you're talking about the delay
14 in getting the company operational?
15 A.   I'm talking about the delay in
16 having sales and revenue coming in.
17 Q.   We'll talk about that.  In your
18 experience at Johnco, did it work out that
19 Johnco was able to cover itself, its
20 expenses, with revenue produced from
21 Yelvington?
22 A.   Well, we never did have any
23 substantial revenue from Yelvington.

Page 63

1  Q.   There's a difference there between
2  "no" and "substantial."  Did you have any
3  revenue from Yelvington during the time
4  that you were there?
5  A.   No, we didn't.
6  Q.   And after the time that you left
7  there, your knowledge is all secondhand;
8  is that correct?
9  A.   Right.
10 Q.   I believe you said you effectively
11 gave up your duties sometime near the
12 beginning of '06?
13 A.   Right.
14    (Whereupon, at this time a short
15 break was taken.)
16 Q.   I just want to close a couple of
17 loops here for the stuff we've talked
18 about up to this point.  At one point you
19 were talking about financing and the
20 financing you got from the bank that
21 financed the land deal, not your personal
22 deal.  Do you know what the term of that
23 loan was?  You mentioned that it was a

Page 64

1  draw.
2  A.   I don't remember the terms.  We had
3  a cap on the loan of whatever it was, and
4  we were permitted to draw against that.  I
5  don't know what the time frame was.  I
6  don't remember the time frame.  It seems
7  that the bank was open to setting up a
8  monthly schedule or quarterly schedule,
9  something of that kind, at the time we
10 completed the draw, completed building the
11 plant.
12 Q.   At the time that you took that loan,
13 were you required to make interest
14 payments periodically?
15 A.   No.
16 Q.   So you weren't required to make any
17 payments periodically?
18 A.   No.
19 Q.   When did the payments kick in?
20 A.   I don't remember.  What we were
21 doing, the one thing we were doing was
22 paying on our individual loans.  That part
23 of the payments were being made.

16  (Pages 61 to 64)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 65

1 **Q.    Those were through a different bank,**
2 **though; right?**
3 A.    Well, mine were through a different
4 bank, and I'm not familiar with Clatus'
5 finances to know whether he wrote a check,
6 had the money, borrowed it, or what.  I
7 don't know that.
8 **Q.    I just need to understand this a**
9 **little bit better.  So you were drawing**
10 **down on the -- I'm sorry, help me with the**
11 **name of that bank again.**
12 A.    West Alabama Bank & Trust?
13 **Q.    West Alabama Bank & Trust, to**
14 **construct the operation?**
15 A.    Right.
16 **Q.    And then also to pay off or to keep**
17 **current the loans that both you and Mr.**
18 **Junkin had individually; is that correct?**
19 A.    Right.
20 **Q.    Do you know what the interest rate**
21 **was for the loan that you had with West**
22 **Alabama Bank & Trust?**
23 A.    I don't remember.

Page 66

1 **Q.    Let's switch gears now and talk a**
2 **little bit about the capitalization of**
3 **Johnco.  As I understand it, you and Mr.**
4 **Junkin put in $600,000 each, to take us to**
5 **1.2 million; correct?**
6 A.    Right.
7 **Q.    Then I think you said you borrowed**
8 **two million?**
9 A.    Well, we had a loan approved for,
10 seems like it was a million-six, or
11 thereabouts.  We ultimately got an
12 increase of the approved amount up to
13 something like two million dollars.
14 **Q.    So the initial capitalization was**
15 **2.8 million?**
16 A.    Right.
17 **Q.    Then it ultimately became 3.2**
18 **million; is that correct?**
19 A.    That's close.
20 **Q.    Again to close another loop here,**
21 **you said that Johnco leased a locomotive**
22 **from M&B; is that correct?**
23 A.    We had an agreement to lease a

Page 67

1 locomotive.
2 **Q.    Does that mean there was never**
3 **anything signed?**
4 A.    Well, they wrote us a letter and
5 said, "When you begin operation, we will
6 issue a locomotive for $1,000 a month,"
7 which was, I thought, a great rate.  But
8 the shipments over the track never began.
9 **Q.    During the time you were there;**
10 **correct?**
11 A.    During the time I was there.  So the
12 locomotive never was delivered.  My
13 understanding is, from talking to Ben,
14 that that never did happen; that the
15 trains that showed up had an engine with
16 them, which stayed there until it was
17 loaded, until the train was loaded.  I
18 don't know that.  That's what I've been
19 told.
20 **Q.    What did Johnco need to lease a**
21 **locomotive for?**
22 A.    Well, at the outset we were going to
23 move the cars past a loading point, and

Page 68

1 sixty cars with 100 tons of material in
2 each one of them is hard to move.  So we
3 thought we needed one.
4 **Q.    At the point that you're planning**
5 **this, how many rail cars did you plan for**
6 **Johnco to be able to load at one time?**
7 A.    We were required to be able to load
8 52.
9 **Q.    Load at a single time?**
10 A.    Yes.
11 **Q.    I'm not expressing this well; but**
12 **when I hear "load 52 cars at a single**
13 **time," what I envision is a large dump**
14 **filling them all at the same time.  What I**
15 **need to know is, how many individual cars**
16 **could you load at one time, or did you**
17 **envision loading?**
18 A.    We planned to load them one at a
19 time.
20 **Q.    So one car at a time, and then you**
21 **have to move that car out of the way to**
22 **get another one in the right place to**
23 **load; correct?**

17 (Pages 65 to 68)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 69

1   A.   Well, you pretty much have to move
2   continuously, because you can't put all
3   the gravel at one point on one car.
4   Q.   I understand.  So without power, you
5   couldn't load the cars?
6   A.   Well, you have to move the cars to
7   load them.  Yes, that's true.
8   Q.   I'm just trying to figure out the
9   physical operation of this.  What I
10  understand is there's a conveyor belt, in
11  some instances, that --
12  A.   Well, you can load cars without a
13  conveyor, without doing it that way.  The
14  reason it was set up to do it that way is
15  that when the supply agreement with
16  Yelvington was presented to us, it said
17  open or covered rail cars.  His
18  explanation for that was that at certain
19  times of the year, covered cars became
20  available which had been used possibly for
21  grain shipments in the Midwest.  Those
22  cars had very narrow openings in the top
23  which can be closed.  You can't take a

Page 70

1   loader and dump over the side of those.
2   It has to be pretty precise in where it's
3   going, so we needed a conveyor for that
4   purpose.  My understanding is that the
5   cars that came in never had that kind of
6   configuration.
7   Q.   And we're talking about open hopper
8   cars and covered hopper cars; correct?
9   A.   Right.
10  Q.   I think you said something about 52
11  cars.  Can you tell me again what you said
12  about 52 cars?
13  A.   That's in the contract.
14  Q.   And it says Johnco has to be able to
15  load 52 cars; is that correct?
16  A.   Correct.
17  Q.   Why is that in there; do you know?
18  A.   Well, that's what he wanted in
19  there, so we had to be set up to do that.
20  Q.   By "he," you mean Mr. Yelvington?
21  A.   Yes.
22  Q.   Did he ever express to you what the
23  purpose of that was, or anyone from

Page 71

1   Yelvington?
2   A.   I was aware that they could haul
3   longer trains for a less expense.  They're
4   called unit trains.  I understand from Ben
5   that the trains that actually were
6   delivered up there were a good bit longer
7   than that.
8   Q.   But the minimum for a unit train is,
9   what, 52; is that what you're telling me?
10  A.   I think that's a function of what
11  the railroad dictates.
12  Q.   And you understood --
13  A.   I don't know that.  It's cheaper for
14  them to pull that size, I'm assuming, you
15  know.
16  Q.   Did you understand, at the time of
17  the supply agreement, that Yelvington
18  intended that Johnco would load unit
19  trains for them?
20  A.   We had to be able to load 52 cars,
21  yes.
22  Q.   That makes sense to me.  You had
23  also talked about repaying the railroad

Page 72

1   for the track, and I think you said it was
2   per car that used the track; is that
3   correct?
4   A.   Per car loaded on the track.
5   Q.   Per car loaded.  Do you know what
6   that rate was to repay the railroad?
7   A.   I don't remember precisely what that
8   was.  I don't.
9   Q.   Fair enough.  Do you have those
10  records somewhere?
11  A.   Somewhere the contract with the
12  railroad is in existence.  I don't know
13  whether I delivered it -- I'm assuming
14  that went to Clatus when all the records
15  went up there.
16  Q.   Have you been asked to gather any
17  documents for production to Yelvington in
18  relation to this lawsuit?
19  A.   No, I haven't.
20  Q.   But you keep some of your documents
21  relating to Johnco; is that correct?
22  A.   I'm not sure what I have.  I
23  intended to deliver everything that was

18  (Pages 69 to 72)

# FREEDOM COURT REPORTING

Page 73

1 pertinent to this business to Clatus when
2 he took the records.
3 Q. Let's go to that for a minute. You
4 said that you sold out -- by "you," I
5 think you mean both you and your
6 brother -- sold out to Mr. Junkin?
7 A. Right.
8 Q. And that decision was made in early
9 2006; correct?
10 A. Right.
11 Q. Why did you sell out to Mr. Junkin?
12 A. Well, it had taken so long to get
13 started, and it appeared that we were
14 going to need -- if we didn't have some
15 revenue coming in pretty shortly, that
16 somebody was going to have to put up some
17 more money. I didn't have any. Mr.
18 Junkin was willing to invest additional
19 funds to see the operation through. I
20 thought the payback on what we had
21 borrowed and what I had borrowed
22 individually was going to extend out
23 beyond what I wanted to be involved.

Page 75

1 did you expect Johnco would make sales and
2 shipments to Yelvington?
3 A. Well, it appeared to me that we were
4 accumulating enough material there to make
5 shipments.
6 Q. And how much material did you need
7 to accumulate to make a shipment?
8 A. Well, if there's 52 cars, you need
9 5,200 tons. I thought that that was not
10 going to be a problem to have that. I'm
11 not sure how much there was there, but I
12 didn't see a problem about accumulating
13 that.
14 Q. You're saying "accumulating," which
15 makes me wonder how long does it take to
16 accumulate 5,200 tons, or did it for
17 Johnco at the time that you sold out?
18 A. How long did it take? 5,200 tons of
19 gravel should have been produced there in
20 three, four, or five days, easy, you know.
21 That's a variable, of course.
22 Q. Did you ever know it to take longer
23 than four or five days?

Page 74

1 Well, at the time I was -- well, I'm 76
2 years old now. I want to do something
3 else.
4 Q. What was your thoughts about the
5 viability of Johnco at the point that you
6 agreed to sell out to Mr. Junkin?
7 A. I thought that it would be
8 profitable. I thought the time frame in
9 which it would become substantially
10 profitable would go out there somewhere.
11 But I thought if the shipments occurred
12 like we planned, I thought we could make
13 some money.
14 Q. When you say "shipments occurred
15 like we planned," what plan did you have
16 at the point that you sold out to Mr.
17 Junkin?
18 A. Well, we had the gravel shipments
19 that we were counting on.
20 Q. At the point that you sold out, had
21 you made any shipments to Yelvington?
22 A. We had not.
23 Q. At the point that you sold out, when

Page 76

1 A. Yes.
2 Q. Did you ever know any time that it
3 only took four or five days to produce
4 5,200?
5 A. I've been down there when material
6 was flowing through the plant at a rate
7 substantially more than that.
8 Q. The material that you're talking
9 about, do you know if that would meet the
10 specifications that were required by the
11 supply agreement?
12 A. Yes. I did take some samples and
13 verify the gradation.
14 Q. And when was that?
15 A. I'm not sure. At one point I took
16 some samples and brought them back to
17 Aliceville and put them on UPS to the lab
18 in Daytona Beach.
19 Q. Did you ever do that more than once?
20 A. I don't know.
21 Q. What were the terms of your sale to
22 Mr. Junkin?
23 A. He paid me what I invested.

19 (Pages 73 to 76)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 77

1  Q.   Did he pay off the notes?  You had a
2  personal note.  Did he pay off that note?
3  A.   I didn't pay it all off.  I had to
4  sell some property to make interest
5  payments on it.  I've paid off most of the
6  $600,000 that I borrowed.
7  Q.   I'm curious, then.  When you say Mr.
8  Junkin --
9  A.   He paid me $600,000.
10  Q.   So he paid you flat-out.  But then
11  you had to bear the costs of the interest
12  and those type things; is that correct?
13  A.   Yes, and a couple of years of
14  messing with this thing.
15  Q.   I can appreciate that.  Tell me, if
16  you would, please, what your role was in
17  negotiating the supply agreement.
18  A.   Well, I talked back and forth to
19  Mark Klebe a lot about it.
20  Q.   Were you the lead person at Johnco
21  for negotiating that supply agreement?
22  A.   I probably was, yes.
23  Q.   Did you have any conversations

Page 78

1  regarding what the supply agreement would
2  be with anyone at Yelvington other than
3  Mr. Klebe?  I think you already told me
4  you talked to Mr. Yelvington at one point
5  initially.
6  A.   I think after Gary gave us the
7  quantities and the figures, our
8  negotiation centered around how many
9  cars -- this was with Mark Klebe -- how
10  fast they needed to be loaded.  More or
11  less at the last minute they wanted, I
12  thought, if I remember right, they wanted
13  the right of refusal for additional
14  production.  We had some discussion, maybe
15  some correspondence back and forth, about
16  what that meant and why they needed that.
17  I finally just decided in my own mind that
18  this contract wasn't going to be signed if
19  they didn't have that in there.  I really
20  would have preferred to have more
21  flexibility in what we could sell, but
22  that's not how it turned out.
23  Q.   Did you prepare any drafts of the

Page 79

1  agreement and submit them to Mr. Klebe?
2  A.   That process went back and forth
3  with his drafting the agreement and my
4  saying "I think so-and-so language would
5  be better," his revising it.  If I
6  remember, he had a program that he could
7  underline or maybe print out in red
8  different changes he was making.  That's
9  something I didn't have, so that was kind
10  of new to me.
11  Q.   You're talking about red-lining, so
12  you could see what changes he made?
13  A.   Yes.  We both prepared what was
14  finally signed.
15  Q.   How did you communicate with Mr.
16  Klebe most often?
17  A.   Well, I talked to him on the phone,
18  and he likes to e-mail.  I may have
19  e-mailed him some back and forth.  I'm not
20  sure.
21  Q.   Actually, tell me what that means.
22  You said that the negotiation centered
23  around how many cars, after the point that

Page 80

1  you talked to Mr. Yelvington.  What does
2  that mean?
3  A.   That means how many cars we would
4  have to prepare to load at one time, and
5  how much time we would have to load those
6  cars.
7  Q.   And I believe you already told me
8  initially the discussions were two days to
9  load?
10  A.   Well, initially it was also about
11  thirty cars, you know, something like
12  that.  The contract doesn't really say you
13  have two days.  In all the round-robin
14  discussions between Doug Davis and Mark,
15  maybe Gary, we were aware that the train
16  schedule through there, they had one train
17  a day in each direction, you know.  It
18  depends on what time of day they
19  ordinarily spot a car.  You have so many
20  hours after that, including a full day, to
21  do it.  Our discussions at one point were
22  we had two days; but as it turned out,
23  when the contract was signed, it said 52

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 81

1  cars at once. I'm told, Ben said when
2  they brought the first train through
3  there, they wanted them to load it that
4  day.
5  **Q.  Do you know why they would want them**
6  **loaded that day?**
7  A.  Well, I assumed it had something to
8  do with the railroad's demands, having to
9  move. Gary owns these cars, I'm told. He
10  wants to keep them moving.
11  **Q.  That's a good point. The railroad**
12  **was an integral component in making sure**
13  **that these rail cars and power were**
14  **available; is that correct?**
15  A.  Sure.
16  **Q.  Because they're the ones who**
17  **controlled the schedule of the trains on**
18  **the track; is that correct?**
19      MR. PEARSON:  I object to the form.
20  A.  Well, I think that's obvious.
21  That's a given.
22  **Q.  Let's turn now, if we could, please,**
23  **to some of the issues that Johnco had in**

Page 82

1  **getting the operation up and moving. At**
2  **this point in time you've purchased the**
3  **property, I'm assuming you've incorporated**
4  **the company, and you have signed the**
5  **supply agreement. Now it's time to start**
6  **operations?**
7  A.  Right.
8  **Q.  What is the first thing that Johnco**
9  **does to get the operation up and moving?**
10  A.  Well, we began pricing equipment and
11  seeing what different components were
12  going to cost.
13  **Q.  Did you price any equipment before**
14  **you entered into the supply agreement?**
15  A.  Yes. I don't remember what parts of
16  it. We had some tentative prices, you
17  know, all through the process.
18  **Q.  So you're pricing the equipment.**
19  **What else is going on? Purchasing**
20  **equipment?**
21  A.  Well, yes, naturally we purchased
22  equipment. Ben hired a welder. We bought
23  a portable welder, about the first thing

Page 83

1  we bought. He ordered some steel.
2  **Q.  At the time that you were starting**
3  **to put together the operations, did you**
4  **already have an idea of how the property**
5  **was going to look?**
6  A.  Yes. We knew where the deposit was.
7  We knew we had borings of the location of
8  the sand and gravel underneath the
9  surface; we knew what parts of it were
10  best to mine. We knew to locate the
11  actual plant was a function of the
12  distance to the load-out point, the
13  quality of the material there and how far
14  it was from a water source, whether we had
15  electricity there, could get electricity
16  there. We knew all of those things in
17  deciding, you know, where to put it.
18  **Q.  What else to get the operation up**
19  **and running?**
20  A.  Ben hired a grading contractor to
21  excavate the topsoil off of this spot
22  where we began mining, and used that to
23  construct a dam to hold water in case we

Page 84

1  needed additional water. We bought
2  various pieces of equipment, bought a
3  crane, bought several new pieces of
4  equipment. He started with his crew and
5  the welding equipment, that one welder,
6  and started building the steel structure
7  for the plant.
8  **Q.  By "the plant," you mean the**
9  **classifying unit? Is that what I've heard**
10  **it called?**
11  A.  Well, the plant consists of the pump
12  box, steel bins to hold the sifted gravel,
13  a sand classifying screen shaker, a
14  de-watering screw radial stacking
15  conveyor. That's the basic components of
16  the plant.
17  **Q.  As I understand it, the plant's**
18  **stage in the operation is after the**
19  **product has been mined from the ground, it**
20  **is sent to the plant where it goes through**
21  **an operation, where it ultimately comes**
22  **out in the different grades of gravel,**
23  **sand, et cetera?**

21 (Pages 81 to 84)

# FREEDOM COURT REPORTING

Page 85

1  A.   Correct.
2  Q.   So for lack of a better term, it's
3  the midpoint in the process, with the end
4  of it being loading?
5  A.   Right.  That's fair.
6  Q.   What else do you do to get this
7  thing operational?
8  A.   Well, he built a dredge.
9  Q.   Who built a dredge?
10 A.   Ben.  Bought a new dredge pump for
11 that, built the load-out bins and conveyor
12 and belt-weighing system, bought a couple
13 of trucks, built the road for hauling from
14 the plant to the load-out bin, bought a
15 generator.  The power company decided they
16 couldn't service the site with
17 electricity.
18 Q.   Was the initial plan to have the
19 power company service the site?
20 A.   Well, it would have been nice, but
21 we never had any encouragement from them
22 about that.
23 Q.   When did you find out that they

Page 86

1  weren't going to service the site?
2  A.   I don't know.
3  Q.   Is that after you had begun to
4  prepare for operations?
5  A.   Obviously before we bought the
6  generator.
7  Q.   Fair enough.
8  A.   So then we installed the different
9  components on the plant, hooked the
10 pipeline up, cranked the dredge up.  We
11 did buy a new cutter head for the dredge,
12 and cranked it up.
13 Q.   At the point that you crank it up,
14 how long did that take from the point of
15 the supply agreement?
16 A.   I don't know exactly.  I don't have
17 a note about when that occurred.
18 Q.   Do you have any idea of how long it
19 took?
20 A.   Well, let's see.  We closed on the
21 property in August, July, August of '04;
22 and sometime mid-'05, the fall of '05, my
23 recollection is that we were producing

Page 87

1  already by then.
2  Q.   Producing or ready to produce; is
3  that correct?  That means actually pull
4  the product from the ground?
5  A.   Yes.
6  Q.   I'll represent to you that the
7  supply agreement was executed by both
8  parties sometime in April of '04.  Is that
9  your recollection?
10 A.   I don't remember that.  I looked for
11 a copy, and I didn't have one.
12 Q.   And it's your recollection that you
13 exercised the option on the property
14 sometime in August of '04; is that
15 correct?
16 A.   Right.
17 Q.   Then over the next twelve or so
18 months, you were preparing to become
19 operational; is that correct?
20 A.   Right.
21 Q.   At what point in time was Johnco
22 operational?  By "operational," I mean had
23 the ability to pull number 67 gravel out

Page 88

1  of the ground at the specifications
2  required by the supply agreement?
3  A.   Well, I would say late '05.  We had
4  one period where -- we had a lot of
5  shakedown things that you have to go
6  through to get --
7  Q.   You mean start-up problems?
8  A.   Yes.
9  Q.   When did you have those start-up
10 problems, over what period of time?
11 A.   Well, through the late fall of '04
12 up through mid-'05, I would say.
13 Q.   I think you said that you were
14 operational, by my definition, in late
15 '05.  Were you continuing to have start-up
16 problems up to the point that you were
17 operational?  I'm looking to put us in a
18 time frame here.
19 A.   Did we have problems until we were
20 operational?  I don't know how to express
21 that.
22 Q.   Sure.  That's fair enough.  All I'm
23 really looking for here is, there are

22  (Pages 85 to 88)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 89

1  problems associated with a start-up?
2  A.   Sure.
3  Q.   I think almost universally. I'm
4  looking for your assessment of when those
5  start-up problems stopped.
6  A.   I think in the fall of '05, most, if
7  not all, of Ben's problems with the
8  operation were over with. That's not to
9  say that there weren't adjustments to be
10  made to different components there.
11  Q.   Those adjustments that you're
12  talking about now, were those related to
13  fine tuning the start-up of the operation,
14  or were those adjustments that had to be
15  made periodically anyway?
16  A.   Well, we did add one component to
17  the plan itself; and that was, of course,
18  material washing.
19  Q.   When was that?
20  A.   I don't know.
21  Q.   Fall of '05?
22  A.   Could have been. I know it was '05,
23  but we added it because the gravel wasn't

Page 90

1  coming out as clean as we thought it
2  needed to be. We added that, and that
3  pretty much cleared that up.
4  Q.   By "not as clean as you thought it
5  needed to be," does that mean it wasn't
6  meeting the specifications required?
7  A.   Well, the sieve analysis appeared to
8  be okay, but it had sort of a silty
9  coating on it.
10  Q.   Like a clay?
11  A.   Some clay, yes. So we added that
12  piece of equipment to clean it up.
13  Q.   Now, was that visible on the gravel
14  itself; I mean, you could look at it and
15  see the clay or silt on it?
16  A.   Well, you couldn't see it when it
17  first came out of the bin; but once it had
18  been dumped and sat there awhile, you
19  could dig into it and --
20  Q.   So somebody who knew what they were
21  doing could walk by and take a look and
22  say, "Well, it's clay-coated or
23  silt-coated"; is that correct?

Page 91

1  A.   I'm not sure what they could have
2  seen or done. We felt it needed fixing,
3  and so we did it.
4  Q.   And when was that problem cleared
5  up?
6  A.   I don't know, but I'm thinking that
7  was in the summer of '05.
8  Q.   Did Johnco maintain records, either
9  invoices or other records, regarding, I
10  think the material washer you said you
11  purchased?
12  A.   The coarse material washer, yes, we
13  bought that. I'm sure there are records.
14  Q.   Are those records in your
15  possession, or were they transferred to
16  Mr. Junkin?
17  A.   They're not in my possession.
18  Q.   Did you transfer those records to
19  Mr. Junkin?
20  A.   I transferred everything pertinent
21  to this business, that I remember.
22  Q.   At any point in time did you have
23  any dredge problems?

Page 92

1  A.   A dredge, when you put it in a small
2  hole, needs room to operate. It has to
3  move. Do you know what a dredge is? I
4  would think you do.
5  Q.   Loosely, loosely I know what a
6  dredge is, yes.
7  A.   Well, it has to move. We had
8  start-up problems to deal with about the
9  hole being small and difficulty in
10  maneuvering, and the cutter head not
11  wanting to bite into the bank like it
12  should if it were large enough. But we
13  didn't have problems with the dredge, that
14  I knew of, that were unexpected. That's
15  my view of it.
16  Q.   I guess I don't understand that. Do
17  you mean you expected to have problems
18  with the dredge?
19  A.   We expected that the dredge, being
20  in a small hole, would have difficulty
21  maneuvering.
22  Q.   That was just a function of the
23  operation of this particular mine as you

23 (Pages 89 to 92)

# FREEDOM COURT REPORTING

Page 93

1 saw it; is that correct?
2 A. Well, a hydraulic dredge is hooked
3 to a pipe, as I assume you understand. In
4 order to move, it has to swing in an arc
5 around the discharge point on the bank.
6 If you don't have a symmetrical arc around
7 which to move the dredge, it has to jiggle
8 around in different positions to keep
9 producing, to keep pumping. That's the
10 kind of problem I'm talking about. Any
11 dredge would have that.
12 Q. Did you plan the site such that the
13 dredge would have the space it needed to
14 move around without difficulty?
15 A. You dig a hole big enough to float
16 it. Then the dredge creates its own
17 space. There's no point in digging a
18 tremendous hole to give the dredge room to
19 operate, because the material you remove
20 for the dredge to operate could be removed
21 by the same dredge and put through the
22 plant. That doesn't make any sense.
23 Q. That's what I'm after. So this was

Page 94

1 one of those type of problems that you
2 know you're going to have, you expect to
3 have it, but it's going to solve itself
4 over time?
5 A. Right.
6 Q. Did you have any other problems with
7 the dredge, that you recall?
8 A. We had to replace the winches one
9 time.
10 Q. When was that; do you know?
11 A. I don't know. We bought some new
12 winches. We thought they weren't big
13 enough. You know, that's all I can think
14 of.
15 Q. Do you ever recall the dredge being
16 impacted?
17 A. Impacted? The dredge doesn't get
18 impacted; the pipeline gets impacted. The
19 pipeline, if you're starting in a new
20 deposit, your water table is here, and you
21 have a substantial elevated bank in front
22 of the dredge, and you can't maneuver that
23 dredge effectively -- that is, you can't

Page 95

1 go forward and backward -- if the bank
2 caves in and surrounds your suction line
3 with material, and you can't extract your
4 suction line from it quickly enough, it
5 will simply fill up the pipeline with sand
6 and gravel solidly. So it's no longer
7 solution, and it can't move. That
8 happens. It happened down there.
9 Q. Do you recall when that happened?
10 A. I don't know.
11 Q. Do you ever recall losing the auger
12 bit off the dredge?
13 A. I don't remember that.
14 Q. Did you ever have a problem with the
15 water pump?
16 A. The water pumps on the dredge, I
17 don't remember us ever having a problem
18 with it, if we're talking about the
19 dredge. We ultimately had to pump water
20 from another pond up to the pond where the
21 dredge was operating.
22 Q. Why was that?
23 A. Because we were pumping water out of

Page 96

1 the pond faster than the groundwater was
2 replenishing it.
3 Q. Is that a problem you expected to
4 have when you started out in this
5 operation?
6 A. That's the reason that the
7 overburden was used to create another
8 pond, a dam around another water holding
9 area. That's the reason that was done, so
10 we would have a water source to pump in
11 from.
12 Q. Do you recall ever having any
13 problems with the generator?
14 A. I don't recall there being problems
15 with the generator. That was one thing we
16 did not buy new. I know that the
17 electricians that wired up the whole
18 operation spent a couple of weeks, you
19 know, getting everything functioning. I
20 don't remember there being a time when the
21 generator didn't function for any
22 substantial period of time.
23 Q. Do you recall having any screen

24 (Pages 93 to 96)

# FREEDOM COURT REPORTING

Page 97

1  problems?
2  A.   They had supplied -- not knowing
3  exactly what the material is, I'll just
4  call it plastic -- screening material. It
5  turned out that that wouldn't screen the
6  material. We had to replace that with
7  steel.
8  Q.   Do you recall when that problem
9  occurred?
10  A.   I don't know.
11  Q.   Can you ballpark it at all?
12  A.   I can't recall.
13  Q.   Did it occur prior to you selling
14  out to Mr. Junkin?
15  A.   Yes.
16  Q.   Did you ever have any problems with
17  the operation of the classifier?
18  A.   The sand classifier?
19  Q.   Yes.
20  A.   He kept tinkering with the sand
21  classifier, doing different things to get
22  the gradation exactly like we needed. You
23  know, I'm not sure how much of a problem

Page 98

1  that was. We didn't have a sale for the
2  sand. We were just trying, in the
3  process, to try to make the sand coming
4  out of there in specs in case we did get a
5  market for it.
6  Q.   What were you doing with the sand
7  that was produced?
8  A.   It was being stacked there by the
9  plant.
10  Q.   What is the product mix there with
11  regard to sand, number 67, and oversize?
12  A.   The screen analysis that we did
13  initially of the borings, the spot where
14  we set the dredge in operation indicated
15  there was 47 percent gravel, 53 percent
16  sand. If 10, 15 percent of the gravel,
17  say 10 percent was oversize, 10 percent of
18  47 percent is whatever that is, 5 percent.
19  So we would have 35, 40 percent 67 gravel,
20  and 5, 6, 7 percent oversize, and the rest
21  sand.
22  Q.   What did you plan to do with the
23  sand as it was being produced?

Page 99

1  A.   Well, we were going to put it in
2  specifications and hopefully sell it.
3  Q.   And if you didn't sell it, what was
4  to happen to it?
5  A.   Well, at some point -- as I say, the
6  radial stacker was there to stack it up.
7  At some point when we moved the dredge in
8  that direction, that is the pit where you
9  are excavating, you can put it back in the
10  pit.
11  Q.   Was that your plan?
12  A.   Well, if we couldn't sell it, that's
13  pretty much what we would have to do with
14  it, yes.
15  Q.   Did you ever have any conversations
16  with anyone, except for your lawyers,
17  about what would happen if Johnco couldn't
18  move the sand or couldn't sell the sand?
19  A.   Ben and I talked about what we could
20  do with it, you know. We continually
21  tried to sell it.
22  Q.   Why was that?
23  A.   Why did we want to sell it?

Page 100

1  Q.   I think you told me, because that's
2  where the profit was; right? If you could
3  move it, that's where --
4  A.   That's where some of the profit
5  would have been, yes. Did I have a
6  conversation with Ben about it, what we
7  could do with it? Yes, we talked about
8  it. Could we put it in this spec; could
9  we put it in that? Would Lafarge buy it;
10  would they buy it at what price, you know.
11  Q.   Did you ever have any conversations
12  with Ben or anyone else about what would
13  happen if you couldn't sell the sand?
14  A.   No. It seemed apparent to us if we
15  couldn't sell it, it would stay there.
16  Q.   Did you ever tell anyone, at any
17  point in time, that if Johnco couldn't
18  sell the sand, it was going to have to
19  shut down its operation?
20  A.   No, I didn't. I told, I think Gary,
21  and I may have told Phillip, "We would
22  sure like to sell some sand." I told
23  Keith Bodiford with Lafarge that we would

25  (Pages 97 to 100)

# FREEDOM COURT REPORTING

Page 101

1  love to sell some sand. I thought it
2  would be great to sell sand, you know. I
3  didn't tell anybody that we were going to
4  shut down if we couldn't sell it.
5  **Q.  Did you tell anybody that Johnco**
6  **would have to shut down if it couldn't**
7  **sell the oversize gravel?**
8  A.  No, I don't think so. I don't
9  remember doing that at all. My answer
10  would be I didn't do that.
11  **Q.  Did you ever have the impression**
12  **that Johnco would have to shut down if it**
13  **couldn't sell the oversize gravel?**
14  A.  No, because, really, we were selling
15  the oversize gravel. I don't know whether
16  we had sold oversize gravel when I got out
17  or not. Ben said that he had a customer
18  who was buying oversize gravel, by truck
19  hauling it to Montgomery and shipping it
20  into Florida or somewhere. I don't know
21  whether that occurred before I got out or
22  not. The oversize, in my mind, was a
23  product that would move at some point, you

Page 102

1  know.
2  **Q.  Just so I can close the loop here,**
3  **do I understand correctly that you weren't**
4  **involved with the first load taken by**
5  **Yelvington in May of 2005?**
6  A.  That's right.
7  **Q.  Excuse me. Was that May of 2006?**
8  A.  It was '06, I think.
9  **Q.  Thank you.**
10  MR. LEEK: For your purposes, we'll
11  just keep these numbered consecutively.
12  Is that okay?
13  MR. PEARSON: Yes.
14  (Whereupon, Defendant's Exhibit
15  Number 1 was marked for identification. a
16  copy of which is attached to the original
17  of the transcript.)
18  **Q.  Mr. Johnston, I have handed you what**
19  **has been marked as Defendant's Exhibit 1,**
20  **which I'll represent to you is our answer**
21  **to this Complaint. The reason I'm using**
22  **the answer is because it contains both the**
23  **factual allegations and the responses.**

Page 103

1  **Have you ever seen this document before?**
2  A.  No.
3  **Q.  I'm just going to give it to you so**
4  **you have it in writing in front of you,**
5  **and I'm going to ask you a couple of**
6  **questions about the factual allegations in**
7  **it. Do you understand that?**
8  A.  Sure.
9  **Q.  If you turn to the second page and**
10  **look at paragraph 6, there's an allegation**
11  **that Johnco invested four million dollars**
12  **in capital expenses to build and place**
13  **into operation this facility. Do you see**
14  **that?**
15  A.  Uh-huh.
16  **Q.  Is that "yes"?**
17  A.  Do I see it?
18  **Q.  Yes, sir.**
19  A.  Yes, I see it.
20  **Q.  Do you know how that number of four**
21  **million dollars was arrived at?**
22  A.  "Plaintiff invested four million
23  dollars."

Page 104

1  **Q.  Sir, it may be that you just don't**
2  **know how that number was arrived at.**
3  **That's fine. I just need to check the**
4  **boxes in my outline here, and move on.**
5  A.  I'm trying to figure if the interest
6  accumulated -- it says we agreed. I don't
7  know. Put it that way, I don't know.
8  **Q.  You don't know how that number was**
9  **arrived at?**
10  A.  No.
11  **Q.  In preparation of this lawsuit, were**
12  **you asked to give any information?**
13  A.  No. As a matter of fact, I didn't
14  know it was being filed at the time it was
15  filed.
16  **Q.  If you'll turn to the next page for**
17  **me and look at paragraph 7, in there it**
18  **says that "Number 67 concrete gravel at a**
19  **rate of approximately 5,200 tons per**
20  **week." What did you understand the**
21  **frequency with which Yelvington would come**
22  **and get the gravel would be?**
23  A.  Well, I was thinking at the time

26  (Pages 101 to 104)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 105

1 that we would load a train each week.
2 **Q.    At what time was that?**
3 A.    But that obviously would be
4 substantially more than 150,000 tons a
5 year.  That comes to 33,000 tons a week, I
6 guess; doesn't it?  Not 5,200.  We had to
7 be prepared to load 5,200 tons when the
8 train got there.
9 **Q.    Well, what was your expectation at**
10 **the point that you signed the agreement,**
11 **of how frequently the trains would be**
12 **loaded?**
13 A.    We expected that they would send us
14 a train to be loaded, at the very minimum,
15 3,000 tons a week at that rate.  My
16 discussions with Klebe indicated that they
17 could take as much as, I believe he said
18 two-seventy, which would have been this
19 much every week.  My understanding was
20 they were committed to take 150,000 tons a
21 year, and I think that's what the contract
22 says; and if they showed up every week and
23 we had the materials loaded, we would do

Page 106

1 so.  I don't know whether that is clear.
2 **Q.    Well, that's one of the problems I'm**
3 **having here.  I'm trying to resolve the**
4 **express tonnage commitment, which I think**
5 **you said was 150,000 tons, and that's my**
6 **recollection too, with the frequency.**
7 A.    Right.
8 **Q.    Can we agree that the tonnage and**
9 **the frequency of pickup are separate**
10 **things; is that correct?**
11 A.    We can agree that the commitment was
12 for 150,000 tons.
13 **Q.    Annually; correct?**
14 A.    And we can agree that when they
15 showed up, we had to be ready to load
16 5,200 tons.
17 **Q.    When they showed up; is that**
18 **correct?**
19 A.    Right.
20 **Q.    Do you have an understanding of what**
21 **FOB means?**
22 A.    Yes.
23 **Q.    What does FOB mean, in your**

Page 107

1 **understanding?**
2 A.    It means that the freight from that
3 point on is the expense of the customer.
4 **Q.    What is your understanding of what**
5 **Johnco's obligation was with regard to**
6 **delivering the product?**
7 A.    We delivered it to the rail site.
8 loading site.
9 **Q.    Do you know of any weeks in which**
10 **Johnco delivered 5,200 tons of product to**
11 **the rail site while you were there?**
12 A.    If you're asking me if I stayed
13 there and counted the number of loads
14 hauled to the rail site, and that they
15 totaled 5,200, no, I didn't.
16 **Q.    I'm really not.  I'm just asking you**
17 **if you know specifically there were six**
18 **weeks or twenty-four weeks in which Johnco**
19 **delivered 5,200 tons to the rail site for**
20 **pickup.**
21 A.    I know that there was a substantial
22 quantity of gravel at the rail site when I
23 last was there.

Page 108

1 **Q.    When was that?**
2 A.    That would have been in late 2005,
3 early 2006.
4 **Q.    And do you know whether it was 5,200**
5 **tons or not?**
6 A.    My estimate would be it was
7 substantially more than that.  I didn't
8 cross section, no.
9 **Q.    Do you know what quality that gravel**
10 **was that you saw?**
11 A.    I don't know when we installed the
12 coarse material washer.  If it was after
13 that, the gravel was ready to go.
14 **Q.    But you don't know if that had been**
15 **done yet; is that correct?**
16 A.    No, I don't.
17 **Q.    At some point in time did Johnco**
18 **hire a lab or quality control employee?**
19 A.    We hired a -- I say "we."  Ben hired
20 a girl and taught her to run the screen
21 analysis.
22 **Q.    Do you know when that was?**
23 A.    No, I don't.

27  (Pages 105 to 108)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 109

1  Q.    Can you tell me roughly when that
2  was?
3  A.    No, I don't know.
4  Q.    Was that before you --
5  A.    She was there before I left, yes.
6  Q.    Okay. Thank you. Let's turn now to
7  the next paragraph, paragraph 8. Did you
8  have an understanding of how long the
9  $5.25 price would be fixed under the
10  agreement?
11  A.    Well, I think it's set out in the
12  agreement.
13  Q.    What was your understanding of how
14  long that would be fixed?
15  A.    Well, it goes up after 24 months by
16  5 percent. Is this a quote from the
17  contract itself?
18  Q.    Well, that's an allegation put forth
19  by Johnco, so I can't really answer that;
20  but I'll represent to you that that is
21  consistent with what is in the contract.
22  A.    Well, that's what I understood then.
23  Q.    From what point in time was the 24

Page 110

1  months to begin to run?
2  A.    It says --
3  Q.    I'm not asking you what it reads
4  here.
5  A.    Twenty-four months was from the time
6  we signed the contract, if I remember
7  correctly. It says "24 months from April
8  2004."
9  Q.    That's what the pleading says;
10  correct?
11  A.    Right.
12  Q.    So does that mean that the price was
13  fixed for a period of time during which
14  the construction of the mine was
15  occurring; is that correct?
16  A.    Well, it means what it says.
17  Q.    I'm asking you what your
18  understanding is.
19  A.    I understood that we would get an
20  increase of 5 percent after April 2006.
21  That's what it says.
22  Q.    Did you have an understanding of how
23  long Johnco had to construct the facility

Page 111

1  under the contract?
2  A.    Does the contract say that?
3  Q.    It does, but I'm asking for your
4  understanding. We're going to get into
5  the supply agreement specifically.
6  A.    I don't remember. Whatever it says.
7  Q.    Do you recall there was a finite
8  time to construct that facility?
9  A.    I don't know. I would have to look
10  at it.
11  Q.    At any point in time did anyone at
12  Yelvington ever come to you, or anyone at
13  Johnco, to your knowledge, and say, "Hey,
14  you haven't constructed this in the time
15  that you were supposed to"?
16  A.    No, but we did talk about where it
17  would be shipped. As I understood it at
18  the time, they were trying to build a
19  facility in Milton, Florida, and that
20  there wasn't a place to deliver it until
21  that was done. So that never came up,
22  really, that we had delay beyond what they
23  expected.

Page 112

1  Q.    And did you ever receive any kind of
2  notification from Yelvington saying Johnco
3  is in breach of this contract in any way?
4  A.    No, not to my knowledge. I didn't
5  receive it.
6  Q.    Did Johnco ever give Yelvington any
7  kind of notification that it was in breach
8  of the contract in any way?
9  A.    I didn't.
10  Q.    Do you know whether anyone at Johnco
11  did, while you were there?
12  A.    No, not before I left.
13  Q.    At any point in time while you were
14  at Johnco, did you tell anyone at
15  Yelvington, "We've got material on the
16  ground that is ready for you to come and
17  get"?
18  A.    That would have been before January
19  of '06?
20  Q.    Yes, before you got out, which we
21  think is January of '06.
22  A.    The only discussion I had with
23  anyone about shipments was with Gary and

28  (Pages 109 to 112)

# FREEDOM COURT REPORTING

Page 113

1  Phillip, and I believe Mr. Conrad was
2  there and maybe a couple of pilots at the
3  airport in Montgomery. I said, "Gary, we
4  really need to ship some material. Also,
5  if you could take some sand, we need you
6  to do that." I said, "If there's any
7  pricing you could add to what we're
8  selling you, we could use that." I didn't
9  really get any response to any of that. I
10  believe Gary said, "I'll think about it."
11  Q.  When was this meeting?
12  A.  I can't come up with that.
13  Q.  Was that in 2005?
14  A.  I think so. If you represent Gary,
15  you know he's a busy guy. He comes and
16  goes.
17  Q.  Yes.
18  A.  He was supposed to come by and see
19  us twice along in 2005, I think. One time
20  he didn't make it to Alabama. One time he
21  was there and I went down to see him, and
22  he only spent about twenty minutes at the
23  plant, so I missed him; and then this

Page 114

1  meeting I just talked about. He was
2  coming to the plant, and he called and
3  said he had only a few minutes; he had to
4  take off from the airport, could we come
5  over there and see him. I didn't have a
6  lot of contact with him.
7  Q.  Do you think that was before 2006?
8  A.  I think so.
9  Q.  Do you think it was at the beginning
10  of 2005?
11  A.  I don't know.
12  Q.  Let's see if we can focus a little
13  bit more on what you do remember about
14  that conversation. You said that you
15  talked to him about pricing. What do you
16  mean? What did you talk about with regard
17  to pricing?
18  A.  I asked him if there had been any
19  price appreciation since we had entered
20  into this agreement.
21  Q.  For the gravel?
22  A.  Yes.
23  Q.  So were you asking him if they could

Page 115

1  pay more?
2  A.  Yes.
3  Q.  Why were you asking him if they
4  could pay more?
5  A.  Well, we hadn't shipped any; and I
6  thought when we did ship, you know, there
7  had been a substantial price appreciation
8  between his first offer and what we agreed
9  to, so I would like to know if the market
10  could withstand that.
11  Q.  You understand at that point,
12  though, that there was a supply agreement
13  in place?
14  A.  I understand, yes. He didn't have
15  to do that. I understand that.
16  Q.  Sure. Did Johnco need to get more
17  money for that gravel?
18  A.  Well, we needed to get some money
19  for gravel. We hadn't sold any, you know.
20  Q.  So for Johnco to continue to
21  operate, it needed to get more money for
22  that gravel; is that correct?
23  A.  Well, we didn't have to have it, you

Page 116

1  know. I thought it was worth bringing the
2  subject up.
3  Q.  What did you talk to the Yelvingtons
4  about with regard to sand?
5  A.  I asked them if they could move any
6  sand.
7  Q.  Did you tell them that Johnco needed
8  to move some sand?
9  A.  I don't remember saying that we
10  needed to. I asked him if they thought
11  they could move some. As we were leaving
12  the meeting, I think Phillip and I and
13  Ben, Phillip indicated that he thought
14  there was a possibility of moving sand
15  somewhere, maybe Birmingham or Atlanta or
16  someplace. Of course, he said it was
17  nothing definite, you know. There was
18  just a possibility out there.
19  Q.  That they would try to work on that
20  for you?
21  A.  Yes.
22  Q.  I guess that leads to my next point
23  here. What was your relationship like

29  (Pages 113 to 116)

# FREEDOM COURT REPORTING

Page 117

1  with the folks at Yelvington?
2  A.   I would say it was distant. Mark
3  Klebe was very cordial on the phone, you
4  know, I thought. Gary seemed to have too
5  much going on to be really -- he was kind
6  of distant to be really concerned about
7  whether we got going or not. That was my
8  impression.
9  Q.   Well, did you find them to be
10  cooperative? By "them," I mean
11  Yelvington, the company, so anybody that
12  worked with them.
13  A.   Well, up until the time I left
14  there, I didn't have any disagreements
15  with them about anything.
16  Q.   For instance, I think you have
17  already told me at one point in time they
18  offered to finance part of the track
19  build-out; correct?
20  A.   That was early on, yes.
21  Q.   And then they actually offered to
22  and did supply some of the materials for
23  the track build-out; right?

Page 118

1  A.   That was along with the negotiating
2  with the railroad they did that.
3  Q.   And I think most recently, you said
4  that they offered to help you find a buyer
5  for; is that correct? Move some
6  sand; is that correct?
7  A.   They said, "We will try to find a
8  place to move your sand."
9  Q.   And did they do that?
10  A.   No.
11  Q.   Not move the sand, did they try to
12  find a place to move the sand?
13  A.   I don't know.
14  Q.   Did you ever have any more
15  discussions with them after that about
16  moving the sand?
17  A.   Way back at some point they had
18  plans. I learned from someone, maybe
19  Phillip, that they were considering
20  opening up several distribution centers
21  around Atlanta which could possibly use
22  sand. That's as far as it went, you know.
23  I don't know if it did or didn't. My

Page 119

1  understanding is, in talking to Lafarge,
2  that Atlanta is a substantial market for
3  sand, a big market. But where it comes
4  from, I don't know.
5  Q.   Let's see if we can get through this
6  document real quickly here. If you could
7  turn to page 4 of 10, and look at
8  paragraph 11. I really just want you to
9  take note of the date October 1, 2006. Do
10  you know what that date signifies?
11  A.   Well, I wasn't there. I don't know.
12  Q.   Do you know when Johnco shut down
13  operations?
14  A.   I really don't know that.
15  Q.   In March of 2006, were you still
16  coming to the Johnco facility?
17  A.   No.
18  Q.   Do you know what ability to mine the
19  product that Johnco had in March of 2006?
20  A.   What ability? Well, I wasn't there,
21  so I assume they had whatever ability they
22  had when I was there.
23  Q.   What was the ability of Johnco to

Page 120

1  mine the product at the point that you
2  stopped coming around?
3  A.   I don't know. That seems to be too
4  broad. My opinion is they could mine the
5  product.
6  Q.   In what quantities?
7  A.   They could mine the product in
8  quantities sufficient to satisfy this
9  contract.
10  Q.   So 150,000 tons?
11  A.   Sure.
12  Q.   And how frequently could they get
13  5,200 tons out of the ground at the time
14  that you left, on average?
15      MR. PEARSON: I object. I think
16  that has been asked and answered.
17  Q.   You can answer the question.
18  A.   They certainly should have been able
19  to do that every week.
20  Q.   Were they doing it every week?
21  A.   I don't know.
22  Q.   Did Johnco keep production records?
23  A.   They did not, while I was there,

30 (Pages 117 to 120)

## 367 VALLEY AVENUE
### (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

Page 121

1  keep production records. The material
2  being produced was being stockpiled, all
3  of it. Unless you count truckloads, and
4  there wasn't an invoice with each truck.
5  When I left, we didn't have records of
6  production.
7  **Q.  Did you have any records of storage,**
8  **how much was on the ground?**
9  A.  No.
10 **Q.  How would Johnco know how much it**
11 **had on the ground?**
12 A.  Well, one easy calculation would
13 have been you could cross section the
14 sand, which is in a contiguous pile there,
15 cones, and figure the volume there. You
16 can figure we've got 40 percent of that
17 amount of gravel.
18 **Q.  Do you know of any time that Johnco**
19 **did that?**
20 A.  No, it would have been more than
21 that. It would have been 60 percent sand,
22 40 percent gravel. I'm not sure what the
23 arithmetic would be.

Page 122

1  **Q.  Do you know of any time that Johnco**
2  **did that while you were there?**
3  A.  Did what?
4  **Q.  Cross section the sand to determine**
5  **how much gravel it had on hand.**
6  A.  I don't know. My figure is about
7  60/40, 60 percent of 100 percent is this,
8  50,000 tons, or whatever it is. It would
9  be almost that much gravel up there.
10 **Q.  I guess you could do that because --**
11 A.  We weren't selling any.
12 **Q.  You weren't selling any sand, so**
13 **that's where you went to figure out how**
14 **much gravel you had?**
15 A.  Right.
16 **Q.  Do you have any knowledge of why**
17 **Johnco ceased operating?**
18 MR. PEARSON: Let me object to the
19 form of the question.
20 **Q.  You can answer.**
21 A.  I don't have any knowledge of why.
22 I assume Clatus made a business decision
23 to do that. I don't know. He didn't ask

Page 123

1  me about it.
2  **Q.  Did you ever talk to him about his**
3  **decision to shut down the operation?**
4  A.  After the fact he told me that
5  that's what he had done.
6  **Q.  And what did he tell you?**
7  A.  He said he had decided to close it
8  down.
9  **Q.  Did he tell you why?**
10 A.  No, he didn't.
11 **Q.  Did he mention Yelvington's name in**
12 **that conversation?**
13 A.  He said that he thought Yelvington
14 wasn't buying what they committed to buy.
15 I said, "Well, I don't know."
16 **Q.  Did he mention anything to you about**
17 **sand?**
18 A.  No, he didn't talk about sand.
19 **Q.  Did he mention anything to you about**
20 **oversize gravel?**
21 A.  He really didn't. It was a brief
22 conversation. He said he decided to shut
23 it down.

Page 124

1  **Q.  Did he mention anything to you about**
2  **the inability to sell additional gravel or**
3  **other product?**
4  A.  No.
5  **Q.  Did he mention anything to you about**
6  **problems they were having out at**
7  **Whitehall?**
8  A.  No.
9  (Off-the-record discussion.)
10 **Q.  We're back on the record here. One**
11 **thing I wanted to close the loop on is,**
12 **you mentioned something about Yelvington**
13 **telling you that they intended to take**
14 **some gravel to Milton; is that correct?**
15 A.  I think that information came from
16 Phillip.
17 **Q.  Right.**
18 A.  They were building a facility. Gary
19 never did tell me that, himself.
20 **Q.  When I refer to Yelvington, I'm**
21 **talking about the company in a sense.**
22 **What other Yelvington facilities did they**
23 **have that could take gravel?**

31  (Pages 121 to 124)

# FREEDOM COURT REPORTING

Page 125

1   A.   I don't know. We were shown a
2   brochure with dozens of them on there.
3   **Q.   That could take gravel, was that**
4   **your understanding?**
5   A.   Yes.
6   **Q.   So they didn't necessarily need**
7   **Milton to take the gravel; is that**
8   **correct?**
9   A.   Well, you know, after the freight
10  rates went up like they did, my thinking
11  was that might have been the only place
12  they could economically move it. It was
13  closest. But nobody told me that. You
14  know, I'm just rationalizing what
15  happened, the fact that they didn't take
16  any.
17  **Q.   Do you have any knowledge of what**
18  **Yelvington's freight rates are?**
19  A.   I don't.
20       (Whereupon, Defendant's Exhibit
21  Number 2 was marked for identification, a
22  copy of which is attached to the original
23  of the transcript.)

Page 126

1   **Q.   I have handed you what has been**
2   **marked as Defendant's Exhibit 2, and I'm**
3   **going to ask you if you recognize what is**
4   **in that picture.**
5   A.   It appears to be the site at
6   Whitehall.
7   **Q.   Is that the Johnco operation?**
8   A.   Yes.
9   **Q.   Let me clear this up. Johnco didn't**
10  **have any other operations than at**
11  **Whitehall; is that correct?**
12  A.   That's right.
13  **Q.   So when we say "Johnco," we can also**
14  **say "Whitehall," and they are fairly**
15  **interchangeable; is that correct?**
16  A.   As far as the location is concerned,
17  that's true. That's where our location
18  was.
19  **Q.   Let's see if we can orient this**
20  **thing here. It has got little compass up**
21  **in the top right-hand corner; do you see**
22  **that?**
23  A.   I see it.

Page 127

1   **Q.   Pointing north. So if you put the**
2   **picture pointing north, and if you could**
3   **tell me what the different things are that**
4   **are on here, I would appreciate it. And I**
5   **mean in the broadest sense. Can you tell**
6   **me where the loop track was?**
7   A.   It's in the northeast corner of the
8   property. It appears on the aerial
9   photograph as a circle.
10  **Q.   Can you tell me where the loading**
11  **area for train shipments was?**
12  A.   It's just to the southeast of that
13  loop track, and it looks white on this
14  aerial photograph.
15  **Q.   Can you see, is there any material**
16  **on the ground in this photograph? Can you**
17  **tell?**
18  A.   Well, it looks like there is.
19  **Q.   It's hard to tell, I appreciate**
20  **that. Can you tell me where the sand was**
21  **stockpiled?**
22  A.   Just east of the plant itself.
23  **Q.   Can you tell me where the plant is?**

Page 128

1   A.   It's in the south central part of
2   this photograph. There is a
3   blue-appearing area there where it's being
4   mined, and just to the right or east of
5   there is where the sand is.
6   **Q.   If I may, just to help us in the**
7   **record, if we follow the road leading**
8   **actually diagonal from the loading area,**
9   **it ends in what appears to be a pond, and**
10  **then a big square off to the right of that**
11  **pond, is that correct, or east of that**
12  **pond? Do you see it that way?**
13  A.   The road goes from the loading site
14  to the plant site.
15  **Q.   Then the plant site is there; the**
16  **dredge hole was there. Is that correct?**
17  A.   Right.
18  **Q.   Then there is also a stockpile of**
19  **sand; is that correct?**
20  A.   Yes.
21       (Whereupon, Defendant's Exhibit
22  Number 3 was marked for identification, a
23  copy of which is attached to the original

32  (Pages 125 to 128)

# FREEDOM COURT REPORTING

Page 129

1 of the transcript.)
2 **Q. I'll ask you to take a look at**
3 **Defendant's Exhibit 3, which would be**
4 **identical to Defendant's Exhibit 2 with**
5 **the exception of some labels on it.**
6 **Hopefully, we've just identified the**
7 **content of those labels. Can you tell me**
8 **if you agree with the content of those**
9 **labels?**
10 A. Do you want me to read these labels?
11 **Q. Yes. You don't have to read them**
12 **aloud. I need one that is marked with the**
13 **appropriate labels for ease of use later,**
14 **and I just want to make sure that we can**
15 **agree that these labels are accurate.**
16 A. "This is the loading area for train
17 shipments"; that's correct. "This is the
18 area where sand is stockpiled under a
19 radial conveyor"; that's correct. "This
20 is the pit where a floating dredge sits
21 and pumps out a mixture of sand and gravel
22 which is then separated on shore"; that's
23 correct. "This circle is the loop track

Page 130

1 that was built to hold 52-plus cars during
2 loading."
3 **Q. Is that correct?**
4 A. That's correct.
5 **Q. Great. You can hand those back to**
6 **the court reporter, and we will move on.**
7 **Do you have any knowledge of whether any**
8 **sand has been sold since you left?**
9 A. I don't know.
10 **Q. Do you know whether any sand has**
11 **been pumped back into the pit since you**
12 **left?**
13 A. I haven't been there.
14 **Q. And just to close the loop on that,**
15 **do you have any knowledge of whether any**
16 **sand has been disposed of at all since you**
17 **left?**
18 A. I don't have any knowledge.
19 (Whereupon, Defendant's Exhibit
20 Number 4 was marked for identification, a
21 copy of which is attached to the original
22 of the transcript.)
23 **Q. You have just been handed**

Page 131

1 **Defendant's Exhibit 4. Do you recognize**
2 **this document?**
3 A. It looks like my writing.
4 **Q. That was my next question. Were**
5 **these notes you took initially when you**
6 **were discussing with Yelvington how much**
7 **gravel they could take?**
8 A. It appears to be a note that I made
9 following a telephone call with Gary.
10 **Q. Take a look at the second page, if**
11 **you would, for me. Is that a continuous**
12 **note, or is that a separate note?**
13 A. I don't know.
14 **Q. It seems to reference a conversation**
15 **with Doug Davis; is that correct?**
16 A. It seems to be a discussion I had
17 with him about the rail site.
18 **Q. And is this your handwriting as**
19 **well? I don't want to get ahead of**
20 **myself.**
21 A. I would say that's my writing, yes.
22 **Q. Just for purposes of putting the**
23 **time frame around when this note would**

Page 132

1 **have been made, had you had any**
2 **conversations with Doug Davis regarding**
3 **what M&B would maintain in April of 2003?**
4 A. Well, I don't know that this second
5 page is April of 2003.
6 **Q. I understand that. I'm just trying**
7 **to put a time frame on the second page.**
8 A. If I made a note of it, that
9 apparently was part of our discussion.
10 **Q. I guess my point is, that discussion**
11 **didn't necessarily occur in April of 2003?**
12 **I have stapled them together.**
13 A. No, it didn't. You know, I don't
14 know.
15 **Q. But they may be separate notes?**
16 A. Could be.
17 **Q. When is the first time you talked to**
18 **Doug Davis?**
19 A. Oh, my. It was very soon after M&B
20 bought that portion of the track from CSX.
21 **Q. Do you know when that was, what**
22 **year?**
23 A. I don't know.

33 (Pages 129 to 132)

# FREEDOM COURT REPORTING

Page 133

1 **Q.    Was it after 2003?**
2 A.   I don't know that. I really don't
3 remember.
4 **Q.    Do you see the first entry on that**
5 **second page there? It says "Term begins**
6 **with the first shipment." Can you tell me**
7 **what that means?**
8 A.   I don't know. I assume the term of
9 the lease on the railroad, since that
10 second note refers to the track.
11 **Q.    Fair enough.**
12    MR. PEARSON: I would like to do
13 something for the record, just so I'll
14 understand. You have marked as one
15 exhibit Defendant's Exhibit 4, a Bates
16 numbered page which we produced to you,
17 and it's Bates numbered Johnco 92; and
18 then the second page, which is stapled to
19 it, is marked Johnco 105. I just want to
20 make it clear that what you're trying to
21 do here is establish whether these two
22 Bates numbered pages were written at the
23 same time; is that what you're trying to

Page 134

1 do?
2    MR. LEEK: And whose handwriting it
3 is. I'm not suggesting that they are one
4 note.
5    MR. PEARSON: Then I don't object,
6 as long as they are not indicated that
7 they were done in April of '03.
8    MR. LEEK: That's fine. In fact,
9 that's what I was trying to get at, is to
10 figure out when that second page was
11 written. It doesn't appear to me it was
12 written in April of '03.
13    (Whereupon, Defendant's Exhibit
14 Number 5 was marked for identification, a
15 copy of which is attached to the original
16 of the transcript.)
17 **Q.    Mr. Johnston, what I have handed you**
18 **is an e-mail from Phillip Holladay to Gary**
19 **Yelvington. I'm not asking you whether**
20 **you recognize this e-mail or not. What**
21 **I'm asking you is, is the information in**
22 **this e-mail accurate, as you relate it to**
23 **Mr. Holladay?**

Page 135

1    MR. PEARSON: I'm going to object in
2 this way, foundationally; the objection is
3 to form foundationally. Why are you
4 saying that Pep gave this information to
5 Phillip?
6    MR. LEEK: I'm sorry. Ben gave this
7 information to Phillip.
8    THE WITNESS: He asked me if it was
9 accurate.
10    MR. LEEK: Yes, I'm asking him if
11 this information is accurate.
12    MR. PEARSON: Oh, okay.
13 A.   The figures that I remember from the
14 test borings are that there was, at the
15 time, two-and-a-half proven million tons
16 of gravel reserve. I do remember that.
17 **Q.    So that part of this information in**
18 **this e-mail is what you recall; is that**
19 **correct?**
20 A.   Right. I don't know the other
21 percentages, whether they're exactly right
22 or not. 55/45 would be what I remember
23 the overall percentages of natural deposit

Page 136

1 would be.
2 **Q.    I believe you testified already, at**
3 **some point, I think you said it was 60/40.**
4 **At another point, I think you said it was**
5 **47-and-a-half percent gravel.**
6 A.   What I said was this. It was
7 47-and-a-half percent gravel of total
8 deposit. Of that portion that is gravel,
9 something like 10 percent of that would be
10 oversize gravel. So out of 100 tons of
11 total coming through the plant, 40 tons of
12 that would be 67. 7 tons, more or less,
13 would be oversize, and the balance would
14 be sand.
15 **Q.    What this e-mail indicates is that**
16 **it would be 45 percent total gravel, of**
17 **which 9 percent would be oversize?**
18 A.   Either figure could be accurate.
19 **Q.    And that's kind of what I'm after.**
20 **To the best of your recollection, is this**
21 **accurate?**
22 A.   It's within the range of, what do
23 they say, natural variation in the

34  (Pages 133 to 136)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

1   deposit, certainly.

2      (Whereupon, Defendant's Exhibit

3   Number 6 was marked for identification, a

4   copy of which is attached to the original

5   of the transcript.)

6   **Q.  I just need you to take a look at**

7   **this document and tell me whether you**

8   **recognize it, and identify it for me.**

9   A.  Joe Mitchell says -- well --

1   A.  Could have been.  I don't know.

2   **Q.  Is it possible that you talked to**

3   **Mr. Holladay about Johnco's sand in**

4   **January of 2006?**

5   A.  If I talked to him, it would have

6   been on the phone.  I'm not sure about

7   that.

8   **Q.  Fair enough.**

9   A.  He says he talked to both of us. I

# FREEDOM COURT REPORTING

Page 141

1  that would pretty well balance that, yes.
2  Q.  Do you recall telling Mr. Holladay
3  that you would like to make some sand
4  available to Yelvington, in or about
5  January of 2006?
6  A.  I don't remember that.
7  Q.  Did you ever give Yelvington a price
8  for sand after January 12, 2006?
9  A.  I don't think so.
10  (Whereupon, Defendant's Exhibit
11  Number 8 was marked for identification, a
12  copy of which is attached to the original
13  of the transcript.)
14  Q.  I have marked this as Defendant's
15  Exhibit 8.  Do you ever recall calling
16  Mr. Holladay on a Saturday?
17  A.  I don't remember telling him that we
18  would have to shut down if they didn't
19  purchase the sand.
20  Q.  I understand.  Do you recall having
21  any conversation with Mr. Holladay on a
22  Saturday?
23  A.  I don't remember this conversation.

Page 142

1  Q.  I'm not asking specifically about
2  this conversation.  I'm asking about
3  Saturday.
4  A.  You're talking about any Saturday?
5  Q.  Yes.
6  A.  Could have been.  I don't know.
7  Q.  Did you ever have a conversation
8  with Mr. Holladay about sand in March of
9  2006?
10  A.  My recollection was I talked to
11  Phillip earlier than this.  That's what I
12  remember.
13  Q.  Do you believe that this is
14  inaccurate, the statement that you talked
15  to him about sand in March of 2006?
16  A.  I simply don't remember that being
17  our conversation.
18  Q.  Let's see if we can piece it
19  together this way.  Do you recall whether
20  Johnco was still talking to Lafarge about
21  buying their sand in 2006?
22  A.  I don't think so.  I think we pretty
23  well had given up on that possibility.

Page 143

1  Q.  You were still involved with Johnco
2  in March of 2006; is that correct?
3  A.  Well, I had not actually been paid
4  for my interest.  I wasn't physically down
5  there, and I could have continued to try
6  to help them sell things, yes.
7  Q.  Do you recall, at any point in time,
8  Lafarge telling you that they had stocked
9  up on sand and didn't need Johnco's sand
10  right now?
11  A.  Keith did tell me that, I think, at
12  one time, yes.  He told me several times,
13  really.  As I say, he came to the plant.
14  At a later date, in the summer of '05 he
15  came to Montgomery and asked me to bring a
16  sample, which I did.  Later that fall he
17  had Ben take him a sample, I think.  At
18  some point Ben took a sample of sand to
19  Atlanta, and they looked at it.  But I
20  remember these things as being in late
21  '05.  Now, it's possible I continued to
22  talk to Keith in 2006.
23  Q.  Do you recall telling Mr. Holladay

Page 144

1  that Johnco might have to shut down if you
2  couldn't move some sand soon?
3  A.  No, I don't recall saying that.
4  Q.  Does that mean that you didn't say
5  it, or that you don't recall whether you
6  said it?
7  A.  That wasn't my opinion at any time.
8  Q.  I appreciate that.  Could you have
9  said that Johnco might have to shut down
10  if they couldn't move sand soon?
11  A.  I don't think so.
12  Q.  Did you ask Yelvington in March of
13  2006 whether there was any way they could
14  help you move some sand?
15  A.  If that's when we went to Montgomery
16  and met him at the airport, I did ask him
17  if he could move some sand.  I also asked
18  him if he could begin to take some gravel
19  or if he could pay any more for the gravel
20  that he was going to take.
21  Q.  When I say "Yelvington," I mean the
22  company; let me specify that.  This
23  doesn't appear to relate to your meeting

36  (Pages 141 to 144)

# FREEDOM COURT REPORTING

Page 145

1  with Gary Yelvington in Montgomery, does
2  it, to the best of your recollection, what
3  you can piece together from this?
4  A.   Well, it doesn't appear to be
5  anything but a message from Phillip to
6  Gary Yelvington.
7  Q.   In March of 2006; correct?
8  A.   That's what he said, yes.
9  Q.   Do you recall whether you met with
10 Mr. Yelvington in or around March of 2006?
11 A.   I don't remember. The last time I
12 saw him was in the airport in Montgomery.
13 I don't remember when that was.
14 Q.   Did you ever quote, or did Johnco
15 ever quote Yelvington $3 a ton for sand?
16 A.   I don't know. That would have been
17 a good price. If we discussed price at
18 all, that would have been in the range of
19 what we would have sold it for. My
20 thinking was we quoted that to Bodiford,
21 but maybe also to Gary. I don't know.
22      (Whereupon, Defendant's Exhibit
23 Number 9 was marked for identification, a

Page 146

1  copy of which is attached to the original
2  of the transcript.)
3  Q.   Do you recognize Defendant's Exhibit
4  9?
5  A.   Yes.
6  Q.   What is Defendant's Exhibit 9?
7  A.   I sent this to Doug Davis.
8  Q.   It appears that it was sent sometime
9  around September 14, 2004; is that
10 correct?
11 A.   Right.
12 Q.   Does this accurately represent the
13 span of cost difference between building a
14 track that you were aware of at that time?
15      MR. PEARSON: I object to the form.
16 I'm not sure I understood what you just
17 asked.
18 Q.   All I'm looking for is the range. I
19 think you told me earlier you estimated it
20 was, I think you said $250,000 to
21 $500,000. I'm asking you if these numbers
22 here, regarding the projected cost,
23 represent what you understood to be the

Page 147

1  range of costs associated with building
2  the track.
3  A.   I remember that they had raised the
4  estimate on what it would cost to build
5  the track, as I say in this fax.
6  Q.   And you appear to be frustrated in
7  this fax. Is that accurate?
8  A.   Well, I didn't think we could pay
9  $600,000 to build a track and make this
10 business go.
11 Q.   Was it after this point in time that
12 Yelvington agreed to finance, or offered
13 to finance the construction of the track
14 for you?
15 A.   I don't know. I don't think Gary
16 ever offered to completely finance the
17 track.
18 Q.   Or a portion of it?
19 A.   He did offer to provide a portion of
20 the material in exchange for some freight
21 or some concession on the price for the
22 gravel.
23 Q.   And that was to the railroad,

Page 148

1  correct; or was that to Johnco?
2  A.   First he was going to pay it for us,
3  and we would repay him out of gravel
4  shipments. Finally when we agreed on the
5  price with the railroad of $300,000, then
6  he supplied the rail and maybe some
7  ballasts. The $300,000 that we agreed to
8  pay the railroad was included in -- his
9  contribution was included in that figure.
10 Now, how they washed that out between
11 them, I don't know.
12 Q.   I guess I don't understand that.
13 Are you saying that --
14 A.   He furnished the railroad with
15 material to build this; the railroad
16 charged us $300,000.
17 Q.   Was Johnco then obligated to pay
18 that $300,000?
19 A.   To the railroad.
20 Q.   So Mr. Yelvington or Yelvington
21 Distributors wasn't obligated to pay that
22 $300,000?
23 A.   No.

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 149

1 **Q.   Thank you.**
2   **(Whereupon, Defendant's Exhibit**
3 **Number 10 was marked for identification, a**
4 **copy of which is attached to the original**
5 **of the transcript.)**
6 **Q.   I have handed you Defendant's**
7 **Exhibit 10.  Do you recognize this**
8 **document?**
9 A.   Yes, I do.
10 **Q.   What is this document?**
11 A.   A letter from Doug Davis to me,
12 proposing to build a track, and setting
13 out the costs, and offering to rent us the
14 locomotive that I mentioned earlier.  This
15 was during the discussion where they were
16 going to permit us to load 26 cars and
17 switch them back and load 26 more. rather
18 than having all 52 there at one time.
19 **Q.   Subsequently that changed; is that**
20 **correct?**
21 A.   Right.
22   (Whereupon, Defendant's Exhibit
23 Number 11 was marked for identification, a

Page 150

1 copy of which is attached to the original
2 of the transcript.)
3 **Q.   I'll show you what is marked as**
4 **Defendant's 11.  This isn't the best copy**
5 **in the world, but I want to ask you if you**
6 **recognize this document.**
7 A.   This appears to be our agreement
8 with M&B Railroad.
9 **Q.   This particular document isn't**
10 **signed.  Do you know of any rail services**
11 **agreement that was signed by the parties?**
12 A.   We did have a signed agreement.  I
13 haven't seen one in some time.  I don't
14 have one.
15 **Q.   Do you have any reason to believe**
16 **that this agreement is not the signed**
17 **agreement between the parties, other than**
18 **the fact the signatures aren't there?  Let**
19 **me ask that better.  Do you have any**
20 **reason to believe that this agreement is**
21 **not consistent with the signed agreement**
22 **between M&B and Johnco?**
23 A.   No, I don't.

Page 151

1 **Q.   Take a look at the last page for me,**
2 **if you would, please, page 13 of the**
3 **document.  Do you recognize that design?**
4   MR. PEARSON:  That's not on my page
5 13.
6   MR. LEEK:  Your last page?
7   MR. PEARSON:  That's page 14 in
8 mine.
9   MR. LEEK:  Oh, excuse me, page 14.
10 A.   You're asking what, now?
11 **Q.   Do you recognize this design?  What**
12 **I really want to know, is this the design**
13 **that was built-out at Johnco?**
14 A.   Yes, it is.
15 **Q.   Thank you.**
16   **(Whereupon, Defendant's Exhibit**
17 **Number 12 was marked for identification, a**
18 **copy of which is attached to the original**
19 **of the transcript.)**
20 **Q.   You have just been handed**
21 **Defendant's Exhibit 12.  This, again, is**
22 **an e-mail from Mr. Holladay.  I'm not**
23 **asking you if you recognize the e-mail**

Page 152

1 itself, but I want you to take note of the
2 date, and then the information in the
3 e-mail, and see if you recall this
4 information to be accurate.  Do you have
5 any specific recollection of having any
6 conversation with Mr. Holladay on October
7 10, 2005?
8 A.   Well. I do not remember a
9 conversation with Mr. Holladay to this
10 effect.  The facts that he relates in here
11 appear to be accurate.
12 **Q.   That's really all I'm after.  So is**
13 **it your recollection that in October of**
14 **2005, that Johnco was still having**
15 **problems getting the gravel washed clean**
16 **enough to meet specs?**
17 A.   If that's the time frame where we
18 changed screens and put in the coarse
19 material washer, that's probably true,
20 yes.
21 **Q.   Then the very next line actually**
22 **talks about changing screens or washing**
23 **equipment; is that correct?**

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 153

1  A.  Yes, that's right.
2  Q.  And then this is attached to another
3  e-mail dated September 16, 2005, where it
4  specifically references replacing nylon
5  screens with wire screens.  Does that
6  timing meet your recollection?
7  A.  Yes, that's probably right.
8  Q.  And then I believe it also says that
9  you would call when you had those problems
10  worked out.
11  A.  I said that?
12  Q.  Yes.  Do you recall making that
13  statement to Mr. Holladay?
14  A.  I don't recall that.
15  Q.  Do you recall putting the onus on
16  yourself to call and say, "We've got these
17  problems worked out.  We're ready for the
18  next step"?
19  A.  No, I don't remember that.
20  Q.  Well, does it make sense to you that
21  if the problems were Johnco-related
22  problems, that Johnco would be the one --
23  A.  I wouldn't have tried to address

Page 154

1  them here.
2  Q.  Let me finish my question here.  Is
3  it fair to say if Johnco were having some
4  problems, that Johnco would be the one to
5  tell Yelvington those problems were
6  resolved?
7  A.  Is it fair for us to tell Yelvington
8  that problems with this project --
9  Q.  Let me see if I can ask it in a
10  different way.
11  A.  We should have informed them,
12  Yelvington, about our progress toward
13  fulfilling this contract, yes.
14  Q.  And Johnco was the one who was to do
15  that; correct?
16  A.  Right.
17  (Whereupon, Defendant's Exhibit
18  Number 13 was marked for identification, a
19  copy of which is attached to the original
20  of the transcript.)
21  Q.  You have just been handed
22  Defendant's Exhibit 13.  Do you recognize
23  this document?

Page 155

1  A.  It's on my fax machine.  I don't
2  recall it, but it has my fax number on it,
3  so I'm sure it came from my fax machine.
4  Q.  And it has your fax number and a
5  date of February of '06; is that correct?
6  A.  Yes.
7  Q.  Would anybody be faxing anything
8  from your fax number besides you or not at
9  your direction?
10  A.  I don't think so.  Not to Phillip
11  Holladay, anyway.
12  Q.  Do you have any recollection of
13  discussing oversize gravel screen analysis
14  with Mr. Holladay on or around February of
15  2006?
16  A.  I don't remember that.
17  Q.  Do you know how this document came
18  to be?
19  A.  Well, I don't remember.  I assume
20  that they needed an analysis of the
21  oversize, and we sent it to them.
22  Q.  Why would Yelvington need an
23  analysis?

Page 156

1  A.  I don't know why they did.  I don't
2  know what their motivation was.
3  Q.  Did you ever come to an
4  understanding of why they would need an
5  analysis of oversize gravel?
6  A.  I'm told that Ben eventually -- that
7  they eventually shipped some oversize to
8  Yelvington on the rail.  I don't know when
9  that was, but I understand they did.
10  Q.  Just so I'm clear, Ben didn't work
11  out of your office in Aliceville; right?
12  A.  No, he didn't.
13  Q.  Do you know, in February of '06,
14  whether Johnco was producing any oversize
15  gravel?
16  A.  Well, if they were running at all,
17  they were producing oversize gravel.  It
18  had to come out of the same deposit.
19  Q.  Do you know whether they were
20  running at all in February of '06?
21  A.  I wasn't there, but I'm told that
22  they were producing during that time.
23  Q.  You've said a couple of times that

39  (Pages 153 to 156)

# FREEDOM COURT REPORTING

Page 157

1  you weren't there. You mean you
2  physically weren't on-site?
3  A.   Right.
4  Q.   But you were still having some
5  conversation?
6  A.   I talked to Ben a lot.
7  Q.   Let me ask you about the process of
8  getting trains, actually the process of
9  moving the product. How did that
10  typically work between Johnco and
11  Yelvington, or would you know?
12  A.   Well, I know how it was supposed to
13  work. I never did see a train come in.
14  Q.   How was it supposed to work?
15  A.   They were going to bring the cars in
16  there and leave them, and were going to
17  pick them up when we got them loaded.
18  Q.   How were they to know when to bring
19  the cars in?
20  A.   Well, obviously when they had some
21  place to ship it. As I say, there were
22  several weeks or months during which, my
23  understanding was they were building this

Page 158

1  facility in Milton, that would be ready
2  shortly. During that time frame, Doug
3  Davis was saying it can't be done; they
4  were not going to be ready.
5  Q.   That's Doug Davis at M&B; right?
6  A.   Right. We were just trying to
7  produce everything we could and have it
8  available.
9  Q.   How would Yelvington know that you
10  had number 67 on the ground that met
11  specifications? My question is, how would
12  they know to send a train up there?
13  A.   Well, in my early conversations with
14  Phillip Holladay, some of what he said
15  indicated that he was either going to
16  bring customers there to look at our
17  product, or was going to describe our
18  product to them, or that he was trying to
19  interest people in our product; and that
20  that was part of the process in
21  determining when they would send a train
22  to get it. I assumed that was in the area
23  that he lived and worked, which was south

Page 159

1  Alabama.
2  Q.   What did you say to him when he told
3  you, "I'm going to bring some people by to
4  look at the product"?
5  A.   Well, we were certainly willing for
6  him to bring them up there. It seems to
7  me that maybe he did bring some, but I
8  wasn't there to see it. I don't know
9  that.
10  Q.   Did you tell him at that point, "I
11  don't care who you bring here. You need
12  to pick up gravel every week"?
13  A.   No, I didn't tell him that.
14  Q.   Did you ever tell him anything like
15  that?
16  A.   I told Gary in the meeting in
17  Montgomery that we would certainly like
18  him to move some gravel, material.
19  Q.   Did you give him a time frame of
20  when you expected him to be there?
21  A.   No, I didn't.
22  Q.   Do you have an e-mail address?
23  A.   Do I have one?

Page 160

1  Q.   Yes.
2  A.   The e-mail address that -- I don't
3  have one. The one I have is the one that
4  we had during this time frame.
5  Q.   Is that Johnco397@bellsouth.net?
6  A.   It's Johnco@NCTV.com.
7  Q.   Do you know whose e-mail address is
8  Johnco397@bellsouth.net?
9  A.   It was the company's at the time.
10  Q.   Does that e-mail address, does that
11  still operate?
12  A.   No.
13  Q.   Is it still used by anyone?
14  A.   No.
15  Q.   When was that e-mail address in
16  play?
17  A.   It was during the -- what is that,
18  Johnco397?
19  Q.   Yes, sir.
20  A.   Isn't that at Whitehall? Could I
21  see that?
22  Q.   Actually, I'm going to hold on to it
23  for a minute. The address specifically

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 161

1 reads Johnco397@bellsouth.net.
2 A.  I think that's in Whitehall.
3 Q.  So that's an e-mail address into
4 Whitehall?
5 A.  Yes, I think so.
6 Q.  And you had a separate one that was
7 Johnco --
8 A.  NCTV.com.
9 Q.  That helps me figure out who that
10 is. Johnco have any more e-mail
11 addresses, that you're aware of?
12 A.  No.
13     (Whereupon, Defendant's Exhibit
14 Number 14 was marked for identification, a
15 copy of which is attached to the original
16 of the transcript.)
17 Q.  I have marked this as Defendant's
18 Exhibit 14. Do you recognize this
19 document?
20     MR. PEARSON:  This is the
21 Plaintiff's Exhibit 1 down there on Gary's
22 deposition?
23     MR. LEEK:  Yes, it is. It is also

Page 162

1 produced by you all.
2 A.  I'm not sure that I recognize every
3 page specifically. I have seen a document
4 of his brochure, I guess you would call
5 it, that we provided to the bank when we
6 went for financing. It looks like that's
7 what this is.
8 Q.  To the best of your recollection, is
9 that what this is?
10 A.  Yes.
11 Q.  For what purposes did you provide
12 this to the bank?
13 A.  We wanted to show the bank who our
14 potential customer was, and that they had
15 plenty of places to ship our production
16 to.
17 Q.  Did Yelvington ask to show this to
18 the bank?
19 A.  No.
20 Q.  When you said "potential customer,"
21 does that mean --
22 A.  His potential customer.
23 Q.  Does that mean that Johnco didn't

Page 163

1 have a supply agreement at the time they
2 were showing this to the bank?
3 A.  I don't know. I don't know that.
4 Q.  Fair enough. Did the bank ask you
5 to see this brochure, or anything like it?
6 A.  No.
7 Q.  What did you conclude was
8 significant about this brochure, such that
9 you should show it to the bank?
10 A.  Showing that they were a substantial
11 company; they had a multitude of places
12 they could ship gravel if they wanted to;
13 and that a supply agreement with them
14 would be a good business arrangement.
15 Q.  What offices did you hold at Johnco
16 prior to Mr. Junkin buying you out?
17 A.  I was president.
18 Q.  Did you hold any other offices?
19 A.  No.
20 Q.  Was Mr. Junkin involved in
21 negotiating the supply agreement?
22 A.  I don't think so. My recollection
23 is not. Of course, entering into the

Page 164

1 agreement and the financing of the whole
2 thing and the purchase of the land was
3 kind of a simultaneous process at the
4 time, and he was involved whenever we put
5 up any money. He was certainly involved
6 from that point.
7 Q.  To your knowledge, did Mr. Junkin
8 have any conversations with anyone at
9 Yelvington prior to the execution of the
10 supply agreement?
11 A.  Not to my knowledge.
12 Q.  Do you know when Mr. Junkin first
13 had any conversations with anyone at
14 Yelvington regarding the supply agreement?
15 A.  I don't know.
16 Q.  Or regarding Johnco?
17 A.  I don't know that.
18 Q.  Initially was Mr. Junkin a --
19 "silent partner" is probably not the right
20 word, but he wasn't in the operation of
21 Johnco. Is that correct?
22 A.  He wasn't in the daily management of
23 the company to start with, no.

41 (Pages 161 to 164)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 165

1  Q.   At some point in time, did he take
2  on a role in the daily management of the
3  company?
4  A.   He would from time to time -- no, he
5  didn't take an active part in the
6  management. He wanted to know how things
7  were going all the time, of course.
8        (Whereupon, Defendant's Exhibit
9  Number 15 was marked for identification, a
10  copy of which is attached to the original
11  of the transcript.)
12  Q.   This has been marked as Defendant's
13  Exhibit 15. If you would, please, take a
14  look at this document and tell me if you
15  recognize it.
16  A.   That's our supply agreement between
17  Johnco and Yelvington.
18  Q.   Is this the one that you negotiated
19  with Yelvington, that we've been talking
20  about up to this point?
21  A.   Right.
22       MR. PEARSON: I have to get a point
23  of clarification here.

Page 166

1       MR. LEEK: Sure.
2       MR. PEARSON: Looking at page 2 of
3  the supply agreement, there appears to be
4  some handwritten stuff that has been put
5  in there, 5-12-06 and a #4 at 8.50.
6  Obviously 5-12-06 could not have been
7  written on this agreement in '04. Well,
8  it could have been written there, but that
9  would mean somebody was anticipating two
10  years in advance of a shipment. Do you
11  know who wrote that on there?
12       MR. LEEK: I don't. But with the
13  exception of the handwritten notes in here
14  that were just referenced, does this
15  appear to be the supply agreement? This
16  is obviously somebody's copy of it.
17       MR. PEARSON: Only for purposes of
18  the deposition, I'm going to object to
19  that being a true and correct copy of the
20  page as it existed when the supply
21  agreement was entered into. Again, I'm
22  talking about, I guess, Defendant's
23  Exhibit 15 to the Pep Johnston depo, and

Page 167

1  the supply agreement, page 2.
2       MR. LEEK: We'll get into that and
3  see if we can reconcile that.
4  Q.   Otherwise, other than that
5  handwriting, do you recognize this
6  document?
7  A.   Yes.
8  Q.   And you'll note that there are two
9  page 1's, one with a G.Y., and one with a
10  P.M.J.; is that correct?
11  A.   Two page 1's; right.
12  Q.   Is it your recollection that this
13  change in this agreement was initialed in
14  counterparts?
15  A.   We initialed these; and, of course,
16  we weren't in the same place when we
17  initialed this. I do remember that. I'm
18  not sure why that particular line was --
19  this is a copy of the agreement, we'll
20  say.
21  Q.   And one of the questions I have for
22  you is, I think it's fairly common for
23  people in different locations to initial

Page 168

1  things in counterparts. That means
2  initial their signature, and then send it
3  to the other one?
4  A.   Right.
5  Q.   Then the other one initials it and
6  sends one back. Do you have any
7  recollection of initialing this change
8  after Mr. Yelvington had initialed it?
9  A.   I don't.
10  Q.   First of all, are those your
11  initials on the second page 1 of the
12  agreement?
13  A.   Yes.
14  Q.   Do you have any recollection of
15  seeing a document with Mr. Yelvington's
16  initials on it after you initialed it?
17  A.   We would have returned a completed
18  copy of the agreement. I don't remember
19  specifically seeing that, but it appears
20  that that's what we did. When it was
21  completed he sent me a copy, and I sent
22  him one.
23       (Whereupon, Defendant's Exhibit

42 (Pages 165 to 168)

# FREEDOM COURT REPORTING

Page 169

1  Number 16 was marked for identification, a
2  copy of which is attached to the original
3  of the transcript.)
4  **Q.  I have had this marked as**
5  **Defendant's Exhibit 16.  Again, this has**
6  **some handwritten notes on it.  I'll**
7  **represent the document was provided by**
8  **Johnco to us, and I wouldn't know who made**
9  **those notes.  Do you know who made these**
10 **notes on this document?  I'm talking about**
11 **Defendant's 16 now.**
12 A.  You know, I don't remember making
13 these underlinings on here.  What are you
14 asking me about this?
15 **Q.  If you know who made these notes.**
16 A.  I don't know.
17 **Q.  Do you have any knowledge of how**
18 **your initials and Mr. Yelvington's**
19 **initials got to be on the same page?**
20 A.  I don't.  I would think that he sent
21 me page number whatever it is with his
22 initials, and I sent him one with mine;
23 and then when I got his, I added mine to

Page 170

1  his.  I would assume that's what happened,
2  but I don't remember that.
3  **Q.  Fair enough.  You can set 16 aside**
4  **for now.  Let's go back to Defendant's 15,**
5  **if we could, please.  If you would focus**
6  **your attention -- let's do this first.  If**
7  **you'll focus your attention on the**
8  **effective date in the first paragraph on**
9  **the page, it says April 16, 2004?**
10 A.  Yes.
11 **Q.  Do you recall when you signed this**
12 **document?  I'm not trying to trick you**
13 **here, so I'll lead you to it.**
14 A.  Well, my signature is notarized
15 April 28th, so I'm assuming that's when it
16 was.
17 **Q.  And it was notarized by your CPA; is**
18 **that correct?**
19 A.  Right.
20 **Q.  Excuse me, attested to by your CPA;**
21 **is that correct?**
22 A.  Right.
23 **Q.  And then the notary was somebody**

Page 171

1  **else named Latham, Annette; is that**
2  **correct?**
3  A.  I don't know who that is.  Well, the
4  28th is the date of it.  That's what you
5  asked me; right?
6  **Q.  It appears that Mr. Yelvington**
7  **signed this on April 16th; is that**
8  **correct?**
9  A.  Right.
10 **Q.  Was the agreement effective before**
11 **you signed it, as you understood it?**
12     MR. PEARSON:  I object.  It calls
13 for a legal conclusion.
14 **Q.  I'm only asking for your**
15 **understanding of it.**
16     MR. PEARSON:  Of course, Pep might
17 be well qualified to give one.
18 A.  Was the agreement effective; is
19 what you're saying?
20 **Q.  Yes.  See, one of the problems we**
21 **have is an effective date specified in the**
22 **agreement, but then it wasn't signed by**
23 **both parties until April 28th.  So the**

Page 172

1  **question is, what is the effective date?**
2  **I'm asking for what your understanding of**
3  **what the effective date of this agreement**
4  **was.**
5  A.  Well, we had an understanding of
6  what the agreement was to be.  It just
7  hadn't been signed off on.  I assume at
8  the time we didn't know we would be
9  considering the nuances of legal
10 interpretation.  We just knew we had an
11 agreement.
12 **Q.  Fair enough.  If you would turn to**
13 **section 2.1 for me, titled Plant Facility,**
14 **and if you would just read that to**
15 **yourself.**
16 A.  (Witness complies.)  Right.
17 **Q.  Do you now have an understanding of**
18 **what the time frame that Johnco was to**
19 **construct this facility was?**
20 A.  Well, the document says we were to
21 build it within twelve months.
22 **Q.  Twelve months of either April 16 or**
23 **April 28, 2004; is that correct?**

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 173

1  A.  Right.
2  Q.  So the latest of those two dates
3  would be April 28, 2005; is that correct?
4  A.  Right.
5  Q.  Was the facility constructed by
6  April 28, 2005?
7  A.  My recollection is that the plant
8  and the dredge was constructed.  I don't
9  know that we had completed the load-out
10  site at the railroad.  I don't think that
11  the rail siding itself had been completed.
12  That process had taken quite some time.
13  And I don't think we had completed the
14  load-out facility at the rail site.
15  Q.  So by the terms of this agreement,
16  Johnco had failed to comply with the
17  construction part of that provision; is
18  that correct, 2.1?
19  A.  Well, it says "Construct a facility
20  to mine and classify."  I think we had
21  finished that.
22  Q.  So it's your position that Johnco
23  actually had complied, because they had

Page 174

1  constructed the mine and classification
2  facility?
3  A.  Right.
4  Q.  And as I understand your testimony,
5  Johnco didn't have any time frame within
6  which it had to construct the loading
7  facility?
8  A.  Well, the loading facility and the
9  rail load-out track had to proceed
10  together.  And that was a function of the
11  design by the railroad engineers, their
12  construction crew, Gary furnishing them
13  whatever he was going to furnish.
14  Q.  Well, Gary wasn't obligated to
15  furnish anything; right?
16  A.  He ended up being obligated to the
17  railroad to furnish.
18  Q.  Under the supply agreement?
19  A.  As a practical matter, there was no
20  point in us having material there when
21  there was no railroad to put it on.  That
22  was something beyond our control.
23  Q.  And whose risk was that?

Page 175

1  A.  Whose risk was that?
2  Q.  As you understand the agreement.
3  A.  Well, if they had wanted to -- you
4  mean, were we at risk of them canceling
5  our contract because we weren't ready; is
6  that what you're saying?
7  Q.  No.  Who assumed the risk that the
8  loading site would never be constructed
9  under this agreement?  I'm not trying to
10  get you in any particular way here.  Isn't
11  it true that Johnco's obligation was to
12  deliver the gravel rail-side and load the
13  cars before it became Yelvington's gravel?
14  A.  Sure.
15  Q.  And to deliver the gravel rail-side
16  and load it, you had to have a loading
17  facility; right?
18  A.  Right.
19  Q.  But it's your position that Johnco
20  wasn't obligated to build that loading
21  facility within the twelve months
22  specified in 2.1; is that correct?
23  A.  My position is that it was not

Page 176

1  possible, because the rail siding was not
2  there.  The railroad had changed hands
3  three different times.
4  Q.  I understand that those things may
5  have occurred after the supply agreement.
6  What I'm asking you is, what was your
7  understanding at the point of the supply
8  agreement?  Was Johnco required to build a
9  loading facility within this twelve-month
10  period?
11  A.  I don't think so.
12  Q.  Did you have an understanding of
13  whether they were required to do it?
14  MR. PEARSON:  I object to the form.
15  It's asked and answered.
16  A.  We knew that we had to load cars.
17  How we did that doesn't require building a
18  facility.  What they're doing down there
19  now is loading cars with a front end
20  loader, driving up to the side of the cars
21  and dumping it in there, I understand.
22  The load-out facility was not an absolute
23  requirement of this process.  We built

44  (Pages 173 to 176)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 177

1 that thinking they were going to send us a
2 bunch of covered cars, which never
3 happened. But my position is that we
4 could load cars, could have loaded cars
5 whenever that rail siding was available to
6 put cars on, and that didn't happen by
7 this April, whatever it is, date here.
8 **Q. You understood that the contract was**
9 **contingent on Johnco constructing**
10 **sufficient rail siding to load or handle a**
11 **minimum of 52 open or covered hopper cars;**
12 **correct?**
13 A. Right.
14 **Q. Then it also says on a regular**
15 **shipment basis, or schedule; correct?**
16 A. Right.
17 **Q. What does "regular shipment**
18 **schedule" mean to you, under this**
19 **agreement?**
20 A. It meant to me, initially, that they
21 were going to send us cars every week that
22 we were going to load; that those cars
23 could be loaded over a period of a couple

Page 178

1 of days; and that the average was going to
2 amount to 150,000 tons a year.
3 **Q. And I think you already testified**
4 **that if they sent you a minimum of 52 cars**
5 **at 5,200 tons a unit, train, that you**
6 **would have exhausted that 150,000 tons in**
7 **six months, roughly; is that correct?**
8    MR. PEARSON: I object to the math.
9 **Q. Roughly.**
10 A. Well, if we had shipped more cars
11 than this contract provided for, they
12 wouldn't have been obligated further.
13 That's true. Although, although we were
14 required to notify them if we had any more
15 than that.
16 **Q. Did you ever do that?**
17 A. Never did.
18 **Q. Did you ever have any more than**
19 **150,000 tons?**
20 A. Well, we certainly didn't have
21 150,000 tons there available to load, no.
22 **Q. Did you ever produce 150,000 tons**
23 **during the operation of Johnco while you**

Page 179

1 were there?
2 A. I don't know. I don't know.
3 **Q. And just so we're clear here, it's**
4 **your position that Yelvington was required**
5 **to send a train every week; correct?**
6 A. No. They were required to send
7 enough trains to buy the 150,000 tons.
8 **Q. Over what period of time?**
9 A. Over a period of one year.
10 **Q. So as long as they sent enough**
11 **trains to buy 150,000 tons, Yelvington met**
12 **its obligation to Johnco; is that correct?**
13 A. Right.
14 **Q. Do you know in what weeks Johnco**
15 **delivered 5,200 tons of number 67 gravel**
16 **to the rail side?**
17 A. In what weeks?
18 **Q. In what weeks of Johnco's operation.**
19 **Do you know if it happened in any week? I**
20 **think you have already told me that, yes,**
21 **you think it did.**
22 A. I don't know that.
23 **Q. Let's turn, if we could, please, to**

Page 180

1 3.1. 3.1 references 150,000 tons, tonnage
2 requirement; correct?
3 A. I'm not sure if we're on the same
4 document.
5 **Q. Look at page 2 of the supply**
6 **agreement. I just skipped ahead a little**
7 **bit. 3.1 gives you part of a sentence on**
8 **page 1, and then moves to page 2.**
9 A. Okay.
10 **Q. Do you see the very first words on**
11 **page 2 say "150,000 tons annually";**
12 **correct?**
13 A. Uh-huh.
14 **Q. Is that a "yes"?**
15 A. Yes, I see that.
16 **Q. And that is the 150,000 ton**
17 **requirements you're talking about;**
18 **correct?**
19 A. Yes.
20 **Q. I want you to skip down a little**
21 **bit, a little bit over half, where it**
22 **talks about "Seller and buyer**
23 **acknowledging that the tonnage specified**

45 (Pages 177 to 180)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 181

1  above will be subject to rail car supply
2  and availability." Do you see that?
3  A.   Yes.
4  Q.   What is your understanding of what
5  that language meant?
6  A.   Well, it meant that if he didn't
7  have enough rail cars, that he wasn't
8  obligated to buy.
9  Q.   So he wasn't even obligated to buy
10 the 150,000 tons if he didn't have enough
11 rail cars; or if rail cars weren't
12 available, is what it says. Correct?
13 A.   Right.
14 Q.   In your experience in the sand and
15 gravel producing industry, what affects
16 the availability of rail cars?
17       MR. PEARSON: I object to the form.
18 A.   Well, would there be any other
19 definition than supply and demand?
20 Q.   Well, certainly supply and demand
21 affects it. But what other factors would
22 affect it, if you know?
23 A.   I'm not sure that's within what I'm

Page 182

1  knowledgeable about. In this discussion
2  there was information from someone that
3  Gary had oodles of rail cars, several
4  thousand. My assumption was that this
5  wouldn't be a problem. Maybe naively, but
6  that's what I assumed.
7  Q.   Fair enough. Just to close the loop
8  on this, we talked about it a little bit
9  earlier, the title under the supply
10 agreement, if you look at section 3.2.
11 The title to the gravel doesn't actually
12 pass to Yelvington until it is loaded on
13 the rail cars or other transportation
14 vehicles; correct?
15 A.   Right.
16 Q.   So it's Johnco's responsibility to
17 make sure that those cars get loaded?
18 A.   Right.
19 Q.   And if they don't get loaded, it's
20 not Yelvington's material; correct?
21 A.   Right.
22 Q.   Do you know of any time that
23 Yelvington failed to make payment for

Page 183

1  number 67 gravel within the time permitted
2  by this agreement?
3  A.   I don't know that.
4  Q.   That's fair enough. To your
5  knowledge, was this agreement ever
6  modified?
7  A.   No.
8  Q.   During the course of your time with
9  Johnco, did you ever send notice to
10 Yelvington of anything, breach or
11 otherwise?
12 A.   No.
13     (Whereupon, at this time a short
14 break was taken.)
15     MR. LEEK: We're back on the record.
16 I don't have anything further for you,
17 Mr. Johnston.
18     MR. PEARSON: I don't have any
19 questions for the witness at this time.
20     FURTHER DEPONENT SAITH NOT.
21
22
23

Page 184

1       C E R T I F I C A T E
2
3  STATE OF ALABAMA)
4  JEFFERSON COUNTY
5
6       I hereby certify that the above and
7  foregoing deposition was taken down by me
8  in stenotype and the questions and answers
9  thereto were reduced to typewriting under
10 my supervision and that the foregoing
11 represents a true and correct record of
12 the testimony/evidence given by the
13 deponent.
14       I further certify that I am neither of
15 counsel nor of kin to any of the parties to the
16 action, nor am I in anywise interested in the results
17 of said cause.
18
19
20
21
22
23     Donna L. Winters, Commissioner

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# EXHIBIT 4

# FREEDOM COURT REPORTING

Page 1

1  IN THE UNITED STATES DISTRICT COURT
2  FOR THE MIDDLE DISTRICT OF ALABAMA
3  CASE NUMBER
4  CV-06-2:06CV993-10
5
6  JOHNCO MATERIALS, INC.,
7  PLAINTIFF,
8  VS.
9  CONRAD YELVINGTON
10  DISTRIBUTORS, INC.,
11  DEFENDANT.
12
13  DEPOSITION OF:
14  JAMES BENJAMIN JOHNSTON
15
16  S T I P U L A T I O N
17  IT IS STIPULATED AND AGREED by and
18  between the parties through their
19  respective counsel, that the deposition of
20  JAMES BENJAMIN JOHNSTON, may be taken
21  before Donna Winters, Commissioner and
22  Notary Public, State of Alabama at Large,
23  at the law offices of Junkin, Pearson,

Page 2

1  Harrison & Junkin, 600 Greensboro Avenue,
2  Suite 601, Tuscaloosa, Alabama 35401, on
3  the 24th day of July 2007 commencing at
4  2:30 p.m.
5  DEPOSITION OF: JAMES BENJAMIN JOHNSTON
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

Page 3

1  IT IS FURTHER STIPULATED AND AGREED
2  that the signature to and the reading of
3  the deposition by the witness is reserved,
4  the deposition to have the same force and
5  effect as if full compliance had been had
6  with all laws and rules of Court relating
7  to the taking of depositions.
8  IT IS FURTHER STIPULATED AND AGREED
9  that it shall not be necessary for any
10  objections to be made by counsel as to any
11  questions, except as to form or leading
12  questions, and that counsel for the
13  parties may make objections and assign
14  grounds at the time of the trial, or at
15  the time said deposition is offered in
16  evidence or prior thereto.
17  IT IS FURTHER STIPULATED AND AGREED
18  that notice of filing of this deposition
19  by the Commissioner is waived.
20
21
22
23

Page 4

1  E X H I B I T S
2  EXHIBIT PG DESCRIPTION
3  DX-17 *** ***
4  DX-18 *** ***
5  DX-19 *** ***
6
7  I N D E X
8  EXAMINATION BY:   PAGE NUMBER
9  Mr. Leek        6 - 138
10
11
12  A P P E A R A N C E S:
13  MR. THOMAS J. LEEK, Attorney at Law,
14  150 Magnolia Avenue, Daytona Beach,
15  Florida 32115-2491, appearing for the
16  Plaintiff.
17  JUNKIN, PEARSON, HARRISON & JUNKIN,
18  by Mr. H. Gregory Pearson, Alston Place,
19  600 Greensboro Avenue, Suite 601,
20  Tuscaloosa, Alabama 35401, appearing for
21  the Defendant.
22  ALSO PRESENT: Clatus Junkin and
23  Phillip Holladay.

1 (Pages 1 to 4)

# FREEDOM COURT REPORTING

Page 5

1    I, Donna Winters, a Court Reporter
2  of Birmingham, Alabama, acting as
3  Commissioner, and a Notary Public for the
4  State of Alabama at Large, certify that on
5  this date, as provided by Rule 30 of the
6  Alabama Rules of Civil Procedure, and the
7  foregoing stipulation of counsel, there
8  came before me, JAMES BENJAMIN JOHNSTON,
9  witness in the above cause, for oral
10  examination, whereupon the following
11  proceedings were had:
12
13    JAMES BENJAMIN JOHNSTON,
14  having been first duly sworn, was examined
15  and testified as follows:
16
17    COURT REPORTER: Usual stipulations?
18    MR. PEARSON: It will be usual
19  stipulations, reserve the right to read
20  and sign. And in regard to my comments
21  about the objection to the 30(b)
22  designation that you did earlier, I'm
23  carrying it forward into this deposition.

Page 6

1  the exact same thing I said. Certainly
2  Mr. Johnston here can testify from
3  personal knowledge and will have personal
4  knowledge about a lot of the things you
5  can ask. You ask whatever questions you
6  want.
7    MR. LEEK: Fair enough.
8
9  EXAMINATION BY MR. LEEK:
10  **Q.  Are you ready to begin, sir?**
11  A.  I guess so.
12  **Q.  As ready as you can be; huh? Can**
13  **you state your full name for the record,**
14  **please?**
15  A.  James Benjamin Johnston.
16  **Q.  And are you the brother of Pep**
17  **Johnston?**
18  A.  Yes.
19  **Q.  Thank you. Mr. Johnston, let me ask**
20  **you a couple of background questions here**
21  **about your involvement in litigation.**
22  **Have you ever given a deposition before?**
23  A.  Yes, sir.

Page 7

1  **Q.  How many times have you given a**
2  **deposition?**
3  A.  Once, I think.
4  **Q.  And what was that matter regarding?**
5  A.  In regards to an estate.
6  **Q.  Were you the plaintiff or defendant**
7  **in that matter?**
8  A.  I don't think I was a -- I don't
9  know. It involved a family affair.
10  **Q.  Fair enough. Unrelated to Johnco in**
11  **any way, I assume?**
12  A.  That's right, sir.
13  **Q.  Well, the rules are going to be**
14  **largely the same. I'm going to ask you**
15  **questions, and you're going to be required**
16  **to give answers to those questions. If**
17  **you hear an objection, stop your answer.**
18  **We'll resolve the objection, and then**
19  **you're going to get an instruction about**
20  **how to continue; okay?**
21  A.  Fair enough.
22  **Q.  Wait for me to finish my question**
23  **before you start your answer, or she's**

Page 8

1  going to get mad at us because she can't
2  take them both down at the same time. Do
3  **you understand that?**
4  A.  Yes, sir.
5  **Q.  I also need you to give your answers**
6  **verbally, so tell me "yes" or "no" and**
7  **avoid "uh-huh" or "huh-uhs." Fair enough?**
8  A.  Yes.
9  **Q.  Let's start by making sure we're all**
10  **talking about the same people here. What**
11  **I'm going to do is, I'm going to give you**
12  **the name of a person or entity, and you**
13  **tell me who that person or entity is,**
14  **briefly, in relationship to Johnco and**
15  **this lawsuit; okay?**
16  A.  Yes, sir.
17  **Q.  Who is Conrad Yelvington**
18  **Distributors, Inc.?**
19  A.  Well, it's a company out of
20  Jacksonville, Florida that Johnco had a
21  contract with on gravel.
22  **Q.  That's a supply agreement that is**
23  **the center of this litigation; is that**

2 (Pages 5 to 8)

# FREEDOM COURT REPORTING

Page 9

1 correct?
2 A. I think so.
3 Q. And you're going to hear me refer to
4 Conrad Yelvington Distributors, Inc. as
5 many things. Yelvington Distributors is
6 one. Sometimes I'll say CYDI, and
7 sometimes I'll just refer to them as
8 Yelvington. You understand, when I say
9 those things, that I'm referring to the
10 company; is that correct?
11 A. Correct.
12 Q. Who is Gary Yelvington?
13 A. He is the son of Conrad Yelvington,
14 and I assume that he is president of the
15 company now.
16 Q. And that is the Yelvington Company;
17 correct?
18 A. Yes, sir.
19 Q. One of the other things that we've
20 got to avoid in depositions is pronouns;
21 okay? And so we need to make sure we are
22 identifying who the parties are that are
23 talking. Instead of saying "he" or "him"

Page 10

1 or "it," we just need to make sure we
2 identify them; okay?
3 A. Yes, sir.
4 Q. Who is Mark Klebe?
5 A. He works for Conrad Yelvington
6 Distributing Company. I think he's an
7 accountant.
8 Q. Did you ever have any interaction
9 with Mr. Klebe?
10 A. Not a whole lot. I think when I
11 went to Florida back in 2003, I met him.
12 That's about the only --
13 Q. Fair enough. Who is Phillip
14 Holladay?
15 A. At the time he was a consultant for
16 Conrad Yelvington Distributing Company.
17 Q. You understood his relationship was
18 through Yelvington; is that correct?
19 A. Yes, sir.
20 Q. Who is Clatus Junkin?
21 A. He was a partner and now the sole
22 owner of Johnco Materials.
23 Q. Who is Pep Johnston?

Page 11

1 A. He's my brother.
2 Q. Was he also previously an owner of
3 Johnco?
4 A. Yes, sir.
5 Q. What is Johnco Materials?
6 A. It's a corporation that my brother
7 and I formed to pursue this.
8 Q. By "this," you mean the business
9 endeavor; correct?
10 A. Yes, sir.
11 Q. I meant to ask your brother this,
12 but do you know what the corporate
13 organization is for Johnco; is it a C
14 corporation, a subchapter S
15 A. I think it's just a straight
16 corporation.
17 Q. An L.L.C.? Do you know what type of
18 corporation it is?
19 A. It's not an L.L.C.
20 Q. All right. That's enough. When I
21 refer to Johnco today, I'm talking about
22 the company Johnco Materials. Do you
23 understand that?

Page 12

1 A. Yes, sir.
2 Q. Okay. Thank you. What is your
3 current address?
4 A. Where I live?
5 Q. Yes, sir.
6 A. 21 Pinecrest Lane, Monroeville,
7 Alabama 36460.
8 Q. Does anyone live there with you?
9 A. My wife.
10 Q. How long have you lived there?
11 A. Since about 1970. I could be off
12 some on that, now.
13 Q. Any plans to move anytime soon?
14 A. No, sir.
15 Q. If you could, tell me your
16 experience in the sand and gravel
17 producing industry.
18 A. Well, my father was in the sand and
19 gravel business, B.F. Johnston. I started
20 working at a sand and gravel plant with
21 him in 1953. When I wasn't in school or
22 in the Army or something, I worked in sand
23 and gravel some form of mining most of

3 (Pages 9 to 12)

# FREEDOM COURT REPORTING

Page 13

1  the time since then.
2  Q.  Do you have any degrees or
3  certifications that relate to the sand and
4  gravel mining business?
5  A.  Nothing other than I have a degree,
6  a B.S. in mechanical engineering.
7  Q.  Are you employed now?
8  A.  Yes, sir.
9  Q.  Where are you employed?
10 A.  Johnco Materials.
11 Q.  What do you do for Johnco Materials?
12 A.  I'm general manager at the plant.
13 Q.  Is Johnco Materials still operating?
14 A.  Yes, sir.
15 Q.  Is it still taking gravel out of
16 ground?
17 A.  Yes, sir.
18 Q.  Well, what are the product mixes
19 that Johnco is taking out of the ground
20 now?
21 A.  Well, we're taking sand and gravel.
22 Right now we're producing 57 gravel.
23 Well, overall the gravel is about 45

Page 15

1  to anyone right now?
2  A.  We're in the process of furnishing a
3  substantial -- not a substantial amount --
4  to somebody to make sure it will work for
5  crushing for asphalt.
6  Q.  Is the answer to my question "yes,"
7  you're selling it now, or you intend to
8  sell it in the future?
9  A.  We have some loaded on train cars
10 waiting to be shipped out.
11 Q.  To whom is that being shipped?
12 A.  I think it's Dunn Construction
13 Company.
14 Q.  Where are they located?
15 A.  In Mississippi.
16 Q.  Do you know what purpose they intend
17 to use that for?
18 A.  They intend to crush it for asphalt.
19 That's my understanding.
20 Q.  Have you sold any number 57 gravel
21 since October of 2006 to any person
22 intending to use it for ready-mix
23 concrete?

Page 14

1  percent, and sand would be about 55
2  percent. 97 percent, I believe, of the
3  gravel that is coming out is number 57
4  gravel, and the other 3 percent is an
5  oversize product.
6  Q.  Can you tell me what the uses are
7  for 57 gravel, what you understand them to
8  be?
9  A.  Well, it can be used in ready-mix
10 concrete, or it could be crushed for
11 asphalt.
12 Q.  Anything else?
13 A.  Well, people buy small amounts of it
14 to put on a driveway or something.
15 Q.  Are you familiar with number 67
16 gravel?
17 A.  Yes, sir.
18 Q.  What are the uses for number 67
19 gravel, that you know of?
20 A.  I don't know if it can be crushed
21 for asphalt, but it could definitely be
22 used in ready-mix concrete.
23 Q.  Is Johnco selling number 57 gravel

Page 16

1  A.  We haven't sold any 57 to anybody.
2  We sold some 67.
3  Q.  That was my next question. Just so
4  I can make sure I have closed this loop
5  here, since October of 2006, Johnco has
6  not sold any number 57 gravel to anyone;
7  is that correct?
8  A.  That's correct.
9  Q.  Have you supplied it to anyone?
10 A.  No, sir.  We haven't produced it.
11 Q.  Haven't produced it since October of
12 2006?
13 A.  We haven't produced any 57 until
14 recently.
15 Q.  Thank you.  This is one of those
16 things I need you to let me finish my
17 question, so it will come across right in
18 the transcript.  Again, just to clarify,
19 since October of 2006, Johnco has not
20 produced any number 57 gravel at all?
21 A.  Until recently.
22 Q.  When did Johnco begin producing
23 number 57 gravel?

4  (Pages 13 to 16)

# FREEDOM COURT REPORTING

Page 17

1  A.  Probably within the last month.
2  Q.  And did you begin producing number
3  57 gravel for any particular customer?
4  A.  Yes, sir.
5  Q.  And who was that customer?
6  A.  Dunn.
7  Q.  Between October of 2006 and present,
8  has Johnco produced any number 67 gravel?
9  A.  I don't know the exact date that we
10  shut down; but, no, we did not produce any
11  67 after we shut down sometime, I believe,
12  in November.
13  Q.  So do I understand that Johnco has
14  not produced any number 67 gravel since
15  shutting down?
16  A.  Yes, sir.
17  Q.  When did Johnco shut down?
18  A.  I don't know the exact date. I
19  think it was sometime in November of last
20  year, '06.
21  Q.  Have you remained continuously
22  employed with Johnco --
23  A.  Yes, sir. Excuse me.

Page 18

1  Q.  -- since you started working there?
2  A.  Yes, sir.
3  Q.  Back in, I guess, 2004-ish?
4  A.  Yes.
5  Q.  And what were you doing during the
6  time that Johnco was shut down?
7  A.  I don't remember exactly what all I
8  did do. We sold some 67 that we had left.
9  Q.  You're still going in to the
10  operation every day, even though the
11  mining function is shut down; is that
12  correct?
13  A.  Yes, sir, pretty much.
14  Q.  To whom have you sold 67 since the
15  mine shut down?
16  A.  Most of it we sold, most of the 67
17  sold to an outfit, B&H Concrete, in
18  Flomaton. Wait a minute. Maybe Florala,
19  Alabama.
20  Q.  Do you keep records of those sales?
21  A.  We make a ticket out on every load.
22  Q.  Do you keep any other records of the
23  sales? Are there any other records that

Page 19

1  those sales would be indicated on?
2  A.  I don't know any.
3  Q.  Well, do you know anyone who does?
4  A.  Well, they have to be sent in to the
5  office in Fayette.
6  Q.  And what office is that?
7  A.  The Johnco Materials office now.
8  Q.  Johnco Materials has an office in
9  Fayette?
10  A.  I don't know whether they have an
11  office or not. They have an accountant,
12  and Mr. Junkin has a law office there. We
13  actually send them, I believe, to the
14  accountant's office.
15  Q.  And what you send are the invoices;
16  is that correct?
17  A.  We do send a copy.
18  Q.  Do you send any other documents to
19  the accountant?
20  A.  I don't think so.
21  Q.  How frequently do you send the
22  invoices to the accountant?
23  A.  Oh, depending on whether we're

Page 20

1  selling anything or not. We may send them
2  only once a month.
3  Q.  Does that indicate that you send
4  invoices whenever there's a sale?
5  A.  Not every time there's a sale, no,
6  sir.
7  Q.  Is there any scheduled time in which
8  you have to send invoices?
9  A.  No, sir.
10  Q.  How do you determine when it's time
11  to send any invoices to the accountant?
12  A.  I don't know.
13  Q.  Well, at some point in time you
14  decide to send them; right?
15  A.  Yes, sir.
16  Q.  Does the accountant tell you that
17  it's time to send them?
18  A.  No, sir.
19  Q.  So what triggers sending the
20  invoices to the accountant?
21  A.  I don't know.
22  Q.  Do you make that decision?
23  A.  Sometimes.

5 (Pages 17 to 20)

# FREEDOM COURT REPORTING

Page 21

1 **Q. Who else would make that decision?**
2 A. Well, if they happen to call me and
3 want the invoices, I'll send them.
4 **Q. Fair enough. What is the name of**
5 **the accountant?**
6 A. Her first -- well, the actual
7 accountant is Rick McCabe, I believe. I
8 deal mostly with a lady in the office
9 named Rita, if I talk to her. I don't
10 know what her last name is.
11 **Q. Do you know the name of the**
12 **accounting firm?**
13 A. Rick McCabe & Associates, or
14 something, I believe, like that.
15 **Q. Fair enough. Have you sold number**
16 **67 gravel since the shutdown to any other**
17 **person or entity, other than B&H Concrete?**
18 A. Yes, sir.
19 **Q. Who else?**
20 A. I sold some to Scott Callen Sand and
21 Gravel.
22 **Q. Where are they out of?**
23 A. That is in Lowndesboro, Alabama. I

Page 22

1 sold some to a county commissioner down
2 there named Charlie King, and a couple of
3 small septic tank installers. That is
4 pretty much it.
5 **Q. Do you recall the name of anyone**
6 **else that you would have sold number 67**
7 **gravel to?**
8 A. There's a Calvin -- I don't know
9 what the name of the company is, Calvin
10 Materials or something. And I can't think
11 of the name of the two septic tank
12 installers.
13 **Q. Where are they located?**
14 A. This Calvin fellow is on Highway 80
15 there in Lowndesboro, and I believe both
16 of the septic tank installers are in
17 Hayneville, Alabama. One of them's name
18 is David Fails. A man that works for the
19 other fellow is Scott. It's not Scott
20 Callen; it's Scott something else.
21 **Q. Do you have invoices for all these**
22 **sales?**
23 A. Yes, sir.

Page 23

1 **Q. Was the price to each one of these**
2 **people the same?**
3 A. No, sir.
4 **Q. Does the invoice reflect the price?**
5 A. It should. I believe it does.
6 **Q. What else is on your typical**
7 **invoice?**
8 A. Well, it will have a date, who it
9 was sold to, what it is, how many tons;
10 and then it has their signature on it and,
11 of course, the price, what it is; and
12 sometimes a customer, if he's hauling with
13 several different trucks, he will want his
14 truck numbers on there.
15 **Q. Does it indicate who the salesperson**
16 **was?**
17 A. No, sir.
18 **Q. Are you the salesperson?**
19 A. We really don't have a salesperson.
20 **Q. That's kind of what I'm after. If**
21 **there's a sale to be made, are you the one**
22 **that is going to handle it?**
23 A. If a customer comes in there, the

Page 24

1 loader operator handles it. We do not
2 have a salesperson at the plant, as such.
3 **Q. When did Johnco begin mining product**
4 **out of the ground again?**
5 A. We actually started producing some
6 more 67 -- first of all, we sold what we
7 had left over last fall, last November.
8 **Q. Who did you sell that to?**
9 A. B&H.
10 **Q. They took the whole thing?**
11 A. No, sir. Some of these other
12 customers that I just mentioned bought
13 some of that; and then we produced some
14 more 67, probably started two or three
15 months ago.
16 **Q. Was that roughly April or May of**
17 **2007 you began producing 67 again?**
18 A. Yes, sir.
19 **Q. When did you begin producing 57?**
20 A. Two or three weeks ago.
21 **Q. How do you determine whether you're**
22 **going to produce 57 or 67?**
23 A. Do you mean by Clatus telling me

6 (Pages 21 to 24)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 25

1  what he wants me to produce, or do you
2  mean how I change the plant up to produce
3  the different ones?
4  Q.  Well, I probably mean both, but my
5  ignorance doesn't allow me to ask the
6  question more specifically. Let me ask it
7  this way. The mine at Whitehall, is that
8  capable of producing either 67 or 57?
9  A.   Yes, sir, with a slight change on
10  the plant.
11  Q.  And what change is that?
12  A.   Change the screen.
13  Q.  Is 57 smaller or larger?
14  A.   Larger.
15  Q.  So you change the screen, and it
16  screens out the 67?
17  A.   No, sir.
18  Q.  It screens out the 57?
19  A.   We change the screen such that we
20  screen out the stuff that can't be
21  included. It takes a smaller screen to
22  make 67. In other words, you take out
23  more when you make 67 than when you make

Page 26

1  57. You put a bigger screen on to make
2  57. on the top. You can leave your bottom
3  screens the same.
4  Q.  So is 67 a byproduct, for lack of a
5  better term, of 57?
6  A.   I wouldn't say it was a byproduct.
7  Q.  What would you say it was?
8  A.   Just a different product.
9  Q.  Kind of what I'm after here is, if
10  you're producing 57, are you producing
11  some 67 necessarily?
12  A.   No, sir. It would be possible to do
13  that but impractical.
14  Q.  What would make that impractical?
15  A.   Well, you would have to have a much
16  more complicated plant.
17  Q.  I think you're the guy to explain
18  this to me. Again, forgive my ignorance.
19  When the dredge starts pulling up product,
20  is it pulling up both 67 and 57?
21  A.   It's all one and the same part of
22  it.
23  Q.  When the dredge pulls up the

Page 27

1  product, how is it then turned into the
2  appropriate size for sale?
3  A.   You run it across a three-deck
4  screen, and it separates it into three
5  different sizes, so it actually makes four
6  separations. It has a top screen, big
7  stuff; next screen, middle size stuff;
8  bottom screen, smaller gravel; and then
9  the stuff that goes through the bottom of
10  the screen is sand.
11  Q.  So when you set one of the middle
12  screens to catch 57 --
13  A.   I didn't say that.
14  Q.  Well, I thought you told me that you
15  adjust the screens to get 57.
16  A.   You do.
17  Q.  How does that work? I'm just trying
18  to understand the process here. It will
19  help us go quicker. Tell me how it works
20  that you end up with one size gravel as
21  opposed to another.
22  A.   By different screen sizes.
23  Q.  So if you want to get 57, you put a

Page 28

1  57 screen size in; is that right?
2  A.   Not exactly.
3  Q.  Well, can you explain it to me?
4  A.   How much detail do you want?
5  Q.  Well, as much as you think is
6  necessary to get through to me.
7  A.   We ain't got time. No, I'm just
8  joking.
9  Q.  I understand.
10  A.   You have a three-deck screen.
11  Normally, the way this is set up, the
12  middle screen is used mainly to keep too
13  much material from getting on the small
14  screen. If you get too much on there, it
15  will not do a good job of screening. The
16  top deck, to make 67 we had a
17  seven-eighths screen opening on it; and
18  the middle one, we had a three-eighths;
19  and the bottom one, we had a
20  three-sixteenths. The middle deck mainly
21  was to keep the load off the bottom deck;
22  and if you screen it on the top deck with
23  a seven-eighths, you can take and mix the

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 29

1  two off the bottom two decks together, and
2  that will make 67. You can put a bigger
3  screen on top, like an inch-and-a-half,
4  instead of a seven-eighths, and then you
5  can mix everything that goes through that
6  and stops on the three-eighths screen and
7  everything that stops on the
8  three-sixteenths screen back together, and
9  you've got 57.
10 **Q.   I think I understand as well as I'm**
11 **able to today. Are you currently selling**
12 **any sand?**
13 A.   Off and on.
14 **Q.   Have you sold any sand since the**
15 **shutdown?**
16 A.   Yes, sir.
17 **Q.   How much sand would you estimate**
18 **that you've sold since the shutdown?**
19 A.   Somewhere between twelve and fifteen
20 thousand tons.
21 **Q.   Do you know the name of the**
22 **customers that you've sold sand to since**
23 **you shut down?**

Page 30

1  A.   We've sold it to Scott Callen Sand
2  and Gravel Company.
3  **Q.   Anyone else?**
4  A.   We've sold some to Benton Farms, and
5  I think we sold one load to David Fails
6  Septic Tank.
7  **Q.   Say that last name for me again.**
8  A.   Fails, F-A-I-L-S, I believe.
9  **Q.   I want to step back in time here a**
10 **bit. Did you have any role at all in**
11 **obtaining financing for Johnco Materials**
12 **at its inception?**
13 A.   I signed a bunch of notes.
14 **Q.   Other than that?**
15 A.   Like what?
16 **Q.   Did you meet with the banks?**
17 A.   I think so.
18 **Q.   Were you involved in presentations**
19 **to the bank of the application or Johnco's**
20 **business plan, or anything like that?**
21 A.   I don't believe so.
22 **Q.   Do you recall which banks you met**
23 **with?**

Page 31

1  A.   Well, my brother and I first talked
2  to First National Bank in Aliceville, and
3  also the West Alabama Bank & Trust
4  Company.
5  **Q.   Do you recall talking to any other**
6  **banks, personally?**
7  A.   I think we talked to another one in
8  Tuscaloosa. That might have been West
9  Alabama Bank & Trust Company, may have
10 been over there. We may have talked to
11 them there, but I think it was a different
12 company, but I don't know which one.
13 **Q.   Prior to purchasing the land at**
14 **Whitehall, did you ever prepare a business**
15 **model?**
16 A.   No, sir.
17 **Q.   Did you ever prepare any cost**
18 **analysis?**
19 A.   Well, my brother and I discussed
20 them.
21 **Q.   Did you ever prepare and put that**
22 **down on a document somewhere?**
23 A.   I don't believe so.

Page 32

1  **Q.   Did you ever prepare a cash flow**
2  **analysis?**
3  A.   A tax flow?
4  **Q.   Cash flow.**
5  A.   Excuse me. I don't believe so. I'm
6  not sure.
7  **Q.   Did you ever prepare an income**
8  **analysis?**
9  A.   No. Pep might have discussed it.
10 He handled that part of the business.
11 **Q.   That's kind of what I'm trying to do**
12 **here, is figure out who knows what. If**
13 **you don't know about it, I'm going to set**
14 **it aside. Did you ever see any documents**
15 **that would have contained any of those**
16 **things I said; a business model, cash flow**
17 **analysis, cost analysis, income analysis,**
18 **et cetera?**
19 A.   I'm not sure.
20 **Q.   To give a time frame for you, I'm**
21 **talking about before you purchased the**
22 **property. Does that change your answer at**
23 **all?**

8 (Pages 29 to 32)

# FREEDOM COURT REPORTING

Page 33

1   A.   No, sir.
2   Q.   So you can't tell me whether you
3   have or haven't seen one of those; is that
4   correct?
5   A.   That's correct.
6   Q.   Did you ever provide documents to
7   any person that you intended to show the
8   viability of Johnco?
9   A.   I didn't prepare any.
10  Q.   I didn't say prepare. I said
11  provide.
12  A.   Excuse me. I'm not sure.
13  Q.   You don't have any recollection of
14  that?
15  A.   No, sir.
16  Q.   Do you know if any of those
17  documents exist?
18  A.   No, sir, I do not.
19  Q.   It's just not part of what you did;
20  is that correct?
21  A.   No, sir.
22  Q.   Prior to the shutdown, immediately
23  prior, how many employees did Johnco have?

Page 34

1   A.   Immediately prior? I think we had
2   eight back in August, and we were probably
3   down to six or seven at the time we shut
4   down.
5   Q.   And what happened to those employees
6   at the time that you shut down?
7   A.   I think all but -- prior to the
8   shutdown?
9   Q.   At the time of the shutdown.
10  A.   Okay. All but two of us were laid
11  off.
12  Q.   Does Johnco keep records of the
13  employees who work there?
14  A.   I'm sure they do.
15  Q.   Do you keep those?
16  A.   I don't keep a written record of it,
17  but I know personally every one of them.
18  Q.   Sure. But sometimes you've got to
19  keep records to report to the government,
20  et cetera. Does Johnco keep those type of
21  pay records?
22  A.   I'm sure they do.
23  Q.   But that's not part of what you do;

Page 35

1   is that correct?
2   A.   That's correct.
3   Q.   Were there any people who were
4   performing services for Johnco that Johnco
5   didn't classify as employees, up to the
6   point of the shutdown? Do you understand
7   what I'm asking?
8   A.   No, sir.
9   Q.   Sometimes we call them employees,
10  sometimes we call them independent
11  contractors, but they all do basically the
12  same thing.
13  A.   We did not use independent
14  contractors to do regular work. We might
15  hire a welder to come in that would be an
16  independent contractor. Not might, we
17  did.
18  Q.   And that is for just a specific job;
19  is that correct?
20  A.   Yes, sir.
21  Q.   So you didn't hire a welder as an
22  independent contractor to work
23  continuously for Johnco; is that correct?

Page 36

1   A.   No, sir.
2   Q.   That's what I'm asking. I'm not
3   interested in those people who came in to
4   do a specific repair or a specific job.
5   I'm interested in anybody you may have had
6   a continuing relationship with that you're
7   not classifying as employees. Were there
8   any of those?
9   A.   No, sir.
10  Q.   Do you know where the records of
11  employees are kept?
12  A.   The records would be kept at the
13  office in Fayette, at the accountant's
14  office.
15  Q.   Thank you. Prior to the purchase of
16  the property, had you or anyone at Johnco
17  developed a mining plan?
18  A.   Prior to the purchase of the
19  property? No, we probably did that after
20  the purchase of the property.
21  Q.   At what point after you purchased
22  the property did Johnco develop a mining
23  plan?

9 (Pages 33 to 36)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 37

1  A.  Well, we hired an engineer, Robert
2  English, and began working on it. I'm not
3  exactly sure what you mean by "a mining
4  plan." This is a mining plan you present
5  to ADEM to get permission to mine.
6  **Q.  And what is contained in that plan?**
7  **What information is contained in that**
8  **plan?**
9  A.  How you're going to proceed to mine
10  it, what you're going to do with the waste
11  water, where you're going to mine exactly,
12  what steps are you going to go through to
13  mine it, what steps are you going to go
14  through to reclaim the land after you're
15  through with it.
16  **Q.  Does it also include information**
17  **about how much product you intend to**
18  **produce?**
19  A.  No, sir. Not that plan, no.
20  **Q.  What was the entity that you said**
21  **you give that to; is it ADEM?**
22  A.  You present a plan to ADEM to get
23  permission.

Page 38

1  **Q.  Tell me what that is.**
2  A.  Alabama Department of Environmental
3  Management.
4  **Q.  Thank you. Do you know of any other**
5  **mining plan than the one you presented to**
6  **ADEM?**
7  A.  As far as what?
8  **Q.  Well, a plan to mine.**
9  A.  I'm not understanding your question.
10  I'm sorry.
11  **Q.  Well, I appreciate that. You knew**
12  **what I meant by "mining plan" when we**
13  **talked about what is presented to ADEM.**
14  **Is there anything similar to that, that**
15  **you present to anyone else?**
16  A.  Not to present to another agency,
17  no, sir.
18  **Q.  Do you know if Johnco prepared any**
19  **mining plans similar to that at any point**
20  **in time, since you've been associated with**
21  **them?**
22  A.  Similar to that, no, sir.
23  **Q.  Do you know of any marketing plan**

Page 39

1  **that Johnco has prepared, at any point in**
2  **time?**
3  A.  The only marketing plan we had,
4  basically, was a contract with Conrad
5  Yelvington Distributing Company to buy
6  150,000 tons of gravel a year, number 67
7  gravel a year.
8  **Q.  Do you know what Johnco anticipated**
9  **the product mix would be at the time that**
10  **they entered into that supply agreement**
11  **with Yelvington?**
12  A.  Approximately the figures that I
13  gave you.
14  **Q.  I'm trying to remember what those**
15  **are now.**
16  A.  45 percent gravel, 55 percent sand;
17  and of the 45 percent gravel, some 80 -- I
18  believe I said 80 percent. 80 to 85
19  percent of the 45 percent would be 67
20  gravel.
21  **Q.  What was Johnco's plan with regard**
22  **to disposing of the sand when it entered**
23  **into the supply agreement?**

Page 40

1  A.  Well, we were trying to sell it to,
2  one was an outfit, Lafarge, a ready-mix
3  company.
4  **Q.  What ready-mix company?**
5  A.  Lafarge.
6  **Q.  Oh, Lafarge is the ready-mix company**
7  **you're talking about?**
8  A.  Lafarge, L-A-F-A-R-G-E.
9  **Q.  I understand. I just wanted to make**
10  **sure that Lafarge and the ready-mix**
11  **company you're talking about are one and**
12  **the same.**
13  A.  Yes, sir.
14  **Q.  And you had planned to do that at**
15  **the time that Johnco entered the supply**
16  **agreement; is that correct?**
17  A.  I don't know at what point. We just
18  had plans to try to sell some sand. Sand
19  was not a big part of our plans at all.
20  **Q.  But it's 55 percent of what you**
21  **produce; correct?**
22  A.  Yes, sir.
23  **Q.  So you had to make some plans for**

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 41

1  what to do with the sand; right?
2  A.    Well, you either sell it or you
3  dispose of it.
4  Q.    What was your plan at the point that
5  you entered the supply agreement with
6  regard to disposing of it if you couldn't
7  sell it?
8  A.    Well, you could pump it into a waste
9  area; you can run it back in the pit that
10  you dig.
11  Q.    I understand those are all things
12  that could be done, but what was the plan
13  when you entered the supply agreement?
14  A.    The plan was to try to sell it.
15  Q.    Prior to the shutdown, was Johnco
16  able to sell any sand?
17  A.    Very little.
18  Q.    Was it ever able to sell sand to
19  Lafarge?
20  A.    No, sir.
21  Q.    Were you dealing with Lafarge with
22  regard to selling that sand?
23  A.    I may have talked to -- my brother

Page 42

1  handled Lafarge. I may have talked to
2  somebody else. I don't know.
3  Q.    Do you recall any other customers to
4  whom you tried to sell sand between the
5  time that you entered the supply agreement
6  and the shutdown?
7  A.    No, sir.
8  Q.    What about the oversize gravel, what
9  was Johnco's plan to deal with the
10  oversize gravel at the time it entered the
11  supply agreement? Sir, it may be that you
12  don't know; and if it is, just tell me
13  that, and I'll stop asking the questions.
14  But if you do, let me know what you know.
15  A.    I don't think we had a plan, as
16  such. We did wind up selling some of it.
17  Q.    Did you make the decision to shut
18  down the plant?
19  A.    No, sir.
20  Q.    Did you ever tell Phillip Holladay,
21  or anyone at Yelvington, that if Johnco
22  couldn't sell some sand, they would have
23  to shut down?

Page 43

1  A.    No, sir.
2  Q.    Did you ever tell them if you
3  couldn't move sand, that you would have to
4  shut down?
5  A.    No, sir.
6  Q.    Do you remember having any
7  conversations with Phillip Holladay in
8  March of 2006, any conversations at all?
9  A.    I don't remember any specific
10  conversation with him about that. At that
11  time I talked to Phillip several times
12  during the period of time over the
13  telephone, but I don't remember what we
14  discussed.
15  Q.    Was Phillip Holladay your primary
16  contact with Yelvington?
17  A.    Yes, sir.
18  Q.    And how frequently did you have
19  contact with Phillip between the time of
20  the supply agreement, or when Phillip
21  comes on board actually, and the shutdown?
22  A.    How frequently?
23  Q.    Roughly.

Page 44

1  A.    I don't know. I might talk to him
2  once a week, once every two weeks. From
3  the time my brother and I sold our share
4  until the shutdown, I had none.
5  Q.    And when did you and your brother
6  sell your shares?
7  A.    I don't know exactly.
8  Q.    What year was that?
9  A.    Last year.
10  Q.    2006?
11  A.    Yes, sir.
12  Q.    Was it the first half of 2006 or the
13  last half?
14  A.    I think it was the first half.
15  Q.    Can you recall whether it was
16  January or June?
17  A.    It was not January.
18  Q.    Was it June?
19  A.    Could have been.
20  Q.    Could it have been February?
21  A.    No, sir.
22  Q.    How about March?
23  A.    I don't know.

11 (Pages 41 to 44)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 45

1  Q.   Sometime between March and June; is
2  that your best recollection?
3  A.   I don't know for sure.
4  Q.   That's fair enough. I'm just trying
5  to narrow it down. Did you receive any
6  compensation for your sale of your shares?
7  A.   Yes, sir.
8  Q.   What compensation was that?
9  A.   $25,000.
10 Q.   Did you receive that from Mr. Junkin
11 or from your brother?
12 A.   Well, I'm not sure who the check
13 came from. I think it went to my brother,
14 and he gave me my part of it.
15 Q.   At the point that you sold out your
16 shares, you owned 30 percent; is that
17 correct?
18 A.   Yes, sir. Not very much for two
19 years of work.
20 Q.   That's a good point. During that
21 two years of work, were you drawing a
22 salary?
23 A.   Yes, sir.

Page 46

1  Q.   Was your brother also drawing a
2  salary?
3  A.   I think during that period of time
4  he drew a salary for part of the time, and
5  then he quit.
6  Q.   When did he quit; do you know?
7  A.   I don't know, sir.
8  Q.   Did Mr. Junkin draw a salary during
9  that two-year period?
10 A.   I don't believe so.
11 Q.   And do you continue to draw a salary
12 now?
13 A.   Yes, sir.
14 Q.   Now, as I understand from your
15 brother's testimony, you're the guy who
16 was doing the hands-on, day-to-day
17 operations of Johnco; is that correct?
18 A.   Yes, sir.
19 Q.   As I understand it, that's true from
20 the point that you all start moving dirt
21 around to the point that the mine becomes
22 operational; is that correct?
23 A.   Yes, sir.

Page 47

1  Q.   At what point in time did the mine
2  become fully operational?
3  A.   As far as what, now?
4  Q.   Well, that's a good question. Let
5  me see if I can get at it this way.
6  Normally when a business starts up, they
7  have start-up issues. You've got to
8  figure out how you're going to do this,
9  and you've got to figure out how you're
10 going to do that. There's some period of
11 time before you get on stride.
12 A.   Okay. I understand.
13 Q.   At what point in time did the mine
14 get on stride? By that I mean become
15 fully operational.
16     MR. PEARSON: I object to the form.
17 Q.   You can answer.
18 A.   He objects, but I can answer?
19     MR. PEARSON: I objected to the
20 form. You can answer if you know.
21 A.   Well, I would say fully operational
22 to where we could produce good, clean
23 stuff, in February of '06.

Page 48

1  Q.   So in February of '06, the mine is
2  in operation where the material you're
3  pulling out is clean stuff that is going
4  to meet specs; correct?
5  A.   Yes, sir.
6  Q.   And you can pull it out on some kind
7  of regular consistent basis?
8  A.   Yes, sir.
9  Q.   In February of '06, how much number
10 67 gravel could the mine produce on, let's
11 say -- well, let's say in a month, how
12 much could it produce?
13 A.   It depends on how many hours a month
14 you want to run. The mine and the plant
15 is capable of maximum production of about
16 120 tons of 67 an hour, and about 20 tons
17 of oversize gravel.
18 Q.   An hour?
19 A.   Yes, sir. Then depending on how
20 much time you operate in a month, whatever
21 you need to operate. You obviously can't
22 run it twenty-four hours a day, and you
23 can't run it all the time. You're going

12  (Pages 45 to 48)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 49

1  to have some problems.
2  **Q.    What is a reasonable amount of time**
3  **to expect it to be run in a month period?**
4  A.    We would run it whatever amount of
5  time it took to get the job done.
6  **Q.    What was the job you were trying to**
7  **get done?**
8  A.    We were trying to be able to produce
9  150,000 tons a year; and I would think
10  that you would want to be capable, due to
11  the fluctuations in selling, to do twice
12  that much.  I think you could very easily
13  do that.
14  **Q.    So you think the mine could produce**
15  **300,000 tons of number 67; is that**
16  **correct?**
17  A.    If you operate it enough hours, yes,
18  sir.
19  **Q.    Now, is there some point in time**
20  **that you kind of lose your return on**
21  **investment there, or the law of**
22  **diminishing return some people call it?  I**
23  **would expect that if you run that type of**

Page 50

1  **equipment twenty-four hours a day, you**
2  **should expect more breakdowns.**
3      MR. PEARSON:  I object to the form.
4  I think he has already testified you
5  couldn't run it twenty-four hours a day,
6  and your question incorporates into its
7  premise that you have to operate it
8  twenty-four hours a day.  I am objecting
9  to that form.
10  **Q.    Do you understand what I'm saying,**
11  **sir?**
12  A.    No, sir, I have no idea.
13  **Q.    Well, let's go at it this way.  At**
14  **the time that the mine became fully**
15  **operational, did Johnco have a written**
16  **plan about how often to run the mine, I**
17  **mean how many hours to run in a given day?**
18  A.    No, sir, not any particular number
19  of hours.
20  **Q.    Do you know of any plan, written or**
21  **unwritten, of how many hours a day to run**
22  **the mine?**
23  A.    No, sir.

Page 51

1  **Q.    How about how many hours a week to**
2  **run the mine?**
3  A.    No, sir.
4  **Q.    How about how many hours a month to**
5  **run the mine?**
6  A.    No, sir.
7  **Q.    Do you recall specifically how many**
8  **hours a week the mine was running after it**
9  **first became fully operational?**
10  A.    No, sir.
11  **Q.    Do you have any records of**
12  **production that would tell me "This week**
13  **we ran the operation 75 hours"?**
14  A.    No, sir.
15  **Q.    Can you tell me how many hours a**
16  **week the mine was run in February of 2006?**
17  A.    No, sir.
18  **Q.    Can you tell me how many hours a**
19  **week the mine was run in March of '06?**
20  A.    No, sir.
21  **Q.    Is there any week in which you can**
22  **tell me how many hours the mine was run**
23  **from February of '06 to present?**

Page 52

1  A.    No, sir.
2  **Q.    When the mine is being run, do you**
3  **have an operator that is running the**
4  **dredge, or something like that?**
5  A.    I did have until I had to lay him
6  off.
7  **Q.    So could you take the number of**
8  **hours that that operator worked and**
9  **determine how many hours the mine was**
10  **running?**
11  A.    No, sir.
12  **Q.    Why not?**
13  A.    Because he was working at times when
14  the mine was not running.
15  **Q.    Fair enough.**
16  A.    I might use him to load train cars,
17  if we happen to have any.
18  **Q.    Did you only have one operator**
19  **during that time period?**
20  A.    I had one decent operator.  A dredge
21  operator is rather hard to come by.  I had
22  one that I was training, and then I know
23  how to run one.  I'm not as good as he

13  (Pages 49 to 52)

# FREEDOM COURT REPORTING

Page 53

1  was.
2  **Q.   Did the amount of sand that Johnco**
3  **was producing between the supply agreement**
4  **and the shutdown affect the amount of**
5  **gravel it could produce at any time?**
6  A.   Sand never got in the way; but if
7  the percentage of sand varied, it would
8  have an effect on it.
9  **Q.   Explain that to me, if you would,**
10 **please.**
11 A.   Well, the percentages of gravel
12 varies some. I gave you a figure of what
13 the average was. If the percentage of
14 gravel goes up, your production goes up,
15 and the amount of sand goes down.
16 **Q.   Did the sand ever present a space**
17 **problem for Johnco?**
18 A.   Not up until the time we shut down.
19 **Q.   At the time that you shut down, was**
20 **it presenting a space problem?**
21 A.   No, sir.
22 **Q.   At any point in time has it**
23 **presented a space problem?**

Page 54

1  A.   No, sir.
2  **Q.   Well, you made the qualification**
3  **there, "not up until the time we shut**
4  **down." I'm trying to figure out what that**
5  **means.**
6  A.   Not up until the time we shut down.
7  You can go ahead.
8  **Q.   Well, I'm trying to figure out what**
9  **that means, "not up until the time we shut**
10 **down." Usually people don't make**
11 **qualifications unless they mean something.**
12 **My question was, did the sand present any**
13 **space problems for Johnco at any time, and**
14 **you said not up until the time you shut**
15 **down. Can you explain to me what that**
16 **means?**
17 A.   You would eventually have a problem
18 that you had to solve.
19 **Q.   If you couldn't get rid of the sand?**
20 A.   You can always get rid of it. You
21 can't always sell it, but you can always
22 get rid of it and get it out of the way.
23 **Q.   You mean you may not always have a**

Page 55

1  **place to put it? What does that mean?**
2  **Oh, sell it. Is that what you said, "sell**
3  **it"?**
4  A.   Yes, sir.
5  **Q.   Thank you. Between the time that**
6  **the mine became fully operational and the**
7  **shutdown, what is the most number 67**
8  **gravel produced by Johnco in any given**
9  **week?**
10 A.   I don't know what is the most we
11 ever produced. We would produce enough to
12 make sure that we had a train or two train
13 loads sitting there; and then we might cut
14 back on production, because we had a
15 limited storage area. I mean, we can't
16 just keep producing it and keep storing
17 it.
18 **Q.   What do you store in the storage**
19 **area besides number 67 gravel?**
20 A.   Well, we have one storage area for
21 sand, one for oversize, and then the big
22 areas was for the 67.
23 **Q.   And your storage area for all of**

Page 56

1  those is limited; is that correct?
2  A.   Well, you've got to limit it
3  somewhere.
4  **Q.   Sure. In how many weeks between the**
5  **time that the mine became fully**
6  **operational and the shutdown did Johnco**
7  **deliver 5,200 tons of number 67 gravel to**
8  **the rail side?**
9  A.   I'm not following that.
10 **Q.   You had to get from the plant area**
11 **to the loading facility; right?**
12 A.   Yes, sir.
13 **Q.   And Johnco was supposed to deliver**
14 **the gravel to the loading facility;**
15 **correct? Actually it was supposed to load**
16 **Yelvington's trains.**
17 A.   Supposed to load the train. We
18 weren't required to put it in any specific
19 location.
20 **Q.   You were required to deliver it rail**
21 **side; is that what you understood?**
22 A.   We were required to put it on the
23 rail. We could store it anywhere we

14  (Pages 53 to 56)

# FREEDOM COURT REPORTING

Page 57

1 wanted to, I assume.
2 **Q. Did you have any involvement with**
3 **the negotiation of the supply agreement?**
4 A. Say that exactly the same one more
5 time.
6 **Q. Did you have any involvement with**
7 **the negotiation of the supply agreement?**
8 A. I discussed some of it with my
9 brother; but as far as negotiating between
10 Johnco and Yelvington, no.
11 **Q. Thank you. Between the time the**
12 **mine was fully operational and the**
13 **shutdown, did Johnco have any mechanical**
14 **failures?**
15 A. Yes.
16 **Q. Did those mechanical failures affect**
17 **production?**
18 A. There are normal breakdowns, some
19 worse than others, but nothing that would
20 affect our ability to meet the
21 requirements, I don't believe.
22 **Q. And which requirement is that?**
23 A. 150,000 tons of gravel a year.

Page 58

1 **Q. What mechanical problems did Johnco**
2 **experience during that time period? That**
3 **time period, again, is between the time it**
4 **becomes fully operational and the**
5 **shutdown?**
6 A. Well, I don't know exactly. We
7 might have a hole come in a gravel screen.
8 I don't know whether you consider that a
9 breakdown. We could have a hydraulic hose
10 burst here or a hydraulic hose burst
11 there.
12 **Q. Are you talking about things that**
13 **could have happened, or things that you**
14 **recall happened?**
15 A. Did happen. Not any specific thing,
16 but I'm sure that we had hydraulic hoses
17 burst. I know we had screens burst. We
18 plugged a pipeline between the dredge and
19 the plant more than once. Some of these
20 things take a few minutes to fix; some of
21 them take several hours. We had a cutter
22 head shaft break. I don't remember
23 exactly how long we were shut down, maybe

Page 59

1 a week, to get a new cutter head shaft in.
2 Actually the cutter head shaft, we had to
3 get a new cutter head shaft and a new
4 basket.
5 **Q. Any other problems you can remember**
6 **during that period, mechanical problems?**
7 A. Nothing unusual.
8 **Q. Anything that held up operations for**
9 **more than a day?**
10 A. I just told you about the cutter
11 head basket.
12 **Q. Well, other than the stuff you told**
13 **me.**
14 A. More than a day? I can't think of
15 anything.
16      (Whereupon, at this time a short
17 break was taken.)
18 **Q. Let me ask you a couple of questions**
19 **to see if I can close the loop on a couple**
20 **of things here. Mr. Holladay is helping**
21 **me understand how this works. Number 67**
22 **and number 57 gravel refer to a mix of**
23 **product that make up each number 57 and**

Page 60

1 each number 67; right?
2 A. Yes, sir.
3 **Q. And number 57 is larger than number**
4 **67; correct?**
5 A. Correct.
6 **Q. So number 67 mix would be used in**
7 **the number 57 product; correct?**
8 A. Essentially 57 can be 67 with some
9 big stuff added on top of it.
10 **Q. So 67 plus some big stuff?**
11 A. Yes, sir.
12 **Q. Now that makes sense to me. I**
13 **understand that better now. Is there a**
14 **contract with Dunn to purchase the 57?**
15 A. I don't know, sir.
16 **Q. You haven't seen one if there is; is**
17 **that correct?**
18 A. No, sir. I wouldn't be privy to
19 that.
20 **Q. Do you have any understanding of how**
21 **much number 57 Dunn intends to purchase on**
22 **an annual basis?**
23 A. No, sir.

15 (Pages 57 to 60)

# FREEDOM COURT REPORTING

Page 61

1  Q.   Have you made any changes with
2  regard to the operation of the mine to
3  gear up to produce number 57 for Dunn?
4  A.   Changed the gravel screens.
5  Q.   Did you add any staff?
6  A.   No, sir.  As a matter of fact, we're
7  operating rather short-handed right now.
8  Q.   Did you make any decisions to run
9  the mine more hours in a day?
10  A.   No, sir.
11  Q.   Are you trying to stockpile number
12  57 on the ground for Dunn?
13  A.   Not as of yet.
14  Q.   Is there a plan to do so?
15  A.   I don't know that.
16  Q.   Well, do you have any indication
17  that that's what is going to happen?
18  A.   I'm pretty sure it's going to
19  happen.
20  Q.   And how are you pretty sure it's
21  going to happen?
22  A.   From what I hear about their
23  discussion between the Junkins and Dunn.

Page 62

1  Q.   From whom do you hear about those
2  discussions?
3  A.   From Clatus, from Clay.  Clay Junkin
4  is Clatus' son, one of his sons.
5  Q.   Does Clay Junkin work in Johnco, in
6  the operation of it?
7  A.   No, sir.
8  Q.   Who is the contact with Dunn?
9  A.   I don't know, sir.
10  Q.   Do you have any contact directly
11  with Dunn?
12  A.   No, sir.
13  Q.   Do you know what price number 57 is
14  going to be sold to Dunn for?
15  A.   No, sir.
16  Q.   Do you know whether Johnco has
17  quoted a price to Dunn?
18  A.   I don't know, sir.
19  Q.   I guess we need to define what
20  "shutdown" means.  At some point in time
21  I understand that the mining operation
22  shut down; is that correct?
23  A.   Yes, sir.

Page 63

1  Q.   And you believe that time was
2  sometime in November of 2006?
3  A.   Yes, sir.
4  Q.   Was the mine operation running
5  continuously from the point that it became
6  fully operational until the time that it
7  shut down?
8  A.   Yes, I'm pretty sure it was in
9  continuous operation.  We stockpiled so
10  much gravel and it wasn't moving, that we
11  cut back on operation because we didn't
12  need any gravel because it wasn't being
13  sold -- wasn't being bought.
14  Q.   When was it that you had enough
15  gravel on the ground that you cut back the
16  operation?
17  A.   I don't know exactly.  I know when
18  we started, we had about -- when we loaded
19  the first train out, we had about three
20  loads of gravel, three train loads of
21  gravel on the ground.
22  Q.   On the ground where?
23  A.   At the plant.

Page 64

1  Q.   Where at the plant?
2  A.   Well, it was up at the railroad.
3  That's the only place we've ever
4  stockpiled any number 67 gravel.
5  Q.   So all the gravel that you had at
6  the point that you loaded the first train
7  that was being stockpiled was at the
8  loading facility; is that correct?
9  A.   All the 67 was.
10  Q.   67; is that correct?
11  A.   Yes, sir.
12  Q.   But during the time that the mining
13  operation was shut down, Johnco continued
14  to operate the other functions, is that
15  correct, the selling of the product;
16  correct?
17  A.   Yes, sir.
18  Q.   I'm assuming if the mining operation
19  is shut down, you don't need to run the
20  plant for sifting, et cetera; is that
21  correct?
22  A.   Say that again, please, sir.
23  Q.   I'm assuming that if you shut down

16 (Pages 61 to 64)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 65

1  the mining operation, you're not putting
2  any more product into the plant to be
3  cleaned and sifted, et cetera; that at
4  some point shortly after that, the plant
5  shuts down operation too. Is that
6  correct?
7      MR. PEARSON: I object to the form.
8  It wasn't clear to me; so if it's clear to
9  you, answer it.
10 A.    It's not clear.
11 Q.    It's not a large point. During the
12 time that you consider Johnco to have been
13 shut down, what was Johnco doing? For
14 instance, I know that they sold some
15 product; correct?
16 A.    Yes, sir.
17 Q.    What else were they doing?
18 A.    Not a whole lot of anything.
19 Q.    Just trying to sell product?
20 A.    Well, we were selling some, loading
21 out some.
22 Q.    During the time that the mine was
23 shut down, were you contacting potential

Page 66

1  buyers for the product you had on the
2  ground?
3  A.    I contacted this B&H, and then I
4  contacted another outfit down at Luverne,
5  Alabama. I can't remember their names,
6  two people. I know that several people
7  came in to look at the operation, an
8  outfit called -- well, one was Florida
9  Rock came in and talked.
10 Q.    This was while it was shut down?
11 A.    Yes, sir. Florida Rock came in, and
12 then USA Couch came in. There are two
13 other companies that I can't think of
14 their name offhand.
15 Q.    USA Couch is USA Ready Mix; is that
16 correct?
17 A.    Well, Couch is a part of USA Ready
18 Mix.
19 Q.    A division?
20 A.    I don't know what their corporate
21 setup is.
22 Q.    Did any of these people come to look
23 at the Johnco facility prior to Johnco

Page 67

1  shutting down?
2  A.    I don't believe so.
3  Q.    Was there any discussions about
4  selling the Johnco facility prior to
5  Johnco shutting down?
6  A.    I don't know, sir.
7  Q.    Did anyone have any of those
8  discussions with you?
9  A.    No, sir.
10 Q.    Have you ever heard that there were
11 plans to sell Johnco prior to it shutting
12 down?
13 A.    I couldn't say, sir. I don't know.
14 Q.    After it shut down, were there plans
15 to sell Johnco that you're aware of?
16 A.    There were no plans, as such. There
17 was discussion of it.
18 Q.    Fair enough. Were there discussions
19 about selling Johnco?
20 A.    I was informed that there were.
21 Q.    Who informed you of that?
22 A.    Mr. Junkin.
23 Q.    What did he tell you?

Page 68

1  A.    I don't remember specifically. He
2  said he was open to sell it, sell Johnco.
3  Q.    When did you first learn of that?
4  A.    I don't know.
5  Q.    Well, if Johnco shut down in
6  November of 2006 --
7  A.    It was after that. Excuse me, I
8  answered before you finished your
9  question.
10 Q.    And I believe you have told me
11 already that Johnco began operating the
12 mine again sometime in March or April of
13 2007. Did you learn that there were
14 discussions about the sale of Johnco in
15 between the shutdown and when it started
16 mining again?
17 A.    Between the time it was shut down
18 and March of 2007?
19 Q.    Yes, sir.
20 A.    Yes. That's the period of time. I
21 thought we had already covered that
22 period.
23 Q.    I'm just trying to put book ends on

17 (Pages 65 to 68)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 69

1  timing of when this conversation took
2  place. Did you have more than one
3  conversation with Mr. Junkin about selling
4  the mine?
5  A.  I'm pretty sure I did.
6  Q.  Over what period of time were you
7  discussing selling the mine with Mr.
8  Junkin?
9  A.  I don't know, sir.
10  Q.  Are there still plans to sell the
11  mine?
12  A.  I don't know what his plans are,
13  sir.
14  Q.  Has he told you, at any time since
15  the mine has begun operating again, that
16  he is having discussions about selling the
17  mine?
18  A.  No, sir.
19  Q.  Are you aware of any discussions,
20  since the mine began operating again,
21  about selling the mine?
22  A.  No, sir.
23  Q.  At the time that the mine was shut

Page 70

1  down, how much number 67 gravel did Johnco
2  have on the ground?
3  A.  I don't remember, sir, but it was
4  several thousand tons. I could narrow it
5  down some to say between 4,000 and 10,000
6  tons.
7  Q.  How many train loads is that?
8  A.  6,000 tons to the train load, the
9  way we were loading them.
10  Q.  So that would be somewhere between
11  one and not quite two train loads, is that
12  correct, that you had on the ground at the
13  time of shutdown?
14  A.  That sounds correct.
15  Q.  And of that, have you sold it all?
16  A.  We have sold all of that, and we
17  have produced some more 67. We do have 67
18  on the ground now.
19  Q.  How much do you have on the ground
20  now?
21  A.  Probably three or four thousand
22  tons.
23  Q.  About half-a-train load?

Page 71

1  A.  That would be correct.
2  Q.  Has Johnco ever pumped any sand back
3  into the pit?
4  A.  No, sir.
5  Q.  Has it ever disposed of sand in any
6  way other than selling it?
7  A.  A small amount of it.
8  Q.  And how did you dispose of it?
9  A.  I say disposed of it. We moved it
10  out of the main stockpile out to another
11  pile not too far from the plant.
12  Q.  You moved it out from where -- I
13  understand there's a conveyor belt that
14  takes sand up and drops it in an area?
15  A.  Yes, sir.
16  Q.  How much sand can that area hold?
17  A.  I could calculate it, but it's
18  probably around 50,000 tons or so.
19  Q.  And what was the reason you would
20  take sand from that pile and move it to a
21  different pile?
22  A.  Because we got some gravel in some
23  of it, and that was part of it; and we

Page 72

1  tried to manufacture some that was a
2  little bit different, other than concrete.
3  It didn't work out, and we moved it out of
4  the way too.
5  Q.  Does the production of number 57
6  gravel result in any oversize?
7  A.  Yes, sir.
8  Q.  What percentage of number 57 gravel
9  is oversize?
10  A.  Well, right now it's running about 3
11  percent.
12  Q.  Have you sold any of the oversize
13  gravel since producing number 57?
14  A.  We don't have enough of it, sir.
15  Q.  So is the answer, no, you haven't?
16  A.  We don't have but about 75 tons of
17  it.
18  Q.  Who determines now at Johnco, who
19  determines whether you're going to produce
20  57 or 67?
21  A.  I do what Mr. Junkin tells me to do.
22  Q.  So that's Mr. Junkin's call; is that
23  correct? Is that what you're telling me?

18 (Pages 69 to 72)

# FREEDOM COURT REPORTING

Page 73

1  A.  Yes.
2  Q.  Does Mr. Junkin also bring customers
3  to Johnco? I mean, is he also involved in
4  the selling process?
5  A.  Very much.
6  Q.  Does he handle most of that?
7  A.  He is handling the Dunn discussions.
8  Q.  Is he handling any other
9  discussions?
10  A.  He has talked to some other people.
11  Q.  Do you know who those other people
12  are?
13  A.  Well, I know that he talked to Bill
14  Cornelius with B&H Concrete.
15  Q.  Anyone else?
16  A.  He talked to USA Couch. They're in
17  the ready-mix business. I don't know
18  whether he talked to Scott Callen. Callen
19  was talking about shutting his operation
20  down and buying stuff from us, and he was
21  going to talk to him. Now, whether he got
22  around to it or not, I don't know, sir.
23  Q.  Since the shutdown, has Johnco sold

Page 74

1  any number 67 gravel at less than
2  five-and-a-quarter a ton?
3  A.  No, sir.
4  Q.  Have they sold it at more than
5  five-and-a-quarter a ton since then?
6  A.  Yes, sir.
7  Q.  Just so I can close the loop on
8  that, in every instance that Johnco has
9  sold gravel since the shutdown, have they
10  sold it for more than five-and-a-quarter?
11  A.  I don't think every instance, but
12  most of the time, yes, sir.
13  Q.  Since they've been producing number
14  57 gravel, which I understand is after the
15  shutdown, has Johnco sold number 57 gravel
16  at a price per ton greater than
17  five-and-a-quarter?
18  A.  We haven't sold any of it.
19  Q.  You haven't sold any of it yet?
20  A.  No, sir. I say we haven't. I know
21  we haven't collected for it because it's
22  sitting there on the rail car. It may
23  have gone out today.

Page 75

1  Q.  Who is coming to pick it up? I'm
2  sorry, that was a bad question. Who is
3  supplying the power to move those rail
4  cars?
5  A.  The railroad company.
6  Q.  And is Johnco paying to move those
7  rail cars?
8  A.  I don't know who is paying to move
9  those rail cars. The rail line is M&B,
10  and it's my understanding it's going on
11  M&B to Meridian, Mississippi, and going on
12  Norfolk Southern south in Mississippi
13  somewhere. I could be wrong on where it's
14  going. I believe it's going to Laurel,
15  Mississippi. Now, M&B is moving a lot of
16  freight for CSX, and the power that was
17  moving the train came in there with CSX
18  engines. M&B is using practically all CSX
19  engines to move their freight from
20  Montgomery west. Now, how far they're
21  going, I don't know.
22  Q.  But that's not Johnco's
23  responsibility?

Page 76

1  A.  No, sir.
2  Q.  Do you keep any records on the
3  maintenance of the different equipment
4  that Johnco has?
5  A.  As far as what, sir?
6  Q.  Maintenance logs, hour logs, et
7  cetera.
8  A.  No, sir.
9  Q.  Do you keep any records on repairs?
10  Sometimes a repair will generate an
11  invoice because you've got --
12  A.  Well, it generates invoices, and we
13  keep the invoices. I take the invoice and
14  write on there what piece of equipment it
15  went to, if I buy gas that goes in this
16  pickup or that pickup; or if we have a
17  certain bill, maybe I put on there
18  "dredge" or "plant" or "loaders," and that
19  goes to the accountant. What they do with
20  it from there, I don't know.
21  Q.  And from those invoices, could you
22  then determine the approximate date of
23  whenever the malfunction was?

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 77

1    A.   Well, all your invoices have a date
2    on them.
3    Q.   And is it fair to assume that the
4    malfunction occurred sometime around the
5    date of that invoice, in general?
6    A.   Well, I would assume so.
7    Q.   And is it also fair to assume that
8    you could tell what the particular
9    malfunction was based on what was written
10   on the invoice; you could?
11   A.   If there's enough detail put on the
12   invoice. You know, some invoices have a
13   part number on them, and I might not
14   recognize the part number.
15   Q.   But you're the one putting the
16   detail on the invoice; is that correct?
17   A.   Not all of them.
18   Q.   Who else would do that?
19   A.   Whoever I happened to send to get
20   stuff.
21   Q.   You mentioned that it was hard to
22   find a good dredge operator. What has
23   caused you to conclude that?

Page 78

1    A.   Experience.
2    Q.   Is operating a dredge a fairly
3    skilled activity?
4    A.   Well, it takes somebody with some
5    sense. It's not that hard a job, but it
6    can be boring as all get-out. I could
7    find a lot of dredge operators that just
8    absolutely will not operate a dredge
9    because it's so boring. You can't get
10   somebody that is too smart, because they
11   get bored quicker. So it's somewhat of a
12   problem.
13   Q.   Do you know how much sand was stored
14   under the radial storage at the time of
15   the shutdown?
16   A.   Do I know how much? No. It was
17   probably somewhere in the range of forty
18   to fifty thousand tons.
19   Q.   I think you told me the capacity for
20   that particular area is 50,000; is that
21   right?
22   A.   Well, I'm not sure about that; but
23   it was about, I would guess about 75

Page 79

1    percent full.
2    Q.   To your knowledge, has Johnco
3    offered any gravel or any product to
4    Yelvington since the shutdown?
5    A.   I don't have any idea. I don't
6    think so.
7    Q.   But you don't know that it has been
8    done; is that correct?
9    A.   No, sir.
10   Q.   What did you understand Johnco's
11   obligation under the supply agreement was
12   with regard to constructing the plant
13   mining facility?
14   A.   Well, it was our responsibility to
15   build the plant.
16   Q.   Was there a time frame in which you
17   understood that had to be done?
18   A.   I don't believe there's anything in
19   the contract on that.
20   Q.   In any event, the timing of it or
21   the time it took wasn't a consideration;
22   is that correct?
23        MR. PEARSON: I object to the form.

Page 80

1    Q.   You can answer.
2    A.   Quit interrupting my train of
3    thought. Repeat it, please, sir.
4    Q.   You had just told me that you didn't
5    think there was any language in the
6    contract regarding when Johnco had to
7    complete the construction of the mining
8    and classifying facilities; and I said, in
9    any event, the timing of getting that done
10   wasn't something that was a pressing
11   consideration for you all. Is that
12   correct?
13   A.   It evidently wasn't very pressing,
14   because they never pressured us to do
15   anything. They never pressured us to
16   produce anything; never said, "We want
17   gravel. You need to get going."
18   Q.   Did you ever have any conversations
19   with anyone at Yelvington where you said,
20   "I need you to come get some gravel here"?
21   A.   Where they said that?
22   Q.   No. Where you would have said to
23   Yelvington, "I need you to come get some

20 (Pages 77 to 80)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 81

1  gravel"?
2  A.  I think I talked to Phillip about
3  that.
4  Q.  What do you think you talked to him
5  about?
6  A.  Just what you asked.
7  Q.  What specifically do you think you
8  said?
9  A.  I think I told him we needed to get
10  some gravel moved.
11  Q.  When was that?
12  A.  In early '06.
13  Q.  And what did he say?
14  A.  I don't remember.
15  Q.  Did he say they wouldn't do it?
16  A.  No. It seemed to be that they were
17  going to ship some to Milton; they
18  couldn't get the rail spur in. I don't
19  know what else.
20  Q.  How many times do you think you had
21  the conversation with Mr. Holladay that
22  you needed Yelvington to come get some
23  gravel?

Page 82

1  A.  Oh, probably at least three or four.
2  Q.  You said "probably." Do you have
3  any specific recollection of three or four
4  conversations?
5  A.  No, sir.
6  Q.  Or your best estimate?
7  A.  That's my best estimate.
8  Q.  I'll assume, then, that you don't
9  have any specific recollection of where
10  you were when you made those requests?
11  A.  No.
12  Q.  And you don't have any specific
13  recollection of when those requests were
14  made; is that correct?
15  A.  No, sir.
16  Q.  Did you ever get any resistance from
17  Yelvington about coming and getting
18  gravel?
19  A.  Any resistance? They didn't come
20  get it.
21  Q.  Well, did they ever express any
22  desire to you not to come and get it?
23  A.  No, but they never called and asked

Page 83

1  us to hurry up and get ready to send them
2  some.
3  Q.  Was that their obligation, as you
4  understood it, under the supply agreement?
5  A.  To do what?
6  Q.  To call you, call Johnco and say,
7  "Hurry up and get ready and send us some"?
8  A.  No, not to hurry up, but I expected
9  them to call and say, "We want to send a
10  train."
11  Q.  Was it Johnco's obligation under the
12  supply agreement to let them know when
13  they had the ability to fill a train?
14  A.  I don't know that specifically, but
15  I'm sure it was.
16  Q.  What is your understanding of how
17  frequently Yelvington was required to come
18  and get gravel from Johnco?
19  A.  My understanding was that they were
20  going -- an average, to start with, it was
21  an average of 52 cars.
22  Q.  A train load; is that correct?
23  A.  A train load, on an average of every

Page 84

1  two weeks.
2  Q.  5,200, if you do that math --
3  A.  It might have been 60 cars. But
4  when we got started, it changed to 60
5  cars. That's an average. Whatever it
6  was, it came out to 150,000 tons a year.
7  Q.  That was my next question. What is
8  your understanding of what Yelvington's
9  requirement was with regard to the amount
10  of number 67 they were required to
11  purchase under the supply agreement?
12  A.  150,000 tons a year, minimum.
13  Q.  Let's talk about the build-out --
14  I'm sorry, were you going to say
15  something?
16  A.  I was just thinking with my fingers.
17  Q.  Let's talk about the build-out, for
18  a minute, of the loading facility. Whose
19  obligation was it to build out the loading
20  facility under the supply agreement?
21  A.  Well, it was our responsibility to
22  build it, get it built.
23     MR. PEARSON: Just a point of

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 85

1  clarification, load-out facility, I need
2  to make sure that you all are on the same
3  page in what exactly you're discussing;
4  because load-out facility might be
5  different than the entire circular siding,
6  and I just need to make sure you all are
7  talking about the same thing.
8  Q.  Define "load-out facility" for me.
9  A.  Well, I would assume the whole
10  thing. Getting the rail built and
11  building the load-out facility was our
12  responsibility.
13  Q.  Me too. And as we go forward here,
14  I'm talking about the whole thing; the
15  rail and the whole load-out facility, as
16  you've defined it there. I understand M&B
17  handled the construction of the load-out
18  facility. Is that your understanding?
19  A.  Yes, sir. Not the whole thing. M&B
20  handled the building of the track.
21  Q.  And as I understand it, Johnco had
22  to take care of the grading and basically
23  the preparation to put the track in; is

Page 86

1  that correct?
2  A.  Yes, sir.
3  Q.  Did you have discussions with M&B,
4  or anyone at M&B, in that process of
5  designing the load-out facility?
6  A.  Yes, sir.
7  Q.  With whom did you talk at M&B?
8  A.  Mr. Doug Davis.
9  Q.  Between you and your brother, who
10  was primarily responsible for negotiating
11  that build-out?
12  A.  My brother.
13  Q.  What was the general nature of your
14  conversations with Mr. Davis about that
15  build-out prior to it being built, or
16  construction starting? Excuse me.
17  A.  Well, we discussed the design of the
18  track.
19  Q.  Did you discuss numbers of how much
20  it was going to cost and those types of
21  things?
22  A.  I don't believe so.
23  Q.  That was left to your brother and

Page 87

1  Doug; is that correct?
2  A.  Yes, sir.
3  Q.  Did you understand that the supply
4  agreement required Johnco to be able to
5  load a minimum of 52 cars a trip?
6  A.  Yes, sir.
7  Q.  And did that factor into the design
8  of the load-out facility?
9  A.  Yes, sir.
10  Q.  Let me make sure I understand the
11  loading process here. The initial time
12  that Johnco loaded product for Yelvington,
13  which I believe was May of 2006; is that
14  your recollection?
15  A.  Yes, sir.
16  Q.  How much material was on the ground,
17  number 67 gravel was on the ground at that
18  point?
19  A.  I would say there was enough up at
20  the railroad to load at least three train
21  cars. It was piled up to where there was
22  just a narrow roadway between the two
23  piles, to where we could get a loader in

Page 88

1  to load it in the load-out bin.
2  Q.  And that's my next series of
3  questions here. The way I understand it
4  is, the loader comes in, picks it up, puts
5  it in a load-out bin that then loads the
6  cars?
7  A.  No, sir. It loads a conveyor, and
8  it goes up to the car.
9  Q.  The conveyor loads the car?
10  A.  Yes, sir.
11  Q.  In May of 2006, how many cars could
12  that conveyor service at a time, at one
13  time?
14  A.  It can only serve one car at one
15  time.
16  Q.  So you could only load one car at a
17  time at the facility as it was arranged in
18  May of 2006; is that right?
19  A.  Yes, sir.
20  Q.  At some point in time did that
21  change?
22  A.  Well, it changed every fifteen
23  minutes, or twenty minutes.

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 89

1  Q.   I didn't ask the question well. At
2  some point in time, did Johnco's ability
3  to load a car at a time change?
4  A.   No, sir.
5  Q.   At any point in time, did Johnco
6  build a ramp so they could take a front
7  end loader and load more than one car at a
8  time?
9  A.   Yes, sir.
10  Q.   Do you know whose suggestion it was
11  to do that?
12  A.   To build a ramp?
13  Q.   Yes, sir.
14  A.   Mr. Holladay.
15  Q.   Once they built the ramp, which I
16  understand is after May of 2006, how many
17  cars at a time could Johnco load?
18  A.   Well, the other day we loaded four
19  cars. You mean at one time? You can only
20  load one car with one loader. If you use
21  two things, you can be loading on two cars
22  at the same time. We could put four cars
23  there. We can have 70 cars on the tracks.

Page 90

1  When you're loading with a conveyor, you
2  can load a part of a car, pull it up a
3  little bit, load another part, pull it up
4  and load another little bit. I don't
5  think that you can load it faster one way
6  than you can the other.
7  Q.   I guess my point is this. The more
8  access points you have to load the cars,
9  the greater your ability to load the cars
10  quickly. Is that correct?
11  A.   We couldn't load them any faster.
12  We built an initial load-out facility with
13  the conveyor and the bin, at their
14  insistence, because they wanted to send
15  closed hopper cars in there. They never
16  sent any closed hopper cars in there; and
17  I don't know that we could have loaded
18  closed hopper cars with that facility
19  anyway, because it's almost impossible to
20  stop sixty, seventy loaded cars at a spot
21  where you can get it in the conveyor.
22  Q.   As I understand that, the closed
23  hopper cars have a more narrow opening at

Page 91

1  the top, and the conveyor dumps it?
2  A.   I've never loaded one. I don't know
3  exactly what they have, but I understand
4  they have about a two-square-foot opening,
5  and you have to stop that car probably
6  within a foot. When you get half your car
7  loaded, you've got 3,000 tons, maybe 4,000
8  tons, counting the extra empty cars, that
9  you're trying to stop within one foot,
10  which is almost impossible.
11  Q.   Is it fair to say you have to have
12  power to the cars to load a complete
13  train?
14  A.   Of some sort, yes, sir.
15  Q.   And enough to move a 60-car train or
16  52-car train, whatever you have in there?
17  A.   Yes, sir.
18       MR. PEARSON: Can I ask a point of
19  clarification?
20       MR. LEEK: Sure.
21       MR. PEARSON: You asked him how much
22  gravel was on the ground at the first
23  load; and he responded, "Three train

Page 92

1  cars," and I don't think that he meant --
2       THE WITNESS: Three train loads.
3       MR. PEARSON: I don't think that's
4  what he meant to say, and I didn't want
5  the record to reflect it incorrectly. So
6  if you want to correct what you said.
7  A.   If I said three cars, I was wrong.
8  Q.   I think what you said was two or
9  three cars, but two or three train loads?
10  A.   I said it wrong. It's two or three
11  trains.
12  Q.   You may have said "cars," but I
13  heard "trains." Okay. Either during or
14  after the May 11th load in 2006, did you
15  make any representations to Mr. Holladay
16  about how quickly Johnco could get geared
17  up to load another train?
18  A.   I don't remember doing that, sir. I
19  may have.
20  Q.   Did you ever tell him that Johnco
21  wasn't yet able to load a train car every
22  two weeks after May 11, 2006?
23  A.   I don't remember. It couldn't have

23  (Pages 89 to 92)

# FREEDOM COURT REPORTING

Page 93

1 been after May 11th. We had another two
2 train loads sitting there. If it
3 happened, it had to happen down the road.
4 Q. I guess that's my question. At any
5 point in time do you recall, after May of
6 2006, at any point in time do you recall
7 Johnco being unable to load a unit train
8 every two weeks?
9 A. Not every two weeks, no way.
10 Q. Couldn't have done it every two
11 weeks; is that right?
12 A. I said I didn't say that we couldn't
13 load one every two weeks.
14 Q. Fair enough. So is it your
15 recollection, then, that after May of
16 2006, at all times Johnco was able to load
17 a unit train at least every two weeks?
18 A. That is correct.
19 Q. Could Johnco have loaded a unit
20 train every week?
21 A. If we operated enough hours, we
22 could have.
23 Q. Do you recall any time that you

Page 94

1 operated enough hours where you could have
2 done that, or where you did do that?
3 A. Well, there wasn't any need to
4 because we only sold that one load. From
5 the time we were ready in February until
6 September, we sold one load, one train
7 load in six months. That's March, April,
8 May, June, July, and August, we sold one.
9 Q. After the May shipment, do you know
10 when Yelvington next took another shipment
11 of number 67 gravel?
12 A. It was in September, I believe, sir.
13 Q. Could it have been August?
14 A. Possibly.
15 Q. Could it have been July?
16 A. No, sir. They took another load but
17 not of 67. Sometime during that period of
18 time, they took a load of thirty-something
19 cars of oversize, and the balance was
20 supposed to be sand. At the last minute
21 they changed it, and we finished it out
22 with 67.
23 Q. At whose request did they take the

Page 95

1 oversize?
2 A. You mean ours or theirs?
3 Q. Yes.
4 A. I think it was theirs.
5 Q. Did you have any discussions with
6 them leading up to taking the oversize?
7 A. I probably had a discussion with
8 somebody. I can't remember exactly how
9 many they wanted. I think they wanted
10 about thirty cars that were oversize, and
11 then they wound up wanting more. We gave
12 them all we had; and then somebody with
13 Yelvington told me that instead of the
14 sand, they wanted to finish out the train
15 with 67.
16 Q. At the time that Yelvington took the
17 oversize, had Johnco sold oversize to
18 anybody?
19 A. Yes, sir.
20 Q. Did it have any regular oversize
21 customers at that time?
22 A. Yes, sir. We haven't had any since
23 then because we had to cut them off to

Page 96

1 sell to Yelvington, and they're not really
2 interested in buying any more. The man's
3 name was Jim Maddox, if you want that.
4 Q. Which man was that?
5 A. Jim Maddox, that bought the oversize
6 gravel.
7 Q. That's prior to Yelvington taking a
8 load of oversize; is that correct?
9 A. Part of a load of oversize.
10 Q. And at the time that Yelvington took
11 that, did you have any discussions with
12 Yelvington about continuing to take
13 oversize on a continuing basis?
14 A. I didn't.
15 Q. Do you know of anyone who did?
16 A. No, sir, I do not.
17 Q. So I'm trying to sort this out now.
18 Are you saying because you sold oversize
19 to Yelvington, Maddox no longer wanted to
20 buy it?
21 A. That's my feeling. He didn't tell
22 me that, but he hasn't -- he may have
23 bought a little bit since then.

24 (Pages 93 to 96)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 97

1  Q.   Did he try to buy oversize when you
2  were shipping it to Yelvington and
3  couldn't?  I'm trying to get what makes
4  you have this feeling.
5  A.   Yes.  I told him I was going to have
6  to cut him off until I got this shipment
7  out of there.
8  Q.   But after Yelvington took the
9  oversize, did you continue to produce
10 oversize?
11 A.   Just like sand.  If it's there,
12 you've got to produce it, because it all
13 comes out at one time.
14 Q.   Well, if you had that, why couldn't
15 you sell that to Mr. Maddox?
16 A.   Because he didn't want to buy it,
17 evidently.
18 Q.   Well, I guess what I'm trying to
19 figure out is, why would Maddox get upset
20 that you were selling to Yelvington?
21 A.   I don't know that he got upset
22 because we were selling to Yelvington
23 specifically.  I mean, I don't know that

Page 98

1  he did that.  I just surmised because at
2  that point forward, he didn't buy but very
3  little more, and he's not buying anything
4  now.
5  Q.   Okay.  Did Johnco have anybody to
6  run the power during that May 2006 initial
7  load Yelvington took?
8  A.   Yes, sir.
9  Q.   Did you have anybody that was
10 certified to do it?
11 A.   I had a fellow named Leon Brackin
12 that retired from the railroad.
13 Q.   Was he certified to run power at
14 that point in time?
15 A.   I don't know exactly what that
16 means.
17 Q.   Is it your understanding that you
18 have to be qualified to run power; right?
19 A.   To run a train on a rail line, you
20 have to have some sort of certification.
21 On your own track, it's my understanding
22 they do not have to be certified, or
23 whatever you call it.  But he's well

Page 99

1  qualified.  He knows what he's doing.
2  Q.   When the cars come in, where are
3  they dropped off?
4  A.   On our track.
5  Q.   So the cars are deposited by
6  somebody on your track; is that correct?
7  A.   Yes, sir.
8  Q.   At any point in time when you're
9  loading, does the power have to go out
10 onto the track?
11 A.   It stays on our track.  It does not
12 get on M&B rail line.
13 Q.   Do you recall who ran the power
14 during that May 11th or May 2006 --
15 A.   Our man, Leon Brackin, ran the power
16 that day.
17 Q.   Do you recall Yelvington sending
18 anybody out?
19 A.   Yes, sir.
20 Q.   Do you know why Yelvington sent
21 someone to run the power?
22 A.   To help us.  And I appreciated him
23 being there.

Page 100

1  Q.   I guess, why was it necessary to
2  help?
3  A.   It was not necessary.
4  Q.   So your guy was fine to do it; is
5  that what you're saying?
6  A.   I have all the confidence in the
7  world in him.
8  Q.   Was it legal for him to do it?
9  A.   Yes, sir, it was definitely legal,
10 because he was not on M&B's line.
11 Q.   Did you ever have any discussions
12 with Yelvington at that time about whether
13 Yelvington thought it was legal for that
14 guy to do it?
15 A.   No, sir.
16 Q.   So no reference of whether that was
17 legal or not was ever made; is that
18 correct?
19 A.   Not that I know of.
20 Q.   Now, you said Yelvington sent him up
21 to be helpful?
22 A.   I don't know who sent him.  Phillip
23 may have made contact.  I don't know who

25  (Pages 97 to 100)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 101

1  sent him.
2  **Q.   When I say "Yelvington," I mean the**
3  **company.**
4  A.   Right.
5  **Q.   And he was a Yelvington engineer; is**
6  **that right?  Is that your understanding?**
7  A.   That's my understanding.
8  **Q.   Do you remember his name?**
9  A.   I don't remember his name.
10  **Q.   Dave something?**
11  A.   Yes, I believe it was Dave
12  something.
13  **Q.   Now, you said Yelvington sent him up**
14  **to be helpful.**
15  A.   I don't know why he sent him.  I
16  think he did.
17  **Q.   Your impression was that they sent**
18  **him up to be helpful?**
19  A.   Yes, sir.
20  **Q.   Has Yelvington ever done anything**
21  **else to be helpful to Johnco during the**
22  **course of the supply agreement, up to the**
23  **time of the shutdown?**

Page 102

1  A.   Well --
2  **Q.   I mean things they weren't obligated**
3  **to do, something they just did to be**
4  **helpful.**
5  A.   I can't think of anything.  They
6  furnished these rail to M&B Railroad,
7  which they were paid for.
8  **Q.   How do you know that?**
9  A.   I think Mr. Doug Davis told me that.
10  How did I know what, that they furnished
11  it or that they were paid for it?
12  **Q.   Both.**
13  A.   I think Mr. Doug Davis told me that.
14  **Q.   Were they required to do that, under**
15  **the supply agreement?**
16  A.   No, sir, but they did it for a
17  profit, I'm sure.
18  **Q.   What makes you sure of that?**
19  A.   I just don't have any reason to
20  believe that they wouldn't make a profit
21  on it.
22  **Q.   So you can't tell me, as you sit**
23  **here today, whether they did that at a**

Page 103

1  **discount --**
2  A.   I have no idea.
3  **Q.   -- to help Johnco or not; can you?**
4  A.   I don't have any idea, sir.
5  **Q.   Do you know whether Yelvington**
6  **offered to finance some or all of the**
7  **build-out of the loading facility?**
8  A.   I don't know that, sir.
9  **Q.   You weren't involved in those**
10  **conversations?**
11  A.   No, sir.
12  **Q.   At what point in time was the**
13  **build-out completed and operational of the**
14  **loading facility?**
15  A.   Well, I don't know exactly.  The
16  load-out facility, as far as the bin and
17  whatever, was definitely finished, I would
18  say a couple of months prior to the first
19  load going out.  The ramp was not built
20  until later, because it was during this
21  first load-out that Phillip Holladay
22  suggested that we build a ramp to be able
23  to load in case the load-out facility is

Page 104

1  broke down.
2  **Q.   Did Johnco have any problems,**
3  **mechanically or otherwise, with production**
4  **between the time of the first load and**
5  **shutdown?**
6  A.   Oh, I'm sure we had some.  The
7  biggest thing we had happen was the cutter
8  head shaft breaking off.  We lost the
9  cutter basket and part of the shaft, and
10  we had to order a new one.  So that would
11  definitely have interrupted it.
12  **Q.   Your recollection is that occurred**
13  **after the first load; correct?**
14  A.   That's my recollection.  It had to
15  be.
16  **Q.   Why do you say that?**
17  A.   Well, the reason for the breakage
18  was that the sand and gravel had worn into
19  the shaft.  I made a mistake and had the
20  shaft welded on to build it up, to keep it
21  from wearing out and breaking; and I think
22  I just accelerated the process that it
23  broke.

26 (Pages 101 to 104)

# FREEDOM COURT REPORTING

Page 105

1  Q.    You listed for me a number of
2  mechanical problems that Johnco had. The
3  time frame you gave me before was between
4  the time it became fully operational and
5  shutdown.  Do you recall, did those
6  problems occur between the first load and
7  shutdown?
8  A.    Some of those occurred before the
9  first load went out, and some of them
10  after.  It happened all the time.  It's
11  just routine stuff.
12  Q.    That's fair enough.  Let me go ahead
13  and run through the list here and see if
14  you can tell me if they occurred after
15  that first load went out.  You mentioned
16  holes in the gravel screen.  Did you have
17  those --
18  A.    They happen all the time.
19  Q.    Do you recall them happening after
20  the first load went out?
21  A.    I'm sure they did.  I don't recall
22  any specific ones.
23  Q.    You mentioned hydraulic hoses

Page 106

1  bursting.
2  A.    They burst all the time.
3  Q.    Do you recall that happening after
4  the first load went out?
5  A.    I'm sure it did.  It happens all the
6  time.  It's nothing other than routine
7  stuff.
8  Q.    You said earlier that the pipeline
9  was plugged between the dredge and the
10  plant.
11  A.    Yes, sir.
12  Q.    Did that happen after the first load
13  went out?
14  A.    I'm sure it did, probably before
15  too.
16  Q.    And then the last one you mentioned
17  for me was the cutter head shaft break,
18  and a basket.
19  A.    I'm pretty sure that was between the
20  first -- I'm pretty sure it was after the
21  first load and before August or September.
22  Q.    Do you recall any other mechanical
23  problems that occurred after the first

Page 107

1  load went out?
2  A.    Nothing other than just routine
3  stuff.
4      (Whereupon, at this time a short
5  break was taken.)
6  Q.    Are you ready to go back on the
7  record, sir?
8  A.    I'm ready.
9  Q.    I just need to close a couple of
10  loops here.  You said that the track was
11  designed to handle a minimum of 52 cars;
12  is that correct?
13  A.    No, sir, that's not what I said.
14  Q.    What did you tell me about the track
15  design?
16  A.    We started out at 52 cars, and then
17  different people offering different
18  designs.  I think Yelvington offered one
19  design, and somebody else offered another
20  design, and we finally came up with this
21  design.  We originally were going to put
22  in 25 or 30 cars and were going to put 25
23  or 30 cars across the main line onto M&B's

Page 108

1  side tracks.  After one day they were
2  going to switch them out and move on to
3  the others.  But, anyway, the original
4  design we wound up, and it will handle --
5  we designed it to handle a minimum of 60
6  cars; and we wound up with, depending on
7  the length of the car, it will probably
8  handle 70, 75 cars, along with two
9  engines.
10  Q.    Do you know the purpose of designing
11  the track was ultimately built out to
12  handle at least 52 or 60 cars, whatever
13  the minimum may be?
14  A.    Do I know what?
15  Q.    Do you know why the track was
16  designed to hold that many cars?
17  A.    Well, so we could load out a whole
18  train without doing that.  The design we
19  came up with was such that we could handle
20  that many cars.
21  Q.    Let's have you take a look, if you
22  would, please, at Defendant's Exhibit 1.
23  These are the documents that have

27   (Pages 105 to 108)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 109

1  previously been used in your brother's
2  deposition. What you've got there is
3  something you've probably never seen
4  before, but it's an answer to the
5  Complaint. The reason we use the answer
6  is because it contains both the
7  allegations put forth by Johnco and the
8  responses put forth by Yelvington. If you
9  could take a look at page 4 of 10 for me,
10  specifically paragraph 11, I would
11  appreciate it. Do you see the date
12  October 1, 2006 in that paragraph?
13  A.    March 2006?
14  Q.    I see March 2006 first, and then it
15  says October 1, 2006 after that.
16  A.    Yes.
17  Q.    Do you know what the significance of
18  that date is?
19  A.    Which date?
20  Q.    October 1, 2006.
21  A.    No, sir.
22  Q.    Does that coincide with when Johnco
23  shut down the mining operations?

Page 110

1  A.    October 1st? I don't know that for
2  sure, but it was sometime in the fall of
3  2006.
4  Q.    You previously said November of
5  2006, and I'm just trying to figure out
6  what the meaning of this date is.
7  A.    I don't have any idea. I could be
8  wrong on my November. Is that all you
9  want me to read on this?
10  Q.    Do you know why Johnco ceased the
11  mining operations whenever it did? I
12  think it actually says October 2006 here,
13  looking at paragraph 12.
14  A.    What is your question about it, now?
15  Q.    Do you know why Johnco shut down its
16  mining operations in October of 2006, if
17  that's when it happened?
18  A.    Well, that sounds like the reason
19  right there. All I know is Clatus told me
20  to shut down.
21  Q.    He didn't give you any reasons why?
22  A.    Oh, he told me that he had financial
23  problems, and I'm sure he did.

Page 111

1  Q.    Do you know of any other reasons
2  why?
3  A.    No, sir.
4  Q.    Did he ever tell you what the cause
5  of those financial problems were?
6  A.    Yes.
7  Q.    What did he tell you they were?
8  A.    He didn't have any income from not
9  being able to get Yelvington to take the
10  gravel.
11  Q.    Was that the only source of income
12  he had with Johnco?
13  A.    With Johnco?
14  Q.    Yes.
15  A.    He's a lawyer. I'm sure he makes a
16  lot of money.
17  Q.    We'll set that question aside for a
18  second. Let's have you take a look at
19  Defendant's Exhibit 2, if you would,
20  please. Do you recognize what is in that
21  picture?
22  A.    Yes, sir.
23  Q.    What is in that picture?

Page 112

1  A.    What is in that picture? That's a
2  picture of the mining property there at
3  Whitchall.
4  Q.    I want you, if you could, to also
5  take a look at Defendant's Exhibit 3 for
6  me, please. Defendant's Exhibit 3 should
7  be the same picture but with some labels
8  on it.
9  A.    That's what it looks like.
10  Q.    If you could read to yourself what
11  those labels say, just tell me whether you
12  think the description in those labels is
13  accurate.
14  A.    Tell you what, now?
15  Q.    Whether you think the description
16  provided in those labels is accurate.
17  A.    Well, the first one, I don't think
18  is accurate.
19  Q.    Tell me which one that is.
20  A.    "The circle is the loop track that
21  was built to hold" -- well, 52-plus.
22  "Plus" makes it right. That's pretty much
23  correct. It's not really pointing to --

28    (Pages 109 to 112)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 113

1 "This is the pit where a floating dredge
2 sits." Okay, that's correct. Yes, sir, I
3 would say it's correct.
4 Q.    In your assessment, those labels are
5 generally correct?
6 A.    Yes, sir.
7 Q.    If you could take a look at
8 Defendant's Exhibit 5, I would appreciate
9 it. Defendant's Exhibit 5 is an e-mail
10 from Mr. Holladay to Mr. Yelvington,
11 relating a conversation that Mr. Holladay
12 said he had with you. If you could read
13 over that e-mail, I would appreciate it,
14 to yourself.
15 A.    (Witness complies.)
16 Q.    Once you've read it, let me know.
17 Have you read it?
18 A.    I'll tell you.
19 Q.    Okay.
20 A.    All right, what is your question?
21 Q.    Were you having conversations with
22 Mr. Holladay about your product mix in
23 March of 2005, as best you can tell? As

Page 114

1 best you recall; excuse me.
2 A.    I can't recall that. These figures
3 look right, but I don't remember
4 specifically giving them to him, but I
5 can't say that I didn't give them to him
6 either.
7 Q.    That's fair enough. In fact, I
8 think these figures, the 55 percent sand,
9 45 percent gravel, match up almost exactly
10 with what you told me earlier in the
11 deposition. Is that right?
12 A.    Yes, sir.
13 Q.    When you read this, does this
14 generally comport with what your
15 recollection was in March of 2005, of the
16 ability to produce and the product mix?
17 A.    I don't think this says --
18 Q.    Let me ask that again. Does this
19 generally match up with the product mix
20 that you expected in March of 2005?
21 A.    Yes.
22 Q.    How about that third paragraph there
23 that begins "based on," is the information

Page 115

1 in that paragraph correct, to the best of
2 your knowledge?
3 A.    There's about seven million tons of
4 sand and gravel, that I know of, there
5 that can be economically mined. If you
6 take that and divide it by the 420,000,
7 that gives you a few more years. This is
8 reasonable, reasonably close.
9 Q.    And the numbers stated in the chart
10 down there regarding annual tons, was that
11 what you understood to be Johnco's
12 production plan on a yearly basis as of
13 March 2005?
14 A.    I couldn't say that, because we
15 really didn't have a production plan. We
16 were going to use as much as we could, so
17 we didn't have plans to produce
18 specifically 150,000 tons of 67.
19 Q.    Is it fair to say you were obligated
20 to produce at least 150,000 tons of 67;
21 right?
22 A.    Yes, sir.
23 Q.    So this would represent, then, I

Page 116

1 guess a minimum production plan?
2 A.    Yes.
3 Q.    Fair enough. You can set that down.
4 If you could take a look at Defendant's
5 Exhibit 7, I would appreciate it. This,
6 again, is an e-mail from Mr. Holladay to
7 Mr. Yelvington, and it refers to a
8 conversation that Mr. Holladay purportedly
9 had with you and your brother. Do you
10 recall having any conversations with
11 Mr. Holladay in January of 2006, any
12 conversations at all, regardless of
13 content?
14 A.    I'm sure I did, but I don't remember
15 any specific conversation, no, sir.
16 Q.    Do you recall having a conversation
17 with Mr. Holladay about sand in January of
18 2006?
19 A.    I don't remember that specifically,
20 no, sir.
21 Q.    Does that mean that it didn't
22 happen, or you just don't recall?
23 A.    I don't recall.

29 (Pages 113 to 116)

# FREEDOM COURT REPORTING

Page 117

1  **Q.   Is it fair to say it could have**
2  **happened?**
3  A.   I know that we did talk to Keith
4  Bodiford.
5  **Q.   At Lafarge?**
6  A.   At Lafarge.
7  **Q.   In January of 2006?**
8  A.   I don't remember when it was, sir.
9  **Q.   Okay. Does January of 2006 meet**
10 **with your recollection of about the time**
11 **frame you were talking to Lafarge?**
12 A.   I don't remember anything about the
13 time frame.
14 **Q.   And as I recall your testimony from**
15 **earlier, you weren't the one talking to**
16 **Lafarge about how much sand they could**
17 **take; is that correct?**
18 A.   I don't believe I ever talked to
19 them about how much they planned to take.
20 I remember talking to Mr. Bodiford at some
21 point in time, and I can't remember what
22 we discussed; but I know we were trying to
23 sell them sand.

Page 118

1  **Q.   Was Johnco trying to sell sand in**
2  **January of 2006?**
3  A.   I'm sure we were.
4  **Q.   Why do you say you're sure you were?**
5  A.   It's just the way I feel.
6  **Q.   Do you recall any point in time that**
7  **Johnco wasn't trying to sell sand?**
8  A.   No, sir.
9  **Q.   Is it fair to say that the entire**
10 **time of the supply agreement up to the**
11 **shutdown, Johnco was trying to sell sand?**
12 A.   It's not fair to say that, because I
13 don't know what happened after Mr. Junkin
14 bought it. Up until the time we sold out,
15 we tried to sell sand.
16 **Q.   Do you know of any time, before or**
17 **after Mr. Junkin bought it out, that**
18 **Johnco wasn't trying to sell sand?**
19 A.   No, sir.
20 **Q.   You can hand that back. Well, take**
21 **that up again, please, Defendant's Exhibit**
22 **7. To your knowledge, would 200,000 tons**
23 **per year of sand balance out Johnco's**

Page 119

1  **gravel production of 150,000 tons per**
2  **year, in that 55/45 mix?**
3  A.   I would think it would roughly
4  balance it out, yes.
5  **Q.   So those numbers appear to be**
6  **correct as far as balancing out sand to**
7  **the gravel?**
8  A.   I would say just off the top of my
9  head that roughly that would balance out.
10 **Q.   Fair enough. Thank you. At any**
11 **point in time do you recall hearing or**
12 **talking to anyone at Lafarge about whether**
13 **they had stocked up on sand and were,**
14 **therefore, unable to purchase from Johnco?**
15 A.   I remember a conversation with
16 somebody at some time about being stocked
17 up on sand.
18 **Q.   Somebody at Lafarge?**
19 A.   I don't know who it was. I don't
20 know who the discussion was with or who it
21 was that was stocked up on sand.
22 **Q.   Do you remember when that discussion**
23 **took place?**

Page 120

1  A.   No.
2  **Q.   Fair enough. If you could take a**
3  **look at Defendant's Exhibit 11, I would**
4  **appreciate it, and if you would take a**
5  **look at the last page for me real quick.**
6  A.   All right, sir.
7  **Q.   Do you recognize what that last page**
8  **represents?**
9  A.   I think so.
10 **Q.   What is it?**
11 A.   Sir?
12 **Q.   What is it?**
13 A.   It looks like the circular track we
14 had built.
15 **Q.   That's what I'm after. Is this the**
16 **design that Johnco ultimately had built?**
17 A.   I think so. It looks like it.
18 **Q.   Fair enough. Thank you. You can**
19 **set that down. At any point in time do**
20 **you remember having trouble with getting**
21 **the gravel washed thoroughly, specifically**
22 **as it related to nylon screens versus wire**
23 **screens?**

30 (Pages 117 to 120)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 121

1  A.  Yes, sir.
2  **Q.  Do you recall when that was?**
3  A.  It was the very first day that we
4  cranked the plant up on, that's not
5  actually nylon but polyurethane screens.
6  What you've been referring to as nylon is
7  actually polyurethane.
8  **Q.  Thank you.**
9  A.  We had trouble the very first time
10 we cranked it up, cranked the pump up.
11 **Q.  Do you recall that being sometime**
12 **around September of 2005?**
13 A.  It possibly could have been, sir.
14 **Q.  In any event, it was before the**
15 **mining facility became fully operational?**
16 A.  Yes, sir.
17 **Q.  If you would take a look at**
18 **Defendant's Exhibit 16 for me, do you**
19 **recognize this document?**
20 A.  I think so, yes, sir.
21 **Q.  What do you recognize this document**
22 **to be?**
23 A.  Sir?

Page 122

1  **Q.  What do you recognize this document**
2  **to be?**
3  A.  I haven't read the whole thing, but
4  it looks like the agreement between Johnco
5  Materials and Yelvington.
6  **Q.  The supply agreement we've been**
7  **referring to?**
8  A.  Yes, sir.
9  **Q.  Do you have any knowledge about how**
10 **the initials P.M.J. and G.Y. came to**
11 **appear on this document?**
12 A.  No, sir.
13 **Q.  Do you know whose handwritten notes**
14 **these are in this document?  Do you see a**
15 **number of sections that are underlined and**
16 **bracketed and outlined in a square?**
17 A.  Do I recognize what?
18 **Q.  The notes.  Do you know who put**
19 **those notes on there?**
20 A.  I don't know for sure, no, sir.  I
21 do recognize my brother's initials on page
22 1, the P.M.J.
23 **Q.  But you don't know who put the notes**

Page 123

1  **on there; is that correct?**
2  A.  No.
3  **Q.  You can set that one down.  If you**
4  **could take a look at Defendant's Exhibit**
5  **15, I would appreciate it.  Do you**
6  **recognize this document?**
7  A.  It looks like it's another copy or a
8  different thing of the supply agreement.
9  **Q.  And I'll represent to you that the**
10 **only differences between this one and the**
11 **last one are that the initials are**
12 **separated on two different pages; there**
13 **appears to be some handwritten notes with**
14 **the date in section 4, and #4 and 8.50**
15 **underneath paragraph 6; and it doesn't**
16 **have the handwritten notes that were on**
17 **the prior version we just looked at.  Had**
18 **you seen the supply agreement at any point**
19 **prior to this deposition?**
20 A.  Yes.
21 **Q.  When did you first see this supply**
22 **agreement?**
23 A.  I don't have any idea.

Page 124

1  **Q.  How did you come about seeing the**
2  **supply agreement?**
3  A.  I don't know.  I assume my brother
4  showed me a copy of it.
5  **Q.  Do you know for what purpose he**
6  **showed you the document?**
7  A.  I have no idea.  Since I owned part
8  of the company, I assumed he wanted me to
9  know what was in it.
10 **Q.  How many times have you seen the**
11 **supply agreement before this deposition?**
12 A.  I have no idea.  Probably once or
13 twice.
14 **Q.  That's kind of what I'm after.  In**
15 **your operation of the daily business of**
16 **Johnco, did you refer back to this supply**
17 **agreement?**
18 A.  No, sir.
19 **Q.  To determine what your obligations**
20 **were?**
21 A.  As far as what?
22 **Q.  What your obligations were under the**
23 **supply agreement.  Did you look at this in**

31  (Pages 121 to 124)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 125

1  the daily operation and say, "Okay, Johnco
2  is required to do this"?
3  A.  No, sir, I did not.
4  Q.  Did you look at it to say, "Okay,
5  Yelvington is required to do this"?
6  A.  No, sir.
7  Q.  Take a look at paragraph 2.1, if you
8  would, for me.
9  A.  On the first page of the second copy
10  of the agreement?
11  Q.  It doesn't matter. They're both the
12  same. Supply agreement, page 1. Do you
13  have an understanding of what "mining
14  facility" meant in the first sentence of
15  paragraph 2.1?
16  A.  Now, say that again.  Do I have
17  what?
18  Q.  An understanding of what the term
19  "mining facility" meant in that first
20  sentence of paragraph 2.1.
21  A.  I have an idea, yes, sir.
22  Q.  What is your idea?
23  A.  I would assume that it's -- I would

Page 126

1  think that it was the mining facility, the
2  plant sits on the ground, and the dredge
3  and the pit.
4  Q.  Do you have any understanding
5  whether that included the load-out
6  facility we've identified earlier?
7  A.  I don't have any understanding as to
8  whether that would be included or not.
9  Evidently, it says "in addition to the
10  mine facility, it would include the rail."
11  So I assume that the rail and the load-out
12  facility would not be in the mining
13  facility since it specifically says in
14  addition to the mining facilities, that we
15  are to build the rail.
16  Q.  Can you take a look at paragraph 3.1
17  for me?
18  A.  3.1?
19  Q.  Yes, sir. It begins on page 1 and
20  continues on to page 2. You'll note on
21  page 2, the first three words say "150,000
22  tons annually"; is that correct?
23  A.  Yes, sir.

Page 127

1  Q.  Is that your understanding of what
2  Yelvington's obligation was?
3  A.  At a minimum, yes, sir.
4  Q.  Did you get that understanding from
5  this document, or did you get that
6  understanding from what someone else told
7  you?
8  A.  I got it from this document.  They
9  had originally agreed, I think, on 50,000
10  tons, and we had just about backed out on
11  putting in the operation, and then
12  Yelvington came back and proposed this
13  150,000 tons.
14  Q.  And if you would, look down a little
15  more than halfway there, it says "Seller
16  and buyer acknowledge that the tonnage
17  specified above will be subject to rail
18  car supply and availability." Do you see
19  that?
20  A.  Yes, sir.
21  Q.  Is it your understanding that that
22  language would affect the tonnage that
23  Yelvington would have to take on an annual

Page 128

1  basis?
2  A.  I don't think it would have an
3  effect on the annual basis, but it would
4  allow them not to buy it at a time when
5  they didn't have a rail car supply.
6  Q.  Specifically, it says "the tonnage
7  specified above." Do you see anyplace
8  other than the 150,000 tons annually that
9  the tonnage is specified?
10  MR. PEARSON:  I'm going to object.
11  The agreement says what it says. Quite
12  frankly, right below that it says "5,200
13  tons per week." It's in there, and you're
14  asking him to read it.
15  Q.  I'm asking for your understanding of
16  it.
17  A.  You're going to have to ask me
18  again.  My train of thought is not that
19  long.
20  Q.  Do you see anyplace that tonnage is
21  referenced other than the 150,000 tons
22  annually in that paragraph?
23  A.  I don't see any other place 150,000

32 (Pages 125 to 128)

# FREEDOM COURT REPORTING

Page 129

1  tons is mentioned. I do see a place where
2  it says 5,200 tons a week.
3  **Q.   In parenthesis there?**
4  A.   Yes.
5  **Q.   Do you know what factors affect the**
6  **availability of rail car supply?**
7  A.   What factors?
8  **Q.   Yes.**
9  A.   They've got lots and lots of cars.
10 I would assume that they might have too
11 much need for it elsewhere, but I never
12 heard a complaint out of them as to not
13 having rail cars. It was never ever
14 mentioned to me that they didn't have the
15 rail cars.
16 **Q.   Help me work through this here. To**
17 **get the rail cars to Johnco, who are the**
18 **different, for lack of a better term,**
19 **players involved? Yelvington is one of**
20 **the players; we know that.**
21 A.   And the railroad company.
22 **Q.   So the railroad company can affect**
23 **the availability of cars; correct?**

Page 130

1  A.   They can't affect his availability
2  of cars because he has his own cars. They
3  do not supply the cars.
4  **Q.   I understand that. But to get the**
5  **cars to Johnco, you have to have the**
6  **cooperation of the railroad; is that**
7  **correct?**
8  A.   I would think so, yes.
9  **Q.   In fact, the railroad provides the**
10 **power to get those cars there; is that**
11 **right?**
12 A.   Yes, sir.
13 **Q.   Any other factors in play?**
14 A.   I can't think of anything.
15 **Q.   The railroad also schedules when the**
16 **train can move on its track; correct?**
17 A.   Yes, sir.
18 **Q.   So the railroad controls the**
19 **scheduling and the movement of those cars;**
20 **is that correct?**
21 A.   Yes, sir, but not the availability
22 of them.
23 **Q.   Well, if they can't be moved,**

Page 131

1  they're not available. Is that right?
2      MR. PEARSON: I object to the form.
3  First of all, the foundation is improper.
4  Second of all, it's argumentative, and I
5  think he has answered your question as
6  best he can. I mean, you can argue with
7  him all night. What "availability" means
8  under the terms of the contract is a legal
9  conclusion, which is another form
10 objection. You know, have at it, but this
11 is objectionable.
12 **Q.   You can answer the question.**
13 A.   I haven't got any idea what it was
14 now.
15 **Q.   Well, if the rail cars can't get to**
16 **Johnco, they're not available to be**
17 **loaded; is that correct? I mean, is that**
18 **fair to say?**
19 A.   They're not available at our plant
20 site.
21 **Q.   Right. And the reasons they may not**
22 **get there is because the railroad company**
23 **may not provide power to them; isn't that**

Page 132

1  **correct?**
2  A.   I would assume so.
3  **Q.   And the reason they may not get**
4  **there is because the railroad won't**
5  **schedule them to use the track, or won't**
6  **permit them to use the track to get there;**
7  **isn't that correct?**
8      MR. PEARSON: I object to the form.
9  That's speculation. There's no foundation
10 been laid.
11 **Q.   I mean, you've been in the business**
12 **for a long time; right?**
13 A.   I haven't fooled with that many
14 railroads.
15 **Q.   Well, if you don't know, just say "I**
16 **don't know."**
17 A.   I don't know.
18 **Q.   Can you think of anything that would**
19 **affect the supply and availability of rail**
20 **cars outside of what we've talked about?**
21 A.   Well, they had a hurricane down on
22 the Gulf Coast and wiped out the rail line
23 down there, but that --

33 (Pages 129 to 132)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 133

1  Q.    When was that?
2  A.    Katrina.
3  Q.    Do you recall what month that was?
4  I understand it was 2006.
5  A.    It was 2006, I'm pretty sure. It
6  might have been 2005.
7  Q.    2005 or 2006. Frankly, I don't
8  remember either. Anything else?
9  A.    I can't think of anything.
10  Q.    Did you have any involvement in
11  processing the invoices or payment either
12  to Yelvington or from Yelvington?
13  A.    Very little, if any.
14  Q.    Do you know of any point in time
15  Yelvington failed to pay an invoice?
16  A.    No, sir.
17  Q.    Do you know of any point in time
18  when Yelvington failed to pay an invoice
19  within thirty days of being invoiced?
20  A.    I don't have any knowledge of any of
21  that.
22  Q.    Fair enough. To your knowledge, has
23  this supply agreement ever been modified?

Page 134

1  A.    Not that I know of, sir.
2  Q.    Are you aware of any instance in
3  which Johnco sent any notice to Yelvington
4  under this supply agreement?
5  A.    I don't have any knowledge of it.
6  Q.    Do you have any knowledge of any
7  time that Yelvington ever sent notice to
8  Johnco under this supply agreement?
9  A.    No, sir.
10    (Whereupon, at this time a short
11  break was taken.)
12  Q.    As I understand it, Johnco had a
13  couple of e-mail addresses. One of them
14  was Johnco397@bellsouth.net. Do you
15  recognize that e-mail address?
16  A.    That sounds familiar, but I am
17  computer illiterate, and I don't do
18  e-mail.
19  Q.    Was there anyone at the facility
20  that would have handled e-mail, let's say
21  between the supply agreement and the end
22  of 2006?
23  A.    There is somebody there that is

Page 135

1  capable of doing that, yes, sir.
2  Q.    Did anybody have that as part of
3  their job functions, to review e-mail?
4  A.    I don't think she reviews incoming
5  e-mails, but she'll e-mail stuff out.
6  She's bound to review them. I know she
7  has gotten some from Yelvington.
8  Q.    Oh, okay. That's kind of where I'm
9  going here.
10    (Whereupon, Defendant's Exhibit
11  Number 17 was marked for identification, a
12  copy of which is attached to the original
13  of the transcript.)
14  Q.    Who is "she" that you're talking
15  about?
16  A.    Sir?
17  Q.    Who is the "she" that you were
18  referencing?
19  A.    It's the lady that works for me
20  there.
21  Q.    What is her name?
22  A.    Mary Ann Smith.
23  Q.    How long has she been with you?

Page 136

1  A.    Probably a year-and-a-half, two
2  years.
3  Q.    So can you tell me whether Johnco
4  received this e-mail that you've got in
5  front of you?
6  A.    I can't tell you that we got it, no.
7  I see it come from Jean Norton. I know
8  who she is.
9  Q.    Who is Jean Norton?
10  A.    She works for Conrad Yelvington.
11  Q.    Do you know what her role was?
12  A.    I don't know what her specific job
13  is, no.
14  Q.    Do you understand that she's the
15  person who schedules the trains to come in
16  to Johnco?
17  A.    I understand that, yes, sir.
18  Q.    You can set that aside.
19  A.    See, this is the Mary Ann Smith that
20  I referred to.
21  Q.    In Defendant's Exhibit 17,
22  referenced in Defendant's Exhibit 17, the
23  one you were just looking at? I think

34  (Pages 133 to 136)

# FREEDOM COURT REPORTING

Page 137

1   it's referencing Defendant's Exhibit 17.
2      MR. PEARSON:  It is.
3      (Whereupon, Defendant's Exhibit
4   Number 18 was marked for identification, a
5   copy of which is attached to the original
6   of the transcript.)
7   **Q.   I have marked this as Defendant's**
8   **Exhibit 18.  Do you know whether Johnco**
9   **received this e-mail, dated August 9,**
10  **2006?**
11  A.    I don't have any idea, sir.
12  **Q.   Fair enough.**
13     **(Whereupon, Defendant's Exhibit**
14  **Number 19 was marked for identification, a**
15  **copy of which is attached to the original**
16  **of the transcript.)**
17  **Q.   I have marked this as Defendant's**
18  **Exhibit 19.  Can you tell me whether**
19  **Johnco received this e-mail in September**
20  **of 2006?**
21  A.    I have no idea.  I do remember
22  something about a train coming from
23  Theodore at some point in time.

Page 138

1   **Q.   Around September 2006?**
2   A.    I don't know when it was.
3   **Q.   Do you have any reason to believe it**
4   **wasn't around the time that is indicated**
5   **on that e-mail?**
6   A.    No, I have no reason not to believe
7   that.
8   **Q.   You can put it down.  Thank you.**
9   **Did Johnco have another e-mail address,**
10  **that you're aware of, specifically**
11  **Johnco@NCTV.com?**
12  A.    I don't recognize the address, but I
13  know they had another e-mail address there
14  in Aliceville.
15  **Q.   Is that the one that went to your**
16  **brother's office?**
17  A.    Yes, sir.
18     MR. LEEK:  I don't have anything
19  further.
20     MR. PEARSON:  Well, I don't have any
21  questions for the witness.
22     FURTHER DEPONENT SAITH NOT.
23

Page 139

1          C E R T I F I C A T E
2
3   STATE OF ALABAMA)
4   JEFFERSON COUNTY
5
6      I hereby certify that the above and
7   foregoing deposition was taken down by me
8   in stenotype and the questions and answers
9   thereto were reduced to typewriting under
10  my supervision and that the foregoing
11  represents a true and correct record of
12  the testimony/evidence given by the
13  deponent.
14     I further certify that I am neither of
15  counsel nor of kin to any of the parties to the
16  action, nor am I in anywise interested in the results
17  of said cause.
18
19
20
21
22
23     Donna L. Winters, Commissioner

35  (Pages 137 to 139)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# EXHIBIT 5

STATE OF ALABAMA )
                  )
LOWNDES COUNTY )

## SUPPLY AGREEMENT

THIS SUPPLY AGREEMENT (the "Agreement") is effective April 16, 2004, between JOHNCO MATERIALS, INC., an Alabama corporation whose address is 120 3rd Avenue N.E., Aliceville, Alabama, 35442, and its successors or assigns (collectively, "Seller") and CONRAD YELVINGTON DISTRIBUTORS, INC., a corporation whose address is 2326 Bellevue Avenue, Daytona Beach, Florida 32114, and its successors or assigns (collectively, "Buyer").

1.     DEFINITIONS. The following definitions shall apply to this Agreement, in addition to the definitions contained in other provisions hereof:

(a) "Contract Year" means any year beginning on the effective date of the term of this Agreement or any anniversary thereof, and ending on the day before the next succeeding anniversary thereof;

(b) "Plant Site" means the real property described on the attached Exhibit "A", including the mining facility for the mining and classification of sand and gravel to be constructed thereon by Seller.

(c) "Product" means any product specified in the Schedule attached to this Agreement and made a part of this Agreement by this reference. *J.M. J sy*

2.     CONSTRUCTION OF PLANT FACILITY

2.1     Plant Facility. Within twelve months of the execution of this Agreement, Seller shall construct a mining facility to mine and classify sand and gravel on the Plant Site. In addition to the mining facilities to be constructed on the Plant Site, this contract is contingent on Seller's ability to construct, or obtain rights to, sufficient rail siding to load/handle a minimum of fifty-two (52) open, or covered, hopper railcars on a regular shipment schedule.

2.2     Right To Use Rail Siding. Buyer and the rail cars it provides for shipment of Product it purchases have priority over any other customer of Seller and shall have the unrestricted use of the rail siding.

3.     PRODUCTS - QUANTITIES - QUALITY

3.1     Products; Price; Quantities. After Seller commences mining and grading of sand and gravel Seller shall sell and deliver to Buyer, No. 67 concrete gravel in minimum quantities of

150,000 tons annually for a price equal to Five and Twenty-Five One Hundredths Dollars ($5.25) per ton, F.O.B. Buyer's rail cars loaded on the rail siding on the Plant Site, on a weekly schedule (i.e. approximately 5,200 tons per week), and Buyer shall purchase and accept from Seller said Product at the price and in the quantities specified. However, notwithstanding the foregoing, Buyer shall have the right to reject any such Product that does not meet the above-named classification or Buyer's specifications, and Seller and Buyer acknowledge that the tonnage specified above will be subject to rail car supply and availability. The price per ton established herein for the Product shall remain fixed at $5.25 per ton for gravel for the first twenty-four months (i.e. 2 years) of this Agreement. The price will increase by five percent (5%) at the beginning of year three, and two and one-half percent (2.5%) at the beginning of years four and five.

3.2     Title.  Title to any Product delivered shall pass to Buyer when it is placed in Buyer's possession by loading the Product upon rail cars or other transportation vehicles delivered to the Plant Site and provided by Buyer.

3.3     Right of First Refusal.  Seller hereby grants Buyer a right of first refusal to purchase, at the price established in Section 3.1 above, any and all No. 67 concrete gravel produced by Seller in excess of the quantity required to meet Buyer's tonnage commitment. Upon notification from Seller of the availability of excess Product, Buyer will have fifteen (15) days to respond with its intent to exercise or to waive this right of first refusal.

3.4     Rail Cars. Buyer shall supply the rail cars or other means of transporting any Product purchased by Buyer from Seller under this Agreement.

3.5     Quality. Buyer reserves the right to inspect the Product at the Plant Site to insure that it meets Buyer's specifications for size, color and other quality criteria established by Buyer. Buyer agrees to provide a general guideline, non-binding on Buyer, for the Product Buyer desires to purchase hereunder.

3.6     Payment. Payment for Product shall be made within thirty days from the date of invoice.

4.     TERM.  This Agreement shall become effective on the date of execution hereof, and shall end on the fifth anniversary date of the first shipment of Product.

5.     SELLER'S INDEMNITY. Seller agrees to indemnify, and defend Buyer against, and hold Buyer harmless from any claims, demands, causes of action, or suits, costs, including reasonable attorneys fees, of any nature, including personal injury, death, loss of or damage to person or property, of any nature whatsoever arising out of the ownership and/or operation of the mining operation and plant facility, including, but not limited to the loading of Buyer's rail cars.

6.     SURVIVAL.  This Agreement, including all covenants, representations and warranties herein contained, shall inure to the benefit of, and be binding upon, the parties hereto and their respective successors and assigns, or other legal representatives and shall survive the execution of this Agreement.

7. **MODIFICATION.** This Agreement cannot be changed or terminated orally, but only by a written instrument of change, modification, waiver or termination executed by the parties hereto.

8. **SEVERABILITY.** If any term or provision of this Agreement, or the application thereof to any person or circumstance shall, to any extent, be invalid or unenforceable, the remainder of this Agreement, or the application of such term or provision to persons or circumstances other than those as to which it is held invalid or unenforceable, shall not be affected thereby, and each term and provision of this Agreement shall be valid and be enforced to the fullest extent permitted by law.

9. **APPLICABLE LAW.** This Agreement shall be construed, interpreted, and enforced in accordance with and governed by the laws of the State of Alabama, without giving effect to such state's conflict of laws principles.

10. **TAXES AND CHARGES.** It is agreed that any duty, tax, fee, or other charge which Seller may be required to collect or pay under any municipal, state, federal or other laws now in effect or hereafter enacted with respect to the production, manufacture, inspection, transportation, storage, sale, delivery or use of the Products covered under this Agreement shall be the sole cost of Seller.

11. **NOTICES.** Every notice hereunder (except then otherwise specified and subject to any requirements of law) shall be given by certified or registered letter, telegram or telex and shall be deemed given when the letter is deposited in the U.S. mail or the telegram or telex is dispatched, postage or charges prepaid, and directed to Seller or Buyer (as the case may be) at its address first herein specified, or at such other address as either may have substituted by notice so given to the other.

12. **ENTIRETY - RELEASE - EXECUTION.** This Agreement, as of the beginning date of its term, contains the complete and exclusive agreement of Seller and Buyer. Neither this Agreement nor any subsequent agreement amending or supplementing this Agreement shall be binding on either party hereto unless and until it has been signed by a duly authorized representative of the party against whom enforcement is sought, and commencement of performance hereunder or under any such subsequent agreement shall not constitute a waiver of this requirement.

EXECUTED on the date(s) specified below.

**SELLER:**

**JOHNCO MATERIALS, INC.**

**ATTEST:**

By: _Virginia Latham_

Name: _Virginia Latham_

By: _J.M. Johnson_

Its: _President_

Date: _4/28/04_

**STATE OF** _AL_

**COUNTY OF** _Pickens_

    The foregoing instrument was acknowledged before me this _28_ day of _April_, 2004, by _J.M. Johnston_ as _President_ of Johnco Materials, Inc., who is personally known to me, or has produced _____ as identification.

**NOTARY PUBLIC:**

Sign: _Annette Latham_
Print: _ANNETTE LATHAM_

**(SEAL)**

My Commission Expires: _My Commission Expires_
Title/Rank: _____ _1/21/2008_
Commission Number: _____

**SUPPLY AGREEMENT PAGE -4-**

**BUYER:**

**CONRAD YELVINGTON DISTRIBUTORS, INC.**

**ATTEST:**

By: _Kathleen S. McGee_

Name: _KATHLEEN S. M'GEE_

By: _[signature]_

Its: _Pres._

Date: _4-16-04_

STATE OF _FLORIDA_

COUNTY OF _VOLUSIA_

The foregoing instrument was acknowledged before me this _16th_ day of _April_, 2004, by _GARY YELVINGTON_ as _PRESIDENT_ of Conrad Yelvington Distributors, Inc., ~~who is personally known to me, or has produced~~ _____ ~~as identification.~~

**NOTARY PUBLIC:**

Sign: _[signature]_

Print: _MARK W. KLEBE_

**(SEAL)**

My Commission Expires: _____

Title/Rank: _____

Commission Number: _____

Notary Public, State of Florida
Mark W. Klebe
My Commission Expires July 1, 2005
CC Number DD038253

SUPPLY AGREEMENT PAGE -5-

## EXHIBIT A

## Legal Description of Plant Site

The legal description of the land to be mined is:

Beginning at the SW Corner of NW 1/4 of SE 1/4 of Sec. 31, T 16 N, R 14 E; thence N 0 degrees 141 feet; thence E 90 degrees 2400 feet; thence NW 315 degrees 562 feet; thence W 270 degrees 509 feet; thence N 0 degrees 689 feet; thence E 90 degrees 501 feet; thence SE 116 degrees 1523 feet; thence N 0 degrees 642 feet; thence E 90 degrees 294 feet; thence S 179.6 degrees 1860 feet; thence SW 228.4 degrees 519 feet; thence SW 243.8 degrees 576 feet; thence SW 244.5 degrees 963 feet; thence WSW 269 degrees 724 feet; thence NW 301 degrees 502 feet; thence NW 315 degrees 548 feet; thence NW 321 degrees 526 feet; thence N 359 degrees 646 feet to POB.

The above description is based on bearings. Total description encompasses 161 acres more or less, located in Sections 5 & 6, Township 15 N, and Section 31, Township 16 N, all being in Range 14 E.

# EXHIBIT 6

1

1    IN THE UNITED STATES DISTRICT COURT
     FOR THE MIDDLE DISTRICT OF ALABAMA
2
     CIVIL ACTION NO. 2:06cv993-ID
3
4    JOHNCO MATERIALS, INC.,
5        Plaintiff,
6    vs.
7    CONRAD YELVINGTON
     DISTRIBUTORS, INC.,
8
         Defendant.
9
10
***************************************************
11   DEPOSITION OF:    PHILIP HOLLADAY
12   DATE TAKEN:       July 6, 2007
13   TIME:        COMMENCED AT 10:05 a.m.
                  CONCLUDED AT 2:10 p.m.
14
     PLACE:       150 Magnolia Avenue
15                Daytona Beach, Florida
16   STENOGRAPHICALLY
     REPORTED BY:     SANDRA NARUP
17              REGISTERED PROFESSIONAL REPORTER &
                FLORIDA PROFESSIONAL REPORTER
18   ***************************************************
19
20
21        VOLUSIA REPORTING COMPANY
             432 SOUTH BEACH STREET
22        DAYTONA BEACH, FLORIDA 32114
                 386-255-2150
23
24
25

2

1    Appearing for the Plaintiff
2    H. GREGORY PEARSON, ESQUIRE
     CHARLES E. HARRISON, ESQUIRE
3    Of Junkin, Pearson, Harrison & Junkin, L.L.C.
     601 Greensboro Avenue
4    Suite 600 Alston Place
     Tuscaloosa, Alabama 35401
5    205-366-0111, FAX-205-391-4780
6
7    Appearing for the Defendant
8    THOMAS J. LEEK, ESQUIRE
     Of Cobb & Cole
9    150 Magnolia Avenue
     Daytona Beach, Florida 32114
10   386-255-8171, FAX-386-248-0323
11
12
     ALSO PRESENT:
13
     CLATUS JUNKIN, Corporate Representative for Johnco
14   GARY YELVINGTON, Conrad Yelvington Distributors, Inc
15
16
17
18
19
20
21
22
23
24
25

3

1              I N D E X
                                          PAGE
2
3    DIRECT EXAMINATION BY MR. PEARSON          4
4    CERTIFICATE OF OATH            120
5    CERTIFICATE OF REPORTER        121
6    READ AND SIGN LETTER           122
7    ERRATA SHEET                   123
8
9
10                ------
11
12             Stipulations
13       It is hereby agreed and so stipulated by and
14   between the parties hereto, through their respective
15   counsel, that the reading and signing of the transcript
16   are expressly reserved by the Deponent.
17
18
19
20
21
22
23
24
25

4

1        COURT REPORTER:  Would you please raise your
2    right hand?
3        Do you solemnly swear that the testimony you're
4    about to give in this cause is the truth, the whole
5    truth and nothing but the truth, so help you God?
6        THE WITNESS:  Yes.
7    THEREUPON
8             PHILIP HOLLADAY
9    Was called as a witness, and having first been duly
10   sworn, testified as follows:
11            DIRECT EXAMINATION
12   BY MR. PEARSON:
13       Q.  Mr. Holladay, if you would, please state your
14   name and where you live for the record, please.
15       A.  My name is Philip Holladay, and I live in
16   Spanish Fort, Alabama. Want the address?
17       Q.  Yeah, go ahead.
18       A.  31565 Tara Boulevard, Spanish Fort, Alabama.
19       Q.  How long have you lived there, Philip?
20       A.  About a year and a half.
21       Q.  Where did you live before that?
22       A.  In Daphne, about a mile away.
23       Q.  Just moved houses?
24       A.  Correct.
25       Q.  Are you married?

**5**

1    A.  Yes.
2    Q.  And what's your wife's name?
3    A.  Lisa.
4    Q.  And how long have you been married to Lisa?
5    A.  Since 1979.
6    Q.  Got kids?
7    A.  I have two kids.
8    Q.  How old are they?
9    A.  My daughter is 21 and 16.
10   Q.  Is your daughter living with you, the
11 21-year-old?
12   A.  No.
13   Q.  Did she go to college?
14   A.  Yes.
15   Q.  Where did she go?
16   A.  She just graduated from Rensselaer in New York.
17   Q.  Smart girl.
18   A.  I hope so.
19   Q.  Tell me a little bit about your educational
20 background.  Did you graduate college?
21   A.  Yes, I did.
22   Q.  Where did you go?
23   A.  To UAB, University of Alabama Birmingham.
24   Q.  Did you grow up in the Birmingham area?
25   A.  That's right.

**6**

1    Q.  Where did you go to high school up there?
2    A.  It was Shades Valley Resource Learning Center.
3    Q.  Is that -- I'm not familiar --
4    A.  It's the International Baccalaureate now,
5 Program.
6    Q.  Okay.  I am familiar with that.
7       And when did you go to UAB?
8    A.  I was on the in-and-out plan, but I graduated.
9 I finished my civil engineering degree in 1992.
10   Q.  Okay.  And are you a registered professional
11 engineer?
12   A.  No.  I have an EIT, intern --
13   Q.  What's that?
14   A.  EIT.
15   Q.  Those letters stand for words.  What is that?
16   A.  It's engineering intern, or something like
17 that.  It's the first step of professional registration.
18   Q.  And that -- how do you become EIT?  Do you have
19 to send a form in with some money, or do you have to --
20 there is an educational requirement?
21   A.  There's an educational requirement and an
22 examination.
23   Q.  Okay.  Like a written examination?
24   A.  Correct.
25   Q.  And you've taken that?

**7**

1    A.  Correct.
2    Q.  What's left to get your professional
3 engineering degree --
4    A.  Applying for it.
5    Q.  -- status?
6       Just apply for it?  Are you going to apply for
7 it?
8    A.  I'm not sure.
9    Q.  Okay.  And you said you graduated.  What was
10 the year you said you graduated from UAB, finally?  When
11 you say finally, you said you were in and out.
12   A.  Finally is right.  1992.
13   Q.  Okay.  And your work history.  I understand now
14 you're employed by Conrad Yelvington Distributors, Inc.?
15   A.  That's correct.
16   Q.  All right.  How long have you actually been an
17 employee of --
18   A.  Since February -- January, February of this
19 year.
20   Q.  Of '07?
21   A.  Correct.
22   Q.  All right.  And prior to earlier this year in
23 '07, it's my understanding that you worked for
24 Yelvington.  And I'm going to use that term different
25 ways, but I'm speaking of the company.  How long had you

**8**

1 worked for them before?
2    A.  Since 1990 -- I'm sorry.  2003.
3    Q.  Okay.  And what did you do between 2003 and
4 2007, when you became an employee?  What position or
5 status?  How did you see yourself?  What was your
6 position with Conrad Yelvington?
7    A.  As a consultant.
8    Q.  Consultant?
9    A.  Uh-huh.
10   Q.  And when you say you're a consultant, did you
11 get paid a specific amount of money for a specific thing
12 that you did, or did you get paid some sort of straight
13 retainer type of consulting?
14   A.  That's correct.
15   Q.  A straight retainer type of --
16   A.  Uh-huh.
17   Q.  So but for the designation of non-employee
18 status, you got paid periodically, and it was the same
19 amount at all times?
20   A.  That's correct.
21   Q.  Did you consult for anyone else during the time
22 that you were a consultant for Conrad Yelvington?
23   A.  Early on.
24   Q.  Okay.  When you say early on, what time frame?
25   A.  Probably the first year.  But it was just a one

9

1  spot deal, one or two. I was just trying to think of
2  how many there were. Just probably two occasions in
3  2003.
4      Q. Okay.
5      MR. LEEK: Philip, let me interrupt you. What
6  I need you to do is wait for him to finish his
7  question before you start your answer so that Sandy
8  can make sure she gets everything down.
9      THE WITNESS: Sure.
10     MR. PEARSON: Sorry, Sandy. She has to take
11  both of what we say down, and we make it hard on
12  her. I have a daughter who's a court reporter so
13  I'm usually very sensitive to making sure, but
14  somehow, we just got in this conversation and I lost
15  my head a little bit.
16 BY MR. PEARSON:
17     Q. So you're a consultant. But who else did you
18  consult for during this early time frame?
19     A. There was a contractor in Moss Point,
20  Mississippi that was looking to unload some barges and
21  I'd had some experience with that, and I helped him put
22  a business plan together for that.
23     Q. When you say, unload barges, what were you
24  unloading off the barges?
25     A. Crushed stone.

10

1      Q. Rock and crushed stone?
2      A. Uh-huh.
3      Q. And was all of your consulting related to the
4  building materials, crushed stone, aggregate type of
5  things?
6      A. That's correct.
7      Q. Now, prior to 2003, when you became a
8  consultant for Conrad Yelvington, what had you done, the
9  next job previous to that?
10     A. Just a sales manager for Vulcan Materials
11  Company, in the Mobile, Alabama office.
12     Q. As a sales manager for Vulcan Materials, what
13  would have been your responsibilities in that job?
14     A. We operated a maximum of, at the end, of ten
15  distribution facilities. Some were rail, some were
16  barge, some were ship served. And I was responsible for
17  coordinating the operations activities with our customer
18  base and then selling the material to our customers.
19     Q. So Vulcan Materials would be selling materials
20  that would have to be shipped somewhere to customers
21  elsewhere, and you would coordinate that with the
22  customers and the shipping people?
23     A. Yes.
24     Q. And how many customers were you coordinating
25  with at that time?

11

1      A. Several hundred.
2      Q. All right. Give me an example of what
3  coordinating with customers would entail.
4      A. Material that would come in, and I mean crushed
5  stone that would come in by barge or ship, it requires
6  arranging the services to unload, either a crane or
7  crews to unload the ship. We had to arrange for
8  trucking or other incidentals on the land side.
9      Some projects were direct shipment where we
10  would take the material directly, as it was unloaded, to
11  a customer's location. They had to be prepared for
12  that. There were times where we would put it in our
13  storage yard and then sell it to the customer later.
14     Q. Okay. What was Vulcan Materials business, I
15  mean, if you were to describe it in summary form?
16     A. Vulcan is a manufacturer or producer of crushed
17  stone and building materials, and they operate
18  distribution yards where they're not close to the
19  primary source, where the quarries are.
20     Q. And where are Vulcan's quarries -- because you
21  say you actually received crushed stone from elsewhere
22  on barges. Right?
23     A. That's correct.
24     Q. Now, would that be coming out of Birmingham, or
25  would that be coming from someplace far away?

12

1      A. Both.
2      Q. Okay. But it was Vulcan's quarries? In other
3  words, the product that you were getting into the Mobile
4  area was all Vulcan's product and arranging for it to be
5  distributed?
6      A. Yes. For the most part.
7      Q. Okay. Did you have anything to do with the
8  actual arranging for a particular customer, in other
9  words, selling something to them? We got this stuff,
10  here's our price. Did you do that?
11     A. Yes.
12     Q. Okay. And was that -- did you do it for two or
13  three hundred customers?
14     A. Yes.
15     Q. And did you have a staff, I would assume?
16     A. Yes.
17     Q. How many people did you have working in your
18  sales part?
19     A. Six in the office, and people at each of the
20  distribution yards.
21     Q. Before Vulcan, did you have any other
22  employment?
23     A. Yes.
24     Q. Tell me about that.
25     A. I had worked for an engineering firm, a

13

1  geotechnical consulting firm in Birmingham, for a total
2  of eight years. I worked for a concrete company, as
3  well, producing concrete, ready mix concrete.
4      Q.  The name of the concrete company was?
5      A.  Pioneer Concrete.
6      Q.  All right. And are they local to the
7  Birmingham area?
8      A.  They were at the time.
9      Q.  Are they out of business now?
10     A.  They pulled out of Birmingham.
11     Q.  So they don't operate in Birmingham, but
12 they're still in business?
13     A.  Correct.
14     Q.  And the geotechnical engineering firm, who was
15 that?
16     A.  It was Bhate.
17     Q.  And what do they do?
18     A.  They're geotechnical foundation designers and
19 material testers, testing construction materials.
20     Q.  Okay. And what -- they would actually get
21 samples and test them for the quality and specs that
22 would be needed for a particular job?
23     A.  That's one of the things they did.
24     Q.  And they would do that on a contract basis for
25 different people?

14

1      A.  I wasn't involved with the business side of it
2  so much, but I would assume that's correct, on a fee
3  basis.
4      Q.  What did you do for them?
5      A.  I did a number of things. I was a project
6  manager for the building phase of a project when they do
7  the foundation design. I did some foundation design. I
8  was a -- I managed the materials lab for about two
9  years. Then I was a -- my initial job was as a
10 technician.
11     Q.  When you did the jobs with Pioneer and with the
12 geotech company, which I think you said was Bhate -- I
13 don't know how that's spelled. Do you know how it's
14 spelled?
15     A.  B-H-A-T-E.
16     Q.  And are they -- does that name have any
17 significance, or is it just letters strung together?
18     A.  It was the owner's name.
19     Q.  Okay. And where were you located physically?
20     A.  In Birmingham, Alabama.
21     Q.  For both of those?
22     A.  For Bhate, and I started with Pioneer in
23 Birmingham.
24     Q.  And then did you move from Birmingham while you
25 were with Pioneer?

15

1      A.  That's correct.
2      Q.  Where did you go then?
3      A.  To Houston, Texas, and Albuquerque, New Mexico.
4      Q.  Then you -- the lure of home brought you back?
5      A.  You could say that.
6      Q.  Okay. So how did you come to leave Vulcan and
7  go to work as a consultant for Yelvington?
8      A.  I had been with Vulcan for ten years and there
9  was some management changes, and we had a parting of
10 ways, just philosophical differences. And I was ready
11 to do something different, and had contacted Gary about
12 the possibility of working for him or doing some work
13 for him on a consulting basis.
14     Q.  Had you done -- go ahead.
15     A.  I was just ready to get out of management.
16     Q.  Did you know Gary? And I assume, when you're
17 saying Gary, you're speaking of Gary Yelvington.
18     A.  That's correct.
19     Q.  And he's here with us today at this deposition.
20         Did you know Gary while you worked for Vulcan?
21     A.  Yes.
22     Q.  And did you know him, you know, just like in a
23 social way, or did you all do business with Yelvington
24 Distributors, Inc.?
25     A.  Yelvington did -- we did business with

16

1  Yelvington.
2      Q.  What kind of business did Vulcan do with them
3  while you were with Vulcan?
4      A.  Yelvington provided transportation and handling
5  services for Vulcan's crushed stone.
6      Q.  So they would help you move it?
7      A.  Correct.
8      Q.  And they would also do something -- when you
9  say handling, I'm assuming that involves some sort of
10 loading and unloading and storing. Does it involve any
11 of those things?
12     A.  Yes.
13     Q.  So they would actually store some of your
14 material? Or, did they purchase your material?
15     A.  They did not purchase Vulcan's material.
16     Q.  Okay. They would just store it for them?
17     A.  And reload customers' trucks.
18     Q.  Okay. And was Conrad Yelvington Distributors,
19 Inc. one of your two or three hundred customers?
20     A.  They were not a customer. They were a vendor.
21 A -- yeah, a vendor.
22     Q.  Okay. And how many vendors did you have?
23     A.  I don't recall.
24     Q.  Okay. Were there other companies that did what
25 Yelvington did for Vulcan while you were there?

4 (Pages 13 to 16)

17

1    A.   Not to the same degree, but similar services.
2  Barge unloading, rail car unloading.  We had different
3  subcontractors working for us.
4    Q.   Okay.  So you considered Yelvington a
5  subcontractor?
6    A.   You could say that.  A vendor.  Supplier.
7    Q.   Did they have a long-term relationship with
8  Vulcan?  When I'm speaking of they, I'm meaning
9  Yelvington.
10    A.   What do you mean by long term?
11    Q.   Well, in other words, on a consistent basis,
12  Yelvington had an agreement or a deal with Vulcan to
13  move, load, handle, ship, redistribute their product?
14    A.   Yes.
15    Q.   And did this exist during that whole time you
16  worked for Vulcan?
17    A.   Not the whole time.
18    Q.   So did Yelvington begin after you got there or
19  quit working with Vulcan before you left, which of
20  those?
21    A.   They came into the area that I was responsible
22  for after I started working there.
23    Q.   Okay.  And when you left and you called Gary
24  and you were ready to do something else, tell me what it
25  is that you then did for Yelvington.

18

1    A.   I would say my primary responsibility was to
2  locate -- actually, to develop a strategy for expanding
3  the distribution network, to locate properties that
4  either were zoned properly or could be zoned properly
5  and acquire the property, or assist in acquiring the
6  property for a distribution terminal, and arrange
7  engineering, to get the permits necessary to get the
8  terminals to construction.
9    Q.   Have you been involved with permitting terminal
10  facilities?  Gary had described that to us yesterday in
11  his deposition, some of the things that go into that.
12  Have you been involved as the engineer for doing that?
13    A.   Well, I'm not the engineer, but I arrange for
14  that.
15    Q.   Okay.  And does Yelvington do that for other
16  people on a contract basis, provide the permitting
17  services?
18    A.   Not that I'm aware of.
19    Q.   But you haven't, that you're aware of, had
20  anything to do with that?
21    A.   No.
22    Q.   The permits that you go after are Yelvington's
23  permits?
24    A.   Correct.
25    Q.   How -- and I guess, how did you come to get

19

1  involved with the Johnco Whitehall mining facility?
2    A.   In, I think it was March of 2005 -- you know, I
3  live in Spanish Fort, which is not -- it's a lot closer
4  to Whitehall than Daytona Beach is to Whitehall.  And
5  Gary had called me and told me that they were supposed
6  to be ready to ship sometime -- sometime soon.  He
7  wanted me to go up and check on the progress and the
8  status of the operation, so I did that.
9    Q.   Okay.  And what were -- what exactly, though,
10  were you supposed to do while you were up there?
11    A.   To determine if they were ready to load trains
12  with gravel for our yards.
13    Q.   And March of 2005 was your earliest time that
14  you had anything to do with the Johnco facility in
15  Whitehall?
16    A.   That's correct.
17    Q.   And so did Gary -- and you said Gary is the one
18  who told you to go up there.  Is that right?
19    A.   Correct.
20    Q.   All right.  While you're a consultant, who did
21  you report to at Yelvington?
22    A.   Primarily to Gary.
23    Q.   Okay.  And what were -- what were you supposed
24  to -- what was your charge?  What was your
25  responsibility?  What were you supposed to report to

20

1  him?
2    A.   I believe I said that the -- I was to determine
3  the status of operations, if they were able or ready to
4  load a train with gravel for our distribution yards.
5    Q.   Okay.  And that's all you were supposed to tell
6  him is whether they were ready?
7    A.   Correct.
8    Q.   Okay.  And then how would you go about coming
9  to your conclusion of whether they were ready or not?
10    A.   I talked with the -- with Ben Johnson, who is,
11  I guess, the manager or one of the owners.  I'm not sure
12  exactly what his role is.  And with Pep Johnson.
13    Q.   And did you do that for the first time in March
14  of '05?
15    A.   Correct.
16    Q.   And so when in March of '05, what stage was the
17  project in?
18    A.   I believe I went on the very end of March, and
19  the pit had begun to be dug.  Some of the overburden had
20  been removed.  The dredge was on-site but not in the
21  pit.  And the classifying plant had not become
22  operational yet.
23    Q.   And the classifying plant is the structure
24  that's on top of the ground that the product goes into
25  and gets sifted and sorted and washed and put into the

21

1  various piles?

2  A. That's correct.

3  Q. Okay. And, again, it was -- it was begun, but

4  it wasn't there yet. Is that the classifying plant?

5  A. Pieces of it were there.

6  Q. Okay. And so when you go up there and you see

7  that and you talk to them, then, I mean, what was your

8  questions, what were their answers, what did you talk

9  about?

10  A. Well, I asked -- you know, after exchanging

11  pleasantries and generalities, they then showed me the

12  operation, the extent of the property, explained how the

13  project would be set up. We asked about, you know, just

14  timing, you know, when it would -- when he thought he

15  would be ready. And I don't recall if there was a

16  specific date that he came up with. It was just, we've

17  got to put everything together and had had some delays,

18  and we'll just stay in touch with each other.

19  Q. Okay. And did you stay in touch?

20  A. Yes.

21  Q. And did you say anything to Ben or Pep at this

22  time that, you know, we're in a hurry for gravel, we

23  need you to get this thing done, I mean? Or, are you

24  just asking them, when will it be ready?

25  A. I don't recall.

22

1  Q. Did Gary, in his instructions to you, other

2  than find out what the status is, did Gary say, you

3  know, we need to get this thing going, we need to get it

4  done, I need the gravel?

5  A. That's my recollection. We had business that

6  we -- at our sales yards that we could have supplied

7  with that source.

8  Q. Okay. But you didn't take what Gary told you

9  that you had a need for it and convey that, or you don't

10  recall ever conveying that to Ben or Pep?

11  A. I may have.

12  Q. Okay. And how did Ben and Pep respond to that?

13  A. They were frustrated that things had taken so

14  long to become operational. It seemed like, I think Ben

15  told me, every time they turned around, something was

16  going wrong.

17  My recollection is from a series of

18  conversations. I can't pinpoint it down to, you know,

19  one particular visit, but they were frustrated. Things

20  that they tried didn't work. They had to make constant

21  modifications and revisions. They were trying as hard

22  as they could to start producing gravel.

23  Q. Did you offer any assistance or advice or you

24  need to do this, you need to do that?

25  A. No.

23

1  Q. You didn't?

2  A. No.

3  Q. Just observed?

4  A. Correct. Listened.

5  Q. Listened and observed?

6  A. That's correct.

7  Q. Did you ever offer -- did you ever tell Ben or

8  Pep that you all didn't really need any gravel yet, you

9  all were still in the construction phase of the Milton,

10  Florida terminal?

11  A. No.

12  Q. Did you ever mention Milton, Florida to them?

13  A. I'm not sure if I mentioned it to Ben or Pep.

14  Q. You're not sure whether you did?

15  A. Correct.

16  Q. What was your understanding of what was going

17  on in Milton with the switch?

18  A. Milton was a terminal that we were building.

19  We had an existing work in place that we wanted to take

20  the gravel to. Milton was another location that, you

21  know, just had potential to move gravel to. But we had

22  enough business demand at our existing locations that

23  Milton really wasn't an issue for the 150,000 tons of

24  gravel that we were supposed to take and that the mine

25  could produce.

24

1  Q. So Milton was never offered by Philip Holladay

2  as any excuse or reason -- its incomplete state was

3  never offered, ever, by Philip Holladay to either Pep or

4  Ben or Clatus Junkin as an excuse for not taking gravel?

5  A. It was not ever a reason for not taking 150,000

6  tons a year of gravel.

7  Q. That wasn't my question, Philip. This is my

8  question. Did Philip Holladay ever, to either Pep or

9  Ben or Clatus Junkin, ever offer as an excuse for Conrad

10  Yelvington not taking gravel at a particular time, the

11  reason being that the switch in Milton, Florida was not

12  ready?

13  A. No.

14  Q. And did you ever, Philip Holladay, working as a

15  consultant for Yelvington, tell Ben or Pep or Clatus,

16  ever, that you expected it to be finished in a few

17  weeks, and we would start taking gravel then?

18  A. No.

19  Q. Did you ever tell Pep that you were trying to

20  expand the ability of Yelvington to move sand into the

21  Atlanta area, and you had five or six different

22  potential sources over there and you wanted to keep it

23  quiet so that the competition wouldn't find out about

24  it?

25  A. There were conversations about moving sand.

6 (Pages 21 to 24)

25

1    Q.   Initiated by you?

2    A.   Initiated by Pep and Ben Johnson.

3    Q.   So you weren't interested in the sand?

4    A.   I didn't say that.

5    Q.   Okay. Well, tell me how you involved yourself

6    in that conversation.

7    A.   When the project was delayed -- by the project,

8    I mean the Johnco mine -- our commitment had been, as I

9    understood at the time, was to take 150,000 tons of

10   gravel, and that matched up to a production plan that I

11   had been given by Ben Johnson.

12   Q.   If I could, and I don't mean to interrupt you,

13   but a production plan. Are we talking about a written

14   document?

15   A.   No. It was verbal.

16   Q.   A verbal production plan. Excuse me for

17   interrupting. Try to go on.

18   A.   The production plan had -- was to produce

19   150,000 tons of Number 67 gravel, which we were going to

20   take. There was some oversized gravel that they had a

21   buyer for. And then there was sand that they had

22   planned to sell to someone else.

23       And I would say that probably, on every visit,

24   conversation that I had from about -- well, I can't

25   recall the dates, but most of the conversations involved

26

1    a problem with sand. Sand was a severe issue. They --

2    Ben and Pep told me that they had problems. One of

3    their buyers didn't buy the sand, and that was creating

4    a problem for them, a severe problem.

5        Pep asked me if we could take -- if there was

6    some way we could help out.

7    Q.   Now, when did Pep ask you this?

8    A.   Let's see. This would have been probably in

9    the summer to fall of 2005.

10   Q.   Okay. Were they producing some sand then?

11   A.   I assume so. Whenever it was -- after the

12   dredge had been in the pit, obviously, and they had

13   begun to run. And their -- whatever agreement they had,

14   whatever customer they had for their sand apparently

15   didn't come through for them.

16   Q.   Were they producing the Number 67 gravel at the

17   same time?

18   A.   Probably some, a little bit. The pit had --

19   the deposit has different layers or places where it's

20   primarily sand and you can get into lenses where there's

21   primarily gravel. And I just don't recall what their

22   product mix was at that time.

23   Q.   Do you have any recollection of what their

24   product mix was at any given time?

25   A.   I know it was heavy on sand all the time.

27

1    Q.   Heavy on sand meaning what?

2    A.   Meaning that on the production split -- and I

3    guess I'm taking just this from information passed on to

4    me by Ben and Pep. But the sand was being produced at

5    the rate or maybe sometimes a little bit more than what

6    they anticipated in their production plan.

7    Q.   And that is just something that's being told to

8    you?

9    A.   Correct.

10   Q.   Okay. Well, did the sand prevent them from

11   mining Number 67 gravel?

12   A.   I don't know. I was told that they had -- the

13   sand, if they couldn't sell the sand, they had so much

14   of it on the ground that they were having to move it,

15   and that was driving their cost up and was going to

16   create a real problem for them. So I was given the

17   impression that the sand was impacting their ability to

18   produce Number 67 gravel.

19   Q.   That was your opinion?

20   A.   That was my impression.

21   Q.   Okay. Your impression.

22       Okay. And what is the distinction between your

23   impression and your opinion?

24   A.   There's not one. That was just the word that I

25   used.

28

1    Q.   All right.

2        MR. PEARSON: Excuse me just a minute. Go off

3    for just a second.

4    (Thereupon there was a conference off the record.)

5    BY MR. PEARSON:

6    Q.   Did you ever run the dredge yourself?

7    A.   No.

8    Q.   So, basically, your impressions about the

9    abilities or the problems that Johnco had, those came

10   from what Ben and Pep would have told you?

11   A.   That's correct.

12   Q.   All right. Did Ben or Pep ever tell you they

13   couldn't produce the Number 67 gravel that would have

14   been the 150,000 tons that would have come under the

15   contract to you?

16   A.   At different times, there were different

17   problems. There were times when the dredge wouldn't

18   work or the classifier wouldn't work.

19   Q.   When you say different times, I'm looking for,

20   now, when are those times, in your recollection?

21   A.   This would be -- I'm not sure when they got the

22   dredge in the pit. It was probably sometime in the late

23   spring of 2005. That's -- they floated it in there at

24   some point, tried to pump some sand and gravel out.

25   They -- the -- as I recall, the dredge had got impacted

29

1  a couple of times, clogged up, hit some clay.
2      And there were just -- these are, from what I
3  understand, normal start-up issues. At a new operation,
4  it can take a while to have that -- to get that done.
5      They -- when they were producing 67 gravel at
6  some point through here, the material was so dirty and
7  sandy that it was not -- it didn't meet the quality
8  requirements that our customers would have to have.
9      Q.  And you're still talking about sometime back in
10  2005?
11      A.  No, it started in 2005, and going up through,
12  you know, late 2005, early 2006.
13      Q.  Okay. And did you take samples and test them
14  of the Number 67 gravel?
15      A.  We did do that.
16      Q.  Okay. When did you do that?
17      A.  We -- in one of our visits, the material was
18  visually dirty to -- when I say dirty, it had vines in
19  it and sand and a clay coating. It was just -- you
20  could tell, visually. There was a few hundred tons on
21  the ground. I can't remember the dates. This was just
22  in all the start-up, trying to get the dredge working
23  and get the classifier working.
24      Ben, at one point, relayed to me that he was
25  switching -- I think he had nylon screens. He was

30

1  switching to wire screens in order to clean it up,
2  trying to adjust his water flow. There were a number of
3  things he was trying to do to have the material meet the
4  customer specifications.
5      Q.  Now, one thing you said, one of our visits. Is
6  it you by yourself --
7      A.  That's correct.
8      Q.  -- or are you bringing people with you?
9      A.  One of my visits with them. I was there by
10  myself.
11      Q.  Okay. All right. How many times do you guess,
12  over the time that you had input from March of '05, did
13  you actually go to the Whitehall plant?
14      A.  Probably six or eight, and then numerous phone
15  calls.
16      Q.  And how long would you stay when you went
17  there?
18      A.  It depends. Sometimes it was 30 minutes.
19  Sometimes it was two or three hours.
20      Q.  And what did you do the rest of your time as a
21  consultant for Yelvington? Did you go to other mining
22  operations, or what else did you do?
23      A.  I mentioned earlier that my role was to find
24  property for terminal expansion, for the network
25  expansion. That's what I spent my time on.

31

1      Q.  Okay. And, specifically, were you involved in
2  finding the property for terminals that are being
3  developed now?
4      A.  Yes.
5      Q.  And which ones are those?
6      A.  Those are -- that information is really
7  confidential to our strategic plans.
8      Q.  Actually, I asked the question in such a way so
9  as to not invade any confidential information. The
10  property that I'm asking you about, that is terminals
11  that would be in construction now, those kind of ones.
12  That's -- and I figure, since you're putting them in
13  your brochure, it might not be such a confidential
14  thing.
15      A.  There's one in Hardeeville, South Carolina;
16  Dothan, Alabama; an expansion at Pensacola -- I'm sorry.
17  At Panama City; an expansion at DeFuniak. And there are
18  some others that are not in the brochure yet.
19      Q.  Did you ever -- did you ever -- Philip, let me
20  ask you this. Did you have any responsibilities in
21  regard to ordering any shipments of Number 67 gravel?
22      A.  No. Not --
23      Q.  Go ahead.
24      A.  Just want to make sure I'm clear on this. I
25  would be involved as part of the -- I guess, the passing

32

1  on of information. But we have terminal managers and we
2  have a -- different people, rail department, others that
3  are responsibility directly for ordering the material.
4      Q.  All right. And who -- how does that work? Who
5  orders what from whom? What communication occurs that
6  gets that gravel, gets that shipment up there and a
7  train up there and gets that gravel shipped? Who talks
8  to who on that?
9      A.  You know, I'm not sure. That's really not
10  my -- that's not what I spend my time on, so you have to
11  ask somebody else the details of that.
12      Q.  How do -- how does Johnco know that a train is
13  on the way? Did that come through you?
14      A.  No.
15      Q.  Did you check on stuff like that for them?
16      A.  In the start-up -- let me see if I can
17  explain -- if I can answer your question this way. In
18  the start-up operation, for train service, the railroad
19  has to be involved in setting up the design of the
20  service. And we have rail people, people who coordinate
21  the rail traffic in our office.
22      When -- if material is ready to be shipped, for
23  instance, we might get a phone call that says, we got
24  some material. Then it would initiate a set of events
25  where people could -- to begin the process of getting

33

1  the power and crews lined up for a train to come in for
2  loading. It's not as simple as toggling a switch. It's
3  a -- well, now, diverted train that comes in and loads.
4  It's a little more complicated than that.
5      Q. All right. At what point in time did you have
6  the impression that Johnco was ready to ship Number 67
7  gravel?
8      A. The first time that I was aware they had enough
9  material to load a unit train that was of the quality
10  that we needed -- there was some material that had been
11  produced that was not quality that we needed.
12      Q. All right. And, again, I'm looking for a time
13  frame. I want to know what material -- what time frame
14  was the material produced that didn't meet your quality?
15      A. Before the first train was loaded. And then --
16      Q. Well, obviously, it was before the first train
17  was loaded --
18      A. Well, I don't recall. Most of what was
19  produced initially, when the dredge was first starting,
20  the classifier plant was first starting.
21      Q. We've talked in terms of spring, summer and
22  fall of 2005, and then we moved over to the early part
23  of 2006. Are we still in that time frame?
24      A. That is in -- in the early part of 2006, either
25  with a visit or phone call, I recall that there was not

34

1  enough material on the ground to load a train yet. That
2  was probably in January or February. There were -- I
3  don't even recall what the issues were, but there were
4  just more issues with clarifying and classifying.
5      And the first time there was material -- and we
6  would probably every two to four weeks, depending on if
7  there was new information, I would call Ben.
8      And sometime around the end of April of 2006,
9  he indicated that there was enough material on the
10  ground to load -- to load a unit train. There was at
11  least 6,000 tons of material on the ground. And that's
12  when we began the process of notifying people and
13  arranging for a train to come in to load.
14      Q. So from no time between February and late April
15  did you have any conversations with either Pep or Ben or
16  Clatus Junkin or anybody from Johnco that there was
17  product on the ground?
18      A. Did you ask me if I did or did not have the
19  conversation?
20      Q. I said, at any time between February and late
21  April, when you said you had a phone call with Ben that
22  there was enough product for you to ship, did you ever
23  have any conversation with anybody at Johnco that said,
24  we've got product on the ground, we're ready to go?
25      A. I don't think so.

35

1      Q. Did you ever visit the plant and visually see
2  what was going on during that time frame?
3      A. I don't recall the times of my visits. I did
4  have a visit in there and a couple of phone calls. I
5  know that -- my recollection is that it was in January
6  of 2006, there was not enough material of quality to
7  load in a train. And I just don't recall the specific
8  times of visits or being able to see the material, how
9  much material was on the ground.
10      I just know that when Ben finally said, we have
11  enough to load a unit train -- and I think I did go by
12  somewhere in there to look at it to make sure that the
13  quality looked right, and we had had some testing done.
14      Q. You had had testing done?
15      A. Or they had some testing done.
16      Q. Who is they?
17      A. Johnco. They had -- at some point in there,
18  they had hired a girl and set up a laboratory to run
19  some tests, and they were checking the quality of the
20  material.
21      Q. Did Yelvington independently verify the quality
22  of the material on-site?
23      A. Not at the site, no.
24      Q. Did not?
25      A. We took -- we took --

36

1      Q. Did somebody ship you a sample, then?
2      A. I think we did get a sample and tested it.
3      Q. How many times?
4      A. I don't recall.
5      Q. More than once?
6      A. I don't think so.
7      Q. One sample?
8      A. One time.
9      Q. You tested it one time? In all of the -- in
10  all of your relationship with Johnco, you tested the
11  quality of their Number 67 one time?
12      A. Before the first train was shipped. It was
13  tested after the regular shipments began.
14      Q. Was there a problem with it?
15      A. I don't recall the specific gradations. By the
16  time -- there were some gradation -- I'm going to say
17  gradation. I mean the fineness issues. The sand wasn't
18  getting cleaned out. And for a concrete producer, which
19  was our primary market, there's only so much sand that
20  they can have in their gravel. There were issues, and I
21  don't recall the exact numbers.
22      You know, we were -- we needed the material.
23  We were trying to get, you know -- you know, determine,
24  you know, when the material was going to be ready. And
25  the issue was, there was too much sand and too much clay

37

1 on the material. That was -- that happened repeatedly.
2 Those issues persisted for not just a -- not weeks, but
3 months.
4    Q. Okay. And I need the time frame.
5    A. Well, you know, I have to check the production
6 records at the mine, because I really can't tell you. I
7 would say -- I've already said it was between probably
8 summer of 2005 and January, February, March of 2006.
9    Q. Okay. But you told me you have no recollection
10 of anything between January of 2006 and late April of
11 2006, no phone calls, no visits. You said, in early
12 January, didn't have enough product on the ground.
13    MR. LEEK: Objection to form. You can answer
14   the question.
15 BY MR. PEARSON:
16    Q. Now, correct me if what I just said is wrong.
17 I am trying to find out what you know about what was
18 going on out there, and I want to know how you know it.
19 And I need to know when you know things and how you know
20 things, so if you can help me in those regards, I would
21 appreciate it.
22    Now, I'm going to go ahead and ask you another
23 question, because like me, you probably forgot what the
24 question was. And an exhibit was introduced yesterday
25 in the deposition, and it was an E-mail from Kim

38

1 Thompson. Do you know Kim Thompson?
2    A. Yes.
3    Q. All right. And the E-mail is from Kim to Pep,
4 and it is sending some gradation specification forms of
5 some kind. And it says, here you go, Pep, exclamation
6 point. And then it says, we look forward to moving a
7 lot of volume of your product.
8    Now, what would Kim Thompson -- in your
9 experience as being a consultant for Yelvington, what
10 would Kim Thompson have been doing this for? Did he
11 have a sample already?
12    A. I'm not familiar with the document you're
13 talking about.
14    Q. All right. Well, I'll show it to you. Let's
15 look at the exhibits.
16    MR. HARRISON: Exhibit 2.
17    THE WITNESS: Are these all blank forms?
18 BY MR. PEARSON:
19    Q. Philip, and not trying to be -- I honestly
20 don't know what they are. I'm about to ask you what
21 they are.
22    A. That's the first time I've seen these.
23    Q. And we're referring, for purposes of the
24 record, to Plaintiff's Exhibit 2, which was introduced
25 in Gary Yelvington's deposition yesterday. And you're

39

1 saying that today is the first time you've ever seen
2 that. Is that correct?
3    A. That's correct.
4    Q. All right. Are the forms that you're looking
5 at, which are attached to the E-mail, forms that you've
6 seen before?
7    A. No.
8    Q. In any of your consultations with Johnco on
9 behalf of Yelvington, you've never seen any kind of
10 forms like that?
11    A. Not that I recall.
12    Q. All right. Well, what is Kim Thompson's --
13 what's going on with Kim Thompson, in your understanding
14 on February the 6th of '06, relative to him talking --
15 him E-mailing Pep and saying, here you go, and we're
16 looking forward to taking a large volume of your
17 product?
18    A. Kim Thompson heads up Yelvington's materials
19 lab or quality control department. And at some point,
20 when Ben felt like he had gotten the quality problems
21 fixed and the dredge was stabilized and the classifier
22 was stabilized, a little bit of -- you know, some gravel
23 was coming. He was producing some 67 gravel.
24    And we had a -- I think we had the one sample
25 of -- I don't know if it was a five-gallon bucket, but

40

1 there was material that was shipped to our laboratory
2 that -- to determine if it was -- before we sent a train
3 in and loaded it up, we wanted to verify that the
4 product met the quality requirements that our customers
5 would have, and so a sample was sent to our laboratory.
6    Q. Did you physically -- were you physically
7 involved in collecting that sample?
8    A. No.
9    Q. Were you there? Did you observe it happen?
10    A. No.
11    Q. How do you know about it?
12    A. Because I would have asked Ben, probably, to
13 arrange to have it shipped to the lab.
14    Q. When did you ask Ben to arrange that?
15    A. It's been a long time ago. I don't recall the
16 exact dates. Just before -- obviously, if these are the
17 test results -- and I don't know if that's what they
18 are -- then it would be before this.
19    Q. February --
20    A. I don't know if that's what these are.
21    Q. -- '06.
22    All right. But you're looking at an E-mail
23 from February 6th of '06. Is Kim Thompson involved in
24 doing what you described as talking about the quality
25 assurance of the product?

**41**

1  A.  He managed the laboratory, and someone else,
2  I'm sure, ran the test.  And we would have verified --
3  we would have wanted to verify that the material met the
4  requirements for a Number 67 gravel.
5  Q.  Would you have told either Ben or Pep that
6  that's who they needed to talk to at Yelvington to get
7  the sample tested?
8  A.  I don't recall how the conversation went.  I'm
9  sure we arranged -- we gave them an address to ship the
10  material to.  I don't recall if I did that or if Gary,
11  you know, had Kim run it or, you know -- because I'm not
12  involved.  I wasn't on this E-mail, so I wasn't directly
13  in the loop of sending information back.
14  Q.  Well, who else for Yelvington had direct
15  dealings with Pep and Ben?
16  A.  I don't know.
17  Q.  Don't have any idea?
18  A.  We had -- when the first train was ready to be
19  loaded, where there was material on the ground, they
20  didn't have an engineer to operate the train.  I know
21  one of our engineers went up to do that in order to help
22  out, to be cooperative.
23  Q.  What was his name?
24  A.  That would be Dave McCray, I believe, was his
25  name.

**42**

1  Q.  Were you there?
2  A.  I was.
3  Q.  And you watched, and you're saying that Johnco
4  didn't have an engineer there?
5  A.  Correct.
6  Q.  The first load?
7  A.  Correct.
8  Q.  And your guy, McCray?
9  A.  Correct.
10  Q.  And he operated the train the whole time?
11  A.  Well, I don't know if he operated it the whole
12  time.  I think --
13  Q.  Well, who else would have operated it if your
14  engineer didn't operate it?
15  A.  My understanding is that -- let's see how this
16  works.  The Bay Line was the company that had the power
17  or the engine or -- one of the railroads, anyway, had
18  the power that is required to pull the train around the
19  loop for it to load.
20  Q.  Okay.
21  A.  They require an FRA certified engineer.
22  Whatever arrangements that had been made for that, you
23  know, I guess Johnco either had to have a locomotive of
24  their own, or someone that could operate legally a
25  locomotive supplied by the railroad.

**43**

1  Johnco didn't have a locomotive, and so
2  their -- if they wanted to load more than one car of
3  material, they needed a locomotive and someone to run
4  it.
5  Q.  All that part, I understand.  The question was,
6  if your guy wasn't operating the locomotive, who was?
7  A.  I was in the process of answering your
8  question.
9  Q.  All right.
10  A.  It's my understanding that the -- because Dave
11  does training, he can be in the cab of the locomotive
12  and train someone else.  In this case, I believe it
13  was -- I don't know the girl's name, the girl who worked
14  in the laboratory.  I know she was on the train, and
15  there might have been somebody else that they had up
16  there, and Dave was beginning the process of training
17  them.
18  So that's why I said, I don't know if he
19  operated the train the whole time, but he would have
20  been with the train, with the locomotive the entire
21  time.
22  Q.  Did you notify Johnco at this point that that
23  was some sort of breach of their contract with
24  Yelvington?
25  A.  I'm not sure how they found out that they -- I

**44**

1  don't know how they found out, but somehow Ben or Pep
2  had communicated to us, and I don't know if that was to
3  me or through -- it may have been back through the
4  railroad, to the Bay Line.  Somehow, word got back to
5  us, as a company -- I don't think it came -- that phone
6  call came to me -- that they needed some help to get the
7  train loaded.  They didn't have a certified rail
8  engineer and didn't have a locomotive.
9  And I believe, Gary, you called Dave McCray --
10  I think Gary or someone called Dave McCray, who works
11  over at our Pensacola yard, and asked him if he could go
12  up and help out.
13  Q.  And you physically were there, and McCray was
14  on the train the whole time?
15  A.  He would have been in the engine when the
16  engine was operating and the locomotive was operating.
17  Q.  Okay.  Well, how long does it take to load it?
18  A.  My recollection was about maybe 24 hours or --
19  it was pretty slow the first time.
20  Q.  And 24 hours is considered slow?
21  A.  Yes.
22  Q.  How long should it take?
23  A.  The railroad would like the train to be loaded
24  and ready to be released within 12 hours.  That's fairly
25  standard for a unit train arrangement.

45

1   Q.  What were your requirements?  Or, is this not
2   -- is this Yelvington's requirements?  In other words,
3   Yelvington's requirements were that Johnco had to load
4   the trains in 12 hours?
5        A.  The railroad, and I'm -- some of this just
6   comes from memory.  But the railroad supplies the power
7   and the crews to bring the rail cars out to -- in the
8   facility that we load in.
9            And it's a railroad requirement to get a unit
10  train ready.  You know, they don't want to bring the
11  cars out five at a time, and they don't want to bring
12  them out and have them sit for two or three days because
13  it ties up their equipment, so it's a railroad
14  requirement.
15       Q.  Does that have anything to do, in your
16  understanding, with the supply agreement?  Does it say
17  they have to be 52 cars all at one time?  Is that your
18  understanding of what the contract says?
19       A.  It is -- it's my understanding that, from
20  talking to -- well, let me answer your question.  I
21  believe the contract implies that at least 52 cars will
22  be loaded per loading occurrence.
23       Q.  That's what you understand?
24       A.  I'm sorry?
25       Q.  That's what you understand?

46

1        A.  That's correct.
2        Q.  And what about -- and they have to be loaded
3   within how soon?
4        A.  It's typical that railroad requires --
5        Q.  I want to know what the contractual requirement
6   that Yelvington has with Johnco to load the train when
7   it's put on their site.  How long do they have?
8        MR. LEEK:  Object to form.  You can answer the
9   question.
10       THE WITNESS:  What did you say?
11       MR. LEEK:  I said, object to form.  You can
12  answer the question.  He's asking for your
13  understanding of the contractual requirement.
14       THE WITNESS:  I don't know that that's
15  stipulated.
16  BY MR. PEARSON:
17       Q.  Okay.  And is there a time stipulated that if
18  you don't load it within X amount of time, you're in
19  breach?
20       A.  I don't think the contract says that
21  specifically.
22       Q.  Well, do you have any actual knowledge of
23  having that conversation with Ben or Pep or Clatus?
24       A.  Yes.
25       Q.  Okay.  Tell me how long you told them they had

47

1   to load a train.
2        A.  We told them that the railroad wanted the train
3   loaded within 12 hours.
4        Q.  You say we told them.  I want --
5        A.  I told them.  I told them.
6        Q.  Philip Holladay told --
7        A.  I would have told Ben and Pep.
8        Q.  All right.  You say you would have told them.
9        A.  I did.
10       Q.  All right.  Specifically, when did you tell
11  them this?
12       A.  I do not remember the specific day.  It would
13  have been in one of the conversations we had about the
14  loading, the rate of their ability to load the train.
15       Q.  And you told them they had to do it in
16  12 hours?
17       A.  I told them the railroad wanted the train
18  loaded in 12 hours.
19       Q.  Okay.  Well, what happens if it doesn't get
20  loaded in 12 hours?
21       A.  The train -- the railroad pulls their power
22  away, and it might be hours or days before it comes
23  back.
24       Q.  Did that happen?
25       A.  I believe it did happen.

48

1        Q.  Which time?
2        A.  I don't recall.  I'd have to look at some train
3   records.
4        Q.  You're saying that on one of the six trains
5   that got loaded there, the railroad, because Johnco
6   couldn't load it in 12 hours, they pulled their power
7   away --
8        A.  What I said was, the railroad -- you asked me
9   what could happen if you don't load.  I said the
10  railroad can pull their power.
11       Q.  And I asked you, did that actually occur?
12       A.  There were times when the railroad did pull
13  their power, and it was -- there was some delay in
14  getting it back.
15       Q.  I'm asking you when.
16       A.  You know, I don't recall the exact dates.
17       Q.  How do you know that it occurred?
18       A.  Because the trains would be sitting on the
19  siding, waiting to get pulled, waiting for the railroad
20  to come back and pick it up.
21       Q.  And you're saying that that is Johnco's
22  problem?
23       A.  I'm saying that's what the railroad expected.
24       Q.  Let me ask you a question.  You're saying that
25  that's Johnco's problem, after they get those rail cars

49

1  loaded on their siding, that it's their problem whether
2  that train picks them up? Is that what your
3  understanding of the contract is?
4      A.  I did not say that.
5      Q.  Okay. But you're implying in this deposition
6  that Johnco did something wrong. Am I missing what
7  you're implying? And if you're not, I am missing it.
8  Did Johnco do anything wrong in loading those trains?
9      A.  When shipments began, there's -- it's typical
10  in a new operation -- I'm going to answer your question.
11     Q.  Okay.
12     A.  Okay. Things don't always work real smoothly,
13  and they didn't work real smoothly with Johnco in this
14  case. The first load out took a long time. They had
15  problems with the belt scale, they had problems with the
16  motors, the fuses. There were all kinds of problems in
17  the initial load out. That's -- that wasn't a shock to
18  anybody. That's why you do a shake out run. It happens
19  anytime you start something up.
20         If you think I'm implying that Johnco's
21  responsible, I would say that they had some troubles
22  getting up to speed on their load out.
23     Q.  How long did it take them to load the first
24  train?
25     A.  I believe that was about -- I think they

50

1  started -- that would have probably been about 20 hours.
2  Twenty, twenty-one hours, something like that.
3      Q.  You stayed out there that whole time?
4      A.  I didn't.
5      Q.  How do you know it took 20 or 21 hours?
6      A.  Because they told me.
7      Q.  Who told you?
8      A.  Ben and Dave McCray, who was our engineer,
9  helping them load the train.
10     Q.  Did McCray stay out there the whole time?
11     A.  Yes, he did.
12     Q.  And did he operate the train the whole time?
13     A.  I've already answered that question.
14     Q.  All right. If he's helping operate the train
15  and he's Yelvington's guy, I mean, isn't he part of why
16  it didn't get loaded in 20 hours?
17     A.  No. In fact, I would say if he hadn't been
18  there, the train wouldn't have gotten loaded at all.
19  And --
20     Q.  So was -- I mean, did you -- what did you tell
21  Ben and Pep or Clatus -- was Clatus out there that day?
22     A.  No. Well, I don't know if he was out there or
23  not. I did not meet him.
24     Q.  Okay. Where would you have been standing when
25  you were out there?

51

1      A.  I was near the load-out facility.
2      Q.  Okay. You didn't see this gentleman to my
3  right, Clatus Junkin?
4      A.  I do not recall seeing Clatus or meeting him
5  until sometime in that summer.
6      Q.  How long were you there?
7      A.  I was there probably 30 minutes.
8      Q.  From when to when?
9      A.  I think it was -- I don't recall. Mid day,
10  Mid morning, maybe.
11     Q.  Second day? First day? What day?
12     A.  I think the train had been scheduled to arrive
13  where they thought it might come in the day before, but
14  it was the day -- it was May the 11th, the day -- is
15  that the day it loaded? Whatever day it loaded, that
16  would have been the day I came by. I wanted to see the
17  load out, see how it was going, see how fast it was
18  going.
19     Q.  Were they loading while you were there?
20     A.  Yes.
21     Q.  And how long had they been loading before you
22  arrived?
23     A.  Depends on what time I got there. A few hours.
24     Q.  Well, could you not look at the cars, the
25  open-top cars?

52

1      A.  I think they had 11 or 15 cars. It had been
2  really pretty slow.
3      Q.  They had 11 or 15 cars already loaded?
4      A.  Something like that.
5      Q.  When you got there?
6      A.  Correct.
7      Q.  So how long did you say?
8      A.  I think I said I stayed about 30 minutes, maybe
9  45.
10     Q.  How many cars did they load while you were
11  there?
12     A.  One.
13     Q.  And during that time, who did you talk to?
14     A.  I talked to Ben and Dave McCray.
15     Q.  Did you get on the train to talk to Ben?
16     A.  Ben -- no. Ben was at the -- load point,
17  the conveyor load point.
18     Q.  Did you get on the train to talk to Dave
19  McCray?
20     A.  No.
21     Q.  Well, then he wasn't on the train?
22     A.  They had a number of breakdowns on the load-out
23  facility. And when it was broken down, the train didn't
24  move, so everybody was off the train at the time I came
25  by. And then they got back on it and they'd crank out

13 (Pages 49 to 52)

53

1  the conveyor and the train would move a little bit and I
2  saw them load a car.
3      Q.  From early January of '06 till May the 11th of
4  '06, was that your first visit back to the facility in
5  Whitehall?
6      A.  I don't recall.
7      Q.  How much gravel was on the ground at the load
8  out?
9      A.  At the load out --
10     MR. LEEK:  Object to form.  You can answer the
11  question.
12  BY MR. PEARSON:
13     Q.  On May the 11th, when you were there, watching
14  them load the train.
15     A.  Would you accept an estimate?
16     Q.  Certainly.
17     A.  At the load-out point, I would estimate about a
18  thousand tons, from memory.  And the rest of it was
19  being trucked up from the -- they were loading from down
20  at the classifier and bringing it up to the load point.
21     Q.  Ten cars was all that was on the ground?
22     A.  I think my -- my recollection is ten cars of
23  shippable material.
24     Q.  Well, what's up there that's not shippable?
25     A.  I think there was some material that had some

54

1  sand and some vines in it that had been moved up there.
2      Q.  And what did you do about that?
3      A.  I didn't do anything about it.  They had
4  indicated to us that they wouldn't put that in our train
5  to load it.
6      Q.  Who indicated that to you?
7      A.  Ben.
8      Q.  And Ben said, we're not loading that?
9      A.  Correct.
10     Q.  Okay.  Well, what did they do with it?
11     A.  I don't know.
12     Q.  Nothing, while you were there?
13     A.  No.
14     Q.  There wasn't three trainloads on the ground?
15     A.  It is not my recollection there were three
16  trainloads at the load-out point, because they were
17  trucking material up to the load-out point, and they
18  were using a loader to load it, as well.  But they were
19  having to get gravel from down at the classifier to --
20     Q.  Did you go down to the classifier?
21     A.  Not on that trip.
22     Q.  So you don't know how much was on the ground at
23  the classifier?
24     A.  No.
25     Q.  What was -- how much is the most gravel you've

55

1  seen on the ground at the classifier?
2      A.  I don't recall.
3      Q.  Did you ever see as much as a trainload on the
4  ground up there?
5      A.  About a trainload.
6      Q.  When did you see that?
7      A.  When the train was -- on the May 11th.  There
8  was gravel on the ground at the -- I mean, you can look
9  and see it.  It's just not that far away.  I could see
10  the gravel pile.  It was small.
11     Q.  Small?  How big was the sand pile?
12     A.  A lot bigger.  I mean, I don't have a picture
13  or anything, but it was just -- it was a pretty good
14  mountain of sand and a fairly small gravel pile, and
15  they were loading that out and bringing it up to the
16  train to load.
17     Q.  From your point of vision, could you see what
18  was on the other side of the sand pile?
19     A.  No.
20     Q.  Do you know whether anything was piled up back
21  there?
22     A.  No.
23     Q.  When's the next time you came back after May
24  the 11th?
25     A.  I don't recall.

56

1      Q.  So you recall being there in January, and you
2  don't recall anything until May the 11th.  Is that
3  right?
4      A.  I don't recall specific dates.  I recall the
5  essence of conversations that --
6      Q.  I understand the essence of conversations.  I'm
7  talking about physically going to Whitehall and seeing
8  it, January, May 11th.  I've talked to you about those
9  two.  What other --
10     A.  There was no reason to go back until Ben
11  Johnson called and said, I've got enough material to --
12  we trusted that he knew what he was saying.  And when he
13  had about enough material to load a unit train, we
14  arranged for a unit train to go in.  And I wanted to be
15  there, see the loading, see how that was going for the
16  efficiency.
17     Q.  For efficiency?
18     A.  See how fast it was going, just be there for
19  the first load out.  It was something to celebrate.
20     Q.  And you were there 30 minutes?
21     A.  About that.
22     Q.  And what did you report -- or, did you report
23  what you saw?
24     A.  I'm sure I did.
25     Q.  Who did you report it to?

14 (Pages 53 to 56)

57

1    A.  I'm sure I called Gary and just told him --
2    told him that they had started, the train showed up,
3    that Dave was working the train.  And things were slow,
4    but we were having a success and they were --
5    Q.  Now, you're sure you said that, or you remember
6    saying that?
7    A.  I don't know.  That's -- I would have called
8    Gary and told him that the train is loading.  I recall
9    saying, it's going slow, they're having a number of
10   breakdowns, some fuses or motors or whatever the issues
11   were.
12   Q.  Did you call him immediately that day?  The
13   train is loading is a present tense statement.
14   A.  I would have called him sometime that day.
15   There's not good cell phone service out at Whitehall,
16   and I may have had to get back on I-65 before I did
17   that.
18   Q.  Okay.  You told him it was loading, and -- but
19   did you -- would you say that you indicated there was a
20   lot of problems, and they're not going to be able to
21   take it?  What did you tell him?
22   A.  I told him that -- the conversation that I --
23   about my conversation with Ben Johnson during the load
24   out.  The essence of my conversation, obviously, after
25   observing the situation, was that -- ways to speed up

58

1    the load out.  And I suggested to Ben that one way to do
2    that -- if you're familiar with the way it's configured,
3    there's a ring track, a loop track, and one load-out
4    point with a truck dumper and a conveyor.
5         And I think they were -- my recollection is,
6    they were loading about four cars an hour, which was a
7    little slower than everybody wanted it to be.
8         So we talked about ways to enhance the load
9    out, and I suggested that he take some of his overburden
10   or waste material and build a ramp that a loader could
11   work on.  And I believe that shows up in the pictures.
12   I think, you know, that they built that.  You can still
13   see that today.  The idea is that he could load from the
14   loading point and a loader at the same time and double
15   the load-out rate.
16        So that was a conversation that we had that
17   day.  And he agreed that would be a good idea,
18   obviously, because he built the ramp.  And so I would
19   have reported -- I'm sure I reported to Gary that --
20   that was a conversation we had.  And we were trying to
21   meet the railroad's criteria for getting the train
22   loaded as quickly as probable, and that Dave had been
23   helping them operate the train.
24        And we weren't sure what was going to happen --
25   you know, what Johnco's response was going to be, how

59

1    they were going to handle that for upcoming trains,
2    whether -- one of the things we talked about, I recall,
3    was, if we needed to, we could -- Dave could go back and
4    help train them because he's a Florida certified
5    trainer.  And he could go back and help them do that.
6    That was an option that we talked about to try to make
7    this work because we were -- you know, really wanted to
8    move the material out of there.
9         And I know Gary volunteered that he could --
10   that we would do that to help them get started, to help
11   train their people, so we go ahead and -- if that was
12   the only thing preventing them from moving gravel, that
13   we would make that available to them.
14        As it turned out, they ended up hiring somebody
15   for the -- a retired engineer from the Bay Line Railroad
16   who, I think, operated their trains, moving forward.
17   That's my recollection.
18   Q.  So when did you send the next train back?
19   A.  I'm not sure I sent any train.
20   Q.  When, in your knowledge, did the next train go
21   back?
22   A.  My conversations with Ben were that -- again,
23   keep in mind that this is a new operation and is having
24   some start-up issues.  And Ben reported on a telephone
25   conversation to me that they were still having -- that

60

1    they were not able to produce as much gravel after that
2    first train to keep up with -- they couldn't produce
3    enough to load a train every two weeks, you know, 6,000
4    tons.
5    Q.  All right.  Now, you got to stop.  This is the
6    first anybody said of this.  Did you report what you
7    just said, that Ben told you that Johnco could not
8    produce enough gravel to even load a single train in two
9    weeks?  Did you report that to Gary Yelvington?
10   A.  I'm sure that I did.
11   Q.  Do you remember reporting that to Gary
12   Yelvington?
13   A.  I don't remember.
14   Q.  Okay.
15   A.  I believe that I did.
16   Q.  Did you tell Ben Johnson that wouldn't be good
17   enough?
18   A.  What I told -- no, I don't think I said that.
19   Q.  All right.  What did you say?
20   A.  You know, I don't really remember.  The idea
21   was, we were all trying to work together to -- I mean,
22   they were working day and night to try to get gravel
23   ready to ship that met quality.  We wanted the material.
24   We were -- we had customers who needed it.  We had the
25   capacity to take it.  So we were all cooperating in a

61

1    way to make this work. It wasn't --

2    **Q. All right. Now, let me get -- you go there**

3    **May 11th. There's not enough gravel. Gravel is not of**

4    **the right quality, takes too long to load it. Now, this**

5    **is your impressions. And then you -- then you have a**

6    **phone call with Ben where Ben tells you, we can't**

7    **produce enough for even one train in two weeks. And**

8    **now, when's the next time you went back?**

9    A. I don't recall.

10   **Q. That didn't seem like a problem maybe you**

11   **needed to go address on the Yelvington side?**

12   A. Well, it's not Yelvington's responsibility to

13   get Johnco's -- they didn't invite me. He didn't ask

14   for my help. Apparently, Ben grew up in a

15   gravel-producing family, and that would be like me

16   telling you how to do your legal business. It wasn't

17   requested, and I didn't volunteer it.

18   **Q. Now, this conversation where Ben tells you that**

19   **Johnco can't produce enough gravel to load a train, even**

20   **one train in two weeks, when did that conversation**

21   **occur?**

22   A. That was in the follow-up to the May 11th

23   train. They were producing, but it was spotty. I don't

24   even recall what the --

25   **Q. Telephone conversation, though?**

62

1    A. Right. You know, there was some issues. I

2    think they had -- there was just a number of things.

3    You know, at one point, a water pump broke. A generator

4    went out. There were just a series of incidents, and I

5    can't remember the exact dates.

6           But then I know that somewhere between the

7    May 11th and sometime in that summer, the auger came off

8    the dredge. Then another time, the operator, when they

9    finally got it back on or before that, the operator --

10   apparently, there's a take-away rake that you cut

11   material and it jammed up, and they were shut down for

12   some days while they fixed that impact.

13          And, you know, that -- while we were ready for

14   material, that doesn't really surprise us. I've been on

15   the front end of a number of operations starting up,

16   conveyors, and things just go wrong. And our part was

17   to be patient and work with them, and when the materials

18   were ready, we were ready to take it. So there were

19   just -- I mean, and there was no reason for me to go

20   stand and watch Ben work.

21   **Q. Well, let me ask you a question. Did you ever**

22   **have any conversations with Clatus Junkin where he said,**

23   **you all need to be taking some gravel?**

24   A. I don't recall a conversation with that tone.

25   **Q. Tell me --**

63

1    A. I do recall a conversation with Clatus.

2    **Q. All right. Tell me what conversation you**

3    **recall with Clatus.**

4    A. Sometime -- I think it was in July of 2006.

5    **Q. The first time you ever talked to him in your**

6    **life?**

7    A. That's my memory.

8    **Q. July '06?**

9    A. July, I believe it was July of '06, that I

10   knew -- if I ever talked to him or met him, I did not

11   know who he was.

12   **Q. Telephone call or person to person?**

13   A. This was a telephone call.

14   **Q. Okay.**

15   A. And Clatus told me that he had bought -- we

16   had -- I had only met Ben and Pep, and had heard somehow

17   that there was an investor, but didn't know who that

18   was.

19          And Clatus called me and told me that he had

20   bought out the Johnsons' interest in the operation and

21   that he was going to keep Ben on board to manage the

22   facility, that Pep wouldn't be involved, and then, you

23   know, that Clatus would be the -- would be handling

24   things to try to salvage the operation.

25          He told me that, you know, the project had had

64

1    severe delays and that it was -- they were in a

2    financial bind. They couldn't move the sand. Or they

3    were -- the buyer for the sand had bailed out or there

4    was a problem --

5    **Q. You're telling me -- all these things you're**

6    **telling me, Clatus is saying to you?**

7    A. Correct.

8    **Q. All right. What are you saying to him?**

9    A. I'm listening at this point --

10   **Q. Okay. You're listening.**

11   A. Clatus tells me that -- one of the things I

12   recall is, he said, you know, we have -- their

13   production plan was to produce 150,000 tons of gravel,

14   and there was 300,000 tons of sand, however it worked

15   out. And he said, one of our options is, he said, if we

16   can sell more gravel to either you or someone else, he

17   said, we might can -- you know, he said one option is

18   just to pump the sand back in the pit and not worry

19   about the sand.

20          But sand, at that point, was what was -- my

21   impression, it was -- consistent with everything I'd

22   heard from Ben and Pep, the sand wasn't moving. They

23   had a mountain of it. Sometime before that

24   conversation, Ben had told me that if they couldn't move

25   the sand, they didn't have room to produce -- they just

65

1  didn't have room to produce any more --

2    Q.  Well, let me stop you, because you're -- I

3  think we're off a little bit with Clatus's conversation.

4    Now, Clatus is telling you he's taken over and

5  all that.  Now, I'm sure, since you've already had this

6  conversation with Ben Johnson, that you would have

7  immediately told Clatus, Ben told me you all can't even

8  produce one trainload in two weeks.  You told Clatus

9  that?

10    A.  I don't think I said that.

11    Q.  Okay.  Did you tell Clatus -- what did you tell

12  Clatus, you all can't produce this gravel, we can't take

13  it?  He never said one word to you about taking gravel?

14    MR. LEEK:  Object to the form.  You can answer

15    the question.

16    MR. PEARSON:  Yeah.  Don't answer that.  It's a

17    terrible question.

18    MR. LEEK:  Let me -- can we go off the record

19    for just a second?

20    MR. PEARSON:  Sure.

21  (Thereupon there was a conference off the record.)

22  (Thereupon, at 11:24 a.m., a recess was taken in the

23  proceedings, after which, at 12:47 p.m., the proceedings

24  were reconvened and the following proceedings were had:)

25  BY MR. PEARSON:

66

1    Q.  I don't remember exactly where we left off

2  before lunch, so if I ask you something I already asked

3  you, I'll apologize in advance.  I'm sure, though,

4  you'll remind me if I've already asked you.

5    The -- when you were consulting for Yelvington,

6  did you visit any of the other producers of Number 67

7  gravel that Yelvington might have bought from in that

8  area?

9    A.  No.

10    Q.  You didn't have any responsibilities in that

11  regard?

12    A.  Correct.

13    Q.  Okay.  And tell me if I'm wrong.  I know you

14  answered shortly, and I'm not -- but there was sort of a

15  hesitation.  Is there something you wanted to tell me

16  about that?  I mean, you said, correct, but it was after

17  a little bit of a hesitation.

18    A.  I was thinking about, you said, is that my

19  responsibility, and --

20    Q.  No.  Did you have any responsibilities in that

21  regard related to any of the other producers of Number

22  67 --

23    A.  I was processing that question.  And, to my

24  knowledge, there weren't any that I was ever asked to go

25  visit.

67

1    Q.  All right.  Well, sometimes we do ask questions

2  that make you go back in time, and you have to call on

3  some brain cells that have probably been locked away for

4  awhile.

5    Let me ask you about, there was a meeting that

6  Gary testified to yesterday that occurred at some point

7  where Yelvington, Gary and Conrad, flew into the

8  Montgomery airport, and I know there was another pilot

9  there, and Pep and Ben met with them.  Were you at that

10  meeting?  Did you fly into that meeting with Pep and

11  Ben, where Pep and Ben actually came to the airport to

12  meet you?

13    A.  There was one meeting where that occurred.

14    Q.  All right.  Now, did you fly in on the plane

15  with them, or did you drive in and meet there?

16    A.  I drove in.

17    Q.  Okay.  So you were requested to meet there?  I

18  mean, in other words, you went there specifically to

19  meet?

20    A.  Correct.

21    Q.  Okay.  What was the purpose of that meeting, as

22  you understood it?

23    A.  I'm trying to recall when that meeting

24  occurred.

25    Q.  Please, if you can recall, tell me.

68

1    A.  It would just help me -- in my -- well, I

2  don't -- I don't have a good recollection of when the

3  meeting was.  I believe it was in the spring or early

4  summer of '06.  And I believe the issues we talked about

5  were just the rail, you know, the rail service

6  getting -- because we -- I've already talked about how

7  the load out was a little bit slower, and the railroad

8  had issues with a curfew, and to make rail cars

9  available to us, they had certain times that they wanted

10  the train to be loaded by.  And I believe that was the

11  context of that meeting.

12    They hadn't seen Gary in a while, and we had --

13  I think we had been in the area and he drove down to

14  meet them.  But I don't recall that -- that's my

15  recollection, that we talked about start-up.

16    Q.  Now, based on what you just said, you put that

17  meeting after the first shipment, then?

18    A.  I don't recall if it was a month or two before

19  or a month or two after.

20    Q.  Well, then I misunderstood what you said,

21  because I thought you said it was related to the load

22  out being slow.

23    A.  If it was after, that would have been one of

24  the discussion points.  It could have been about -- all

25  I was trying to say was, it could have been before that,

Page 19 of 32.

**69**

1  and we could have talked about general, overall issues.
2  I just don't recall the date of the meeting. Didn't
3  take notes and --
4  **Q. Well, and that brings another point up. And I**
5  **meant to ask you earlier, do you take notes and keep**
6  **notes on your various phone calls and meetings?**
7  A. Not usually.
8  **Q. In this particular instance where the Johnco**
9  **Whitehall gravel operation is concerned and you start in**
10  **March of '05, do you keep a file on anything?**
11  A. If I had -- I could. Some gradation reports or
12  something that I might have gotten from --
13  **Q. Where would you physically --**
14  A. -- production reports.
15  **Q. Where would you -- excuse me. I interrupted.**
16  **Go ahead and finish. You had gradation reports?**
17  A. I said, if I had anything like that, I would
18  have -- I could have kept it on file. I may or may not
19  have, but --
20  **Q. Okay. Physically, where would that file be?**
21  A. That would be in my office.
22  **Q. Okay. So wherever you normally go to work**
23  **every day, that's where it would be?**
24  A. (Nods head.)
25  **Q. Can you look and -- because I'm going to make a**

**70**

1  **request for that file, copy it, and would you look and**
2  **see what you have, please?**
3  A. (Nods head.)
4  **Q. Do you have any specific recollection of having**
5  **seen a file like that before?**
6  A. I do have a file labeled Johnco. I don't think
7  there's very much in it, but I can look at it and see.
8  **Q. All right. Well, I am going to make a request**
9  **and I'll make it here on the record, and then I'll**
10  **follow-up with Tom. But I want a copy of whatever**
11  **you've got in that file.**
12  **Did you ever have written communications with**
13  **Johnco that -- where you were an author or a recipient**
14  **of a writing?**
15  A. No, I don't believe so.
16  **Q. E-mail?**
17  A. I don't think we ever communicated with E-mail.
18  I don't think they had E-mail at the site. My
19  communications were primarily with Ben Johnson,
20  occasionally, with Pep. And I don't remember ever
21  sending Pep an E-mail. He didn't seem like an E-mail
22  kind of guy. Maybe he was, but I didn't communicate
23  with him that way. I talked to him on the telephone.
24  **Q. Okay. When you all talked on the phone, did**
25  **you keep notes of those conversations?**

**71**

1  A. Probably not. I would have more likely related
2  in a phone conversation to Gary, just fulfilling my role
3  to keep him apprised of what was going on. There would
4  really be no reason for me to keep a note.
5  **Q. But if you kept a note, would it be in the same**
6  **place with the other Johnco stuff?**
7  A. You should see my office. I really couldn't --
8  probably, but I don't know.
9  **Q. Well, just whatever you got, I'd like to get a**
10  **copy of. Is that all right with you?**
11  A. That's fine with me.
12  **Q. Is it going to put you out terribly to look and**
13  **see if you've got anything?**
14  A. No.
15  **Q. And I assume, and I'm making this assumption --**
16  **correct me if I'm wrong -- you don't have any written**
17  **communications with Clatus Junkin, either?**
18  A. You're asking if I have any written
19  communication with Clatus?
20  **Q. With Clatus.**
21  A. I don't recall any written communications with
22  Clatus.
23  **Q. And I'm talking about Clatus, on behalf of**
24  **Johnco but, you know, sometimes people don't put Johnco**
25  **on the thing.**

**72**

1  Gary described your functions yesterday, and he
2  did say that I should ask you. But he described your
3  functions yesterday as a person who had the pulse of the
4  area for us and as the person who reported to him that
5  would give him their opinion of the readiness of Johnco
6  to produce gravel. All right. Now -- and I'm
7  paraphrasing what he said. He said what he said and
8  it's of record. But given that assumption, do you
9  understand that's what you were to do, also?
10  A. Well, not having seen what he said, but I would
11  say that part of my responsibility was to assist Gary in
12  understanding the readiness of the operation, to feed
13  that information back to him so we could plan when to
14  start moving gravel to our distribution yards.
15  **Q. And would one of those things be that you**
16  **thought -- in other words, before they would have sent**
17  **trainloads up there or trains to be loaded, you would**
18  **have told Gary you thought they could load it. Right?**
19  **Or they thought they could load an entire train and ship**
20  **it. Would you not have given that input?**
21  A. If I had understood that they were ready to
22  continuously or -- put it this way. To regularly load
23  the gravel trains of the quality we wanted, I would have
24  let him know that information.
25  **Q. Okay. What about just a train going up there,**

73

1  because I think you sent me on May 11th -- and when I say
2  you, I'm talking about Yelvington. And I think the next
3  one was, like, June 27th. Did you have any input into
4  those trains going up there, and what would have been
5  your opinion on those?
6      A.  Recollection was, after the first train, they
7  were going to build a ramp to -- to load the train with
8  a loader, in addition to the load point. There were
9  some questions about what they were going to do for an
10  engineer to pull the train, because that had not been
11  taken care of.
12      Somewhere in there, in my memory, after the
13  first train, the dredge had -- at least, I recall a
14  couple of problems. One was where it was impacted,
15  which the intake tube completely filled up with gravel.
16  That was an operator error, and it took some time to get
17  that operational. And then there was a -- I believe the
18  cutter head came off the dredge, and --
19      Q.  After the first load and before the second
20  load?
21      A.  That's my memory.
22      Q.  So sometime in May, maybe in June?
23      A.  My memory is, sometime after the first load.
24  Let me say that. That's my recollection.
25      Q.  But not necessarily before the second load?

74

1      A.  I --
2      Q.  The second load being June 27th.
3      A.  I don't remember. My sense of it, if I had to
4  think of it yesterday, it would have been, it was after
5  the first load and before the second one.
6      Q.  Okay. But on the times that Johnco sent --
7  excuse me. Yelvington sent trains up, did you have some
8  input to Gary before they sent each of those six trains
9  that went there? Did you have input?
10      A.  Probably not directly to Gary. There are --
11  there's the rail department that we have that organizes
12  and coordinates with the CSX railroad, and -- because
13  this is two-railroad movement, the Bay Line and the CSX,
14  there's a little higher level of coordination that had
15  to happen. That would occur with our rail department.
16      I think that sometime after probably in July,
17  when we realized that, you know, there was enough
18  material on the ground to load a train, we began the
19  process of working with the railroad.
20      Like I told you before, the railroad doesn't
21  just flip a switch, and they have their resources
22  allocated, crews, power and other things. And rail car
23  availability is subject to them being able to provide
24  all that. So, you know, you can't call up and say,
25  we'll take a train up at Whitehall. You know, that

75

1  process begins.
2      And they did not want to start -- they
3  wouldn't -- couldn't start service without assurances
4  that there was plenty of -- you know, enough material to
5  load trains on a regular basis. They didn't want to
6  start and then stop. Nobody wanted to do that. That's
7  not in the interest of Johnco or Yelvington or the
8  railroad.
9      So somewhere in there, Ben and I would have
10  communicated, and he would have told me there's enough
11  gravel on the ground to load a train, and the railroad
12  would have, you know, put power to it and we would have
13  sent cars in to load.
14      Q.  Did you ever physically go look and see if
15  there was enough gravel on the ground? I mean just --
16      A.  I can't remember dates. I went by a time or
17  two, met with Ben. Had lunch with Ben and Pep one day.
18  But there was really no reason to, and I trusted Ben
19  that he would tell me what the situation was and we
20  would work from there.
21      Q.  All right. Do you remember a meeting at the
22  Golden Rule restaurant in Calera?
23      A.  I do.
24      Q.  Okay. When did that occur?
25      A.  That's a good question. My recollection is --

76

1  well, it was after the first time I talked to Clatus on
2  the telephone, when he introduced himself to me and said
3  he had been the third investor or --
4      Q.  So it was after the July phone call?
5      A.  It was after that.
6      Q.  It was after?
7      A.  That's my memory, because I didn't know him
8  before then, and he wanted to meet us. And he had said
9  Pep had been the front man before, you know, that date,
10  and that -- you know, for -- because the project had so
11  many delays, he felt like it would be better if it was
12  managed by one person. He was going to leave Ben on to
13  manage the local site. We would still coordinate with
14  Ben at the site level.
15      He said he would like to meet Gary Yelvington.
16  And we arranged -- Gary was going to be up there. I
17  think one flight actually got cancelled because of
18  weather, and we rescheduled that meeting for sometime in
19  August. I believe it was the 21st or the 22nd, and --
20  if that's when that occurred. But it was after my first
21  phone conversation with Clatus, and we arranged a
22  meeting for -- it was more of a get-acquainted meeting.
23  And that was at the Golden Rule.
24      Q.  Who all was at that meeting?
25      A.  I don't recall. I know Gary was there and

77

1  Clatus and myself. And I'm not sure if anybody else sat
2  in on that conversation.
3      Q. Okay. What -- I know you just said something
4  about August 21st and August 22nd. Would you say that
5  part again? What is it about August 21st and 22nd that
6  is memorable to you about, that meeting may have
7  occurred sometime around then?
8      A. Just having looked back through the times that
9  I met with Gary in my -- I guess in my Palm Pilot, I
10  would have kept a note that I went to Calera. We had a
11  meeting for a certain day. We met with some people up
12  there.
13      So I just check, just to jog my memory, when
14  some significant dates might be, and that's when I -- I
15  don't have a record that we met Clatus that day. I just
16  have a record that Gary was in Calera either on
17  August 21st or 22nd.
18      Q. And this is a Palm Pilot that goes back to
19  August 21st and 22nd of '06?
20      A. It used to.
21      Q. Okay. When did it not go back? I mean, when
22  did you look at it?
23      A. Well, it died. I mean, it's -- it
24  malfunctioned. So when I look at it, I had a --
25  probably, I don't know, a couple -- well, no, I know

78

1  when it was. It was back in -- trying to remember when
2  we found out that we were being -- notice had been
3  served. Sometime earlier this year.
4      And then Gary and I talked about it, you know,
5  on the way or before we got here. We were just trying
6  to jog our memories when we met Clatus for the first
7  time.
8      Q. All right. As far as you know, though, it was
9  sometime in the summer, after the --
10      A. We did meet at Golden Rule with Gary and Clatus
11  and myself.
12      Q. And you -- and I've taken Gary's deposition,
13  too, and I've taken Mr. Klebe's. Of course, he had
14  nothing to offer as to that. But nobody can really pin
15  it down yet. And you really haven't done any more to
16  pin it down other than try, you know, by talking about a
17  Palm Pilot reference to a Calera meeting on August 21st
18  and 22nd. But your Palm Pilot didn't indicate Clatus
19  was there?
20      A. That's correct, just that I was there in Calera
21  and so was Gary.
22      Q. Okay. Let's see. You mentioned earlier that,
23  you know, you knew Johnco had other customers for the
24  bigger gravel. What did you know about that?
25      A. We had -- when I visited with Ben and Pep, or

79

1  at least Ben, about the production plan, just talking
2  about it, I asked the question, you know, what were the
3  products that were being made, because with our
4  distribution network, we could -- sometimes there's a
5  waste product or a byproduct that comes out of a sand
6  mine that some of our customers might have a use for,
7  and described to me that they really didn't have that.
8  They had the oversized material, the 67 and the sand. I
9  just asked a general question, did he have a customer
10  for the oversized material, and he said he did. It was
11  some -- it seemed like it was Ohio or somewhere. It was
12  a pretty distant location, and they --
13      Q. Is that the same oversized material that you
14  all bought some number of cars --
15      A. That's correct.
16      Q. -- in June?
17      And that's the only time you got it, when
18  Yelvington got it?
19      A. Right.
20      Q. Did your meeting with Ben on the production
21  plan, does that go back into '05? Because you
22  started --
23      A. I would believe so.
24      Q. Okay. You've told me -- and I may not have
25  asked you about all of them, but you told me about a

80

1  phone call with Clatus where you first were introduced
2  to him by a phone call. You told me about a meeting
3  with Clatus at the Golden Rule in Calera. And I'm
4  talking about Clatus Junkin.
5      A. Right.
6      Q. What other communications have you had with
7  Clatus Junkin that you can remember?
8      A. I think, through -- let's see, probably
9  sometime between August and October, there may have been
10  a phone conversation or two, just to talk about Clatus's
11  request to us to evaluate whether or not we could take
12  more than 150,000 tons that was in the production plan.
13  That conversation went back -- that's the first
14  conversation I had with him, was one of his options was
15  to not try to sell the sand, but to waste the sand. And
16  because the handling cost was getting so high, if he
17  could double up his gravel production and if either we
18  could sell it or someone else could sell it, that would
19  be a way that he could keep the mine operational.
20      Q. Now, double up the gravel production. Are we
21  talking about selling sand here, or are we talking about
22  selling more gravel? I don't understand.
23      A. Okay. My recollection is that one of the
24  options that Clatus had available to him was to not sell
25  sand. But he said he could not make the mine work

81

1  economically if he didn't sell the sand and only sold
2  150,000 tons of gravel, which is what their original
3  production plan was and what we were scheduled to take
4  on an annual basis.
5      And he told me that -- he said, one of my
6  options to save the mine and make this economically
7  viable is to ramp up production at the mine, and all the
8  sand that comes off would be wasted. I mean, if he
9  could sell any of it, that would be good, but if he
10  could -- he thought he could make it work by not selling
11  any sand at all.
12      And he would produce 300,000 tons of gravel and
13  wanted to know if Yelvington could take that extra
14  150,000 tons over the 150 that was their original
15  production plan. So we had some follow-up conversations
16  about that.
17  **Q.  What was your response to that?**
18  A.  Well, I told him that we had some -- our
19  existing locations had -- we had a market plan for the
20  150,000. I told him that we were always trying to --
21  part of my role was to grow the network, that we had a
22  terminal at Milton that was being constructed. There
23  were concrete producers at that location, and that it
24  might be possible for us to approach them and sell some
25  gravel at that location, some additional gravel above

82

1  the 150,000 tons.
2      That's what he had asked me for. And it was
3  all conceptual at that point. If he could do this, if
4  that was one of his options, would we be able to help.
5  And there was no commitment. We said we would explore
6  it with him.
7  **Q.  Did Clatus use the words, 150,000 tons and**
8  **300,000 tons?**
9  A.  I believe he used the words, 150,000 tons and
10  double that. That's my recollection.
11  **Q.  Did he ever discuss a periodic taking? In**
12  **other words, daily, weekly, monthly, bimonthly? Did he**
13  **ever talk to you about taking more gravel or taking**
14  **gravel more often?**
15  A.  No. I thought I recall -- well, you've asked
16  me several questions. Can you go back and ask them one
17  at a time so I can --
18  **Q.  And that's a good point. Did Clatus ever ask**
19  **you to take the gravel more often, meaning Yelvington?**
20  A.  More often than what?
21  **Q.  More than often than the six loads that had**
22  **been delivered between May 11th and September 25th, for**
23  **example?**
24  A.  I don't recall a specific conversation where
25  Clatus -- I mean, he was very gentlemanly. He would

83

1  call up, and I never felt, you know, threatened, or
2  where he said, I'm desperate, you got to come get your
3  gravel, it's running out and it's running into the pit.
4  We were -- it was a start-up operation, their gravel
5  mine was.
6  **Q.  Can I ask you a question? You said, running**
7  **into the pit. What --**
8  A.  I said, he never said that that --
9  **Q.  I understand. Why would you say, I've got so**
10  **much gravel, it's running into the pit? What do you**
11  **mean by that?**
12  A.  I would say he never said that that occurred.
13  In other words, he never said, I'm choking on gravel.
14  That was a way of saying, I have so much gravel that
15  it's piling up and I can't move around, or --
16  **Q.  Are you visualizing a pile of gravel next to**
17  **the pit?**
18  A.  No. I'm saying that he -- you asked me, did he
19  ever ask us to take more material, and --
20  **Q.  And not to be smart alecky, but, he didn't say**
21  **it was running into the pit, was just your way of saying**
22  **he didn't talk about taking any gravel?**
23  A.  That's correct. There was never a sense of
24  desperation about us not -- about the rate at which we
25  were taking gravel.

84

1  **Q.  All right. He seemed to be pleased, then, with**
2  **the rate that gravel was being taken?**
3  A.  I don't know if he was pleased or not.
4  **Q.  You didn't sense any -- any sense that he**
5  **wanted Yelvington to take more gravel?**
6  A.  What I sensed from Clatus and from Ben and
7  everybody that I dealt with at Johnco was that sand was
8  choking them, and they were -- they had asked us for an
9  opportunity to look and see if there was a way to help
10  them with sand. We explored that in a number of
11  markets. We couldn't get a price from the railroad to
12  make that work. It was sand, sand, sand, sand, and
13  that's what I recall having conversations about.
14  **Q.  And just, let's make sure I'm on the same page**
15  **as you are. You all didn't have any contract to buy any**
16  **sand from Johnco, did you?**
17  A.  That's correct.
18  **Q.  Okay. So --**
19  A.  Not that I'm aware of.
20  **Q.  And there was no -- I mean, as far as I know,**
21  **the only contract was to sell Number 67 gravel. Is that**
22  **the one you're aware of?**
23  A.  Yes.
24  **Q.  But you're saying that all of your**
25  **conversations were dominated -- and you said everybody**

85

1  you dealt with at Johnco, so you've mentioned Pep,
2  you've mentioned Ben and you've mentioned Clatus. Is
3  there anybody else you dealt with at Johnco?
4      A.  No.
5      Q.  So those three?
6      A.  Correct.
7      Q.  And that every conversation was dominated by
8  the sand issue?
9      A.  Let me -- if I said that, let me clarify that I
10  don't know if it was every conversation. A number of
11  conversations were, the sand problem was a dominant
12  issue. So if I need to clarify something I said in the
13  past, let me say it that way.
14      Q.  All right. So can you then tell me when you
15  had conversations with somebody where sand wasn't the
16  issue of the conversation? Somebody at Johnco.
17      A.  I don't recall specifically.
18      Q.  You don't recall any conversations specifically
19  where sand wasn't the dominant part of the conversation?
20      A.  Let me say it this way. Most -- I remember
21  sand being an issue in just about every conversation I
22  had. There might have been a conversation or two about
23  the load-out rate or something where that didn't come
24  up.
25      But when I visited the mine or when there

86

1  were -- there were a series of conversations in the
2  summer and fall of '05, when they were relating to me
3  that -- this is they, Ben and Pep, that their
4  arrangement to sell sand to a customer had been
5  postponed and then finally delayed, and they had some
6  reaction to that. And they asked us -- Ben made the
7  comment to me, he said, you know, obviously, our -- it
8  was Pep, rather. Pep made the comment to me, if we
9  can't sell the sand, we're not going to make it.
10      Q.  And when did that occur?
11      A.  That would have been summer or fall of '05.
12  And that's my recollection. You know, sometime in
13  there. Sometime before the first train. He asked us if
14  there was any way that we could help him out with sand.
15  And he gave me the price that he wanted, that they would
16  have liked to have sold it for.
17      We contacted the railroad on Johnco's behalf,
18  or our behalf, really, and asked for some rates into a
19  couple of locations. And the rates, if you take the
20  cost less what the material would sell for, there was
21  really no way to pay Johnco what they were asking for
22  for the sand.
23      Q.  What were they asking for?
24      A.  I think it was -- Pep mentioned something in
25  the range of three to three-fifty a ton, was what they

87

1  had targeted to sell to Lafarge.
2      Q.  What would it sustain?
3      A.  It wouldn't sustain anything. And that's what
4  we were --
5      Q.  In other words, zero was where the number was?
6      A.  If they gave it to us, we couldn't have made it
7  work.
8      Q.  Okay.
9      A.  And that was as courtesy to --
10      Q.  And let me ask you, you got a lot of experience
11  in this field, and Gary does, too. And was it not
12  obvious, before you started looking into it, that if
13  zero was -- if you couldn't even make it work if they
14  gave it to you, wasn't that obvious before?
15      A.  It's not obvious until you know what your costs
16  are. It wasn't obvious at all. We had to ask for the
17  freight rates. This would be taking the material to
18  markets where there is a sand shortage and --
19      Q.  Freight rates are different if you're taking
20  sand than if you're taking gravel?
21      A.  They can be, and they can be different by
22  location.
23      Q.  Certainly, they're different by location, going
24  uphill, downhill, north, south, you know, distance, all
25  that. I know that. But these are things that

88

1  Yelvington has done for a lifetime. It's not stuff you
2  were aware of? I mean, is it not something -- if I
3  bring up to you, I got this sand and it's sitting out
4  there in Lowndes County, Alabama, and I want to sell it
5  in Atlanta, you wouldn't have some sense of what the
6  freight rates are going to be to get it to Atlanta?
7      A.  No. It's not something that we do. We're not
8  in those markets. We don't have those numbers, and we
9  had to go ask.
10      Q.  And is Atlanta the one you asked about?
11      A.  No. That was more of a long-term concept. We
12  checked into Jacksonville, I believe.
13      Q.  You didn't look into Atlanta?
14      A.  I just said, that's a long-term strategic
15  location, or could be for us, and so there wasn't a
16  market opportunity at the time. That could be years
17  away.
18      Q.  And my question was, so you didn't look into
19  Atlanta?
20      A.  Not for Johnco sand at that time.
21      Q.  Okay. The only place you looked into was
22  Jacksonville?
23      A.  That is correct. That's my memory. That's my
24  recollection.
25      Q.  And you looked into -- how long does it -- just

89

1  **curious. I mean, what does it take to check into a**
2  **freight rate to get some sand into Jacksonville?**
3    A.  We contact the railroad market manager and they
4  have to call their service design, and they look and see
5  how much -- how long the trip is going to take, how many
6  crews, how many engines, so forth, and they price it out
7  for that. And they also look at their market situation,
8  see what they can make on other products. And that can
9  take anywhere from -- I mean, it can take weeks. And
10  they'll come back with a rate.
11  **Q.  Okay.**
12    A.  And that's what they did.
13  **Q.  Okay.**
14    A.  And, again, that was a courtesy to Ben and Pep
15  at the time to --
16  **Q.  Could Ben and Pep have made the same phone**
17  **calls that you did?**
18    A.  They probably could have.
19  **Q.  And they would have gotten the information back**
20  **in a few weeks?**
21    A.  I'd have to --
22  **Q.  Well, you said --**
23    A.  I said it can take up to -- it can take weeks.
24  **Q.  Okay. Customers, did you bring customers to**
25  **Whitehall, potential customers?**

90

1    A.  I don't think so. I don't recall bringing a
2  customer to Whitehall.
3  **Q.  Did you ever bring any other person to**
4  **Whitehall other than yourself?**
5    A.  Not that I remember.
6  **Q.  And so I guess that presupposes, then, that you**
7  **all didn't go out there and take some samples of**
8  **anything, then. Right?**
9    A.  I don't recall taking samples with anybody at
10  Johnco.
11  **Q.  Did you ever take any samples at Whitehall,**
12  **ever?**
13    A.  I don't think I personally sampled the gravel.
14  **Q.  Okay. Well, anything, did you sample anything?**
15    A.  No.
16  **Q.  Never with anybody who sampled anything?**
17    A.  I can't picture -- I can't remember being there
18  with somebody else and doing sampling.
19  **Q.  Okay. The conversations that you described**
20  **with Clatus, and you've had -- now you've described**
21  **three for me. Is there any more?**
22    A.  I don't remember exact -- the exact number of
23  conversations. Which three are you referring to, just
24  so we'll be on the same --
25  **Q.  One where the introduction was, one where you**

91

1  **went to Calera and ate at the Golden Rule, and one where**
2  **Clatus told you that -- he expressed the options about**
3  **what he was going to do with the sand and those kind of**
4  **things, that conversation.**
5    A.  Okay. That conversation, the third one you
6  just referenced, happened in the first -- the first time
7  I talked to Clatus on the telephone.
8  **Q.  Okay. So still, we're only at two**
9  **conversations, then.**
10    A.  Those are the two that I referred to so far.
11  **Q.  Okay. Now I'd like to go forward or backwards,**
12  **whichever is the -- since the first one is -- you've**
13  **described, and I figure we're going forward. Any other**
14  **conversations you've had with Clatus?**
15    A.  I think there was at least one time, and I
16  don't remember the date, where Clatus asked me about the
17  status of our Milton terminal. And I referred to that
18  earlier as something we mentioned as a -- could be a
19  possibility for a gravel market for additional tonnage,
20  if that was something that was pursued.
21    The only other conversation I remember that
22  really sticks out in my mind after that is when we
23  learned -- we had a train that was scheduled to load in
24  October. I think that's right. And we got a message --
25  I got a message, an E-mail back from our rail

92

1  department, saying that Gary had learned somehow that
2  Johnco had shut down. I think that was on -- that was
3  in October sometime. October 19th or 20th, I think, was
4  when that was.
5  **Q.  All right. Now, who scheduled a train**
6  **October 19th or 20th? Who scheduled a train to**
7  **Whitehall on October 19th or 20th?**
8    A.  Before I answer that question, would you like
9  me to finish answering the previous question?
10  **Q.  Oh, I thought you had.**
11    A.  You asked me about another conversation and I
12  told you that I had one, but I had one with him after
13  the train was -- the October -- or, after they closed
14  down, I had a conversation with him.
15  **Q.  Closed down and cancellation, those are two**
16  **different terms. I want to find out what train was**
17  **scheduled in October. I want to know who knows about a**
18  **train being scheduled in October. I want to know.**
19    A.  Jean Norton in our rail department.
20  **Q.  Jean Norton scheduled a train?**
21    A.  Well, I don't know if she -- let me back up. I
22  don't know if she scheduled trains. She's
23  responsible --
24  **Q.  Is that a woman?**
25    A.  She's the one who told me that the train --

93

1    that Johnco was out of business, and we would not be
2    sending a train there.
3      **Q.  In October of '06?**
4      A.  Correct.
5      **Q.  And she said that a train was scheduled and it**
6    **had been cancelled?**
7      A.  We had a train lined up to go to Johnco --
8      **Q.  Is lined up different than scheduled?**
9      A.  It's basically the same thing.  We were working
10   with the railroad to get them to put crews and power to
11   take a train --
12     **Q.  In October of '06?**
13     A.  Correct.
14     **Q.  So Johnco -- now, do you know -- did Jean tell**
15   **you who cancelled it?**
16     A.  What we heard was, she was at a sales meeting
17   where Gary told her that --
18     **Q.  Gary?**
19     A.  Gary Yelvington --
20     **Q.  Okay.**
21     A.  -- said -- he didn't cancel it.  He said,
22   Johnco is out of business.  That's what she relayed to
23   us.
24     **Q.  Okay.  So as far as you know, what Jean said**
25   **was what she heard from Gary?**

94

1      A.  Correct.
2      **Q.  And where were you when this conversation**
3    **occurred?**
4      A.  I would have been in Mobile or Spanish Fort.
5      **Q.  All right.  And so it was a phone call between**
6    **you and Jean?**
7      A.  I said it was -- I learned by E-mail.
8      **Q.  Okay, an E-mail.  It was an E-mail.  Do you**
9    **have a copy of that E-mail?**
10     A.  I don't know if I do or not.
11     **Q.  Do you keep E-mail?**
12     A.  Sometimes, if they're pertinent.  And
13   otherwise, I just delete them to keep my archive files
14   small.
15     **Q.  Did Jean -- but Jean said that you scheduled a**
16   **train.  Right?**
17     A.  I'm sorry.  Say again?
18     **Q.  Jean said you all scheduled a train?**
19     A.  We had -- we had begun fairly routine shipments
20   in August and September.  A train left.  I think he got
21   pulled out of Montgomery on October the 2nd.  And we
22   were -- we were trying to get a train to go back in
23   there.  At that point, it was becoming fairly routine
24   business.
25         We had one of our distribution yards that was

95

1    out of gravel and we had a customer who had switched
2    their mix designs over to it, and they were eager for
3    the material.  So we were trying to get -- you know,
4    have the ongoing business of gravel delivered to that
5    location.
6      **Q.  All right.  Now, when we started this thing, we**
7    **were talking about conversations with Clatus.  I mean,**
8    **what conversation did you have with Clatus about this in**
9    **October?**
10     A.  I didn't have one in October.
11     **Q.  Didn't have any conversations in October?**
12     A.  It was late October when we found out.
13     **Q.  I understand, but I want to find out if Philip**
14   **Holladay talked to Clatus Junkin in October of 2006.**
15     A.  No.
16     **Q.  You did not?**
17     A.  No, I didn't, in October of 2006.
18     **Q.  Not by phone, not in person?**
19     A.  I don't -- I don't recall talking to Clatus
20   after I was notified that Johnco had shut down, in phone
21   or in person, in October of 2006.
22     **Q.  And you were notified that Johnco had shut down**
23   **by Jean, by E-mail?**
24     A.  Correct.
25     **Q.  That's the first you heard about it?**

96

1      A.  Correct.
2      **Q.  And that was in October?**
3      A.  Correct.
4      **Q.  Okay.  And do you remember the date of that**
5    **E-mail?**
6      A.  I believe there was just one E-mail.
7      **Q.  Okay.**
8      A.  And I think that was around October 19th or
9    20th.
10     **Q.  Okay.  Now, after October, you had no**
11   **communications whatsoever with Clatus Junkin.  Anybody**
12   **else with Johnco, did you talk to them?**
13     A.  I didn't say I didn't have any conversations
14   with Clatus after October.
15     **Q.  No, no.  I agree.  That was a bad question.**
16   **I'm going to get to after October.**
17         **But as far as we know, sitting here with you**
18   **testifying to me now, you didn't talk to Clatus Junkin**
19   **October, even once?**
20     A.  As I said before, after being notified that
21   Johnco had closed, I do not recall talking to Clatus in
22   the remainder of October, which would be 10 or 11 days.
23     **Q.  After then, so you're leaving open the**
24   **possibility you talked to Clatus in October after the**
25   **19th or 20th, but you just don't recall it?**

97

1    A. I'm leaving that possibility open, but I do not
2    recall. And I do not have a hankering of a memory, a
3    suspicion of a conversation with him during that.
4    Q. But nothing -- you're sure, nothing before
5    October 19th or 20th, you had no communications with
6    Clatus?
7    A. No. You reversed that. I said, I have no
8    recollection after I was notified, which was
9    October 19th or 20th. I don't recall anything --
10    Q. All right. And I understand this. And I'm
11    not -- I just want to know what you're really saying,
12    Philip. All right.
13         Now, if you don't remember whether you talked
14    to Clatus or not, that's fine. Say that. But if you
15    remember, I didn't talk to Clatus, I want know that.
16    Which way is it?
17    A. I do not recall talking to Clatus in October.
18    Q. Okay. Does that foreclose the possibilities
19    that you actually talked to Clatus in October?
20    A. I don't recall. I don't recall means I don't
21    recall. If I recalled, I would recall. So I don't
22    recall.
23    Q. Did you talk to anybody else at Johnco in
24    October --
25    A. I don't think so.

98

1    Q. -- in October of 2006?
2         When's the last time you remember talking --
3    before October of '06, do you remember talking to
4    anybody at Johnco?
5    A. I don't really remember. It seemed like things
6    were getting better. We were loading trains at a
7    take-away rate that was our target and the railroad was
8    making cars available, and so we were -- there was
9    really no reason to have a lot of conversations at that
10    point. Things were going smooth. I was, you know,
11    with -- just going on with other things in my area of
12    responsibility.
13    Q. Well, the trainloads in September that you're
14    speaking of, were you involved in the decision-making to
15    send those two trains?
16    A. Not specifically.
17    Q. Were you notified they were sent?
18    A. I was aware that we were sending trains.
19    Q. All right. Did you -- well, did you know,
20    before the trains were sent, the trains were being sent?
21    A. We were shooting for about a biweekly schedule,
22    about every two weeks, so it was ongoing. The railroad
23    was working with us to establish crews and cars for
24    that.
25    Q. My question is, did you know, before the

99

1    September 7th train was sent, that it was going to be
2    sent?
3    A. Yes.
4    Q. Did you know, before the September 25th train
5    was sent, that it was going to be sent?
6    A. Yes.
7    Q. How long in advance did you know?
8    A. I don't recall. It could have been just a
9    matter of hours or days, just depending on when the
10    E-mail would have come through saying that -- you know,
11    where the empties were that were going there to load.
12    Q. So you get an E-mail when a train is going to
13    come?
14    A. There are E-mail notifications at times that
15    describe where the -- that's part of our rail
16    department's job. They have to know where the cars are
17    to give the producer notice when it's coming in.
18    Q. So on the six trains that Yelvington took, did
19    you get an E-mail, prior to those trains going to Johnco
20    and Whitehall, that they were going?
21    A. I probably did.
22    Q. Did you get it on the company computer?
23    A. I don't have a company computer.
24    Q. Okay. Did you get it on an E-mail on your home
25    computer?

100

1    A. Yes.
2    Q. Okay. Do you keep files of that on the
3    computer?
4    A. I don't -- I think those are so far back, I
5    don't have those anymore.
6    Q. What do you do with them?
7    A. I delete them and I get them out of my inbox so
8    that I can have more room on my computer for --
9    Q. Important stuff?
10    A. No, I didn't say that. You're putting words in
11    my mouth, and I don't appreciate it.
12    Q. All right. Well, that was my mistake. I
13    apologize.
14         Let me ask you this. What day did you get the
15    E-mail telling you that you were getting the October of
16    '06 -- the October of '06 train was scheduled, what day
17    did you get that --
18    A. I don't remember. There are --
19    Q. Did you get it?
20    A. I don't remember.
21    Q. You don't remember?
22    A. There are daily update -- daily or every other
23    day, there are E-mails that go out. Everybody gets
24    every E-mail, and I just don't recall. It's -- for what
25    I do, it's more like background information. It's not

101

1  my area of responsibility to coordinate the trains.
2      Q.  So when you would get the notifications of
3  these trains going to Whitehall, did you ever call Ben
4  or Pep or anybody?
5      A.  You know, I don't remember.  I think at that
6  point, the -- I'm not sure what the lines of
7  communication were, but it wasn't --
8      Q.  I'm talking --
9      A.  It wasn't my function for me to call up and
10  say, you know, the train's going to be here on this
11  date.  At that point, I had -- it was -- things were
12  beginning to work smoothly, as anticipated, and I was
13  moving on to other things, so I wasn't involved on a
14  day-to-day basis.
15      Q.  You were not?
16      A.  Not at that point.
17      Q.  Okay.  When did you cease being involved on a
18  day-to-day basis?
19      A.  I would say that once the trains began to be
20  shipped on a regular basis, it was something that was
21  handed off to the transportation department.
22      Q.  Who handed it off?
23      A.  Well, I didn't hand it off, but it's their
24  function.  It's the role they take on.  And they
25  coordinate with the railroad and everything that's done

102

1  with that.
2      Q.  And what date do you assign to that being
3  handed off?
4      A.  I just said, it was around the time that the
5  trains began to run as everyone had anticipated.
6      Q.  Okay.  Well, what date is that?
7      A.  I believe that that would be sometime in July
8  or August.
9      Q.  And as everybody anticipated is the other part
10  of your quote, that when the trains began to run as
11  everybody anticipated, who are you including in the
12  everybody?
13      A.  As far as I know, everyone that I had dealings
14  with at Johnco and at Yelvington --
15      Q.  All right.
16      A.  -- and with the railroad.
17      Q.  You had dealings with three people at Johnco,
18  you told us, Ben, Pep and Clatus.  All right.  Now, did
19  you have communications with Pep that everything was
20  going just as everybody anticipated at this point?
21      A.  I don't know if there was a specific
22  communication to the effect.  So I can't say yes to
23  that.
24      Q.  When's the last time you talked to Pep?
25      A.  I don't recall.  It's been over a year ago, and

103

1  I don't remember.  I would not have talked to Pep after
2  I talked to Clatus because he was no longer involved in
3  the operation.
4      Q.  When's the last time you talked to Ben?
5      A.  I don't remember.
6      Q.  And is your understanding that everybody at
7  Johnco anticipated that two trains a month was what
8  was -- that was everybody's anticipation?
9      A.  That's exactly right, because the production
10  department --
11      Q.  I understand.
12      A.  Yes.
13      Q.  But who told you that from Johnco?
14      A.  I would say that Ben Johnson told me that.
15      Q.  Okay.  You --
16      A.  Or inferred that.
17      Q.  Okay.  And how would he infer that?
18      A.  Because he told me that the production plan to
19  make available to us was 150,000 tons of gravel.  And I
20  was able to do the math, and it works out to -- with a
21  52-car train, 5200 tons, or about 6,000, it works out to
22  be about two trains a month.  That was -- people were
23  expecting the trains to come at about that rate.  Ben
24  had told me that he --
25      Q.  What people?

104

1      A.  Ben and Pep and --
2      Q.  They told you they were only expecting two
3  trains a month?  Ben and Pep both told you that?
4      A.  In conversations that we had, that was -- it
5  was -- it was something that -- it was so assumed, I
6  didn't even make a -- I mean, it was like a base
7  assumption.
8      Q.  Who assumed it?
9      A.  Well, I assumed it, they assumed it.
10      Q.  How do you know they assumed it?  How do you
11  know what they assumed?
12      A.  Well, all right.  I don't know what they
13  assumed.  I can tell you that we had conversations
14  saying that the trains would be minimum of 52 cars,
15  possibly up to 60, a hundred tons per car.  That's
16  5200 tons per train, up to -- if there's 60 cars, it's
17  about 6,000 tons.  And I had a conversation with Ben
18  about the fact that the timing was about -- that was
19  about their production rate.  About every two weeks,
20  they would be able to replenish what had been shipped.
21      Q.  Okay.  Now, I want to know the timing of that
22  conversation with Ben.  I want to know when you had that
23  conversation with Ben.
24      A.  I don't recall.  Sometime in 2005, if I had to
25  put a bracket on it.

26 (Pages 101 to 104)

105

1    Q. Okay. All right. Well, that's fine, and
2   that's fair.
3        But let me ask you, what was the production
4   rate?
5    A. Ben told me -- I don't know. I'll say that.
6    Q. Okay.
7    A. Ben told me that it would be 150,000 tons of
8   gravel, Number 67 gravel, a year.
9    Q. But you don't know what they were actually
10  producing, you're just basing it on, Ben told you
11  150,000 tons?
12   A. He told me that was their mining plan. And he
13  also told me, in meetings when things weren't working,
14  that they were not meeting that. They were not
15  producing at that rate.
16   Q. When did he tell you that?
17   A. Sometime -- if you want me to put a bracket on
18  it --
19   Q. I do.
20   A. -- I would say 2005.
21   Q. Okay. Did he ever tell you that in 2006?
22   A. I don't remember.
23   Q. Did Pep ever tell you that they couldn't
24  produce more than that in 2006?
25   A. I don't recall if he did or not.

106

1    Q. Did Pep ever talk to you about what they could
2   produce?
3    A. Just give me a second. I don't recall if I had
4   a specific conversation with Pep or if he was in the
5   room when we had a conversation. Ben was responsible
6   for most of the mechanical operational side, and that's
7   who I had most of my conversations with.
8    Q. Did Clatus Junkin ever tell you that Johnco
9   couldn't produce 150,000 tons a year of Number 67
10  gravel?
11   A. Ask me that question again.
12   Q. Did Clatus Junkin ever tell you that Johnco
13  could not produce more than 150,000 tons of Number 67
14  gravel?
15   A. I don't think he ever told me that.
16   Q. Did he ever tell you that they could produce
17  more than 150,000 tons of Number 67 gravel?
18   A. No, he did not tell me that, either.
19   Q. Did Clatus ever talk to you whatsoever about
20  any gravel rates that Johnco could produce?
21   A. The only conversation that we had that would
22  fall in that category is the conversation from -- in my
23  memory, from July, when he said that they were not able
24  to sell the sand.
25        And, you know, recognizing that the production

107

1   plan was 150,000 tons of gravel, he would need to do
2   what was necessary to double production. And if he
3   could sell 300,000 -- well, he didn't use the term
4   300,000. He said, if I can double production -- and I
5   can do the math, so I came up with the 300,000 -- to
6   Yelvington and/or someone else, that he felt like he
7   could keep the mine in operation.
8    Q. What equipment did Johnco have out there? I
9   know we talked about the dredge and the facility that's
10  above the pit that you, I think, called the grading
11  facility?
12   A. I wasn't responsible for knowing what kind of
13  equipment they had, so I don't know. I didn't do an
14  inventory and they didn't give me one.
15   Q. What do you remember seeing there?
16   A. I remember seeing a dredge, a classifying unit.
17   Q. A classifying unit. Excuse me. Not grading
18  unit.
19   A. An electrical generator, a front-end loader, a
20  truck and a rail load-out facility with a truck dumper.
21   Q. Okay. And you heard -- I heard a loader and a
22  truck, but that's what you said?
23   A. You asked me what I saw.
24   Q. I know, and I'm just --
25   A. I can remember seeing a loader, one. There may

108

1   have been more. I saw one. There may have been more
2   than one truck. I remember seeing a truck.
3    Q. Okay. I got you.
4        All right. I don't think we've gotten to the
5   conversations that you may have had with anybody at
6   Johnco after October of '06. Did you have any
7   conversations with anybody after October of '06?
8    A. Yes.
9    Q. Tell me about that.
10   A. On -- sometime in November, when we --
11   Q. Of '06, again?
12   A. Correct. And this would have been early --
13  early of '06. I had been informed that Johnco was shut
14  down. And I called Clatus to ask if that was true, to
15  confirm that, you know, just with my own ears. And he
16  did confirm that and elaborated.
17   Q. What did he say?
18   A. He told me that -- he said, yes, we've shut
19  down. He said -- he said, I filed a lawsuit against
20  Yelvington. He was very nice. It wasn't combative at
21  all. But he said, I'm very serious about this. He
22  said, you know, we're -- I can't remember all the
23  details, but I know he told me, he said, I'm serious
24  about this, but he said, we can work this out, we can
25  make this go away.

109

1    Let's see. He asked me -- he was surprised
2  that I wasn't aware of the lawsuit. And we hadn't -- I
3  think afterwards, we learned that the notice had been
4  sent to -- through our agent, or through Yelvington's
5  agent, to the controller and she was out, so it was
6  sitting in a Fed Ex envelope on her desk. But I called
7  him in that intervening period when the civil action was
8  filed and before we had opened the envelope, so we were
9  not aware of it.
10    I had customers who were out of material, out
11  of gravel, and I was trying to find a way to get gravel
12  to my customers, our customers.
13    Q. Which customers?
14    A. The specific customer was Metro Gravel in
15  Gautier, Mississippi.
16    Q. And did you tell Clatus that?
17    A. I don't know if I told him that or not.
18    Q. Did Clatus say --
19    A. I think -- I'm sorry.
20    Q. Go ahead.
21    A. I called to ask if they were indeed shut down,
22  and the rest of the conversation was Clatus talking to
23  me. That's the way I recall that.
24    Q. All right. Did Clatus tell you how it could be
25  worked out?

110

1    A. He mentioned to me that he had sent a release.
2  He wanted to sell the mine, and that he had sent a
3  release to Yelvington, to Mark Klebe. I think he said
4  Mark's name specifically.
5    And he said -- you know, he hadn't heard back
6  from us. And he said, I need to sell this, and I can't
7  sell it with this contract hanging over my head, hanging
8  over the mine.
9    And the inference -- I took it to mean that if
10  we signed the release, that the lawsuit would go away.
11  That was the implication that I perceived.
12    Q. But Clatus didn't say that, you just understood
13  that? Well, what did Clatus say, and then I can find it
14  from there.
15    A. This is a conversation that's months ago.
16    Q. Not very important in your memory, or is it
17  very important?
18    A. I would appreciate it if you wouldn't put words
19  in my mouth again.
20    Q. All right. Well --
21    A. If you'll ask me questions, I'll do my best to
22  answer them.
23    Q. All right. I'm asking you some questions.
24    Was this an important conversation?
25    A. I think so.

111

1    Q. But you don't remember what was said?
2    A. I remember a lot of what was said.
3    Q. All right. Well, tell me what Clatus said.
4    A. I don't remember it verbatim.
5    Q. Okay. Tell me what Clatus said about making it
6  go away.
7    A. Let's see. Clatus said that -- let me just
8  work through it again. He said -- I said, have you shut
9  down. And he said yes. In fact, we've filed a lawsuit
10  against your company for -- for whatever reason. I
11  think he used the words breach of contract.
12    And he said, are you not aware of that. And I
13  replied that I was not, and we were not at the time.
14  And he said that he had sent some correspondence to Mark
15  Klebe to -- it was a release of the contract. He said,
16  I need to -- I want to sell the operation and I've got a
17  potential buyer, and they won't buy it as long as I've
18  got a contract with Yelvington.
19    And he said -- he repeated, you know, the basic
20  concepts two or three times. He said, you know, this --
21  he was trying to make me understand that he was serious
22  about the lawsuit. But then he would say, but we can
23  make it go away. But I'm serious about this, it's a
24  serious legal lawsuit, but I think we can work something
25  out.

112

1    He did not specifically, in my memory, connect
2  the dots and say, if you will sign the release, but he
3  said there was a release several times. He said, you
4  guys haven't responded, so I've withdrawn that and I'm
5  filing a lawsuit.
6    Q. Told you he had withdrawn the release?
7    A. That's correct.
8    Q. Now, if you're listening to this, Philip, what
9  was your response to, we can make this go away? When
10  you heard Clatus say that, what was your response?
11    A. I didn't have a response to him. And I didn't
12  have enough information to even form a response at that
13  point.
14    He was mentioning things to me that I had no
15  awareness of. And so at that point, it was just a piece
16  of information, that he confirmed that Johnco had shut
17  down. He told me that he had not been able to sell us
18  sand, and that he had a buyer, and the buyer wouldn't
19  buy the contract --
20    Q. Clatus -- let me stop you, just because you've
21  added some more to the conversation here as you've gone
22  back through it for the third or fourth time. Clatus
23  told you he wasn't able to sell sand, and that's why he
24  was shutting down?
25    A. Did I say that?

f773469c-04e8-4b74-924b-e1f3d241e9c8

113

1    Q.   You said he had a buyer for the plant.  He
2  wasn't able to sell his sand.  Did Clatus say to you, I
3  wasn't able to sell my sand?
4    A.   Clatus said to me, I was not able to sell the
5  sand.  Then he said, I have a buyer, or I have a
6  potential buyer, I believe was the word that he used.
7  And they --
8    Q.   For the sand?
9    A.   For Johnco, for whole operation.
10    Q.   For the whole operation.
11    A.   He told me specifically, he was looking to sell
12  the whole operation.
13    Q.   Did he tell you who the buyer was?
14    A.   He did not.
15    Q.   Do you know who the buyer was?
16    A.   No, I don't.  And he said that he would -- he
17  said, but they will not purchase the mine from him
18  with -- he said, with a contract in place, or something
19  like that, at the prices that are in the contract.
20       So at that point, it was a relay of information
21  from Clatus to me.  And he referred to things that I had
22  no knowledge about, like an offer, the release and the
23  rescindion (sic) and legal action.
24       So at that point, I didn't say anything else.
25  Thanked him for -- I mean, he was very gracious to me,

114

1  and it was a -- you know, for finding out that a lawsuit
2  has been filed, it was a pleasant conversation and he
3  was very gentlemanly, and I hung up and had no response
4  to him.
5    Q.   Was there any mention in the conversation by
6  Clatus about any gravel not being shipped or sold?
7    A.   No.
8    Q.   Did you mention anything about calling to see
9  because you wanted to arrange for a shipment of gravel?
10    A.   That may have come up, because I -- and I don't
11  recall specifically, but we -- as I said early, we had a
12  customer who was out of gravel, out of the Johnco
13  gravel.  We had, at that point, had fairly consistent --
14  you know, we had consistent takeaways from the train,
15  and we had a customer relying on the gravel.  We had a
16  market for it.
17       And so I think -- I believe I asked him, do you
18  have any gravel on the ground and is there a possibility
19  to work something out.  And that's -- you know, one of
20  those two or three cycles around, he said, I think we
21  can make this go away.  But that was -- those are the
22  points that I remember.  I don't really recall anything
23  else in that conversation.  It was fairly short.
24    Q.   Well, what did he say when you asked him, did
25  he have any gravel on the ground?

115

1    A.   I don't recall.  It was -- I think he just got
2  back to -- I know he said the word -- he said to me, at
3  least three times, this is a serious matter, I'm serious
4  about this, this is a serious lawsuit.  So he would just
5  go back and refer to the lawsuit, and then imply to me
6  we can work it out.  He said, we can work it out, this
7  can go away, you know, we can work it out.
8    Q.   And you weren't curious about what he meant by
9  that?
10    A.   I thought I knew what he meant, but I had not
11  had the communications that -- the other communications
12  that he was referring to, and so it would have been
13  inappropriate for me to -- inconsiderate of me to begin
14  a conversation with a litigant.
15       I just listened and thanked him.  And at that
16  point, the original purpose of my conversation was -- we
17  had found out a new piece of information, that he had
18  sued us, and I didn't know that when I called him.
19    Q.   What did you do with this information?
20    A.   I called Mark Klebe.  And I may have -- I think
21  Gary was out at that time, but I talked to Mark about
22  it.
23    Q.   When did you call Mark?  Right after?
24    A.   I hung up and called him.  Correct.
25    Q.   And what -- what was the -- what was involved

116

1  in that conversation between you and Mark Klebe?
2    A.   I just relayed the conversation that we had
3  had.  And he was surprised about the lawsuit, didn't
4  know anything about it.  And he -- Clatus had said
5  something about, we filed it with your agent in Alabama.
6  And so Mark began a -- he told me, well, I'll make a
7  phone call and see if we find out the action, find out
8  what it was.
9       And at that point, you know, just a quick
10  notice, a heads-up, and you would have to ask Mark about
11  anything after that.
12    Q.   Did you tell Mark that Clatus said, we can work
13  this out?
14    A.   I sure did.  I thought that was -- my
15  perception was that I was getting signals that the
16  lawsuit could go away and that I could relay that
17  information to Mark or to Gary.
18       I mean, he knew, I'm sure -- I'm not sure.  I
19  assumed that Clatus thought -- knew that I would tell
20  Mark and Gary.  And I did, because I thought that was a
21  very important piece of information.
22    Q.   Did you tell Gary?
23    A.   I'm sure I did.  Or Mark -- well, you know, I'm
24  not sure.  I know I told Mark, and I don't know if I
25  told Gary that day or not.  Subsequent to that, I know I

117

1    did.

2    **Q. What did you -- tell me about that.**

3    A.  It would be the same thing.  I just relayed the

4    information, straight.  I mean, it was fresh in my mind,

5    and it was a little bit of a surprise, so those things

6    do stick out.

7    **Q. Were you involved in any conversations that led**

8    **up to a letter that Mark Klebe wrote to Clatus on**

9    **November the 10th, 2006?**

10    A.  Do you have a copy of the letter?

11    **Q. Yes.**

12    A.  Could I see what you're talking about?

13    **Q. It's Plaintiff's Exhibit 11, I think.**

14    **Plaintiff's Exhibit 11, which was introduced yesterday**

15    **in Mark Klebe's deposition.  Did you have any input into**

16    **that letter?**

17    A.  My input would have just been limited to

18    conversations about passing on the information from my

19    conversation with Clatus.

20    And then after we found a copy of the legal

21    action, the civil action in Lisa Vann's office, there

22    was a conversation where Mark tells me, yeah, we found

23    it, and he filled me in on -- I had not been aware of

24    these other correspondences, the information from

25    Charles Harrison, or whatever else.

118

1    And he just -- he probably either E-mailed or

2    told me about those -- those correspondences.  I had

3    been aware that there had been a offer to release the

4    contract.  And so he just kept me apprised of the

5    surroundings of this, but I don't --

6    **Q. That what?**

7    A.  I didn't write this letter, or I didn't draft

8    it, if you're asking about that kind of input.

9    **Q. Well, you didn't draft it.  I think Mark said**

10    **he drafted it.  But were you involved in the**

11    **conversations before it was drafted?**

12    A.  I had conversations with Mark and Gary before

13    this was drafted, and I can't tell you today how much of

14    that went into this or not.

15    **Q. Before Plaintiff's Exhibit 11, is that -- yeah,**

16    **that's the one we're looking at.  Is that right,**

17    **Plaintiff's 11?**

18    A.  That's correct.

19    **Q. Why don't you all -- well, before I quit, did**

20    **you have any other conversations with anybody from**

21    **Johnco, before today?  After, you know, the phone call**

22    **with Clatus, did you have any -- between the phone call**

23    **with Clatus and you coming in here today to talk with**

24    **me, anybody with Johnco?**

25    A.  I don't think so.  I don't recall.

119

1    MR. PEARSON:  All right.  Let me have a minute.

2    (Thereupon, at 1:54 p.m., a recess was taken in the

3    proceedings, after which, at 2:09 p.m., the proceedings

4    were reconvened and the following proceedings were had:)

5    MR. PEARSON:  That's all the questions I have

6    for this witness.

7    MR. LEEK:  Okay.  Philip, you have the

8    opportunity to read the transcript if it's

9    transcribed to make sure that Sandy hasn't made any

10    errors.  I don't think that she will, trust that

11    she's going to do a good job, but it's yours to read

12    or waive.  Mr. Yelvington and Mr. Klebe have chosen

13    to read.

14    THE WITNESS:  I would like to read it.

15    MR. LEEK:  Okay.  You'll get noticed through

16    us, and we'll get it to you.

17    (Thereupon the deposition was concluded at 2:10 p.m.)

18

19

20

21

22

23

24

25

120

1    CERTIFICATE OF OATH

2

3    STATE OF FLORIDA    )

4    COUNTY OF VOLUSIA    )

5

6    I, Sandra Narup, Registered Professional Reporter

7    and Florida Professional Reporter, the undersigned

8    authority, certify that PHILIP HOLLADAY personally

9    appeared before me and was duly sworn on July 6, 2007.

10

11    WITNESS my hand and official seal this 12th day of

12    July, 2007.

13

14

15

16

17

    _____

    Sandra Narup

18    Registered Professional Reporter

    and Florida Professional Reporter

19

    Notary Public, State of Florida

20    My Commission No.: DD 472186

    Expires:  January 15, 2010

21

    (This signature is valid only

22    if signed in blue ink.)

23

24

25

121

1          CERTIFICATE OF REPORTER

2

3  STATE OF FLORIDA    )
                       )
4  COUNTY OF VOLUSIA   )

5

6      I, SANDRA NARUP, Registered Professional Reporter,

7  Florida Professional Reporter and Notary Public, do

8  hereby certify that I was authorized to and did

9  stenographically report the deposition of PHILIP

10 HOLLADAY, that a review of the transcript was requested;

11 and that the foregoing transcript is a true record of my

12 stenographic notes.

13     I further certify that I am not a relative,

14 employee, attorney, or counsel of any of the parties,

15 nor am I a relative or employee of any of the parties'

16 attorneys or counsel connected with the action, nor am I

17 financially interested in the action.

18

19     DATE this 12th day of July, 2007.

20

21

22
                    _____
                    SANDRA NARUP
23                  Registered Professional Reporter &
                    Florida Professional Reporter
24
                    (This signature is valid only
25                  if signed in blue ink.)

---

122

1  Volusia Reporting Company
   432 S. Beach Street
2  Daytona Beach, Florida 32114
   386-255-2150
3
4  July 12, 2007
5  THOMAS J. LEEK, ESQUIRE
   Of Cobb & Cole
6  150 Magnolia Avenue
   Daytona Beach, Florida 32114
7
8  Re: Johnco v Conrad Yelvington
9  Dear Mr. Leek:
10 Attached please find your copy of the deposition of
   PHILIP HOLLADAY, which was taken in the above-styled
11 cause on July 6, 2007. Also attached is the Deponent's
   errata sheet to be completed by the deponent when
12 reading your copy of the deposition. This form is
   self-explanatory.
13
   After the deponent has completed this form, please
14 return it to our office for inclusion in the original
   transcript.
15
   If the reading and signing is not completed within 30
16 days, we shall conclude that the witness has failed to
   exercise his/her right to read and sign the transcript.
17 If this is not ample time, please contact our office.
18 Thank you for your cooperation.
19
20 Sincerely,
21
22 Sandy Narup
   Registered Professional Reporter &
23 Florida Professional Reporter
24 H. GREGORY PEARSON, Esquire
   THOMAS J. LEEK, Esquire
25

---

123

1              ERRATA SHEET

2      IN RE:  Johnco v Conrad Yelvington

3    DEPOSITION OF PHILIP HOLLADAY, TAKEN July 6, 2007

4  PAGE NO. LINE NO. CHANGE          REASON

5    ____  ____    _____    _____

6    ____  ____    _____    _____

7    ____  ____    _____    _____

8    ____  ____    _____    _____

9    ____  ____    _____    _____

10   ____  ____    _____    _____

11   ____  ____    _____    _____

12   ____  ____    _____    _____

13   ____  ____    _____    _____

14   ____  ____    _____    _____

15   ____  ____    _____    _____

16   ____  ____    _____    _____

17   ____  ____    _____    _____

18   ____  ____    _____    _____

19   ____  ____    _____    _____

20   ____  ____    _____    _____

21   ____  ____    _____    _____

22

   Under penalties of perjury, I declare that I have read

23 the foregoing and that the facts stated in it are true.

24
   _____
25 DATE              PHILIP HOLLADAY



# EXHIBIT 7

# FREEDOM COURT REPORTING

Page 1

1    IN THE UNITED STATES DISTRICT COURT
2    FOR THE MIDDLE DISTRICT OF ALABAMA
3         CASE NUMBER
4         CV-06-2:06CV993-10
5
6    JOHNCO MATERIALS, INC.,
7         PLAINTIFF,
8    VS.
9    CONRAD YELVINGTON
10   DISTRIBUTORS, INC.,
11        DEFENDANT.
12
13        DEPOSITION OF:
14        CLATUS JUNKIN
15
16        S T I P U L A T I O N
17        IT IS STIPULATED AND AGREED by and
18   between the parties through their
19   respective counsel, that the deposition of
20   CLATUS JUNKIN, may be taken before Donna
21   Winters, Commissioner and Notary Public,
22   State of Alabama at Large, at Freedom
23   Court Reporting, 367 Valley Avenue,

Page 3

1        IT IS FURTHER STIPULATED AND AGREED
2    that the signature to and the reading of
3    the deposition by the witness is reserved,
4    the deposition to have the same force and
5    effect as if full compliance had been had
6    with all laws and rules of Court relating
7    to the taking of depositions.
8        IT IS FURTHER STIPULATED AND AGREED
9    that it shall not be necessary for any
10   objections to be made by counsel as to any
11   questions, except as to form or leading
12   questions, and that counsel for the
13   parties may make objections and assign
14   grounds at the time of the trial, or at
15   the time said deposition is offered in
16   evidence or prior thereto.
17       IT IS FURTHER STIPULATED AND AGREED
18   that notice of filing of this deposition
19   by the Commissioner is waived.
20
21
22
23

Page 2

1    Birmingham, Alabama 35209, on the 25th day
2    of July 2007 commencing at 10:00 a.m.
3    DEPOSITION OF:  CLATUS JUNKIN
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

Page 4

1             E X H I B I T S
2    EXHIBIT PG DESCRIPTION
3    DX-20  167 10-23-06 letter
4    DX-21  167 10-13-06 fax with Termination
5    of Contract and General Release
6    DX-22  168 10-12-06 e-mail and General
7    Release
8
9
10
11
12
13
14
15
16
17
18
19
20
21            I N D E X
22   EXAMINATION BY:    PAGE NUMBER
23   Mr. Leek      6 - 189

1  (Pages 1 to 4)

# FREEDOM COURT REPORTING

Page 5

1      A P P E A R A N C E S:
2      MR. THOMAS J. LEEK, Attorney at Law,
3   150 Magnolia Avenue, Daytona Beach,
4   Florida 32115-2491, appearing for the
5   Plaintiff.
6      JUNKIN, PEARSON, HARRISON & JUNKIN,
7   by Mr. H. Gregory Pearson, Alston Place,
8   600 Greensboro Avenue, Suite 601,
9   Tuscaloosa, Alabama 35401, appearing for
10  the Defendant.
11     ALSO PRESENT: Phillip Holladay.
12
13     I, Donna Winters, a Court Reporter
14  of Birmingham, Alabama, acting as
15  Commissioner, and a Notary Public for the
16  State of Alabama at Large, certify that on
17  this date, as provided by Rule 30 of the
18  Alabama Rules of Civil Procedure, and the
19  foregoing stipulation of counsel, there
20  came before me, CLATUS JUNKIN, witness in
21  the above cause, for oral examination,
22  whereupon the following proceedings were
23  had:

Page 6

1          CLATUS JUNKIN,
2   having been first duly sworn, was examined
3   and testified as follows:
4
5      COURT REPORTER: Usual stipulations?
6      MR. PEARSON: I want to carry
7   forward the same stipulation that was in
8   the first two, which is you can ask all of
9   your questions. You know, we have
10  objected to the designation of 30(b) for
11  the purposes that you set forth, but I'm
12  not going to tell you that Clatus isn't
13  going to be it. You just ask your
14  questions of personal knowledge, and we'll
15  go from there. We may designate an
16  additional person to testify, specifically
17  I'm talking about damages more than
18  anything.
19     MR. LEEK: I understand.
20
21  EXAMINATION BY MR. LEEK:
22  Q.   Are you ready to get started, Mr.
23  Junkin?

Page 7

1   A.   I am.
2   Q.   Thank you. Can you state your full
3   name for the record, please?
4   A.   Clatus Junkin.
5   Q.   Do you have any other names? Is
6   Clatus Junkin it?
7   A.   Yes.
8   Q.   So no middle name?
9   A.   I have Kirt, K-I-R-T, yes.
10  Q.   So it's Kirt Clatus Junkin; correct?
11  A.   No, middle name.
12  Q.   Clatus Kirt Junkin?
13  A.   Yes.
14  Q.   Mr. Junkin, I know you've been a
15  lawyer for a long time, and a judge for a
16  long time, so we're going to dispense with
17  the normal instructions here. The only
18  one I'm going to caution you on is please
19  let me finish my question before you start
20  your answer, because that one seems to
21  trip everybody up. Let's start with this.
22  Can you tell me what your experience in
23  the sand and gravel mine producing

Page 8

1   industry was prior to Johnco?
2   A.   I started with that business that I
3   own in Fayette, called West Alabama Sand
4   and Gravel, probably twenty-five years
5   ago. I developed it from a couple of
6   worn-out pieces of machinery and worn-out
7   washer, gravel washer operation, to what
8   today is a fairly substantial operation.
9   It's modernized. It has fed itself over
10  the years of buying new equipment,
11  upgrading, and so forth. Now, the
12  operation that I have in Fayette is more
13  of a specialty type of gravel, as opposed
14  to the operation at Whitehall which would
15  be a bulk operation more.
16  Q.   And by "specialty," do you mean
17  lower volume but a higher price?
18  A.   Yes.
19  Q.   And by "bulk," you mean higher
20  volume, lower price?
21  A.   Yes.
22  Q.   Thank you. The West Alabama Sand
23  and Gravel company that you have, are you

2 (Pages 5 to 8)

# FREEDOM COURT REPORTING

Page 9

1  the sole owner of that?
2  A.  Yes.
3  Q.  And did you purchase that as an
4  operating business, or did you start it
5  from ground-up?
6  A.  I did not purchase the business.  I
7  purchased some equipment and a stockpile
8  of gravel that had already been washed,
9  from an operation called Fayette Sand and
10  Gravel.  Now, they did leave and go out of
11  business as to mining or washing gravel.
12  They continued in business as a
13  construction company, and so forth, septic
14  tanks, and things like that.
15  Q.  Are you describing an asset sale as
16  opposed to a stock sale; is that what
17  you're telling me?
18  A.  Yes.  I'm not sure that they were
19  even incorporated.
20  Q.  How long had that business been in
21  place before you bought it?
22  A.  A few years.  They were just a local
23  operation.  My operation in Fayette is

Page 10

1  national.
2  Q.  What is the address of that location
3  there?
4  A.  You've got me.  I use my office
5  address and my post office box as my
6  address for all businesses.
7  Q.  Do you reside in Fayette now?
8  A.  Yes.
9  Q.  What is your residence address?
10  A.  It's 2147 Columbus Street West,
11  Fayette, 35555.
12  Q.  How long have you been there?
13  A.  At that address?
14  Q.  More than ten years?
15  A.  Yes.
16  Q.  Does anyone else reside there with
17  you?
18  A.  No.
19  Q.  Do you have any plans to move?
20  A.  Not at the moment.  It's a big
21  house.
22  Q.  What is your office address there?
23  A.  202 Third Street Northeast, Fayette.

Page 11

1  Q.  Is that the address you use for
2  Johnco as well, Johnco's address?
3  A.  Yes.
4  Q.  Now?
5  A.  Yes.
6  Q.  Prior to this time, it was Pep
7  Johnston's office in Aliceville?
8  A.  Yes.
9  Q.  Thank you.  At what point in time
10  did you begin using your office in Fayette
11  as the Johnco office?
12  A.  Immediately when I bought it and
13  started switching bank accounts, and so
14  forth.  But, of course, his office still
15  to this day gets some of our mail; because
16  once you start, people pick up on an
17  address.  It seems like every week, maybe
18  even every other day, he will forward me
19  something that comes to Johnco in
20  Aliceville.
21  Q.  Is your arrangement with him, when
22  that happens, it gets forwarded to you?
23  A.  Yes.

Page 12

1  Q.  I neglected to do something here.
2  We need to make sure we are talking about
3  the same people and the same things.  If
4  you could, please, I'm going to call out
5  some names of people and entities; and if
6  you could just identify them briefly for
7  purposes of this litigation, I would
8  appreciate it.  Conrad Yelvington
9  Distributors, Inc.?
10  A.  That was the company that we entered
11  into a contract with to take the gravel
12  that we produced.
13  Q.  And by contract, we're talking about
14  the supply agreement?
15  A.  Supply agreement, yes.
16  Q.  That is the basis of this
17  litigation; right?
18  A.  Right.
19  Q.  You'll hear me call them Yelvington
20  or Yelvington Distributors.  When I say
21  "Yelvington," I mean the company.
22  A.  I understand.
23  Q.  If I refer to one of the individuals

3 (Pages 9 to 12)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 13

1  named Yelvington, I'll call them Gary
2  Yelvington or Conrad Yelvington. Who is
3  Gary Yelvington?
4  A. He is, the only way I know to
5  designate him. I think he's maybe the
6  president, operator now, of the company.
7  He is the son of Conrad Yelvington, who I
8  understand was the founder of the company.
9  Q. Do you understand Gary Yelvington to
10 be the head of Yelvington at the point of
11 the supply agreement forward?
12 A. Yes.
13 Q. Who is Mark Klebe?
14 A. I met him one time. He counted the
15 money, was his expression to me. He's
16 some kind of comptroller, financial
17 person, something. I don't know what all
18 else he does.
19 Q. And you understand him to be
20 associated with Yelvington; correct?
21 A. Yes.
22 Q. Who is Phillip Holladay?
23 A. At the time I knew him, he

Page 14

1  identified himself as a consultant.
2  Q. For Yelvington or to Yelvington?
3  A. A consultant to the world, I guess.
4  I never did really --
5  Q. How about in association with the
6  supply agreement, was he a consultant to
7  Yelvington?
8  A. I don't know what his job was. I
9  was told that he was to be my contact
10 person with Yelvington.
11 Q. Fair enough. Who is Ben Johnston?
12 A. Ben Johnston was one of the original
13 members of the initial Johnco corporation.
14 There were three shareholders.
15 Q. Was Pep Johnston one of the others?
16 A. Yes.
17 Q. And then you would be the third; is
18 that correct?
19 A. That's right.
20 Q. What is Johnco Materials?
21 A. Johnco Materials was a corporation
22 that we formed for the purpose of
23 purchasing a tract of property to

Page 15

1  establish a mining operation with Conrad
2  Yelvington company, to produce gravel and
3  sell it to them.
4  Q. But Yelvington never had any
5  ownership interest in Johnco Materials?
6  A. They never had any ownership
7  interest in it, but they were the basis
8  for us going into business.
9  Q. And does Johnco Materials exist as a
10 company today?
11 A. Yes.
12 Q. And that is the plaintiff in this
13 case; correct?
14 A. Right.
15 Q. So there aren't any affiliates or
16 subsidiaries that are out there holding
17 different assets of Johnco Materials; is
18 that correct?
19 A. Yes.
20 Q. As we go through, you'll hear me
21 refer to it as Johnco, and I mean the
22 company.
23 A. That's fine.

Page 16

1  Q. Let's talk a little bit about your
2  employment today. Are you employed by
3  Johnco Materials, meaning do you hold an
4  office for which you receive compensation?
5  A. No.
6  Q. So the only compensation you receive
7  from Johnco Materials is through
8  distributions to shareholders; is that
9  correct?
10 A. Well, you've been around here long
11 enough to find out there haven't been any
12 of those. I presume, if it were to ever
13 get to that point.
14 Q. The reason I ask is because Ben
15 Johnston told me yesterday that he and Pep
16 drew salaries from the company at some
17 point in time, so I was wondering if you
18 do so.
19 A. They were more actively involved. I
20 never drew a salary. I can say that Pep's
21 was nominal. He was sort of paid back for
22 his expenses and the gas and stuff he
23 burned. Ben, since day one, has been

4  (Pages 13 to 16)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 17

1  compensated salary-wise for his work.
2  **Q.    Pep also testified that he took**
3  **money, I think, in the form of**
4  **distributions -- although, he didn't say**
5  **"distributions" -- and that you did as**
6  **well for the purpose of paying off the**
7  **individual debt incurred to get the**
8  **company started.**
9  A.    Well, that's not really what
10  happened.  Initially, while the company
11  was sitting there and the plant being
12  built, we paid the interest only on the
13  notes that the two of us -- he had
14  incurred a note, borrowed the money to put
15  up the initial $600,000.  Of course, I had
16  too.  He insisted that he be paid interest
17  on that, and I maxed it.
18  **Q.    So you took money in a distribution**
19  **that way, but you didn't have to pay**
20  **interest on anything; is that correct?**
21  A.    On the $600,000.
22  **Q.    Right.  That's what I'm talking**
23  **about.**

Page 18

1  A.    Up until that ceased.
2  **Q.    And just so I can clarify this for**
3  **purposes of the record, Pep testified that**
4  **he took out a $600,000 loan or mortgage of**
5  **different assets.  He wasn't sure if you**
6  **had done the same.  And throughout the**
7  **time, I guess up until the point that it**
8  **stopped, the company, Johnco, made**
9  **distributions to him, enough to cover what**
10  **he needed to cover on his personal**
11  **$600,000 mortgage; and he thought you did**
12  **the same thing.  Is that accurate, with**
13  **the exception of you weren't paying off a**
14  **mortgage?**
15  A.    Well, part of what you say may or
16  may not be accurate, because you add that
17  he said he took distribution.
18  **Q.    I'm sorry, I shouldn't have.  That's**
19  **just my shorthand label for taking money**
20  **out of a company when it's not salary, and**
21  **you're an owner.**
22  A.    I generally agree that that's what
23  he did.  Also, I would presume it would be

Page 19

1  in the form of compensation, each of them
2  had a life insurance policy that the
3  company paid for.
4  **Q.    And did the company start paying**
5  **those things to Ben and Pep and you from**
6  **the time it closed on the loan?**
7  A.    Yes.
8  **Q.    That makes sense to me.  Now,**
9  **Mr. Junkin, I understand that you have**
10  **quite a bit of experience in business and**
11  **a number of business interests.  I'm not**
12  **interested in any interest you have in**
13  **publicly traded companies, but I am**
14  **interested in the interest that you have**
15  **in private companies.  Can you tell me,**
16  **give me a list of the private companies of**
17  **which you own 10 percent or more at**
18  **present?**
19  A.    Well, West Alabama Sand and Gravel,
20  Inc.; I have a company, Junkin Properties,
21  Inc., where I buy and sell property.  Of
22  course, West Alabama Sand and Gravel, you
23  know what it does.

Page 20

1  **Q.    Right.**
2  A.    I have an L.L.C. that I practice.  I
3  have a P.C. that I practice under, and
4  then part of another entity that also
5  practices law.  I have a newspaper called
6  the Hoover Gazette.  It's under a
7  corporation, Ego Publishing, that I own.
8  **Q.    How about the syrup company, do you**
9  **still own the syrup company?**
10  A.    No.  I sold it a few years ago.
11  **Q.    Anything else you can think of?**
12  A.    Not right at the moment.  If I do,
13  I'll tell you about it.
14  **Q.    The businesses that you've just**
15  **described, with the exception of your law**
16  **practice and the property, Junkin**
17  **Properties, are those businesses that you**
18  **bought as existing businesses, or the**
19  **assets of existing businesses?**
20  A.    No.  None of those businesses were
21  bought, except the transaction -- all the
22  other businesses were formed.
23  **Q.    They were start-ups?**

5 (Pages 17 to 20)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 21

1  A.  Yes.
2  Q.  So the newspaper wasn't in existence
3  at the time that you started it?
4  A.  No.
5  Q.  I understand.  What is your
6  experience in preparing business models
7  for prospective companies?
8  A.  I don't have any.
9  Q.  So for the other companies that you
10  have started up, you haven't prepared a
11  business model?
12  A.  Not a formal one.  I put ideas on
13  paper.  You add up and say, "If we sell
14  this much, it will do this well," and so
15  forth.
16  Q.  Let's talk about that.  Typically
17  when you're starting up a business, what
18  are the things that you analyze to
19  determine whether it's going to work for
20  your own personal benefit?
21  A.  Well, of course, you've got to
22  analyze the cost of operation.
23  Q.  So I'm going to call that a cost

Page 22

1  analysis, if that's all right.  Anything
2  else?
3  A.  Your marketing, what the market is,
4  if you're producing a product.
5  Q.  Market plan?
6  A.  Market plan.
7  Q.  Anything else?  Income analysis?
8  A.  Well, the costs would sort of
9  include that.
10  Q.  So that would actually be a cash
11  flow analysis, then?
12  A.  Yes.  Your overall, what you expect
13  to sell, doing different models of high
14  and low sales, and so forth, and
15  break-even points.
16  Q.  Just so I can clean this up a little
17  bit, we have called it a cost analysis.
18  But in that cost analysis, you're looking
19  at the income that you project versus the
20  costs that you project; and at the end of
21  the day, you're saying what the business
22  cash flows are.  Is that correct?
23  A.  Right.

Page 23

1  Q.  Let's call that, if we could, a cash
2  flow analysis.  How long do you typically
3  take these things out?  Do you look at a
4  one-year window, a five-year window, a
5  ten-year window?
6  A.  It would depend on the circumstance.
7  If you've got to develop a market, then
8  you might look further out.  If you feel
9  like your market is there, then you hope
10  that your second year will be similar to
11  your first year and add something for
12  increased costs.  You don't go out five or
13  ten years.  By the same token, if you're
14  speaking about this, you do recognize what
15  assets you have, depletable assets, and
16  how long it will take you to, in this
17  instance, mine the property, and so forth.
18  Q.  When you say "this instance," you're
19  talking about Johnco?
20  A.  Yes.  The overall value of the
21  gravel that is on the property.
22  Q.  Just so I can clean this up, too,
23  we're talking about the reserve; right?

Page 24

1  How much material there is to take out of
2  the ground at the spot that you have?
3  A.  Yes.
4  Q.  Let me clear this up.  Johnco
5  Materials only has one mining operation;
6  right?  That's the one at Whitehall?
7  A.  Yes.
8  Q.  For the businesses that you've
9  owned, how many of those have you had to
10  go out and seek outside financing?
11  A.  Businesses that I have owned?
12  Q.  Yes, that you have owned.
13  A.  We were talking about my current
14  businesses.
15  Q.  Let's look at just the current
16  businesses.
17  A.  The only current business that I had
18  to seek outside financing, other than
19  Johnco, would be West Alabama Sand and
20  Gravel.
21  Q.  Did you have to seek outside
22  financing at the point that you started it
23  up, or that you bought the assets?

6  (Pages 21 to 24)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 25

1  A.  Yes.
2  **Q.  How many times, in your professional**
3  **career, have you had to go out and seek**
4  **outside financing for purposes of a**
5  **business operation?**
6  A.  I had a syrup company which I
7  financed through a bank, and I had a motel
8  operation that I financed through the
9  bank.  I will tell you that currently I
10 did overlook something.  I have an oil
11 change, express oil change and car wash,
12 and it was financed.
13 **Q.  Was that a start-up?**
14 A.  Yes.
15 **Q.  What is the name of that one?**
16 A.  Fayette Express Lube and Car Wash.
17 The lube building was built, and then the
18 car wash was added in another building
19 beside it.
20 **Q.  So in your professional career,**
21 **you've had to seek outside financing for**
22 **start-up how many times, would you say?**
23 A.  Three or four.  Excuse me.  The

Page 26

1  syrup company was not a start-up.
2  **Q.  I understand, but you needed**
3  **financing?**
4  A.  The motel was not a start-up.  I
5  bought an existing business.  The lube
6  company, oil change, that was a start-up.
7  **Q.  Thank you for correcting me on that.**
8  **Let's focus, if we can, on the times**
9  **you've had to seek outside financing,**
10 **whether it was a start-up or not.  In**
11 **those instances you've had to seek outside**
12 **financing, have you always sought the**
13 **financing through a financial institution**
14 **as opposed to, let's say, private equity?**
15 A.  Yes.
16 **Q.  How many times would you say you've**
17 **gone through that process of submitting**
18 **the applications to financial institutions**
19 **for funding?  I think you just told me**
20 **three or four, maybe?**
21 A.  Yes, I would say so.
22 **Q.  And in your experience in doing**
23 **that, what typically do the banks require**

Page 27

1  **you to provide them before they will**
2  **process your request for funding?**
3  A.  Well, I have a financial statement,
4  whatever that may be at the time I get the
5  loan.
6  **Q.  So that would be a personal**
7  **financial statement; is that correct?**
8  A.  Yes.  I then do a general value
9  analysis of the business that I'm going to
10 enter into.  If the business has a
11 history, of course, I then have that
12 history that I present.  If it's an idea,
13 I show them why I think it will work.
14 **Q.  And how would you go about showing**
15 **them why you think it would work?  What**
16 **types of things would you show them to do**
17 **that?**
18 A.  Well, let's talk about Johnco.
19 **Q.  Sure.**
20 A.  When we went to the bank, one of the
21 primary things that we showed the bank was
22 our supply agreement with a reputable
23 company.  We showed them, then, the value

Page 28

1  of the property that we were going to
2  purchase.
3  **Q.  Through an appraisal or something**
4  **like that?**
5  A.  Yes.  You look at the value of the
6  property, the ground only, and then the
7  minerals separately, and then in
8  combination.  So it would be the real
9  property plus the mineral interest, or
10 with the mineral interest.  It would be a
11 cost return of constructing the plant, and
12 what it would then be worth after you
13 build it and put it into operation.  So
14 you start out with pieces, or we did in
15 this instance, and you put them all
16 together, and you reach a value.
17 **Q.  When you say "the value of the**
18 **plant," are you talking about the value of**
19 **the physical structure; or are you talking**
20 **about the value of the operation, or both?**
21 A.  Well, I think the value of the
22 operation was considered.  Of course, they
23 were loaning us money to buy equipment and

7 (Pages 25 to 28)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 29

1 build a plant, which they then in turn
2 were receiving a mortgage lien against.
3 **Q.    So they were looking at the value of**
4 **the property, or value of the assets; is**
5 **that correct?  Or were they looking at the**
6 **value of the --**
7 A.    Well, when we got it all together,
8 that was going to be the source of how
9 they get paid back, so they looked at that
10 also.
11 **Q.    I want to focus now on the bank that**
12 **Johnco actually got financing through,**
13 **which I think was --**
14 A.    West Alabama Bank & Trust.
15 **Q.    Were you involved in that process of**
16 **seeking the financing from West Alabama**
17 **Bank & Trust?**
18 A.    I was the reason that financing was
19 possible.  That was my bank, a bank that I
20 had done business with for years, the bank
21 that does my financing for West Alabama
22 Sand and Gravel.  I had an affluent credit
23 history with them.  Pep and Ben were

Page 30

1 actually not able to do this without my
2 assistance.
3 **Q.    And that's what I understand from**
4 **Pep as well.  So did you spearhead, then,**
5 **the application for financing through West**
6 **Alabama Bank & Trust?**
7 A.    The term "spearhead," I would not
8 necessarily know the definition of what
9 that would be; but I was the one who went
10 to an individual who is the president of
11 the operation, by the name of Rob Finney,
12 who I sat down with, along with them, to
13 present this.  I presume I would, then,
14 qualify as a spearhead.
15 **Q.    Or the point person.  We can call it**
16 **whatever you want.**
17 A.    I understand.
18 **Q.    In this particular instance with**
19 **Johnco, did you present West Alabama Bank**
20 **& Trust with a personal financial**
21 **statement?**
22 A.    I'm sure I did at some point in
23 time.

Page 31

1 **Q.    Do you recall whether that was**
2 **before or after the bank agreed to loan**
3 **the money?**
4 A.    It would be before.  That bank would
5 know my financials.  See, I would be
6 presenting that bank financial statements
7 on a regular basis.  They probably said,
8 "Give us one specifically for this," but I
9 might have given them one two months
10 before.  They had knowledge of what my
11 financial condition was.
12 **Q.    Did you present them with a value**
13 **analysis of the business, Johnco?**
14 A.    Not a formal one, but we did an
15 informal analysis.  I don't recall that we
16 ever actually presented it as such.  These
17 people are country bankers.  They know
18 about sand and gravel operations.  They
19 knew about mine, for one, and the fact it
20 had been successful.
21 **Q.    As part of the application process,**
22 **were you required to give them any**
23 **documents to substantiate what your value**

Page 32

1 **analysis of the business was?**
2 A.    The only real document that I
3 remember that they weighed heavily was the
4 document to support our supply agreement
5 that we obtained from the Conrad
6 Yelvington company.  They had an extensive
7 brochure that outlined all the yards that
8 they had, described their business and all
9 the rail cars that they owned, and all the
10 aggregate that they took on a yearly
11 basis, and those sort of things.  We, more
12 or less, had to sell the bank on the fact
13 that the people that we were depending on
14 to buy our gravel were substantial and
15 could, in fact, take it financial-wise and
16 facility-wise.
17 **Q.    By that, are you saying that the**
18 **bank already had confidence that you knew**
19 **how to run a sand and gravel business?**
20 A.    I would think they did.
21 **Q.    So they didn't need any proof from**
22 **you that operationally you could make this**
23 **thing work if you had customers?**

8 (Pages 29 to 32)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 33

1  A.  Right.
2  Q.  And I believe what you're telling me
3  is, they just wanted to make sure that you
4  were going to have customers?
5  A.  Right.
6  Q.  Did they ask you if you had
7  customers?
8  A.  Oh, I told them exactly what we had.
9  I mean, that's no secret. We had one
10  customer, and that was it.
11  Q.  Did you offer that to them, or did
12  they ask you for some support that you
13  were going to be able to do this?
14  A.  I don't recall. That was an
15  integral part of our presentation. I
16  mean, they had to know that. I presume
17  that I told them. I wouldn't just go in
18  there and say, "I want a couple of million
19  dollars right now, and we're going to try
20  to go out and find somebody. We're going
21  to spend that and then try to find
22  somebody to sell the gravel to." That was
23  a part of my support of me being able to

Page 34

1  fund this operation.
2  Q.  But going into it, knowing what you
3  were going to ask the bank for, you went
4  in with the idea you were going to show
5  them the supply agreement; is that
6  correct?
7  A.  The supply agreement and the
8  supporting brochure.
9  Q.  Was the brochure prepared by
10  Yelvington for you, or for Johnco?
11  A.  It's their general brochure. I
12  think they prepare it every year.
13  Q.  But it wasn't prepared for this
14  specific purpose; right?
15  A.  I didn't see any need. I presume
16  that it was accurate, and they do it
17  annually.
18  Q.  My question, though, was, Yelvington
19  didn't prepare the brochure you took to
20  the bank for the specific purpose of you
21  getting financing; is that correct?
22  A.  Oh, no.
23  Q.  It's just something you used to help

Page 35

1  you get your financing?
2  A.  Right.
3  Q.  Did the bank require you to present
4  them with any documents regarding cash
5  flow analysis of Johnco prior to giving
6  you funding?
7  A.  Not documents as such. We did a
8  general analysis of what we believed
9  that -- you take the supply agreement, and
10  you interpret it as we did, and you do a
11  high side and a low side.
12  Q.  Did you do that in writing for the
13  bank?
14  A.  No.
15  Q.  So you just went in and presented --
16  A.  Here is the supply agreement. You
17  can read what this supply agreement says.
18  It says that these people are going to
19  take 52 tons of gravel -- train loads, I
20  think probably is what we said -- pretty
21  much on a weekly basis. Regardless of
22  what happens, they're going to take 150
23  tons.

Page 36

1  Q.  150,000?
2  A.  150,000 tons, but they may take
3  substantially more. So you look at the
4  figures based on, "Okay, if they only do
5  the minimum, then it will be this."
6  Hopefully, they have indicated to us that
7  they feel -- they even have a clause in
8  this contract that says they get first
9  refusal on any other that we do. So it
10  was that sort of interpretation.
11      Number two, part of number one, was
12  that it would be on a regular basis. It
13  would be weekly on a regular basis. That
14  would mean that I would have -- and it
15  would start when I started mining. So
16  when I started mining, as soon as we
17  got -- you read in the contract -- supply
18  for them, they would start taking; and
19  then within a thirty-day period, we would
20  start a cash flow from what they were
21  buying then. They were looking at the
22  fact that they were going to have to kind
23  of blindly finance this operation up to

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 37

1  the point of starting up, and then it
2  would be on our ability to pay and our
3  ability to back it up, and of course the
4  value of what we created. And then the
5  cash flow from the company would take over
6  and start making payments to them.
7  **Q. Sure. Tell me, if you would,**
8  **please, what your definition of start-up**
9  **mining is. You said the trigger for**
10  **Yelvington to start taking gravel is when**
11  **Johnco started mining. So what does that**
12  **mean?**
13  A. I don't know the exact wording; but
14  it was when we got gravel and brought it
15  and put it by the track in a quantity
16  sufficient for them to come get, and they
17  were going to take it by train load. I
18  thought a reasonable interpretation would
19  be that we started mining when we put a
20  train load of gravel beside that track to
21  load. Everybody saw that, everybody.
22  They knew what we were doing.
23  **Q. I think you may have said this, but**

Page 38

1  **what is your definition of train load?**
2  A. By the contract, it would be 52
3  cars. They later increased it to 60, and
4  it seems to be that 75 is fairly common;
5  but the contract itself speaks in terms of
6  it being 52 cars.
7  **Q. Tell me about your cash flow**
8  **analysis of Johnco. What did you tell the**
9  **bank was how this was going to operate**
10  **from a cash flow perspective?**
11  A. Well, the only sure thing that we
12  had was the fact we had a price fix for
13  the gravel.
14  **Q. And a supply agreement?**
15  A. Yes. We were to sell it on a weekly
16  basis. Now, I didn't think that there
17  would be a train there every week, but I
18  expected it to run on a schedule. They
19  might miss a week every third week, or
20  they might miss a week somewhere. I know
21  that that is not going to be possible.
22  And that would be where your cash flow
23  would come from. You multiply the amount

Page 39

1  that we're getting for the gravel by the
2  amount that we're supposed to be supplying
3  and they're supposed to be taking, under
4  the contract.
5  **Q. Don't you also have to subtract out**
6  **Johnco's costs, to determine cash flow?**
7  A. Well, sure, but I didn't know what
8  kind of cash flow you were talking about.
9  I thought you were talking about the gross
10  cash flow.
11  **Q. I'm not talking about gross**
12  **revenues. I'm talking about cash flow in**
13  **the sense that we're looking at not only**
14  **the income stream but the expenditures as**
15  **well. There is a cost to producing the**
16  **gravel, and then there's income you**
17  **receive from the gravel. What I'm**
18  **interested in is the cash flow analysis.**
19  **What did you tell the bank would be the**
20  **net result, on a periodic basis, of the**
21  **transaction, the cash flow?**
22  A. You're looking for a specific
23  figure?

Page 40

1  **Q. You know, I recognize specific**
2  **figures are going to be difficult. If you**
3  **have those, that's great.**
4  A. I don't. We had an overall figure.
5  **Q. And what was the overall figure?**
6  A. Amount-wise? Again, as I told you,
7  it could vary. We had to tell them
8  that -- under that contract, if they
9  wanted to do it for however many weeks it
10  took them to get to 150,000 tons and stop
11  and go home --
12  (Off-the-record discussion.)
13  A. Of course, we didn't feel like that
14  would happen. But that was the extreme
15  possibility, that they could come and get
16  150 tons and stop.
17  **Q. 150,000 tons?**
18  A. 150,000 tons. When I say "150,"
19  that means 150,000 tons. I mean, you
20  know, that's the worst case scenario, we
21  felt like. So, you know, somewhere in
22  between that amount, maybe 200, 250 tons,
23  you have to project.

10 (Pages 37 to 40)

# FREEDOM COURT REPORTING

Page 41

1 Q. Well, what was the worst case
2 scenario that you gave the bank,
3 number-wise? Did it cover; did it not
4 cover?
5 A. Oh, yes. Now, initially you might
6 not; but if you see that's all they're
7 going to do, then you adjust accordingly.
8 One of the problems with starting up
9 something like this was, we had to hire a
10 bunch of people, and we got ten or twelve
11 people out there; and we started producing
12 gravel eight hours a day as hard as we
13 could go, putting it up there beside that
14 track. We got it up to a point of about
15 four train loads doing it this way, and
16 nothing had happened. So that's when you
17 have to start pulling back; you lay people
18 off. Pep and I made a decision that we
19 had to lay people off for a couple of
20 weeks until this gravel could start
21 moving.
22     I gave that to you as an example.
23 You would give scenarios to the bank that

Page 42

1 here it may take ten or twelve people. If
2 we're going to go full out, we may have to
3 work eighty hours a week, but it depended
4 on what they take. We may cut this back
5 down to seven people and forty hours a
6 week. I mean, this is the way things like
7 that happen.
8 Q. So when you say initially it might
9 not cover, that assumes that Johnco is
10 prepared for Yelvington to take
11 substantially more than 150,000 tons; is
12 that correct? I mean, you've got the
13 staff in place and everybody there to
14 produce more than 150,000 tons; correct?
15 A. If need be. One of the things would
16 be that staff came in when we started, to
17 be sure that we got the contract. I mean,
18 we were willing to spend a little too much
19 to be sure that we were able -- this is
20 our only customer. We want to satisfy
21 them. When they want gravel, we want
22 gravel on the ground; and we did that. We
23 hired the people to do that.

Page 43

1     As it turns out, you see, we don't
2 need four train loads sitting there when
3 they come finally to get the first load.
4 We would have only needed one train load,
5 but I didn't know they were going to go
6 two or three months before they came to
7 get that first load.
8 Q. But in your planning and talking to
9 the bank, you recognized that initially,
10 at least, Johnco might be staffed in such
11 a way that the supply agreement wouldn't
12 cover the costs; but you're saying Johnco
13 could adjust, lay people off and scale
14 back, based on what Yelvington actually
15 did?
16 A. Yes, because there's going to be a
17 lag time. We contend that we certainly
18 were ready. We were ready before March
19 1st; but on March 1st, had they come and
20 got that first load, they weren't due to
21 pay for it for thirty days. So they're
22 not going to pay us anything until April.
23 So you see here, by looking at that

Page 44

1 contract, there's going to be a lag time
2 at least, and they do 29 days before you
3 get a check every time. So you've got to
4 be prepared for that. I think we were
5 prepared for all of those things. The
6 thing we wasn't prepared for was to pay
7 all these people, put all that gravel up
8 there, and then nobody come and get it.
9 And any sort of cost analysis, or
10 whatever, that you may have had gets shot
11 when the other side of the contract
12 doesn't perform.
13 Q. Well, what I'm trying to figure out
14 is, what was the cost analysis that you
15 did, assuming the other side performed?
16 I'm not sure that I'm getting that.
17 A. Well, you are, except I can't give
18 you a figure; but I've told you all the
19 factors that we considered.
20 Q. Did you ever come up with figures at
21 the point that you're getting financing?
22 A. Yes. We had a low side, if they
23 performed to the very minimum; and then we

11  (Pages 41 to 44)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 45

1 had a projected what we hoped they would
2 do, which would make us do a lot better.
3 We felt like we could break this operation
4 down into the initial start-up; and then
5 as you go out, you adjust, so you become
6 more efficient and you do better. And you
7 start getting paid, hopefully. That
8 contract said we were going to. They were
9 going to take it on a regular basis, and
10 we presumed they would pay us on a regular
11 basis.
12     I did not walk in there, and the
13 bank just hand me a line of credit for
14 two-and-a-half, three million dollars,
15 without us going over things and me
16 convincing them that this could be a
17 viable operation.
18 Q.   Where would I find those figures you
19 presented the bank with today?
20 A.   I'm not sure. I don't know whether
21 they actually kept them or whether or not
22 it was a session -- we also met with a
23 person by the name of -- they call him

Page 46

1 Bubba Wade, but he's Andrew Wade. He's
2 the overall. This was a fairly big deal
3 for West Alabama Bank & Trust.
4 Q.   Is Mr. Wade the chairman of the
5 board, or something?
6 A.   Yes.
7 Q.   Or the loan committee?
8 A.   Right. And Mr. Finney, who is the
9 president. They analyzed the supply
10 agreement with us; they look at the
11 brochure; they get comfortable that Conrad
12 Yelvington can perform, very capable of
13 performing, taking all of these things
14 into consideration. Like I said, we did
15 not sit down and type up and do that sort
16 of a presentation. It was more of an
17 informal presentation as to an overall
18 picture.
19 Q.   As part of that informal
20 presentation, did you submit documents to
21 them? I know your personal financial
22 statement, you either submitted then or
23 had recently submitted. How about other

Page 47

1 documents?
2 A.   We submitted documents. I think we
3 probably had -- of course, we had an
4 appraisal on the property, they had that.
5 We had a general idea of the equipment
6 that we were going to buy and assemble
7 into a plant. We gave them that.
8 Q.   Did you go through the application
9 process with any bank other than West
10 Alabama Bank & Trust?
11 A.   No.
12 Q.   Not when you were involved; is that
13 correct?
14 A.   I think they went and were not
15 successful.
16 Q.   Did you work with anyone besides Pep
17 and Ben to come up with your presentation
18 to the bank, which would include your cash
19 flow analyses, all the analyses you did?
20 A.   No.
21 Q.   So did you work with a CPA, a
22 business planner, or anyone like that?
23 A.   I didn't need one. I considered

Page 48

1 this to be very simple. I have a CPA that
2 follows me around on a regular basis, but
3 I don't recall him ever getting involved
4 in this.
5 Q.   Is that the CPA for Johnco as well?
6 I think Ben told me they were one and the
7 same yesterday.
8 A.   Well, they later were.
9 Q.   At that point in time who was your
10 CPA?
11 A.   At that point in time, the CPA for
12 Pep was the one that started keeping
13 Johnco's records.
14 Q.   When you said that you had a CPA
15 follow you around, who were you talking
16 about?
17 A.   His name is Rick McCabe. I didn't
18 mean that.
19 Q.   I understand what you mean.
20 A.   I use him in all of my businesses,
21 is what I mean.
22 Q.   When you say you use him in all of
23 your businesses, you don't mean

12 (Pages 45 to 48)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 49

1  necessarily to help you analyze the
2  numbers before you get into them; you mean
3  the operations. Is that correct?
4  A.    Sometimes he has helped me to look
5  at.
6  Q.    But not in this instance, not in
7  Johnco?
8  A.    No.
9  Q.    Mr. Junkin, are you involved in any
10  other lawsuits as a plaintiff or a
11  defendant currently?
12  A.    Well, just in the last day or two I
13  became involved in one.
14  Q.    As plaintiff or defendant?
15  A.    A plaintiff.
16  Q.    What type of case is that?
17  A.    It's a case involving a return of
18  funds on a deposit for a condominium in
19  Destin, Florida. I don't think I'm
20  involved in another one.
21  Q.    How about in the last ten years,
22  have you been a defendant in a lawsuit, or
23  one of your companies been a defendant in

Page 51

1  A.    I don't believe so. There may be
2  something down there that they keep up
3  with the tickets.
4  Q.    Do you understand what I mean? I'm
5  talking about like QuickBooks or Quicken
6  or Peachtree, I think is one of them.
7  A.    They don't do anything down there;
8  except if they sold some gravel, they do
9  an invoice and send that to Fayette.
10  Q.    To your accountant?
11  A.    Yes.
12  Q.    Or their accountant, I guess?
13  A.    Yes. And you have charge accounts,
14  credit cards. All of this stuff now comes
15  to Rita -- I think Ben knew her first
16  name -- at Rick McCabe's office, and she
17  saw it, the company bookkeeper with Rick.
18  At the end of the month, he gives me a
19  financial statement.
20  Q.    So can I assume from that that any
21  records regarding income coming in to the
22  company would be sent to that CPA;
23  correct?

Page 50

1  a lawsuit? Let's exclude any kind of
2  worker's compensation claims, or even any
3  employment claims. I don't care about
4  those.
5  A.    I don't think so.
6  Q.    Fair enough. Have you ever served
7  as an expert witness in a case, except as
8  to fees, attorney's fees?
9  A.    Yes, two or three times in some
10  cases involving interpretation of
11  insurance policies, things like that.
12  Q.    How about in cases involving the
13  sand and gravel business?
14  A.    No.
15  Q.    Have you ever served as a witness in
16  a case involving the sand and gravel
17  business, where you were asked to give
18  opinions or testimony about the sand and
19  gravel business?
20  A.    No.
21  Q.    Does Johnco currently use some kind
22  of accounting software, let's say at the
23  Whitehall facility?

Page 52

1  A.    Yes.
2  Q.    And then any records regarding money
3  going out of the company would also be
4  sent to that CPA?
5  A.    Yes.
6  Q.    Does that CPA cut the checks for the
7  company?
8  A.    Yes, at the present time.
9  Q.    Do you have a plan to change that?
10  A.    Well, you know, if we could ever
11  figure out a way to get the company on its
12  own footing, I would like for it to have
13  its own bookkeeper. That was the only
14  reason I reserved that.
15  Q.    Fair enough. Did the bank require
16  Johnco or you to provide any kind of
17  reporting to the bank with regard to how
18  the operation was going after the
19  inception of the loan? At this point in
20  time, we're going to focus on after the
21  point that you get the loan, and now we're
22  in the operation, or construction and then
23  operation of the company.

13  (Pages 49 to 52)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 53

1  A.    There was no formal requirement, but
2  they knew that I would, and I did. It was
3  just something that happened. I felt like
4  this was a substantial loan to them, so I
5  gave them a regular report on our progress
6  of getting into business, and so forth.
7  And then when we started in the business,
8  I told them, "We're ready to go. We're
9  fixing to start having money," and then I
10  had to go back and report that that wasn't
11  happening at the moment.
12  Q.    What forms did those reports take?
13  A.    Verbally.
14  Q.    So nothing in writing?
15  A.    No. And these notes were renewed, I
16  think the notes were on a yearly basis; so
17  we had to renew, sort of, the notes twice.
18  When the second renewal came around, we
19  thought income from the company was
20  imminent.
21  Q.    And at the point that you had to
22  renew the notes, did they require you to
23  submit any kind of written reports, or

Page 54

1  anything like that?
2  A.    No.
3  Q.    Any kind of documents that you had
4  to submit?
5  A.    No.
6  Q.    Were you required to prove up your
7  expenses? As I understood it, you were
8  getting draws from the bank.
9  A.    Yes.
10  Q.    My experience with banks is they
11  like to see where the money they are
12  giving you goes. Did they not require you
13  to show them any kind of proof of that?
14  A.    I don't know that they required it,
15  but I feel confident that they saw that.
16  Q.    They saw it in the sense of some
17  kind of written document?
18  A.    I can't say. I can't answer that
19  question.
20  Q.    Did you have a particular loan
21  agent? I know Mr. Finney is the
22  president, but other than him.
23  A.    This was his deal.

Page 55

1  Q.    What was the initial amount of money
2  that the bank agreed to loan you, or loan
3  Johnco?
4  A.    In round figures, I would say it was
5  right about two million for starting up
6  the operation.
7  Q.    Let me see if I can recall what Mr.
8  Johnston's testimony was. He said that
9  the company was initially capitalized with
10  the 1.2 million dollars that you and
11  Mr. Johnston put in?
12  A.    Right.
13  Q.    And then a loan of, I think he said
14  1.6 million. Does that meet with your
15  recollection, which would take you to
16  about 2.8?
17  A.    Yes, but then it gets --
18  Q.    If you can't remember the precise
19  number, that's fine too.
20     MR. PEARSON: Wasn't there an
21  additional amount that he testified to?
22     MR. LEEK: Yes. He said it was
23  increased, and we're going to get into

Page 56

1  that. I'm talking about the initial
2  amount.
3  A.    Well, that would be where my problem
4  would be, is how much we had to increase
5  it from the initial line. I know that we
6  had an initial line that was not
7  sufficient, and we had to increase that.
8  Q.    Initially did Johnco get the money
9  they asked for from the bank?
10  A.    Yes.
11  Q.    I know ultimately you had it
12  increased, but initially you asked for a
13  certain amount, and they gave it to you;
14  is that correct?
15  A.    Yes.
16  Q.    Then subsequently Johnco had to go
17  back and get more money; is that right?
18  A.    Yes.
19  Q.    How many times did Johnco have to go
20  back and get more money?
21  A.    I think just maybe the one time.
22  Q.    And what was the reason that Johnco
23  needed to go get more money? You were

14 (Pages 53 to 56)

# FREEDOM COURT REPORTING

1 still in the start-up phase; is that
2 correct? So you hadn't started mining
3 yet, as I understand it. Is that
4 accurate?
5 A.   Well, we had started mining; we had
6 started hiring people; we had started
7 putting the mine into operation when we
8 had to go back. That was part of the
9 reason.
10 Q.   And when I say "started mining," I'm
11 using it in the sense that you used it
12 earlier, at the time that you could
13 actually get the thing operational and get
14 a train load out to the rail side.
15 A.   Well, that probably occurred over
16 about a three or four-month period. We
17 started mining, as such, in about
18 November, as I recall.
19 Q.   Of '05?
20 A.   Yes. Then into December. We worked
21 the bugs out and changed a screen one
22 time.
23 Q.   Did the increase in financing you

1 sought occur prior to March of 2006?
2 A.   I would think it was just almost --
3 it was either shortly before or shortly
4 after. Records, I presume, would show
5 that.
6 Q.   What was the reason you needed an
7 increase in financing?
8 A.   Part of it was we had -- I presume
9 it's going to be after March; because part
10 of the reason Pep told me, we had hired
11 the people and we had started the
12 operation, and we had not yet started
13 receiving any compensation.
14 Q.   You said there were annual notes;
15 right?
16 A.   Most of the time that would be the
17 case with stuff that I do.
18 Q.   And do you think that was the case
19 with Johnco?
20 A.   Probably. Now, some of the notes
21 may have not fallen -- all of the notes
22 may not hit at the same time.
23 Q.   I see.

1 A.   Some of them may -- I might have a
2 note here; it might be an annual note, but
3 then this note might be an annual note not
4 due until three months later, that sort of
5 thing. But they were based on either a
6 six months or an annual basis.
7 Q.   Because they were set up as draws,
8 you were getting a separate note for each
9 draw; is that correct?
10 A.   Yes. Well, no. We would go in and
11 get a line, so to speak, and then draw
12 from that, and then maybe increase. As we
13 drew that down, we would then go back and
14 increase as it was needed.
15 Q.   You don't know, sitting here today,
16 whether you sought an increase in the
17 financing before or after March of 2006;
18 is that correct?
19 A.   I know that it was necessary because
20 of the starting of the operation. Now,
21 whether or not we had gotten on into it --
22 I know that from the fact that Pep said,
23 "We've got to have some more money to keep

1 this thing going."
2 Q.   Between you and Pep, was Pep
3 primarily responsible for following the
4 numbers and making sure the numbers were
5 working out, at the time period before you
6 buy Pep out?
7 A.   We never did get to the point where
8 numbers were working out while he was
9 there, because he and I never owned it
10 together when there was any income.
11 Numbers won't work out unless you've got
12 the other side of the equation.
13 Q.   I understand that.
14 A.   But on a monthly basis, he was
15 responsible for compiling the expenses.
16 And he gave me, I received a report. I
17 received bank statements, a copy of all
18 the bank statements on a monthly basis.
19 That was his job, to see that I had that
20 report.
21 Q.   Where are those reports kept today?
22 A.   I presume our CPA has them, and I
23 see no reason that he probably wouldn't

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 61

1  have them.
2  Q.    You are now the head of Johnco;
3  right? You are the sole shareholder, as I
4  understand it?
5  A.   Yes.
6  Q.    You have the authority to direct
7  your CPA to produce those documents if you
8  want; correct?
9  A.   Yes.
10  Q.   So they're within Johnco's control?
11  A.   Yes. And I will say this, that I
12  think we maybe generally produced, maybe
13  a sampling of one, sort of, to show maybe
14  a final analysis of the overall expenses
15  as to the plant, and so forth.
16  Q.   Do you know the difference between
17  audited, reviewed, and compiled financial
18  statements?
19  A.   Yes.
20  Q.   Did Johnco have audited financial
21  statements?
22  A.   No.
23  Q.   Did they have reviewed financial

Page 62

1  statements?
2  A.   I don't know that Johnco -- now, I
3  think of those in terms of producing them
4  to someone. I'm not sure that Johnco has
5  ever produced its own individual financial
6  statement. At the end of each year there
7  would be, to some degree, a financial
8  statement, because you pay your taxes, and
9  you get the report from the CPA that is
10  given as to your share of the taxes, and
11  so forth.
12  Q.   So there is at least an annual
13  report of financial?
14  A.   We've paid -- well, we didn't pay
15  any taxes.
16  Q.   You reported them?
17  A.   We reported that we were in
18  business. We paid taxes on employees and
19  things like that.
20  Q.   If I wanted to find a breakdown of
21  the four million dollars in expenses
22  allegedly incurred to get the business
23  operational, where would I go to find

Page 63

1  that?
2  A.   My CPA probably. I might have to be
3  sure that he got it all together.
4  Q.   But the CPA maintains those records?
5  A.   He's got all my records now. This
6  one CPA would have everything.
7  Q.   At the point that you became
8  involved with Johnco, did the company have
9  a mining plan, meaning what it expected to
10  take out of the ground and what it
11  expected to do with it?
12  A.   You know how much is there. We felt
13  like we knew how much our plant could
14  produce, so the initial plan was that we
15  would take out sufficient quantities to
16  supply our only customer, making certain
17  that for sure we hit 150,000 tons, hoping
18  there would be more.
19  Q.   Do you agree with Ben Johnston's
20  assessment that it was about, on average,
21  55 percent sand, 45 percent gravel, of
22  which about 9 percent was oversized?
23  A.   I have no reason not to.

Page 64

1  Q.    So you planned to pull out at least
2  150,000 tons of number 67 gravel; correct?
3  A.   Yes.
4  Q.    And as a result, there's going to be
5  200,000 tons, roughly, of sand; correct?
6  A.   Yes.
7  Q.    Did Johnco have a plan for what to
8  do with the sand?
9  A.   Well, you try to sell it; but sand,
10  it just is almost a waste product. If
11  you're not careful, sand will wind up
12  costing you. You can fix what it would
13  bring, hopefully, if you create a market
14  for it. If it doesn't, to begin with you
15  just take a pump and blow it back into
16  where you're mining it out, and use it to
17  reclaim.
18  Q.   Does that increase your costs, if
19  you're going to dispose of the sand by
20  pumping it back into a pit?
21  A.   It would just be the fuel necessary
22  to run the pump.
23  Q.   And the people to do it?

16   (Pages 61 to 64)

# FREEDOM COURT REPORTING

Page 65

1  A.   No people necessary.
2  **Q.   You don't have to set it up or**
3  **anything like that?**
4  A.   You set it up one time.  There would
5  be a little increase in costs.
6  **Q.   Did Johnco hope to sell sand when it**
7  **started this operation?**
8  A.   I think there was some hope that
9  sand would sell.
10  **Q.   What Pep told me was that the**
11  **150,000 tons Johnco expected to cover its**
12  **costs, and if they could sell sand or**
13  **oversize, then that was all going to be**
14  **profit; that was all gravy?**
15        MR. PEARSON:  I object to the form
16  of that because Pep said what he said in
17  his deposition.
18  A.   I think that would generally
19  characterize an overall plan that we had.
20  If you're able to do something with the
21  sand, that would be additional -- I guess
22  the term, probably, that would be gravy.
23  Sand would be always questionable because

Page 66

1  of its volume and the cost as to what, you
2  know, you can do with it.  We knew that we
3  potentially had a good market for the
4  oversize, one of two directions.
5  **Q.   And you knew that coming into**
6  **Johnco, right, that you potentially had a**
7  **good market for oversize?**
8  A.   Oh, yes, either one of two
9  directions.  Either landscape, which is
10  what the business is primarily -- part of
11  the business that I'm in, and I'm
12  confident that that could be sold into
13  Florida or into the Atlanta market.
14  **Q.   Oversize, I guess by ton, is more**
15  **profitable than concrete mix; is that**
16  **correct?**
17  A.   Yes.  Probably the highest value for
18  it would be if you could develop a
19  metallurgical business.  Again, you get
20  into distance; your freight gets involved
21  there.  There was very little question
22  that it would readily sell into the
23  landscape market.

Page 67

1  **Q.   I think your attorney is right;**
2  **Pep's testimony will speak for itself.**
3  **But as I understood what he was saying,**
4  **the expectation coming into this**
5  **arrangement was that 150,000 tons of**
6  **number 67 gravel, or what was guaranteed**
7  **under the supply agreement, would cover**
8  **the cost.  If you sold more number 67**
9  **gravel to Yelvington or anyone else, or**
10  **sand or oversize, then that's where the**
11  **profit was going to come.  Is that your**
12  **understanding?**
13        MR. PEARSON:  I object to the form.
14        MR. LEEK:  That's fine, and I made
15  the qualification.
16  **Q.   I'm just looking for your**
17  **understanding based on what I represented**
18  **to you today.**
19  A.   Well, certainly we felt confident
20  that the 150,000 tons would cover our
21  costs.  Then again, because you've got so
22  many variables, if we're able to operate
23  efficiently, do a good job.  Sand and

Page 68

1  gravel can have a substantial profit
2  margin.  When you get it down pat, so to
3  speak, you don't have to have a lot of
4  people.  So you're talking about primarily
5  salary and fuel cost, and then your normal
6  breakdowns, wear and tear.
7  **Q.   Correct me if I'm wrong here.  What**
8  **you're telling me is that Johnco could**
9  **have made a profit off the 150,000 tons if**
10  **it controlled the costs of people,**
11  **equipment, et cetera, factors within**
12  **Johnco's control?**
13  A.   We felt sure we could.  Certainly we
14  were comfortable that there was margin.
15  **Q.   How much profit did you expect**
16  **Johnco would make off 150,000 tons of**
17  **number 67 gravel?**
18  A.   I don't know that we ever put it
19  down to an exact figure.  Again, you would
20  also have to look at that in terms of
21  interest, depreciation, these sort of
22  things that get involved in accounting,
23  where you're paying interest and starting

17  (Pages 65 to 68)

# FREEDOM COURT REPORTING

Page 69

1  to buy, pay back for the facility, and
2  those sort of things; which over the years
3  winds up, hopefully, as value and profit,
4  but not necessarily at the moment. I
5  think it was always in the back of our
6  mind that we put it together; and
7  somebody, after you do all the lifting,
8  somebody may want to buy this thing. So
9  that was part of the value that you're
10  looking at. The sum of the whole is worth
11  more than the pieces.
12  **Q. That's a good point. Did you have**
13  **an exit strategy when you came into**
14  **Johnco?**
15  A. I'm afraid not. I didn't know I was
16  going to need one so quickly.
17  **Q. You touched on it. Some people**
18  **invest in a company with the idea of**
19  **building it up and then selling it. Some**
20  **people start a company because they want**
21  **to sustain their income for the next**
22  **twenty-five years. Did you have any**
23  **expectations in that regard?**

Page 70

1  A. I had either or; it was fine with
2  me. I'm 67 years old. I have four boys
3  who would have loved to have seen that
4  operation go and keep it; but if somebody
5  comes along with a checkbook and the right
6  amount of money, we'll sell it. Of
7  course, we would sell it subject to the
8  agreement. I recognized that.
9  **Q. What plan did Johnco have in place,**
10  **when it got underway, to find or make a**
11  **market for sand and oversize? I mean, how**
12  **were you going to let them know that you**
13  **were here and you had it?**
14  A. The oversize, generally people like
15  that will find you. People are always
16  looking for this larger rock. There's not
17  much of it around, so you figure they're
18  going to find you. There are a number of
19  companies that take sand. The plan would
20  be to try to sell it to one of, probably,
21  three or four companies.
22  **Q. And what was that plan? What**
23  **efforts were going to be made to try to**

Page 71

1  sell it?
2  A. That was secondary. Again, you
3  realize if you can hit it -- I know the
4  difficulty of getting -- you try to keep
5  sand from costing you anything, and hope
6  that you can get some value out of it.
7  That was sort of the plan. Nothing about
8  this business depended on sand; or if it
9  would have, I wouldn't have been there.
10  **Q. You already had essentially a**
11  **distribution network for oversize because**
12  **of your sand and gravel business already;**
13  **is that correct?**
14  A. No, not really. I know they have
15  really never become involved. But it
16  happened just as we thought; three or four
17  people came in and wanted the oversize.
18  **Q. Can I ask one more series of**
19  **questions here, and then we'll take a**
20  **break. Yesterday Ben Johnston described**
21  **for me the process of making gravel; and I**
22  **want to see -- at the risk of opening**
23  **myself to ridicule, I want to see if I**

Page 72

1  **understand it and if you agree with it.**
2  **He said specifically as to number 67, as I**
3  **understand it, number 67 gravel is**
4  **actually a sub set of number 57 gravel; is**
5  **that correct? 57 is a little larger; 67**
6  **is a little smaller. So the 67 material**
7  **goes into making 57. Is that accurate?**
8  A. Well, that wouldn't be the way you
9  put it. When you're talking about making
10  gravel, you don't relate one size to the
11  other. You make 57, and it has certain
12  sizes; and then you make 67, and it has
13  certain sizes. Then you have number 4 and
14  7, et cetera.
15  **Q. Sure. But the size of 67 is the**
16  **same size as using 57, with the exception**
17  **of 57 can have larger pieces; correct?**
18  A. Yes. Put it this way. If you're
19  making 67, you'll have some oversize. If
20  you're making 57, very little oversize.
21  So all the 67 will go into the 57. Is
22  that the way you understand it?
23  **Q. That's the way I understand it. I'm**

18 (Pages 69 to 72)

# FREEDOM COURT REPORTING

Page 73

1  not sure if that's the way I said it, but
2  that's the way I understand it.
3      (Whereupon, at this time a short
4  break was taken.)
5  Q.   The product mix that we discussed
6  earlier, was that product mix or plan
7  consistent for the entire time that Johnco
8  was operational during this supply
9  agreement? I mean, you didn't change it
10 at any point; is that correct?
11 A.   You're talking about 67 oversize and
12 sand?
13 Q.   Yes, 55/45?
14 A.   And then 55/45, no.
15 Q.   So Johnco didn't materially change
16 that product mix plan at any time during
17 the supply agreement; is that correct?
18 A.   No.
19 Q.   What knowledge do you have of
20 Johnco's attempts to sell sand to Lafarge?
21 A.   General. Pep would mention it to me
22 on occasion.
23 Q.   Did Pep spearhead those efforts?

Page 74

1  A.   Yes. Those efforts took place, you
2  know, after we got started up. And I know
3  where we are, say, March 1st, but we
4  started producing sand and stuff. We had
5  sand in January, February.
6  Q.   As I understand it, when you start
7  the process, you are moving the
8  overburden, and then you start going down.
9  The first layer may be 80 percent sand,
10 and then it starts to change by layers; is
11 that correct?
12 A.   But you don't mine it that way. You
13 mine it up and down, so the top may be
14 more sand. The very bottom probably is --
15 you really can't say. Larger stones tend
16 to eventually, if they have any leverage
17 to move, will come to the top in a
18 mixture. And that's the way you mix it.
19 You just mix it the way you mine.
20 Q.   What did you understand to be
21 Johnco's efforts with regard to selling
22 sand to Lafarge? What was the result of
23 those efforts, and what were the

Page 75

1  components along the way?
2  A.   I think there was a time when it
3  looked promising, but it didn't turn out.
4  Q.   Did you ever understand that the
5  reason Lafarge wasn't purchasing sand at
6  any particular point was because they had
7  already stocked up on it, something to
8  that effect?
9  A.   I have no knowledge of anything like
10 that.
11 Q.   Let's talk about when you came in
12 and bought out the Johnstons. When do you
13 recall the actual sale taking place?
14 A.   It was mid-May, would be my best
15 judgment, when we discussed it.
16 Q.   May of 2006?
17 A.   Yes.
18 Q.   That's when the actual sale took
19 place?
20 A.   Yes.
21 Q.   As I understood Pep's testimony, he
22 said you all had agreed that that was
23 going to happen at some time significantly

Page 76

1  prior to that, perhaps January of 2006?
2  A.   No.
3  Q.   Not accurate?
4  A.   No, no. We may have started
5  discussing it in March, April. I would
6  say we probably discussed it for a month
7  or so. He was driving over there, and he
8  just came in. Basically he said to me he
9  was 75 years old, and it just wasn't as
10 much fun as he thought it was going to be,
11 and we then started talking. Of course,
12 if I was going to take it over, I had to
13 take it all, so that was sort of how it
14 happened. He had, I'm sure, discussed it
15 with Ben, and so forth. I would say maybe
16 a month, month-and-a-half, of talk.
17 Q.   Well, what analysis did you do in
18 determining that it was time to invest
19 more money into Johnco?
20 A.   Well, that wasn't the way it went.
21 My analysis was that I've gotten in this
22 deep, and I've got to hang on. Basically
23 it was riding my financial shoulders. So

19 (Pages 73 to 76)

# FREEDOM COURT REPORTING

Page 77

1  if I'm in control, then hopefully I can
2  get something going. They had started to
3  report to me that nobody was taking the
4  gravel. They had a meeting at the
5  airport, got them to fly in. They flew
6  in, talked about taking gravel, flew out,
7  and nothing happened.
8      So that was where I found myself, us
9  out here incurring heavy expenses; people
10  that we had hired, fuel costs, all these
11  things that rise, and we were without
12  income. You think, "Well, why do you buy
13  that?" I buy it because it's not going to
14  matter one way or the other. I'm the one
15  that is going to wind up responsible for
16  this.
17  Q.    You thought you would wind up
18  responsible for the whole debt anyway?
19  A.    Just about, probably.
20  Q.    But you wouldn't have been
21  responsible for Pep's $600,000 mortgage;
22  is that correct?
23  A.    No.

Page 78

1  Q.    In any legal sense, at least?
2  A.    No.
3  Q.    And you paid Pep and Ben, I guess,
4  $600,000 for the remaining shares; is that
5  correct?
6  A.    Yes. I just basically took over
7  their debt.
8  Q.    And you assumed their debt?
9  A.    Yes.
10  Q.    Were there personal guarantees on
11  the notes?
12  A.    Yes.
13  Q.    Did Pep have personal guarantees on
14  the notes?
15  A.    Yes.
16  Q.    Did you assume those personal
17  guarantees?
18  A.    I'm the only one that has the
19  personal guarantee, so it's not an
20  assumption.
21  Q.    Well, did the bank release them from
22  their personal guarantees?
23  A.    Yes.

Page 79

1  Q.    I understand. So at what point in
2  time do you begin to take over more of an
3  operational role in Johnco?
4  A.    Just before I bought it. Because
5  Pep had been doing it; he's still there;
6  he's still involved. I really couldn't
7  take it over. I thought I could make it
8  work.
9  Q.    What did you plan to do differently
10  that Pep wasn't doing?
11  A.    Raise hell until they bought some
12  gravel.
13  Q.    And did you do that?
14  A.    I got started. Pretty soon I tried
15  to set up a meeting, and did set up a
16  meeting in Calera with the owners of
17  Yelvington. Mr. Holladay arranged that
18  for me. I think he coordinated the
19  meeting. I went up there for the purpose
20  of telling them that "You've got to take
21  gravel." I didn't go beg; I didn't go
22  threaten. I went because I thought I was
23  dealing businessman to businessman. We

Page 80

1  had a nice little lunch. They indicate,
2  "Oh, they're fixing to get going." But,
3  now, up there, he always figured out a way
4  to put you off two or three weeks. He
5  said they were going over to Atlanta just
6  the next week; and they were going to try
7  to get permission from someone, whoever,
8  to do a 75-car train down into north
9  Florida, and felt like within a week or
10  two they would know that, and they would
11  be putting that train out there. That
12  generally was the excuse for not saying,
13  "We're coming right now to pick up the
14  gravel."
15  Q.    Did you accept that?
16  A.    Well, what else do you do?
17  Q.    I'm not sure there is anything. My
18  question is, did you accept it?
19  A.    Well, I had no choice.
20  Q.    Why is that?
21  A.    When you asked me did I accept it,
22  what --
23  Q.    Let me ask it this way.

20 (Pages 77 to 80)

# FREEDOM COURT REPORTING

Page 81

1  A.    Give me an option as to what I can
2  do other than accept it.
3  Q.    What did you say to them when they
4  said, "We're planning to send a 75-car
5  train in about a week or two"?
6  A.    I said, "Whatever. As quick as you
7  can." I didn't necessarily say, "Okay."
8  I hate that I have become so
9  insignificant. We had numerous -- maybe I
10  had not started personally, but we had
11  numerous contacts with Mr. Holladay,
12  because he was our point man on the
13  ground.
14  Q.    Sure.
15  A.    Now, he said the other day in his
16  deposition that he had three conversations
17  with me. He had three conversations with
18  me arranging and getting me up to Calera
19  that day, because he was the person who
20  was in charge of getting me there and
21  getting me to that restaurant. We had had
22  numerous conversations. I was getting
23  mine secondhand. He was feeding them a

Page 82

1  reason for not taking this gravel, that
2  they were going to carry it down to
3  Milton, Florida, and that the yard down
4  there was not ready.
5  Q.    Who is "them"? You said he was
6  feeding "them."
7  A.    Pep and Ben, or that's what they
8  were repeating back to me. You think I'm
9  sitting here with four million dollars,
10  and we've got gravel on the ground, and
11  I'm not getting concerned that it's still
12  down there? So I had started probing
13  them, "What is happening?" They said,
14  "We're trying. We have met with the
15  Yelvingtons. We talked to Holladay." He
16  comes by, he says "This thing in Milton,
17  Florida." You know, they've got twenty
18  other sites. Why are we talking about
19  Milton, Florida?
20       Now, we have the meeting up in
21  Calera. They designate Mr. Holladay as my
22  contact man. Wait a week. I go to
23  Mr. Holladay, "Have you heard anything

Page 83

1  about the 75-car train?" "I wasn't in on
2  that. As I understand it, they're going
3  to carry your product to Milton, Florida."
4  "When are they going to carry my product
5  to Milton, Florida?" "When the railroad
6  comes with a switch." "When are they
7  going to be there with the switch?" "Next
8  week." Next week I call. "They didn't
9  make it last week, but they tell us
10  they're coming next week." So the first
11  thing you know, they've got me out to
12  June. Now, they did throw in this train
13  somewhere, and they start promising that
14  they were going to take a train load, or
15  partial train load, outside the contract.
16  Q.    Are you talking about the oversized?
17  A.    The oversize. They put it in a
18  landfill or something down there. So
19  that's the way it goes. It finally came
20  to a point that Phillip just blew me off
21  and said, "You're going to have to go to
22  Gary. All I know is they're planning to
23  take your stuff down to Milton, Florida.

Page 84

1  The Milton, Florida yard is not ready. If
2  you're going somewhere else or you're
3  going to figure out something, you've got
4  to talk to Gary." I had a couple of those
5  conversations along the way.
6       I was getting to the point that --
7  we filed this lawsuit in November. This
8  lawsuit was probably fixing to get filed
9  about the middle of June; because, in my
10  opinion, here we were, we had been
11  operating four or five months, and they
12  had been up there and took one load. I
13  felt like they were in substantial breach
14  of the contract then; and if nothing else,
15  filing a lawsuit might make them know that
16  I intended for them to carry out their
17  side of the bargain.
18       But then something kind of slowed me
19  down, because about that time this outfit
20  called Rinker, which was one of the larger
21  aggregate companies at that time, came in
22  and indicated to me that they were
23  serious. They paid a company $75,000 to

21 (Pages 81 to 84)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 85

1  go back in and re-test this property,
2  which confirmed that the minerals for
3  sure, the material was there. They then
4  started asking me to do a letter of
5  intent, and made general offers to me to
6  purchase the company; but at that time
7  they made it, a part of any purchase
8  agreement had to be that I got out of the
9  Yelvington contract. That probably goes
10  on -- again, this is something I could
11  find out -- they come in sometime the
12  middle of July, and this probably goes on
13  for about a month. So the hopes of doing
14  something over there probably kept me from
15  pushing as much as I would have, because I
16  felt like maybe I had an alternative, to
17  try and force them to come and get the
18  gravel. I looked in the other direction
19  for a little while.
20  **Q.   When did Rinker first contact you**
21  **about purchasing Whitehall?**
22  A.   I had a contact with a fellow by the
23  name of Dan Turner, who was the initial

Page 86

1  contact. We had some conversations, and
2  I'm not sure exactly when the testing
3  started, but that will be documented
4  because they've got dates --
5  **Q.   When do you think your initial**
6  **conversations with Dan were?**
7  A.   Maybe along the first of July. I
8  think we probably talked for a couple of
9  weeks, got a general idea of what they
10  were looking for.
11  **Q.   At that point in time, did**
12  **Mr. Turner indicate to you that there may**
13  **be a deal here that could be had for the**
14  **purchase of Whitehall?**
15  A.   Yes. He walked up one day out of
16  the blue.
17  **Q.   Where did that meeting take place?**
18  A.   I happened to be down there. Now,
19  I'm not sure whether or not I happened to
20  be down there, or he called me and I went
21  to the site to meet him. But the first
22  time I ever saw him, well, the only time I
23  ever saw him, three or four occasions, was

Page 87

1  at the site. He later did the analysis
2  for this company of the make-up of the
3  sand. He's a geologist, and he does that
4  for a living.
5  **Q.   How long between your initial**
6  **contact with Mr. Turner and the testing**
7  **was there?**
8  A.   Probably a week or two. As soon as
9  they could arrange for these people to
10  come in. I just recall they're not an
11  Alabama company. They come in from out of
12  state. Whether it's Florida, Georgia, I
13  don't know.
14  **Q.   How frequently did you talk to**
15  **Mr. Turner about the sale of Johnco to**
16  **Rinker?**
17  A.   Well, he was just acting as a
18  finder. After the results started coming
19  in, then I had an actual contact with
20  Mark Davies with Rinker Company.
21  **Q.   Can you spell that?**
22  A.   It's Davis with an E, D-A-V-I-E-S.
23  He and I started talking; and, of course,

Page 88

1  he would refer to various people who were
2  over him. That was going on. Like I
3  said, we had that stipulation that I would
4  have to -- they did not appear to be
5  interested in the business with Yelvington
6  involved, so I was going to have to figure
7  some way to get out of that contract,
8  either buy out or do something.
9  **Q.   Do you have any knowledge about**
10  **whether or not Rinker is a competitor to**
11  **Yelvington in any way?**
12  A.   They all work together and compete.
13  Yelvington moves material primarily; and
14  as I subsequent to this found out, they
15  are a big player in northern Florida and
16  on down. Northern is where I would be
17  concerned with. Anybody that you start
18  talking to about moving material or
19  getting gravel, you say, "You're going to
20  have to deal with Yelvington, because
21  they've got this deal with CSX and
22  priorities," and so forth. I went around
23  the world to answer your question, but the

22 (Pages 85 to 88)

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 89

1  answer is they do compete, but they also
2  cooperate.
3  **Q.   How about as it relates to number 67**
4  **gravel or concrete mix?**
5  A.   Oh, I don't know about that.
6  **Q.   You know Rinker has concrete plants;**
7  **right?**
8  A.   Yes.
9  **Q.   And they use number 67 gravel, as**
10  **well as other things; is that correct?**
11  A.   I'm not that familiar, really.  I
12  presume so.
13  **Q.   Johnco had a deal with Yelvington**
14  **for number 67 gravel at that point.**
15  **That's correct; right?**
16  A.   Yes.
17  **Q.   What did Rinker tell you that they**
18  **thought was the reason they wanted the**
19  **Johnco facility?**
20  A.   Reason?  They wanted to buy the
21  gravel.
22  **Q.   Did you know for what purpose?**
23  A.   Not really.  I know they placed

Page 90

1  practically no value on the sand.
2  **Q.   How long were your negotiations with**
3  **Rinker until you came up with something**
4  **that was a final or near final deal?**
5  A.   We never really could get there,
6  because that was always a condition.  We
7  got some figures.  They made me an initial
8  ballpark of where they would like to
9  start, and I told them where I would like
10  to start, and we kept talking.  But,
11  again, they said, you know, "You'll have
12  to do something about the Yelvington
13  contract."
14  **Q.   And what were those numbers that**
15  **they gave you?**
16  A.   They started at seven -- it was like
17  this.  They would pay me four million
18  dollars upfront, and then they would
19  guarantee a royalty flow of three million
20  dollars over a ten-year period as to the
21  gravel.  They would assign a ten-cent a
22  ton royalty to the sand and potentially
23  increase that.  These were just general,

Page 91

1  "We'll do a contract this way.  If we get
2  a market for the sand, you know, we'll
3  kick the sand up to fifty cents or forty
4  cents," or something like that.  They were
5  way low on their gravel royalty at this
6  figure.  I think they said, "Okay, we'll
7  pay you sixty cents, maybe, or seventy
8  cents; but we won't guarantee what we
9  take."  If we go to fixing an amount,
10  that's what it was.  They then agreed to
11  increase the front part of that offer to
12  five million and the same payout.  So
13  their offer eventually was eight, in round
14  figures, eight million dollars; and then I
15  countered to that.
16  **Q.   What was your initial demand?**
17  A.   Fourteen.
18  **Q.   And how did you come up with that**
19  **valuation?**
20  A.   Actually, Mr. Turner helped me with
21  that.  As I recall, he values it higher.
22  When you've got the minerals in the
23  ground, you know, while they're in there,

Page 92

1  if they're coming with the land and you've
2  got no way to mine them, gravel is
3  probably not worth anything.  If it's
4  coming with the land and you've got a
5  way --
6  **Q.   You already have an operation in**
7  **place, a mining operation; right?**
8  A.   -- that starts to increase it.  You
9  look at their value in the ground, and
10  then you look at -- there is a projected
11  value that you can figure.  "Over a
12  ten-year period, we'll probably be able to
13  sell this for X number of dollars."  If
14  you are an end user, then it becomes even
15  more valuable to you, because you in
16  effect cut out the middleman, and so
17  forth.  So taking all this into
18  consideration, he actually came up, I
19  think, with a figure higher than that; but
20  we eventually settled on that figure.
21  **Q.   Did Rinker ever increase its offer**
22  **over the eight million dollars?**
23  A.   No, it kind of stalled out, because

23  (Pages 89 to 92)

# FREEDOM COURT REPORTING

Page 93

1  I then go down to talk to Gary.
2  **Q. When was that? When did you first**
3  **go talk to Gary about this?**
4  A.   It's going to be sometime in
5  October.
6  **Q.   Of 2006?**
7  A.   Yes. I can back it up by some
8  things happening and say it was
9  mid-October, 10th to the 15th, somewhere
10 in there. I went down there to have that
11 conversation with him.
12 **Q.   Tell me about that conversation.**
13 A.   Well, for the first time in twenty
14 years -- I tell you that to see how
15 serious this has gotten for me -- I got on
16 an airplane. I have a deathly fright of
17 flying, but I flew down there. That was
18 kind of a depressing situation, because I
19 saw, really, what was probably the biggest
20 thing I had ever been involved with was a
21 speck, or totally insignificant to these
22 people.
23      I fly in; Gary comes over and picks

Page 94

1  me up in a pickup truck. No, I rented a
2  vehicle, because I wanted to ride around
3  and see Daytona. He comes and he picks me
4  up at the airport, and we go then to
5  Piccadilly's. We have a conversation
6  there where I basically tell him, "You've
7  got to do something. You haven't taken
8  the gravel that you agreed to under the
9  contract. I have an opportunity now to
10 sell this place, or possibly sell it.
11 It's either you get out or us work
12 something out, or do something. They're
13 not going to take it with this contract in
14 place." "Well," he said, "You know, we
15 want to be a part of whatever you do." I
16 said, you know, "You've had your
17 opportunity to be a part of it. You could
18 have come and gotten the gravel, and I
19 probably never would be sitting here,
20 because I think there was a time when this
21 could have been a viable, you know, good
22 operation for us and you." "Well, I don't
23 want this. This is not going to be my

Page 95

1  fault, now, that things are going bad." I
2  said, "I didn't come down here to blame
3  you. I came down here to tell you what my
4  situation was."
5       His idea right then -- now, I sat
6  and listened about sand, sand, sand. The
7  first time I ever had a conversation with
8  anyone where the word "sand" was
9  mentioned, to my best knowledge, was he
10 said, "What you've got to do is start
11 selling the sand." He said, "We're
12 working trying to get sites up in
13 Atlanta." I said, you know, "Too late for
14 that." Anyway --
15 **Q.   Did you tell him it was too late for**
16 **that?**
17 A.   I generally thought I did; because
18 what I was trying to do then, and I had
19 prepared releases -- I don't know whether
20 you all have gotten copies of them or
21 not -- I sent releases to them, "Let me
22 out of this thing." I didn't say in the
23 release -- I basically said, "I won't hold

Page 96

1  you liable for anything," you know.
2       So we get through with that
3  conversation, and I think that the
4  conversation is going to continue. He
5  gives me directions to his office. I go
6  out, and I get into my truck, and he goes
7  and gets into his truck. A little girl
8  comes around and makes a U-turn and slams
9  into me in this parking lot, so I have to
10 delay twenty or thirty minutes while the
11 police officer comes and investigates. I
12 go and I find the office, and I get back
13 to the office; and when I get back to the
14 office, I discovered that Gary had to fly
15 off somewhere. He left, but I'm to talk
16 to Mr. Klebe. Well, Mr. Klebe comes out,
17 and I go up to his office, and we probably
18 have a five or ten-minute conversation.
19      One of the significant things that I
20 recall, he said, "Well, you know, I helped
21 draft the contract. It probably should
22 have said 'biweekly.'" I said, "Well, you
23 know, that would have been super had they

24 (Pages 93 to 96)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 97

1  done biweekly. If you all had done
2  biweekly, we would be much further along
3  than we are; but the truth of the matter
4  is, it said you would pick it up weekly.
5  Well, you know, so we spend about ten
6  minutes together; and he said, "Do you
7  want to see the office?" I said, "Okay,
8  yes, I'd like to see your office." I'm
9  sure you've been to their office. It's
10  beautiful, a lot of granite around on the
11  countertops. He carries me around, shows
12  me all the facilities, and then carries me
13  out to show me the two Lear jets; another
14  company that they own, that they're
15  refurbishing these Lear jets. And
16  basically carries me on through this
17  office out the back door, and that was the
18  end of that meeting. That is where I go
19  back to indicating how insignificant this
20  whole thing was to these people.
21  Q.  Now, had you already presented the
22  releases to Yelvington at the time that
23  you had the meeting with Gary and then

Page 98

1  with Mark?
2  A.  I'm not sure that I did.
3  Q.  So you think you did that after?
4  A.  I think that I then went home. You
5  know, I then sent them to them, because he
6  had raised the concern that maybe I might
7  be going to try to blame him. So I made
8  sure that this release would totally
9  release him. The concern of the wording
10  was that they would be released from all
11  liability. Klebe eventually is the one
12  that calls me and said, "We ain't going to
13  let you out of this contract. We've got a
14  five-year contract here, and we intend to
15  enforce it."
16  Q.  Did you withdraw the release before
17  or after that conversation with Klebe?
18  A.  I think after, because I was then
19  saying, "Okay, maybe the release was the
20  wrong thing to do." Because of that
21  incident, I had certainly begun to
22  question whether or not that was the thing
23  that I should have done.

Page 99

1  Q.  How much return on investment would
2  you have made had Rinker purchased it for
3  the second offer, the eight-million-dollar
4  offer?
5  A.  I don't know. You can figure that
6  out as easy as I can.
7  Q.  You must have had an idea; right?
8  A.  Well, basically I was going to
9  recover my upfront costs with a little
10  bit, and then I would have had this stream
11  of income.
12  Q.  So what was that little bit amount?
13  You said "upfront costs plus a little
14  bit." What little bit amount was that?
15  A.  I think we made a mistake when we
16  only sued for four million. I think
17  there's a possibility that we overlooked a
18  loader or two that was on some sort of
19  payment plan. We valued the spur only at
20  what we owe against it as opposed to what
21  we actually have in it, I think, when we
22  came up with that figure. So the figure
23  that I probably have invested in this

Page 100

1  place by now is approaching, and at that
2  time, four-and-a-half million. It
3  steadily increases because interest is
4  running.
5  Q.  And the amount that they would have
6  paid you then was five million upfront,
7  plus another three million on the back
8  end; right?
9  A.  Right. That would have gotten me
10  out.
11  Q.  So the little bit upfront that you
12  would have recovered above and beyond your
13  initial investment was about five hundred
14  thousand, and then plus another three
15  million dollars over ten years?
16  A.  I would just have to sit down with a
17  pencil and date everything as to how much
18  interest had increased and find the
19  figure.
20  Q.  But roughly we're talking
21  three-and-a-half million bucks, is what
22  would have been your return on investment
23  had that Rinker deal gone through?

25  (Pages 97 to 100)

# FREEDOM COURT REPORTING

Page 101

1  A.    I hope that would be fair, certainly
2  a close approximation, give or take a
3  little bit.
4  Q.    Has the Rinker deal fell through?
5  A.    Yes.
6  Q.    Are you still in discussions with
7  Rinker?
8  A.    No.
9  Q.    When is the last time you had
10 discussions with Rinker about purchasing
11 Johnco?
12 A.    Shortly after that. I mean, they
13 basically said, "If you can't get out of
14 the contract, we don't want to talk to
15 you." Of course, then, too, I felt
16 compelled to go ahead and file the suit.
17    Let me tell you one other thing that
18 happened. Apparently Gary is just
19 obsessed with trying to get sand into
20 Atlanta. Anybody that ever has any
21 contact with him dealing with this
22 business, he contends that he has four or
23 five sites picked out, and that he can go

Page 102

1  to Atlanta; and that, later on down the
2  road, reaffirmed itself with some other
3  things that happened. So the next week,
4  or whenever I get home, he has a fellow by
5  the name of John Howard with the Hanson
6  Company -- either John or Frank or
7  something. He shows up over at our place,
8  and he is talking about possibly taking a
9  train load of sand to analyze it, or
10 something. I'm not real sure that that
11 wasn't something for show or something,
12 because I went over to Atlanta, and
13 they've got a granite pit over there or
14 something. I didn't see how they could do
15 much testing, or whether they could have
16 really been serious.
17    On the day that he came, I can
18 recall this seemed to be some controversy.
19 I know this was late in October, and we
20 were still running. He was impressed with
21 the volume of gravel.
22 Q.    Who is "he" in that statement?
23 A.    John -- Howard is the last name, for

Page 103

1  sure. I'm not sure about the first name.
2  Q.    You think that was late in October?
3  A.    I know it was. It was a couple of
4  weeks after I got back from Atlanta. He
5  and, like, three or four other people.
6  Then I know that I had another
7  conversation with him prior to filing
8  suit, which I believe took place around
9  the first of November.
10 Q.    Tell me who "him" is.
11 A.    Howard.
12 Q.    Hanson?
13 A.    With the Hanson Company.
14 Q.    I got you. Thank you. I have to,
15 kind of, go back and break a little bit of
16 it down. Let's go back to that meeting in
17 Calera. Who was there, again? I know you
18 said it was Gary, Phillip, and you; but
19 was there anyone else?
20 A.    The father.
21 Q.    Conrad?
22 A.    Yes. And there was two or three
23 pilots, somebody, some other people. They

Page 104

1  were up there, as I understand it, doing
2  some kind of deal with Vulcan, because I
3  initially joined up with them as they came
4  out of a Vulcan pit or something, and
5  followed them up there to this restaurant.
6  Q.    Who participated in the actual
7  meeting with Gary that you had? I know
8  pilots and other people, but they didn't
9  participate; correct?
10 A.    It was he and I. He sat at the end,
11 his father sat by him on the end, and I
12 sat right here, and he and I had
13 conversation. The other people had
14 conversation, but they didn't have
15 conversation with us.
16 Q.    Fair enough. You say at that point
17 in time, you asked them to come get some
18 gravel; right?
19 A.    Sure I did. That was the purpose in
20 me going up there.
21 Q.    And then he said they were planning
22 to send a train in a couple of weeks?
23 A.    He wanted to be sure that my

26  (Pages 101 to 104)

# FREEDOM COURT REPORTING

Page 105

1  facility could handle 75 cars.
2  Q.  Did he tell you what sending 75 cars
3  was contingent on?  I mean, were there any
4  issues?
5  A.  Yes.  He said he had to get it
6  approved.
7  Q.  Through the railroad?
8  A.  Maybe some Transportation
9  Department, or something; that he couldn't
10  run a 75-car train through north Florida.
11  Now, that may be a total misunderstanding
12  on my part.  I've never checked that, but
13  I can't imagine that I would come up with
14  that idea.
15  Q.  Well, the process, as I understand
16  it, is to make cars available to Johnco.
17  To get them there, you've got to get the
18  railroad involved; you've got to get
19  power; you've got to get within the
20  railroad schedule, all that stuff.  Right?
21  A.  They do it every day.  You get out
22  there and you see one go by, if you stand
23  by the railroad track.  That's no big

Page 106

1  deal.
2  Q.  I'm sure they do, but that has all
3  got to be scheduled, though; right?
4  A.  Sure.
5  Q.  Now, in that meeting did sand come
6  up at all, the one in Calera?
7  A.  No.
8  Q.  So did you make any references to
9  sand whatsoever?
10  A.  None.
11  Q.  Did Gary make any references to
12  sand?
13  A.  No.
14  Q.  Did Conrad make any references to
15  sand?
16  A.  No.  He knew I was there to talk
17  about gravel, and that I wasn't real
18  happy.  You see these remarks in his
19  deposition where he said I was kind of
20  blaming the Johnstons as to the operation
21  of the plant.  Basically what I was saying
22  to Gary was, "I'm going to be dealing with
23  you from now on about getting the gravel

Page 107

1  moving.  Pep, I've bought him out; and Ben
2  will be primarily running the plant.  He
3  will be there available.  He will be there
4  if you need him, but I want to be the
5  contact."  So that's when he assigned
6  Mr. Holladay, who at that time was a
7  consultant, to be my contact with
8  Yelvington.
9  Q.  At any point in time, in any
10  conversation with anyone at Yelvington,
11  did you tell them that you thought the
12  original business model put together by
13  Pep and Ben was not a good one, or
14  something to that effect?
15  A.  No.
16  Q.  So you didn't say anything about the
17  original business plan?
18  A.  I wasn't talking about business
19  models.  I was talking about a supply
20  agreement and the fact that they were
21  supposed to be taking gravel.
22  Q.  At any point in time in any
23  conversation with anyone at Yelvington,

Page 108

1  did you say or suggest that the Johnstons
2  hadn't operated the mine in ways that you
3  thought it should be done?
4  A.  No.  That's what I just explained to
5  you, that I don't even see how they could
6  have interpreted that as what I was saying
7  to them.  I did point out the change that
8  I was becoming actively involved.  That
9  did not necessarily mean that somebody
10  else had not been doing something
11  directly.  It meant that Pep was no longer
12  an owner, and I was now the sole owner,
13  but Ben was going to stay with me; and
14  he's still with me today.  Somebody
15  thought he had been fired or dismissed.
16  That has never been considered.
17  Q.  When was your next conversation with
18  anyone at Yelvington after the meeting in
19  Calera?
20  A.  Well, if you called Mr. Holladay at
21  Yelvington, it was immediately.  I know I
22  then came back, and I immediately asked
23  him about this train that was supposed to

27  (Pages 105 to 108)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 109

1  be approved and coming, and he doesn't
2  know anything about the 75-car train.
3  Then from there on until he reaches a
4  point where he just throws up his hands
5  and says, "You've got to talk to the
6  Yelvingtons," his primary thing that he
7  kept telling me, ad nauseam, was that,
8  "We're going to carry your gravel to
9  Milton, Florida, and we can't get switches
10 in down there. The railroad is not doing
11 what they're supposed to do," you know.
12 **Q.    Did he tell you any other reasons**
13 **why they weren't getting the gravel;**
14 **something about Milton, something about**
15 **the railroad not doing what it was**
16 **supposed to do. Anything else?**
17 A.    I presume that if he had, I would
18 recall it, because I certainly recall the
19 Milton, Florida thing.
20 **Q.    And this meeting was prior to that**
21 **first load in May, is that correct, the**
22 **one in Calera?**
23 A.    This all occurred about the same

Page 110

1  time. I was taking the business over. I
2  went down, and I was there at the first
3  loading most of the time. We had about
4  four train loads there at the time. We
5  had so much gravel there, we had to
6  just -- it was piled high on both sides,
7  and we did a loader up through it to get
8  it up here. It had to come through these
9  mounds of gravel to get to the facility to
10 load it into.
11 **Q.    Well, I'm interested in the timing**
12 **of this meeting in Calera. Do you have**
13 **any recollection of whether that was**
14 **before or after the first load was made?**
15 A.    I really don't. I've tried to put
16 that, but I can tell you that I know that
17 the meeting was in May. I haven't been
18 able to tie that down, because I had a
19 vehicle, it was a Lexus, an old station
20 wagon, three or four years old, and it was
21 getting about 100,000 miles on it. I have
22 a son that lives in Birmingham, and I
23 came -- I had let him have another car

Page 111

1  that I had to trade in, and I came and I
2  took that vehicle that day to Calera, and
3  he took my Lexus over to the Lexus place
4  to be serviced; and I think that occurred
5  on about the 19th of May.
6  **Q.    But those records regarding that**
7  **Lexus would tell us what date it was taken**
8  **in, at least?**
9  A.    Yes, whatever they say.
10 **Q.    How long did your son have the**
11 **Lexus?**
12 A.    Pardon?
13 **Q.    How long did he have the Lexus?**
14 A.    Just the day. He did that while I
15 went to Calera.
16 **Q.    What model Lexus is that?**
17 A.    It's a 470 GX, or something like
18 that.
19 **Q.    Is that the one you brought down to**
20 **Daytona, or do you have a different one**
21 **now?**
22 A.    No, that's a different one. I had
23 to get rid of it.

Page 112

1  **Q.    When did you shut down the mining**
2  **operations of Johnco?**
3  A.    There has really never been, as
4  such, a formal shutting down. We operated
5  up through the first of November, sometime
6  in through there. We operated through
7  October pretty heavy, because we thought
8  for sure in October we were still just --
9  we were talking to Rinker, and I was
10 trying to get out of the contract. But up
11 until I made the decision, which I made
12 after I went to Daytona, to file the
13 lawsuit, I thought that I was going to
14 continue to do business. We were getting
15 ready for the next train load. We
16 probably had a train load or better for
17 that month. But, now, we had come down to
18 a skeleton crew, or four, five, six
19 people, as low as we could operate.
20 **Q.    Well, you were here for Ben's**
21 **deposition yesterday, and he said there**
22 **was a period of time when the mining**
23 **operation shut down, and it continued to**

28 (Pages 109 to 112)

# FREEDOM COURT REPORTING

Page 113

1  be shut down until sometime the last two
2  or three months.
3  A.  Well, totally shut down, I have
4  tried to keep him occasionally going out
5  there.  I guess that would be accurate,
6  after we sold that gravel; but I didn't
7  want that dredge and everything sitting
8  out there totally idle.  Occasionally, I
9  would send him back out there to run up a
10  little gravel, enough to keep everything
11  in good shape.  I really didn't want it
12  particularly known that it was shut down,
13  because I then felt the need to try to
14  market this thing; and I felt like it
15  would be better if there was some
16  operation going on.
17  Q.    Would you call that effectively shut
18  down?  The mining operations.  I'm not
19  talking about the sales, the mining.
20  A.  Probably, from December, January,
21  February, March.
22  Q.  Of this year?
23  A.  Yes.

Page 114

1  Q.  So December '06 through March of
2  this year.  How about November, do you
3  know when you effectively shut it down?  I
4  heard a couple of different dates,
5  November 1st.
6  A.  Sometime in November, I told him,
7  "Send these other folks home.  I'll keep
8  two or three of you there to try to keep
9  this thing together a little bit."
10  Another thing, after I had filed the
11  lawsuit, a lawyer by the name of McEardle,
12  McArdle, or something, calls me.  His
13  thing to me is, "Let's you and I talk, and
14  let those folks go litigate.  You're a
15  lawyer; I'm a lawyer."
16  Q.  Hold on just a second here.  I don't
17  want you to reveal any type of settlement
18  discussions or negotiations.
19  A.  Not specifically, but I think it's
20  important that this incident occurred.  I
21  won't tell you exactly what was said,
22  except a little bit.
23  Q.  Fair enough.  Go ahead.

Page 115

1  A.  He and I talked.  We talked about
2  various ways.  I'm realistic; I'm a
3  lawyer.  Everybody knows that ninety
4  percent of cases are settled in some
5  fashion, so I was agreeable to him.  He
6  said, "You and I can talk.  Let's see if
7  there's some way we can work together."
8  Maybe he or I, one or the other, have an
9  avenue that it might be settled, and we
10  don't get anywhere with that.  It's
11  getting on over close to Christmas, and I
12  put a proposition out as to a way that I
13  think it might be settled, by actually
14  Gary and them being involved, and so
15  forth.
16  By this time I think I had some
17  feelers put out by some other companies
18  that might have been agreeable to Gary
19  being involved.  Anyway, he tells me, "I'm
20  sure I can't get in touch with them for a
21  week or two, but I'll be back with you,"
22  and I'm still waiting.  He hasn't been
23  back.  But, anyway, the conversation that

Page 116

1  Mr. Holladay recounts that he and I had
2  after I filed the lawsuit, I guess you
3  just get involved in all those things, and
4  you hear people talk, and I know they had
5  the situation where they went and did the
6  letter and talked, and so forth; but that
7  didn't occur.  When he called me, that
8  conversation lasted about thirty seconds.
9  He said that I was a gentleman.  I was.  I
10  said, "Mr. Holladay, I have sued your
11  boss, and you and I do not need to discuss
12  the business in any fashion."  He told me
13  that he appreciated that, and that was the
14  end of that conversation.  I had not heard
15  from him in a couple of months, so I
16  really didn't know why he was calling
17  then.
18  Q.  Did he tell you the reason he was
19  calling then?
20  A.  To see how things was going on, just
21  like he happened to be passing through
22  town or something.
23  Q.  Well, in the depositions of

29 (Pages 113 to 116)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 117

1  Mr. Holladay and the Yelvington people, I
2  believe Mr. Pearson indicated that
3  Mr. Holladay ordered a load of gravel
4  after the lawsuit was filed. Are we
5  talking about one and the same
6  conversation?
7       MR. PEARSON: I want to object to
8  the form. I'm not a witness in this case.
9  Whatever questions I ask are not
10  testimony.
11      MR. LEEK: Absolutely. This is just
12  purely for discovery purposes.
13  A.  He didn't order a load of gravel.
14  If he had, that would be the first one.
15  Q.  That's fine.
16  A.  I'm a lawyer. I wasn't going to
17  talk to him about anything.
18  Q.  Did you have only one discussion
19  with Mr. Holladay after the lawsuit was
20  filed?
21  A.  Yes.
22  Q.  So we're on the right conversation.
23  A.  Let me tell you where his

Page 118

1  conversation comes from.
2  Q.  Whose?
3  A.  Mr. Holladay. The conversation that
4  he recounted having with me, that's bits
5  and pieces of conversations that I've had
6  with other people. He said three or four
7  things that he attributed to our
8  conversation, which didn't occur; so I
9  know I didn't say it to him. He talks to
10  a lot of people. I talk to one person at
11  a time in the sand and gravel business.
12  Some of the things he said, some of them I
13  said to Mr. McEardle, so I don't know
14  whether he had a conversation with Mr.
15  McEardle or Mr. McEardle had told -- and
16  this all got back this way. But I said
17  not anything directly to him. I think my
18  last conversation with him was maybe
19  sometime over in July or August, something
20  like that.
21      (Whereupon, at this time a short
22  break was taken.)
23  Q.  Let's focus, if we could now, on the

Page 119

1  negotiation of the supply agreement. Did
2  you have any involvement in the
3  negotiation of that agreement?
4  A.  Just through Pep.
5  Q.  So in what way did you have
6  involvement?
7  A.  He was talking to them. He was
8  coming by, and he and I were having
9  general discussions.
10  Q.  And at that point in time, Pep was
11  the point person with Yelvington; is that
12  correct?
13  A.  Yes.
14  Q.  And how often did you talk to Pep
15  about the potential supply agreement
16  before it became an actual agreement?
17  A.  Well, the whole thing quickly, they
18  came to me. He knew of my history of
19  being involved with sand and gravel. They
20  came to me to see if I might be interested
21  in getting involved in this with them. My
22  thing to them was, "I've had a business
23  where I started out with no customers and

Page 120

1  built it on an idea. I don't want to do
2  that again. It's tough. So I won't talk
3  about being in business until I have a
4  firm agreement to sell the product, the
5  gravel, ahead of time." So they went and
6  they then started talking to the
7  Yelvingtons, or whoever. I don't know who
8  they talked to at that time. They came
9  back with, I think the price was way too
10  low or something; and maybe they didn't
11  have any minimum bottom floor guarantee,
12  so we just dismissed it. I don't know
13  whether they, at that time, approached
14  Yelvington; but I do know that the second
15  time Gary then came back to them.
16  Q.  And you heard that through Pep; is
17  that correct?
18  A.  Sure. Pep told me that. And they
19  then come to me, and they say, "Hey, he's
20  back, and he says he thinks generally he
21  can do this." That may have been where
22  the first figure was 50 tons. So one of the
23  supply agreement, sort of, was one of the

30  (Pages 117 to 120)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 121

1 first things that got hashed out in
2 general, because that was important to me;
3 the minimum amount, a regular cash flow,
4 take it on basis had to be a part of it.
5 I became satisfied. We had a trigger time
6 and a start time and a regular flow, I
7 thought, cash flow, which I had already
8 learned was critical to trying to operate
9 a business. If you don't, you'll be
10 putting it in out of your pocket.
11 Q. How many conversations did you have
12 with Pep regarding the terms of the supply
13 agreement before it was executed?
14 A. I don't know. I could try to piece
15 it together, but I would do so on the
16 phone. I would go to Aliceville and talk
17 with him.
18 Q. About the supply agreement, or for
19 other purposes?
20 A. Both, the supply agreement.
21 Certainly, when we got serious about this
22 thing, we started on the side making
23 plans, if we do get the supply agreement

Page 122

1 as we want it, then, you know, you start
2 making an overall plan. He and I ran
3 through some figures. They had the
4 general knowledge of how much gravel we
5 would sell at that time. You just start
6 the whole plan, but the central part of it
7 is certainly the supply agreement.
8 Q. As I understand, prior to the supply
9 agreement, the Johnstons had already
10 procured an option on the land; is that
11 correct? Does that meet with your
12 understanding of it? That may be prior to
13 you becoming involved too.
14 A. I'm not sure about that. I do know
15 that I considered that we, at some point
16 in time, had an option to buy the
17 property. I don't know that I was
18 designated on the option, but it was taken
19 for this purpose. No need to talk about
20 what you're going to do with the property
21 unless you have some idea that you can get
22 it.
23 Q. Do you understand that the first

Page 123

1 load taken by Yelvington was May 11, 2006?
2 A. Yes.
3 Q. Does that meet with your
4 understanding?
5 A. Yes.
6 Q. Do you know if the mine had any
7 mechanical problems --
8 (Whereupon, at this time a lunch
9 break was taken.)
10 Q. Do you recall whether Johnco had any
11 mining problems between the first load
12 taken by Yelvington in May and the next
13 load taken by Yelvington?
14 A. It wouldn't have made any difference
15 if they had, because they had three loads
16 sitting out there, so I don't recall.
17 Q. I appreciate that. You don't recall
18 whether there were any mechanical
19 problems, or anything like that?
20 A. Nothing, no, not significant.
21 Q. If there were things that had to be
22 repaired for which purchases had to be
23 made, those would be reflected on invoices

Page 124

1 and documents that are with the CPA's; is
2 that correct?
3 A. I would think so.
4 Q. Does Johnco pay its employees by the
5 hour, with the exception of Ben?
6 A. Yes.
7 Q. So you have to keep hourly time
8 records; is that correct?
9 A. Yes. We would have a time record at
10 the end. I don't know whether they have a
11 clock down there to check in or not, but
12 you would be able to tell how much
13 somebody worked by his weekly pay at the
14 time.
15 Q. Have you ever had any conversations
16 with Doug Davis?
17 A. Doug Davis?
18 Q. Yes. I'm sorry, let me be a little
19 more specific. Have you had any
20 conversations with Doug Davis since the
21 inception of the supply agreement up to
22 the present?
23 A. It seems like I talked to him,

31 (Pages 121 to 124)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 125

1  maybe, the first of this year, but I don't
2  recall what the subject was. He is no
3  longer with M&B. I was maybe trying to
4  get him to do something to help me with
5  some sort of idea of what I could do.
6  **Q. With what?**
7  A. I don't recall what the project was.
8  Whatever it was, he turned it down and
9  said that, you know, he was no longer with
10 M&B and didn't want to do it on a private
11 basis.
12 **Q. So you sought him to come and work**
13 **for you?**
14 A. No. To advise me on something; and
15 I'm sure, at some point in time, I'll
16 remember what that was, but at the moment
17 I don't.
18 **Q. Fair enough.**
19 A. I believe that's the first time I
20 had ever talked to him, but I wouldn't be
21 absolutely sure.
22 **Q. Fair enough. If you would look at**
23 **Defendant's Exhibit 1, I would appreciate**

Page 126

1  **it. Have you seen this document before?**
2  A. Yes.
3  **Q. Do you recognize this to be the**
4  **answer filed by Yelvington to the**
5  **Complaint filed by Johnco; is that**
6  **correct?**
7  A. Yes.
8  **Q. Like I said yesterday, the reason we**
9  **use the answer is because it contains both**
10 **the allegations in the Complaint and the**
11 **responses. If you could take a look at**
12 **page 2, paragraph 6, I would appreciate**
13 **it. In paragraph 6 it references four**
14 **million dollars in capital expenses to**
15 **build and place into the operation. Do**
16 **you see that?**
17 A. Yes.
18 **Q. I believe you testified earlier you**
19 **think that number might be a little low;**
20 **right?**
21 A. Yes.
22 **Q. How did you arrive at the four**
23 **million dollar number to put in this**

Page 127

1  **Complaint?**
2  A. Generally, it was adding up the
3  costs of the -- you have the land cost,
4  and then the construction of the plant
5  cost, and the construction of the railroad
6  spur which just got all out of hand, way
7  beyond what was initially planned. Then,
8  again, adding this up, I think there were
9  two loaders that were listed somewhere
10 separately and not with the other
11 equipment that may have gotten overlooked.
12 **Q. These are all costs that were**
13 **necessarily incurred for Johnco to operate**
14 **a mining facility; is that correct?**
15 A. Yes.
16 **Q. And these are all costs that are**
17 **necessarily incurred for Johnco to operate**
18 **a mining facility today; isn't that**
19 **correct?**
20 A. The costs are still there.
21 **Q. The costs are still there; right?**
22 A. Yes.
23 **Q. Johnco, as I understand it, is**

Page 128

1  **producing product today; correct?**
2  A. Johnco has started up enough to
3  produce a product for someone to take
4  twenty loads of gravel to determine
5  whether or not they may be able to use the
6  gravel.
7  **Q. Was that done?**
8  A. Yes.
9  **Q. And I believe Mr. Johnston said**
10 **there were some other sales that had also**
11 **taken place.**
12 A. A few, nominal.
13 **Q. The equipment and the land that**
14 **you're using to produce the product today**
15 **is the same equipment and land that you**
16 **were using to produce the product under**
17 **the supply agreement; isn't that right?**
18 A. Yes.
19 **Q. Now, this says four million dollars**
20 **even.**
21 A. I said approximately four million.
22 **Q. So did you actually take invoices**
23 **and a calculator and sit down and come up**

32 (Pages 125 to 128)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 129

1  with that number?
2  A.   No.  I have a list of expenditures,
3  what we had spent over a period up until
4  the time we filed the lawsuit.  That's why
5  the word "approximately" goes in there,
6  you know.
7  Q.   Sure.  I just wondered what kind of
8  analysis of your hard costs did you do
9  prior to filing this Complaint.
10 A.   I looked at documents that had the
11 figures on them and added them up.
12 Q.   If you add all those numbers up,
13 does it come up to four million dollars
14 even?
15 A.   I doubt it.  It may be a couple of
16 hundred over, a couple of hundred under.
17 But I don't think anymore it would be a
18 couple of hundred under; because at the
19 time we actually did this, I told you, I
20 think we overlooked a couple of things.
21 Q.   Are we talking about a couple of
22 hundred dollars, or are we talking about a
23 couple hundred thousand dollars?

Page 130

1  A.   We may be talking about five or six
2  hundred thousand.
3  Q.   Do you maintain documents and
4  records of all the expenses you included
5  in that number?
6  A.   Yes.
7  Q.   And where do you maintain those?
8  A.   My accountant.
9  Q.   Thank you.  Let's turn to the next
10 page, if we could, please.  In paragraph
11 7, it says 5,200 tons per week.  Was it
12 your expectation that Yelvington would
13 deliver a train every week?
14 A.   It was my expectation that they
15 would try.  I recognized that they
16 probably would not be able to.
17 Q.   But the contract doesn't make the
18 exception for "probably not be able to";
19 does it?
20 A.   No.
21 Q.   It just says per week.  But that
22 wasn't your expectation; right?
23 A.   It was my expectation, but I would

Page 131

1  not think that they would breach the
2  contract if one week they didn't show up.
3  Q.   Would they have been in breach of
4  the contract, in your estimation, if they
5  had a train out there every two weeks?
6  A.   Yes.  The contract says what it
7  says.  They saw it, it was an arm's-length
8  transaction.  They can read and write just
9  like you and I can.  If they wanted it to
10 be every two weeks, that's what they
11 should have put in there.
12 Q.   You just told me that even though it
13 says every week, you wouldn't think they
14 would be in breach if they missed a week.
15 A.   Right.
16 Q.   So my question is, would you think
17 they would be in breach if they missed two
18 weeks?
19 A.   I thought you meant if they came
20 every two weeks.
21 Q.   I'm just coming at it from the other
22 direction now.
23 A.   No.  You know, we're talking about

Page 132

1  contract law, and that's a fact question
2  probably for a jury to determine.  It's
3  not what I think.  I know what I've got.
4  I've got a supply agreement that says
5  they're supposed to be out there every
6  week.
7  Q.   I'm asking for your estimation.
8  Your impression of the agreement and its
9  operation, do you think that if they
10 missed two weeks they would have been in
11 breach?
12 A.   Well, refresh my memory on what a
13 breach of contract definition is.  I used
14 to charge juries, but I haven't charged
15 one in a while.  I think it's where you
16 fail to perform reasonably.  I mean,
17 there's some leeway always in a contract.
18 Q.   I think the language of the law uses
19 "materially."  Would you consider it a
20 material breach if they missed two weeks?
21 A.   Well, if they were doing it fairly
22 often, I might.  One time, probably not.
23 Q.   Let's stay with paragraph 7.  What

33 (Pages 129 to 132)

# FREEDOM COURT REPORTING

Page 133

1  do you understand "FOB on defendant's rail
2  cars" meant?
3  A.   It meant when the gravel hits the
4  bottom of the rail cars, it's theirs.
5  Q.   Before that time, it's Johnco's;
6  after that time, it's Yelvington's?
7  A.   It's theirs when we put it on the
8  car.
9  Q.   Let's move on to paragraph 8, if we
10  could.  This talks about the fixed rate
11  for 24 months.  Do you see that?
12  A.   Yes.
13  Q.   Here it says for April 28, 2004;
14  correct?
15  A.   Right.
16  Q.   Let's assume April 28th is the
17  effective date of the contract, of the
18  supply agreement, okay, for purposes of
19  these questions.
20  A.   April 28th, what?
21  Q.   2004, excuse me.  It's there in
22  paragraph 8.  As of the execution of the
23  supply agreement, Johnco didn't have a

Page 134

1  functioning facility; is that correct?
2  A.   You're asking me to make an
3  assumption which is not correct.
4  Q.   What is that?
5  A.   You're asking me to take some
6  figure -- the supply agreement starts when
7  we start mining.
8  MR. PEARSON:  I don't know if that
9  was his question.
10  Q.   It really wasn't.
11  MR. PEARSON:  Let me get the supply
12  agreement.
13  THE WITNESS:  That would be helpful.
14  MR. PEARSON:  If you're going to be
15  asking him questions out of the supply
16  agreement, then he needs to be able to
17  look at one, in my opinion.  He has the
18  right to do that.
19  A.   I don't guess I'm understanding
20  where we're going or what we're doing.
21  Q.   But you don't necessarily need to,
22  to answer my questions.  Just follow my
23  questions; and at the appropriate time,

Page 135

1  I'm going to give you the supply
2  agreement.
3  A.   I always like to understand what a
4  question is before I answer it.
5  Q.   I know.  That's just the nature of
6  the lawyer beast.  This says a fixed price
7  for 24 months from April 28, 2004;
8  correct?
9  A.   That's what it says.
10  Q.   Do you understand that April 28,
11  2004 was the date that the supply
12  agreement was executed?
13  A.   Executed, you mean signed?
14  Q.   Yes.
15  A.   I can find that out.
16  Q.   I know.  This is your Complaint.
17  I'll represent to you that you contended
18  that April 28, 2004 is the effective date
19  of the supply agreement.
20  A.   That's when a supply agreement was
21  entered into, I think.
22  Q.   And my question is, at what point
23  did the 24 months of the fixed rate begin

Page 136

1  to run?
2  MR. LEEK:  Hold on; let him answer.
3  You can object to form, but don't give a
4  speaking objection.
5  MR. PEARSON:  I'm going to object to
6  the form.
7  MR. LEEK:  Okay.
8  A.   Repeat it one more time.
9  Q.   From what point did the 24 months of
10  the fixed rate begin to run; what does
11  Johnco contend it began to run from?
12  MR. PEARSON:  I'm going to object.
13  MR. LEEK:  That's fine.
14  MR. PEARSON:  No.  We contend what
15  the Complaint says we allege and contend.
16  MR. LEEK:  Okay.  That's good.  Just
17  read it, then.
18  Q.   I'm going to ask if you agree with
19  that from April 28, 2004 contention.
20  A.   You want me to read, "Defendant
21  agreed to purchase said gravel at a rate
22  of $5.25 a ton.  The price per ton was to
23  remain fixed for 24 months, from April

34  (Pages 133 to 136)

# FREEDOM COURT REPORTING

1  28th; thereafter to be increased by 5
2  percent after April 28, 2006; by
3  two-and-a-half percent on April 28th,
4  2007; and again by two-and-a-half percent
5  on April 28th, 2008."
6  **Q.   Do you agree with that statement?**
7  **Do you believe that statement is accurate?**
8  A.   I'm certainly sure that we always
9  try to be accurate when we're filing a
10  Complaint. If I could see the supply
11  agreement, I guess I could compare the
12  two.
13  **Q.   And you're going to get plenty of**
14  **opportunity to do that.**
15  A.   Off the top of my head, I'm simply
16  not prepared to answer that.
17  **Q.   Let me go at it this way. I**
18  **understand. We're getting hung up on some**
19  **minor issues here.**
20  A.   It will be a major issue until I
21  understand what the question is.
22  **Q.   I appreciate that. Let's try to go**
23  **at it from a different direction. Did**

1  **Johnco have a functional mining facility**
2  **as of April 28, 2004?**
3  A.   No.
4  **Q.   So if this statement is accurate,**
5  **that the price was to run for 24 months**
6  **from April 28, 2004, that included a time**
7  **during which there was no facility;**
8  **correct?**
9  A.   If it did, then that's fine.
10  **Q.   I don't understand that answer.**
11  A.   Well, you're saying that it included
12  the time, and it obviously does.
13  **Q.   And that's right.**
14  A.   It says 24 months, 2004 to 2006.
15  **Q.   I think that is obviously what is**
16  **alleged here. Is it your contention that**
17  **if Johnco had not completed construction**
18  **of a facility to mine product out of the**
19  **ground until after April 28, 2006, that**
20  **that 24-month period would have expired,**
21  **and the new rates would have been in**
22  **place?**
23  A.   I guess it's however you interpret

1  the contract. If we were good enough to
2  get a price increase before we started in
3  business, if that's what we agreed to,
4  both parties, there was a meeting of the
5  minds, then that's what that would be.
6  **Q.   Okay. What is your position on it?**
7  A.   That's what it appears to me to be;
8  that two years from the date stated there,
9  we get a price increase.
10  **Q.   Even if Johnco hadn't produced one**
11  **piece of gravel?**
12  A.   It doesn't have anything to do with
13  producing. It has to do with inflation
14  and value going up.
15  **Q.   Just so we're clear here, then I'm**
16  **going to move on. It is Johnco's position**
17  **that that 24-month term would run,**
18  **regardless of when it actually commenced**
19  **mining operations; is that correct?**
20  A.   Could, if that was what --
21  **Q.   I'm not asking if it could. I'm**
22  **asking if it is. Is that Johnco's**
23  **position?**

1  A.   It's Johnco's position that it says
2  what it says.
3  **Q.   Fair enough.**
4  A.   And I think it maybe happened.
5  Didn't they increase the price?
6  **Q.   What do you think maybe happened?**
7  A.   That Yelvington agreed to this and
8  increased the price.
9  **Q.   I don't know.**
10  A.   Well, I think they did.
11  **Q.   In your assessment of the**
12  **obligations of the parties, what was the**
13  **relationship between the frequency with**
14  **which Yelvington was required to pick up**
15  **the gravel and the overall tonnage**
16  **commitment?**
17  A.   The overall tonnage commitment was a
18  guideline to say "You've got to get out
19  there and get at least this much." On a
20  regular basis, you read the contract
21  together. I had to read it together.
22  Anyone walking around can read this
23  contract and see what it meant.

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 141

1  Q.   Well, does a regular basis mean
2  every week?
3  A.   Well, it says weekly.
4  Q.   I'm asking you. I know what it
5  says.
6  A.   Most every week.
7  Q.   Most every week?
8  A.   Yes. It says on a weekly basis, and
9  we go back again to arguing over whether
10  or not they could skip a week. I think
11  they could.
12  Q.   Fair enough. Let's turn to page 4
13  of 10, if we could, please. Take a look
14  at paragraph 11. In paragraph 11 it
15  references a date of October 1, 2006. Can
16  you tell me what the significance of that
17  date is?
18  A.   What is that, March?
19  Q.   October 1, 2006.
20  A.   Well, it would have better been
21  written through the month of October,
22  because that's factual. Facts are facts;
23  and however it was pled there, we went

Page 142

1  through the month of October producing
2  gravel.
3  Q.   That helps me a great deal. What
4  you're telling me is that Johnco
5  effectively shut down production of gravel
6  at the end of October 2006?
7  A.   Right about -- simultaneous with
8  filing the lawsuit, which, if I recall
9  correctly, was around November 1st, or
10  something like that.
11  Q.   Let's take a look at paragraph 12,
12  if we could, please.
13  A.   Now, let me be sure of one thing. I
14  don't know that we absolutely shut down
15  when the lawsuit was filed. The
16  significance of October is that at the end
17  of October, I filed a lawsuit. And soon
18  thereafter, we wound it down.
19  Q.   Let's take a look at paragraph 12,
20  if we could. The phrase I'm interested in
21  is "By reason of defendant's failure to
22  perform." Were there any other causes
23  that caused Johnco to cease operations?

Page 143

1  A.   The reason Johnco ceased operation
2  was because these people did not come and
3  buy the gravel. They cut off our cash
4  flow, and it was simply futile to try to
5  continue to operate.
6  Q.   Were there any other reasons that
7  you acknowledge that led to the shutdown
8  of Johnco besides anything having to do
9  with Yelvington?
10  A.   Nothing significant that I know of.
11  Q.   You said "nothing significant," so
12  now I have to ask, anything that you would
13  consider insignificant, but nonetheless a
14  reason that they had to cease operations?
15  A.   I'll put it this way. At the
16  moment, not anything that I can think of.
17  The primary -- I guess I can't use that
18  word either. It's real hard to say
19  something only, but I will. That was it.
20  I couldn't keep on putting out the money
21  and operating this business and them not
22  buying my gravel.
23  Q.   Okay. Thank you. You can set that

Page 144

1  aside. Let me hand you what has been
2  marked as Defendant's Exhibit 3.
3  Hopefully, this one will be real quick.
4  Pep and Ben both testified that they
5  generally agree with the descriptions put
6  on the labels, describing the different
7  things going on on this piece of property.
8  Do you also agree with that?
9  A.   This is the pit where the dredge is;
10  this is the area where the sand is
11  stockpiled; this is the loading area. It
12  should be added that this is the area
13  where the gravel is stockpiled. This
14  circle is the loop track that was built to
15  hold approximately 70 to 75, 80 cars,
16  depending on the length, again.
17  Q.   And that says 52 plus?
18  A.   Yes. I would say generally this is
19  accurate.
20  Q.   Thank you very much. If you could
21  take a look at Defendant's Exhibit 5, I
22  would appreciate it. I'm not asking you
23  to comment on Mr. Holladay's e-mail to Mr.

36 (Pages 141 to 144)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 145

1  Yelvington; but the information contained
2  in here regarding the mixture of sand to
3  gravel, does that generally comport with
4  your recollection?
5  A.   We indicated a 55/45 mixture would
6  be reasonable.
7  Q.   Excellent.  How about the stuff in
8  the paragraph beginning with "Based on
9  this information"?
10 A.   "Based on this information"?
11 Q.   Yes.  Was the plan to produce about
12 420,000 tons total, a year?
13 A.   The plan was to produce whatever
14 they would buy, if it was at all possible.
15 Q.   So this would have been a minimum;
16 is that correct?  This indicates 150,000
17 tons.
18 A.   Right.
19 Q.   Thank you.  That's all I have for
20 Defendant's Exhibit 5.  Do you recall
21 whether Johnco was having discussions with
22 Lafarge about moving sand in January of
23 2006?

Page 146

1  A.   I think Pep generally had some
2  ongoing discussion with Lafarge, and I
3  would think that would be a time that his
4  discussions would have taken place.
5  Q.   Do you recall whether Johnco was
6  having discussions with Lafarge in March
7  of 2006 about moving sand?
8  A.   Again, my recollection there would
9  just be that after start-up and prior to
10 my taking over, I know that Pep had
11 discussions with Lafarge.
12 Q.   As I understand the build-out of the
13 loading facility or track there, the
14 railroad fronted some money for Johnco to
15 build that out.  Is that accurate?  Johnco
16 financed that through the railroad?
17 A.   Part of it.
18 Q.   Do you know whether Johnco has ever
19 repaid that money to the railroad?
20 A.   No, we have not, and they don't
21 really care because they use the facility
22 more than we do.  The agreement is that
23 they can stay on there.  They just have to

Page 147

1  get off when we have a train coming.
2  Q.   If you could take a look at
3  Defendant's Exhibit 15, I would appreciate
4  it.  Do you recognize this document?
5  A.   I don't know.  I've never seen this
6  document.
7  Q.   What is different about this
8  document than the one you've seen?
9  A.   It has some initials on it and some
10 other writing.
11 Q.   Have you not seen a document with
12 initials on it?
13 A.   Well, I saw it yesterday.  This is
14 not a document that I've ever had in my
15 possession or seen before yesterday in
16 this trial, I'll put it that way.
17 Q.   Take a look at Defendant's Exhibit
18 16, if you would, please.  You can hold
19 both of them, if you would, please.  Do
20 you recognize 16?  I'll represent to you
21 16 is the one that was produced by Johnco.
22 A.   Specifically, generally, I think.  I
23 think -- now, whether or not it's the

Page 148

1  exact one, I've just never seen this one
2  with the initials and stuff on it.
3  They're different in that respect.
4  Q.   I agree.  16 has the initials of Pep
5  and purportedly Gary on the same page;
6  correct?
7  A.   This?
8  Q.   Yes.
9  A.   Yes.
10 Q.   And 15 has the initials of Gary and
11 Pep, but on two separate pages of the
12 first page of the supply agreement?
13 A.   Yes.
14 Q.   So those are differences.  16 has
15 some notes on it with some underlining as
16 well.  Do you know who put those notes on
17 it?
18 A.   I would say that I did.
19 Q.   You did?
20 A.   Yes.
21 Q.   So 16 has initials on the same page
22 and some underlining and notes that you
23 probably put on it; is that correct?

37 (Pages 145 to 148)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 149

1    A.   Yes.
2    Q.   15 has initials on separate pages,
3    and then has a date and some numbers at
4    the bottom of page 2 that you probably
5    haven't seen before; is that correct?
6    A.   I have never seen that document
7    before yesterday in the depositions.
8    Q.   Other than those two differences, do
9    you see any difference between the supply
10   agreements and substance?  I'll represent
11   to you there isn't.
12   A.   A quick look would tell that it's
13   not.  I think the same thing is marked out
14   and initialed, and there's no substantive
15   difference.
16   Q.   Do you have any knowledge of how the
17   G.Y. got to be on this page of Defendant's
18   Exhibit 16, along with the P.M.J.?
19   A.   I do not.
20   Q.   Let's take a look at 15, if we
21   could.  You can hand her back 16.  Take a
22   look at 3.1, if you would for me.
23   A.   3.1?

Page 150

1    Q.   Yes, sir.
2    A.   Okay.
3    Q.   Do you know in what weeks Johnco
4    delivered 5,200 tons of number 67 gravel
5    to the buyer's rail cars loaded on the
6    rail siding at the plant?
7    A.   Well, that really wasn't the way it
8    was done.  We piled the gravel up there;
9    and when they sent a train -- which we
10   designate in our Complaint -- when they
11   came to get a load, we loaded it on the
12   train.  We started delivering to the rail
13   side probably sometime in January or
14   February.  By March 1st we had a
15   substantial amount of gravel there that we
16   would turn around, and we would load it.
17   Q.   So it's not your contention that
18   Johnco was required to deliver 5,200 tons
19   per week to the rail side to load it on
20   the buyer's cars; is that correct?
21   A.   No, not if we had 5,200 already up
22   there.
23   Q.   But the agreement says you're going

Page 151

1    to sell and deliver; right?
2    A.   Yes.
3    Q.   But that part of it didn't
4    necessarily mean deliver every week;
5    right?
6    A.   Yes.  But if we got two tons up
7    there, 52 tons up there, we don't have to
8    deliver any that week.
9    Q.   Even though it says deliver?
10   A.   We're talking about two different
11   things.
12   Q.   No, I think we're talking about the
13   same thing.
14   A.   I'm talking about deliver up to the
15   rail side.
16   Q.   That's what I'm talking about, too.
17   A.   Well, if they're not taking
18   anything, pretty soon we're going to have
19   fifty loads up there.
20   Q.   My point is very simple.  Even
21   though it says deliver, in reality that
22   doesn't work, delivering every week;
23   because you may have more than enough up

Page 152

1    there.  Right?
2    A.   It does work.  What that means is
3    that there will be 52 tons of gravel up
4    there for them to pick up.
5         MR. PEARSON: Can I correct you?
6    Did you say 52 tons?  What did you mean?
7         THE WITNESS:  5,200 tons per week.
8    Q.   For my purposes, I understand that
9    you mean 5,200.
10   A.   5,200 tons per week, three cars
11   rather than three train loads.
12   Q.   Let's take a look, now, a little bit
13   further down on this agreement where it
14   talks about the acknowledgement that "The
15   tonnage specified above will be subject to
16   rail cars supply and availability."  Do
17   you see that?
18   A.   Yes, sir.  I heard something about
19   that yesterday too.  What paragraph is
20   that?
21   Q.   We're still on 3.1, and it's a
22   little bit further down in the paragraph.
23   A.   Yes, I see that.

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

1  Q.   Were you responsible for putting
2  that language into the supply agreement?
3  A.   No.
4  Q.   What language were you responsible
5  for, specifically, going into the supply
6  agreement?
7  A.   I was responsible generally for all
8  the language.
9  Q.   What does that mean, "generally"?
10  A.   I had knowledge of this being
11  drafted and would review it periodically,
12  and would discuss it with Mr. Johnston.
13  The final draft, I saw and approved.
14  Q.   Did you have any of these specific
15  terms that you say came from you, that you
16  insisted be put in here?
17  A.   Well, yes, I had a minimum. I don't
18  know that it was 150,000. That was
19  probably negotiated. I wanted it on a
20  regular basis. I wanted it on a weekly
21  basis.
22  Q.   That's kind of what I'm after, Mr.
23  Junkin. As I understand your role, you

1  set out for Pep, "These are the things
2  that have to be in this contract," but you
3  didn't necessarily say 150,000 tons? You
4  said, "We need to have a minimum quantity,
5  and that quantity has to work for us"?
6  A.   Right.
7  Q.   You left it to Pep, as I understand
8  it, and Yelvington to come up with the
9  specific numbers that you plugged into
10  those principles; is that correct?
11  A.   They came up with them, but I
12  approved them.
13  Q.   Fair enough. Let's go back now to
14  the language that says "Tonnage specified
15  above will be subject to rail car supply
16  and availability." What is your
17  understanding of what that --
18  A.   Where are you again?
19  Q.   Remember, we were looking at the
20  part that says "Tonnage specified above
21  will be subject to rail car supply and
22  availability." We're still on 3.1.
23  A.   For some reason, I'm having a hard

1  time finding that. Oh, "Buyer
2  acknowledges that the tonnage specified
3  above will be subject to rail car supply
4  and availability."
5  Q.   I think specifically it says "Seller
6  and buyer acknowledge." Do you see that
7  now?
8  A.   Yes.
9  Q.   What is your understanding of what
10  that language, or how that language
11  affected the overall tonnage that
12  Yelvington was going to be required to
13  purchase?
14  A.   It wouldn't affect it at all. What
15  I imagined, that would be some extreme or
16  extraordinary circumstance. There was no
17  doubt in our mind with the number of cars
18  that he had and the connection that he had
19  with the railroad, that he would be able
20  to have the cars there, and he always did
21  so far as we know. Never anybody told us
22  there weren't any cars available.
23  Q.   What do you understand to be the

1  effect of this language in the contract?
2  I know that practically you didn't think
3  it would be an issue for Johnco, but what
4  do you understand to be the effect of this
5  language in the supply agreement?
6  MR. PEARSON: I object to the form.
7  A.   Well, if you didn't get there one
8  week or so, he might say, "We didn't have
9  any cars today." If he's not going to
10  come for two months, I don't think that
11  would excuse him.
12  Q.   You don't?
13  A.   Yes, because I don't think -- unless
14  he absolutely could show that he had no
15  ability to get cars.
16  Q.   I want you to focus, if you would,
17  for me on not what anybody can show, but
18  what the language says here. All I'm
19  specifically looking for here is, do you
20  agree that if rail car supply was short,
21  or somehow otherwise they weren't
22  available, that the 150,000 ton commitment
23  would have been reduced?

39 (Pages 153 to 156)

# FREEDOM COURT REPORTING

Page 157

1    MR. PEARSON: I object to the form.
2 **Q. Or let me say affected.**
3    MR. PEARSON: The contract says what
4 it says.
5    MR. LEEK: I appreciate that.
6 **Q. I'm just looking for your**
7 **understanding.**
8 A.    I presume that if he could show that
9 that was the reason he didn't get the 150
10 tons, then we would have to excuse him.
11 **Q. At any point in time did Johnco have**
12 **excess gravel, as that term is used in**
13 **3.3, meaning above 150,000 tons?**
14 A.    We never knew. I mean, they weren't
15 coming and getting it. About everything
16 we had was excess.
17 **Q. What does that mean?**
18 A.    It means that their schedule to come
19 and get it, like, they came one time or
20 two times in six months.
21 **Q. I appreciate that, Mr. Junkin, and**
22 **I've heard you say that a number of times.**
23 **But if you would, focus on my questions**

Page 158

1 **and just answer what I'm asking you. At**
2 **any point in time, did Johnco produce in**
3 **excess of 150,000 tons of gravel in a**
4 **year, that the supply agreement was**
5 **operational?**
6 A.    When we first started out, had we
7 continued to produce as we were producing
8 at the outset, we would have produced
9 substantially more than 150,000.
10 **Q. Not could have, would have. Did**
11 **you?**
12 A.    Yes.
13 **Q. Did you produce more than 150,000**
14 **tons?**
15 A.    No.
16 **Q. That's all I'm after. So can I**
17 **assume from that, then, that Johnco never**
18 **sent a notice to Yelvington saying "We've**
19 **got excess gravel"?**
20 A.    Well, I don't know who we would have
21 sent it to. We couldn't get them to come
22 buy it to begin with.
23 **Q. That's not my question.**

Page 159

1 A.    That's argumentative, and your
2 question assumes something. Where does it
3 say anything about sending notice?
4 **Q. In 3.3 it talks about sending**
5 **notice.**
6 A.    Exactly how does it say it? Where
7 is it? 3.3. We didn't ever do that.
8 **Q. That's all I'm asking. At any point**
9 **in time, did Yelvington fail to make**
10 **payment within thirty days of a shipment?**
11 A.    He did not, but he waited right
12 until the 30th day.
13 **Q. Which was within the agreement;**
14 **right?**
15 A.    Yes.
16 **Q. At any point in time, was this**
17 **agreement modified, to your knowledge?**
18 A.    I don't know what you're saying.
19 When?
20 **Q. At any point in time was the**
21 **agreement modified, to your knowledge?**
22 A.    From what; from this?
23 **Q. From this supply agreement you've**

Page 160

1 got in front of you.
2 A.    By another agreement somewhere;
3 written, verbally, practical?
4 **Q. Look at paragraph 7, if you would,**
5 **please.**
6 A.    To my knowledge, this agreement was
7 never modified.
8 **Q. That's all I'm looking for. At any**
9 **point in time, has Johnco notified**
10 **Yelvington that this agreement is somehow**
11 **terminated?**
12 A.    Well, when we sued them for breach
13 of contract, I think they probably -- I
14 don't know if that necessarily terminates
15 the contract. We were seeking to enforce
16 it, get damages for what they had damaged
17 us.
18 **Q. I agree with you. My question is,**
19 **though, at any point in time --**
20 A.    We never notified them it had been
21 terminated.
22 **Q. Is this agreement still in place**
23 **today, still effective?**

40 (Pages 157 to 160)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 161

1    MR. PEARSON: I object to the form
2  of the question, calls for a legal
3  conclusion. We're litigating that
4  particular issue.
5  A.    Yes, because when they breached it
6  as bad as they breached it, I think they
7  effectively voided it, so I don't think it
8  would be in effect.
9  Q.    That's all I'm asking for, whether
10  Johnco thinks that this agreement is still
11  in play or not --
12  A.    No.
13  Q.    -- as far as having to produce under
14  it. You can set that aside. Do you have
15  an e-mail address?
16  A.    Yes.
17  Q.    Do you have one that you use for
18  Johnco purposes?
19  A.    No.
20  Q.    Do you ever receive any information
21  from Johnco or any Johnco-related business
22  through e-mail?
23  A.    No.

Page 162

1  Q.    Do you recognize the e-mail address,
2  Johnco397@bellsouth.net?
3  A.    No.
4  Q.    Do you recognize one,
5  Johnco@NCTV.com, I think?
6  A.    No.
7  Q.    You don't use either one of those;
8  is that correct?
9  A.    No.
10  Q.    Let's talk for a second about that
11  first load-out in May of 2006. I believe
12  you said that you were there; correct?
13  A.    Yes.
14  Q.    When was the next shipment taken by
15  Yelvington after that?
16  A.    I don't know. We pleaded it
17  somewhere over in June; but, now, it
18  wasn't under the contract, or part of it
19  wasn't.
20  Q.    I'm not talking about the oversize,
21  even though I know there was some number
22  67 taken then. I'm talking about the next
23  unit train of number 67 gravel.

Page 163

1    MR. PEARSON: To make this go
2  quicker, and I'm going to object, if we'll
3  show him the Complaint where it sets out
4  the dates, that would be easier than
5  saying "When was the next one done?" I
6  think we have all agreed to what they
7  were.
8  A.    There was one well over in June.
9  Q.    You can take a look at Defendant's
10  Exhibit 1, if you like. I think it's in
11  there; although, I can't tell you for sure
12  where it is.
13  A.    It was June 27th.
14  Q.    At that point, June 27th through the
15  beginning of October, did Yelvington take
16  a train approximately every two weeks?
17  A.    No. They didn't take anything in
18  July.
19  Q.    They didn't take anything in July?
20  A.    No.
21  Q.    You're right, I'm sorry. I'm
22  confused here. So we had one in May; the
23  June one included the oversized. Is that

Page 164

1  correct?
2  A.    Yes.
3  Q.    Set aside the oversize for a second.
4  When is the next time that Yelvington took
5  a unit train of number 67?
6  A.    August 8th.
7  Q.    At the point of August 8th, did
8  Yelvington then take a train every two
9  weeks up until October, approximately
10  every two weeks?
11  A.    I guess that's approximately two
12  weeks. September; they took one on the
13  7th, and then they took it again on the
14  25th, so that's not two weeks. That would
15  be into the third week.
16  Q.    Right, so approximately two weeks.
17  What about beginning in August?
18  A.    No, I didn't say approximately two
19  weeks. It was in excess of three weeks,
20  so that's not approximately two weeks.
21  Q.    7th to the 25th?
22  A.    Yes, eighteen days. It's closer to
23  three than it is two.

41 (Pages 161 to 164)

# FREEDOM COURT REPORTING

Page 165

1  Q.   Beginning in August and up until
2  October, was Yelvington taking two trains
3  a month?
4  A.   Beginning when?
5  Q.   August 8th, I think is the date you
6  said.
7  A.   Yes, but they didn't take anything
8  in October. They quit. Two months there,
9  they came and got four loads. It's right
10 there; we acknowledge that.
11 Q.   Good. In October, that's about the
12 time that you went down and started
13 talking to them about getting out of the
14 contract; is that right?
15 A.   Yes, but I didn't say anything that
16 would interfere -- I went down there to
17 get them to come get gravel, not to tell
18 them they couldn't get it; and that was
19 well understood. Mr. Yelvington knew that
20 I was not happy with him not coming to get
21 the gravel; and while I was down there, he
22 didn't say, "Hey, we'll come next week.
23 We'll get a train, and we're going to

Page 166

1  start getting gravel." He said, "You need
2  to sell some sand."
3  Q.   Mr. Junkin, if you could focus on my
4  question.
5  A.   I did.
6  Q.   Did you begin talking to Yelvington
7  in October about getting released from the
8  supply agreement?
9  A.   Oh, I think so, yes.
10 Q.   Beginning of October; isn't that
11 right?
12 A.   I don't know that you could call it
13 the beginning; but it was before
14 mid-October, I would estimate. If you
15 could find out when I went down there,
16 that's when I talked to him about it.
17 Q.   Do you know whether Yelvington had
18 planned to send a train in October?
19 A.   If he did, he kept it a secret. He
20 didn't tell me.
21 Q.   So you didn't know?
22 A.   No.
23 Q.   Thank you.

Page 167

1      (Whereupon, Defendant's Exhibit
2  Number 20 was marked for identification, a
3  copy of which is attached to the original
4  of the transcript.)
5  Q.   Mr. Junkin, I'm only giving you
6  these for the purposes of identification.
7  Is this a letter you sent to Gary
8  Yelvington on or about October 23, 2006?
9  A.   Yes.
10 Q.   And it was at this point in time
11 that you withdrew and rescinded the offer,
12 I guess, to get out of the agreement, to
13 terminate the agreement. Is that right?
14 A.   Right.
15 Q.   You can set that one aside.
16     (Whereupon, Defendant's Exhibit
17 Number 21 was marked for identification, a
18 copy of which is attached to the original
19 of the transcript.)
20 Q.   Mr. Junkin, I hand you this only for
21 purposes of identification as well; but if
22 you could take a look at this and let me
23 know if you recognize it, I would

Page 168

1  appreciate it.
2  A.   Well, I generally do. Mr. Harrison
3  drafted this, I'm sure.
4  Q.   On the front cover page, there
5  appears to be a note to Gary from you; is
6  that correct? It may be in Linda's
7  handwriting.
8  A.   Yes.
9  Q.   Does the date here, as far as you
10 know, accurately reflect when this fax was
11 sent?
12 A.   I would think it would.
13     (Whereupon, Defendant's Exhibit
14 Number 22 was marked for identification, a
15 copy of which is attached to the original
16 of the transcript.)
17 Q.   Mr. Junkin, I'm handing you what has
18 been marked as Defendant's 22, which is,
19 in fact, an e-mail forwarding an e-mail
20 from Charles Harrison of October 11th. Do
21 you see that?
22 A.   Yes.
23 Q.   Excepting the part from Gary

42  (Pages 165 to 168)

# FREEDOM COURT REPORTING

Page 169

1  Yelvington to Mark Klebe, does the date of
2  October 11, 2006 meet with your
3  recollection of when this release was sent
4  to, proposed release was sent to
5  Yelvington?
6  A.  I, of course, have no idea; but it
7  says what it says. I generally agree. I
8  don't have reason to argue with it.
9  Q.  That's all I'm after, if that
10  generally comports with your recollection
11  about the time frame; that's what I'm
12  after. Did you, in fact, instruct
13  Mr. Harrison to send two proposed releases
14  to Yelvington?
15  A.  Yes. I'm sure I did. And I don't
16  remember the distinction between the two
17  at the moment.
18  Q.  Fair enough. There is also an
19  e-mail address in here, cjunkin@WATVC.com;
20  correct?
21  A.  Where?
22  Q.  It's in the e-mail from
23  Mr. Harrison.

Page 170

1  A.  Yes.
2  Q.  Is that your e-mail address?
3  A.  Yes.
4  Q.  In fact, Mr. Harrison suggests that
5  you could be reached through that address
6  about these releases; isn't that correct?
7  A.  Yes.
8  Q.  Thank you. You can set that one
9  aside. At some point in time did you meet
10  with Gary Yelvington and discuss doubling
11  the production, the minimum quantity of
12  number 67 gravel, out of Whitehall?
13  A.  No.
14  Q.  Did you ever tell him that you
15  needed to get 300,000 out of there at a
16  higher price to make it work?
17  A.  No.
18  Q.  Did you ever talk to him, at that
19  point, about pumping sand away?
20  A.  I, on more than one occasion, have
21  talked to different people about one way
22  to not have the sand problem is to pump it
23  back in the pit. I don't remember whether

Page 171

1  I mentioned that to him or not.
2  Understand, now, a lot of these
3  conversations that got brought up to
4  November occurred the spring of this year
5  when Gary got involved with USA Ready Mix,
6  maybe trying to buy the place, shipping
7  sand to Atlanta.
8  Q.  Did you say spring of 2007?
9  A.  Yes.
10  Q.  How about July of 2006, did you have
11  a meeting with Gary at that time?
12  A.  In July? Not to my knowledge. If I
13  did, tell me. I'll be happy to
14  acknowledge it, but I don't recall having
15  a meeting with him but on two occasions;
16  once in Calera on May 20th, either 19th or
17  20th, something, a date which we can
18  establish, and in October when I flew down
19  there.
20  Q.  How about Phillip Holladay, do you
21  recall meeting with him in July of 2006?
22  A.  Meeting with him, no.
23  Q.  How about a telephone conversation?

Page 172

1  I'm not sure in what way the meeting took
2  place.
3  A.  I think by that time he had thrown
4  up his hands and gone to the house,
5  because he wore the Milton, Florida tale
6  out and said I had to deal with Gary. I
7  never had a conversation with him about
8  sand, though.
9  Q.  Did you ever talk to him about
10  doubling the gravel production over the
11  150,000 ton minimum?
12  A.  I can't imagine what it would have
13  been with him. That would have been early
14  on in the -- I talked to him early on,
15  like May, June, in this part. I may have
16  asked him if they could take twice as
17  much if we could produce it. I don't
18  know.
19  Q.  Did you ask him if you could charge
20  more than the amount that was specified in
21  the supply agreement?
22  A.  For what?
23  Q.  Gravel.

43 (Pages 169 to 172)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 173

1  A.   When?
2  **Q.   The same time you may have talked to**
3  **him about doubling your production.**
4  A.   That would have been nice, but I
5  can't imagine that I would. I knew what
6  the supply agreement said.
7  **Q.   Did you ever quote a price for**
8  **anything to him of eighteen-fifty a ton?**
9  A.   Eighteen-fifty a ton? I can't
10  imagine that I did. There may have been
11  something at my Fayette operation. Yes.
12  it could have very well happened.
13  **Q.   Say that again.**
14  A.   That's the prices that we get at the
15  Fayette operation, if somebody had a
16  conversation with me about up there.
17  **Q.   Well, would you have had any**
18  **conversations with Mr. Holladay, or anyone**
19  **at Yelvington, regarding the Fayette**
20  **operation?**
21  A.   Yes, I think possibly somewhere
22  along the way here. I think I may have
23  discussed that with Gary. That was where

Page 174

1  I first met him twenty-five years ago. We
2  sell landscape gravel, and eighteen-fifty
3  into Florida for landscape gravel would be
4  a reasonable price.
5  **Q.   What was Johnco's plan for having**
6  **the mine constructed and fully operational**
7  **as far as timing; how long did you expect**
8  **it to take you?**
9  A.   How long?
10  **Q.   Yes.**
11  A.   Well, we felt like it would be
12  somewhere around -- the total time of
13  starting up and getting everything going
14  was probably going to be in the
15  neighborhood of -- I don't have an answer
16  to that. It took the time that it took.
17  **Q.   I know it did. What was your plan?**
18  A.   That was our plan.
19  **Q.   Just let it take the time it took?**
20  A.   Yes. I don't know that you would
21  have --
22  **Q.   So you didn't have an idea that, "We**
23  **want to have this thing constructed and**

Page 175

1  **operational and money flowing in, in**
2  **twelve months," or anything like that?**
3  A.   Twelve months?
4  **Q.   Or anything like that, any time**
5  **period, any certain time period that is**
6  **accurate.**
7  A.   Well, I think for an overall getting
8  through with everything, we were looking
9  at a couple of years.
10  **Q.   So you were expecting that it would**
11  **take a couple of years before this mine**
12  **was fully operational and producing a cash**
13  **flow; is that correct?**
14  A.   Whether I expected that or not, I
15  had that capacity, and that's what
16  happened.
17  **Q.   I'm interested in your expectations.**
18  A.   I don't know that I can tell you
19  what my expectations were. My
20  expectations developed as it came into
21  operation.
22  **Q.   Did you ever prepare any kind of**
23  **construction plan or construction time**

Page 176

1  **line?**
2  A.   No.
3  **Q.   At the time that you entered this**
4  **business endeavor, you didn't have it in**
5  **your mind that you should plan to have**
6  **construction complete by a certain time;**
7  **is that correct?**
8  A.   No. I generally left that up to Pep
9  and Ben. They were on the note just like
10  I was, and they would be trying to get it
11  done as quickly as they could.
12  **Q.   I'm sure they were, but wouldn't**
13  **that affect your cost, because you're**
14  **carrying the interest the entire time it's**
15  **being constructed; right?**
16  A.   Sure.
17  **Q.   So delays in construction would**
18  **cause you to incur more expense in**
19  **interest; right?**
20  A.   Well, not that great, because we
21  were doing draws based on when we used the
22  money.
23  **Q.   "Not that great" means "yes"; right?**

44 (Pages 173 to 176)

# FREEDOM COURT REPORTING

Page 177

1 There would be some costs incurred as a
2 result of the delay?
3 A.   Some costs, I think, yes.
4 Q.   The longer it takes you to construct
5 it, the further out you're going to push
6 out making a cash flow; isn't that right?
7 A.   I would have to agree with that.
8 Q.   And there is expense involved in
9 pushing out the cash flow part of it as
10 well; isn't there?
11 A.   Well, when you say "pushing out," I
12 don't know that we ever pushed anything
13 out.
14 Q.   I understand. I mean, we're kind of
15 quibbling over semantics now. If you were
16 forced to delay construction and make the
17 time at which it becomes operational there
18 for cash flows, aren't there costs
19 associated with that too?
20 A.   I don't know why I should answer.
21 That's some kind of generalized
22 hypothetical question.
23 Q.   Well, it's a deposition, and you

Page 178

1 answer questions. That's the one I posed
2 to you. Do you have an answer for that?
3 I mean, do you acknowledge that if you
4 push out the time that the mine can become
5 operational, that there are costs
6 associated with pushing that out?
7 A.   Costs associated with, such as? You
8 mentioned interest expense. There might
9 be some additional interest expense.
10 Q.   If you've hired somebody today,
11 you've got to carry them for a longer
12 period of time without having money coming
13 in; right?
14 A.   Well, I think that would be
15 reasonable. That's why we needed it to
16 come in as quick as we can, when it gets
17 there.
18 Q.   Does Johnco contend in any way that
19 Yelvington affected, in any way, the
20 amount of time it took Johnco to get the
21 mine up and operational?
22 A.   I don't recall. I know that he got
23 all involved with the rail spur, so I

Page 179

1 don't know whether that delayed us any or
2 not.
3 Q.   You mean where he offered to finance
4 part of it and then provide some of the
5 materials?
6 A.   I don't know that he offered to
7 finance. I never heard about that. I
8 think he sold some materials for it. He
9 kept wanting it redesigned, and we
10 eventually spent this huge amount of money
11 to design this almost mile-long circular
12 track for his convenience.
13 Q.   You say Yelvington wanted it
14 redesigned?
15 A.   Yes.
16 Q.   How do you know Yelvington wanted it
17 redesigned?
18 A.   I picked it up from Pep that he and
19 Davis and Yelvington, they first talked
20 about a Y, and they talked about a V, and
21 eventually they settled that this will be
22 the best way so he can get his trains in
23 there and get it all on one track.

Page 180

1 Q.   Let's define "they." The "they" in
2 this conversation is Doug Davis from the
3 railroad; right?
4 A.   That's who I understand was involved
5 in the specific planning of the track;
6 Davis, Yelvington, and Pep.
7 Q.   The information you have that
8 Yelvington was involved in that comes from
9 Pep; is that correct?
10 A.   Yes.
11 Q.   Do you have any firsthand knowledge
12 of whether Yelvington was involved in the
13 design of that track?
14 A.   No.
15 Q.   Do you have any document that would
16 suggest Yelvington was involved in the
17 design of that track, that you're aware
18 of?
19 A.   Not that I know of.
20 Q.   As I understand it, at the time that
21 this agreement was initially contemplated,
22 the rail service would have been provided
23 completely to the Johnco facility by CSX;

45 (Pages 177 to 180)

# FREEDOM COURT REPORTING

Page 181

1  is that correct?  Is that your
2  understanding?
3  A.  He wanted to use Norfolk Southern;
4  he wasn't confined to CSX.
5  Q.  I'm talking about the rail service
6  to Johnco.  Do you understand that
7  initially when the supply agreement was
8  entered into, CSX was going to do it?
9  A.  You mean they own that railroad
10  coming by us?
11  Q.  Yes.
12  A.  I've heard that.
13  Q.  And do you understand, at some
14  point, that that stretch of track was sold
15  to M&B?
16  A.  Yes, I know that happened.
17  Q.  And that occurred during the
18  construction of the Whitehall facility;
19  correct?
20  A.  I can't say that, but I presume that
21  it did.  I think when I got sort of
22  actively involved, they bought it.
23  Q.  M&B bought it?

Page 182

1  A.  Yes.
2  Q.  M&B is a short line railroad; right?
3  A.  Yes.
4  Q.  So now the players to get cars to
5  the facility and cars out of the facility
6  involved Johnco, Yelvington, M&B, and at
7  least CSX, or some other longer track; is
8  that correct?
9  A.  I think that's probably the case.
10  Q.  Did Johnco ever advise Yelvington
11  about efforts it was taking to reduce
12  costs through layoffs or anything like
13  that?
14  A.  Say that again.
15  Q.  Did Johnco ever advise Yelvington
16  about efforts it was taking to reduce
17  costs, including layoffs and things like
18  that?
19  A.  We had no contact with them on
20  something like that, I feel confident.
21  Q.  Prior to October of 2006, had Johnco
22  notified Yelvington of any financial
23  problems it was having?

Page 183

1  A.  Well, maybe not specifically.  But
2  Yelvington knew that they were riding my
3  back.  They weren't coming and getting the
4  gravel until they got a customer, and that
5  was not the intent of this contract.  The
6  intent of this contract was that they
7  would come and get it on a weekly basis
8  and carry it and store it somewhere.
9  Q.  Well, I think we hashed through
10  that.
11  A.  I don't think I've ever said that
12  before.
13  Q.  Focusing on my question, did Johnco
14  ever report to Yelvington that they were
15  having financial problems?
16  A.  Holladay, I told him that this was
17  getting to be a financial strain on me.  I
18  imagine I had a conversation early on with
19  Gary.  When I was telling these people,
20  "You need to come get gravel."  I would
21  expect they would think that -- and they
22  know what it cost.  They know if they come
23  up there and get four loads of gravel,

Page 184

1  that I'm going to have $120,000 in my
2  pocket; or if they don't, then that means
3  they've still got it.
4  Q.  You're saying there's information
5  from which they could have derived that
6  you were having problems?
7  A.  If you're breaching a contract, you
8  know you're breaching it.
9  Q.  But did that mean that you told them
10  that you were having financial problems?
11  A.  I certainly didn't go crying, but
12  they should have picked it up from our
13  general conversation.  They could read
14  into it that this is getting to be a
15  strain on me.
16  Q.  Fair enough.
17     (Whereupon, at this time a short
18  break was taken.)
19  Q.  Now, you had indicated earlier that
20  you had some feelers from people
21  interested in buying Johnco; is that
22  correct?  I think "feelers" was the term
23  that you used.

46 (Pages 181 to 184)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 185

1   A.   I guess, conversations with them.
2   Q.   **With whom have you had**
3   **conversations?  If you could give me the**
4   **approximate time frame of those, I would**
5   **appreciate that too.**
6   A.   I've had various discussions by way
7   of supplying gravel to -- I'll just put it
8   this way.  When you say "buying the
9   operation," it's hard for me to separate
10  it out because they've talked about buying
11  the material, one part of it, and so
12  forth.  But the contacts that I've had,
13  I'll just name all of them.  Florida Rock,
14  I think, came.
15  Q.   **Who did you talk to at Florida Rock?**
16  A.   I don't know.  And I think Turner
17  may have been responsible for that, the
18  guy that brought Rinker there.  They came
19  by one day and looked at the plant.  USA
20  Ready Mix, I know all the people involved
21  with them, and I think they generally
22  heard about the situation and tried to
23  help, so I don't know that they ever

Page 186

1   thought about buying it.  That's where a
2   lot of this sand stuff comes from.
3   Q.   **Who did you discuss selling Johnco**
4   **with at USA Ready Mix?**
5   A.   Selling Johnco?
6   Q.   **Yes.**
7   A.   I don't know that it ever came down
8   to actually selling, to where you would
9   say that.
10  Q.   **Who is your contact at USA Ready**
11  **Mix?**
12  A.   Steve Shaw is one.  He's probably
13  the main one.
14  Q.   **Do you know Sam Phelps?**
15  A.   Yes.
16  Q.   **Who is Sam Phelps?**
17  A.   Sam Phelps is a lawyer, a long-time
18  friend of mine who is probably a
19  part-owner in the overall umbrella company
20  of USA Ready Mix.
21  Q.   **Isn't there a Phelps, a son?**
22  A.   Scott Phelps.
23  Q.   **What other companies have you talked**

Page 187

1   to about selling Johnco?
2   A.   Well, of course, we had the Rinker
3   situation.  This guy that Ben was talking
4   about yesterday, I think his name was
5   Cornelius, that bought some of the gravel
6   that we had left over, he at one time
7   called.
8   Q.   **Is that Dunn?**
9   A.   No.  Dunn, I don't have any problem
10  telling you who Dunn is.  Dunn is someone
11  over in Mississippi that we possibly could
12  maybe work out an agreement to supply
13  material to.
14  Q.   **Who is Cornelius with?**
15  A.   He is his own.  He's with a family
16  operation that may have had a "B" in it.
17  Q.   **B&H, or something like that?  I'm**
18  **trying to remember the ones that Ben said.**
19  A.   May have been.  But I don't really
20  think that was serious.
21  Q.   **Anyone else?**
22  A.   Not that I would consider able to
23  buy it.

Page 188

1   Q.   **Even if you don't consider them able**
2   **to buy it, I'm interested in the people**
3   **that you have discussed selling Johnco to.**
4   A.   To?
5   Q.   **Yes, selling it to.**
6   A.   I'm not sure that applies to all of
7   them.  "Selling to" and "selling it" is
8   two different things.
9   Q.   **Well, selling it.**
10  A.   There was maybe some guy, Alexander,
11  over in Atlanta, but I would think his was
12  more of a supply.  We talked to him about
13  buying materials.  That's all I can think
14  of.
15  Q.   **Do you think there could have been**
16  **more, and this is just all that you can**
17  **remember?**
18  A.   No, this pretty well wraps it up.
19  Q.   **You know us lawyers.  Every time you**
20  **say "pretty well wraps it up," I've got to**
21  **explore what "pretty well" means.  Do you**
22  **think this is it, or do you think there**
23  **could be more?**

47 (Pages 185 to 188)

# FREEDOM COURT REPORTING

Page 189

1   A.   I think this is it. I just hate for
2   you to come back and say, "Well, you said
3   this was it," when I later remember that
4   there was one more character that came by
5   one day.
6   **Q.   I understand.**
7        MR. LEEK: I think we'll call it a
8   day, sir. I have nothing further.
9        MR. PEARSON: I don't have any
10  questions, but I would like to reserve the
11  right to read and sign. Let me ask you
12  something. On the issues where we
13  discussed trains and tons and cars, you
14  know, like you'll say a "train car" as
15  opposed to a "train load," I would
16  consider those errata. I've listened to a
17  lot of them, and I think I did the same
18  thing when I was taking Phillip's
19  deposition. Do you have any problem with
20  us putting those things in the errata
21  sheet?
22        MR. LEEK: No. You mean where he
23  said 150 tons?

Page 190

1        MR. PEARSON: Yes, where he would
2   say 52 tons instead of 5,200 or 150 tons.
3        MR. LEEK: No, I don't have any
4   problem with that.
5        MR. PEARSON: All right.
6        MR. LEEK: That's all we have.
7   Thank you for your patience.
8        FURTHER DEPONENT SAITH NOT.
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

Page 191

1        C E R T I F I C A T E
2
3   STATE OF ALABAMA)
4   JEFFERSON COUNTY
5
6        I hereby certify that the above and
7   foregoing deposition was taken down by me
8   in stenotype and the questions and answers
9   thereto were reduced to typewriting under
10  my supervision and that the foregoing
11  represents a true and correct record of
12  the testimony/evidence given by the
13  deponent.
14        I further certify that I am neither of
15  counsel nor of kin to any of the parties to the
16  action, nor am I in anywise interested in the results
17  of said cause.
18
19
20
21
22
23        Donna L. Winters, Commissioner

48  (Pages 189 to 191)