IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

JOHNCO MATERIALS, INC.,   CASE NO.: CV-06-2:06CV993-ID

  Plaintiff,

vs.

CONRAD YELVINGTON
DISTRIBUTORS, INC.,

  Defendant.
_____/

## DEFENDANT'S REPLY TO PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT

COMES NOW the Defendant, Conrad Yelvington Distributors, Inc. ("CYDI"), by and through its undersigned counsel and hereby responds to the Plaintiff's, JOHNCO MATRIALS, INC. ("Johnco"), Response In Opposition to Defendant's Motion for Partial Summary Judgment, and in support thereof states as follows:

I.   **JOHNCO IS NOT TO BE PUT INTO A BETTER POSITION THAN IT WOULD HAVE BEEN HAD THE CONTRACT BEEN PERFORMED COMPLETELY.**

Here, had both parties met every obligation they had under the Supply Agreement and nothing more, CYDI would have purchased zero (0) tons of sand and zero (0) tons of oversized gravel. *See* the Supply Agreement attached as Exhibit A to the Complaint. As in *Goolesby*, the question presented here is what lost profits did Johnco reasonably expect to earn from the Supply Agreement. To determine what lost profits are reasonable, the court considers: 1) whether the lost profits sought are the immediate fruits of the principal contract, or conversely are they dependant on collateral engagements not brought to the notice of the contracting parties; and 2) whether the lost profits sought are capable of ascertainment with reasonable, or sufficient

1

certainty, or conversely are they too speculative. *Goolesby v. Kock Farms, LLC*, 955 So.2d 422, at 428 (Ala. 2006).

*The Lost Profits Sought for the Prospective Sale of Sand and Oversize Gravel Are Not the Immediate Fruits of the Supply Agreement, and Are Dependant On Collateral Engagements.*

Whether the lost profits sought for the prospective sale of sand and oversize gravel are the immediate fruits of the principal contract is a question answered by referring to the Supply Agreement. The immediate fruits of the Supply Agreement are the lost profits attributable to the sale of 150,000 tons of No. 67 gravel to CYDI; nothing more. Johnco asserts that its negotiations with CYDI leading to the Supply Agreement were "extensive", resulting in a half dozen or more drafts. *See* Plaintiff's Response in Opposition to Defendant's Motion for Partial Summary Judgment ("Response"), ¶ 4. Thus, it's notable that the Supply Agreement contains no reference whatsoever to the production, sale, or purchase of sand nor oversize gravel. Just as CYDI could not have claimed it was entitled to Johnco's sand and oversize gravel products, Johnco cannot now claim that CYDI was obligated to take it. Therefore, it cannot be said that the lost profits of sand and oversized gravel are the immediate fruits of the Supply Agreement.

Thus, the lost profits from the sale of sand and oversize gravel are necessarily dependent on collateral engagements, leaving the question of whether such collateral engagements were brought to the notice of the CYDI "at the time the contract was made." *Aldridge v. Dolbeer*, 567 So.2d 1267, 1269-1270 (Ala. 1990). Here, there were no collateral engagements for the purchase of sand or oversize gravel at the time the Supply Agreement was made, nor has there ever been any such collateral engagement for the purchase of sand or oversize gravel over the course of the Supply Agreement.

Johnco asserts, however, that CYDI knew it would have to sell sand and oversize gravel to be successful. Johnco cites many examples of conversations between the parties about

2

Johnco's need to dispose of sand, and in fact CYDI tried to help Johnco sell some of its sand at different times after the Supply Agreement was made. However, none of the conversations referenced by Johnco occurred before or at the time the Supply Agreement was made. To cover this deficiency, Johnco cites Gary Yelvington's general knowledge of the sand and gravel industry that the sale of all of the products produced by a company was necessary to be successful, and should have been a high priority for Johnco. However, Gary Yelvington later testified that at the time the Supply Agreement to purchase No. 67 gravel was made, ".... I think we can move the product, but you got to sell the other stuff. I mean, we had no market for anything except maybe the concrete aggregate (No. 67 gravel)." Depo of G. Yelvington, p. 152:19-22.

