IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

JOHNCO MATERIALS, INC.,                  CASE NO.: CV-06-2:06CV993-ID

     Plaintiff,

vs.

CONRAD YELVINGTON
DISTRIBUTORS, INC.,

     Defendant.

_____/

## NOTICE OF FILING DOCUMENTS IN SUPPORT OF DEFENDANT, CONRAD YELVINGTON DISTRIBUTORS, INC., REPLY TO PLAINTIFF'S RESPONSE IN OPPOSITION TO MOTION FOR PARTIAL SUMMARY JUDGMENT

Defendant, CONRAD YELVINGTON DISTRIBUTORS, INC., by and through its undersigned counsel, hereby gives notice of filing the following documents, attached hereto, in support of its Reply to Plaintiff's Response in Opposition to Defendant's Motion for Partial Summary Judgment:

1.     Excerpts from the deposition testimony of Presley Morgan Johnston taken on July 24, 2007.

2.     Excerpts from the deposition testimony of James Benjamin Johnston taken on July 24, 2007.

3.     Excerpts from the deposition testimony of Gary Yelvington taken on July 5, 2007.

4.     Fed.R.Civ.P. 26(A)(1) Disclosures dated January 17, 2007.

5.     Report of David Borden filed on September 25, 2007.

*COBB & COLE*

By:    /s/ Thomas J. Leek
        THOMAS J. LEEK
        FLA. BAR NO. 0116408
        150 Magnolia Avenue
        Post Office Box 2491
        Daytona Beach, FL 32115-2491
        Telephone:  (386) 255-8171
        Facsimile:  (386) 323-9255
        E-mail: Tom.Leek@CobbCole.com
CO-COUNSEL FOR DEFENDANT

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY I HEREBY CERTIFY that on the 6th day of November, 2007, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system, which will send a notice of electronic filing to:

H. Gregory Pearson, Esquire
Charles E. Harrison, Esquire
Junkin, Pearson, Harrison, & Junkin, L.L.C.
601 Greensboro Avenue
Suite 600, Alston Place
Tuscaloosa, AL 35401

Angela R. Rogers
Bradley Arant Rose & White LLP
The Alabama Center for Commerce
401 Adams Avenue, Suite 780
Montgomery, AL 36104

            /s/ Thomas J. Leek
            Attorney

## FREEDOM COURT REPORTING

1    IN THE UNITED STATES DISTRICT COURT

2    FOR THE MIDDLE DISTRICT OF ALABAMA

3    CASE NUMBER

4    CV-06-2:06CV993-10

5

6    JOHNCO MATERIALS, INC.,

7    PLAINTIFF,

8    VS.

9    CONRAD YELVINGTON

10    DISTRIBUTORS, INC.,

11    DEFENDANT.

12

13    DEPOSITION OF:

14    PRESLEY MORGAN JOHNSTON

15

16    S T I P U L A T I O N

17    IT IS STIPULATED AND AGREED by and

18    between the parties through their

19    respective counsel, that the deposition of

20    PRESLEY MORGAN JOHNSTON, may be taken

21    before Donna Winters, Commissioner and

22    Notary Public, State of Alabama at Large,

23    at the law offices of Junkin, Pearson,

# FREEDOM COURT REPORTING

Page 2

1   Harrison & Junkin, 600 Greensboro Avenue,

2   Suite 601, Tuscaloosa, Alabama 35401, on

3   the 24th day of July 2007 commencing at

4   9:00 a.m.

5   DEPOSITION OF:   PRESLEY MORGAN JOHNSTON

# FREEDOM COURT REPORTING

Page 3

1    IT IS FURTHER STIPULATED AND AGREED

2  that the signature to and the reading of

3  the deposition by the witness is reserved,

4  the deposition to have the same force and

5  effect as if full compliance had been had

6  with all laws and rules of Court relating

7  to the taking of depositions.

8    IT IS FURTHER STIPULATED AND AGREED

9  that it shall not be necessary for any

10  objections to be made by counsel as to any

11  questions, except as to form or leading

12  questions, and that counsel for the

13  parties may make objections and assign

14  grounds at the time of the trial, or at

15  the time said deposition is offered in

16  evidence or prior thereto.

17    IT IS FURTHER STIPULATED AND AGREED

18  that notice of filing of this deposition

19  by the Commissioner is waived.

20

21

22

23

**FREEDOM COURT REPORTING**

Page 61

1    A.      We hope so.

2    Q.      Did any of these sales ever come

3    through for you?

4    A.      No.   Lafarge at one time said,

5    "We're interested, and we'll buy

6    so-and-so," and I think the freight rates

7    finally killed that proposition.

8    Q.      The numbers that you had worked up

9    and put together regarding the operation

10   of Johnco, could Johnco have survived on

11   the sale of number 67 gravel to Yelvington

12   alone, at the rate specified in the supply

13   agreement?

14   A.      We believe so, yes.

15   Q.      What makes you believe that?

16   A.      Well, 150,000 tons a year at

17   five-and-a-quarter is whatever it is.  We

18   thought that with any additional sales of

19   anything, we thought that that amount of

20   revenue per year would pay our expenses

21   and debt service; and that if we did sell

22   sand and oversize, or whatever, most of

23   that would have been profit.

# FREEDOM COURT REPORTING

Page 77

1  Q.    Did he pay off the notes?  You had a

2  personal note.  Did he pay off that note?

3  A.    I didn't pay it all off.  I had to

4  sell some property to make interest

5  payments on it.  I've paid off most of the

6  $600,000 that I borrowed.

7  Q.    I'm curious, then.  When you say Mr.

8  Junkin --

9  A.    He paid me $600,000.

10  Q.    So he paid you flat-out.  But then

11  you had to bear the costs of the interest

12  and those type things; is that correct?

13  A.    Yes, and a couple of years of

14  messing with this thing.

15  Q.    I can appreciate that.  Tell me, if

16  you would, please, what your role was in

17  negotiating the supply agreement.

18  A.    Well, I talked back and forth to

19  Mark Klebe a lot about it.

20  Q.    Were you the lead person at Johnco

21  for negotiating that supply agreement?

22  A.    I probably was, yes.

23  Q.    Did you have any conversations

# FREEDOM COURT REPORTING

Page 1

1    IN THE UNITED STATES DISTRICT COURT

2    FOR THE MIDDLE DISTRICT OF ALABAMA

3                CASE NUMBER

4          CV-06-2:06CV993-10

5

6    JOHNCO MATERIALS, INC.,

7            PLAINTIFF,

8    VS.                              ORIGINAL

9    CONRAD YELVINGTON

10   DISTRIBUTORS, INC.,

11           DEFENDANT.

12

13             DEPOSITION OF:

14       JAMES BENJAMIN JOHNSTON

15

16         S T I P U L A T I O N

17       IT IS STIPULATED AND AGREED by and

18   between the parties through their

19   respective counsel, that the deposition of

20   JAMES BENJAMIN JOHNSTON, may be taken

21   before Donna Winters, Commissioner and

22   Notary Public, State of Alabama at Large,

23   at the law offices of Junkin, Pearson,

## FREEDOM COURT REPORTING

Page 2

1    Harrison & Junkin, 600 Greensboro Avenue,

2    Suite 601, Tuscaloosa, Alabama 35401, on

3    the 24th day of July 2007 commencing at

4    2:30 p.m.

5    DEPOSITION OF:   JAMES BENJAMIN JOHNSTON

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

Page 3

1    IT IS FURTHER STIPULATED AND AGREED

2    that the signature to and the reading of

3    the deposition by the witness is reserved,

4    the deposition to have the same force and

5    effect as if full compliance had been had

6    with all laws and rules of Court relating

7    to the taking of depositions.

8    IT IS FURTHER STIPULATED AND AGREED

9    that it shall not be necessary for any

10   objections to be made by counsel as to any

11   questions, except as to form or leading

12   questions, and that counsel for the

13   parties may make objections and assign

14   grounds at the time of the trial, or at

15   the time said deposition is offered in

16   evidence or prior thereto.

