IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| JOHNCO MATERIALS, INC., | ) | |
| | ) | |
| Plaintiff, | ) | CIV. NO. 2:06cv993-ID |
| v. | ) | (WO) |
| | ) | |
| CONRAD YELVINGTON | ) | |
| DISTRIBUTORS, INC., | ) | |
| | ) | |
| Defendant. | ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

### I. INTRODUCTION

In this diversity lawsuit, Plaintiff Johnco Materials, Inc. ("Johnco") brings a state-law breach-of-contract action against Conrad Yelvington Distributors, Inc. ("CYDI"), alleging that CYDI breached a five-year Supply Agreement when it failed to buy from Johnco agreed-upon monthly quantities of No. 67 gravel.  Before the court is CYDI's amended motion for partial summary judgment, which is accompanied by a brief and an evidentiary submission.  (Doc. Nos. 33, 45.)  Johnco filed a brief and an evidentiary submission in response to the amended motion for partial summary judgment to which CYDI filed a reply.  (Doc. No. 36-38.)

The amended motion for partial summary judgment presents two issues for determination relating to Johnco's damages requests on the breach-of-contract claim. The first issue is whether Johnco can recover consequential damages from CYDI for the loss of alleged sales of oversize gravel and sand which are the byproducts of the

production of No. 67 gravel.  After careful consideration of the arguments of counsel, the relevant law and the record as a whole, the court finds that this issue is due to be decided in favor of CYDI.  The second issue is whether Johnco can recover both expectation and reliance damages.  Because Johnco correctly concedes that it is not entitled to recover both types of damages, the court finds that the second issue essentially is moot.  Accordingly, as explained more fully herein, the court finds that CYDI's amended motion for partial summary judgment is due to be granted in part and denied as moot in part.

## II.  JURISDICTION AND VENUE

Jurisdiction over this action is proper pursuant to 28 U.S.C. § 1332 (diversity).  The parties do not contest personal jurisdiction or venue, and the court finds adequate allegations in support of both personal jurisdiction and venue.

## III.  STANDARD OF REVIEW

A court considering a motion for summary judgment must construe the evidence and make factual inferences in the light most favorable to the nonmoving party.  See Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970).  At the summary judgment juncture, the court does not "weigh the evidence and determine the truth of the matter," but solely "determine[s] whether there is a genuine issue for trial."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986) (citations omitted).

2

Summary judgment is entered only if it is shown "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." Celotex, 477 U.S. at 323. The movant can meet this burden by presenting evidence showing that there is no dispute of material fact or by showing that the non-moving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. Id. at 322-23, 325. The burden then shifts to the nonmoving party, which "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). Summary judgment will not be entered unless the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party. See id. at 587.

## IV. FACTS

Viewed in the light most favorable to Johnco, the material summary judgment facts are as follows. Johnco is an Alabama corporation which was formed for the purpose of purchasing a tract of property to establish a sand-and-gravel mining operation

to produce and sell sand and gravel.  Johnco was incorporated by P. M. Johnston and Ben

Johnston in 2003.  CYDI is a Florida corporation with its headquarters in Daytona Beach,

Florida.  Gary Yelvington is the president of CYDI.  (See Pretrial Hearing Order,

Stipulations, ¶¶ 1-4 (Doc. No. 77).)  During his deposition taken in connection with this

litigation, Yelvington provided an overview of CYDI's aggregate distribution facilities

and operations.  (Yelvington Dep. at 13-31 (Johnco Ex. 4).)

CYDI and Johnco negotiated for Johnco to construct and operate a mining facility

to supply CYDI with No. 67 gravel which CYDI, in turn, would resell primarily to ready-

mix concrete producers.  (Id. at 39-40); (Pretrial Hearing Order, Stipulations, ¶ 8 (Doc.

No. 77).)  Solidifying their negotiations, Johnco and CYDI entered into a Supply

Agreement on April 16, 2004.[1]  (Pretrial Hearing Order, Stipulations, ¶ 7 (Doc. No. 77).)

The terms of the Supply Agreement specified that Johnson would sell certain quantities of

No. 67 gravel to CYDI at specified prices for a period of five years once Johnco

commenced mining operations.  Specifically, the Agreement provided as follows:

> After Seller commences mining and grading of sand and gravel, Seller shall
> sell and deliver to Buyer, No. 67 concrete gravel in minimum quantities of
> 150,000 tons annually for a price equal to Five and Twenty-Five One
> Hundredths Dollars ($5.25) per ton, F.O.B. Buyer's rail cars loaded on the
> rail siding on the Plant Site, on a weekly schedule (i.e., approximately
> 5,200 tons per week), and Buyer shall purchase and accept from Seller said
> Product at the price and in quantities specified. . . .  The price per ton

---

[1] On the date of the Supply Agreement, Johnco was owned by P. M. Johnston, Ben
Johnston and Clatus Junkin, each of whom were officers.  The Johnstons conveyed their
interests in Johnco to Clatus Junkin in the spring of 2006.  (See Pretrial Hearing Order,
Stipulations, ¶¶ 5-6 (Doc. No. 77).)

> established herein for the Product shall remain fixed at $5.25 per ton for
> gravel for the first twenty-four months (*i.e.*, 2 years) of this Agreement.
> The price will increase by five percent (5%) at the beginning of year three,
> and two and one-half percent (2.5%) at the beginning of years four and five.

(Supply Agreement at 1-2 (Johnco Ex. 5).)

