IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DISTRICT

JOHNCO MATERIALS, INC.,             CASE NO.: CV-06-2:06CV993-ID-SRW

    Plaintiff,

vs.

CONRAD YELVINGTON
DISTRIBUTORS, INC.,

    Defendant.
_____/

**DEFENDANT'S, CONRAD YELVINGTON DISTRIBUTORS, INC.,
MOTION IN LIMINE TO PRECLUDE, OR IN THE ALTERNATIVE LIMIT, THE
TESTIMONY OF PLAINTIFF'S EXPERT, J. LESTER ALEXANDER,
AND TO PRECLUDE HIS SUMMARY AND SUPPLEMENTAL REPORTS FROM
<u>INTRODUCTION AS EVIDENCE</u>**

    Defendant, CONRAD YELVINGTON DISTRIBUTORS, INC. ("CYDI"), hereby moves in limine for the Court to enter an Order, pursuant to Fed.R.Civ.P. 16(c)(4) and 26(a), and Fed.R.Evid. 104(a) and 702, prohibiting Plaintiff's expert, J. Lester Alexander, from testifying at trial because the opinions offered by Mr. Alexander are not based upon sufficient facts or data, and are not the product of reliable principles and methods, and because his report failed to adequately identify the principles and methods upon which he relied in formulating his opinions, and he was unwilling or unable to testify at deposition regarding the basis for his opinions. In the alternative, Mr. Alexander's testimony should be limited regarding 1) topics about which he refused or was unable to give deposition testimony and failed to include in his expert report, and 2) the novel opinions offered by him in his Supplementary Report issued on February 29, 2008. Finally, CYDI seeks to preclude the Summary Report and Supplemental Report prepared by Mr. Alexander from being introduced or admitted into evidence at trial. In support thereof, CYDI

states as follows:

1. On or about July 31, 2007, Plaintiff, JOHNCO MATERIALS, INC. ("Johnco"), first contacted J. Lester Alexander to provide expert testimony regarding Johnco's purported damages in this case. (Deposition of J. Alexander, 20:18-22, 22:4-7, 22:16-23, 23:1-5). Mr. Alexander was forced to make his finding and issued his report quickly because "there was an extremely short time frame between when I was retained and when I issued my report, and [he] just – it was a lot of running around doing all kind of stuff to meet that deadline." (Alexander, 28:5 - 29:2).

2. The Court imposed deadline for the identification of Johnco's expert and submission of an expert report was August 1, 2007, but was extended to August 8, 2007. (See Dkt. Nos. 15, 21).

3. On August 8, 2007, Johnco identified J. Lester Alexander as its expert witness in the disclosures made pursuant to Fed.R.Civ.P. 26(a)(2), and attached a report titled "Summary Report of Accounting, Economics & Appraisal Group, LLC" prepared by Mr. Alexander, a copy of which is attached hereto as Exhibit "A." (See Dkt. No. 22).

4. Johnco subsequently identified Mr. Alexander as the corporate representative with knowledge of "Any and all damages sought by the plaintiff as set forth in plaintiff's complaint."

5. Nearly four (4) months later on November 29, 2007, CYDI deposed Mr. Alexander in his capacity as both a fact witness and an expert witness. *See* Defendant's Notice of Taking 30(b)(6) Deposition; Amended Notice of Taking Deposition of J. Lester Alexander, III, With Subpoena; and Second Amended Notice of Taking Deposition of J. Lester Alexander, III, copies of which are attached hereto as Composite Exhibit "B."

6. In his deposition, Mr. Alexander refused or was unable to testify and failed to

a. The profitability, if any, of Johnco's operations, had Johnco sold 150,000 tons of No. 67 gravel to CYDI pursuant to the Supply Agreement (Alexander, 105:14 – 107:19, 124:16 – 125:2, 202:20 – 203:8);

b. Whether Johnco would have been able to sell No. 67 gravel to a purchaser other than CYDI (Alexander, 137:7 – 19);

c. Johnco's production or operations after the fall of 2006, including without limitation, Johnco's transition from a wet mining operation to a dry mining operation; Johnco's sales of product to Dunn; and Johnco's efforts or ability to mitigate its alleged damages, other than those identified in Mr. Alexander's report (Alexander, 151:9 – 152:9, 153:5 – 154:19, 158:2 – 159:19);

d. The effect that the sale or liquidation value of Johnco's assets would have to mitigate Johnco's alleged damages (Alexander, 185:22 – 189:5);

e. Damages incurred by CYDI, as set forth in CYDI's counterclaim (Alexander, 152:17-23); and

f. Any or all perceived errors or inaccuracies in the report of defendant's expert, David Borden (Alexander, 241:1 – 243:2, 245:1 – 262:14).

