**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF ALABAMA**

| | | |
|---|---|---|
| JOHNCO MATERIALS, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Civil Action No. |
| vs. | ) | 2:06cv993-ID |
| | ) | |
| CONRAD YELVINGTON | ) | |
| DISTRIBUTORS, INC., | ) | |
| | ) | |
| Defendant. | ) | |

## BRIEF IN SUPPORT OF MOTION IN LIMINE BY PLAINTIFF JOHNCO MATERIALS, INC.

Comes now Johnco Materials, Inc. ("Johnco"), the plaintiff in the above-styled cause, and submits this Brief in support of its Motion in Limine.

## I.    EVIDENCE AND ARGUMENT AS TO THE SUPPLY AND AVAILABILITY OF RAIL CARS.

Johnco moves that any evidence and argument as to the supply and availability of rail cars be precluded by order of the Court. Such evidence

could only be offered in support of an affirmative defense that CYDI's performance was burdened by the unavailability or lack of supply of rail cars. Such affirmative defense was not pleaded by CYDI and therefore has been waived. Because CYDI cannot rely on this affirmative defense, any evidence offered in support of the defense is immaterial.

"An affirmative defense is defined as '[a] defendant's assertion raising new facts and arguments that, if true, will defeat the plaintiff's or prosecution's claim, even if all allegations in the complaint are true.' " Ayers v. Consolidated Const. Services of SW Fla., Inc., No. 2:07-cv-123-FtM-29DNF, slip op. at *1 (M.D. Fla. Nov. 26, 2007), quoting Saks v. Franklin Covey Co., 316 F.3d 337, 350 (2d Cir. 2003).

The matter of rail car supply and availability is one which constitutes new facts and arguments that, if true, would defeat Johnco's claim that CYDI failed to perform. The Supply Agreement states, "...Seller and Buyer acknowledge that the tonnage specified above will be subject to rail

car supply and availability." Supply Agreement, ¶3.1. The matter of rail car availability is one that was built into the contract, and therefore should have been pleaded as an affirmative defense, if applicable.

Affirmative defenses generally are waived by the failure to raise them in the pleadings. FED.R.CIV.P. 8(c); *see* Castrol v. Fidelity Nat'l Ins. Co., No. 06-21666, 2007 WL 1173072, at *2 (S.D. Fla., Apr.18, 2007) (applying waiver doctrine to affirmative defenses not pleaded); Ziade v. Koch, 952 So. 2d 1072, 1075 (Ala. 2006).

CYDI's deposition testimony demonstrates that CYDI did not pursue a defense on the basis of rail car unavailability during this litigation. Gary Yelvington testified that CYDI had approximately 1,815 hopper rail cars under lease by which to move product.[1]

In Defendant's Designation of Exhibits for Trial, served on counsel

---

[1]*See Exhibit 1,* Deposition of Gary Yelvington, July 5, 2007, pp. 24-26.

for Johnco on Monday, March 3, 2008, reference is made by CYDI to a number of documents the only relevance of which would be difficulties encountered during the scheduling of rail cars for Whitehall.  Such evidence, while arguably relevant to an affirmative defense if properly pleaded, is immaterial as probative of an affirmative defense that has been waived in this case.

The only purpose of presenting evidence of scheduling difficulties with rail cars at this point would be to confuse the issues and unfairly prejudice Johnco.  CYDI cannot be permitted to present evidence and argument to an affirmative defense it has waived, and upon such waiver Johnco has relied.

II.    **EVIDENCE AND ARGUMENT AS TO ANY DELAY IN CONSTRUCTION OF THE WHITEHALL FACILITY.**

Similarly, all evidence and argument by CYDI as to any alleged delay in the construction of the Whitehall sand and gravel mining facility

must be excluded.  Such evidence would go to support an affirmative defense under the contract, and such affirmative defense has also been waived by failure to plead on the part of CYDI.

Johnco anticipates that CYDI may attempt to show that the construction of the Whitehall facility was delayed beyond that initially contemplated in the Supply Agreement of April 28, 2004.  The Supply Agreement states in pertinent part:

> Within twelve months of the execution of this Agreement, Seller shall construct a mining facility to mine and classify sand and gravel on the Plant site.  In addition to the mining facilities to be constructed on the Plant Site, this contract is contingent on Seller's ability to construct, or obtain rights to, sufficient rail siding to load/handle a minimum of fifty-two (52) open, or covered, hopper railcars on a regular shipment schedule.

Supply Agreement, ¶2.1.  It is undisputed that the mining facility was not constructed within twelve months.  Johnco contends that the mining facility began to produce sand and gravel in the fall of 2005 and became

fully operational by February 2006.

Again, affirmative defenses raise new facts and arguments that, if true, will defeat a plaintiff's claim even if the plaintiff's claim is true. *See* Ayers, *supra* at *1. Any assertion by CYDI that a delay in the construction of the mining facility at Whitehall excuses the breach of CYDI is in the nature of an affirmative defense and must be pleaded. Because it has not been pleaded, it is waived, and any evidence or argument in support of the defense must be precluded.

CYDI may assert that it has in fact pleaded this matter affirmatively. In CYDI's "Third Affirmative Defense," CYDI states, "Plaintiff breached the Agreement prior to any purported breach by the defendant."

Such vague and non-specific assertion of a defense is, however, wholly insufficient to constitute an affirmative defense on the basis of delay in construction. It gives no notice to Johnco of the nature of

Johnco's alleged prior breach.  It provides Johnco no facts upon which to assess the either the nature or the validity of the assertion of the defense. The "Third Affirmative Defense" is as broad and non-specific as a sentence can be and still be grammatically correct.

Other courts have disposed of would-be affirmative defenses that provided much more notice of what was being pleaded than is given by CYDI in the "Third Affirmative Defense."  In <u>Rudzinski v. Metropolitan Life Ins. Co.</u>, No. 05-C-0474, 2007 WL 2973830, at *1 (N.D.Ill. Oct. 04, 2007), for instance, the Northern District of Illinois struck affirmative defenses which were more detailed than that pleaded by CYDI in this case. In <u>Rudzinkski</u>, defendant pleaded a number of affirmative defenses, stating simply the defenses of "unclean hands," "mootness and ripeness," "hearsay and privilege," and "breach of fiduciary duty."  The plaintiff challenged these as "bare bones conclusory allegations."  Id. at *1.  Agreeing and striking the defenses, the court noted:

> Affirmative defenses are pleadings subject to the same pleading requirements applicable to complaints, and must contain a short and plain statement upon which relief may be granted. *Id.* "Even under the liberal notice pleading standards of the Federal Rules, an affirmative defense must include either direct or inferential allegations as to all elements of the defense asserted." Reis Robotics USA, Inc. v. Concept Industries, Inc., 462 F. Supp.2d 897, 904 (N.D.Ill.2006); Heller, 883 F.2d at 1295 ("bare bones conclusory allegations" are not sufficient.)   Equitable defenses, such as unclean hands, must plead the specific elements required to establish the defense. State Farm Mut. Auto. Ins. Co. v. Riley, 199 F.R.D. 276, 279 (N. D. Ill.2001). In addition, "[m]erely stringing together a long list of legal defenses is insufficient to satisfy Rule 8(a).... It is unacceptable for a party's attorney simply to mouth [affirmative defenses] in formula-like fashion ('laches,' 'estoppel,' 'statute of limitations' or what have you), for *that does not do the job of apprising opposing counsel and this Court of the predicate for the claimed defense – which after all is the goal of notice pleading*." Reis Robotics, 462 F. Supp.2d at 907 (citations omitted).
>
> In this case, MetLife's bare bones allegations do not satisfy even the liberal notice pleading standards under the Federal Rules. The allegations fail to put either Sharp or the Court on notice of the factual and legal elements that form the basis of the referenced defenses.

*Id*. at *1-2 (emphasis added).

Moreover, that CYDI has not intended to pursue the defense of delay

8

of construction is made apparent by the testimony of two of CYDI's corporate officers in this case. Gary Yelvington, the president and CEO of Yelvington, testified that the delay in construction and operation was part of any new business:

> It was a new business that was talked about several years prior, but it was slow or delayed in getting started. So it was a typical new business where both parties, in my opinion, were trying to initiate the start of something that would have been good for us.[2]

Yelvington testified that CYDI was "trying to work with" Johnco despite any delay: "We were working with them any way we could to try and get this thing started out properly."[3] Yelvington testified that CYDI – not Johnco – was "being cautious" and "taking it slow"[4] even after Johnco began producing gravel. Asked about specifically about the "Third

---

[2]Gary Yelvington deposition, July 5, 2007, p. 31.

[3]Gary Yelvington deposition, July 5, 2007, pp. 37-38.

[4]Gary Yelvington deposition, July 5, 2007, p. 45.

Affirmative Defense," Yelvington testified he did not know what it meant.[5]

Further, CYDI Chief Financial Officer Mark Klebe – who was designated by CYDI under FED.R.CIV.P. 30(b)(6) as its corporate representative in the matter of counterclaim damages – testified that Yelvington's alleged damages began only as of May 11, 2006, when CYDI took its first load of No. 67 gravel from Johnco.[6]

Throughout this litigation, CYDI has not sought to assert any issues relating to delay of construction, either by pleading or in discovery.  The lack of pleading directed to the issue, and the testimony of two of CYDI's corporate officers eliminating delay in construction as an issue, precludes CYDI from now attempting to inject the issue into trial.

---

[5]Gary Yelvington deposition, July 5, 2007, p. 140.

[6]*See Exhibit 2,*Mark Klebe deposition, December 20, 2007, p. 16.

### III.  **EXPERT OPINION AS TO CYDI'S COUNTERCLAIM DAMAGES BY CHIEF FINANCIAL OFFICER MARK KLEBE.**

In "Defendant's Witness List," served by CYDI on counsel for Johnco on Monday, March 3, 2008, CYDI identifies its chief financial officer Mark Klebe as a witness likely to be called at trial.

While Klebe may or may not be able to testify as a fact witness as to the course of negotiations as to the Supply Agreement, he should be precluded from offering expert opinion as to CYDI's counterclaim damages because he was neither disclosed as an expert witness under FED.R.CIV.P. 26(a)(2)(A), nor did he prepare and sign a report as expert witness under FED.R.CIV.P. 26(a)(2)(B). Moreover, the methodology underlying Klebe's opinion evidence is not reliable within the meaning of Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579, 125 L.Ed. 2d 469, 113 S. Ct. 2786 (1993).

The reliability issue is addressed in a separate motion under the authority of <u>Daubert</u> to exclude the opinion testimony of Klebe, and Johnco adopts and incorporates the arguments made in that motion in support of its motion in limine here.

As an a priori matter however, Klebe may not offer opinion evidence of a technical nature on damages because he was never disclosed as an expert by CYDI. FED.R.CIV.P. 26(a)(2)(A) governs the whether a party must disclose the identity of an expert witness:

> In addition to the disclosures required by paragraph (1), a party shall disclose to other parties the identity of any person who may be used at trial to present evidence under Rules 702, 703, or 705 of the Federal Rules of Evidence.

Further, FED.R.CIV.P. 26(a)(2)(B) requires that an expert witness must give a report in the absence of order of the court:

> Except as otherwise stipulated or directed by the court, this

disclosure shall, with respect to a witness who is retained or specially employed to provide expert testimony in the case or whose duties as an employee of the party regularly involve giving expert testimony, be accompanied by a written report prepared and signed by the witness. The report shall contain a complete statement of all opinions to be expressed and the basis and reasons therefor; the data or other information considered by the witness in forming the opinions; any exhibits to be used as a summary of or support for the opinions; the qualifications of the witness, including a list of all publications authored by the witness within the preceding ten years; the compensation to be paid for the study and testimony; and a listing of any other cases in which the witness has testified as an expert at trial or by deposition within the preceding four years.

Under FED.R.CIV.P. 26(a)(2)(C), disclosure and report must be made as directed by the Court, and absent other direction by no later than 90 days before the date of trial. This Court on January 12, 2007 directed deadlines for the disclosures and reports for both parties:

The parties shall disclose to each other the identity of ANY person who may be used at trial to present evidence under Rules 702, 703, or 705 of the Federal Rules of Evidence, and provide the reports of retained experts or witnesses whose duties as an employee of the party regularly involved giving expert testimony, required by Rule 26(a)(2) of the Federal

13

> Rules of Civil Procedure.  The disclosure deadline is **August 1, 2007**, for Plaintiff(s), and **September 4, 2007**,[7] for Defendant(s).

Uniform Scheduling Order, January 12, 2007, ¶7 [Doc. 15](emphasis by capitalization and bold type original with court).

