IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DISTRICT

JOHNCO MATERIALS, INC.,       CASE NO.: CV-06-2:06CV993-ID-SRW

      Plaintiff,

vs.

CONRAD YELVINGTON
DISTRIBUTORS, INC.,

      Defendant.

_____ /

**DEFENDANT'S, CONRAD YELVINGTON DISTRIBUTORS, INC.,
MOTION IN LIMINE TO PRECLUDE, OR IN THE ALTERNATIVE LIMIT, THE
TESTIMONY OF PLAINTIFF'S EXPERT, J. LESTER ALEXANDER,
AND TO PRECLUDE HIS SUMMARY AND SUPPLEMENTAL REPORTS FROM
INTRODUCTION AS EVIDENCE**

Defendant, CONRAD YELVINGTON DISTRIBUTORS, INC. ("CYDI"), hereby moves

in limine for the Court to enter an Order, pursuant to Fed.R.Civ.P. 16(c)(4) and 26(a), and

Fed.R.Evid. 104(a) and 702, prohibiting Plaintiff's expert, J. Lester Alexander, from testifying at

trial because the opinions offered by Mr. Alexander are not based upon sufficient facts or data,

and are not the product of reliable principles and methods, and because his report failed to

adequately identify the principles and methods upon which he relied in formulating his opinions,

and he was unwilling or unable to testify at deposition regarding the basis for his opinions.  In

the alternative, Mr. Alexander's testimony should be limited regarding 1) topics about which he

refused or was unable to give deposition testimony and failed to include in his expert report, and

2) the novel opinions offered by him in his Supplementary Report issued on February 29, 2008.

Finally, CYDI seeks to preclude the Summary Report and Supplemental Report prepared by Mr.

Alexander from being introduced or admitted into evidence at trial.  In support thereof, CYDI

states as follows:

1.      On or about July 31, 2007, Plaintiff, JOHNCO MATERIALS, INC. ("Johnco"), first contacted J. Lester Alexander to provide expert testimony regarding Johnco's purported damages in this case.  (Deposition of J. Alexander, 20:18-22, 22:4-7, 22:16-23, 23:1-5).  Mr. Alexander was forced to make his finding and issued his report quickly because "there was an extremely short time frame between when I was retained and when I issued my report, and [he] just – it was a lot of running around doing all kind of stuff to meet that deadline."  (Alexander, 28:5 - 29:2).

2.      The Court imposed deadline for the identification of Johnco's expert and submission of an expert report was August 1, 2007, but was extended to August 8, 2007.  (See Dkt. Nos. 15, 21).

3.      On August 8, 2007, Johnco identified J. Lester Alexander as its expert witness in the disclosures made pursuant to Fed.R.Civ.P. 26(a)(2), and attached a report titled "Summary Report of Accounting, Economics & Appraisal Group, LLC" prepared by Mr. Alexander, a copy of which is attached hereto as Exhibit "A."  (See Dkt. No. 22).

4.      Johnco subsequently identified Mr. Alexander as the corporate representative with knowledge of "Any and all damages sought by the plaintiff as set forth in plaintiff's complaint."

5.      Nearly four (4) months later on November 29, 2007, CYDI deposed Mr. Alexander in his capacity as both a fact witness and an expert witness.  *See* Defendant's Notice of Taking 30(b)(6) Deposition; Amended Notice of Taking Deposition of J. Lester Alexander, III, With Subpoena; and Second Amended Notice of Taking Deposition of J. Lester Alexander, III, copies of which are attached hereto as Composite Exhibit "B."

6.      In his deposition, Mr. Alexander refused or was unable to testify and failed to

a.    The profitability, if any, of Johnco's operations, had Johnco sold 150,000 tons of No. 67 gravel to CYDI pursuant to the Supply Agreement (Alexander, 105:14 – 107:19, 124:16 – 125:2, 202:20 – 203:8);

b.    Whether Johnco would have been able to sell No. 67 gravel to a purchaser other than CYDI (Alexander, 137:7 – 19);

c.    Johnco's production or operations after the fall of 2006, including without limitation, Johnco's transition from a wet mining operation to a dry mining operation; Johnco's sales of product to Dunn; and Johnco's efforts or ability to mitigate its alleged damages, other than those identified in Mr. Alexander's report (Alexander, 151:9 – 152:9, 153:5 – 154:19, 158:2 – 159:19);

d.    The effect that the sale or liquidation value of Johnco's assets would have to mitigate Johnco's alleged damages (Alexander, 185:22 – 189:5);

e.    Damages incurred by CYDI, as set forth in CYDI's counterclaim (Alexander, 152:17-23); and

f.    Any or all perceived errors or inaccuracies in the report of defendant's expert, David Borden (Alexander, 241:1 – 243:2, 245:1 – 262:14).

See November 29, 2007, Deposition Transcript of J. Lester Alexander, attached hereto as Exhibit "C."

7.    On February 28, 2008, this Court entered an order granting CYDI's motion for partial summary judgment on the issue of damages limiting Johnco's asserted damages, and on February 29, 2008, Johnco filed a "Supplemental Report of Accounting, Economics & Appraisal Group, LLC" prepared by Mr. Alexander, a copy of which is attached hereto as Exhibit "D."

8.    In his supplemental report, Mr. Alexander provided novel and different expert opinions regarding the issue of damages of CYDI's alleged breach of contract, which are based almost entirely on the Court's Memorandum Opinion and Order issued on February 28, 2008 as to CYDI's amended motion for partial summary judgment.

9.    As demonstrated at his deposition and through the expert report of Dave Borden, attached hereto as Exhibit "E," the opinions of Mr. Alexander offered by Johnco are not based upon sufficient facts or data to be reliable, and principles and methods used by Mr. Alexander are not reliable.  Mr. Alexander was forced to formulate his opinions and prepare a report in an "extremely short time frame", and as a result the opinions are speculative and conclusory.  Even after nearly four (4) months, Mr. Alexander remained unprepared for deposition and unable to testify regarding the bases for his opinions.  Only now, following this Court's order granting partial summary judgment on the issue of damages and a mere month from trial, does Johnco attempt to flesh out its claim for damages through a "supplemental" report issued by Mr. Alexander.

10.    Alternatively, permitting Mr. Alexander to testify at trial regarding the matters identified in paragraphs 4(a) through (f), which were not included in Mr. Alexander's report and about which he refused or was unable to testify at his deposition, would violate Rules 26(a) and 37, Fed.R.Civ.P.

11.    Additionally, Mr. Alexander should be precluded from testifying regarding his novel expert opinions contained in the Supplementary Report as the filing of this report circumvented and violated Rules 26(a) and 37, Fed.R.Civ.P.

12.    Finally, the Summary Report and Supplemental Report prepared by Mr. Alexander are inadmissible as hearsay and cumulative evidence.

      13.      CYDI will suffer prejudice if this motion is not granted.

WHEREFORE, CYDI moves that this Court enter an Order in Limine precluding expert testimony from Plaintiff's expert, J. Lester Alexander.  Or, in the alternative, CYDI moves that this Court enter an Order in Limine limiting the testimony of J. Lester Alexander regarding those topics set forth in paragraphs 4(a) through (f), above, about which he refused or was unable to include in his expert report or to give deposition testimony as well as the novel opinions offered by him in his Supplementary Report issued on February 29, 2008.  Finally, CYDI requests the Court preclude the Summary Report and Supplemental Report prepared by Mr. Alexander from being introduced or admitted into evidence at trial.

## MEMORANDUM OF LAW IN SUPPORT OF MOTION

### Statement of Facts

On August 8, 2007, Johnco submitted a Summary Report prepared by Mr. Alexander, in which Mr. Alexander opined on damages for the alleged breach of contract in this case.  His opinion was based on a requirement by CYDI to purchase No. 67 gravel in "an annual volume of 260,000 tons per year," which he claimed would have generated for Johnco $7.4 million from the sale of No. 67 gravel and an "additional $3.1 million from the sale of production of by-products."  (Summary Report, p. 2).  Mr. Alexander speculated, "This results in a net lost profit of $4,473,873 due to the failure of CYDI to uphold their contractual obligations, before present value discounting and pre-judgment interest."[1]  (Alexander Summary Report, p. 2).

On February 28, 2008, this Court issued a Memorandum Opinion and Order on CYDI's

---

[1]  Mr. Alexander continued, "The lost profit amounts have not been reduced to their net present value as of the date of trial nor have they been increased for pre-judgment interest through the date of trial.  It is my opinion that the impact of discounting the net lost profits would be substantially offset by statutory pre-judgment interested considering the estimated date of trial verses the time frame of the lost profits determinations."  (Alexander Summary Report, p. 2).

amended motion for partial summary judgment as to damages.  Due to Johnco's reliance on "speculation and conjecture" in its claim for consequential, loss-of-profit damages, the Court entered partial summary judgment in favor of CYDI on that issue.  (Memorandum Opinion and Order, p. 24).  Further, because Johnco conceded it was not entitled to both expectation and reliance damages, the Court found Johnco's claim for reliance damages moot. (Memorandum Opinion and Order, pp. 25-26).

Specifically, as to Mr. Alexander's opinions on damages, the Court essentially found Mr. Alexander's opinion inadequate on two grounds.  First, the Court found that Mr. Alexander failed to opine on "what basis he believes that during the relevant time period there would have been a market demand" and whether there was a "ready, willing, and able third-party buyer"… "who would have purchased 43,600 tons of oversize gravel annually for five consecutive years." (Memorandum Opinion and Order, pp. 22-23).  Secondly, the Court found that the "alleged lost sales of the byproducts to third parties constitute activities that are independent of and collateral to the Supply Agreement" and "that there is a complete absence of evidence … that Johnco would have lost substantial profits from sales of oversize gravel and sand in the event of a breach or that CYDI would be liable for those alleged lost sales."  (Memorandum Opinion and Order, p. 24).

The following day, on February 29, 2008, Johnco submitted a Supplemental Report prepared by Mr. Alexander.  To address the Court's first concern regarding market demand and an available third-party buyer, Mr. Alexander stated, without any explanation:

> "[I]t is reasonable to conclude that JMI would have been able to at least recover the cost of the joint products from the existing markets for oversize gravel and sand, which include the concrete, asphalt and other markets."  (Alexander Supplemental Report, p. 1).

> "My research indicates that a substantial market exists for both oversize gravel and sand and that JMI's pricing within that market is competitive." (Alexander Supplemental Report, p. 1).

> "Moreover, there is insufficient evidence to conclude that JMI would not have been able to access available markets had CYDI not breached the Supply Agreement, which caused the productions of joint products (particularly the highly profitable oversize gravel) to stop." (Alexander Supplemental Report, p. 2).

To address the Court's second concern regarding lost profits, Mr. Alexander opined on a different method of accounting called "joint product costing method," which he claimed is used "for determining the incremental costs associated with lost incremental revenue under the Supply Agreement" and to measure the "true economic losses" incurred by Johnco. (Alexander Supplemental Report, p. 1). Mr. Alexander based his opinions, new to this case, almost entirely on the findings in the Court's Memorandum Order and Opinion issued the previous day.

Additionally, in his Supplemental Report, Mr. Alexander submitted lost profit figures based on sales of only No. 67 gravel in amounts of 260,000 tons per year and 150,000 tons per year "after discounting to present value and including prejudgment interest."[2] (Alexander Supplemental Report, p. 1). Regarding interest, not only did Mr. Alexander fail to offer an explanation for his calculation, but this was the first time he: 1) discounted present value, 2) included prejudgment interest, or 3) used the 150,000 figure for number of tons sold annually. In the Summary Report, his calculations were based on lost profit "before present value discounting and pre-judgment interest." (Alexander Summary Report, p. 3). Further, when given the

---

[2]    Specifically, Mr. Alexander stated: "JMI's lost profits are $4,110,179, determined in accordance with the Memorandum Order, assuming sales of only No. 67 gravel by JMI to CYDI in quantities of 5,200 tons per week (260,000 tons per year), after discounting to present value and including prejudgment interest"; and "JMI's lost profits are $2,322,122, determined in accordance with the Memorandum Order, assuming sales of only No. 67 gravel by JMI to CYDI in quantities of 3,000 tons per week (150,000 tons per year), after discounting to present value and including prejudgment interest." (Supplemental Report, p. 2).

opportunity previously, Mr. Alexander failed to offer his opinion regarding the profitability, if any, of Johnco's operations, had Johnco sold 150,000 tons of gravel to CYDI pursuant to the Supply Agreement.  (Alexander, 105:14-107:19, 124:16-125:2, 202:20-203:8).

## Discussion of Law

### RULE 702

The admission of expert evidence is governed by Federal Rule of Evidence 702[1], as explained by *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 593 (1993).  Expert evidence must be both relevant and reliable to be admissible.  *See Daubert*, 509 U.S. at 595.  In *Daubert* and its progeny, the Supreme Court has held that Fed. R. Evid. 702 requires the trial court act as a "gatekeeper for the admissibility of expert testimony," to determine whether the opinion's reasoning and underlying methodology are valid and are applicable to the facts of the case.  *See Id.* at 592-93; *see, e.g., Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 152-53 (1999).

"The importance of *Daubert*'s gatekeeping requirement cannot be overstated."  *U.S. v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004), *cert. denied,* 2005 WL 175881 (May 31, 2005). "This 'function inherently require[s] the trial court to conduct an exacting analysis' of the *foundations* of expert opinions to ensure they meet the standards for admissibility under Rule 702."  *Id.* (emphasis in original; citations omitted).  "As a gatekeeper the court must do 'a preliminary assessment of whether the reasoning or methodology properly can be applied to the

---

[1]  FRE 702, which governs the reliability of experts, states:
If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

facts in issue.'" *U.S. v. Masferrer*, 367 F. Supp. 2d 1365, 1371 (S.D. Fla. 2005) (quoting *Daubert*, 509 U.S. at 593-94).

"[E]stablishing qualification, reliability, and helpfulness rests on the proponent of the expert opinion." *Frazier*, 387 F.3d at 1260. This is "a substantial burden under Rule 702." *Masferrer,* 367 F. Supp. 2d at 1371-72. These strict admissibility standards "ensure that speculative, unreliable expert testimony does not reach" the fact finder. *See McCorvey v. Baxter Healthcare Corp.*, 298 F.3d 1253, 1256 (11th Cir. 2002). Cross-examination of an expert witness whose opinion is irrelevant or unreliable is no substitute for the trial court's "gatekeeping" function. *See id.* at 1257. "The district court's role is especially significant since the expert's opinion 'can be both powerful and quite misleading because of the difficulty in evaluating it.'" *Frazier*, 387 F.3d at 1260 (quoting *Daubert*, 509 U.S. at 595). The Supreme Court also has emphasized that trial courts must test the analytical distance between the data and the opinion proffered. *See Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).

The Eleventh Circuit has established a three-part inquiry in which a court must engage in determining the admissibility of expert testimony under FRE 702: (1) whether the expert is qualified to testify competently regarding the matters he intends to address; (2) whether the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in *Daubert*; and (3) whether the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue. *See City of Tuscaloosa v. Harcos Chems., Inc.*, 158 F.3d 548, 562 (11th Cir. 1998); *Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK Ltd.*, 326 F.3d 1333, 1340-41 (11th Cir. 2003).

In ascertaining the reliability of an expert under the *Daubert* factors, "the party presenting

the expert must show that the expert's findings are based on sound science, and this will require some objective, independent validation of the expert's methodology." *Daubert v. Merrell Dow Pharms, Inc.*, 43 F.3d 1311, 1316 (9th Cir. 1995) (on remand) ("Daubert II"). If the party fails to provide sufficient explanation and validation of its expert's methodology and reasoning, the Court cannot make the findings required by FRE 702 and should refuse to admit into evidence the expert's testimony. *See Claar v. Burlington N. R.R. Co.*, 29 F.3d 499, 502 (9th Cir. 1994) (rejecting the proffered experts' testimony as unreliable because the experts failed to explain the reasoning and methods underlying their conclusions). *Daubert's* lesson is simple: the expert must bring to the courtroom something more than just his word; he must have some independent verification of his opinions in the form of research, hard data, publications, testing, or other validation. *See Daubert*, 509 U.S. at 590.

## RULE 26

Rule 26 imposes specific disclosure requirements upon any witness "who is retained or specially employed to provide expert testimony in the case…" *Pireto v. Malgor*, 361 F.3d 1313, 1317 (11th Cir. 2004) (quoting Fed.R.Civ.P. 26(a)(2)(B)). The Federal Rules require a party to submit to the other parties a report containing certain basic information for each expert witness it intends to use during the course of the litigation. *See Fed.R.Civ.P. 26(a)(2)(B)*. The expert report must contain the following elements:

(i)     a complete statement of all opinions the witness will express and the basis and reasons for them;

(ii)    the data or other information considered by the witness in forming them;

(iii)   any exhibits that will be used to summarize or support them;

(iv)    the witness's qualifications, including a list of all publications authored in the previous 10 years;

(v)     a list of all other cases in which, during the previous four years, the witness testified as an expert at trial or by deposition; and

(vi)    a statement of the compensation to be paid for the study and testimony in the case.

Fed.R.Civ.P. 26(a)(2)(B).

These disclosures shall be made at the times directed by the Court or, if no deadlines are established by the Court, at least 90 days before the trial date.  Fed.R.Civ.P. 26(a)(2)(C).  This Court established a deadline for the plaintiff's expert disclosures of August 1, 2007, which was subsequently extended to August 8, 2007.  (See Dkt. Nos. 15, 21).

Disclosure of *rebuttal* expert reports is required at the times directed by the Court or, if no deadlines are established by the Court, within 30 days after the disclosure made by the other party.  Fed.R.Civ.P. 26(a)(2)(C).  CYDI disclosed the report of its expert, David Borden, to Johnco on September 25, 2007. (Dkt. No. 27).  Accordingly, because this Court's Uniform Scheduling Order did not prescribe a deadline for the disclosure of rebuttal expert reports, Johnco's rebuttal to Mr. Borden's report was required to be disclosed on or before October 25, 2007.

Rule 26 also allows the parties to supplement their expert disclosures made pursuant to Rule 26(a)(2).  Fed.R.Civ.P. 26(e)(1).  "With respect to testimony of an expert from whom a report is required under subdivision (a)(2)(B) the duty to supplement extends both to information contained in the report and to information provided through a deposition of the expert…"  *Id*. However, Rule 26(e)(1) does not grant a license to supplement a previously filed expert report simply because a party wants to or because a party's expert did an inadequate or incomplete preparation.  See, i.e., *Coles v. Perry*, 271 F.Supp. 2d 157 (D.D.C. 2003); *Aveka L.L.C. v. Mizuno Corp*., 212 F.R.D. 306 (M.D. N.C. 2002).  Supplementary disclosures are not intended to provide an extension of the expert designation and report production deadline.  See *Bowman v. Hawkins,*  2005 WL 1527677, *2 (S.D.Ala. 2005); see also *Metro Ford Truck Sales, Inc. v. Ford Motor Co*., 145 F.3d 320, 41 Fed. R. Serv. 3d 741, 172 A.L.R. Fed. 675 (5th Cir. 1998).

> Fed.R.Civ.P. 26(a)(2)(B) requires that an expert report "contain a complete statement of all opinions to be expressed and the basis and the reasons therefore" to facilitate discovery. Although Fed.R.Civ.P. 26(e) requires a party to "supplement or correct" disclosure upon information later acquired, that provision does not give license to sandbag one's opponent with claims and issues which should have been included in the expert witness report (indeed, the lawsuit from the outset).

*Beller v. United States,* 221 F.R.D. 689, 696 (D. N.M. 2003) (citing *Resolution Trust Corp. v. Gregory*, D.N.M. No. CIV 94-0052).  Based on this, the Southern District of Alabama, United States District Court, held:

> To rule otherwise would create a system where preliminary reports could be followed by supplementary reports and there would be no finality to expert reports, as each side, in order to buttress its case or position, could "supplement" existing reports and modify opinions previously given.  This practice would surely circumvent the full disclosure requirement implicit in Rule 26 and would interfere with the Court's ability to set case management deadlines, because new reports and opinions would warrant further consultation with one's own expert and virtually require new rounds of depositions. That process would hinder rather than facilitate settlement and the final disposition of the case.

*Bowman v. Hawkins*, 2005 WL 1527677, *2 (S.D.Ala.) (S.D.Ala. 2005) (citing *Beller v. United States,* 221 F.R.D. 689, 696 (D. N.M. 2003)); *See also Carter v. The Finely Hospital,* 2003 WL 22232844, *2 (N.D.Ill. Sept.22, 2003) (concluding that "[i]t is disingenuous to argue that the duty to supplement under Rule 26(e)(1) can be used as a vehicle to disclose entirely new expert opinions after the [expert disclosure] deadline established by the court....").

Because the expert witness discovery rules are "designed to allow both sides in a case to prepare their cases adequately and to prevent surprise, ... compliance with the requirements of Rule 26 is not merely aspirational."  *Cooper v. Southern*, 390 F.3d 695, 728 (11th Cir. 2004) (citing *Sherrod v. Lingle*, 223 F.3d 605, 613 (7th Cir. 2000)).   A party that 'without substantial justification' fails to disclose information required by Rule 26(a)(2) "is not permitted to use the

witness as evidence at trial 'unless such failure is harmless.'" *Pireto*, 361 F.3d at 1318 (quoting Fed.R.Civ.P. 37(c)(1)).

An expert report is hearsay under Fed.R.Evid. 802. *See T.C. v. Cullman County Dept. of Human Resources*, 899 So.2d 281, 294 (Ala.Civ.App. 2004); *Kern v. Standard Fire Ins. Co*., 2006 WL 1982115, *3 (M.D.Ala. 2006). An expert report does not meet the business records exception of Fed.R.Evid. 803(6), if prepared in anticipation of litigation. *See W.D. Rubright Co. v. International Harvester Co.,* 358 F.Supp. 13881403 (W.D.Pa.1973) (cited by *T.C. v. Cullman County Dept. of Human Resources*, 899 So.2d 281, 294 (Ala.Civ.App. 2004 (Murdock, J., concurring specially)). As such, an expert report is not admissible in evidence at trial. Further, if the expert is present to testify and does in fact testify, the contents of an expert report is cumulative under Fed.R.Evid. 403 and therefore not admissible. *See, e.g., McElroy v. Perry*, 753 So.2d 121, 26 (Fla. 2d DCA 2000) ("We do not suggest that if an expert testifies, his written report, which is hearsay, becomes admissible. In fact, the in-court testimony renders the report cumulative, which is another basis for exclusion.").

## <u>Analysis</u>

### *RULE 702 ANALYSIS*

Mr. Alexander's Summary Report relies exclusively on the five (5) month production and cost history of Johnco from March 2006, and May through August, 2006, and no attempt is made to compare Johnco to any other similar sand and gravel mining operation with an established production and cost history. Assuming *arguendo* that the facts are as stated by Johnco and Mr. Alexander, Johnco was "fully operational" from the first week in March, 2006 through September, 2006. (See Alexander Summary Report, pp. 2, 3). It is undisputed that Johnco was a start up business, and kept no records of its production during this time. Additionally, Mr.

Alexander projects the incremental costs incurred for five (5) years of production of No. 67 gravel based on costs incurred during only five (5) months of production. (See Alexander Summary Report, p. 3).

It is axiomatic that lost profits cannot be determined until such time as the costs of production are determined. While absolute certainty is not required, "the loss of profits must be the natural and proximate, or direct, result of the breach complained of and they must also be capable of ascertainment with reasonable, or sufficient, certainty, or there must be some basis on which a reasonable estimate of the amount of the profit can be made…." *Super Valu Stores, Inc. v. Peterson*, 506 So.2d 317, 327 (Ala. 1987). Here, Alexander does not rely, nor even consider, the costs of production of a comparable business, and admittedly has no substantial experience in sand and gravel mining to draw upon his own experience to offer an opinion of the costs of production of sand and gravel. (Alexander, 82:3-7). In fact, Mr. Alexander does not rely upon any of the kinds of proof analyzed in *Peterson*.

Even the costs he considers are incomplete. Mr. Alexander assumes that all of the operating expenses of Johnco, with the exception of fuel and oil, are fixed and would not increase with additional production, even though Mr. Alexander's projected production is triple the actual annualized volume of production experienced by Johnco during the months used by Mr. Alexander. Mr. Alexander completely fails to consider the cost of the depletion of the gravel, the transportation costs related to Johnco's agreement with M&B Railroad, the depreciation on equipment, reclamation costs, over burden removal costs, engineering testing costs associated with compliance, legal and accounting costs, and normal office-related expenses. (See Report of Dave Borden, pp. 13-15). Moreover, Mr. Alexander's assumptions regarding fuel consumption are not calculations which were disclosed in the Summary Report.

