## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA

| | | |
|---|---|---|
| **JOHNCO MATERIALS, INC.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **Civil Action No.** |
| **vs.** | ) | **2:06cv993-ID** |
| | ) | |
| **CONRAD YELVINGTON** | ) | |
| **DISTRIBUTORS, INC.,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## BRIEF IN SUPPORT OF PLAINTIFF'S MOTION UNDER FED.R.EVID. 702 TO EXCLUDE EXPERT OPINION TESTIMONY OF MARK KLEBE, DAVID BORDEN AND EUGENE HARTLEY

Comes now Johnco Materials, Inc. ("Johnco"), the plaintiff in the above-styled cause, and respectfully submits the following Brief in support of its Motion Under FED.R.EVID. 702 to Exclude Expert Opinion Testimony of Mark Klebe, David Borden and Eugene Hartley as methodologically unreliable.

<u>**FACTS**</u>

Conrad Yelvington Distributors, Inc. ("CYDI") is a distributor of construction materials, including crushed stone, aggregate, sand, and gravel. Deposition of Gary Yelvington, p. 8, ll.17-21.[1]

In 2003, CYDI negotiated with Johnco Materials, Inc. ("Johnco") for construction and operation of a mining facility to supply CYDI with No. 67 gravel, a classification of gravel 3/4" to 3/8" in size. Deposition of Gary Yelvington, p. 39, ll.13-20; *see* Pretrial Stipulation No. 9.

Mark Klebe is the Chief Financial Officer of CYDI. Deposition of Mark Klebe, July 5, 2007, p. 6, l.22. Klebe negotiated with P. M. "Pep" Johnston of Johnco on the terms of what became the Supply Agreement. Deposition of Mark Klebe, July 5, 2007, p. 8, ll.1-15.[2]

---

[1]*See* Exhibit 1.

[2]*See* Exhibit 2.

On April 28, 2004, CYDI and Johnco executed the Supply Agreement, under terms of which CYDI would purchase No. 67 gravel from Johnco. *See* Pretrial Stipulation No. 7. The Supply Agreement required CYDI to take a minimum of 150,000 tons of No. 67 gravel per year . Deposition of Gary Yelvington, p. 46, ll.16-25 to p. 47, ll.1-6:

> After Seller commences mining and grading of sand and gravel, Seller shall sell and deliver to Buyer, No. 67 concrete gravel in minimum quantities of 150,000 tons annually for a price equal to Five and Twenty-Five One Hundredths Dollars ($5.25) per ton, F.O.B. Buyer's rail cars loaded on the rail siding on the Plant Site, on a weekly schedule (i.e., approximately 5,200 tons per week).... The price per ton established herein for the Product shall remain fixed at $5.25 per ton for gravel for the first twenty-four months (i.e., 2 years) of this Agreement. The price will increase by five percent (5%) at the beginning of year three, and two and one-half percent (2.5%) at the beginning of years four and five.

Supply Agreement, p. 2, §3.1.

Johnco constructed both a sand and gravel mining facility at Whitehall, a short distance west of Montgomery, and a loop railroad track

3

at the facility in accordance with the Supply Agreement.  Deposition of P. M. Johnston, p. 45, ll.1 to p. 48, ll.23].[3]

Johnco commenced mining at Whitehall, beginning to produce by fall 2005 and becoming fully operational by February 2006.  Deposition of Ben Johnston,  p. 47, ll.21-23; p. 48, ll.6-8.[4]  By February 6, 2006, Johnco submitted samples to CYDI.  *See* Pretrial Stipulation No. 13; Deposition of Gary Yelvington, p. 70, ll.20-25 to p. 71, ll.22-25.

The mining of No. 67 gravel necessitates joint-product in the nature of sand and oversize gravel.  *See* Pretrial Stipulation No. 16.   Oversize gravel is approximately one to three inches in diameter.  *See* Pretrial Stipulation No. 22.  The production at Whitehall averages a mix that is 45 percent gravel, 55 percent sand; the gravel mix is 80 percent No. 67 gravel and 20 percent oversize gravel.  *See* Pretrial Stipulation Nos. 17 and 18.

------

[3]*See* Exhibit 3.

[4]*See* Exhibit 4.

Johnco and CYDI looked at avenues for distribution of Johnco's sand production, including Jacksonville and Atlanta. *See* Pretrial Stipulation Nos. 19 and 20; Deposition of Gary Yelvington, p. 52, ll.8-9, 18-19; p. 147, ll.4-12]. CYDI also discussed purchasing the sand from Johnco. *See* Pretrial Stipulation No. 21; Deposition of P. M. Johnston, p. 60, ll.9-12; p. 116, ll.3-6; p. 144, ll.12-20; deposition of Gary Yelvington, p. 53, ll.12-13.

Ben Johnston testified that Johnco's business plan was to sell the sand. Deposition of Ben Johnston, p. 41, l.14; p. 118, ll.16-19; Deposition of P. M. Johnston, p. 98, l.22 to p. 99, l.2; Deposition of Clatus Junkin, July 2007, p. 65, l.6-9.[5] Pep and Ben Johnston testified there were several possibilities for sale of the sand, although no formal market existed at that time. Deposition of P. M. Johnston, p. 26, ll.17-21; p. 27, ll.3-5; p. 27, ll.10-23; p. 59, ll.8-18; p. 60, ll.1-8; Deposition of Ben Johnston, p. 40, ll.1-3.

---

[5]*See* Exhibit 5.

Johnco sold some of its oversize gravel. Deposition of P. M. Johnston, p. 101, ll.11-23; Deposition of Ben Johnston, p. 42, l.16. Johnco also explored marketing possibilities for the oversize gravel. Deposition of P. M. Johnston, p. 52, ll.5-17; p. 57, ll.11-16; p. 58, ll.8-23. CYDI purchased a trainload of No. 4 or oversize gravel from Johnco apart from the Supply Agreement. Deposition of Gary Yelvington, p. 38, ll.5-7.

Johnco brought action on November 1, 2006, alleging CYDI breached the Supply Agreement by failing to take delivery of No. 67 gravel on a weekly schedule of approximately 5,200 tons per week [Doc. 1]. Although Johnco was ready for CYDI to take delivery of gravel in March 2006, CYDI did not order its first train load of gravel until May 11, 2006. Deposition of Gary Yelvington, p. 65, ll.7-12; Deposition of Pep Johnston, p. 50, ll.14-17; p. 102, ll.2-8; p. 87, ll.10-15; Deposition of Clatus Junkin, p. 121, l.23 to p. 122, l.5. Including the initial load on May 11, 2006, *see* Pretrial Stipulation No. 23, CYDI ordered only five-and-a half trainloads of No. 67 gravel, amounting to a total of only 32,000 tons

of gravel, in the first nine months of Johnco's production. Deposition of Gary Yelvington, p. 81, ll.22-25; p. 98, ll.1-4; p. 99, ll. 1-8; p. 130, l.25 to p.131, ll.1-8; p. 99, ll.15-24 to p. 100, ll. 1-5; p. 100, ll.6-16; p. 100, ll. 23-25 to p. 101, ll.1-16; p. 124, ll.16-23.

Prior to this Court's ruling in its Memorandum Opinion and Order on partial summary judgment on February 28, 2008, Johnco sought recovery of loss of profits from future sales of sand and oversize gravel as consequential damages under the contract. Johnco introduced expert opinion testimony from its CPA economist, J. Lester Alexander. Alexander testified that Johnco's loss of profit from sale of No. 67 gravel, together with sand and oversize gravel – joint products which are salable and produced as a necessary incident of mining and classification of the No. 67 gravel – would cost Johnco lost profits in the amount of $4,473,873 [Doc. 33-5, p. 12].

CYDI similarly presented expert testimony of its own CPA, David

Borden.  Borden expressed opinion as to the measure of Johnco's lost profits damages.  His calculations included annualized sales projections and revenues generated thereby, including the joint products of oversize gravel and sand.  Borden stated that, based on sales assumptions of 150,000 tons of No. 67 gravel together with projected annual sales of 4,486 tons of oversized gravel and projected annual sales of 15,004 tons of sand, he projected revenues for Johnco and an Estimated Annual Net Income Loss of $294,801, and of $3,084 using Les Alexander's incremental costs.[6]

CYDI also disclosed as an expert witness Eugene Hartley, an economic exploration geologist.  Hartley testified at his deposition that in his opinion the operations at Johnco's sand and gravel mining facility were not economically viable.

CYDI has counterclaimed in this case [Doc. 9-1].  CYDI alleges Johnco breached the Supply Agreement by failing to provide the minimum

---

[6]*See* Borden 0350, attached as Exhibit 6.

amount of No. 67 gravel required by the Supply Agreement. Without

identifying him as an expert, CYDI offered as its only corporate

representative witness on the matter its chief financial officer Mark Klebe

to testify to the damages it alleges under its counterclaim. Klebe estimated

that CYDI would suffer damages of $3,619,616.20 for loss of sales of

Johnco's No. 67 gravel for three of its 30-plus terminals for the contract

year 2006-07, and extending through contract years 2007-08, 2008-09,

2009-10, and 2010-11. Klebe's testimony establishes that these purported

damages from only three of its terminals are premised, not on contracts or

orders presently in existence, but solely on Klebe's estimation of projected

future sales and projected future prices from only three of its terminals, and

based on hearsay statements by customers in CYDI's Florida panhandle

market to others at CYDI.

On February 28, 2008, this Court entered a Memorandum Opinion

and Order [Doc. 78], granting CYDI's motion for partial summary

judgment in part and mooting it in part. The Court held that the parties

could not look to the sales of oversize gravel and sand, being "collateral

engagements not brought to the notice of the contracting parties" [Doc. 78,

p. 12], in engaging in a lost profit analysis:

> Each case must be judged on its facts. In this case, the evidence establishes that Johnco failed in virtually all of its attempts to obtain a buyer for the byproducts at issue during the relevant time period. This evidence – coupled with the complete absence of evidence from Johnco's expert or from another source that there would have been a ready, willing and able buyer or a market demand for the claimed quantities of oversize gravel and sand – leads the court to conclude as a matter of law that there is no basis on which Johnco's consequential damages can be proven to a reasonable certainty. Additionally, the court finds that there is a complete absence of evidence from which it can be inferred that the parties contemplated at the time the Supply Agreement was entered into that Johnco would have lost substantial profits from sales of oversize gravel and sand in the event of a breach or that CYDI would be liable for those alleged lost sales. *The court further finds that these alleged lost sales of the byproducts to third parties constitute activities that are independent of and collateral to the Supply Agreement.* In sum, the court finds that Johnco relies wholly on speculation and conjecture in requesting consequential, loss-of-profit damages for alleged lost future sales of the byproducts. Summary judgment, therefore, is appropriate because the record taken as a whole *could not lead a rational trier of fact to award consequential, loss-of-profits damages to Johnco for alleged profits from lost sales of oversize gravel and sand byproducts. See* <u>Matsushita Elec. Indus. Co.</u>, 475

U.S. at 586.

[Doc. 78, pp. 23-24 (footnote omitted)] (emphasis added).

In the wake of the Court's February 28, 2008 Memorandum Opinion and Order, Les Alexander filed a Supplemental Report [Doc. 79-2] on February 29, 2008, within the time allowed for supplementation by the Federal Rules of Civil Procedure. Alexander excluded, per the holding in the order, any consideration of lost profits from the sale of oversize gravel and sand, and re-calculated Johnco's lost profits to be $4,110,179[7] or $2,322,122,[8] determined in accordance with the Memorandum Opinion and Order.

Counsel for Johnco provided Alexander's Supplemental Report to counsel for CYDI on February 29, 2008, four days before the deadline for

_____

[7]Assuming sales of No. 67 gravel to CYDI in quantities of 5,200 tons per week [Doc. 79-2, p. 2]

[8]Assuming sales of No. 67 to CYDI in quantities of 150,000 tons per year [Doc. 79-2, p. 2].

supplementation of expert reports under the Federal Rules of Civil Procedure. Borden did not file a similar supplementation in the wake of the Memorandum Opinion and Order.

Johnco moves to exclude the damages opinion testimony of Klebe and Borden, and the opinion testimony of Eugene Hartley.

**ARGUMENT**

## I.    INTRODUCTION

The United States Supreme Court requires federal trial judges to act as gatekeepers and exclude unreliable expert testimony. *See* Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579, 125 L.Ed. 2d 469, 113 S. Ct. 2786 (1993). Jurors place greater weight on the testimony of an expert witness, because their testimony is based upon a specialized knowledge which is typically foreign to the jury. Because the jury lacks this

specialized knowledge, jurors are susceptible to placing considerable authority in unreliable witnesses. The arduous task of determining what is and what is not reliable must therefore be carried out by the trial judge.

The trial judge's duty to act as a gatekeeper is usually a difficult one. Oftentimes, litigation will precede scientific research, causing the proffered expert testimony to be novel and thus controversial. The trial judge is then faced with the daunting task of determining whether the proffered testimony is reliable. Fortunately for this Court, a determination of the reliability of the opinion testimony of Klebe, Borden and Hartley is not a difficult task. The law stated by this Court and, in the case of Klebe and Hartley, their own words conclusively demonstrate that their testimony is not methodologically reliable.

II.    **THE FEDERAL RULES OF EVIDENCE AND SUPREME COURT PRECEDENCE REQUIRE THIS COURT TO EXCLUDE EXPERT TESTIMONY THAT IS UNRELIABLE.**

In 1993, the United States Supreme Court addressed for the first time

13

the admissibility of expert testimony.  Daubert v. Merrell Dow Pharms., Inc., 509 U.S.  579, 125 L.Ed. 2d 469, 113 S. Ct. 2786 (1993).    The Supreme Court held the Federal Rules of Evidence require the trial judge exclude any unreliable expert testimony.  509 U.S. at 589; FED.R.EVID. 702.   The Supreme Court charges all trial judges with the duty of determining whether the proffered testimony is sufficiently "ground[ed] in the methods and procedures of science" to be reliable.  Id. at 590.

To help facilitate the trial judge's reliability determination, Daubert established a non-exhaustive list of four factors for reviewing admissibility of expert testimony:  (1) whether the theory or technique "can be (and has been) tested"; (2) "the known or potential rate of error," (3) "whether the theory or technique has been subject to peer review and publication"; and (4) whether the scientific theory or technique has gained "general acceptance" in the relevant scientific community. 509 U.S. at 593-94.  In addition, this "inquiry must be 'tied to the facts' of a particular 'case.' " Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137, 150, 143 L.Ed.2d 238,

119 S. Ct. 1167, 1175 (1999), citing Daubert, 509 U.S. at 591.

Since Daubert, the Supreme Court has emphasized that the trial court's gatekeeping duty is non-delegable: "Of course, neither the difficulty of the task nor any comparative lack of expertise can excuse the judge from exercising the 'gatekeeper' duties that the Federal Rules impose...." General Electric Co. v. Joiner, 522 U.S. 136, 148, 139 L.Ed.2d 508, 118 S. Ct. 512, 520 (1997). The trial court has no "discretion to abandon the gatekeeping function... [or] to perform the function inadequately." Kumho Tire, 526 U.S. at 158-59. More recently, the Eleventh Circuit has stated that "[r]ulings on admissibility under Daubert inherently require the trial court to conduct an *exacting* analysis of the proffered expert's methodology." McCorvey v. Baxter Healthcare Corp., 298 F.3d 1253, 1257 (11th Cir. 2002) (emphasis added).

The Supreme Court has affirmed that the trial court's gatekeeping duty "applies not only to testimony based on 'scientific' knowledge, but

15

also to testimony based on 'technical' and 'other specialized' knowledge."

Kumho Tire, 526 U.S. at 141.  The Court there stated:

> The objective of that requirement is to ensure the reliability
> and relevancy of expert testimony. It is to make certain that an
> expert, whether basing testimony upon professional studies or
> personal experience, employs in the courtroom the same level
> of intellectual rigor that characterizes the practice of an expert
> in the relevant field.

526 U.S. at 152.  There is no question that this same rigorous standard
applies to the testimony of Borden and Hartley, and to the extent his
testimony consists of opinion, to Klebe as well.

**III.    THE TESTIMONY OF MARK KLEBE IS UNRELIABLE
BECAUSE IT NOT BASED ON CONTRACTS OR ORDERS
IN EXISTENCE, BUT SOLELY UPON INADMISSIBLE
HEARSAY.**

CYDI chief financial officer Mark Klebe testified factually to the
negotiation of the Supply Agreement, and to the negotiations between
Johnco and CYDI in late 2006.  Johnco does not object to Klebe's factual

testimony.

Without being tendered as an expert witness,[9] however, Klebe was also proffered as CYDI's Rule 30(b)(6) representative to testify as to CYDI's purported damages under its counterclaim. In connection with that deposition, Klebe offered opinion testimony that was unreliable and unsubstantiated.

While Klebe may or may not be able to testify as a fact witness as to the course of negotiations as to the Supply Agreement, he should be precluded from offering expert opinion as to CYDI's counterclaim damages because the methodology underlying Klebe's opinion evidence

---

[9]Q.    [BY JOHNCO ATTORNEY GREG PEARSON] All right. Are you going to be giving any testimony today as an expert witness?
MR. LEEK: Object to the form. I don't know that he'd know that. *He hasn't been designated as an expert.*

*See* Exhibit 7, Mark Klebe deposition, December 20, 2007, p. 10, ll. 20-23 (emphasis added).

is not reliable within the meaning of  Daubert.

The centerpiece of Klebe's opinion on CYDI's damages is Plaintiff's Exhibit 2[10] to his December 20, 2007 deposition, which "is a summary of a calculation we prepared on our damages number for this case." Deposition of Mark Klebe, Dec. 20, 2007, p. 12, ll.2-4.  Exhibit 2 reveals a damages projection to CYDI of $3,619,616.20.

Klebe made the following assumptions for  Exhibit 2:

1.     A contract of five years' duration, beginning with 2006-07.[11]
2.     An annual commitment of 150,000 tons.[12]
3.     Actual sale by Johnco of 32,000 tons of No. 67 gravel by Johnco to CYDI for 2006-07,[13] with a shortfall of 118,000 for that year of the contract.[14]

---

[10]See Exhibit 8.

[11]Deposition of Mark Klebe, Dec. 20, 2007, p. 18, l. 6.

[12]Deposition of Mark Klebe, Dec. 20, 2007, p. 21, ll.13-17.

[13]Deposition of Mark Klebe, Dec. 20, 2007, p. 21, ll. 17-18.

[14]Deposition of Mark Klebe, Dec. 20, 2007, p. 21, ll. 19-20.

18

4.    Shortfalls of 150,000 for each trailing year of the contract.[15]

5.    $5.51 cost of purchasing the No. 67 from Johnco ("material component").

6.    "Freight component" (i.e., cost of transportation) of $6.11, $6.11 and $7.25 to CYDI's terminals in Milton, Pensacola and Gautier, respectively.[16]

7.    Sales price of $18.00, $16.50 and $18.00 to potential future customers from CYDI's terminals in Milton, Pensacola and Gautier, respectively.

Klebe testified that the sales prices less the material component less the freight component resulted in a "margin of contribution" of $6.38, $4.88, and $5.24 respectively for the three terminals, which he averaged into a "weighted average margin of contribution per ton" of $5.68 per ton.[17]

Klebe's opinion is inadmissible under <u>Daubert</u> because there is no reliable basis for the sales price projected by Klebe in part.

First, Klebe admits that his projected sales price is not based on

[15]Deposition of Mark Klebe, Dec. 20, 2007, p. 18, ll. 3-6.

[16]Deposition of Mark Klebe, Dec. 20, 2007, pp. 61, ll.8-11.

[17]Deposition of Mark Klebe, Dec. 20, 2007, p. 19, ll.12-20.

existing contracts, or future anticipated contracts:

31

[TESTIMONY BY MARK KLEBE]

5    Q.   Okay. All right. Are there
6  any contracts in place with any customers to
7  sell a specific amount of No. 67 gravel that
8  Yelvington would supply to these customers?
9  Do you have any contracts in place with any
10  customers to sell that gravel?
11    A.   No.
12    Q.   And my question, I probably
13  need to expand it. In 2006-2007, first
14  year, which you call the fiscal year from
15  May the 11th to May the 10th of next year,
16  did you have any contracts in place with
17  customers to sell No. 67 gravel?
18    A.   Any active contracts with
19  customers?
20    Q.   Yes.
21    A.   No.
22    Q.   Would that be true for
23  2007-2008, which is the year we're in now?

32

[TESTIMONY BY MARK KLEBE]

1    A.   To my knowledge, there are no
2  active contracts with customers to sell them
3  gravel.
4    Q.   All right. Do you have active
5  contracts with customers in the next three
6  future years which you project?
7    A.   No.

20

Deposition of Mark Klebe, Dec. 20, 2007, pp. 31-32.  Klebe admits that

any future sales is marketing projection opinion only.  Deposition of Mark

Klebe, Dec. 20, 2007, p. 56, ll.12-15.  Klebe himself demonstrates no

knowledge or experience or direct involvement in marketing the gravel,

and in fact disclaims any personal knowledge of the market or customers

as will be seen by the cited deposition excerpts referenced *infra.*

Second, Klebe's sole basis for the sales price that is the linchpin of

his damages calculation consists of Klebe's assumption – not knowledge

– that Gary Yelvington and Phillip Holladay of CYDI spoke with potential

customers in the markets serviced by the three terminals, and that they

accurately relayed that information.  Klebe admits he spoke with no one

other than Yelvington and Holladay:

                                              29
                      [TESTIMONY BY MARK KLEBE]
                      1      Q.    And let me interrupt you.  You
                      2   say we, and when you say we, who are you
                      3   referring to?  I mean, are you talking about
                      4   Yelvington, the company, and the people that
                      5   work there that would be involved in the

6   sales of these things?  Who is we?

7        A.    We have a number of people

8   within Yelvington.  *It was kind of a*

9   *collective thought.*  It *would be* through

10  some who you have previously talked to,

11  Philip Holladay who knows the market out

12  here; *it could be* through discussions with

13  Gary Yelvington, who you've previously

14  talked to, all who have knowledge of the

15  market.

16       Q.    Did you talk to these people

17  to come up with these numbers?

18       A.    Yes.

19       Q.    Who else did you talk to?

20       A.    In terms of the sales volume?

21       Q.    Correct.

22       A.    No one.

* * * *

30

[TESTIMONY BY MARK KLEBE]

15       Q.    And is it your understanding

16  that those people got their information

17  about the market and what would be available

18  for the purposes of Yelvington selling No.

19  67 gravel, they got their knowledge from

20  talking to potential customers?

21       A.    *That's a question you'd have*

22  *to ask them.*

23       Q.    Okay, but you're the one

31

1   that's been put up here to tell me.  So do

22

2   you assume that that's how they got their
3   information?
4       A.   *I would assume so.*

Deposition of Mark Klebe, Dec. 20, 2007, pp. 29-31 (emphasis added).

Further: "The sales price, again, is based on conversations with the aforementioned individuals."  Deposition of Mark Klebe, Dec. 20, 2007, p. 50, ll.20-22.    Klebe admits that he's *"not out there myself in the market,"* and that he *"would assume"* that Gary Yelvington and Phillip Holladay got their sales price information from talking to potential customers.  Deposition of Mark Klebe, Dec. 20, 2007, p. 81, ll.22 to p. 82, l.14 (emphasis added).

Klebe admitted that he had no idea how Phillip Holladay derived his figures for sales prices in the three markets, and had not bothered to check:

56
[TESTIMONY BY MARK KLEBE]
16      Q.   The next -- The sales price
17   number of eighteen dollars for Milton, how
18   did you -- how did you come to conclude that
19   eighteen dollars was going to be your sales

23

20  price for the No. 67 out of Milton?
21      A.    From my calculations that
22  number was provided to me in consultation
23  with Phillip Holladay.

57

1      Q.    Okay.  And do you know how
2  Phillip came up with it?
3      A.    I believe Phillip looked at
4  what the current demand and market numbers
5  would be in that area.
6      Q.    And do you know how he did
7  that?
8      A.    No.
9      Q.    Did you ask him?
10      A.    Actually, no.
11      Q.    *You just assumed that his*
12  *number was correct?*
13      A.    *Yes.*
14      Q.    Okay.  And does that hold true
15  for the sixteen dollar and fifty cent number
16  per ton that you project for Pensacola?
17      A.    Yes.
18      Q.    And the same for Gautier,
19  Mississippi, another eighteen dollar number?
20      A.    Correct.

Deposition of Mark Klebe, Dec. 20, 2007, pp. 56-57.  In other words, the

entire basis of Klebe's opinion consists of unsubstantiated and assumed

conversations that at best involve double hearsay.

24

Third, there is no evidence that a market for the No. 67 gravel exists or will exist for the amount of gravel proposed estimated by Klebe:  "I think we retained a right to buy it from Johnco *if we felt that that market could actually come to fruition*."  Deposition of Mark Klebe, Dec. 20, 2007, p. 26, ll.10-11 (emphasis added).

Fourth, Klebe is unable to state with specificity when the shortfall for 2006-07 would have begun:

40

[TESTIMONY BY MARK KLEBE]
```
 5          In that first year 2006-2007,
 6   what is Yelvington's position as to when the
 7   shortfall of a hundred and eighteen thousand
 8   tons, which is what you've put on here of
 9   your estimate, when did that begin to occur?
10          MR. LEEK:  Same objection.
11   You can answer.
12      A.    From my calculations
13   standpoint of going into there, it occurred
14   when Johnco ceased producing material.
15      Q.    Okay.  And do you know when
16   that was?
17      A.    Actually, no.  I don't recall.
```

Deposition of Mark Klebe, Dec. 20, 2007, p. 40, ll. 5-17.

Fifth, there is no reliable testimony as to the rationale of the choice

of the three terminals at Milton, Pensacola and Gautier, over other CYDI

terminals.   Klebe testified:

54

[TESTIMONY BY MARK KLEBE]
1   And so the three locations we
2   chose were Milton, Pensacola, and Gautier
3   because that's really, as any business
4   would, you're going to move any material you
5   have to the spot where you're going to get
6   the most advantage from it.  And looking at
7   what was available there as a customer in
8   that market place, it was determined *that we*
9   *felt* that we *could* have a steady supply of
10   material, we *could* move seventy thousand
11   tons.

Deposition of Mark Klebe, p. 54, ll. 1-11 (emphasis added).

Klebe could not give the name of a customer in any of the markets,

other than a customer he believed to be named "WPR":  "I'm not sure of

the exact customer's name. I believe it's WPR, that's the only way I know

it by. But I would have to actually consult with Kelvington and Holladay

to get a better understanding of the customer base." Deposition of Mark

Klebe, Dec. 20, 2007, p. 54, ll. 17-21. He admitted CYDI had no contract

for sale of gravel to "WPR" or anyone else in those markets. Deposition

of Mark Klebe, Dec. 20, 2007, p. 54, l.22 to p. 55, l.12.

Klebe testified he chose the terminal at Milton "because it is

currently operating a facility in 2007." Deposition of Mark Klebe, Dec. 20,

2007, pp. 51, ll. 8-10. But Klebe projects that Milton, which opened only

in November 2007 after Johnco ceased production, could have taken and

presumably sold to as yet unknown potential customers 70,000 tons of No.

67 alone before the end of the 2006-07 contract period. *See* Plaintiff's

Exhibit 2 to the Deposition of Mark Klebe, Dec. 20, 2007.

Sixth, Klebe's projection assumes sale of *all* of the No. 67 gravel

bought from Johnco. But Klebe admitted that as of the date of his

27

deposition – December 20, 2007 – CYDI still had some of the 32,000 tons of Johnco No. 67 gravel in inventory, almost 15 months after the last gravel train CYDI sent to Whitehall was loaded and picked up. Deposition of Mark Klebe, Dec. 20, 2007, p. 64, l.13 to p. 65, l.8. He admitted he did not consider in giving his opinion whether CYDI had sold all of the Johnco No. 67 gravel it acquired. Deposition of Mark Klebe, Dec. 20, 2007, p. 106, ll.1-6.

Seventh, Klebe's unsubstantiated sales price projection is at variance with CYDI's *actual sales price* of Johnco's No. 67 gravel. Klebe admitted, for instance, that although he projected a sales price of $16.50 per ton for potential customers at the Pensacola terminal, Plaintiff's Exhibit 3 to his deposition — an invoice from CYDI to Pensacola Ready–Mix for sale of Johnco No. 67 gravel — showed an actual paid sales price of $15.00 per ton. Mark Klebe deposition, p. 70, l. 6 to p. 73, l.15.

Klebe admitted that although CYDI has sold No. 67 gravel to

Pensacola Ready Mix and others in the Pensacola market, he did not average the actual sales prices to arrive at his sales price.  Deposition of Mark Klebe, Dec. 20, 2007, p. 73, ll.2-15.  Although CYDI produced all invoices of Johnco No. 67 gravel purchases during litigation, Klebe stated that he didn't think "going back through these individual invoices... really played into going to this":

<blockquote>
79<br>
[TESTIMONY BY MARK KLEBE]<br>
12                        What I<br>
13  thought was a better determination since<br>
14  most of this was forward looking, was to be<br>
15  able to get *some determination* of what we<br>
16  believe these different customers or<br>
17  producers as I'll call them, ready mix<br>
18  producers, would be doing in the future.<br>
19  You know, *we have some sense* -- I say we,<br>
20  it's *my understanding* from talking with Gary<br>
21  and Phillip and all, that certainly they're<br>
22  familiar with the market; they have *some*<br>
23  *sense* of what these customers produce.
</blockquote>

Deposition of Mark Klebe, Dec. 20, 2007, p. 79, ll.12-23 (emphasis added)

Klebe's opinion testimony – the assumptions of which are the sales

29

volumes and price and ability to sell gravel at that price in the three specified markets – is patently unreliable and founded on assumed double hearsay conversations with assumed potential customers, instead of calculations based on existing data on invoices.  Even if Klebe had been disclosed as  as expert witness in this case, his opinion testimony fails the threshold test of reliability under Fed.R.Evid. 702 and must be excluded.

IV.    **THE TESTIMONY OF DAVID BORDEN IS UNRELIABLE BECAUSE ITS METHODOLOGY DOES NOT ACCORD WITH THE APPLICABLE LAW STATED BY THIS COURT.**

CYDI offers expert opinion of the calculation of Johnco's damages through certified public accountant David Borden.  On September 25, 2007, in accordance with this Court's Uniform Scheduling Order, Borden submitted a report as required under FED.R.CIV.P. 26(a)(2)(B) [Doc. 27-2].

At his deposition on December 21, 2007, Borden disclosed a

"Proforma Income Statement,"[18] containing his calculations as to Johnco's

lost profits.    While criticizing Johnco economist Les Alexander for his

projections of future annual sand and oversize gravel sales [*see* Doc. 27-2,

pp. 12-13; Deposition of David Borden, Dec. 21, 2007, pp. 88-89[19]],

Borden himself projected annual future Johnco sales of 4,486 tons of

oversize gravel and 15,004 tons of sand for purposes of his damages

calculation.


At his deposition, Borden stated:


                        74
        [TESTIMONY BY DAVID BORDEN]
        7      A.    What I did, I looked at —
        8   First, I looked at Johnco, and I assumed
        9   that Johnco would have sold a hundred and
       10   fifty thousand tons of gravel at five
       11   dollars and fifty-one cents a ton.  I took
       12   all of the oversized sales that they made
       13   during that eighteen-month period of time
       14   and developed an average amount per month
       15   that they actually sold during that period.

---

[18]*See* Exhibit 6 [Borden 0350]

[19]*See* Exhibit 9.

                    31

> 16  *I did the same thing with sand, and I*
> 17  *recognize there are legal arguments about*
> 18  *whether oversize and sand should be included*
> 19  *in this or not, and I'm not getting into*
> 20  *that.  But I — For sake of what I did, I*
> 21  *included oversized and sand.*

Deposition of David Borden, Dec. 21, 2007, p. 74, ll. 7-21 (emphasis added).

Subsequently, this Court on February 28, 2008 entered a Memorandum Opinion and Order [Doc. 78], holding that Johnco could not include alleged lost sales of oversize gravel and sand in the absence of evidence that these were not collateral engagements with other parties. The Court noted that the lack of evidence of a ready market at the time of the Supply Agreement was entered into precluded Johnco from offering evidence as to projected future sales of oversized gravel and sand, which the Court found to be activities that are  independent of and collateral to the Supply Agreement, and that a "rational trier of fact [could not] award consequential, loss-of-profits damages to Johnco for alleged profits from

lost sales of oversize gravel and sand byproducts." Doc. 78, pp. 23-24 (emphasis added).

On February 29, 2008, Alexander supplemented his Rule 26(a)(2)(B) expert report, removing loss of profit damages calculations from projected future sales of sand and oversized gravel, which activities are independent of and collateral to the Supply Agreement, in order to bring his calculations for damages from the breach of the Supply Agreement in line with the law stated in the Court's Memorandum Opinion and Order [Doc. 79-2].

CYDI's expert witness Borden, however, has failed to supplement his expert opinion within the time required by FED.R.CIV.P. 26(e). The only testimony he can provide at trial is loss of profits including projections of annualized lost sales of oversize gravel and sand by-products. This testimony is contrary to the law applicable to this case as stated by the Court.

Nor has CYDI moved for this Court to reconsider its Memorandum Opinion and Order, which is appropriate if a party feels the Court "has obviously misapprehended a party's position or the facts or applicable law." <u>Schrag v. Dinges</u>, 144 F.R.D. 121, 123 (D. Kan.1992).

While the doctrine of "law of the case" applies  to proceedings following an appellate court's issuance of mandate, the broad principles of law of the doctrine are very much applicable in this instance. Law-of-the-case rules have developed to maintain consistency and avoid reconsideration of matters once decided during the course of a single continuing lawsuit.  *See* <u>U.S. v. Connell</u>, 6 F.3d 27, 30 (1st Cir. 1993) (doctrine affords security of consistency within single case).  As rules that govern within a single action, law of the case regulates judicial affairs before a final judgment is entered.  <u>Hughes Aircraft Co. v. U.S.</u>, 86 F.3d 1566, 1851 (D.C. Cir. 1996) (Nies, J., dissenting), *vacated on other grounds* 520 U.S. 1183, 137 L.Ed.2d 680, 117 S. Ct. 1466 (1997).  Courts will refusal to reconsider a matter once resolved in a continuing

proceeding.  Golden Door Jewelry Creations, Inc. v. Lloyds Underwriters Non-Marine Assn., 117 F.3d 1328, 1336 (11th Cir. 1997).

Here, no "substantially different evidence" has been presented since the entry of the Memorandum Opinion and Order, nor has controlling authority changed.  The only manifest injustice that would be worked would occur if the Court precludes Johnco from testifying as to future projected sales of oversize gravel and sand while permitting CYDI's expert witness from testifying to the same issue, on the same evidence available.

An expert witness' testimony contrary to the established law of the case will be precluded.   See, e.g., Fox v. Mazda Corp. of America, 868 F.2d 1190, 1194 (10th Cir.1989) (affirming district court's exclusion of proffered expert testimony and damages model on ground it was precluded by terms of mandate).

Borden's expert opinion as to calculation of Johnco's damages is

35

based upon an unreliable methodology contrary to the law stated to be applicable in this case, in that it relies upon projected future sales of gravel and sand, collateral to and outside of the Supply Agreement.

## V.    THE TESTIMONY OF EUGENE HARTLEY IS UNRELIABLE BECAUSE THE METHODOLOGY EMPLOYED IS NOT BASED ON TESTING OR ANALYSIS.

Finally, Johnco moves to exclude the expert opinion evidence offered by CYDI economic exploration geologist[20] Eugene Hartley. Hartley's "methodology" is so scant as scarcely to be a methodology at all, much less a reliable one.  Purporting to testify that Johnco's sand and gravel mining operation was not economically viable, Hartley's opinion, is without any analytical underpinnings and in the end the basis is rank speculation and guesswork and comes down to "Because I said so."

---

[20]*See* Exhibit 9, Deposition of Eugene Hartley, Dec. 20, 2007, p. 25, ll.7-9.

