IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

JOHNCO MATERIALS, INC.,                    CASE NO.: CV-06-2:06CV993-10

      Plaintiff,

vs.

CONRAD YELVINGTON
DISTRIBUTORS, INC.,

      Defendant.

_____ /

**NOTICE OF FILING DOCUMENTS IN SUPPORT OF
DEFENDANT, CONRAD YELVINGTON DISTRIBUTORS, INC.,
RESPONSE TO PLAINTIFF'S MOTION TO EXCLUDE EXPERT TESTIMONY OF
MARK KLEBE, DAVID BORDEN, AND EUGENE HARTLEY**

Defendant, CONRAD YELVINGTON DISTRIBUTORS, INC., by and through its

undersigned counsel, hereby gives notice of filing the following documents, attached hereto, in

support of its Response to Plaintiff's Motion to Exclude Expert Testimony of Mark Klebe, David

Borden and Eugene Hartley.

1.    Excerpts from the deposition testimony of David Borden taken on December 21, 2007.

2.    Excerpts from the deposition testimony of Eugene Hartley taken on December 20, 2007

and Exhibit 2.

**Cobb Cole**

/s/ Thomas J. Leek
THOMAS J. LEEK
FLA. BAR NO. 0116408
150 Magnolia Avenue
Post Office Box 2491
Daytona Beach, FL 32115-2491
Telephone:  (386) 255-8171
Facsimile:  (386) 323-9255
E-mail: Tom.Leek@CobbCole.com
CO-COUNSEL FOR DEFENDANT

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the 17th day of March, 2008, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system, which will send a notice of electronic filing to the following CM/ECF participants and served by U.S Mail and Electronic Mail a copy of the foregoing on the following non-CM/ECF participants:

H. Gregory Pearson, Esquire
Charles E. Harrison, Esquire
Junkin, Pearson, Harrison, & Junkin, L.L.C.
601 Greensboro Avenue
Suite 600, Alston Place
Tuscaloosa, AL 35401

J. David Martin, Esquire
Copeland, Franco, Screws & Gill, P.A.
444 South Perry Street (36104)
Post Office Box 347
Montgomery, AL 36101


___/s/ Thomas J. Leek_____

{034542-058 : KPARS/KPARS : 00547553.DOC; 1}

## FREEDOM COURT REPORTING

Page 74

1    Q.    And do you have a number it

2    should have been?

3    A.    I've done some analysis

4    looking at a correction of his calculations.

5    Q.    All right.  What's your

6    number?

7    A.    What I did, I looked at --

8    First, I looked at Johnco, and I assumed

9    that Johnco would have sold a hundred and

10   fifty thousand tons of gravel at five

11   dollars and fifty-one cents a ton.  I took

12   all of the oversized sales that they made

13   during that eighteen-month period of time

14   and developed an average amount per month

15   that they actually sold during that period.

16   I did the same thing with sand, and I

17   recognize there are legal arguments about

18   whether oversize and sand should be included

19   in this or not, and I'm not getting into

20   that.  But I -- For sake of what I did, I

21   included oversized and sand.

22            And what I then did is I took

23   the operating expenses from Johnco's own

EXHIBIT

A

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

## FREEDOM COURT REPORTING

Page 75

1    historical financial statements during that

2    period of time of May through September,

3    even though actually in September the

4    cutback had already occurred, there was

5    substantial reductions in compensation that

6    occurred in the month of September.  That's

7    when it appears that there were -- from

8    financial records, at least, that there was

9    a shutdown or beginning of shutdown in

10   production.  But I included September in

11   there even though I don't have a full

12   complement of salaries.

13              What I then did is annualized,

14   which is just putting on a twelve-month

15   basis those five months of activity.  There

16   were -- I don't want to digress on this,

17   there was a few expenses where I just took

18   the annual amounts off the tax returns

19   because they were not represented in that

20   five-month period of time, and those were

21   auto expenses and interest and amortization

22   was like eleven hundred dollars.  So I

23   annualized the expenses for that five-month

**FREEDOM COURT REPORTING**

Page 76

1    period of time, to just give a view of what

2    the expenses would be on a full year's

3    basis.  And I assumed, even though they had

4    not done it in the past, that they could

5    have produced the hundred and fifty thousand

6    tons.  The only adjustments I made is I

7    adjusted for the M&B Railroad charge; I used

8    Les' same methodology on fuel costs; and

9    I've got depletion, and I've got it at forty

10   cents.  I don't know whether it's forty or

11   twenty or fifteen or fifty, but I've got it

12   at forty cents for purposes of this

13   calculation.

14            I do not have considered in

15   this analysis, yet, overburden removal or

16   any reclamation cost.  But in looking at

17   that, what it indicated is that the

18   normalized full complement of a year

19   expenses for Johnco would have been almost a

20   million two, and the revenues that Johnco

21   would have generated under that assumption

22   was slightly under nine hundred thousand,

23   indicates that Johnco would have lost two

## FREEDOM COURT REPORTING

Page 77

1    hundred and ninety-five thousand dollars on

2    a full-year basis with the sale of a hundred

3    and fifty thousand tons of number 67.

4            Now, that is not the approach

5    that you would make for a lost profits

6    calculation.  In a lost profits calculation,

7    you would not consider -- you would consider

8    only the costs that were avoided, and those

9    costs that would be -- that were incremental

10   in nature, and there are some costs that are

11   fixed that are not avoidable.

12           And even though I don't agree

13   with the not considering a substantial

14   portion of other costs as being incremental

15   expenses in considering only fuel, I adopted

16   Les Alexander's methodology for my

17   calculation.  And what I did is I took the

18   same revenue number, and then I subtracted

19   out the annualized expense numbers, you

20   know, just put them on a full-year basis

21   just like I did the revenue, and I made the

22   same adjustments for transportation,

23   depletion, and same calculation that I did

## FREEDOM COURT REPORTING

Page 78

1    before on the increase in fuel cost.