While Gary Yelvington testified he knew that a sand and gravel business needs to sell the products it produces to be successful, it cannot be said that Yelvington's testimony shows that the parties contemplated that CYDI was in any way involved in the production, sale or purchase of sand or oversize gravel at the time of making the Supply Agreement. Here again, the testimony of Johnco's principals is illustrative.

Pep Johnston led the negotiations with CYDI for Johnco. Depo. of P. Johnston, p. 77:20-22. In responding to a question about Johnco's production plan at the time of seeking financing for Johnco, Pep Johnston stated, "Well, initially we thought we wouldn't have a market for the sand. After we were set up, Lefarge in Atlanta – well, Keith Bodiford works for them, came by and wanted to know if we would sell some sand, and we made him a price and took some samples over there. It never did materialize, though." Depo. of P. Johnston, p. 26:13-22. Pep Johnston was then immediately asked if his statement regarding the lack of a plan for the sale of sand was accurate and he replied that there were possibilities, "but we did not have a market for

3

it, no." Depo. of P. Johnston, pp. 26:23 – 27:1-5. Thus, it is evident from the testimony of Johnco's co-founder and chief Supply Agreement negotiator that Johnco did not contemplate the sale of sand at the time the Supply Agreement was made, let alone CYDI.

To refute Pep Johnston's testimony regarding the parties' contemplation with regard to the sale of sand at the time the Supply Agreement was made, Johnco offers the testimony of Ben Johnston, the general manager of operations of Johnco. Specifically, Johnco points to that testimony during which Ben Johnston said, "the plan was to sell it." Response, ¶11. The complete testimony of Ben Johnston reveals that at the time of making the Supply Agreement, "Sand was not a big part of our plans at all." Depo. of B. Johnston, p. 40:18-19.

Ben Johnston testified similarly with regard to what Johnco contemplated at the time of making the Supply Agreement. Specifically when asked, "what was Johnco's plan to deal with the oversize gravel at the time it entered the Supply Agreement?", he said, "I don't think we had a plan, as such." Depo. of B. Johnston, p. 42:8-16. Pep Johnston testified that finances anticipated by Johnco at the time of entering the Supply Agreement were such that it did not need to sell oversize gravel or sand to be a viable company. Depo. of P. Johnston, p. 61:8-23. Here again, Johnco had nothing more than the speculative intent to sell oversize gravel, with no plan in place to do so. Thus, it cannot be said that the parties contemplated that the loss of the sale of sand or oversize gravel would be the probable result of any breach.

*Having No Collateral Engagements for the Sale of Sand and Oversize Gravel, Johnco Attempts to Prove the Lost Profits by Reference to Sporadic, Isolated Sales of Small Amounts of Sand and Oversize Gravel. Such Sales Are Insufficient to Demonstrate that Johnco's Lost Profits from the <u>Sale of Sand and Oversize Gravel are Capable of Reasonable Ascertainment.</u>*

The availability of lost profits is contingent upon Johnco's ability to demonstrate that such consequential damages are "capable of ascertainment with reasonable, or sufficient certainty, or there must be some basis on which a reasonable estimate of the amount of damages

4

can be made...." *Goolesby*, 955 So.2d at 428. It bears repeating that Johnco did not procure any continuing agreement for the sale of any byproduct from its inception to its shutdown, other than the Supply Agreement. It is also undisputed that sand and oversize gravel are commodities, the sales price of which are dependant on many market factors existing at the time of the proposed sale, include the proposed use of the sand and oversize gravel, whether the aggregate will be used in public or private sector construction, whether the proposed use is for the commercial or residential sector, the location of the plant in relation to the market, transportation costs, and weather. *See* Report of Dave G. Borden filed September 25, 2007 (Borden Report), pp. 4-5. Here, Johnco asks the court to assume a supply, a market, a sale's price and a buyer, and stretch such assumptions out over a five (5) year period.

Johnco admits that it had no marketing plan for the sale of sand or oversize gravel at the inception of Johnco. Depo. of B. Johnston, pp. 38:23–39:7. Rather, it relies on isolated and sporadic sales of sand and oversize gravel between January 2006 and June 2007, and fails to account for the undisputed difficulty Johnco had selling its byproducts.