17   IT IS FURTHER STIPULATED AND AGREED

18   that notice of filing of this deposition

19   by the Commissioner is waived.

20

21

22

23

**FREEDOM COURT REPORTING**

Page 38

Q.      Tell me what that is.

A.      Alabama Department of Environmental Management.

Q.      Thank you.  Do you know of any other mining plan than the one you presented to ADEM?

A.      As far as what?

Q.      Well, a plan to mine.

A.      I'm not understanding your question. I'm sorry.

Q.      Well, I appreciate that.  You knew what I meant by "mining plan" when we talked about what is presented to ADEM. Is there anything similar to that, that you present to anyone else?

A.      Not to present to another agency, no, sir.

Q.      Do you know if Johnco prepared any mining plans similar to that at any point in time, since you've been associated with them?

A.      Similar to that, no, sir.

Q.      Do you know of any marketing plan

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA

CIVIL ACTION NO.  2:06cv993-ID

JOHNCO MATERIALS, INC.,

     Plaintiff,

vs.

CONRAD YELVINGTON
DISTRIBUTORS, INC.,

     Defendant.

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

| | |
|---|---|
| DEPOSITION OF: | GARY YELVINGTON |
| DATE TAKEN: | July 5, 2007 |
| TIME: | COMMENCED AT 9:46 a.m. |
| | CONCLUDED AT 3:05 p.m. |
| PLACE: | 150 Magnolia Avenue |
| | Daytona Beach, Florida |
| STENOGRAPHICALLY REPORTED BY: | SANDRA NARUP |
| | REGISTERED PROFESSIONAL REPORTER & |
| | FLORIDA PROFESSIONAL REPORTER |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

VOLUSIA REPORTING COMPANY
432 SOUTH BEACH STREET
DAYTONA BEACH, FLORIDA 32114
386-255-2150

1    <u>**Appearing for the Plaintiff**</u>

2    H. GREGORY PEARSON, ESQUIRE
     CHARLES E. HARRISON, ESQUIRE
3    Of Junkin, Pearson, Harrison & Junkin, L.L.C.
     601 Greensboro Avenue
4    Suite 600 Alston Place
     Tuscaloosa, Alabama 35401
5    205-366-0111, FAX-205-391-4780

6

7    <u>**Appearing for the Defendant**</u>

8    THOMAS J. LEEK, ESQUIRE
     Of Cobb & Cole
9    150 Magnolia Avenue
     Daytona Beach, Florida 32114
10   386-255-8171, FAX-386-248-0323

11

12   <u>**ALSO PRESENT:**</u>

13   CLATUS JUNKIN, Corporate Representative for Johnco

14

15

16

17

18

19

20

21

22

23

24

25

1     Q.    Did you tell Pep that you would be willing to

2   take some gravel from that operation, give him a

3   quantity and a price you might be willing to pay?

4     A.    I might have given him a ballpark of what it

5   could be purchased at.

6     Q.    Do you recall what that is?

7     A.    No, not now.

8     Q.    How about the volumes?

9     A.    No.

10     Q.    Okay.  Did -- well, what was the next time you

11   talked to Ben and Pep?

12     A.    I don't recall.  I mean, I talked to them early

13   on in -- I mean, they seemed kind of determined to do

14   this thing.  And, like I said, at first, I tried to

15   discourage them.

16           And then it appeared that the market was

17   starting to get pretty good, the housing market and

18   everything, and then I felt like, you know, it was

19   probably a good idea.  I think we can move the product,

20   but you got to sell the other stuff.  I mean, we had no

21   market for anything except maybe that concrete

22   aggregate.

23     Q.    Okay.

24     A.    We did -- we do have markets for products, but

25   the way Ben wanted to produce the product out there with

1    stipulations related to depositions where you object

2    to form and reserve all the other objections?

3         MR. LEEK:  Yes.  And when you say usual

4    stipulations, I don't know what the usual

5    stipulations are.  But assuming they're the same as

6    ours, yes.  You shouldn't expect a problem from me

7    on that.

8         MR. PEARSON:  Okay.  Gary, at this time,

9    subject to my earlier comments relative to damages

10   testimony and if you're going to be designated to

11   give testimony related to the damages, then I'm done

12   at this point.

13        THE WITNESS:  With me?

14        MR. PEARSON:  Yeah.  And I appreciate you

15   sitting and putting up with this all day.

16        MR. LEEK:  You have the opportunity to read the

17   transcript if it's ordered to make sure that she's

18   taken down things correctly, or you can waive that

19   right.  I'm comfortable with you waiving it.  I'm

20   confident Sandy's going to take down things

21   correctly.

22        THE WITNESS:  Fine with me.

23   (Thereupon the deposition was concluded at 3:05 p.m.)

24

25

1                        CERTIFICATE OF OATH

2

3    STATE OF FLORIDA      )

4    COUNTY OF VOLUSIA     )

5

6        I, Sandra Narup, Registered Professional Reporter

7    and Florida Professional Reporter, the undersigned

8    authority, certify that GARY YELVINGTON personally

9    appeared before me and was duly sworn on July 5, 2007.

10

11       WITNESS my hand and official seal this 12th day of

12   July, 2007.

13

14

15

16

17       _____
                    Sandra Narup
18                  Registered Professional Reporter
                    and Florida Professional Reporter
19
                    Notary Public, State of Florida
20                  My Commission No.: DD 472186
                    Expires:  January 15, 2010
21
                    (This signature is valid only
22                  if signed in blue ink.)

23

24

25

*VOLUSIA REPORTING COMPANY*

1                    CERTIFICATE OF REPORTER

2

3    STATE OF FLORIDA       )
                            )
4    COUNTY OF VOLUSIA      )

5

6        I, SANDRA NARUP, Registered Professional Reporter,

7    Florida Professional Reporter and Notary Public, do

8    hereby certify that I was authorized to and did

9    stenographically report the deposition of GARY

10   YELVINGTON, that a review of the transcript was

11   requested; and that the foregoing transcript is a true

12   record of my stenographic notes.

13       I further certify that I am not a relative,

14   employee, attorney, or counsel of any of the parties,

15   nor am I a relative or employee of any of the parties'

16   attorneys or counsel connected with the action, nor am I

17   financially interested in the action.

18

19       DATE this 12th day of July, 2007.

20

21

22   _____
     SANDRA NARUP
23   Registered Professional Reporter &
     Florida Professional Reporter
24
     (This signature is valid only
25   if signed in blue ink.)

*VOLUSIA REPORTING COMPANY*

# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA

| | | |
|---|---|---|
| JOHNCO MATERIALS, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Civil Action No. |
| vs. | ) | 2:06cv993-ID |
| | ) | |
| CONRAD YELVINGTON | ) | |
| DISTRIBUTORS, INC., | ) | |
| | ) | |
| Defendant. | ) | |

## FED.R.CIV.P 26(A)(1) DISCLOSURES

Comes now the plaintiff in the above-styled cause, and respectfully provides the disclosures as mandated by Fed.R.Civ.P. 26(a)(1) and the local rules of this Court:

A. **The name and, if known, address and telephone number, of each individual likely to have discoverable information that the disclosing party may use to support its claims or defenses, unless solely for impeachment, identifying the subjects of the information.**

James Benjimen Johnston
21 Pinecrest Lane
Monroeville, Alabama 36460
Liability claims of plaintiff, and defenses asserted thereto; damages.

P.M. Johnston
Post Office Box 442
120 3rd Ave. N.E.
Aliceville, Alabama 35442
Liability claims of plaintiff, and defenses asserted thereto; damages.

Phillip Holiday
Post Office Box 335
Montrose, Alabama 36559
Liability claims of plaintiff, and defenses asserted thereto; damages.

Gary Yelvington
Daytona Beach, Florida
Liability claims of plaintiff, and defenses asserted thereto; damages.

William R. Finney
Post Office Box 580
Reform, Alabama 35486-0580
Liability claims of plaintiff, and defenses asserted thereto; damages.