The Supply Agreement explicitly addressed the construction of a plant facility and

rail siding by Johnco:

> Within twelve months of the execution of this Agreement, Seller shall
> construct a mining facility to mine and classify sand and gravel on the Plant
> Site.  In addition to the mining facilities to be constructed on the Plant Site,
> this contract is contingent on Seller's ability to construct, or obtain rights
> to, sufficient rail siding to load/handle a minimum of fifty-two (52) open, or
> covered, hopper railcars on a regular shipment schedule.

(Id. at 2.)

On the basis of the Supply Agreement, in May 2004, Johnco purchased real

property in Lowndes County, Alabama, for its plant site, which became known as

"Whitehall."  (Pretrial Hearing Order, Stipulations, ¶ 12 (Doc. No. 77).)  Also on the

basis of the Supply Agreement, Johnco constructed a loop railroad track at the Whitehall

facility.

Johnco commenced mining and grading at Whitehall, beginning to produce No. 67

gravel by the fall of 2005.  Johnco submitted samples of No. 67 gravel to CYDI in

January 2006, and CYDI approved the samples by February 2006.  (Id. ¶¶ 13-14.)  Also

by February 2006, Johnco was fully operational and was mining quantities of No. 67

gravel sufficient to begin fulfilling CYDI's agreed-upon monthly purchases.  CYDI,

however, did not order its first train load of gravel until May 11, 2006.  After this first

shipment, between June 27, 2006 and September 25, 2006, CYDI ordered only five-and-

a-half train loads of No. 67 gravel, totaling 32,000 tons of gravel.  On October 19, 2006,

Johnco notified CYDI that it was in breach of the Supply Agreement and that,

consequently, Johnco would have to terminate production of No. 67 gravel.  Johnco

ceased operations and the production of No. 67 gravel at the beginning of November

2006 and remained shutdown until March 2007.  (Ben Johnston Dep. at 17.)

Presently at issue is whether CYDI is liable in damages for sales of two

byproducts of No. 67 gravel which Johnco says it lost as a result of CYDI's breach of the

Supply Agreement.  It is undisputed that Johnco's production of No. 67 gravel also

resulted in the simultaneous production of byproducts of oversize gravel and sand.[2]

(Pretrial Hearing Order, Stipulations, ¶ 15 (Doc. No. 77).)  Oversize gravel measures

between one inch in diameter up to three inches in diameter.[3]  (Id. ¶ 22.)  The average

product mix at Whitehall was 45 percent gravel and 55 percent sand.  (Id. ¶ 17.)  Of the

45 percent gravel, on average 80 percent could be processed into No. 67 gravel, with the

remaining 20 percent being oversize gravel.  (Id. ¶ 18.)

From the inception of its negotiations with CYDI, Johnco desired to sell the

oversize gravel and sand byproducts which would result from the production of No. 67

---

[2] It also is undisputed that CYDI knew that oversize gravel and sand were
byproducts of No. 67 gravel production at Whitehall.  (Pretrial Hearing Order,
Stipulations, ¶ 16 (Doc. No. 77).)

[3] By comparison, No. 67 gravel measures 3/8 inches to 3/4 inches.  (Pretrial
Hearing Order, Stipulations, ¶ 9 (Doc. No. 77).)

gravel sold to CYDI.  (See Ben Johnston Dep. at 40-41, 118 (Johnco Ex. 4)); (P. M.

Johnston Dep. at 98-99 (Johnco Ex. 3)); (Junkin Dep. at 65 (Johnco Ex. 7).)  At some

point prior to the signing of the Supply Agreement, CYDI even discussed with Johnco

potentially purchasing the sand.  (Pretrial Hearing Order, Stipulations, ¶ 21 (Doc. No.

77).)  Ultimately, however, CYDI determined that it would be unable to purchase sand

from Johnco, and, at the time the Supply Agreement was signed, CYDI "had no market

for anything except" No. 67 gravel.  (Yelvington Dep. at 152 (Johnco Ex. 1).)  CYDI,

however, offered to help find a buyer for Johnco's sand and engaged in efforts to help

Johnco find a buyer (Pretrial Hearing Order, Stipulations, ¶ 20 (Doc. No. 77)), but those

efforts did not materialize into any sales of sand for Johnco.

Johnco cites at least four examples of preliminary discussions it had with potential

buyers for the purchase of sand, but all of those negotiations failed.  (See, e.g., Johnco

Mem. of Law at 27-28 (Doc. No. 36), citing P. M. Johnston Dep. at 26-27, 59-61, 143.)

It is not clear as to the exact time frames of these negotiations, only that they occurred

around the time that Johnco was trying to obtain financing (presumably, start-up

financing), but there is evidence that by March 2006 Johnco "had given up" on the

"possibility" of selling sand.  (P. M. Johnston Dep. at 142-43); (see also P. M. Johnston

Dep. at 26-27, stating that "initially we thought there were several possibilities for sand;

but we did not have a market for it").  P. M. Johnston testified that, prior to shutting

down its mining operations in November 2006, Johnco sold "very little" sand.  (Id. at 41.)

7

Johnco also cites evidence establishing that P. M. Johnston contacted several metallurgical outlets in search of a buyer for the oversize gravel, including smelters in Selma, Alabama, and in Ohio. Those contacts, however, did not result in contracts or sales for Johnco. (Johnco Mem. of Law 29 (Doc. No. 36), citing P. M. Johnston Dep. at 52, 58.) The Johnstons testified that Johnco did sell some of its oversize gravel, but they do not indicate the quantities sold. P. M. Johnston does not remember when those sales occurred, stating that he cannot recall whether Johnco sold any oversize gravel prior to the time he sold his interest to Junkin in the spring of 2006. (Id. (citing P. M. Johnston Dep. at 101 and Ben Johnston Dep. at 42).)