See November 29, 2007, Deposition Transcript of J. Lester Alexander, attached hereto as Exhibit "C."

7. On February 28, 2008, this Court entered an order granting CYDI's motion for partial summary judgment on the issue of damages limiting Johnco's asserted damages, and on February 29, 2008, Johnco filed a "Supplemental Report of Accounting, Economics & Appraisal Group, LLC" prepared by Mr. Alexander, a copy of which is attached hereto as Exhibit "D."

8. In his supplemental report, Mr. Alexander provided novel and different expert opinions regarding the issue of damages of CYDI's alleged breach of contract, which are based almost entirely on the Court's Memorandum Opinion and Order issued on February 28, 2008 as to CYDI's amended motion for partial summary judgment.

9. As demonstrated at his deposition and through the expert report of Dave Borden, attached hereto as Exhibit "E," the opinions of Mr. Alexander offered by Johnco are not based upon sufficient facts or data to be reliable, and principles and methods used by Mr. Alexander are not reliable. Mr. Alexander was forced to formulate his opinions and prepare a report in an "extremely short time frame", and as a result the opinions are speculative and conclusory. Even after nearly four (4) months, Mr. Alexander remained unprepared for deposition and unable to testify regarding the bases for his opinions. Only now, following this Court's order granting partial summary judgment on the issue of damages and a mere month from trial, does Johnco attempt to flesh out its claim for damages through a "supplemental" report issued by Mr. Alexander.

10. Alternatively, permitting Mr. Alexander to testify at trial regarding the matters identified in paragraphs 4(a) through (f), which were not included in Mr. Alexander's report and about which he refused or was unable to testify at his deposition, would violate Rules 26(a) and 37, Fed.R.Civ.P.

11. Additionally, Mr. Alexander should be precluded from testifying regarding his novel expert opinions contained in the Supplementary Report as the filing of this report circumvented and violated Rules 26(a) and 37, Fed.R.Civ.P.

12. Finally, the Summary Report and Supplemental Report prepared by Mr. Alexander are inadmissible as hearsay and cumulative evidence.

13. CYDI will suffer prejudice if this motion is not granted.

WHEREFORE, CYDI moves that this Court enter an Order in Limine precluding expert testimony from Plaintiff's expert, J. Lester Alexander. Or, in the alternative, CYDI moves that this Court enter an Order in Limine limiting the testimony of J. Lester Alexander regarding those topics set forth in paragraphs 4(a) through (f), above, about which he refused or was unable to include in his expert report or to give deposition testimony as well as the novel opinions offered by him in his Supplementary Report issued on February 29, 2008. Finally, CYDI requests the Court preclude the Summary Report and Supplemental Report prepared by Mr. Alexander from being introduced or admitted into evidence at trial.

## MEMORANDUM OF LAW IN SUPPORT OF MOTION

### Statement of Facts

On August 8, 2007, Johnco submitted a Summary Report prepared by Mr. Alexander, in which Mr. Alexander opined on damages for the alleged breach of contract in this case. His opinion was based on a requirement by CYDI to purchase No. 67 gravel in "an annual volume of 260,000 tons per year," which he claimed would have generated for Johnco $7.4 million from the sale of No. 67 gravel and an "additional $3.1 million from the sale of production of by-products." (Summary Report, p. 2). Mr. Alexander speculated, "This results in a net lost profit of $4,473,873 due to the failure of CYDI to uphold their contractual obligations, before present value discounting and pre-judgment interest."[1] (Alexander Summary Report, p. 2).