Whether or not Klebe was required to submit a report under Rule 26(a)(2)(B) or not – as one "whose duties as an employee of the party regularly involve giving expert testimony" – is a wholly separate matter from whether the requirement of Rule 26(a)(2)(A) that Klebe's identity as a proposed expert be disclosed.  This Court made it clear that "ANY person" (emphasis original) used to present expert opinion must be disclosed, delineating this class of required disclosure from the second less inclusive class of persons from who expert reports would be required.

_____

[7]CYDI's deadline for disclosure was subsequently extended by agreement of the parties and Order of the Court to September 25, 2007 [Doc. 24].

It is undisputed that Klebe was never disclosed as an expert witness under Section 7 of the Uniform Scheduling Order, and never prepared or submitted a report under Rule 26(a)(2)(B).[8]

---

[8]Even when Klebe was designated at his deposition on December 20, 2007 – some three months after CYDI's disclosure deadline – as CYDI's corporate representative under Rule 30(b)(6) — and the only witness identified by CYDI in such capacity — to testify on the matter of CYDI's counterclaim damages, it was explicitly stated that he was not offered as an expert witness:

> Q.    [BY JOHNCO ATTORNEY GREG PEARSON] All right. Are you going to be giving any testimony today as an expert witness?
> MR. LEEK: Object to the form. I don't know that he'd know that. *He hasn't been designated as an expert.*

Mark Klebe deposition, December 20, 2007, p. 10, ll. 20-23 (emphasis added). Further:

> MR. PEARSON:    Just so you know, while we're on the Record, I don't think this is anything new: We're not waiving any objections we might have as to whatever valuation he gave based on expert witness or any other kind of opinion testimony. We're not intending to waive that by asking the questions. It was just my opportunity to ask the questions, so that's what we've done.
> MR. LEEK:    Okay.

Mark Klebe deposition, December 20, 2007, p. 118, ll. 9-19.

A party that without substantial justification fails to disclose an expert witness as required by Rule 26(a)(2)(A), or to amend or supplement as required by Rule 26(e), is not permitted to use at trial such witness not so disclosed, unless the failure is harmless. FED.R.CIV.P. 37(c)(1); Marco Island Cable, Inc. v. Comcast Cablevision of the South, Inc., No. 2:04-cv-26-FtM-29DNF at *1, 2006 WL 1722341 (M.D. Fla, June 22, 2006).

Klebe's deposition reveals technical testimony as to the projection of CYDI's counterclaim damages rising to the level of expert opinion, and requiring disclosure of Klebe as an expert. The failure of CYDI to disclose Klebe as expert is not harmless. Johnco did not discover Klebe's opinions until his deposition immediately prior to the expiration of the discovery cut-off under Section 6 of the Uniform Scheduling Order, three and a half months after the deadline for Johnco's disclosure of retained experts and three months after CYDI disclosed its own experts. Klebe's status as expert indeed was disclaimed by CYDI's counsel at his deposition; to this day, Klebe has never been disclosed as providing expert opinion evidence,

although the foundation of his deposition testimony is in fact expert opinion evidence of a technical nature.

Klebe cannot be permitted to offer expert opinion at trial in contravention of the Federal Rules of Civil Procedure and explicit order of this Court. Johnco moves in limine for the exclusion of his testimony on the basis of his non-disclosure, as well as its fundamental unreliability.

IV.    **EXPERT OPINION OFFERED AS TO THE CALCULATION OF JOHNCO'S DAMAGES BY DAVID BORDEN.**

In "Defendant's Witness List," CYDI further identifies David Borden as a witness likely to be called at trial. Borden, who was disclosed as an expert witness on September 25, 2007 and who was deposed on December 21, 2007, submitted an expert report at the time of his disclosure and provided a number of expert opinions as to his calculation of Johnco's damages in that report and in his deposition.

Borden should be precluded from offering expert opinion at trial as to the calculation of Johnco's damages. Given the Court's February 28, 2008 order granting partial summary judgment [Doc. 78], the methodology anchoring Borden's opinion is not reliable within the meaning of <u>Daubert v. Merrell Dow Pharms., Inc.</u>, 509 U.S. 579, 125 L.Ed. 2d 469, 113 S. Ct. 2786 (1993). This issue of reliability is addressed in a separate <u>Daubert</u> motion to exclude Borden's opinion testimony, and Johnco adopts and incorporates the arguments made in that motion in support of its motion in limine here.

## V.    <u>EXPERT OPINION OFFERED AS TO MITIGATION OF JOHNCO'S DAMAGES BY DAVID BORDEN.</u>

Johnco moves in limine that CYDI be precluded from evidence or argument as to Johnco's alleged failure to mitigate its damages on the basis of expert opinion by David Borden.

CYDI pleaded the affirmative defense of failure to mitigate damages

("Second Affirmative Defense") [Doc. 9-1, p. 6]. In his report of September 25, 2007 for CYDI, Borden criticized Johnco's economist Les Alexander for failure "to consider fully the effects of mitigation." Although Borden himself did not give an opinion as to these effects, he stated:

> JMI [i.e., Johnco] has the ability to produce either #67 or #57 gravel at its mining facility in Lowndes County. Further, JMI resumed mining operations in April 2007, and around June 2007, JMI began producing #57 gravel. JMI is currently having the #57 gravel tested by a potential buyer, Dunn Construction, for use in asphalt production. Yet Alexander fails to consider this potential mitigating impact as well as any other reasonable mitigating efforts that JMI could undertake.

[Doc. 27-2, p. 16]. Borden stated that he would "reserve the right to modify and supplement this report pending such additional discovery," including financial and production records [Doc. 27-2, p. 17].

*Exhibit 3*, [Borden 0361] is a document produced from Borden's file

19

prior to his deposition. On Borden's "To Do" list is marked as item 6: "Mitigation upon subs. discovery – Dunn."

Although financial records as well as discovery as to the Dunn Construction testing have been had since the time of his report, Borden has not supplemented his report within the time permitted by the Federal Rules of Civil Procedure to express an expert opinion on the matter of mitigation. He may not now express an opinion as to Johnco's alleged failure to mitigate damages at trial.

## VI.    EXPERT OPINION OFFERED ABOUT JOHNCO'S PRODUCTION CAPACITY BY DAVE BORDEN.

In his deposition of December 21, 2007, CYDI's expert witness, certified public accountant David Borden, repeatedly disclaimed that he was offering any opinion testimony as to Johnco's production capacity or ability to produce No. 67 gravel – all the while expressing "questions" and

"concerns" over such production capacity:


22

[TESTIMONY OF DAVID BORDEN]

9   You've got conflicting
10   testimony in terms of, we were trying to
11   produce, we were curtailing production.
12   You've got all kinds of things in the Record
13   that conflict with respect to what was going
14   on here from a production standpoint.  So I
15   don't know whether [Johnco] could have or not.
16          But, frankly, for purposes
17   what I've done in my analysis of
18   Mr. Alexander's calculations, I'm assuming
19   [Johnco] could have produced a hundred and fifty
20   thousand tons.  *I don't know whether they*
21   *could, in fact, have done that.*


* * * *
26

[TESTIMONY OF DAVID BORDEN]

11   You know, again, *I'm not offering opinions*
12   *here about what they produced or could have*
13   *produced.*  I don't think the records exist
14   for me to do that, but *there's significant*
15   *questions, given their production history*
16   *and all the problems they were having,*
17   *whether they could have produced a hundred*
18   *and fifty thousand tons* much less the two
19   sixty.  But I'm not – *Again, I don't want*
20   *to get off into an opinion on that.*


* * * *
21

32

[TESTIMONY OF DAVID BORDEN]

19    A.    No.  I think I've told you,
20  for purposes of what we're doing, I have
21  serious problems with what Mr. Alexander's
22  calculation indicates, *even under the*
23  *assumption that they -- that Johnco could*

33

1  *produce a hundred and fifty thousand tons of*
2  *gravel.  And I'm -- I do have very*
3  *significant questions whether they could*
4  *have produced it, whether they ever did*
5  *produce at that level.*  But I'm -- I'm just
6  assuming that they can, for purposes of what
7  I'm doing.

\* \* \* \*

60

[TESTIMONY OF DAVID BORDEN]

12    A.    Well, two sixty is totally
13  outside the scope of the contractual
14  commitment.  That's not a production issue;
15  that's, the contract-doesn't-provide-it
16  issue.
17       *And furthermore, there are all*
18  *kinds of questions about whether they could*
19  *have produced it.*
20    Q.    And we keep going over those,
21  and you keep ending your answers with
22  "there's all kind of questions."  What kind
23  of questions?

61

1    A.    Well, again, if you look at --
2    from May forward, they were operating at a
3    full -- what appears to be or at least the
4    assumption Les has made, at a full
5    production equivalent level with the
6    exception that the fuel costs would escalate
7    to process and classify and load, all
8    functions, I mean one place it talks about
9    loading but then in another place it talks
10   about loading and producing, I think.  So I
11   think the assumption is that there would be
12   escalations of fuel costs only.  But aside
13   from that, production is -- capacity or
14   capability is at a fully-blown level to
15   produce not a hundred and fifty thousand
16   tons, but two hundred and sixty thousand
17   tons.
18          So I'm just saying, it's a
19   little bit of a -- I mean, you've got
20   somebody that's staffed to produce two
21   hundred and sixty thousand tons, which is
22   twenty-one or twenty-two thousand tons a
23   month, and they're producing, at the most,

62

1   eight.

* * * *

65

[TESTIMONY OF DAVID BORDEN]
9    Q.    But do you jump from what they
10   sold to that's all they could produce, is

23

11  that what you were doing?
12      A.    *Well, I have questions about*
13  *their production.*
14      Q.    But are you doing that?
15      A.    No.  I'm not jumping to it
16  because --
17      Q.    All right.
18      A.    *What I'm saying is I have*
19  *questions about whether they could produce.*

Deposition of David Borden, December 21, 2007, pp. 22, 26, 32-33, 38, 60-61, 65 (emphasis added).[4]

Borden states emphatically and consistently that he is assuming for purposes of his damages calculations that Johnco was capable of producing 150,000 tons of No. 67 gravel annually in order to meet what CYDI contends is its commitment under the Supply Agreement.  Deposition of David Borden, December 21, 2007, pp. 22, 29, 32-33.  Borden's opinions are premised on that assumption.  Borden cannot be permitted to opine at trial about his "*questions*" regarding Johnco's production capacity and

---

[4] *See Exhibit 4,* Deposition of Dave Borden.

thereby to offer opinion evidence by way of the back door.

## VII. EXPERT OPINION OFFERED AS TO THE ECONOMIC VIABILITY OF JOHNCO'S OPERATION BY EUGENE HARTLEY.

In "Defendant's Witness List," CYDI further identifies economic exploration geologist Eugene Hartley as a witness likely to be called at trial. Hartley, who was disclosed as an expert witness on September 25, 2007 and who was deposed on December 20, 2007, submitted an expert report at the time of his disclosure and provided a number of expert opinions as to the purported lack of viability of Johnco's economic viability in that report and in his deposition.

Hartley should be precluded from offering expert opinion at trial as to Johnco's economic viability, as there is hardly any methodology at all underlying his opinion, except unsupported, conclusory rank speculation and guesswork, which approach does not rise to the level of the required

reliable methodology under <u>Daubert v. Merrell Dow Pharms., Inc.</u>, 509 U.S. 579, 125 L.Ed. 2d 469, 113 S. Ct. 2786 (1993). The issue of reliability is addressed in a separate <u>Daubert</u> motion to exclude Hartley's opinion testimony, and Johnco adopts and incorporates the arguments made in that motion in support of its motion in limine here.

## VIII. <u>TESTIMONY BY GARY YELVINGTON AS TO CYDI'S COUNTERCLAIM DAMAGES.</u>

Johnco moves to preclude any testimony by Gary Yelvington as to CYDI's counterclaim damages, as Yelvington disclaimed any knowledge of counterclaim damages in his deposition.

CYDI made no disclosure of its computation of its counterclaim damages in its FED.R.CIV.P. 26(a)(1) disclosures on January 15, 2007. Instead, it stated, "Counter-plaintiff, Yelvington Transport, Inc. [sic] is currently in the process of compiling information and working toward

computing damages.   Accordingly, the Rule 26 disclosures will be supplemented to reflect the computation when it is completed."  *See* Exhibit 5.

On July 5, 2007, counsel for Johnco deposed Gary Yelvington.  At that time, Yelvington disclaimed knowledge about counterclaim damages:

> 160
>
> Q.    Who is going to testify on behalf of Yelvington about these damages? Do you know?
>
> A.    We probably have to figure out exactly what they are currently and what they — how they change as prices and so forth goes up.  So it would probably be — Mark Klebe would probably do that.
>
> Q.    Okay.  But he's not going to have that information today, either.
>
> A.    I doubt that.  You can ask him.
>
> Q.    Well, I will.  But to the extent Gary, that you're going to testify about that at some point in the future, I'm going to want to be able to reconvene and ask you about the damages, since that is part of the lawsuit.  And, you know, my opportunity to ask them is — you know, I'm not getting to get that opportunity
>
> 161

27

today because you don't have the
information available to you.