(*Id.* at 14).

Mr. Alexander also assumes production by Johnco of 260,000 tons of No. 67 gravel despite that Johnco's actual annualized production, using Mr. Alexander's numbers, is approximately 96,000 tons.  (See Alexander Summary Report, p. 1, and Report of Dave Borden, p. 11-12).  The opinion that CYDI would take 260,000 tons of No. 67 gravel conflicts with the express language of the Supply Agreement and the undisputed testimony of the Johnco principals, past and present.  (See Depositions of C. Junkin, 40:1-11 , B. Johnston, 57:18-23 , and P. Johnston 106:11-13).  There is no opinion offered in the Summary Report based upon an assumption of a 150,000 ton commitment despite that the Supply Agreement expressly states that the minimum annual tonnage that CYDI is obligated to purchase is 150,000 tons.  However, Mr. Alexander attempts to rectify this error by providing new opinions in his Supplemental Report using 150,000 tons as an alternative basis for his damage opinions.

The Summary Report also fails to discount the calculated damages to present value, concluding without analysis, that such is not necessary because pre-judgment interest would offset such a reduction.  (See Alexander Summary Report, p. 3, and Report of Dave Borden, p. 15).  This, of course, assumes prejudgment interest is applicable in this case, but is flawed in any event because the period of prejudgment interest is different than the period of the discount rate, and assumes a modest discount rate.  (See Report of Dave Borden, p. 15).  Moreover, Mr. Alexander was not prepared to discuss his calculation of the discount rate at his deposition, and as such prohibited CYDI from discovering the basis of this opinion.  In his Supplement Report, however, Mr. Alexander reverses field and assigns a discount rate to the damage amount and reduces the damage to net present value. Mr. Alexander continues to assert that prejudgment interest is appropriate, but provides no such calculation in his Supplemental Report.

Finally, Mr. Alexander's opinions are unreliable because he assumes that gravel that was not sold to CYDI could not, and necessarily would not, ever be sold to any third party. In fact, Mr. Alexander fails to consider any potential mitigation of damages, despite the fact that Johnco remains in operation today producing gravel. This unreliable base assumption also affects Johnco's ability to recover the incidental costs associated with operating the facility in the months of March and April, 2006, because Johnco ultimately received the benefit of such costs incurred when it sold the product to CYDI in the May, 2006. As a result, the costs were not unnecessary and at the most Johnco was delayed in realizing the benefit of the costs. Thus, considering the costs as an additional measure of damages is duplicative of the lost profits calculation. (See Alexander Summary Report, pp. 2-3, and Report of Dave Borden, pp. 13-16).

Mr. Alexander's report is a hastily prepared, cursory review of issues in this litigation, and relies upon speculation and conjecture, and asserts conclusory, factually unsupported opinions. As a result of the above, Mr. Alexander's report is unreliable in that his reasoning and underlying methodology are invalid, and the opinions given fail to meet the standards of admissibility. As such, the Mr. Alexander should be precluded from testifying as an expert witness in this case.

### *RULE 26 ANALYSIS*

#### *Deposition Testimony*

On November 29, 2007, CYDI deposed Mr. Alexander in his capacity as both a fact witness and an expert witness. In his deposition, Mr. Alexander refused or was unable to testify and failed to include information or explanations regarding the following items:

    a.    The profitability, if any, of Johnco's operations, had Johnco sold 150,000 tons of No. 67 gravel to CYDI pursuant to the Supply Agreement;

b.      Whether Johnco would have been able to sell No. 67 gravel to a purchaser other than CYDI;

c.      Johnco's production or operations after the fall of 2006, including without limitation, Johnco's transition from a wet mining operation to a dry mining operation; Johnco's sales of product to Dunn; and Johnco's efforts or ability to mitigate its alleged damages, other than those identified in Mr. Alexander's report;

d.      The effect that the sale or liquidation value of Johnco's assets would have to mitigate Johnco's alleged damages;

e.      Damages incurred by CYDI, as set forth in CYDI's counterclaim; and

f.      Any or all perceived errors or inaccuracies in the report of defendant's expert, David Borden.

See November 29, 2007, Deposition Transcript of J. Lester Alexander, attached hereto as Exhibit "C."

CYDI deposed Mr. Alexander and asked for his opinion about the items set forth in paragraphs (a) through (f), above, which *were not* addressed in his Summary Report, but he was unwilling or unable to testify regarding those matters. Items in paragraphs 4(b), 4(c), 4(d), and 4(e) have yet to be addressed, even though Mr. Alexander has been given the opportunity to do so, and as such, Mr. Alexander should be precluded from testifying to these matters. Further, it was not until Mr. Alexander's Supplemental Report was issued on February 29, 2008 that Mr. Alexander, for the first time, summarily addressed the issues in items 4(a) and 4(f). By doing this, Johnco circumvented the Federal Rules of Civil Procedure that govern expert disclosure.

Permitting testimony regarding these items allows Johnco to sandbag his opponent with

opinions on issues that should have been included in the initial expert witness report and explained in its expert's deposition testimony. Johnco's failure to provide CYDI with this information sufficiently in advance of trial has harmed CYDI in that it has prevented CYDI from fully preparing its case, should Mr. Alexander be permitted to testify about the items described in paragraphs 4(a) through (f), above.

***Expert Reports***

Mr. Alexander's novel opinions regarding market demand, an available third-party buyer, the newly applied "joint product costing method," discounted present value, prejudgment interest, or Johnco's profitability in selling 150,000 tons of gravel to CYDI under the Supply Agreement contradict his opinions in the Summary Report. As trial is set for March 31, 2008, CYDI is not able to depose Mr. Alexander on these new opinions and is not able to be adequately prepared to defend against these new opinions. Johnco was required to fully disclose its expert opinions by August 1, 2007, four months before the deposition of Mr. Alexander and eight months prior to trial. Now, after the Court ruled adversely to Johnco and pointed out the flaws in Mr. Alexander's expert opinions, Johnco has changed its expert's opinions in the eleventh hour. This practice is prohibited by the Federal Rules of Civil Procedure, and Mr. Alexander's new opinions in the Supplemental Report regarding market demand, an available third-party buyer, the "joint product costing method,"discounted present value, prejudgment interest, or Johnco's profitability in selling 150,000 tons of gravel to CYDI under the Supply Agreement should be excluded at trial.

Further, the Supplemental Report was the first time Mr. Alexander rebutted the report of CYDI's expert, Dave Borden. Again, he offered no explanation or detailed analysis, but instead only vacant conclusions in rebuttal. The deadline for Johnco's disclosure of an expert rebuttal

report to Mr. Borden's report was on or before October 25, 2007. Mr. Alexander failed to offer a rebuttal report before the deadline, and failed to offer any rebuttal testimony at his deposition. (Alexander, 241:1-243:2, 245:1-262:14). As such, any testimony regarding Mr. Borden's opinions and the portion of Mr. Alexander's Supplemental Report related to such rebuttal should be excluded from trial.

Finally, as stated *supra*, an expert report prepared in anticipation of litigation is hearsay under Fed.R.Evid. 802 and not admissible in evidence at trial. *See Kern v. Standard Fire Ins. Co.*, 2006 WL 1982115, *3 (M.D.Ala. 2006). Further, if the expert is present to testify and does in fact testify, the contents of an expert report is cumulative under Fed.R.Evid. 403 and therefore not admissible. *See, e.g., McElroy v. Perry*, 753 So.2d 121, 26 (Fla. 2d DCA 2000). According to Johnco's witness list submitted on March 3, 2008, Mr. Alexander is scheduled to testify at trial. As such, both the Summary Report and Supplemental Report are not admissible as hearsay and cumulative evidence.

Cobb Cole

/s/ Thomas J. Leek
THOMAS J. LEEK
FLA. BAR NO. 0116408
150 Magnolia Avenue
Post Office Box 2491
Daytona Beach, FL 32115-2491
Telephone: (386) 255-8171
Facsimile: (386) 323-9255
E-mail: Tom.Leek@CobbCole.com
CO-COUNSEL FOR DEFENDANT

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the ___ day of March, 2008, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system, which will send a notice of electronic filing to the following CM/ECF participants and served by U.S Mail and Electronic Mail a copy of the foregoing on the following non-CM/ECF participants:

H. Gregory Pearson, Esquire
Charles E. Harrison, Esquire
Junkin, Pearson, Harrison, & Junkin, L.L.C.
601 Greensboro Avenue
Suite 600, Alston Place
Tuscaloosa, AL 35401

J. David Martin, Esquire
Copeland, Franco, Screws & Gill, P.A.
444 South Perry Street (36104)
Post Office Box 347
Montgomery, AL  36101

____/s/ Thomas J. Leek_____

## Summary Report of Accounting, Economics & Appraisal Group, LLC

### By: J. Lester Alexander, III

### Johnco Materials, Inc. v.
### Conrad Yelvington Distributors, Inc.
### As of August 8, 2007

### CV-06-2:06cv993-ID

This report and the attached appendices is a summary of my findings and opinions to date in the above referenced matter.

I am a Certified Public Accountant and a Certified Fraud Examiner with approximately twenty-eight years of professional experience performing audit, tax and consulting services. I am the co-founder and the Managing Principal of Accounting, Economics and Appraisal Group, LLC ("AEA"). I hold a Bachelor of Science in Accounting from the University of Alabama. I am a former partner of Pricewaterhouse Coopers, LLP and former Southeastern practice leader of one of its legacy firm's consulting practices. In recent years, I have concentrated my practice in the areas of financial investigation, forensic accounting and valuation consulting services. I have been recognized as an expert in Alabama and other state and federal courts. I reserve the right to supplement and amend my opinions for information learned up to and throughout trial. Furthermore, I intend to develop and make available prior to trial additional charts and aides designed to make the financial and economic concepts addressed in my report more understandable to lay persons.

In regard to this matter, I was assisted by members of my firm who worked under my direction. AEA's billing rates for this engagement range from $55 to $290 per hour.

## SCOPE AND METHODOLOGY

Counsel for Johnco Materials, Inc. ("JMI") retained me as expert witness to review and analyze documentary and oral evidence related to the Supply Agreement dated April 16, 2004 between JMI and Conrad Yelvington Distributors, Inc. ("CYDI") for the supply of Number 67 concrete gravel and any financial/economic facts and circumstances occurring during and after the dates covered under Supply Agreement.

In performing my work, I read and analyzed the Supply Agreement, related sales invoices, federal tax returns, financial statements and other information produced in this matter.  I utilized certain case pleadings and the depositions of Ben Johnston, Pressley Morgan ("Pep") Johnston, and Clatus Junkin.  I have studied industry data, financial research and industry trends regarding profits and other information. A complete listing of information considered is included as an appendix to this report.  As a result of this work, I have developed the following findings and opinions.

EXHIBIT

A

**FINDINGS AND OPINIONS**

## JMI invested a significant amount of money in the establishment of a mining facility and the related rail siding as specified in the Supply Agreement.

In April 2004, JMI and CYDI entered into a Supply Agreement for No. 67 concrete gravel. This Agreement called for the construction of a mining facility to mine and classify sand and gravel.[1] Upon completion of this facility, CYDI was to begin purchasing the specified size of gravel on a weekly schedule at an approximate volume of 5,200 tons per week representing an annual volume of 260,000 tons per year. The cost per tonnage price would increase after the first two years at a small percentage increment.[2]

JMI purchased land with a cost in excess of $1.6 million. JMI then proceeded to purchase depreciable plant and rail car loading equipment with a cost of over $1.2 million that would be needed in order to meet the obligations as agreed. In addition, JMI incurred other costs to prepare the mining facility to produce at least 5,200 tons per week.[3] The amount invested by JMI to meet their obligations under the Supply Agreement was more than $2.8 million.

## Although sufficient gravel was produced by JMI, CYDI failed to purchase quantities specified in the Supply Agreement.

Although CYDI was aware that JMI commenced mining operations during March 2006, CYDI did not schedule the initial delivery until May 11, 2006, approximately 9 weeks after mining operations commenced. After the initial delivery on May 11, 2006, CYDI failed to schedule weekly deliveries and only scheduled sporadic shipments during June 2006, August 2006, and September 2006. The total amount delivered by JMI to CYDI during this seven month time frame was approximately 32,000 tons.

## JMI suffered lost profits and incidental costs attributable to the failure of CYDI to take deliveries of No. 67 concrete gravel anticipated under the Supply Agreement.

Based on the quantities and prices as set forth in the Supply Agreement, I have determined that JMI would have generated gross revenue in excess of $7.4 million from the sale of No. 67 gravel to CYDI and an additional $3.1 million from the sale of the production by-products.[4] This level of gross revenues is reasonable in light of the substantial investment made by the owners of JMI

---

[1] Paragraph 2.1 of the Supply Agreement states: "Seller shall construct a mining facility to mine and classify sand and gravel on the Plant Site. In addition to the mining facilities to be constructed on the Plant Site, this contract is contingent on Seller's ability to construct … sufficient rail siding to load/handle a minimum of fifty-two (52) open, or covered, hopper railcars on a regular shipment schedule.

[2] Paragraph 3.1 of the Supply Agreement states: "After Seller commences mining and grading of sand and gravel, Seller shall sell and deliver to Buyer, No. 67 concrete gravel in minimum quantities of 150,000 tons annually for a price equal to … ($5.25) per ton, F.O.B. Buyer's rail cars loaded on the rail siding on the Plant Site, on a weekly schedule (i.e. approximately 5,200 tons per week), and buyer shall purchase an accept from Seller said Product at the price and in the quantities specified …"

[3] Per deposition testimony of Clatus Junkin.

[4] See Appendix 2 for the calculation of expected gross revenue at 5,200 tons of No. 67 concrete gravel produced and sold per week.

to place the mine into operation. The loss of expected gross revenues through CYDI's failure to purchase the contractual quantities of No. 67 concrete gravel resulted in significant financial harm to JMI.

Using the costs from mining operations at production capacity for JMI during the period March 2006 and May 2006 through August 2006 [5], the gross revenue expected should be reduced by a cost to produce of $4.16 per ton sold. This results in a net lost profit of $4,473,873 due to the failure of CYDI to uphold their contractual obligations, before present value discounting and pre-judgment interest.[6] The lost profit amounts have not been reduced to their net present value as of the date of trial nor have they been increased for pre-judgment interest through the date of trial. It is my opinion that the impact of discounting of the net lost profits would be substantially offset by statutory pre-judgment interest considering the estimated date of trial verses the time frame of the lost profits determinations.

In addition to these costs, JMI has informed me that they had commenced mining operations and were staffed to meet the delivery requirements specified in the supply agreement as of the first week in March 2006. However, CYDI did not take the initial delivery until May 11, 2006. We have determined the incidental costs incurred by JMI during the intervening period attributable to CYDI's delay in the initial delivery to be $75,342, before pre-judgment interest.

## OTHER CONSIDERATIONS

My report is issued in accordance with the Management Consulting Standards of the American Institute of Certified Public Accountants. This report is to be used solely in connection with proceedings related to the above referenced matter and should not be used for any other purpose. Outside distribution of this report to others is not permitted without the written consent of AEA Group, LLC. The information in this report is based on information learned through August 8, 2007. Discovery in the captioned litigation is ongoing as is my review and analysis of the facts and circumstances of the case. As such, I reserve the right to consider any additional information that is presented to me. Further, I reserve the right to supplement and amend my opinions for information learned up to and throughout trial.

Very truly yours,

By: _J. Lester Alexander, III_
J. Lester Alexander, III, CPA

---

[5] Per deposition testimony of Clatus Junkin, these months are an accurate representation of costs associated with the mine running at production capacity.
[6] See Appendix 1 for the calculation of profits lost by JMI.

# INDEX OF APPENDICES

Appendix 1 -   Lost Profits @ 5,200 Tons Per Week

Appendix 2 -   Gross Revenue @ 5,200 Tons Per Week

Appendix 3 -   Sales Volume Assumptions

Appendix 4 -   Cost Per Ton @ 5,200 Tons Per Week

Appendix 5 -   Incidental Costs

Appendix 6 -   Resume of J. Lester Alexander, III

Appendix 7 -   Trial, Deposition and Arbitration Testimony in Last Four Years

Appendix 8 -   List of Information Considered

Appendix 1

## Lost Profits @ 5,200 Tons Per Week

| | Cumulative | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 |
|---|---|---|---|---|---|---|
| Gross Revenue (Appendix 2 and 3) | $ 10,513,500 | $ 2,051,740 | $ 2,088,140 | $ 2,124,540 | $ 2,124,540 | $ 2,124,540 |
| Incremental Costs (Appendix 4): | | | | | | |
| Anticipated Tons [1] | | 260,000 | 260,000 | 260,000 | 260,000 | 260,000 |
| Cost Per Ton (Appendix 4) | | $ 4.16 | $ 4.28 | $ 4.41 | $ 4.54 | $ 4.68 |
| Incremental Costs | $ 5,738,200 | $ 1,081,600 | $ 1,112,800 | $ 1,146,600 | $ 1,180,400 | $ 1,216,800 |
| Lost Profits | $ 4,775,300 | $ 970,140 | $ 975,340 | $ 977,940 | $ 944,140 | $ 907,740 |
| (Less): Actual Gravel and Sand Sales [2] | (301,427) | (275,668) | (25,759) | | | |
| Net Lost Profits | $ 4,473,873 | $ 694,472 | $ 949,581 | $ 977,940 | $ 944,140 | $ 907,740 |

[1] Source: Section 3.1 of Supply Agreement dated April 16, 2004 between Johnco Materials, Inc. and Conrad Yelvington Distributors, Inc.

[2] Source: Johnco Materials, Inc. Profit and Loss Statements for the period May 2006 through June 2007.

Appendix 2

# Gross Revenue @ 5,200 Tons Per Week

| | Cumulative | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 |
|---|---|---|---|---|---|---|
| **#67 Concrete Gravel** | | | | | | |
| Contracted Quantity[1] | 1,300,000 | 260,000 | 260,000 | 260,000 | 260,000 | 260,000 |
| Price Per Ton[1] | | $ 5.51 | $ 5.65 | $ 5.79 | $ 5.79 | $ 5.79 |
| Gross Revenue | $ 7,417,800 | $ 1,432,600 | $ 1,469,000 | $ 1,505,400 | $ 1,505,400 | $ 1,505,400 |
| **#4 Oversize Gravel** | | | | | | |
| Anticipated Quantity[2] | 218,000 | 43,600 | 43,600 | 43,600 | 43,600 | 43,600 |
| Price Per Ton[3] | | $ 8.50 | $ 8.50 | $ 8.50 | $ 8.50 | $ 8.50 |
| Gross Revenue | $ 1,853,000 | $ 370,600 | $ 370,600 | $ 370,600 | $ 370,600 | $ 370,600 |
| **Sand** | | | | | | |
| Anticipated Quantity[2] | 731,000 | 146,200 | 146,200 | 146,200 | 146,200 | 146,200 |
| Price Per Ton[4] | | $ 1.70 | $ 1.70 | $ 1.70 | $ 1.70 | $ 1.70 |
| Gross Revenue | $ 1,242,700 | $ 248,540 | $ 248,540 | $ 248,540 | $ 248,540 | $ 248,540 |
| **Total Gross Revenue** | $ 10,513,500 | $ 2,051,740 | $ 2,088,140 | $ 2,124,540 | $ 2,124,540 | $ 2,124,540 |

[1] Source: Section 3.1 of Supply Agreement dated April 15, 2004 between Johnco Materials, Inc. and Conrad Yelvington Distributors, Inc., based on 50 weeks per year production.

[2] Source: Anticipated quantity for # 4 Oversize Gravel and Sand calculated based on historical relationship between tons of # 67 Concrete Gravel, # 4 Oversize Gravel, and Sand sold during the period January 2006 through June 2007 (see Appendix 3).

[3] Source: Price per ton for delivery of 3,329,866 tons to Conrad Yelvington Distributors, Inc. during June 2006 (Bates Johnco Materials 00058 to 00059) and for multiple deliveries totaling ~ 5,400 tons to Meddox Stone & Gravel during the period March 2006 through October 2006, based on detailed analysis of sales invoices for the period January 2006 through June 2007.

[4] Source: Average price per ton for deliveries during the period January 2006 through June 2007, based on detailed analysis of sales invoices for the period January 2006 through June 2007.

Appendix 3

# Sales Volume Assumptions

## Actual Sales History  January 2006 Through June 2007

| | # 67 Concrete Gravel | # 4 Oversize Gravel | Sand | Combined |
|---|---|---|---|---|
| Tons Sold [1] | 40,028.63 | 6,729.35 | 22,505.63 | 69,263.61 |
| % of Sales | 57.8% | 9.7% | 32.5% | 100.0% |

[1] Source: Detailed analysis of sales invoices for the period January 2006 through June 2007.

## Anticipated Tons @ 5,200 Tons Per Week

| | # 67 Concrete Gravel | # 4 Oversize Gravel | Sand | Combined |
|---|---|---|---|---|
| Tons Sold | 260,000 | 43,600 | 146,200 | 449,800 |
| % of Sales | 57.8% | 9.7% | 32.5% | 100.0% |

Case 2:06-cv-00993-ID-SRW    Document 22-2    Filed 08/08/2007    Page 8 of 13
Case 2:06-cv-00993-KOB-SRW    Document 89-2    Filed 03/10/2008    Page 8 of 13

Appendix 4

## Cost Per Ton @ 5,200 Tons Per Week

| | Cumulative | Actual Operating Costs [1] | | | | |
|---|---|---|---|---|---|---|
| | | March 2006 | May 2006 | June 2006 | July 2006 | August 2006 |
| Tons # 67 Concrete Gravel Sold [2] | 21,863.12 | 135.00 | 5,953.04 | 3,241.59 | 189.13 | 12,344.36 |
| Salaries | $ 99,623 | $ 16,913 | $ 18,771 | $ 23,734 | $ 18,366 | $ 21,839 |
| Insurance-Workers' Comp. | 4,165 | - | - | - | - | 4,165 |
| Life Insurance | 6,628 | 1,657 | - | 1,657 | 1,657 | 1,657 |
| Payroll Tax | 10,219 | 1,834 | 1,409 | 2,661 | 2,030 | 2,285 |
| Contract Labor | 1,625 | - | - | 1,625 | - | - |
| Training | 150 | - | - | 150 | - | - |
| Fuel and Oil | 52,551 | 7,782 | 6,700 | 18,854 | 9,137 | 10,078 |
| Repairs | 25,040 | 8,270 | 1,518 | 5,680 | 3,305 | 6,267 |
| Equipment Rental | 19,063 | 2,044 | 5,141 | 4,098 | - | 7,780 |
| Insurance | 6,110 | 1,517 | 2,783 | 1,810 | - | - |
| Supplies | 8,893 | 395 | 1,119 | 5,545 | 980 | 854 |
| Hauling Charges | 1,830 | - | - | 180 | - | 1,650 |
| Small Tools | 1,091 | 429 | - | 454 | - | 208 |
| Miscellaneous Expenses | 769 | 74 | 695 | - | - | - |
| Utilities | 5,264 | 512 | 735 | 1,245 | 1,374 | 1,398 |
| Total Operating Costs | $ 243,021 | $ 41,427 | $ 38,871 | $ 67,693 | $ 36,849 | $ 58,181 |
| Escalate Variable Fuel and Oil Cost from Average Cost Per Actual Ton Sold to Cost for 5,200 Tons Per Week [3] | 207,844 | 44,297 | 45,379 | 33,225 | 42,942 | 42,001 |
| Total Equivalent Operating Costs | $ 450,865 | $ 85,724 | $ 84,250 | $ 100,918 | $ 79,791 | $ 100,182 |
| Anticipated Tons # 67 Concrete Gravel [4] | 108,335 | 21,667 | 21,667 | 21,667 | 21,667 | 21,667 |
| Cost Per Ton | $ 4.16 | $ 3.96 | $ 3.89 | $ 4.66 | $ 3.68 | $ 4.62 |

| | Cost Per Ton Escalated for Inflation [5] | | | | |
|---|---|---|---|---|---|
| | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 |
| Cost Per Ton | $ 4.16 | $ 4.28 | $ 4.41 | $ 4.54 | $ 4.68 |

[1] Source: Johnso Materials, Inc. Statements of Operations for the March 2006 through September 2006 period of operations under the Supply Agreement. April 2006 and September 2006 operating costs were excluded from analysis due to effect of cost avoidance reduction in work force by Johnso Materials, Inc., resulting in operating costs not comparable to months of fully-staffed production.