Hartley's opinion is simply stated. He testified he does not "believe" the Johnco sand and gravel mining operation would be "successful":

> 99
> [TESTIMONY OF EUGENE HARTLEY]
> 15    Q.    I need you, because you're the
> 16  expert, would you please state for me the
> 17  expert opinions that you intend to give in
> 18  court, in this case.
> 19    A.    I *don't believe* this operation
> 20  was going to be successful.
> 21    Q.    Okay.
> 22    A.    I would not have recommended
> 23  it to a client if I was sent to to buy it,
>
> 100
> 1  for example.
> 2    Q.    I *don't believe* that this
> 3  operation was going to be successful[?]
> 4    A.    Yeah. As it was done.

Deposition of Eugene Hartley, Dec. 20, 2007, pp. 99-100 (emphasis added). But this opinion is utterly unsupported by reliable methodology. If one single exchange from Hartley's deposition encapsulates both the totality of his opinion and its utter lack of reliability, it is this one:

37

125

[TESTIMONY OF EUGENE HARTLEY]

11      Q.     Okay.  Are you going to
12   testify at trial that Johnco is economically
13   not viable?
14      A.     From what I've seen so far, I
15   don't think they could be.  They couldn't
16   sell the sand.
17      Q.     Have you looked at any
18   financial data?
19      A.     No.

Hartley's testimony is rebuttable at every turn.  His opinion is shot through

with hesitation, doubt, ambiguity, and  irresolution.  By Hartley's own

admission it is unsupported by any reference to financial data or

documents, by review of receipts and invoices, by financial analysis, by

examination transportation costs or drilling reports, or by any testing

whatsoever.


     Hartley's complaints about Johnco's operation fall into five broad

categories.  Each opinion is unreliable on its face.

A.    **Alleged Poor Location of Johnco**


First, Hartley testifies that Johnco is in a bad location.  He identified

this as the primary reason he believes Johnco was economically unviable

as an operating concern:


                                        39
               [TESTIMONY OF EUGENE HARTLEY]
               21      Q.    And specifically in regard to
               22   Johnco, do you have an opinion on whether
               23   they're a successful company or not?

                                        40
               1      A.    I have an opinion that they
               2   are not a successful company.
               3      Q.    *Okay.  And that's based on*
               4   *what?*
               5      A.    *Location primarily.*


Deposition of Eugene Hartley, Dec. 20, 2007, p. 39, l.13 to p. 40, l. 5

(emphasis added).


Despite the fact that Johnco is located over what Hartley admitted


                                    39

was a plentiful gravel reserve,[21] (and the fact that The Supply Agreement)

calls for rail transport). Hartley stated Johnco "did not have a truck market

since it's a ways from Montgomery and other metropolitan buyer area."

Deposition of Eugene Hartley, Dec. 20, 2007, p. 27, ll.19-23.  In arriving

at this opinion, Hartley stated that he looked only at Johnco's location on

a map and the location of competitors.  Deposition of Eugene Hartley, Dec.

20, 2007, p. 28, ll.6-15.  He stated that this assessment was "based on my

experience."  Deposition of Eugene Hartley, Dec. 20, 2007, p. 30, ll.1-2.

Hartley noted further that "railwise and truckwise, Johnco probably

---

[21]Deposition of Eugene Hartley, Dec. 20, 2007, p. 116, ll. 5-13:

116
[TESTIMONY OF EUGENE HARTLEY]
5   I don't have a
6   problem with reserves out there in the
7   ground.
8        Q.    Whatever it is, you don't have
9   a problem with the reserves?
10       A.    Right.
11       Q.    There's plenty of gravel out
12   there?
13       A.    Yes.

has a dollar-fifty to two-dollar disadvantage to some producers closer to and on the main rail on the east side of Montgomery." Deposition of Eugene Hartley, Dec. 20, 2007, p. 31, l.17 to p. 32, l. 2. This, again, Hartley said simply was "[b]ased on my experience." Deposition of Eugene Hartley, Dec. 20, 2007, p. 32, l.5. Further:

31
[TESTIMONY OF EUGENE HARTLEY]
2      Q.    And how did you come to the
3   conclusion -- What did you do to come to the
4   conclusion that railwise, Johnco probably
5   had a dollar-fifty to two-dollar
6   disadvantage?
7      A.    Based on my experience with
8   putting in rail spurs and locating
9   industrial and aggregate plants and mines
10   over a large period of time.

Deposition of Eugene Hartley, Dec. 20, 2007, p. 31, ll.2-10. Hartley admitted he did not review any freight rates for Johnco, nor did he look at freight rates for the east side of Montgomery. Deposition of Eugene Hartley, Dec. 20, 2007, p. 32, ll.6-11.

41

Hartley also complained that Johnco's location was "not good" because it was located on a shortline railroad. He then qualified that being located on a shortline railroad was not a disadvantage with respect to the Supply Agreement with CYDI, "but [with] others it *might* create an extra cost." Deposition of Eugene Hartley, Dec. 20, 2007, p. 96, ll.18-23 (emphasis added). Hartley provided no examples of "others" for whom a shortline railroad spur *"might"* impose an "extra cost."

Finally, Hartley expressed "concerns" about bridge weights in the area, without having conducted any investigation of same:[22]

172
[TESTIMONY OF EUGENE HARTLEY]
20    Q.    Next opinion.
21    A.    I did not do, but *there may be*
22    *concern* about some of the bridges on the

_____

[22]Hartley's opinion as to the available truck market and bridge weights has no relevance whatsoever to the Supply Agreement, under which Johnco was to construct a rail spur and make gravel available rail-side for pickup by CYDI. Nonetheless, Hartley's testimony here is illustrative of his consistent pattern of stating half-formed opinion testimony without benefit of investigation or analysis.

23  highways away from the property for weight

173

1  limits, *that should be investigated.  I did*
2  *not investigate that.*  I did see one bridge
3  toward Montgomery that had a thirty-four-ton
4  weight limit on it.  And trucks carry
5  twenty-two, twenty-five tons, and that
6  doesn't leave much room for the weight of
7  the truck.  So I would — *I would express a*
8  *concern or need for a study for that.*
9     Q.    Where was this bridge, what
10  road was it on?
11     A.    On the road that parallels the
12  railroad.  It heads eastward toward
13  Montgomery, which is the main road in front
14  of the property.
15     Q.    The one that goes to
16  Lowndesboro?
17     A.    I think so.
18     Q.    Is there any alternative route
19  away from the property?
20     A.    Not going way to the south.
21  There's bridges down there, *and I don't know*
22  *anything about that.  I'm just expressing*
23  *concerns.*

Deposition of Eugene Hartley, Dec. 20, 2007, p. 172, l.20 to p. 173, l.23

(emphasis added).

43

In <u>Kumho Tire Co., Ltd. v. Carmichael</u>, 526 U.S. 137, 143 L.Ed.2d 238, 119 S. Ct. 1167 (1999), the Supreme Court held that <u>Daubert</u>'s gatekeeping function applies to opinion evidence rendered on the basis of experience, as well as scientifically based or technical opinion. "[A court] is to make certain that an expert, *whether basing testimony upon professional studies or personal experience*, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." 526 U.S. at 152 (emphasis added).

There is no demonstration that Hartley's experience here is reliable in determining whether Johnco's location is "good" or "bad" with relation to any market, absent any reference to objective data readily available for determining freight and transportation costs. Hartley cannot be allowed to opine as to the desirability of Johnco's location, nor use that opinion to support his overarching opinion that Johnco's operation was not economically viable.

**B.**    **Alleged Lack of Formal Written Marketing Plan, Due Diligence and Understanding of Industry**

Second, Hartley testified that Johnco lacked a formal written, marketing plan, and did not do the "normal" things a company does to be successful.  He testified that he got this information solely from the depositions.  Deposition of Eugene Hartley, Dec. 20, 2007, p. 34, l.20.

Hartley testified, for instance, that "for companies to be successful, you have got to have a [business] plan."  Deposition of Eugene Hartley, Dec. 20, 2007, p. 34, l.23 to p. 35, l.10.  Hartley admitted at his deposition that he did not state in his report that Johnco was not a successful company, although he was "leaning in that direction."  Deposition of Eugene Hartley, Dec. 20, 2007, p. 43, ll.16-30; p. 44, l.10-12.

Hartley's testimony in this regard is hardly conclusive of the efficacy of written business plans in general, much less as applied to Johnco:

34

[TESTIMONY OF EUGENE HARTLEY]

15    Q.    You said Johnco lacked a
16  formal written plan?
17    A.    Yes.
18    Q.    And you got that information
19  from where?
20    A.    The depositions.
21    Q.    All right.  What's the
22  significance of that?
23    A.    *In my experience*, for


35

1  companies to be successful, you have to have
2  a plan.


* * * *


11    Q.    Okay.  And so would it be your
12  expert opinion that a company can't be
13  successful unless it has a formal, written
14  business plan?
15    A.    *I'm saying most companies that
16  are successful do have such a plan*, and it
17  passes those criteria or passes those steps
18  just like the links of a chain.
19    Q.    I know.  But what is your —
20  Is it just your expert opinion that most
21  companies that are successful have a formal,
22  written plan?
23    A.    Yes.  And if they — When they


36

1  go through this process, if it doesn't pass


46

2  those steps, they don't do — they don't do
3  or they may not do or they may alter their
4  method of opening an operation.
5      Q.    And what do you know about
6  whether Johnco did or didn't do any of these
7  things?
8      A.    They were asked — I believe
9  it was either Pep Johnston or Ben Johnston,
10  were asked if they had a formal plan in the
11  depositions, and *they apparently did not.*
12      Q.    I guess you missed my
13  question.  I understand that you have
14  concluded from reading the deposition there
15  wasn't a formal, written business plan?
16      A.    That's right.
17      Q.    I understand that.  And you
18  said in your expert opinion, most companies
19  who are successful — which are successful
20  have a formal, written business plan.  I
21  guess that infers then that there are some
22  which don't have formal, written business
23  plans that can also be successful; is that

37

1  correct?
2      A.    Yes.  *Some may, but I'm not*
3  *aware of them.*
4      Q.    You're aware of no companies
5  that are successful unless they have a
6  formal, written business plan?
7          That's your expert opinion,
8  that you don't know of any?
9      A.    *Off the top of my head, I*
10  *cannot think of any that did not have a more*

47

11  *formal plan.*

\* \* \* \*

39
13     Q.    Okay.  So back to it.  I need
14  to understand again:  Is it your expert
15  opinion that a company cannot be successful
16  without a formal, written business plan?
17       A.    I think it's unlikely that a
18  mining operation would not be successful
19  without a formal plan unless they stumbled
20  across a bonanza.

Deposition of Eugene Hartley, Dec. 20, 2007, p. 34, l.15 to p. 37, l.11; p.

39, ll. 13-20 (emphasis added).  Hartley testified that it was his opinion that

Johnco was not a successful company because "[i]t did not appear they had

done their homework."  Deposition of Eugene Hartley, Dec. 20, 2007, p.

45, ll.14-15.

Hartley struggled to put this lack of "homework" into more concrete

terms:

47
[TESTIMONY OF EUGENE HARTLEY]
6     A.    Based on my read of the

48

7   depositions, they did not understand the
8   jaws of the property, they didn't have an
9   expiration plan, they didn't have results of
10  the part of quality in the reserves.  It was
11  later determined they did have — had done
12  their permits.
13            In my read of it, it was my
14  opinion they did not understand the industry
15  and the competition and the trends in the
16  markets and the location.  I didn't see that
17  they had a lot of expertise in this
18  business.  They had worked for their daddy
19  when they were teenagers or something.

Deposition of Eugene Hartley, Dec. 20, 2007, p. 47.


In formulating his opinion on Johnco's alleged lack of diligence in determining the gravel reserves, Hartley admitted that it would make a difference in his opinion had dozens of drill holes been bored to explore the reserves prior to the purchase of the property.  Deposition of Eugene Hartley, Dec. 20, 2007, p. 52, ll.11-22.  He stated that he "saw no indication of that."  Deposition of Eugene Hartley, Dec. 20, 2007, p. 52, ll.16-17.  But Hartley — who reviewed West Alabama Bank & Trust

("WAB&T") records and would have had the information[23] — ignored

Bank documents produced to CYDI showing that in 1958 some 88 test

holes were drilled on the Johnco property, with some testings re-performed

by Ben Johnston in 2002 prior to purchase of the Johnco property,[24] and

showing sand and gravel to a depth of up to 30 feet in places.


Hartley also testified there were "startup" problems with Johnco's

operation.  Deposition of Eugene Hartley, Dec. 20, 2007, p. 93, ll. 4-17.

But he immediately undercut his own opinion by admitting *most* businesses

have startup problems:


                              93
           [TESTIMONY OF EUGENE HARTLEY]
           20      Q.     Tell me what is significant
           21   about startup.
           22      A.     There are problems in most
           23   operations during the startup.

_____

    [23]*See* Deposition of Eugene Hartley, Dec. 20, 2007, p. 48, ll.8-9:
"They had gone for financing, and they didn't have much to show to the
bank."

    [24]See Exhibit 10 (WAB&T 0214-0219).

94

1    Q.    What kind of problems?
2    A.    Mining problems, plant
3  problems, shipping problems.  There's always
4  bugs to work out.
5    Q.    All right.  And what have you
6  determined about those?
7    A.    Based on my read of the
8  depositions, there were startup problems.
9    Q.    What were they?
10     A.    There was some dredge
11  problems, there were some volume problems,
12  there was a problem with the cutter head not
13  biting, I think the term they used, into the
14  material.  The initial pond may have been
15  too small.

Deposition of Eugene Hartley, Dec. 20, 2007, p. 93, l.20 to p. 94, l.15.

Hartley does not attempt to place these startup problems into the context

of long-term, continued viability, or explain how they relate to "economic

viability."

Tellingly, Hartley's opinion is based *on what he did not see* —

which bespeaks of his own lack of work and investigation — rather than

51

on his independent investigation and analysis.[25]  His caution that the

entirety of his opinion is based upon his review of deposition testimony

rather than any independent analysis or testing should be kept in mind in

reviewing his testimony:

47
[TESTIMONY OF EUGENE HARTLEY]
6        A.    *Based on my read of the*
7    *depositions*, they did not understand the
8    jaws of the property, they didn't have an
9    expiration plan, they didn't have results of
10   the part of quality in the reserves.  It was
11   later determined they did have — had done
12   their permits.
13            In my read of it, it was my
14   opinion they did not understand the industry
15   and the competition and the trends in the
16   markets and the location.  *I didn't see* that
17   they had a lot of expertise in this
18   business.  They had worked for their daddy
19   when they were teenagers or something.
20       Q.    Are you talking about the
21   Johnstons?
22       A.    The Johnstons.  The expertise,

_____

[25]Counsel apologizes for the lengthy deposition excerpts.  There simply is no way, however, to convey the utter lack of investigative curiosity on the part of CYDI's expert in the absence of such.

23  they hired — *I saw no evidence* they hired a

48

1  geologist or hired anyone to do a
2  significant amount of exploration, *at least*
3  *that wasn't indicated in the depositions.  I*
4  *didn't see* where they had put the plant
5  together with the advice of experts,
6  including mining engineers and equipment
7  people; *I'm sure there was some of that.*
8  They had gone for financing, and they didn't
9  have much to show to the bank.  The bank —
10  I believe, they were initially turned down.
11  This is a red flag when I read something
12  about a company.
13         They didn't seem to have much
14  in the way of quality control.  There was
15  noted, quote, they hired a girl.  It was
16  unprofessional to me.  They had hard working
17  people, personnel management, that's an
18  individual thing.  Management staffing,
19  administration issues, financial issues.  I
20  am not seeing any kind of discounted cash
21  flow evaluation noted in the report.  *They*
22  *appeared to have trouble with the funding*
23  *part of it, and I didn't see any budget.*

49

1     Q.   *Did you do a discounted cash*
2  *flow analysis?*
3     A.   *No.*
4     Q.   Are you a CPA?
5     A.   No.  But I did write — I have
6  done discounted cash flow evaluations.  I've

53

7  presented that at professional meetings and
8  I wrote the computer program entitled
9  Discounted Cash Flow Valuation of Mineral
10  Operations.
11      Q.    Is that the stuff you show in
12  your curriculum vitae that you did in the
13  early part of the '80s?
14      A.    Yes.
15      Q.    Have you done any since then?
16      A.    Yes.
17      Q.    Do you have financial
18  training?  Are you qualified to testify as
19  an expert witness on the financial parts of
20  cash flow analysis and all that kind of
21  stuff?
22          MR. LEEK:  Object to the form.
23  But you can answer the question.

                                      50
1          MR. PEARSON:  I object to my
2  form.
3      A.    I have experience in that and
4  I have experience valuating properties that
5  were done in these states for estate tax
6  purposes, IRS evaluations, and things.
7      Q.    *At the time you issued your*
8  *written report, had you looked at financial*
9  *documents for Johnco?*
10      A.    *I had not.  Again, I relied on*
11  *the depositions.*


                    *  *  *  *

                    54

151
9    Q.    Did you not visit the site?
10    A.    I knew they were closed down.
11    Q.    *You didn't visit the site?*
12    A.    *No, I didn't visit the site.*
13  I would have trespassed.
14    Q.    *You didn't visit the site*
15  *before you did your written operation?*
16    A.    *No.*  I would have been
17  trespassing.

\* \* \* \*
152
7    Q.    Do you feel like it would have
8  been — Before you did your written report
9  that you filed in federal court, don't you
10  think it would have been a good idea to
11  visit the site to find out about an opinion
12  that you're giving me three months later,
13  that you could have given me on September
14  the 25th?
15    A.    *I expressed to the attorneys I*
16  *needed to visit the site early on.*

Deposition of Eugene Hartley, Dec. 20, 2007, pp. 47-50, 151-152 (emphasis added).

Regarding Hartley's testimony that he has done financial analyses in past cases to determine whether a deposit can be economically mined:

138

[TESTIMONY OF EUGENE HARTLEY]

9       Q.    And is there sort of a
10    standard scale you would use for something
11    in the ground before it's mined?
12        A.    No.  There's no standards.
13    You do it by comparison, just like assessing
14    a piece of property in a lot of ways:  What
15    are they doing in the neighborhood.  Depends
16    on a lot of factors.
17        Q.    You do a financial analysis to
18    come up with that?
19        A.    I did.  I did part of a
20    financial analysis for that.
21        Q.    *Did you do a financial*
22    *analysis in this case?*
23        A.    *No.*

Deposition of Eugene Hartley, Dec. 20, 2007, p. 138, ll.9-23.

Regarding Hartley's testimony that Johnco's dredge mining was an

atypical  and problematic method of mining:

146

[TESTIMONY OF EUGENE HARTLEY]

17                Did you do any ground water
18    analysis or any kind of testing to find out
19    whether or not they had enough water to do a
20    dredge operation?

21     A.   *No.  That was not in my job.*
22  But they should have done that as one of
23   those steps in the — in that link.  It's

147

1  one of those links in that chain of business
2  plan.
3     Q.   *Do you know whether or not*
4  *they did that?*
5     A.   *It was not noted in the*
6  *depositions.*
7     Q.   Are you assigning any problems
8  to their mining operation because of lack of
9  water?
10     A.   *I'm saying that we don't know.*

* * * *

149

22     Q.   I'm trying to get this.  It
23   appears that you were going to testify that

150

1  Johnco wasn't going to be economically
2  viable and at one point you were trying to
3  get there.  I'm trying to find out if this
4  is one of those things that you were going
5  to assign that to.
6     A.   It's one of those steps that
7  they should have done in their business
8  plan.
9     Q.   And all you're saying is they
10   should have done it, *you don't know whether*
11   *they did do it or not?*
12     A.   *That's correct.*

57

13    Q.    *And you didn't do it?*
14    A.    *I didn't do it.*
15    Q.    *And you didn't ask anybody for*
16    *any data about it?*
17    A.    *No.*
18    Q.    *Did you go to the state of*
19    *Alabama geological survey to see if they got*
20    *any ground water data over there?*
21    A.    *No.*

Deposition of Eugene Hartley, Dec. 20, 2007, p. 146-47.

Relative to Hartley's testimony that Johnco "did not have a good

sales and marketing department or individual":

187
[TESTIMONY OF EUGENE HARTLEY]
7         It's also my opinion that
8    Johnco did not have a good sales and
9    marketing department or individual, which is
10   critical for sand and gravel operation.
11        Q.    And how did you come to that
12   conclusion?  On what basis?
13        A.    Because in the depositions, it
14   was indicated by Ben and/or Pep that they,
15   quote, talked to companies.  I didn't -- I
16   formed the opinion that they had not -- they
17   did not have a salesman besides themselves,
18   to do the job.

58

19    Q.    And you think that in your
20    expert opinion they had to have a salesman
21    to do the job?
22    A.    For other markets besides
23    Yelvington.  They needed to sell their sand.

Deposition of Eugene Hartley, Dec. 20, 2007, p. 187.  Again, Hartley does

not provide any evidence how Pep and Ben Johnston's  actions on behalf

of Johnco were insufficient with regard to sales and marketing, or how this

related to the Supply Agreement and the contractual commitment by CYDI

to take gravel under that Agreement.

In the end, Hartley did nothing in the way of analysis to support his

opinion:

193
[TESTIMONY OF EUGENE HARTLEY]
7    Q.    All right.  *Did you make any*
8    *analysis to determine one way or another,*
9    *whether this operation was profitable for*
10    *Johnco?*
11    A.    *No.*
12    Q.    *You did not?*
13    A.    *No.*

14      Q.    Okay.  And the problem that
15  you say the sand was causing, is that -- are
16  you saying it was causing an economic
17  problem because it was a cost to mine it,
18  therefore it is an economic problem, a
19  financial problem?
20      A.    It is an operating cost.
21      Q.    Okay.  I'm saying your expert
22  opinion is the sand was a problem.  Is it an
23  economic and a financial problem, is that

194

1  the problem that it is?
2      A.    Yes, it is.
3      Q.    Okay.  *And what did you do to*
4  *determine that?*
5      A.    *I saw it sitting there unsold.*
6      Q.    *But you have done no financial*
7  *analysis to quantify what this problem is*
8  *and how much it is?*
9      A.    *I have not quantified the*
10  *nature of the problem.*
11      Q.    *From a financial standpoint?*
12      A.    *I'm sure it's a financial*
13  *problem, but I have not quantified.*
14      Q.    You're sure it's a financial
15  problem, why are you sure?
16      A.    Because it's unsold material
17  sitting on the ground, that had a cost to
18  put there.
19      Q.    *Do you know how much the cost*
20  *was?*
21      A.    *No.*
22      Q.    Does the fact that the sand

60

23   was sitting there, in your expert opinion,

195

1   make Johnco economically unviable?
2       A.    Not by itself.
3       Q.    Not by itself?
4       A.    (Witness nods head
5   affirmatively.)
6       Q.    Not by itself, is that your
7   expert opinion?
8       A.    Yes.  It adds to it.  It's
9   just another factor.
10      Q.    All right.  Is it your expert
11  opinion that Johnco was economically
12  unviable, financially unviable?
13      A.    For the period of production,
14  I believe Johnco was financially unviable,
15  financially.
16      Q.    *And have you looked at*
17  *financial records to make that*
18  *determination?*
19      A.    *I looked at tons of materials*
20  *sold to Yelvington and tons of materials*
21  *sold to a few other companies.*
22      Q.    *Did you look at any other*
23  *financial documents?*

196

1       A.    *No.*
2       Q.    *Would you have needed to do*
3   *that to make that determination?*
4       A.    *Yes.  Accurately.*
5       Q.    *Is there any reason you*
6   *couldn't have already done that?*

7  A. *I wasn't asked to do that.*  I
8 wasn't given the documents to do that.
9  Q. Okay.
10  A. Again, I was asked to do an
11 evaluation not a valuation.
12  Q. Okay.  So you're not going to
13 be testifying on any kind of valuation?
14  A. Except where it's part of an
15 evaluation.
16  Q. But you have not looked at
17 financial documents to make any of these
18 determinations.  *I mean, we've already*
19 *determined what you've looked at, and they*
20 *weren't financial documents?*
21  A. *That's exactly right.*

Deposition of Eugene Hartley, Dec. 20, 2007, pp. 193-96 (emphasis added).

Hartley's opinion – indifferent, perfunctory, incurious – is so unreliable as to be laughable.  *In rendering an opinion as to Johnco's economic viability, Hartley read only deposition testimony.*  He never conducted a financial analysis of Johnco's operation.  He never reviewed financial documents of Johnco.  He never conducted a financial analysis of Johnco's crushing operation.   He never conducted an analysis to

determine whether Johnco's operation was profitable.  He never reviewed receipts and invoices.  He never examined freight rates for Johnco or competitors.  He never reviewed available pre-purchase drilling reports.  He never performed screening tests on materials in making a determination of the quality of Johnco's material sold.  He never performed water tests to determine if dredging was economically viable.  He asks this Court to trust his reading of the depositions and his "experience."

## C.    Alleged Insufficiency Of Railroad Loop

Third, Hartley expressed "concerns" that the railroad loop Johnco constructed was insufficient — but had no idea how big it was, or how many cars it would hold.

159
[TESTIMONY OF EUGENE HARTLEY]
22      A.    I am concerned, have some
23   concerns about the railroad loop.  I've put

160
1   in or designed railroad loops and other

2    railroad spurs, done the initial design.
3    I'm currently negotiating railroad spurs
4    with CSX Railroad for another site.  The
5    loop that was built is okay, but it's not
6    large enough for some of the requirements --
7    for some of the unit trains that are now
8    being required by CSX Railroad and other
9    railroads.
10        Q.    How big is it?
11        A.    It's sufficient for a
12    fifty-two car -- fifty-two plus cars.
13        Q.    Do you know how long the
14    railroad loop is?
15        A.    The diameter is -- according
16    to the photographs I measured were -- the
17    diameter is three thousand -- I'm sorry,
18    I'll have to check.
19            It's a quarter of a mile.
20    It's a quarter of a mile in diameter,
21    whatever that is in feet.
22        Q.    What is the -- You want to
23    know how far a quarter of a mile is in feet?

161

1        A.    No.  I have it written there.
2    It's a few hundred and something feet.
3        Q.    A quarter of a mile is
4    thirteen hundred and twenty feet.
5        A.    Okay.
6        Q.    Now, you say that that's the
7    diameter of their loop?
8        A.    That's the diameter of the
9    loop.  And Pi times that is the distance on
10    the loop.

64

11    Q.    So what'd you come up with?

12    A.    It was sufficient enough for

13  fifty to sixty cars, roughly.  The railroads

14  are now requiring more cars for a unit

15  train.

16    Q.    And if -- How much -- How many

17  cars are you talking about?

18    A.    When I started talking to CSX

19  a year ago, they were requiring sixty-five

20  cars to be assembled in one piece to be

21  considered a unit train.  And now they're --

22    Q.    If the railroad loop was big

23  enough where it could hold sixty-five cars

162

1  and a couple of engines, it would be fine?

2    A.    No.  It would have been last

3  year, maybe.

4    Q.    Now how big is it?

5    A.    A hundred.

6    Q.    They need a hundred cars?

7    A.    Big loop.  A hundred-car loop.

8  And they need –

9    Q.    You can't sell sand and gravel

10  without a hundred cars?

11    A.    Sure.  You can sell it one car

12  at a time, if you're willing to pay the

13  extra freight.

* * * *

163

10    Q.    Do you know how many cars

11  Johnco's railroad loop will hold?

12      A.    I think I read
13  fifty-something.  *I'm not sure.*
14      Q.    But you don't know one way or
15  the other, how many it will hold?
16      A.    It won't hold a hundred.  I
17  know that.
18      Q.    How many will it hold?
19      A.    *I don't know that.*
20      Q.    *Okay.  But you've concluded*
21  *that it's not big enough?*
22      A.    *Yes.  I need to -- We need to*
23  *survey it and measure it and determine how*

164

1  *many it will hold.*  And that's not the only
2  issue.

Deposition of Eugene Hartley, Dec. 20, 2007, p. 159-64 (emphasis added).

In the end, Hartley was forced to admit the loop was sufficient for the

Supply Agreement:

164
[TESTIMONY OF EUGENE HARTLEY]
3      Q.    Okay.  But it was -- Was that
4  size railroad loop sufficient, in your
5  expert opinion, to service the trains that
6  Yelvington was going to bring up there under
7  the supply agreement?
8      A.    I assume it was.  Because it
9  was fifty-two cars, unit trains expressed at

66

10   that time.  But that was the 2004 agreement.

\* \* \* \*

165

10        Q.    Are you making an opinion that
11   the railroad spur loop would cause Johnco
12   some sort of problem in its performance
13   under the supply agreement?
14        A.    No.  After the supply
15   agreement was out, or for anybody else, yes.
16   If they wanted to get unit train rates,
17   which are critical.
18        Q.    All right.  They can still
19   ship product, what you're saying is they
20   would get more favorable rates if they could
21   hold bigger trains?
22        A.    That's exactly right.

Deposition of Eugene Hartley, Dec. 20, 2007, p. 164-65.

## D.    <u>Volume of Sand</u>

Hartley's criticism of Johnco's "sales and marketing department or individual" was based on his assessment of Johnco's need to sell sand:

187
[TESTIMONY OF EUGENE HARTLEY]

23   They needed to sell their sand.

188

1      Q.    And how did you come to the
2   conclusion that they needed to sell the
3   sand?
4      A.    Because it was amounting to a
5   large waste byproduct.  There was a big pile
6   of it out there.
7      Q.    And what does -- And how does
8   that affect your opinions about them, that
9   they needed to sell it, there's a large pile
10   out there?
11      A.    When you -- Because there's a
12   cost in making that sand, whether it's a
13   byproduct or not, it's an operating cost
14   that needs to be recovered.
15          When you only extract thirty
16   percent of a product and you waste seventy
17   percent of a product, that's not good.[26]

Deposition of Eugene Hartley, Dec. 20, 2007, p. 187, l. 23 to p. 188, l.17.


The product mix at Whitehall is not 30 percent gravel and 70 percent

sand, as Hartley opines.  The stipulated product mix at Whitehall is 45

percent gravel and 55 percent sand.  Pretrial Stipulation 17.    Hartley

_____

[26]

68

admitted he could "only speculate" on the actual product mix at Whitehall "based on the size of the [sand] stockpile" and the 22,000 tons of sand sales. Deposition of Eugene Hartley, Dec. 20, 2007, p. 189, ll.8-12.[27] With respect to the sand stockpile, Hartley further admitted that his estimation of "more than likely" over fifty thousand tons" of sand was arrived at by his usual method – rank speculation based on "experience."

189

[TESTIMONY OF EUGENE HARTLEY]

13    Q.    How big is the stockpile?  Do
14   you have an expert opinion on that?
15    A.    Probably over forty thousand
16   tons.  More likely than not there were over
17   fifty thousand tons sitting there.
18    Q.    And how did you come to that
19   conclusion?
20    A.    By the size of it, based on
21   experience.
22    Q.    Eyeballing it?
23    A.    Yeah.

190

1    Q.    Based on experience eyeballing

_____

[27]"At that site, *based on any experience*, I would say that it's maybe thirty-five/sixty-five, sixty-five sand." Deposition of Eugene Hartley, Dec. 20, 2007, p. 190, l.23 to p. 191, l.2.

2   it?
3       A.    Yeah.  I tried to look at the
4   photograph, and it was -- I don't know
5   the -- *the height is hard to determine.  It*
6   *should be surveyed.*
7       Q.    You would need to know the
8   height; right?
9       A.    The volume of it.
10      Q.    To come up with how much is
11  there, the volume?
12      A.    Yes.

13      Q.    Then you can figure out what
14  it weighs?
15      A.    Yes.
16      Q.    *And you didn't do anything to*
17  *determine that?*
18      A.    *No.*

Deposition of Eugene Hartley, Dec. 20, 2007, p. 189, l.13 to p. 190, l.18

(emphasis added).


    Although Hartley did nothing to ascertain how much sand was

stockpiled, he was sure it was a problem for Johnco:


191
[TESTIMONY OF EUGENE HARTLEY]

14     Q.     And what analysis -- What did
15  you do to determine that sand was a big
16  problem?
17     A.     I formed -- It's my opinion
18  that since it's piled up down there and it
19  hasn't been sold or moved, and they
20  expressed concern in several of the
21  depositions about the lack of ability to
22  sell sand, that there was a problem.
23     Q.     And so are you forming an

                            192
 1  expert opinion or making an observation that
 2  somebody thought sand was a problem or your
 3  expert opinion is sand was a problem?
 4     A.     Both.
 5     Q.     Okay.  On what basis are you
 6  making the opinion that sand was a problem?
 7  *What did you do to determine that?*
 8     A.     *Read the depositions.*
 9     Q.     *That's all?*
10     A.     To form that -- *I read the*
11  *depositions and then after I saw the pile, I*
12  *realized that it was a problem, based on*
13  *what I saw.*


Deposition of Eugene Hartley, Dec. 20, 2007, p. 191, l. 14 to p. 192, l.13

(emphasis added).  He did not, of course, deign to do anything to quantify

how *much* of a problem the sand stockpile might pose:

194

[TESTIMONY OF EUGENE HARTLEY]

3     Q.    Okay.  And what did you do to
4  determine that?
5     A.    I saw it sitting there unsold.
6     Q.    *But you have done no financial*
7  *analysis to quantify what this problem is*
8  *and how much it is?*
9     A.    *I have not quantified the*
10  *nature of the problem.*
11     Q.    From a financial standpoint?
12     A.    I'm sure it's a financial
13  problem, *but I have not quantified.*
14     Q.    You're sure it's a financial
15  problem, why are you sure?
16     A.    Because it's unsold material
17  sitting on the ground, that had a cost to
18  put there.
19     Q.    *Do you know how much the cost*
20  *was?*
21     A.    *No.*
22     Q.    *Does the fact that the sand*
23  *was sitting there, in your expert opinion,*

195

1  *make Johnco economically unviable?*
2     A.    *Not by itself.*

Deposition of Eugene Hartley, Dec. 20, 2007, p. 194, l.3 to p. 195, l. 2.

### E.    Alleged Quality and Cleanliness of Sand and Gravel

Finally, Hartley expresses general doubt as to the quality and cleanliness of the Johnco material. Again, he does this based solely on his experience, and without any testing or analysis whatsoever.

For instance, Hartley implicitly criticized the "round" nature of Johnco's materials. He applauded Johnco's use of a vertical shaft impact crusher, stating that Johnco would have to engage in crushing operations in order to generate more "angular" gravel. Deposition of Eugene Hartley, Dec. 20, 2007, p. 175, ll.3-16. He stated, however, that this presented the problem of production of additional fine material:

177
[TESTIMONY OF EUGENE HARTLEY]

22       The bad news about that is
23   that when you crack gravel, you make fines.

178

1  So if you've got thirty percent gravel,
2  recoverable gravel, as you may have out
3  there, once it's cracked and asphalt rock is

73

4   sold from it, asphalt 57s for example,
5   you're going to wind up with less reserves,
6   less saleable product and more fines.

Deposition of Eugene Hartley, Dec. 20, 2007, p. 177, l.22 to p. 178, l.6.

Hartley admitted, however, that the crushing of the rock expanded the market possibilities of the rock.  Deposition of Eugene Hartley, Dec. 20, 2007, p. 178, ll.19-21.  And the crushed material would bring a higher price, which Hartley admitted he had not calculated:

179
[TESTIMONY OF EUGENE HARTLEY]
8       Q.    But you also get a higher
9    price.  So have you done any -- Would you
10   agree with that?
11      A.    Yes.  You normally could get a
12   higher price.
13      Q.    Have you done any --
14      A.    No.
15      Q.    -- financial analysis on the
16   economic impact, of financial impact of this
17   crusher, to the economic viability of the
18   site?
19      A.    No, I have not.

74

Deposition of Eugene Hartley, Dec. 20, 2007, p. 180, ll.8-19.

More significantly, Hartley criticized Johnco for not being able to produce clean gravel. This opinion was based solely on Hartley's assessment, from his reading of the depositions, of the size of Johnco's plant: "They had a small plant, could not produce clean material in my opinion." Deposition of Eugene Hartley, Dec. 20, 2007, p. 61, ll.12-13; *see* Deposition of Eugene Hartley, Dec. 20, 2007, p. 62, l.21 to p. 63, l.2.

Hartley admitted that it would change his opinion if Johnco actually did produce clean gravel and CYDI purchased it. Deposition of Eugene Hartley, Dec. 20, 2007, p. 63, ll.3-9. Hartley admitted that although he was aware CYDI purchased 32,000 tons of No. 67 gravel over the course of five months from May to September 2006,[28] he never made inquiry of

---

[28]Deposition of Eugene Hartley, Dec. 20, 2007, p. 63, l.21 to p. 64, l.2.