2    Basically, what it indicates is that on an

3    incremental basis with a hundred and fifty

4    thousand tons, Johnco would have been about

5    break even.  Actually I show a little bit of

6    a loss.

7                 So that's the analysis that I

8    did that you asked about.

9         Q.      And given that, I mean, can

10   you conclude that if you assume liability

11   for purposes of the calculations,

12   Yelvington's liability, just assume it for

13   purposes of this calculation, not admit it

14   but assume it, then Yelvington just did

15   Johnco a favor by breaching the contract,

16   saved them some money?

17        A.      No.  Number one, I don't agree

18   that Yelvington breached the contract.

19        Q.      I understand.  I said you are

20   assuming that for purposes of liability.

21        A.      And, number two, obviously

22   this was not a good contract, as it turned

23   out, given market conditions from Johnco's

**FREEDOM COURT REPORTING**

1          A.      Yes.

2          Q.      You say evaluation of Johnco

3     sand and gravel operation?

4          A.      Yeah.

5          Q.      Well, right off the bat, what

6     kind of evaluation?

7          A.      I'm an economic exploration

8     geologist, specializing in aggregates and

9     industrial minerals.  I'm typically hired to

10    evaluate greenfield sites, prospect for

11    existing sites, do inspections of operating

12    sites to determine -- to locate them or

13    determine if in my opinion, do I think

14    they're feasible.  In some cases do an

15    evaluation, in some cases do a financial

16    valuation if there's enough information

17    possible.

18         Q.      All right.  That's what you

19    generally do?

20         A.      That's what I generally do.

21         Q.      Okay.  And is that what -- you

22    termed yourself as an economic exploration

23    geologist.  Is that what an economic

EXHIBIT

B

## FREEDOM COURT REPORTING

Page 26

1    exploration geologist would do typically?

2         A.      That specializes in aggregates

3    and industrial minerals, that's correct.

4         Q.      All right.  And what were you

5    asked to do in this case?

6         A.      Evaluate the deposit.

7         Q.      Evaluate the deposit in what

8    way?  To see what color it was?  I mean, I

9    need to understand, evaluate is a word that

10   has no meaning to me unless you tell me what

11   that meaning is.

12        A.      Evaluate means to determine

13   the nature of, often to determine if it's a

14   feasible operation or potentially a feasible

15   operation or site.  And it -- usually in

16   regards to the land, but may have been in

17   regards to the plant.

18        Q.      Okay.  What did -- I guess --

19   And I still don't have what your opinions

20   are.  Are your opinions that you have, and

21   you're going to testify to in this case, are

22   they in this written report?

23        A.      Yes.

## FREEDOM COURT REPORTING

1    issues in this case that you were hired to

2    do?

3         A.    And not necessarily the

4    report?

5         Q.    It doesn't have to be in the

6    report, but I'm going to ask you why it's

7    not in the report.  Do you understand that?

8         A.    Yes.  The report was written

9    on September 25th.

10        Q.    Okay.  I mean, it's your turn.

11        A.    Would you like to go over the

12   plant, the property, piece by piece?

13   You're asking for my opinions, we have to

14   break it down.

15        Q.    I need you, because you're the

16   expert, would you please state for me the

17   expert opinions that you intend to give in

18   court, in this case.

19        A.    I don't believe this operation

20   was going to be successful.

21        Q.    Okay.

22        A.    I would not have recommended

23   it to a client if I was sent to to buy it,

## FREEDOM COURT REPORTING

1    for example.

2         Q.    I don't believe that this

3    operation was going to be successful.

4         A.    Yeah.  As it was done.

5         Q.    As it was done.  All right.  I

6    would not recommend it to a client.  What

7    other opinions do you have?

8         A.    I would express certain

9    opinions about different topics on the

10   property, both pros and cons.  I am

11   typically asked to do that.  That is, after

12   all, an evaluation.

13        Q.    All right.  Let's stop.  Let

14   me ask you:  What opinion do you have on any

15   topic about the property that is pro?

16        A.    Property is large enough.

17        Q.    Large enough for what?

18        A.    To be a mine site, and to sit

19   a plant and railroad spur.

20        Q.    Okay.  Any other pros?

21        A.    I was unsure initially as to

22   the amount of reserves.  Now after examining

23   the Rinker data of August 2006, I believe

# Evaluation of the Johnco Materials Sand and Gravel Operation

White Hall area, Lowndes County, Alabama
By M. Eugene Hartley, Economic Exploration Geologist
Register Professional Geologist AL #1157
September 25, 2007

## Abstract

Johnco Materials, Inc. is located west of Montgomery, Alabama and is a recent start-up sand and gravel mine and plant. It has a circular rail loop, but is on a short line railroad, not on a main rail line such as CSX. Johnco did not have a truck market since it is further from the main metropolitan market, Montgomery, than its main competitors. Rail-wise and truck-wise Johnco probably has a $1.50 to $2 disadvantage to some producers closer to and on main rail on the east side of Montgomery. Most production was from April to October 2006. Johnco lacked a formal written plan. Also, unlike most producers, Johnco was almost entirely dependant upon a single customer for only one of its products. Johnco was not able to sell much sand, the main product by volume. Sand may have been choking the plant and stockpile area. Unsold sand product would have a big financial impact on Johnco. Such factors attributed to the closure by November 2006.