Johnco relies on the Alexander Report for its assertion that the sale of sand and oversize gravel may be reasonably calculated. However, on it's face Alexander's Report is so deficient as to be unusable. Specifically, the cornerstone of the assumptions from which all calculations are built and set forth by Alexander's Report is the assumed production of 260,000 tons of No. 67 gravel, and resulting concomitant production of 146,200 tons of sand and 43,600 tons of oversize gravel annually. Alexander Report, App. 2. However, the Supply Agreement expressly limits CYDI's obligation to purchase No. 67 gravel to 150,000 tons.[1] From this, the Alexander Report extrapolates the "anticipated quantity" of oversize gravel and sand, and takes the quantity figure

---

[1] Johnco apparently concedes this point as it repeatedly refers to the amount of No. 67 gravel at issue as 150,000 tons in its response to the motion for partial summary judgment.

out five (5) years. *Id.* To determine the price of gravel over the five (5) year period, the Alexander report relies on a single sale of oversize gravel to CYDI in June 2006 of approximately 3,390 tons, and multiple smaller sales of oversize gravel to a single purchaser over six (6) months totaling approximately 3,400 tons. *Id.* The precise method used in the Alexander Report to arrive at a price per ton of the sand is unspecified except for a general reference to sales invoices, which are used to predict the price per ton but interestingly not the quantity of sand sold. *Id.* The sales invoices show sporadic sales of no more than truck loads of sand in widely varying amounts, with the prices fluctuating by up to fifty-percent (50%) from sale to sale. In reality, the Alexander Report highlights the inability to determine the lost profits from the sale of sand or oversize gravel to a reasonable degree of certainty.

## II. JOHNCO DID NOT PLEAD RELIANCE DAMAGES IN LIEU OF EXPECTATION DAMAGES, BUT RATHER CONSISTENTLY MAINTAINED IT WAS ENTITLED TO BOTH EXPECTATION AND RELIANCE DAMAGES.

In paragraph 15 A-C of the Complaint, Johnco seeks damages reflecting the value of No. 67 gravel, it alleges CYDI should have purchased and taken between March 1, 2006 and October 1, 2006, the benefit of its bargain for prospective sales of No. 67 gravel through the five (5) year term of the Supply Agreement, and the amount of money it spent on real property, building of a dredge, construction of a plant and railroad spur, and staffing the facility "in reliance" upon the Supply Agreement. Complaint, ¶¶6-7. Neither the Complaint, Johnco's Rule 26 disclosures, nor the Alexander Report contain any averment that such damages are sought in the alternative. Johnco lumps all these together, and demands recovery of the whole. Complaint, ¶15.

Despite the express language of the prayer for relief in the Complaint and Johnco's prior Rule 26 disclosures, Johnco appears now to concede that it must choose between expectation and reliance damages, and may not recover both from CYDI.

{034542-058 : TLEEK/LPARK : 00537329.DOC; 1}

*COBB & COLE*

By:   /s/ Thomas J. Leek
     THOMAS J. LEEK
     FLA. BAR NO. 0116408
     150 Magnolia Avenue
     Post Office Box 2491
     Daytona Beach, FL 32115-2491
     Telephone: (386) 255-8171
     Facsimile: (386) 323-9255
     E-mail: Thomas.Leek@CobbCole.com
     CO-COUNSEL FOR DEFENDANT

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on the 6th day of November, 2007, I electronically filed the foregoing with the Clerk of Court by using the CM/ECF system, which will send a notice of electronic filing to:

H. Gregory Pearson, Esquire
Charles E. Harrison, Esquire
Junkin, Pearson, Harrison, & Junkin, L.L.C.
601 Greensboro Avenue
Suite 600, Alston Place
Tuscaloosa, AL 35401

Angela R. Rogers
Bradley Arant Rose & White LLP
The Alabama Center for Commerce
401 Adams Avenue, Suite 780
Montgomery, AL 36104

                                         /s/ Thomas J. Leek
                                         Attorney