Clatus Junkin
202 3rd St. NE
Fayette, Alabama 35555
Liability claims of plaintiff, and defenses asserted thereto; damages.

**B.**   **A copy of, or a description by category and location of, all documents, data compilations, and tangible things that are in the possession, custody or control of the party and that the disclosing party may use to support its claims or defenses, unless solely for impeachment.**

Plaintiff possesses documents relevant to the contract with defendant; to purchases of real and personal property and other capital expenditures made

2

necessary by its performance under the contract; and to the claims asserted by plaintiff against the defendant. Plaintiff produces all such documents that to its knowledge it may use to support its claims contemporaneous with this disclosure.

**C.    A computation of any category of damages claimed by the disclosing party, making available for inspection and copying as under Rule 34 the documents or other evidentiary material, not privileged or protected from disclosure, on which such computation is based, including materials bearing on the nature and extent of injuries suffered.**

See documents produced contemporaneous with this disclosure. Plaintiff paid $1,675,110.34 in connection with the real property the purchase of which was made necessary to effect performance under the contract, which payments are reflected in documents produced with these disclosures. Plaintiff further is obligated to pay $300,000.00, and is responsible for annual payments of $19,000.00 over the course of five (5) subsequent years, for use of the railroad spur made necessary to effect performance under the contract, which payments are reflected in documents produced with these disclosures. Plaintiff further made capital and other expenditures for the year 2005 through January 2006, which expenditures are reflected in documents

produced with these disclosures.[1]  Interest continues to accrue on the debt incurred,

which is financed through West Alabama Bank & Trust and Citicapital.  Finally,

plaintiff's damages will include loss of profit and loss of business opportunity, which

plaintiff is presently unable to calculate, due in part to plaintiff's efforts to mitigate

its losses through sale of the business and/or its assets.


**D.**    **For inspection and copying as under Rule 34, any insurance agreement under which any person carrying on an insurance business may be liable to satisfy part or all of a judgment which may be entered in the action or to indemnify or reimburse for payments made to satisfy the judgment.**


None known at this time.


s/ H. Gregory Pearson (PEA017)

Charles E. Harrison (ASB-9408-N70C)

---

[1]Capital and other expenditures for calendar 2006 to date have not yet been compiled, and
will be produced during the ordinary course of discovery.

*OF COUNSEL:*

JUNKIN, PEARSON, HARRISON
   & JUNKIN, L.L.C.
601 Greensboro Avenue
Suite 600 Alston Place
Tuscaloosa, Alabama 35401
Telephone: (205) 366-0111
Telecopier: (205) 391-4780

## CERTIFICATE OF SERVICE

Pursuant to Fed.R.Civ.P. 5(d) and LR 5.1 for the Middle District of Alabama, I do hereby certify that I have on this the 17th day of January 2007 served a copy of the foregoing Disclosures on:

Charles A. Stewart III, Esq.
Angela R. Rogers, Esq.
BRADLEY ARANT ROSE & WHITE LLP
The Alabama Center for Commerce
401 Adams Avenue, Suite 780
Montgomery Alabama 36104

Thomas J. Leek, Esq
COBB & COLE
150 Mognolia Avenue
Post Office Box 2491
Daytona Beach, FL 32115-2491

by mailing the same by United States mail, properly addressed and first-class postage prepaid to the last-known address of the above, or by personal delivery.

Charles E. Harrison (HAR124)

5

THIS AGREEMENT, by and between Johnco Materials, Inc., hereinafter called Johnco, and Conrad Yelvington Distributors, Inc., hereinafter call Yelvington, WITNESSETH:

THAT WHEREAS, Johnco has contracted to buy certain lands in Lowndes County, Alabama, as shown by the map attached; and whereas Johnco plans to mine and sell sand and gravel from these lands;

NOW THEREFORE, Johnco and Yelvington do contract and agree as follows:

1. Johnco agrees to begin construction of a plant to mine and classify sand and gravel from the aforementioned lands.

2. At such time during calendar year 2004 as Johnco begins production with its sand and gravel plant, Yelvington agrees to begin purchasing #67 concrete gravel from the plant site in quantities of one hundred fifty thousand (150,000) tons annually (average of 3,000 tons per week), for a price of $5.25 per ton f.o.b. rail cars loaded at the plant site on the MBNR rail siding to be constructed. This tonnage commitment will be subject to rail car supply and availability.

3. Yelvington agrees that it, or its assigns, will provide the transportation for any material purchased under this agreement that is moved by rail.

4. The material purchased must meet agreed to specifications for size, color, and quality after unloading at Yelvington's distribution terminals. A general guideline for quality and size gradation will be outlined and mutually agreed to.

5. Johnco agrees to do the grading work and provide labor for the development of a rail siding capable of loading and staging a minimum of 35 rail cars for shipment on a regular basis.

6. Yelvington agrees to provide, the metal materials, ballast, and crossties for the construction of the rail siding, in accordance with specifications required by M&B Railroad, LLC.

7. Johnco agrees to reimburse Yelvington for the cost of the metal materials, ballast, and crossties provided for the construction of the rail siding, as such costs exceed amounts reimbursed by M&B Railroad, LLC, at the rate of twenty-five cents per ton of gravel and sand purchased and shipped on said railroad by all customers, until said costs are recovered.

8.  Johnco and Yelvington agree to use their best efforts to schedule work on construction of the sand and gravel plant and the rail siding so that production and shipment of gravel and/or sand can begin in a coordinated manner and as soon as possible.

9.  Johnco is permitted to use the rail siding for loading of rail cars for shipment of sand and/or gravel to other customers so long as such shipments do not interfere with the loading, or placement, of Yelvington's rail cars.

10.  The term of this contract will be for a period of five (5) years from the date of the first shipment of gravel.

11.  The initial price will not increase for the first two (2) years of this contract. At the end of year two, the parties will negotiate a mutually agreeable price increase for the remaining contract term. If the parties are unable to agree otherwise, the price of material will increase by the percent change in the Gross Domestic Price – Implicit Price Deflator (GDP-IPD) index over the prior year, as finally published in the *Survey of Current Business* by the Bureau of Economic Analysis for the calendar quarter ending six months prior. Not withstanding the above, the amount of any price increase will first be applied to any balance remaining to be reimbursed to Yelvington for the    items supplied under Item 6.

12.  Yelvington will be granted a right of first refusal for any #67 concrete gravel produced by Johnco in excess of that required to meet Yelvington's tonnage commitment. Upon notification from Johnco of the availability of material, Yelvington shall have 15 days to respond with its intent to exercise, or waive, this right.

13.  All payments are due 30 days from invoice date.

Johnco Materials
00002

**JOHNCO MATERIALS, INC.,**

**Plaintiff**

**vs.**

**CONRAD YELVINGTON DISTRIBUTORS, INC.,**

**Defendant.**

**Civil Action No. CV-06-2:06CV993-10**

**Report of
Dave G. Borden, CPA/ABV
Aldridge Borden & Company, P.C.
September 25, 2007**

EXHIBIT

tabbies®

A

# TABLE OF CONTENTS

|  | Page |
|---|---|
| INTRODUCTION | 3 |
| QUALIFICATIONS | 3 |
| DOCUMENTS RELIED UPON IN FORMING OPINION | 4 |
| BACKGROUND | 4 |
| ANALYSIS OF PRODUCTION AND SALES | 8 |
| REVIEW OF ALEXANDER REPORT | 9 |
| CONCLUSION | 16 |
| CONTINUING NATURE OF WORK | 17 |
| EXHIBIT 1 – ADDITIONAL BIOGRAPHICAL INFORMATION |  |
| EXHIBIT 2 – TESTIMONY LAST FOUR YEARS |  |
| EXHIBIT 3 – DOCUMENTS RELIED UPON IN FORMING OPINION |  |
| EXHIBIT 4 – ANALYSIS OF JMI PRODUCT SALES |  |

# REPORT OF DAVE G. BORDEN, CPA/ABV

## INTRODUCTION

I have been retained by the law firm of Cobb & Cole as an expert witness in the case of Johnco Materials, Inc ("JMI") v. Conrad Yelvington Distributors, Inc ("CYDI") (Civil Action No. CV-06-2:06CV993-10). I have been engaged to review and provide expert testimony regarding the expert report of J. Lester Alexander, III ("Alexander") relative to alleged damages suffered by JMI in the above styled case.