Seeking legal relief, Johnco commenced this litigation against CYDI on November 1, 2006, invoking the court's diversity jurisdiction and filing a one-count breach-of-contract claim. In the complaint, Johnco alleges that CYDI breached the Supply Agreement by failing "to purchase and take gravel in the quantities specified and anticipated under the Agreement, and with the frequency specified and anticipated in the Agreement." (Compl. ¶ 14.) Johnco avers that, as a result of CYDI's breach, it is entitled to damages as follows: (1) The value of No. 67 gravel which Johnco says CYDI "should have purchased and taken between March 1, 2006 and October 1, 2006, but did not in fact purchase and take[;]" (2) The "benefit of its bargain as to prospective sales under the contract, in the amount of $4,234,500, for 150,000 tons [of No. 67 gravel] contracted for annually through the contractual term of May 11, 2011"; and (3) $4 million in contractual damages which Johnco expended "to build and place into operation the

8

Lowndes County facility, consisting of real property, building of a dredge, construction of a plant and railroad spur, and the staffing of the facility in reliance upon the Agreement."  (Id. at 7.)

CYDI filed an answer on December 5, 2006, admitting some averments, but denying the averments as to the substantive breach-of-contract and damages allegations. (Answer (Doc. No. 9).)  CYDI also raised a number of affirmative defenses and a counterclaim asserting that Johnco, not CYDI, breached the contract by failing to deliver the requisite quantities of No. 67 gravel as required by the Supply Agreement.[4]  (Id.)

Johnco's complaint does not specifically request damages for the purported lost sales of the oversize gravel and sand byproducts.  Johnco, however, hired an economist, J. Lester Alexander, who ascribes a monetary value to these claimed losses, and Johnco contends that CYDI is liable for those losses.  (See Alexander Report, attached as Ex. 5 to Doc. No. 33.)  In his report, Alexander opines that "[b]ased on the quantities and prices as set forth in the Supply Agreement, [he] [has] determined that [Johnco] would have generated . . . $3.1 million [in gross revenues] from the sale of the production by-products," i.e., oversize gravel and sand, generated from the production of the contracted No. 67 gravel.  (Id.)  Alexander's calculations are based upon anticipated annual sales of 43,600 tons of oversize gravel at $8.50 per ton, and anticipated annual sales of 146,200 tons of sand at $1.70 per ton, as set out in the charts below.

---

[4] The affirmative defenses and counterclaim are not at issue at this time.

| Oversize Gravel | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 | Total |
|---|---|---|---|---|---|---|
| Anticipated Tons | 43,600 | 43,600 | 43,600 | 43,600 | 43,600 | 218,000 |
| Price Per Ton | $8.50 | $8.50 | $8.50 | $8.50 | $8.50 | |
| Gross Revenue | $370,600 | $370,600 | $370,600 | $370,600 | $370,600 | $1,853,000 |

| Sand | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 | Total |
|---|---|---|---|---|---|---|
| Anticipated Tons | 146,200 | 146,200 | 146,200 | 146,200 | 146,200 | 731,000 |
| Price Per Ton | $1.70 | $1.70 | $1.70 | $1.70 | $1.70 | |
| Gross Revenue | $248,540 | $248,540 | $248,540 | $248,540 | $248,540 | $1,242,700 |

In a footnote, Alexander states that the anticipated tons of oversize gravel and sand are "calculated based on historical relationship between tons of # 67 Concrete Gravel, #4 Oversize Gravel, and Sand sold during the period January 2006 and June 2007 (see Appendix 3)." (Id., Append. 2.)  In Appendix 3, Alexander provides a breakdown of Johnco's "actual sales" for the period of January 2006 through June 2007 as follows:

| Actual Sales | # 67 Concrete Gravel | # 4 Oversize Gravel | Sand | Combined |
|---|---|---|---|---|
| Tons Sold | 40,028.63 | 6,729.35 | 22,505.63 | 69,263.61 |
| % of Sales | 57.8% | 9.7% | 32.5% | 100.0% |

In the chart below, Alexander uses these percentages of sales (*i.e.*, 57.8%, 9.7% and 32.5%) as the bases for estimating how many tons of oversize gravel and sand Johnco could have sold had CYDI purchased 260,000 tons annually of "# 67 Concrete Gravel" (5200 tons per week for 50 weeks):

| Anticipated Tons | # 67 Concrete Gravel | # 4 Oversize Gravel | Sand | Combined |
|---|---|---|---|---|
| Tons Sold | 260,000 | 43,600 | 146,200 | 449,800 |
| % of Sales | 57.8% | 9.7% | 32.5% | 100.0% |

Alexander also outlines other costs which for present purposes can be lumped together in the category of reliance damages.  These alleged damages to which CYDI objects include the approximate $1.6 million Johnco paid for the plant site and the approximate $1.2 million Johnco paid for the purchase of depreciable plant and rail car loading equipment.  (Alexander Report at 2); (see CYDI Mem. of Law at 8 (Doc. No. 45).) Alexander also enumerates in Appendix 5 various costs incurred by Johnco in March 2006 and April 2006 relating to salaries, payroll taxes, insurance and repairs attendant to establishing Johnco's operations, totaling approximately $75,342.  (Alexander Report, Append. 5.)

## V.  DISCUSSION

CYDI's amended motion for partial summary judgment raises two issues concerning the damages which Johnco seeks on its breach-of-contract claim.  For purposes of the

11

discussion which follows, the court assumes, without deciding, that CYDI breached the Supply Agreement.