On February 28, 2008, this Court issued a Memorandum Opinion and Order on CYDI's

---

[1] Mr. Alexander continued, "The lost profit amounts have not been reduced to their net present value as of the date of trial nor have they been increased for pre-judgment interest through the date of trial. It is my opinion that the impact of discounting the net lost profits would be substantially offset by statutory pre-judgment interested considering the estimated date of trial verses the time frame of the lost profits determinations." (Alexander Summary Report, p. 2).

amended motion for partial summary judgment as to damages. Due to Johnco's reliance on "speculation and conjecture" in its claim for consequential, loss-of-profit damages, the Court entered partial summary judgment in favor of CYDI on that issue. (Memorandum Opinion and Order, p. 24). Further, because Johnco conceded it was not entitled to both expectation and reliance damages, the Court found Johnco's claim for reliance damages moot. (Memorandum Opinion and Order, pp. 25-26).

Specifically, as to Mr. Alexander's opinions on damages, the Court essentially found Mr. Alexander's opinion inadequate on two grounds. First, the Court found that Mr. Alexander failed to opine on "what basis he believes that during the relevant time period there would have been a market demand" and whether there was a "ready, willing, and able third-party buyer"… "who would have purchased 43,600 tons of oversize gravel annually for five consecutive years." (Memorandum Opinion and Order, pp. 22-23). Secondly, the Court found that the "alleged lost sales of the byproducts to third parties constitute activities that are independent of and collateral to the Supply Agreement" and "that there is a complete absence of evidence … that Johnco would have lost substantial profits from sales of oversize gravel and sand in the event of a breach or that CYDI would be liable for those alleged lost sales." (Memorandum Opinion and Order, p. 24).

The following day, on February 29, 2008, Johnco submitted a Supplemental Report prepared by Mr. Alexander. To address the Court's first concern regarding market demand and an available third-party buyer, Mr. Alexander stated, without any explanation:

> "[I]t is reasonable to conclude that JMI would have been able to at least recover the cost of the joint products from the existing markets for oversize gravel and sand, which include the concrete, asphalt and other markets." (Alexander Supplemental Report, p. 1).

> "My research indicates that a substantial market exists for both oversize gravel and sand and that JMI's pricing within that market is competitive." (Alexander Supplemental Report, p. 1).
>
> "Moreover, there is insufficient evidence to conclude that JMI would not have been able to access available markets had CYDI not breached the Supply Agreement, which caused the productions of joint products (particularly the highly profitable oversize gravel) to stop." (Alexander Supplemental Report, p. 2).

To address the Court's second concern regarding lost profits, Mr. Alexander opined on a different method of accounting called "joint product costing method," which he claimed is used "for determining the incremental costs associated with lost incremental revenue under the Supply Agreement" and to measure the "true economic losses" incurred by Johnco. (Alexander Supplemental Report, p. 1). Mr. Alexander based his opinions, new to this case, almost entirely on the findings in the Court's Memorandum Order and Opinion issued the previous day.

Additionally, in his Supplemental Report, Mr. Alexander submitted lost profit figures based on sales of only No. 67 gravel in amounts of 260,000 tons per year and 150,000 tons per year "after discounting to present value and including prejudgment interest."[2] (Alexander Supplemental Report, p. 1). Regarding interest, not only did Mr. Alexander fail to offer an explanation for his calculation, but this was the first time he: 1) discounted present value, 2) included prejudgment interest, or 3) used the 150,000 figure for number of tons sold annually. In the Summary Report, his calculations were based on lost profit "before present value discounting and pre-judgment interest." (Alexander Summary Report, p. 3). Further, when given the

---

[2] Specifically, Mr. Alexander stated: "JMI's lost profits are $4,110,179, determined in accordance with the Memorandum Order, assuming sales of only No. 67 gravel by JMI to CYDI in quantities of 5,200 tons per week (260,000 tons per year), after discounting to present value and including prejudgment interest"; and "JMI's lost profits are $2,322,122, determined in accordance with the Memorandum Order, assuming sales of only No. 67 gravel by JMI to CYDI in quantities of 3,000 tons per week (150,000 tons per year), after discounting to present value and including prejudgment interest." (Supplemental Report, p. 2).

opportunity previously, Mr. Alexander failed to offer his opinion regarding the profitability, if any, of Johnco's operations, had Johnco sold 150,000 tons of gravel to CYDI pursuant to the Supply Agreement. (Alexander, 105:14-107:19, 124:16-125:2, 202:20-203:8).