Deposition of Gary Yelvington, July 5, 2007, pp. 160-61. Counsel for

CYDI then agreed to put up a CYDI witness on the matter of CYDI

counterclaim damages upon receipt of a Rule 30(b)(6) notice. *Id.* at p.

161.


Johnco subsequently propounded a Rule 30(b)(6) notice of

deposition as to the matter of CYDI's counterclaim damages, and — on

December 20, 2007, days prior to the expiration of the discovery cutoff of

December 31, 2007 — CYDI propounded Mark Klebe as its Rule 30(b)(6)

representative on the matter of CYDI damages.   Mark Klebe  at that

deposition testified that some of his knowledge as to counterclaim damages

is derived from conversations Gary Yelvington may have had with

potential customers.


FED.R.CIV.P. 37(c)(1) states:

28

**(1)** ***Failure to Disclose or Supplement.*** If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless. In addition to or instead of this sanction, the court, on motion and after giving an opportunity to be heard:

(A)    may order payment of the reasonable expenses, including attorney's fees, caused by the failure;

(B)    may inform the jury of the party's failure; and

(C)    may impose other appropriate sanctions, including any of the orders listed in Rule 37(b)(2)(A)(i)-(vi).

Johnco moves in limine, as a Rule 37 sanction for CYDI's failure to supplement its initial Rule 26(a)(1) (non)-disclosure, and as a matter of fundamental fairness given the disclaimer of knowledge in his deposition, that Gary Yelvington be precluded from offering testimony, whether factual or opinion as to any aspect of CYDI's counterclaim damages.

## IX.  **EVIDENCE OF COMPROMISE AND OFFERS TO COMPROMISE.**

Johnco moves in limine to preclude any evidence or argument that the parties engaged in offers of compromise and settlement of this case, as such contravene FED.R.EVID. 408.

Rule 408 states in pertinent part:

(a)  PROHIBITED USES.  Evidence of the following is not admissible on behalf of any party, when offered to prove liability for, invalidity of, or amount of a claim that was disputed as to validity or amount, or to impeach through a prior inconsistent statement or contradiction:

(1)    furnishing or offering or promising to furnish – or accepting or offering or promising to accept – a valuable consideration in compromising or attempting to compromise the claim; and

(2)    conduct or statements made in compromise negotiations regarding the claim, except when offered in a criminal case and the negotiations related to a claim by a public office or agency in the exercise of regulatory, investigative, or enforcement authority.

Evidence of offer and compromise are improper for any purpose which could be offered in this case, and CYDI should be precluded from evidence or argument of same.

## X.     **THE PRESENTATION OF THIS MOTION.**

Finally, Johnco moves that evidence or argument that Johnco presented a motion in limine for ruling by the Court ought to be precluded. A party ought not be permitted to suggest to the jury by argument or otherwise that the other party has sought to exclude from proof any matter bearing on the issues in this case or the rights of the parties to this suit.

Respectfully submitted,


s/ H. Gregory Pearson
H. Gregory Pearson (ASB-4733-S81H)
Attorney For Plaintiff
email: greg@jphj.net


Charles E. Harrison (ASB-9408-N70C)
Attorney For Plaintiff
email: chuck@jphj.net


*OF COUNSEL:*

JUNKIN, PEARSON, HARRISON
    & JUNKIN, L.L.C.
601 Greensboro Avenue
Suite 600 Alston Place
Tuscaloosa, Alabama 35401
Telephone: (205) 366-0111
Telecopier: (205) 391-4780

32

## CERTIFICATE OF SERVICE

Pursuant to FED.R.CIV.P. 5(e) and the Administrative Procedures For Filing, Signing, And Verifying Pleadings and Documents In The District Court Under the Case Management/Electronic Case Files (CM/ECF) System In Civil Cases [General Order No. 2:04-mc-3164], I do hereby certify that I have electronically filed the foregoing Brief in Support of Motion in Limine with the Clerk of the Court by uploading same to the Court's CM/ECF web site at http://www/almd.uscourts.gov, which will send notification of such filing to the following:

> Thomas J. Leek, Esq
> COBB & COLE
> 150 Magnolia Avenue
> Post Office Box 2491
> Daytona Beach, FL 32115-2491
>
> George Walker III, Esq.
> David Martin, Esq.
> COPELAND, FRANCO, SCREWS
>   & GILL, P.A.
> 444 S. Perry St.
> Montgomery, Alabama 36101-0347

and I hereby certify that I have mailed by United States Postal Service, properly addressed and first-class postage prepaid and affixed this document to the following non-CM/ECF participants:

> [none]

This the 10th day of March 2008.

Charles E. Harrison (ASB-9408-N70C)

33

# EXHIBIT ONE

21

1  under development at the time this brochure is done.  Is
2  that the additional distribution terminals that you're
3  referring to?
4      A.  Yes.
5      Q.  Tell me which ones, if you remember, that are
6  the most recent ones that would have been under
7  development at this time.
8      A.  Under development could mean under -- being
9  permitted or planned.  And the ones I recall since --
10  let's see.  Had one at Mulberry, one at Milton, Florida.
11  Dothan.
12      Q.  Those would be the newer ones?
13      A.  Yes, sir.  Dothan is still under development.
14  It's being constructed now.  But some of these take a
15  long time to get the right approvals and zoning and so
16  forth.  I'm just trying to look and see if there's any
17  others on here.  I don't see any others.
18      Q.  When you say, to get approvals, when you put a
19  terminal in and it's near a railroad track, is that your
20  criteria, mainly, it's got to be next to a railroad
21  track?
22      A.  Yeah.  All our terminals are rail served.
23      Q.  All right.  Does it matter who owns the
24  railroad where you put your terminal?
25      A.  Does it matter who owns it?

22

1      Q.  Well, I noticed that you indicate that you have
2  a relationship -- you're linked to CSX Transportation's
3  computer for up-to-date on rail shipments and car
4  locations, and I'm assuming that CSX owns railroad
5  tracks.  Do you put --
6      A.  Yes.
7      Q.  -- most of your -- and I don't know how it
8  works.  Do most of your terminals go next to CSX tracks?
9      A.  Most of them do, but we have some that are
10  adjacent to other railroads.
11      Q.  And you work with those other railroads --
12      A.  Yes.
13      Q.  -- as well?
14      A.  Uh-huh.
15      Q.  What goes into permitting, generally?
16      A.  Well, you have to find a piece of real estate.
17  It has to have the proper zoning.  You have to deal with
18  any wetland issues in the development of it.  You have
19  to get some air permits.  There's quite a bit of time
20  and planning to develop these terminals because of the
21  amount of cars that land there each day, or each day
22  that they receive cars.
23      So there's interaction with sometimes the
24  Department of Transportation based on crossing the
25  highway.  Just a lot of planning for each and every

23

1  terminal because of the amount of cars that have to
2  arrive.
3      Q.  What is -- what would a normal terminal
4  facility include?
5      A.  An unloading pit, a concrete pit that you build
6  underneath the track structure or the siding.  We call
7  it the siding, not the main line.  The railroad uses the
8  main line to deliver the train, but then you have to
9  construct the siding or the track that's in the property
10  or along the property.
11      And then you have to construct a concrete pit
12  with a steel hopper in the pit, which the product drops
13  out the bottom of the car, goes up a conveyer.  And then
14  a radial stacker is what we use commonly to stockpile
15  the various sizes in the various conical piles around
16  that radius.  And then we also haul some of the product
17  and put it into bins that are not on that radius.
18      And then we load it out with front-end loaders
19  into trucks, scale it across the scale, give them a
20  ticket.  And that's pretty much the way we distribute
21  the products.
22      Q.  Is there usually some type of office facility,
23  a building, trailer?
24      A.  It's usually a modular building.  Twelve by
25  sixty is pretty common for what we've done.  We mount

24

1  that beside the truck scale.
2      Q.  And who staffs a terminal facility?  How many
3  people would you have staffing one?
4      A.  You know, different terminals, different
5  amounts, but there are generally approximately five or
6  six people.
7      Q.  And they receive the product and do the various
8  things related to -- now, when it comes in, does it come
9  in on -- and I'm going to use this term loosely and
10  we'll explore it a little more, but your rail cars, rail
11  cars that you've got leased and control of?
12      A.  Yes.  Most of them are our cars.
13      Q.  Okay.  And that's what I want to explore.  Your
14  brochure, again, going back to this, says you lease over
15  1815 hopper cars.  And does all of the product come on
16  hopper cars?
17      A.  Not all the product.  We lease -- let me see.
18  Hopper cars.  I mean, this number changes some with the
19  leases and when they expire.  But we also have gondola
20  cars that are not bottom drop cars that are generally
21  used for larger stone that you unload with a backhoe.
22      Q.  How does the backhoe get it out of there?  Does
23  it just reach over the top and get it out?
24      A.  Reaches over the top and scoops it out and
25  places it next to the rail siding or in a truck.

---

**25**

1  Q. Now, and that's called a gondola?

2  A. Gondola car.

3  Q. Gondola car.

4  A. Uh-huh.

5  Q. And does it look different? Is it just open

6  all the way across the top, or can a hopper also be

7  open?

8  A. They're both open across the top. The hopper

9  has doors out the bottom. The gondola has a flat bottom

10  without doors.

11  Q. I got you.

12  And then there are another type of hopper car

13  that would be a closed-top hopper car?

14  A. A covered hopper car.

15  Q. A covered hopper car.

16  A. Uh-huh.

17  Q. And do you move product in those?

18  A. Yes, we do.

19  Q. Do you lease some of those, as well?

20  A. Yes, we do.

21  Q. Now, the 1815 hopper cars, more or less, that

22  you've got here -- and I may have missed it. You may

23  have said it. Does it include, then, generally, the

24  gondola cars, as well? Would that number be included in

25  there, or are those additional cars?

---

**26**

1  A. The way it reads, it says hopper cars. That

2  would be opened or covered hopper cars.

3  Q. So gondola cars would be in addition to that,

4  probably?

5  A. Probably.

6  Q. In the year 2006, do you know how many cars,

7  approximately, you had moving product?

8  A. Not exactly.

9  Q. Would it be a lot different from the 1815 that

10  you had in this brochure, on page 75?

11  A. Probably not.

12  Q. And where are most of those cars on any given

13  day?

14  A. Running back and forth between origins that are

15  active in shipping to supply our terminals.

16  Q. Do they ever sit anywhere for any length of

17  time?

18  A. We hope not.

19  Q. And if they do sit somewhere for a few days,

20  why is that? Give me some of the reasons that they

21  might sit somewhere.

22  A. The biggest reason they sit is, the railroad

23  sometimes doesn't have the locomotives or the power to

24  pull them. That's one reason.

25  The other reason they're sitting is, we've just

---

**27**

1  unloaded them or we're fixing to start unloading them,

2  or we have more cars than we might need in order to have

3  enough cars. Sometimes you have to have too many cars.

4  Q. So that --

5  A. So the demand and supply. Supply and demand.

6  Q. All right. And do those -- if you have more

7  than you need, those would be sitting empty, and they

8  would be on your siding at your terminals?

9  A. Well, we haven't had to sit them empty. We try

10  to have enough cars but not too many cars.

11  Q. Who do you lease them from?

12  A. Various leasing companies that specialize in

13  rail car leases.

14  Q. And what would be the length of term of a lease

15  for one of these hopper cars?

16  A. Three to ten years.

17  Q. And --

18  A. Some short term. I mean, some are month to

19  month. Very few, but some are month to month.

20  Q. Do you take the cars that you lease -- by the

21  way, do you own any cars? Does Yelvington actually own

22  its cars?

23  A. No.

24  Q. Okay. So all of them are a lease arrangement

25  or a long-term lease arrangement?

---

**28**

1  A. Yes, sir.

2  Q. All right. Now, do you turn around and lease

3  those cars out to anybody else on a sublease basis?

4  A. Not recently.

5  Q. Okay. Did you used to do that?

6  I'm sorry. Go ahead.

7  A. We have a particular move where we do allow

8  another producer to use our cars and we use their cars,

9  because they're all in one particular pool, moving from

10  one origin to various destinations. And when they use

11  our cars, we charge them so much a day. When we use

12  their cars, they charge us so much a day. And that's

13  just because it's easier to use the whole pool of cars

14  and not have to make sure that it's only our cars or not

15  their cars. I mean, it's too much switching around,

16  trying to -- so we just kind of count them all as one

17  group of cars.