[2] Source: Detailed analysis of sales invoices for the period January 2006 through June 2007.

[3] Source: Operating costs incurred by Johnso Materials, Inc. during the March 2006 through September 2006 period of operations under the Supply Agreement represent staffing and operating costs necessary to produce 5,200 tons of # 67 Concrete Gravel per week. Actual operating costs incurred by Johnso Materials, Inc. for operation producing less than contracted quantities delivered to Conrad Yelvington Distributors, Inc. are equivalent to costs necessary to produce 5,200 tons of # 67 Concrete Gravel per week, with the exception of Fuel and Oil, which would escalate to power equipment to load rail cars specified as the shipping method by the Supply Agreement. For analytical purposes, actual Fuel and Oil cost has been escalated to equivalent cost necessary to produce and rail car load 5,200 tons of # 67 Concrete Gravel per week.

[4] Production of # 4 Oversize Gravel and Sand are byproducts of the production of # 67 Concrete Gravel: tons of # 4 Oversize Gravel and Sand are not included in the Anticipated Tons for purposes of calculating Cost Per Ton.

[5] Cost Per Ton escalated 3.0% for inflation, comparable to 2.4% increase from June 2006 to June 2007 in Consumer Price Index published by the Bureau of Labor Statistics of the U.S. Department of Labor for comparable geographic and demographic areas, specifically for South region, Size D Nonmetropolitan area size (less than 50,000) (www.bls.gov/news.release/cpi.t03.htm).

Appendix 5

# Incidental Costs

|  | March 2006 [1] | April 2006 [1] | Combined |
|---|---|---|---|
| Salaries | $ 16,913 | $ 7,084 | $ 23,997 |
| Insurance-Workers' Comp. | - | 3,892 | 3,892 |
| Life Insurance | 1,657 | 1,657 | 3,314 |
| Payroll Tax | 1,834 | 699 | 2,533 |
| Training | - | 70 | 70 |
| Fuel and Oil | 7,782 | 5,397 | 13,179 |
| Repairs | 8,270 | 3,052 | 11,322 |
| Equipment Rental | 2,044 | 7,952 | 9,996 |
| Insurance | 1,517 | 1,822 | 3,339 |
| Supplies | 395 | 1,555 | 1,950 |
| Small Tools | 429 | 64 | 493 |
| Miscellaneous Expenses | 74 | 64 | 138 |
| Utilities | 512 | 607 | 1,119 |
|  | $ 41,427 | $ 33,915 |  |
| Incidental Costs |  |  | $ 75,342 |

[1] Source: Johnco Materials, Inc. Statements of Operations for March 2006 and April 2006.

**Resume of J. Lester Alexander, III**                                        Appendix 6

**Professional Experience**

Mr. Alexander is co-founder and the Managing Principal of Accounting Economics & Appraisal Group. He is a former partner of PricewaterhouseCoopers LLP and former southeastern practice leader of one of its legacy firm's consulting practices. Mr. Alexander has practiced for more than twenty-eight years performing audit, tax and consulting services. In recent years Mr. Alexander has concentrated his practice in the areas of fraud investigation, forensic accounting and valuation consulting services. Mr. Alexander holds a Bachelor of Science in Accounting from the University of Alabama and is a Certified Public Accountant and a Certified Fraud Examiner.

Mr. Alexander has provided services and, from time to time, expert testimony in various courts and in situations involving alternative dispute resolution. He has provided services in connection with contract disputes, security issues, insurance coverage issues, non-compete agreements, lost profits, business valuation and various other matters. He has testified in connection with class action certification hearings and class action fairness hearings. Mr. Alexander's experience includes testimony about customary practices and standards of care in auditing, operating and controlling business activities. Mr. Alexander has concentrated experience in a variety of industries including real estate, contracting, manufacturing, insurance, and healthcare.

He is experienced in the areas of business valuation, acquisition due diligence, investment advisory, tax advisory and cost accounting advisory services. He has evaluated the value of ownership interests in businesses in connection with acquisitions, disposals and disputes. He has performed suitability studies in connection with investment transactions in a wide range of financial instruments. In addition, he has performed incremental cost studies, contribution margin studies and other applications of cost accounting for clients in connection with new products, acquisitions, patent valuations and evaluation of trademarks. This experience includes making projections of incremental revenues and costs in connection with profitability analysis of proposed business ventures, new products and other profitability analysis for companies.

Throughout his career Mr. Alexander has advised governing bodies, committees and members on their role in overseeing the activities of companies and senior management. His clients have included publicly-traded companies, privately-held companies, governmental entities and tax-exempt companies. He has advised governing bodies overseeing companies in the start-up/growth, mature and restructuring phases of operational development. He has performed these services for governing bodies overseeing companies operating in the insurance, reinsurance, manufacturing, healthcare, technology, financial services, real estate, contracting, and retail industries.

Mr. Alexander has performed determinations of solvency; investigated potentially fraudulent transfers made by debtors; analyzed preferential payments to creditors; analyzed the course of dealings between debtor/creditor; and valued the consideration received when a debtor transfers assets. Mr. Alexander has testified in court as an expert witness concerning solvency, fraudulent transfers, preference payments, ordinary course of business, reasonably equivalent value, cash/collateral tracing, lost profits, business valuation and records reconstruction.

Further, Mr. Alexander has been appointed Trustee of both Chapter 11 and Chapter 7 Bankruptcy Estates, where he pursued recoveries (including adversary proceedings in Federal and State courts), made solvency determinations and performed the routine duties of both a Chapter 11 and Chapter 7 Bankruptcy Trustee. Creditors and Trustees have engaged Mr. Alexander to investigate insider transactions, value businesses and to evaluate loan collateral. Mr. Alexander has served as a lead advisor for various financial institutions in connection with their underwriting and credit/investment evaluation activities. In addition, Mr. Alexander has conducted auctions and assisted others in evaluating competitive bids received in auction.

**Resume of J. Lester Alexander, III**                                    Appendix 6

## Professional/Business/Community Affiliations

Lecturer on Documentation and Demonstration of Extra Work Costs on Construction Projects - 2006, Birmingham, Alabama

Lecturer on Financial Damages - 2004 Cumberland Law School Continuing Education Seminar, Birmingham Alabama

Lecturer on Financial and Business Fraud Schemes - 2004 Corporate Counsel Seminar, Birmingham Alabama

Lecturer on Detecting Fraud Schemes - Fall Bankruptcy Seminar, 2003, Alabama Bar Continuing Education Series, Birmingham Alabama

Lecturer on Accountant's View of Sarbanes Oxley - 2003 Seminar, Alabama Bar Continuing Education Series, Birmingham Alabama

Lecturer on Online Fraud Prevention - 2002 Institute of Management Accountants, Birmingham, Alabama

Lecturer on Forensic Computer Investigation - 2001 Discovery Seminar, Alabama Bar Continuing Education Series, Birmingham , Alabama

Lecturer on Online Business & Financial Research Methods - 2001 Federation of Insurance & Corporate Counsel's Internet University, Napa, California

Lecturer on Identifying and Investigating Fraud - 2001 Institute of Management Accountants, Birmingham, Alabama

"Expert Witness Research Post Kumho Tire", presented at the American Bar Association's 2000 Annual Meeting, New York, New York

Lecturer on Online Discovery - Defense Research Institute's 2001 Annual Meeting of Young Lawyers, Miami, Florida

Lecturer on Online Expert Witness Research - 2001 Louisiana State Bar 17th Summer School for Lawyers, Destin, Florida

Panelist on Consumer Fraud Issues - Coopers & Lybrand 1997 National Banking Conference, Washington, DC

Former National Practice Leader - Coopers & Lybrand's Financial Services Consumer Dispute Resolution Practice

Former Regional Service Line Leader - Coopers & Lybrand's Litigation Consulting Services Southern Region

Former Practice Leader for Dispute Analysis and Investigations - PricewaterhouseCoopers LLP, Birmingham, Alabama

Former Member - Banking and Insurance Industry Groups - PricewaterhouseCoopers LLP

American Institute of Certified Public Accountants

Alabama Society of Certified Public Accountants

Florida Institute of Certified Public Accountants

Association of Certified Fraud Examiners

Associate Member-American Bar Association

Past Regional Director - Exchange Club of Alabama, Past President, Secretary, Director and Treasurer - Birmingham Breakfast Exchange Club

**Trial, Deposition & Arbitration Testimony in Last Four Years**               Appendix 7

Intergraph Corporation v. Bentley Software Systems, Inc (Circuit Court of Madison County, Alabama)

HydroPower Inc v. Eaton Manufacturing (Circuit Court of Jefferson County Alabama)

The Utilities Board of the City of Daphne v. City of Spanish Fort et al (Federal District Court, Southern District of Alabama)

Compass Bank v. Blitz Media, Inc., et al. (United States District Court, Northern District of Alabama, Southern Division)

Steward Machine v. White Oak, et al. (United States District Court, Connecticut)

Refrigerated Construction Services v. Coldmatic Building Systems, Inc, et al (United States District Court, Northern District of Alabama, Southern Division)

ABB Automation, Inc. v. DeVries, et al. (Circuit Court of Jefferson County)

Proliance, Inc. v. City of Huntsville (Circuit Court of Madison County, Alabama)

Steve Jamison, et al. v. Kerr-McGee Corporation, et al. (State Court, Mississippi)

Mason Dillard et al v Bellsouth Advertising et al (Circuit Court of Jefferson County, Alabama)

Terry Manufacturing Co., Inc. v. The Peoples Bank et al. (United States Bankruptcy Court, Middle District, Alabama)

Terry Manufacturing Co., Inc. v. Bonifay Manufacturing Inc. et al. (United States Bankruptcy Court, Middle District, Alabama)

Terry Manufacturing Co., Inc. v. HLC Industries (United States Bankruptcy Court, Middle District, Alabama)

Terry Manufacturing Co., Inc. v. N.D. Horton et al (United States Bankruptcy Court, Middle District, Alabama)

Terry Manufacturing Co., Inc. v. Albright, et al (United States Bankruptcy Court, Middle District, Alabama)

Pemco World Air Services, Inc v. GE Capital Aviation Services, Inc (Circuit Court of Dale County, Alabama)

Terry Manufacturing Co., Inc. v. Delong & Caldwell (United States Bankruptcy Court, Middle District, Alabama)

Terry Manufacturing Co., Inc. v. J Martin & Associates (United States Bankruptcy Court, Middle District, Alabama)

AHAT, et al v. Gen Re, et. al. (Circuit Court of Montgomery County, Alabama)

Amason and Associates, Inc. v Silver Beach Condominium Owners Association, et. al (Circuit Court of Baldwin County, Alabama)

Campbell & Sons Oil Co. Inc, et al v. Merrill Lynch Business Services, Inc, et. al. (Circuit Court of Madison County, Alabama)

**List of Information Considered**                                    Appendix 8

Complaint and relevant pleadings.

Depositions of Ben Johnston, Presley Morgan ("Pep") Johnston, and Clatus Junkin.

Supply agreement dated April 16, 2004 between Johnco Materials, Inc. and Conrad Yelvington Distributors, Inc.

Various documents regarding and/or related to the Supply Agreement with Conrad Yelvington Distributors, Inc.

Johnco Materials, Inc. monthly profit and loss statements for the period January 2006 through June 2007.

Johnco Materials, Inc. Schedule of Sales and Other Income for the period January 2004 through February 2006.

Johnco Materials, Inc. Invoice Registers for the period January 2006 through April 2006.

Johnco Materials, Inc. Sales and Sales Tax Registers for the period May 2006 through June 2007.

Johnco Materials, Inc. sales invoices, including invoices from Johnco Materials, Inc. to Conrad Yelvington Distributors, Inc.

Income tax returns of Johnco Materials, Inc. for the period January 1, 2005 through December 31, 2006.

Payroll records of Johnco Materials, Inc. for the period January 1, 2006 through December 31, 2006.

Johnco Materials, Inc. Schedule of White Hall Set Up Costs dated March 15, 2006.

Johnco Materials, Inc. Schedule of Loan Activity for loans identified as WABT 4471844, WABT 4471921, and WABT 4481194, for the period May 4, 2004 through February 27, 2006.

Johnco Materials, Inc. Schedule of Loan From Clatus Junkin for the period June 1, 2006 through July 31, 2007.

Bureau of Labor Statistics (www.bls.gov)

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA

JOHNCO MATERIALS, INC.,                    CASE NO.: CV-06-2:06CV993-10

      Plaintiff,

vs.

CONRAD YELVINGTON
DISTRIBUTORS, INC.,

      Defendant.

_____/

## **DEFENDANT'S NOTICE OF TAKING 30(b)(6) DEPOSITION**

**TO:**  **H. Gregory Pearson, Esquire**
     **Charles E. Harrison, Esquire**
     **Junkin, Pearson, Harrison, & Junkin, L.L.C.**
     **601 Greensboro Avenue**
     **Suite 600, Alston Place**
     **Tuscaloosa, AL 35401**

Please take notice that the defendant, by and through its undersigned counsel, and pursuant to Fed.R.Civ.P. 30(b)(6), will take the deposition of the corporate representative of Johnco Materials, Inc. and/or defendant's expert witness, J. Lester Alexander, III, CPA, upon oral examination.

Topics of Examination: Pursuant to Fed.R. Civ.P. 30(b)(6), said corporation "shall designate one or more officers, directors, or managing agents, or other persons who consent to testify on its behalf" as to the matters on which examination is requested. The matters on which examination of the corporation is requested are as follows: **Any and all damages sought by the plaintiff as set forth in plaintiff's complaint.**

EXHIBIT
B

Said deposition will take place at the offices of J. Lester Alexander, III, CPA on **Tuesday, October 30, 2007 at 10:00 a.m**, unless defendant identifies an alternative corporate representative to testify, then said deposition will take place at a date, time and location mutually agreed upon by counsel for plaintiff and for defendant..

This deposition will be taken before before a court reporter or any other duly qualified officer duly authorized who is not of counsel to either of the parties or interested in the event of the cause.

The examination will continue from day to day pursuant to adjournments, if any, until completed. This deposition is being taken for the purpose of discovery, for use as evidence at the trial of this cause, or for any other purpose permitted by the Federal Rules of Civil Procedure.

Cobb & Cole

By: _____
THOMAS J. LEEK
FLA. BAR NO. 0116408
150 Magnolia Avenue
Post Office Box 2491
Daytona Beach, FL 32115-2491
Telephone: (386) 255-8171
Facsimile: (386) 323-9255
E-mail: Tom.Leek@CobbCole.com
CO-COUNSEL FOR DEFENDANT

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a copy of the foregoing was served via U.S. Mail on this 9th day of October 2007, to:

H. Gregory Pearson, Esquire
Charles E. Harrison, Esquire
Junkin, Pearson, Harrison, & Junkin, L.L.C.
601 Greensboro Avenue
Suite 600, Alston Place
Tuscaloosa, AL 35401

Angela R. Rogers
Bradley Arant Rose & White LLP
The Alabama Center for Commerce
401 Adams Avenue, Suite 780
Montgomery, AL 36104

_____
Attorney

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| JOHNCO MATERIALS, INC. | ) | CASE NO. CV-06-2:06CV993-ID |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| CONRAD YELVINGTON | ) | |
| DISTRIBUTORS, INC., | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | / | |

## AMENDED NOTICE OF TAKING DEPOSITION
## OF J. LESTER ALEXANDER, III WITH SUBPOENA

TO:     **J. Lester Alexander, III, CPA**
**c/o Charles E. Harrison, Esquire**
**JUNKIN, PEARSON, HARRISON & JUNKIN, LLC**
**601 Greensboro Avenue**
**Suite 600 – Alston Place**
**Tuscaloosa, AL 35401**

PLEASE TAKE NOTICE at **10:00 a.m. on Tuesday, November 27, 2007 at the offices of**

**J. Lester Alexander, III, CPA, Accounting, Economics & Appraisal Group, LLC, 2 North 20th**

**Street, Suite 1400, Birmingham, Alabama 35203, Defendant, CONRAD YELVINGTON**

**DISTRIBUTORS, INC., will take the deposition of J. Lester Alexander, III, CPA,** upon oral

examination pursuant to Federal Rules of Civil Procedure, 30(b)(1), before a court reporter or any

other duly qualified officer duly authorized who is not of counsel to either of the parties or interested

in the event of the cause.

The examination will continue from day to day pursuant to adjournments, if any, until

completed. The deposition is being taken for the purpose of discovery, for use as evidence at trial of

this cause, or for any other purpose permitted by the Federal Rules of Civil Procedure.

*COBB & COLE*

By: _____

**THOMAS J. LEEK, ESQUIRE**
**FLA. BAR NO. 0116408**
150 Magnolia Avenue
Post Office Box 2491
Daytona Beach, FL  32115-2491
Telephone:  (386) 255-8171
Facsimile:   (386) 248-0323

**ATTORNEYS FOR DEFENDANT**

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that a true and correct copy of the foregoing Notice of Taking Deposition of J. Lester Alexander has been provided by U.S. Mail this 15 day of October, 2007 to the following:

Angela R. Rogers, Attorney at Law
Bradley, Arant, Rose & White, L.L.P.
Alabama Center for Commerce
401 Adams Avenue, Suite 780
Montgomery, AL 36104

Charles E. Harrison, Esquire
Junkin, Pearson, Harrison & Junkin, L.L.C.
601 Greensboro Avenue
Suite 600, Alston Place
Tuscaloosa, AL 35401

_____
Attorney

cc:    Bain & Associates Court Reporting Service, Inc.
       505 North 20th Street
       Suite 1250
       Birmingham, Alabama 35203
       Phone: 205 322-0592 or 1-888-326-0594

Issued by the
UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

JOHNCO MATERIALS, INC.,                    **AMENDED SUBPOENA IN A CIVIL CASE**

     Plaintiff,                          CASE NO.: CV-06-2:06CV993-ID

vs.

CONRAD YELVINGTON
DISTRIBUTORS, INC.,

     Defendant.

TO:    J. Lester Alexander, III, CPA
       c/o Charles E. Harrison, Esq.
       Junkin, Pearson, Harrison & Junkin, LLC
       601 Greensboro Avenue
       Suite 600 -- Alston Place
       Tuscaloosa, AL 35401

_____ **YOU ARE COMMANDED** to appear in the United States District Court at the place, date, and time specified below to testify in the above case.

| PLACE OF TESTIMONY | COURTROOM |
|---|---|
|  | |
|  | DATE AND TIME |

  **X**   **YOU ARE COMMANDED** to appear at the place, date, and time specified below to testify at the taking of a deposition in the above case.

| PLACE OF DEPOSITION<br>**Offices of J. Lester Alexander, III, CPA, Accounting, Economics & Appraisal Group, 2 North 20th Street, Suite 1400, Birmingham, AL  35203** | DATE AND TIME<br>**October 30, 2007 at 10:00 a.m.** |
|---|---|

  **X**   **YOU ARE COMMANDED** to produce and permit inspection and copying of the following documents or objects at the place, date, and time specified below

**SEE ATTACHED EXHIBIT "A"**

| PLACE<br>**Offices of J. Lester Alexander, III, CPA, Accounting, Economics & Appraisal Group, 2 North 20th Street, Suite 1400, Birmingham, AL  35203** | DATE AND TIME<br>**November 27, 2007 at 10:00 a.m.** |
|---|---|

    **YOU ARE COMMANDED** to permit inspection of the following premises at the date and time specified below.

| PREMISES | DATE AND TIME |
|---|---|
|  | |

    Any organization not a party to this suit that is subpoenaed for the taking of a deposition shall designate one or more officers, directors, or managing agents, or other persons who consent to testify on its behalf, and may set forth, for each person designated, the matters on which the person will testify.  Federal Rules of Civil Procedure, 30(b)(6).

| ISSUING OFFICER SIGNATURE AND TITLE (INDICATE IF ATTORNEY FOR PLAINTIFF OR DEFENDANT)<br>, **Attorney for defendants** | DATE<br>10/18/07 |
|---|---|
| ISSUING OFFICER'S NAME, ADDRESS, AND PHONE NUMBER<br>**Thomas J. Leek, Esquire, Cobb & Cole, P.O. Box 2491, Daytona Beach, FL 32115; Telephone 386-323-9210** | |

{034542-058 : KKOBY/KKOBY : 00535872.WPD; 1}

## PROOF OF SERVICE

DATE _____    PLACE _____

SERVED

Served on (print name): _____
Manner of service: _____

Served by (print name): _____
Title: _____

## DECLARATION OF SERVER

I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Proof of Service is true and correct.

Executed on _____

_____
Signature of Server

_____
Address of Server

---

Rule 45, Federal Rules of Civil Procedure, Parts C & D:

(c) PROTECTION OF PERSONS SUBJECT TO SUBPOENAS.

(1) A party or an attorney responsible for the issuance and service of a subpoena shall take reasonable steps to avoid imposing undue burden or expense on a person subject to that subpoena. The court on behalf of which the subpoena was issued shall enforce this duty and impose upon the party or attorney in breach of this duty an appropriate sanction, which may include, but is not limited to, lost earnings and a reasonable attorney's fee.

(2) (A) A person commanded to produce and permit inspection and copying of designated books, papers, documents or tangible things, or inspection of premises need not appear in person at the place of production or inspection unless commanded to appear for deposition, hearing or trial.

(B) Subject to paragraph (d)(2) of this rule, a person commanded to produce and permit inspection and copying may, within 14 days after service of the subpoena or before the time specified for compliance if such time is less than 14 days after service, serve upon the party or attorney designated in the subpoena written objection to inspection or copying of any or all of the designated materials or of the premises. If objection is made, the party serving the subpoena shall not be entitled to inspect and copy the materials or inspect the premises except pursuant to an order of the court by which the subpoena was issued. If objection has been made, the party serving the subpoena may, upon notice to the person commanded to produce, move at any time for an order to compel the production. Such an order to compel production shall protect any person who is not a party or an officer of a party from significant expense resulting from the inspection and copying commanded.

(3) (A) On timely motion, the court by which a subpoena was issued shall quash or modify the subpoena if it

(i) fails to allow reasonable time for compliance;

(ii) requires a person who is not a party or an officer of a party to travel to a place more than 100 miles from the place where that person resides, is employed or regularly transacts business in

person, except that, subject to the provisions of clause (c)(3)(B)(iii) of this rule, such a person may in order to attend trial be commanded to travel from any such place within the state in which the trial is held, or

(iii) requires disclosure of privileged or other protected matter and no exception or waiver applies, or

(iv) subjects a person to undue burden.

(B) If a subpoena

(i) requires disclosure of a trade secret or other confidential research, development, or commercial information, or

(ii) requires disclosure of an unretained expert's opinion or information not describing specific events or occurrences in dispute and resulting from the expert's study made not at the request of any party, or

(iii) requires a person who is not a party or an officer of a party to incur substantial expense to travel more than 100 miles to attend trial, the court may, to protect a person subject to or affected by the subpoena, quash or modify the subpoena or, if the party in whose behalf the subpoena is issued shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship and assures that the person to whom the subpoena is addressed will be reasonably compensated, the court may order appearance or production only upon specified conditions.

(d) DUTIES IN RESPONDING TO SUBPOENA.

(1) A person responding to a subpoena to produce documents shall produce them as they are kept in the usual course of business or shall organize and label them to correspond with the categories in the demand.

(2) When information subject to a subpoena is withheld on a claim that it is privileged or subject to protection as trial preparation materials, the claim shall be made expressly and shall be supported by a description of the nature of the documents, communications, or things not produced that is sufficient to enable the demanding party to contest the claim.

{034542-058 : KKOBY/KKOBY : 00535872.WPD; 1}

## Exhibit A

1.  Any and all documents contained in your file regarding this matter, the reports and/or opinions you rendered in this case.

2.  Any and all recorded communications and/or correspondence between you and any individual, including but not limited to plaintiff, or any agent of plaintiff, and Clatus Junkin, regarding this matter, and/or the reports and/or opinions you rendered regarding this case.

3.  All materials relied upon or referred to by you for purposes of formulating your expert report in this case, including but not limited to, correspondence, reports, notes, reports from other experts or other persons, transcripts of testimony, and/or publications.