CYDI to determine whether CYDI was satisfied with the cleanliness of the

gravel:

> 64
> [TESTIMONY OF EUGENE HARTLEY]
> 13    Q.    Okay.  But after reading
> 14   Phillip Holladay's deposition, you didn't
> 15   ask anybody from Yelvington about the
> 16   thirty-two thousand tons that they purchased
> 17   and whether it was clean or not?
> 18    A.    No.

Deposition of Eugene Hartley, Dec. 20, 2007, p. 64, l.13-18.

Hartley admitted also that his opinion that Johnco could not have

produced clean gravel was not stated in his report,[29] but rather *on an aerial*

*photograph* Hartley saw after his report was submitted.  Deposition of

Eugene Hartley, Dec. 20, 2007, p. 68, ll.14-22.  Hartley admitted he does

not know when the photograph was taken.  Deposition of Eugene Hartley,

Dec. 20, 2007, p. 70, l.17 to p. 71, l.7.   From the aerial photograph,

---

[29]Deposition of Eugene Hartley, Dec. 20, 2007, p. 67, ll.9-15.

Hartley extracts the following:

71

[TESTIMONY OF EUGENE HARTLEY]
20      A.     The photograph shows a zoom
21   view of the mine pit, pond, and plant area.
22   It shows a pond surrounded by a -- it has
23   been mined or mined in part, surrounded by

72

1   an area that has been stripped in
2   preparation for dredging.  It shows next to
3   that, the plant and a very simple straight
4   line configuration, a simple plant; followed
5   by what appears to be an arc-like stack of
6   material, I believe, identified as sand.
7      Q.     *You can't tell from the photo*
8   *what it is?*
9      A.     *No.*
10      Q.     Okay.
11      A.     The small footprint of the
12   plant indicated to me the very simple plant,
13   as opposed to --
14      Q.     Just a second so -- We still
15   haven't gotten there yet.
16      A.     Okay.
17      Q.     You told me that you can
18   conclude from this photograph that Johnco
19   could not deliver clean gravel from its
20   dredge operation.
21      A.     *Based on my experience*, I
22   don't see how you can....

77

\* \* \* \*

73

17    Q.    This isn't about the dredge.
18  But from this aerial photo, you're
19  supposedly going to tell me how you can
20  conclude that Johnco could not produce clean
21  gravel from its operation, the dredge
22  operation?
23    A.    Again, if a deposit was clean

74

1  to start with, yes, you could do it with
2  very little.  Based on my experience on this
3  type of river gravel in this part of
4  Alabama, and many other parts of the
5  country, the gravel is coated with clay.  It
6  has to be scrubbed off.  *I do not see how*
7  *you can easily scrub it off in a simple*
8  *plant.*

\* \* \* \*

80

11    Q.    Okay.  Well, your expert
12  opinion is the plant operation that Johnco
13  had out there was dredge operation, could
14  not deliver clean gravel.  And you say
15  you're sure.  Now, I don't know how I'm
16  missing it.  How am I missing it?
17    A.    *It's my expert opinion I don't*
18  *see how they could have produced clean*
19  *gravel.*
20    Q.    *So you don't know whether they*
21  *did or not?*
22    A.    *I believe more likely than*

78

23  *not, that they could not have consistently*

81

1  *produced clean gravel.*
2      Q.    Could you have asked your
3  client whether they got clean gravel or not?
4      A.    Yes, I could have asked.
5      Q.    *Would it have mattered to you*
6  *if you had asked your client and they told*
7  *you they got clean gravel, would that matter*
8  *to you when you give your opinion?*
9      A.    Yes.
10      Q.    *But you did not do that before*
11  *you gave your opinion?*
12      A.    *I did not.*

Deposition of Eugene Hartley, Dec. 20, 2007, p. 71-74, 80-81 (emphasis added).

Hartley admitted that the proper methodology for determining the cleanliness of the gravel would be to put the gravel on a vibrating screen or perform a washing test. Instead, Hartley contented himself with "not[ing] dirt on my hands":

84
[TESTIMONY OF EUGENE HARTLEY]

17    Q.    Did you take samples of gravel
18  from the plant?
19    A.    I took a few grabbed samples.
20    Q.    What did you do with those?
21    A.    Put them in a bag and looked
22  at them later.  *Some dirt came off on my*
23  *hands I didn't think they were really clean.*

85
1    Q.    Where'd you grab them from?
2    A.    Down inside the stockpile.
3    Q.    Where?
4    A.    At the railroad siding.  And I
5  took samples of the sand also.
6    Q.    And what kind of testing did
7  you do?
8    A.    *No testing.  Just noted dirt*
9  *on my hands.*
10    Q.    *What is the proper methodology*
11  *to test to see whether the gravel would be*
12  *clean or not?*
13    A.    *Screening tests on a vibrating*
14  *screen to determine how much material would*
15  *wind up in the pan or one of the fine sieves*
16  *or to do a washing test.*
17    Q.    *Did you do any of that?*
18    A.    *No.*
19    Q.    Did you try to find out if
20  anybody had?
21    A.    No.
22    Q.    Did you make an assumption of
23  whether that had ever been done?

80

86

1    A.    No.
2    Q.    Would that be helpful to you
3  in giving that opinion?
4    A.    If it was done on a regular
5  quality control basis, yes.
6    Q.    *But you didn't investigate*
7  *that?*
8    A.    *No.*

Deposition of Eugene Hartley, Dec. 20, 2007, p. 84-86 (emphasis added).

Finally, Hartley expressed doubt that the sand was "spec" sand – graded

and cleaned properly – although again he did nothing in the way of

investigating or analyzing this concern:

180
[TESTIMONY OF EUGENE HARTLEY]
9  A.        .... But you can see from that that
10  there in the sand material there appears to
11  be what we would call shot gravel, I'm not
12  sure how much.  But that material, I do not
13  think, would make specification sand as it
14  is.
15    Q.    Specification sand meaning
16  what?
17    A.    Gradation, graded properly,
18  cleaned properly.  It appeared actually to
19  be fairly clean sand.
20    Q.    But, I mean, spec sand that

81

21  would then be used for what?
22      A.    Concrete and asphalt.
23      Q.    Concrete and asphalt.

181

1       A.    More for concrete, probably.
2       Q.    And have you made any
3  investigation -- I don't know if that's an
4  expert opinion or if you're just expressing
5  that this needs to be done.
6       A.    *It's my expert opinion that it*
7  *needs –*
8       Q.    That's it's not?
9       A.    *-- that it needs to be*
10  *processed a little more, maybe just*
11  *screened.*
12      Q.    Okay.  Do you know one way or
13  the other, whether the sand that's there is
14  screened for any particular spec?
15      A.    *No, I do not know that.*

Deposition of Eugene Hartley, Dec. 20, 2007, p. 180-181 (emphasis added).

Hartley's testimony on the quality and quantity of material is not only completely unreliable, but demonstrates by his own words that the proper methodologies were not employed in reaching his opinion.

82

Each independent basis of Hartley's opinion that Johnco's operations were not economically viable is methodologically unreliable. Hartley scarcely did more than thumb through the depositions taken in the case. He admitted he undertook no analyses or testing of any type, even while admitting that these would have been the proper methodology for investigating some of the concerns he expressed. He did not inspect the Johnco before issuing his opinion.

Unbelievably enough for an "economic exploration geologist," Hartley never reviewed Johnco's financial documents or performed a financial analysis, even while stating he was capable of having done so. The methodology underlying his opinions is so completely unreliable as to mandate the exclusion of his opinion testimony at trial.

### Conclusion

Each of the three expert witnesses – two disclosed, and one not

83

disclosed — suffer insuperable reliability issues in connection with their respective opinions.

Mark Klebe's methodology is unreliable because instead of using actual existing data he attempts to make a projection on the basis of unsubstantiated double hearsay that in some cases is contradicted by the invoices produced by CYDI to Johnco during discovery.

David Borden's methodology is unreliable because this Court has held that future sales of oversize gravel and sand unrelated to the Supply Agreement cannot serve as the basis of damage projections, and Borden's damage projections rely in part on just such future sales projections. Borden clearly anticipated the nature of this issue. *See* Deposition of David Borden, p. 74, ll.16-20. He could have given an opinion based upon an alternate projection. He did not do so, and he did not supplement his report after this Court issued its Memorandum Opinion and Order of February 28, 2008. CYDI and Borden choose instead to stand with

Borden's opinion about the lost profits of Johnco, which opinion includes projected sales of sand and oversize gravel contrary to the February 28, 2008 opinion.

Eugene Hartley's methodology is unreliable because he eschewed the many obvious tools available to him in investigating a hypothesis that Johnco was not economically viable, in favor of thumbing through a stack of depositions.

The testimony of all three witnesses is unreliable under <u>Daubert</u> and must be excluded at trial.

Respectfully submitted,


s/ H. Gregory Pearson
H. Gregory Pearson (ASB-4733-S81H)
Attorney For Plaintiff
email: greg@jphj.net


Charles E. Harrison (ASB-9408-N70C)
Attorney For Plaintiff
email: chuck@jphj.net

*OF COUNSEL:*

JUNKIN, PEARSON, HARRISON
    & JUNKIN, L.L.C.
601 Greensboro Avenue
Suite 600 Alston Place
Tuscaloosa, Alabama 35401
Telephone: (205) 366-0111
Telecopier: (205) 391-4780

86

## CERTIFICATE OF SERVICE

Pursuant to FED.R.CIV.P. 5(e) and the Administrative Procedures For Filing, Signing, And Verifying Pleadings and Documents In The District Court Under the Case Management/Electronic Case Files (CM/ECF) System In Civil Cases [General Order No. 2:04-mc-3164], I do hereby certify that I have electronically filed the foregoing Brief in Support of Plaintiff's Motion to Exclude with the Clerk of the Court by uploading same to the Court's CM/ECF web site at http://www.almd.uscourts.gov, which will send notification of such filing to the following:

> Thomas J. Leek, Esq
> COBB & COLE
> 150 Magnolia Avenue
> Post Office Box 2491
> Daytona Beach, FL 32115-2491
>
> George Walker III, Esq.
> David Martin, Esq.
> COPELAND, FRANCO, SCREWS
>   & GILL, P.A.
> 444 S. Perry St.
> Montgomery, Alabama 36101-0347

and I hereby certify that I have mailed by United States Postal Service, properly addressed and first-class postage prepaid and affixed this document to the following non-CM/ECF participants:

> [none]

This the 10th day of March 2008.

Charles E. Harrison (ASB-9408-N70C)

87

# EXHIBIT ONE

**Yelvington**

---

7

1    But if I ask you a question in the deposition,
2 and it's quite possible, and it's just not a good
3 question or you don't understand it, go ahead and
4 interrupt me and just say, look, I don't understand
5 that, could you rephrase it. I'd appreciate that. And
6 then that way, we can get on the same page, because
7 nobody is trying to trick anybody here. We just want t
8 try to answer the questions.
9    A.  I understand.
10    Q.  And then we will move through.
11    First of all, have you ever given a deposition
12 before?
13    A.  Yes, sir.
14    Q.  And when was the most recent time you've done
15 that?
16    A.  I really don't recall. Probably in the last
17 five years or so.
18    Q.  Was it a matter related to the business that
19 you're in, litigation related to the business?
20    A.  Yes.
21    Q.  Okay. And were you a party in that lawsuit?
22    A.  Yes, I believe I was.
23    Q.  When I say you, I'm speaking of Conrad
24 Yelvington Distributors, Inc.
25    A.  Yes.

15 who will testify as a representative of Conrad
16 Yelvington Distributors, Inc. And as we move through
17 the deposition, I will try to be careful to discuss your
18 testimony as being as that representative. Obviously,
19 if you have knowledge of something, I want to know about
20 it.
21    But at the same time, you are going to be
22 testifying as to certain matters that relate to the
23 transactions and agreements and contractual disputes
24 between Johnco and Conrad Yelvington. So when I ask you
25 a question, those will be the kinds of questions that

---

6

1    Q.  Is that the case here, the Yelvington company
2 was the party in the lawsuit?
3    A.  Yes.
4    Q.  Were you individually a party in the lawsuit?
5    A.  I really don't recall. I don't believe I was.
6    Q.  Have you individually, yourself, ever been a
7 party in a lawsuit, plaintiff, defendant, in the last
8 ten years?
9    A.  I don't specifically recall any.
10    Q.  Okay. Is that information that you could get
11 if we asked for it? Not sitting here at the table
12 today, but if we ask an interrogatory, could you come up
13 with that information?
14    A.  I guess I could. I'd have to get some folks to
15 help me.
16    Q.  How many times do you think you've given a
17 deposition in a case, Gary?
18    A.  Probably less than five times in my life. And
19 that's a guess. I specifically don't remember, so not
20 that many times.
21    Q.  The litigation that you've given deposition in
22 most recently, the first time, you said, within about
23 the last five years, is that a contractual dispute type
24 of case? Or, do you remember what kind of case it was?
25    A.  I don't remember.

8

1 I'm asking you because I'm taking your deposition as a
2 corporate rep.
3    But first, let me get a little personal
4 information. When did you go to Alabama, Gary?
5    A.  I was there from '71 to '75.
6    Q.  Did you graduate?
7    A.  Yes.
8    Q.  Okay. And what was your degree in?
9    A.  Business.
10    Q.  And tell me something about your family
11 business. And I'm just calling it a family business
12 because it's named for your dad, Conrad Yelvington. Is
13 that correct?
14    A.  That's correct.
15    Q.  How long has that business been in existence?
16    A.  I believe it was incorporated in 1960.
17    Q.  Okay. And tell me what you all do.
18    A.  We're distributors of construction materials.
19    Q.  When you say construction materials, tell me
20 what you're talking about.
21    A.  Crushed stone, aggregate, sand, gravel and sod.
22    Q.  Sod?
23    A.  Uh-huh.
24    Q.  Okay. Aggregate. You know, for somebody who's
25 a little bit more naive, tell me what aggregate is. Is

37

1 Railroad, could come over and take the cars and move
2 them back to Whitehall.
3     We were trying to make sure we didn't just drop
4 any train by there. We had a lot of trains going
5 through there. We had to try to coordinate it so that
6 when we dropped a train in Montgomery, that there wasn't
7 delay, that it didn't sit in the yard. They already had
8 issues in the yard, so we didn't want that to happen.
9     We wanted this to be a smooth start. We wanted
10 everybody to kind of understand and make it a good
11 transition so that we wouldn't have the railroad, you
12 know, pushing back on, you know, this isn't working
13 right, you know. We were careful to start this
14 properly. Wanted to make sure that product was
15 available. Wanted to make sure that they had somebody
16 that could load it. I mean, we were cautious and
17 anxious to move forward with the opportunity.
18     Q. What knowledge do you have that Johnco did not
19 have the product available?
20     A. I guess, the fact that they were late starting,
21 in our opinion, my opinion, late getting started, over a
22 year, year and a half. Obviously, they had some issues
23 with equipment. Had never done this before, didn't have
24 sales for some of the products, especially sand. We
25 were trying to work with them, trying to move the

38

1 product.
2     There's just some things we couldn't do. We
3 didn't have a place to take the sand. I know they
4 wanted to move sand and it was a burden for them, but we
5 didn't have a place that we could take sand. We did
6 take some other gravel, Number 4 gravel, because they
7 apparently had a large pile of that, so we took that.
8 And --
9     Q. The Number 4 gravel, Gary, that you talk of,
10 that is a larger diameter gravel?
11     A. Yes.
12     Q. And that was not under the contract, the supply
13 agreement contract?
14     A. No, but we took it. We had a place to move it,
15 and we took that.
16     Q. But that's not part of the supply agreement
17 contract?
18     A. It wasn't in the contract. No.
19     Q. And are you indicating in any way that you
20 considered that you were doing a favor for Johnco by
21 taking that?
22     A. We were working with them any way we could to
23 try to get this thing started out properly. We had good
24 intentions. We had -- we thought it was a great
25 opportunity.

39

1     Q. The Number 4 that you moved, that you indicate
2 you were trying to work with them, did you buy that
3 gravel at a fair price?
4     A. Yes.
5     Q. And could you resell that gravel and make a
6 profit out of it?
7     A. Yes.
8     Q. And were there any problems with Johnco
9 supplying that to you when you asked them for it?
10     A. No. We had Philip look at the material and we
11 got a sample of it. They needed to move it. We had a
12 place to move it, so we made that part of a train.
13     Q. The gravel that was under the supply agreement,
14 as I understand it, is called Number 67.
15     A. Yes.
16     Q. And what -- describe what Number 67 gravel is,
17 just generally.
18     A. Generally, it's a -- basically, it's a
19 three-quarters to three-eighths size material most
20 commonly used for ready mix concrete.
21     Q. Was that what you were buying it to use it for?
22     A. Primarily.
23     Q. And you would then sell it to somebody who
24 would use it for that?
25     A. Yes.

40

1     Q. Did you have customers that used Number 67 for
2 that?
3     A. Yes. We had potential customers for that --
4     Q. And --
5     A. -- product.
6     Q. For that product?
7     A. Yes.
8     Q. Excuse me for interrupting.
9     And did you buy Number 67 gravel from any other
10 producers?
11     MR. LEEK: Object to form. You can answer the
12 question.
13     MR. PEARSON: Let me -- I agree.
14 BY MR. PEARSON:
15     Q. Prior to the Johnco supply agreement, did you
16 buy Number 67 gravel from other suppliers?
17     A. Prior to the agreement?
18     Q. Prior to the agreement.
19     A. Yes.
20     Q. Now, who did you buy that from?
21     A. I believe we bought some from Elmore Sand &
22 Gravel, I believe.
23     Q. And where would they be located?
24     A. They're in -- they're just north of Montgomery.
25     Q. How did you move that?

45

1   And as far as being ready on a certain date,
2   you know, I don't specifically remember that.
3   Q.  Okay.
4   A.  And if you were ready on a certain date, would
5   you be able to continue to ship that product.  I mean,
6   it was a -- we were kind of feeling our way into getting
7   this thing started.  We had a very high interest in
8   getting it done.
9   Q.  So would it be fair, then, to characterize what
10  you're saying, Gary, and I'm trying to listen to you.
11  Would it be fair to characterize what you're saying is
12  that Yelvington wasn't sure -- and I'm talking about
13  your company.  Yelvington wasn't sure whether or not
14  Johnco could do it, so they were taking it really slow?
15  A.  We were being cautious for a couple of reasons.
16  We wanted to make sure the railroad, since this was a
17  long-term deal, didn't lose confidence that this thing
18  wasn't going to work.  We wanted to make sure that we
19  could get the cars out there on a regular basis.  And
20  then handoff of those two -- between those two railroads
21  and getting the cars to land in Montgomery at a time
22  that's compatible with the service from Montgomery out
23  to Whitehall.
24      We were being cautious.  Our credibility as a
25  supplier and the utilization of our equipment is

46

1   important to us to keep that balance.
2   Q.  Was your credibility as a purchaser and a party
3   to the contract with Johnco also important to you?
4   A.  Absolutely.
5   Q.  And do you -- did Johnco -- I mean, excuse me.
6   Does Yelvington have an understanding of the contract
7   that they were obligated to purchase this gravel and
8   ship it on a regular basis?
9   A.  Yes.  We had a volume that we knew we could
10  move.
11  Q.  Okay.  But you didn't come get that volume or
12  attempt to come get that volume from Whitehall.  Would
13  that be fair?
14  A.  Yeah.  We would move the volume that we were
15  committed to.
16  Q.  When you were committed to move it, are you
17  speaking of committed to Johnco, or committed to one of
18  your customers, which one, when you say you were
19  committed to?
20  A.  We were -- we would have been in a position to
21  take the material from Johnco over the commitment of the
22  agreement.  What we committed to in the agreement, we
23  would have been able to do.
24  Q.  What was your understanding of that?
25  A.  A hundred and fifty thousand tons a year.

47

1   Q.  And that's a minimum?
2   A.  That's a minimum.
3   Q.  Did you ever consider that you would be taking
4   more than that minimum?
5   A.  We could.  We had an option, I believe, in the
6   contract to take excess.
7   Q.  In fact, didn't Yelvington require that Johnco
8   be able to load 5200 tons or 52 open hopper cars per
9   week?
10  A.  On the weeks that we sent the train in, yes.
11  Q.  Okay.  So you had no understanding that you
12  would -- they had to be able to do 52 open hopper cars
13  or closed hopper cars a week.  You had no understanding
14  of --
15  A.  Well, clarify a week.  The week that we sent it
16  out there, yes, but not every week.
17  Q.  Not every week?
18  A.  Not every week.  Do the math.
19  Q.  Now, from -- was there any point in time when
20  Yelvington intended, then, to take the gravel on some
21  regular schedule?
22  A.  Yes.
23  Q.  All right.  What was the regular schedule that
24  Yelvington intended to take Number 67 gravel from
25  Whitehall?

48

1   A.  Well, I believe we were getting in the groove
2   of taking it beginning in August.  We started running
3   two trains a month.
4   Q.  Was there anything in the contract that said
5   two trains a month was what you're supposed to run?
6   A.  It didn't say.  Two trains a month would have
7   met the volume commitment.
8   Q.  Was there any problem with loading -- when you
9   sent the two trains in August and the two trains in
10  September, did Johnco have any problem loading those,
11  getting them out of there for you?
12  A.  I don't recall any problems.
13  Q.  Okay.  You didn't send any trains in October,
14  though.  You scheduled no trains in October of '06.
15  A.  Well, I believe, at some point, Mr. Junkett
16  (sic) came down and -- or, at some point, they sent us a
17  letter, shutting down the operation.
18  Q.  And have you got a copy of the letter where
19  they sent it, shutting down the operation?
20  A.  I don't have it.
21  Q.  You don't have it?
22  A.  Not with me, no.
23  Q.  Okay.  But that is a letter that Junkin sent
24  you, shutting down the operation?
25  A.  I don't know if he sent a letter or told Philip

69

1    A.  Or was that gravel or was that gravel and sand?
2    I don't recall anybody telling me we got 15 to 20,000,
3    or 16, whatever you just said, tons of gravel here,
4    ready.  What I wanted to hear was not how much you had,
5    but are you consistent in your production of that.
6    That's kind of what I was wanting to hear.
7    Q.  And so when did you hear that?
8    A.  Specifically?  I guess Mr. Junkett would have
9    come up and said, hey, we got this operation now.  I'm
10   involved.  We've been in the gravel business.  We want
11   to move -- we want to move gravel.  Can you help us move
12   sand?  Mr. Junkett mentioned he'd like to move sand, can
13   we do that.  We had some ideas that maybe we could move
14   sand --
15   Q.  Did Mr. --
16   A.  -- successfully.
17   Q.  Did Mr. Junkin's conversation, hey, I'm
18   involved, we need you to move some gravel -- forget the
19   sand part of it, just for purposes of this question.
20   Was that the trigger point that then they're ready to go
21   and you took your May 11th load?
22   A.  Well, I don't believe I -- I don't remember
23   when I met Mr. Junkett.  I'd have to go back and --
24   maybe you can tell me.
25   Q.  You think it was in the summer?  You think

70

1    you'd already taken a load?
2    A.  I don't know for sure if it was before or after
3    that.
4    Q.  Okay.  Kim Johnson, who is she?
5    A.  Kim Johnson?
6    Q.  Yeah.
7    A.  I don't know.
8    Q.  Well, got a -- it's not a trick question.  I
9    don't know who she is either.
10   (Thereupon said document was received and marked as
11   Plaintiff's Exhibit 2.)
12   BY MR. PEARSON:
13   Q.  Look at that one, if you would.
14   A.  Kim Thompson?
15   Q.  Thompson.  I'm sorry.  I apologize.
16   A.  I didn't know Kim Johnson.
17   Q.  Let me correct it to Kim Thompson.
18   A.  Kim Thompson is in sales and quality control
19   for us.
20   Q.  I've given you what we've marked as Plaintiff's
21   2, which appears to be an E-mail from Kim Thompson to
22   Pep on February the 6th of '06.  Would that be -- tell
23   me what this E-mail is.  It's got attachments to it,
24   several attachments, and explain to me what those are.
25   A.  Looks like gradation reports.

71

1    Q.  What would be the purpose of Kim sending these
2    to Pep?
3    A.  What he was wanting to do is get the gradation
4    of the product that Pep was producing, gradation meaning
5    particle size analysis.
6    Q.  Is Kim a man or a woman?
7    A.  A what?
8    Q.  Is Kim a man or a woman?
9    A.  A man.
10   Q.  Okay.  Kim Thompson works for Johnco?
11   A.  No.  He works for us.
12   Q.  Excuse me.  Works for --
13   A.  Yelvington, yes.
14   Q.  -- Yelvington.  Excuse me.
15        And in February of '06, he's writing this
16   E-mail to Pep, and he goes, here you go, exclamation
17   point.  It was nice talking to you.  I'm sure we'll be
18   talking more in the future as we have plans to move a
19   lot of volume with your product.
20        What is -- I mean, tell me what that means to
21   you.
22   A.  Well, Kim is -- I was probably -- probably made
23   Kim aware that we had a supply agreement to move this
24   product, and that I wanted him to contact Mr. Johnson
25   and get samples so that we could run them in our lab to

72

1    determine the product meeting the Number 67
2    specifications.
3    Q.  Did you all do that?
4    A.  I believe we did.
5    Q.  Did the product that was produced at Whitehall
6    by Johnco meet your specifications?
7    A.  I believe they did at a point, which, at this
8    point, I can't tell you when that was.  But at some
9    point, they did.
10   Q.  Have you ever tested product there that didn't
11   meet your specifications that they produced?
12   A.  I can't answer that without asking someone.
13   Q.  Do you have any knowledge -- I mean, any
14   knowledge whatsoever in your mind that that occurred?
15   A.  I don't know.
16   Q.  All right.  Would the necessity for you going
17   on and sending this, would that indicate to you that you
18   knew they're mining Number 67, they're washing it, and
19   now you need the specs on it?
20   A.  Well, that they were either mining it or were
21   far enough along in the mining that they would, at some
22   point, have a sample that would be a representation of
23   what they could produce.
24   Q.  All right.  After the supply agreement was
25   entered into, at any point subsequent to that, have you

49

1  Holladay or faxed us or something.
2  **Q. Saying that the Whitehall operation had shut**
3  **down?**
4  A. Yes. I had had several conversations with Mr.
5  Junkett.
6  **Q. All right. Tell me about those, Gary.**
7  A. Well, he was -- first of all, I didn't know Mr.
8  Junkett was involved in it until sometime in the summer
9  of 2006.
10  **Q. All right. What was your first knowledge that**
11  **he was involved in it?**
12  A. I forget how I found out, but I found out, I
13  think, through Philip Holladay that he was involved and
14  wanted to meet me.
15  **Q. And when did you all meet?**
16  A. I'm not sure. Maybe July. I'm not sure
17  exactly, but I remember eating lunch with him at the
18  Golden Rule barbecue place in --
19  **Q. Calera?**
20  A. Calera. Yes, sir.
21  **Q. All right. Is that when you flew up to Calera?**
22  A. I was up there on business, and he came and met
23  me.
24  **Q. Who was with you that trip, Gary?**
25  A. Well, I think Philip Holladay was there. I

50

1  believe he was. I'm not sure -- my father would have
2  been with me, I'm sure.
3  **Q. Was Mark Klebe there at that meeting?**
4  A. I don't recall.
5  **Q. Did you have discussions that day in Calera at**
6  **the Golden Rule barbecue with Mr. Junkin about the**
7  **Whitehall gravel operation and Yelvington's plans for**
8  **it?**
9  A. Yeah, we talked briefly. I met him. I've
10  known him before as a gravel producer up in Fayette,
11  Alabama, I believe.
12  **Q. And what did you all talk about that day in**
13  **Calera?**
14  A. He wanted to ship material, and he wasn't real
15  happy with, you know, what had happened, you know, with
16  Ben Johnson's performance out at the mine. They had
17  some issues out there, and that he intended to make it
18  better.
19  **Q. So Junkin was -- Mr. Junkin was apologizing to**
20  **you for something?**
21  A. Well, just, I guess, really trying to reassure
22  me that they were going to make this thing work, that
23  there had been some issues that they had some -- they
24  were going to make the gravel, that his son was in the
25  business and understood the business and --

51

1  **Q. Did you offer any reasons to Mr. Junkin why you**
2  **all hadn't been taking the gravel to that point?**
3  A. You know, I don't really remember specifically.
4  There was not a lot of real heavy discussion or anything
5  at that time. It was more of a meet him and, you know,
6  this is who is financially responsible, which, you know,
7  I had not known. I don't know if I knew it prior to
8  that. I probably did, but I had a -- I don't believe I
9  ever met Mr. Junkett before.
10  **Q. Did you have any discussion with Mr. Junkin**
11  **about going to Atlanta to get permission to move a**
12  **75-car unit train in north Florida during that meeting?**
13  A. A 75-car unit train to north Florida?
14  **Q. Through north Florida.**
15  A. Through north Florida?
16  **Q. Any conversation whatsoever. I could be wrong.**
17  **I don't know. Did you have a conversation with Mr.**
18  **Junkin that you yourself were headed to Atlanta to meet**
19  **with CSX to get some sort of permission to move at least**
20  **75 cars in some sort of unit train arrangement?**
21  A. Well, we move unit trains.
22  **Q. Okay.**
23  A. So that sounds familiar that we would have been
24  talking about unit trains.
25  I think, at the time, and I'm -- I don't know.

52

1  Maybe I shouldn't even answer it, because I don't recall
2  exactly. But I do know that there was a problem with
3  excess sand, and we wanted to try to move sand or help
4  them. We wanted to help them. We wanted to get this
5  thing going. And I know sand was something that they
6  were piling up because it's 60 or 70 percent of their
7  production.
8  And we had looked at maybe trying to move sand
9  into Jacksonville to see if that would be a way to help
10  them with that excess product, since they had
11  probably -- you know, I don't know that they ever had
12  a -- anybody lined up to buy that portion of the
13  product, but that's the majority of what they produce
14  out there.
15  So I don't know what happened, didn't ask, I
16  don't believe, that -- what happened to the customer for
17  the sand. But we were anxious to move product for them,
18  if we could do it. But we couldn't move it to
19  Jacksonville cost effectively. We couldn't sell it.
20  **Q. Why are you under the impression at all that**
21  **there was a customer for the sand?**
22  A. Why am I under the impression?
23  **Q. Where your source of information that**
24  **you don't know what happened -- I'm quoting what you**
25  **just said.**

13 (Pages 49 to 52)

93f7f9bb-1dbb-4811-8553-35dc8ec418c9

145

1  to pick up the phone and order gravel during those days?
2  A. I mean, I don't know that March the 1st he was
3  ready to ship gravel. Obviously --
4  Q. Well, what knowledge do you have, again, that
5  he's not, other than you --
6  A. I told you that I had a person involved in
7  that.
8  Q. Only through Philip Holladay.
9  A. Philip Holladay was going out there, talking to
10  them, and getting information from Ben Johnson, who was
11  later let go for inability to operate the thing
12  properly. That's what I'm saying.
13  Q. What is the basis for Ben Johnson being -- your
14  saying Ben Johnson's been let go?
15  A. Well, I think I read that he was no longer out
16  there in the spring. He was something, let go or
17  relieved as a shareholder or -- I know that Mr. Junkin
18  told me that Ben, you know, wasn't making the right
19  decisions, and that's why he got involved.
20  It was financially something that he was used
21  to a smaller, more profitable, smaller operation where
22  he got larger amounts of money for specialty, niche-type
23  gravels, and this was a larger operation that had low
24  prices, lots of volume, and he was having trouble
25  selling sand. And some of the things that he was trying

146

1  to do, he was not successful doing.
2  Q. Okay. And, Gary, I marvel at your -- the
3  detail with which you recall these conversations that
4  you had with Clatus, except for the one part where,
5  apparently, you have zero recall of any discussion about
6  Yelvington taking gravel from Johnco under the supply
7  agreement. You have yet to agree that there's ever been
8  any discussion with Pep or Ben or Clatus that any of
9  them stated or asked that Yelvington take gravel from
10  Yelvington (sic) under the supply agreement. Now, did
11  that occur or not occur?
12  A. Well, when you say -- clarify what you mean by
13  that first. That I don't remember anything?
14  Q. No. You've had --
15  A. I think it's because there was no urgency that
16  I sensed from Mr. Johnson, Ben or Pep. That is the
17  reason --
18  Q. The only urgency that you sensed from them had
19  nothing to do with Johnco (sic) not taking Number 67
20  gravel, it only had to do with, they wanted Johnco --
21  they wanted Yelvington to take some sand?
22  A. I was made aware from them about their issues
23  about sand. They had a lot of sand. They had this
24  oversized -- things weren't working out on their sand
25  deal with Lafarge. Things apparently hadn't worked out

147

1  on the metallurgic, could I -- I think it was assumed by
2  Mr. Johnson, both Ben and Pep, that we were going to
3  take the 150,000 tons. That's what I'm saying.
4  Q. Okay. Well, let me ask you. You said you sent
5  somebody out there, you know, to look at the sand, some
6  guy named -- and you haven't said his name, but is Frank
7  Howard from Atlanta, is that a name that you -- is that
8  somebody you recognize? Is that somebody?
9  A. Frank Howard from Atlanta. I did get in touch
10  with -- let me see who ) -- I sent somebody out there.
11  And, again, the urgency of moving the sand, I sent
12  somebody out there from Hanson --
13  Q. Okay.
14  A. -- to talk to --
15  Q. Clatus.
16  A. -- Mr. Junkin about sand.
17  Q. Okay.
18  A. And I thought this was a company -- for two
19  reasons, I sent them out there. One, this was a company
20  that understood mining operations. This was a company
21  that had assets in Atlanta, Georgia, that had rail
22  infrastructure, that we were actually talking to about
23  setting up a terminal there and needed their mutual
24  agreement for us to come in and set up a terminal. So I
25  was anxious to see if they could go out there and maybe

148

1  help --
2  Q. Okay.
3  A. -- them with this operation. They had a
4  problem with sand.
5  Q. All right. Now, would Yelvington have been
6  involved in moving that sand over to Hanson?
7  A. Potentially, because Yelvington has rail cars
8  and relationships and equipment needed, necessary to do
9  this.
10  I mean, producing gravel in Whitehall means
11  nothing. It's like having uranium on the moon. If you
12  can't get it somewhere, it has no value. Whitehall is
13  not attached to a local market. It's removed from a
14  local market. It's disadvantaged by other materials
15  that are closer for the products that are produced.
16  Q. All right. The sand that you're speaking of,
17  that would have been moved by rail through your cars
18  over there, if everything had worked out from a pricing
19  standpoint?
20  A. We could have participated in that, had it
21  worked out. There was no guarantee. I was just trying
22  to offer some help because I wanted to see the
23  facility --
24  Q. Did you ever --
25  A. -- continue.

**37 (Pages 145 to 148)**

53

1    A. Yeah.

2    Q. I don't know what happened to their customer

3 for the sand. What is your understanding about some

4 customer for the sand?

5    A. Well, in — I guess, over the various meetings

6 with the Johnsons, they had hopes of moving the sand to

7 Lafarge, I guess, was mentioned to me. And then when

8 something happened to that, then they started producing

9 the gravel for us.

10    There was a significant amount of sand that was

11 piling up that they had to move and wanted to know if we

12 could move it. And they offered it to us for $2.50 a

13 ton. But where our current terminals were, even at that

14 price, we couldn't move it cost effectively and be

15 competitive in the markets that we were in. Sand is

16 locally available in a lot of the markets that we're in

17 with our terminals, so we couldn't move sand.

18    Q. And is it your understanding or did somebody

19 tell you that unless they could sell that sand to you or

20 somebody for 2.50 a ton, they couldn't produce their

21 gravel? Your gravel, to you, under the contract?

22    A. I just knew that they had a problem with a lot

23 of sand. They weren't selling the sand.

24    Q. They didn't have a contract with you to sell

25 you the sand?

54

1    A. No. No.

2    Q. Okay. And you had somehow come to the

3 understanding in your own mind that the sand was a

4 problem. Was it a problem for Yelvington under the

5 supply agreement?

6    A. No, because we didn't have it in our supply

7 agreement. But we did have a desire for Johnco to be

8 successful. And if we could have moved it, helped them

9 out, it would have given them an opportunity to sell

10 something that they had not been successful, up until

11 that point, selling.