## Introduction

Johnco Materials is a fairly new producer of sand and gravel. The company was conceived and founded in the period 2002 to 2004 by brothers Ben and Pep Johnston. A partner, Clatus Junkin, was added a short while later. In 2006 Junkin became the sole owner... A supply agreement was signed between Johnco Materials, Inc. with Conrad Yelvington Distributors, Inc. in April 2004 after which a plant was built by Johnco. Hereinafter, Johnco Materials, Inc. will be termed "Johnco" and Conrad Yelvington Distributors, Inc. will be termed "Yelvington" as they are typically called in the business. In other documents Yelvington may be termed by their initials, CYDI. Production began at Johnco in March of 2006. The first shipment was made in May 2006. The plant was closed in October or November of 2006. Legal action between Johnco and Yelvington began during the fall of 2006.

I was hired by Yelvington's attorneys at Cobb & Cole to do an evaluation of the operation. Over the course two weeks I have done my evaluation based on the information provided. This is presented after the signature line. The documents I relied upon are listed on the last page of this report.

## Writer's Qualifications

I am qualified to do a minerals and mining company evaluation. I am a registered professional geologist in the State of Alabama, PG AL #1157. Furthermore, I have done work related to aggregates and other construction materials in several states including several sites in Alabama. Most of my work was for large mining companies or for companies that I owned or co-owned. I am now partially retired and do not work exclusively for any one company. Unlike many geologists I have also been involved in designing several rail spurs in Alabama and Tennessee, for aggregates mines. In total, I have over 30 years experience as an economic and exploration geologist. A copy of my vita is attached.

PLAINTIFF'S
EXHIBIT

2

## Location

Johnco is located near and east of the small town of White Hall in rural Lowndes County in central Alabama. The site is about 20 straight-line miles west of Montgomery. The deposit is now about two miles south of the Alabama River which was important to concentrating the coarse sand and gravel many years ago. Geologically the area is similar to the parts of Montgomery, Elmore and Macon counties that are typically mined for sand and gravel. Those mines are typically closer to truck markets and main rail lines. Location-wise those deposits probably have a $1.50 to $2 transportation advantage than would a deposit in the White Hall area. This is due to the added truck haul distance or the added costs typically associated with having to involve two rail lines. In this case a short line, M&B, originates the haul and switches to CSX in Montgomery.

## Geology

Geology and geologic processes are important in understanding the sand and gravel deposits of central Alabama. This is important for the exploration for the better and often the few very economic deposits remaining.

This area is part of the geologic and physiographic Coastal Plain Province. Most of this part of the Coastal Plain is composed of sedimentary rock strata of Cretaceous Age that are now exposed as weathered and partially weathered soft material. The dominant underlying sedimentary geologic unit is the Selma Group which is chalk-rich. The Selma Group is marine in origin, *i.e.* ocean-deposited sediments were deposited offshore over 60 millions ago in the Cretaceous Age, a geologic time unit at the end of the dinosaur's reign. The sediments for the Selma Group were later compacted and lithified into sedimentary rock layers. These sedimentary layers sit upon a much older base or a basement complex of metamorphic and igneous rocks. The top of the basement is typically over 1,000 feet down from the present surface. The basement complex ranges from about 700 feet to over 3,000 feet. Some of these basement rock units would probably make a superior quality coarse aggregate to sediment gravel, but they are much too deep to be mined economically.

The sand and gravel deposits sit upon all of the above and are relatively close the surface. They are not close enough to be easily located, however. Soil and other overburden typically hide them. The deposit of sand and gravel is not a simple layer. They have a complicated origin and exist in irregular shapes, often as lens that taper out laterally, change in composition laterally, and abruptly begin and end on their top and bottom.

The original sources for the sand and gravel material were rocks mostly in central and northern Alabama and some of the sedimentary rocks of the Coastal Plain. The parent rocks to the north weathered (rotted) into material such as silt and clay, the dominant components of mud. Most weather-resistant rocks and minerals where silica-rich. These formed the major part of the desirable coarse sand and gravel deposits. The best gravel is composed of mostly of quartz and chert. This pre-ore mix was transported to the sea in rivers and stream s as mud containing a little gravel.

The originally deposited sediments from the north were much to rich in clay, silt and fine sand to be economic for today's aggregate products. It took reworking, perhaps multiple times, by streams and rivers to winnow out or segregate out part of the clay, silt and fine sand to leave local economically minable concentrations of the more desirable coarse sand and gravel. Unfortunately the irregular streams and meandering rivers left irregular, highly variable deposits and shapes, not uniform layers.

Many are lens; some are long strips. Many of these irregular shapes now occur in the river terraces south, but within a few miles of the present location of the Alabama River. Three main terraces are recognized in several counties along the Alabama River. The exploration goal is to find large enough deposits with the least amount of overburden, clay, silt, and fine sand. The flat nature of much of the land surface and the occurrence of soil and other overburden typically hides the deposits. Drilling is necessary to evaluate most deposits.

### Johnco Pit Size, Mining and Processing Methodology

Unlike many deposits in central Alabama the ore at Johnco's site is mined by a dredge. Dredging is a typical sand and gravel mining method, however. A starter pond is created and a floating dredge mines the material. The object is to get the material flowing as suspended solids in pumped water. This is accomplished with a cutter head extended from the barge to loosen the ore. The ore slurry is then pumped through pipes to a nearby plant where further processing occurs. The material must often be washed and sorted. Sorting is done by a stack of vibrating screens that carry the wet ore. Some washing is done by the dredging action and on the wet screens but more washing is often necessary if a clay coating remains on the gravel. The wet products are then stacked into piles nearby with conveyors. A radial stacker is often used to build several product stock piles in an arc beside the plant. Johnco is not located close enough to local markets to have a truck market, so most of the product is transported to their rail loadout facility. Truck markets, if available, could be supplied directly from the initial stockpiles. The distance to the rail load out shown in a map photocopy indicates that Johnco has to transport the gravel product with a truck or other vehicle. They appear to have a typical rail stockpile and conveyor belt system to load standard 100-ton open hopper rail cars. A ramp was also built to allow loading by a front end loader to speed the process and to backup the conveyor in case of breakdown.