## QUALIFICATIONS

I am the Chairman of Aldridge Borden & Company, P.C. in Montgomery, Alabama. We are a CPA firm practicing primarily in the State of Alabama. Our firm provides a wide range of specialized services, including management consulting, strategic planning, litigation consulting, business valuation, mergers and acquisitions consulting, tax planning, compliance, auditing, and information technology consulting.

My own areas of expertise include business valuation, strategic planning, mergers and acquisitions, and litigation consulting. I have extensive experience in a wide range of business valuations, business acquisitions, mergers, and sales, and have been qualified as an expert in state and federal courts in Alabama and Florida in numerous instances involving a broad range of commercial and economic matters. I am a Certified Public Accountant (CPA) and, in addition, hold the Accredited in Business Valuation (ABV) Certification from the American Institute of Certified Public Accountants.

In the course of my consulting practice both in connection with the mergers, acquisitions, and sales practice and the business valuation practice, I am required on a regular basis to research and analyze industry trends and practices and assess the subject company and its strengths and weaknesses relative to a particular industry. This research and analysis includes, but is not limited to, markets for sale of products, customers, competition, capital expenditure requirements necessary for the business, and financial performance.

Exhibit 1 to this report contains additional biographical information including articles that I have authored. Exhibit 2 contains my four-year deposition or trial testimony. I am being compensated at an hourly rate of $305 per hour.

Additional firm employees have assisted in the review of information relating to this matter. Rates for those employees range from $65 to $240 per hour.

3

## DOCUMENTS RELIED UPON IN FORMING OPINION

Exhibit 3 contains a list of documents upon which I have relied in reaching my opinions.

## BACKGROUND

### The Supply Agreement

In April 2004, JMI and CYDI entered into a supply agreement ("Supply Agreement").[1] Under the terms of the Supply Agreement, JMI was required to construct a mining facility to mine and classify sand and gravel. In addition to the mining facility, JMI was required to construct rail siding sufficient to load/handle a minimum of fifty-two (52) open, or covered, hopper railcars on a regular shipment basis.[2] Construction of the mining facility was scheduled to be completed within twelve months of the execution of the Supply Agreement.[3] The term of the Supply Agreement was for five years, and it was scheduled to end on the fifth anniversary of the first shipment of the product.

In addition to the requirements to construct the mining facility, the terms of the Supply Agreement called for CYDI to purchase #67 concrete gravel in minimum quantities of 150,000 tons annually. The initial purchase price was $5.25 per ton, and included a price increase of 5% beginning in year three, April 28, 2006, and additional price increases of 2.5% beginning in years four and five.

### Overview of the Aggregate Market

The aggregates industry is a mature and cyclical business, and demand for products is dependent on construction activity. Primary end users include public infrastructure and commercial and residential construction markets.    First Research reports that "Construction material use is seasonal, with nearly two-thirds of US cement consumption between May and October.[4]

---

[1] JMI was formed by Ben and Pep Johnston. After entering into the Supply Agreement with CYDI, the Johnstons determined they did not have the financial capacity to obtain the necessary financing to purchase the property and construct the mining facility as called for in the Supply Agreement. As a result, they admitted a third shareholder, Clatus Junkin ("Junkin"). As a result of admitting Junkin, JMI was able to obtain the necessary financing to purchase the land and construct the mining facility.

[2] The Supply Agreement indicates that railcars would be loaded on a weekly schedule (approximately 5,200 tons per week) subject to rail car availability and supply. According to his deposition testimony, Junkin claims that it was his expectation that a train would pickup material every week. However, Pep Johnston, who negotiated the Supply Agreement on behalf of JMI, stated in his deposition that his understanding was that JMI had to be prepared to load 5,200 tons when the train got to JMI (page 106 deposition testimony). Pep Johnston's expectation is similar to Gary Yelvington ("Yelvington") who negotiated the Supply Agreement on behalf of CYDI. According to his deposition testimony, Yelvington indicates that JMI had to be able to load 5,200 tons per week when the train was at JMI.

[3] The Supply Agreement was signed by CYDI on April 16, 2004, and it was signed by JMI on April 28, 2004.

[4] First Research, Inc. Industry Profile, August 6, 2007. Note that the largest users of 67 stone are concrete producers. Concrete producers use cement mixed with aggregates to make concrete.

4

Construction spending in the public sector is generally more stable than private construction spending as governmental appropriations and expenditures are typically less sensitive to interest rate fluctuations than private-sector spending. As such, commercial and residential construction activity is affected by economic cycles and local conditions.

Due to the relatively low value of aggregates compared to their weight, producers typically locate plants in close proximity to the end use market. Transportation to the market can be accomplished by truck, rail or barge. Generally, shipping by truck is limited to locations within 45 miles of the plant site. If annual tonnage requirements exceed 20,000 tons or the distance exceeds 45 miles, shipping by rail is more economical.[5]

The aggregates market in the southeast was significantly impacted by the destruction caused by Hurricane Katrina in 2005. The Federal Reserve Board, in November 2005, reported strong demand for construction related manufacturers, and further, that while clean up efforts had begun, full-scale rebuilding was not scheduled to get underway until early 2006.[6]

Demand for construction materials in the southeast market drove up prices for aggregates. Martin Marietta reported aggregate price increases in the Southeast of 11.5% and 11.0% for 2006 and 2005,[7] respectively, compared to only a 3.9% increase in 2004.[8] Further, Martin Marietta reports that increases in aggregate pricing have continued into 2007.

## JMI

Subsequent to the execution of the Supply Agreement, JMI purchased the property in Lowndes County, Alabama. The purchase price for the property was approximately $1,680,000, and approximately $1,000,000 of this price was allocated to the gravel reserves.[9] [10]

While there are no documents available to me, to support JMI's estimated gravel reserve, an email from Philip Holladay ("Holladay") to Yelvington indicates discussion of gravel reserves at the Lowndes County location of approximately 2.5 million tons. Using this information, JMI's cost per ton or depletion of gravel would be approximately $0.40.

---

[5] Quarryology 101. www.pitandquarry.com
[6] The Beige Book Summary for Atlanta District November 2005.
[7] Vulcan Materials also reported increases in aggregate prices in 2005 and 2006. However, the data was not segmented by geographic region.
[8] Martin Marietta Annual Report for 2006.
[9] 2004 Federal Income tax return for JMI.
[10] Based on Pep Johnston's deposition testimony (p. 87), the property was purchased in August 2004. However, the 2004 JMI Federal Tax return indicates the property was purchased in May 2004.