## A. Consequential Damages

CYDI argues that, assuming *arguendo* that it breached the Supply Agreement, it is not liable to Johnco for damages for Johnco's alleged "lost profit from the sale of the by-products (*i.e.*, sand and oversize gravel)" to third parties.[5] (CYDI Mem. of Law at 6 (Doc. No. 45).) CYDI points out that the only product that it was obligated to purchase under the Supply Agreement was No. 67 gravel; thus, it contends that the only damages that flow immediately from its alleged breach of the Supply Agreement are those relating to the sale of No. 67 gravel. Consequently, CYDI contends that Johnco's desired sales of the byproducts are not the "immediate fruits" of the Supply Agreement, but rather are "entirely dependent upon collateral engagements not brought to the notice of the contracting parties" and, thus, are not recoverable. (Id.) CYDI also points out that, at the time the Supply Agreement was signed, Johnco did not have a plan or contract in place for the sale of either oversize gravel or sand and argues that Johnco's expert relies on unsupported assumptions that "a market and willing buyer" existed for the byproducts. (Id. at 7-8.) CYDI, therefore,

---

[5] CYDI speaks in terms of Johnco's alleged "lost profit from the sale of the by-products" in framing its arguments for summary judgment. (CYDI Mem. of Law at 6 (Doc. No. 45).) The court concludes after careful study of CYDI's brief that CYDI is referring to "consequential, loss-of-profit damages," as discussed below, and is arguing that the alleged anticipated profits from the sale of the No. 67 gravel byproducts are not recoverable consequential damages. (See, e.g., id. at 8.)

asserts that there is no evidence indicating to a reasonable certainty the amount of the alleged lost profits at issue.

In response, Johnco asserts that, had CYDI performed its end of the bargain under the Supply Agreement, Johnco possibly could have earned approximately $3.1 million in gross revenues from sales of the byproducts of No. 67 gravel (*i.e.*, the oversize gravel and sand) and that these potential lost sales constitute recoverable consequential damages. Johnco points out that it is impossible to mine No. 67 gravel without producing oversize gravel and sand byproducts and that CYDI was aware that Johnco desired to sell these byproducts. Johnco, therefore, says that at the very least there is a material factual dispute "as to whether such damages flow directly and naturally and in due course from CYDI's breach" and whether anticipated sales of these byproducts "were within the contemplation of the parties." (Johnco Mem. of Law at 25 (Doc. No. 36).) Johnco also asserts that the report filed by its expert as to the value of the potential sales of oversize gravel and sand raises "a genuine dispute . . . whether there is a basis on which a reasonable estimate of the amount of the damages can be made." (Id. at 33.)

It is undisputed that Alabama law governs this action. (See Supply Agreement, § 9.) Citing Goolesby v. Koch Farms, LLC, 955 So.2d 422 (Ala. 2006), the parties state that in appropriate circumstances Alabama common law permits a seller to recover consequential

damages in a breach-of-contract action.[6]  (See, e.g., CYDI Mem. of Law at 6 (Doc. No. 45).)  The court assumes, without deciding, that the parties have correctly stated the law in Alabama as pertains to a seller's recovery for consequential damages.

In Goolesby, pursuant to a grower contract, Koch Farms agreed to supply chickens to the Goolesbys, and the Goolesbys agreed to raise the chickens and sell the eggs to Koch Farms.  The Goolesbys alleged that Koch Farms breached the grower contract by repossessing the chicken flock prior to the expiration of the contract and sought consequential and other damages.  955 So.2d at 427.

The Goolesby court explained that, typically, damages in a breach-of-contract action are the non-breaching party's "expectation interest" which means "that sum which would place the injured party in the same condition he would have occupied if the contract had not been breached."  Id. (citations omitted).  These expectation damages are generally those that "are the natural and proximate consequences of the breach and such as may reasonably be supposed to have been within the contemplation of the parties at the time the contract was made."  Winslett v. Rice, 128 So.2d 94, 99 (Ala. 1960), overruled in part on other grounds by Springdale Gayfer's Store Co. v. D. H. Holmes Co., 201 So. 2d 855 (Ala.

_____

[6] The court notes that Alabama's Uniform Commercial Code contains an express provision permitting a buyer to recover consequential damages for a seller's breach, but does not contain a corresponding provision for a buyer's breach.  See Ala. St. § 7-2-715(b) (1975) ("Consequential damages resulting from the seller's breach include: (a) Any loss resulting from general or particular requirements and needs of which the seller at the time of contracting had reason to know and which could not reasonably be prevented by cover or otherwise; and (b) Injury to person or property proximately resulting from any breach of warranty.").

14

1967)).  The <u>Goolesby</u> court computed the expectation damages by ascertaining the amount

of money the breaching party owed under the unfulfilled contract terms and subtracting

from that figure the expenses which the non-breaching party would have incurred if the

contract had not been breached.  955 So.2d at 428.

The <u>Goolesby</u> court also discussed consequential damages, quoting its prior opinion

in <u>Med Plus Properties v. Colcock Const. Group, Inc.</u>, 628 So.2d 370 (Ala. 1993).  <u>See</u>

<u>Goolesby</u>, 955 So.2d at 428.  In <u>Med Plus Properties</u>, the Supreme Court of Alabama

clarified the confusion in the case law as to the use of the phrase "lost profit."  628 So.2d

at 376.  "The phrase 'lost profit' has been used either to designate an item of what is often

called 'general' or 'expectancy' damages, or to designate a form of 'consequential

damages.'"  <u>Id.</u>  As to "consequential, loss-of-profit damages," which are at issue in this

case, the <u>Med Plus Properties</u> court explained:

> In order that it may be a recoverable element of damages, the loss of profits
> must be the natural and proximate, or direct, result of the breach complained
> of and they must also be capable of ascertainment with reasonable, or
> sufficient, certainty, or there must be some basis on which a reasonable
> estimate of the amount of the profit can be made; absolute certainty is not
> called for or required.