## Discussion of Law

### *RULE 702*

The admission of expert evidence is governed by Federal Rule of Evidence 702[1], as explained by *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 593 (1993). Expert evidence must be both relevant and reliable to be admissible. *See Daubert*, 509 U.S. at 595. In *Daubert* and its progeny, the Supreme Court has held that Fed. R. Evid. 702 requires the trial court act as a "gatekeeper for the admissibility of expert testimony," to determine whether the opinion's reasoning and underlying methodology are valid and are applicable to the facts of the case. *See Id.* at 592-93; *see, e.g., Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 152-53 (1999).

"The importance of *Daubert*'s gatekeeping requirement cannot be overstated." *U.S. v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004), *cert. denied,* 2005 WL 175881 (May 31, 2005). "This 'function inherently require[s] the trial court to conduct an exacting analysis' of the *foundations* of expert opinions to ensure they meet the standards for admissibility under Rule 702." *Id.* (emphasis in original; citations omitted). "As a gatekeeper the court must do 'a preliminary assessment of whether the reasoning or methodology properly can be applied to the

---

[1] FRE 702, which governs the reliability of experts, states:
If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

facts in issue.'" *U.S. v. Masferrer*, 367 F. Supp. 2d 1365, 1371 (S.D. Fla. 2005) (quoting *Daubert*, 509 U.S. at 593-94).

"[E]stablishing qualification, reliability, and helpfulness rests on the proponent of the expert opinion." *Frazier*, 387 F.3d at 1260. This is "a substantial burden under Rule 702." *Masferrer,* 367 F. Supp. 2d at 1371-72. These strict admissibility standards "ensure that speculative, unreliable expert testimony does not reach" the fact finder. *See McCorvey v. Baxter Healthcare Corp.*, 298 F.3d 1253, 1256 (11th Cir. 2002). Cross-examination of an expert witness whose opinion is irrelevant or unreliable is no substitute for the trial court's "gatekeeping" function. *See id.* at 1257. "The district court's role is especially significant since the expert's opinion 'can be both powerful and quite misleading because of the difficulty in evaluating it.'" *Frazier*, 387 F.3d at 1260 (quoting *Daubert*, 509 U.S. at 595). The Supreme Court also has emphasized that trial courts must test the analytical distance between the data and the opinion proffered. *See Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).

The Eleventh Circuit has established a three-part inquiry in which a court must engage in determining the admissibility of expert testimony under FRE 702: (1) whether the expert is qualified to testify competently regarding the matters he intends to address; (2) whether the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in *Daubert*; and (3) whether the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue. *See City of Tuscaloosa v. Harcos Chems., Inc.*, 158 F.3d 548, 562 (11th Cir. 1998); *Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK Ltd.*, 326 F.3d 1333, 1340-41 (11th Cir. 2003).

In ascertaining the reliability of an expert under the *Daubert* factors, "the party presenting

the expert must show that the expert's findings are based on sound science, and this will require some objective, independent validation of the expert's methodology." *Daubert v. Merrell Dow Pharms, Inc.*, 43 F.3d 1311, 1316 (9th Cir. 1995) (on remand) ("Daubert II"). If the party fails to provide sufficient explanation and validation of its expert's methodology and reasoning, the Court cannot make the findings required by FRE 702 and should refuse to admit into evidence the expert's testimony. *See Claar v. Burlington N. R.R. Co.*, 29 F.3d 499, 502 (9th Cir. 1994) (rejecting the proffered experts' testimony as unreliable because the experts failed to explain the reasoning and methods underlying their conclusions). *Daubert's* lesson is simple: the expert must bring to the courtroom something more than just his word; he must have some independent verification of his opinions in the form of research, hard data, publications, testing, or other validation. *See Daubert*, 509 U.S. at 590.

## RULE 26

Rule 26 imposes specific disclosure requirements upon any witness "who is retained or specially employed to provide expert testimony in the case…" *Pireto v. Malgor*, 361 F.3d 1313, 1317 (11th Cir. 2004) (quoting Fed.R.Civ.P. 26(a)(2)(B)). The Federal Rules require a party to submit to the other parties a report containing certain basic information for each expert witness it intends to use during the course of the litigation. *See* Fed.R.Civ.P. 26(a)(2)(B). The expert report must contain the following elements:

   **(i)**   a complete statement of all opinions the witness will express and the basis and reasons for them;
   **(ii)**  the data or other information considered by the witness in forming them;
   **(iii)** any exhibits that will be used to summarize or support them;
   **(iv)**  the witness's qualifications, including a list of all publications authored in the previous 10 years;
   **(v)**   a list of all other cases in which, during the previous four years, the witness testified as an expert at trial or by deposition; and
   **(vi)**  a statement of the compensation to be paid for the study and testimony in the case.