18  Q. And you say that's one particular producer?

19  A. Yes.

20  Q. Which producer is that?

21  A. It's Rinker in Miami.

22  Q. Rinker. So Yelvington and Rinker have some

23  sort of business arrangement with each other?

24  A. On the cars.

25  Q. On the cars. What does Rinker do? You said

---

29

1  one particular producer, and that word has meaning to
2  you, and you then said Rinker is that producer. What
3  does that mean, a producer?
4      A.  A producer of crushed stone.
5      Q.  Okay. That's what I'm asking. What does
6  Rinker do?
7      A.  They produce the product at a particular quarry
8  where we have a substantial amount of cars and they have
9  smaller amount of cars, and we use each other's cars
10  based on that being the easiest way to load trains in
11  and out of the facility that produces the stone which
12  they own.
13      Q.  And how long has that relationship between
14  Yelvington and Rinker existed?
15      A.  Twenty-five years.
16      Q.  And does Yelvington buy a substantial amount of
17  Rinker's product that it produces from its quarry?
18      A.  Yes.
19      Q.  And where are Rinker's quarries, or is it one
20  quarry?
21      A.  Well, it's one quarry that we have this
22  arrangement, and that's their quarry in Miami, called
23  The Chrome Aggregate Quarry.
24      Q.  And what do they produce there?
25      A.  Limestone.

30

1      Q.  And then it's crushed and used for something?
2      A.  Ready mix concrete, block, and whatever we sell
3  it to other people for. Pipe bedding, site work,
4  utilities.
5      Q.  If you need to move product and, you know, I
6  mean, you need a trainload of product, if the need came
7  up and you needed to move it, how long would it take you
8  to get a train and get it over somewhere to get it moved
9  if you needed a trainload of product?
10      MR. LEEK:  Let me object to form, but you can
11  answer the question.
12      THE WITNESS:  Okay. If it's something we're
13  doing on a regular basis, the cars are naturally
14  flowing back and forth. If it's something that's
15  new or hasn't been done before, it takes a little
16  longer to arrange the transportation.
17  BY MR. PEARSON:
18      Q.  But it's simply a matter of making the
19  arrangements for the transportation. Would that be
20  fair?
21      A.  Well, that's the matter. Sometimes it's simple
22  and sometimes it isn't.
23      Q.  And in particular with the Johnco supply
24  agreement, what was Yelvington's shipment schedule
25  relative to moving that product in 2006?

31

1      A.  What was our -- you have to clarify the
2  question.
3      Q.  Did Yelvington have a regular shipment schedule
4  to move product from Whitehall, the Johnco facility in
5  Whitehall, in 2006?
6      A.  We didn't have a regular schedule.
7      Q.  At all?
8      A.  No.
9      Q.  Why is that, Gary?
10      A.  Well, Johnco had to bring the production up to
11  supply the material. We had to arrange the railroad to
12  take the cars out there to the loading point.
13      Q.  Go ahead.
14      A.  There was -- due to the Katrina activity, there
15  was quite a bit of business on the line from the
16  Montgomery yard, out to -- out past the Johnco quarry on
17  a Short Line Railroad.
18          It was a new business that was talked about
19  several years prior, but it was slow or delayed in
20  getting started. So it was a typical new business where
21  both parties, in my opinion, were trying to initiate the
22  start of something that would have been good for us.
23      Q.  Do you know of any instance where Johnco
24  scheduled a train into Whitehall that they didn't load
25  it immediately, within the allowable time?

32

1      A.  Well, I know that --
2      Q.  Prior to the filing of the lawsuit that we're
3  taking your deposition in today.
4      A.  Well, we had some -- we had somebody
5  interacting with Johnco, Philip Holladay, who I believe
6  you will take a deposition from, that was cueing me in
7  on the availability and his understanding of what was
8  going on out there.
9      Q.  What was Mr. Holladay cueing you in? Exactly
10  what was he saying?
11      A.  Just keeping up with, you know, how they were
12  doing, did it look like they were going to be able to
13  supply the material, you know, moving the cars out
14  there, getting both CSX and Short Line, which I believe
15  is the M & B Railroad, to coordinate to make the handoff
16  from one railroad to the other, making sure the cars
17  got -- there was some other cars and obligations that
18  the railroad had with each other on other business that
19  they had to coordinate.
20      Q.  Going back to my first question, are you aware
21  of any time in '06, prior to the filing of this lawsuit,
22  where a train came to Whitehall that you all sent over
23  there that didn't get timely loaded completely --
24      A.  We wouldn't send it out there if they couldn't
25  load it because we were busy with our cars.

37

1  Railroad, could come over and take the cars and move
2  them back to Whitehall.
3      We were trying to make sure we didn't just drop
4  any train by there. We had a lot of trains going
5  through there. We had to try to coordinate it so that
6  when we dropped a train in Montgomery, that there wasn't
7  delay, that it didn't sit in the yard. They already had
8  issues in the yard, so we didn't want that to happen.
9      We wanted this to be a smooth start. We wanted
10  everybody to kind of understand and make it a good
11  transition so that we wouldn't have the railroad, you
12  know, pushing back on, you know, this isn't working
13  right, you know. We were careful to start this
14  properly. Wanted to make sure that product was
15  available. Wanted to make sure that they had somebody
16  that could load it. I mean, we were cautious and
17  anxious to move forward with the opportunity.
18      Q.  What knowledge do you have that Johnco did not
19  have the product available?
20      A.  I guess, the fact that they were late starting,
21  in our opinion, my opinion, late getting started, over a
22  year, year and a half. Obviously, they had some issues
23  with equipment. Had never done this before, didn't have
24  sales for some of the products, especially sand. We
25  were trying to work with them, trying to move the

38

1  product.
2      There's just some things we couldn't do. We
3  didn't have a place to take the sand. I know they
4  wanted to move sand and it was a burden for them, but we
5  didn't have a place that we could take sand. We did
6  take some other gravel, Number 4 gravel, because they
7  apparently had a large pile of that, so we took that.
8  And --
9      Q.  The Number 4 gravel, Gary, that you talk of,
10  that is a larger diameter gravel?
11      A.  Yes.
12      Q.  And that was not under the contract, the supply
13  agreement contract?
14      A.  No, but we took it. We had a place to move it,
15  and we took that.
16      Q.  But that's not part of the supply agreement
17  contract?
18      A.  It wasn't in the contract. No.
19      Q.  And are you indicating in any way that you
20  considered that you were doing a favor for Johnco by
21  taking that?
22      A.  We were working with them any way we could to
23  try to get this thing started out properly. We had good
24  intentions. We had -- we thought it was a great
25  opportunity.

39

1      Q.  The Number 4 that you moved, that you indicate
2  you were trying to work with them, did you buy that
3  gravel at a fair price?
4      A.  Yes.
5      Q.  And could you resell that gravel and make a
6  profit out of it?
7      A.  Yes.
8      Q.  And were there any problems with Johnco
9  supplying that to you when you asked them for it?
10      A.  No. We had Philip look at the material and we
11  got a sample of it. They needed to move it. We had a
12  place to move it, so we made that part of a train.
13      Q.  The gravel that was under the supply agreement,
14  as I understand it, is called Number 67.
15      A.  Yes.
16      Q.  And what -- describe what Number 67 gravel is,
17  just generally.
18      A.  Generally, it's a -- basically, it's a
19  three-quarters to three-eighths size material most
20  commonly used for ready mix concrete.
21      Q.  Was that what you were buying it to use it for?
22      A.  Primarily.
23      Q.  And you would then sell it to somebody who
24  would use it for that?
25      A.  Yes.

40

1      Q.  Did you have customers that used Number 67 for
2  that?
3      A.  Yes. We had potential customers for that --
4      Q.  And --
5      A.  -- product.
6      Q.  For that product?
7      A.  Yes.
8      Q.  Excuse me for interrupting.
9      And did you buy Number 67 gravel from any other
10  producers?
11      MR. LEEK:  Object to form. You can answer the
12  question.
13      MR. PEARSON:  Let me -- I agree.
14  BY MR. PEARSON:
15      Q.  Prior to the Johnco supply agreement, did you
16  buy Number 67 gravel from other suppliers?
17      A.  Prior to the agreement?
18      Q.  Prior to the agreement.
19      A.  Yes.
20      Q.  Now, who did you buy that from?
21      A.  I believe we bought some from Elmore Sand &
22  Gravel, I believe.
23      Q.  And where would they be located?
24      A.  They're in -- they're just north of Montgomery.
25      Q.  How did you move that?

93f7f9bb-1dbb-4811-8553-35dc8ec418c9

45

1    And as far as being ready on a certain date,
2  you know, I don't specifically remember that.
3      Q. Okay.
4      A. And if you were ready on a certain date, would
5  you be able to continue to ship that product. I mean,
6  it was a -- we were kind of feeling our way into getting
7  this thing started. We had a very high interest in
8  getting it done.
9      Q. So would it be fair, then, to characterize what
10 you're saying, Gary, and I'm trying to listen to you.
11 Would it be fair to characterize what you're saying is
12 that Yelvington wasn't sure -- and I'm talking about
13 your company. Yelvington wasn't sure whether or not
14 Johnco could do it, so they were taking it really slow?
15     A. We were being cautious for a couple of reasons.
16 We wanted to make sure the railroad, since this was a
17 long-term deal, didn't lose confidence that this thing
18 wasn't going to work. We wanted to make sure that we
19 could get the cars out there on a regular basis. And
20 then handoff of those two -- between those two railroads
21 and getting the cars to land in Montgomery at a time
22 that's compatible with the service from Montgomery out
23 to Whitehall.
24     We were being cautious. Our credibility as a
25 supplier and the utilization of our equipment is

46

1  important to us to keep that balance.
2      Q. Was your credibility as a purchaser and a party
3  to the contract with Johnco also important to you?
4      A. Absolutely.
5      Q. And do you -- did Johnco -- I mean, excuse me.
6  Does Yelvington have an understanding of the contract
7  that they were obligated to purchase this gravel and
8  ship it on a regular basis?
9      A. Yes. We had a volume that we knew we could
10 move.
11     Q. Okay. But you didn't come get that volume or
12 attempt to come get that volume from Whitehall. Would
13 that be fair?
14     A. Yeah. We would move the volume that we were
15 committed to.
16     Q. When you were committed to move it, are you
17 speaking of committed to Johnco, or committed to one of
18 your customers, which one, when you say you were
19 committed to?
20     A. We were -- we would have been in a position to
21 take the material from Johnco over the commitment of the
22 agreement. What we committed to in the agreement, we
23 would have been able to do.
24     Q. What was your understanding of that?
25     A. A hundred and fifty thousand tons a year.

47

1      Q. And that's a minimum?
2      A. That's a minimum.
3      Q. Did you ever consider that you would be taking
4  more than that minimum?
5      A. We could. We had an option, I believe, in the
6  contract to take excess.
7      Q. In fact, didn't Yelvington require that Johnco
8  be able to load 5200 tons or 52 open hopper cars per
9  week?
10     A. On the weeks that we sent the train in, yes.
11     Q. Okay. So you had no understanding that you
12 would -- they had to be able to do 52 open hopper cars
13 or closed hopper cars a week. You had no understanding
14 of --
15     A. Well, clarify a week. The week that we sent it
16 out there, yes, but not every week.
17     Q. Not every week?
18     A. Not every week. Do the math.
19     Q. Now, from -- was there any point in time when
20 Yelvington intended, then, to take the gravel on some
21 regular schedule?
22     A. Yes.
23     Q. All right. What was the regular schedule that
24 Yelvington intended to take Number 67 gravel from
25 Whitehall?