4.  Your curriculum vitae.

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA

JOHNCO MATERIALS, INC.     )     CASE NO. CV-06-2:06CV993-10
                             )
        Plaintiff,        )
                             )
vs.                     )
                             )
CONRAD YELVINGTON     )
DISTRIBUTORS, INC.,      )
                             )
        Defendant.      )
                             /

### SECOND AMENDED NOTICE
### OF TAKING DEPOSITION J. LESTER ALEXANDER, III

**TO:**    **J. Lester Alexander, III, CPA**
           **c/o Charles E. Harrison, Esquire**
           **JUNKIN, PEARSON, HARRISON & JUNKIN, LLC**
           **601 Greensboro Avenue**
           **Suite 600 - Alston Place**
           **Tuscaloosa, AL 35401**

PLEASE TAKE NOTICE at **10:00 a.m. on Thursday, November 29, 2007** at the office of **Charles E. Harrison, Esquire, JUNKIN, PEARSON, HARRISON & JUNKIN, LLC, 601 Greensboro Avenue, Suite 600 - Alston Place, Tuscaloosa, AL 35401, Defendant, CONRAD YELVINGTON DISTRIBUTORS, INC., will take the deposition of J. Lester Alexander, III, CPA,** upon oral examination pursuant to Federal Rules of Civil Procedure, 30(b)(1), before a court reporter or any other duly qualified officer duly authorized who is not of counsel to either of the parties or interested in the event of the cause.

1

The examination will continue from day to day pursuant to adjournments, if any, until completed. The deposition is being taken for the purpose of discovery, for use as evidence at trial of this cause, or for any other purpose permitted by the Federal Rules of Civil Procedure.

COBB & COLE

By: _____
THOMAS J. LEEK, ESQUIRE
FLA. BAR NO. 0116408
150 Magnolia Avenue
Post Office Box 2491
Daytona Beach, FL 32115-2491
Telephone: (386) 255-8171
Facsimile: (386) 248-0323

**ATTORNEYS FOR DEFENDANT**

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing Notice of Taking Deposition of J. Lester Alexander has been provided by U.S. Mail this 2nd day of October, 2007 to the following:

Angela R. Rogers, Attorney at Law
Bradley, Arant, Rose & White, L.L.P.
Alabama Center for Commerce
401 Adams Avenue, Suite 780
Montgomery, AL 36104


Charles E. Harrison, Esquire
Junkin, Pearson, Harrison & Junkin, L.L.C.
601 Greensboro Avenue
Suite 600, Alston Place
Tuscaloosa, AL 35401

_____
Attorney


cc:    Tuscaloosa Court Reporting
       612 Lurleen B. Wallace Boulevard
       Tuscaloosa, AL 35401
       Fax: 205-758-4371

3

**EXHIBIT**

tabbies

C
_____

**TUSCALOOSA COURT REPORTING**
**Merrill Legal Solutions**

Page 1

1

2                    J. LESTER ALEXANDER, III

3                                                       COPY

4

5              INSTRUCTIONS TO THE WITNESS

6

7

8              PLEASE READ YOUR DEPOSITION OVER

9     CAREFULLY BEFORE YOU SIGN IT.  YOU SHOULD

10    MAKE ALL YOUR CHANGES ON THE ATTACHED ERRATA

11    SHEET.  PLEASE DO NOT MARK ON THE ORIGINAL

12    DEPOSITION.

13              AFTER MAKING ANY CHANGES WHICH

14    YOU HAVE NOTED ON THE ATTACHED ERRATA SHEET,

15    SIGN YOUR NAME ON THE ERRATA SHEET AND DATE

16    IT.  THEN SIGN YOUR DEPOSITION AT THE END OF

17    YOUR TESTIMONY IN THE SPACE PROVIDED.  YOU

18    ARE SIGNING IT SUBJECT TO THE CHANGES YOU

19    HAVE MADE ON THE ERRATA SHEET, WHICH WILL BE

20    ATTACHED TO THE DEPOSITION.

21              RETURN THE ORIGINAL ERRATA SHEET,

22    TRANSCRIPT AND EXHIBITS TO TUSCALOOSA COURT

23    REPORTING, 612 LURLEEN B. WALLACE BOULEVARD,

24    NORTH, TUSCALOOSA, ALABAMA 35401.

25              ACCORDING TO THE RULES OF CIVIL

26    PROCEDURE, YOU WILL HAVE THIRTY (30) DAYS

27    FROM THE DATE YOU RECEIVE THIS DEPOSITION IN

28    WHICH TO READ, SIGN AND RETURN YOUR

29    DEPOSITION TO THE ABOVE OFFICE.  IF YOU FAIL

30    TO DO SO, YOU AUTOMATICALLY WAIVE YOUR RIGHT

31    TO MAKE ANY CORRECTIONS TO YOUR DEPOSITION.

32

Page 1

1          IN THE UNITED STATES DISTRICT COURT

2          FOR THE MIDDLE DISTRICT OF ALABAMA

3

4

5   JOHNCO MATERIALS, INC., )

6              PLAINTIFF,    )

7   VS.                      ) CIVIL ACTION NO.

8   CONRAD YELVINGTON        ) CV 06-2:06CV993-10

9   DISTRIBUTORS, INC.,      )

10             DEFENDANT.    )

11

12

13

14

15               DEPOSITION OF

16          J. LESTER ALEXANDER, III

17             NOVEMBER 29, 2007

18             ————

19

20

21   DEBORAH S. RANDALL, Commissioner

22   ACCR #:  238

23   EXPIRATION DATE:  SEPTEMBER 30, 2008

Page 2

1              S T I P U L A T I O N

2              IT IS STIPULATED AND AGREED, by

3      and between the parties through their

4      respective counsel, that the deposition of

5              J. LESTER ALEXANDER, III

6      may be taken before Deborah S. Randall,

7      Commissioner and Notary Public, State of

8      Alabama at Large, at the law offices of

9      Junkin, Pearson, Harrison & Junkin, L.L.C.,

10     601 Greensboro Avenue, Suite 600,

11     Tuscaloosa, Alabama 35401, on the 29th day

12     of November, 2007.

13             IT IS FURTHER STIPULATED AND

14     AGREED that the signature to and the reading

15     of the deposition by the witness is not

16     waived, the deposition to have the same

17     force and effect as if full compliance had

18     been had with all laws and rules of Court

19     relating to the taking of depositions.

20             IT IS FURTHER STIPULATED AND

21     AGREED that it shall not be necessary for

22     any objections to be made by counsel as to

23     any questions, except as to form or leading

**TUSCALOOSA COURT REPORTING**
**Merrill Legal Solutions**

Page 3

1    questions, and that counsel for the parties

2    may make objections and assign grounds at

3    the time of the trial, or at the time said

4    deposition is offered in evidence or prior

5    thereto.

6              IT IS FURTHER STIPULATED AND

7    AGREED that notice of filing of this

8    deposition by the Commissioner is waived.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

TUSCALOOSA COURT REPORTING
Merrill Legal Solutions

Page 4

1                          I N D E X

2   EXAMINATION BY                      PAGE NUMBER

3   Mr. Leek                            6 - 263

4

5

6                       E X H I B I T S

7   Defendant's Exhibit No. 1                11

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

612 Lurleen Wallace Blvd., N. * Tuscaloosa, Alabama 35401 * www.legalink.com
(205) 758-4006 * (800) 844-3370 * Fax (205) 758-4371

**TUSCALOOSA COURT REPORTING**
**Merrill Legal Solutions**

Page 5

1    BEFORE:

2            Deborah S. Randall, Commissioner.

3    APPEARANCES:

4            JUNKIN, PEARSON, HARRISON &

5    JUNKIN, L.L.C., by Mr. H. Gregory Pearson,

6    601 Greensboro Avenue, Suite 600,

7    Tuscaloosa, Alabama 35401, appearing for the

8    Plaintiff.

9            COBB & COLE, by Mr. Thomas J.

10   Leek, 150 Magnolia Avenue, P. O. Box 2491,

11   Daytona Beach, Florida 32115-2491, appearing

12   for the Defendant.

13

14   ALSO PRESENT:

15           Mr. W. Dane Floyd.

16

17

18

19

20

21

22

23

## TUSCALOOSA COURT REPORTING
## Merrill Legal Solutions

Page 6

1              I, Deborah S. Randall, a Court

2       Reporter of Tuscaloosa, Alabama, and a

3       Notary Public for the State of Alabama at

4       Large, acting as Commissioner, certify that

5       on this date, as provided by Rule 30 of the

6       Alabama Rules of Civil Procedure, and the

7       foregoing stipulation of counsel, there came

8       before me at the law offices of Junkin,

9       Pearson, Harrison & Junkin, L.L.C., 601

10      Greensboro Avenue, Suite 600, Tuscaloosa,

11      Alabama 35401, beginning at or about 10:50

12      a.m., J. LESTER ALEXANDER, III, witness in

13      the above cause, for oral examination,

14      whereupon the following proceedings were

15      had:

16

17              J. LESTER ALEXANDER, III,

18

19      being first duly sworn was examined and

20      testified as follows:

21

22      EXAMINATION BY MR. LEEK:

23      Q.        Good morning, Mr. Alexander.

TUSCALOOSA COURT REPORTING
Merrill Legal Solutions

Page 7

1    Will you state your full name for the

2    record, please?

3    A.        It's Julian Lester Alexander,

4    III.

5    Q.        And the name of your company?

6    A.        Accounting Economics & Appraisal

7    Group, L.L.C.

8    Q.        Thank you.  We're going to go

9    through a couple of preliminary matters

10   here, but just so I can have a clear record,

11   have you ever done any work for Conrad

12   Yelvington Distributors, Inc.?

13   A.        No, not to my knowledge.

14   Q.        Have you ever done any work for

15   any Conrad Yelvington Distributors, Inc.

16   subsidiary or related company?

17   A.        I don't know even who their

18   subsidiaries are, so I don't know.

19   Q.        Fair enough.  You'll hear me

20   refer to Conrad Yelvington Distributors,

21   Inc. as CYDI, Yelvington, Yelvington

22   Distributors throughout the course of the

23   deposition and I need you to understand I'm

TUSCALOOSA COURT REPORTING
Merrill Legal Solutions

Page 20

1    A.        I don't have that kind of

2    information.  I don't know who's

3    representing who.

4    Q.        Well, you didn't --

5    A.        At that time that was my first

6    meeting.

7    Q.        Sure.  You didn't meet with

8    anybody representing Yelvington; right?

9    A.        No.

10   Q.        So the only party represented in

11   that meeting would have been Johnco?

12   A.        Yeah.  I'm really not

13   understanding the line of questions.  I'm

14   not intending to say anything to confuse

15   you, so I'm not understanding where this is

16   going.

17   Q.        Okay.  Don't --

18   A.        I met with the parties, counsel

19   that hired me and with Mr. Junkin and I

20   assumed people in that room were either

21   representing him or were representatives of

22   him.

23   Q.        Okay.

TUSCALOOSA COURT REPORTING
Merrill Legal Solutions

Page 21

1    A.        But I don't know.

2    Q.        But you don't know who those

3    people were?

4    A.         I mean, I have a vague

5    recollection, but I don't know what role

6    they played in this case or anything.  I

7    mean, I was doing my due diligence about

8    what's going on, tell me what the story is,

9    what are the facts, what happened, and so,

10   you know, Mr. Junkin was important to me.  I

11   needed to interview him to find out, and

12   there were other people as I was asking

13   questions that were coming in and out and

14   getting information and giving me stuff.

15   Q.        And let me give you -- before I

16   went with the standard deposition

17   instructions because you've done this

18   before, but let me give you this one.  When

19   you're answering my question, just try to

20   answer the question that's been asked.

21   Don't try to worry about where I'm headed.

22   I just need you to focus and answer the

23   question that's been asked; okay?

Page 22

1    A.          I understand.  And you need to

2    understand I was trying to tell you that I

3    did not understand your question.

4    Q.          I appreciate that.  When was that

5    meeting?

6    A.          Shortly before the date of my

7    report.

8    Q.          Was it before -- what was the

9    first contact you had with anybody on behalf

10   of Johnco?  Was it by telephone?

11   A.          Telephone.

12   Q.          How long after that telephone

13   call was your meeting?

14   A.          My recollection is shortly after

15   that telephone call.

16   Q.          Do you recall the date of that

17   telephone call?

18   A.          I don't, but it was shortly

19   before the date of my report.

20   Q.          And we'll go through this and

21   establish a time line, but I think when we

22   read the e-mails to you that the date of

23   that telephone call was probably July 31st.

Page 23

1    Does that help you recall when it was?

2    A.          I mean, I don't understand your

3    question.  If you've read the e-mail and you

4    know it's July 31st, fine.  I've already

5    said I don't remember.

6    Q.          Okay.

7    A.          But if you want to show me the

8    e-mail, I can look at it and maybe it'll

9    refresh my memory.

10   Q.          We'll do it.  We're just trying

11   to get through some preliminary stuff here.

12   You also said that you I guess reviewed some

13   testing results?

14   A.          Yes.

15   Q.          And those testing results aren't

16   with your production here today; is that

17   correct?

18   A.          No.  I didn't take them into

19   possession.

20   Q.          And how did you get those testing

21   results?

22   A.          From counsel for Johnco.

23   Q.          Was that also at the same

TUSCALOOSA COURT REPORTING
Merrill Legal Solutions

Page 24

1    meeting?

2    A.          No.

3    Q.          Was that after the report was

4    issued?

5    A.          Yes.

6    Q.          How many times have you reviewed

7    the deposition transcripts of Mr. Junkin?

8    A.          I don't know.  Several times.

9    Q.          How about Mr. Johnston?

10   A.          I don't know.

11               MR. PEARSON:  Which one?

12               MR. LEEK:  I'm sorry.  Good

13   point.

14   A.          Yeah.

15   Q.          Pep Johnston?

16   A.          At least twice.

17   Q.          And how do you know it's at least

18   twice?

19   A.          Because I examined it in the

20   process of issuing the report and I

21   re-examined it after issuing the report.

22   Q.          How long was your meeting with --

23   I'm sorry.  Let me step back a second.  Did

Page 25

1    you have one meeting, face-to-face meeting

2    with the Johnco people between the time you

3    were hired and issuing your report?

4    A.        Yes.

5    Q.        How long was that meeting?

6    A.        I don't recall.

7    Q.        Was it more than five minutes?

8    A.        Yes.

9    Q.        Was it less than a day, workday?

10   A.        That I don't recall whether it

11   was -- first of all, I don't know what you

12   would call a full workday.  I would call a

13   full workday eight hours.  I don't remember.

14   I do remember that it was the bulk of the

15   day, that there was travel involved.

16   Q.        Where did that meeting take

17   place?

18   A.        In this office right here.

19   Q.        And you traveled from Birmingham;

20   is that correct?

21   A.        I did.

22   Q.        Well, can you estimate your

23   face-to-face time with the Johnco people in

TUSCALOOSA COURT REPORTING
Merrill Legal Solutions

Page 26

1    that meeting?

2    A.          I might be able to.

3    Q.          Would you, please?

4    A.          You'll have to let me get that

5    box.

6    Q.          Sure.  Go ahead.

7    A.          I can.

8    Q.          How long was that face-to-face

9    time?

10   A.          Three-and-a-half hours.

11   Q.          Do you recall how many different

12   documents and pieces of evidence you

13   reviewed in that three-and-a-half hours?

14   A.          No.

15   Q.          Do you recall anything else that

16   you received, reviewed but returned in that

17   three-and-a-half hours other than the

18   depositions of Mr. Junkin and the Johnstons?

19   A.          I don't think that's a fair

20   characterization of my testimony.

21   Q.          Okay.  Elaborate.

22   A.          You'll have to rephrase the

23   question because I don't understand it.

TUSCALOOSA COURT REPORTING
Merrill Legal Solutions

Page 27

1    Q.        All right.  You said that in your

2    initial meeting with Johnco you reviewed but

3    did not retain the depositions of Mr. Junkin

4    and the Johnstons; is that correct?

5    A.        No.

6    Q.        Did you review the depositions of

7    Mr. Junkin and the Johnstons in your initial

8    meeting with Johnco?

9    A.        No.

10   Q.        When did you review them?

11   A.        In the course of writing my

12   report and doing the work necessary to

13   support my report.

14   Q.        I think I -- I think I must have

15   misunderstood.  You testified earlier that

16   you were handed the deposition transcripts;

17   correct?

18   A.        Not of those two individuals but

19   of that Klebe and -- of your clients.

20   Q.        Right.

21   A.        And I did not retain them.

22   Q.        In the initial meeting that you

23   had with them were you also given the

Page 28

1    deposition transcripts of Mr. Junkin and the

2    Johnstons?

3    A.          I was not given any deposition

4    transcripts in the initial meeting.

5    Q.          Were you given those deposition

6    transcripts prior to issuing your report?

7    A.          I don't know whether we were able

8    to get the transcripts.  I don't know what

9    the time line.  I don't remember the time

10   line.  I remember that there were some

11   timing issues and I remember that we worked

12   around those timing issues and that's the

13   reason after I issued my report I re-read

14   those depositions.

15   Q.          Okay.

16   A.          But I can't recall any more

17   than -- there was an extremely short time

18   frame between when I was retained and when I

19   issued my report, and I just -- it was a lot

20   of running around doing all kind of stuff to

21   meet that deadline.  And I just can't tell

22   you today what I did, when I did it, except

23   that I know what I did before the report

**TUSCALOOSA COURT REPORTING**
**Merrill Legal Solutions**

Page 29

1    went out and I know what I did after the

2    report went out.

3    Q.        Are you billing Johnco by the

4    hour?

5    A.        I sure am.

6    Q.        Do you provide written

7    descriptions of your time spent by the hour

8    or some portion of it to Johnco?

9    A.        We use full format billing on

10   most matters unless we're asked not to.

11   Q.        Can you tell me what full format

12   billing means?

13   A.        By person, by day, by task.

14   Q.        So if you had reviewed the

15   deposition transcripts of Mr. Junkin and the

16   Johnstons would that be reflected in one of

17   your bills?

18   A.        It might be; it might not be.   I

19   mean, it depends on the task.   I mean,

20   reviewing the deposition transcript is what

21   is done but the task may be something else.

22   Q.        Like what?

23   A.        Analyzing the financial history.

Page 30

1    Q.        So --

2    A.        It's hard to just look at

3    numbers.  You might have to read what

4    somebody said about them to understand what

5    you're looking at.

6    Q.            So you would include reviewing

7    the deposition transcripts of a party under

8    the term "analyzed financial history"?

9    A.            No.  I just answered your

10   question.  I'm not going to set any rules

11   about how I write down what I do.  I write

12   down what I do and my folks write down what

13   they do based on what they are doing.  And,

14   you know, if they were assigned the task,

15   "Go read the deposition," it might say "read

16   deposition".  But if they were assigned the

17   task, "Go solve this problem or go get the

18   real answer and tell me what the facts are,"

19   they're professionals.  They're going to do

20   whatever they need to do to get it and then

21   they're going to write down what they did

22   based on their judgment so that I understand

23   they followed my direction and worked under

Page 106

1    you --

2    A.          You're going to have to give

3    me -- the answer to your question, if you

4    want an answer, is maybe but not in this

5    case based on my examination of the

6    evidence.

7    Q.          And again, that's your dispute

8    with the reasonable expectations of the

9    parties.  What I'm asking you to do is to --

10   A.          No, you're mischaracterizing what

11   I'm saying.  That's fine.  I just want to

12   make sure it's on the record.

13   Q.          What I'm asking you to do is

14   assume this.  Yelvington is only required

15   legally to take 150,000 tons, assume that,

16   set that aside.  If that is true, does that

17   change the damage calculations in your

18   report?

19   A.          Well, based on what I've seen I'm

20   not sure that I can make those assumptions.

21   I mean, there's probably a way you could ask

22   that question.  But what I'm looking at is

23   an Agreement that has a word that I

Page 107

1    understand in it weekly, has a quantity that

2    I know how to multiply times the number of

3    weeks, fifty-two hundred, has the word

4    regular, which I've inquired and examined

5    and looked at was what happened in any way

6    regular and then has a provision that makes

7    it clear that when it's in breach.  Now,

8    that's how I see it, and I may not be

9    looking at it right but I've looked at a lot

10   of agreements to calculate numbers and

11   financial effects.

12           It's -- you know, again, I am

13   supposed to figure out where the parties

14   would have been but for, and I do not

15   believe the minimum is the right number in

16   this matter.  But if the court were to say

17   the minimum is the right number, my damages

18   would be adjusted from the two hundred and

19   sixty tons to the hundred and fifty tons.

20   Q.          Again, we're talking about

21   thousands of tons, but I understand what

22   you're saying.

23   A.          Yeah, two hundred and sixty

Page 108

1    thousand to a hundred and fifty thousand.

2    Q.          What specifically, other than the

3    Supply Agreement and the language of it, did

4    you rely upon --

5    A.          And the changes to it.

6    Q.          And the changes to it, did you

7    rely upon in reaching the conclusion that a

8    reasonable person, a reasonable party would

9    expect there was 260,000 tons expected under

10   this contract?

11   A.          Well, the expectation comes after

12   you make a determination of where they were.

13   So you've got to start there; okay?

14   Q.          Okay.

15   A.          And the first question is, when I

16   examine the situation, is what was the

17   purpose of this venture; okay?

18   Q.          You mean Johnco's purpose?

19   A.          No.  I didn't limit in any way

20   that question.  So what was the purpose of

21   the venture.  And the agreement, Supply

22   Agreement gives the insight into the

23   purpose.  The investment and the types of

Page 124

1    I'm not trying to say that any of

2    that was reasonable except to the extent the

3    contract had -- excuse me, to the extent the

4    5200 tons per week had been taken at the

5    prices specified that clearly says it was a

6    viable and profitable investment.

7    Q.    Okay.  And by viable do you mean

8    it cash flowed to such an extent it made a

9    profit?

10    A.    Well, it would have but for.

11    Q.    Would have on those numbers?

12    A.    I mean that's what my support

13    says.

14    Q.    Sure.

15    A.    It's just a math thing.

16    Q.    In doing that math thing, would

17    it have been viable under that definition at

18    a hundred and fifty thousand tons?

19    A.    You know, I've thought about that

20    but I haven't looked at it yet, and I'd like

21    to give it a little more consideration

22    before just answering off the cuff.  But I

23    think I can give you an answer at the end of

Page 125

1    the day, but before today I haven't really

2    put much thought into that.

3    Q.        All right.  I'll make a note of

4    it and come back to it.  Have you had any

5    conversations with Pep or Ben Johnston?

6    A.        I don't remember.  I don't think

7    so, but I don't remember.

8    Q.        Do you know whether anyone in

9    your office has had conversations with Pep

10   or Ben Johnston?

11   A.        The same.  I took the collective

12   you.

13   Q.        Thank you.  Do you know what the

14   value of the land is that Johnco purchased

15   today?

16   A.        No.

17   Q.        Did you do any determinations to

18   figure out whether land was appreciating in

19   that area or depreciating, remaining

20   stagnant?

21   A.        No.

22   Q.        As part of your investment

23   calculation, did you determine the value of

Page 137

1    A.          But you're going to have to give

2    me enough information so I can answer your

3    question.

4    Q.          I'll do it.  This is all the

5    information you need.  A piece of gravel --

6    A.          Well, it may or may not be.

7    Q.          A piece of gravel comes out of

8    the ground that Yelvington was supposed to

9    buy, can that gravel be sold, that same

10   piece of gravel be sold to someone else?

11   A.          I don't know.

12   Q.          Do you have any reason to believe

13   that that piece of gravel can't be sold to

14   someone else?

15   A.          I haven't given the kind of

16   consideration that I would need to give nor

17   am I given enough information to answer that

18   kind of question.  I'm not even sure I

19   understand it because it's so vague.

20   Q.          Well, what is vague about can it

21   be sold to someone else?

22   A.          I don't -- it's your question and

23   I've already told you it's vague.  If you

Page 151

1    Q.          I'm talking about this dispute,

2    but can you assume what you need to to

3    answer the question.

4    A.          Then I can't answer your

5    question.

6    Q.          Why?

7    A.          Because we can't be talking about

8    JMI and me answer a question about JMI.

9    Q.          Is it your opinion that JMI --

10   let's start with this.  Do you know that JMI

11   has switched from a wet mining operation to

12   a dry mining operation?