12    I mean, we didn't expect to be in a lawsuit

13 with Johnco. We expected to have a relationship with

14 them, take what we told them we'd take, help them with

15 products like Number 4 or other products, if we could,

16 to make sure that they were a viable supplier.

17    Q. Okay. Now, Gary, did you have the

18 understanding at the outset that you were going to be

19 their number one customer?

20    A. Well, number one in what sense?

21    Q. Number one in the --

22    A. In volume?

23    Q. Well, in any sense you want to talk about it,

24 did you consider that Conrad Yelvington Distributors,

25 Inc. was the most important customer that Johnco would

55

1 have?

2    A. Well, what we going to buy was 150,000

3 tons.

4    Q. You never told them you'd buy more?

5    A. I told them there was a possibility and that we

6 wanted the right to buy more.

7    Q. And you actually put that in the contract, did

8 you not?

9    A. It was in the contract.

10    Q. You had a right of first refusal. When I say

11 you, I'm talking about the company.

12    A. That's right.

13    Q. Had a right of first refusal —

14    A. That's right.

15    Q. — for all Number 67 in excess of 150,000 tons

16 a year.

17    A. That's right.

18    Q. What other --

19    A. I don't believe they ever called us and told us

20 they had excess. They never notified us as having any

21 excess gravel.

22    Q. Exactly what do you mean by calling and

23 notifying you they had excess? They called you and told

24 you that they had a potential buyer for the mine. They

25 wanted a release from you so that they could sell the

56

1 mine. Is that correct?

2    A. Yes. Mr. Junkett came down and tried to get a

3 release.

4    Q. And you did not give it to him. Is that

5 correct?

6    A. I wanted to see if there was a way that we

7 could be included in whatever he was trying to do so

8 that we could still get the product.

9    MR. LEEK: Mr. Pearson, I apologize. At some

10 point in time, could we get a two-minute break? I

11 appreciate it.

12    MR. PEARSON: Let's do it now. We'll go off

13 right now.

14 (Thereupon, at 11:00 a.m., a recess was taken in the

15 proceedings, after which, at 11:16 a.m., the proceedings

16 were reconvened and the following proceedings were had:)

17 BY MR. PEARSON:

18    Q. We were talking about the status of Yelvington

19 as Johnco's primary customer, and you talked about them

20 having the right of first refusal on all the quantities

21 above 150,000.

22    You mentioned Philip Holladay earlier. And I

23 meant to ask you and I'll just go ahead and ask you now.

24 What position does Philip Holladay have with Yelvington?

25    A. Philip lives in Daphne, Alabama, and he

37

1  Railroad, could come over and take the cars and move
2  them back to Whitehall.
3      We were trying to make sure we didn't just drop
4  any train by there. We had a lot of trains going
5  through there. We had to try to coordinate it so that
6  when we dropped a train in Montgomery, that there wasn't
7  delay, that it didn't sit in the yard. They already had
8  issues in the yard, so we didn't want that to happen.
9      We wanted this to be a smooth start. We wanted
10  everybody to kind of understand and make it a good
11  transition so that we wouldn't have the railroad, you
12  know, pushing back on, you know, this isn't working
13  right, you know. We were careful to start this
14  properly. Wanted to make sure that product was
15  available. Wanted to make sure that they had somebody
16  that could load it. I mean, we were cautious and
17  anxious to move forward with the opportunity.
18      Q.  What knowledge do you have that Johnco did not
19  have the product available?
20      A.  I guess, the fact that they were late starting,
21  in our opinion, my opinion, late getting started, over a
22  year, year and a half. Obviously, they had some issues
23  with equipment. Had never done this before, didn't have
24  sales for some of the products, especially sand. We
25  were trying to work with them, trying to move the

38

1  product.
2      There's just some things we couldn't do. We
3  didn't have a place to take the sand. I know they
4  wanted to move sand and it was a burden for them, but we
5  didn't have a place that we could take sand. We did
6  take some other gravel, Number 4 gravel, because they
7  apparently had a large pile of that, so we took that.
8  And --
9      Q.  The Number 4 gravel, Gary, that you talk of,
10  that is a larger diameter gravel?
11      A.  Yes.
12      Q.  And that was not under the contract, the supply
13  agreement contract?
14      A.  No, but we took it. We had a place to move it,
15  and we took that.
16      Q.  But that's not part of the supply agreement
17  contract?
18      A.  It wasn't in the contract. No.
19      Q.  And are you indicating in any way that you
20  considered that you were doing a favor for Johnco by
21  taking that?
22      A.  We were working with them any way we could to
23  try to get this thing started out properly. We had good
24  intentions. We had -- we thought it was a great
25  opportunity.

39

1      Q.  The Number 4 that you moved, that you indicate
2  you were trying to work with them, did you buy that
3  gravel at a fair price?
4      A.  Yes.
5      Q.  And could you resell that gravel and make a
6  profit out of it?
7      A.  Yes.
8      Q.  And were there any problems with Johnco
9  supplying that to you when you asked them for it?
10      A.  No. We had Philip look at the material and we
11  got a sample of it. They needed to move it. We had a
12  place to move it, so we made that part of a train.
13      Q.  The gravel that was under the supply agreement,
14  as I understand it, is called Number 67.
15      A.  Yes.
16      Q.  And what -- describe what Number 67 gravel is,
17  just generally.
18      A.  Generally, it's a -- basically, it's a
19  three-quarters to three-eighths size material most
20  commonly used for ready mix concrete.
21      Q.  Was that what you were buying it to use it for?
22      A.  Primarily.
23      Q.  And you would then sell it to somebody who
24  would use it for that?
25      A.  Yes.

40

1      Q.  Did you have customers that used Number 67 for
2  that?
3      A.  Yes. We had potential customers for that --
4      Q.  And --
5      A.  -- product.
6      Q.  For that product?
7      A.  Yes.
8      Q.  Excuse me for interrupting.
9      And did you buy Number 67 gravel from any other
10  producers?
11      MR. LEEK:  Object to form. You can answer the
12  question.
13      MR. PEARSON:  Let me -- I agree.
14  BY MR. PEARSON:
15      Q.  Prior to the Johnco supply agreement, did you
16  buy Number 67 gravel from other suppliers?
17      A.  Prior to the agreement.
18      Q.  Prior to the agreement.
19      A.  Yes.
20      Q.  Now, who did you buy that from?
21      A.  I believe we bought some from Elmore Sand &
22  Gravel, I believe.
23      Q.  And where would they be located?
24      A.  They're in -- they're just north of Montgomery.
25      Q.  How did you move that?

65

1    A.  Well, I'm not sure if it was during the
2  construction.  When was the construction phase, I guess,
3  is the question.  Two years, apparently, from the time
4  the agreement was signed until anything was loaded.  So
5  whether it was in that two-year period or after, I'm not
6  sure.
7    Q.  Did you all order any loads of gravel before
8  May 11th of 2006 and schedule any shipments of any
9  gravel from Johnco's plant?
10    A.  I don't believe we did.  They were having
11  start-up issues, so we wouldn't have wanted to start
12  anything and not continued it.
13    Q.  Well, when you say they had start-up issues,
14  specifically what start-up issues are you talking about?
15    A.  I think they had a problem with the dredge,
16  keeping it running.  They had -- you know, Mr. Holladay
17  could probably give you more detail.  He was out there
18  on a more regular basis.
19    Q.  But your knowledge of that comes through Mr.
20  Holladay?
21    A.  Yes.  His communications --
22    Q.  Not directly from Ben?  Ben didn't tell you
23  that?
24    A.  I didn't talk to Ben that much, so I don't
25  recall specifically talking to --

66

1    Q.  Did Pep Johnson ever tell you they had problems
2  and couldn't produce the gravel?
3    A.  I don't recall exactly.  I know that they
4  wanted to move sand.  I know that that was something
5  that they had in the back of their mind.  And a lot of
6  the conversations after May 11th was about sand with Mr.
7  Holladay.
8      And, actually, Mr. Junkett mentioned trying to
9  move sand.  We tried to see if we could get rates that
10  would move sand to places that we had terminals.  And we
11  weren't able to do that.
12    Q.  Did Mr. Johnson, Pep Johnson, ever talk to you
13  about coming and moving some gravel?
14    A.  You mean coming just to move the gravel?
15    Q.  Yeah.  Can you come get some loads of gravel --
16    A.  I don't recall ever hearing from anybody that,
17  hey, you got to hurry up and come out here, we got all
18  this gravel and you're not taking it.  Never did I hear
19  that.  I'll tell you that.
20    Q.  And so in your meetings with Pep Johnson --
21  didn't you all fly to Montgomery one time and meet with
22  Pep?
23    A.  Seems like we did.  I don't recall when that
24  was.  It seems like we did.
25    Q.  What do you remember about that meeting?

67

1    A.  You know, I really don't remember anything
2  significant in that meeting.
3    Q.  They didn't indicate to you that they needed to
4  be moving some gravel and for Yelvington to come get it?
5    A.  I don't recall ever -- ever feeling like we
6  were letting them down, ever.
7    Q.  And that's just -- you just don't recall
8  feeling that way yourself?
9    A.  Well, nobody called me and said, listen, we are
10  up here producing all this gravel, and you're not taking
11  it.  Come get it.
12      The stuff we were hearing is, we've had
13  problems moving the sand and we don't have Lafarge to
14  take the sand, can you move sand.  I think everybody
15  assumed that we were going to move gravel.  We had a
16  supply agreement to move gravel.
17      This was a start-up operation.  Okay.  Any
18  start-up operation, you have, with a new operation,
19  little things you have to work out.  It started in May,
20  and by August, we were taking two trains a month.  I
21  don't even know -- you know, it doesn't -- it doesn't
22  seem logical that we were part of the problem, to me.
23    Q.  When, in your understanding, Gary, would you
24  have been required, under the contract, to take gravel?
25    A.  When we took gravel, we were to take unit train

68

1  quantities.  So in a particular week, we would take a
2  52-car train.
3    Q.  And it was not that good of a question, and I
4  apologize.
5      At what point in time was Yelvington obligated
6  to begin to take gravel?
7    A.  At what point in time?  When, I guess, they
8  were prepared to ship it on a regular basis, when they
9  had kind of ironed out any issues they had with
10  production or equipment or the people to load it in a
11  timely manner.  Just when everybody was comfortable, but
12  hey, we're in the groove right here.  Now let's kind of
13  keep moving.  We're able to do this.  That was my
14  opinion of when they were prepared to do it.
15    Q.  And having between 15 and 20,000 tons on the
16  ground at the load-out facility by the rail cars at the
17  first of March, ready to load onto your trains, that
18  would not have been a time when you would have been
19  obligated to come get your gravel?
20      MR. LEEK:  Object to form.  You can answer the
21  question.
22      THE WITNESS:  Fifteen to twenty thousand tons,
23  I mean, was that all 67 gravel?
24  BY MR. PEARSON:
25    Q.  Well --

17 (Pages 65 to 68)

93f7f9bb-1dbb-4811-8553-35dc8ec418c9

81

1    There was discussions with Mr. Junkett. He
2  came to see me, and we discussed something and there was
3  some dialogue going there.  And then we found out by
4  letter that he's retracting that --
5     Q.  We'll get to that.
6     A.  -- what he wanted to do.
7     Q.  We'll get to that.  You seem to be a little bit
8  angry with me, but I'm trying to get an answer to my
9  question.  I'm not trying to argue with you.
10    A.  Okay.
11    Q.  I'm not trying to be impolite.  I really am
12  not.  I'm trying to find out --
13    A.  I get a little defensive when I feel like
14  somebody's trying to put words in my mouth.
15    Q.  Okay.  Well, I would like for you to use your
16  own words, but at the same time, those words should be
17  in response to the question I pose to you.
18    A.  Okay.
19    Q.  And I'll make that deal with you if you'll do
20  that.
21    A.  Okay.
22    Q.  All right.  September 25th, I'll represent to
23  you, is going to be the last date that you took a
24  shipment.
25    A.  Okay.

82

1     Q.  All right.  Now, you said something about
2  inventory on the ground.  Are you talking about your
3  inventory or are you talking about inventory at Johnco's
4  Whitehall facility?
5     A.  Johnco's Whitehall facility.  You told me that
6  Philip Holladay ordered a train.  I don't recall --
7     Q.  I asked --
8     A.  -- specifically that he ordered a train.  If he
9  ordered a train, it was probably because we wanted to
10  receive a train.
11    Q.  Okay.  And I'll represent to you that the
12  evidence in this case is going to be that Philip
13  Holladay called Cletus Junkin sometime in the first ten
14  days of November of '06 and ordered a train.
15    Now, my question related to that is, why would
16  he do that?  Why would he do that?
17    A.  Well, you'd have to ask him that.
18    Q.  And I will.  But you're the president of
19  Yelvington, and you say you didn't take any product
20  after September the 25th or after September because they
21  shut down.  And I'm telling you, your guy ordered gravel
22  in November, after we filed the lawsuit.  And I want to
23  know what reason he would have to order it if you didn't
24  order it because they're shut down or you believe
25  they're shut down.

83

1     A.  I don't recall specifically.  We were going to
2  take 150,000 tons of gravel.  Whether it was October or
3  November, whether it was two trains a month, whether it
4  was one train a month, whether it was two trains a week,
5  we were going to take the volume.  Okay?  The operation
6  shut down, and we were unable to take the volume.
7  That's as clear as I can be.
8     Q.  The volume you were going to take did not have
9  to be, in Yelvington's mind, on any regular shipment
10  basis, though.
11    A.  It would become regular.  It would become
12  regular.  But, you know, some weeks, like it rains.
13  Okay?  Customers don't use product as fast during those
14  weeks.  Sometimes there's hurricanes.  There's all kinds
15  of things and that ebb and flow the supply and demand of
16  materials.
17    At the end of a year, we would have taken
18  150,000 tons of materials.
19    Q.  Okay.  And the customers don't take gravel when
20  it rains and hurricanes occur and they don't take it
21  then, and what you're talking about is Yelvington's
22  customers that you're going to resell the gravel to.  Is
23  that correct?
24    A.  That's right.  And, you know, since we do move
25  ten million tons a year, nine to ten million tons a

84

1  year, there are problems.  There are problems with the
2  producer.  There are problems sometimes with the
3  railroad.  There are problems sometimes with the
4  customers or weather-related problems.  There's problems
5  that everybody has that change the way the schedule
6  moves.
7     But at the end of the year, Conrad Yelvington
8  Distributors would have taken 150,000 tons minimum from
9  Johnco.
10    Q.  But as of November the 10th, November the 10th
11  of 2006, as of that date --
12    A.  Well, what's --
13    Q.  -- you had only taken 32,000, approximately.
14    A.  But what's significant about November 10th?
15    Q.  That's the date of the letter that Mark Klebe
16  wrote, saying he wanted a train.
17    A.  Well, I don't know the significance of that,
18  where that fits with, you know, our need for material or
19  our inventory or your inventory or --
20    Q.  Does your need -- and I'm saying Yelvington's
21  need.  Does Yelvington's need for material have anything
22  to do with the minimum volumes being shipped on a
23  regular basis?
24    A.  Our need for material?
25    Q.  Yes.  Does the need for material have any

21 (Pages 81 to 84)

93f7f9bb-1dbb-4811-8553-35dc8ec418c9

97

```
1    A. And then the CYXX, I believe we lease those
2  cars from First Union.
3    Q. Okay.
4    A. The MBXX cars, I believe we lease those cars
5  from Mitsui Capital. They may have another name now.
6  But those are all individual leasing companies that I
7  just gave you.
8    Q. Right. And Conrad Yelvington, these are part
9  of that fleet of hopper cars that you all leased that we
10 discussed earlier in this deposition, the 1800 plus
11 hopper cars that you all leased?
12   A. Yeah.
13   Q. Okay. Now, if you go on over to the next bates
14 numbered pages which are attached, which appear to be
15 load tickets, is that something that is -- who creates
16 those load tickets? Is that something Johnco created?
17 And I'm asking you because I don't know.
18   A. I don't know. That's the first time I've seen
19 these.
20   Q. All right. All right. But the invoice, if you
21 look back on the first page of the invoice of
22 Plaintiff's Exhibit 3, which is Johnco Materials, and
23 it's bates numbered page 44, even though mine's sort
24 of --
25   A. Yeah.
```

98

```
1    Q. Okay. This appears to be an invoice dated 5/11
2  of 2006, for the first 60 -- excuse me, 58 cars or 60
3  cars that was -- that you all sent up there to be loaded
4  out.
5    A. Okay.
6    Q. Is that what it looks like to you?
7    A. Looks like to me, yes, sir.
8    Q. However many cars it is, that's -- I noticed
9  that the last two cars on the list just say no load for
10 whatever reason. And I don't know what that reason is.
11   A. Yeah.
12   Q. Do you assign any significance to the fact that
13 the last two cars say no load?
14   A. No. I mean, they -- I don't know why they
15 wouldn't have been loaded.
16   Q. Okay.
17   A. They might have forgot them, or they might have
18 not got there at the same time or -- I don't know.
19   Q. If you look at Plaintiff's Exhibit 4, it
20 appears to be -- now, the tickets are not attached and
21 none of the attachments are on any of the rest of these
22 plaintiff's exhibits. But Plaintiff's Exhibit 4 appears
23 to be a summary invoice that is dated on June 27th of
24 '06. Is that right?
25   A. It looks like it.
```

99

```
1    Q. Okay. Now, when I'm looking at this invoice,
2  if you'll go to the second page of the invoice, which is
3  the bates number at the bottom, Johnco Materials 59, it
4  appears that the -- starting in the third line down on
5  the listing of the individual cars, those -- the last 27
6  cars or so on that page, or however many that turns out
7  to be, is what was loaded with 67 gravel. Right?
8    A. Yes, sir.
9    Q. And the other cars up to that point show to be
10 loaded with Number 4 oversize.
11   A. That's right.
12   Q. And that Number 4 oversize, we've already
13 established, isn't part of the contract gravel. Right?
14   A. That's right.
15   Q. Okay. Go to Plaintiff's Exhibit 5. It appears
16 to be another invoice, and it's dated August 8th of '06.
17 That seems to comport with your memory of when the
18 shipment was made?
19   A. I don't remember it, but it's in one of those
20 lists which --
21   Q. Right. And, again, this appears to be
22 individualized cars, how much tonnage they were loaded
23 with --
24   A. Yes.
25   Q. -- and all of that kind of stuff, and then an
```

100

```
1  invoice, and it's dated August 8th of '06. Right?
2    A. Yes.
3    Q. All right. And this is all Number 67 gravel on
4  this one?
5    A. Yes, sir.
6    Q. All right. Then if you look at Plaintiff's
7  Exhibit 6, that's the next invoice, and it's dated
8  August 21st of 2006?
9    A. Uh-huh.
10   Q. Okay.
11   A. Yeah. Okay.
12   Q. August 21st of '06?
13   A. Yeah.
14   Q. All right. And it again appears to be all
15 Number 67 gravel, however many cars it is.
16   A. Yeah.
17   Q. Okay. Then we'll go ahead -- we can go back
18 over them if you need to look at them.
19   A. No. I was just trying to look and see if they
20 were in order.
21   Q. I attempted to hand them to you in order, so if
22 I didn't, it's my mistake.
23     Plaintiff's Exhibit 7 appears to be an invoice
24 that was sent to you for moving Number 67 gravel. And
25 I'll represent to you that I quickly counted those cars
```

25 (Pages 97 to 100)

101

1 and I believe there's like 52 of them but, you know, I'm
2 not going to swear to it. It's however many it is, but
3 I think it's 52.
4    A. It's a trainload quantity.
5    Q. Yeah, it's a trainload quantity of --
6    A. Yes, sir.
7    Q. And that one's dated September the 7th of '06.
8    A. Yes, sir.
9    Q. All right. And then Plaintiff's Exhibit 8,
10 which is the last one, is dated September the 25th of
11 '06. Is that right?
12    A. Yes.
13    Q. And, again, it appears to be a trainload
14 quantity of Number 67 that has been shipped to
15 Yelvington.
16    A. Yeah.
17    Q. Then going backwards on them, just real
18 quickly, tell me -- you know, it looks like the
19 September 25th shipment, it's got written on there, ship
20 to Gautier (phonetic), Mississippi. This that --
21    A. Gautier.
22    Q. Gautier? Is that how you say that?
23    A. Yes.
24    Q. All right. Spelled G-A-U-T-I-E-R.
25    A. Right.

102

1    Q. And Plaintiff's Exhibit 7, it says, shipped to
2 Florida. Can you tell --
3    A. I don't know where, but --
4    Q. Yeah. What it says --
5    A. It's not specific.
6    Q. Okay. The Plaintiff's Exhibit 6, again, is
7 Gautier --
8    A. Yes, sir.
9    Q. -- Mississippi?
10    A. Uh-huh.
11    Q. Plaintiff's Exhibit 5, Theodore, Alabama?
12    A. Yes, sir.
13    Q. Now, do you all have -- other than the one that
14 says Florida, generally, but do you have -- do you have
15 a terminal in Gautier?
16    A. Yes, sir.
17    Q. Okay. You have a terminal in Theodore?
18    A. Yes, sir.
19    Q. And you've got numerous terminals in Florida.
20 We just don't know which one that might have gone to --
21    A. Right.
22    Q. -- right now.
23       Plaintiff's Exhibit 4, I don't show where that
24 was shipped to. Do you have any way to tell from
25 looking at that?

103

1    A. No, but that's the one with the oversized
2 gravel, so I think it went to Jacksonville.
3    Q. Okay. And then Plaintiff's Exhibit 3, which is
4 the May 11th, the first load, that shows Pensacola.
5    A. Uh-huh.
6    Q. Is that where that would have gone to?
7    A. That's what it looks like.
8    Q. Okay. Now, other than these six loads which
9 are invoiced on Plaintiff's 3 through Plaintiff's 8, is
10 there any other loads of gravel that Yelvington took
11 under the supply agreement, that you're aware of?
12    A. If they're not on that list, I'm not aware of
13 any.
14    Q. And when you say the list, you're talking
15 about --
16    A. There was a list in some of the stuff that I've
17 got that outlined, you know, the shipments that we took.
18    Q. Well, I'll represent to you, just for ease of
19 this, and I'll let your attorney correct me, but we had
20 put those dates in those -- of those shipments in the
21 complaint, and you agreed that those were those ones.
22 Is there any reason to say that's not them now?
23    A. I don't believe so. Are these -- all of those
24 are here. Right?
25    Q. Yes. Those are the ones that are here.

104

1    A. Yeah.
2    Q. Now, the next thing I want to do -- let me ask
3 you a question. The supply agreement which I'm going to
4 mark and put in now, basically, I'll represent to you
5 that it says that you get -- that you all pay within
6 30 days, or you pay 30 days after the invoice.
7       Now, is there any reason to believe that these
8 were not invoiced at or very near the time that these
9 trains were loaded and shipped out? Do you have any
10 knowledge of that at all?
11    A. I wouldn't know that.
12    Q. Okay.
13 (Thereupon said document was received and marked as
14 Plaintiff's Exhibit 9.)
15       MR. LEEK: Could we go off the record for just
16 a second?
17       MR. PEARSON: Yeah.
18 (Thereupon there was a conference off the record.)
19 BY MR. PEARSON:
20    Q. I've given you what's been marked as
21 Plaintiff's Exhibit 9, Gary. And do you recognize what
22 that document is?
23    A. Yeah, I recognize it. It was a version of the
24 supply agreement.
25    Q. Is it the -- is it the final version that is in

26 (Pages 101 to 104)

121

1    A.  I think cash flow is important in any
2  operation.
3    Q.  Okay.  You would need it to be successful?
4    A.  Yeah.  You need cash flow, but you also need to
5  be funded when you go into any operation, any business
6  operation.  And it's important that you have employees
7  that know what they're doing.  It's important, if it's
8  your money, to be involved on a day-to-day basis to make
9  sure things go like you want them to go.
10    Q.  And would it also be important for people who
11  are parties to a contract to buy product, that they
12  actually perform under that contract?
13    A.  Yeah.  And we were prepared to do that.
14    Q.  But you will agree that you only took six loads
15  of gravel during the entire time that you took anything
16  from Johnce?
17    A.  The agreement says that we'll take 150,000 tons
18  a year.
19    Q.  Do you think that, under your scenario, that
20  Yelvington can take that entire 150,000 tons in one
21  week?
22    A.  No, because they couldn't load it all in one
23  week.
24    Q.  Well, how about two weeks?
25    A.  They couldn't load it in two weeks.

122

1    Q.  How about one month?
2    A.  Could they load it in six months, yes.
3    Q.  They could do it in six months?
4    A.  I believe they could.
5    Q.  So you believe --
6    A.  That's 25,000 tons a month.  That would be a
7  train every week.
8    Q.  And so you think, at 150,000 tons, that you
9  could not buy anything for six months under this supply
10  agreement, and buy all of it in the last six months?
11    A.  Well, again, you're trying to put words in my
12  mouth --
13    Q.  No, I'm not.  I'm trying to listen to what
14  you're saying.
15    A.  Okay.  What you need to understand is, this is
16  a start-up operation.  It's a new company that doesn't
17  have proper equipment, that's maybe under-financed, that
18  didn't necessarily have customers for the other products
19  that need to be sold.  And doesn't have a local truck
20  market to help subsidize the rail market, which both the
21  sand and all the products have to go out on.  And, you
22  know, those are some of the issues and the problems with
23  this operation.
24    Q.  But would you disagree with me that had
25  Yelvington been buying a trainload a week, that that

123

1  particular cash flow would have been very helpful to a
2  start-up operation?
3    A.  I wasn't privy to the cash flow or the funding
4  of the company.  I didn't even know Mr. Junkett was in
5  the company.  I only dealt with Mr. Johnson, Pep and
6  Ben.  Didn't even know Mr. Junkett.  I didn't know him,
7  number one.  Didn't know his financial resources, number
8  two.
9        It's only that I became aware of that when he
10  came to me and said that, you know, they'd had some
11  problems down there and made some changes and that he
12  was involved and he had taken the other two people out,
13  and he was going to get this thing straightened out.
14    Q.  Well, did he --
15    A.  And he had a sand problem, and could we help
16  him.
17    Q.  All right.  Now, you describe this conversation
18  over and over, Gary, that you had with Mr. Junkin, and
19  I'm assuming you're talking about the conversation you
20  had at the Golden Rule in Calera.  Correct?
21    A.  Well, conversations at the Golden Rule, and
22  conversations with him that we may have talked on the
23  phone about.  I'm not sure -- I think it would have been
24  after the Golden Rule.
25    Q.  Well, what did you tell -- I mean, and one of

124

1  the things that seems to be missing from your
2  description of all your conversations that you had with
3  Clatus Junkin, what seems to be missing, to me, is any
4  description of what Yelvington was going to do to
5  fulfill its obligations under the contract and take
6  Number 57 gravel.  I haven't heard you mention that.
7  Did you have any conversations with Clatus, Clatus, I
8  believe Yelvington can help you by going ahead and
9  taking some loads of gravel under our contract?  Did you
10  ever have that conversation?
11    A.  Well, in fact, we did take gravel that we
12  weren't even under the contract.
13    Q.  Okay.
14    A.  So that's one indication that we wanted to do
15  that.
16    Q.  Okay.  But what about the contract gravel?
17    A.  Okay.  What about it?  It was an annual
18  commitment of 150,000 tons, of which, in August and
19  September, we took two trains.
20    Q.  But you didn't take any after September 25th.
21    A.  No.  And after September 25th, that train
22  actually arrived sometime the first, probably, of
23  October.  And shortly after that -- I'm not sure if it
24  came from Mr. Junkett directly, because unfortunately,
25  my memory is not good enough to remember who it came

31 (Pages 121 to 124)

93f7f9bb-1dbb-4811-8553-35dc8ec418c9

129

1  where it was into a hopper and get it into the rail car.
2      Q.  And you think the trucks did that?
3      A.  Well, trucks or loaders. I mean, you got --
4  you can't move it by hand.
5      Q.  Well, obviously, you have to get it up there,
6  but --
7      A.  That's right.
8      Q.  -- but your guys told you that the trucks
9  didn't get it up there? I mean, what did he tell you
10 specifically, Gary?
11     A.  They weren't able to load it within 24 hours.
12     Q.  And you don't remember --
13     A.  Now, that could have been -- it could have been
14 weather. I don't know. They just didn't load it in
15 24 hours.
16     Q.  But your guy was up there and he was moving the
17 train and he's telling you this, but who is he? What's
18 his name?
19     A.  Well, it was either Philip Holladay or the
20 fellow -- and I don't recall his name. He works at our
21 Pensacola yard. I know the guy that went up there. I
22 can't recall his name right now.
23     Q.  But he still works for you?
24     A.  Yes, he does.
25     Q.  Okay. So --

130

1      A.  In fact, he trains our locomotive operators.
2  He's a very experienced person up there.
3      Q.  Okay. So he's still an employee of Yelvington?
4      A.  Yes, he is.
5      Q.  Okay. And have you talked to him since he
6  loaded that shipment? That would have been something
7  over a year ago.
8      A.  Yeah, I've talked to him, but, I mean --
9      Q.  About the inability --
10     A.  No, not about Johnco.
11     Q.  Okay. Ever talk to him about Johnco since
12 then?
13     A.  I don't recall in specific, anything specific.
14 I'm sure I have, but specifically what it was about, no,
15 I don't know.
16     Q.  Okay. Now, you could produce to your lawyer
17 this man's name so that we could take his deposition --
18     A.  Sure.
19     Q.  -- or whatever we need to do?
20         All right. Philip may know his name. Right?
21     A.  Yeah. Definite.
22     Q.  I think I'll, you know, talk to him, probably
23 tomorrow and we'll figure out his name.
24     A.  Yeah.
25     Q.  Between the loading of the first train on May

131

1  the 11th, by that time, apparently, you were satisfied,
2  because you ordered a train, that they were going to be
3  able to comply with the contract, but something --
4  you're saying they couldn't load it in 24 hours, so now
5  you're not satisfied anymore. When did you take the
6  next load? I think it's in there. It's, like,
7  June 27th --
8      A.  Yeah.
9      Q.  -- 5th, late in June.
10     A.  Yeah. I think Philip Holladay's going to give
11 you a better timeline than me. Okay. I only heard, you
12 know, some of the issues. Okay. May 11th, they were
13 not ready to start running, May 11th, on a regular
14 basis. I do specifically recall that.
15     Q.  But you recall that coming from your people,
16 from Philip Holladay?
17     A.  Yeah. I mean, I wasn't communicating with Ben
18 or Pep Johnson.
19     Q.  Or Clatus?
20     A.  Well, I didn't even know he worked there at
21 that time.
22     Q.  Okay.
23     A.  I don't even think I knew he was part of the
24 operation or organization.
25     Q.  So it's nobody from Johnco's side that's

132

1  telling you, we can't produce it?
2      A.  It's nobody from Johnco's side that told me
3  that they couldn't produce or that they had so much
4  material on the ground and why weren't we coming to get
5  it. That's the right answer right there. Nobody told
6  me either way that they couldn't produce or had plenty
7  there and needed me to move it as soon as possible, that
8  they were having financial problems and would
9  consider --
10     Q.  Well, would it only be financial problems,
11 Gary, that would motivate you to come get the gravel
12 that was under that contract? I mean, does somebody
13 have to tell you to come get it because we're having
14 problems?
15     A.  You know, here's the thing that irritates me
16 about the discussion, because I don't want to be
17 painted -- my credibility is very important to me, and I
18 don't want to be placed in a position where I did
19 something that I knew was contrary to what it was.
20         What I was hearing from the people that I had
21 confidence in that was involved in the day-to-day -- or,
22 involved in Johnco's operation was, look, they did okay.
23 You know, they got some bugs to work out, they've had
24 this problem or that problem. And the pulse of all that
25 was coming from Mr. Holladay.

33 (Pages 129 to 132)

93f7f9bb-1dbb-4811-8553-35dc8ec418c

# EXHIBIT TWO

5

1  that you can actually understand so that when we answer
2  it, we'll know what it is. Is that okay with you?
3      A.   Fine with me.
4      Q.   All right. Would you just state your name for
5  the record, please?
6      A.   Mark Klebe.
7      Q.   And tell me, where are you employed, Mr. Klebe?
8      A.   Conrad Yelvington Distributors, Inc.
9      Q.   How long have you worked there?
10     A.   Since -- roughly, eight years.
11     Q.   Okay. And where are you from before that?
12 Daytona?
13     A.   You mean originally? How far --
14     Q.   Well, I mean, before -- eight years ago, you
15 came to work for Conrad Yelvington. And what did you do
16 before that?
17     A.   Before that, I was a public accountant.
18     Q.   So do you have an accounting degree from a
19 university?
20     A.   I do.
21     Q.   Which university?
22     A.   University of Central Florida.
23     Q.   Okay. And when did you graduate?
24     A.   1981.
25     Q.   Okay. Are you a CPA?

6

1      A.   I am.
2      Q.   And did you work as a CPA?
3      A.   I did.
4      Q.   Who did you work for?
5      A.   Two different firms.
6      Q.   Who are they?
7      A.   One was Brent Millikan & Company in New Smyrna
8  Beach, Florida. And the other one was Granville &
9  Associates in Ormond Beach, Florida.
10     Q.   Okay. And you live in Daytona now?
11     A.   I do not. I live in Port Orange.
12     Q.   That's not far from here? Or, is it a long way
13 from here? I don't know.
14     A.   It's within five miles, I would say. It's
15 contiguous to the area.
16     Q.   Okay. So Tuscaloosa, you could be from North
17 Port and it's just across the river, so I didn't know if
18 it was the same down here.
19         Tell me, do you hold an office with Conrad
20 Yelvington Distributors, Inc.? I mean, do you hold like
21 a named office?
22     A.   My title is chief financial officer.
23     Q.   Okay. And tell me what you do. What are your
24 responsibilities as the chief financial officer?
25     A.   Well, I guess I work probably more closely with

7

1  Gary in structuring some of the deals that we work with.
2  Ultimately, would oversee the financial operations and
3  interact with our auditors, our relationships with other
4  outside entities.
5      Q.   Okay. The lawsuit and the matter that we're
6  here on today involves a supply agreement with Johnco up
7  in Whitehall in Alabama. What was the first time you
8  had any knowledge of or involvement with Pep Johnson or
9  Ben Johnson in regard to that Whitehall plant?
10     A.   I couldn't say when the first actual meeting or
11 interaction was. I think 2003 was probably when I
12 recall a correspondence or some notes.
13     Q.   And when you say notes, you have your notes of
14 some sort of correspondence? Or, what notes are you
15 referring to?
16     A.   I was looking back at either drafts of
17 contracts, or I think there was even a question list
18 that Pep had proposed to us once, which I presume came
19 out from late '03, when he was looking at this deal.
20     Q.   What kind of questions?
21     A.   Whether or not, you know, we could help with
22 the rail infrastructure, building it, whether or not
23 we'd be able to take some material. I'd have to refer
24 to the actual memo to go -- or, question list to know
25 further.

8

1      Q.   Okay. So the earliest time that you can
2  remember having a contact with Pep is in 2003?
3      A.   Yes.
4      Q.   Do you believe there was a time earlier than
5  that that you just don't have any memory of, or is
6  that -- pretty much, you figure that's going to be when
7  it starts?
8      A.   That would probably be when it starts, as far
9  as I'm aware of.
10     Q.   Okay. And how did you get involved with that?
11 I mean, how did you come to be aware of it to start
12 with?
13     A.   Well, we were trying to work up some agreement
14 for us to do business together, so the natural course of
15 things, I get involved with that.
16     Q.   So Pep's first contacts, I think, may
17 have been with Gary. And so did Gary then bring you
18 into the fold so that you would start having contacts
19 directly with Pep?
20     A.   I would say yes, to the best of my
21 recollection. There's no other way I really would have
22 known.
23     Q.   Do you maintain a file on your early
24 communications with Johnco?
25     A.   I do have some information, yes.