### A Plan for Most New Mining Operations

In recent years the declining amount of easy-to-find aggregates ore deposits especially those close to market and increased competition has necessitated most companies to do a fairly rigid plan before starting a mining operation. This is similar to a business plan modified for the mining industry. A written plan is often done to outline the steps to be taken. These are handy to provide evidence to the owner, to convince potential partners or buyers and to sources of financing. Some of the key steps to a written plan are as follows:

1. Table of Contents
2. Description of Business
3 The Company
4. The Property
4a Geology of the Property
4b Exploration Plan
4c Results including Product Quality and Reserves
4d Permits and Permitability
5 The Industry and Competition
6. The Market
7. Expertise
7a Geology and Mining Engineer Expertise

7b Business Expertise
7c Operations: Mine, Plant, Transportation, Lab, Scales and Office. Processing Methodology
8 Personnel and Management
8a Management & Staffing
8b Administration Issues
9 Financial Issues
9a DCF or other feasibility analysis
9b Funding
9c Budget

The steps in some plans vary. Most of these steps above are like the links of a chain.

A step before making any formal plan would be a cursory visit to the site. Many operations I have examined fail in my opinion before any formal plan after an initial cursory visit that reveals obstacles that probably may be uneconomic to overcome. From what I now know I think Johnco may have successfully passed the cursory visit stage, but with some reservations about location.

### Comments about Johnco's Plan

The testimonies of the principals indicate that Johnco did not have a formal written plan. The following comments are based on my reading of depositions and related to above suggested plan numbers:

4. The Property. The property is not located on the better east side of Montgomery.

4a Geology of the Property. The geology of the property may have not been well known. Much of this may be partly academic in nature and not important to the miner's success, but the potential existence of an irregular ore body should have been.

4b Exploration Plan. The testimonies of the principals indicate that Johnco did not have a formal exploration plan. However, I saw one mention of the word borings. I do not know the nature of these and if they were thorough. Detailed drilling or representative sampling by other means is important.

4c Results including Product Quality and Reserves. This is critical, but I saw no evidence that this was determined to any great extent. Results should provide evidence of several features. This includes the following:

1. Quantity of ore and shape of the orebody
2. The composition of the ore. This includes the amount and mix of fines, sand and gravel.
3. The expected composition and mix of the dredged ore sent to the plant.
4. The expected composition and mix of the plant produced products
5. Reserves, no detailed information was provided about the reserves.

4d Permits and Permitability. Various permits are needed by a mining operation. This includes local permits and certain environmental permits. The main environmental permits are for air and water. These are EPA-mandated rules are managed by the state authority, ADEM in Montgomery. I contacted ADEM about the permits being held by Johnco. Such sand and gravel operations operating in a wet environment are usually exempt from air permits since the material is wet and not often dust-

producing. This is subject to change if there are complaints from neighbors or if crushing is done. Johnco did not do any crushing. They wanted more coarse material and not just for #67 product. Some producers get a premium price for product bigger than #57, also termed "oversize".

ADEM's Jenifer Leach said that Johnco Materials, Inc. has Storm Water Permit #AL0076422. The five-year permit was issued on July 9, 2004 and expires on July 30, 2009. Typically they are renewable.

ADEM's Aaron Peters handles 401 permits for ADEM after the initial application is made to the US Army Corps of Engineers. He said that dredging operations over one acre should fall into his department. In the ADEM data base he found the Storm Water Permit noted above but no 401 or dredging-type application or permit for Johnco. As a cross reference he also searched the names Johnston and Junkin, even Ju* (wildcard) with no hits. Therefore, he did not think that Johnco or the Johnston's had a 401-type permit for a dredging operation.

Reclamation: Unless required by local authority Alabama does not have a state-required reclamation plan.

Zoning. Zoning is a local issue. I did not check it. Many rural counties do not have widespread zoning. I am not sure about Lowndes County.

5 The Industry and Competition. The principals had some familiarity with the sand and gravel business and probably knew who the competition was. I am not certain to what extent they understood the industry.

6. The Market. I do not think the principals had a good understanding of the market, especially the sand market. They had no competitive truck market. Also, they refer to Lafarge as a potential sand buyer, but did not know that Lafarge was actively seeking (and is usually successful) in having its own sand deposit on the m better located east side of Montgomery on a main rail line of CSX.

Also, most buyers protect themselves by having several potential suppliers. Most producers protect themselves by having several potential buyers. Dependency upon a single buyer is a disaster waiting to happen.

7. Expertise. Johnco demonstrated that it had the expertise to open a business and produce a product.

7a Geology and Mining Engineer Expertise. Many companies like this cannot afford to have these technical personnel on the payroll, but they typically use them to get started. Many are available on a consulting basis. This was not noted in the testimonies.

7b Business Expertise. The Johnston's were able to get the business going, but had trouble in obtaining sufficient financing to endure the typical extra costs associated with startup problems. Also, it took them twice as long to get started as they expected.

7c Operations: Mine, Plant, Transportation, Lab, Scales and Office Facilities and Processing Methods. The equipment was capable to produce products.

8 Personnel and Management. They were staffed at minimal levels, but over time, were able to produce aggregates products.

9 Financial Issues. Any business plan relying upon a single customer for financial viability fails to account for the variability of the industry.

9a DCF or other feasibility analyses. The testimonies of the principals indicate there were no written studies for discounted cash flow analysis, internal rate of return analysis or other feasibility analysis.

9b Funding. The principals had difficulty with funding. This is a red flag. Outside funding would have been made easier to obtain with a formal written plan or business plan including a feasibility analysis.