After the property was acquired, JMI began pricing and purchasing equipment for the plant. The basic components of the plant included a pump box, steel bins to hold the sifted gravel, a sand classifying screen shaker and a de-watering screw radial stacking conveyor.[11]

In addition, Ben Johnston built a dredge, the load-out bins and conveyor and belt weighing system. Ben Johnston also built the roads for hauling from the plant to the load-out bins.[12] By the end of 2004, JMI had invested in excess of $400,000 in equipment relative to the operations of the facility.[13] [14]

In addition to the plant, JMI also constructed a load-out facility which included the rail siding. M&B Railroad ("M&B") assisted in the design of the track layout for the load-out facility. In addition to the costs incurred by JMI, M&B incurred costs of approximately $300,000 in the construction of the rail siding.[15]

JMI entered into a Rail Services Agreement with M&B for the financing of the rail siding. Under the terms of the Rail Services Agreement, JMI agreed to pay, in addition to M&B's normal charges, an additional charge of $0.25 per ton on the first 1,500,000 tons of aggregate, sand or other product shipped from the facility.[16]

The load out facility was completed around March 2006.[17] [18] Although JMI began limited operations in 2005, according the Ben Johnston, the facility did not begin producing quality gravel until February 2006.[19] Although Ben Johnston testified JMI began producing quality gravel in February 2006, Holladay testified that it was not until around the end of April 2006 that JMI had enough material on the ground to load a unit train.[20]

From May 2006 through September 2006, CYDI purchased approximately 32,000 tons of #67 gravel from JMI. In addition, CYDI purchased approximately 3,300 tons of #4 oversized gravel from JMI in June 2006.[21]

While there are no documents available to me establishing the overall geology of the JMI site, Ben Johnston represented the mineral content mix to be 55% sand,

---

[11] Pep Johnston deposition testimony page 84.
[12] Pep Johnston deposition testimony page 85.
[13] 2004 Federal Income tax return of JMI.
[14] Tax returns subsequent to 2004 have not been produced as of the date of my report. I reserve the right to supplement my report upon production of such records.
[15] Pep Johnston deposition testimony pages 45-46.
[16] DX 11 to Pep Johnston deposition testimony.
[17] Ben Johnston deposition testimony page 103.
[18] Although the Agreement required the rail siding to handle 52 rail cars, it could actually handle 70 to 75 plus two engines. Ben Johnston deposition testimony page 108.
[19] Ben Johnston deposition testimony page 47.
[20] Holladay deposition testimony page 34.
[21] See Exhibit 4 to my report.

36% #67 gravel, and 9% oversized #4 gravel.[22] Prior to commencing operations at the facility, JMI did not have any definitive marketing plans for either the sand or the oversized gravel.[23] JMI's only marketing plan was to sell the 150,000 tons of #67 gravel to CYDI.[24] [25]

In late 2005 or early 2006, JMI was approached by Lafarge, a ready-mix company with headquarters in Ohio, about buying some of the JMI sand. However, this deal did work out, and although JMI considered sand to be a by-product of the production process, sand was creating a problem for JMI.[26] In a meeting with Yelvington, Pep Johnston inquired if CYDI could take some sand, "if you could take some sand, we need you to do that."[27] JMI's problem with sand was also discussed in an email dated March 6, 2006 from Holladay, a CYDI consultant, to Yelvington. In the email, Holladay informed Yelvington that Pep Johnston had indicated JMI may have to shut down if JMI could not move the sand.[28] Junkin indicated that one way to solve the sand problem was to pump the sand back into the pit.[29]

Around May 2006, Junkin, the financial investor in JMI, purchased Ben and Pep Johnston's interest in JMI, and became the sole owner of JMI. Ben Johnston remained as an employee of JMI, and managed the mining facility in Lowndes County.

Around October 2006, Junkin went to CYDI's office in Daytona to request that the Supply Agreement be terminated. Junkin had been approached by a potential buyer, Rinker, for the mining facility, but Rinker would not purchase the facility as long as the Supply Agreement with CYDI was in place. The Supply Agreement was not terminated, and in November 2006, JMI ceased mining operations at the Lowndes County facility.

Although, mining operations at the facility ceased, JMI continued to sell products that were previously mined. These sales included #67 gravel as well as sand. JMI sold between 12,000 and 15,000 tons of sand subsequent to November 2006.[30]

Around April 2007, JMI resumed mining operations at the Lowndes County facility producing #67 gravel. However, around June 2007, JMI shifted focus and began

---

[22] Ben Johnston deposition testimony page 39.
[23] Junkin deposition testimony page 65 and 70, and Ben Johnston deposition testimony page 42.
[24] Ben Johnston deposition testimony page 39.
[25] JMI believed that the sale of 150,000 tons per year to CYDI would pay for the debt service and expenses of JMI, and if JMI was able to sell sand and oversized, most of that would have been profit. See Pep Johnston deposition testimony at page 61.
[26] Philip Holladay deposition testimony page 25.
[27] Pep Johnston deposition testimony page 113.
[28] DX 8 to Pep Johnston deposition.
[29] Junkin deposition testimony page 170.
[30] Ben Johnston deposition testimony page 29.

producing #57 gravel. The #57 gravel was shipped to Dunn Construction in Mississippi, and the product is being tested for use in asphalt production.

## ANALYSIS OF PRODUCTION AND SALES

JMI did not maintain records with respect to actual production. However, it is possible to estimate production in total (for the entire period of operation vs. each week or month) by using the sales volumes of minerals provided by Alexander from the books and records of JMI, the estimated mineral composition represented by plaintiffs, and testimony of plaintiffs regarding the amount of mineral inventories available for sale at either the beginning of the shut down period (November, 2006) or the beginning of the second start –up of production (April of 2007). I have included, as Exhibit 4 to my report, a table that sets forth JMI's sales activity based on sales to CYDI and sales to other buyer based on Appendix 3 and 4 of Alexander's report.

Alexander's report indicates that JMI sold approximately 40,028 tons of #67 gravel during the period January 2006 through June 2007. Further, Ben Johnston testified that JMI sold all of the #67 gravel it had produced prior to the shut down[31] or during the period of the shut-down, and it began producing #67 again around April 2007 to fill sales orders for #67 gravel.[32] Therefore, it is correct to assume that the 40,028 tons of #67 gravel represents all, if not more than all, of the gravel produced by JMI during its entire period of operation prior to its shut down in November of 2006.

Both Junkin and Ben Johnston testified that JMI was producing gravel prior to March 2006[33], and further, there were no mechanical issues that would affect JMI's ability to meet the requirements under the Supply Agreement.[34] In addition, Alexander represented, in his report, that in the months of March, May, June, July and August 2006, JMI was "staffed to meet the delivery requirements specified in the supply agreement (which he interprets as being 260,000 tons of #67 gravel annually) as of the first week of March 2006." Alexander also explains that the expenses he used for establishing incremental costs of JMI's operations were from these same months. His report states "Using the costs from mining operations at production capacity for JMI during the period March 2006 and May 2006 through August 2006..." In further explanation there is a footnote supporting the preceding statement that contains the following reference: Footnote 5 to Alexander report – "Per deposition testimony of Clatus

---

[31] All of JMI's sales of #67 gravel did not occur prior to the shut down. Ben Johnston testified that JMI had sales of #67 gravel, which were produced prior to shut down, during the period of shut down.
[32] Ben Johnston deposition testimony page 24.
[33] Ben Johnston deposition testimony page 47 and Junkin deposition testimony page 43.
[34] Ben Johnston deposition testimony page 57.

Junkin, these months are an accurate representation of costs associated with the mine running at production capacity."[35]

Since production records relative to JMI's mining operations have not been produced, for purposes of my production analysis, I have conservatively assumed that all of the #67 gravel sold by JMI was produced during the months of March, May, June, July and August 2006.[36] Using the five months as an indicator of JMI production capacity indicates that JMI's monthly production of #67 gravel averaged only 8,006 tons per month or annual production capacity of only approximately 96,000 tons per year. This production level is significantly less than the production required under the Supply Agreement of 150,000 tons per year.

Using JMI's product mix as represented by Ben Johnston in his deposition testimony, during this five month period, JMI would have produced approximately 61,150 tons of sand. On an annualized basis, JMI's historical production of sand would be approximately 146,700 tons annually.

## REVIEW OF ALEXANDER REPORT

Alexander was retained by JMI's counsel to review and analyze evidence related to the Supply Agreement, and as a result of his work, Alexander has provided a calculation of alleged damages in the amount of $4,549,215. These alleged damages consist of lost profits of $4,473,873 and incidental costs of $75,342.

While it is my understanding that CYDI will deny any liability related to the damage claims, I have reviewed Alexander's calculations and methodology, and noted a number of issues that result in the calculation lacking adequate foundation and not conforming to the facts and circumstances in this matter.