<u>Id.</u> (quoting <u>Paris v. Buckner Feed Mill, Inc.</u>, 182 So.2d 880, 881 (1966)).  This rule is

called the rule of "reasonable certainty."  <u>Morris Concrete, Inc. v. Warrick</u>, 868 So.2d 429,

440 (Ala. Civ. App. 2003).

In furtherance of its discussion on consequential damages, the Goolesby court also cited Garrett v. Sun Plaza Development Co., 580 So.2d 1317 (Ala. 1991).  See Goolesby, 955 So.2d at 428.  In Garrett, the court held that

> profits are too remote and cannot be recovered when they are not the immediate fruits of the principal contract, but are dependent on collateral engagements not brought to the notice of the contracting parties.  In addition, this Court has held that compensatory damages for lost profits are not allowed if they are too speculative.

580 So.2d at 1320 (internal footnote omitted); see also Mall, Inc. v. Robbins, 412 So.2d 1197, 1201 (Ala. 1982) ("Generally, the rule in Alabama is that recovery of lost profits of collateral enterprises is not permitted, because the profits are too speculative.") (citing, among others, Paris v. Buckner Feed Mill, Inc., supra).  As elaborated upon in Paris,

> [M]ere speculative profits, such as might be conjectured would be the probable result of an adventure, defeated by the breach of a contract, the gains from which are entirely conjectural, and with respect to which no means exist of ascertaining even approximately the probable results, can not, under any circumstances, be brought within the range of recoverable damages.  Profits speculative, conjectural or remote, are not, generally, regarded as an element in estimating the damages.

182 So.2d at 882 (internal citation omitted).

Applying the foregoing principles, the Goolesby court rejected the argument advanced by the Goolesbys on appeal that they were entitled to consequential damages because "the dispute with Koch Farms made it more difficult for them to enter into a grower contract with another supplier."  955 So.2d at 428.  It explained that "[t]here was no reasonably certain basis on which to determine the likelihood that the Goolesbys would or

16

would not be able to enter into another grower contract or what the terms of such a contract would be."  Id. (citation omitted).

The Garrett and Paris courts also disallowed the non-breaching parties' claims for consequential damages.  In Garrett, where the buyer argued that the trial court erred in excluding evidence concerning purported profits the buyer lost by foregoing another investment venture in order to enter into the breached contract at issue, the court stated: "Profits from business ventures that could have been entered into had this one not been undertaken are too speculative to be considered when awarding damages."  Garrett, 580 So.2d at 1320.  In Paris, the seller breached a contract to furnish the buyer with eggs.  The Supreme Court of Alabama held that the buyer was entitled to recover the additional costs he incurred when he had to buy eggs from other sources, resulting in decreased profits to the buyer.  The court, however, held that the buyer was treading into an "area of speculation" by seeking to "recover profits which he might have made in subsequent transactions with third persons had the [seller] continued to furnish eggs to him."  182 So.2d at 882.

Turning to the facts of this case for purposes of applying the law, it is helpful initially to point out what is not in dispute.  First, it is undisputed that CYDI did not contract to buy any of the oversize gravel and sand byproducts; hence, CYDI is correct that full performance by it under the Supply Agreement would not have required it to purchase even an ounce of oversize gravel or sand.  (CYDI Reply at 1 (Doc. No. 38).)  Relatedly and second, it is undisputed that the Supply Agreement contains no contingency clause or other

17

requirement directed toward Johnco's sales of the byproducts. Third, it is undisputed that CYDI knew that mining No. 67 gravel would produce byproducts of oversize gravel and sand and that had CYDI fully performed under the contract, Johnco would have retained these byproducts from its processing of No. 67 gravel during the five-year contractual period. Fourth, it is undisputed that, at the time the parties signed the Supply Agreement, Johnco had not entered into a contract with any third party for the sale of either the oversize gravel or sand. Johnco, therefore, cannot argue that CYDI's breach caused an actual loss and reduced profits on a third-party contract which Johnco was unable to fulfill due to CYDI's breach. Stated differently, it cannot be argued that CYDI knew or had reason to know that its breach of the Supply Agreement would lead to a breach of an existing third-party contract between Johnco and a byproducts buyer.

Notwithstanding these undisputed facts, Johnco says in a nutshell that because it had good intentions to sell the oversize gravel and sand byproducts from the beginning of its negotiations with CYDI (evidenced by its multiple, *albeit* failed, negotiations with CYDI and third parties) and because CYDI knew of its hopes to profit from sales of these known byproducts, "a factual question is presented as to whether the sale of the oversize gravel and sand was within the contemplation of the parties" when they entered into the Supply Agreement. (Johnco Mem. of Law at 25-31 (Doc. No. 36).) On at least two bases, the court disagrees with Johnco.

First, Johnco has not cited an Alabama case, and the court is not aware of one, discussing under what circumstances, if any, recovery of consequential, loss-of-profit

damages is permitted when a seller's production of a contracted good results in the production of a non-contracted byproduct and the seller contends that the buyer's failure to buy the contracted good caused it to lose potential sales of the byproduct.  Goolesby, *supra*, which both parties cite, is not altogether factually on point, as in that case the Goolesbys claimed that the breach hindered their ability to enter into another contract of the same nature as the one breached.  The court, however, has read Alabama Chemical Co. v. Geiss, 39 So. 255 (Ala. 1905), which is cited by Johnco.  That decision also is not factually on all fours with this one, but its teachings and the corollaries which logically can be drawn from them indicate that Johnco reaches too far in claiming damages for lost sales of non-contracted byproducts.