Fed.R.Civ.P. 26(a)(2)(B).

These disclosures shall be made at the times directed by the Court or, if no deadlines are established by the Court, at least 90 days before the trial date. Fed.R.Civ.P. 26(a)(2)(C). This Court established a deadline for the plaintiff's expert disclosures of August 1, 2007, which was subsequently extended to August 8, 2007. (See Dkt. Nos. 15, 21).

Disclosure of *rebuttal* expert reports is required at the times directed by the Court or, if no deadlines are established by the Court, within 30 days after the disclosure made by the other party. Fed.R.Civ.P. 26(a)(2)(C). CYDI disclosed the report of its expert, David Borden, to Johnco on September 25, 2007. (Dkt. No. 27). Accordingly, because this Court's Uniform Scheduling Order did not prescribe a deadline for the disclosure of rebuttal expert reports, Johnco's rebuttal to Mr. Borden's report was required to be disclosed on or before October 25, 2007.

Rule 26 also allows the parties to supplement their expert disclosures made pursuant to Rule 26(a)(2). Fed.R.Civ.P. 26(e)(1). "With respect to testimony of an expert from whom a report is required under subdivision (a)(2)(B) the duty to supplement extends both to information contained in the report and to information provided through a deposition of the expert…" *Id*. However, Rule 26(e)(1) does not grant a license to supplement a previously filed expert report simply because a party wants to or because a party's expert did an inadequate or incomplete preparation. See, i.e., *Coles v. Perry*, 271 F.Supp. 2d 157 (D.D.C. 2003); *Aveka L.L.C. v. Mizuno Corp.*, 212 F.R.D. 306 (M.D. N.C. 2002). Supplementary disclosures are not intended to provide an extension of the expert designation and report production deadline. See *Bowman v. Hawkins,* 2005 WL 1527677, *2 (S.D.Ala. 2005); see also *Metro Ford Truck Sales, Inc. v. Ford Motor Co.*, 145 F.3d 320, 41 Fed. R. Serv. 3d 741, 172 A.L.R. Fed. 675 (5th Cir. 1998).

> Fed.R.Civ.P. 26(a)(2)(B) requires that an expert report "contain a complete statement of all opinions to be expressed and the basis and the reasons therefore" to facilitate discovery. Although Fed.R.Civ.P. 26(e) requires a party to "supplement or correct" disclosure upon information later acquired, that provision does not give license to sandbag one's opponent with claims and issues which should have been included in the expert witness report (indeed, the lawsuit from the outset).

*Beller v. United States,* 221 F.R.D. 689, 696 (D. N.M. 2003) (citing *Resolution Trust Corp. v. Gregory*, D.N.M. No. CIV 94-0052). Based on this, the Southern District of Alabama, United States District Court, held:

> To rule otherwise would create a system where preliminary reports could be followed by supplementary reports and there would be no finality to expert reports, as each side, in order to buttress its case or position, could "supplement" existing reports and modify opinions previously given. This practice would surely circumvent the full disclosure requirement implicit in Rule 26 and would interfere with the Court's ability to set case management deadlines, because new reports and opinions would warrant further consultation with one's own expert and virtually require new rounds of depositions. That process would hinder rather than facilitate settlement and the final disposition of the case.

*Bowman v. Hawkins*, 2005 WL 1527677, *2 (S.D.Ala.) (S.D.Ala. 2005) (citing *Beller v. United States,* 221 F.R.D. 689, 696 (D. N.M. 2003)); *See also Carter v. The Finely Hospital,* 2003 WL 22232844, *2 (N.D.Ill. Sept.22, 2003) (concluding that "[i]t is disingenuous to argue that the duty to supplement under Rule 26(e)(1) can be used as a vehicle to disclose entirely new expert opinions after the [expert disclosure] deadline established by the court....").