48

1      A. Well, I believe we were getting in the groove
2  of taking it beginning in August. We started running
3  two trains a month.
4      Q. Was there anything in the contract that said
5  two trains a month was what you're supposed to run?
6      A. It didn't say. Two trains a month would have
7  met the volume commitment.
8      Q. Was there any problem with loading -- when you
9  sent the two trains in August and the two trains in
10 September, did Johnco have any problem loading those,
11 getting them out of there for you?
12     A. I don't recall any problems.
13     Q. Okay. You didn't send any trains in October,
14 though. You scheduled no trains in October of '06.
15     A. Well, I believe, at some point, Mr. Junkett
16 (sic) came down and -- or, at some point, they sent us a
17 letter, shutting down the operation.
18     Q. And have you got a copy of the letter where
19 they send it, shutting down the operation?
20     A. I don't have it.
21     Q. You don't have it?
22     A. Not with me, no.
23     Q. Okay. But that is a letter that Junkin sent
24 you, shutting down the operation?
25     A. I don't know if he sent a letter or told Philip

137

1    Q. All right. And I'm specifically talking now
2  specifically about the trip where you flew into
3  Montgomery and met with Pep and Ben in Montgomery, at
4  the airport, when they came over to see you. Did they
5  say anything to you about, we need you to take some
6  gravel, meaning Yelvington, your company? Did they talk
7  to you about that?
8    A. Like I have said before, as far as any urgency,
9  the urgency appeared to me to be, can you help us move
10 the sand. And by the way, we've got this large gravel,
11 can you help us move that.
12   Q. Okay.
13   A. Can you help us do those kind of things.
14   Q. But nothing about moving any of the contract
15 Number 67 gravel?
16   A. We were going to move what we committed to
17 move.
18   Q. But I'm not asking that question. You've
19 stated that over and over and over.
20   A. Right.
21   Q. Did Pep say anything or did Ben say anything,
22 we need Yelvington to move its -- to move the gravel.
23 Did they state that to you?
24   A. I think that was -- I mean, I knew that they
25 wanted to sell gravel. They had other issues that they

138

1  were asking us for help on.
2    Q. And you were trying to help them get the sand
3  moved?
4    A. I was trying to do a lot of things. I moved
5  the big gravel for them, or helped them move. They had,
6  at some point, a substantial amount of that big gravel.
7  Couldn't move the sand, unfortunately.
8    Q. Would you be planning to move the sand in the
9  rail cars, too? Would that be the way you would move
10 that sand?
11   A. It's the only way we could move it because we
12 only have terminals that are rail served. And there's
13 really not a local market for the sand in Whitehall.
14   Q. How much sand did they have out there to move?
15   A. I don't know who told me this, but it was like
16 a 60 percent sand and 40 percent gravel, one versus the
17 other.
18   Q. But as far as what had been mined and piled up,
19 do you know how much they were telling you? Did anybody
20 ever tell you --
21   A. How much sand?
22   Q. Yeah, they needed to move.
23   A. No. They just said they produced a lot of
24 sand, could we help them move it. And I know
25 specifically that they've tried to get various folks to

139

1  try to help them move the sand. And I wish we could
2  have moved it because that's the business we're in.
3    Q. I want -- if you go back to what, again, we
4  marked as Plaintiff's Exhibit 10, if you would now for
5  me, Gary.
6      I want to -- I want to go over to -- if you
7  look over on page six of ten of that document. These
8  are affirmative defenses. And I'm not going to try
9  to -- you know, not go over what affirmative defenses
10 are. But these are things that are being pled or
11 contended by Yelvington in this instance. Are you
12 familiar with, like, what an affirmative defense would
13 be?
14   A. Not really.
15   Q. Okay. Do you know what failed to sufficiently
16 mitigate means in plaintiff's second affirmative
17 defense?
18   A. No.
19   Q. Okay. So you didn't have any input that you
20 know of into that and don't have anything to offer
21 there?
22   A. It looks like legal.
23   Q. Okay. And I don't disagree. I'm just asking
24 if you have anything further to add here.
25      Third affirmative defense, plaintiff -- do you

140

1  understand the plaintiff is Johnco here?
2    A. Yeah.
3    Q. All right. Plaintiff breached agreement prior
4  to any purported breach by defendant. And you realize
5  that Conrad Yelvington Distributors, Inc. is the
6  defendant in that sentence?
7    A. Plaintiff is unable --
8    Q. No, read number three.
9    A. Oh. Plaintiffs breached the agreement prior to
10 any purported breach by the defendant. I wouldn't know
11 what -- I don't know what that means.
12   Q. You don't know of anything that you had to
13 offer other than what you've already told me today about
14 that?
15   A. Well, what did I tell you today about that? I
16 mean, what is that?
17   Q. Okay. All right. That's obvious, you didn't
18 have a whole lot of input into it.
19      The fourth affirmative defense, Gary. And I
20 specifically -- you know, I'm going to ask you, in the
21 part of this sentence where it says that the plaintiff
22 was unable to produce the amount of aggregate required
23 by the agreement. You see that in that sentence?
24   A. Plaintiff was unable to perform its obligation
25 under the agreement because it was unable to produce the

157

1  stayed with what they said they would do in this supply
2  agreement.
3      **Q. Who are you buying it from at the higher price?**
4      A. I think we're buying it from Martin Marietta.
5  We're buying some from Martin Marietta right now.
6      **Q. Is this the gravel you told me about earlier in**
7  **the deposition, the number 57?**
8      A. It's 57 or 67. It's used for the same purpose,
9  concrete.
10     **Q. Well, my question is, are you buying 67 gravel**
11 **from Martin Marietta?**
12     A. I'm not sure if it's 57 or 67.
13     **Q. All right.**
14     A. But, you know, I'm selling them for the same
15 use, to make concrete out of. If they had 67, I would
16 buy 67. Since they may not make 67, then their option
17 is to make --
18     **Q. So you don't really know if you're buying 57 or**
19 **67?**
20     A. As I speak to you today, no. If you want me
21 to, I'll step out of the room and confirm it.
22     **Q. I think that it would be something that I'm**
23 **going to want to know before we end.**
24     A. Okay.
25     **Q. I mean, I don't need to -- we can stop anytime**

158

1  and do it.
2      But when did you start buying this?
3      A. What, 57?
4      MR. PEARSON: Okay. Then now maybe be a good
5  time. Let's just go off the record. We'll take a
6  quick break.
7  (Thereupon, at 2:45 p.m., a recess was taken in the
8  proceedings, after which, at 2:55 p.m., the proceedings
9  were reconvened and the following proceedings were had:)
10 BY MR. PEARSON:
11     **Q. When we left, we took a break, you were going**
12 **to make a call to find out something about --**
13     A. Jennifer Hoffman, who handles all that for us,
14 is out all week, so I wasn't able to find out.
15     **Q. Okay. All right. Let's just examine what you**
16 **do know, then.**
17     The price that you're buying whatever gravel
18 you're buying from Martin Marietta -- is that who you're
19 buying it from?
20     A. Uh-huh.
21     **Q. Is what?**
22     A. Higher.
23     **Q. Do you know -- I mean --**
24     A. No.
25     **Q. In the complaint, it says $7.50. But do you**

159

1  **know what you're paying?**
2      A. I think when that question was asked of us to
3  determine that, that's what it was at that time.
4      **Q. All right. Who are you buying it from? Who**
5  **are you buying this more expensive gravel from?**
6      A. I believe it's Martin Marietta.
7      **Q. Okay. Is there anybody else?**
8      A. Maybe The Concrete Company. Those are the only
9  two I'm aware of.
10     **Q. And how are you moving it?**
11     A. By rail.
12     **Q. Okay. And are these the larger trains?**
13     A. Only from Martin Marietta, and it's only -- can
14 only be on the weekends. So it's difficult to schedule,
15 because the trains have to be just in the right spot to
16 be compatible with their loading. They only have one
17 day they can do it.
18     **Q. Okay. What are the rail costs to move it from**
19 **the Martin Marietta, The Concrete Company's -- I mean,**
20 **are the rail costs different than moving it from**
21 **Whitehall?**
22     A. Yeah.
23     **Q. Okay. Tell me how.**
24     A. It's just a -- it's a different deal. I mean,
25 the Whitehall deal was an old deal that the railroad

160

1  would have lived up to. And the Martin Marietta deal is
2  kind of a new deal, and the railroad now has a lot of
3  different cost increases recently with new business that
4  are charging a whole lot more now than they used to.
5      **Q. Where are you moving it to?**
6      A. Just to our gulf coast terminals relative to
7  this. I mean, we move it from there to all kinds of
8  places, all our terminals except Michigan. But
9  specifically what we're talking about here, just to the
10 gulf coast terminals.
11     **Q. Who is going to testify on behalf of Yelvington**
12 **about these damages? Do you know?**
13     A. We probably have to figure out exactly what
14 they are currently and what they -- how they change as
15 prices and so forth goes up. So it would probably be --
16 Mark Klebe would probably do that.
17     **Q. Okay. But he's not going to have that**
18 **information today, either.**
19     A. I doubt it. You can ask him.
20     **Q. Well, I will. But to the extent, Gary, that**
21 **you're going to testify that at some point in the**
22 **future, I'm going to want to be able to reconvene and**
23 **ask you about the damages, since that is part of the**
24 **lawsuit. And, you know, my opportunity to ask them**
25 **is -- you know, I'm not getting to get that opportunity**

161

1 **today because you don't have information available to**
2 **you.**
3    MR. PEARSON: Tom, are you going to have any
4 problem with that?
5    MR. LEEK: I don't expect. I want to take a
6 look at the 30B6 notice, because I don't think it
7 referenced anything to do with the damages here, but
8 I don't expect --
9    MR. PEARSON: But I'm going to take a 30B6 from
10 somebody on damages.
11    MR. LEEK: Right. Sure. Not a problem.
12    MR. PEARSON: Okay. I mean, you all can tell
13 me who it is. I'm not saying it has to be Gary.
14    MR. LEEK: Sure.
15    MR. PEARSON: I'm sure Gary is sick of me.
16    THE WITNESS: No, I'm sick of you asking me
17 stuff I don't know the answer to.
18    MR. PEARSON: All right. If you all will give
19 me just a minute and let me walk out, and then I
20 might be done here. But just give me just a minute,
21 and I'll be back in a second.
22 (Thereupon, at 2:59 p.m., a recess was taken in the
23 proceedings, after which, at 3:04 p.m., the proceedings
24 were reconvened and the following proceedings were had:)
25    MR. PEARSON: Tom, are we using the usual

162

1 stipulations related to depositions where you object
2 to form and reserve all the other objections?
3    MR. LEEK: Yes. And when you say usual
4 stipulations, I don't know what the usual
5 stipulations are. But assuming they're the same as
6 ours, yes. You shouldn't expect a problem from me
7 on that.
8    MR. PEARSON: Okay. Gary, at this time,
9 subject to my earlier comments relative to damages
10 testimony and if you're going to be designated to
11 give testimony related to the damages, then I'm done
12 at this point.
13    THE WITNESS: With me?
14    MR. PEARSON: Yeah. And I appreciate you
15 sitting and putting up with this all day.
16    MR. LEEK: You have the opportunity to read the
17 transcript if it's ordered to make sure that she's
18 taken down things correctly, or you can waive that
19 right. I'm comfortable with you waiving it. I'm
20 confident Sandy's going to take down things
21 correctly.
22    THE WITNESS: Fine with me.
23 (Thereupon the deposition was concluded at 3:05 p.m.)
24
25

163

1    CERTIFICATE OF OATH
2
3 STATE OF FLORIDA    )
4 COUNTY OF VOLUSIA    )
5
6    I, Sandra Narup, Registered Professional Reporter
7 and Florida Professional Reporter, the undersigned
8 authority, certify that GARY YELVINGTON personally
9 appeared before me and was duly sworn on July 5, 2007.
10
11    WITNESS my hand and official seal this 12th day of
12 July, 2007.
13
14
15
16
17
       _____
18    Sandra Narup
    Registered Professional Reporter
    and Florida Professional Reporter
19
    Notary Public, State of Florida
20    My Commission No.: DD 472186
    Expires: January 15, 2010
21
    (This signature is valid only
22    if signed in blue ink.)
23
24
25

164

1    CERTIFICATE OF REPORTER
2
3 STATE OF FLORIDA    )
                       )
4 COUNTY OF VOLUSIA    )
5
6    I, SANDRA NARUP, Registered Professional Reporter,
7 Florida Professional Reporter and Notary Public, do
8 hereby certify that I was authorized to and did
9 stenographically report the deposition of GARY
10 YELVINGTON, that a review of the transcript was
11 requested; and that the foregoing transcript is a true
12 record of my stenographic notes.
13    I further certify that I am not a relative,
14 employee, attorney, or counsel of any of the parties,
15 nor am I a relative or employee of any of the parties'
16 attorneys or counsel connected with the action, nor am I
17 financially interested in the action.
18
19    DATE this 12th day of July, 2007.
20
21
22
       _____
23    SANDRA NARUP
    Registered Professional Reporter &
    Florida Professional Reporter
24
    (This signature is valid only
25    if signed in blue ink.)

# EXHIBIT TWO

# FREEDOM COURT REPORTING

Page 9

1 so let's try not to talk over each other.
2 You do a very good job of that, sometimes I
3 don't. Is that all right with you?
4     A.    That's fine.
5     Q.    All right. We have marked for
6 purposes of your deposition as Plaintiff's
7 Exhibit 1 to the Mark Klebe deposition as
8 the 30(b)(6) representative for Conrad
9 Yelvington Distributors. Would you look at
10 that.
11     A.    (Witness complies.)
12        Okay.
13     Q.    All right. On the -- Do you
14 notice that we asked that you bring with you
15 or produce for us copies of documents that
16 you would have used or relied on in order to
17 testify as the 30(b)(6) representative? Did
18 you --
19     A.    Yes.
20     Q.    Do you see that?
21     A.    Yes.
22     Q.    And did you look at that list
23 of those documents?