13   A.          I don't know where they are in

14   any of their continuing operations.  I have

15   been informed of possible changes.  I just

16   don't know what the status is.  I don't know

17   if they switched, are going to switch,

18   thinking about switching, might switch.

19   Q.          Well, let's assume -- and I was

20   there yesterday and so was Mr. Floyd.  Let's

21   assume they are in the process of switching

22   from a wet mining operation to a dry mining

23   operation, will that have an affect on their

Page 152

1    cost?

2    A.          Not for my purposes, no.

3    Q.          Why not?

4    A.          It's not relevant.

5    Q.          Why isn't that relevant, that's

6    what I'm after?

7    A.          Because I'm trying to put the

8    parties back but for failure to receive

9    regular weekly shipments.

10   Q.          Let me ask this question.  Do you

11   know whether Yelvington has sued Johnco to

12   get them to start giving them the product?

13   A.          I have been informed that there

14   is a counter-complaint.  I don't want to

15   characterize why it was.  I'll take whatever

16   you represent it to be and assume it's true.

17   Q.          If Yelvington were willing and

18   able to take the product now and Johnco are

19   willing to give it to them, would that

20   affect Johnco's damages?

21   A.          That's just way too broad.  I

22   don't know.  It could.  It might not.  I

23   don't know.

TUSCALOOSA COURT REPORTING
Merrill Legal Solutions

Page 153

1    Q.          Do you know how the equipment at

2    Johnco was configured initially?

3    A.          I don't have that kind of detail

4    information.  I've just got the numbers.

5    Q.          Do you know whether the dredge is

6    in operation now?

7    A.          At some point they -- right after

8    October 2006 it's my understanding they

9    stopped the dredging operations.  I don't

10   know if they have resumed them.

11   Q.          So you don't know whether they

12   started dredging again in January of 2007?

13   A.          It's my belief -- and I just

14   don't -- I can't testify as a fact.  It's my

15   belief that I've been informed or my

16   recollection that I was informed that they

17   stopped the dredging.  And while they may

18   have recently started back dredging, I just

19   don't know.

20   Q.          And just to close that loop, you

21   wouldn't know if they started back in

22   January of 2007 dredging again?

23   A.          Well, no.  I've got financial

Page 154

1    statements and have taken that information

2    into account in my analysis, but what I

3    don't know is were the selling off rock that

4    was there or were they continuing to dredge,

5    other than I do know they stopped dredging

6    for some period of time and they did sell

7    off a lot of the rock that was there.

8    Q.        Do you know whether they have

9    sold off any newly produced product let's

10   say after October, after October 2006?

11   A.        I don't have that kind of -- I

12   don't have the information in that level of

13   detail.

14   Q.        So they may have, they may not

15   have, you don't know?

16   A.        I've already answered that

17   question and then you keep asking me more,

18   and so, I mean, refer back to my earlier

19   answer on that one.

20   Q.        In determining Johnco's damages,

21   I know you looked at what they sold.  Did

22   you look at what was actually produced and

23   perhaps not sold?

TUSCALOOSA COURT REPORTING
Merrill Legal Solutions

Page 155

1    A.        No.  For production I looked at

2    the staffing required to produce the amount

3    that would have been produced and then

4    assumed that it would have to be produced

5    and that there was no stockpile because that

6    was conservative and lowered my damage

7    number.

8    Q.        Have you seen records that show

9    how much product came out of the ground,

10   setting aside what was sold?

11   A.        I don't understand your question.

12   Q.        Yeah.  Have you seen any document

13   or heard any -- learned of any information

14   about how much product was taken out of the

15   ground as opposed to how much was sold?

16   A.        Or other than how much was sold?

17   Q.        Yeah.

18   A.        I'm not aware of any today, any

19   production records that would have told me

20   that, and that is why I made the assumption

21   that I made, which caused my damages to be

22   lower and conservative.

23   Q.        And what you're saying is you --

## TUSCALOOSA COURT REPORTING
### Merrill Legal Solutions

Page 156

1    A.          The same with my cost

2    assumptions.  I used the same approach which

3    caused my cost to be higher.

4    Q.          You assumed that everything they

5    took out of the ground they sold, is that

6    correct, for purposes of determining the

7    damage number?

8    A.          Let's be real clear, because I've

9    read Dave's report.  I have assumed they

10   produced based on demand but that they

11   were -- and then I have been informed and

12   inquired and done my own investigation of

13   what level they were staffed and capable of

14   producing, as opposed to Dave's assumption

15   that they were at maximum production

16   capacity, and I think that's what you're

17   getting at, although I really didn't

18   understand your question.

19   Q.          What investigation did you do to

20   determine what they could produce?

21   A.          I interviewed my client.  I

22   inquired about the size of the property and

23   the amount of minerals that were there.  I

## TUSCALOOSA COURT REPORTING
### Merrill Legal Solutions

Page 157

1   inquired about the mineral mix, content mix

2   is what you call it, the mix and the

3   minerals and then I looked at the

4   reasonableness based on my knowledge of

5   business of what they were telling me about

6   how the mining process operates and what

7   costs are incurred in operating that and

8   then what costs are incurred when you

9   increase your capacity, for example, adding

10  a shift for overtime, what are those costs,

11  and then I studied the months where my

12  client represented that they were staffed at

13  the appropriate capacity.  I excluded the

14  months where my client told me, "We had

15  taken mitigating steps in those months.  We

16  had laid people off."  Those would not be

17  months in which we could have fulfilled the

18  Supply Agreement without adding extra costs.

19  And based on that I determined an

20  incremental per ton cost and used that

21  throughout the forecast period.  Regardless

22  of whether they were step variable, I

23  treated them as absolutely unit variable,

Page 158

1    which is conservative in this case.

2    Q.          Did you get your information

3    about the production capacity of Johnco from

4    any other source than your client?

5    A.          Well, as of today, yes.  Well,

6    production capacity -- as of today about

7    mining the amount of minerals in the ground,

8    I've gained additional information; but as

9    of the date of the report, it was based on

10   my client.

11   Q.          Do you know as you sit here on

12   what capacity Johnco is producing gravel

13   now?

14   A.          No.

15   Q.          Do you have any information

16   whether Johnco is producing number 67 gravel

17   now?

18   A.          I just have things I've been

19   informed that I really don't know.

20   Q.          Okay.  What's your --

21   A.          So I don't want to speculate.

22   Q.          I'm not asking you to speculate

23   but tell me what your understanding opinion

Page 159

1    is based on what you found out?

2    A.          That they are not.

3    Q.          Not producing 67 gram?

4    A.          Correct.

5    Q.          Do you have an understanding what

6    they are producing?

7    A.          A different size, or they're

8    preparing -- it's my understanding they're

9    preparing to produce another size but they

10   are not producing anything, but I don't -- I

11   don't really know.  And as you said, you

12   were down there yesterday.  You do know.

13   Q.          Do you have any information that

14   Johnco is producing number 57 gravel, let's

15   say has in 2007 up to the present?

16   A.          I may have.  I mean, it may be in

17   the depositions.  I may have been informed.

18   I don't know.  That doesn't sound unfamiliar

19   to me.

20   Q.          Do you know the relative

21   difference between 57 gravel and 67 gravel?

22   A.          At one time I did.  I think 57 is

23   bigger.

Page 184

1    costs that will be incurred in the future to

2    keep the equipment running in the proper

3    state of technical affairs or whatever?

4    Yes.

5    Q.          Where would I see that in this

6    report or appendix?

7    A.          It's in my numbers.

8    Q.          Okay.  So it's built into your

9    numbers?  I mean, I'm not going to look at

10   anything, any schedule or anything like that

11   that says this is where I considered the

12   life expectancy of a piece of machinery

13   that's not going to be used?

14   A.          You know, I don't understand

15   where are you going to find it in my report.

16   Are you asking me how did I do it?

17   Q.          No.  I'm asking you if there's

18   any place I could find that in the report

19   other than what's incorporated into your

20   final numbers?

21   A.          Well, I mean, I just don't know

22   how to answer that other than saying I used

23   the actual historical experience that was

## TUSCALOOSA COURT REPORTING
## Merrill Legal Solutions

Page 185

1    incurred during the startup period and did

2    not eliminate any of the inefficiencies of

3    startup, did not eliminate any of the

4    inefficiencies caused by laying people off,

5    experienced people, and hiring inexperienced

6    people and bringing them back in.  I did not

7    eliminate any of those inefficiencies.  And

8    after taking all that into consideration and

9    looking at the fact that they did, it's my

10    understanding because of laying people off

11    and bringing in they did experience

12    equipment failures, did incur repairs costs

13    that they otherwise would not have incurred

14    if they had not had the turnover in the

15    people, which they would not have likely had

16    had the people been able to keep their jobs

17    instead of having to be laid off because of

18    lack of income, because of lack of orders

19    from Yelvington, I think if you consider all

20    that what this shows you is a reasonable

21    determination what those costs are.

22    Q.        Did you consider in any way what

23    could be recouped by Johnco if they

Page 186

1    liquidated the assets that you've included

2    in your report as part of the investment?

3    A.          Isn't that what this is?  Yeah,

4    that's what this whole report is about.

5    Q.          Okay.

6    A.          They could recoup but for the

7    actions of Yelvington the money on Appendix

8    1.  That's what lost profits is.

9    Q.          That wasn't my question.  My

10   question relates to the assets that they

11   have, setting aside the --

12   A.          My answer stands.

13   Q.          Hold on a second -- setting aside

14   the assets in the ground?  I'm talking about

15   the trucks and the equipment and the like.

16   Did you consider what effect that would have

17   on Johnco's investment if they liquidated

18   those?

19   A.          Wait a minute.  See if I get what

20   you're asking me.  I think I understand.  In

21   coming up with the impact on Johnco, in

22   other words to put Johnco back in the place

23   that they would have been but for the

Page 187

1    actions of Yelvington, did I take into

2    account proceeds from liquidating the very

3    assets that would be needed to operate --

4    Q.          Yeah.

5    A.          -- had Yelvington done -- that

6    makes absolutely no sense.  That's

7    ludicrous.

8    Q.          Just answer the question.

9    A.          I just did.

10   Q.          It may be no, but if you can tell

11   me a yes or no?

12   A.          I think that's a yes and I told

13   you that's ludicrous.

14   Q.          So yes you did consider that?

15   A.          Well --

16   Q.          Let me step back a second.

17   A.          Did I consider jumping off the

18   roof?  Well, no, but I'm not going to jump

19   off the roof.  I mean, that doesn't make any

20   sense.  How in the world can you operate --

21   they could not supply 5200 tons a week if

22   they sold their mining equipment.

23   Q.          And I think that's fair.  I'm

Page 188

1    right with you.  Do you contend in any way

2    that Johnco is entitled to recover from

3    Yelvington their investment in putting

4    together the operation?

5    A.          I'm not contending anything.  I'm

6    an accountant.

7    Q.          Are you opining in any way that

8    they should be able to recover that?  What's

9    the purpose --

10   A.          It's a legal --

11   Q.          I agree.

12   A.          It's legal questions.  I'm not

13   here to offer any legal opinions.  I've said

14   that over and over again.

15   Q.          And I appreciate that.  I just

16   need to make sure when we get to trial

17   nothing changes.  So when you get to trial,

18   it's not your intention to opine that they

19   should somehow be able to recover their

20   investment in Johnco; is that correct?

21   A.          That's a legal determination.

22   Q.          Sure.

23   A.          If I'm asked to opine about what

TUSCALOOSA COURT REPORTING
Merrill Legal Solutions

Page 189

1    their investments was, I intend to testify

2    about that.  I have no -- I have no opinion

3    about why I'm going to be asked to do that

4    if -- or even if I'm going to be asked to do

5    that.  I just don't know.

6    Q.          Fair enough.  Looking at page 2

7    of the report prepared by you, for lack of a

8    better term I'm going to call it a heading,

9    the second heading says --

10   A.          That's what it is.

11   Q.          Okay, good.  "Although sufficient

12   gravel was produced by JMI, CYDI failed to

13   purchase quantities specified in the Supply

14   Agreement."  Did you draw the conclusion

15   that sufficient gravel was produced?

16   A.          Yeah.  Let me clarify that.  Yes,

17   in this context.  Sufficient gravel was

18   being produced to meet the sales that were

19   being -- the sales orders that were being

20   presented to them.  I'm not attempting -- I

21   saw that earlier today.  I'm not attempting

22   to opine about production capabilities.

23   That's not my job.

Page 202

1    A.        Okay.

2    Q.        Begins, "This level of gross

3    revenues is reasonable in light of the

4    substantial investment made by the owners of

5    JMI to place the mine into operation."  Can

6    you explain to me what that means?

7    A.        It's what we were talking about

8    at the first of the deposition.

9    Q.        And that's what I thought.  So

10   you're saying that the revenues as projected

11   at 260,000 tons is reasonable in light of

12   the investment made; is that correct?

13   A.        Or vis-a-versa.  It's more of a

14   test, as opposed to my client telling me, "I

15   only paid a dollar for this and I'm going to

16   make a zillion billion dollars."

17   Q.        That sounds reasonable.  Okay.

18   A.        To Steve -- I mean to Greg it

19   does.

20   Q.        And then we left a question open

21   whether you could make the same statement if

22   the required amount was 150,000 tons as

23   opposed to 260,000 tons.  Have you had an

Page 203

1    opportunity to consider that?

2    A.          You know, I'm still thinking

3    about it.  I would need to look at it more

4    closely.  I tend to doubt -- while it would

5    reduce my lost profits, I tend to doubt

6    whether that in and of itself would make the

7    venture not feasible, but I just don't know

8    and I need to look at that.

9    Q.          Do you recall any testimony of

10   Clatus Junkin or the Johnstons regarding --

11   well, let's just say testimony that their

12   expectation going into the venture, I think

13   you called it, was that the hundred and

14   fifty thousand tons purchased by -- to be

15   purchased by Yelvington would cover their

16   costs and they expected to make a profit off

17   the sale of other things?

18          MR. PEARSON:  Object to the

19   characterization of the testimony.  It

20   speaks for itself, but you can answer the

21   question.

22   Q.          Do you recall anything like that?

23   A.          I recall your questioning along

Page 239

1    some type of demonstration of the ability to

2    mine 5200 tons a week.  Although I believe

3    the facts I've seen shows that they were

4    able to do that, which is also another

5    uncertainty that doesn't seem to be present.

6    Q.          Well, do you know of any week in

7    which they produced 5200 tons?

8    A.          I know -- I remember that the

9    testimony is that they had produced several

10   loads, whatever, which I'll call weeks and

11   stopped.  I don't recall how many because

12   they did not receive any orders.

13   Q.          Okay.  Maybe we're saying the

14   same things but I'm not certain.  Can you

15   point to anything that shows that Johnco

16   produced 5200 tons in any given week during

17   its operation --

18   A.          I don't.

19              MR. PEARSON:  You mean as you sit

20   here today out of his memory?

21   Q.          Out of your memory or out of any

22   document that you've got?

23              MR. PEARSON:   I mean, you've

Page 240

1    asked him to do it out of his memory.

2                MR. LEEK:  Well, I mean, he's got

3    documents.

4    Q.          (By Mr. Leek) You can rely on

5    those.

6    A.          And I understand that question is

7    are there production records, that's what I

8    understand that question to be, and I'm not

9    aware of any production records, but there's

10   testimony and there's other stuff --

11   Q.          Okay.

12   A.          -- but I don't know if there's --

13   I know -- well, I'm going to stop there.

14   Let the record stand on that.  I just don't

15   remember.

16   Q.          Okay.

17   A.          And earlier when I answered that

18   question I was referring to production

19   records.  It's my understanding that today

20   there are not any production records.

21   Q.          Have you had a chance to review

22   completely the report of Mr. Borden?

23   A.          No.

## TUSCALOOSA COURT REPORTING
## Merrill Legal Solutions

Page 241

1    Q.           Have you identified any problems

2    with Mr. Borden's report based on the review

3    you have done?

4    A.           Yeah.  I'm not sure I'm prepared

5    to recite them to you because I'm not done,

6    but yeah.

7    Q.           Just tell me about what you have

8    accomplished with regard to that report.

9    A.           I've read about it and focused in

10   on where he's had a difference of opinion

11   and thought about how he might have reached

12   that conclusion and thought about whether

13   there was any need for me to do more work to

14   figure out if he somehow knew something I

15   didn't know and thought about reasons why

16   he's gotten some of it wrong, --

17   Q.           Okay.

18   A.           -- figured out why he got it

19   wrong.

20   Q.           And which of those opinions are

21   you talking about specifically?

22   A.           We'll have to go through the

23   report.  I'm not done yet.

### TUSCALOOSA COURT REPORTING
### Merrill Legal Solutions

Page 242

1    Q.          You've got it in front of you.

2    A.          I've got my binder in front of

3    me.

4    Q.          You've got this one too

5    (indicating).  In my notebook it's under

6    Johnco 0973.  I'm sorry, Tab D?

7    A.          Tab what?

8    Q.          D.

9                MR. PEARSON:  D?

10   Q.          Bate stamp --

11   A.          First of all -- I've got it in

12   front of me now.  Let me just say this.  I

13   have not really read from the beginning on

14   page 3 called Introduction through

15   Background.  I've skimmed it, but I haven't

16   read it at this time.  And I have started

17   and then I've skimmed the section called

18   Analysis of Production and Sales, beginning

19   on page 8, and I have read Review of

20   Alexander Report on page 9, and I may have

21   read his Conclusion.  So I can go back to

22   the Alexander section and look at it, but

23   the other stuff I don't even -- it would be

Page 243

1    a complete waste of time for us to try to go

2    through that.

3    Q.          Okay.  I won't do that.  Just to

4    close the loop here, have you formed any

5    opinions regarding the assertions put forth

6    by Mr. Borden in the section entitled

7    "Analysis of Production and Sales" on page

8    8?  That's one you said you had looked at.

9                MR. PEARSON:  What page are you

10   on?

11               MR. LEEK:  It's on page 8 of the

12   report.

13               MR. PEARSON:  Okay.

14   A.          What is his opinion?

15   Q.          I'm asking you if you've come to

16   the conclusion that anything you've

17   determined is an opinion in here is faulty

18   under that section?

19   A.          I'm not going to try to determine

20   what Dave's opinions are.

21   Q.          Well, you've read this.

22   A.          Right, I've read it.  I'm telling

23   you I'm not going to testify as to what

Page 244

1   Dave's opinions are.

2   Q.          Okay.

3   A.          But you retained him and he

4   issued them to you and I'm asking you -- I'm

5   looking at this on page 8.  I'm happy to

6   answer any questions about what you say his

7   opinions are.

8   Q.          Do you have any problem with the

9   information he's provided in the section

10  entitled "Analysis of Production and Sales"?

11  A.          I'm not at that stage.

12  Q.          Are you at the stage yet where

13  you can identify any flaw in his

14  methodology?

15  A.          I just scanned this page and I

16  could not see scanning it what his opinions

17  were and that's why I asked the question.

18  So if you see an opinion on here -- and I'm

19  not saying there's not one.  I'm just saying

20  please identify it; otherwise, I'm going to

21  wait to comment on this page.  I'm looking

22  at page 8.

23  Q.          I know what you're looking at.

Page 245

1    Have you determined that there's any flaw in

2    the information you reviewed based on

3    anything he's put down whether you consider

4    it an opinion or not in this section?

5                    MR. PEARSON:  Ask --

6    A.              Now you just changed from page 8

7    to a whole section?

8    Q.              No, I referred to this section

9    before by title.

10   A.              That's an unfair question.

11                   MR. PEARSON:  I'm going to object

12   to the form of the question.

13   Q.              I don't understand what's unfair

14   about that question.

15                   MR. PEARSON:  What's unfair --

16                   MR. LEEK:  Hold on.  I'm asking

17   him.

18                   MR. PEARSON:  Oh, I'm sorry.  I

19   thought you were responding to my objection.

20   Excuse me.  Go right ahead.

21                   THE WITNESS:  Read the question

22   back.  There's so much chatter I couldn't --

23   I can't remember.

Page 246

1          (Whereupon, the last question was

2          read back by the Court Reporter,

3          as requested.)

4          MR. PEARSON:  And I'm going to

5    object to the form of that question.

6          MR. LEEK:  Okay.

7    A.          I think I just told you that's a

8    section I have not fully reviewed and in

9    that context that's completely unfair.

10   Second, he hasn't even testified yet.  So I

11   don't know -- I don't in my opinion have

12   enough information in order to form fully my

13   opinions until I have an opportunity to

14   better understand what he did upon the

15   taking of his deposition.

16   Q.          Okay.  So the answer to that

17   question then would simply be no?

18   A.          No, it would not.

19   Q.          Let's move onto the next section

20   I believe you said you have read, which is

21   Review of Alexander Report.  Do you see that

22   section?

23   A.          I have seen that section.

Page 247

1    Q.          Have you read that section?

2    A.          I have read that section.

3    Q.          Do you take issue with any

4    assertion that Mr. Borden makes in that

5    section?

6    A.          I very well do.

7    Q.          Okay.  And what are they?  What

8    are the issues you have with the assertions

9    made?

10   A.          I'm not prepared to give you a

11   comprehensive recitation of the issues.

12   Q.          Okay.  It doesn't have to be

13   comprehensive.  Just give me what you've

14   got, what you recall.

15   A.          Let me look at it.  That's how

16   I'm going to recall.  The second paragraph I

17   disagree with.

18   Q.          That's the paragraph beginning,

19   "While it is my"?

20   A.          Yes.

21   Q.          And what specifically do you

22   disagree with?

23   A.          His conclusion that the

Page 248

1    calculation is lacking adequate foundation

2    and not conforming to the facts and

3    circumstances in this matter.

4    Q.          Okay.  Anything else?

5    A.          There very well may be other

6    things about that paragraph but not at this

7    time.

8    Q.          How about the next paragraph?

9    A.          It's my understanding that he is

10   incorrect in his first sentence.

11   Q.          In what way?

12   A.          He's got his facts wrong.

13   Q.          Which facts specifically?

14   A.          The facts contained in that

15   sentence concerning comprehensive geological

16   assessment and testing date.

17   Q.          And so I understand it, are you

18   saying that in preparation of your report

19   you reviewed comprehensive geological

20   assessments and testing data?

21   A.          No.  Read the sentence.

22   Q.          Okay.  So what he's saying -- I

23   see what you're saying.  What he's saying is

Page 249

1    it wasn't available to him --

2    A.          Right.

3    Q.          -- at the time of his report?

4    A.          So his scope is limited.

5    Q.          And so do you disagree about

6    whether that was available to him or not?

7    A.          It's available.  I don't know --

8    Q.          Now.

9    A.          -- whether you made it available

10   to him or not.

11   Q.          Now.  Do you know it to be

12   available at the time of that report?

13   A.          I can't tell you.  I mean, if

14   we're back to the date of his report versus

15   now, we're going to have to wait until his

16   deposition before I'm going to be able to

17   answer that question.

18   Q.          Okay.  Is there anything else in

19   that section, Lack of Foundation, with which

20   you have a problem?

21   A.          Oh, yeah, absolutely.

22   Q.          What else?

23   A.          I have to read it.  Let's go

# TUSCALOOSA COURT REPORTING
## Merrill Legal Solutions

Page 250

1    sentence by sentence.  The very next

2    sentence I disagree with.

3    Q.          Which parts?

4    A.          The entire sentence.  I don't

5    know how to break it down.

6    Q.          Do you not believe that the

7    records are foundational, that part you

8    disagree with?

9    A.          First of all, whether something

10   is foundational or not I think you're asking

11   that in a legal context.  But what I

12   understand Dave to be saying is you have to

13   have a geological assessment and testing

14   data and a formal marketing plan for a

15   byproduct in order to calculate lost

16   profits.  I think he's just wrong.  I think

17   you don't have to have any of those formal

18   documents.  While the information might

19   typically be contained, it's something one

20   would seek to know and I did seek to know

21   and I knew it when I did my calculation.

22            This represents -- if Dave knew

23   that I knew it and made this criticism, this

## TUSCALOOSA COURT REPORTING
## Merrill Legal Solutions

Page 251

1    is in the neighborhood of hyper-technical

2    form over substance, but it's probably a

3    reflection of his lack of information when

4    he issued this report.

5    Q.         Did you have any comprehensive

6    geological assessment or testing data at the

7    time that you issued your report?