2 (Pages 5 to 8)

bf3a6cb9-d0b5-4dc1-b439-ddb6c0fa437f

# EXHIBIT THREE

**FREEDOM COURT REP**

P.M. Johnson

Page 45

1  to the railroad about the track that we
2  needed to build.
3  **Q.   You're talking about the loop track?**
4  A.   Well, we first began talking to CSX
5  Railroad about the design of a track.
6  They did give us a design. The design at
7  the time was a Y coming off the main line,
8  with a straight track going into the
9  property on the east side. The discussion
10  with Yelvington was that the trains would
11  come in, and we would have two days to
12  load them. Our plan was that we would
13  load half of them, they would switch half
14  of them out onto a side track which was
15  adjacent to the property, and then we
16  would load the other half. At some point
17  here CSX sells the line to --
18  **Q.   M&B?**
19  A.   -- M&B. At that point Doug Davis is
20  the man with M&B that I began to talk
21  with. He designed four or five different
22  track configurations to do what we needed
23  to do. They agreed to lease us an engine.

Page 46

1  We went through all these different
2  designs and studies, and we were talking
3  about what it was going to cost, and I was
4  trying to get it done as cheap as I could.
5  The prices ranged all the way from almost
6  a half-million dollars at one point, down
7  to -- I think we ultimately got it built
8  for $300,000. We did most of the grading
9  work on that.
10     I was talking back and forth to Doug
11  Davis about when it could get done. I'm
12  not sure how it went through Doug Davis,
13  but Gary was going to furnish part of it.
14  At one time Gary wanted to finance part of
15  the railroad himself, we were going to pay
16  him so much a car. We arranged enough
17  financing, we thought, that we didn't need
18  that. Gary did, I understand, furnish the
19  rail for the siding that we finally built.
20  Somehow he traded that out with M&B
21  Railroad. I think he got paid for all
22  that. I don't know whether he got a
23  freight concession, or how he was paid.

Page 47

1  Q.   L
2  second
3  Mr. Y
4  track l
5  A.   H
6  the trac
7  **Q.   W**
8  A.   W
9  Q.   N
10  financi
11  A.   W
12  He talk                                   ... needed
13  it.
14  **Q.   So he would do that for Johnco if it**
15  **was needed?**
16  A.   Yes, if we would pay him back by the
17  car, a reduced price per ton of gravel, or
18  something like that.
19  **Q.   So he was going to front the money**
20  **and then get paid in some way, either**
21  **through services or cash; is that correct?**
22  A.   Yes.
23  **Q.   And you said that Yelvington**

Page 48

1  **provided some of the materials; is that**
2  **correct?**
3  A.   He provided the steel. We did all
4  the grading for this track, and we paid
5  for that. He furnished the steel. I
6  don't know whether he furnished the
7  balance, that is the stone, the subgrade
8  for the actual ties or not. I don't know
9  whether he did that or not. Anyway, we
10  ended up having a lease payback on the
11  railroad of $300,000; and Gary was paid, I
12  understand, through the railroad somehow.
13  **Q.   Let me make sure I understand this.**
14  **Yelvington provided some of the materials,**
15  **and Johnco ended up with an obligation to**
16  **the railroad?**
17  A.   Right.
18  **Q.   For $300,000?**
19  A.   Right.
20  **Q.   Do you know who paid Yelvington?**
21  A.   Doug Davis said they had been
22  compensated. I don't know how that was
23  done.

12  (Pages 45 to 48)

# FREEDOM COURT REPORTING

Page 57

1 trying to keep customers happy. We had a
2 little ready-mix plant there, and we ran
3 that too.
4 Q.  Do you have any degrees or
5 certifications that would relate to the
6 sand and gravel production business?
7 A.  No, I don't.
8 Q.  And I'm talking about geotechnical,
9 engineering degrees, anything like that?
10 A.  None at all.
11 Q.  Let's go back to the additional
12 customers you were trying to sell while
13 you worked for Johnco. What were you
14 trying to sell the smelter at Selma, what
15 product?
16 A.  Metallurgical gravel.
17 Q.  Is that number 67; right? You'll
18 have to forgive my ignorance here, because
19 I don't know all the specifications.
20 A.  The gravel in Whitehall has what, to
21 us, is a large size range, ranging
22 anywhere from a quarter-of-an-inch up to
23 three inches, we'll say. 67 gravel, for

Page 58

1 the most part, is below an inch, part of
2 it below three-quarters of an inch. So
3 metallurgical gravel is the larger portion
4 of that sieve analysis, from an inch up to
5 whatever. What they do with it is melt
6 it, actually melt the gravel and make
7 various products out of it.
8 Q.  And that's what you were trying to
9 sell the smelter in Selma; is that
10 correct?
11 A.  Right. Well, the one in Ohio
12 actually melts this gravel and uses it in
13 manufacturing zinc, which is an alloy.
14 I'm not sure what function the gravel
15 plays, unless it's flux, maybe. But,
16 anyway, that material is worth more money
17 than concrete gravel.
18 Q.  Just so I'm clear here, you were
19 trying to sell the smelter in Selma
20 oversize gravel, and you were also trying
21 to sell the smelter in Ohio oversize
22 gravel; is that correct?
23 A.  Right.

Page 59

1 Q.  What were you trying to sell Hodgson
2 Concrete, what product?
3 A.  Sand and gravel.
4 Q.  Oversize gravel?
5 A.  No.
6 Q.  Number 67 or concrete gravel?
7 A.  67.
8 Q.  What were you trying to sell the
9 block plant in Montgomery?
10 A.  It's a particular grade of sand that
11 they would manufacture blocks with. I'm
12 not sure of the screen analysis of that.
13 It's basically concrete sand, but it can't
14 have any sizeable pebbles in it of any
15 kind.
16 Q.  And what were you trying to sell
17 Lafarge?
18 A.  We were trying to sell Lafarge sand.
19 Q.  You have given me a list of five
20 additional customers you were trying to
21 sell products to. Are there others that
22 you just can't remember?
23 A.  There could be. I'm trying to think

Page 60

1 when USA Materials, if I'm not mistaken,
2 they had bought out a plant down around
3 Dothan, and they came by and expressed an
4 interest in sand or gravel, one. I don't
5 know that I talked to them. Maybe Ben
6 talked to them. But I was aware that, you
7 know, they had been by, and we talked to
8 them.
9 Q.  Did you ever try to sell sand to
10 Yelvington?
11 A.  We asked Gary if he could take some
12 sand, yes.
13 Q.  Just so I can complete our list
14 here, that takes us up to potentially
15 seven. Are there any other additional
16 customers that you tried to sell to?
17 A.  I can't think of any. Of course,
18 we're talking about rail delivery here.
19 From time to time people would come by and
20 want a load of something, you know, on a
21 truck.
22 Q.  Sure. But these would have been
23 large sales; right?

15 (Pages 57 to 60)

# FREEDOM COURT REPORTING

Page 113

1  Phillip, and I believe Mr. Conrad was
2  there and maybe a couple of pilots at the
3  airport in Montgomery. I said, "Gary, we
4  really need to ship some material. Also,
5  if you could take some sand, we need you
6  to do that." I said, "If there's any
7  pricing you could add to what we're
8  selling you, we could use that." I didn't
9  really get any response to any of that. I
10 believe Gary said, "I'll think about it."
11 **Q.  When was this meeting?**
12 A.  I can't come up with that.
13 **Q.  Was that in 2005?**
14 A.  I think so. If you represent Gary,
15 you know he's a busy guy. He comes and
16 goes.
17 **Q.  Yes.**
18 A.  He was supposed to come by and see
19 us twice along in 2005, I think. One time
20 he didn't make it to Alabama. One time he
21 was there and I went down to see him, and
22 he only spent about twenty minutes at the
23 plant, so I missed him; and then this

Page 114

1  meeting I just talked about. He was
2  coming to the plant, and he called and
3  said he had only a few minutes; he had to
4  take off from the airport, could we come
5  over there and see him. I didn't have a
6  lot of contact with him.
7  **Q.  Do you think that was before 2006?**
8  A.  I think so.
9  **Q.  Do you think it was at the beginning**
10 **of 2005?**
11 A.  I don't know.
12 **Q.  Let's see if we can focus a little**
13 **bit more on what you do remember about**
14 **that conversation. You said that you**
15 **talked to him about pricing. What do you**
16 **mean? What did you talk about with regard**
17 **to pricing?**
18 A.  I asked him if there had been any
19 price appreciation since we had entered
20 into this agreement.
21 **Q.  For the gravel?**
22 A.  Yes.
23 **Q.  So were you asking him if they could**

Page 115

1  pay more?
2  A.  Yes.
3  **Q.  Why were you asking him if they**
4  **could pay more?**
5  A.  Well, we hadn't shipped any; and I
6  thought when we did ship, you know, there
7  had been a substantial price appreciation
8  between his first offer and what we agreed
9  to, so I would like to know if the market
10 could withstand that.
11 **Q.  You understand at that point,**
12 **though, that there was a supply agreement**
13 **in place?**
14 A.  I understand, yes. He didn't have
15 to do that. I understand that.
16 **Q.  Sure. Did Johnco need to get more**
17 **money for that gravel?**
18 A.  Well, we needed to get some money
19 for gravel. We hadn't sold any, you know.
20 **Q.  So for Johnco to continue to**
21 **operate, it needed to get more money for**
22 **that gravel; is that correct?**
23 A.  Well, we didn't have to have it, you

Page 116

1  know. I thought it was worth bringing the
2  subject up.
3  **Q.  What did you talk to the Yelvingtons**
4  **about with regard to sand?**
5  A.  I asked them if they could move any
6  sand.
7  **Q.  Did you tell them that Johnco needed**
8  **to move some sand?**
9  A.  I don't remember saying that we
10 needed to. I asked him if they thought
11 they could move some. As we were leaving
12 the meeting, I think Phillip and I and
13 Ben, Phillip indicated that he thought
14 there was a possibility of moving sand
15 somewhere, maybe Birmingham or Atlanta or
16 someplace. Of course, he said it was
17 nothing definite, you know. There was
18 just a possibility out there.
19 **Q.  That they would try to work on that**
20 **for you?**
21 A.  Yes.
22 **Q.  I guess that leads to my next point**
23 **here. What was your relationship like**

29 (Pages 113 to 116)

# FREEDOM COURT REPORTING

Page 141

1  that would pretty well balance that, yes.
2  Q.  Do you recall telling Mr. Holladay
3  that you would like to make some sand
4  available to Yelvington, in or about
5  January of 2006?
6  A.  I don't remember that.
7  Q.  Did you ever give Yelvington a price
8  for sand after January 12, 2006?
9  A.  I don't think so.
10  (Whereupon, Defendant's Exhibit
11  Number 8 was marked for identification, a
12  copy of which is attached to the original
13  of the transcript.)
14  Q.  I have marked this as Defendant's
15  Exhibit 8.  Do you ever recall calling
16  Mr. Holladay on a Saturday?
17  A.  I don't remember telling him that we
18  would have to shut down if they didn't
19  purchase the sand.
20  Q.  I understand.  Do you recall having
21  any conversation with Mr. Holladay on a
22  Saturday?
23  A.  I don't remember this conversation.

Page 142

1  Q.  I'm not asking specifically about
2  this conversation.  I'm asking about
3  Saturday.
4  A.  You're talking about any Saturday?
5  Q.  Yes.
6  A.  Could have been.  I don't know.
7  Q.  Did you ever have a conversation
8  with Mr. Holladay about sand in March of
9  2006?
10  A.  My recollection was I talked to
11  Phillip earlier than this.  That's what I
12  remember.
13  Q.  Do you believe that this is
14  inaccurate, the statement that you talked
15  to him about sand in March of 2006?
16  A.  I simply don't remember that being
17  our conversation.
18  Q.  Let's see if we can piece it
19  together this way.  Do you recall whether
20  Johnco was still talking to Lafarge about
21  buying their sand in 2006?
22  A.  I don't think so.  I think we pretty
23  well had given up on that possibility.

Page 143

1  Q.  You were still involved with Johnco
2  in March of 2006; is that correct?
3  A.  Well, I had not actually been paid
4  for my interest.  I wasn't physically down
5  there, and I could have continued to try
6  to help them sell things, yes.
7  Q.  Do you recall, at any point in time,
8  Lafarge telling you that they had stocked
9  up on sand and didn't need Johnco's sand
10  right now?
11  A.  Keith did tell me that, I think, at
12  one time, yes.  He told me several times,
13  really.  As I say, he came to the plant.
14  At a later date, in the summer of '05 he
15  came to Montgomery and asked me to bring a
16  sample, which I did.  Later that fall he
17  had Ben take him a sample, I think.  At
18  some point Ben took a sample of sand to
19  Atlanta, and they looked at it.  But I
20  remember these things as being in late
21  '05.  Now, it's possible I continued to
22  talk to Keith in 2006.
23  Q.  Do you recall telling Mr. Holladay

Page 144

1  that Johnco might have to shut down if you
2  couldn't move some sand soon?
3  A.  No, I don't recall saying that.
4  Q.  Does that mean that you didn't say
5  it, or that you don't recall whether you
6  said it?
7  A.  That wasn't my opinion at any time.
8  Q.  I appreciate that.  Could you have
9  said that Johnco might have to shut down
10  if they couldn't move sand soon?
11  A.  I don't think so.
12  Q.  Did you ask Yelvington in March of
13  2006 whether there was any way they could
14  help you move some sand?
15  A.  If that's when we went to Montgomery
16  and met him at the airport, I did ask him
17  if he could move some sand.  I also asked
18  him if he could begin to take some gravel
19  or if he could pay any more for the gravel
20  that he was going to take.
21  Q.  When I say "Yelvington," I mean the
22  company; let me specify that.  This
23  doesn't appear to relate to your meeting

36 (Pages 141 to 144)

# FREEDOM COURT REPORTING

Page 97

1 problems?
2 A.   They had supplied -- not knowing
3 exactly what the material is, I'll just
4 call it plastic -- screening material. It
5 turned out that that wouldn't screen the
6 material. We had to replace that with
7 steel.
8 Q.   Do you recall when that problem
9 occurred?
10 A.   I don't know.
11 Q.   Can you ballpark it at all?
12 A.   I can't recall.
13 Q.   Did it occur prior to you selling
14 out to Mr. Junkin?
15 A.   Yes.
16 Q.   Did you ever have any problems with
17 the operation of the classifier?
18 A.   The sand classifier?
19 Q.   Yes.
20 A.   He kept tinkering with the sand
21 classifier, doing different things to get
22 the gradation exactly like we needed. You
23 know, I'm not sure how much of a problem

Page 98

1 that was. We didn't have a sale for the
2 sand. We were just trying, in the
3 process, to try to make the sand coming
4 out of there in specs in case we did get a
5 market for it.
6 Q.   What were you doing with the sand
7 that was produced?
8 A.   It was being stacked there by the
9 plant.
10 Q.   What is the product mix there with
11 regard to sand, number 67, and oversize?
12 A.   The screen analysis that we did
13 initially of the borings, the spot where
14 we set the dredge in operation indicated
15 there was 47 percent gravel, 53 percent
16 sand. If 10, 15 percent of the gravel,
17 say 10 percent was oversize, 10 percent of
18 47 percent is whatever that is, 5 percent.
19 So we would have 35, 40 percent 67 gravel,
20 and 5, 6, 7 percent oversize, and the rest
21 sand.
22 Q.   What did you plan to do with the
23 sand as it was being produced?

Page 99

1 A.   Well, we were going to put it in
2 specifications and hopefully sell it.
3 Q.   And if you didn't sell it, what was
4 to happen to it?
5 A.   Well, at some point -- as I say, the
6 radial stacker was there to stack it up.
7 At some point when we moved the dredge in
8 that direction, that is the pit where you
9 are excavating, you can put it back in the
10 pit.
11 Q.   Was that your plan?
12 A.   Well, if we couldn't sell it, that's
13 pretty much what we would have to do with
14 it, yes.
15 Q.   Did you ever have any conversations
16 with anyone, except for your lawyers,
17 about what would happen if Johnco couldn't
18 move the sand or couldn't sell the sand?
19 A.   Ben and I talked about what we could
20 do with it, you know. We continually
21 tried to sell it.
22 Q.   Why was that?
23 A.   Why did we want to sell it?

Page 100

1 Q.   I think you told me, because that's
2 where the profit was; right? If you could
3 move it, that's where --
4 A.   That's where some of the profit
5 would have been, yes. Did I have a
6 conversation with Ben about it, what we
7 could do with it? Yes, we talked about
8 it. Could we put it in this spec; could
9 we put it in that? Would Lafarge buy it;
10 would they buy it at what price, you know.
11 Q.   Did you ever have any conversations
12 with Ben or anyone else about what would
13 happen if you couldn't sell the sand?
14 A.   No. It seemed apparent to us if we
15 couldn't sell it, it would stay there.
16 Q.   Did you ever tell anyone, at any
17 point in time, that if Johnco couldn't
18 sell the sand, it was going to have to
19 shut down its operation?
20 A.   No, I didn't. I told, I think Gary,
21 and I may have told Phillip, "We would
22 sure like to sell some sand." I told
23 Keith Bodiford with Lafarge that we would

25  (Pages 97 to 100)

# FREEDOM COURT REPORTING

Page 25

1 relating to Johnco?
2 A. I don't think so, no.
3 Q. Do you recall what the production
4 plan was that you put together for
5 Regions?
6 A. Well, we were going to sell 150,000
7 tons a year at whatever that is,
8 five-and-a-quarter.
9 Q. That's number 67 gravel; correct?
10 A. Right. There was to be a market
11 for, we thought for metallurgical gravel,
12 which was the oversize.
13 Q. How much of that did you intend to
14 produce?
15 A. Well, the deposit itself, according
16 to Ben's testing, has anywhere from 40 to
17 47 percent gravel, depending on what area
18 you're testing.
19 Q. Is that both number 67 and
20 oversized?
21 A. That's all the gravel. About 15
22 percent of the gravel would have been
23 oversize, according to the screen analysis

Page 26

1 he made; so whatever that comes to.
2 Q. What other parts of your production
3 plan did you have?
4 A. We told the bank what we thought it
5 would cost. We knew what it would cost to
6 buy the property, and we told them what we
7 thought we could buy various pieces of
8 equipment for, that kind of thing.
9 Q. Did you have to present that to them
10 in writing, some kind of cost analysis?
11 A. I'm sure we did. I don't recall the
12 details of it, but I'm sure we did.
13 Q. What about the sand, what was your
14 plan with regard to the sand?
15 A. Well, initially we thought we
16 wouldn't have a market for the sand.
17 After we were set up, Lafarge in
18 Atlanta -- well, Keith Bodiford works for
19 them, came by and wanted to know if we
20 would sell some sand, and we made him a
21 price and took some samples over there.
22 It never did materialize, though.
23 Q. Just so I'm clear here, initially

Page 27

1 when you seek financing, you don't have a
2 plan to sell the sand; is that correct?
3 A. We thought there were several
4 possibilities for sand; but we did not
5 have a market for it, no.
6 Q. What possibilities did you think you
7 had for sand? Again, we're talking about
8 the time that you're going to get
9 financing.
10 A. Well, there was a new block plant
11 opening on the west side of Montgomery
12 that we talked to.
13 Q. What was their name; do you know?
14 A. I don't. One of the ready-mix
15 places on the west side of town was
16 interested, if we could supply them
17 gravel. Of course, we were committed to
18 Gary for the 150,000 tons, and we couldn't
19 guarantee that we would supply both. So
20 that was just a possibility.
21 Q. At the time that you're seeking
22 financing?
23 A. Right.

Page 28

1 Q. Did you seek financing from any
2 other person or entity other than Regions?
3 I'm talking about the time that you and
4 Ben sought financing.
5 A. We kicked around ideas. We didn't
6 actually apply to anybody else.
7 Q. Did you talk to anybody else?
8 A. Well, we talked to somebody with the
9 Department of Agriculture, some kind of
10 government loan program, and they wanted a
11 whole bunch of information. We ultimately
12 did not apply to them. We just kicked
13 that idea around.
14 Q. Why didn't you apply with them?
15 A. We had pretty much decided that Ben
16 and I couldn't handle it.
17 Q. Did Regions process your
18 application, to the point where you got a
19 determination?
20 A. Well, they turned us down.
21 Q. Fair enough. Did you talk to
22 anybody else besides Regions and the
23 Department of Agriculture about financing?

7 (Pages 25 to 28)

# FREEDOM COURT REPORTING

Page 57

1  trying to keep customers happy. We had a
2  little ready-mix plant there, and we ran
3  that too.
4  Q.  Do you have any degrees or
5  certifications that would relate to the
6  sand and gravel production business?
7  A.  No, I don't.
8  Q.  And I'm talking about geotechnical,
9  engineering degrees, anything like that?
10  A.  None at all.
11  Q.  Let's go back to the additional
12  customers you were trying to sell while
13  you worked for Johnco. What were you
14  trying to sell the smelter at Selma, what
15  product?
16  A.  Metallurgical gravel.
17  Q.  Is that number 67; right? You'll
18  have to forgive my ignorance here, because
19  I don't know all the specifications.
20  A.  The gravel in Whitehall has what, to
21  us, is a large size range, ranging
22  anywhere from a quarter-of-an-inch up to
23  three inches, we'll say. 67 gravel, for

Page 58

1  the most part, is below an inch, part of
2  it below three-quarters of an inch. So
3  metallurgical gravel is the larger portion
4  of that sieve analysis, from an inch up to
5  whatever. What they do with it is melt
6  it, actually melt the gravel and make
7  various products out of it.
8  Q.  And that's what you were trying to
9  sell the smelter in Selma; is that
10  correct?
11  A.  Right. Well, the one in Ohio
12  actually melts this gravel and uses it in
13  manufacturing zinc, which is an alloy.
14  I'm not sure what function the gravel
15  plays, unless it's flux, maybe. But,
16  anyway, that material is worth more money
17  than concrete gravel.
18  Q.  Just so I'm clear here, you were
19  trying to sell the smelter in Selma
20  oversize gravel, and you were also trying
21  to sell the smelter in Ohio oversize
22  gravel; is that correct?
23  A.  Right.

Page 59

1  Q.  What were you trying to sell Hodgson
2  Concrete, what product?
3  A.  Sand and gravel.
4  Q.  Oversize gravel?
5  A.  No.
6  Q.  Number 67 or concrete gravel?
7  A.  67.
8  Q.  What were you trying to sell the
9  block plant in Montgomery?
10  A.  It's a particular grade of sand that
11  they would manufacture blocks with. I'm
12  not sure of the screen analysis of that.
13  It's basically concrete sand, but it can't
14  have any sizeable pebbles in it of any
15  kind.
16  Q.  And what were you trying to sell
17  Lafarge?
18  A.  We were trying to sell Lafarge sand.
19  Q.  You have given me a list of five
20  additional customers you were trying to
21  sell products to. Are there others that
22  you just can't remember?
23  A.  There could be. I'm trying to think

Page 60

1  when USA Materials. if I'm not mistaken,
2  they had bought out a plant down around
3  Dothan, and they came by and expressed an
4  interest in sand or gravel, one. I don't
5  know that I talked to them. Maybe Ben
6  talked to them. But I was aware that, you
7  know, they had been by, and we talked to
8  them.
9  Q.  Did you ever try to sell sand to
10  Yelvington?
11  A.  We asked Gary if he could take some
12  sand, yes.
13  Q.  Just so I can complete our list
14  here, that takes us up to potentially
15  seven. Are there any other additional
16  customers that you tried to sell to?
17  A.  I can't think of any. Of course,
18  we're talking about rail delivery here.
19  From time to time people would come by and
20  want a load of something, you know, on a
21  truck.
22  Q.  Sure. But these would have been
23  large sales; right?

15 (Pages 57 to 60)

# FREEDOM COURT REPORTING

Page 101

1  love to sell some sand. I thought it
2  would be great to sell sand, you know. I
3  didn't tell anybody that we were going to
4  shut down if we couldn't sell it.
5  Q.  Did you tell anybody that Johnco
6  would have to shut down if it couldn't
7  sell the oversize gravel?
8  A.  No, I don't think so. I don't
9  remember doing that at all. My answer
10  would be I didn't do that.
11  Q.  Did you ever have the impression
12  that Johnco would have to shut down if it
13  couldn't sell the oversize gravel?
14  A.  No, because, really, we were selling
15  the oversize gravel. I don't know whether
16  we had sold oversize gravel when I got out
17  or not. Ben said that he had a customer
18  who was buying oversize gravel, by truck
19  hauling it to Montgomery and shipping it
20  into Florida or somewhere. I don't know
21  whether that occurred before I got out or
22  not. The oversize, in my mind, was a
23  product that would move at some point, you

Page 102

1  know.
2  Q.  Just so I can close the loop here,
3  do I understand correctly that you weren't
4  involved with the first load taken by
5  Yelvington in May of 2005?
6  A.  That's right.
7  Q.  Excuse me. Was that May of 2006?
8  A.  It was '06, I think.
9  Q.  Thank you.
10  MR. LEEK: For your purposes, we'll
11  just keep these numbered consecutively.
12  Is that okay?
13  MR. PEARSON: Yes.
14  (Whereupon, Defendant's Exhibit
15  Number 1 was marked for identification. a
16  copy of which is attached to the original
17  of the transcript.)
18  Q.  Mr. Johnston, I have handed you what
19  has been marked as Defendant's Exhibit 1,
20  which I'll represent to you is our answer
21  to this Complaint. The reason I'm using
22  the answer is because it contains both the
23  factual allegations and the responses.

Page 103

1  Have you ever seen this document before?
2  A.  No.
3  Q.  I'm just going to give it to you so
4  you have it in writing in front of you,
5  and I'm going to ask you a couple of
6  questions about the factual allegations in
7  it. Do you understand that?
8  A.  Sure.
9  Q.  If you turn to the second page and
10  look at paragraph 6, there's an allegation
11  that Johnco invested four million dollars
12  in capital expenses to build and place
13  into operation this facility. Do you see
14  that?
15  A.  Uh-huh.
16  Q.  Is that "yes"?
17  A.  Do I see it?
18  Q.  Yes, sir.
19  A.  Yes, I see it.
20  Q.  Do you know how that number of four
21  million dollars was arrived at?
22  A.  "Plaintiff invested four million
23  dollars."

Page 104

1  Q.  Sir, it may be that you just don't
2  know how that number was arrived at.
3  That's fine. I just need to check the
4  boxes in my outline here, and move on.
5  A.  I'm trying to figure if the interest
6  accumulated -- it says we agreed. I don't
7  know. Put it that way, I don't know.
8  Q.  You don't know how that number was
9  arrived at?
10  A.  No.
11  Q.  In preparation of this lawsuit, were
12  you asked to give any information?
13  A.  No. As a matter of fact, I didn't
14  know it was being filed at the time it was
15  filed.
16  Q.  If you'll turn to the next page for
17  me and look at paragraph 7, in there it
18  says that "Number 67 concrete gravel at a
19  rate of approximately 5,200 tons per
20  week." What did you understand the
21  frequency with which Yelvington would come
22  and get the gravel would be?
23  A.  Well, I was thinking at the time

26 (Pages 101 to 104)

# FREEDOM COURT REPORTING

Page 49

1  Q.  Do you know whether Mr. Yelvington,
2  or Yelvington, provided those materials at
3  a reduced rate for Johnco?
4  A.  I don't.
5  Q.  Could Johnco have built out the
6  track if the costs were $500,000,
7  $600,000, that Johnco had to incur itself?
8  A.  In hindsight, I doubt seriously we
9  could have.
10  Q.  To your knowledge, did Johnco ever
11  pay the railroad the $300,000 that it owed
12  for the build-out?
13  A.  No, it didn't.
14  Q.  Has it paid anything to the railroad
15  for that?
16  A.  I don't know.
17  Q.  During the time that you were at
18  Johnco, why didn't Johnco pay the railroad
19  the $300,000 that was owed on the
20  build-out?
21  A.  The payback was at so much a car
22  shipped over the railroad; so if no
23  shipments were going out, the railroad

Page 51

1  A.  Well, it seems to me that there were
2  sixty or seventy cars there, and first
3  train. They came in and said, "We want
4  them all done today. You don't have two
5  days." So they started early that morning
6  and got through at 10 o'clock or so that
7  night, so I'm told.
8  Q.  Were you involved with Johnco at
9  that time?
10  A.  Clatus and I had agreed that he was
11  going to buy us out.
12  Q.  When was that?
13  A.  I don't remember. It was early
14  2006.
15  Q.  And at the point that you and Mr.
16  Junkin had agreed that Mr. Junkin was
17  going to buy you out, did you stop your
18  roles with Johnco?
19  A.  Pretty much, yes. Of course, I
20  talked to Ben occasionally and said, "How
21  are you doing," and so forth, you know. I
22  would like for them to do well if they
23  could.

Page 50

1  wasn't getting compensated. If Gary
2  didn't ship out on this track, the
3  railroad had no income that we were
4  obligated to pay.
5  Q.  And during the time that you were at
6  Johnco, were there any shipments made?
7  A.  No.
8  Q.  Do you know whether shipments were
9  made after you left Johnco?
10  A.  I understand they were. As a matter
11  of fact, I talked to Ben the night the
12  first train came in down there. Everybody
13  was excited.
14  Q.  About May 2006; is that your
15  recollection?
16  A.  Yes, I understand that's when it
17  was.
18  Q.  What did Mr. Johnston say in that
19  conversation?
20  A.  He said, "You got them all loaded,"
21  and I said, "I don't know how you did it."
22  Q.  Why did you say, "I don't know how
23  you did it"?

Page 52

1  Q.  Well, let's close the loop on your
2  roles here. We got off on the loop track,
3  and I'm not sure we ever finished the list
4  of what your roles were with Johnco.
5  A.  Well, as I say, I was trying to
6  sell. There were several metallurgical
7  people that I talked to, and at one time
8  had at least encouragement from. There's
9  a smelter over at Selma, but our material
10  doesn't meet their specs. It has too much
11  iron in it. There's one up in Ohio that
12  was most encouraging. It turned out the
13  freight differential, when the diesel
14  rates went up, it didn't turn out that we
15  could sell it up there for what we thought
16  it was worth. So that's some of the
17  things I was doing.
18  Q.  Let's see if we can go through
19  those. You said you were selling to
20  additional customers, and I think you just
21  listed me a couple here; you had oversight
22  of spending?
23  A.  Well, I had oversight of paying.

13 (Pages 49 to 52)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

Case 2:06-cv-00993-KOB-SRW   Document 91-4   Filed 03/10/2008   Page 11 of 13

# FREEDOM COURT REPORTING

Page 57

1 trying to keep customers happy. We had a
2 little ready-mix plant there, and we ran
3 that too.
4 Q. Do you have any degrees or
5 certifications that would relate to the
6 sand and gravel production business?
7 A. No, I don't.
8 Q. And I'm talking about geotechnical,
9 engineering degrees, anything like that?
10 A. None at all.
11 Q. Let's go back to the additional
12 customers you were trying to sell while
13 you worked for Jobnco. What were you
14 trying to sell the smelter at Selma, what
15 product?
16 A. Metallurgical gravel.
17 Q. Is that number 67; right? You'll
18 have to forgive my ignorance here, because
19 I don't know all the specifications.
20 A. The gravel in Whitehall has what, to
21 us, is a large size range, ranging
22 anywhere from a quarter-of-an-inch up to
23 three inches, we'll say. 67 gravel, for

Page 58

1 the most part, is below an inch, part of
2 it below three-quarters of an inch. So
3 metallurgical gravel is the larger portion
4 of that sieve analysis, from an inch up to
5 whatever. What they do with it is melt
6 it, actually melt the gravel and make
7 various products out of it.
8 Q. And that's what you were trying to
9 sell the smelter in Selma; is that
10 correct?
11 A. Right. Well, the one in Ohio
12 actually melts this gravel and uses it in
13 manufacturing zinc, which is an alloy.
14 I'm not sure what function the gravel
15 plays, unless it's flux, maybe. But,
16 anyway, that material is worth more money
17 than concrete gravel.
18 Q. Just so I'm clear here, you were
19 trying to sell the smelter in Selma
20 oversize gravel, and you were also trying
21 to sell the smelter in Ohio oversize
22 gravel; is that correct?
23 A. Right.

Page 59

1 Q. What were you trying to sell Hodgson
2 Concrete, what product?
3 A. Sand and gravel.
4 Q. Oversize gravel?
5 A. No.
6 Q. Number 67 or concrete gravel?
7 A. 67.
8 Q. What were you trying to sell the
9 block plant in Montgomery?
10 A. It's a particular grade of sand that
11 they would manufacture blocks with. I'm
12 not sure of the screen analysis of that.
13 It's basically concrete sand, but it can't
14 have any sizeable pebbles in it of any
15 kind.
16 Q. And what were you trying to sell
17 Lafarge?
18 A. We were trying to sell Lafarge sand.
19 Q. You have given me a list of five
20 additional customers you were trying to
21 sell products to. Are there others that
22 you just can't remember?
23 A. There could be. I'm trying to think

Page 60

1 when USA Materials, if I'm not mistaken,
2 they had bought out a plant down around
3 Dothan, and they came by and expressed an
4 interest in sand or gravel, one. I don't
5 know that I talked to them. Maybe Ben
6 talked to them. But I was aware that, you
7 know, they had been by, and we talked to
8 them.
9 Q. Did you ever try to sell sand to
10 Yelvington?
11 A. We asked Gary if he could take some
12 sand, yes.
13 Q. Just so I can complete our list
14 here, that takes us up to potentially
15 seven. Are there any other additional
16 customers that you tried to sell to?
17 A. I can't think of any. Of course,
18 we're talking about rail delivery here.
19 From time to time people would come by and
20 want a load of something, you know, on a
21 truck.
22 Q. Sure. But these would have been
23 large sales; right?

15 (Pages 57 to 60)

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 49

1    Q.  Do you know whether Mr. Yelvington,
2    or Yelvington, provided those materials at
3    a reduced rate for Johnco?
4    A.  I don't.
5    Q.  Could Johnco have built out the
6    track if the costs were $500,000,
7    $600,000, that Johnco had to incur itself?
8    A.  In hindsight, I doubt seriously we
9    could have.
10   Q.  To your knowledge, did Johnco ever
11   pay the railroad the $300,000 that it owed
12   for the build-out?
13   A.  No, it didn't.
14   Q.  Has it paid anything to the railroad
15   for that?
16   A.  I don't know.
17   Q.  During the time that you were at
18   Johnco, why didn't Johnco pay the railroad
19   the $300,000 that was owed on the
20   build-out?
21   A.  The payback was at so much a car
22   shipped over the railroad; so if no
23   shipments were going out, the railroad

Page 51

1    A.  Well, it seems to me that there were
2    sixty or seventy cars there, and first
3    train.  They came in and said, "We want
4    them all done today.  You don't have two
5    days."  So they started early that morning
6    and got through at 10 o'clock or so that
7    night, so I'm told.
8    Q.  Were you involved with Johnco at
9    that time?
10   A.  Clatus and I had agreed that he was
11   going to buy us out.
12   Q.  When was that?
13   A.  I don't remember.  It was early
14   2006.
15   Q.  And at the point that you and Mr.
16   Junkin had agreed that Mr. Junkin was
17   going to buy you out, did you stop your
18   roles with Johnco?
19   A.  Pretty much, yes.  Of course, I
20   talked to Ben occasionally and said, "How
21   are you doing," and so forth, you know.  I
22   would like for them to do well if they
23   could.

Page 50

1    wasn't getting compensated.  If Gary
2    didn't ship out on this track, the
3    railroad had no income that we were
4    obligated to pay.
5    Q.  And during the time that you were at
6    Johnco, were there any shipments made?
7    A.  No.
8    Q.  Do you know whether shipments were
9    made after you left Johnco?
10   A.  I understand they were.  As a matter
11   of fact, I talked to Ben the night the
12   first train came in down there.  Everybody
13   was excited.
14   Q.  About May 2006; is that your
15   recollection?
16   A.  Yes, I understand that's when it
17   was.
18   Q.  What did Mr. Johnston say in that
19   conversation?
20   A.  He said, "You got them all loaded,"
21   and I said, "I don't know how you did it."
22   Q.  Why did you say, "I don't know how
23   you did it"?

Page 52

1    Q.  Well, let's close the loop on your
2    roles here.  We got off on the loop track,
3    and I'm not sure we ever finished the list
4    of what your roles were with Johnco.
5    A.  Well, as I say, I was trying to
6    sell.  There were several metallurgical
7    people that I talked to, and at one time
8    had at least encouragement from.  There's
9    a smelter over at Selma, but our material
10   doesn't meet their specs.  It has too much
11   iron in it.  There's one up in Ohio that
12   was most encouraging.  It turned out the
13   freight differential, when the diesel
14   rates went up, it didn't turn out that we
15   could sell it up there for what we thought
16   it was worth.  So that's some of the
17   things I was doing.
18   Q.  Let's see if we can go through
19   those.  You said you were selling to
20   additional customers, and I think you just
21   listed me a couple here; you had oversight
22   of spending?
23   A.  Well, I had oversight of paying.