9c Budget. Pep Johnston testified that he did not remember a written budget being prepared.

{End of comments and report.}

Report signed this 25the day of September 2007 by

_M. Eugene Hartley_

M. Eugene Hartley, P.G. AL 1157

Prior expert testimony and publication information required by Rule 26.

1. None of my 17 publications were produced in the past tens years.
2. I do not believe I have provided expert witness in a trial in the past four years.
I have given one deposition in early 2006 in the case of University of Montevallo Foundation v Middle Tennessee Land Development in Shelby County Alabama Circuit Court.
3. My compensation for this project as a consultant or expert witness is as follows:
$700 per day for exploration and travel, $150 per hour for research and report writing, $200 per hour for court time and reasonable expenses.



Industrial Minerals Consulting, Inc.

M. Eugene Hartley, President
769 Lake Crest Drive; Birmingham, Alabama 35226  Tel. 205-988-9933  Fax 205-988-3278
Mobile Telephone 205-266-0991    E-Mail:  limerock@bellsouth.net
Registered Professional Geologist including TN 4961, GA 435,AL 1157
IMC Tax Number (EIN) 58-2136710

# Vita of M. Eugene Hartley

**Classification:** Economic geologist specializing in high cal limestone, aggregates and other industrial minerals exploration, evaluation and development.  Also experienced in mining company acquisitions and PC applications.

**Degrees:**    BS (1968) and MS (1972). Geology, University of Georgia, Athens, GA.

**Experience:**   Over 30 years.  Exploration, evaluations and valuations since 1973.  Located, acquired and started several mines and quarries, mainly aggregates.  Also, property, mine and plant evaluations in many states and several foreign countries as noted below.  Experience includes managing five offices in Nevada (5 years), Washington State (3 years), and Georgia (10 years) and Alabama (since 1994).  For the past few years my consulting work has concentrated on Tennessee and Georgia mainly on limestone for aggregates and industrial minerals uses including the scarcely available high calcium limestone for use as cement ore, lime feed and power plant scrubber rock.  Currently I am assisting in the opening of a large high calcium limestone mine in Tennessee and evaluating several industrial mineral deposits in other states.

## Career Highlights:

1.       I have started several limestone quarries for aggregates and industrial mineral uses.  The last big discovery was the giant greenfield limestone site in central Birmingham, Alabama that was sold to Lafarge in July 2003.  It started production in April 2005 and is becoming a major limestone mine in Alabama.  My ownership interests in other Alabama limestone and dolomite sites were sold to my ex-partners in the summer of 2004.

2.       I have done acquisition, exploration, zoning, reserves, mine design and permitting supervision of 17 sites that became quarries.  This includes several aggregate and industrial minerals quarries in Alabama, Georgia, Tennessee and Utah since 1994.  Between 1994 and the summer of 2001 I owned the following corporations that were involved in starting limestone quarries: Red Mountain Corporation, Bradley Stone, Inc., and Bama Crushed Inc., and Western Aggregates.  These quarries are now operated by Oldcastle, Geneva Rock, Vulcan and/or Martin Marietta.  Initially they were sold to Southern Ready Mix, Inc. or US Aggregates, Inc.  Most were limestone but two operations were involved sand in Tennessee.  I also did the discovery, acquisition and initial engineering of three new rail sites for limestone.  This included the unit-train site loop at Saginaw for loadout on ChemLime property, the loadout spurs at Alabaster and the only multiple spur loadout yard on the east side of Memphis, TN.  I worked closely with both NS and CSX railroad engineers, rail installation contractors and did rate negotiations with NS.  In addition, I was involved in the mine planning at Chemical Lime's O'Neal mine for lime-grade and aggregates grade limestone.

2.       I have done due diligence for dozens of sites or company acquisitions involving limestone, granite, marble, cement raw materials, and kaolin clay.  This includes assisting Blue Circle Cement for cement raw materials and in acting as lead in the $148.5 million acquisition of Georgia Marble Company, Aggregates Division (1989).  I assisted RTZ / U.S. Borax in their attempted acquisition of Georgia Kaolin Co. in 1990.  I also negotiated a successful deal with an Italian-owned cement mill and local environmental land trust to extend a limestone mine lease in TN.

3.　　I have had several greenfield site ore deposit discoveries involving marble in Georgia, limestone in Alabama and Utah, granite in Georgia, cement clay in Georgia and South Carolina, silica sand in Georgia, and barite in Washington State. I also re-started abandoned limestone and sand quarry sites in Tennessee.

4.　　For eight years I was chief geologist for Combustion Engineering, C-E Minerals, Inc. Tasks included establishing and managing their exploration offices in Georgia, Nevada and Washington State and evaluating mines and mineral deposits worldwide. Successful mineral trading for equipment was begun in China during the Nixon presidency. My interest in scrubber-grade limestone began while at Combustion Engineering. C-E (now ABB) was the major producer of coal-fired power plants, and equipment including Tyler screens and Raymond roller mills..

5.　　Co-founder and President of successful Exploration Resources, Inc., (a minerals and water exploration, environmental, computer, and CAD applications company), 1984 to 1994 when sold to partners.

6.　　Chairman of Industrial Minerals Session, Northwest Mining Assoc., Spokane. Annual Meeting 1983.

7.　　Author or co-author of 17 geological publications including discounted cash flow valuation methods.

8.　　Various Russian marble, granite and cement ventures, primarily in Urals and Siberia, 1991-94 resulting in co-ownership of Koelga, largest marble quarry in the world. Acquisition of marble processing equipment was done in northern Italy. In 1994, the local government and unrealistic partners in the Urals made the project unfeasible.