### Lack of Foundation

At this point in discovery, neither detailed production records nor comprehensive geological assessment and testing data are available for my review of Alexander's lost profits calculation. Both of these foundational records, along with marketing plans for the sale of the sand, are necessary for a proper calculation of lost profits, particularly for a start-up business with no significant production and sales history such as JMI.   The following are foundational components not

---

[35] It is possible that in the month of March 2006, the plaintiffs will contend that the mine was staffed and attempting to operate at production capacity, but not actually producing at that level.  However, starting in May of 2006, Alexander's lost profits calculation (discussed subsequently) asserts that the mine was capable of actually producing at 260,000 tons of #67 gravel annually.

[36] There was gravel produced in some of the other months.  However, for purposes of my calculation I have aggregated all production in the five-month period, thus overstating the actual production level Johnco was achieving during this period.

established that in my experience are required for a proper analysis, all of which have substantial impact on the calculation of lost profits:

1. <u>Comprehensive assessment of the geology of the site</u>, including geological testing results and approximate locations, depth, thickness, and content of the mineral deposits, depth of water table, and over burden thickness and composition. This assessment of the geology would provide meaningful information not only about the content and value of the mineral deposit, but also the likely difficulty and cost of mining the deposit. There apparently were test borings done of the site, but documentation of this geological study is not available to me at the date of this report.

2. <u>Basic production records from production</u> on the site showing dates, volumes and mineral content (particularly mix of sand to gravel, and size of gravel) of production experience on the property. Mining production records, while relevant primarily to only the portion of the site currently mined, would at least provide an indicator of the mineral content, cost of mining, and future performance of the mine assuming similarity of the deposit.

3. Establishment of market for sales of sand assumed by Alexander of 146,200 tons annually, despite JMI having no marketing plan for the sale of the sand and selling only a small portion of the sand produced by the mine. It is undisputed that JMI had no marketing plan for the sale of the sand produced at the mine, and the evidence indicates major problems sustained in disposing of the sand. Sand sales for the entire period of the mine's existence resulted in sale of only a small fraction of the sand produced, substantially less in scope than is contemplated by Alexander in the lost profits calculation.

## Revenue Assumption Not Consistent with Plaintiff Deposition Testimony

One of the fundamental assumptions underlying Alexander's lost profits calculation is that CYDI was obligated, under the terms of the Supply Agreement, to purchase 260,000 tons annually of the #67 gravel.

As set forth in the Supply Agreement, CYDI's minimum obligation was 150,000 tons annually. Further, Pep Johnston, Ben Johnston and Junkin all testified that the minimum requirement under the Supply Agreement was 150,000 tons annually.[37] As a result, Alexander's calculation erroneously reflects a gross revenue component of $7,417,800 equal to the sale of 260,000 tons of #67 gravel. Alexander's gross revenue component relative to sales of #67 gravel is overstated by approximately $3.1 million.

---

[37] See Junkin deposition testimony page 40, Pep Johnston deposition testimony page 106 and Ben Johnston page 57 and page 84.

**JMI Historical Annual Production only 96,000 Tons of #67 Gravel**

As discussed previously, during the five month period March, May, June, July and August 2006, JMI's annualized production of #67 gravel was at most approximately 96,000 tons. The following chart compares JMI's historical, annualized production of #67 gravel to the requirements under the Supply Agreement and Alexander's calculation of 260,000 tons annually. Alexander asserts in his lost profits calculation that JMI was incurring costs and capable of producing at 260,000 tons of #67 gravel annually. The only adjustment made by Alexander to incremental costs for the additional volume above this five month period is the cost of fuel and oil "which would escalate to power equipment to load rail cars specified as the shipping method by the Supply Agreement. For analytical purposes, actual Fuel and Oil cost has been escalated to equivalent cost necessary to produce and rail car load 5,200 tons of #67 Concrete Gravel per week".



**JMI**
**Annualized Production of #67 Gravel**
**Produced in March, May – August 2006**

As reflected in the chart, JMI's historical production at the plant was not adequate to meet the annual requirements of the 150,000 tons of #67 gravel, much less the 260,000 tons as outlined in the Alexander lost profits calculation. However, assuming for sake of argument, that the mine could have produced at either 150,000 tons or 260,000 tons, it is my opinion, the incremental operating expenses in Alexander's calculation (in addition to fuel and oil) would have significantly increased (discussed subsequently) with this almost three-fold increase in volume.

11

Further, Ben Johnston testified that the _maximum_ production for the facility was 120 tons per hour of #67 gravel.[38] At this rate, the facility would have to operate _at maximum output_ for a minimum of 43 hours per week to produce 260,000 tons or 5,200 tons of #67 gravel per week.[39] Assuming 80% efficiency would require operating the plant for almost 54 hours per week.[40]  At operations extending beyond one shift, or alternatively requiring overtime pay, operating costs for labor would have been significantly increased.[41]

## Lost Profits Calculation Assumes Sales of 146,200 Tons of Sand

Alexander's lost profit calculation also contains an assumption that JMI suffered lost sand sales revenue on 146,200 tons of sand. This component accounts for $1,242,700 of alleged lost revenue and lost profit.[42]

As discussed above, JMI did not have a marketing plan for the sale of sand, and had incurred major problems in selling the sand.  JMI was even considering pumping sand back into the production pit. Further, Holladay testified that even if JMI had given CYDI the sand (for no cost to CYDI), CYDI could not be profitable selling the sand because of the transportation cost.[43] While JMI was able to sell all of the #67 gravel and apparently most of the #4 oversized gravel it produced, JMI was only able to sell a small portion of the sand it produced, even at production volumes that were only approximately 1/3 of the production volumes Alexander assumes in his lost profits calculation. Yet Alexander calculates alleged lost sand sales of 146,200 tons annually of sand, over 6.5 times the 22,506 tons of sand JMI had sold during its entire seventeen-month period of existence from March of 2006 (asserted production capability) to July of 2007. See Chart Below.

---

[38] Ben Johnston deposition testimony page 48.

[39] Due to the lack of production records, it is uncertain whether the facility ever operated at this capacity, even for brief periods of time.

[40] Alexander's calculation assumes the facility would be producing 50 weeks a year. As such, Alexander's calculation fails to allow for maintenance, either reactive or preventive, related shut down. Ben Johnston testified that the mine could not run all the time because there are going to be problems, and at one point the plant was shut down for a week while equipment was being repaired. See Ben Johnston deposition testimony at page 48.

[41] Upon production of JMI payroll records, I will review payroll and overtime pay to determine if this is considered in Alexander analysis.

[42] Alexander classifies these products as by-products and as such does not attribute any production costs to these items.

[43] Holladay deposition testimony page 87.

12

## Actual Sand Sales Compared to Alexander Lost Profits Calculation of Sand Sales



Alexander's calculation of sand sales is inconsistent with JMI's operational sales history and fails to consider the problems JMI was incurring selling the sand, not to mention JMI's lack of a marketing plan at the outset for the sale of the sand. In my opinion, it is not reasonable to assume that JMI could sustain the level of sand sales as set forth in the Alexander calculation, particularly without any incremental sales and marketing costs associated with this effort.

### Fails to Consider all Incremental Cost

Alexander's calculation of alleged lost profits includes a component for incremental costs that JMI would avoid by not producing the products. His calculation is based on JMI's operating results for selected months during the period March 2006 through August 2006, and an assumption that JMI was operating at full production capacity during these months.[44] Alexander's calculation omits the months of April and September 2006, and based on Plaintiff's lack of production records, it is uncertain as to the activity that occurred during these omitted months.

There are numerous costs of operating the mine that it appears Alexander fails to consider in his analysis. I reserve the right to modify this report after full production of the financial records of JMI. However, the following are costs that are apparently not considered in his lost profits analysis:

---

[44] Actually, Alexander's assumption is for production beyond 150,000 tons of #67 stone established in the Supply Agreement. Alexander states in his report that "Operating costs incurred by Johnco Materials, Inc. during the March 2006 through September 2006 period of operations under the Supply Agreement represent staffing and operating costs necessary to produce 5,200 tons of #67 Concrete Gravel per week, with the exception of Fuel and Oil, which would escalate to power equipment to load rail cars specified as the shipping method by the Supply Agreement".