In Geiss, the Supreme Court of Alabama discussed the damages available in a breach-of-contract action for a seller's failure to deliver lumber to a buyer.  The seller knew that the buyer was going to use the lumber to build a fertilizer plant and also knew that the buyer had entered into a contract with a third-party builder for the construction of the plant.  Based upon the delay resulting from the seller's failure to deliver the logs, the buyer had to pay certain expenses of its builder, and the buyer claimed these amounts as damages.  Geiss, 39 So. at 255-56.  Rejecting the buyer's damages claim, the Geiss court stated that it was well established in breach-of-contract actions involving the sale and delivery of personal property "that losses sustained by the purchaser by reason of his failure to realize profits on contracts which he entered into on the faith of receiving the personal property bought are too remote, conjectural, and speculative."  Id. at 255.  The

19

court cited language used by some courts to award special damages, namely, that "if the contracting party knew the purpose for which the article was being purchased, he is liable for the consequential injury which occurs to the purchaser on account of the failure to deliver it," but concluded that "this [was] too broad a statement of the rule." Id. at 256. "'[M]ere notice of such circumstances given to one party will not render him liable for the special damages, unless it can be inferred from the whole transaction that he consented to become liable for such special damage.'" Id. (citation omitted).

Here, the principles in Geiss would appear to extend with equal, if not more, force to the facts of the case because the notice which Johnco assigns to CYDI is notice of Johnco's purposes for the non-contracted byproducts. Johnco has not submitted any evidence from which it can be inferred that, in the event of a breach, CYDI consented to be liable for lost sales of the non-contracted byproducts resulting from the production of the contracted No. 67 gravel. Johnco relies only on CYDI's "mere notice" of Johnco's intentions concerning the sale of the byproducts. Id. There is nothing in the Supply Agreement or in the surrounding negotiations indicating that the parties had anything in mind other than CYDI's agreement to purchase No. 67 gravel for the contractual period. To state the matter more succinctly, Johnco has not presented any evidence that these consequential, loss-of-profit damages were within the contemplation of the parties at the time of the execution of the Supply Agreement.

As stated, there also is a second reason for rejecting Johnco's claim for consequential, loss-of-profit damages. The court finds that the fact that Johnco speaks only

20

in terms of hopes, intentions and unrealized possibilities for future contracts for the sale of the byproducts demonstrates that there is no evidentiary basis upon which a reasonable estimate of the amount of the alleged lost profits can be made.  See Med Plus Properties, 628 So.2d at 376.  Similar to the plight of the Goolesbys, who sought consequential damages because "the dispute with Koch Farms made it more difficult for them to enter into a grower contract with another supplier," the court finds that Johnco has not submitted *any* evidence that had CYDI not breached the Supply Agreement, it would have been able to enter into a contract with a buyer for the sale of either the oversize gravel or sand. Goolesby, 955 So.2d at 428 (holding that "[t]here was no reasonably certain basis on which to determine the likelihood that the Goolesbys would or would not be able to enter into another grower contract").

Here, the evidence shows that, but for a few sporadic sales, Johnco was unsuccessful in its negotiations to secure a buyer for the sand or oversize gravel, either before, at or after the signing of the Supply Agreement.  Johnco's evidence outlining its own defeated attempts to obtain a byproducts buyer contradicts the argument now advanced by Johnco that it is entitled to recover damages based upon $3.1 million in purported lost revenues for the sale of the byproducts which would have resulted from the production of the contracted No. 67 gravel.  (See, e.g., Johnco Mem. of Law at 27-29 (Doc. No. 36), citing P. M. Johnston Dep. at 26-27, 52, 58, 59-61, 143.)  There simply is no evidence from which it can be inferred that the claimed revenues from sales of the byproducts would materialize.

Johnco, though, points to its expert's report, but CYDI argues that Johnco's expert does not fill the evidentiary gap because the expert merely "assume[s] a market and willing buyer" for the byproducts during the relevant time period. (CYDI Mem. of Law at 6.) Johnco overlooks CYDI's argument in its responsive brief, (see, e.g., Johnco Mem. of Law at 33), and the court agrees with CYDI for the following reasons.

Johnco's expert provides concrete facts that between January 2006 and June 2007, Johnco sold 40,028 tons of No. 67 gravel, 6,729.35 tons of oversize gravel and 22,505 tons of sand. The expert then calculates anticipated tons of oversize gravel and sand *sales* for future years by using Johnco's percentages of oversize gravel and sand sales during the January 2006 - June 2007 period (which was 9.7% and 32.5% respectively). (See Alexander Report, Append. 3, Ex. 5 to Doc. No. 33.) For instance, the expert says that, if Johnco's sales of No. 67 gravel increased to 260,000 tons annually in future years (260,000 being the annual tonnage which Alexander ascribes to CYDI's breach), then correspondingly (based upon the 9.7% figure, above) Johnco's anticipated *sales* of oversize gravel would be 43,600 tons annually. (Id.) The problem with the expert's *sales* calculations is that the expert does not offer an opinion or otherwise explain why or upon what basis he believes that during the relevant time period there would have been a market demand or a ready, willing and able third-party buyer for oversize gravel at the calculated quantities. Cf. HGI Assoc., Inc. v. Wetmore Printing Co., 236 Fed. Appx. 563, 564 (11th Cir. 2007) (holding that buyer was not entitled to lost profits on its breach-of-contract claim because there was "no concrete evidence of demand for the unsold software from