Because the expert witness discovery rules are "designed to allow both sides in a case to prepare their cases adequately and to prevent surprise, … compliance with the requirements of Rule 26 is not merely aspirational." *Cooper v. Southern*, 390 F.3d 695, 728 (11th Cir. 2004) (citing *Sherrod v. Lingle*, 223 F.3d 605, 613 (7th Cir. 2000)). A party that 'without substantial justification' fails to disclose information required by Rule 26(a)(2) "is not permitted to use the

witness as evidence at trial 'unless such failure is harmless.'" *Pireto*, 361 F.3d at 1318 (quoting Fed.R.Civ.P. 37(c)(1)).

An expert report is hearsay under Fed.R.Evid. 802. *See T.C. v. Cullman County Dept. of Human Resources*, 899 So.2d 281, 294 (Ala.Civ.App. 2004); *Kern v. Standard Fire Ins. Co.*, 2006 WL 1982115, *3 (M.D.Ala. 2006). An expert report does not meet the business records exception of Fed.R.Evid. 803(6), if prepared in anticipation of litigation. *See W.D. Rubright Co. v. International Harvester Co.,* 358 F.Supp. 13881403 (W.D.Pa.1973) (cited by *T.C. v. Cullman County Dept. of Human Resources*, 899 So.2d 281, 294 (Ala.Civ.App. 2004 (Murdock, J., concurring specially)). As such, an expert report is not admissible in evidence at trial. Further, if the expert is present to testify and does in fact testify, the contents of an expert report is cumulative under Fed.R.Evid. 403 and therefore not admissible. *See, e.g., McElroy v. Perry*, 753 So.2d 121, 26 (Fla. 2d DCA 2000) ("We do not suggest that if an expert testifies, his written report, which is hearsay, becomes admissible. In fact, the in-court testimony renders the report cumulative, which is another basis for exclusion.").

## Analysis

*RULE 702 ANALYSIS*

Mr. Alexander's Summary Report relies exclusively on the five (5) month production and cost history of Johnco from March 2006, and May through August, 2006, and no attempt is made to compare Johnco to any other similar sand and gravel mining operation with an established production and cost history. Assuming *arguendo* that the facts are as stated by Johnco and Mr. Alexander, Johnco was "fully operational" from the first week in March, 2006 through September, 2006. (See Alexander Summary Report, pp. 2, 3). It is undisputed that Johnco was a start up business, and kept no records of its production during this time. Additionally, Mr.

Alexander projects the incremental costs incurred for five (5) years of production of No. 67 gravel based on costs incurred during only five (5) months of production. (See Alexander Summary Report, p. 3).

It is axiomatic that lost profits cannot be determined until such time as the costs of production are determined. While absolute certainty is not required, "the loss of profits must be the natural and proximate, or direct, result of the breach complained of and they must also be capable of ascertainment with reasonable, or sufficient, certainty, or there must be some basis on which a reasonable estimate of the amount of the profit can be made…." *Super Valu Stores, Inc. v. Peterson*, 506 So.2d 317, 327 (Ala. 1987). Here, Alexander does not rely, nor even consider, the costs of production of a comparable business, and admittedly has no substantial experience in sand and gravel mining to draw upon his own experience to offer an opinion of the costs of production of sand and gravel. (Alexander, 82:3-7). In fact, Mr. Alexander does not rely upon any of the kinds of proof analyzed in *Peterson*.

Even the costs he considers are incomplete. Mr. Alexander assumes that all of the operating expenses of Johnco, with the exception of fuel and oil, are fixed and would not increase with additional production, even though Mr. Alexander's projected production is triple the actual annualized volume of production experienced by Johnco during the months used by Mr. Alexander. Mr. Alexander completely fails to consider the cost of the depletion of the gravel, the transportation costs related to Johnco's agreement with M&B Railroad, the depreciation on equipment, reclamation costs, over burden removal costs, engineering testing costs associated with compliance, legal and accounting costs, and normal office-related expenses. (See Report of Dave Borden, pp. 13-15). Moreover, Mr. Alexander's assumptions regarding fuel consumption are not calculations which were disclosed in the Summary Report.

(*Id.* at 14).