*(handwritten: Klebe    motion Limine)*

16     A.    Certainly.
17     Q.    All right. Are you going to
18 be giving any testimony today as an expert
19 witness?
20        MR. LEEK: Object to the form.
21 I don't know that he'd know that. He hasn't
22 been designated as an expert.
23        MR. PEARSON: That's fine.

Page 11

1 And maybe that was a better question for
2 you. But I did not think he had been
3 designated as an expert.
4     Q.    Mark, you're going to testify,
5 as I understand it, about Yelvington's
6 damages that it claims it suffered as a
7 result of breach of the supply agreement by
8 Johnco as it claimed in its counterclaim; is
9 that right?
10     A.    Correct.
11     Q.    And I'm going to -- Did you
12 prepare documents today that are a summary
13 of -- and bring to the deposition that would
14 be a summary of what you claim those damages
15 would be, or what Yelvington claims those
16 damages would be?
17        All right. Let's mark this if
18 you don't mind. Mark, if you would -- Mark,
19 if you'd look at the exhibit that I've
20 marked as Plaintiff's Exhibit 2. And if you
21 would please tell me what that is.
22        (Whereupon, Plaintiff's
23        Exhibit No. 2 was marked

Page 12

1        for identification.)
2     A.    This exhibit is a summary of a
3 calculation we prepared on our damages
4 number for this case.
5     Q.    All right. At the top, you've
6 dated it December the 20th, that's today;
7 correct?
8     A.    Correct.
9     Q.    And you entitled it a contract
10 summary; is that right?
11     A.    It really does not have a
12 title. The title is actually the Johnco
13 damages calculation.
14     Q.    All right. And down below the
15 date you have contract summary. What do you
16 mean by contract summary?
17     A.    That was simply information
18 for me to understand where we were from the
19 standpoint that just in terms of the
20 commencement date and the contract
21 requirement for tonnages. Based on my
22 understanding of the contract, commencement
23 date was to have been April 27th, 2005. The

3 (Pages 9 to 12)

# FREEDOM COURT REPORTING

Page 13

1  actual date did not occur, or it's my
2  understanding that the first shipment date,
3  when it became effective, and perhaps that's
4  what I should do, have the commencement
5  date, effective date. The first shipment, I
6  understand, was May 11th of 2006, and then
7  it would run five years from that date, and
8  that it was required to move a hundred and
9  fifty thousand tons a year.
10      Q.    All right. Now, Mark, you say
11  the commencement date per the contract. Is
12  that a determination that you made?
13      A.    That's my reading through
14  their views in it. And perhaps, like I say,
15  I should have tried to figure out where we
16  were in terms of effective date.
17  Commencement date would probably be
18  incorrect.
19          My understanding from reading
20  the contract is that the effective date of
21  this contract for the five-year measurement
22  is actually May 11th, 2006. That's really
23  the only number I drove off of on this

Page 14

1  sheet.
2      Q.    All right. And I need to
3  clear up: Is there -- Is Yelvington
4  applying any significance to the April 27th,
5  2005, date which you called the commencement
6  date? Is there any significance of that
7  date to Yelvington?
8      A.    Not in terms of this
9  calculation.
10      Q.    Is there any significance to
11  that in terms of the alleged breach by
12  Yelvington?
13          MR. LEEK: Objection. By
14  alleged breach, do you mean breach by
15  Yelvington or breach by Johnco?
16      Q.    Yelvington's alleged breach by
17  Johnco, do you attach significance to that
18  date for that purpose?
19      A.    Only from the standpoint that
20  Johnco had the opportunity to elect to not
21  be a party to this contract at all had they
22  not put everything together in one year,
23  from my understanding only. But we actually

Page 15

1  started shipping and continued on with this
2  contract as of May 11th, 2006, becoming the
3  effective date when we took a shipment.
4          I think secondarily to that --
5  Not to volunteer too much info, but
6  secondarily to that, there's the question of
7  how the pricing should work and what date
8  should that really begin on. So I think we
9  could always discuss that.
10      Q.    All right. After April the
11  27th, of 2005, which you show to be the
12  commencement date on this Plaintiff's
13  Exhibit 2 to this deposition, and prior to
14  May the 11th, of 2006, at any time did
15  Yelvington order gravel, No. 67 gravel,
16  under the supply agreement that was not
17  produced by Johnco?
18      A.    That's a question I can't
19  answer.
20      Q.    Is it Yelvington's position in
21  calculating these damages that any damages
22  actually accrue between April 27th in 2005
23  and -- Well, let me see -- Strike that

Page 16

1  question completely, it was terrible.
2          When you're looking at
3  Plaintiff's Exhibit 2, so we can talk about
4  it, is there a date when Yelvington, under
5  Plaintiff's Exhibit 2, you can show me where
6  Yelvington starts accruing damages to its --
7  in its opinion, I would assume? Is this an
8  opinion of when it started accruing damages?
9      A.    It's my opinion.
10      Q.    Okay. It's your opinion when
11  you started. All right.
12          Tell me when, in your opinion,
13  Yelvington started accruing damages.
14      A.    This began May 11th, 2006.
15      Q.    That's when the damages
16  started to accrue for Yelvington?
17      A.    And to clarify what we did is,
18  we said that effective May 11th, 2006, this
19  contract went into force in terms of that
20  was when -- the beginning of the five-year
21  period would run. And so -- Pardon me, I'm
22  not legal, so I'm not going to know some of
23  the terminologies of effective commitment

4 (Pages 13 to 16)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 117

1    Q.    Would it be important -- First
2    of all, do you know how much storage
3    capacity Yelvington has on these yards that
4    you have there for storing?
5    A.    I do not.
6    Q.    Would you think that would be
7    something that would be necessary for you to
8    know in order to make a damages calculation?
9    A.    No.
10    Q.    Do you believe Yelvington just
11    stored seventy thousand tons at the Milton
12    facility?
13    A.    As I've already indicated, I
14    can't give you an indication of how much we
15    can store at any of these one locations.
16    Each yard is unique, and I don't recall what
17    each of these yards could store.
18    Q.    And you don't feel that that
19    would be important to know?
20    A.    No.
21        MR. PEARSON:  I think that's
22    all the questions I've got.
23        MR. LEEK:  I don't have any.

Page 118

1        You're going to have the
2    option to read this transcript if it's
3    ordered or waive it.
4        THE WITNESS:  I'd like to read
5    it.
6        MR. LEEK:  Yeah, we'll read.
7    You can send it care of my office if it's
8    ordered.
9        MR. PEARSON:  Just so you
10    know, while we're on the Record, I don't
11    think this is anything new:  We're not
12    waiving any objections we might have as to
13    whatever valuation he gave based on expert
14    witness or any other kind of opinion
15    testimony.  We're not intending to waive
16    that by asking the questions.  It was just
17    my opportunity to ask the questions, so
18    that's what we've done.
19        MR. LEEK:  Okay.
20        MR. PEARSON:  Thanks.
21    (The deposition was concluded at 12:45 p.m.,
22    December 20th, 2007.)
23

Page 119

1        REPORTER'S CERTIFICATE
2    STATE OF ALABAMA,
3    ELMORE COUNTY,
4        I, Sara Mahler, Certified Court
5    Reporter and Commissioner for the State of
6    Alabama at Large, do hereby certify that the
7    above and foregoing proceeding was taken
8    down by me by stenographic means, and that
9    the content herein was produced in
10    transcript form by computer aid under my
11    supervision, and that the foregoing
12    represents, to the best of my ability, a
13    true and correct transcript of the
14    proceedings occurring on said date and at
15    said time.
16        I further certify that I am neither
17    of kin nor of counsel to the parties to the
18    action; nor in any manner interested in the
19    result of said case.
20
21
22        _____
        Sara Mahler, CCR
23        ACCR #420

30  (Pages 117 to 119)

## 367 VALLEY AVENUE
### (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# EXHIBIT
# THREE



To Do

1. WP Notebook completion
2. Docs Relied Upon / WDF
3. FN    Notebook - DT
4. Repairs/Incidents/BG    Analyses
5. RMA
6. Mitigation upon Subs. Discovery - Dunn
7. Lee Alexander notebook review
8. Review 05/06 TR's
9. Rinker Analysis Review

Borden - 0361

# EXHIBIT FOUR

# FREEDOM COURT RE]

*Borden*

*Motion Limine*

## Page 21

1  the third and fourth quarters of the year.
2      Q.   You would agree with me,
3  between March and -- excuse me, between May
4  11th and September 25th, Yelvington only
5  picked up thirty-two thousand tons of number
6  67 during the period of time which you say
7  is the best season to be selling gravel?
8      A.   It is the better season to be
9  selling the gravel. I think the important
10  thing to note though is that at the time
11  Johnco shut down, Yelvington had picked up
12  everything that Johnco had except for about
13  one unit train of 67 gravel.
14      Q.   And based on that, are you
15  making an assumption that they could not
16  produce any more gravel?
17      A.   What I'm -- What I'm looking
18  at is the fact that Johnco was essentially
19  out of gravel by the time they filed suit in
20  this litigation.
21      Q.   And I understand --
22      A.   And what you're saying is that
23  they could have produced more. I don't know

## Page 23

1  thous
2      A
3  comm
4  thous
5  calcu
6  fifty
7      (
8  that (
9  take
10  numl
11  prevent Johnco from producing
12  and sixty thousand tons of 67 gravel?
13      A.   Sure. But that wouldn't have
14  been a damage attributable to Yelvington's
15  conduct. And what I'm doing is dealing with
16  that.
17      Q.   And on what basis would that
18  not be a damage?
19      A.   Because Yelvington was not
20  responsible for the additional volume of
21  activity. They had only a
22  first-right-of-refusal with respect to that
23  additional volume.

## Page 22

1  whether they could have or not. There are
2  no production records; we don't have data
3  that indicates down time, interruptions,
4  tons per hour, tons per day, tons per week.
5  There's no production data that's been
6  produced in this case that provides any
7  relevant information to look at what they
8  could have produced.
9          You've got conflicting
10  testimony in terms of, we were trying to
11  produce, we were curtailing production.
12  You've got all kinds of things in the Record
13  that conflict with respect to what was going
14  on here from a production standpoint. So I
15  don't know whether they could have or not.
16          But, frankly, for purposes
17  what I've done in my analysis of
18  Mr. Alexander's calculations, I'm assuming
19  they could have produced a hundred and fifty
20  thousand tons. I don't know whether they
21  could, in fact, have done that.
22      Q.   Well, are you assuming they
23  could have produced two hundred and sixty

## Page 24

1      Q.   Did you ever consider whether
2  your client -- Did you ever consider that
3  your client was going to take additional
4  gravel over a hundred and fifty thousand?
5      A.   Well, certainly they
6  negotiated for an option, a
7  first-right-of-refusal to do that. They
8  wanted to control the amount of activity
9  that flowed from that site. They had an
10  option to take it, but they did not have an
11  obligation to take it.
12      Q.   I guess you didn't hear
13  Mr. Klebe's testimony yesterday because you
14  weren't here.
15      A.   No, I was not.
16      Q.   Would it change your opinion
17  if you know Mr. Klebe testified yesterday
18  that if Yelvington could have gotten more
19  than a hundred and fifty thousand tons from
20  Johnco, they would have easily been able to
21  sell it?
22      A.   It would not change it at all.
23  I mean, certainly you would anticipate,

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 25

1  given the elements of this contract. I
2  mean, this is -- what turned out to maybe
3  have been a good contract for Johnco at the
4  time, but obviously given the market
5  conditions that have occurred since the time
6  that this contract was entered into, this
7  has turned out to not be a good contract for
8  Johnco because of the fixed price element of
9  the contract. I would think Yelvington
10 would be motivated to get as much gravel as
11 they could from this contract.
12    Q.    More than a hundred and fifty
13 thousand tons?
14    A.    I think they would want to,
15 because of the diseconomic provisions in
16 terms of the -- to Johnco because of the
17 pricing of the commitment to Yelvington with
18 respect to the fixed price.
19    Q.    So it's not -- So it wouldn't
20 be unreasonable to expect that had
21 everything gone normally, and we don't --
22 we're not sitting here at this table taking
23 this deposition because there's litigation.