8    A.         No, but I gave consideration to

9    how much rock was there and what was

10   essentially the practical capacity and were

11   they going to be able to supply that

12   contract, which is why if geological data is

13   available you would get that.

14   Q.         Any other assertion in that

15   paragraph that you have a problem with?

16   A.         Another thing about that

17   statement is it fails to recognize that

18   while Dave might need it because he's

19   working for your client that were not

20   involved in the business and were not

21   running the business, I was working for the

22   company that was doing the mining, had the

23   people that operated the mine and access to

## TUSCALOOSA COURT REPORTING
## Merrill Legal Solutions

Page 252

1    them.  So there's a lot of different ways to

2    get information if you have access to the

3    people.  The example is if you're auditing

4    the company, you can get a lot more

5    information from them than if you're the

6    expert witnesses working for the other side

7    that's suing that company.

8    Q.          And I believe your testimony

9    earlier was you don't recall whether you had

10   any personal discussions, you or -- let's

11   just limit it with you individually here,

12   with Ben Johnston, is that correct, prior to

13   publishing your report?

14   A.          No, but I think I got his

15   testimony.  I'm pretty sure I got it.  I

16   know I got his testimony on that issue, and

17   I know also I did have a conversation with

18   Clatus Junkin about the issue before -- I

19   said, "We need to get the testimony."  I

20   mean, the way the process worked was I sat

21   down the first day, we talked about what the

22   issues were.  I said, "This is the kind of

23   information I'm going to have to have if you

Page 253

1    want my expert opinion."  And among that

2    information was I have to get satisfied

3    there's enough rock here that you had the

4    capabilities of mining it.  All the issues

5    that I'm seeing Dave speaking to I

6    addressed.

7    Q.          Any other problems with anything

8    in that particular paragraph?

9    A.          I'm just to that sentence.  I

10   haven't even read the next one yet.  The

11   implication that this is a risky -- by the

12   use of the word start-up I think he's

13   implying that this is your classic risky

14   start-up business.  And you really have to

15   take into account the fact that we have a

16   contract where not only the price was

17   bargained for but minimum shipping

18   quantities were bargained for and

19   specifically weekly shipping quantities were

20   actively negotiated.  You can see it between

21   one draft of the agreement and the next

22   where it goes from three thousand tons,

23   which is about the hundred and fifty

Page 254

1    thousand, maybe exactly if you use a fifty

2    week year, to the 5200 week, resulting in a

3    contract that has the frequency, the amount

4    and the price specified.

5    Q.        Did you see anything else?

6    A.        I'm flipping to the top of page

7    8.

8    Q.        Top of page 8?

9    A.        Top of page 10.

10             MR. PEARSON:  Ten, yeah.  I was

11   going to say --

12   A.        I went the wrong way.  Sorry.

13   Well, number one exists, and I don't

14   disagree that it's a good idea to have a

15   comprehensive assessment of the site and

16   that's one of the first questions I asked

17   and I was told yes, it exists and here's

18   what it says, you know.

19   Q.        But you didn't actually see it;

20   is that correct?

21   A.        Well, if that's his criticism,

22   we'll just let him tell me that when he

23   testifies.

Page 255

1    Q.          But, I mean, that's a question to

2    you?

3    A.          Because built into that is the

4    assumption that I was lied to, and there's

5    records in this case that someone else can

6    go look at and it will come out.

7    Q.          My question to you is quite

8    simple.

9    A.          I just answered it.

10   Q.          You didn't actually see a report

11   of comprehensive assessments of the geology

12   of the site.  Your information comes from

13   the plaintiff in this case; is that correct?

14   A.          Well, the way you asked your

15   question that's not correct.

16   Q.          Okay.  So let me break it into

17   pieces.  You didn't actually see a report;

18   is that correct?

19   A.          Report --

20   Q.          Prior to --

21   A.          The way you're asking the

22   question I saw a report.

23   Q.          You saw a report, a comprehensive

TUSCALOOSA COURT REPORTING
Merrill Legal Solutions

Page 256

1    assessment of the geology of the site

2    report?

3    A.        Yes.

4    Q.        What is that report?

5    A.        You haven't asked me when.

6    Q.        Well, actually I did earlier.

7    A.        Not in that question you didn't.

8    Q.        Prior to the report?

9    A.        No, I did not.  I asked did one

10   exist and what does it say.

11   Q.        All right.  Thank you.  Do you

12   have any other problems with the paragraphs

13   where I think we're on paragraph one now?

14   A.        We're on the heading.

15   Q.        Okay.

16   A.        Just an observation that looks

17   like testimony of the geologist, but I guess

18   Dave has got enough oil and gas experience

19   to do that.  It's interesting that he issues

20   the criticism and then acknowledges that

21   he's aware that the information is available

22   but he just didn't bother to get it.

23   Q.        Where does he say he didn't

Page 257

1    bother to get it?

2    A.          The last sentence of paragraph

3    one.

4    Q.          He says, "It's not available to

5    me;" right?

6    A.          I mean, that's what it says,

7    yeah.  He didn't get it.

8    Q.          Yeah.  Do you know why he didn't

9    get it?

10   A.          No.

11   Q.          Okay.

12   A.          Clearly I don't think the fact

13   that the production records were not

14   maintained prevent one from making

15   conservative determinations of unit costs

16   and those kinds of things, and even though

17   Dave makes this criticism he doesn't either

18   because he precedes to do it.

19   Q.          Anything else?

20   A.          He's wrong on his assumption

21   there was no marketing plan.

22   Q.          Have you seen a written marketing

23   plan?

Page 258

1   A.          There's a big difference to me in

2   a marketing plan and action, a piece of

3   paper labeled Marketing Plan.  Now, if his

4   criticism is I haven't seen a piece of paper

5   labeled Marketing Plan, that's a different

6   thing.  I would agree with him there's not a

7   piece of paper that says Marketing Plan.

8   But there's clearly evidence, in fact

9   there's actual sales.  So if they weren't

10  marketing -- if they weren't going out and

11  marketing, how did they sell the stuff,

12  number one.  Number two, if they had no plan

13  but they were still able to sell it and they

14  were formulating plans, just think how much

15  more they could have sold once they got a

16  plan in place if the stuff was selling

17  itself as they were formulating the plan.

18  Excuse me, I have to ask this question.

19  What time is it?

20          MR. PEARSON:  It is 5:40 p.m.

21  A.          We're going to need to wrap this

22  up soon.

23          MR. PEARSON:  I hope we can do

Page 259

1    that.  We can do that, can't we?

2              MR. LEEK:  Uh-huh (affirmative).

3    A.        When?

4    Q.        As soon as we get done with this,

5    going through the report here.

6    A.        This is going to take quite a bit

7    of time.

8    Q.        I'm not asking for you to look at

9    it now and evaluate it.  I'm asking you to

10   tell me what, based on your review of the

11   sections you indicated, you have concluded

12   there's a problem with.  Okay?  So I'm not

13   asking you --

14   A.        And I've said I can only do that

15   by going through the report.  So if I

16   understood what you just said, we can end

17   this.  I cannot do it without going through

18   the report.  And if you said can you do it

19   without going through the report, please do

20   it, the answer is no, I cannot do it without

21   going through the report.

22   Q.        Well, I recall from your

23   testimony earlier you were able to recall

Page 260

1    that you had a problem with Mr. Borden's

2    assertions regarding discount rates and

3    reducing the damages to present value.

4    That's something you recalled without

5    looking at the report; is that correct?

6    A.          You asked me a question.  I

7    responded to it.  You ask me another

8    question -- if you want to ask me anything

9    about this report, I may be able to respond

10    to it.  If you want me to just dump

11    everything I can remember about this report,

12    I'm going to have to go through this report,

13    and I think that's very fair.

14    Q.          I'm not disagreeing with you.

15    Let's focus on those things that you

16    remembered.  And right now I recall you said

17    you had a problem with his assertions

18    regarding net present value.  What problem

19    was that?  Have you already described that

20    to me in prior testimony?

21    A.          Yes.  That's the reason I'm

22    looking at you puzzled.  I don't understand.

23    You're asking me to testify about something

TUSCALOOSA COURT REPORTING
Merrill Legal Solutions

Page 261

1    we've already testified about.

2         MR. PEARSON:  We spent a lot of

3    time on that and I believe that's going to

4    be objectionable to asked and answered, and

5    I don't think there's any trick to that.  I

6    think he's completely said why he did what

7    he did, and that is in fact the criticism

8    you've asked of this.

9         MR. LEEK:  Just so you know, the

10    only thing prolonging this line of

11    questioning right now is the fact you're

12    talking.

13         MR. PEARSON:  Okay, good.  Then

14    I'm going to shut up.

15    Q.         (By Mr. Leek) You indicated

16    earlier you also had -- that you felt that

17    he didn't have the information available to

18    him to make the opinions or to make the

19    assertions he was making; do you recall

20    that?

21    A.         Yeah, and that's not a

22    professional opinion.  That's a feeling that

23    I have because I know him and he's -- I know

Page 262

1    of his quality and I know that he would not

2    write things that were not incorrect, and

3    he's written some things that were

4    incorrect.  Just like he knows I wouldn't

5    write some things that were incorrect and

6    in -- I've already talked about the

7    twenty-four thousand in start-up costs in

8    March and I've told you what I would do with

9    them.  Now, if you want me to go through the

10    report and point all that stuff out, I'm

11    really not ready to, although I can tell you

12    I recall seeing several places where that

13    happened.  But for me to recall it, we're

14    going to have to go through the report.

15    Q.        Okay.

16              MR. LEEK:  Why don't we go off

17    the record for a couple of minutes here and

18    let me talk to Dane and see if we're done.

19              (Whereupon, a short break was

20              taken.)

21    Q.        (By Mr. Leek) I don't have any

22    further questions.  I don't believe that

23    I've been provided copies of your billing

**Supplemental Report of Accounting, Economics & Appraisal Group, LLC**

**By: J. Lester Alexander, III**

**Johnco Materials, Inc. v.**
**Conrad Yelvington Distributors, Inc.**
**As of February 29, 2008**

**CV-06-2:06cv993-ID**

This report and the attached appendices is a supplement to my report issued August 8, 2007 that contained my opinions as of that date regarding the amount of lost profits and lost future profits incurred by Johnco Materials, Inc. ("JMI"). Since that time, discovery has continued and new documentary and oral evidence has been presented to me. I have read and analyzed the new information and have given consideration to information learned as of the date of my previous report. In addition, I have considered the Memorandum Order and Opinion dated February 28, 2008, issued by Judge DeMent in this matter ("the Memorandum Order"), and related motions and briefs filed by the parties. As a result, my fundamental opinions contained in the August 8, 2007 report remain unchanged.

The following are supplements to my opinions.

### JMI's Suffered Losses as a Result of CYDI's Breach of the Supply Agreement

True economic losses are lost incremental revenues minus the incremental cost associated with those revenues.[1] For JMI, the true economic losses incurred as a result of the alleged breach of Conrad Yelvington Distributors, Inc. ("CYDI") are the lost incremental revenue from the sales of No. 67 gravel to CYDI under the Supply Agreement, minus the incremental costs associated with those revenues.

Cost accounting principles provide different methods for the allocation of costs for a by-product or a joint product.[2] In light of the Memorandum Order, the alleged lost sales of oversize gravel and sand to third parties constitute activities that are independent of and collateral to the Supply Agreement[3]. Consequently, the application of the joint product costing method is the appropriate cost accounting method for determining the incremental costs associated with lost incremental revenue under the Supply Agreement.[2]

While not considering any lost profits from the sale of oversize gravel and sand, in my opinion it is reasonable to conclude that JMI would have been able to at least recover the cost of the joint products from the existing markets for oversize gravel and sand, which include the concrete, asphalt and other markets. My research indicates that a substantial market exists for both oversize gravel and sand and that JMI's pricing within that market is competitive. Moreover,

---

[1] Gaughan, Patrick A. (2004). Measuring Business Interruption Losses and Other Commercial Damages. Hoboken, New Jersey: John Wiley & Sons.

[2] Arnstein, William E. and Frank Gilabert. (1980). Direct Costing. New York, New York: AMACOM a division of The American Management Association.

[3] Memorandum Order and Opinion dated February 28, 2008, issued by Judge DeMent in this matter.

**EXHIBIT**

tabbies

D

there is insufficient evidence to conclude the JMI would not have been able to access available markets had CYDI not breached the Supply Agreement, which caused the production of joint products (particularly the highly profitable oversize gravel) to stop. JMI's margins on sales of oversize gravel were substantial, and sand was sold at a price that substantially recovered its cost.[4]

JMI's lost profits are $4,110,179, determined in accordance with the Memorandum Order, assuming sales of only No. 67 gravel by JMI to CYDI in quantities of 5,200 tons per week (260,000 tons per year), after discounting to present value[5] and including prejudgment interest.[6]

JMI's lost profits are $2,322,122, determined in accordance with the Memorandum Order, assuming sales of only No. 67 gravel by JMI to CYDI in quantities of 3,000 tons per week (150,000 tons per year), after discounting to present value and including prejudgment interest.

In deriving these amounts I considered the above information, my report dated August 8, 2007 and the following:

> A study of the actual incremental, avoided, fixed and sunk/committed costs of JMI for March 2006 and May 2006 through September 2006.[7] Incremental costs were attributed to production, including production of joint products independent of and collateral to the Supply Agreement, based on an hourly production capacity of 120 tons of No. 67 gravel, 30 tons of oversize gravel and 183 tons of sand. Overtime premium was assessed to production levels greater than 70% of the capacity of a 40 hour shift at 50 shifts per year.

> Lost profits were reduced by the actual sales of No. 67 gravel to CYDI.

> The information contained in the appendices to this report.

### CYDI's Expert Borden's Opinions are Flawed

My opinions contained herein and in my report date August 8, 2007 rebut the opinions of CYDI's expert, Dave Borden. Borden's opinions are incorrect for a variety of reasons. For example, Borden incorrectly deducted from his profit determinations fixed costs, sunk costs and other costs that could not reasonably be avoided. He also failed to make a reasonable allowance for the capacity of the operation; instead he based his determinations on production levels adversely impacted by the alleged breach of CYDI.

Moreover, Borden's methodology of deducting the cost of production of joint products from the sales value of No. 67 gravel is contrary to the holding in the Memorandum Order that sales of

---

[4] JMI incremental costs of production were $1.85 per ton compared to a weighted average sales price per ton of $8.50 and $1.76 for oversize and sand, respectively.
[5] The present value rate is 5.95% based on JMI's bank line of credit agreement and prime rate per the Wall Street Journal as of February 29, 2008.
[6] The prejudgment interest rate is assumed to be 6% and is computed through March 31, 2008.
[7] The base period for projecting avoided costs includes all months studied previously by me plus all months studied by Defendant's expert Borden. In addition to the base period, I studied costs reported by JMI in its general ledger, financial statements and / or income tax returns for 2005, 2006 and 2007.

oversize gravel and sand to third parties constitutes activities that are independent of and collateral to the Supply Agreement.[3]    Consequently, Borden's methodology misstates his determinations to the detriment of JMI. It is an undisputed fact that oversize gravel and sand were produced and sold by JMI. During the limited time of production, JMI demonstrated the ability to sell oversize gravel and sand. Moreover, the ultimate profitability of the oversize gravel and sand is a separate matter with separate customers, separate marketing efforts, and the sales and ultimate profit or loss of the oversize gravel and sand is unrelated to the profit to be earned under JMI's contract to sell No. 67 gravel to CYDI.

## OTHER CONSIDERATIONS

The information in this report is based on information learned through February 29, 2008.  I reserve the right to consider any additional information that is presented to me and supplement or amend my opinions for information learned through trial.


Very truly yours,


By: _J. Lester Alexander, III_

J. Lester Alexander, III, CPA

**INDEX OF APPENDICES**

Appendix A – Lost Profits at 5,200 Tons per Week (260,000 Tons per year)

Appendix B – Lost Profits at 3,000 Tons per Week (150,000 Tons per year)

Appendix C – Avoided Costs

Appendix D – Fixed, Sunk and Committed Costs

Appendix E –Actual Tons Purchased

Appendix F -- Cumulative Tons Purchased

Appendix G – Alabama Market and JMI Market Share

Appendix H – Supplemental Listing of Information Considered

Appendix A

## Lost Profits at 5,200 Tons per Week
### (260,000 Tons per Year)

| | | Total | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 |
|---|---|---|---|---|---|---|---|
| Gross revenue [A] | | $ 7,241,300 | $ 1,256,100 | $ 1,469,000 | $ 1,505,400 | $ 1,505,400 | $ 1,505,400 |
| (Less) Cost of deposit in ground [B] $ 0.40 | | (507,200) | (91,200) | (104,000) | (104,000) | (104,000) | (104,000) |
| Lost revenue | | 6,734,100 | 1,164,900 | 1,365,000 | 1,401,400 | 1,401,400 | 1,401,400 |
| Avoided costs [1] | | | | | | | |
| Fuel per ton @ 0.64 | | 811,500 | 145,900 | 166,400 | 166,400 | 166,400 | 166,400 |
| Labor $ 0.56 | | 710,100 | 127,700 | 145,600 | 145,600 | 145,600 | 145,600 |
| Other costs per ton @ 0.40 | | 507,200 | 91,200 | 104,000 | 104,000 | 104,000 | 104,000 |
| Overtime premium 0.28 | | 129,000 | 25,800 | 25,800 | 25,800 | 25,800 | 25,800 |
| Other avoided costs | | 170,000 | 34,000 | 34,000 | 34,000 | 34,000 | 34,000 |
| Inflation–U.S. Dept. of Labor, BLS, South Region, Size D 3.0% | | 197,600 | 6,500 | 22,400 | 38,600 | 55,800 | 74,300 |
| Total avoided costs | | 2,525,400 | 431,100 | 498,200 | 514,400 | 531,600 | 550,100 |
| Total avoided costs per ton | | $ | $ 1.89 | $ 1.92 | $ 1.98 | $ 2.04 | $ 2.12 |
| Gross damages | | 4,208,700 | 733,800 | 866,800 | 887,000 | 869,800 | 851,300 |
| Present value factor $1/(1+r)^{n-1}$ 5.95% | | | . | . | 0.976205 | 0.921383 | 0.869640 |
| Damages, before prejudgment interest | | 4,008,237 | 733,800 | 866,800 | 865,894 | 801,419 | 740,324 |
| Prejudgment interest factor @ 6.0% | | | 0.016438% | 0.016438% | 0.016438% | - | - |
| Prejudgment interest days | | | 577 | 212 | 15 | - | - |
| Prejudgment interest | | 101,942 | 69,600 | 30,207 | 2,135 | - | - |
| **Damages** | | $ 4,110,179 | $ 803,400 | $ 897,007 | $ 868,029 | $ 801,419 | $ 740,324 |

*Sources:*

1 - Appendix C

*Footnotes:*

A - Yelvington's expected purchases less actual purchases times price.

B - Borden's estimate of the cost per ton of deposits in the ground was used as a measure of conservatism. However, I disagree with Borden's per ton cost calculation
   because his estimate of reserves conflicts with oral and documentary evidence.

Appendix B

## Lost Profits at 3,000 Tons per Week
### (150,000 Tons per Year)

| | | Total | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 |
|---|---|---|---|---|---|---|---|
| Gross revenue [A] | | $ 4,103,000 | $ 650,000 | $ 847,500 | $ 868,500 | $ 868,500 | $ 868,500 |
| (Less): Cost of deposit in ground [B] | $ 0.40 | (287,200) | (47,200) | (60,000) | (60,000) | (60,000) | (60,000) |
| Lost revenue | | 3,815,800 | 602,800 | 787,500 | 808,500 | 808,500 | 808,500 |
| Avoided costs [1] | | | | | | | |
| Fuel per ton @ $ | 0.64 | 459,500 | 75,500 | 96,000 | 96,000 | 96,000 | 96,000 |
| Labor $ | 0.56 | 402,100 | 66,100 | 84,000 | 84,000 | 84,000 | 84,000 |
| Other costs per ton @ $ | 0.40 | 287,200 | 47,200 | 60,000 | 60,000 | 60,000 | 60,000 |
| Overtime premium $ | 0.28 | - | - | - | - | - | - |
| Other avoided costs | | 170,000 | 34,000 | 34,000 | 34,000 | 34,000 | 34,000 |
| Inflation-U.S. Dept. of Labor, BLS, South Region, Size D | 3.0% | 113,500 | 3,400 | 12,900 | 22,200 | 32,200 | 42,800 |
| Total avoided costs | | 1,432,300 | 226,200 | 286,900 | 296,200 | 306,200 | 316,800 |
| Total avoided costs per ton | | | $ 1.92 | $ 1.91 | $ 1.97 | $ 2.04 | $ 2.11 |
| Gross damages | | 2,383,500 | 376,600 | 500,600 | 512,300 | 502,300 | 491,700 |
| Present value factor $1/(1+r)^3$ | 5.95% | | | | 0.976206 | 0.921393 | 0.869640 |
| Damages, before prejudgment interest | | 2,267,723 | 376,600 | 500,600 | 500,110 | 462,811 | 427,602 |
| Prejudgment interest factor @ | 6.0% | | 0.016438% | 0.016438% | 0.016438% | | |
| Prejudgment interest days | | | 577 | 212 | 15 | | |
| Prejudgment interest | | 54,399 | 35,720 | 17,446 | 1,233 | - | - |
| **Damages** | | **$ 2,322,122** | $ 412,320 | $ 518,046 | $ 501,343 | $ 462,811 | $ 427,602 |

*Sources:*
1 - Appendix C

*Footnotes:*
A - Yelvington's expected purchase less actual purchase times price.
B - Borden's estimate of the cost per ton of deposits in the ground was used as a measure of conservation. However, I disagree with Borden's per ton cost calculation because his estimate of reserves conflicts with oral and documentary evidence.
The present value rate is 5.95% based on JMI's bank line of credit agreement and prime rate per the Wall Street Journal as of February 29, 2008.
The prejudgment interest rate is assumed to be 6% and is computed through March 31, 2008.