13  (Pages 49 to 52)

## 367 VALLEY AVENUE
### (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 101

1  love to sell some sand. I thought it
2  would be great to sell sand, you know. I
3  didn't tell anybody that we were going to
4  shut down if we couldn't sell it.
5  Q.  Did you tell anybody that Johnco
6  would have to shut down if it couldn't
7  sell the oversize gravel?
8  A.  No, I don't think so. I don't
9  remember doing that at all. My answer
10  would be I didn't do that.
11  Q.  Did you ever have the impression
12  that Johnco would have to shut down if it
13  couldn't sell the oversize gravel?
14  A.  No, because, really, we were selling
15  the oversize gravel. I don't know whether
16  we had sold oversize gravel when I got out
17  or not. Ben said that he had a customer
18  who was buying oversize gravel, by truck
19  hauling it to Montgomery and shipping it
20  into Florida or somewhere. I don't know
21  whether that occurred before I got out or
22  not. The oversize, in my mind, was a
23  product that would move at some point, you

Page 103

1  Have you ever seen this document before?
2  A.  No.
3  Q.  I'm just going to give it to you so
4  you have it in writing in front of you,
5  and I'm going to ask you a couple of
6  questions about the factual allegations in
7  it. Do you understand that?
8  A.  Sure.
9  Q.  If you turn to the second page and
10  look at paragraph 6, there's an allegation
11  that Johnco invested four million dollars
12  in capital expenses to build and place
13  into operation this facility. Do you see
14  that?
15  A.  Uh-huh.
16  Q.  Is that "yes"?
17  A.  Do I see it?
18  Q.  Yes, sir.
19  A.  Yes, I see it.
20  Q.  Do you know how that number of four
21  million dollars was arrived at?
22  A.  "Plaintiff invested four million
23  dollars."

Page 102

1  know.
2  Q.  Just so I can close the loop here,
3  do I understand correctly that you weren't
4  involved with the first load taken by
5  Yelvington in May of 2005?
6  A.  That's right.
7  Q.  Excuse me. Was that May of 2006?
8  A.  It was '06, I think.
9  Q.  Thank you.
10      MR. LEEK:  For your purposes, we'll
11  just keep these numbered consecutively.
12  Is that okay?
13      MR. PEARSON:  Yes.
14      (Whereupon, Defendant's Exhibit
15  Number 1 was marked for identification, a
16  copy of which is attached to the original
17  of the transcript.)
18  Q.  Mr. Johnston, I have handed you what
19  has been marked as Defendant's Exhibit 1,
20  which I'll represent to you is our answer
21  to this Complaint. The reason I'm using
22  the answer is because it contains both the
23  factual allegations and the responses.

Page 104

1  Q.  Sir, it may be that you just don't
2  know how that number was arrived at.
3  That's fine. I just need to check the
4  boxes in my outline here, and move on.
5  A.  I'm trying to figure if the interest
6  accumulated -- it says we agreed. I don't
7  know. Put it that way, I don't know.
8  Q.  You don't know how that number was
9  arrived at?
10  A.  No.
11  Q.  In preparation of this lawsuit, were
12  you asked to give any information?
13  A.  No. As a matter of fact, I didn't
14  know it was being filed at the time it was
15  filed.
16  Q.  If you'll turn to the next page for
17  me and look at paragraph 7, in there it
18  says that "Number 67 concrete gravel at a
19  rate of approximately 5,200 tons per
20  week." What did you understand the
21  frequency with which Yelvington would come
22  and get the gravel would be?
23  A.  Well, I was thinking at the time

26 (Pages 101 to 104)

# EXHIBIT FOUR

## FREEDOM COURT R[...]

Ben Johnston

### Page 45

1  Q.   Sometime between March and June; is
2  that your best recollection?
3  A.   I don't know for sure.
4  Q.   That's fair enough.  I'm just trying
5  to narrow it down.  Did you receive any
6  compensation for your sale of your shares?
7  A.   Yes, sir.
8  Q.   What compensation was that?
9  A.   $25,000.
10  Q.   Did you receive that from Mr. Junkin
11  or from your brother?
12  A.   Well, I'm not sure who the check
13  came from.  I think it went to my brother,
14  and he gave me my part of it.
15  Q.   At the point that you sold out your
16  shares, you owned 30 percent; is that
17  correct?
18  A.   Yes, sir.  Not very much for two
19  years of work.
20  Q.   That's a good point.  During that
21  two years of work, were you drawing a
22  salary?
23  A.   Yes, sir.

### Page 46

1  Q.   Was your brother also drawing a
2  salary?
3  A.   I think during that period of time
4  he drew a salary for part of the time, and
5  then he quit.
6  Q.   When did he quit; do you know?
7  A.   I don't know, sir.
8  Q.   Did Mr. Junkin draw a salary during
9  that two-year period?
10  A.   I don't believe so.
11  Q.   And do you continue to draw a salary
12  now?
13  A.   Yes, sir.
14  Q.   Now, as I understand from your
15  brother's testimony, you're the guy who
16  was doing the hands-on, day-to-day
17  operations of Johnco; is that correct?
18  A.   Yes, sir.
19  Q.   As I understand it, that's true from
20  the point that you all start moving dirt
21  around to the point that the mine becomes
22  operational; is that correct?
23  A.   Yes, sir.

### Page 47

1  Q.
2  bec
3  A.
4  Q.
5  me
6  Nor
7  hav
8  figu
9  and
10  goin
11  time
12  A.
13  Q.   ... ... point in time did the mine
14  get on stride?  By that I mean become
15  fully operational.
16       MR. PEARSON:  I object to the form.
17  Q.   You can answer.
18  A.   He objects, but I can answer?
19       MR. PEARSON:  I objected to the
20  form.  You can answer if you know.
21  A.   Well, I would say fully operational
22  to where we could produce good, clean
23  stuff, in February of '06.

### Page 48

1  Q.   So in February of '06, the mine is
2  in operation where the material you're
3  pulling out is clean stuff that is going
4  to meet specs; correct?
5  A.   Yes, sir.
6  Q.   And you can pull it out on some kind
7  of regular consistent basis?
8  A.   Yes, sir.
9  Q.   In February of '06, how much number
10  67 gravel could the mine produce on, let's
11  say -- well, let's say in a month, how
12  much could it produce?
13  A.   It depends on how many hours a month
14  you want to run.  The mine and the plant
15  is capable of maximum production of about
16  120 tons of 67 an hour, and about 20 tons
17  of oversize gravel.
18  Q.   An hour?
19  A.   Yes, sir.  Then depending on how
20  much time you operate in a month, whatever
21  you need to operate.  You obviously can't
22  run it twenty-four hours a day, and you
23  can't run it all the time.  You're going

12 (Pages 45 to 48)

### 367 VALLEY AVENUE
### (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 41

1 what to do with the sand; right?
2 A.   Well, you either sell it or you
3 dispose of it.
4 Q.   What was your plan at the point that
5 you entered the supply agreement with
6 regard to disposing of it if you couldn't
7 sell it?
8 A.   Well, you could pump it into a waste
9 area; you can run it back in the pit that
10 you dig.
11 Q.   I understand those are all things
12 that could be done, but what was the plan
13 when you entered the supply agreement?
14 A.   The plan was to try to sell it.
15 Q.   Prior to the shutdown, was Johnco
16 able to sell any sand?
17 A.   Very little.
18 Q.   Was it ever able to sell sand to
19 Lafarge?
20 A.   No, sir.
21 Q.   Were you dealing with Lafarge with
22 regard to selling that sand?
23 A.   I may have talked to -- my brother

Page 42

1 handled Lafarge. I may have talked to
2 somebody else. I don't know.
3 Q.   Do you recall any other customers to
4 whom you tried to sell sand between the
5 time that you entered the supply agreement
6 and the shutdown?
7 A.   No, sir.
8 Q.   What about the oversize gravel, what
9 was Johnco's plan to deal with the
10 oversize gravel at the time it entered the
11 supply agreement? Sir, it may be that you
12 don't know; and if it is, just tell me
13 that, and I'll stop asking the questions.
14 But if you do, let me know what you know.
15 A.   I don't think we had a plan, as
16 such. We did wind up selling some of it.
17 Q.   Did you make the decision to shut
18 down the plant?
19 A.   No, sir.
20 Q.   Did you ever tell Phillip Holladay,
21 or anyone at Yelvington, that if Johnco
22 couldn't sell some sand, they would have
23 to shut down?

Page 43

1 A.   No, sir.
2 Q.   Did you ever tell them if you
3 couldn't move sand, that you would have to
4 shut down?
5 A.   No, sir.
6 Q.   Do you remember having any
7 conversations with Phillip Holladay in
8 March of 2006, any conversations at all?
9 A.   I don't remember any specific
10 conversation with him about that. At that
11 time I talked to Phillip several times
12 during the period of time over the
13 telephone, but I don't remember what we
14 discussed.
15 Q.   Was Phillip Holladay your primary
16 contact with Yelvington?
17 A.   Yes, sir.
18 Q.   And how frequently did you have
19 contact with Phillip between the time of
20 the supply agreement, or when Phillip
21 comes on board actually, and the shutdown?
22 A.   How frequently?
23 Q.   Roughly.

Page 44

1 A.   I don't know. I might talk to him
2 once a week, once every two weeks. From
3 the time my brother and I sold our share
4 until the shutdown, I had none.
5 Q.   And when did you and your brother
6 sell your shares?
7 A.   I don't know exactly.
8 Q.   What year was that?
9 A.   Last year.
10 Q.   2006?
11 A.   Yes, sir.
12 Q.   Was it the first half of 2006 or the
13 last half?
14 A.   I think it was the first half.
15 Q.   Can you recall whether it was
16 January or June?
17 A.   It was not January.
18 Q.   Was it June?
19 A.   Could have been.
20 Q.   Could it have been February?
21 A.   No, sir.
22 Q.   How about March?
23 A.   I don't know.

11  (Pages 41 to 44)

# FREEDOM COURT REPORTING

Page 117

1  Q.  Is it fair to say it could have
2  happened?
3  A.  I know that we did talk to Keith
4  Bodiford.
5  Q.  At Lafarge?
6  A.  At Lafarge.
7  Q.  In January of 2006?
8  A.  I don't remember when it was, sir.
9  Q.  Okay.  Does January of 2006 meet
10  with your recollection of about the time
11  frame you were talking to Lafarge?
12  A.  I don't remember anything about the
13  time frame.
14  Q.  And as I recall your testimony from
15  earlier, you weren't the one talking to
16  Lafarge about how much sand they could
17  take; is that correct?
18  A.  I don't believe I ever talked to
19  them about how much they planned to take.
20  I remember talking to Mr. Bodiford at some
21  point in time, and I can't remember what
22  we discussed; but I know we were trying to
23  sell them sand.

Page 118

1  Q.  Was Johnco trying to sell sand in
2  January of 2006?
3  A.  I'm sure we were.
4  Q.  Why do you say you're sure you were?
5  A.  It's just the way I feel.
6  Q.  Do you recall any point in time that
7  Johnco wasn't trying to sell sand?
8  A.  No, sir.
9  Q.  Is it fair to say that the entire
10  time of the supply agreement up to the
11  shutdown, Johnco was trying to sell sand?
12  A.  It's not fair to say that, because I
13  don't know what happened after Mr. Junkin
14  bought it.  Up until the time we sold out,
15  we tried to sell sand.
16  Q.  Do you know of any time, before or
17  after Mr. Junkin bought it out, that
18  Johnco wasn't trying to sell sand?
19  A.  No, sir.
20  Q.  You can hand that back.  Well, take
21  that up again, please, Defendant's Exhibit
22  7.  To your knowledge, would 200,000 tons
23  per year of sand balance out Johnco's

Page 119

1  gravel production of 150,000 tons per
2  year, in that 55/45 mix?
3  A.  I would think it would roughly
4  balance it out, yes.
5  Q.  So those numbers appear to be
6  correct as far as balancing out sand to
7  the gravel?
8  A.  I would say just off the top of my
9  head that roughly that would balance out.
10  Q.  Fair enough.  Thank you.  At any
11  point in time do you recall hearing or
12  talking to anyone at Lafarge about whether
13  they had stocked up on sand and were,
14  therefore, unable to purchase from Johnco?
15  A.  I remember a conversation with
16  somebody at some time about being stocked
17  up on sand.
18  Q.  Somebody at Lafarge?
19  A.  I don't know who it was.  I don't
20  know who the discussion was with or who it
21  was that was stocked up on sand.
22  Q.  Do you remember when that discussion
23  took place?

Page 120

1  A.  No.
2  Q.  Fair enough.  If you could take a
3  look at Defendant's Exhibit 11, I would
4  appreciate it, and if you would take a
5  look at the last page for me real quick.
6  A.  All right, sir.
7  Q.  Do you recognize what that last page
8  represents?
9  A.  I think so.
10  Q.  What is it?
11  A.  Sir?
12  Q.  What is it?
13  A.  It looks like the circular track we
14  had built.
15  Q.  That's what I'm after.  Is this the
16  design that Johnco ultimately had built?
17  A.  I think so.  It looks like it.
18  Q.  Fair enough.  Thank you.  You can
19  set that down.  At any point in time do
20  you remember having trouble with getting
21  the gravel washed thoroughly, specifically
22  as it related to nylon screens versus wire
23  screens?

30  (Pages 117 to 120)

# FREEDOM COURT REPORTING

Page 37

1  A.   Well, we hired an engineer, Robert
2  English, and began working on it. I'm not
3  exactly sure what you mean by "a mining
4  plan." This is a mining plan you present
5  to ADEM to get permission to mine.
6  Q.   And what is contained in that plan?
7  What information is contained in that
8  plan?
9  A.   How you're going to proceed to mine
10  it, what you're going to do with the waste
11  water, where you're going to mine exactly,
12  what steps are you going to go through to
13  mine it, what steps are you going to go
14  through to reclaim the land after you're
15  through with it.
16  Q.   Does it also include information
17  about how much product you intend to
18  produce?
19  A.   No, sir. Not that plan, no.
20  Q.   What was the entity that you said
21  you give that to; is it ADEM?
22  A.   You present a plan to ADEM to get
23  permission.

Page 38

1  Q.   Tell me what that is.
2  A.   Alabama Department of Environmental
3  Management.
4  Q.   Thank you. Do you know of any other
5  mining plan than the one you presented to
6  ADEM?
7  A.   As far as what?
8  Q.   Well, a plan to mine.
9  A.   I'm not understanding your question.
10  I'm sorry.
11  Q.   Well, I appreciate that. You knew
12  what I meant by "mining plan" when we
13  talked about what is presented to ADEM.
14  Is there anything similar to that, that
15  you present to anyone else?
16  A.   Not to present to another agency,
17  no, sir.
18  Q.   Do you know if Johnco prepared any
19  mining plans similar to that at any point
20  in time, since you've been associated with
21  them?
22  A.   Similar to that, no, sir.
23  Q.   Do you know of any marketing plan

Page 39

1  that Johnco has prepared, at any point in
2  time?
3  A.   The only marketing plan we had,
4  basically, was a contract with Conrad
5  Yelvington Distributing Company to buy
6  150,000 tons of gravel a year, number 67
7  gravel a year.
8  Q.   Do you know what Johnco anticipated
9  the product mix would be at the time that
10  they entered into that supply agreement
11  with Yelvington?
12  A.   Approximately the figures that I
13  gave you.
14  Q.   I'm trying to remember what those
15  are now.
16  A.   45 percent gravel, 55 percent sand;
17  and of the 45 percent gravel, some 80 -- I
18  believe I said 80 percent. 80 to 85
19  percent of the 45 percent would be 67
20  gravel.
21  Q.   What was Johnco's plan with regard
22  to disposing of the sand when it entered
23  into the supply agreement?

Page 40

1  A.   Well, we were trying to sell it to,
2  one was an outfit, Lafarge, a ready-mix
3  company.
4  Q.   What ready-mix company?
5  A.   Lafarge.
6  Q.   Oh, Lafarge is the ready-mix company
7  you're talking about?
8  A.   Lafarge, L-A-F-A-R-G-E.
9  Q.   I understand. I just wanted to make
10  sure that Lafarge and the ready-mix
11  company you're talking about are one and
12  the same.
13  A.   Yes, sir.
14  Q.   And you had planned to do that at
15  the time that Johnco entered the supply
16  agreement; is that correct?
17  A.   I don't know at what point. We just
18  had plans to try to sell some sand. Sand
19  was not a big part of our plans at all.
20  Q.   But it's 55 percent of what you
21  produce; correct?
22  A.   Yes, sir.
23  Q.   So you had to make some plans for

10  (Pages 37 to 40)

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 41

1 what to do with the sand; right?
2 A.   Well, you either sell it or you
3 dispose of it.
4 Q.   What was your plan at the point that
5 you entered the supply agreement with
6 regard to disposing of it if you couldn't
7 sell it?
8 A.   Well, you could pump it into a waste
9 area; you can run it back in the pit that
10 you dig.
11 Q.   I understand those are all things
12 that could be done, but what was the plan
13 when you entered the supply agreement?
14 A.   The plan was to try to sell it.
15 Q.   Prior to the shutdown, was Johnco
16 able to sell any sand?
17 A.   Very little.
18 Q.   Was it ever able to sell sand to
19 Lafarge?
20 A.   No, sir.
21 Q.   Were you dealing with Lafarge with
22 regard to selling that sand?
23 A.   I may have talked to -- my brother

Page 42

1 handled Lafarge. I may have talked to
2 somebody else. I don't know.
3 Q.   Do you recall any other customers to
4 whom you tried to sell sand between the
5 time that you entered the supply agreement
6 and the shutdown?
7 A.   No, sir.
8 Q.   What about the oversize gravel, what
9 was Johnco's plan to deal with the
10 oversize gravel at the time it entered the
11 supply agreement? Sir, it may be that you
12 don't know; and if it is, just tell me
13 that, and I'll stop asking the questions.
14 But if you do, let me know what you know.
15 A.   I don't think we had a plan, as
16 such. We did wind up selling some of it.
17 Q.   Did you make the decision to shut
18 down the plant?
19 A.   No, sir.
20 Q.   Did you ever tell Phillip Holladay,
21 or anyone at Yelvington, that if Johnco
22 couldn't sell some sand, they would have
23 to shut down?

Page 43

1 A.   No, sir.
2 Q.   Did you ever tell them if you
3 couldn't move sand, that you would have to
4 shut down?
5 A.   No, sir.
6 Q.   Do you remember having any
7 conversations with Phillip Holladay in
8 March of 2006, any conversations at all?
9 A.   I don't remember any specific
10 conversation with him about that. At that
11 time I talked to Phillip several times
12 during the period of time over the
13 telephone, but I don't remember what we
14 discussed.
15 Q.   Was Phillip Holladay your primary
16 contact with Yelvington?
17 A.   Yes, sir.
18 Q.   And how frequently did you have
19 contact with Phillip between the time of
20 the supply agreement, or when Phillip
21 comes on board actually, and the shutdown?
22 A.   How frequently?
23 Q.   Roughly.

Page 44

1 A.   I don't know. I might talk to him
2 once a week, once every two weeks. From
3 the time my brother and I sold our share
4 until the shutdown, I had none.
5 Q.   And when did you and your brother
6 sell your shares?
7 A.   I don't know exactly.
8 Q.   What year was that?
9 A.   Last year.
10 Q.   2006?
11 A.   Yes, sir.
12 Q.   Was it the first half of 2006 or the
13 last half?
14 A.   I think it was the first half.
15 Q.   Can you recall whether it was
16 January or June?
17 A.   It was not January.
18 Q.   Was it June?
19 A.   Could have been.
20 Q.   Could it have been February?
21 A.   No, sir.
22 Q.   How about March?
23 A.   I don't know.

11 (Pages 41 to 44)

# EXHIBIT FIVE

# FREEDOM COURT REPORTING

Page 65

1   A.   No people necessary.
2   Q.   You don't have to set it up or
3   anything like that?
4   A.   You set it up one time. There would
5   be a little increase in costs.
6   Q.   Did Johnco hope to sell sand when it
7   started this operation?
8   A.   I think there was some hope that
9   sand would sell.
10  Q.   What Pep told me was that the
11  150,000 tons Johnco expected to cover its
12  costs, and if they could sell sand or
13  oversize, then that was all going to be
14  profit; that was all gravy?
15       MR. PEARSON:  I object to the form
16  of that because Pep said what he said in
17  his deposition.
18  A.   I think that would generally
19  characterize an overall plan that we had.
20  If you're able to do something with the
21  sand, that would be additional -- I guess
22  the term, probably, that would be gravy.
23  Sand would be always questionable because

Page 66

1   of its volume and the cost as to what, you
2   know, you can do with it. We knew that we
3   potentially had a good market for the
4   oversize, one of two directions.
5   Q.   And you knew that coming into
6   Johnco, right, that you potentially had a
7   good market for oversize?
8   A.   Oh, yes, either one of two
9   directions. Either landscape, which is
10  what the business is primarily -- part of
11  the business that I'm in, and I'm
12  confident that that could be sold into
13  Florida or into the Atlanta market.
14  Q.   Oversize, I guess by ton, is more
15  profitable than concrete mix; is that
16  correct?
17  A.   Yes. Probably the highest value for
18  it would be if you could develop a
19  metallurgical business. Again, you get
20  into distance; your freight gets involved
21  there. There was very little question
22  that it would readily sell into the
23  landscape market.

Page 67

1   Q.   I think your attorney is right;
2   Pep's testimony will speak for itself.
3   But as I understood what he was saying,
4   the expectation coming into this
5   arrangement was that 150,000 tons of
6   number 67 gravel, or what was guaranteed
7   under the supply agreement, would cover
8   the cost. If you sold more number 67
9   gravel to Yelvington or anyone else, or
10  sand or oversize, then that's where the
11  profit was going to come. Is that your
12  understanding?
13       MR. PEARSON:  I object to the form.
14       MR. LEEK:  That's fine. and I made
15  the qualification.
16  Q.   I'm just looking for your
17  understanding based on what I represented
18  to you today.
19  A.   Well, certainly we felt confident
20  that the 150,000 tons would cover our
21  costs. Then again, because you've got so
22  many variables, if we're able to operate
23  efficiently, do a good job. Sand and

Page 68

1   gravel can have a substantial profit
2   margin. When you get it down pat, so to
3   speak, you don't have to have a lot of
4   people. So you're talking about primarily
5   salary and fuel cost, and then your normal
6   breakdowns, wear and tear.
7   Q.   Correct me if I'm wrong here. What
8   you're telling me is that Johnco could
9   have made a profit off the 150,000 tons if
10  it controlled the costs of people,
11  equipment, et cetera, factors within
12  Johnco's control?
13  A.   We felt sure we could. Certainly we
14  were comfortable that there was margin.
15  Q.   How much profit did you expect
16  Johnco would make off 150,000 tons of
17  number 67 gravel?
18  A.   I don't know that we ever put it
19  down to an exact figure. Again, you would
20  also have to look at that in terms of
21  interest, depreciation, these sort of
22  things that get involved in accounting,
23  where you're paying interest and starting

17  (Pages 65 to 68)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 121

1  first things that got hashed out in
2  general, because that was important to me;
3  the minimum amount, a regular cash flow,
4  take it on basis had to be a part of it.
5  I became satisfied. We had a trigger time
6  and a start time and a regular flow, I
7  thought, cash flow, which I had already
8  learned was critical to trying to operate
9  a business. If you don't, you'll be
10  putting it in out of your pocket.
11  Q.  How many conversations did you have
12  with Pep regarding the terms of the supply
13  agreement before it was executed?
14  A.  I don't know. I could try to piece
15  it together, but I would do so on the
16  phone. I would go to Aliceville and talk
17  with him.
18  Q.  About the supply agreement, or for
19  other purposes?
20  A.  Both, the supply agreement.
21  Certainly, when we got serious about this
22  thing, we started on the side making
23  plans, if we do get the supply agreement

Page 122

1  as we want it, then, you know, you start
2  making an overall plan. He and I ran
3  through some figures. They had the
4  general knowledge of how much gravel we
5  would sell at that time. You just start
6  the whole plan, but the central part of it
7  is certainly the supply agreement.
8  Q.  As I understand, prior to the supply
9  agreement, the Johnstons had already
10  procured an option on the land; is that
11  correct? Does that meet with your
12  understanding of it? That may be prior to
13  you becoming involved too.
14  A.  I'm not sure about that. I do know
15  that I considered that we, at some point
16  in time, had an option to buy the
17  property. I don't know that I was
18  designated on the option, but it was taken
19  for this purpose. No need to talk about
20  what you're going to do with the property
21  unless you have some idea that you can get
22  it.
23  Q.  Do you understand that the first

Page 123

1  load taken by Yelvington was May 11, 2006?
2  A.  Yes.
3  Q.  Does that meet with your
4  understanding?
5  A.  Yes.
6  Q.  Do you know if the mine had any
7  mechanical problems --
8      (Whereupon, at this time a lunch
9  break was taken.)
10  Q.  Do you recall whether Johnco had any
11  mining problems between the first load
12  taken by Yelvington in May and the next
13  load taken by Yelvington?
14  A.  It wouldn't have made any difference
15  if they had, because they had three loads
16  sitting out there, so I don't recall.
17  Q.  I appreciate that. You don't recall
18  whether there were any mechanical
19  problems, or anything like that?
20  A.  Nothing, no, not significant.
21  Q.  If there were things that had to be
22  repaired for which purchases had to be
23  made, those would be reflected on invoices

Page 124

1  and documents that are with the CPA's; is
2  that correct?
3  A.  I would think so.
4  Q.  Does Johnco pay its employees by the
5  hour, with the exception of Ben?
6  A.  Yes.
7  Q.  So you have to keep hourly time
8  records; is that correct?
9  A.  Yes. We would have a time record at
10  the end. I don't know whether they have a
11  clock down there to check in or not, but
12  you would be able to tell how much
13  somebody worked by his weekly pay at the
14  time.
15  Q.  Have you ever had any conversations
16  with Doug Davis?
17  A.  Doug Davis?
18  Q.  Yes. I'm sorry, let me be a little
19  more specific. Have you had any
20  conversations with Doug Davis since the
21  inception of the supply agreement up to
22  the present?
23  A.  It seems like I talked to him,

31 (Pages 121 to 124)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# EXHIBIT SIX

# Johnco Materials, Inc (JMI)

## Proforma Income Statement

### (Based Upon May 2006 - September 2006 Historical Financial Statements)

| Sales Assumptions: | Tons | Price | Revenue |
|---|---|---|---|
| #87 Gravel | 150,000 | 5.51 | 826,500 |
| Oversized (1) | 4,486 | 8.50 | 38,131 |
| Sand (1) | 15,004 | 2.00 | 30,008 |
| Total | 169,490 | | 894,639 |

| Fuel Cost Assumptions: | Tons |
|---|---|
| Benchmark Production of #87 | 40,000 |
| Annualized Benchmark Production #87 | 96,000 |
| Annual Requirement #67 | 150,000 |

| Expenses | May 06 | June 06 | July 06 | Aug 06 | Sept 06 | Totals | Annualized | | | Alexander's Incremental Costs | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Auto Expense | - | - | - | - | - | - | 5,968 | (2) | | | |
| Bank Charges | - | 384 | 299 | 717 | 1,509 | 2,909 | 6,982 | | | | |
| Amortization Expense | - | - | - | - | - | - | 1,103 | (2) | | | |
| Depreciation | 2,345 | 2,345 | 2,345 | 2,345 | 2,345 | 11,725 | 28,140 | | | | |
| Dues | - | - | 200 | 215 | - | 415 | 996 | | | | |
| Contract Labor | - | 1,625 | - | - | 550 | 2,175 | 5,220 | | 5,220 | Contract Labor | |
| Equipment Rental | 5,141 | 4,098 | - | 7,780 | 4,019 | 21,039 | 50,494 | | 50,494 | Equipment Rental | |
| Fuel & Oil | 6,700 | 18,854 | 9,137 | 10,078 | 18,294 | 63,063 | 151,352 | | 151,352 | Fuel & Oil | |
| Hauling Charges | - | 180 | - | 1,650 | - | 1,830 | 4,392 | | 4,392 | Hauling Charges | |
| Travel | 337 | 277 | - | 146 | 111 | 871 | 2,090 | | | | |
| Life Insurance | - | 1,657 | 1,657 | 1,657 | 1,657 | 6,629 | 15,911 | | 15,911 | Life Insurance | |
| Insurance | 2,783 | 1,810 | - | - | - | 4,593 | 11,023 | | 11,023 | Insurance | |
| Insurance - WC | - | - | - | 4,165 | - | 4,165 | 9,997 | | 9,997 | Insurance - WC | |
| Interest | - | - | - | - | - | - | 223,932 | (2) | | | |
| Cleaning | - | 100 | 75 | 125 | 100 | 400 | 960 | | | | |
| Tax and License | - | - | 826 | - | - | 826 | 1,982 | | | | |
| Misc Expense | 695 | - | - | - | - | 695 | 1,668 | | 1,668 | Misc Expense | |
| Office Expense | - | 96 | 128 | 1,236 | 247 | 1,708 | 4,099 | | | | |
| Postage | - | 78 | - | 78 | 39 | 195 | 468 | | | | |
| Rent | 400 | 800 | - | 400 | 400 | 2,000 | 4,800 | | | | |
| Repairs | 314 | 21,498 | 3,518 | 11,930 | 28,955 | 66,215 | 158,917 | | 158,917 | Repairs | |
| Professional Fees | - | 400 | 300 | 800 | 400 | 1,900 | 4,560 | | | | |
| Salaries | 18,771 | 23,734 | 18,366 | 21,839 | 13,651 | 96,362 | 231,269 | | 231,269 | Salaries | |
| Small Tools | - | 454 | - | 208 | 290 | 952 | 2,286 | | 2,286 | Small Tools | |
| Supplies | 1,119 | 5,545 | 980 | 854 | 4,559 | 13,058 | 31,338 | | 31,338 | Supplies | |
| Payroll Taxes | 1,409 | 2,661 | 2,030 | 2,285 | 1,186 | 9,570 | 22,969 | | 22,969 | Payroll Taxes | |
| Telephone | - | 576 | 232 | 1,220 | 334 | 2,361 | 5,667 | | | | |
| Training | - | 150 | - | - | - | 150 | 360 | | 360 | Training | |
| Utilities | 735 | 1,245 | 1,374 | 1,398 | 1,466 | 6,218 | 14,923 | | 14,923 | Utilities | |
| Total Expenses | 40,750 | 86,567 | 41,468 | 71,128 | 80,113 | 322,026 | 1,003,866 | | | | |

**Adjustments:**

| | | | | | | | | Annualized | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Transportation (@.25 per ton of gravel) | | | | | | | 0.25 | 38,622 | | 38,633 | |
| Depletion (@ .40 ton of gravel) | | | | | | | 0.40 | 61,794 | | 61,813 | |
| Increase in fuel costs (increase to 150k tons per year) (3) | | | | | | | | 85,158 | | 85,158 | |
| Overburden Removal (not yet considered) | | | | | | | | xx | | xx | |
| Reclamation (not yet considered) | | | | | | | | xx | | xx | |
| Normalized Annualized Expenses | | | | | | | | 1,189,440 | | 897,723 | Normalized Incremental Expenses |
| Estimated Annual Revenues | | | | | | | | 894,639 | | 894,639 | Estimated Annual Revenues |
| **Estimated Annual Net Income (Loss)** | | | | | | | | **(294,801)** | | **(3,084)** | Restated Lost Profits Per Year |

Note: Estimated #87 gravel production during the months of May 2006 through September 2006 was only 8,000 tons per month. In order to meet the production requirement in the CYDI Supply Agreement JMI would have to produce 12,500 tons of #87 gravel per month. While it is clear that many of the operating expenses would increase incrementally with the increased volume, for purposes of this calculation all of these expenses, other than fuel, have been left constant which is consistent with Alexander's calculation.

(1) Based on actual sales from January 2006 through June 2007. (Sales / 18 months * 12 months).
  Oversized = 6,729 / 18 * 12 = 4,486.
  Sand = 22,506 / 18 * 12 = 15,004.

(2) Used actual 12 month expense from Johnco Profit and Loss Statement.

Borden - 0350

| (3) $63,063 / 40,000 tons = | 1.577 per ton |
|---|---|
| 150,000 annual required tons = | 236,550 |
| 96,000 annualized tons = | 151,392 |
| Fuel Cost Increase (Alexander) | 85,158 |

# EXHIBIT SEVEN

# FREEDOM COURT REPORTING

Page 9

1   so let's try not to talk over each other.
2   You do a very good job of that, sometimes I
3   don't. Is that all right with you?
4       A.   That's fine.
5       Q.   All right. We have marked for
6   purposes of your deposition as Plaintiff's
7   Exhibit 1 to the Mark Klebe deposition as
8   the 30(b)(6) representative for Conrad
9   Yelvington Distributors. Would you look at
10  that.
11      A.   (Witness complies.)
12          Okay.
13      Q.   All right. On the -- Do you
14  notice that we asked that you bring with you
15  or produce for us copies of documents that
16  you would have used or relied on in order to
17  testify as the 30(b)(6) representative? Did
18  you --
19      A.   Yes.
20      Q.   Do you see that?
21      A.   Yes.
22      Q.   And did you look at that list
23  of those documents?

Page 10

1       A.   In terms of items one through
2   three?
3       Q.   Yes.
4       A.   Yes.
5       Q.   Have you already produced all
6   those documents to us in this litigation?
7       A.   I believe we have.
8       Q.   Okay. And that would include
9   all number one, all number two, and all of
10  number three?
11      A.   To the best of my knowledge.
12      Q.   If we get into this thing and
13  you think that there's something that is not
14  on here, would you please call it to my
15  attention?
16      A.   Certainly.
17      Q.   All right. Are you going to
18  be giving any testimony today as an expert
19  witness?
20          MR. LEEK:  Object to the form.
21  I don't know that he'd know that. He hasn't
22  been designated as an expert.
23          MR. PEARSON:  That's fine.