**Project Experience:** Since 1973 Hartley has directed field exploration, mine evaluation, or brokering of the following commodities listed with their general locations:  AGGREGATES (crushed stone, sand and gravel): Alabama, Arizona, California, Colorado, Florida, Georgia, Maine, Mississippi, Utah, Nevada, New Jersey, New York, South Carolina, Tennessee, Utah, eastern Canada, Antigua, Barbados, Switzerland; ANDALUSITE: Spain, Nevada, Washington; BARITE: Nevada, Washington, South Carolina, Arkansas, Georgia, Idaho, Montana, California, Canada; BAUXITE and BAUXITIC KAOLIN:  Peoples Republic of China, Shanxi Province, and Georgia; BENTONITE CLAY: Oregon; MINERAL FILLERS: U. S.; CEMENT RAW MATERIALS: U.S. and Canada; CHROMITE: North Carolina, California; CORUNDUM: North Carolina; DIMENSION STONE (marble and granite): Eastern U.S., northern Italy, Ukraine, Russia incl. Siberia; DOLOMITE: Eastern U.S. and Canada; FELDSPAR (including feldspar from granites, anorthosites, and feldspathic sands); Georgia, Oklahoma, Missouri, New Jersey, Idaho, Washington; FLUORITE: Kentucky, Illinois, Nevada; FOUNDRY SANDS: Nevada, North Carolina, Tennessee; GLASS RAW MATERIALS: various states in U.S.; DISSEMINATED GOLD: Washington, Nevada, Georgia, Colorado, South Carolina; GRAPHITE Alabama, Nevada; HEAVY MINERALS: Georgia, Wyoming, New Jersey; GROUNDWATER: Georgia, Utah, Alabama; KAOLIN CLAY: South Carolina, Georgia; KYANITE: Georgia, North Carolina, Virginia, Idaho, Spain; LIMESTONE: California, Florida, Georgia, Washington, Alabama, Tennessee, Utah, Arizona, Nevada, western Canada and Newfoundland; MAGNESITE AND BRUCITE: Nevada, Washington, Texas, and Mexico; MARBLE: California (Lucerne Valley), Georgia, Vermont, Alabama, Tennessee, Russia incl. Siberia; MICA: southeastern U.S., Idaho; PAPERMAKING MATERIALS: U.S.; RAW MATERIALS FOR OIL AND GAS DRILLING FLUIDS: U.S.; OLIVINE: North Carolina, Georgia, Canada; PUMICE: Lesser Antilles - southern Caribbean islands; REFRACTORY RAW MATERIALS: U.S., China, Mexico and Spain; RUTILE: Georgia, North Carolina, Colorado; SILICA (including quartz crystal, high purity glass sands, and quartzite): Nevada, Arkansas, Oklahoma, Georgia, Washington, Idaho, North Carolina, New Jersey; SILLIMANITE: Georgia, Colorado, Idaho; TALC: Georgia, North Carolina, Idaho; TOPAZ: Colorado; VOLCANOGENIC BASE METALS: Georgia, South Carolina; WOLLASTONITE: California. The above is to show experience only. Much of the data is confidential.

**Type of Experience:** Most of Hartley's work has been for major mining companies. He provides exploration and services to mining companies, investors, attorneys and property owners. This includes exploration planning and management, information searches, cursory (brief) examinations with recommendations, expert witness, advisory roles, land acquisition, preliminary market and competitor analysis (including aerial photography),

complete evaluations, valuations including discounted cash flow valuations, assistance in engineering, marketing, metallurgical problems and mine permitting. Experience has included zoning battles mostly with wins, but there have been three zoning loses.

**Personal Information**: Born: Sep. 23, 1945 in Savannah, Georgia. Health: Good. Size: Height: 5' 9", Weight: 190 lbs. Race: Caucasian. Religion: Baptist. Children: none. Divorced, was married 1967-88 and 1994-March 2002. Permanent resident of Alabama since 2002. Arrests or drug usage: None. Hobbies: European train travel, collecting travel books and DVD movies, tool and fastener collecting, wood working, tool making, personal computing, dancing, tennis, aerial photography, and gardening. Passport and citizen: USA. I keep an overseas roller bag packed.

**Personal Leadership Roles**: 1. President, Graduate Student Council, University of Georgia, 1972-73. 2. President, Forest Heights Community Association (large homeowners association), Athens, GA, 1976. 3. Program Chairman, Carrollton, GA Jaycees, 1972. I started the *Work To Cleanup Town* to locally replace the less productive *Walk For Mankind* yearly fund-raising project.

**Professional Memberships**: American Institute of Mining Engineers / Society of Mining Engineers. Much of my working career I was a member of The Northwest Mining Association (Spokane), Georgia Geological Society, and until recently, Georgia Mining Association and TAPPI (the industrial papermaking association).

**Clients List**: Lafarge, Blue Circle, Asarco, Hecla, Vulcan Materials, Cowan Stone (Tabsum), Placer, Huber, Cominco, Combustion Engineering, duPont, RTZ / U.S. Borax, Tate [marble] Estate (estate of Ga Marble founders), Southern Ready Mix, and USDOJ Antitrust Division (kaolin clay only, never others), U.S. Aggregates, and various attorneys and several accounting firms. I get along well with all of the aggregate mining companies except Martin Marietta, a result from bitter competition and litigation for adjacent properties. Yet, Martin Marietta enjoys operating a quarry I started (Alabaster) and another very successful site that I helped acquire and expand (Vance).