1. Essentially, Alexander assumes all of the operating expenses of the mine (with the exception of fuel and oil) incurred during the base period (March 2006 and May – August 2006) were fixed (would not increase with additional production) at the levels incurred during those months. This is despite the fact that the volume asserted in the lost profits calculation (260,000 tons annually of #67 gravel) were almost triple the volumes experienced during the base period (only 96,000 tons of #67 gravel annually). In my opinion, it is not reasonable to assume all of these costs would remain fixed in these circumstances.

2. Depletion on minerals mined from the property. As discussed above, depletion would have been approximately $0.40 per ton.

3. Transportation costs related to railroad transportation agreement between JMI and M&B Railroad. These additional costs would have approximated $0.25 per ton.

4. Depreciation on equipment used in the production of sand and gravel, or alternatively capital expenditures and replacements required in the operation at the production level assumed. According to its 2004 Federal Tax return, JMI had already invested approximately $400,000 in equipment relative to operating the mining facility. Additional equipment would have likely been purchased in subsequent years as well.  Production would result in wear and tear on the equipment from production hours.

5. Reclamation costs – It is unclear what the reclamation plan was with respect to the property.  However, there is no evidence that these costs were considered.

6. Over burden removal costs.  Apparently, over burden removal was sub-contracted to other providers.  It appears that this cost was incurred prior to Alexander's cost of production base period calculations beginning in March of 2006.  Future discovery of JMI financial records will hopefully clarify if these costs were considered.

7. Engineering testing for production purposes and compliance

8. Costs associated with the marketing and sales effort to market sand of 146,200 tons annually.

9. Legal and accounting costs

10. Telephone, computers, and other office cost requirements

In addition, Alexander makes assumptions regarding incremental fuel consumption "which would escalate to power equipment to load rail cars specified as the shipping method by the Supply Agreement." The details of these calculations are not replicated in the report, and it is not possible to determine the fuel consumption assumptions or the pricing considered in his analysis. Further there may be costs included in Alexander's base period calculations that JMI continued to incur during the shut down period. If the Alexander calculation was corrected for the above items (1 – 10), then consideration should be given as an offset for the costs included in the base period that were not avoided by JMI during the shut down period.

Upon production of fuel and other internal financial records of JMI, I reserve the right to modify this section of my report.

### Failure to Discount to Present Value

In his report, Alexander states that he did not discount his future lost profits calculation to present value at the date of the liability event or to the trial because, in his opinion, the effect of discounting would be offset by pre-judgment interest. I have been instructed by counsel that pre-judgment interest is not an appropriate element of damages in the calculation of lost profits in this matter. However, even assuming pre-judgment interest is applicable, Alexander's opinion with respect to the offsetting effects of pre-judgment interest and discounting of future profits is incorrect.

First, pre-judgment interest, if applicable, would accrue from the point of alleged breach, either March or May of 2006 in this case, to the point of trial, or less than 24 months. However, the discount rate would span the time from the point of the alleged breach or date of trial through the future lost earnings period, or up to 60 months in this case. As a result, the time period covered by the discount rate is greater than the time period covered by the pre-judgment interest period.

In addition, an appropriate risk adjusted discount rate would be higher than the pre-judgment interest rate. The discount rate incorporates two elements: 1) the time value of money and 2) risk – the higher the risk, the higher the discount rate.

Based on JMI's operating history and all of the issues previously discussed, it is my opinion that there is a significant risk associated with JMI's ability to perform as Alexander's model projects. These factors indicate that not only is discounting future lost profits to present value appropriate, but a risk adjusted discount rate should be used in discounting to present value.

For these reasons, in my opinion, the effect of pre-judgment interest (even if it were applicable in this circumstance) would not offset discounting of future lost profits to present value.

### Incidental Cost Calculation

In addition to his lost profits calculation, Alexander also computes alleged incidental damages resulting from CYDI's failure to pick up #67 in March 2006 when JMI was allegedly ready for CYDI to begin moving product. The costs included in Alexander's calculation are the costs that JMI incurred for operating the facility in the months of March and April 2006.

While there is conflicting testimony as to when JMI had enough product on the ground to supply a trainload of #67 gravel,[45] there is no requirement under the Supply Agreement whereby CYDI was obligated to pick up #67 gravel on a specified date.

However, even in the event the jury should find that CYDI was obligated to begin loading gravel as of March 1, 2006 and JMI had sufficient quantity of such gravel available on that date, Alexander's calculation overstates the alleged damage JMI suffered.

JMI ultimately received a benefit of the costs incurred in that it produced and ultimately sold the product which it produced. As a result, JMI did not incur unnecessary costs, but rather at the most it was delayed in realizing the benefit of those costs. To consider these costs as an additional measure of damages is duplicative of the lost profits calculation which considers the value of these products sold.  As such, the proper measure for this component of alleged damages is the interest incurred or adjustment for the time value of money as a result of the delay.

Based on JMI's interest rate with West Alabama Bank & Trust, the approximate amount of damages JMI would have suffered would have been less than $1,000.

### Failure to Consider Mitigation

In addition to the discrepancies outlined above, Alexander also fails to consider fully the effects of mitigation. While Alexander did reduce his alleged damages by the amount of sales JMI recognized through June 2007, he has not considered any mitigation JMI could undertake or should have reasonably undertaken over the period of the Supply Agreement.

JMI has the ability to produce either #67 or #57 gravel at its mining facility in Lowndes County. Further, JMI resumed mining operations in April 2007, and around June 2007, JMI began producing #57 gravel. JMI is currently having the #57 gravel tested by a potential buyer, Dunn Construction, for use in asphalt production. Yet Alexander fails to consider this potential mitigating impact as well as any other reasonable mitigating efforts that JMI could undertake.

### CONCLUSION

In my opinion JMI's actual historical production of #67 gravel for the period March 2006 and May – August 2006 was substantially less than the 150,000 ton minimum volume requirement as set forth in the Supply Agreement, and approximately one-third of the 260,000 tons asserted by Alexander in his lost profits calculation.

---

[45] Holladay testified that JMI was not ready to ship until late April 2006. See Holladay deposition at page 34.

16

At this point in discovery, neither detailed production records nor comprehensive geological assessment and testing data are available for my review of Alexander's lost profits calculation. In my opinion, both of these foundational records are necessary for a proper calculation of lost profits, particularly for a start-up business with no significant production and sales history such as JMI. Further, the lost profits calculation assumes volume requirements in excess of the minimum requirement called for in the Supply Agreement, assumes production and sales levels JMI has historically not attained during its period of existence, fails to consider all incremental costs associated with production operations, and fails to discount the future lost profits to present value. Lastly, the incidental cost calculation is duplicative of lost profits and no consideration is given for mitigation.

## CONTINUING NATURE OF WORK

It is my understanding that discovery is ongoing. Further, as of the date of my report, financial records and production records related to the operation of JMI have not been produced by the Plaintiff. Therefore, I reserve the right to modify and supplement this report pending such additional discovery.


_Dave G. Borden_
Dave G. Borden, CPA/ABV

September 25, 2007
Date

17

EXHIBIT 1

### Dave G. Borden, C.P.A., A.B.V.

Dave G. Borden is chairman of the Board of Aldridge, Borden & Company, P.C., in Montgomery, Alabama. He graduated from the University of Alabama in 1972 with a B.S. degree in Accounting.

He has previously served as an officer and member of the Alabama State Board of Public Accountancy, the Advisory Board for the University of Alabama School of Accountancy, and past president of the Montgomery Chapter of CPA's. He currently is a member of the Alabama Society of CPA's Political Action Committee Board of Directors. In 2002, Dave was awarded the Lifetime Achievement Award for services to the Alabama Society of Certified Public Accountants.

Dave has been a frequent instructor for the Alabama Society of CPA's and other state societies dealing with numerous tax related matters. His area of expertise is the merger and acquisitions consulting services area with a focus on the purchase, sale, reorganization, liquidation, and valuation of the corporate business. He also practices in the litigation consulting area and strategic planning area for business enterprises. Dave is a Certified Public Accountant and, in addition, holds the Accredited in Business Valuation (ABV) Certification.