resellers, customers, or others," and, thus, there was "no evidence from which the district court could determine to a reasonable certainty the amount of the lost profits at issue"). The absence of an explanation or opinion from the expert is glaring when one considers that the expert's assumed future oversize gravel sales for a twelve-month period exceed the actual sales for an eighteen-month period by more than 500%. Johnco also has not directed the court to any part of the expert's report or the summary judgment record which provides a rationale for the assumption that had Johnco sold 260,000 tons of No. 67 gravel (presumably to CYDI), Johnco would have been able to find a third-party buyer or buyers who would have purchased 43,600 tons of oversize gravel annually for five consecutive years. In reaching its finding, the court carefully reviewed, among other cases, Super Valu Stores, Inc. v. Peterson ("Peterson"), in which the Supreme Court of Alabama illustrated in treatise-like fashion methods for demonstrating with reasonable certainty anticipated profits of an unestablished business in a breach-of-contract action. See 506 So.2d 317, 327-32 (Ala. 1987). Johnco, though, has not submitted any evidence similar to the kinds discussed in Peterson. For instance, Johnco had not cited evidence of a "comparable business's sales" of sand and gravel byproducts. 506 So.2d at 329.

Each case must be judged on its facts. In this case, the evidence establishes that Johnco failed in virtually all of its attempts to obtain a buyer for the byproducts at issue during the relevant time period. This evidence – coupled with the complete absence of evidence from Johnco's expert or from another source that there would have been a ready, willing and able buyer or a market demand for the claimed quantities of oversize gravel and

23

sand – leads the court to conclude as a matter of law that there is no basis on which

Johnco's consequential damages can be proven to a reasonable certainty. Additionally, the

court finds that there is a complete absence of evidence from which it can be inferred that

the parties contemplated at the time the Supply Agreement was entered into that Johnco

would have lost substantial profits from sales of oversize gravel and sand in the event of a

breach or that CYDI would be liable for those alleged lost sales. The court further finds

that these alleged lost sales of the byproducts to third parties constitute activities that are

independent of and collateral to the Supply Agreement. In sum, the court finds that Johnco

relies wholly on speculation and conjecture in requesting consequential, loss-of-profit

damages for alleged lost future sales of the byproducts. Summary judgment, therefore, is

appropriate because the record taken as a whole could not lead a rational trier of fact to

award consequential, loss-of-profits damages to Johnco for alleged profits from lost sales

of oversize gravel and sand byproducts.[7] See Matsushita Elec. Indus. Co., 475 U.S. at 586.

## B.  Reliance Damages: Double Recovery

CYDI argues that the damages Johnco seeks to recover for expenses pertaining to

the purchase of the plant site and depreciable plant and rail car loading equipment, as well

---

[7] It also is worth repeating that Johnco did not request consequential, loss-of-profit damages for the alleged lost sales of the byproducts in its complaint.  CYDI, however, has not mentioned this failure or addressed whether this failure has any legal consequences.  The court, thus, likewise does not express any opinion on Johnco's omission and has not researched the issue.

24

as the various costs outlined in Appendix 5 of Alexander's report, are reliance damages. (See CYDI Mem. of Law at 8 (Doc. No. 45).)  Because Johnco also seeks recovery of expectation damages, CYDI asserts that under Goolesby, *supra*, Johnco cannot "recover both its expectation and reliance damages, as such would necessarily result in a windfall for Johnco."  (Id. at 9.)  Johnco acknowledges that its complaint contains a demand for both expectation and reliance damages, but concedes that it cannot recover both types of damages and must elect at trial which type of damages it is pursuing.  (Johnco Mem. of Law at 34 (Doc. No. 36).)

In Goolesby, the Supreme Court of Alabama explained:

The Goolesbys also argue that they were entitled to recover damages for their expenses in preparing to perform under the contract-including the cost of purchasing additional land, building the henhouses, and hiring additional workers.  Such damages, referred to as "reliance damages," are generally awarded in lieu of, not in addition to, expectation damages.  See Lord, *supra*, § 64:2, at 30-32.  If allowed to recover both the lost contract income and reliance damages, the Goolesbys would be placed in a better economic position than if there had been full performance of the grower contract.  This is not the purpose of contract damages, and the trial court was correct in excluding reliance damages from its calculations.  See Garrett, 580 So.2d at 1320 ("the injured party is not to be put in a better position by a recovery of damages for the breach than he would have been in if there had been performance").

955 So.2d at 428-29 (internal citation omitted).

Based upon the authority of Goolesby and Johnco's concession, the court finds that the issue raised by CYDI as to whether Johnco can recover both expectation and reliance damages has been resolved by the parties in their summary judgment briefs.  The parties

agree that Johnco cannot recover both.  CYDI's amended motion for partial summary

judgment on this point, therefore, is due to be denied as moot.[8]


## VI.  ORDER

Accordingly, it is CONSIDERED and ORDERED that CYDI's amended motion for

partial summary judgment (Doc. No. 45) be and the same is hereby GRANTED in part and

DENIED as moot in part, as set out herein.

DONE this 28th day of February, 2008.

_____      /s/ Ira DeMent      _____
                                      SENIOR UNITED STATES DISTRICT JUDGE

---

[8] The court notes that CYDI's amended motion for partial summary judgment focuses only on the Supreme Court of Alabama's prohibition against the recovery of both expectation and reliance damages.  The issue of whether on the facts of this case one of the damages requests is more appropriate than the other has not been raised and, therefore, is not addressed in this opinion.

26

A copy of this checklist is available at the website for the USCA, 11th Circuit at www.ca11.uscourts.gov
Effective on April 9, 2006, the new fee to file an appeal will increase from $255.00 to $455.00.