Mr. Alexander also assumes production by Johnco of 260,000 tons of No. 67 gravel despite that Johnco's actual annualized production, using Mr. Alexander's numbers, is approximately 96,000 tons. (See Alexander Summary Report, p. 1, and Report of Dave Borden, p. 11-12). The opinion that CYDI would take 260,000 tons of No. 67 gravel conflicts with the express language of the Supply Agreement and the undisputed testimony of the Johnco principals, past and present. (See Depositions of C. Junkin, 40:1-11 , B. Johnston, 57:18-23 , and P. Johnston 106:11-13). There is no opinion offered in the Summary Report based upon an assumption of a 150,000 ton commitment despite that the Supply Agreement expressly states that the minimum annual tonnage that CYDI is obligated to purchase is 150,000 tons. However, Mr. Alexander attempts to rectify this error by providing new opinions in his Supplemental Report using 150,000 tons as an alternative basis for his damage opinions.

The Summary Report also fails to discount the calculated damages to present value, concluding without analysis, that such is not necessary because pre-judgment interest would offset such a reduction. (See Alexander Summary Report, p. 3, and Report of Dave Borden, p. 15). This, of course, assumes prejudgment interest is applicable in this case, but is flawed in any event because the period of prejudgment interest is different than the period of the discount rate, and assumes a modest discount rate. (See Report of Dave Borden, p. 15). Moreover, Mr. Alexander was not prepared to discuss his calculation of the discount rate at his deposition, and as such prohibited CYDI from discovering the basis of this opinion. In his Supplement Report, however, Mr. Alexander reverses field and assigns a discount rate to the damage amount and reduces the damage to net present value. Mr. Alexander continues to assert that prejudgment interest is appropriate, but provides no such calculation in his Supplemental Report.

Finally, Mr. Alexander's opinions are unreliable because he assumes that gravel that was not sold to CYDI could not, and necessarily would not, ever be sold to any third party. In fact, Mr. Alexander fails to consider any potential mitigation of damages, despite the fact that Johnco remains in operation today producing gravel. This unreliable base assumption also affects Johnco's ability to recover the incidental costs associated with operating the facility in the months of March and April, 2006, because Johnco ultimately received the benefit of such costs incurred when it sold the product to CYDI in the May, 2006. As a result, the costs were not unnecessary and at the most Johnco was delayed in realizing the benefit of the costs. Thus, considering the costs as an additional measure of damages is duplicative of the lost profits calculation. (See Alexander Summary Report, pp. 2-3, and Report of Dave Borden, pp. 13-16).

Mr. Alexander's report is a hastily prepared, cursory review of issues in this litigation, and relies upon speculation and conjecture, and asserts conclusory, factually unsupported opinions. As a result of the above, Mr. Alexander's report is unreliable in that his reasoning and underlying methodology are invalid, and the opinions given fail to meet the standards of admissibility. As such, the Mr. Alexander should be precluded from testifying as an expert witness in this case.

*RULE 26 ANALYSIS*

*Deposition Testimony*

On November 29, 2007, CYDI deposed Mr. Alexander in his capacity as both a fact witness and an expert witness. In his deposition, Mr. Alexander refused or was unable to testify and failed to include information or explanations regarding the following items:

a.  The profitability, if any, of Johnco's operations, had Johnco sold 150,000 tons of No. 67 gravel to CYDI pursuant to the Supply Agreement;

    b.    Whether Johnco would have been able to sell No. 67 gravel to a purchaser other than CYDI;

    c.    Johnco's production or operations after the fall of 2006, including without limitation, Johnco's transition from a wet mining operation to a dry mining operation; Johnco's sales of product to Dunn; and Johnco's efforts or ability to mitigate its alleged damages, other than those identified in Mr. Alexander's report;

    d.    The effect that the sale or liquidation value of Johnco's assets would have to mitigate Johnco's alleged damages;

    e.    Damages incurred by CYDI, as set forth in CYDI's counterclaim; and

    f.    Any or all perceived errors or inaccuracies in the report of defendant's expert, David Borden.

See November 29, 2007, Deposition Transcript of J. Lester Alexander, attached hereto as Exhibit "C."

    CYDI deposed Mr. Alexander and asked for his opinion about the items set forth in paragraphs (a) through (f), above, which *were not* addressed in his Summary Report, but he was unwilling or unable to testify regarding those matters. Items in paragraphs 4(b), 4(c), 4(d), and 4(e) have yet to be addressed, even though Mr. Alexander has been given the opportunity to do so, and as such, Mr. Alexander should be precluded from testifying to these matters. Further, it was not until Mr. Alexander's Supplemental Report was issued on February 29, 2008 that Mr. Alexander, for the first time, summarily addressed the issues in items 4(a) and 4(f). By doing this, Johnco circumvented the Federal Rules of Civil Procedure that govern expert disclosure.