Page 26

1  It's reasonable to expect that given the
2  good price that you say Yelvington was
3  getting this at, and given the fact that you
4  have no reason to believe that Johnco could
5  not produce it, that they could have taken
6  more?
7    A.    Two things: The fact that
8  they might have done it doesn't mean there
9  was a contractual commitment to take it; and
10 then the second element of that, I have --
11 You know, again, I'm not offering opinions
12 here about what they produced or could have
13 produced. I don't think the records exist
14 for me to do that, but there's significant
15 questions, given their production history
16 and all the problems they were having,
17 whether they could have produced a hundred
18 and fifty thousand tons much less the two
19 sixty. But I'm not -- Again, I don't want
20 to get off into an opinion on that.
21    Q.    You're not going to opine that
22 Johnco could not produce two hundred and
23 sixty thousand tons, you're not going to

Page 27

1  make that opinion?
2    A.    Greg, I'm not unless you ask
3  me a question like that, and I have to
4  respond to it. That's the only basis on
5  which I will do that.
6    Q.    Well, I understand. And if I
7  ask you a question, what you think, that's
8  different than an expert opinion on the same
9  subject, would you agree with that?
10    A.    Well, you're asking me a
11 question that may extend beyond my expert
12 opinions, and I'm going to tell you what I
13 think. And I'll try to distinguish for you
14 what's expert opinion and what's not.
15    Q.    The only basis then that you
16 have of thinking that there may be a
17 significant question of whether Johnco could
18 produce it, is lack of information?
19    A.    No. They never did it.
20        They never did it. And
21 because of that, and they never demonstrated
22 that they could do it, and they never
23 produced any records that they did it. So I

Page 28

1  guess it would just be pure speculation or
2  you'd have to know more -- You'd have to
3  know what the plant was actually producing
4  to determine what the volume capacities were
5  of the plant, because there's no production
6  record that I know of. If there is, I'd
7  like to see it that indicates that.
8    Q.    Do you have any reason to
9  believe that Ben Johnston, a degreed
10 mechanical engineer who operated that plant,
11 would not know what it was capable of
12 producing? Do you have any reason to
13 believe that?
14    A.    Well, people talk about what
15 its capable of producing in a certain
16 environment. The plant can operate at a
17 capacity of five hundred tons her hour, and
18 it has twenty percent 67 gravel, that's
19 twenty-five percent, whatever, that's a
20 hundred and twenty tons per hour.
21        The fact that a plant can
22 operate at a particular capacity, you know
23 as well as anybody, doesn't mean that it

7 (Pages 25 to 28)

# FREEDOM COURT REPORTING

Page 29

1   does. You have breakdowns, you've got
2   screens that plug, you got just all kinds of
3   maintenance issues that you have to deal
4   with that may keep a sand and gravel plant
5   from operating at its capacity.
6       Q.    Did you look at any of that
7   and make a determination that the Johnco
8   plant could not produce more than a hundred
9   and fifty thousand tons?
10      A.    No. What I have -- What I
11  indicated to you, for purposes of what I've
12  done with respect to Les Alexander's
13  calculation, I've assumed they could produce
14  a hundred and fifty thousand tons. I do not
15  know whether they could or could not. Okay.
16  But I've just assumed. I've
17  given the benefit of the doubt that they
18  could have produced a hundred and fifty
19  thousand tons of gravel, of 67 gravel.
20      Q.    Doesn't part of your doubt and
21  question relate to the fact that they did
22  not produce and sell that gravel to
23  Yelvington?

Page 30

1       A.    Part of it is that. Part of
2   it is there's not record one of the
3   production.
4       Q.    Would it be reasonable for you
5   to consider that if Yelvington had sent --
6   First of all, are you aware of any train
7   that was ordered and sent out to Johnco to
8   be loaded that was not immediately filled up
9   and loaded and to Yelvington that they
10  ordered? Are you making any -- Do you know
11  of any instance where Yelvington ordered a
12  trainload of gravel from Johnco that was not
13  immediately filled?
14      MR. LEEK: Object to the form.
15  You can answer the question.
16      A.    I don't know of any. But I
17  have not -- I haven't looked at that. I have
18  assumed that they were able to load the
19  train. Obviously, there were issues early
20  on with the speed and some of the problems
21  they had with loading, but that's not an
22  issue to me.
23      Q.    That's not an issue?

Page 31

1       A.    It's not. It's not.
2       Q.    But you comment on some speed.
3   Do you know how quickly they loaded the
4   first train?
5       A.    I think it took a couple of
6   days or the better part of that.
7       Q.    That's what your basis is,
8   that it took a couple of days?
9       A.    No. No.
10      Greg, again, I'm not quibbling
11  with Johnco's performance from the
12  standpoint of loading the trains. I mean, I
13  think that's -- That's just normal kind of
14  start-up stuff that people go through and
15  have to work through in order to make an
16  agreement like this work. I'm not quibbling
17  with that. You're asking me about did they
18  not immediately load --
19      Q.    I'm just asking if you know of
20  an instance.
21      A.    I think they wanted to be able
22  to load them quicker than that. And they
23  built the ramp so that they could accelerate

Page 32

1   the pace.
2       Q.    You've got the tickets, if you
3   looked at those depositions that show the
4   time that it took to load every single car
5   on that first load that you said took two
6   days to load. Did you look at that and add
7   them up?
8       A.    No, I didn't.
9       Q.    Would it surprise you to know
10  that it was significantly less than even one
11  day?
12      A.    No.
13      Q.    I just wanted to know if you
14  looked at it.
15      Now, you're assuming that
16  because Johnco didn't produce the gravel
17  that they couldn't produce the gravel; is
18  that right?
19      A.    No. I think I've told you,
20  for purposes of what we're doing, I have
21  serious problems with what Mr. Alexander's
22  calculation indicates, even under the
23  assumption that they -- that Johnco could

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 33

1  produce a hundred and fifty thousand tons of
2  gravel. And I'm -- I do have very
3  significant questions whether they could
4  have produced it, whether they ever did
5  produce at that level. But I'm -- I'm just
6  assuming that they can, for purposes of what
7  I'm doing.
8      Q.  All right. Now, would it
9  matter that Yelvington never sent trains out
10  there every week to find out whether or not
11  it could have been produced at fifty-two
12  hundred tons a week, wouldn't that have been
13  a good test?
14      MR. LEEK:  Objection.
15      A.  No. They weren't required to
16  send trains every week.
17      Q.  When were they required to
18  send trains?
19      A.  They were required to send
20  trains on a regular-scheduled basis, and
21  they were going to load fifty-two hundred
22  tons at a time when they did. And if you --
23  If you look at that on a -- it's about every

Page 34

1  two weeks.
2      Q.  All right. Well, let me ask
3  you something --
4      A.  That's what they basically did
5  in August and September.
6      Q.  Let me ask you something.
7      A.  Okay.
8      Q.  You are ignoring, you have to
9  be ignoring, language in the supply
10  agreement. You're picking out regular, but
11  ignoring language in the supply agreement
12  two different places that says regular
13  weekly shipments, i.e. approximately
14  fifty-two hundred tons per week.
15          There are two references to
16  weekly shipments, and aren't you ignoring
17  that?
18      A.  No, I'm not. I'm not.
19      Q.  You're just -- And so you're
20  saying that no frequency of any kind is in
21  that contract?
22      A.  Regular is in that contract.
23      Q.  What is regular to you?

Page 35

1      A.  On some type of repetitive and
2  ongoing type of basis with a hundred and
3  fifty thousand tons annual commitment.
4      Q.  Well, let's just look at that.
5      A.  I mean you're not -- I mean,
6  obviously -- Well, you know, I mean, there's
7  not a lot of construction activity going on
8  this time of the year and in the month of
9  January. I mean, there are breaks in that
10  period.
11      Q.  So it probably wouldn't have
12  been picking up as much gravel in the
13  winter, is what you're saying?
14      A.  Absolutely. You wouldn't
15  expect it.
16      Q.  Well, let me just -- Let's go
17  back to regular for a minute. Do you know
18  the dates that they picked up the gravel?
19      A.  I do.
20      Q.  What were they?
21      A.  Well, there was May and then
22  there were two in June that were about -- I
23  mean -- excuse me, two in September and two

Page 36

1  in August. And they were all -- The two in
2  August and two in September were about a
3  couple of weeks apart, thereabout.
4      Q.  Do you remember one in June?
5      A.  Yes. There was a short --
6  There was a load that was not a full unit
7  train, I'm sorry, that included some number
8  4 oversize.
9      Q.  And the date for the first
10  shipment is May 11?
11      A.  Correct.
12      Q.  And the date for the second
13  shipment is June 27th?
14      A.  Correct.
15      Q.  How many days between that? A
16  bunch, forty-something?
17      A.  About forty-something days.
18      Q.  The next load is August 8th,
19  how many days between June 27th and August
20  8th?
21      A.  Five or six weeks.
22      Q.  Then you go to August 21st, so
23  it goes to thirteen days.

9 (Pages 33 to 36)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 37

1    A.    Okay.
2    Q.    And then you go to September
3  the 7th.
4    A.    About another thirteen or
5  fourteen days.
6    Q.    Eighteen.
7    A.    Okay.
8    Q.    Then we go to September 25th.
9    A.    Okay.
10    Q.    And then no more after that.
11  Now, tell me --
12    A.    But, now, here is the thing
13  that you've got to look at --
14    Q.    I'm not finished.  Let me -- I
15  understand, I'm going to give you plenty of
16  chances.
17    A.    You were asking a question?
18    Q.    I haven't asked a question.
19    A.    Good.
20    Q.    What about those dates is
21  regular to you:  May 11th, June 27th, August
22  8th, August 13th, September 7th, September
23  25th?  What is regular and what indicates

Page 38

1  that that is in any way regular?
2    A.    All right.  First off, I'm --
3  You're arguing with me about liability
4  issues and, again, I'm not offering expert
5  testimony about what regular is, but I'm
6  going to respond to you.
7        If you take the last four
8  shipments, I would think that's about as
9  regular as you're going to get.  I mean,
10  there's not much variation there in time.
11  If you also look at the fact, basically I
12  think the complaint says Johnco shutdown in
13  October, the allegation now is November.
14  And when you look at financial records, it's
15  really September is when the activity
16  curtailed significantly with respect to the
17  plant, if you look at salaries, expenses, if
18  you look at September, you'll see that
19  September is when the curtailment actually
20  happened.
21        And at the time the -- I guess
22  the blow-up occurred in October, Yelvington
23  had picked up everything Johnco had except

Page 39

1  for one unit train of 67 gravel.  So you've
2  got -- Yes, you did have some gaps.  I don't
3  quarrel with you about there being gaps
4  early on in the process for whatever reason.
5  But by the time you get through August and
6  September, Yelvington's picked up
7  essentially everything that Johnco has.
8    Q.    Would you agree with me that
9  cash flow would have been a lot better had
10  Yelvington been sending trains out there on
11  a regular, weekly basis picking up fifty-two
12  hundred tons a week?
13    A.    They were not obligated to
14  send trains out there every -- on a regular,
15  weekly basis.
16    Q.    I didn't ask whether they were
17  obligated to.
18    A.    Well but it's important --
19    Q.    Aren't you discussing
20  liability?
21    A.    Well, you're asking me a
22  liability question, Greg.
23    Q.    I'm asking you a cash flow

Page 40

1  question, Dave.
2    A.    All right.
3    Q.    Would their cash flow have
4  been a lot better if Yelvington had been
5  ordering trains and sending them out there
6  every week, picking up fifty-two hundred
7  tons a week?
8    A.    Hypothetically, it would have
9  been better.  But they were not obligated to
10  do that.
11    Q.    Well, I know that's your
12  opinion, they're not obligated.  And I would
13  tell you that I think you are making a
14  liability opinion there, but that's up to
15  you.
16        Is it reasonable to expect
17  that they could have come out there every
18  week -- If Johnco had sent the train,
19  hypothetically, out there every week would
20  -- Excuse me.  If Yelvington had sent a
21  train out there every week, fifty-two cars,
22  is Johnco obligated to load them under that
23  supply agreement, shipping?

10 (Pages 37 to 40)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 57

1  of gravel, I can calculate depletion
2  allowance based on that, or if it's a lesser
3  amount, I can calculate depletion based on
4  that, look at alternatives.
5      Q.   I need to understand: Are you
6  making an assumption, for your purposes of
7  your calculation -- and I guess you're
8  criticizing Les Alexander's use of two
9  hundred and sixty thousand tons to calculate
10 lost profits?
11     A.   That's correct.
12     Q.   And you are using, as a basis
13 for your criticism, actual quantities mined
14 as being representative of the production
15 capacity of the plant?
16     A.   I think that that is -- One of
17 the concerns I have is whether they could
18 have produced even the hundred and fifty
19 thousand tons. But for purposes of my work
20 here and my criticisms of Les Alexander's
21 work, I've given the benefit of the doubt
22 and assumed that they could produce a
23 hundred and fifty thousand tons.