Appendix C

## Avoided Costs

| | March | May | June | July | August | September | Total | Annualized | Cost per | Basis |
|---|---|---|---|---|---|---|---|---|---|---|
| **Production costs:** | | | | | | | | | | |
| Fuel & oil | $ 7,782 | $ 6,700 | $ 18,854 | $ 9,137 | $ 10,078 | $ 18,294 | $ 70,845 | | $0.64 | 39,933 tons[1] / 36% / 110,925 tons |
| | | | | | | | | | | |
| **Labor costs:** | | | | | | | | | | |
| Contract labor | $ - | $ - | $ 1,625 | $ - | $ - | 550 | | $ 4,350 | | |
| Insurance - WC | - | - | - | - | 4,165 | - | | 8,330 | | |
| Payroll taxes | 1,834 | 1,409 | 2,661 | 2,030 | 2,285 | 1,186 | | 22,810 | | |
| Salaries and wages | 16,913 | 18,771 | 23,734 | 18,366 | 21,839 | 13,651 | | 226,548 | | |
| | $18,747 | $20,180 | $28,020 | $20,396 | $28,289 | $15,387 | | $ 262,038 | $0.56 | 466,200 tons |
| | | | | | | | | | | |
| Overtime premium | | | | | | | | | $0.28 | 0.5 times |
| | | | | | | | | | | |
| **Other costs:** | | | | | | | | | | |
| Bank charges | $ - | $ - | $ 384 | $ 299 | $ 717 | $ 1,509 | | $ 5,818 | | |
| Equipment rental | 2,044 | 5,141 | 4,098 | - | 7,780 | 4,019 | | 46,164 | | |
| Hauling charges | - | - | 180 | - | 1,650 | - | | 3,660 | | |
| Miscellaneous expense | 74 | 695 | - | - | - | - | | 1,538 | | |
| Insurance | 1,517 | 2,783 | 1,810 | - | - | - | | 12,220 | | |
| Repairs & maintenance | 8,270 | 1,518 | 5,680 | 3,305 | 6,267 | 12,691 | | 75,462 | | |
| Small tools | 429 | - | 454 | - | 208 | 290 | | 2,762 | | |
| Supplies | 395 | 1,119 | 5,545 | 980 | 854 | 4,559 | | 26,904 | | |
| Training | - | - | 150 | - | - | - | | 300 | | |
| Utilities | 512 | 735 | 1,245 | 1,374 | 1,398 | 1,466 | | 13,460 | | |
| | $13,241 | $11,991 | $19,546 | $ 5,958 | $18,874 | $ 24,534 | | $ 188,288 | $0.40 | 466,200 tons |
| | | | | | | | | | | |
| **Other avoided costs:** | | | | | | | | | | |
| Auto expense | $ 4,913 | $ - | $ - | $ - | $ - | $ - | | $ 9,826 | | |
| Cleaning | 125 | - | 100 | 75 | 125 | 100 | | 1,050 | | |
| Life insurance | 1,657 | - | 1,657 | 1,657 | 1,657 | 1,657 | | 16,570 | | |
| Office expense | 201 | - | 96 | 128 | 1,236 | 247 | | 3,816 | | |
| Travel | 326 | 337 | 277 | - | 146 | 111 | | 2,394 | | |
| Postage | - | - | 78 | - | 78 | 39 | | 390 | | |
| | $ 7,222 | $ 337 | $ 2,208 | $ 1,860 | $ 3,242 | $ 2,154 | | $ 34,046 | | |

*Sources:*

See e.g. JOHNCO 0191 and Amended Tax Return

1 - See e.g. IMI Sales Invoices

Appendix D

## Fixed, Sunk and Committed Costs

| | March | May | June | July | August | September | Total | Annualized |
|---|---|---|---|---|---|---|---|---|
| **Fixed or not avoided/avoidable:** | | | | | | | | |
| Dues | - | - | - | 200 | 215 | - | 415 | 830 |
| Professional fees | 3,000 | - | - | 300 | 800 | 400 | 4,900 | 9,800 |
| Rents | 400 | 400 | 800 | - | 400 | 400 | 2,400 | 4,800 |
| Taxes and licenses | 110 | - | - | 826 | - | - | 936 | 1,872 |
| Telephone | 573 | - | 576 | 232 | 1,220 | 334 | 2,935 | 5,870 |
| Subtotal | 4,083 | 400 | 1,776 | 1,558 | 2,635 | 1,134 | 11,586 | 23,172 |
| | | | | | | | | |
| **Sunk/committed costs:** | | | | | | | | |
| Amortization expense | - | - | - | - | - | - | - | - |
| Depletion | - | - | - | - | - | - | - | - |
| Depreciation | 2,658 | 2,658 | 2,658 | 2,658 | 2,658 | 2,658 | 15,948 | 31,896 |
| Interest | 7,279 | - | - | - | - | - | 7,279 | 14,558 |
| Subtotal | 9,937 | 2,658 | 2,658 | 2,658 | 2,658 | 2,658 | 23,227 | 46,454 |
| | | | | | | | | |
| **Installment debt repayment:** | | | | | | | | |
| M&B rail spur financing [1] | - | - | 19,500 | - | - | 19,500 | 39,000 | 78,000 |
| Subtotal | - | - | 19,500 | - | - | 19,500 | 39,000 | 78,000 |
| | $ 14,020 | $ 3,058 | $ 23,934 | $ 4,216 | $ 5,293 | $ 23,292 | $ 73,813 | $ 147,626 |

*Source:*

See e.g. JOHNCO 0191 and Amended 2006 Tax Returns

1 - See e.g. M&B Rail Services Agreement



Appendix E

Actual Tons Purchased

Purchases are not Regular nor Weekly



Appendix F

Cumulative Tons Purchased
**Actual vs. 5,200 Weekly vs. 150,000 Annually**

Appendix G

## Alabama Market and JMI Market Share

| | State of Alabama [1] | JMI | JMI relative to State of Alabama |
|---|---|---|---|
| Production | 20,100,000 | 466,200 | 2.3% |
| Unit Price | $ 4.78 | $ 3.72 | (1.06) |

*Source:*

1 - U.S. Department of the Interior, U.S. Geological Survey, 2006 Minerals Yearbook,

Sand and Gravel, Construction, published January 2008.

*Footnote:*

JMI's market share is low and its price is competitive, therefore it is reasonable to conclude that JMI

could have increased its market share based on its competitive price.

**Supplemental List of Information Considered**                    Appendix H

Expert report of Dave G. Borden, CPA, including supporting documents considered

Deposition and exhibits of Dave Borden (December 21, 2007)

Deposition and exhibits of Clatus Junkin (January 11, 2008)

Invoices for actual sales of No. 67 gravel bearing sales prices ranging from $5.51 per ton to $9.92 per ton

Invoices for actual sales of oversize gravel bearing sales prices ranging from $8.50 per ton to $9.10 per ton

Invoices for actual sales of sand bearing sales prices ranging from $1.30 per ton to $30.00 per ton

Third Party production from:
- West Alabama Bank & Trust
- McCabe and Associates
- M&B Railroad

2006 Amended income tax return of Johnco Materials, Inc.

Arnstein, William E. and Frank Gilabert. (1980). *Direct Costing.* New York, New York: AMACOM a division of The American Management Association.

Gaughan, Patrick A. (2004). *Measuring Business Interruption Losses and Other Commercial Damages.* Hoboken, New Jersey: John Wiley & Sons.

Horngren, Charles T. (1977). *Cost Accounting, A Managerial Emphasis*, 4th edition. Englewood Cliffs, New Jersey: Prentice Hall.

Garrison, Ray H. (1979). *Managerial Accounting, Concepts for Planning, Control, Decision Making*, Revised edition. Dallas, Texas: Business Publications

Financial Accounting Standards Board. (2004). Inventory. In *Current Text* (Vol. I, pp. 27519 to 27631). Norwalk, CT: Financial Accounting Standards Board.

Financial Accounting Standards Board. (2004). Accounting Research Bulletin No. 43, Chapter 4, Inventory Pricing. In *Original Pronouncements* (Vol. III, pp. ARB 43-11 to ARB 43-15). Norwalk, CT: Financial Accounting Standards Board.

U.S. Department of the Interior, U.S. Geological Survey, 2006 Minerals Yearbook, Sand and Gravel, Construction, published January 2008.

Wall Street Journal, February 29, 2008.

www.yellowpages.com

Memorandum Order and Opinion dated February 28, 2008, issued by Judge DeMent in this matter, and related motions and briefs filed by the parties.

All information referenced in Alexander report dated August 8, 2007.

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA

| | | |
|---|---|---|
| JOHNCO MATERIALS, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Civil Action No. |
| vs. | ) | 2:06cv993-ID |
| | ) | |
| CONRAD YELVINGTON | ) | |
| DISTRIBUTORS, INC., | ) | |
| | ) | |
| Defendant. | ) | |

## PLAINTIFF'S SUPPLEMENTATION
## OF PREVIOUSLY FILED REPORT
## OF EXPERT WITNESSES

Comes now Johnco Materials, Inc., the plaintiff in this cause, and

pursuant to FED.R.CIV.P. 26 supplements the previously filed report of its

expert witness J. Lester Alexander, III, CPA.

1

Respectfully submitted,


s/ H. Gregory Pearson
H. Gregory Pearson (ASB-4733-S81H)
Attorney For Plaintiff
email: greg@jphj.net


Charles E. Harrison (ASB-9408-N70C)
Attorney For Plaintiff
email: chuck@jphj.net


*OF COUNSEL:*

JUNKIN, PEARSON, HARRISON
& JUNKIN, L.L.C.
601 Greensboro Avenue
Suite 600 Alston Place
Tuscaloosa, Alabama 35401
Telephone: (205) 366-0111
Telecopier: (205) 391-4780


2

## CERTIFICATE OF SERVICE

Pursuant to FED.R.CIV.P. 5(e) and the Administrative Procedures For Filing, Signing, And Verifying Pleadings and Documents In The District Court Under the Case Management/Electronic Case Files (CM/ECF) System In Civil Cases [General Order No. 2:04-mc-3164], I do hereby certify that I have electronically filed the foregoing Motion to Strike with the Clerk of the Court by uploading same to the Court's CM/ECF web site at http://www.almd.uscourts.gov, which will send notification of such filing to the following:

Thomas J. Leek, Esq
COBB & COLE
150 Mognolia Avenue
Post Office Box 2491
Daytona Beach, FL 32115-2491

George Walker III, Esq.
David Martin, Esq.
COPELAND, FRANCO, SCREWS
  & GILL, P.A.
444 S. Perry St.
Montgomery, Alabama 36101-0347

and I hereby certify that I have mailed by United States Postal Service, properly addressed and first-class postage prepaid and affixed this document to the following non-CM/ECF participants:

[none]

This the 29th day of February 2007.

Charles E. Harrison (ASB-9408-N70C)

3

**JOHNCO MATERIALS, INC.,**

**Plaintiff**

**vs.**

**CONRAD YELVINGTON DISTRIBUTORS, INC.,**

**Defendant.**

**Civil Action No. CV-06-2:06CV993-10**

**Report of
Dave G. Borden, CPA/ABV
Aldridge Borden & Company, P.C.
September 25, 2007**



EXHIBIT

E

# TABLE OF CONTENTS

|  | Page |
|---|---|
| INTRODUCTION | 3 |
| QUALIFICATIONS | 3 |
| DOCUMENTS RELIED UPON IN FORMING OPINION | 4 |
| BACKGROUND | 4 |
| ANALYSIS OF PRODUCTION AND SALES | 8 |
| REVIEW OF ALEXANDER REPORT | 9 |
| CONCLUSION | 16 |
| CONTINUING NATURE OF WORK | 17 |
| EXHIBIT 1 – ADDITIONAL BIOGRAPHICAL INFORMATION | |
| EXHIBIT 2 – TESTIMONY LAST FOUR YEARS | |
| EXHIBIT 3 – DOCUMENTS RELIED UPON IN FORMING OPINION | |
| EXHIBIT 4 – ANALYSIS OF JMI PRODUCT SALES | |

## REPORT OF DAVE G. BORDEN, CPA/ABV

## INTRODUCTION

I have been retained by the law firm of Cobb & Cole as an expert witness in the case of Johnco Materials, Inc ("JMI") v. Conrad Yelvington Distributors, Inc ("CYDI") (Civil Action No. CV-06-2:06CV993-10). I have been engaged to review and provide expert testimony regarding the expert report of J. Lester Alexander, III ("Alexander") relative to alleged damages suffered by JMI in the above styled case.

## QUALIFICATIONS

I am the Chairman of Aldridge Borden & Company, P.C. in Montgomery, Alabama. We are a CPA firm practicing primarily in the State of Alabama. Our firm provides a wide range of specialized services, including management consulting, strategic planning, litigation consulting, business valuation, mergers and acquisitions consulting, tax planning, compliance, auditing, and information technology consulting.

My own areas of expertise include business valuation, strategic planning, mergers and acquisitions, and litigation consulting. I have extensive experience in a wide range of business valuations, business acquisitions, mergers, and sales, and have been qualified as an expert in state and federal courts in Alabama and Florida in numerous instances involving a broad range of commercial and economic matters. I am a Certified Public Accountant (CPA) and, in addition, hold the Accredited in Business Valuation (ABV) Certification from the American Institute of Certified Public Accountants.

In the course of my consulting practice both in connection with the mergers, acquisitions, and sales practice and the business valuation practice, I am required on a regular basis to research and analyze industry trends and practices and assess the subject company and its strengths and weaknesses relative to a particular industry. This research and analysis includes, but is not limited to, markets for sale of products, customers, competition, capital expenditure requirements necessary for the business, and financial performance.

Exhibit 1 to this report contains additional biographical information including articles that I have authored. Exhibit 2 contains my four-year deposition or trial testimony. I am being compensated at an hourly rate of $305 per hour.

Additional firm employees have assisted in the review of information relating to this matter. Rates for those employees range from $65 to $240 per hour.

3

## DOCUMENTS RELIED UPON IN FORMING OPINION

Exhibit 3 contains a list of documents upon which I have relied in reaching my opinions.

## BACKGROUND

### The Supply Agreement

In April 2004, JMI and CYDI entered into a supply agreement ("Supply Agreement").[1] Under the terms of the Supply Agreement, JMI was required to construct a mining facility to mine and classify sand and gravel. In addition to the mining facility, JMI was required to construct rail siding sufficient to load/handle a minimum of fifty-two (52) open, or covered, hopper railcars on a regular shipment basis.[2] Construction of the mining facility was scheduled to be completed within twelve months of the execution of the Supply Agreement.[3] The term of the Supply Agreement was for five years, and it was scheduled to end on the fifth anniversary of the first shipment of the product.

In addition to the requirements to construct the mining facility, the terms of the Supply Agreement called for CYDI to purchase #67 concrete gravel in minimum quantities of 150,000 tons annually. The initial purchase price was $5.25 per ton, and included a price increase of 5% beginning in year three, April 28, 2006, and additional price increases of 2.5% beginning in years four and five.

### Overview of the Aggregate Market

The aggregates industry is a mature and cyclical business, and demand for products is dependent on construction activity. Primary end users include public infrastructure and commercial and residential construction markets.    First Research reports that "Construction material use is seasonal, with nearly two-thirds of US cement consumption between May and October.[4]

---

[1] JMI was formed by Ben and Pep Johnston. After entering into the Supply Agreement with CYDI, the Johnstons determined they did not have the financial capacity to obtain the necessary financing to purchase the property and construct the mining facility as called for in the Supply Agreement. As a result, they admitted a third shareholder, Clatus Junkin ("Junkin"). As a result of admitting Junkin, JMI was able to obtain the necessary financing to purchase the land and construct the mining facility.

[2] The Supply Agreement indicates that railcars would be loaded on a weekly schedule (approximately 5,200 tons per week) subject to rail car availability and supply. According to his deposition testimony, Junkin claims that it was his expectation that a train would pickup material every week. However, Pep Johnston, who negotiated the Supply Agreement on behalf of JMI, stated in his deposition that his understanding was that JMI had to be prepared to load 5,200 tons when the train got to JMI (page 106 deposition testimony). Pep Johnston's expectation is similar to Gary Yelvington ("Yelvington") who negotiated the Supply Agreement on behalf of CYDI. According to his deposition testimony, Yelvington indicates that JMI had to be able to load 5,200 tons per week when the train was at JMI.

[3] The Supply Agreement was signed by CYDI on April 16, 2004, and it was signed by JMI on April 28, 2004.

[4] First Research, Inc. Industry Profile, August 6, 2007. Note that the largest users of 67 stone are concrete producers. Concrete producers use cement mixed with aggregates to make concrete.

4

Construction spending in the public sector is generally more stable than private construction spending as governmental appropriations and expenditures are typically less sensitive to interest rate fluctuations than private-sector spending. As such, commercial and residential construction activity is affected by economic cycles and local conditions.

Due to the relatively low value of aggregates compared to their weight, producers typically locate plants in close proximity to the end use market. Transportation to the market can be accomplished by truck, rail or barge. Generally, shipping by truck is limited to locations within 45 miles of the plant site. If annual tonnage requirements exceed 20,000 tons or the distance exceeds 45 miles, shipping by rail is more economical.[5]

The aggregates market in the southeast was significantly impacted by the destruction caused by Hurricane Katrina in 2005. The Federal Reserve Board, in November 2005, reported strong demand for construction related manufacturers, and further, that while clean up efforts had begun, full-scale rebuilding was not scheduled to get underway until early 2006.[6]

Demand for construction materials in the southeast market drove up prices for aggregates. Martin Marietta reported aggregate price increases in the Southeast of 11.5% and 11.0% for 2006 and 2005,[7] respectively, compared to only a 3.9% increase in 2004.[8] Further, Martin Marietta reports that increases in aggregate pricing have continued into 2007.

## JMI

Subsequent to the execution of the Supply Agreement, JMI purchased the property in Lowndes County, Alabama. The purchase price for the property was approximately $1,680,000, and approximately $1,000,000 of this price was allocated to the gravel reserves.[9] [10]

While there are no documents available to me, to support JMI's estimated gravel reserve, an email from Philip Holladay ("Holladay") to Yelvington indicates discussion of gravel reserves at the Lowndes County location of approximately 2.5 million tons. Using this information, JMI's cost per ton or depletion of gravel would be approximately $0.40.

---

[5] Quarryology 101. www.pitandquarry.com
[6] The Beige Book Summary for Atlanta District November 2005.
[7] Vulcan Materials also reported increases in aggregate prices in 2005 and 2006. However, the data was not segmented by geographic region.
[8] Martin Marietta Annual Report for 2006.
[9] 2004 Federal Income tax return for JMI.
[10] Based on Pep Johnston's deposition testimony (p. 87), the property was purchased in August 2004. However, the 2004 JMI Federal Tax return indicates the property was purchased in May 2004.

After the property was acquired, JMI began pricing and purchasing equipment for the plant. The basic components of the plant included a pump box, steel bins to hold the sifted gravel, a sand classifying screen shaker and a de-watering screw radial stacking conveyor.[11]

In addition, Ben Johnston built a dredge, the load-out bins and conveyor and belt weighing system. Ben Johnston also built the roads for hauling from the plant to the load-out bins.[12] By the end of 2004, JMI had invested in excess of $400,000 in equipment relative to the operations of the facility.[13] [14]

In addition to the plant, JMI also constructed a load-out facility which included the rail siding. M&B Railroad ("M&B") assisted in the design of the track layout for the load-out facility. In addition to the costs incurred by JMI, M&B incurred costs of approximately $300,000 in the construction of the rail siding.[15]

JMI entered into a Rail Services Agreement with M&B for the financing of the rail siding. Under the terms of the Rail Services Agreement, JMI agreed to pay, in addition to M&B's normal charges, an additional charge of $0.25 per ton on the first 1,500,000 tons of aggregate, sand or other product shipped from the facility.[16]

The load out facility was completed around March 2006.[17] [18] Although JMI began limited operations in 2005, according the Ben Johnston, the facility did not begin producing quality gravel until February 2006.[19] Although Ben Johnston testified JMI began producing quality gravel in February 2006, Holladay testified that it was not until around the end of April 2006 that JMI had enough material on the ground to load a unit train.[20]

From May 2006 through September 2006, CYDI purchased approximately 32,000 tons of #67 gravel from JMI. In addition, CYDI purchased approximately 3,300 tons of #4 oversized gravel from JMI in June 2006.[21]

While there are no documents available to me establishing the overall geology of the JMI site, Ben Johnston represented the mineral content mix to be 55% sand,

---

[11] Pep Johnston deposition testimony page 84.
[12] Pep Johnston deposition testimony page 85.
[13] 2004 Federal Income tax return of JMI.
[14] Tax returns subsequent to 2004 have not been produced as of the date of my report. I reserve the right to supplement my report upon production of such records.
[15] Pep Johnston deposition testimony pages 45-46.
[16] DX 11 to Pep Johnston deposition testimony.
[17] Ben Johnston deposition testimony page 103.
[18] Although the Agreement required the rail siding to handle 52 rail cars, it could actually handle 70 to 75 plus two engines. Ben Johnston deposition testimony page 108.
[19] Ben Johnston deposition testimony page 47.
[20] Holladay deposition testimony page 34.
[21] See Exhibit 4 to my report.

36% #67 gravel, and 9% oversized #4 gravel.[22] Prior to commencing operations at the facility, JMI did not have any definitive marketing plans for either the sand or the oversized gravel.[23] JMI's only marketing plan was to sell the 150,000 tons of #67 gravel to CYDI.[24] [25]

In late 2005 or early 2006, JMI was approached by Lafarge, a ready-mix company with headquarters in Ohio, about buying some of the JMI sand. However, this deal did work out, and although JMI considered sand to be a by-product of the production process, sand was creating a problem for JMI.[26] In a meeting with Yelvington, Pep Johnston inquired if CYDI could take some sand, "if you could take some sand, we need you to do that."[27] JMI's problem with sand was also discussed in an email dated March 6, 2006 from Holladay, a CYDI consultant, to Yelvington. In the email, Holladay informed Yelvington that Pep Johnston had indicated JMI may have to shut down if JMI could not move the sand.[28] Junkin indicated that one way to solve the sand problem was to pump the sand back into the pit.[29]

Around May 2006, Junkin, the financial investor in JMI, purchased Ben and Pep Johnston's interest in JMI, and became the sole owner of JMI. Ben Johnston remained as an employee of JMI, and managed the mining facility in Lowndes County.

Around October 2006, Junkin went to CYDI's office in Daytona to request that the Supply Agreement be terminated. Junkin had been approached by a potential buyer, Rinker, for the mining facility, but Rinker would not purchase the facility as long as the Supply Agreement with CYDI was in place. The Supply Agreement was not terminated, and in November 2006, JMI ceased mining operations at the Lowndes County facility.

Although, mining operations at the facility ceased, JMI continued to sell products that were previously mined. These sales included #67 gravel as well as sand. JMI sold between 12,000 and 15,000 tons of sand subsequent to November 2006.[30]

Around April 2007, JMI resumed mining operations at the Lowndes County facility producing #67 gravel. However, around June 2007, JMI shifted focus and began

---

[22] Ben Johnston deposition testimony page 39.
[23] Junkin deposition testimony page 65 and 70, and Ben Johnston deposition testimony page 42.
[24] Ben Johnston deposition testimony page 39.
[25] JMI believed that the sale of 150,000 tons per year to CYDI would pay for the debt service and expenses of JMI, and if JMI was able to sell sand and oversized, most of that would have been profit. See Pep Johnston deposition testimony at page 61.
[26] Philip Holladay deposition testimony page 25.
[27] Pep Johnston deposition testimony page 113.
[28] DX 8 to Pep Johnston deposition.
[29] Junkin deposition testimony page 170.
[30] Ben Johnston deposition testimony page 29.

producing #57 gravel. The #57 gravel was shipped to Dunn Construction in Mississippi, and the product is being tested for use in asphalt production.

## ANALYSIS OF PRODUCTION AND SALES

JMI did not maintain records with respect to actual production. However, it is possible to estimate production in total (for the entire period of operation vs. each week or month) by using the sales volumes of minerals provided by Alexander from the books and records of JMI, the estimated mineral composition represented by plaintiffs, and testimony of plaintiffs regarding the amount of mineral inventories available for sale at either the beginning of the shut down period (November, 2006) or the beginning of the second start –up of production (April of 2007). I have included, as Exhibit 4 to my report, a table that sets forth JMI's sales activity based on sales to CYDI and sales to other buyer based on Appendix 3 and 4 of Alexander's report.

Alexander's report indicates that JMI sold approximately 40,028 tons of #67 gravel during the period January 2006 through June 2007. Further, Ben Johnston testified that JMI sold all of the #67 gravel it had produced prior to the shut down[31] or during the period of the shut-down, and it began producing #67 again around April 2007 to fill sales orders for #67 gravel.[32] Therefore, it is correct to assume that the 40,028 tons of #67 gravel represents all, if not more than all, of the gravel produced by JMI during its entire period of operation prior to its shut down in November of 2006.

Both Junkin and Ben Johnston testified that JMI was producing gravel prior to March 2006[33], and further, there were no mechanical issues that would affect JMI's ability to meet the requirements under the Supply Agreement.[34] In addition, Alexander represented, in his report, that in the months of March, May, June, July and August 2006, JMI was "staffed to meet the delivery requirements specified in the supply agreement (which he interprets as being 260,000 tons of #67 gravel annually) as of the first week of March 2006." Alexander also explains that the expenses he used for establishing incremental costs of JMI's operations were from these same months. His report states "Using the costs from mining operations at production capacity for JMI during the period March 2006 and May 2006 through August 2006…" In further explanation there is a footnote supporting the preceding statement that contains the following reference: Footnote 5 to Alexander report – "Per deposition testimony of Clatus

---

[31] All of JMI's sales of #67 gravel did not occur prior to the shut down. Ben Johnston testified that JMI had sales of #67 gravel, which were produced prior to shut down, during the period of shut down.
[32] Ben Johnston deposition testimony page 24.
[33] Ben Johnston deposition testimony page 47 and Junkin deposition testimony page 43.
[34] Ben Johnston deposition testimony page 57.

Junkin, these months are an accurate representation of costs associated with the mine running at production capacity."[35]

Since production records relative to JMI's mining operations have not been produced, for purposes of my production analysis, I have conservatively assumed that all of the #67 gravel sold by JMI was produced during the months of March, May, June, July and August 2006.[36] Using the five months as an indicator of JMI production capacity indicates that JMI's monthly production of #67 gravel averaged only 8,006 tons per month or annual production capacity of only approximately 96,000 tons per year. This production level is significantly less than the production required under the Supply Agreement of 150,000 tons per year.