Page 11

1   And maybe that was a better question for
2   you. But I did not think he had been
3   designated as an expert.
4       Q.   Mark, you're going to testify,
5   as I understand it, about Yelvington's
6   damages that it claims it suffered as a
7   result of breach of the supply agreement by
8   Johnco as it claimed in its counterclaim; is
9   that right?
10      A.   Correct.
11      Q.   And I'm going to -- Did you
12  prepare documents today that are a summary
13  of -- and bring to the deposition that would
14  be a summary of what you claim those damages
15  would be, or what Yelvington claims those
16  damages would be?
17          All right. Let's mark this if
18  you don't mind. Mark, if you would -- Mark,
19  if you'd look at the exhibit that I've
20  marked as Plaintiff's Exhibit 2. And if you
21  would please tell me what that is.
22          (Whereupon, Plaintiff's
23          Exhibit No. 2 was marked

Page 12

1           for identification.)
2       A.   This exhibit is a summary of a
3   calculation we prepared on our damages
4   number for this case.
5       Q.   All right. At the top, you've
6   dated it December the 20th, that's today;
7   correct?
8       A.   Correct.
9       Q.   And you entitled it a contract
10  summary; is that right?
11      A.   It really does not have a
12  title. The title is actually the Johnco
13  damages calculation.
14      Q.   All right. And down below the
15  date you have contract summary. What do you
16  mean by contract summary?
17      A.   That was simply information
18  for me to understand where we were from the
19  standpoint that just in terms of the
20  commencement date and the contract
21  requirement for tonnages. Based on my
22  understanding of the contract, commencement
23  date was to have been April 27th, 2005. The

3 (Pages 9 to 12)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 17

1  coming up.
2       But in terms of this
3  calculation, it was my understanding that
4  beginning with the first shipment, a
5  five-year period would run that a hundred
6  and fifty thousand tons would be supplied by
7  Johnco to Yelvington. So when we're doing
8  our contract years on this sheet, you'll see
9  that we're crossing from 2006 to 2007, 2007
10 to 2008. Basically looking in terms of the
11 time frame of running from May 11th, 2006,
12 to May 10th, 2007. So in terms of accruing
13 damages, we're simply looking at this in
14 this calculation to keep it down to a --
15 probably as easy a calculation as we could
16 determine; that there was an annual
17 commitment of a hundred and fifty thousand
18 tons a year. And the first year, I think we
19 agreed that thirty-two thousand tons were
20 supplied by Johnco, which meant that for
21 that first calendar -- or fiscal year if
22 you, not calendar but fiscal year, we
23 realized a shortfall of a hundred and

Page 18

1  eighteen thousand tons, at which point
2  Johnco ceased production also during that
3  year. So for the trailing four years, we
4  have a shortfall, in our estimation, of a
5  hundred and fifty thousand tons each year
6  over the five-year term of the contract.
7       Q.   All right. Now, that's your
8  part of the Plaintiff's Exhibit 2 that is in
9  the -- sort of in the middle of the page.
10 What does annual MC stand for?
11      A.   That's the annual margin of
12 contribution to our numbers.
13      Q.   What does annual margin of
14 contribution mean?
15      A.   You might think of it in terms
16 of you can interchange that to contribution
17 margin or you can change it to gross profit,
18 probably would be a good close approximation
19 of what we're talking about.
20      Q.   And the first one that you
21 have there is six hundred sixty-nine
22 thousand dollars -- six hundred and
23 sixty-nine thousand seven hundred and

Page 19

1  sixty-eight dollars, you have for year
2  2006-2007. How did you come to that
3  calculation?
4       A.   We determined that we had a
5  shortfall of a hundred and eighteen thousand
6  tons. I went and looked at what we felt the
7  market would be for the hundred and fifty
8  thousand tons that would be committed to us
9  to come in here. Looking at where we felt
10 the pricing would be based on comparable
11 market and what our marketing group or sales
12 group felt would come out. Compared that to
13 our cost and came up with weighted average
14 contribution margin per ton of five dollars
15 and sixty-eight cents per ton. For the
16 location shown on this exhibit, five dollars
17 and sixty-eight cents per ton times the
18 hundred and eighteen thousand dollar
19 shortfall should reach six sixty-nine seven
20 sixty-eight.
21      Q.   Okay. So that is an opinion,
22 and you have gotten that by taking data and
23 consulting with people in your company; is

Page 20

1  that correct?
2       A.   Correct.
3       Q.   And that would be your opinion
4  of what your margin of contribution would
5  have been?
6            MR. LEEK: Let me object to
7  form. You're calling for a legal conclusion
8  of what opinion means.
9       Q.   What do you think opinion
10 means, Mark?
11      A.   Well, opinion would be, in
12 this case, bringing these numbers together
13 that it's the closest calculation I can get
14 to what I feel our damages would be.
15      Q.   And would you agree with me
16 that this is your opinion of what those
17 damages would be?
18      A.   I would think it's my best
19 calculation of what the damages would be.
20      Q.   And let's just look at the
21 first year. What assumptions do you have to
22 make that you -- that in order to get to the
23 position that you take that you had a

5 (Pages 17 to 20)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 21

1  tonnage shortfall of hundred and eighteen
2  thousand and that your annual margin --
3  excuse me, the annual margin of contribution
4  was six sixty-nine seven sixty-eight based
5  on -- I think your number was five
6  sixty-eight a ton. What assumptions do you
7  have to make to come to that?
8      A.    Well, the first number --
9          MR. LEEK: Hold on. Objection
10 to form. You can answer the question. Go
11 ahead.
12     A.    I guess the first item that
13 we're looking at is not an assumption. We
14 know that there was a requirement for a
15 hundred and fifty thousand tons. My
16 understanding, there was a requirement for a
17 hundred and fifty thousand tons. We know
18 that thirty-two thousand tons were supplied,
19 so we have an actual number of a hundred and
20 eighteen thousand tons we're short.
21         I think in each of the
22 trailing years, if Johnco is not producing,
23 we know for a fact that a hundred and fifty

Page 22

1  thousand tons will not be supplied as long
2  as they no longer produce. So I don't feel
3  there is any assumption in that that a
4  shortfall occurred.
5      Q.    Okay. Now, what about the
6  price?
7      A.    Now, in terms of the pricing,
8  what we've looked at is trying to look at
9  what would be in the market. Now, we have
10 talked to our customers, we know where some
11 of our customer base is. So we are able to
12 project where we feel this gravel would have
13 been able to be best sold.
14     Q.    I don't mean to interrupt you.
15 You say that you talked to your customers
16 and felt like based on your conversations
17 with your customers, that you could have
18 sold it to them?
19     A.    I have not personally talked
20 to my customers to clarify that or our
21 company's customers. We know that we have
22 customers in the areas of these locations
23 that consume gravel. We have a pretty good

Page 23

1  sense of the amount of gravel that they're
2  able to do, because you know the tonnages
3  that a number of these entities produce. So
4  looking at that, and doing our own market
5  analysis, that's how we determined that we
6  could sell at least this much tonnage. Our
7  projection is that we could actually sell
8  far more than a hundred and fifty thousand
9  tons per year throughout our network.
10         We've chosen the three
11 locations for this calculation, at least
12 from a business standpoint, we feel we've
13 given, obviously, the best profit and
14 contribution margin or margin of
15 contribution.
16     Q.    And in any regard to your
17 statement that you feel like you could have
18 sold far more -- do I need to let you finish
19 that, I'll be happy to.
20     A.    No. Please go ahead.
21     Q.    Let me start the question
22 over.
23         You felt like you could

Page 24

1  have -- And I when I say you felt like it's,
2  your opinion as --
3      A.    It's our company's opinion.
4      Q.    It's the company's opinion,
5  that Yelvington could have sold far more
6  than a hundred and fifty thousand tons of
7  No. 67 gravel a year?
8      A.    Yes. That's right.
9      Q.    Is that gravel that Yelvington
10 intended to purchase from Johnco?
11     A.    If it was available, yes.
12     Q.    So the hundred and fifty
13 thousand tons that you're referring to,
14 you've come up with that number because it
15 was a minimum contractual requirement in the
16 supply agreement?
17     A.    Correct. It's a knowing
18 number.
19     Q.    It's the minimum number.
20         Well, we also know other
21 numbers in the supply agreement, as you
22 know. I mean we talked about that the last
23 time, which is the regular weekly shipments

6 (Pages 21 to 24)

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 61

1    A.    Correct.
2    Q.    And the same for Gautier --
3  Excuse me. Not the same for Gautier. Seven
4  dollars and twenty-five cents for Gautier?
5    A.    Correct.
6    Q.    All right. Explain to me what
7  the freight component is then.
8    A.    Freight component is the cost
9  of actually shipping that material on the
10 CSX Railroads or any other railroads that
11 would be involved. I think in this case,
12 Johnco's mine was actually on a shortline.
13 But this would be the cost of actually
14 moving the material from the -- we refer to
15 it as the White Hall location, or the Johnco
16 location, to these individual terminal
17 facilities.
18    Q.    Okay. And then what you're
19 assuming from there is that whatever
20 customer you have that would buy it, they're
21 going to assume whatever cost to move it
22 from your terminal location -- You don't
23 seem to put any freight component in it for

Page 62

1  moving it from your terminal to your
2  customer?
3    A.    Our material sold FOB our
4  terminal.
5    Q.    That's what I'm saying. Any
6  additional cost to move it, the customer
7  would bear?
8    A.    Correct.
9    Q.    And so is the direct cost then
10 adding those two numbers together, the
11 material component and the freight
12 component?
13    A.    Yes.
14    Q.    That's all you did is just add
15 them together?
16    A.    Correct.
17    Q.    All right. And then the next
18 column says margin of contribution per ton,
19 and tell me what is that number.
20    A.    That's the difference between
21 our sales price that we would sell the
22 material for at those locations and the
23 direct cost. So for Milton, it would be the

Page 63

1  difference between the eighteen dollar sales
2  price per ton for No. 67 gravel, less the
3  direct cost of eleven sixty-two a ton to
4  reach a number of six dollars and
5  thirty-eight cents per ton.
6    Q.    And over to the right of that,
7  you got extended margin of contribution, a
8  number for Milton of four hundred forty-six
9  thousand six hundred. How did you come up
10 with that?
11    A.    That's done by multiplying
12 seventy thousand tons times the margin of
13 contribution per ton of six dollars and
14 thirty-eight cents per ton.
15    Q.    And you did the same type of
16 calculation for the other two locations
17 based on forty thousand tons; right?
18    A.    Correct.
19    Q.    And then the weighted average
20 of margin of contribution per ton over there
21 to the right then is the five dollar and
22 sixty-eight number, which you did some math
23 to come up with that; right?

Page 64

1    A.    That's taking the total that
2  the extended margin contribution and dollar
3  values for all the tonnage from those
4  locations, which totals eight fifty-one four
5  hundred, dividing it by the tonnage that
6  we're talking about for the overall
7  requirement to move of a hundred and fifty
8  thousand tons, so that the weighted average
9  margin of contribution per ton over the
10 whole spectrum of a hundred and fifty
11 thousand tons is five dollars and
12 sixty-eight cents.
13    Q.    Mark, have you ever done a
14 calculation on the thirty-two thousand tons
15 that Johnco -- that Yelvington actually
16 purchased from Johnco in the first year?
17 Have you ever done a calculation as to how
18 much of that gravel that Johnco provided,
19 the No. 67 gravel that you got, the
20 thirty-two thousand, how much of it that
21 Yelvington sold?
22    A.    No.
23    Q.    Do you know whether you've

16 (Pages 61 to 64)

# FREEDOM COURT REPORTING

Page 29

1    Q.    And let me interrupt you. You
2  say we, and when you say we, who are you
3  referring to? I mean, are you talking about
4  Yelvington, the company, and the people that
5  work there that would be involved in the
6  sales of these things? Who is we?
7    A.    We have a number of people
8  within Yelvington. It was kind of a
9  collective thought. It would be through
10 some who you have previously talked to,
11 Philip Holladay who knows the market out
12 here; it could be through discussions with
13 Gary Yelvington, who you've previously
14 talked to, all who have knowledge of the
15 market.
16   Q.    Did you talk to these people
17 to come up with these numbers?
18   A.    Yes.
19   Q.    Who else did you talk to?
20   A.    In terms of the sales volume?
21   Q.    Correct.
22   A.    No one.
23   Q.    Earlier, you had mentioned you

Page 30

1  had discussions with your sales people. Is
2  that different than Gary and Phillip?
3    A.    No.
4    Q.    That is Gary and Phillip?
5    A.    In this instance, yes.
6    Q.    And when I say Gary and
7  Phillip, for purposes of a clean record,
8  we're talking about Gary Yelvington, the
9  president of the company, and Phillip
10 Holladay who is an employee of the company,
11 though I'm not exactly sure what his title
12 is.
13   A.    He is the business manager of
14 our Gulf Coast region.
15   Q.    And is it your understanding
16 that those people got their information
17 about the market and what would be available
18 for the purposes of Yelvington selling No.
19 67 gravel, they got their knowledge from
20 talking to potential customers?
21   A.    That's a question you'd have
22 to ask them.
23   Q.    Okay, but you're the one

Page 31

1  that's been put up here to tell me. So do
2  you assume that that's how they got their
3  information?
4    A.    I would assume so.
5    Q.    Okay. All right. Are there
6  any contracts in place with any customers to
7  sell a specific amount of No. 67 gravel that
8  Yelvington would supply to these customers?
9  Do you have any contracts in place with any
10 customers to sell that gravel?
11   A.    No.
12   Q.    And my question, I probably
13 need to expand it. In 2006-2007, first
14 year, which you call the fiscal year from
15 May the 11th to May the 10th of next year,
16 did you have any contracts in place with
17 customers to sell No. 67 gravel?
18   A.    Any active contracts with
19 customers?
20   Q.    Yes.
21   A.    No.
22   Q.    Would that be true for
23 2007-2008, which is the year we're in now?

Page 32

1    A.    To my knowledge, there are no
2  active contracts with customers to sell them
3  gravel.
4    Q.    All right. Do you have active
5  contracts with customers in the next three
6  future years which you project?
7    A.    No.
8    Q.    Okay. Now, the five dollars
9  and sixty-eight cents a ton, that number
10 which you have come up with, is that
11 number -- do you have a different tonnage
12 number or per ton dollar number for the
13 annual margin of contribution for these
14 other years that come up to eight fifty-one
15 four hundred?
16   A.    For our calculation purposes
17 here, and to try to keep it on as even a
18 keel at we can and not allow for a lot of
19 variables, this was done with the
20 presumption that we would maintain our same
21 margin of contribution throughout the years.
22   Q.    I know I can divide it, you
23 probably already have, but in 2007-2008,

8  (Pages 29 to 32)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 49

1    Q.    You're going to follow the
2  advice of counsel and not answer the
3  question?
4    A.    Correct.
5    Q.    All right.  You took the
6  hundred and fifty thousand minimum
7  requirement tonnage commitment out of the
8  supply agreement; is that right?
9    A.    That's correct.
10    Q.    And was there anything else in
11  the supply agreement that you could have
12  taken as how the shipments of No. 67 would
13  have been made?  Is there any other language
14  in the supply agreement that would help you
15  find out how they would be made?
16    A.    Not in my opinion.
17    Q.    Okay.
18        MR. LEEK:  Can we go off the
19  Record?
20        (Off the Record.)
21    Q.    (BY MR. PEARSON):  And
22  specifically, Mark, the language in the
23  supply agreement that speaks about regular

Page 50

1  weekly shipments, approximately fifty-two
2  hundred tons per week, that does not --
3  that's not something that you would use to
4  calculate when the shipments would be made?
5    A.    Not in my opinion.
6    Q.    Okay.  All right.  We're
7  still -- If you don't mind, let's still look
8  at Plaintiff's Exhibit 2 to your deposition,
9  here, Mark.  And go down, if you would, to
10  the bottom portion of Plaintiff's Exhibit 2,
11  which you have got a caption on it called
12  market.
13    A.    Yes.
14    Q.    Would you go through that and
15  tell me where you came up with that?
16    A.    All right.  Well, we've
17  already previously discussed the sales
18  volume.
19    Q.    All right.
20    A.    All right.  The sales price,
21  again, is based on conversations with the
22  aforementioned individuals.  What we failed
23  is the market price that we could get at

Page 51

1  each of these locations, which I also
2  correlated back to what we were able to sell
3  product for in Gautier in 2007, which
4  actually came out to a slightly higher
5  number with some gravel that we were able to
6  obtain from a source in 2007.  So I would
7  call these actually conservative compared to
8  that number, it was actually up around
9  nineteen fifty a ton.  But according to
10  where we felt the trail would go and what
11  the market would bear, this is the sales
12  price we would see in that slot.
13    Q.    I'm going to interrupt you
14  just for a second.  For the Record, when you
15  say Gautier, is that what you said?
16    A.    Yes.
17    Q.    For the court reporter's
18  benefit, Gautier is G-A-U-T-I-E-R.  And is
19  that a location in Mississippi?
20    A.    That is.
21    Q.    And that's what showed as the
22  bottom location on your market projection;
23  is that correct?

Page 52

1    A.    That's correct.  We showed
2  three locations:  Milton, Florida;
3  Pensacola, Florida; and Gautier,
4  Mississippi.
5    Q.    Now, when you show Milton,
6  Florida, why did you pick Milton, Florida,
7  as a location?
8    A.    I picked Milton, Florida,
9  because it is currently an operating
10  facility in 2007.
11    Q.    And when you say operating
12  facility in 2007, you mean a Yelvington
13  operating facility?
14    A.    A Yelvington facility.
15    Q.    What do y'all have there?  A
16  terminal?
17    A.    A terminal in Milton, Florida.
18    Q.    And what do you do at that
19  terminal?
20    A.    We sell aggregate material.
21    Q.    You receive it there by rail?
22    A.    Correct.
23    Q.    Do you receive it any other

13  (Pages 49 to 52)

# FREEDOM COURT REPORTING

Page 81

1  been able to get on a short term basis. But
2  I can pull a summary report, which is
3  another report that we have here, that gives
4  me some sense of is it reasonable or is it
5  not, in terms of our pricing.
6          These invoices before you are,
7  short of the tickets, kind of our source
8  documents for anything else that we pull.
9  Our process begins with tickets, goes and
10 gets invoiced typically the following day,
11 delivered to the customer, and follows
12 through our entire accounting system. I
13 rely on that accounting system in coming up
14 with my numbers.
15     Q.     And you say in coming up with
16 your forward-looking prices that you
17 projected on Plaintiff's Exhibit 2, to this
18 deposition for the three locations for No.
19 67 gravel -- and I know we're going back
20 over something that you've already said --
21     A.     That's fine.
22     Q.     -- but correct me if I'm
23 wrong, those prices that you project there,

Page 82

1  those came from talking to Gary and Phillip
2  who in turn get their information and sense
3  of things, as you said, from the customers.
4      A.     I would assume that that's
5  where they get their information. That's
6  true.
7          In terms of my job, in terms
8  of trying to even come up with this, you
9  know, I have to rely on a number of people
10 to try to pull that together for me.
11 They're my best source. I'm not out there
12 myself in the market. So we have to go out
13 and determine what we believe the current
14 price is.
15     Q.     Do you have -- And, excuse me.
16 Did I cut you off?
17     A.     No, you didn't.
18     Q.     Does Conrad Yelvington
19 Distributors Inc., does it have a written
20 marketing plan that would support these
21 damages calculations that you've put in
22 Plaintiff's Exhibit 2?
23     A.     No.

Page 83

1      Q.     Do you have a written
2  marketing plan at all?
3      A.     No.
4      Q.     And I say you, I mean
5  Yelvington.
6          I guess the next best thing to
7  do --
8          MR. PEARSON: Can I mark that?
9          MR. LEEK: Yeah.
10         (Whereupon, Plaintiff's
11          Exhibit No. 4 was marked
12          for identification.)
13     Q.     (BY MR. PEARSON): Mark, you
14 have before you what's been marked as
15 Plaintiff's Exhibit 4 for your deposition.
16     A.     Yes.
17     Q.     And it is a document that you
18 brought here today with you.
19     A.     Yes.
20     Q.     Okay. And I've just been
21 given a copy of this a few minutes ago when
22 we began this deposition. So I'm going to
23 throw it to you, Mark. Tell me what

Page 84

1  Plaintiff's Exhibit 4 purports to be.
2      A.     What this shows you on this
3  particular report are sales of gravel for
4  the year 2007, starting on January 1st of
5  '07, it says through 12/17, so I believe
6  we're running it through that date of sales
7  of only No. 67 gravel in a single location,
8  this being Gautier, Mississippi. And this
9  was run for the purpose of me, as I
10 indicated earlier, prior to you introducing
11 this as an idea of trying to kind of say
12 okay, is some of the pricing that we're
13 talking about here, does that seem
14 reasonable.
15         This is the source where I
16 knew that we had sold some gravel to Metro
17 Concrete. That's the one that I was looking
18 at the most, it is identified here, as well
19 as Mallet Brothers. It shows that we were
20 selling 67 gravel to both of those
21 companies, and it shows their average
22 material rate to them of either nineteen
23 fifty for one particular product or

Page 53

1  way?
2     A.    Not to my knowledge. I
3  believe it's all by rail served.
4     Q.    All right. And then store it
5  there?
6     A.    Correct.
7     Q.    And inventory or whatever you
8  do, and then sell it to customers from that
9  location?
10    A.    Correct.
11    Q.    And you are projecting
12  Yelvington's sales out of Milton to be
13  seventy thousand; is that correct?
14    A.    Yes.
15    Q.    Where does the number seventy
16  thousand from Milton -- I mean, what did you
17  have to do to get to the seventy thousand
18  number out of Milton?
19    A.    What I did to get to the
20  seventy thousand number was consult with
21  Gary Yelvington and Phillip Holladay, to say
22  currently, with that location open, where
23  could we sell No. 67 gravel to our best

Page 54

1  advantage. And so the three locations we
2  chose were Milton, Pensacola, and Gautier
3  because that's really, as any business
4  would, you're going to move any material you
5  have to the spot where you're going to get
6  the most advantage from it. And looking at
7  what was available there as a customer in
8  that market place, it was determined that we
9  felt that we could have a steady supply of
10  material, we could move seventy thousand
11  tons.
12    Q.    And what customer did you have
13  there or customers did you have there that
14  you considered would buy this seventy
15  thousand tons? And I'm talking about
16  Milton.
17    A.    I'm not sure of the exact
18  customer's name. I believe it's WPR, that's
19  the only way I know it by. But I would have
20  to actually consult with them to get a
21  better understanding of the customer base.
22    Q.    But do you sell to WPR now?
23    A.    No. Because we don't have any

Page 55

1  material being supplied by Johnco.
2     Q.    And you don't have a contract
3  to have sold them anything?
4     I'm -- I've been over that.
5  Correct me if I'm wrong. You don't have a
6  contract to sell them anything, and you
7  didn't previously have a contract to selling
8  them anything?
9     A.    Who are we talking about?
10    Q.    WPR.
11    A.    No. To my knowledge we
12  didn't.
13    Q.    Okay. You are -- It would be
14  then, that in your opinion, or Yelvington,
15  the company's opinion, that you could have
16  sold to them if you had the gravel?
17    A.    Correct. Commencing here this
18  year in 2007.
19    Understand that we could have
20  sold gravel to any number of markets. These
21  are the three that I feel would have given
22  us the best contribution margin, which from
23  a business standpoint is where we would have

Page 56

1  taken the stone.
2     Q.    And I guess you have -- You've
3  taken three numbers from Milton, seventy
4  thousand, from Pensacola, forty thousand,
5  and from Gautier, forty thousand, and those
6  add up to a hundred and fifty thousand. But
7  am I to understand that though you don't put
8  it on your calculation for damages, you had
9  other locations that you believed you could
10  have sold it?
11    A.    Absolutely.
12    Q.    Okay. And, again, that is a
13  marketing projection opinion, that you would
14  have sold it if you had it?
15    A.    Yes. I guess so.
16    Q.    The next -- The sales price
17  number of eighteen dollars for Milton, how
18  did you -- how did you come to conclude that
19  eighteen dollars was going to be your sales
20  price for the No. 67 out of Milton?
21    A.    From my calculations that
22  number was provided to me in consultation
23  with Phillip Holladay.

14 (Pages 53 to 56)

# FREEDOM COURT REPORTING

Page 57

1    Q.    Okay. And do you know how
2  Phillip came up with it?
3    A.    I believe Phillip looked at
4  what the current demand and market numbers
5  would be in that area.
6    Q.    And do you know how he did
7  that?
8    A.    No.
9    Q.    Did you ask him?
10   A.    Actually, no.
11   Q.    You just assumed that his
12  number was correct?
13   A.    Yes.
14   Q.    Okay. And does that hold true
15  for the sixteen dollar and fifty cent number
16  per ton that you project for Pensacola?
17   A.    Yes.
18   Q.    And the same for Gautier,
19  Mississippi, another eighteen dollar number?
20   A.    Correct. But understand, if
21  we look at Gautier, Mississippi, and you
22  look at the second sheet that I handed you
23  showing sales, for instance, to I believe it

Page 58

1  was Metro, you'll see a sales price there of
2  nineteen fifty per ton, which is an actual
3  number. So in terms of just doing a
4  scratch-and-sniff test, I don't find these
5  numbers unreasonable. In fact, I would say
6  we're being, perhaps, conservative.
7    Q.    All right. And we will get to
8  the other and how it fits in. And you will
9  probably -- You've given me another document
10  which we haven't actually gotten to discuss
11  yet, and I'm going to have to sort of look
12  at it, and then we'll get to it.
13            Let me go over the material
14  component that you have here. That's five
15  fifty-one, now where did you come up with
16  that number?
17   A.    That's the price that we had
18  finally -- were buying the material from
19  Johnco for.
20   Q.    Okay. The five fifty-one
21  represents the price that you were actually
22  paying Johnco for the thirty-two thousand
23  tons that Yelvington actually ordered and

Page 59

1  bought?
2    A.    Yes, unfortunately. I say
3  that only from the stand point that I think
4  we had an argument that it really should
5  have been five and a quarter a ton, but we
6  did agree to help them, and we'd pay five
7  fifty-one.
8    Q.    And you're stating that as an
9  aside. It's not part of the lawsuit or it
10  is part of the lawsuit?
11   A.    Actually it's not.
12   Q.    Okay. Five fifty-one is what
13  Yelvington had paid to Johnco?
14   A.    That's what we agreed to pay
15  to Johnco. That would be a number that was
16  set to escalate each year of the contract.
17  We agreed, I think, to pay it earlier than
18  was needed. But for purposes of the
19  calculation, I kept it static.
20   Q.    When you say you kept it
21  static, does that mean that you would not
22  have -- you're not escalating it through the
23  term of the contract?

Page 60

1    A.    No. What I mean -- Well, yes,
2  you could say that. As I said, it goes to
3  the conversation earlier, where it really
4  goes along the line of saying this number
5  would have escalated, as would any of these
6  costs. We have no real way of knowing
7  exactly how they would escalate or where
8  they would go from year to year. So the
9  presumption in this calculation is that that
10  weighted average of contribution margin
11  would be maintained as a steady number, so
12  that as prices went up, so would sales
13  price.
14            Let me back up. So as costs
15  went up, so would sales price, just for
16  clarification.
17   Q.    All right. And the freight
18  component you show for the three locations,
19  what are those based on? You show for
20  Milton, Florida, six dollars and eleven
21  cents; is this per ton?
22   A.    Correct.
23   Q.    And same for Pensacola?

15 (Pages 57 to 60)

## 367 VALLEY AVENUE
### (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 25

1  at fifty-two hundred tons a week. We know
2  that's also a number in the supply
3  agreement. But -- Would you agree with
4  that?
5      A.   I would not.
6      Q.   You would not agree that that
7  was in the supply agreement?
8      A.   Not in the terminology that
9  you used in your last deposition.
10     Q.   All right. Would you tell
11 me -- During my last deposition?
12     A.   Or during our last discussions
13 on that.
14     Q.   Tell me what you know about
15 the supply agreement and fifty-two hundred
16 tons a week, what's actually in there?
17 Because we can actually pull it out.
18     A.   Well, we can.
19          But in our opinion, the supply
20 agreement calls for a commitment of a
21 hundred and fifty thousand tons annually.
22 All right. I don't believe the supply
23 agreement in our opinion calls for an amount

Page 26

1  coming out per week.
2      Q.   Okay. Well, but -- and I
3  don't want to get too far off course here,
4  but it was Yelvington's expectation that
5  they could sell far more than a hundred and
6  fifty thousand tons of No. 67 gravel a year,
7  and they intended to buy that from Johnco if
8  Johnco could produce it?
9      A.   I think we retained the right
10 to buy it from Johnco if we felt that that
11 market could actually come to fruition. Our
12 opinion that we could sell more versus what
13 would have actually occurred is hard to
14 determine. But certainly we know we had a
15 commitment for a hundred and fifty thousand
16 tons. We know we had a commitment in that
17 contract from Johnco that if they produced
18 an excess of a hundred and fifty thousand
19 tons, we had the right of first refusal.
20 That was derived because we felt, and
21 perhaps far more as a misnomer, but we felt
22 we could sell certainly more than a hundred
23 and fifty thousand tons. Far more, I think

Page 27

1  that's a little difficult to define, but
2  certainly we could sell more than a hundred
3  and fifty thousand tons, so we retained that
4  right. Had we discovered we could not, then
5  our cap was a commitment of a hundred and
6  fifty thousand tons.
7      Q.   Okay. And if you assume that
8  you could sell more than a hundred and fifty
9  thousand tons, and if Johnco produced more
10 than a hundred and fifty thousand tons, you
11 expected to buy it from Johnco?
12     A.   That was one source.
13     Q.   Okay. What other sources did
14 you have at that time that you would have
15 been buying that extra gravel from?
16     A.   At that time, none. But
17 sources could come on-line.
18     Q.   And I understand that.
19          If you would, and I know
20 you've explained it generally, but talk me
21 through the methodology that you went
22 through within your company to come up
23 with -- I understand where you came up with

Page 28

1  the hundred and eighteen thousand tons
2  shortfall in the first year; you've
3  explained where that came from.
4          Explain again the methodology
5  of how you came to that annual margin of
6  contribution number of five dollars and
7  sixty-eight cents a ton, which you talked
8  about having conversations with your sales
9  people and those kind of things. Take me
10 through that if you would.
11     A.   Well, we looked back
12 through -- We can just start with each of
13 the items. We looked at our projected sales
14 items. You understand we have a number of
15 locations throughout the panhandle. We know
16 that customers exist near our facilities in
17 each of these locations within the
18 panhandle. So we took this projection, you
19 know, the three locations that we felt
20 currently, meaning basically in 2007, that
21 we could now move this material to our
22 best and optimum margin of contribution for
23 us.

7  (Pages 25 to 28)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 37

1  terms of present value, you could also look
2  at it in terms of the four million then
3  being the future value and saying if I
4  invested X dollars today at six percent,
5  what would I have to invest today to have
6  that number go up down the road.
7      Q.    Okay. Let me take you back up
8  just for a moment to the 2006-2007 year,
9  where you show a tonnage shortfall of a
10  hundred and eighteen thousand.
11     A.    Yes.
12     Q.    All right. My question to you
13 is: Did -- Prior to the time that you are,
14 I guess, testifying that this tonnage
15 shortfall began to occur, you actually
16 acquired thirty-two thousand tons?
17     A.    From Johnco.
18     Q.    From Johnco of No. 67 gravel,
19 that's what we're talking about. So prior
20 to the time that the shortfall occurred, you
21 actually don't project any shortfall.
22 Thirty-two thousand, everything's fine up
23 until the point that that stopped; is that

Page 38

1  correct?
2      A.    No. I don't think I -- I
3  would put it in those terms. What I'm
4  looking for is on an annual basis.
5      Q.    And I understand that. But
6  when you do this calculation, and I
7  understand you're doing it as -- I assume
8  you're using your CPA skills and financial
9  skills to make these calculations?
10     A.    I'm using what I know of
11 calculating at present values; financial
12 skills, yes.
13     Q.    All right. Did -- Prior to
14 November 1st of 2006, prior to that date,
15 are you aware of any order for No. 67 gravel
16 that Yelvington made to Johnco under the
17 supply agreement, that Johnco did not fill?
18     A.    I am personally not aware of
19 that.
20     Q.    All right. And is that in any
21 way a qualification, Mark, when you say
22 you're personally not aware, I'm asking you
23 as the 30(b)(6) representative testifying to

Page 39

1  damages, so are you telling me as the
2  corporate rep for Yelvington that Yelvington
3  doesn't know of any order it made to Johnco
4  that was not filled?
5      A.    Actually now I'm telling you I
6  personally do not know of any order that was
7  not fulfilled.
8      Q.    Okay.
9          MR. LEEK: Let me object
10 because it goes beyond -- He can testify as
11 to the damages. If you want to know how it
12 relates to the damage calculations, he can
13 do that. If you want him to testify as to
14 what the company did with regard to orders,
15 that's a different topic.
16         MR. PEARSON: And I
17 understand. I'm really not trying to abuse
18 this, Tom. What I'm trying to get is you've
19 got to assume that there was a hundred and
20 eighteen thousand shortfall in order to
21 calculate damages on that, and you've got
22 to -- What I've got to try to figure out is
23 when did that shortfall begin to occur,

Page 40

1  those kinds of things.
2      Q.    (BY MR. PEARSON:) Now, and,
3  Mark, if you don't know, I understand, but
4  I've got to ask you.
5          In that first year 2006-2007,
6  what is Yelvington's position as to when the
7  shortfall of a hundred and eighteen thousand
8  tons, which is what you've put on here of
9  your estimate, when did that begin to occur?
10         MR. LEEK: Same objection.
11 You can answer.
12     A.    From my calculations
13 standpoint of going into there, it occurred
14 when Johnco ceased producing material.
15     Q.    Okay. And do you know when
16 that was?
17     A.    Actually, no. I don't recall.
18     Q.    Okay. Again, you have no
19 knowledge, whatsoever, though, that any
20 gravel was ever ordered from Johnco in that
21 first year, No. 67 gravel ordered by
22 Yelvington from Johnco under the supply
23 agreement, you don't have any knowledge

10  (Pages 37 to 40)

# FREEDOM COURT REPORTING

Page 65

1  sold it all?
2       A.   I know that we still have some
3  in inventory.
4       Q.   You still have some of
5  Johnco's gravel in inventory?
6       A.   It's my understanding, yes.
7       Q.   Do you track that?
8       A.   Yes, we can.
9       Q.   And if I was to take the
10 invoices that you provided to me where --
11 and we'll go over one in a minute.  But on
12 your invoices you show No. 67, and it will
13 have a parenthesis Johnco out beside it.  Is
14 that when you're selling Johnco No. 67
15 gravel that you bought, on your invoices?
16      A.   I'll have to see it again to
17 see what you're talking about.
18      Q.   And I'll show you that later.
19 We'll go over it.
20           The reason I don't have but
21 one of these is we just got this stuff and
22 haven't had time to copy it all.  But I'll
23 mark it and let you see it.

Page 66

1           I'm going to show you what
2  we've marked as Plaintiff's Exhibit 3.  I'll
3  represent to you that it is a copy of an
4  invoice which was produced to us in this
5  lawsuit by Conrad Yelvington.  And I was
6  already in Montgomery yesterday, and it was
7  faxed to me at the hotel, so there is a
8  faxed header at the top of it, and that's
9  because it was faxed from my fax machine in
10 Tuscaloosa down here to me.  So the header
11 across the top is what you will see.
12           Look at Plaintiff's Exhibit 3
13 if you would.
14           (Whereupon, Plaintiff's
15           Exhibit No. 3 was marked
16           for identification.)
17      A.   Okay.
18      Q.   And if you would, I'll have to
19 sort of read upside down looking across the
20 table.
21      A.   I'll turn it around for you.
22 It's okay.
23      Q.   Tell me what Plaintiff's

Page 67

1  Exhibit 3 is.
2       A.   Plaintiff's Exhibit 3 is an
3  invoice for gravel.
4       Q.   And is it an invoice where
5  Yelvington is selling gravel to a customer?
6       A.   Yes, it is.
7       Q.   And is this the typical form
8  of invoice that Yelvington uses?
9       A.   Yes, it is.
10      Q.   And you're familiar with
11 those?
12      A.   Yes, I am.
13      Q.   It has an invoice number and a
14 date, an order number, et cetera.  Those are
15 all things that you're familiar with?
16      A.   Yes, I am.
17      Q.   Would this be considered a
18 record that you would keep in the normal
19 course of your business at Yelvington?
20      A.   Yes, it is.
21      Q.   And would it be made at or
22 near the time of the transaction that it
23 purports to?

Page 68

1       A.   It should be made most likely
2  the day after the transaction occurred, the
3  tonnage was picked up.
4       Q.   Okay.  And while this is a
5  copy of one that's faxed, is there anything
6  about that invoice that would lead you to
7  believe that it's not an accurate
8  representation of a copy of one of your
9  invoices?
10      A.   No.
11      Q.   Okay.  Looking at it, if you
12 don't mind --
13           MR. LEEK:  What's that --
14      Q.   (BY MR. PEARSON:)  It's on
15 Conrad Yelvington Distributors, Inc., CYDI
16 Bates number 04159.
17           And it appears to be an
18 invoice to Pensacola Ready Mix and it's for
19 a total amount of fifteen hundred and
20 sixty-four dollars and five cents; is that
21 right?
22      A.   That's correct.
23      Q.   Okay.  And is Pensacola Ready

17 (Pages 65 to 68)

# FREEDOM COURT REPORTING

Page 105

1    Q.    And you made the
2  determination --
3    A.    Without actually having the
4  sale, I don't know that anyone would know
5  that you could absolutely do it. But we
6  believe it could be done.
7    Q.    And the basis for that belief
8  would be?
9    A.    Understanding the markets that
10  we operate in.
11    Q.    And how do you come to that
12  understanding?
13    A.    Those individuals are familiar
14  with the sales that occur in the
15  marketplace, and they're familiar with the
16  volume of material that's put out by the
17  plants that typically buy from us.
18        If we can price it properly, I
19  would think that any consumer out there is
20  going to buy product they can get on a
21  consistent basis at a reasonable price.
22    Q.    As we sit here at the table
23  today -- and I may have asked you this and I

Page 106

1  apologize if I have. But in making your
2  calculation of damages, you have not -- you
3  have not considered whether or not you've
4  sold all the thirty-two thousand tons of
5  Johnco gravel that you acquired?
6    A.    No, I've not.
7    Q.    You do not think that was
8  important?
9    A.    I think that this was based on
10  looking at -- For this calculation, no.
11        It was my determination that,
12  you know, we can sell the tons that we have
13  out there. A lot of what we're looking at
14  is based on a consistent supply. Failure to
15  get a consistent supply over time, you know,
16  that we have a source for this material,
17  goes into factoring in do we have damages.
18    Q.    In order to make your damages
19  calculation, have you had to assume that
20  Johnco breached the contract?
21    MR. LEEK: Object. It calls
22  for a legal conclusion. You can answer.
23    A.    Well, I would assume that

Page 107

1  Johnco stopped producing material. So, yes,
2  they're failing to provide us with a hundred
3  and fifty thousand tons of material a year.
4    Q.    Do you make any assumption,
5  one way or the other, as to whether Conrad
6  Yelvington ordered the material or not?
7    A.    I don't feel that that's
8  relevant to what we're doing here.
9        You're asking me to calculate
10  damages. I'm looking at damages based on
11  material we did not get; damages for
12  material that we could not get because
13  Johnco wasn't producing it.
14    Q.    Do you assume that in making
15  this damages calculation that Yelvington had
16  no fault whatsoever in the inability of
17  Johnco to produce?
18    MR. LEEK: Same objection.
19  But you can answer.
20    A.    Again, I don't find that
21  relevant to my determination of what the
22  damages would be.
23        (Off the Record.)