**Employment, Present and Past:**
Current: President and sole owner of Industrial Minerals Consulting, Inc., a one-man aggregates and industrial minerals exploration and evaluation company. The 2003 Lafarge buy-sell agreement does not allow me and/or IMC to do exploration for aggregates or limestone including lime and cement grade in most of a five-county area around Birmingham, Alabama for a five-year period. As of Jan. 2007 I am opening a limestone mine in Tennessee for a client and exploring elsewhere.
June 2002 to July 2003: Governor and co-owner of Birmingham Aggregates, LLC: Lakeshore (Wenonah) Quarry discovery.
This green field quarry site was sold out to Lafarge on July 2, 2003. This site is now in production as Lafarge Lakeshore.
2002 – 2004 (varies): Officer and co-owner of Will, LLC; Calhoun Rock, LLC; and Woodstock Aggregates LLC
Aug. 1994 to 2002: Owner of Red Mountain Corp, Bama Crushed, Bradley Stone and Western Aggregates.
Aug. 1994 to present: President and sole owner of Industrial Minerals Consulting, Inc.
Aug. 1992 to 1995: Pres. and Co-owner of Marble and Industrial Minerals, Inc. for doing business in Russia.
1983 to Aug. 1994: Co-founder, Partner, President and/or Chairman of the Board of Exploration Resources (ExR) a closely-held corporation with 75 employees (by 1994) in Athens, GA and Aiken, SC. Other two partners acquired my interest in 1994. The divisions are or were Geology, Technical Editing / Business Computer Sales and Service, and Environmental. The Environmental Division specializes in groundwater data management. Monitoring and mapping for the world's largest nuclear facility, Westinghouse/DOE's Savannah River Site. ExR co-authors SRS' environmental reports. This includes chemical analyses compilation, editing, map-making, camera-ready copy production. The Geology Division specialized in industrial minerals exploration, acquisitions and valuations and hardrock groundwater exploration. ExR started as Exploration Software partnership with an early IBM PC in 1984.

Hartley co-founded Exploration Resources in his previous home in Athens, Georgia. During the first two years he did some software and data base development for mining, legal, and government agencies. This includes "GlyDict", (a PC computer word processor dictionary for the mining industry), "DEDITOR", a chemical dilution and environmental (fish protection) program for duPont and the SRS at the world's largest nuclear military production facility, and co-author of "DCF" (a discounted cash flow valuation program for the mining industry). Much of the time Hartley has served as a consultant to the mining industry. Services offered included exploration planning and project management, drilling management, sampling, information searches, cursory (brief) examinations with recommendations, advisory roles, land acquisition, preliminary market and competitor analysis, complete evaluations, computer valuations by discounted cash flow methods, assistance in metallurgical problems, assistance in regulatory permitting and development, and AutoCAD and other PC computer consulting.

<u>Fall 1983 - Winter 1984 Quarters</u>: Half-time faculty member, lecturer. Geology Department, University of Georgia. Introductory course instruction. Assisted with lectures and exercises of Geology 631 "Economic Geology of Metallic Ore Deposits" Reference: Dr. G. O. Allard, Professor, and Dr. Norm Herz,(ret.) Geology Dept.

<u>November 1975 to January 1983</u>: Chief Geologist. Combustion Engineering, C-E Minerals, Inc. Managed offices in NV, WA, and GA. Duties: exploration and evaluation of industrial mineral ore deposits in the U. S. and a few foreign countries. Although successful, the entire department was abolished on 12-31-82 as C-E experienced difficult times during the oil crisis. Reference: ABB, C-E, Long Ridge Rd, Stamford, CT

<u>September 1973 to November 1975</u>: Geologist. Applied Exploration Consultants (now Carpenter Minerals). Geologic mapping and petrology for Conoco's volcanogenic base metals exploration program in the Slate Belt of Georgia and South Carolina. Reference Dr. Robert H. Carpenter, Carpenter Minerals Exploration Co., P.O. Box 998, Roanoke Rapids, NC 27870, tel. 919-536-3574.
<u>September 1971 to August 1973</u>: Instructor. West Georgia College. Reference Dr. Sumner Long, Head, West Georgia College, Carrollton, GA 30117 Tel 706-834-1250.
<u>College Quarters 1968 to 1971</u>: Teaching Assistant, freshman labs. University of Georgia.
<u>August to September 1969</u>: Land surveyor. Also surveying for geophysical stations.
<u>Summer 1969</u>: Summer field assistant. Geochem stream sediment sampling. Dr. V.J. Hurst.
<u>Summer 1966</u>: Summer assistant. Miscellaneous duties. Huber Kaolin Co., Wrens, GA.
<u>Summer 1964</u>: Lab technician. Clay ore and product testing. Thiele Kaolin Co., Sandersville, GA

**Education:** Grades 1-12 (1951-63): Louisville Academy, Louisville, Georgia; B.S.1968 (Geology) UGA
M.S. 1971 (Geology); UGA, Ph.D. (incomplete, "ABD" = all finished but dissertation).

**References**
1. Dr. William H. McLemore (Bill), formerly State Geologist of Georgia 1979-2005, Jasper, GA tel. 404-395-5032
2. Dr. Robert Cook (Bob) Head, Geology Department, Auburn University, Auburn, AL tel. 334-844-4282
3. Dr. Robert H. Carpenter (Bob), exploration geologist, consultant, former major professor on Hartley's M.S. and Ph.D. programs at UGA. Retired in North Carolina. Tel. 252-235-4075