He is past president of the Central Alabama Community Foundation, Leadership Montgomery, Montgomery Area United Way, St. Margaret's Hospital, and past Chairman of the Montgomery County Board of Education. He has been active in many civic endeavors in Montgomery and has been recognized by the following organizations for his efforts: Montgomery YMCA as the City of Montgomery's 1997 Man of the Year, the Montgomery Area United Way as its Alexis de Tocqueville Society Award recipient for volunteerism to the Montgomery in 1998, the Montgomery Advertiser as its Citizen of the Year in 2005, and Leadership Montgomery as its Leader of the Year in 2006.

**EXHIBIT 1**

Currently Dave serves the local Montgomery and State of Alabama community in the following capacities:

A+ Education Foundation Board of Directors and Executive Committee

Member Board of Control for Chamber of Commerce Committee of 100

President, Montgomery Education Foundation

Greil Memorial Foundation Board of Directors, Treasurer

Envision Montgomery 2020 Board of Directors

Member Alabama Committee for Accountability and Accelerated Student Learning

Member of Alabama Nature Conservancy Board of Directors

**EXHIBIT 2**

Dave G. Borden, C.P.A., A.B.V.
September 25, 2007
Testimony Last 4 Years

| Plaintiff(s) | Defendant(s) | Law Firm | Attorney |
|---|---|---|---|
| Stewart Lubricants & Service. Co. & SLS West Inc. | Castrol Industrial North America, Inc. | Lightfoot Franklin & White | John Johnson |
| Charoen Pokphand USA, Inc. | David Hicks And Associates, Inc. | Balch Bingham | Joe McCorkle |
| Pamela Ashworth et al | Compass Bank et al | Lightfoot Franklin | Sam Franklin |
| Chatham Oil Company, Inc.; Bill G. Trull; Harry L. Vice And SouthLamar 1-Stop, Inc. | Hunt Refining Company, Inc. Tri-Co Oil Company, Inc. Benjamin Fair & Emmette Langdon | Bradley Arant | Richard Monk |
| Key Machinery Co., Inc. | Case Corporation, et al | Lightfoot Franklin | Lee Hollis |
| Whitfield Foods, Inc. | Fogg Filler Company; White Cap, Inc.; KHS, Inc.; HK Systems, Inc., Billy Weldon, et al | McDermott, Will & Emery Clark & Scott, P.C. | Robert S. O'Meara James C. Ayers, Jr. |
| Phoenix Energy Corporation | Alabama Gas Corporation | Benton & Centeno | Doug Centeno |
| John G. Hudson, et al | The Golf Channel, et al | Baxley, Dillard, Dauphin | David McKnight |
| GTT, Inc. and Esfeller Construction Co., Inc. | Kiefel Technologies | Devine Millimet | Alex Walker |
| United States of America | McWane, Inc., et al | Maynard Cooper | Fournier J. Gale |
| Vulcan Lands, Inc | State of Alabama, et al | Slate Kennedy | Susan Kennedy |

# EXHIBIT 2

| Plaintiff(s) | Defendant(s) | Law Firm | Attorney |
|---|---|---|---|
| State of Alabama, Department Of Conservation and Natural Resources, M. Barnett Lawley, et al., | Exxon Corporation | Lightfoot Franklin | Chris King |
| Madison Oslin, Inc | International Paper | Cabaniss, Johnston, Gardner, Dumas & O'Neal | Sandy Robinson |
| Lyncor Limited | John Newcomb | Wright, Lindsey & Jennings | Claire Hancock |
| Sebastian Jones and Vanessa Lewis | Mutual Savings Life Insurance Company, Roy Williams, et al | Hill, Hill, Carter | Robert Bradford |
| The Geneva County Healthcare Authority | Quorum Health Resources, Inc., et al | Beasley Allen | Scarlotte Tuley |
| Serra Chevrolet, Inc. | General Motors Corporation | Lightfoot Franklin | Terry McCarthy |
| Ray Dunlap | J.K. Harris & Company, et al. | Hill, Hill, Carter | John Bradwell |
| McCord Properties, Ltd, et al | Orkin Exterminating Co, Inc, et al | Lightfoot Franklin | Mike Bell |
| Kelmor, LLC, et al. | Alabama Dynamics, Inc., et al. | Maynard Cooper | Tom Thaggard Lee Huffaker |
| Marketron International, Inc. | OneDomain, Inc., et al. | Lightfoot Franklin | Robin Hinkle |
| Aeropower, Ltd. And Kama International | Steve Matherly; SM& T Aircraft, Inc et al | Bradley Arant | Charles A. Stewart |
| Cook Publishing | CVS | Lightfoot Franklin | Mac Moore |

2

**EXHIBIT 2**

Lee L. Saad Construction Company, Inc.

Dean Chitwood — International Service Group Inc.
2WR/Holmes Wilkins Architects, et al. — Rushton Stakely — Dennis Bailey

Israel Berger, et al. — David J. Adair, et al. — Lightfoot Franklin — Sam Franklin

Vesta Insurance Group, et al. — Baxley, Dillard, Dauphin McKnight & Barclift — Chuck Dauphin

3

EXHIBIT 3

## DOCUMENTS RELIED UPON

Complaint
Supply Agreement
Depositions and related Exhibits of
     Ben Johnston
     Pep Johnston
     Clatus Junkin
     Gary Yelvington
     Philip Holladay
     Mark Klebe
First Research Industry Profile Report for Cement, Concrete and Construction Material
Quarryology 101 – www.pitandquarry.com
The Federal Reserve Board's Beige Book Summaries for the Atlanta District for the
months of
     October 2005
     November 2005
     March 2006
     June 2006
Annual Reports of Vulcan Materials, Inc and Martin Marietta, Inc for 2005 and 2006
2004 Federal Income Tax return for JMI
Expert Report of J. Lester Alexander, III

JMI
Analysis of Product Sales

EXHIBIT 4

| Buyer | Date | | Price | #67 Gravel Units | Total | #4 Oversized Gravel Price | Units | Total | Sand Price | Units | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|
| CYDI | 5/11/2006 | (1) | 5.51 | 5,953.04 | 32,801.25 | | | | | | |
| CYDI | 6/27/2006 | (1) | 5.51 | 2,721.13 | 14,993.43 | | | | | | |
| CYDI | 8/8/2006 | (1) | 5.51 | 5,964.91 | 32,864.65 | 8.50 | 3,329.86 | 28,303.78 | | | |
| CYDI | 8/21/2006 | (1) | 5.51 | 6,158.44 | 33,933.00 | | | | | | |
| CYDI | 9/7/2006 | (1) | 5.51 | 5,199.66 | 28,650.13 | | | | | | |
| CYDI | 9/25/2006 | (1) | 5.51 | 6,031.39 | 33,232.96 | | | | | | |
| Total CYDI | | | | 32,028.57 | 176,475.42 | | 3,329.86 | 28,303.78 | | - | - |
| Unidentified | March 2006 | (2) | | 135.00 | | | | | | | |
| Unidentified | June 2006 | (2) | | 520.46 | | | | | | | |
| Unidentified | July 2006 | (2) | | 189.13 | | | | | | | |
| Unidentified | August 2006 | (2) | | 221.01 | | | | | | | |
| Unidentified | Unknown | (3) | | 6,934.46 | | | 3,399.49 | | | 22,505.63 | |
| Total JMI Sales | | (4) | | 40,028.63 | | | 6,729.35 | | | 22,505.63 | |

(1) Sales obtained from JMI invoices to CYDI per DX 3 - DX8 to Yelvington deposition.
(2) Sales identified by Alexander in Appendix 4 which were not sold to CYDI.
(3) Based on total sales per Alexander's Appendix 3 less specific sales to CYDI and less specific sales identified in Alexander Appendix 4.
(4) Totals agree to Alexander's Appendix 3.