## CIVIL APPEALS JURISDICTION CHECKLIST

1. **Appealable Orders:** Courts of Appeals have jurisdiction conferred and strictly limited by statute:

   (a) **Appeals from final orders pursuant to 28 U.S.C. § 1291:** Only final orders and judgments of district courts, or final orders of bankruptcy courts which have been appealed to and fully resolved by a district court under 28 U.S.C.§ 158, generally are appealable. A final decision is one that "ends the litigation on the merits and leaves nothing for the court to do but execute the judgment." Pitney Bowes, Inc. v. Mestre, 701 F.2d 1 365, 1 368 ( 11th Ci r. 1 983). A magistrate judge's report and recommendation is not final and appealable until judgment thereon is entered by a district court judge. 28 U.S.C. § 636(c).

   (b) **In cases involving multiple parties or multiple claims,** a judgment as to fewer than all parties or all claims is not a final, appealable decision unless the district court has certified the judgment for immediate review under Fed.R.Civ.P. 54(b). Williams v. Bishop, 732 F.2d 885, 885- 86 (11th Cir. 1984). A judg ment which resolves all issues except matters, such as attorneys' fees and costs, that are collateral to the merits, is immediately appealable. Budinich v. Becton Dickinson & Co., 486 U.S.196, 201, 108 S.Ct. 1717, 1721-22, 100 L .Ed.2d 178 (1988); LaChance v. Duffy's Draft House, Inc., 146 F.3d 832, 837 (11th Cir. 1998).

   (c) **Appeals pursuant to 28 U.S.C. § 1292(a):** Appeals are permitted from orders "granting, continuing, modifying, refusing or dissolving injunctions or refusing to dissolve or modify injunctions . . ." and from "[i]nterlocutory decrees . . . determining the rights and liabilities of parties to admiralty cases in which appeals from final decrees are allowed." Interlocutory appeals from orders denying temporary restraining orders are not permitted.

   (d) **Appeals pursuant to 28 U.S.C. § 1292(b) and Fed.R.App.P. 5**: The certification specified in 28 U.S.C. § 1292(b) must be obtained before a petition for permission to appeal is filed in the Court of Appeals. The district court's denial of a motion for certification is not itself appealable.

   (e) **Appeals pursuant to judicially created exceptions to the finality rule:** Limited exceptions are discussed in cases including, but not limited to: Cohen v. Beneficial Indus. Loan Corp., 337 U.S. 541, 546, 69S.Ct. 1221, 1225-26, 93 L.Ed. 1528 (1949); Atlantic Fed. Sav. & Loan Ass'n v. Blythe Eastman Paine Webber, Inc., 890 F.2d 371, 376 (11th Cir. 1989); Gillespie v. United States Steel Corp., 379 U.S. 148, 157, 85 S.Ct. 308, 312, 13 L.Ed.2d 199 (1964).

2.    **Time for Filing**: The timely filing of a notice of appeal is mandatory and jurisdictional. Rinaldo v. Corbett, 256 F.3d 1276, 1278 (11th Cir. 2001). In civil cases, Fed.R.App.P. 4(a) and (c) set the following time limits:

    (a)    **Fed.R.App.P. 4(a)(1):** A notice of appeal in compliance with the requirements set forth in Fed.R.App.P. 3 must be filed in the district court within 30 days after the entry of the order or judgment appealed from. However, if the United States or an officer or agency thereof is a party, the notice of appeal must be filed in the district court within 60 days after such entry. **THE NOTICE MUST BE RECEIVED AND FILED IN THE DISTRICT COURT NO LATER THAN THE LAST DAY OF THE APPEAL PERIOD – no additional days are provided for mailing.** Special filing provisions for inmates are discussed below.

    (b)    **Fed.R.App.P. 4(a)(3):** "If one party timely files a notice of appeal, any other party may file a notice of appeal within 14 days after the date when the first notice was filed, or within the time otherwise prescribed by this Rule 4(a), whichever period ends later."

    (c)    **Fed.R.App.P. 4(a)(4):** If any party makes a timely motion in the district court under the Federal Rules of Civil Procedure of a type specified in this rule, the time for appeal for all parties runs from the date of entry of the order disposing of the last such timely filed motion.

    (d)    **Fed.R.App.P. 4(a)(5) and 4(a)(6):** Under certain limited circumstances, the district court may extend the time to file a notice of appeal. Under Rule 4(a)(5), the time may be extended if a motion for an extension is filed within 30 days after expiration of the time otherwise provided to file a notice of appeal, upon a showing of excusable neglect or good cause. Under Rule 4(a)(6), the time may be extended if the district court finds upon motion that a party did not timely receive notice of the entry of the judgment or order, and that no party would be prejudiced by an extension.

    (e)    **Fed.R.App.P. 4(c):** If an inmate confined to an institution files a notice of appeal in either a civil case or a criminal case, the notice of appeal is timely if it is deposited in the institution's internal mail system on or before the last day for filing. Timely filing may be shown by a declaration in compliance with 28 U.S.C. § 1746 or a notarized statement, either of which must set forth the date of deposit and state that first-class postage has been prepaid.

3.    **Format of the notice of appeal:** Form 1, Appendix of Forms to the Federal Rules of Appellate Procedure, is a suitable format. See also Fed.R.App.P. 3(c). A pro se notice of appeal must be signed by the appellant.

4.    **Effect of a notice of appeal:** A district court loses jurisdiction (authority) to act after the filing of a timely notice of appeal, except for actions in aid of appellate jurisdiction or to rule on a timely motion of the type specified in Fed.R.App.P. 4(a)(4).