    Permitting testimony regarding these items allows Johnco to sandbag his opponent with

opinions on issues that should have been included in the initial expert witness report and explained in its expert's deposition testimony. Johnco's failure to provide CYDI with this information sufficiently in advance of trial has harmed CYDI in that it has prevented CYDI from fully preparing its case, should Mr. Alexander be permitted to testify about the items described in paragraphs 4(a) through (f), above.

*Expert Reports*

Mr. Alexander's novel opinions regarding market demand, an available third-party buyer, the newly applied "joint product costing method," discounted present value, prejudgment interest, or Johnco's profitability in selling 150,000 tons of gravel to CYDI under the Supply Agreement contradict his opinions in the Summary Report. As trial is set for March 31, 2008, CYDI is not able to depose Mr. Alexander on these new opinions and is not able to be adequately prepared to defend against these new opinions. Johnco was required to fully disclose its expert opinions by August 1, 2007, four months before the deposition of Mr. Alexander and eight months prior to trial. Now, after the Court ruled adversely to Johnco and pointed out the flaws in Mr. Alexander's expert opinions, Johnco has changed its expert's opinions in the eleventh hour. This practice is prohibited by the Federal Rules of Civil Procedure, and Mr. Alexander's new opinions in the Supplemental Report regarding market demand, an available third-party buyer, the "joint product costing method,"discounted present value, prejudgment interest, or Johnco's profitability in selling 150,000 tons of gravel to CYDI under the Supply Agreement should be excluded at trial.

Further, the Supplemental Report was the first time Mr. Alexander rebutted the report of CYDI's expert, Dave Borden. Again, he offered no explanation or detailed analysis, but instead only vacant conclusions in rebuttal. The deadline for Johnco's disclosure of an expert rebuttal

report to Mr. Borden's report was on or before October 25, 2007. Mr. Alexander failed to offer a rebuttal report before the deadline, and failed to offer any rebuttal testimony at his deposition. (Alexander, 241:1-243:2, 245:1-262:14). As such, any testimony regarding Mr. Borden's opinions and the portion of Mr. Alexander's Supplemental Report related to such rebuttal should be excluded from trial.

Finally, as stated *supra*, an expert report prepared in anticipation of litigation is hearsay under Fed.R.Evid. 802 and not admissible in evidence at trial. *See Kern v. Standard Fire Ins. Co.*, 2006 WL 1982115, *3 (M.D.Ala. 2006). Further, if the expert is present to testify and does in fact testify, the contents of an expert report is cumulative under Fed.R.Evid. 403 and therefore not admissible. *See, e.g., McElroy v. Perry*, 753 So.2d 121, 26 (Fla. 2d DCA 2000). According to Johnco's witness list submitted on March 3, 2008, Mr. Alexander is scheduled to testify at trial. As such, both the Summary Report and Supplemental Report are not admissible as hearsay and cumulative evidence.

Cobb Cole

/s/ Thomas J. Leek
THOMAS J. LEEK
FLA. BAR NO. 0116408
150 Magnolia Avenue
Post Office Box 2491
Daytona Beach, FL 32115-2491
Telephone: (386) 255-8171
Facsimile: (386) 323-9255
E-mail: Tom.Leek@CobbCole.com
CO-COUNSEL FOR DEFENDANT

**CERTIFICATE OF SERVICE**

     I HEREBY CERTIFY that on the ___ day of March, 2008, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system, which will send a notice of electronic filing to the following CM/ECF participants and served by U.S Mail and Electronic Mail a copy of the foregoing on the following non-CM/ECF participants:

H. Gregory Pearson, Esquire
Charles E. Harrison, Esquire
Junkin, Pearson, Harrison, & Junkin, L.L.C.
601 Greensboro Avenue
Suite 600, Alston Place
Tuscaloosa, AL 35401

J. David Martin, Esquire
Copeland, Franco, Screws & Gill, P.A.
444 South Perry Street (36104)
Post Office Box 347
Montgomery, AL 36101

                                                                        ___/s/ Thomas J. Leek_____