Page 58

1      Q.   But you won't assume they
2  could produce two hundred and sixty thousand
3  tons?
4      A.   No. I mean, I have --
5  Obviously, it becomes much more problematic
6  based upon -- You know, the concern
7  obviously is if there are production
8  records, they have not been produced. The
9  actual production indicates a much, much
10 lower amount, more on the order of, as I
11 have in the report, approximately eight
12 thousand tons, at the most, per month.
13         I understand the argument
14 that, well, we were shutdown part of that
15 time, we were waiting on Yelvington part of
16 that time, and so we didn't produce part of
17 that time. That's the --
18     Q.   Is that unreasonable, if
19 Yelvington is not ordering trains and coming
20 out there and picking it up, is it
21 unreasonable for them to minimize your
22 production and minimize your staffing when
23 they're not receiving orders from

Page 59

1  Yelvington?
2      A.   Well, they didn't minimize
3  their staffing, Greg. That's one of the
4  issues. The staffing continues on, the cost
5  structure continues on, like this production
6  taking place. That's what I'm saying.
7          I don't know -- I don't know
8  what they could have produced. I don't.
9  Okay? That's beyond my scope.
10         All I can look at is the
11 historical records of what they actually
12 did. And, again, because I can't say
13 affirmatively that they couldn't have
14 produced a hundred and fifty thousand tons.
15 For purposes of what I'm doing, I have
16 assumed that they could produce the amount
17 that's contractually committed in the supply
18 agreement, which is a hundred and fifty
19 thousand tons.
20     Q.   And you don't question your
21 assumption of only eight thousand tons based
22 on actual use, you don't question that
23 assumption whatsoever with the understanding

Page 60

1  that that's far less even than the hundred
2  and fifty. You won't even get to the one
3  fifty there.
4      A.   That's correct. That's
5  correct.
6      Q.   So you are making the
7  assumption that here my records show only
8  ninety-six, but I'm going to go ahead and
9  assume one fifty, but I'm not going to let
10 Les assume that two sixty could have been
11 produced?
12     A.   Well, two sixty is totally
13 outside the scope of the contractual
14 commitment. That's not a production issue;
15 that's, the contract-doesn't-provide-it
16 issue.
17         And furthermore, there are all
18 kinds of questions about whether they could
19 have produced it.
20     Q.   And we keep going over those,
21 and you keep ending your answers with
22 "there's all kind of questions." What kind
23 of questions?

15 (Pages 57 to 60)

**Page 61**

1  A.  Well, again, if you look at --
2  from May forward, they were operating at a
3  full -- what appears to be or at least the
4  assumption Les has made, at a full
5  production equivalent level with the
6  exception that the fuel costs would escalate
7  to process and classify and load, all
8  functions, I mean one place it talks about
9  loading but then in another place it talks
10  about loading and producing, I think.  So I
11  think the assumption is that there would be
12  escalations of fuel costs only.  But aside
13  from that, production is -- capacity or
14  capability is at a fully-blown level to
15  produce not a hundred and fifty thousand
16  tons, but two hundred and sixty thousand
17  tons.
18  So I'm just saying, it's a
19  little bit of a -- I mean, you've got
20  somebody that's staffed to produce two
21  hundred and sixty thousand tons, which is
22  twenty-one or twenty-two thousand tons a
23  month, and they're producing, at the most,

**Page 62**

1  eight.
2  Q.  Do you know what those people
3  are doing out there?  Do you know if they're
4  actually running the dredge or producing?
5  A.  I do not.  I mean, downtime
6  analysis would be very helpful in this.
7  Q.  Let me ask you this:  When you
8  say downtime, I said do you know what those
9  people are doing?  Do you know if they're
10  doing dirt work, do you know if they're
11  putting some gravel on some roads, keeping
12  the trucks -- replacing spark plugs?
13  Do you know what they're doing
14  out there while they're waiting on
15  Yelvington to order the train?
16  MR. LEEK:  Object to the form.
17  You can answer.
18  A.  I do not know.  What you're
19  saying is that basically there's still
20  construction underway and overburden removal
21  taking place is what you're saying.
22  Q.  I'm not saying that.  I'm
23  saying you are assuming that because we're

**Page 63**

1  staffed at a level that will allow us to
2  produce fifty-two hundred tons a week that
3  we then must be producing it, or if we're
4  not, we can't produce it.  Would that be a
5  fair characterization?
6  A.  Not necessarily.  You can have
7  all kinds of start-up issues during part of
8  this period of time.  I mean, I feel certain
9  there were all kinds of things, obviously,
10  and there's been testimony about them,
11  problems with the dredge and problems
12  with --
13  Q.  During what time frame?  I
14  mean, are you talking about in the fall of
15  2005?
16  A.  No.  There were problems with
17  the dredge in the fall of 2006.
18  Q.  I need to get an answer from
19  you.  You're criticizing Les because he says
20  that our costs, relative to being staffed
21  and ready to produce fifty-two hundred tons
22  a week, you're saying it's unreasonable
23  because we didn't produce fifty-two hundred

**Page 64**

1  tons a week based on sales.
2  A.  Well, what my fundamental
3  criticism --
4  Q.  Is that correct?
5  A.  -- of what he's done is really
6  the expense side of it, Greg.  And then I'll
7  come back to that.
8  The fundamental criticism is
9  that if you are in fact staffed to produce
10  fifty-two hundred tons a week, you know,
11  that's one thing.  But here is what's going
12  on.  You've got a set of costs during this
13  testing period of time that is based upon an
14  actual history of producing only about eight
15  thousand tons.  Okay.  You're then --
16  Q.  And your history, you mean
17  sales history?
18  A.  Well, you know it can't be
19  more than that because you know what you had
20  to start with, which was nothing, and you
21  know what you had at the end, so you can --
22  and you know what you sold, so you can
23  figure -- that's normal accounting, you can

16 (Pages 61 to 64)

# FREEDOM COURT REPORTING

Page 65

1 figure what you're producing. And I'm just
2 saying at the most, they were producing
3 eight thousand tons a month.
4     Q.    And are you then?
5     A.    Unless they were selling
6 gravel that -- or that was not being
7 recorded or something, and I don't think
8 they were doing that.
9     Q.    But do you jump from what they
10 sold to that's all they could produce, is
11 that what you were doing?
12     A.    Well, I have questions about
13 their production.
14     Q.    But are you doing that?
15     A.    No. I'm not jumping to it
16 because --
17     Q.    All right.
18     A.    What I'm saying is I have
19 questions about whether they could produce.
20 Because if they're staffed fully to do it
21 and they're not doing it and they're not
22 building substantial inventories, why are
23 they not doing it? That's a question.

Page 66

1     But what I am -- What I am
2 assuming, for purposes of what I'm doing, is
3 that they could have produced a hundred and
4 fifty thousand tons.
5     Q.    Are you assuming any level of
6 idle time out there while we're staffed to
7 this full capacity?
8     A.    Well, certainly you have some
9 idle time.
10     Q.    Do you know whether the dredge
11 was running the whole time we're staffed to
12 full capacity?
13     A.    I don't. That's obviously one
14 of the things that would be very important
15 in proving lost profits, is how much time
16 was the dredge actually operating, how much
17 time was it down, why was it down, how much
18 production could the plant process, what was
19 the capacity of the plant, what was it
20 producing. All of those questions are
21 necessary to really look at effectively a
22 lost profits calculation with respect to a
23 sand and gravel operation. But the

Page 67

1 information is not there to do it.
2     Q.    Well, it may not be there --
3 Information may not be there that you're
4 accepting, but Les has actually interviewed
5 the people, is that a reasonable way to get
6 it?
7     A.    Well, I think certainly that
8 is a starting place. But you have to look
9 at what you know to be reasonable and to
10 look at an assumption where production you
11 know can't be more than eight thousand tons,
12 and you're assuming production is going to
13 go to over twenty-one thousand tons in a
14 month, and you don't make any allowance for
15 any increased cost other than fuel cost. I
16 think that's just not consistent with the
17 way the world works.
18     Q.    But, again, you don't -- You
19 are having to reject the testimony of the
20 man who ran the plant, who's got -- he's a
21 degreed mechanical engineer, you're having
22 to reject his testimony that that plant
23 could have produced that fifty-two hundred

Page 68

1 tons a week at that capacity. You're having
2 to reject that, are you not?
3     A.    Hypothetically, I don't know
4 whether it could or could not. And I do --
5 I do reject that unless I've seen evidence
6 of it being able to that.
7     Q.    Are you rejecting it because
8 you don't -- based on somebody else saying
9 it couldn't do it?
10     A.    No. No, I'm not. I'm not.
11 And, again, Greg, I'm not -- I mean here, I
12 guess we need to -- from an efficiency
13 standpoint here, again, I'm assuming that it
14 can produce a hundred and fifty thousand
15 tons. Okay. So if we want to argue about
16 my concerns about whether it could or not,
17 I'm glad to continue on with that. But I'm
18 really not quarreling with that right now.
19     Q.    Well, we're talking about --
20     A.    Not in terms of my
21 professional opinion.
22     Q.    But you're criticizing Les for
23 assuming two hundred and sixty thousand tons

17  (Pages 65 to 68)

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# EXHIBIT
# FIVE

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA

JOHNCO MATERIALS, INC.,                          CASE NO.: CV-06-2:06CV993-10

      Plaintiff/Counter-Defendant,

vs.

CONRAD YELVINGTON
DISTRIBUTORS, INC.,

      Defendant/Counter-Plaintiff.
_____/

## NOTICE OF INITIAL DISCLOSURES PURSUANT TO RULE 26 (a)(1)(A) to (D)

      Defendant/Counter-Plaintiff, CONRAD YELVINGTON DISTRIBUTORS, INC.,
("YELVINGTON"), makes its initial disclosures as required by Rule 26 (a)(1)(A) to (D),
Fed.R.Civ.P., as well as Rule 3.05(d) of the Local Rules of this Court, and as contemplated by the
Report of The Parties' Planning Meeting entered on or about December 20, 2006. Defendants state
that these disclosures are initial and, as contemplated by both counsel in this case, can and will be
supplemented during the progress of this case.

1. Fed.R.Civ.P. 26(a)(1)(A) Disclosures. The following are names of individuals that are likely to have discoverable information that is relevant to the support of the defense. Also provided below is the subject of the information which each individual possess.

A)    **P.M. "Pep" Johnson**
      **Subject: Knowledge of contract at issue**

**Each of the following named individuals may be contacted care of Thomas J. Leek, Esquire, by mail addressed to Thomas J. Leek, Esquire, Cobb & Cole, 150 Magnolia Avenue, Post Office Box 2491, Daytona Beach, FL 32115-2491, or by telephone at (386) 255-8171.**

B)    **Mark Klebe**
      **Subject: Knowledge of circumstances surrounding all allegations.**

C)    **Gary Yelvington**
      **Subject: Knowledge of circumstances surrounding all allegations.**

D)    **Phillip Holiday**
      **Subject: Knowledge of circumstances surrounding all allegations.**

2. Fed.R.Civ.P.26(a)(1)(B) Disclosures. Description by category and location of documents in the possession, custody or control of the party that are relevant to the disputed facts alleged with particularity.

A)    **Supply Agreement dated April 28, 2004**

**Location:    Defendant's place of business and the office of defendant's counsel.**

B)    **Correspondence between the parties which confirm transactions during the relevant period.**

**Location:    Defendant's place of business.**

3. Fed.R.Civ.P.26(a)(1)(C) Disclosures. Computation of any category of damages claimed by plaintiff. **Counter-Plaintiff, Yelvington Transport, Inc., is currently in the process of compiling information and working toward computing damages. Accordingly, the Rule 26 disclosures will be supplemented to reflect the computation when it is completed.**

4. Fed.R.Civ.P.26(a)(1)(D) Disclosures. Insurance agreements. **YELVINGON is unaware of any insurance agreement under which any person carrying on an insurance business may be liable to satisfy all or part of a judgement which may be entered in the action or to indemnity or reimburse for any payments made to satisfy any such judgement.**

COBB & COLE

By:_____

THOMAS J. LEEK, Esquire
FLA. BAR NO. 0116408
150 Magnolia Avenue
Post Office Box 2491
Daytona Beach, FL 32115-2491
Telephone: (386) 255-8171
Facsimile: (386) 248-0323
ATTORNEYS FOR DEFENDANT

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that I sent a copy of the foregoing to the following by U.S. Mail: H. Gregory Pearson, Esquire and Charles E. Harrison, Esquire of Junkin, Pearson, Harrison, & Junkin, L.L.C. which is located at 601 Greensboro Avenue, Suite 600, Alston Place, Tuscaloosa, AL 35401 and Angela R. Rogers, Esquire of Bradley Arant Rose & White, LLP which is located at Alabama Center for Commerce, 401 Adams Avenue, Suite 780, Montgomery, AL 36104, on this 15th day of January, 2007.

Attorney