Using JMI's product mix as represented by Ben Johnston in his deposition testimony, during this five month period, JMI would have produced approximately 61,150 tons of sand. On an annualized basis, JMI's historical production of sand would be approximately 146,700 tons annually.

### REVIEW OF ALEXANDER REPORT

Alexander was retained by JMI's counsel to review and analyze evidence related to the Supply Agreement, and as a result of his work, Alexander has provided a calculation of alleged damages in the amount of $4,549,215. These alleged damages consist of lost profits of $4,473,873 and incidental costs of $75,342.

While it is my understanding that CYDI will deny any liability related to the damage claims, I have reviewed Alexander's calculations and methodology, and noted a number of issues that result in the calculation lacking adequate foundation and not conforming to the facts and circumstances in this matter.

### Lack of Foundation

At this point in discovery, neither detailed production records nor comprehensive geological assessment and testing data are available for my review of Alexander's lost profits calculation. Both of these foundational records, along with marketing plans for the sale of the sand, are necessary for a proper calculation of lost profits, particularly for a start-up business with no significant production and sales history such as JMI. The following are foundational components not

---

[35] It is possible that in the month of March 2006, the plaintiffs will contend that the mine was staffed and attempting to operate at production capacity, but not actually producing at that level. However, starting in May of 2006, Alexander's lost profits calculation (discussed subsequently) asserts that the mine was capable of actually producing at 260,000 tons of #67 gravel annually.

[36] There was gravel produced in some of the other months. However, for purposes of my calculation I have aggregated all production in the five-month period, thus overstating the actual production level Johnco was achieving during this period.

established that in my experience are required for a proper analysis, all of which have substantial impact on the calculation of lost profits:

1. Comprehensive assessment of the geology of the site, including geological testing results and approximate locations, depth, thickness, and content of the mineral deposits, depth of water table, and over burden thickness and composition. This assessment of the geology would provide meaningful information not only about the content and value of the mineral deposit, but also the likely difficulty and cost of mining the deposit. There apparently were test borings done of the site, but documentation of this geological study is not available to me at the date of this report.

2. Basic production records from production on the site showing dates, volumes and mineral content (particularly mix of sand to gravel, and size of gravel) of production experience on the property. Mining production records, while relevant primarily to only the portion of the site currently mined, would at least provide an indicator of the mineral content, cost of mining, and future performance of the mine assuming similarity of the deposit.

3. Establishment of market for sales of sand assumed by Alexander of 146,200 tons annually, despite JMI having no marketing plan for the sale of the sand and selling only a small portion of the sand produced by the mine. It is undisputed that JMI had no marketing plan for the sale of the sand produced at the mine, and the evidence indicates major problems sustained in disposing of the sand. Sand sales for the entire period of the mine's existence resulted in sale of only a small fraction of the sand produced, substantially less in scope than is contemplated by Alexander in the lost profits calculation.

## Revenue Assumption Not Consistent with Plaintiff Deposition Testimony

One of the fundamental assumptions underlying Alexander's lost profits calculation is that CYDI was obligated, under the terms of the Supply Agreement, to purchase 260,000 tons annually of the #67 gravel.

As set forth in the Supply Agreement, CYDI's minimum obligation was 150,000 tons annually. Further, Pep Johnston, Ben Johnston and Junkin all testified that the minimum requirement under the Supply Agreement was 150,000 tons annually.[37] As a result, Alexander's calculation erroneously reflects a gross revenue component of $7,417,800 equal to the sale of 260,000 tons of #67 gravel. Alexander's gross revenue component relative to sales of #67 gravel is overstated by approximately $3.1 million.

---

[37] See Junkin deposition testimony page 40, Pep Johnston deposition testimony page 106 and Ben Johnston page 57 and page 84.

**JMI Historical Annual Production only 96,000 Tons of #67 Gravel**

As discussed previously, during the five month period March, May, June, July and August 2006, JMI's annualized production of #67 gravel was at most approximately 96,000 tons. The following chart compares JMI's historical, annualized production of #67 gravel to the requirements under the Supply Agreement and Alexander's calculation of 260,000 tons annually. Alexander asserts in his lost profits calculation that JMI was incurring costs and capable of producing at 260,000 tons of #67 gravel annually. The only adjustment made by Alexander to incremental costs for the additional volume above this five month period is the cost of fuel and oil "which would escalate to power equipment to load rail cars specified as the shipping method by the Supply Agreement. For analytical purposes, actual Fuel and Oil cost has been escalated to equivalent cost necessary to produce and rail car load 5,200 tons of #67 Concrete Gravel per week".



**JMI
Annualized Production of #67 Gravel
Produced in March, May – August 2006**

- Alexander Lost Profits Calculation
- Supply Agreement Annual Requirement
- JMI Production Annualized

As reflected in the chart, JMI's historical production at the plant was not adequate to meet the annual requirements of the 150,000 tons of #67 gravel, much less the 260,000 tons as outlined in the Alexander lost profits calculation. However, assuming for sake of argument, that the mine could have produced at either 150,000 tons or 260,000 tons, it is my opinion, the incremental operating expenses in Alexander's calculation (in addition to fuel and oil) would have significantly increased (discussed subsequently) with this almost three-fold increase in volume.

11

Further, Ben Johnston testified that the *maximum* production for the facility was 120 tons per hour of #67 gravel.[38] At this rate, the facility would have to operate *at maximum output* for a minimum of 43 hours per week to produce 260,000 tons or 5,200 tons of #67 gravel per week.[39] Assuming 80% efficiency would require operating the plant for almost 54 hours per week.[40]    At operations extending beyond one shift, or alternatively requiring overtime pay, operating costs for labor would have been significantly increased.[41]

### Lost Profits Calculation Assumes Sales of 146,200 Tons of Sand

Alexander's lost profit calculation also contains an assumption that JMI suffered lost sand sales revenue on 146,200 tons of sand. This component accounts for $1,242,700 of alleged lost revenue and lost profit.[42]

As discussed above, JMI did not have a marketing plan for the sale of sand, and had incurred major problems in selling the sand.  JMI was even considering pumping sand back into the production pit. Further, Holladay testified that even if JMI had given CYDI the sand (for no cost to CYDI), CYDI could not be profitable selling the sand because of the transportation cost.[43] While JMI was able to sell all of the #67 gravel and apparently most of the #4 oversized gravel it produced, JMI was only able to sell a small portion of the sand it produced, even at production volumes that were only approximately 1/3 of the production volumes Alexander assumes in his lost profits calculation. Yet Alexander calculates alleged lost sand sales of 146,200 tons <u>annually</u> of sand, over 6.5 times the 22,506 tons of sand JMI had sold during its entire seventeen-month period of existence from March of 2006 (asserted production capability) to July of 2007.  See Chart Below.

---

[38] Ben Johnston deposition testimony page 48.

[39] Due to the lack of production records, it is uncertain whether the facility ever operated at this capacity, even for brief periods of time.

[40] Alexander's calculation assumes the facility would be producing 50 weeks a year. As such, Alexander's calculation fails to allow for maintenance, either reactive or preventive, related shut down. Ben Johnston testified that the mine could not run all the time because there are going to be problems, and at one point the plant was shut down for a week while equipment was being repaired. See Ben Johnston deposition testimony at page 48.

[41] Upon production of JMI payroll records, I will review payroll and overtime pay to determine if this is considered in Alexander analysis.

[42] Alexander classifies these products as by-products and as such does not attribute any production costs to these items.

[43] Holladay deposition testimony page 87.

## Actual Sand Sales Compared to Alexander Lost Profits Calculation of Sand Sales



Alexander's calculation of sand sales is inconsistent with JMI's operational sales history and fails to consider the problems JMI was incurring selling the sand, not to mention JMI's lack of a marketing plan at the outset for the sale of the sand. In my opinion, it is not reasonable to assume that JMI could sustain the level of sand sales as set forth in the Alexander calculation, particularly without any incremental sales and marketing costs associated with this effort.

### Fails to Consider all Incremental Cost

Alexander's calculation of alleged lost profits includes a component for incremental costs that JMI would avoid by not producing the products. His calculation is based on JMI's operating results for selected months during the period March 2006 through August 2006, and an assumption that JMI was operating at full production capacity during these months.[44] Alexander's calculation omits the months of April and September 2006, and based on Plaintiff's lack of production records, it is uncertain as to the activity that occurred during these omitted months.

There are numerous costs of operating the mine that it appears Alexander fails to consider in his analysis. I reserve the right to modify this report after full production of the financial records of JMI. However, the following are costs that are apparently not considered in his lost profits analysis:

---

[44] Actually, Alexander's assumption is for production beyond 150,000 tons of #67 stone established in the Supply Agreement. Alexander states in his report that "Operating costs incurred by Johnco Materials, Inc. during the March 2006 through September 2006 period of operations under the Supply Agreement represent staffing and operating costs necessary to produce 5,200 tons of #67 Concrete Gravel per week, with the exception of Fuel and Oil, which would escalate to power equipment to load rail cars specified as the shipping method by the Supply Agreement".

1. Essentially, Alexander assumes all of the operating expenses of the mine (with the exception of fuel and oil) incurred during the base period (March 2006 and May – August 2006) were fixed (would not increase with additional production) at the levels incurred during those months. This is despite the fact that the volume asserted in the lost profits calculation (260,000 tons annually of #67 gravel) were almost triple the volumes experienced during the base period (only 96,000 tons of #67 gravel annually). In my opinion, it is not reasonable to assume all of these costs would remain fixed in these circumstances.

2. Depletion on minerals mined from the property. As discussed above, depletion would have been approximately $0.40 per ton.

3. Transportation costs related to railroad transportation agreement between JMI and M&B Railroad. These additional costs would have approximated $0.25 per ton.

4. Depreciation on equipment used in the production of sand and gravel, or alternatively capital expenditures and replacements required in the operation at the production level assumed. According to its 2004 Federal Tax return, JMI had already invested approximately $400,000 in equipment relative to operating the mining facility. Additional equipment would have likely been purchased in subsequent years as well. Production would result in wear and tear on the equipment from production hours.

5. Reclamation costs – It is unclear what the reclamation plan was with respect to the property. However, there is no evidence that these costs were considered.

6. Over burden removal costs. Apparently, over burden removal was sub-contracted to other providers. It appears that this cost was incurred prior to Alexander's cost of production base period calculations beginning in March of 2006. Future discovery of JMI financial records will hopefully clarify if these costs were considered.

7. Engineering testing for production purposes and compliance

8. Costs associated with the marketing and sales effort to market sand of 146,200 tons annually.

9. Legal and accounting costs

10. Telephone, computers, and other office cost requirements

In addition, Alexander makes assumptions regarding incremental fuel consumption "which would escalate to power equipment to load rail cars specified as the shipping method by the Supply Agreement." The details of these calculations are not replicated in the report, and it is not possible to determine the fuel consumption assumptions or the pricing considered in his analysis. Further there may be costs included in Alexander's base period calculations that JMI continued to incur during the shut down period. If the Alexander calculation was corrected for the above items (1 – 10), then consideration should be given as an offset for the costs included in the base period that were not avoided by JMI during the shut down period.

Upon production of fuel and other internal financial records of JMI, I reserve the right to modify this section of my report.

### Failure to Discount to Present Value

In his report, Alexander states that he did not discount his future lost profits calculation to present value at the date of the liability event or to the trial because, in his opinion, the effect of discounting would be offset by pre-judgment interest. I have been instructed by counsel that pre-judgment interest is not an appropriate element of damages in the calculation of lost profits in this matter. However, even assuming pre-judgment interest is applicable, Alexander's opinion with respect to the offsetting effects of pre-judgment interest and discounting of future profits is incorrect.

First, pre-judgment interest, if applicable, would accrue from the point of alleged breach, either March or May of 2006 in this case, to the point of trial, or less than 24 months. However, the discount rate would span the time from the point of the alleged breach or date of trial through the future lost earnings period, or up to 60 months in this case. As a result, the time period covered by the discount rate is greater than the time period covered by the pre-judgment interest period.

In addition, an appropriate risk adjusted discount rate would be higher than the pre-judgment interest rate. The discount rate incorporates two elements: 1) the time value of money and 2) risk – the higher the risk, the higher the discount rate.

Based on JMI's operating history and all of the issues previously discussed, it is my opinion that there is a significant risk associated with JMI's ability to perform as Alexander's model projects. These factors indicate that not only is discounting future lost profits to present value appropriate, but a risk adjusted discount rate should be used in discounting to present value.

For these reasons, in my opinion, the effect of pre-judgment interest (even if it were applicable in this circumstance) would not offset discounting of future lost profits to present value.

### Incidental Cost Calculation

In addition to his lost profits calculation, Alexander also computes alleged incidental damages resulting from CYDI's failure to pick up #67 in March 2006 when JMI was allegedly ready for CYDI to begin moving product. The costs included in Alexander's calculation are the costs that JMI incurred for operating the facility in the months of March and April 2006.

While there is conflicting testimony as to when JMI had enough product on the ground to supply a trainload of #67 gravel,[45] there is no requirement under the Supply Agreement whereby CYDI was obligated to pick up #67 gravel on a specified date.

However, even in the event the jury should find that CYDI was obligated to begin loading gravel as of March 1, 2006 and JMI had sufficient quantity of such gravel available on that date, Alexander's calculation overstates the alleged damage JMI suffered.

JMI ultimately received a benefit of the costs incurred in that it produced and ultimately sold the product which it produced. As a result, JMI did not incur unnecessary costs, but rather at the most it was delayed in realizing the benefit of those costs. To consider these costs as an additional measure of damages is duplicative of the lost profits calculation which considers the value of these products sold.   As such, the proper measure for this component of alleged damages is the interest incurred or adjustment for the time value of money as a result of the delay.

Based on JMI's interest rate with West Alabama Bank & Trust, the approximate amount of damages JMI would have suffered would have been less than $1,000.

### Failure to Consider Mitigation

In addition to the discrepancies outlined above, Alexander also fails to consider fully the effects of mitigation. While Alexander did reduce his alleged damages by the amount of sales JMI recognized through June 2007, he has not considered any mitigation JMI could undertake or should have reasonably undertaken over the period of the Supply Agreement.

JMI has the ability to produce either #67 or #57 gravel at its mining facility in Lowndes County. Further, JMI resumed mining operations in April 2007, and around June 2007, JMI began producing #57 gravel. JMI is currently having the #57 gravel tested by a potential buyer, Dunn Construction, for use in asphalt production. Yet Alexander fails to consider this potential mitigating impact as well as any other reasonable mitigating efforts that JMI could undertake.

### CONCLUSION

In my opinion JMI's actual historical production of #67 gravel for the period March 2006 and May – August 2006 was substantially less than the 150,000 ton minimum volume requirement as set forth in the Supply Agreement, and approximately one-third of the 260,000 tons asserted by Alexander in his lost profits calculation.

---

[45] Holladay testified that JMI was not ready to ship until late April 2006. See Holladay deposition at page 34.

At this point in discovery, neither detailed production records nor comprehensive geological assessment and testing data are available for my review of Alexander's lost profits calculation. In my opinion, both of these foundational records are necessary for a proper calculation of lost profits, particularly for a start-up business with no significant production and sales history such as JMI. Further, the lost profits calculation assumes volume requirements in excess of the minimum requirement called for in the Supply Agreement, assumes production and sales levels JMI has historically not attained during its period of existence, fails to consider all incremental costs associated with production operations, and fails to discount the future lost profits to present value. Lastly, the incidental cost calculation is duplicative of lost profits and no consideration is given for mitigation.

## CONTINUING NATURE OF WORK

It is my understanding that discovery is ongoing. Further, as of the date of my report, financial records and production records related to the operation of JMI have not been produced by the Plaintiff. Therefore, I reserve the right to modify and supplement this report pending such additional discovery.

Dave G. Borden, CPA/ABV

September 25, 2007
Date

EXHIBIT 1

### Dave G. Borden, C.P.A., A.B.V.

Dave G. Borden is chairman of the Board of Aldridge, Borden & Company, P.C., in Montgomery, Alabama. He graduated from the University of Alabama in 1972 with a B.S. degree in Accounting.

He has previously served as an officer and member of the Alabama State Board of Public Accountancy, the Advisory Board for the University of Alabama School of Accountancy, and past president of the Montgomery Chapter of CPA's. He currently is a member of the Alabama Society of CPA's Political Action Committee Board of Directors. In 2002, Dave was awarded the Lifetime Achievement Award for services to the Alabama Society of Certified Public Accountants.

Dave has been a frequent instructor for the Alabama Society of CPA's and other state societies dealing with numerous tax related matters. His area of expertise is the merger and acquisitions consulting services area with a focus on the purchase, sale, reorganization, liquidation, and valuation of the corporate business. He also practices in the litigation consulting area and strategic planning area for business enterprises. Dave is a Certified Public Accountant and, in addition, holds the Accredited in Business Valuation (ABV) Certification.

He is past president of the Central Alabama Community Foundation, Leadership Montgomery, Montgomery Area United Way, St. Margaret's Hospital, and past Chairman of the Montgomery County Board of Education. He has been active in many civic endeavors in Montgomery and has been recognized by the following organizations for his efforts: Montgomery YMCA as the City of Montgomery's 1997 Man of the Year, the Montgomery Area United Way as its Alexis de Tocqueville Society Award recipient for volunteerism to the Montgomery in 1998, the Montgomery Advertiser as its Citizen of the Year in 2005, and Leadership Montgomery as its Leader of the Year in 2006.

**EXHIBIT 1**

Currently Dave serves the local Montgomery and State of Alabama community in the following capacities:

A+ Education Foundation Board of Directors and Executive Committee

Member Board of Control for Chamber of Commerce Committee of 100

President, Montgomery Education Foundation

Greil Memorial Foundation Board of Directors, Treasurer

Envision Montgomery 2020 Board of Directors

Member Alabama Committee for Accountability and Accelerated Student Learning

Member of Alabama Nature Conservancy Board of Directors

EXHIBIT 2

Dave G. Borden, C.P.A., A.B.V.
September 25, 2007
Testimony Last 4 Years

| Plaintiff(s) | Defendant(s) | Law Firm | Attorney |
|---|---|---|---|
| Stewart Lubricants & Service. Co. & SLS West Inc. | Castrol Industrial North America, Inc. | Lightfoot Franklin & White | John Johnson |
| Charoen Pokphand USA, Inc. | David Hicks And Associates, Inc. | Balch Bingham | Joe McCorkle |
| Pamela Ashworth et al | Compass Bank et al | Lightfoot Franklin | Sam Franklin |
| Chatham Oil Company, Inc.; Bill G. Trull; Harry L. Vice And SouthLamar 1-Stop, Inc. | Hunt Refining Company, Inc. Tri-Co Oil Company, Inc. Benjamin Fair & Emmette Langdon | Bradley Arant | Richard Monk |
| Key Machinery Co., Inc. | Case Corporation, et al | Lightfoot Franklin | Lee Hollis |
| Whitfield Foods, Inc. | Fogg Filler Company; White Cap, Inc.; KHS, Inc.; HK Systems, Inc., Billy Weldon, et al | McDermott, Will & Emery Clark & Scott, P.C. | Robert S. O'Meara James C. Ayers, Jr. |
| Phoenix Energy Corporation | Alabama Gas Corporation | Benton & Centeno | Doug Centeno |
| John G. Hudson, et al | The Golf Channel, et al | Baxley, Dillard, Dauphin | David McKnight |
| GTT, Inc. and Esfeller Construction Co., Inc. | Kiefel Technologies | Devine Millimet | Alex Walker |
| United States of America | McWane, Inc., et al | Maynard Cooper | Fournier J. Gale |
| Vulcan Lands, Inc | State of Alabama, et al | Slate Kennedy | Susan Kennedy |

1

# EXHIBIT 2

| Plaintiff(s) | Defendant(s) | Law Firm | Attorney |
|---|---|---|---|
| State of Alabama, Department Of Conservation and Natural Resources, M. Barnett Lawley, et al., | Exxon Corporation | Lightfoot Franklin | Chris King |
| Madison Oslin, Inc | International Paper | Cabaniss, Johnston, Gardner, Dumas & O'Neal | Sandy Robinson |
| Lyncor Limited | John Newcomb | Wright, Lindsey & Jennings | Claire Hancock |
| Sebastian Jones and Vanessa Lewis | Mutual Savings Life Insurance Company, Roy Williams, et al | Hill, Hill, Carter | Robert Bradford |
| The Geneva County Healthcare Authority | Quorum Health Resources, Inc., et al | Beasley Allen | Scarlotte Tuley |
| Serra Chevrolet, Inc. | General Motors Corporation | Lightfoot Franklin | Terry McCarthy |
| Ray Dunlap | J.K. Harris & Company, et al. | Hill, Hill, Carter | John Bradwell |
| McCord Properties, Ltd, et al | Orkin Exterminating Co, Inc, et al | Lightfoot Franklin | Mike Bell |
| Kelmor, LLC, et al. | Alabama Dynamics, Inc., et al. | Maynard Cooper | Tom Thaggard Lee Huffaker |
| Marketron International, Inc. | OneDomain, Inc., et al. | Lightfoot Franklin | Robin Hinkle |
| Aeropower, Ltd. And Kama International | Steve Matherly; SM& T Aircraft, Inc et al | Bradley Arant | Charles A. Stewart |
| Cook Publishing | CVS | Lightfoot Franklin | Mac Moore |

**EXHIBIT 2**

Lee L. Saad Construction Company, Inc.

International Service Group Inc.
2WR/Holmes Wilkins Architects, et al.          Rushton Stakely          Dennis Bailey

Dean Chitwood          David J. Adair, et al.          Lightfoot Franklin          Sam Franklin

Israel Berger, et al.          Vesta Insurance Group, et al.          Baxley, Dillard, Dauphin          Chuck Dauphin
                                                                    McKnight & Barclift

3

EXHIBIT 3

DOCUMENTS RELIED UPON

Complaint
Supply Agreement
Depositions and related Exhibits of
        Ben Johnston
        Pep Johnston
        Clatus Junkin
        Gary Yelvington
        Philip Holladay
        Mark Klebe
First Research Industry Profile Report for Cement, Concrete and Construction Material
Quarryology 101 – www.pitandquarry.com
The Federal Reserve Board's Beige Book Summaries for the Atlanta District for the
months of
        October 2005
        November 2005
        March 2006
        June 2006
Annual Reports of Vulcan Materials, Inc and Martin Marietta, Inc for 2005 and 2006
2004 Federal Income Tax return for JMI
Expert Report of J. Lester Alexander, III

JMI
Analysis of Product Sales

EXHIBIT 4

| Buyer | Date | | Price | #67 Gravel Units | Total | #4 Oversized Gravel Price | Units | Total | Sand Price | Units | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|
| CYDI | 5/11/2006 | (1) | 5.51 | 5,953.04 | 32,801.25 | | | | | | |
| CYDI | 6/27/2006 | (1) | 5.51 | 2,721.13 | 14,993.43 | | | | | | |
| CYDI | 8/8/2006 | (1) | 5.51 | 5,964.91 | 32,864.65 | 8.50 | 3,329.86 | 28,303.78 | | | |
| CYDI | 8/21/2006 | (1) | 5.51 | 6,158.44 | 33,933.00 | | | | | | |
| CYDI | 9/7/2006 | (1) | 5.51 | 5,199.66 | 28,650.13 | | | | | | |
| CYDI | 9/25/2006 | (1) | 5.51 | 6,031.39 | 33,232.96 | | | | | | |
| Total CYDI | | | | 32,028.57 | 176,475.42 | | 3,329.86 | 28,303.78 | | - | - |
| Unidentified | March 2006 | (2) | | 135.00 | | | | | | | |
| Unidentified | June 2006 | (2) | | 520.46 | | | | | | | |
| Unidentified | July 2006 | (2) | | 189.13 | | | | | | | |
| Unidentified | August 2006 | (2) | | 221.01 | | | | | | | |
| Unidentified | Unknown | (3) | | 6,934.46 | | | 3,399.49 | | | 22,505.63 | |
| Total JMI Sales | | (4) | | 40,028.63 | | | 6,729.35 | | | 22,505.63 | |

(1) Sales obtained from JMI invoices to CYDI per DX 3 - DX8 to Yelvington deposition.
(2) Sales identified by Alexander in Appendix 4 which were not sold to CYDI.
(3) Based on total sales per Alexander's Apprendix 3 less specific sales to CYDI and less specific sales identified in Alexander Appendix 4.
(4) Totals agree to Alexander's Appendix 3.