Page 108

1    MR. PEARSON: Back on.
2    Q.    (BY MR. PEARSON:) In order
3  to -- I want to ask you a few more questions
4  about your damages calculations, Mark.
5    A.    Okay.
6    Q.    Under the supply agreement,
7  Yelvington could -- I mean, is it your
8  interpretation of the supply agreement
9  Yelvington could send a fifty-two-car train
10  to take fifty-two hundred tons a week under
11  the supply agreement?
12    MR. LEEK: Objection. I think
13  that's beyond the scope of the notice here.
14  If you can tell me how it's related to
15  damages --
16    MR. PEARSON: It's very
17  relevant to damages because he's obviously
18  got to have some gravel before he can sell
19  it. And I'm going to ask him some questions
20  about that. If you're going to tell him not
21  to answer, that's fine; but I don't think
22  that that's -- I don't think you can do
23  that.

27  (Pages 105 to 108)

# FREEDOM COURT REPORTING

Page 73

1  correct.
2      Q.    So obviously, you didn't use
3  this as the price out of Pensacola?
4      A.    No.
5      Q.    Okay. Did you sell to other
6  people out of Pensacola where you sold it
7  for more money?
8      A.    I believe we did.
9      Q.    Did you average those?
10     A.    In terms of coming up with?
11     Q.    This sixteen dollar and fifty
12 cent price per ton?
13     A.    No. That number is what we
14 believe the current market price is in that
15 area.
16     Q.    But at least in June of '06,
17 you were getting fifteen dollars for it; is
18 that right?
19     A.    To this particular customer on
20 this particular sale.
21     Q.    All right. Just for purposes
22 of me understanding, is this a copy of your
23 copy of the invoice you actually send to the

Page 74

1  customer?
2      A.    Yes.
3      Q.    If you were to take these
4  invoices, and I guess we might want to let
5  you look at them. But I have asked for all
6  of the invoices from Yelvington to be
7  produced to me where No. 67 gravel was
8  bought and sold by Yelvington from any
9  source, including Johnco, over the past five
10 years, but obviously Johnco only for the
11 last two. Do you know if that's been
12 produced to me?
13     A.    To my knowledge, it has.
14     Q.    It has?
15     A.    To my knowledge, it has.
16     Q.    Let's -- If you don't mind,
17 would you look at these invoices that we've
18 got stacked up here that are copies and see
19 if they match up with what your
20 understanding is of the invoices.
21     MR. PEARSON:  And then we
22 will -- Instead of putting them all in the
23 Record, Tom, we will recite the Bates

Page 75

1  numbers of them. Is that acceptable to you?
2      A.    So what is it you want me to
3  do?
4      Q.    (BY MR. PEARSON:)  What I want
5  you to do is look at the invoices that are
6  in front of you, and I want you to take note
7  of the sequential numbers of them and tell
8  me what they are and whether or not they are
9  all of the invoices that they purport to be.
10     First of all, I'm looking
11 at -- Let's just strike that question for
12 now. Let's go off the Record and then I can
13 better tell you what I'm looking for.
14     (Off the Record.)
15     MR. PEARSON: We're back on
16 the Record.
17     In one of the subjects for
18 discussion had to do with production of
19 invoices from Conrad Yelvington based on
20 Johnco's request for production. Earlier
21 this week, we were produced twenty-five
22 hundred or more invoices and receipts that
23 were CYDI Bates numbers 1730 through 4579.

Page 76

1  And they are in response to our request for
2  production for copies of all invoices
3  related to sales of No. 67 gravel by Conrad
4  Yelvington Distributors, Inc. from 2002 to
5  the present. I believe that these invoices
6  go through August 29th is the last date, so
7  we'll say through August. And these were
8  produced.
9      And would you make a
10 representation relative to that, because
11 we -- I need to understand that based on me
12 needing to ask the witness a few questions,
13 whether these purport to be all of the
14 invoices that relate to the sale of 67
15 gravel through August?
16     MR. LEEK:  And officially
17 we're relying on the responses as provided
18 to you. To my understanding this is all of
19 them. But to the extent there have been
20 some transactions recently, they may not be
21 included in here. But as of the response
22 time that we've given you, it is.
23     MR. PEARSON: And, again, this

19 (Pages 73 to 76)

# FREEDOM COURT REPORTING

Page 77

1  is exactly what we were given right there.
2  We have not copied them.
3        MR. LEEK:  And I'm not
4  inspecting it to make sure that that's the
5  case, but I trust that it is.
6        MR. PEARSON:  The Bates
7  numbers appear to be sequential from 1730 --
8  CYDI 1730 through 4579.  And assuming that's
9  what's in that stack, that's what the
10  response is?
11        MR. LEEK:  Correct.
12        MR. PEARSON:  In addition, a
13  subset of that appears from CYDI 4150
14  through 4579, three hundred and something
15  pages, appear to be invoices for all the
16  sales of Johnco No. 67 gravel.
17        Do you have -- And we had
18  asked for that.  Do you have any reason to
19  believe that that's not all of them through
20  August?
21        MR. LEEK:  Again, we'll rely
22  on responses given.  But I don't have any
23  reason to believe that that's not all of

Page 78

1  them.
2        MR. PEARSON:  And will you
3  allow your witness to take your
4  representation and answer questions
5  regarding this?
6        MR. LEEK:  Yes.
7        Q.  (BY MR. PEARSON):  Mr. Klebe,
8  sitting in front of you, but not going to be
9  attached to your deposition, are copies of
10  invoices which purport to be all of the
11  sales of No. 67 gravel that Conrad
12  Yelvington made, which 67 gravel was
13  acquired from Johnco.
14        Did you look at those invoices
15  in giving the damages test- -- prior to
16  giving the damages testimony that you've
17  given here today?
18        A.  I did not.
19        Q.  Did you feel like that would
20  have been something that would have been
21  necessary to do?
22        A.  I did not.
23        Q.  And why not?

Page 79

1        A.  I think in trying to come up
2  with the idea of claims, we need to look at
3  a couple of components.  First of all, I
4  understand these documents go back five
5  years in terms of overall deals from our
6  overall things and some of the things from
7  Johnco ultimately come from '06.  Going
8  forward, a lot of these sales are based on
9  jobs that our customers have.
10        So the history of what they
11  have do not necessarily directly correlate
12  to what they'll do in the future.  What I
13  thought was a better determination since
14  most of this was forward looking, was to be
15  able to get some determination of what we
16  believe these different customers or
17  producers as I'll call them, ready mix
18  producers, would be doing in the future.
19  You know, we have some sense -- I say we,
20  it's my understanding from talking with Gary
21  and Phillip and all, that certainly they're
22  familiar with the market; they have some
23  sense of what these customers produce.  And

Page 80

1  based on that, we determined that this -- We
2  have a pool of customers that we would have
3  out there at our various terminals, and that
4  this pool of customers could account for
5  certainly a hundred and fifty thousand tons
6  of business as long as we had a steady
7  supply to rely on and potentially more.  And
8  so going back through these individual
9  invoices themselves, I didn't think that
10  really played into going to this.
11        Secondly, as far as looking at
12  the individual invoices, I typically do not
13  get into that level; I rely on other people
14  to put that in and go through obviously from
15  our nature.  So we do have summary reports
16  that we pull to give us some sense of what
17  can happen.  I did not pull a summary report
18  to look at our entire history over five
19  years of sales, nor did I pull one to look
20  at the sale of every -- as I previously
21  discussed, to look at what the disposition
22  of the Johnco materials was, let alone
23  material from any other source we might have

20  (Pages 77 to 80)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# EXHIBIT EIGHT

**Conrad Yelvington Distributors, Inc.**
**Johnco Damages Calculation**
**December 20, 2007**

**Contract Summary**

**Commencement Date:**

| | Per contract | Actual |
|---|---|---|
| | 4/27/2005 | 5/11/2006 |

**Contract requirement:** 150,000 tons per year

| Contract Year | Tonnage Commitment | Tonnage Supplied | Tonnage Shortfall | Annual MC | XNPV 6% |
|---|---|---|---|---|---|
| 2006-07 | 150,000 | 32000 | 118,000 | $669,768.00 | |
| 2007-08 | 150,000 | 0 | 150,000 | $851,400.00 | |
| 2008-09 | 150,000 | 0 | 150,000 | $851,400.00 | |
| 2009-10 | 150,000 | 0 | 150,000 | $851,400.00 | |
| 2010-11 | 150,000 | 0 | 150,000. | $851,400.00 | |
| | | | | $4,075,368.00 | $3,619,616.20 |

| Market | Projected Sales Volume (Tons) | Sales Price Component | Material Component | Freight Component | Direct Cost | MC/Ton | Extended MC | Wgt Avg MC/Ton |
|---|---|---|---|---|---|---|---|---|
| Milton | 70,000 | $18.00 | $5.51 | $6.11 | $11.62 | $6.38 | $446,600 | |
| Pensacola | 40,000 | $16.50 | $5.51 | $6.11 | $11.62 | $4.88 | $195,200 | |
| Gautier | 40,000 | $18.00 | $5.51 | $7.25 | $12.76 | $5.24 | $209,600 | |
| | 150,000 | | | | | | $851,400 | $5.68 |


PLAINTIFF'S EXHIBIT

# EXHIBIT NINE

# FREEDOM COURT REPORTING

Page 9

1  A.  Some of it you would have, but
2  most of it you probably have not. I mean,
3  it also contains, Greg, some of the
4  documents, the key documents, and obviously
5  you've seen those. But there are notes and
6  deposition summaries and analyses and other
7  things that you have not seen.
8  Q.  All right. And I'll want to
9  get a copy of those somehow. I just want to
10  have those. Is that any problem in getting
11  those, even though we're sitting here the
12  last day before Christmas?
13  MR. LEEK: That's fine.
14  MR. PEARSON: Will you want to
15  Bates number those or how do you want to do
16  that?
17  MR. LEEK: Let me think about
18  that.
19  MR. PEARSON: Well, I can get
20  a copy, and you can give me a Bates number
21  too. It's not that big of a deal. It's
22  only a few hundred pages max in that.
23  Q.  (BY MR. PEARSON): Now, you

Page 10

1  were here yesterday, Dave, for at least part
2  of the deposition of Eugene Hartley?
3  A.  Yes.
4  Q.  And you took notes during that
5  deposition?
6  A.  I did.
7  Q.  Are those included in your
8  notebook?
9  A.  They are.
10  Q.  Okay. And to the extent that
11  you heard something yesterday that you have
12  relied on or enhances one of your opinions
13  that you're going to give, you'll just tell
14  me that today as we move through the
15  questioning, if it seems to be relevant and
16  material to your answer?
17  A.  I will. I will.
18  (Whereupon, Plaintiff's
19  Exhibit No. 2 was marked
20  for identification.)
21  Q.  Okay. Let's mark this.
22  I'm handing you what I've
23  marked as Plaintiff's Exhibit 2 to your

Page 11

1  deposition, and I'll represent to you that
2  appears to be the expert report that you
3  filed on September the 25th, in this case,
4  along with the attachments, which would
5  include the documents that you reviewed
6  before making that report and a chart that
7  you attached and, of course, your CV and
8  work and stuff you've done, along with the
9  actual written report that you made where
10  you summarized your opinions.
11  And we're going to go through
12  that in some length, but the opinions that
13  you gave in your written report are -- have
14  any of those changed since September the
15  25th?
16  A.  The opinions have not changed.
17  There is, of course, some more information
18  that has been produced subsequent to that
19  report, which allows me to confirm some of
20  the opinions in the report. But -- For
21  example, we did not have financial
22  information with respect to Johnco's income
23  statement performance for '06 and '07. We

Page 12

1  now, at least, immediately prior to
2  Mr. Alexander's deposition, got that. And
3  at the time we did our report, we also did
4  not have the drill hole summary data that
5  Rinker had done incident to their possible
6  purchase of the Johnco facility, and we've
7  received that since that time. So those are
8  two pieces of information that were missing
9  and not produced earlier that we have
10  received subsequent to the report.
11  Q.  In regard to the Rinker
12  report, have you independently analyzed
13  that?
14  A.  I have.
15  Q.  And did you do that yourself?
16  A.  I did.
17  Q.  Okay. And what reserves did
18  you assign to the ground layer?
19  A.  I didn't focus on the reserve
20  calculations. I think -- I understood
21  fairly early on from that that the total
22  aggregate amount of the reserves would not
23  be an issue as it relates to the hundred and

3 (Pages 9 to 12)

# FREEDOM COURT REPORTING

Page 13

1  fifty thousand tons that Johnco had
2  committed to Yelvington and vice versa. So
3  I was really not focusing on the reserves, I
4  was really looking more at the sand and
5  gravel composition, and kind of the overlay
6  with 57 and 67 relative to not only the
7  overall deposit, and also where they were
8  mining it at the particular time.
9      Q.   All right. The introduction
10 to your written report, Dave, and I'm sure
11 you remember it, it says: I've been engaged
12 to review and provide expert testimony
13 regarding the expert report of J. Lester
14 Alexander relative to the alleged damages
15 suffered by JMI in the above-styled case.
16 And that has been the nature of your
17 identification to me as an expert witness.
18         Are you intending to testify
19 as an expert witness on any additional
20 topics that are not included in your written
21 report?
22     A.   The only thing that -- I will
23 be testifying with respect to damages and

Page 14

1  damages as it relates to the report of
2  Mr. Alexander. There are certain factual
3  findings based upon the financial records,
4  that if I'm asked to testify about in
5  connection with that, I will.
6      Q.   And that, I understand. You
7  will look at evidence and tell me where you
8  come up with whatever it is you come up with
9  as a basis for these opinions that you have,
10 relative to alleged damages suffered by JMI.
11 And I'm particularly focusing on alleged
12 damages suffered by JMI, not damages in this
13 case. As you know, there has been a
14 counterclaim filed.
15     A.   Correct.
16     Q.   You've not been hired to look
17 at or discuss or testify relative to any
18 counterclaim damage?
19     A.   That is correct.
20     Q.   If you'd go over, please, if
21 you don't mind, I just want to sort of go
22 through page four.
23         Go to page four. And I would

Page 15

1  assume that's where you start with things
2  that are material to your opinions,
3  particularly to your opinions, would you
4  agree with that?
5         The first part appears to be
6  sort of a recital of who you are and why
7  you're qualified and what you do in your
8  practice and what the exhibits are and how
9  much you charge.
10     A.   Correct.
11     Q.   When we get over to background
12 in the supply agreement, that's sort of
13 where we start, right?
14     A.   That's correct.
15     Q.   And you indicate that -- And
16 apparently, most of your testimony is
17 centered around that the supply agreement
18 calls for Conrad Yelvington Distributors to
19 purchase number 67 concrete gravel in
20 minimum quantities of a hundred and fifty
21 thousand tons annually.
22         And you criticize
23 Mr. Alexander's report, particularly that he

Page 16

1  projects that lost profits could be on sales
2  of two hundred and sixty thousand tons of
3  gravel?
4      A.   That's correct.
5      Q.   And when you do that, Dave, do
6  you have to ignore the language in the
7  supply agreement about the frequency and the
8  quantity of the regular shipments?
9      A.   I think you have to ignore the
10 language in the supply agreement to assume
11 anything other than exactly what it says, a
12 hundred and fifty thousand tons annually.
13 The fifty-two hundred tons relates to the
14 way that the gravel would have been picked
15 up, and that is consistent with, I think,
16 Greg, I believe, everybody's testimony that
17 has testified in this case on both sides.
18     Q.   Well, that is an
19 interpretation that you've made relative
20 to -- That is an assumption and an
21 interpretation that you've made from reading
22 the various evidence?
23     A.   Well, I can read the

4 (Pages 13 to 16)

# FREEDOM COURT REPORTING

## Page 73

1 in terms of the cost per ton. But just
2 assume that all of it got produced during
3 that period. My complaint is this: If
4 you're looking at taking expenses that were
5 developed when the average production was
6 only eight thousand tons a month, you
7 certainly would expect, for example, that
8 your supply costs would be more if you were
9 producing more; you would expect that your
10 twenty-five cents a ton that you're paying
11 to M&B would be more; you would expect that
12 your -- you probably would have more salary
13 expenses during that period of time,
14 particularly if you had to work more than
15 one shift; you would expect more repair and
16 maintenance expenses. Well, none of that
17 was considered.
18         What he did was increase for
19 the fuel to give effect to the increased
20 production, but not give effect to anything
21 else, and I just don't think that's a
22 correct way to do it. He assumed every
23 other cost was fixed except for fuel.

## Page 74

1     Q.    And do you have a number it
2 should have been?
3     A.    I've done some analysis
4 looking at a correction of his calculations.
5     Q.    All right. What's your
6 number?
7     A.    What I did, I looked at --
8 First, I looked at Johnco, and I assumed
9 that Johnco would have sold a hundred and
10 fifty thousand tons of gravel at five
11 dollars and fifty-one cents a ton. I took
12 all of the oversized sales that they made
13 during that eighteen-month period of time
14 and developed an average amount per month
15 that they actually sold during that period.
16 I did the same thing with sand, and I
17 recognize there are legal arguments about
18 whether oversize and sand should be included
19 in this or not, and I'm not getting into
20 that. But I -- For sake of what I did, I
21 included oversized and sand.
22         And what I then did is I took
23 the operating expenses from Johnco's own

## Page 75

1 historical financial statements during that
2 period of time of May through September,
3 even though actually in September the
4 cutback had already occurred, there was
5 substantial reductions in compensation that
6 occurred in the month of September. That's
7 when it appears that there were -- from
8 financial records, at least, that there was
9 a shutdown or beginning of shutdown in
10 production. But I included September in
11 there even though I don't have a full
12 complement of salaries.
13         What I then did is annualized,
14 which is just putting on a twelve-month
15 basis those five months of activity. There
16 were -- I don't want to digress on this,
17 there was a few expenses where I just took
18 the annual amounts off the tax returns
19 because they were not represented in that
20 five-month period of time, and those were
21 auto expenses and interest and amortization
22 was like eleven hundred dollars. So I
23 annualized the expenses for that five-

## Page 76

1 period of time, to just give a view of what
2 the expenses would be on a full year's
3 basis. And I assumed, even though they had
4 not done it in the past, that they could
5 have produced the hundred and fifty thousand
6 tons. The only adjustments I made is I
7 adjusted for the M&B Railroad charge; I used
8 Les' same methodology on fuel costs; and
9 I've got depletion, and I've got it at forty
10 cents. I don't know whether it's forty or
11 twenty or fifteen or fifty, but I've got it
12 at forty cents for purposes of this
13 calculation.
14         I do not have considered in
15 this analysis, yet, overburden removal or
16 any reclamation cost. But in looking at
17 that, what it indicated is that the
18 normalized full complement of a year
19 expenses for Johnco would have been almost a
20 million two, and the revenues that Johnco
21 would have generated under that assumption
22 was slightly under nine hundred thousand,
23 indicates that Johnco would have lost two

19 (Pages 73 to 76)

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 85

1  consistent with that at the same time. I
2  don't think you'd get to a higher number on
3  the bottom line.
4      Q.   But would you agree with me
5  that people wouldn't go into business and
6  get a capacity to produce a hundred and
7  twenty tons of number 67 an hour and then
8  reasonably expect that all they're ever
9  going to do is sixty percent of that number,
10  would you?  That's not reasonable.
11          MR. LEEK:  Object to the form.
12  You can answer the question.
13     A.   Well, it depends again on what
14  that -- You know, a lot of times when you
15  look at theoretical capacity, somebody's
16  production capacity may not be more than
17  eighty percent of that, because you've got
18  downtime and all kinds of issues.
19     Q.   Is eighty percent a reasonable
20  number?
21          MR. LEEK:  Objection.
22     A.   It depends on what you're
23  talking about.

Page 86

1      Q.   Well, sand and gravel
2  operation, is that a reasonable number?
3      A.   You know, I would think that
4  eighty percent would be a reasonable target
5  that somebody would like to achieve and
6  attain.  But whether they can do it or not
7  is another matter entirely.  And what their
8  expense structure would be is another matter
9  entirely.  I mean, you could put an extra
10  twenty percent production on this, but
11  consider expenses appropriately, and you're
12  not going to get a better result.
13     Q.   Well, you wouldn't expect a
14  business to do much more than break even if
15  they're going to set up some capacity and
16  only go with sixty percent of that.  You
17  wouldn't even expect them to do anything
18  that made them break even or lose money,
19  would you?
20          MR. LEEK:  Same objection.
21     A.   Well, it depends.  In a sand
22  and gravel operation, you do have a lot of
23  costs that are incurred on the front end.

Page 87

1  It really gets back to whether you can sell
2  all your product.
3          The problem that obviously
4  Johnco suffers from, is the fact that
5  they've got a lower-priced product relative
6  to the market, and they're selling only
7  about thirty percent of what they're
8  actually producing and running through the
9  plant.  You would not expect somebody to
10  make money under those circumstances.  I
11  mean, I'm surprised frankly, that's it's as
12  close as it is.
13     Q.   And you can't take historical
14  sales and project or forecast future lost
15  profits like that.  That's not a reasonable
16  basis for doing that?
17     A.   No.  I think historical --
18  That's exactly what I've done.  I took the
19  historical sales on a monthly basis and used
20  that to calculate what the future sales
21  activity would be.  May be some better way
22  to do it, I'm just saying in this
23  calculation I did that.

Page 88

1      Q.   Didn't Les do the same thing?
2      A.   No.
3      Q.   Les didn't take historical
4  sales and forecast it?
5      A.   No.  No.
6          What he did is he took -- Even
7  though you're sitting there with massive
8  amounts of sand, I mean you had probably six
9  or seven times the amount -- at least,
10  probably eight or ten times the amount of
11  sand that was actually sold.  He looked at
12  that small amount of gravel that was
13  produced during that period of time and said
14  even though they were selling basically a
15  hundred percent of the 67 gravel that they
16  were producing, he looked at that small
17  amount of gravel that was being produced and
18  established a relationship between that and
19  the sand.  Even though we're sitting there
20  on the sand side with ten times the sand
21  than you could -- than they were selling,
22  from an inventory standpoint, and assumed
23  that as the gravel production grew, that

22 (Pages 85 to 88)

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 89

1 the -- and sales grew, that the sand would
2 grow along with it. And you were already in
3 a situation where you had more sand than you
4 could probably ever sell. And he assumed
5 that it would grow commensurate with the
6 gravel production. You know, I don't agree
7 with that approach. I just don't think
8 that's -- You know, if you were selling sand
9 along with the gravel and there was some
10 kind of relationship that was established
11 about we're producing X amount of sand -- I
12 mean, gravel and selling it, and we're
13 sealing the same percentage of sand and
14 there was some reasonable relationship
15 between the two, that might make sense. But
16 clearly in this case, they had more sand
17 than -- obviously they had problems with
18 sand across the board all during this period
19 of time.
20     Q.    And when you say problems with
21 sand, tell me what you mean.
22     A.    Selling it.
23     Q.    Selling?

Page 90

1     A.    Correct.
2     Q.    Sand was not creating a
3 problem for them in the ability to mine and
4 produce number 67, you don't mean problem in
5 that area?
6     A.    I don't know whether it was
7 creating a problem there or not. Okay.
8           But clearly sand, if it was
9 not a major focus of what they were doing,
10 it should have been. And the testimony is
11 that there were, obviously, efforts all
12 through this period of time to try to sell
13 sand, but they were unsuccessful in doing
14 it. And all I'm saying is that it's not
15 appropriate to look at a relationship
16 between gravel and sand where you're selling
17 a hundred percent of your gravel and you're
18 selling, I don't know, ten percent of your
19 sand and assume that the sand sales are
20 going to grow with the gravel sales.
21     Q.    Well, you say all during this
22 period, what period are you saying that they
23 were attempting to sell the sand actively

Page 91

1 and couldn't do it? What period?
2     A.    Well, I don't know, you know,
3 at what point it became a very significant
4 issue for them. But obviously as they
5 produced gravel and had more and more sand,
6 that if they could have sold, could have
7 generated profitability for them, I'm sure
8 it became more and more and more of an
9 issue. But they were selling sand as early
10 as January of '06. And the only significant
11 size sale of sand that occurred was in May
12 of '07.
13     Q.    They're selling sand in
14 January of '06, how are they producing that
15 sand without producing 67 gravel at the same
16 time?
17     A.    You can produce -- You're
18 producing two tons of sand, at least, for
19 every ton of 67 gravel that you're
20 producing, if not three.
21     Q.    What product?
22     A.    I mean, they're selling three
23 hundred and twenty-five tons, Greg, in

Page 92

1 January and six hundred and twenty-seven
2 tons in February. I mean, these are --
3 These are relatively small amounts of sale.
4 The fact that you produced sand, doesn't
5 mean that you produced commercially sellable
6 gravel either.
7           And, again, I'm not trying to
8 quibble with you about what they were
9 producing, and I'm not getting into the
10 quality of it, but you can generate sand
11 without having commercially sellable gravel.
12     Q.    You've brought up commercially
13 sellable gravel. What did your client,
14 who's hired you to do this, what did they
15 tell you about when they did their test and
16 said that our gravel fit their
17 specifications, and in fact our sand fit
18 their specifications. What has your
19 client -- Do you know anything?
20     A.    No. I've seen reference that
21 it -- to the fact that it met spec. I don't
22 remember when.
23     Q.    When?

23 (Pages 89 to 92)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# EXHIBIT TEN



WAB&T 00214



## LEGAL DESCRIPTION OF PROPOSED 161 ACRE PARCEL

Beginning at SW Corner of NW 1/4 of SE 1/4 Sec 31, T16N, R14E; thence N 0 degrees 141 feet; thence E 90 degrees 2400 feet; thence NW 315 degrees 562 feet; thence W 270 degrees 509 feet thence; N 0 degrees 689 feet; thence E 90 degrees 501 feet; thence SE 116 degrees 1523 feet; thence N 0 degrees 642 feet; thence E 90 degrees 294 feet; thence S 179.6 degrees 1860 feet; thence SW 228.4 degrees 519 feet; thence SW 243.8 degrees 576 feet; thence SW 244.5 degrees 963 feet; thence WSW 269 degrees 724 feet; thence NW 301 degrees 502 feet; thence NW 315 degrees 548 feet; thence NW 321 degrees 526 feet; thence N 359 degrees 646 feet to POB.

The above description is based on the bearings. Total description encompasses 161 acres more or less, located in Sections 5 & 6, Township 15 N and Section 31, Township 16 N, All being in Range 14 E.

**NOTE: The above described tract is based on estimated bearings and distances. No certified Land Survey was supplied to the Appraiser for this analysis.**

WAB&T 00215



## CALCULATION OF MINERAL DEPOSIT (SAND & GRAVEL)
## ON APPROXIMATELY 161 ACRE PARCEL AS DESCRIBED

*NOTE: THESE CALCUATIONS ARE BASED ON BORE TESTINGS PERFORMED IN 1958 ON THE SUBJECT WITH SOME TEST HOLES BEING RETESTED BY MR. BEN JOHNSTON IN 2002. THE APPRAISER WAS NOT PRESENT AT ANY OF THE TESTINGS; HOWEVER, HE WAS GIVEN THE RE-TESTING PROCEDURES AND RESULTS FROM WHICH THESE CALCULATIONS ARE PERFORMED.*

*IN THE ORIGINAL BORE TESTINGS DONE IN 1958, TEST HOLES WERE MADE AT INTERVALS OF 300'; CONSEQUENTLY, EACH HOLE REPRESENTS AN AREA OF 90,000 SQUARE FEET OR 10,000 SQUARE YARDS OF TEST SURFACE.*

*TABLE #1 DEPICTS A TABULATION OF 60 TEST HOLES COMPRISING 161 ACRES MORE OR LESS WITH THE HOLE NUMBER FROM THE ORIGINAL TEST MAP AND THE LINEAR FOOTAGE OF SAND AND GRAVEL MATERIAL BELOW THE OVERLAYMENT AS WELL AS THE DEPTH OF OVERLAYMENT. AN AVERAGE OF 12.69 LINEAR FEET OF OVERLAYMENT WAS CALCULATED FOR THE 60 TEST HOLES ANALYZED FOR THE STUDY.*

*FOLLOWING THIS LINE OF ANALYSIS; USING THE LINEAR DEPTH IN YARDS OF SAND AND GRAVEL BELOW THE OVERLAYMENT DERIVED FROM THE ORIGINAL TESTING RESULTS, 379 LINEAR YARDS OF SAND AND GRAVEL MIX WERE CONCLUDED. FURTHER ANALYSIS INDICATES 10,000 SQUARE YARDS OF SURFACE AREA WHEN MULTIPLIED BY THE LINEAR DEPTH OF SAND AND GRAVEL MIX OF 379 YARDS COMPUTES TO BE 3,790,000 CUBIC YARDS OF SAND AND GRAVEL MIX CONTAINED UNDER THE 161 ACRE PARCEL AS DESCRIBED.*

*WEIGHT TESTINGS PERFORMED BY MR. JOHNSTON IN 2002 INDICATE THAT A MIXED WEIGHT OF SAND AND GRAVEL FROM THE TEST HOLES IS 2,970 POUNDS PER CUBIC YARDS. UTILIZING THIS WEIGHT FACTOR AND THE CONCLUDED CUBIC YARDS CALCULATED UNDER THE 161 ACRE PARCEL, A RESULTANT VALUE OF 5,628,150 TONS OF SAND AND GRAVEL MIX IS PRESENT.*

*EIGHT (8) TEST HOLES WERE REVISITED BY MR. JOHNSTON, SIX OF WHICH ARE DEPICTED IN TABLE #2 IN THE REPORT. THIS TABLE INDICATES THE HOLE NUMBER AND THE PERCENT OF GRAVEL BY WEIGHT FOR EACH TEST HOLE REVISITED AND ITS CORRESPONDING HOLE NUMBER.*

*TABLE #3 DEPICTS THE CORRESPONDING HOLES INDICATED IN TABLE #2 PORTRAYING THE PERCENT OF GRAVEL BY WEIGHT AND SIZE CLASS FOUND IN THE RESPECTIVE HOLE TESTED. THE CONCLUSIONS DRAWN FROM TABLE #2 IS THAT APPROXIMATELY 45% OF THE SAND AND GRAVEL MIX FOUND UNDER THE 161 ACRE PARCEL IS GRAVEL WITH THE BALANCE BEING VARIOUS TYPES AND SIZES OF SAND AND OTHER MATERIALS.*    -1-

WAB&T 00216



THE CONCLUSION DRAWN FROM TABLE #3 IS SELF EXPLANATORY IN THAT PERCENTAGES BY WEIGHT ARE TABULATED BY SIZE CLASS OF GRAVEL FOR THE HOLES TESTED. A TABLE PRODUCED BY THE ALABAMA HIGHWAY DEPARTMENT INDICATING THE SPECIFICATIONS FOR GRAVEL BY NUMBER IS INCLUDED IN THE REPORT AND THE MOST COMMON FOR CEMENT MIXES.

-2-

WAB&T 00217



## CALCULATION ROYALTY (STUMPAGE) VALUE OF MINERAL DEPOSIT
### UNDER PROPOSED 161 ACRE PARCEL

**5,628,150** tons of sand and gravel mix as calculated from test borings 1958.

45% of deposit is gravel of mixed sizes (based on retesting by Ben Johnston).

55% of deposit is sand and other material.

**\*GRAVEL VALUE:**

5,628,150 tons x 45.1% = . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2,538,296 tons
2,538,296 @ $0.50/ton = . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . <u>$ 1,269,148</u>

*(value per ton of #57, #57 gravel derived from market values range of $0.50 to $1.00 per ton)*

**\*\*SAND AND OTHER VALUE:**

5,628,150 tons x 54.9% = . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3,089,854 tons
3,089,854 tons @ $0.25/ton = . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . <u>$ 772,463</u>

*(value per ton of mixed sands derived from market value)*

### TOTAL ESTIMATED USE VALUE OF MINERAL DEPOSIT
### UNDER 161 ACRE PARCEL WHEN DISCOUNTED

*10% for possible future change in market conditions and possible variations in deposit depths*

**ONE MILLION EIGHT HUNDRED THIRTY SEVEN FOUR HUNDRED FIFTY DOLLARS**

## <u>$1,837,450</u>

---

\*Note: Based on market data collected, royalty values (stumpage) for gravel range from $0.50 to $1.00 per ton.

---

\*\*Note: Based on market data collected, royalty values (stumpage) for sand range from $0.15 to $0.50 per ton.

WAB&T 00218

## Table Number 1
## Depth of Sand and Gravel Mix / Overlayment
## by Original 1958 Test Borings on 161 Acre Parcel

| Hole # | Depth of Sand & Gravel in Feet | Depth of Over-Layment in Feet | Hole # | Depth of Sand & Gravel in Feet | Depth of Over-Layment in Feet |
|---|---|---|---|---|---|
| 7 | 16 | 18 | 41 | 17 | 22 |
| 8 | 18 | 18 | 42 | 23 | 14 |
| 9 | 23 | 17 | 43 | 23 | 9 |
| 10 | 18 | 12 | 44 | 25 | 10 |
| 11 | 14 | 14 | 45 | 23 | 11 |
| 12 | 18 | 9 | 46 | 21 | 10 |
| 13 | 18 | 10 | 47 | 22 | 10 |
| 14 | 15 | 15 | 48 | 14 | 18 |
| 15 | 8 | 20 | 52 | 20 | 7 |
| 16 | 20 | 7 | 53 | 20 | 11 |
| 17 | 14 | 12 | 54 | 18 | 13 |
| 18 | 20 | 8 | 55 | 16 | 15 |
| 19 | 14 | 14 | 60 | 10 | 18 |
| 20 | 21 | 10 | 61 | 15 | 16 |
| 21 | 22 | 8 | 62 | 19 | 12 |
| 22 | 22 | 12 | 63 | 14 | 15 |
| 23 | 15 | 18 | 64 | 20 | 15 |
| 24 | 19 | 20 | 65 | 17 | 13 |
| 25 | 22 | 15 | 66 | 18 | 16 |
| 26 | 25 | 11 | 67 | 18 | 10 |
| 27 | 16 | 8 | 68 | 18 | 13 |
| 28 | 30 | 10 | 69 | 9 | 12 |
| 29 | 18 | 15 | 70 | 10 | 14 |
| 30 | 18 | 8 | 71 | 19 | 13 |
| 31 | 17 | 31 | 87 | 12 | 13 |
| 32 | 20 | 12 | 88 | 16 | 13 |
| 33 | 20 | 10 | | | |
| 34 | 27 | 9 | | | |
| 35 | 26 | 9 | | | |
| 36 | 26 | 11 | | | |
| 37 | 25 | 5 | | | |
| 38 | 28 | 6 | | | |
| 39 | 26 | 7 | | | |
| 40 | 21 | 9 | | | |

WAB&T 00219