## Publications of M. Eugene Hartley
1. Hartley, M. E., III, 1971, "Ultramafic and related rocks in the vicinity of Lake Chatuge, Clay County, N. C. and Towns County, Ga." (Abs.) Geol. Soc. America, 5th Annual Meeting, SE Section, Blacksburg, Va., 1971, p. 317.
2. Hartley, M. E., III, 1973, "Ultramafic and related rocks in the vicinity of Lake Chatuge" Ga. Geol. Survey Bulletin 85, 61p.
3. Hartley, M. E., III, and Penley, H. Michael, 1974, "The Lake Chatuge Sill outlining the Brasstown Antiform" Ga. Geol. Survey, Guidebook 13, 27p. (Co-leader 1974 Ga. Geol. Soc. field trip).
4. Hartley, M. E., III; Walker, R. L.; and Jones, L. M., 1971, "Strontium isotope composition of the ultramafic and related rocks in the vicinity of Lake Chatuge, Clay County, N. C. and Towns County, Ga." (Abs.) Geol. Soc. America, 5th Annual Meeting, SE Section, Blacksburg, Va., 1971, p. 316-317.
5. Jones, L. M.; Hartley, M. E., III; and Walker, R. L., 1973, "Strontium isotope composition of alpine-type ultramafic rocks in the Lake Chatuge district, Georgia-North Carolina" Contr. Mineral. and Petrol., v.38, p.321-327.
6. O'Conner, B. J.; Carpenter, R. H.; Paris, T. A.; and Hartley, M. E., III, 1974, "Recently discovered faults in the Central Savannah River Area" (abs.) Georgia Academy of Science, 51st Annual Meeting, Valdosta, Ga., 1974, p. 15.
7. Hartley, M. Eugene, 1976, "Graves Mountain" in Chowns, T. M. (ed.), Stratigraphy, structure, and seismicity in the Slate Belt rocks along the Savannah River Guidebook Ga. Geol. Soc., 11th Annual Meeting, p. 42-52. (Co-leader of 1976 Ga. Geol. Soc. field trip).
8. Whitney, James A.; Paris, T. A.; Carpenter, R. H.; and Hartley, M. E., III, 1977, "Petrology and geochemistry of the southwestern extension of the Slate Belt near Lincolnton, Georgia and McCormick, South Carolina" (abs.) Geol. Soc. America, SE Section, Winston-Salem, North Carolina, p.196.

9.  Whitney, James A.; Paris, T. A.; Carpenter, R. H.; and Hartley, M. E., III, 1978, "Volcanic evolution of the southern Slate Belt of Georgia and South Carolina  A primitive oceanic island arc."  Jour. Geol., v.86, p. 173-192.

10. Carpenter, R. H.; Odom, A.; and Hartley, M. E., III, 1978, "Geochronology of the southern portion of the Slate Belt" (abs.) Geol. Soc. America, SE Section, Annual Meeting, Chattanooga, TN., p.164.

11. Carpenter, R. H.; Odom, A.; and Hartley, M. E., III, 1982, "Geochronological investigation of the Lincolnton metadacite, Georgia and South Carolina" in Bearse, D.N., Black, W.W., Kish, S.A. and Tuff, J.F., eds., Tectonic studies in the Talladega and Carolina slate belts, southern Appalachian orogen Geol. Soc. America Special Paper 191, p. 145-152.

12. Hartley, M. Eugene, 1983, "Usage of a personal computer in the valuation of an industrial mineral deposit" Northwest Mining Assoc., 89th Annual Conv., Spokane, WA., Dec. 2, 1983.

13. Hartley, M. Eugene, 1983, "Non-metallic minerals in the Northwest - recent developments and the outlook for new markets" Northwest Mining Assoc., 89th Annual Conv., Spokane, WA., Dec. 3, 1983.

14. Hartley, M. Eugene, 1984, "Mining project valuation by the DCF method, discounted cash flow Mineral Exploration on Industrial Timberlands" Univ. of Ga. Timberlands Conference, Georgia Center, Athens, Ga., April 3, 1984.

15. Hartley, M. Eugene, 1985, "Valuation of Mineral Deposits", Georgia Association of Assessment Officials, Seminar (for credit), University of Georgia, Continuing Education Center, Univ. of GA, April 22, 1985.

16. Hartley, M. Eugene, 1988, 'Use of PC Computers in Mining', Geological Society of America, Annual Meeting, SE Section, Columbia, SC, April 4-10, 1989.

17. Fay, William M., Bentley, Samuel J. and Hartley, M. Eugene, (1993), "Estimating the Ground Water Resource of the Upper Oconee River Basin", Ga. Water Resources Conf. 1993.

**Feel-Good Deeds** (win-win situations with mining and conservation groups) 1. Clean water pumping at large quarry to ensure stream water supply water for Buck Creek, Alabaster, AL; 2. Fish protection computer program for Savannah River Site, Aiken, SC; 3. Florida Black Bear and animal preserve mining valuation of a high calcium limestone site for Florida DNR acquisition; and 4. The pristine Little Cedar Mountain on Tennessee River saved from disturbance while negotiating long-term high calcium limestone cement rock mining lease extension on other site while working as consultant for The Tennessee River Gorge Trust. The trust acquired the mountain and a nominal royalty needed to continue their operation.  The cement mill (Signal Mountain Cement) got a long lease ensuring survival of the Chattanooga mill and its jobs.  The mill recently modernized and expanded.  I am strongly pro-mining but feel great when it is also in the public's interest.

**Consulting Rates:**  1.  Exploration and travel is $700 per day.  2.  Research and report compilation is $150 per hour.  3.  Courtroom time is $200 per hour.  Rates are in addition to reasonable expenses—none have been rejected in 35 years—Please note if you have special billing requirements before engaging.  **Retainer Required:**  $2,000 from new clients.



M. Eugene Hartley

**Document Relied Upon By Hartley**

Complaint
Answer
Reply to Counterclaim
Supply Agreement
Index of documents produced by Conrad Yelvington in response to request for production
Index of documents produced by Johnco Materials, Inc. in response to request for production
Index of documents produced by West Alabama Bank & Trust in response to non-party subpoena
Transcripts of depositions of Gary Yelvington, Mark Klebe, Philip Holladay with exhibits
Transcripts of depositions of James B. Johnston, Presley M. Johnston, and Clatus Junkin with exhibits