# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA

| | | |
|---|---|---|
| **JOHNCO MATERIALS, INC.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **Civil Action No.** |
| **vs.** | ) | **2:06cv993-ID** |
| | ) | |
| **CONRAD YELVINGTON** | ) | |
| **DISTRIBUTORS, INC.,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## REPLY TO DEFENDANT'S MOTION TO PRECLUDE OR IN THE ALTERNATIVE LIMIT THE TESTIMONY OF PLAINTIFF'S EXPERT, J. LESTER ALEXANDER AND TO PRECLUDE HIS SUMMARY AND SUPPLEMENTAL REPORTS FROM EVIDENCE

Comes now Johnco Materials, Inc. ("Johnco"), the plaintiff in the above-styled cause, and, pursuant to this Court's Order of March 11, 2008 [Doc. 94], replies as follows to the defendant CYDI Amended Motion in Limine to Preclude, Or in the Alternative Limit, the Testimony of Plaintiff's Expert, J. Lester Alexander, and to Preclude His Summary and Supplemental Reports from Introduction as Evidence [Doc. 89].

Johnco submits the following in support of its Reply:

1. Affidavit of J. Lester Alexander (Exhibit "A").

2. CYDI supplemental discovery response providing third-party discovery documents received from M&B Railroad (Exhibit "B").

3. CYDI supplemental discovery response providing third-party discovery documents received from McCabe & Associates (Exhibit "C").

4. Deposition of David Borden (Exhibit "D") (excerpts).

5. Deposition of Les Alexander (Exhibit "E").

6. Summary Report of Les Alexander (Exhibit "F").

7. Supplemental Report of Les Alexander (Exhibit "G").

## INTRODUCTION

CYDI objects and seeks preclusion of Alexander's testimony at trial, arguing that his testimony is based on insufficient facts, that it is not the

product of reliable principles or methods, and that Alexander allegedly was unable or unwilling to testify to certain matters. Alternatively, CYDI seeks to limit Alexander's testimony as to those matters on which Alexander purportedly did not give deposition testimony, and as to matters contained in Alexander's Supplemental Report ("Supplemental Report") of February 29, 2008.[1]

CYDI argues primarily that (1) Alexander's testimony in accordance with the Summary Report of August 8, 2007[2] is premised on an unreliable methodology under FED.R.EVID. 702 and Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 125 L.Ed.2d 469, 113 S. Ct. 2786 (1993), and that (2) Alexander's testimony in accordance with the

---

[1]See Exhibit G. CYDI also seeks preclusion of the introduction into evidence of Alexander's actual Summary Report of August 8, 2007 [see Doc. 22-2] and his Supplemental Report of February 28, 2008 [Doc. 79-2]. Without conceding that all parts of the reports would be inadmissible, Johnco agrees that the expert reports themselves are ordinarily inadmissible absent agreement of the parties. Nonetheless, certain charts and graphs attached as exhibits to the reports could be admissible under FED.R.EVID. 1006 and/or useful to assist the trier of fact as a demonstrative aid at trial.

[2]Exhibit F.

3

Supplemental Report of February 29, 2008 is untimely under FED.R.CIV.P. 26.

With respect to its Rule 702 challenge, CYDI does not challenge the expert credentials of Alexander. Nor does CYDI challenge the relevance of the proffered testimony. Both issues are conceded by CYDI.

Tellingly, CYDI does not attack the methodological basis of the Supplemental Report at all. The Supplemental Report is a refinement of Alexander's opinion testimony and the methodology employed in the Summary Report, and the alterations are based – as CYDI admits – almost entirely on the Court's February 28, 2008 Memorandum Opinion and Order. CYDI contents itself with attacking supposed methodological deficiencies in the now-superseded Summary Report, and attacking the supposed untimeliness of the Supplemental Report. As it is presented, CYDI's motion is a concession that the methodological basis of the Supplemental Report is unassailably sound.

In point of fact, however, both the Summary Report and the Supplemental Report are reliable in the methodology employed. First, Alexander's opinions are based on generally acceptable accounting principles. Certified public accountants regularly make financial determinations, including calculations as to the economic and financial impact of a set of actions or proposed actions of a company. Alexander's methodology under both the Summary Report and the Supplemental Report analyzes the data in this case in accordance with accounting procedures that have gained general acceptance within the accounting field, meeting requirements established by the American Institute of Certified Public Accountants ("AICPA").[3]

Second, Alexander's methodology employs assumptions and variables which are analytically based within substantial data. Most of his assumptions or variables – as to sales prices, sales quantity assumptions,

---

[3]*See* Exhibit A, ¶12.

5

units of production based on stipulated product mix, and cost per unit – are not in dispute.

Third, with the exception of Alexander's refined opinion in the Supplemental Report – a refinement which CYDI's expert did not timely make – Alexander's methodology is the same methodology employed by CYDI's expert.

With respect to CYDI's challenge as to timeliness under Rule 26, this Court announced the law applicable to this case in the Memorandum Opinion and Order of February 28, 2008. The Memorandum Opinion and Order changed the law considered by both Johnco's and CYDI's experts to be applicable, in a profound manner. Alexander immediately supplemented his opinion to reflect the Court's pronouncement of the applicable law on allowable damages in the case, submitting the Supplemental Report on February 29, 2008 as permitted and indeed

required under FED.R.CIV.P. 26(e)(1)(a) (duty to supplement if disclosure incomplete or incorrect).

It is hard indeed to see how Alexander could have supplemented any sooner, or how his earlier unrefined opinion – which included as consequential damages lost profits for the sale of sand and oversize gravel, which sales and future sales this Court ruled on February 28, 2008 are totally independent of and collateral to the Supply Agreement — could have been permitted to withstand challenge in the absence of supplementation.   It was not only proper for Alexander to supplement, it was required of him under FED.R.CIV.P. 26(a)(2)(D) and 26(e).

## CYDI'S RULE 702 CHALLENGE

CYDI's primary challenge is that Alexander's Summary Report is methodologically unreliable.   Again, CYDI does not challenge the

methodology employed by the Supplemental Report, implicitly conceding the reliability of the method employed there.

In point of fact, the methodology used by Alexander in both the Summary Report and Supplemental Report are one and the same, but for the inclusion of accounting principles and refinement consistent with the holdings in the Court's Memorandum Opinion and Order, and some evidence and testimony newly disclosed by CYDI. Further, it is the same methodology employed by CYDI's expert. It is based upon substantial data, most of which is not in dispute between the parties, and utilizes generally accepted accounting principles and methods.

Johnco does not deny that the district court has a distinct function as gatekeeper with respect to the examination of expert technical testimony. Under Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 125 L.Ed.2d 469, 113 S. Ct. 2786 (1993), the Court's function does not extend to the conclusions expressed by the expert, but only to the methodology

employed by the expert.   Because the methodology utilized by Alexander

is demonstrably reliable, the motion to preclude or limit must be denied.


      **1.**      **Daubert Establishes A Limited, Flexible Gatekeeping Function For The District Court.**


Daubert and its progeny establish a three-prong inquiry into the

admissibility of expert scientific or technical opinion: (1) whether the

expert is qualified to testify regarding the matters addressed; (2) whether

the methodology by which the expert reaches his or her conclusions is

sufficiently reliable; and (3) whether the testimony assists the trier of fact

to understand the evidence or to determine a fact in issue.   *See* Quiet

Technology DC-8, Inc. v. Hurel-Dubois UK Ltd., 326 F.3d 1333, 1340-41

(11th Cir. 2003).


This inquiry was meant to be limited, flexible and inclusive, in

keeping with the liberal thrust the Federal Rules of Evidence. Daubert, 509

U.S. at 588; Ambrosini v. Labarraque, 101 F.3d 129, 134 (D.C. Cir. 1996).

The Advisory Committee notes to the 2000 amendment of FED.R.EVID 702 observes that the amendment "is not intended to provide an excuse for an automatic challenge to the testimony of every expert," and notes that rejection of expert testimony remains the exception rather than the rule in the wake of Daubert.

This Circuit has long recognized that the liberal admissibility of expert opinion evidence limits the district court's gatekeeping function. Quiet Technology DC-8, *supra* at 1341.

**2.     The Sole Question Presented Is Whether Alexander's Methodology Is Reliable.**

In this case, only the second Daubert prong – that of methodology – is now challenged.  Certified public accountants regularly make financial determinations, including calculations of the economic and financial impact of a company's actions, in connection with business start-ups or the introduction of new services, or in business disputes.

10

Alexander is a certified public accountant whose expert testimony has been accepted by numerous federal district courts, federal bankruptcy courts, and state court.[4]   CYDI does not by its motion challenge the validity of Alexander's qualifications or credential  to provide expert opinion on the subjects to which he has testified.[5]

Further, no one disputes the third prong under <u>Daubert</u>, that of relevance.  Expert testimony establishing lost profits by reason of breach of contract is at the core of this case, and opinion evidence to that end has an unquestionable relevance.

---

[4]Exhibit A, ¶.

[5]Nor does CYDI's expert David Borden challenge Alexander's credentials:

```
11      A.    Yeah.  And I think, in
12   actuality, there's more than that that would
13   be indicated -- I mean, normally -- and,
14   again, I'd love to see the earnings records,
15   and it might be helpful.  And I'm not trying
16   to shoot at Les.  I know the quality of
17   Les's work and I know what he normally
18   does --
19      Q.    I assume, you say you know the
20   quality --
21      A.    It's good.  It's good.
```

*See* Exhibit D, Deposition of David Borden, p. 104, ll.11-21.

11

The sole question presented to this Court with respect to Alexander's testimony is whether his methodology is unreliable as a matter of law.

### 3.    Alexander's Methodology Is Reliable.

The second prong of the <u>Daubert</u> test enjoins a district court to ensure that "the reasoning or methodology underlying [expert opinion] testimony is scientifically valid and [that the] reasoning or methodology properly can be fitted to the facts in issue." <u>Daubert</u>, 509 U.S. at 592-93.

To assist the district court, <u>Daubert</u> suggests a flexible and non-exclusive list of factors a district court may consider in determining the reliability of a methodology:  (1) its empirical testability; (2) whether the theory or study has been published or subjected to peer review; (3) whether the rate of error is acceptable; and (4) whether the method is generally accepted in the scientific community. <u>Daubert</u>, 509 U.S. at 594.  These factors are neither exhaustive nor applicable in every case.  The particular

12

circumstances of a case may require a district court to consider less than all of the Daubert factors, or factors other than those enumerated in that case. Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137, 150, 143 L.Ed.2d 238, 119 S. Ct. 1167, 1175 (1999).

Faced with a Daubert challenge, a court must address methodology rather than conclusions. "The focus, of course, must be solely on principles and methodology, not on the conclusions that they generate." Daubert, 509 U.S. at 595. The test is whether the methodology itself is reliable and based on valid reasoning, not whether the conclusion is demonstrably correct. Oddi v. Ford Motor Co., 234 F.3d 136, 145-46 (3rd Cir. 2000); Pride v. BIC Corp., 218 F.3d 566, 577 (6th Cir. 2000).

The Court's inquiry into methodology is quite narrow in scope. The purpose of the court's examination of methodology is simply "to exclude opinions based on mere speculation," Joiner v. General Electric Company, 78 F.3d 524, 532 (11th Cir. 1996), and "does not encompass deciding which

13

expert's conclusions are better reasoned or more appealing." *Id.* As one court has noted, "Rule 702 and <u>Daubert</u> and its progeny do not extend the gatekeeping inquiry to the district court's favoring one reliable methodology over another reliable methodology proffered by an opposing expert." <u>In re Voluntary Purchasing Groups, Inc. Litigation</u>, No. Civ.A. 3:94CV2477H *et seq*. at *5, 200 WL 1842779 (N.D. Tex., Dec. 14, 2000).

The reason for this limited inquiry is clear. As long as the methodology is sufficiently reliable, any flaws which arguably may inhere to the conclusions drawn from the methodology are dealt with in the time-honored ways which such flaws have always been dealt in our adversary system-- through presentation of contrary evidence, <u>Daubert</u>, 509 U.S. at 596; <u>Maiz v. Virani</u>, 253 F.3d 641, 666 (11th Cir. 2001); through penetrating cross-examination, <u>Daubert</u>, 509 U.S. at 596; <u>Quiet Technology DC-8, Inc. v. Hurel-Dubois UK Ltd.</u>, 326 F.3d 1333, 1345 (11th Cir. 2003); through "careful instruction on the burden of proof," <u>Daubert</u>, 509 U.S. at 596; <u>Maiz</u>, *supra* at 667; and by trusting to the

14

collective wisdom of the jury.  <u>Quiet Technology DC-8</u>, *supra* at 1345.
The Federal Rules of Evidence are designed to depend primarily on the
truth-finding mechanisms of the adversary system and upon sensible triers
of fact, <u>Daubert</u>, 509 U.S. at 588-89, and the <u>Daubert</u> gatekeeping function
"is not intended to supplant the adversary system or the role of the jury."
<u>Quiet Technology DC-8</u>, *supra* at 1341, quoting <u>Maiz</u>, *supra* at 666.

In this case the methodology employed by Alexander – in both the
Summary Report and the Supplemental Report – is  eminently reliable.
The methodology can be stated simply:  calculation of revenues that have
been lost by the breach of contract, less incremental costs associated with
those lost revenues, less sales of product actually sold, to reach lost profits.
Stated another way, the methodology employed by Alexander – and by
CYDI expert David Borden – is price minus cost equals profit per unit.

Alexander's opinions in both the Summary and the Supplemental
reports are analytically derived from substantial data, based on Alexander's

15

review of thousands of documents and numerous depositions.[6]   Not only

is the methodology he employs reliable, his opinions are the product of a

number of assumptions, or variables, derived from that data.  The majority

of the assumptions he makes are not disputed by CYDI:


First, Alexander assumes a sales price are derived directly from the

Supply Agreement.[7]  *See* ¶3.1 of Supply Agreement; Appendices A and B

to Supplemental Report; Borden 0350.  CYDI expert David Borden also

makes this assumption.[8]

---

[6]*See* Exhibit A.  *See also* footnotes 1 and 2 to Appendix 1 to Summary Report; footnotes 1 through 4 to Appendix 2 to Summary Report; footnotes 1 through 5 to Appendix 4 to Summary Report; footnote 1 to Appendix 5 to Summary Report; Appendix 8 to Summary Report; footnotes A and B to Appendix A to Supplemental Report; footnotes A and B to Appendix B to Supplemental Report;  source and footnote 1 to Appendix C to Supplemental Report; source and footnote 1 to Appendix D to Supplemental Report; source and footnote to Appendix G to Supplemental Report; Appendix H to Supplemental Report.

[7]*See* Exhibit A, ¶11.

[8]*Id.*

16

Second, Alexander's two assumptions as to sales quantities – 260,000 tons per year (i.e., 5,200 tons per week) or 150,000 tons per year (i.e., 5,200 tons every other week) are both derived from the language of the Supply Agreement, subject to interpretation.[9]  CYDI expert David Borden also makes an assumption of 150,000 tons per year under this part of the methodological formula, also based on his interpretation of the Supply Agreement.[10]  *See* ¶3.1 of Supply Agreement; Appendices A and B to Supplemental Report; Borden 0350.

Third, Alexander makes an assumption as to achievable production of the three products produced by the single process, i.e., No. 67 gravel, oversize gravel and sand, which is based on the undisputed testimony of Ben Johnston (who testified that the plant could produce 120 tons of No. 67 gravel per hour), and the product mix stipulated by the parties – resulting in a calculation of 30 tons per hour and 183 tons per hour of

---

[9]*Id.* at ¶11(b).

[10]*Id.*

17

oversize gravel and sand, respectively.[11]  *See* Pretrial Stipulations 17 and 18; Deposition of Ben Johnston, 48: 9-17; Appendix C to Supplemental Report; and Borden 0350.

Fourth, Alexander assumes a cost per unit based on a five-month period of actual, historically verifiable cost.[12]  CYDI expert David Borden also makes an assumption under this part of the methodological formula, over a similar time frame.[13]  *See* Appendix 4 to Summary Report; Borden 0350; Deposition of David Borden, p. 74, l. 22 through p. 75, l. 2. Alexander has demonstrated that this period provides a reliable basis for his assumption as to cost-per-unit because of the simple nature of the operation of a sand-and-gravel business and the relative ease with which one can predict the cost structure.  *See* Appendix C to Supplemental Report; Deposition of Les Alexander, p. 156, l. 21 through p. 158, l. 1.[14]

---

[11]*Id.* at ¶11(c).

[12]*Id.* at ¶11(d).

[13]*Id.*

[14]Exhibit E.

18

Fifth, Alexander determined units produced and cost-per-unit using an assumed production level of 70 percent, which is a more conservative assumption than the 80 percent level that David Borden testified was a reasonable assumption for production level.[15]  *See* Deposition of David Borden, p. 85, l.13 to p. 86, l.6.

Alexander's methodology takes these assumptions, or variables, and in accordance with generally acceptable accounting principles and procedures determines Johnco's quantum of lost profits:

First, the loss period is determined, based on the term of the Supply Agreement consistent with AICPA recognized practices.[16]

---

[15]*Id.* at ¶11(e).

[16]*Id.* at ¶12(a)(I).

Second, the lost revenues are calculated based on the terms of the Supply Agreement, consistent with AICPA recognized practices.[17]

Third, costs are determined on the basis of avoided costs, an analysis of Johnco's cost structure, and determinations of fixed versus variable costs, consistent with AICPA practices.[18] Joint costs are allocated between products generated in the single process using joint product costing, which is a generally accepted cost accounting method.[19]

The joint product costing method used by Alexander in the Supplemental Report has been recognized in the field since 1977.[20] This cost accounting method was used to eliminate the sales and cost of sales of oversize gravel and sand for purposes of bringing the Supplemental Report into line with the holdings stated by the Court in the Memorandum

---

[17] *Id.* at ¶12(a)(ii).

[18] *Id.* at ¶12(a)(iii).

[19] *Id.*

[20] *Id.*, fn. 12.

Opinion and Order of February 28, 2008.  *See* WILLIAM E. ARNSTEIN &

FRANK GILABERT, *Direct Costing* (1980); CHARLES T. HORNGREN, *Cost

Accounting, A Managerial Emphasis* (4th ed. 1977); Ray H. Garrison,

*Managerial Accounting, Concepts for Planning, Control, Decision Making*

(revised ed. 1979).  *See* Appendix H to Supplemental Report.


Finally, prejudgment interest on past losses and discounting of future

loss profits is undertaken, consistent with AICPA recognized practices.[21]


Alexander's methodology results in a determination of the lost

profits of a single process which generates three products.  *See* Pretrial

Stipulations 16, 17 and 18; Appendices A and B to Supplemental Report.

Moreover, the methodology includes separate identification and testing of

all of Alexander's material assumptions in determining damages, in

accordance with standards of the American Institute of Certified Public

Accountants.  *See* Appendices A through D to Supplemental Report;

---

[21]*Id.* at ¶12(a)(iv).

American Institute of Certified Public Accountants, AICPA PROFESSIONAL STANDARDS, Vol. 2 §CS 100, pp. 15,001-15,014; American Institute of Certified Public Accountants, American Institute of Certified Public Accountants, Business Valuation and Forensic & Litigation Services Section, *Practice Aid 06-4 Calculating Lost Profits* (2006).

Alexander's methodology is the same with regard to the Supplemental Report as it is to his Summary Report. While certain of Alexander's assumptions, i.e., variables, were altered in light of the Court's enunciation of applicable law and in the face of newly produced documents by third parties at the close of discovery, *his methodology did not change*. *See* Appendices 1, 3 and 4 to Summary Report; Appendices A through D to Supplemental Report.

For the Supplemental Report, Alexander simply refined the assumptions made for the Summary Report to account for newly learned information, much of which was produced in January 2008, after Dave

Borden's deposition on December 21, 2007. This information was received after Alexander's Summary Report, after his deposition and after the expert disclosure deadlines.

For example, Alexander first learned after January 22, 2008 that M & B Railroad was anticipating shipments of "150,000 nt/year, 25 trains … in 60 car trains" from the third-party production of M&B Railroad, which was received on January 22, 2008.[22] Moreover, Alexander also learned additional information on avoided costs from the third-party production of McCabe & Associates received in January 2008.[23] *See* Borden Report; Deposition of Dave Borden, p. 43 and supporting documents considered; third-party production from McCabe and Associates and M & B Railroad; Appendix H to Supplemental Report. This information had some effect on the variables plugged by Alexander into the formula of his methodology – but did not alter the methodology itself.

---

[22]Exhibit B.

[23]Exhibit C.

In point of fact, CYDI's expert, David Borden, uses the same price - cost = profit per unit methodology as does Alexander in his lost profits determinations. The only differences between the two experts are their assumptions regarding productivity, units sold and the use of fixed costs to lower incremental profit. *See* Appendices 1, 3 and 4 to Summary Report; Appendices A through C to Supplemental Report; and Borden 0350.

Borden's testimony reveals that his methodology tracks Alexander's:

74
7      A.    What I did, I looked at --
8  First, I looked at Johnco, and I assumed
9  that Johnco would have sold a hundred and
10  fifty thousand tons of gravel at five
11  dollars and fifty-one cents a ton. *I took*
12  *all of the oversized sales that they made*
13  *during that eighteen-month period of time*
14  *and developed an average amount per month*
15  *that they actually sold during that period.*
16  *I did the same thing with sand, and I*
17  *recognize there are legal arguments about*
18  *whether oversize and sand should be included*
19  *in this or not, and I'm not getting into*
20  *that. But I -- For sake of what I did, I*
21  *included oversized and sand.*

24

22          *And what I then did is I took*
23   *the operating expenses from Johnco's own*

75
1   *historical financial statements during that*
2   *period of time of May through September,*
3   even though actually in September the
4   cutback had already occurred, there was
5   substantial reductions in compensation that
6   occurred in the month of September. That's
7   when it appears that there were -- from
8   financial records, at least, that there was
9   a shutdown or beginning of shutdown in
10   production. But I included September in
11   there even though I don't have a full
12   complement of salaries.
13          *What I then did is annualized,*
14   *which is just putting on a twelve-month*
15   *basis those five months of activity.*

\* \* \* \*

76
6          The only adjustments I made is I
7   adjusted for the M&B Railroad charge; *I used*
8   *Les' same methodology* on fuel costs; and
9   I've got depletion, and I've got it at forty
10   cents. I don't know whether it's forty or
11   twenty or fifteen or fifty, but I've got it
12   at forty cents for purposes of this
13   calculation.
14          I do not have considered in
15   this analysis, yet, overburden removal or
16   any reclamation cost. But in looking at

25

17  that, what it indicated is that the
18  normalized full complement of a year
19  expenses for Johnco would have been almost a
20  million two, and the revenues that Johnco
21  would have generated under that assumption
22  was slightly under nine hundred thousand,
23  indicates that Johnco would have lost two

77

1  hundred and ninety-five thousand dollars on
2  a full-year basis with the sale of a hundred
3  and fifty thousand tons of number 67.
4          Now, that is not the approach
5  that you would make for a lost profits
6  calculation.  In a lost profits calculation,
7  you would not consider -- you would consider
8  only the costs that were avoided, and those
9  costs that would be -- that were incremental
10  in nature, and there are some costs that are
11  fixed that are not avoidable.
12          And even though I don't agree
13  with the not considering a substantial
14  portion of other costs as being incremental
15  expenses in considering only fuel, *I adopted*
16  *Les Alexander's methodology for my*
17  *calculation.*  And what I did is I took the
18  same revenue number, and then I subtracted
19  out the annualized expense numbers, you
20  know, just put them on a full-year basis
21  just like I did the revenue, and I made the
22  same adjustments for transportation,
23  depletion, and same calculation that I did

78

1  before on the increase in fuel cost.
2  Basically, what it indicates is that on an
3  incremental basis with a hundred and fifty
4  thousand tons, Johnco would have been about
5  break even.  Actually I show a little bit of
6  a loss.
7          So that's the analysis that I
8  did that you asked about.

* * * *

80

2      Q.    (BY MR. PEARSON):  Dave,
3  before the break, we were talking about you
4  were making an assumption for purposes of
5  your calculations on -- you were assuming a
6  hundred and fifty thousand tons a year could
7  be produced by the plant?
8      A.    Correct.
9      Q.    And you're basing your cost
10  numbers on those?
11      A.    Correct.
12      Q.    I want to know what is your
13  basis for that assumption?  A hundred and
14  fifty, why are you assuming a hundred and
15  fifty?  What's your basis?
16      A.    My basis for that is that is
17  the contractual commitment in the supply
18  agreement.
19      Q.    And is that your only basis?
20      A.    That is the basis.
21      Q.    But that is your only basis
22  for making an assumption that a hundred and
23  fifty thousand is the number the plant could

27

81

1  have produced?
2      A.    Yes.  I mean, that's the
3  contractual commitment.

* * * *

4      Q.    But would you agree with me
5  that people wouldn't go into business and
6  get a capacity to produce a hundred and
7  twenty tons of number 67 an hour and then
8  reasonably expect that all they're ever
9  going to do is sixty percent of that number,
10  would you?  That's not reasonable.
11          MR. LEEK:  Object to the form.
12  You can answer the question.
13      A.    Well, it depends again on what
14  that -- You know, a lot of times when you
15  look at theoretical capacity, somebody's
16  production capacity may not be more than
17  eighty percent of that, because you've got
18  downtime and all kinds of issues.
19      Q.    Is eighty percent a reasonable
20  number?
21          MR. LEEK:  Objection.
22      A.    It depends on what you're
23  talking about.

86

1      Q.    Well, sand and gravel
2  operation, is that a reasonable number?
3      A.    You know, I would think that
4  eighty percent would be a reasonable target
5  that somebody would like to achieve and

6   attain.  But whether they can do it or not
7   is another matter entirely.  And what their
8   expense structure would be is another matter
9   entirely.  I mean, you could put an extra
10   twenty percent production on this, but
11   consider expenses appropriately, and you're
12   not going to get a better result.

See  Exhibit  D,  Deposition  of  David  Borden,  pp.  74-78,  80-81,  86

(emphasis added).  Thus, Borden (1) made an assumption as to quantity of

product assuming breach of contract; (2) made an assumption as to sales

price that is identical to that Alexander made; (3) subtracted incremental

costs based on the operating history of the company. As he said, "I adopted

Les Alexander's methodology for my calculation."  Deposition of David

Borden, pp. 77, ll.15-17.


CYDI's  mis-characterization  of  Alexander's  Summary  Report  is

disingenuous.  It purports to draw a bead on the Summary Report and

attack the "methodology" on the basis that Alexander did not consider law

and information he had not then learned, and indeed could not have known

in advance of the February 28, 2008 Memorandum Opinion and Order. It then attacks the Supplemental Report as untimely.

On the contrary, however, the Supplemental Report properly and aptly takes into account the refinements necessitated by the Court's February 28 order, and does so in a timely fashion. The law of the case as made applicable on February 28 required Alexander's report to be supplemented in order to remove from his lost profits determinations the impact of projecting future sales of sand and oversize gravel. Such amounts must be clearly be separated out of the profits of sales of No. 67 gravel in light of the Memorandum Opinion and Order.

Alexander's removal of sand and oversize gravel sales in such fashion would have only a nominal effect on lost profits, as Alexander's prior method projected losses and not profits on sand sales, which losses largely offset the projected amounts of profits for oversized gravel. *See* Appendices 1, 3 and 4 to Summary Report. His refinements, which serve

to lower calculations of lost profits, are attributable to new information learned information learned.  For instance, Johnco was served with over 700 pages of documents at the December 21, 2007 deposition of David Borden, and Borden's deposition testimony – not his earlier report – is the source of Borden's lost profits damages calculations and includes a more detailed explanation of much of Borden's criticism of Alexander's opinion. Alexander's Supplementary Report refinements, responding to the new information and new criticism, serve to make Alexander's determinations more precise while having the effect of lowering the calculation of damages.[24]

CYDI complains because Alexander has, in refining his Supplemental Report, properly considered and addressed criticism made by David Borden in his December 21, 2007 deposition, together with the holding of the Court in its February 28, 2008 Memorandum Opinion and

---

[24]Alexander calculated damages of $4,473,873 at 260,000 tons per year (5,200 tons per week) in the Summary Report (see Appendix 1).  The refinement of the Supplemental Report lowers this figure to $4,110,179.  *See* Appendix A to Supplemental Report).

31

Order.    For example, Borden criticized Alexander for Alexander's treatment of depletion, overtime, discounting and pre-judgment interest. Alexander resolved these criticisms by making provisions for those items in the refinements of the Supplemental Report. *See* Borden Report; Supplemental Report, and Appendices A and B to Supplemental Report. Because the Court's holding on February 28, 2008 mandated supplementation, it would not have been proper for Alexander to refine the report with an eye toward the Court's holdings of February 28, 2008 and leave Borden's criticisms unanswered.  This is particularly true in light of the Court's holding as to the law that would be applicable in this case regarding a lost profits damages claim for breach of the Supply Agreement.

This is not a complex pharmaceutical case involving numerous epidemiological studies and subtle "re-analysis" of competing literature, as in Daubert, or staggeringly complex computational fluid dynamic calculations as in Quiet Technology DC-8.   This case presents a straightforward accounting analysis of the calculation of lost profits on the

production of a specified quantity of gravel.  The methodology is the same

as that utilized by CYDI's expert:  calculation of revenues that would have

been lost by the breach of contract, less incremental costs associated with

those lost revenues, less sales of product actually sold.  *See* Deposition of

David Borden, pp. 74-78.  As modified to reflect this Court's statement of

the applicable law, it is a wholly reliable accounting methodology.


Even if CYDI were able to show that the inclusion of this variable

or the exclusion of that one were to affect the ultimate conclusion reached,

this does not reach the reliability of the underlying methodology.

"[N]ormally, failure to include variables will affect the analysis'

probativeness, not its admissibility."  Quiet Technology DC-8, *supra* at

1346, quoting Bazemore v. Friday, 478 U.S. 385, 400, 92 L.Ed.2d 315, 106

S. Ct. 3000, 3009 (1986).  Criticism of Alexander's alternate assumption

of 260,000 tons and 150,000 tons as far as quantity of production, for

instance, presents variables that do not render the underlying methodology

unreliable.  The conflict presented by the use of alternative variables is a

matter properly confided to searching cross-examination and presentation of contrary evidence and opinion, rather than to a <u>Daubert</u> challenge.

Nor must Alexander's methodology answer every single question that might be supposed to be presented, in order to be granted <u>Daubert</u> reliability. It is not required for purposes of admissibility that expert testimony answer every conceivable question concerning the application of the method to the facts of the case. *See, e.g.,* <u>Friend v. Time Mfg. Co.</u>, 422 F. Supp. 2d 1079 (D. Ariz. 2005) (denying motion to strike testimony of engineer). The focus of a <u>Daubert</u> reliability inquiry should be on the cumulative weight of the evidence of the methodology, instead of requiring that each individual piece of evidence fully support the expert's theory. <u>Goebel v. Denver and Rio Grande Western Railroad Co.</u>, 346 F.3d 987, 992-95 (10th Cir. 2003).

The methodology employed by Alexander is reliable and sound with reference to generally accepted accounting principles. The formula is

testable, and the results reproducible.  CYDI has failed to meet its burden

under Daubert justifying exclusion of Alexander's testimony as unreliable.


## CYDI's RULE 26 CHALLENGE


CYDI also moves to preclude Alexander's testimony under

Fed.R.Civ.P. 26, arguing that Alexander's Supplemental Report of

February 29, 2008 is untimely.  Amazingly, CYDI complains that "[i]n his

supplemental report, Mr. Alexander provided *novel and different expert

opinions* regarding the issue of damages of CYDI's alleged breach of

contract, *which are based almost entirely on the Court's Memorandum

Opinion and Order issued on February 28, 2008* as to CYDI's amended

motion for partial summary judgment."  Doc.85, ¶8 (emphasis added).


CYDI's assertion is remarkable in several aspects.

First, the opinions expressed by Alexander are neither novel nor different. *The variables which Alexander removed are exactly what CYDI asked this Court to exclude by way of its motion for partial summary judgment.*

Prior to this Court's ruling in its Memorandum Opinion and Order on partial summary judgment on February 28, 2008, Johnco sought recovery of loss of profits from future sales of sand and oversize gravel as consequential damages under the contract, and introduced expert opinion testimony from Alexander to this issue. Alexander testified that Johnco's loss of profit from sale of No. 67 gravel, together with sand and oversize gravel – joint products which are salable and produced as a necessary incident of mining and classification of the No. 67 gravel – would cost Johnco lost profits in the amount of $4,473,873 [Doc. 33-5, p. 12]. CYDI likewise presented expert testimony by Borden. Borden's calculations included annualized sales projections and revenues generated thereby, and also included the joint products of oversize gravel and sand.

On October 15, 2007, CYDI moved for partial summary judgment on this issue, contending that future sales of oversize gravel and sand could not be considered in the damages calculation [Doc. 32].   On February 28, 2008, this Court entered a Memorandum Opinion and Order [Doc. 78], granting CYDI's motion for partial summary judgment in part and mooting it in part.   The Court held that the parties could not look to the sales of oversize gravel and sand, being "collateral engagements not brought to the notice of the contracting parties" [Doc. 78, p. 12], in engaging in a lost profit analysis:

> [T]he court finds that there is a complete absence of evidence from which it can be inferred that the parties contemplated at the time the Supply Agreement was entered into that Johnco would have lost substantial profits from sales of oversize gravel and sand in the event of a breach or that CYDI would be liable for those alleged lost sales. *The court further finds that these alleged lost sales of the byproducts to third parties constitute activities that are independent of and collateral to the Supply Agreement.* In sum, the court finds that Johnco relies wholly on speculation and conjecture in requesting consequential, loss-of-profit damages for alleged lost future sales of the byproducts. Summary judgment, therefore, is

37

> appropriate because the record taken as a whole *could not
> lead a rational trier of fact to award consequential,
> loss-of-profits damages to Johnco for alleged profits from
> lost sales of oversize gravel and sand byproducts.* See
> <u>Matsushita Elec. Indus. Co.</u>, 475 U.S. at 586.

[Doc. 78, pp. 23-24 (footnote omitted)] (emphasis added).

The Court's order of February 28, 2008 changed the law applicable to this case. Faced with an imminent deadline of 30 days before trial for supplementation under the Federal Rules of Civil Procedure,[25] and given the Court's February 28, 2008 announcement of what is to be the applicable law in this case, Alexander filed the Supplemental Report [Doc. 79-2] on February 29, 2008.

In his Supplemental Report, Alexander excluded, per the holding in the Memorandum Opinion and Order, any consideration of lost profits from the sale of oversize gravel and sand, and re-calculated Johnco's lost

---

[25]FED.R.CIV.P. 26(a)(2)(D), 26(e)(2), and 26(a)(3)(B).

profits to be $4,110,179[26] or $2,322,122,[27] determined in accordance with the Memorandum Opinion and Order.

Second, CYDI seems to suggest to this Court that an expert witness, faced with a new holding of the trial court, is prohibited from timely refining his assumptions and opinions in accordance with that new holding – even when the opinion inures to the benefit of CYDI, by effecting a reduction in the amount of damages claimed.

CYDI cannot show unfair prejudice here.   FED.R.CIV.P. 16 grants district courts broad discretion to enforce their scheduling orders. Estes v. King's Daughters Medical Center, 59 Fed. Appx. 749, 753 (6th Cir. 2003); Weaver v. CSX Transp., Inc., No. Civ. 3:06-CV-403 at *1, 2007 WL 2905609 (E.D. Tenn, Oct. 2, 2007).  CYDI must show this Court why,

---

[26]Assuming sales of No. 67 gravel to CYDI in quantities of 5,200 tons per week [Doc. 79-2, p. 2]

[27]Assuming sales of No. 67 to CYDI in quantities of 150,000 tons per year [Doc. 79-2, p. 2].

having obtained the relief it sought of this Court in the exclusion of certain elements of lost profits damages, it is unfairly prejudiced by the immediate refinement of an opposing expert's opinion which takes into account the very same relief.    In the absence of such showing, CYDI cannot demonstrate unfair prejudice.    Indeed, CYDI is seeking to use the power of this Court to *perpetrate* an unfair prejudice by attempting to have this Court hold Alexander's feet to  the fire of his previous Summary Report, when a summary judgment granted shortly before trial has changed the landscape of his opinion.

Moreover, it is clear that Alexander's supplementation on February 29, 2008 was timely.  The filing of the Supplemental Report was well within the time for supplementation permitted by the Federal Rules of Civil Procedure. FED.R.CIV.P. 26(a)(2)(d) subjects expert testimony disclosures to a duty of supplementation in accordance with FED.R.CIV.P. 26(e)(2). Rule 26(e)(2) states in turn:

> (2) EXPERT WITNESS. For an expert whose report must be
> disclosed under Rule 26(a)(2)(B), the party's *duty to
> supplement* extends both to information included in the report
> and to information given during the expert's deposition. Any
> additions or changes to this information *must be disclosed by
> the time the party's pretrial disclosures under Rule 26(a)(3)
> are due.*

(emphasis added). FED.R.CIV.P. 26(a)(3) states in pertinent part, "Unless

the court orders otherwise, these disclosures must be made at least 30 days

before trial." The Court's Uniform Scheduling Order [Doc. 15] and

Pretrial Order [Doc. 77] are silent as to the timing of supplementation, and

the thirty-day rule of FED.R.CIV.P. 26(a)(3) applies. Alexander's

Supplemental Report of February 29, 2008 was filed at least 30 days before

the March 31, 2008 setting for trial.


It is hard indeed to see how Alexander could have supplemented any

sooner, or how his opinion could have been permitted to withstand

challenge in the absence of supplementation.

41

WHEREFORE PREMISES CONSIDERED, plaintiff Johnco

Materials, Inc. replies that the Motion of the defendant CYDI be DENIED.


Respectfully submitted,



s/ H. Gregory Pearson
H. Gregory Pearson (ASB-4733-S81H)
Attorney For Plaintiff
email: greg@jphj.net


Charles E. Harrison (ASB-9408-N70C)
Attorney For Plaintiff
email: chuck@jphj.net


*OF COUNSEL:*

JUNKIN, PEARSON, HARRISON
    & JUNKIN, L.L.C.
601 Greensboro Avenue
Suite 600 Alston Place
Tuscaloosa, Alabama 35401
Telephone: (205) 366-0111
Telecopier: (205) 391-4780

## CERTIFICATE OF SERVICE

Pursuant to FED.R.CIV.P. 5(e) and the Administrative Procedures For Filing, Signing, And Verifying Pleadings and Documents In The District Court Under the Case Management/Electronic Case Files (CM/ECF) System In Civil Cases [General Order No. 2:04-mc-3164], I do hereby certify that I have electronically filed the foregoing Reply with the Clerk of the Court by uploading same to the Court's CM/ECF web site at http://www.almd.uscourts.gov, which will send notification of such filing to the following:

> Thomas J. Leek, Esq
> COBB & COLE
> 150 Magnolia Avenue
> Post Office Box 2491
> Daytona Beach, FL 32115-2491
>
> George Walker III, Esq.
> David Martin, Esq.
> COPELAND, FRANCO, SCREWS
>   & GILL, P.A.
> 444 S. Perry St.
> Montgomery, Alabama 36101-0347

and I hereby certify that I have mailed by United States Postal Service, properly addressed and first-class postage prepaid and affixed this document to the following non-CM/ECF participants:

> [none]

This the 17th day of March 2008.

Charles E. Harrison (ASB-9408-N70C)

43

# EXHIBIT
# A

<u>Affidavit of J. Lester Alexander, III</u>

THE STATE OF ALABAMA
COUNTY OF JEFFERSON

Before me, this undersigned authority, personally appeared J. Lester Alexander, III, who is known to me and being duly sworn, deposes and says as follows:

1.      My name is J. Lester Alexander, III. I am over the age of 19 and competent to execute this affidavit.

2.      I am the founder and Managing Principal of Accounting Economics and Appraisal Group, LLC, a certified public accounting firm that offers forensic accounting, fraud investigation, valuation and other services. I am a former partner of PricewaterhouseCoopers LLP and former southeastern practice leader of one of its legacy firm's litigation consulting practice. I have practiced for more than twenty-nine years performing audit, tax and consulting services. In recent years I have concentrated my practice in the areas of forensic accounting, fraud investigation and valuation consulting services.

3.      I hold a Bachelor of Science in Accounting from the University of Alabama and am a Certified Public Accountant ("CPA") and a Certified Fraud Examiner.

4.    I have provided written and oral expert testimony in matters pending in Federal District Courts, Federal Bankruptcy Courts and state courts. Moreover, my testimony has been admitted into evidence in Federal District Courts, Federal Bankruptcy Courts and state courts on numerous occasions.

5.    CPAs regularly make financial determinations, including calculations of the economic and financial impact of a set of actions or proposed actions. These determinations are regularly performed by CPAs in connection with business start-ups, introduction of new services or products, and disputes, where the determinations are focused on the financial results, but for the allegations in the dispute.

6.    I have issued written expert reports and am knowledgeable of the generally accepted practices undertaken by CPAs and the requirements established by the American Institute of Certified Public Accountants ("AICPA") regarding consulting services where expert testimony and expert reports are issued by CPAs.[1]

---

1 See e.g., **Statement on Standards for Consulting Services ("SSCS") No. 1,** *Consulting Services: Definitions and Standards* (AICPA, *Professional Standards,* CS §100; **AICPA Code of Professional Conduct, Rules 102 , 201 & 202,** ET §102, §201 & §202; **Consulting Services Special Report 03-1,** *Litigation Services and Applicable Professional Standards* (New York: AICPA, 2003); **Business Valuation and Forensic and Litigation Services Practice Aid 04-1,** *Engagement Letters for Litigation Services* (New York: AICPA, 2004); **Consulting Services Practice Aid 96-3,** *Communicating in*

7.  The AICPA requires that the following elements be included in written reports submitted by CPAs to Federal Court:

    a. A complete statement of all opinions to be expressed.

    b. An explanation of the bases and reasons for the opinions.

    c. The data or other information considered by the witness in forming the opinions.

    d. Any exhibits to be used as a summary of or support for the opinions.

    e. Qualifications of the witness, including a list of all publications authored by the witness in the preceding ten years.

    f. A listing of any other cases in the preceding four years in which the witness has testified as an expert at trial or by deposition.

    g. Compensation to be paid for the study and testimony.

    h. Signature of the witness. [2]

8.  My Summary Report dated August 8, 2007 ("Original Report") and my Supplemental Report dated February 29, 2008 ("Supplemental Report"), issued Pursuant to Fed. R. Civ. P. 26(a)

---

*Litigation Services: Reports* (New York: AICPA, 1996). and **Business Valuation and Forensic & Litigation Services Section Practice Aid 06-4**, *Calculating Lost Profits* (New York: AICPA, 2006).

2 See e.g., **AICPA Consulting Services Practice Aid 96-3**, *Communicating in Litigation Services: Reports* (New York: AICPA, 1996).

(2), are in compliance with the requirements established by the AICPA in all substantial respects.

9.  The AICPA requires testimony provided by CPAs in matters pending in Federal District Courts, Federal Bankruptcy Courts and state courts to be:

    a.  Based upon sufficient facts or data;

    b.  The product of reliable principles and methods; and

    c.  Based on reliable application of the principles and methods to the facts of the case. [3]

10. My opinions contained in my Original Report and Supplemental Report are based on sufficient facts and data, are the product of reliable principles and methods, and are the result of the reliable application of the principles and methods to the facts of the case.

11. My opinions are based on sufficient facts and data. For example:

    a.  Sale prices are derived from the Supply Agreement, in the same fashion as Defendant's Expert. [4]

---

3 See e.g., ¶23 (pp. 11—12) of **Business Valuation and Forensic & Litigation Services Section Practice Aid 06-4,** *Calculating Lost Profits* (New York: AICPA, 2006).

4 See e.g. ¶3.1 of Supply Agreement; Appendix 2 to Alexander Original Report; Appendices A and B to Alexander Supplemental Report; Borden 0350.

b.  Both sales quantity assumptions (260,000 tons per year or 150,000 [5] tons per year) are based on interpretations of the Supply Agreement, in the same fashion as Defendant's Expert. [4]

c.  Units of production are based on the same product mix stipulated to by the parties (120 tons of No. 67 gravel per hour, resulting in 30 tons per hour and 183 tons per hour of oversize gravel and sand, respectively). [6]

d.  Cost per unit is based on monthly actual costs over a similar time frame as Defendant's Expert. [7]

e.  Units produced and cost per unit are determined using an assumed production level of 70%, which is more conservative than the 80% level testified to as reasonable by Defendant's Expert. [8]

12.  My opinions are the product of well reasoned and reliable principles and methods widely recognized and generally accepted.

---

5 Third Party production of M & B Railroad produced January 22, 2008 (CYDI 04944).

6 Derived from the product mix specified in Stipulations 17 and 18 of the parties. See e.g., Deposition of Ben Johnston, 48: 9-17; Stipulations 17 and 18; Borden 0350.

7 See e.g., Appendix 4 to Alexander Original Report; Appendices C and D to Alexander Supplemental Report; Borden 0350.

8 See e.g., Deposition of Dave Borden, 85: 19-86: 6; Borden 0350.

a. The major elements of my generally accepted methodology are as follows:

   i. The loss period is based on the term of the Supply Agreement, consistent with AICPA recognized practices. [9]

   ii. The lost revenues are calculated based on terms of the Supply Agreement, consistent with AICPA recognized practices. [10]

   iii. Costs are based on the concept of avoided costs, an analysis of the Plaintiff's cost structure, and determinations of fixed versus variable costs, consistent with AICPA recognized practices. [11] Joint costs are

---

[9] See e.g., Chapter 9: *Loss Period*, ¶56--59 (p. 23) in **Business Valuation and Forensic & Litigation Services Section Practice Aid 06-4**, *Calculating Lost Profits* (New York: AICPA, 2006).

[10] See e.g., Chapter 10: *Calculating Lost Revenues*, ¶60--76 (pp. 25--27) in **Business Valuation and Forensic & Litigation Services Section Practice Aid 06-4**, *Calculating Lost Profits* (New York: AICPA, 2006), including ¶61 "The normal methods of calculating lost revenues include: … An approach based on the terms of the underlying contract" and ¶70 "In some instances, the lost profits calculation is made in relation to a specific contract. In that instance, many of the elements of the calculation may be set forth in the contract document, i.e., the number of units to be sold, unit prices, etc. In this situation, a model might be developed that calculates the revenues anticipated under the terms of the contract."

[11] See e.g., Chapter 11: *Cost Estimation*, ¶77--94 (pp. 29--32) in **Business Valuation and Forensic & Litigation Services Section Practice Aid 06-4**, *Calculating Lost Profits* (New York: AICPA, 2006), including ¶78 "The costs that should be deducted from lost revenues in order to calculate lost profits are generally referred to as avoided costs. *Avoided costs* are those costs that would have been incurred in connection with the generation of the lost revenues but were not incurred", ¶80 "In order to determine the amount of avoided costs, the practitioner needs to understand the plaintiff's cost structure", ¶85 "The starting point for the cost structure analysis may be the determination of fixed versus variable costs", ¶90 Various nonstatistical methods can be employed by the practitioner to estimate costs … These methods include the following: *Account analysis*. This method involves the review of the detailed general ledger or chart of accounts. The practitioner uses judgment to assess whether costs are fixed or variable … *Direct*

allocated between products generated in the single process using joint product costing, which is a generally accepted cost accounting method. [12]

iv. Consideration is given to prejudgment interest on past loses and discounting of future loss profits, consistent with AICPA recognized practices. [13]

---

*assignment.* This method involves the identification by the practitioner of the direct costs of an activity. These costs would include direct labor and materials ... *Cost accounting allocations.* This method apportions costs that are not specific to a particular product or activity based on some objective measure, including revenue, labor hours, or units sold", ¶91 "The practitioner is typically attempting to quantify the amount of incremental costs associated with lost revenues ... Although not always possible, the practitioner may wish to consider using historical data as a means of validating the reasonableness of results achieved" and ¶94 "... the practitioner will need to consider the results of the calculation of avoided costs to evaluate whether the results appear reasonable.'

12 See e.g., Arnstein, William E. and Frank Gilabert. (1980). *Direct Costing.* New York, New York: AMACOM a division of The American Management Association; Horngren, Charles T. (1977). *Cost Accounting, A Managerial Emphasis,* 4th edition. Englewood Cliffs, New Jersey: Prentice Hall; and Garrison, Ray H. (1979). *Managerial Accounting, Concepts for Planning, Control, Decision Making,* Revised edition. Dallas, Texas: Business Publications; Appendix 8 to Alexander Original Report; Appendix H to Alexander Supplemental Report.

13 See e.g., Chapter 12: *Prejudgment Interest on Past losses,* ¶95--102 (pp. 33--34) and Chapter 13: *Financial Discounting of Future Lost Profits to Present Value,* ¶103--129 (pp. 35--42) in **Business Valuation and Forensic & Litigation Services Section Practice Aid 06-4,***C alculating Lost Profits* (New York: AICPA, 2006), including ¶96 "... Rates that might be used for the calculation of prejudgment interest include ... a state statutory rate ..." ¶97 "Many states calculate prejudgment interest utilizing a statutory rate that is set annually. State law may ... limit prejudgment interest to a statutory rate, or exclude compounding ...", ¶110 "...Although some practitioners have argued the appropriateness of applying equity rates of return to lost profit calculations, the courts have generally been reluctant to accept discount rates based on a company's cost of equity", ¶111 "...Among those few jurisdictions that have published written opinions, some courts have ruled that the discount rate used to calculate lost profits should incorporate both an inflationary component and a risk component while others have required the use of a risk-free rate", ¶121 "Some practitioners have used a variation of the subject company's borrowing rate as the basis for determining an appropriate discount rate to apply to projected lost profits. These include ... Marginal cost of the subject company's long-term debt ...", ¶126 "When discounting lost future profits (LFP), the practitioner may wish to consider modifying the calculation to apply a mid-year convention...", ¶128 "Many practitioners have addressed the concept of risk through the application of discount rates that reflect the level of risk inherent in the projected profits. Other practitioners, alternatively, have suggested that the profit projections themselves be modified downward to adjust for risk, allowing the expert to incorporate a risk-reduced, relatively low discount rate [footnote omitted]", and ¶129 "The use of the latter approach does not eliminate the need to substantiate the reasonableness of the selected discount rate and the projected, risk-adjusted, profits ..."

b. My major assumptions are as follows:

   i. Sales price per unit = Supply Agreement. [4]

   ii. Units sold = either 260,000 tons per year 150,000 [5] tons per year, based on interpretation of the Supply Agreement. [4]

   iii. Units produced = stipulated product mix at 70% of capacity. [6]

   iv. Cost per unit = staffing levels at 70% of capacity and actual costs. [14]

c. Defendant's Expert uses the same price - cost = profit per unit methodology as me in his lost profits determinations. The only differences are his assumptions regarding productivity, units sold and using fixed costs to lower incremental profit. [15]

d. The methodology used in my Supplemental Report is the same as the methodology used in my Original Report. In the Supplemental Report I simply refined certain assumptions, i.e.,

---

14 See e.g., Appendices A through C to Alexander Supplemental Report.

15 See e.g., Appendices 1 through 4 to Alexander Original Report; Appendices A through D to Alexander Supplemental Report; Borden 0350.

variables, to account for the impact of information learned subsequent to my deposition. [16]

13.    My opinions are the product of the reliable application of the principles and methods to the facts of the case.

    a.    The method reliably determines lost profits of each of the three products generated in a single process on a profit per unit basis. This method allows one to independently determine the lost profits of each product at varying sales levels using simple multiplication. [16]

    b.    The method includes separate identification and testing of all material assumptions utilized to determine damages. [16]

    c.    The method includes consideration of new information, and updating when necessary, to assure the accuracy and relevance of my opinions. [17]

14.    In conclusion, my methodology, analysis, conclusions and opinions, as expressed in the Original Report and the Supplemental Report, are reasonable and are in accordance with generally

---

16  See e.g., Appendices 1 through 4 to Alexander Original Report; Appendices A through D to Alexander Supplemental Report.

17  See e.g., Alexander Original Report; Alexander Supplemental Report.

accepted practices undertaken by a CPA when issuing expert testimony.

15. This affidavit is true and correct to the best of my personal knowledge, and is based on my personal knowledge.

16. I declare under the penalty of perjury under the laws of the United States of America that the foregoing is true.

_J. Lester Alexander, III_

Subscribed and sworn to before me this ___14th___ day of March in the year 2008.

_Notary Public_

[NOTARIAL SEAL]    My commission expires:
September 22, 2009

# EXHIBIT

# B

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DISTRICT

JOHNCO MATERIALS, INC.,                     CASE NO.: CV-06-2:06CV993-ID

      Plaintiff,

vs.

CONRAD YELVINGTON
DISTRIBUTORS, INC.,

      Defendant.

_____ /

**DEFENDANT, CONRAD YELVINGTON DISTRIBUTORS, INC.,
SECOND SUPPLEMENTAL RESPONSE TO PLAINTIFF'S SECOND
REQUEST FOR PRODUCTION OF DOCUMENTS AND THINGS
PURSUANT TO FED.R.CIV.P. 34**

Pursuant to Rule 34 of the Federal Rules of Civil Procedure, Defendant,

CONRAD YELVINGTON DISTRIBUTORS, INC., by and through their undersigned

counsel, hereby submits their second supplemental responses to Plaintiff's, Johnco

Materials, Inc., second request to produce as follows:

    1.    Any and all documents that you have received pursuant to Rule 45
subpoena in connection with this litigation.

    **ANSWER:**    **Documents received to date which are responsive to this
request are attached and forwarded herewith as bates numbers CYDI 04864-
005012.**

1

**Garland Horton**

| | |
|---|---|
| **From:** | Garland Horton |
| **To:** | Charlie Marshall |
| **Cc:** | Charles McBride; Billy Eason; Murray Cook; Kenneth Bryant |
| **Subject:** | Johnco Materials |
| **Attachments:** | |

**Sent:** Fri 1/20/2006 2:25 PM

I talked with both Pep Johnson, owned of Johnco Materials and Gary Yelvington, President-Conrad Yelvington Distributors.

Gary indicated that Johnco is not ready to ship gravel to his facilities. He thinks they will be ready in the next 30 days and expects to ship the first train in late February. Gary's original projection was to purchase 150,000 nt/year, 25 trains. This will move in 60 car trains to his distribution facilities on the Gulf Coast, including Panama City (BAYL).

Pep Johnson indicated they are ready to begin shipping. He is talking with other potential rail customers. One in particular, LaFarge is a regional concrete producer. LaFarge is talking about moving 40 cars per week of construction grade sand to their facilities in Atlanta.

I confirmed with Keith Bodiford at LaFarge, they are interested is receiving sand from Johnco. They are working on getting the specifications finalized. LaFarge wants to begin shipping sand very soon. LaFarge is not sure what the shipment size will be but would like to ship in 20-30 car units.

It looks like we could see the first shipments from Johnco in February, most likely in the second half of the month.

Garland Horton

**CYDI 04944**

# EXHIBIT C

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DISTRICT

JOHNCO MATERIALS, INC.,                CASE NO.: CV-06-2:06CV993-ID

     Plaintiff,

vs.

CONRAD YELVINGTON
DISTRIBUTORS, INC.,

     Defendant.

_____ /

## DEFENDANT, CONRAD YELVINGTON DISTRIBUTORS, INC., THIRD SUPPLEMENTAL RESPONSE TO PLAINTIFF'S SECOND REQUEST FOR PRODUCTION OF DOCUMENTS AND THINGS PURSUANT TO FED.R.CIV.P. 34

Pursuant to Rule 34 of the Federal Rules of Civil Procedure, Defendant, CONRAD YELVINGTON DISTRIBUTORS, INC., by and through their undersigned counsel, hereby submits their second supplemental responses to Plaintiff's, Johnco Materials, Inc., second request to produce as follows:

     1.    Any and all documents that you have received pursuant to Rule 45 subpoena in connection with this litigation.

     **ANSWER:**   **Documents received to date which are responsive to this request are attached and forwarded herewith as bates numbers CYDI 5013-5356.**

1

**COBB & COLE**

THOMAS J. LEEK
FLA. BAR NO. 0116408
150 Magnolia Avenue
Post Office Box 2491
Daytona Beach, FL 32115-2491
Telephone:  (386) 255-8171
Facsimile:  (386) 323-9255
E-mail: Tom.Leek@CobbCole.com
CO-COUNSEL FOR DEFENDANT

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing has been furnished by U.S. Mail to the following on this _17_ day of January, 2008:

H. Gregory Pearson, Esquire
Charles E. Harrison, Esquire
Junkin, Pearson, Harrison, & Junkin, L.L.C.
601 Greensboro Avenue
Suite 600, Alston Place
Tuscaloosa, AL 35401

J. David Martin, Esquire
Copeland, Franco, Screws & Gill, P.A.
444 South Perry Street (36104)
Post Office Box 347
Montgomery, AL 36101

Attorney

2

{034542-058 : KKOBY/KKOBY : 00542752.DOC; 1}

# EXHIBIT D

4

FREEDOM COURT REPORTING

Page 74

1    Q.   And do you have a number it
2  should have been?
3    A.   I've done some analysis
4  looking at a correction of his calculations.
5    Q.   All right.  What's your
6  number?
7    A.   What I did, I looked at --
8  First, I looked at Johnco, and I assumed
9  that Johnco would have sold a hundred and
10  fifty thousand tons of gravel at five
11  dollars and fifty-one cents a ton.  I took
12  all of the oversized sales that they made
13  during that eighteen-month period of time
14  and developed an average amount per month
15  that they actually sold during that period.
16  I did the same thing with sand, and I
17  recognize there are legal arguments about
18  whether oversize and sand should be included
19  in this or not, and I'm not getting into
20  that.  But I -- For sake of what I did, I
21  included oversized and sand.
22         And what I then did is I took
23  the operating expenses from Johnco's own

Page 75

1  historical financial statements during that
2  period of time of May through September,
3  even though actually in September the
4  cutback had already occurred, there was
5  substantial reductions in compensation that
6  occurred in the month of September.  That's
7  when it appears that there were -- from
8  financial records, at least, that there was
9  a shutdown or beginning of shutdown in
10  production.  But I included September in
11  there even though I don't have a full
12  complement of salaries.
13         What I then did is annualized,
14  which is just putting on a twelve-month
15  basis those five months of activity.  There
16  were -- I don't want to digress on this,
17  there was a few expenses where I just took
18  the annual amounts off the tax returns
19  because they were not represented in that
20  five-month period of time, and those were
21  auto expenses and interest and amortization
22  was like eleven hundred dollars.  So I
23  annualized the expenses for that five-month

Page 76

1  period of time, to just give a view of what
2  the expenses would be on a full year's
3  basis.  And I assumed, even though they had
4  not done it in the past, that they could
5  have produced the hundred and fifty thousand
6  tons.  The only adjustments I made is I
7  adjusted for the M&B Railroad charge; I used
8  Les' same methodology on fuel costs; and
9  I've got depletion, and I've got it at forty
10  cents.  I don't know whether it's forty or
11  twenty or fifteen or fifty, but I've got it
12  at forty cents for purposes of this
13  calculation.
14         I do not have considered in
15  this analysis, yet, overburden removal or
16  any reclamation cost.  But in looking at
17  that, what it indicated is that the
18  normalized full complement of a year
19  expenses for Johnco would have been almost a
20  million two, and the revenues that Johnco
21  would have generated under that assumption
22  was slightly under nine hundred thousand,
23  indicates that Johnco would have lost two

Page 77

1  hundred and ninety-five thousand dollars on
2  a full-year basis with the sale of a hundred
3  and fifty thousand tons of number 67.
4         Now, that is not the approach
5  that you would make for a lost profits
6  calculation.  In a lost profits calculation,
7  you would not consider -- you would consider
8  only the costs that were avoided, and those
9  costs that would be -- that were incremental
10  in nature, and there are some costs that are
11  fixed that are not avoidable.
12         And even though I don't agree
13  with the not considering a substantial
14  portion of other costs as being incremental
15  expenses in considering only fuel, I adopted
16  Les Alexander's methodology for my
17  calculation.  And what I did is I took the
18  same revenue number, and then I subtracted
19  out the annualized expense numbers, you
20  know, just put them on a full-year basis
21  just like I did the revenue, and I made the
22  same adjustments for transportation,
23  depletion, and same calculation that I did

FREEDOM COURT REPORTING

Page 78

1   before on the increase in fuel cost.
2   Basically, what it indicates is that on an
3   incremental basis with a hundred and fifty
4   thousand tons, Johnco would have been about
5   break even. Actually I show a little bit of
6   a loss.
7           So that's the analysis that I
8   did that you asked about.
9       Q.   And given that, I mean, can
10  you conclude that if you assume liability
11  for purposes of the calculations,
12  Yelvington's liability, just assume it for
13  purposes of this calculation, not admit it
14  but assume it, then Yelvington just did
15  Johnco a favor by breaching the contract,
16  saved them some money?
17      A.   No. Number one, I don't agree
18  that Yelvington breached the contract.
19      Q.   I understand. I said you are
20  assuming that for purposes of liability.
21      A.   And, number two, obviously
22  this was not a good contract, as it turned
23  out, given market conditions from Johnco's

Page 79

1   perspective, and this analysis reflects
2   that.
3           Now, could they have perhaps
4   gotten a little more efficient? Perhaps. I
5   think they would have. But at the same
6   time, it's unrealistic to assume that all of
7   these costs would have remained fixed when
8   you went from even eight thousand in the --
9   in Les's scenario to twelve thousand five
10  hundred in the scenario that I'm outlining
11  here, or slightly less than that, the
12  monthly equivalent of a hundred and fifty
13  thousand tons. So I think -- You know, you
14  probably would have had some push either way
15  a little bit, you could have had a more
16  efficient operation as you achieved higher
17  levels of efficiency. But at the same time,
18  there are a lot of costs here that are
19  variable that have not -- that have been
20  considered as fixed and not increasing with
21  increasing volume.
22          MR. PEARSON: Let's take a
23  break for a second.

Page 80

1           (Recess was taken.)
2       Q.   (BY MR. PEARSON): Dave,
3   before the break, we were talking about you
4   were making an assumption for purposes of
5   your calculations on -- you were assuming a
6   hundred and fifty thousand tons a year could
7   be produced by the plant?
8       A.   Correct.
9       Q.   And you're basing your cost
10  numbers on those?
11      A.   Correct.
12      Q.   I want to know what is your
13  basis for that assumption? A hundred and
14  fifty, why are you assuming a hundred and
15  fifty? What's your basis?
16      A.   My basis for that is that is
17  the contractual commitment in the supply
18  agreement.
19      Q.   And is that your only basis?
20      A.   That is the basis.
21      Q.   But that is your only basis
22  for making an assumption that a hundred and
23  fifty thousand is the number the plant could

Page 81

1   have produced?
2       A.   Yes. I mean, that's the
3   contractual commitment. And so what I was
4   doing was looking at, well, what would
5   Johnco have made if they had produced and
6   sold a hundred and fifty thousand tons.
7       Q.   And I'm trying to come up with
8   why you picked a hundred and fifty thousand.
9           Now, did you consider what the
10  production capacity of the plant was, and if
11  so, what did you come up with?
12      A.   I did not. There is not
13  information that I have, other than isolated
14  testimony about what the plant could have
15  produced in a theoretical production mode.
16  There's not evidence out there that I've
17  seen, Greg, that looks at production over
18  any significant period of time, so I did not
19  know what that was.
20      Q.   All right. If you assume that
21  the plant could produce, as Ben Johnston has
22  testified, at one hundred and twenty tons
23  per hour of number 67 gravel, if you assume

21 (Pages 78 to 81)

367 VALLEY AVENUE
(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

8b474430-9bec-4210-9860-7b95d2bfe488

FREEDOM COURT REPORTING

Page 82

1  that, then how does that affect your
2  assumption that -- of a hundred and fifty
3  thousand tons of number 67 a year being
4  produced?
5      A.   It doesn't change my
6  assumption at all, because the contractual
7  commitment was only a hundred and fifty
8  thousand tons.
9      Q.   If you do the calculation,
10 just a hundred and twenty tons an hour,
11 multiply it by a forty hour week, that kind
12 of thing, it comes up to, what, sixty
13 percent of capacity.  Now, is that a
14 reasonable basis for you to conclude a
15 hundred and fifty thousand is all they would
16 have produced?  Is sixty percent of plant
17 capacity a reasonable basis for making the
18 assumption that a hundred and fifty thousand
19 is all they would have produced?
20     A.   A hundred and fifty thousand
21 is all that Yelvington was obligated to buy.
22     Q.   Okay.  So you didn't consider
23 what percent of production capacity of the

Page 83

1  plant that your hundred and fifty thousand
2  was?
3      A.   No.  Because there is -- You
4  do not have significant sales of gravel,
5  obviously, outside of Yelvington, I've seen.
6  I've actually got a hundred and fifty
7  thousand five hundred tons, if you count the
8  oversized.
9      Q.   And in a -- Hypothetically, in
10 a business setting when somebody's business
11 is going to be up and running in your
12 experience and what you do, is sixty percent
13 of capacity a reasonable number?
14     A.   You mean that they would be
15 able to run at sixty percent of capacity?
16     Q.   Is that a reasonable number
17 for somebody to shoot for, sixty percent of
18 their capacity?  Is that what a business
19 would shoot for?
20     A.   Well, here is the thing, Greg,
21 I mean somebody certainly -- I mean starting
22 out, sure.
23     Q.   You think that's reasonable?

Page 84

1      A.   Yeah, to start out.
2           You would expect to achieve
3  higher numbers.  But here is the other
4  aspect of this:  I mean this cost structure
5  is so understated relative to what they're
6  doing.  And, remember, their actual
7  production is probably thirty percent of
8  capacity the way you calculate capacity.  I
9  mean, they are running at a very, very low
10 percentage relative to capacity.  But
11 despite that, on the expense side here, and
12 I hope you understand what I'm saying, I
13 have not -- I have assumed, as Les assumed,
14 that all of these expenses are fixed.  So
15 I've looked at the gravel they would have
16 sold to Yelvington, but I've assumed, even
17 though there's a substantial ramp up in
18 production, that all of these expenses are
19 fixed.
20          So, hey, is this the only
21 calculation you could make?  Yeah.  You
22 might have some more production, but you
23 would have to consider the expenses that are

Page 85

1  consistent with that at the same time.  I
2  don't think you'd get to a higher number on
3  the bottom line.
4      Q.   But would you agree with me
5  that people wouldn't go into business and
6  get a capacity to produce a hundred and
7  twenty tons of number 67 an hour and then
8  reasonably expect that all they're ever
9  going to do is sixty percent of that number,
10 would you?  That's not reasonable.
11          MR. LEEK:  Object to the form.
12 You can answer the question.
13     A.   Well, it depends again on what
14 that -- You know, a lot of times when you
15 look at theoretical capacity, somebody's
16 production capacity may not be more than
17 eighty percent of that, because you've got
18 downtime and all kinds of issues.
19     Q.   Is eighty percent a reasonable
20 number?
21          MR. LEEK:  Objection.
22     A.   It depends on what you're
23 talking about.

22  (Pages 82 to 85)

FREEDOM COURT REPORTING

Page 86

1  Q.  Well, sand and gravel
2  operation, is that a reasonable number?
3  A.  You know, I would think that
4  eighty percent would be a reasonable target
5  that somebody would like to achieve and
6  attain. But whether they can do it or not
7  is another matter entirely. And what their
8  expense structure would be is another matter
9  entirely. I mean, you could put an extra
10  twenty percent production on this, but
11  consider expenses appropriately, and you're
12  not going to get a better result.
13  Q.  Well, you wouldn't expect a
14  business to do much more than break even if
15  they're going to set up some capacity and
16  only go with sixty percent of that. You
17  wouldn't even expect them to do anything
18  that made them break even or lose money,
19  would you?
20  MR. LEEK: Same objection.
21  A.  Well, it depends. In a sand
22  and gravel operation, you do have a lot of
23  costs that are incurred on the front end.

Page 87

1  It really gets back to whether you can sell
2  all your product.
3  The problem that obviously
4  Johnco suffers from, is the fact that
5  they've got a lower-priced product relative
6  to the market, and they're selling only
7  about thirty percent of what they're
8  actually producing and running through the
9  plant. You would not expect somebody to
10  make money under those circumstances. I
11  mean, I'm surprised frankly, that's it's as
12  close as it is.
13  Q.  And you can't take historical
14  sales and project or forecast future lost
15  profits like that. That's not a reasonable
16  basis for doing that?
17  A.  No. I think historical --
18  That's exactly what I've done. I took the
19  historical sales on a monthly basis and used
20  that to calculate what the future sales
21  activity would be. May be some better way
22  to do it, I'm just saying in this
23  calculation I did that.

Page 88

1  Q.  Didn't Les do the same thing?
2  A.  No.
3  Q.  Les didn't take historical
4  sales and forecast it?
5  A.  No. No.
6  What he did is he took -- Even
7  though you're sitting there with massive
8  amounts of sand, I mean you had probably six
9  or seven times the amount -- at least,
10  probably eight or ten times the amount of
11  sand that was actually sold. He looked at
12  that small amount of gravel that was
13  produced during that period of time and said
14  even though they were selling basically a
15  hundred percent of the 67 gravel that they
16  were producing, he looked at that small
17  amount of gravel that was being produced and
18  established a relationship between that and
19  the sand. Even though we're sitting there
20  on the sand side with ten times the sand
21  than you could -- than they were selling,
22  from an inventory standpoint, and assumed
23  that as the gravel production grew, that

Page 89

1  the -- and sales grew, that the sand would
2  grow along with it. And you were already in
3  a situation where you had more sand than you
4  could probably ever sell. And he assumed
5  that it would grow commensurate with the
6  gravel production. You know, I don't agree
7  with that approach. I just don't think
8  that's -- You know, if you were selling sand
9  along with the gravel and there was some
10  kind of relationship that was established
11  about we're producing X amount of sand -- I
12  mean, gravel and selling it, and we're
13  sealing the same percentage of sand and
14  there was some reasonable relationship
15  between the two, that might make sense. But
16  clearly in this case, they had more sand
17  than -- obviously they had problems with
18  sand across the board all during this period
19  of time.
20  Q.  And when you say problems with
21  sand, tell me what you mean.
22  A.  Selling it.
23  Q.  Selling?

23  (Pages 86 to 89)

FREEDOM COURT REPORTING

Page 86

1    Q.    Well, sand and gravel
2  operation, is that a reasonable number?
3    A.    You know, I would think that
4  eighty percent would be a reasonable target
5  that somebody would like to achieve and
6  attain. But whether they can do it or not
7  is another matter entirely. And what their
8  expense structure is another matter
9  entirely. I mean, you could put an extra
10  twenty percent production on this, but
11  consider expenses appropriately, and you're
12  not going to get a better result.
13    Q.    Well, you wouldn't expect a
14  business to do much more than break even if
15  they're going to set up some capacity and
16  only go with sixty percent of that. You
17  wouldn't even expect them to do anything
18  that made them break even or lose money,
19  would you?
20    MR. LEEK: Same objection.
21    A.    Well, it depends. In a sand
22  and gravel operation, you do have a lot of
23  costs that are incurred on the front end.

Page 87

1  It really gets back to whether you can sell
2  all your product.
3        The problem that obviously
4  Johnco suffers from, is the fact that
5  they've got a lower-priced product relative
6  to the market, and they're selling only
7  about thirty percent of what they're
8  actually producing and running through the
9  plant. You would not expect somebody to
10  make money under those circumstances. I
11  mean, I'm surprised frankly, that's it's as
12  close as it is.
13    Q.    And you can't take historical
14  sales and project or forecast future lost
15  profits like that. That's not a reasonable
16  basis for doing that?
17    A.    No. I think historical --
18  That's exactly what I've done. I took the
19  historical sales on a monthly basis and used
20  that to calculate what the future sales
21  activity would be. May be some better way
22  to do it, I'm just saying in this
23  calculation I did that.

Page 88

1    Q.    Didn't Les do the same thing?
2    A.    No.
3    Q.    Les didn't take historical
4  sales and forecast it?
5    A.    No. No.
6        What he did is he took -- Even
7  though you're sitting there with massive
8  amounts of sand, I mean you had probably six
9  or seven times the amount -- at least,
10  probably eight or ten times the amount of
11  sand that was actually sold. He looked at
12  that small amount of gravel that was
13  produced during that period of time and said
14  even though they were selling basically a
15  hundred percent of the 67 gravel that they
16  were producing, he looked at that small
17  amount of gravel that was being produced and
18  established a relationship between that and
19  the sand. Even though we're sitting there
20  on the sand side with ten times the sand
21  than you could -- than they were selling,
22  from an inventory standpoint, and assumed
23  that as the gravel production grew, that

Page 89

1  the -- and sales grew, that the sand would
2  grow along with it. And you were already in
3  a situation where you had more sand than you
4  could probably ever sell. And he assumed
5  that it would grow commensurate with the
6  gravel production. You know, I don't agree
7  with that approach. I just don't think
8  that's -- You know, if you were selling sand
9  along with the gravel and there was some
10  kind of relationship that was established
11  about we're producing X amount of sand -- I
12  mean, gravel and selling it, and we're
13  sealing the same percentage of sand and
14  there was some reasonable relationship
15  between the two, that might make sense. But
16  clearly in this case, they had more sand
17  than -- obviously they had problems with
18  sand across the board all during this period
19  of time.
20    Q.    And when you say problems with
21  sand, tell me what you mean.
22    A.    Selling it.
23    Q.    Selling?

23 (Pages 86 to 89)

FREEDOM COURT REPORTING

Page 102

1  outsourced and contracted out on the front
2  end of this. They may or may not delineate
3  as between overburden removal and normal
4  site prep type costs, but I would like to
5  see them. I'm sure there are repair records
6  that would provide a lot of information
7  about what was going on with respect to the
8  dredge of the plant, the operations of the
9  plant during this period of time.
10     Q.    Everything you've looked at
11  though, you got in these books though;
12  right?
13     A.    That's correct. Either that
14  or I've referenced it in my documents.
15     Q.    So if we've provided these
16  documents previously, your client's
17  attorneys and you just don't have them,
18  you're not blaming us for it, are you?
19     A.    No. If you've provided them,
20  I'm not blaming you.
21     Q.    You could have seen them
22  before you came in here and testified;
23  right?

Page 103

1      A.    I have asked for them. I
2  don't think they've been provided, but
3  anyway . . .
4      Q.    Sometimes -- Sort of as an
5  aside, as hard as we try to keep up with
6  everything that goes on, sometimes stuff
7  slips in and out of our office without us
8  knowing exactly what it is.
9      A.    That same thing happens to me.
10     Q.    In your written report -- And
11  I'm just trying to get how you did it. But
12  you come over here and you talk about the
13  amount of -- It's on page twelve. You know,
14  so what you're doing over on twelve is
15  you're taking Ben Johnston's hundred and
16  twenty tons an hour of 67 gravel, and that's
17  how you're coming up with forty-three hours
18  a week to produce the two sixty?
19     A.    Correct.
20     Q.    And so you're saying that if
21  you assume an eighty percent efficiency,
22  then that's where you come up with
23  fifty-four hours?

Page 104

1      A.    Correct.
2      Q.    And so that's why you are
3  saying that Les should increase his costs
4  for labor to get to that level -- I mean,
5  you're criticizing him because he didn't do
6  that?
7      A.    I mean, one of the -- I think
8  at a minimum, what's indicated from this is
9  more than one shift.
10     Q.    That's what I'm getting at.
11     A.    Yeah. And I think, in
12  actuality, there's more than that that would
13  be indicated -- I mean, normally -- and,
14  again, I'd love to see the earnings records,
15  and it might be helpful. And I'm not trying
16  to shoot at Les. I know the quality of
17  Les's work and I know what he normally
18  does --
19     Q.    I assume, you say you know the
20  quality --
21     A.    It's good. It's good. I
22  think Les didn't have time to do what he
23  normally does here. But in any event, I

Page 105

1  think that the -- what you've got is a
2  situation where -- and I hate to keep
3  harping on this, but if you're only
4  producing eight thousand tons a month, and
5  you're going to assume that you're going to
6  move to a twenty-two thousand ton per month,
7  or twenty-one-plus ton per month production
8  level, that it's just unrealistic to assume
9  that you're going to do that with the same
10  people that you did it producing and moving
11  around eight thousand tons of dirt.
12     Q.    And I've got to ask you, it
13  just seems to you that way --
14     A.    No.
15     Q.    -- or do you have an expertise
16  in sand and gravel mining and their staffing
17  and what was going on out there that allows
18  you to conclude that that's an unreasonable
19  assumption?
20     A.    Well, I mean, you just look,
21  Greg, at the tasks and activities that are
22  taking place, okay.
23        First off, you've got how many

27 (Pages 102 to 105)

# Johnco Materials, Inc (JMI)

### Proforma Income Statement
### (Based Upon May 2006 - September 2006 Historical Financial Statements)

| Sales Assumptions: | Tons | Price | Revenue |
|---|---|---|---|
| #67 Gravel | 150,000 | 5.51 | 826,500 |
| Oversized (1) | 4,486 | 8.50 | 38,131 |
| Sand (1) | 15,004 | 2.00 | 30,008 |
| Total | 169,490 | | 894,639 |

| Fuel Cost Assumptions: | Tons |
|---|---|
| Benchmark Production of #87 | 40,000 |
| Annualized Benchmark Production #87 | 96,000 |
| Annual Requirement #67 | 150,000 |

| Expenses | May 06 | June 06 | July 06 | Aug 06 | Sept 06 | Totals | Annualized | | Alexander's Incremental Costs | |
|---|---|---|---|---|---|---|---|---|---|---|
| Auto Expense | - | - | - | - | - | - | 5,968 | (2) | | |
| Bank Charges | - | 384 | 299 | 717 | 1,509 | 2,909 | 6,982 | | | |
| Amortization Expense | - | - | - | - | - | - | 1,103 | (2) | | |
| Depreciation | 2,345 | 2,345 | 2,345 | 2,345 | 2,345 | 11,725 | 28,140 | | | |
| Dues | - | - | 200 | 215 | - | 415 | 996 | | | |
| Contract Labor | - | 1,625 | - | - | 550 | 2,175 | 5,220 | | 5,220 | Contract Labor |
| Equipment Rental | 5,141 | 4,098 | - | 7,780 | 4,019 | 21,039 | 50,494 | | 50,494 | Equipment Rental |
| Fuel & Oil | 6,700 | 18,854 | 9,137 | 10,078 | 18,294 | 63,063 | 151,362 | | 151,362 | Fuel & Oil |
| Hauling Charges | - | 180 | - | 1,650 | - | 1,830 | 4,392 | | 4,392 | Hauling Charges |
| Travel | 337 | 277 | - | 146 | 111 | 871 | 2,090 | | | |
| Life insurance | - | 1,657 | 1,657 | 1,657 | 1,657 | 6,629 | 15,911 | | 15,911 | Life insurance |
| Insurance | 2,783 | 1,810 | - | - | - | 4,593 | 11,023 | | 11,023 | Insurance |
| Insurance - WC | - | - | - | 4,165 | - | 4,165 | 9,997 | | 9,997 | Insurance - WC |
| Interest | - | - | - | - | - | - | 223,932 | (2) | | |
| Cleaning | - | 100 | 75 | 125 | 100 | 400 | 960 | | | |
| Tax and License | - | - | 826 | - | - | 826 | 1,982 | | | |
| Misc Expense | 695 | - | - | - | - | 695 | 1,668 | | 1,668 | Misc Expense |
| Office Expense | - | 96 | 128 | 1,236 | 247 | 1,708 | 4,099 | | | |
| Postage | - | 78 | - | 78 | 39 | 195 | 468 | | | |
| Rent | 400 | 800 | - | 400 | 400 | 2,000 | 4,800 | | | |
| Repairs | 314 | 21,498 | 3,518 | 11,930 | 28,955 | 66,215 | 158,917 | | 158,917 | Repairs |
| Professional Fees | - | 400 | 300 | 800 | 400 | 1,900 | 4,560 | | | |
| Salaries | 18,771 | 23,734 | 18,366 | 21,839 | 13,651 | 96,362 | 231,269 | | 231,269 | Salaries |
| Small Tools | - | 454 | - | 208 | 290 | 952 | 2,286 | | 2,286 | Small Tools |
| Supplies | 1,119 | 5,545 | 980 | 854 | 4,559 | 13,058 | 31,338 | | 31,338 | Supplies |
| Payroll Taxes | 1,409 | 2,861 | 2,030 | 2,285 | 1,186 | 9,570 | 22,969 | | 22,969 | Payroll Taxes |
| Telephone | - | 576 | 232 | 1,220 | 334 | 2,381 | 5,667 | | | |
| Training | - | - | 150 | - | - | 150 | 360 | | 360 | Training |
| Utilities | 735 | 1,245 | 1,374 | 1,398 | 1,466 | 6,218 | 14,923 | | 14,923 | Utilities |
| Total Expenses | 40,750 | 88,567 | 41,468 | 71,128 | 80,113 | 322,026 | 1,003,866 | | | |

| Adjustments: | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Transportation (@ .25 per ton of gravel) | | | | | | 0.25 | 38,622 | | 38,622 | |
| Depletion (@ .40 ton of gravel) | | | | | | 0.40 | 61,794 | | 61,794 | |
| Increase in fuel costs (increase to 150k tons per year) (3) | | | | | | | 85,158 | | 85,158 | |
| Overburden Removal (not yet considered) | | | | | | | xx | | xx | |
| Reclamation (not yet considered) | | | | | | | xx | | xx | |
| Normalized Annualized Expenses | | | | | | | 1,189,440 | | 887,723 | Normalized Incremental Expenses |
| Estimated Annual Revenues | | | | | | | 894,639 | | 894,639 | Estimated Annual Revenues |
| Estimated Annual Net Income (Loss) | | | | | | | (294,801) | | (3,084) | Restated Lost Profits Per Year |

Note: Estimated #67 gravel production during the months of May 2006 through September 2006 was only
8,000 tons per month. In order to meet the production requirement in the CYDI Supply Agreement
JMI would have to produce 12,500 tons of #67 gravel per month. While it is clear that many of the
operating expenses would increase incrementally with the increased volume, for purposes of this calculation
all of these expenses, other than fuel, have been left constant which is consistent with Alexander's
calculation.

(1) Based on actual sales from January 2006 through June 2007. (Sales / 18 months * 12 months).
    Oversized = 6,729 / 18 * 12 = 4,486.
    Sand = 22,506 / 18 * 12 = 15,004.

(2) Used actual 12 month expense from Johnco Profit and Loss Statement.

| (3) $63,063 / 40,000 tons = | 1.577 per ton |
|---|---|
| 150,000 annual required tons = | 236,550 |
| 96,000 annualized tons = | 151,392 |
| Fuel Cost Increase (Alexander) | 85,158 |

Borden - 0350

# EXHIBIT
# E

# TUSCALOOSA COURT REPORTING
## Merrill Legal Solutions

---

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA


JOHNCO MATERIALS, INC., )
        PLAINTIFF, )
VS.                ) CIVIL ACTION NO.
CONRAD YELVINGTON    ) CV 06-2:06CV993-10
DISTRIBUTORS, INC.,  )
        DEFENDANT.  )




DEPOSITION OF
J. LESTER ALEXANDER, III
NOVEMBER 29, 2007




DEBORAH S. RANDALL, Commissioner
ACCR #: 238
EXPIRATION DATE: SEPTEMBER 30, 2008

---

Page 3

1  questions, and that counsel for the parties
2  may make objections and assign grounds at
3  the time of the trial, or at the time said
4  deposition is offered in evidence or prior
5  thereto.
6        IT IS FURTHER STIPULATED AND
7  AGREED that notice of filing of this
8  deposition by the Commissioner is waived.
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

---

Page 2

1        S T I P U L A T I O N
2        IT IS STIPULATED AND AGREED, by
3  and between the parties through their
4  respective counsel, that the deposition of
5        J. LESTER ALEXANDER, III
6  may be taken before Deborah S. Randall,
7  Commissioner and Notary Public, State of
8  Alabama at Large, at the law offices of
9  Junkin, Pearson, Harrison & Junkin, L.L.C.,
10  601 Greensboro Avenue, Suite 600,
11  Tuscaloosa, Alabama 35401, on the 29th day
12  of November, 2007.
13        IT IS FURTHER STIPULATED AND
14  AGREED that the signature to and the reading
15  of the deposition by the witness is not
16  waived, the deposition to have the same
17  force and effect as if full compliance had
18  been had with all laws and rules of Court
19  relating to the taking of depositions.
20        IT IS FURTHER STIPULATED AND
21  AGREED that it shall not be necessary for
22  any objections to be made by counsel as to
23  any questions, except as to form or leading

---

Page 4

1        I N D E X
2  EXAMINATION BY            PAGE NUMBER
3  Mr. Leek              6 - 263
4
5
6        E X H I B I T S
7  Defendant's Exhibit No. 1          11
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

---

612 Lurleen Wallace Blvd., N. * Tuscaloosa, Alabama 35401 * www.legalink.com
(205) 758-4006 * (800) 844-3370 * Fax (205) 758-4371

# TUSCALOOSA COURT REPORTING
## Merrill Legal Solutions

Page 5

1  BEFORE:
2        Deborah S. Randall, Commissioner.
3  APPEARANCES:
4        JUNKIN, PEARSON, HARRISON &
5  JUNKIN, L.L.C., by Mr. H. Gregory Pearson,
6  601 Greensboro Avenue, Suite 600,
7  Tuscaloosa, Alabama 35401, appearing for the
8  Plaintiff.
9        COBB & COLE, by Mr. Thomas J.
10 Leek, 150 Magnolia Avenue, P. O. Box 2491,
11 Daytona Beach, Florida 32115-2491, appearing
12 for the Defendant.
13
14 ALSO PRESENT:
15       Mr. W. Dane Floyd.
16
17
18
19
20
21
22
23

Page 6

1        I, Deborah S. Randall, a Court
2  Reporter of Tuscaloosa, Alabama, and a
3  Notary Public for the State of Alabama at
4  Large, acting as Commissioner, certify that
5  on this date, as provided by Rule 30 of the
6  Alabama Rules of Civil Procedure, and the
7  foregoing stipulation of counsel, there came
8  before me at the law offices of Junkin,
9  Pearson, Harrison & Junkin, L.L.C., 601
10 Greensboro Avenue, Suite 600, Tuscaloosa,
11 Alabama 35401, beginning at or about 10:50
12 a.m., J. LESTER ALEXANDER, III, witness in
13 the above cause, for oral examination,
14 whereupon the following proceedings were
15 had:
16
17       J. LESTER ALEXANDER, III,
18
19 being first duly sworn was examined and
20 testified as follows:
21
22 EXAMINATION BY MR. LEEK:
23 Q.      Good morning, Mr. Alexander.

Page 7

1  Will you state your full name for the
2  record, please?
3  A.      It's Julian Lester Alexander,
4  III.
5  Q.      And the name of your company?
6  A.      Accounting Economics & Appraisal
7  Group, L.L.C.
8  Q.      Thank you.  We're going to go
9  through a couple of preliminary matters
10 here, but just so I can have a clear record,
11 have you ever done any work for Conrad
12 Yelvington Distributors, Inc.?
13 A.      No, not to my knowledge.
14 Q.      Have you ever done any work for
15 any Conrad Yelvington Distributors, Inc.
16 subsidiary or related company?
17 A.      I don't know even who their
18 subsidiaries are, so I don't know.
19 Q.      Fair enough.  You'll hear me
20 refer to Conrad Yelvington Distributors,
21 Inc. as CYDI, Yelvington, Yelvington
22 Distributors throughout the course of the
23 deposition and I need you to understand I'm

Page 8

1  talking about Conrad Yelvington
2  Distributors, Inc.; is that fair?
3  A.      I guess so.
4  Q.      Okay.  Do you anticipate having
5  any trouble understanding if I say
6  Yelvington Distributors who I'm talking
7  about?
8  A.      No.  I just want to make sure I
9  understand you're talking about the party in
10 the case?
11 Q.      I am.
12 A.      I understand that, yes.
13 Q.      Prior to this engagement have you
14 done any work for Johnco Materials, Inc.?
15 A._     No.
16 Q.      Throughout the course of the
17 deposition I'm going to refer to Johnco
18 Materials, Inc. as Johnco or JMI?  If I say
19 those things, you'll understand that I'm
20 talking about Johnco Materials, Inc.; is
21 that correct?
22 A.      Correct.
23 Q.      Prior to this matter have you

2  (Pages 5 to 8)

# TUSCALOOSA COURT REPORTING
## Merrill Legal Solutions

Page 9

1  done any work for Clatus Junkin?
2  A.    No.
3  Q.    Prior to this matter have you
4  done any work for Mr. Pearson?
5  A.    No.
6  Q.    Prior to this matter have you
7  done any work for Mr. Pearson and Mr.
8  Junkin's law firm?
9  A.    No.
10 Q.    Have you ever done any work for a
11 law firm known as Bradley, Arant or Arant?
12 A.    Yes.
13 Q.    How much work have you done for
14 Bradley, Arant?
15 A.    I started in about 1993, actually
16 before 1993 when I really started focusing
17 on forensic accounting. It may date back
18 into the '80s. It's hard to say. A long
19 time.
20 Q.    Then if you could estimate for me
21 how may times you've been associated with
22 Bradley, Arant or hired by Bradley, Arant?
23 A.    Far too many times to estimate.

Page 10

1  A substantial number of times.
2  Q.    More than a hundred?
3  A.    Oh, I don't know. I stopped
4  counting a long time ago, but many, many,
5  many times. It could easily be more than a
6  hundred times, but I don't know.
7  Q.    Are you currently doing any work
8  for Bradley, Arant?
9  A.    Yes.
10 Q.    And the work that you're doing
11 for Bradley, Arant, that's unrelated to
12 anything having to do with this case; is
13 that correct?
14 A.    That's correct.
15 Q.    Have you had any relationship
16 with U.S.A. Ready Mix either directly or
17 through Bradley, Arant?
18 A.    I go to church with Mark Tyson,
19 but no, not his company.
20 Q.    Okay. Let's go through the
21 binder I have before you here. What we've
22 done is we've pulled documents that were
23 given to us I think almost exclusively by

Page 11

1  you or documents that we've given to you,
2  such as the subpoena, or that you have
3  received from Mr. Pearson or Mr. Harrison.
4      If we could have this marked as
5  Defendant's Composite Exhibit 1, you'll note
6  the tabs inside. A, B, C, D, E, F and G I
7  think all have material under them and then
8  we'll use this throughout the day to get
9  through the deposition.
10     (Whereupon, Defendant's Composite
11         Exhibit #1 was marked for
12         identification and attached to
13         the original of the transcript.)
14 A.    I would like to use my work too.
15 So could I get it back?
16 Q.    Sure. Sure. To the extent you
17 need to refer to that, we'll do it.
18 A.    Yeah, I probably will need to
19 refer to it. I don't know that I'll need
20 this. If you still -- if Dane still needs
21 to look at binder 2 of 2, I don't think I'll
22 need it.
23     MR. FLOYD: I'm good.

Page 12

1      MR. LEEK: Would you mind
2  sticking that back in the box?
3      MR. FLOYD: Yeah.
4  Q.    If you could turn to defendants
5  composite Exhibit A, and specifically the
6  Exhibit A to Exhibit A, do you see -- do you
7  recognize this to be a subpoena duces tecum
8  served on you?
9  A.    Yes.
10 Q.    And the information requested in
11 Exhibit A 1 through 4, have you brought that
12 information with you here today?
13 A.    I've done my best. Let me
14 re-read it just to make sure.
15 Q.    Sure.
16 A.    I've brought everything except in
17 number 3. It's so broad. I'm sure there is
18 information that is relevant to my opinions
19 that I'm relying on that is not in that box,
20 but it would be material that represents
21 written or oral evidence in this case.
22 Q.    Can you tell me, for example,
23 what you're talking about?

3 (Pages 9 to 12)

# TUSCALOOSA COURT REPORTING
## Merrill Legal Solutions

Page 13

1  A.      I don't have a copy of some of
2  the depositions, but I've read portions of
3  them. I just didn't keep a copy of them.
4  Q.      Okay. How would you -- did you
5  get them electronically, is that what you're
6  telling me? I mean, how would you -- I
7  guess what I'm asking --
8  A.      It was handed to me and I read
9  it.
10  Q.      Okay. And then you didn't retain
11  them?
12  A.      No.
13  Q.      Well, let's go through these.
14  Have you provided here today all documents
15  contained in your file regarding this
16  matter?
17  A.      Yes.
18  Q.      How about all recorded
19  communications and/or correspondence between
20  you and any individual, including but not
21  limited to the plaintiff, agent of Mr.
22  Junkin, Mr. Junkin?
23  A.      Yes.

Page 14

1  Q.      Are there other items besides
2  deposition transcripts that you've relied
3  upon in formulating your opinions that you
4  have not brought with you here today?
5  A.      Not that I can specifically
6  identify at this time. Deposition,
7  deposition exhibits, I would include both of
8  those, but that's such a broad category I
9  just wanted to reserve the right that if
10  there's something I might know, have been
11  taught, have previously read that is
12  relevant and I want to make sure you know
13  I'm intending to rely on that if you happen
14  to ask me a question that's relevant to
15  something that I'm trained in my trade to
16  know. I didn't bring a bunch of accounting
17  books and they're relevant to this. Cost
18  accounting information, I didn't bring any
19  of that.
20  Q.      I'm more interested in any
21  specific evidence, or I should say evidence
22  specific to this case that you may have
23  relied upon that's not contained, and you've

Page 15

1  given us a list at one point of the items
2  that you relied on in giving your report.
3  Is there anything else that is specific to
4  this case, evidence specific to this case
5  that you relied upon that is not with you
6  here today?
7  A.      Yeah. Well, the list is actually
8  at the time I did my report what I
9  considered in issuing the report.
10  Q.      Right.
11  A.      There's more information that I
12  considered after issuing my report and, you
13  know, so it's not necessarily a list of what
14  I relied on. And two, the only reason I am
15  qualifying my answer on number 3 is because
16  that is very broad, but I think I understand
17  your question. I believe I have brought
18  everything that would be responsive to a
19  similarly worded item that was not so broad
20  as to reach into, you know, anything
21  possible that I might need to rely on in
22  response to a question that I can't possibly
23  anticipate because you haven't asked it yet.

Page 16

1  Q.      Sure. My question specifically
2  to you, is there anything of evidence
3  specific to this case that you've relied
4  upon that you have not brought with you here
5  today?
6  A.      The question relied on I don't
7  know. The question that I have looked at
8  and read depositions and certain deposition
9  excerpts that I did not bring with me
10  because I did not keep them.
11  Q.      And which ones were those?
12  A.      Mr. -- I think -- I can't
13  remember which Yelvington, if there's more
14  than one, but a Yelvington deposition.
15  Q.      That would be Gary Yelvington. I
16  think he's the Yelvington that's been
17  deposed.
18  A. -    Okay. Well, you can help me with
19  that. Thank you. And then Klebe and
20  exhibits to his deposition. I've looked at
21  some testing results on the site. All of
22  that was done more in a confirming manner,
23  in other words, not necessary to form the

4  (Pages 13 to 16)

# TUSCALOOSA COURT REPORTING
## Merrill Legal Solutions

Page 17

1  basis for my opinion, but I looked at it as
2  a confirming step.
3  Q.      Any other depositions besides Mr.
4  Yelvington's and Mr. Klebe's?
5  A.      I don't know.  I don't remember.
6  Could be.
7  Q.      And I believe you said you
8  disposed of the depositions of Mr.
9  Yelvington and Mr. Klebe that you had
10 received?
11 A.      I mean, I would tell you I never
12 really took them into my custody.  Someone
13 handed me -- counsel handed me their copy, I
14 read it, and then I gave his copy back to
15 him.
16 Q.      Okay.  Let's focus on that for a
17 second.  Have you been handed anything else
18 by counsel which you reviewed but did not
19 retain?
20 A.      Possibly, but not that I can
21 remember at this time.  In other words, I'm
22 trying to tell you everything.
23 Q.      Sure.

Page 18

1  A.      I'm not trying to play a game.
2  Q.      I appreciate that.  By counsel
3  who are you referring to specifically?
4  A.      Mr. Pearson definitely and maybe
5  others.  I mean, I don't remember.
6  Q.      Do you recall being handed
7  anything by Mr. Harrison?
8  A.      There was a meeting initially in
9  the case and I got handed a lot of stuff by
10 a lot of people and I don't remember who
11 handed it to me.
12 Q.      Was Mr. Harrison --
13 A.      And I don't remember if it was
14 anything related to a deposition exhibit or
15 not, but it could have been.  I don't
16 remember.
17 Q.      Was Mr. Harrison present at that
18 meeting?
19 A.      I think so.  But I'll be quite
20 honest with you, I don't think I could tell
21 you everyone's name that was in that
22 meeting.
23 Q.      How many people were in that

Page 19

1  meeting?
2  A.      Off and on two to three.
3  Q.      And would people rotate out?  Is
4  that what you're telling me by off and on?
5  A.      Yeah.  And it was one of my -- I
6  think my initial meeting, so it was early in
7  the case and I had never meet anybody
8  before.  So, you know, it's one of those get
9  introduced and then try to remember whose
10 name is who.
11 Q.      Sure, I understand.  Was Mr.
12 Junkin there?
13 A.      Yes.
14 Q.      Was Mr. Pearson there?
15 A.      Yes.
16 Q.      Do you recall whether any other
17 attorneys appeared on behalf of Johnco at
18 that meeting?
19 A.      That sounds like a technical
20 question.  I'm not sure I know how to answer
21 that, but there were other people there.
22 Q.      Do you recall whether any of them
23 were attorneys for Johnco?

Page 20

1  A.      I don't have that kind of
2  information.  I don't know who's
3  representing who.
4  Q.      Well, you didn't --
5  A.      At that time that was my first
6  meeting.
7  Q.      Sure.  You didn't meet with
8  anybody representing Yelvington; right?
9  A.      No.
10 Q.      So the only party represented in
11 that meeting would have been Johnco?
12 A.      Yeah.  I'm really not
13 understanding the line of questions.  I'm
14 not intending to say anything to confuse
15 you, so I'm not understanding where this is
16 going.
17 Q.      Okay.  Don't --
18 A. _    I met with the parties, counsel
19 that hired me and with Mr. Junkin and I
20 assumed people in that room were either
21 representing him or were representatives of
22 him.
23 Q.      Okay.

5 (Pages 17 to 20)

# TUSCALOOSA COURT REPORTING
## Merrill Legal Solutions

### Page 21

1    A.    But I don't know.
2    Q.    But you don't know who those
3    people were?
4    A.    I mean, I have a vague
5    recollection, but I don't know what role
6    they played in this case or anything.  I
7    mean, I was doing my due diligence about
8    what's going on, tell me what the story is,
9    what are the facts, what happened, and so,
10    you know, Mr. Junkin was important to me.  I
11    needed to interview him to find out, and
12    there were other people as I was asking
13    questions that were coming in and out and
14    getting information and giving me stuff.
15    Q.    And let me give you -- before I
16    went with the standard deposition
17    instructions because you've done this
18    before, but let me give you this one.  When
19    you're answering my question, just try to
20    answer the question that's been asked.
21    Don't try to worry about where I'm headed.
22    I just need you to focus and answer the
23    question that's been asked; okay?

### Page 22

1    A.    I understand.  And you need to
2    understand I was trying to tell you that I
3    did not understand your question.
4    Q.    I appreciate that.  When was that
5    meeting?
6    A.    Shortly before the date of my
7    report.
8    Q.    Was it before — what was the
9    first contact you had with anybody on behalf
10    of Johnco?  Was it by telephone?
11    A.    Telephone.
12    Q.    How long after that telephone
13    call was your meeting?
14    A.    My recollection is shortly after
15    that telephone call.
16    Q.    Do you recall the date of that
17    telephone call?
18    A.    I don't, but it was shortly
19    before the date of my report.
20    Q.    And we'll go through this and
21    establish a time line, but I think when we
22    read the e-mails to you that the date of
23    that telephone call was probably July 31st.

### Page 23

1    Does that help you recall when it was?
2    A.    I mean, I don't understand your
3    question.  If you've read the e-mail and you
4    know it's July 31st, fine.  I've already
5    said I don't remember.
6    Q.    Okay.
7    A.    But if you want to show me the
8    e-mail, I can look at it and maybe it'll
9    refresh my memory.
10    Q.    We'll do it.  We're just trying
11    to get through some preliminary stuff here.
12    You also said that you I guess reviewed some
13    testing results?
14    A.    Yes.
15    Q.    And those testing results aren't
16    with your production here today; is that
17    correct?
18    A.    No.  I didn't take them into
19    possession.
20    Q.    And how did you get those testing
21    results?
22    A.    From counsel for Johnco.
23    Q.    Was that also at the same

### Page 24

1    meeting?
2    A.    No.
3    Q.    Was that after the report was
4    issued?
5    A.    Yes.
6    Q.    How many times have you reviewed
7    the deposition transcripts of Mr. Junkin?
8    A.    I don't know.  Several times.
9    Q.    How about Mr. Johnston?
10    A.    I don't know.
11        MR. PEARSON:  Which one?
12        MR. LEEK:  I'm sorry.  Good
13    point.
14    A.    Yeah.
15    Q.    Pep Johnston?
16    A.    At least twice.
17    Q.    And how do you know it's at least
18    twice?
19    A.    Because I examined it in the
20    process of issuing the report and I
21    re-examined it after issuing the report.
22    Q.    How long was your meeting with --
23    I'm sorry.  Let me step back a second.  Did

6 (Pages 21 to 24)

# TUSCALOOSA COURT REPORTING
## Merrill Legal Solutions

Page 25

1   you have one meeting, face-to-face meeting
2   with the Johnco people between the time you
3   were hired and issuing your report?
4   A.      Yes.
5   Q.      How long was that meeting?
6   A.      I don't recall.
7   Q.      Was it more than five minutes?
8   A.      Yes.
9   Q.      Was it less than a day, workday?
10  A.      That I don't recall whether it
11  was -- first of all, I don't know what you
12  would call a full workday. I would call a
13  full workday eight hours. I don't remember.
14  I do remember that it was the bulk of the
15  day, that there was travel involved.
16  Q.      Where did that meeting take
17  place?
18  A.      In this office right here.
19  Q.      And you traveled from Birmingham;
20  is that correct?
21  A.      I did.
22  Q.      Well, can you estimate your
23  face-to-face time with the Johnco people in

Page 26

1   that meeting?
2   A.      I might be able to.
3   Q.      Would you, please?
4   A.      You'll have to let me get that
5   box.
6   Q.      Sure. Go ahead.
7   A.      I can.
8   Q.      How long was that face-to-face
9   time?
10  A.      Three-and-a-half hours.
11  Q.      Do you recall how many different
12  documents and pieces of evidence you
13  reviewed in that three-and-a-half hours?
14  A.      No.
15  Q.      Do you recall anything else that
16  you received, reviewed but returned in that
17  three-and-a-half hours other than the
18  depositions of Mr. Junkin and the Johnstons?
19  A.      I don't think that's a fair
20  characterization of my testimony.
21  Q.      Okay. Elaborate.
22  A.      You'll have to rephrase the
23  question because I don't understand it.

Page 27

1   Q.      All right. You said that in your
2   initial meeting with Johnco you reviewed but
3   did not retain the depositions of Mr. Junkin
4   and the Johnstons; is that correct?
5   A.      No.
6   Q.      Did you review the depositions of
7   Mr. Junkin and the Johnstons in your initial
8   meeting with Johnco?
9   A.      No.
10  Q.      When did you review them?
11  A.      In the course of writing my
12  report and doing the work necessary to
13  support my report.
14  Q.      I think I -- I think I must have
15  misunderstood. You testified earlier that
16  you were handed the deposition transcripts;
17  correct?
18  A.      Not of those two individuals but
19  of that Klebe and -- of your clients.
20  Q.      Right.
21  A.      And I did not retain them.
22  Q.      In the initial meeting that you
23  had with them were you also given the

Page 28

1   deposition transcripts of Mr. Junkin and the
2   Johnstons?
3   A.      I was not given any deposition
4   transcripts in the initial meeting.
5   Q.      Were you given those deposition
6   transcripts prior to issuing your report?
7   A.      I don't know whether we were able
8   to get the transcripts. I don't know what
9   the time line. I don't remember the time
10  line. I remember that there were some
11  timing issues and I remember that we worked
12  around those timing issues and that's the
13  reason after I issued my report I re-read
14  those depositions.
15  Q.      Okay.
16  A.      But I can't recall any more
17  than -- there was an extremely short time
18  frame between when I was retained and when I
19  issued my report, and I just -- it was a lot
20  of running around doing all kind of stuff to
21  meet that deadline. And I just can't tell
22  you today what I did, when I did it, except
23  that I know what I did before the report

612 Lurleen Wallace Blvd., N. * Tuscaloosa, Alabama 35401 * www.legalink.com
(205) 758-4006 * (800) 844-3370 * Fax (205) 758-4371

## TUSCALOOSA COURT REPORTING
## Merrill Legal Solutions

Page 29

1  went out and I know what I did after the
2  report went out.
3  Q.      Are you billing Johnco by the
4  hour?
5  A.      I sure am.
6  Q.      Do you provide written
7  descriptions of your time spent by the hour
8  or some portion of it to Johnco?
9  A.      We use full format billing on
10  most matters unless we're asked not to.
11  Q.      Can you tell me what full format
12  billing means?
13  A.      By person, by day, by task.
14  Q.      So if you had reviewed the
15  deposition transcripts of Mr. Junkin and the
16  Johnstons would that be reflected in one of
17  your bills?
18  A.      It might be; it might not be. I
19  mean, it depends on the task. I mean,
20  reviewing the deposition transcript is what
21  is done but the task may be something else.
22  Q.      Like what?
23  A.      Analyzing the financial history.

Page 30

1  Q.      So --
2  A.      It's hard to just look at
3  numbers. You might have to read what
4  somebody said about them to understand what
5  you're looking at.
6  Q.      So you would include reviewing
7  the deposition transcripts of a party under
8  the term "analyzed financial history"?
9  A.      No. I just answered your
10  question. I'm not going to set any rules
11  about how I write down what I do. I write
12  down what I do and my folks write down what
13  they do based on what they are doing. And,
14  you know, if they were assigned the task,
15  "Go read the deposition," it might say "read
16  deposition". But if they were assigned the
17  task, "Go solve this problem or go get the
18  real answer and tell me what the facts are,"
19  they're professionals. They're going to do
20  whatever they need to do to get it and then
21  they're going to write down what they did
22  based on their judgment so that I understand
23  they followed my direction and worked under

Page 31

1  my supervision and did properly what they
2  were supposed to do.
3  Q.      Sure. I understand that.
4  A.      I mean, I've got my bills right
5  here if you want to go through them. I'm
6  happy to answer any specific question and
7  give you my best recollection now. I'm just
8  not going to set any rules or standards.
9  Q.      Do you have any recollection
10  specifically of you yourself reviewing the
11  deposition transcripts of Mr. Junkin and the
12  Johnstons prior to issuing the report on
13  August the 8th?
14  A.      I do not have any specific
15  recollection of the series and timing of
16  events. And I myself, to the extent any
17  deposition transcript was reviewed, I did
18  not do it because I did not have time to do
19  it.
20  Q.      Who would have reviewed it in
21  your office?
22  A.      Others. Well -- yes, others. If
23  it were -- see, sitting here today I don't

Page 32

1  know when the transcripts were available, I
2  don't remember when they were taken, and I
3  remember that it was coming down to the
4  wire. So it's possible that a deposition
5  was taken and someone on my staff received a
6  telephone call and then my person
7  interviewed the lawyer who took that
8  deposition to find out what the answers were
9  to the questions we were concerned about or
10  wanted to know the answers to.
11  Q.      If that were the case, how would
12  you indicate that on the information
13  received -- excuse me, the information
14  relied upon in the report? You're familiar
15  with Appendix 8, list of information
16  considered; correct?
17  A.      I am.
18  Q. -    If you had not reviewed the
19  transcript or someone in your company had
20  not reviewed the transcript but had instead
21  interviewed someone, how would that be
22  referenced on Appendix 8 or on any list of
23  information considered?

8 (Pages 29 to 32)

# TUSCALOOSA COURT REPORTING
## Merrill Legal Solutions

Page 33

1   A.       I'm not sure that it would be.
2   That's the reason I'm having trouble
3   answering your question.
4   Q.       Okay. But if you write down that
5   you reviewed or relied upon the deposition
6   transcripts of Mr. Junkin and the Johnstons,
7   does that mean that you actually reviewed
8   those transcripts in this case?
9   A.       Flip back to that page you're
10  looking at in my report and look at the
11  title of that.
12  Q.       List of Information Considered.
13  A.       Yeah, that's what that is. So
14  based on that I don't understand your
15  question.
16  Q.       Well, the question is simply if
17  you wrote it down here that you considered
18  the depositions of Ben Johnston, Presley
19  Morgan Johnston and Clatus Junkin, does that
20  mean that you or someone in your office
21  reviewed the deposition transcripts?
22  A.       It could.
23  Q.       What else could it mean?

Page 34

1   A.       It could mean that they talked to
2   the lawyer after the deposition was taken to
3   find out what they said.
4   Q.       Okay. Let's go back here.
5   You've listed three things that are not in
6   your file that you've brought here today but
7   you at least reviewed. If those are your
8   billing records, please don't put those away
9   yet. They were Mr. Yelvington's deposition,
10  Mr. Klebe's deposition and some testing
11  results. Is there anything else?
12  A.       There may be. I don't remember.
13  Q.       Is there anything that would help
14  you remember?
15  A.       I have no idea.
16  Q.       Well, would they be in the
17  billing records if you reviewed or looked at
18  something?
19  A.       We can look and see. I have no
20  idea.
21  Q.       Why don't we do that? If you'd
22  get your billing records for me. You can
23  hold onto them. Is there anything -- if you

Page 35

1   could review those billing records, please,
2   and tell me if there's anything in there
3   that helps jog your memory of whether you've
4   reviewed something that's not brought with
5   you here today or relied upon something that
6   was not brought with you here today?
7   A.       Other than what I've already
8   testified to?
9   Q.       Yes. While you're reviewing
10  those, if you would also note any entry that
11  would indicate that you reviewed the
12  deposition transcripts or someone in your
13  office reviewed the deposition transcripts
14  of Mr. Junkin and the Johnstons prior to
15  August the 8th?
16  A.       If I see anything in addition to
17  what I've already answered, I'll let you
18  know. Okay. What was your question?
19  Q.       The question was is there
20  anything in those billing records that
21  refreshes your recollection of whether you,
22  first, reviewed or relied upon anything that
23  you haven't brought with you here today

Page 36

1   other than the three things you've told me?
2   A.       There's nothing in there that
3   refreshes my recollection about that.
4   Q.       And then second, is there
5   anything in those billing records that
6   indicates to you that you or someone in your
7   office reviewed the deposition transcripts
8   of Mr. Junkin and the Johnstons prior to
9   issuing your report on August the 8th?
10  A.       I have nothing to add to my
11  testimony.
12  Q.       So that means there's nothing in
13  there that causes you to think that this is
14  the one that we looked at; is that correct?
15  A.       No. Well, there's definitely
16  entries in there that support my testimony.
17  We considered the deposition testimony
18  before. If I can get out the dates, then I
19  can remember when they were taken. We were
20  provided access to either depositions or
21  people to tell us what, depending on what it
22  was, and because of that I, when I received
23  the actual -- the full transcript and got

9 (Pages 33 to 36)

# TUSCALOOSA COURT REPORTING
## Merrill Legal Solutions

Page 37

1  authority to read those depositions, read
2  them, and my bills confirmed that when I
3  looked at them. Okay. So we considered the
4  testimony before. You have to remember, I
5  had access to those people and I could
6  interview them and I had interviewed them.
7  And then I read their sworn testimony after
8  to make sure that what they told me is what
9  they testified to, and with respect to my
10  report I found that to be the case.
11  Q.    I guess my curiosity is, if you
12  relied upon an interview, why would you say
13  depositions of in Appendix 8?
14  A.    I just tried to answer your
15  question. I said I don't recall.
16  Q.    Well, take it out of the specific
17  situation. If you in a general sense rely
18  on an interview, why would you refer to that
19  as considering a deposition of them?
20  A.    I didn't say that's what I did.
21  Q.    I'm not -- take it out of this
22  specific situation and talk to me generally.
23  A.    I want to make sure I understand

Page 38

1  all your hypotheticals. What are you asking
2  me to assume?
3  Q.    I want you to assume that we're
4  not in this specific situation.
5  A.    Okay.
6  Q.    Assume that you've relied upon an
7  interview instead of reviewing a deposition
8  transcript.
9  A.    Instead of considering the sworn
10  testimony?
11  Q.    Yes.
12  A.    Okay. You're assuming that I
13  have to have the deposition and I have to
14  read it, that I can't talk to somebody who
15  attended that deposition and have them
16  inform me of what the answers are. That's
17  your assumption? I don't agree with it, but
18  I just want to make sure that's your
19  assumption.
20  Q.    Right.
21  A.    Is there anything on that list
22  that would say that I did that?
23  Q.    That you interviewed somebody?

Page 39

1  A.    That I talked to someone who
2  attended the deposition, asked them what was
3  testified to, and then later confirmed it
4  myself by reading the deposition?
5  Q.    Not that I see.
6  A.    I'm asking you is that your
7  question?
8  Q.    Yeah. Can you point to
9  something?
10  A.    Well, what I did later happened
11  after the date of that report. You will not
12  find that on there. You'll find it in my
13  billing records.
14  Q.    And I'm not interested in that.
15  I'm talking about the report now.
16  A.    Considering deposition testimony
17  is on that list.
18  Q.    It actually doesn't say
19  deposition testimony, does it? You have it
20  under your Tab B.
21  A.    I know you're a lawyer and you
22  mince words, but it says -- I wrote that
23  list. It says what I considered and it's

Page 40

1  the depositions of Ben Johnston, Morgan --
2  Presley Morgan and Clatus Junkin, and what
3  that means to me is their testimony.
4  Q.    Whether it occurred at a
5  deposition or an interview; is that correct?
6  A.    No, that's not what that says.
7  That is not correct.
8  Q.    Well, I'm trying to figure out
9  the distinction here. Because, you know,
10  reading it straightforward it says
11  depositions, which I think would cause most
12  people to conclude that you reviewed the
13  depositions. But what you're telling me is
14  you would call it reviewing a deposition
15  even if you only spoke to somebody who was
16  at the deposition; is that correct?
17  A.    No, that's not correct. I'm
18  done.
19  Q.    Well, what would make that
20  correct?
21  A.    I have no idea.
22          MR. PEARSON: I've got to object
23  to the form of that. I'm not sure you can

10 (Pages 37 to 40)

# TUSCALOOSA COURT REPORTING
## Merrill Legal Solutions

Page 41

1  make something incorrect correct if you
2  don't change it.
3  A.    Don't let me distract you.  You
4  can ask me a question any time.
5  Q.    Well, let's see if we can wrap
6  this up here.  Is it fair to say you have no
7  specific recollection of whether you
8  reviewed the deposition transcripts of Mr.
9  Johnston, Johnston and Junkin prior to
10  August the 8th issuing the report?
11  A.    Let me just pull this stuff out
12  so I can answer your very specific questions
13  to something that happened a long time ago.
14  I don't need that.
15  Q.    You're going to need it because
16  we're going to be referring to it.
17  A.    Excuse me.  I'm trying to answer
18  your questions.  I don't need that.
19  Q.    Sure.
20  A.    My assistant is going to be so
21  mad at me for screwing this up.
22      MR. PEARSON:  Debbie, let's go
23  off for just a second.

Page 42

1      (Whereupon, a short break was
2      taken.)
3  Q.    (By Mr. Leek) Mr. Alexander,
4  there was a question pending before we took
5  a break for your review of the documents,
6  but I'm concerned that you discussed your
7  deposition testimony and specifically the
8  question pending with counsel during the
9  break.
10      Did you discuss the deposition
11  testimony with counsel during that break?
12  A.    I didn't discuss the testimony.
13  I discussed the question.
14  Q.    Okay.  So you discussed the
15  question that was being asked; is that --
16  A.    Yes.  I expressed my frustration
17  with it because I think I've already
18  answered it, and I'm continuing to review
19  documents now so that I can better answer
20  the question when you ask it again.
21  Q.    And just for purposes of -- you
22  know, you've been an expert I don't know how
23  many times so I assume that you know these

Page 43

1  things, but for purposes of going forward,
2  you are not permitted to discuss your
3  deposition testimony or the questions while
4  one is pending on a break; is that something
5  you understand?
6      MR. PEARSON:  I'd object to that
7  because I don't think that's true.  I think
8  he can discuss anything he wants and then
9  tell you what he discussed, so.
10  Q.    Well, just so you understand --
11  you don't have to agree with it.  You can
12  conduct yourself any way you want, but just
13  so you understand what I'm putting forward.
14  Do you understand what I'm saying?
15  A.    No.  What are you asking me to
16  do?
17  Q.    I'm asking you not to discuss
18  your testimony, whether it be questions or
19  testimony, while a question is pending if
20  we're on a break with the attorneys or
21  anyone else.
22      MR. PEARSON:  Well, let me state
23  for the record since you stated for the

Page 44

1  record, I can assure you he didn't discuss
2  his testimony with me in any way, shape or
3  form on that break.
4  A.    That is true.  I did what I said
5  I did.  I discussed my frustration level
6  with the line of questioning and I did
7  discuss my questioning as to why you
8  continue to ask these questions and then
9  expressed what I was doing, which was going
10  through this box to figure out what you keep
11  asking me what did you or your consultant
12  over there that makes you keep asking me the
13  same question over and over again that I've
14  answered so many times.
15  Q.    I'm sorry to --
16  A.    And so I've refreshed my memory
17  and I now have -- it's as refreshed as it's
18  going to get, my recollection and I'm
19  prepared for your question.
20  Q.    There was a question pending.
21      MR. LEEK:  Madam Court Reporter,
22  if you don't mind, I hate to have to take
23  you through this, but if you could read it

11 (Pages 41 to 44)

# TUSCALOOSA COURT REPORTING
## Merrill Legal Solutions

Page 45

1  back for me, I would appreciate it.
2          (Whereupon, the following
3          question was read back by the
4          Court Reporter, as requested:
5          Q.      Well, let's see if we
6          can wrap this up here. Is it
7          fair to say you have no specific
8          recollection of whether you
9          reviewed the deposition
10         transcripts of Mr. Johnston,
11         Johnston and Junkin prior to
12         August the 8th issuing the
13         report?)
14 A.     No.
15 Q.     Do you have a specific
16 recollection of reviewing those deposition
17 transcripts prior to the report of August
18 the 8th?
19 A.     The collective you or me?
20 Q.     The collective you is fine?
21 A.     Yes.
22 Q.     And what is that -- what is that
23 based upon?

Page 46

1 A.      What is my recollection based
2 upon?
3 Q.      (Nodded yes.)
4 A.      Going back through my documents.
5 Q.      And what documents and
6 specifically what have you seen in those
7 documents that caused you to conclude that
8 you have a recollection?
9 A.      Well, I already had a
10 recollection and you just didn't like that
11 it was detailed enough. I've always said we
12 reviewed and considered the depositions
13 before my testimony. What I couldn't
14 remember was whether or not there was some
15 timing issue, which I did tell you, that
16 might have made it difficult for me and
17 caused me to have to make telephone calls to
18 talk to people as the depositions were
19 going. I could not remember whether that
20 had happened and it was possible it did.
21         I have confirmed that it did not
22 happen and that we did review transcripts.
23 The portions that we believed were relevant

Page 47

1 we obtained them in an electronic format,
2 portions of them, and I read them. After my
3 testimony I received the entire deposition
4 and after receiving approval to read them,
5 which counts for the time delay to October,
6 I read them in preparation for my deposition
7 in entirety.
8          The way we approached the
9 depositions before my expert report was
10 issued was I had questions I wanted to know
11 the answers to, and I was provided their
12 sworn testimony for those questions and I
13 have brought copies of that with me today.
14 Q.     Okay. Are there any other
15 documents in the copies that you're
16 referring to now that have caused you to
17 conclude that you reviewed those excerpts of
18 the depositions prior to issuing your report
19 on August the 8th?
20 A.      Are there any other documents?
21 Q.      Yes, that right now caused you --
22 A.      Yeah. The bills show what I did,
23 the files show what I did. And also, in

Page 48

1 case you're confused about some information
2 in my file, the pieces of the deposition
3 excerpt that were attached to a pleading in
4 this case I received this week and I did not
5 receive them in October and I have not
6 reviewed them. They were provided to me,
7 they were indexed and placed in my file and
8 they happen to have a fax date of October on
9 them, and there may be bits and pieces of
10 the two depositions in there that I said I
11 didn't take possession of. I don't know
12 because I haven't looked at that pleading
13 that closely.
14 Q.      Setting aside the general
15 description of the files and bills, as
16 you've sat here you've pulled out a couple
17 of documents. My assumption is those are
18 the documents that caused you to conclude
19 that you reviewed excerpts of the
20 depositions prior to the report. What --
21 A.      No, you're wrong. I remembered
22 that before I pulled the documents out.
23 Q.      Let's just focus on the documents

12  (Pages 45 to 48)

# TUSCALOOSA COURT REPORTING
## Merrill Legal Solutions

Page 49

1 now. All I want you to do is identify the
2 documents.
3 A.       Okay. My bills, the full
4 deposition transcripts, the partial
5 deposition transcripts, and my report.
6 Q.       Do you have any written
7 correspondence that would indicate that you
8 received those deposition excerpts prior to
9 issuing the report on August the 8th?
10 A.       Yes.
11 Q.       Can you identify those for me?
12 A.       Fax cover sheets.
13 Q.       Will you show those to me,
14 please?
15 A.       Certainly. (Hands over
16 documents).
17 Q.       Do you know whether this was
18 produced to Yelvington at any time prior to
19 today?
20 A.       What are you talking -- what are
21 you asking? I don't understand your
22 question.
23 Q.       Yeah.

Page 50

1 A.       Whether a copy of that fax was
2 produced?
3 Q.       (Nodded yes.)
4 A.       I wouldn't have any basis and
5 have the answer to that. I'm not involved
6 in the production.
7 Q.       Do you recall a request from --
8 generated from Yelvington requesting
9 everything you considered, all documents you
10 considered in reviewing and preparing your
11 report?
12 A.       I'm not sure what you're asking
13 me. Are you talking about a request made to
14 the party in this case or do I recall the
15 document you were just showing me a minute
16 ago marked in Alexander Exhibit Number 1. I
17 don't understand the question.
18 Q.       A separate request. And, you
19 know, I was hoping this would be much
20 quicker, but I'm assuming for -- you've been
21 an expert more times than we can probably
22 count, so I assume that over those years
23 that you've been doing that you've become

Page 51

1 somewhat familiar with the different
2 processes that we use, like request for
3 production. So my question to you is, are
4 you aware of any requests for production
5 either to you or to the defendant whereby it
6 was requested that you produce all documents
7 that you used in preparing your report?
8 A.       I've got my correspondence file
9 here (indicating), the bill file here
10 (indicating); and if I received a request,
11 it's going to be in this file. And in order
12 to answer your question, I'm going to need
13 to review the file.
14 Q.       If you need to do it.
15      MR. LEEK: Can we go off the
16 record for a second?
17      (Off-the-record discussion.)
18 Q.       Let's go back on the record.
19 A.       Here's a stack of numerous things
20 that I received asking me to produce stuff.
21 I think they were issued by your firm. I'm
22 not an attorney so don't assume that I am.
23 I'm a CPA. And I'm happy to go through that

Page 52

1 and see if that's what you're talking about.
2 Q.       Set this aside. Just set these
3 aside somewhere.
4      MR. PEARSON: Do you want copies
5 of them?
6      MR. LEEK: Yeah.
7 A.       Put this back in my folder?
8 Q.       Sure. Who is McCabe &
9 Associates?
10 A.       McCabe I think is a customer.
11 Q.       A customer of your company?
12 A.       No, I think of JMI.
13 Q.       JMI?
14 A.       Yeah.
15 Q.       Let me hand you a fax dated
16 August the 7th, 2007 consisting of three
17 pages and just ask you, if you could, help
18 me understand how McCabe & Associates comes
19 into this case at all?
20 A.       Well, I'm going to go outside of
21 your question. I handed you this in
22 mistake -- by mistake in response to your
23 earlier question, and now this refreshes my

13 (Pages 49 to 52)

# TUSCALOOSA COURT REPORTING
## Merrill Legal Solutions

Page 53

1  memory that McCabe & Associates I believe
2  are accountants for JMI.
3  Q.      Okay. And does this appear to be
4  a fax to you from McCabe & Associates?
5  A.      Yeah. Ned Wolf is someone that
6  works for me.
7  Q.      Thank you. How about Matt
8  Sculley, is that someone who works for you?
9  A.      That was a MBA law school intern
10 at the University of Alabama this summer and
11 he did work for me.
12 Q.      Okay.
13 A.      I think he's going to work for
14 Maynard Cooper.
15 Q.      Did you bring your CV with you
16 here today?
17 A.      It's in my report, so no.
18 Q.      Is the one in your report
19 current?
20 A.      Yeah, except for anything that's
21 happened after that, but I'm not big about
22 changing my CV.
23 Q.      Okay. Fair enough.

Page 54

1  A.      Let me add a further
2  qualification. I do the best I can to keep
3  it current. There may be stuff on there
4  that's out of date.
5  Q.      Have you ever provided any expert
6  analysis or assistance to any other sand and
7  gravel mine besides Johnco?
8  A.      No.
9  Q.      Have you ever performed any other
10 CPA functions for a sand and gravel mine?
11 A.      Stone crushing, which is similar
12 but different, yes.
13 Q.      Well, limiting it to sand and
14 gravel mines is the answer to that question
15 no?
16 A.      Well, it had a sand and gavel
17 operation too. It wasn't as significant as
18 their stone crushing. So, you know, I guess
19 technically it's -- substantially no, you
20 are correct.
21 Q.      Do you have any -- any other
22 experience with sand and gravel mines other
23 than your professional experience?

Page 55

1  A.      Oh, okay. I'm sorry. I was
2  thinking you asked that question wrong. No.
3  Do I have any personal experience with sand
4  and gravel, other than buying it to put in a
5  sand box for my kids --
6  Q.      Right.
7  A.      -- or maybe mixing concrete, no.
8  Q.      Can you give me an estimate of
9  how many cases in the last four years in
10 which you participated as an expert that you
11 were on the plaintiff's side versus the
12 defendant's side?
13 A.      I don't track it, but it's
14 been -- you know, over the years -- I don't
15 count it by four years or whatever -- over
16 the years it was predominantly defense,
17 although I was fairly balanced. And then in
18 2003 I got appointed as a trustee by my
19 client at my client's request, SouthTrust
20 Bank, who I used to work for a lot, and
21 acting as trustee in adversary proceedings I
22 had to file a number of expert reports in
23 preference actions so that's caused the

Page 56

1  plaintiff's side to go up and so now I'm
2  50-50.
3  Q.      What portion, and by portion I'm
4  looking for an estimated percentage, but
5  what portion of your income is derived from
6  being an expert?
7  A.      Well, you know, you get asked
8  that question a lot. We don't track. You
9  have to understand how a CPA looks at what
10 they're doing. We're providing a
11 professional service, financial analysis,
12 investigations, forecasting, marginal
13 profitability analysis, lost profits
14 analysis, the same thing, and we're doing it
15 in certain settings and sometimes we're
16 asked to make a report, and it could be an
17 oral report, it could be a written report,
18 you could be sworn in and asked to swear
19 that what you're reporting is true. That's
20 expert work where you're sworn and asked
21 what's true.
22        That said, we are a forensic
23 accounting firm and we specialize in

14 (Pages 53 to 56)

# TUSCALOOSA COURT REPORTING
## Merrill Legal Solutions

Page 57

1  investigations. We specialize in valuation.
2  We specialize in turnarounds and asset
3  recoveries and we're a highly specialized
4  firm and so a lot of what we do we are hired
5  and retained under attorney-client
6  privilege. A substantial portion of what we
7  do does not involve expert testimony in any
8  way whatsoever. In fact, we had a division
9  up until the end of August that never
10  involved expert testimony but always
11  involved the presence of litigation because
12  it involved environmental litigation. So
13  we're a very specialized firm in that sense.
14  Q.      I think I know what you're
15  saying. You don't have a typical CPA
16  practice where you're preparing tax returns
17  or conducting audits for -- or audits
18  unrelated to providing some kind -- or
19  unrelated to a legal proceeding?
20  A.      Third-party reliance audit work.
21  Q.      Right.
22  A.      We generally will not do
23  third-party reliance work. That's not the

Page 58

1  business that we're in. We generally -- we
2  don't solicit tax return work but we do
3  certain types of highly specialized tax
4  work, mainly in the bankruptcy area. It's
5  not a great business to be in because it's
6  hard to get paid when you do bankrupt
7  companies. Tax returns, it's something that
8  we do. So our work tends to be highly
9  specialized areas of public accounting. It
10  is based on the skills learned in auditing
11  and tax.
12  Q.      Sure.
13  A.      And we do principally hire our
14  CPAs, in fact exclusively as of today from
15  traditional lines where they learn their
16  skills and then bring them into our practice
17  and utilize those functional skill sets in
18  these settings, which is normal for CPAs.
19  Q.      Okay. Thank you. I appreciate
20  you helping me get through that question.
21  Can you list for me what it is that an
22  expert such as yourself retained in this
23  case is retained to do? Tell me generally

Page 59

1  what it is and then we can break it down
2  into pieces if necessary, but if you would
3  list that for me, I would appreciate it.
4  A.      I don't think I can answer it
5  generally. I think I can answer it with
6  respect to this case, because we get
7  retained in a whole variety of situations.
8  Q.      Okay.
9  A.      But in this case I was asked to
10  review the circumstances that existed in the
11  formation and operation of the JMI venture
12  and then make a determination of whether or
13  not the actions of Yelvington had a
14  financial impact on the joint venture and if
15  so, what was it. I will say this. I think
16  I have made certain assumptions in the area
17  of liability, which I believe are
18  reasonable, and I'm not trying to testify to
19  the ultimate issue.
20  Q.      Right. And that's kind of what
21  I'm asking here. You're not an expert for
22  purposes of determining liability; is that
23  correct?

Page 60

1  A.      I mean, a lot of times my
2  testimony is used by attorneys to determine
3  liability because of my background and my
4  training in areas that I have focused in, so
5  I really -- I can't let you limit me there.
6  But in this engagement my primary goal was
7  to determine whether or not there had been
8  any financial harm caused in connection with
9  the venture by Yelvington, so it's more of a
10  damages role.
11  Q.      Okay. And that's what I'm after.
12  And to get to the damages role you have to
13  assume liability; is that correct?
14  A.      Well, yes and no. No, you don't
15  have to assume liability. I mean, and in
16  this case, I mean -- and I think you have to
17  do a reasonable inspection even when you're
18  assuming liability to make a reasonable
19  determination as to whether the things
20  you're assuming are reasonable, and I have
21  done that in this case. I'm just letting
22  you know that I do not intend at this time
23  to testify that someone breached their

15 (Pages 57 to 60)

# TUSCALOOSA COURT REPORTING
## Merrill Legal Solutions

Page 61

1 contract. That's not my point. However, I
2 may offer testimony that's offered as proof
3 of a breach. I mean, I don't know. I'm not
4 a lawyer nor am I a judge.
5 Q.    Are you an expert in interpreting
6 contracts?
7 A.    Absolutely not. I need to say
8 this because I'm in other cases. CPAs read
9 contracts, they routinely understand
10 contracts, and they apply the language in
11 the contract to determine financial effects.
12 Other than that, for example, legal
13 construction I am a CPA.
14 Q.    Fair enough. That's what I'm
15 after. So in this case you assumed
16 Yelvington was liable for certain breaches
17 and then determined the damages, the damages
18 that would result from that liability?
19 A.    Yeah, the -- the determination of
20 liability is outside the scope of my job.
21 Q.    So is what I said accurate?
22 A.    I don't know. I'm not sure I
23 understood your question so that's why I

Page 62

1 rephrased it and said what I said.
2 Q.    Let me ask you this. What effect
3 on your opinions would it have if you
4 assumed Yelvington was not liable for any
5 breaches?
6 A.    I did financial determinations.
7 I'm not sure if any of those would change.
8 Q.    So the losses would still be
9 there whether Yelvington was in breach or
10 not breached; is that correct?
11     MR. PEARSON: I'm going to object
12 to the form.
13 A.    That's really hard for me to
14 imagine because I don't understand how
15 Yelvington would take shipments of rock if
16 it didn't take shipments of rock which is
17 the cause of the losses. So I don't
18 understand your question.
19 Q.    Okay. It's very simple and
20 it's -- you know, it's generic to all cases.
21 You have to assume Yelvington is liable in
22 order to conclude that damages were caused
23 by Yelvington to Johnco; is that correct?

Page 63

1 A.    I mean, I can just tell you my
2 experience, you know. My experience --
3 because I'm not a lawyer and you're asking
4 me a legal question, but my experience is
5 the issue of damages has to be addressed at
6 some level before courts are going to allow
7 an expert to testify about damages. I don't
8 know if you have to absolutely prove them
9 before you testify or not. I don't know.
10 Q.    Confine it to the purposes of
11 preparing your report. We're not talking
12 about testifying later.
13 A.    I don't agree.
14 Q.    Okay. What specifically --
15 A.    I'm not saying this specific
16 case. I'm saying in general I don't agree
17 that you have to assume liability. There
18 are situations that I've been involved in
19 where it's clear there was a problem. For
20 example, if you stole a million dollars from
21 me and I could prove you stole it, I know
22 that's a crime and I believe you're liable
23 and I'm a certified fraud examiner but I'm

Page 64

1 still not going to go and testify to a jury
2 that you should go to jail because that's a
3 legal thing. So if that helps you
4 understand why I'm having trouble answering
5 your question.
6 Q.    Yeah, and I see where we're
7 focusing on different things. In your
8 example that you said, "And I can prove that
9 you stole it." For you to give an opinion
10 on damages here you have to assume that
11 Johnco can prove there was a breach; is that
12 correct? You're not trying to prove there's
13 a breach. Johnco is trying to prove there's
14 a breach. So to get to your opinions you
15 have to assume that Johnco can prove the
16 breach; is that correct?
17 A.    I guess I'm going to leave it the
18 way I've answered it because even the word
19 breach is not a word I use very often and
20 it's always in the legal context. I think
21 I've answered your question.
22 Q.    And as an expert are you required
23 to make predictions?

16 (Pages 61 to 64)

# TUSCALOOSA COURT REPORTING
## Merrill Legal Solutions

Page 65

1    A.    I think you're required to form a
2    reasonable judgment about what might or
3    might not happen in the future. I don't
4    know if that's, you know, predicting the
5    future. I don't know. That's a
6    characterization.
7    Q.    And do you have to rely on
8    certain assumptions to make those judgments
9    or determinations about what may or may not
10   happen in the future?
11   A.    Absolutely. There's always a
12   degree of uncertainty or we wouldn't be here
13   in a dispute.
14   Q.    Is it within your field of
15   expertise to determine or --
16   A.    Before you get the question out,
17   can I say something so you understand?
18   Q.    Sure.
19   A.    I am prosecuting as the litigant
20   fairly significant litigation as a trustee.
21   And the areas you keep going into are
22   affecting me and my fiduciary duties as a
23   trustee and that's making this deposition go

Page 66

1    longer and I just wanted you to know that.
2    Now, you can ask the question.
3        MR. LEEK: Actually let's go off
4    the record for a second.
5        (Off-the-record discussion.)
6    Q.    (By Mr. Leek) In this specific
7    case here, --
8    A.    Okay.
9    Q.    -- what did you rely upon in
10   determining what quantities of product
11   Yelvington was required to take?
12   A.    Well, I relied on a survey of all
13   of the information that was available to me
14   at the time I issued the report, which I
15   will summarize for you. It included my
16   conversations with Mr. Junkin and then my
17   verification of the information I learned
18   from Mr. Junkin and the written testimony of
19   Mr. Johnstons.
20   Q.    Plural, sure.
21   A.    Plural. My review of the
22   financial results provided to us by the CPA,
23   okay, it's my understanding. We had some

Page 67

1    direct interaction. I got it through
2    counsel but it's my understanding he
3    summarized information for us and plugged in
4    because we had a limited amount of time to
5    get this done, and the contract with
6    Yelvington.
7    Q.    The Supply Agreement? What we
8    have referred to as the Supply Agreement?
9    A.    Yeah. I'm sorry, yeah. I didn't
10   intend to give it a new name. So yeah, the
11   Supply Agreement.
12   Q.    Okay. And from that same general
13   description of your sources of information
14   is that also where you determined the price
15   to be paid by Yelvington for the product?
16   A.    Yes. Well, for the product
17   involving Yelvington.
18   Q.    Yes.
19   A.    For the product involving other
20   parties I used the actual history.
21   Q.    And what is your opinion of what
22   product Yelvington was required to purchase?
23   A.    I don't have an opinion about

Page 68

1    whether Yelvington was required to purchase
2    something because that's a legal opinion. I
3    have an opinion about what was reasonable to
4    expect that would have been taken by
5    Yelvington --
6    Q.    I'm looking for --
7    A.    -- and that's number 67.
8    Q.    Okay. Thank you. Is it within
9    your expertise to determine what types of
10   legal -- or damages are legally available in
11   a particular type of action?
12   A.    No.
13   Q.    I'm going to ask you to turn to
14   Tab B of Defendant's Exhibit 1.
15   A.    Okay.
16   Q.    Do you see Tab B?
17   A.    Yes, I do.
18   Q.    Do you recognize what is the
19   first document in Tab B?
20   A.    I do.
21   Q.    What is that?
22   A.    It's entitled, "Plaintiff's
23   Designation of Expert Witnesses."

612 Lurleen Wallace Blvd., N. * Tuscaloosa, Alabama 35401 * www.legalink.com
(205) 758-4006 * (800) 844-3370 * Fax (205) 758-4371

# TUSCALOOSA COURT REPORTING
## Merrill Legal Solutions

Page 69

1  Q.      Did you see this document
2  entitled "Plaintiff's Designation of Expert
3  Witnesses" prior to submitting your report
4  for filing?
5  A.      No.
6  Q.      Have you reviewed this document?
7  A.      No -- yes. Yes, I have one time
8  looked at it.
9  Q.      And when did you review this
10  document?
11  A.      This week.
12  Q.      All right. Let's turn to the
13  second document under Tab B. I note in your
14  list of experience here that your -- part of
15  it is valuation and consulting services.
16  That business valuation; is that correct?
17  A.      And asset.
18  Q.      And asset. Okay. Did you
19  perform a business valuation for Johnco?
20  A.      Business valuation is a term of
21  art. It includes within the process of
22  doing a valuation you would do what we did,
23  but what we did here was short of a business

Page 70

1  valuation.
2  Q.      So you didn't come up with a this
3  is the value of the business?
4  A.      No. No. We came up with
5  something that could be extrapolated into a
6  value of business during a limited set of
7  periods, but we did not go the extra -- we
8  didn't do the extra work because we weren't
9  asked to.
10  Q.      But assuming Johnco is an ongoing
11  concern, you could value that ongoing
12  concern; is that correct? I mean, that's
13  within your experience?
14  A.      Am I qualified to do that, yes.
15  I'm also qualified to do that if they were
16  not a going concern.
17  Q.      Fair enough. You say that you
18  intend to develop additional charts and aids
19  to assist your testimony in this case. Have
20  you done so to date since the report?
21  A.      No.
22  Q.      Okay. You indicate that you've
23  studied industry data. Is the industry data

Page 71

1  that you studied indicated on Appendix 8 of
2  your report, specifically I'm talking about
3  the Bureau of Labor Statistics, or was there
4  other industry data?
5  A.      I do not recall today what
6  industry data we looked at and I don't see
7  any industry data listed on the list of
8  information considered.
9  Q.      What do you understand to be your
10  obligation as an expert witness with regard
11  to listing the information you considered
12  for purposes of an expert report?
13  A.      Are you asking me with respect to
14  Appendix 8?
15  Q.      No, with respect to -- well, just
16  as my question is phrased.
17  A.      I didn't understand your
18  question.
19  Q.      All right. What do you
20  understand to be your obligation as an
21  expert witness to list the information that
22  you consider for purposes of an expert
23  report filed with the court, federal court?

Page 72

1  A.      It's my obligation to include in
2  my Rule 26 report the universe of the
3  information that I consider in forming my
4  opinions whether I relied on them or not.
5  Q.      Okay. So are you telling me then
6  that -- well, let me ask you this. If you
7  considered industry data would you normally
8  include that on a list of information
9  considered, what industry data you looked
10  at?
11  A.      I see your problem. No, not
12  necessarily. Page 1 of my report is my
13  report; and if I tell you about it there,
14  I've told you about it. Appendix 8 is an
15  appendix to my report. While maybe ideally
16  you would like me to list it in both places,
17  many times it's just in the narrative of the
18  report and not in the back.
19  Q.      And why is that?
20  A.      It can be a variety of reasons.
21  A lot of times it's just because we are in a
22  big hurry to get the thing out the door and
23  we make sure that it's in the report and the

612 Lurleen Wallace Blvd., N. * Tuscaloosa, Alabama 35401 * www.legalink.com
(205) 758-4006 * (800) 844-3370 * Fax (205) 758-4371

# TUSCALOOSA COURT REPORTING
## Merrill Legal Solutions

Page 73

1  person pulling the appendix together doesn't
2  get the communication to go back and add
3  that to the appendix, but it's in the report
4  or you wouldn't be asking me this question.
5  Q.      Yeah, sure.  You've mentioned a
6  couple of times that you had a limited time
7  to prepare your report.  Did that affect the
8  opinions in this report?
9  A.      No, or I wouldn't have issued it.
10  Q.      So even though you had a limited
11  time you were comfortable that the time that
12  you spent on the report or the analysis was
13  sufficient for you to state what you've
14  stated in the report; is that correct?
15  A.      Let's be clear.  There's time,
16  linear time, how many days until next week,
17  and then there's time, gee, I'm too busy to
18  do this.  I want to make it clear that it
19  was the first thing, which is in the record.
20  You can look at it.  You can see the date we
21  started versus the August 8th date of the
22  report.  That's what I'm referring to.
23        Now, we have lots of people and

Page 74

1  we have the ability to put the necessary
2  effort and to do the work, and I will not
3  issue an opinion if we have not done the
4  work and I have not satisfied myself that
5  the work is finished.  So in that case I had
6  plenty of time to finish.  It just screwed
7  up my summer and that's what I'm trying to
8  say limited amount of time.  And in those
9  circumstances where you've got -- you know,
10  if we could have stretched it out, I may
11  have been able to have done it all myself or
12  with one assistant.  But when you've got a
13  bunch of different people in because you've
14  got to make sure you get it done is why
15  something might get listed in the front of
16  my report while the other person is having
17  to do the back part.
18  Q.      And I understand exactly what
19  you're saying, exactly what you're saying.
20  But what you're telling me is the fact that
21  you had a limited period of time to prepare
22  this didn't have any affect on the opinions
23  or the report that you did; is that correct?

Page 75

1  A.      Absolutely.
2  Q.      Thank you.  The report also
3  indicates that you -- well, I'm sorry, I
4  forgot to ask this question.  What industry
5  data did you review in preparing this
6  report?
7  A.      I really can't remember at this
8  time.  I don't remember industry data being
9  relied on, and I cannot tell you what we
10  looked at or considered.
11  Q.      Okay.  Is there someone else
12  besides you who could tell me that?
13  A.      No.  I mean, you have our entire
14  file.
15  Q.      Right.  The industry -- when you
16  review industry data, is that online or is
17  it in a textbook that you wouldn't have
18  brought with you today or is that something
19  you would copy and put in the file?
20  A.      We would copy it and put in the
21  file.
22  Q.      So if it's not copied and put in
23  the file, then it wasn't reviewed; is that

Page 76

1  correct?
2  A.      Well, I -- you know, if you want
3  to consider it that way.  I've already said
4  I don't know.
5  Q.      Uh-huh (affirmative).
6  A.      You know, it got put in this
7  paragraph.  I didn't put it there.  So
8  somebody put it there.  It may be a mistake.
9  I'm telling you today I did not rely on any
10  industry data.  I don't believe industry
11  data is necessary in this matter to do what
12  I did.
13  Q.      Okay.  That's --
14  A.      These are reliable
15  determinations.  The types of things you
16  would normally need to refer to industry
17  data because it's an uncertainty or unknown
18  or there's not a reasonable proxy or a
19  reasonable number available to use, those
20  types of things were provided to me.  They
21  were available.
22  Q.      But you don't think those things
23  were necessary for you to formulate the

19 (Pages 73 to 76)

# TUSCALOOSA COURT REPORTING
## Merrill Legal Solutions

Page 77

1  opinions here and I'm asking --
2  A.      Right. And what I'm talking
3  about is the kinds of things that you
4  normally have to do a lot of industry
5  research on is the quantities, well, the
6  quantities are in the contract; the price,
7  the price is in the contract; the what are
8  we going to sell it for in the future; we've
9  got the past, we can see what we're selling
10  it for in the past. So we had all those
11  things and there was really no reason to get
12  out in the industry in my judgment now, in
13  my judgment then. Now, did somebody pull
14  some industry data -- and yesterday having
15  recognized that that was in my report, I did
16  pull the RMA statistics to see if they even
17  had sand and gravel broken out and they
18  don't. It's stone crushing.
19  Q.      The next term in here is
20  financial research. Is it safe for me to
21  assume the financial research this is
22  referring to is the stuff you've already
23  identified?

Page 78

1  A.      Numbers, numbers that were
2  presented to me in this matter.
3  Q.      And relating to Johnco?
4  A.      Yes.
5  Q.      And how about industry trends?
6  It says that you studied industry trends?
7  A.      I'll give you the same answer I
8  gave to the last thing. I really don't
9  think -- I don't know what industry trends
10  somebody on my team may have studied. I
11  don't think they have anything to do with
12  this.
13  Q.      You think that's equally true for
14  industry data; is that correct? So I can
15  close the loop on this.
16  A.      And we're speaking now in regards
17  to determining what were -- what were the
18  reasonable -- what is the reasonable
19  expectation about the units that would have
20  been taken but for the acts of Yelvington?
21  No, I don't think you need to know any
22  industry data for that. And what would the
23  price of that material be. No, I don't

Page 79

1  think you need to know any industry data for
2  that, and those are the two biggest items
3  affecting my calculation.
4  Q.      The next thing that this says is
5  a complete listing of the information
6  considered is included as an appendix to
7  this report. And that's Appendix 8;
8  correct?
9  A.      Yes.
10  Q.      And we know that there are at
11  least one thing considered that's not on
12  this report; is that correct?
13  A.      I don't know that that's correct.
14  I mean, I think I've just been testifying.
15  You're talking about industry data and we're
16  talking about industry trends; correct?
17  Q.      Correct.
18  A.      And then you've identified BLS
19  and I've told you I don't have a
20  recollection of any of that, so I can't
21  answer. Other than that I can't give you
22  any more information about that.
23  Q.      Okay. But in a perfect world if

Page 80

1  you had considered industry data and
2  industry trends it would be listed on
3  Appendix 8, is that correct, on the list of
4  information considered?
5  A.      No. I mean, there's no
6  boilerplate approach to this. So no, I
7  can't set a rule like that.
8  Q.      Okay. Well, do you normally say
9  a complete listing of the information
10  considered is included in your reports?
11  A.      Like I said, there's no
12  boilerplate approach, so.
13  Q.      And in this case can we agree
14  that Appendix 8 is not a complete listing of
15  the information you considered?
16  A.      That's -- again, only because I
17  do not remember what industry data or
18  industry trends were considered if at all.
19  I don't know.
20  Q.      I see what you're saying and I
21  think that's fair enough. Can we agree that
22  the information listed as considered in the
23  report is inconsistent when compared to

20 (Pages 77 to 80)

## TUSCALOOSA COURT REPORTING
## Merrill Legal Solutions

Page 81

1  Appendix 8 at least in a small part?
2  A.      We can agree that I used the word
3  complete on page 1 and you've been able to
4  identify something on page 1 that is not on
5  Appendix 8. I will agree there.
6  Q.      Okay.
7       MR. LEEK: Let's go off the
8  record for a second.
9       (Whereupon, a lunch break was
10      taken.)
11 Q.      (By Mr. Leek) Let me close a
12 couple of loops here. With regard to your
13 expertise, are you an expert in geology?
14 A.      No. I'm a CPA.
15 Q.      And I think you've already said
16 you don't have but limited experience in the
17 sand and gravel mining industry; is that
18 correct?
19 A.      I'm a CPA, and in this case you
20 don't need experience in the industry to run
21 the numbers.
22 Q.      So is it fair to say then the
23 answer to that question is no -- excuse me,

Page 82

1  yes, you only have limited experience in
2  sand and gravel mining?
3  A.      I think it's fair to say that I'm
4  a CPA and I have a substantial amount of
5  experience in performing the calculations
6  for lost profits but not in the sand and
7  gravel industry.
8  Q.      And then is it also fair to say
9  that you've never assisted anyone in opening
10 a sand and gravel mine or operation?
11 A.      Well, I mean, no. I mean, I've
12 done due diligence. I did two things, one
13 ready mix company in Birmingham that's now
14 been bought by U.S.A. Ready Mix. The name
15 escapes me. The Yarborough family owned it.
16 That was an audit client of mine. And then
17 I did the seller due diligence of that
18 company. They owned -- they had a sand and
19 gravel operation as well as a stone crushing
20 operation.
21 Q.      And that's the one you referred
22 to earlier, the stone crushing operation you
23 referred to earlier?

Page 83

1  A.      Yes. And then later a finish
2  company acquired them and I did some more
3  work on behalf of the finish company of that
4  same organization.
5  Q.      Okay. In what states are you a
6  licensed CPA?
7  A.      I don't know all the states. I
8  know that I'm licensed here in Tennessee and
9  in other states, but I don't know. I don't
10 remember.
11 Q.      And I'm assuming your license is
12 currently valid and in good standing?
13 A.      My license is in good standing
14 and valid, yes.
15 Q.      Has your license ever been
16 suspended or revoked?
17 A.      No.
18 Q.      Have you ever been subject to any
19 disciplinary actions?
20 A.      No.
21 Q.      Have you ever been the subject of
22 any complaints to the state licensing body
23 of any state you're licensed in?

Page 84

1  A.      Not to my knowledge.
2  Q.      Have you ever been disqualified
3  as an expert?
4  A.      Not disqualified, no.
5  Q.      Have you ever been rejected as an
6  expert?
7  A.      By the court?
8  Q.      By the court, yes.
9  A.      No. I have had a part of my
10 report limited.
11 Q.      What type of case was that?
12 A.      It was a construction dispute
13 involving a bridge and the contractor went
14 broke and the primary supplier of the
15 gearing components, it's a lift bridge, is
16 Stewart Machine in Birmingham, Alabama, and
17 they found themselves in protracted
18 litigation for years between the Department
19 of Transportation regarding the bridge, the
20 bankruptcy -- contractor bankrupt the
21 bonding company over the storage of the
22 gears that they manufactured and they filed
23 a claim for rent and a claim for business

21 (Pages 81 to 84)

612 Lurleen Wallace Blvd., N. * Tuscaloosa, Alabama 35401 * www.legalink.com
(205) 758-4006 * (800) 844-3370 * Fax (205) 758-4371

# TUSCALOOSA COURT REPORTING
## Merrill Legal Solutions

Page 85

1  interruption caused by those rent and a
2  claim for incidental costs, and I was
3  retained for business interruption and
4  incidental cost and to review the rent. And
5  the Judge gave them the rent, agreed with me
6  that it would be double dipping to give them
7  both and then did not allow the portion in
8  the report related to business interruption
9  in but allowed the incidental cost report
10  in. And I did actually testify. It was a
11  bench trial. But there is that part of the
12  report that did not go in.
13  Q.      Okay. Looking again at Exhibit
14  B, the second document in here, the second
15  page of the second document, now, you want
16  to --
17  A.      It's the same.
18  Q.      Okay. But for my purposes I have
19  to be able to show that it's the same. So I
20  understand if you want to look at yours, if
21  you don't mind at least tracking this one to
22  make sure that they are the same I would
23  appreciate it; otherwise, I'll have to

Page 86

1  attach both.
2  A.      It's either way. However you
3  want to do it. I can mark my binder.
4  Q.      Okay. Looking at the section on
5  page 2 entitled "Findings and Opinions," do
6  you see that?
7  A.      I do.
8  Q.      Can you read the underlined
9  bolded text in it looks like that first
10  section there?
11  A.      Are you testing my reading
12  skills?
13  Q.      No, but I'd like you to read it
14  into the record if you would, please.
15  A.      "JMI invested a significant
16  amount of money in the establishment of a
17  mining facility and the related rail siding
18  as specified in the Supply Agreement."
19  Q.      Thank you. When you say JMI --
20  first of all, is that a finding or an
21  opinion or is there a difference?
22  A.      It's the heading of that section.
23  Q.      So it is neither a finding nor an

Page 87

1  opinion?
2  A.      You'd have to -- I don't know.
3  Q.      Would you consider that a
4  finding?
5  A.      I could consider that an
6  understanding.
7  Q.      Okay. Explain to me what you
8  mean by that.
9  A.      It's what I understand to be the
10  case.
11  Q.      Okay. So you're not necessarily
12  making a determination that they invested a
13  significant amount of money, you're saying
14  you understand that they did?
15  A.      No. I'm giving -- with respect
16  to investing the money, I am giving you that
17  opinion. With respect to the rest of the
18  information in that sentence, it's an
19  understanding.
20  Q.      Okay. Just so --
21  A.      In other words, my opinion is
22  they invested 2.8 million dollars in JMI.
23  Q.      Which you consider to be

Page 88

1  significant; is that correct?
2  A.      Correct, given the nature of JMI,
3  what JMI was to do, and my understanding of
4  the series of events that occurred, yes,
5  it's significant.
6  Q.      And it's your understanding,
7  based on this paragraph and review of the
8  documents, that the Supply Agreement at
9  issue was entered into sometime in April of
10  2004; is that correct?
11  A.      That's what this says. I don't
12  remember specifically what the document says
13  anymore. I'd have to refer to it.
14  Q.      Okay. I want to focus on the --
15  it looks like the third sentence in the
16  paragraph beginning, "In April 2004," and
17  specifically it says, "Upon completion of
18  this facility, CYDI was to begin purchasing
19  the specified size of gravel on a weekly
20  schedule at an approximate volume of 5200
21  tons per week, representing an annual volume
22  of 260,000 tons per year." Is that correct?
23  A.      You read that correctly.

22 (Pages 85 to 88)

# TUSCALOOSA COURT REPORTING
## Merrill Legal Solutions

Page 89

1  Q.      What caused you to conclude that
2  CYDI was to begin purchasing the gravel on a
3  weekly schedule?
4  A.      My understanding of the Supply
5  Agreement and the venture at hand.
6  Q.      Was there anything outside of the
7  Supply Agreement that you relied on in
8  drawing that conclusion?
9  A.      Well, I think that -- it's hard
10  for me today because I'm sitting here today
11  possessing the same opinions that I had on
12  August 8th and not having a real clear
13  recollection of the series of events that
14  got me to today to distinguish, you know,
15  what caused me to write that at that time,
16  but I can answer it -- so I can't answer
17  that question then. I believe there was
18  other information, but I know what I know
19  today and my opinion today is the exact same
20  opinion it was then. So yes, with that
21  qualification, there's other information.
22  Q.      That's caused you to conclude
23  that the Yelvingtons were required to pick

Page 90

1  up -- or, excuse me, purchase gravel on a
2  weekly schedule?
3  A.      I think that's a
4  mischaracterization and you don't understand
5  what I'm saying, so no.
6  Q.      All right. What are you saying
7  there?
8  A.      I'm trying to determine what the
9  financial impact was, and in order to
10  determine that I have to make a
11  determination what the reasonable
12  expectation of a gravel taking, I'm going to
13  call it deliveries, what the delivery
14  schedule -- what was the reasonable
15  expectation that delivery schedule should
16  have been in order to have a basis to
17  compare to what actually happened and that's
18  the purpose of that sentence.
19       And my reading of the final
20  Supply Agreement, my understanding of due
21  diligence, and transaction advisory work and
22  the earlier versions of that Agreement, my
23  discussions with Clatus Junkin, my reading

Page 91

1  of the testimony that's been taken of the
2  three individuals involved in JMI all
3  support my understanding that the reasonable
4  expectation was 5200 tons per week.
5  Q.      Do you know what Pep Johnston
6  said the expectation was about how
7  frequently Yelvington would come and pick up
8  the gravel?
9  A.      I have read it and I'm not going
10  to pass a memory test because it's been
11  since October since I read that.
12  Q.      Would the same be true for what
13  Ben Johnston testified to?
14  A.      The same would be true for all
15  three of them.
16  Q.      Did you consider their testimony
17  in arriving at your opinion today with
18  regard to how frequently Yelvington was to
19  pick up gravel?
20  A.      With regard to what was a
21  reasonable expectation, yes, I considered
22  it.
23  Q.      If in fact Yelvington were not

Page 92

1  required to pick up the gravel on a weekly
2  schedule, how would that affect your
3  opinions --
4  A.      You know,
5  Q.      -- as set forth in the report?
6  A.      You know, required seems to have
7  some legal connotation, and what I'm trying
8  to do is figure out what would have occurred
9  but for, and in order to do that -- so I'm
10  looking at what is a reasonable -- what is
11  the reasonable expectation, not what's
12  required.
13  Q.      So you're not looking at what's
14  legally required, you're looking at what the
15  reasonable expectation of who is?
16  A.      The two parties at odds. What
17  was the reasonable expectation of the
18  shipments -- there's quantity and price;
19  okay? Price is spelled out in the
20  Agreement, and it's my belief price is not
21  in dispute, but I'm sure you'll tell me if
22  it is, but that's my understanding. My
23  understanding is there's a dispute over

612 Lurleen Wallace Blvd., N. * Tuscaloosa, Alabama 35401 * www.legalink.com
(205) 758-4006 * (800) 844-3370 * Fax (205) 758-4371

# TUSCALOOSA COURT REPORTING
## Merrill Legal Solutions

Page 93

1    quantity. And I can talk to my client and
2    they can tell me their position. I could
3    read your client's deposition and I'd learn
4    their position but I think I could get it
5    just from talking to counsel; okay? So I
6    think I understand your position. So I'm a
7    CPA, and I'm going to look at the other
8    contemporaneous evidence and then form what
9    I believe to be the reasonable expectation
10   is based on my training and my ability to
11   analyze financial business records and
12   that's what I have done.
13   Q.    Greg will correct me if I'm
14   wrong, but you can assume for purposes of
15   this questions that Yelvington does not
16   agree it was weekly nor 5200 tons nor
17   260,000.
18   A.    I have assumed that or we
19   wouldn't be here today.
20   Q.    Sure. But moving forward, if
21   Yelvington is correct that the required pick
22   up was not weekly, would that affect your
23   opinion given here that 260,000 per year was

Page 94

1    called for in the Supply Agreement?
2    A.    You know, if the reasonable
3    expectation of the parties was that they
4    would only do what was the minimum required,
5    it might affect my opinion, but that's not
6    my understanding of the facts.
7    Q.    Now, you said "minimum required".
8    Where do you get that language, minimum
9    required?
10   A.    You used that language. I
11   understood your question to be talking about
12   the required amounts, and I've already told
13   you I'm not testifying to required. I'm
14   talking about what is reasonable to conclude
15   what would have happened. What's the
16   reasonable thing that would have happened
17   and what's the basis for that, the
18   reasonable thing. And I have concluded that
19   what one would believe is reasonable, not
20   what your client says, not what his client
21   says, but one looking at this information
22   would conclude is reasonable from the final
23   document, the earlier versions of the

Page 95

1    document, and a reading of my client's
2    testimony and an assumption that your client
3    vehemently disagrees with that, what would a
4    reasonable person like a CPA like me
5    conclude, and I have concluded that weekly
6    has a significance, has a meaning, okay, and
7    the shipments were not weekly, okay, but it
8    was in the contract, I have concluded that
9    5200 has a significance because it was in
10   the earlier drafted contract at 3,000 and it
11   went up to 5200, I've concluded that regular
12   has significance, and I've concluded the
13   pricing schedule in the contract all has
14   significance. Those are the types of things
15   that one would normally have to go out and
16   study industry data to do, but because it's
17   right there in the contemporaneous evidence
18   produced in the formation of this joint
19   venture I'm able to go look at it and reach
20   a judgment.
21   Q.    What makes you call this a joint
22   venture?
23   A.    Well, a venture. Sorry. I did

Page 96

1    not mean to insinuate anything about a joint
2    venture. I'm sorry. I'm involved in
3    another matter involving a joint venture. I
4    meant the venture.
5    Q.    So in your efforts to determine
6    what a reasonable person would look at, did
7    you review the deposition testimony of Mr.
8    Yelvington?
9    A.    No.
10   Q.    Did you review the deposition
11   testimony of Mr. Klebe?
12   A.    No.
13   Q.    Did you review the deposition
14   testimony of Mr. Holladay?
15   A.    I've already testified to this.
16   Q.    So the answer is no; correct?
17   A.    I don't remember Holladay. I may
18   have. I don't remember.
19   Q.    Well, I guess my question is how
20   can you arrive at what a reasonable person
21   would do if you don't read the testimony of
22   the other side?
23   A.    You can arrive -- I can arrive at

612 Lurleen Wallace Blvd., N. * Tuscaloosa, Alabama 35401 * www.legalink.com
(205) 758-4006 * (800) 844-3370 * Fax (205) 758-4371

## TUSCALOOSA COURT REPORTING
### Merrill Legal Solutions

Page 97

1  that by making the assumption that you guys
2  have a position that's spelled out in the
3  pleadings and that your pleadings are
4  consistent with what they would testify to.
5  Q.        If that were true you could rely
6  on the position as spelled out in the
7  pleadings by the plaintiff and not look at
8  their depositions; isn't that correct?
9  A.        No. No. You're misunderstanding
10  me. What I understood your question to be
11  was if I want to get an understanding of
12  what your client's position is I have to
13  read the deposition testimony, and I'm
14  telling you I don't. I can read their
15  complaint and I understand their position.
16  If I want to understand my client's
17  position, I can do the same. I can read the
18  answer or the counterclaim or whatever. I
19  can talk to my client and understand their
20  position. That's how -- I can do it a lot
21  of ways. There's no prescribed way. But
22  then after I do that I have to form my own
23  professional opinion, and I look to the

Page 98

1  document, the changes in the document and
2  the circumstances that are implied, the
3  financial and economic circumstances that
4  are implied by this venture.
5  Q.        I believe your testimony was that
6  regardless of the plaintiff's position or
7  the defendant's position your goal was to
8  come up with what you think a reasonable
9  person would do in this situation, is that
10  correct, or to --
11  A.        No.
12  Q.        -- sort of determine the
13  situation?
14  A.        No. I'm sorry, I didn't mean to
15  interrupt you. I'm trying to come up with
16  lost profits. And the first step in coming
17  up with lost profits is to figure out what the
18  but for would have been, and in making that
19  determination I have to form a professional
20  opinion about what the but for would have
21  been; okay? And it has to be a reasonable
22  determination. And it would seem to need to
23  be based on what was a reasonable

Page 99

1  expectation of what would have happened,
2  that's what I'm trying to say, and I have
3  based that determination on what I've
4  previously testified about.
5  Q.        Would your opinions be changed in
6  this report if Yelvington were only required
7  to take a minimum of a hundred and fifty
8  thousand tons?
9  A.        You keep referring to required,
10  and I think I made it clear I'm not trying
11  to establish any kind of requirement here.
12  I'm trying to look at what was reasonable to
13  expect would have happened.
14  Q.        I understand. Assume the
15  requirement. I'm not asking you to give a
16  legal opinion. I'm asking you to assume
17  that Yelvington was not required by the
18  Supply Agreement to take more than a hundred
19  and fifty thousand tons. Would that affect
20  your opinions?
21  A.        It's my understanding from
22  reading the Agreement that there is a
23  minimum requirement in that Agreement as

Page 100

1  you've said, so I don't have to assume that.
2  Q.        Okay. So the Supply Agreement
3  says the minimum requirement is a hundred
4  and fifty thousand tons; is that correct?
5  Is that your understanding?
6  A.        I'm not going to agree or
7  disagree with your characterization at this
8  time. We'd have to get it out and just read
9  it because I haven't read it in a long time.
10  I'd be happy to read it into the record. I
11  know that that is a significant issue in
12  this case. It's part of your case in chief,
13  and I'm not trying to issue a legal opinion
14  about your case in chief. I'm just trying
15  to tell you what I think was otherwise
16  reasonable given the facts and circumstances
17  that I have learned about this venture in
18  the first eight or nine months of operation
19  and then subsequent to that.
20  Q.        Is it fair to say that in your
21  opinion it was reasonable for Johnco to
22  expect 260,000 tons but you're not passing
23  opinion on whether Yelvington was required

25  (Pages 97 to 100)

# TUSCALOOSA COURT REPORTING
## Merrill Legal Solutions

Page 101

1  to take 260,000 tons?
2  A.    It's the expectation of the
3  parties. It's what's reasonable to conclude
4  both parties, what is that expectation, and
5  I understand that there's a record that says
6  one thing over here and there's a record
7  that says one thing over here, but that's
8  what you have to do when you come in. And
9  when I'm looking at -- we're talking about
10  this first paragraph. I'm looking at a
11  significant amount of money that was
12  invested, the circumstances under which it
13  was invested, and the formation of the
14  entity when it was invested, the Agreement
15  that was entered into, when it was invested,
16  that the purpose of the Agreement -- in
17  other words, the whole purpose of this
18  venture appears to be evidenced in its
19  formation and I think that's significant.
20  Q.    Okay. But not necessarily an
21  answer to my question.
22        MR. LEEK: I'm sorry to do this
23  to you again, but could you read back my

Page 102

1  question?
2        (Whereupon, the last question was
3        read back by the Court Reporter,
4        as requested.)
5        THE WITNESS: Read my answer.
6        (Whereupon, the last answer was
7        read back by the Court Reporter,
8        as requested.)
9  A.    I have no idea what your question
10  was or whether I answered it. I believe I
11  answered it. But if you could ask it again,
12  I could probably answer it more clearly.
13  Q.    Let's break it down into pieces.
14  Is it your opinion that Yelvington was
15  required under the Supply Agreement to take
16  260,000 tons?
17  A.    I have an opinion about what was
18  required.
19  Q.    Okay. And that's what I'm after.
20  What you're opining on is what you believe
21  is reasonable, or what expectation of the
22  parties was reasonable based on the totality
23  of the circumstances; is that correct?

Page 103

1  A.    What I'm opining on is what the
2  evidence says to me the parties believe was
3  reasonable.
4  Q.    Okay.
5  A.    What's a reasonable basis to make
6  a forecast of lost profits on. Let me just
7  say it that way. What is a reasonable basis
8  to do it, that's my opinion. My opinion is
9  about that, the reasonable basis to forecast
10  lost profits.
11  Q.    In your review of the
12  circumstances, did you come to any
13  conclusion or opinion on whether Yelvington
14  could stop purchasing gravel at a hundred
15  and fifty thousand tons?
16  A.    Was it a could stop? I mean, I
17  don't think that's what -- I don't think
18  that would be done in this type. I'm not
19  following your question. I mean I'm trying
20  to come up with lost profits and the steps
21  are laid out in my report and we're on the
22  first step.
23  Q.    Right. And --

Page 104

1  A.    And I don't think it has anything
2  to do with what was required. It has to do
3  what would be reasonably expected to have
4  occurred but for the acts of Yelvington.
5  Q.    Did you consider whether Johnco
6  cut off Yelvington or Yelvington failed to
7  come pick up gravel? Did you come -- I'm
8  sorry, did you come to an opinion on that?
9  A.    I'm not sure I understand the
10  question.
11  Q.    Okay. In your review of the
12  circumstances, did you come to an opinion of
13  whether the cause of the stoppage of picking
14  up gravel was caused by Johnco or
15  Yelvington?
16  A.    I don't think I have an opinion.
17  Again, I have understandings that I have
18  come to, and if that's an opinion, it's an
19  opinion, but I also understand that there's
20  some dispute there. There's some
21  allegations in this matter that conflict
22  with the information I've seen.
23  Q.    What information have you seen

26 (Pages 101 to 104)

# TUSCALOOSA COURT REPORTING
## Merrill Legal Solutions

Page 105

1  that would cause you to conclude that
2  Yelvington was the reason for the stoppage?
3  A.      What actually -- well, I'm not
4  sure I'm concluding Yelvington was the
5  reason for the stoppage.  I mean, you seem
6  to be heading off on a liability point of
7  view and it may be the way I've answered the
8  questions, but I'm here to talk about the
9  lost profit determinations I did and I've
10  already told you I have made an assumption
11  of liability.  But if you want to talk about
12  that, we can, but you need to understand I'm
13  not here to talk about that.
14  Q.      Okay.  And I think that's fair.
15  Isn't it true that if Yelvington is only
16  legally required to take 150,000 tons that
17  changes the damages, damage calculations?
18  A.      You haven't provided me enough
19  information in the hypothetical question for
20  me to answer it.  It requires me to make
21  assumptions.
22  Q.      Okay.  You can make whatever
23  assumptions you need.  I mean, I've given

Page 106

1  you --
2  A.      You're going to have to give
3  me -- the answer to your question, if you
4  want an answer, is maybe but not in this
5  case based on my examination of the
6  evidence.
7  Q.      And again, that's your dispute
8  with the reasonable expectations of the
9  parties.  What I'm asking you to do is to --
10  A.      No, you're mischaracterizing what
11  I'm saying.  That's fine.  I just want to
12  make sure it's on the record.
13  Q.      What I'm asking you to do is
14  assume this.  Yelvington is only required to
15  take 150,000 tons, assume that,
16  set that aside.  If that is true, does that
17  change the damage calculations in your
18  report?
19  A.      Well, based on what I've seen I'm
20  not sure that I can make those assumptions.
21  I mean, there's probably a way you could ask
22  that question.  But what I'm looking at is
23  an Agreement that has a word that I

Page 107

1  understand in it weekly, has a quantity that
2  I know how to multiply times the number of
3  weeks, fifty-two hundred, has the word
4  regular, which I've inquired and examined
5  and looked at was what happened in any way
6  regular and then has a provision that makes
7  it clear that when it's in breach.  Now,
8  that's how I see it, and I may not be
9  looking at it right but I've looked at a lot
10  of agreements to calculate numbers and
11  financial effects.
12        It's -- you know, again, I am
13  supposed to figure out where the parties
14  would have been but for, and I do not
15  believe the minimum is the right number in
16  this matter.  But if the court were to say
17  the minimum is the right number, my damages
18  would be adjusted from the two hundred and
19  sixty tons to the hundred and fifty tons.
20  Q.      Again, we're talking about
21  thousands of tons, but I understand what
22  you're saying.
23  A.      Yeah, two hundred and sixty

Page 108

1  thousand to a hundred and fifty thousand.
2  Q.      What specifically, other than the
3  Supply Agreement and the language of it, did
4  you rely upon --
5  A.      And the changes to it.
6  Q.      And the changes to it, did you
7  rely upon in reaching the conclusion that a
8  reasonable person, a reasonable party would
9  expect there was 260,000 tons expected under
10  this contract?
11  A.      Well, the expectation comes after
12  you make a determination of where they were.
13  So you've got to start there; okay?
14  Q.      Okay.
15  A.      And the first question is, when I
16  examine the situation, is what was the
17  purpose of this venture; okay?
18  Q. -    You mean Johnco's purpose?
19  A.      No.  I didn't limit in any way
20  that question.  So what was the purpose of
21  the venture.  And the agreement, Supply
22  Agreement gives the insight into the
23  purpose.  The investment and the types of

27 (Pages 105 to 108)

# TUSCALOOSA COURT REPORTING
## Merrill Legal Solutions

Page 109

1  equipment gives insight into the purpose.
2  The layout, the fulfillment capabilities
3  give insight, and then the actual operations
4  give insight into the purpose and the
5  economics of what they were doing, which is
6  pulling stone out of the ground and
7  separating it into sizes, and what size
8  was -- did the Supply Agreement represent,
9  how much of the total over -- total overall
10 economics for every ton of dirt you pull out
11 of the ground, essentially three byproducts
12 happened, what's the total economics, and my
13 inspection of those facts all lead me to the
14 purpose.
15 Q.      From where did you get your
16 information regarding the investment?
17 A.      Tax returns.
18 Q.      Is there anything other than the
19 amount listed on those tax returns that
20 caused you to conclude the investment was
21 useful in determining the purpose?
22 A.      I don't really know how to answer
23 that question. I mean --

Page 110

1  Q.      I mean basically you looked at
2  the number and you said --
3  A.      It's the order of magnitude of
4  the investment and what it would take to
5  return that investment.
6  Q.      And you said the layout. What do
7  you mean by layout?
8  A.      The number of cars that could be
9  loaded, you know, how much physical space
10 the circular track occupied.
11 Q.      What about the number of cars
12 caused you to conclude that the purpose was
13 indicated at a 260,000 ton per year
14 expectation?
15 A.      The size of the loading areas is
16 consistent and does not conflict in any way
17 with the 5200 tons per week in the
18 Agreement.
19 Q.      Can you explain that?
20 A.      What did you not understand?
21 Q.      Well, do you know the size of the
22 loading area?
23 A.      I have at one time. I do not

Page 111

1  recall now.
2  Q.      Do you know how many cars it can
3  hold?
4  A.      Ballpark, but I -- you know,
5  subject to reading depositions to get it
6  right; but yes, I looked into that. That's
7  the kind of things I looked into, how many
8  cars could it hold, how many tons go in a
9  car and is that consistent or does that
10 conflict with 5200 tons a week.
11 Q.      Let's separate out the 5200 tons.
12 Let's assume that the track can hold at
13 least 52 cars and for our purposes going
14 forward a car is about --
15     MR. PEARSON:  A hundred tons.
16 Q.      A hundred tons. Thank you. A
17 hundred tons. What about the size of the
18 track causes you to conclude that the
19 frequency with which the gravel was to be
20 picked up was weekly?
21 A.      The fact that it's a circular
22 track makes it easier to move trains in and
23 out. And more important, it takes up a

Page 112

1  tremendous amount of space. I mean, if you
2  were not intending to move a bunch of cars
3  through there, why do that?
4  Q.      Aren't those things true even if
5  it's not picked up weekly?
6  A.      What things?
7  Q.      What you just said, the area
8  which the track takes up, the circular
9  nature of the track, the number of cars that
10 could fit.
11 A.      If you were intending to do a
12 much smaller operation, you wouldn't invest
13 this much money. And making a bigger track
14 calls for a greater investment. You
15 wouldn't do that.
16 Q.      How does that relate to how
17 frequently it would be picked up?
18 A.      The size of -- it's like anything
19 else. You sell one thing it's a certain
20 size business. You sell 260,000 things it's
21 260,000 times bigger, and in that way it
22 relates to size. And if you need more
23 investment to deliver 260,000 things, you

28 (Pages 109 to 112)

# TUSCALOOSA COURT REPORTING
## Merrill Legal Solutions

Page 113

1 would make it if it was contemplated and the
2 expectation at the time was that I was going
3 to be able to recover it.
4 Q.      Do you know what a unit train is?
5 A.      I've heard that term in this
6 case. I'm not going -- I'm not an expert in
7 unit trains.
8 Q.      Do you know generally what it is?
9 A.      Yes.
10 Q.      And I'll represent to you that --
11 actually, let me ask this question. Do you
12 know what unit train meant in 2006 during
13 the operation of Johnco?
14 A.      No.
15 Q.      Okay. And I'll represent to you
16 that 52 cars at that time was considered a
17 unit train.
18      MR. PEARSON: And I'm going to
19 state for the record that defense counsel is
20 making that representation for some purpose
21 I may object to because I do not know
22 whether that is in fact a correct
23 representation of what a unit train was.

Page 114

1      MR. LEEK: Okay. That's fair
2 enough.
3 A.      I'll make it clear that I've
4 heard a wide variety of car numbers referred
5 to as unit trains over my career, so, but
6 taking that as just your assumption and then
7 going forward, well, I'm happy to answer the
8 questions that way.
9 Q.      Okay. Thank you. Did you see
10 any or learn of any information that caused
11 you to conclude that the 5200 tons was
12 relating to 52 cars and actually related to
13 a unit train?
14 A.      What you're saying sounds
15 familiar, but I don't know whether it's --
16 if it's an undisputed fact or disputed fact
17 and who's asserting it because I just don't
18 remember any more about it.
19 Q.      But in any event, you didn't
20 conclude that the 5200 ton's number was the
21 result of the parties desire that the track
22 would loop, loop track, hold unit trains; is
23 that correct?

Page 115

1 A.      I didn't have to make a judgment
2 about the 5200 tons because it's in the
3 Agreement and I believe that's a reliable
4 source to get the amount. The only question
5 is is how often. I'm trying to make a
6 reasonable determination --
7 Q.      I understand.
8 A.      -- of what would have happened.
9 Q.      And assume for me that the
10 purpose of the 5200 tons or the size of the
11 track was to accommodate a unit train, do
12 you agree that that doesn't relate to how
13 frequently the product was to be picked up?
14      MR. PEARSON: I'm going to object
15 to the form.
16      MR. LEEK: Okay.
17 Q.      (By Mr. Leek) Do you understand
18 what I'm asking?
19 A.      I think I understood your
20 question. I don't think your question made
21 a lot of sense, so I'll answer it based on
22 my understanding of your question. If you
23 only were going to pick up one unit train

Page 116

1 one time in five years, the venture had
2 other options, less costly options likely
3 available to them. And if you had all -- if
4 you had all five years to load those 52
5 cars, they had other less costly mining and
6 loading options available to them. So in
7 that sense I cannot agree with your
8 question, but that may not be what you were
9 asking me.
10 Q.      It wasn't, but let's focus on
11 what you said for a minute. What other --
12 what do you know about the other less costly
13 options for mining gravel?
14 A.      I'm not here as an expert in that
15 field. I'm telling you as an accountant,
16 you know, just as common sense if you have
17 five years to load one rock in a train, you
18 could do it by hand and that would be a lot
19 cheaper than 2.8 million dollars. So time
20 does affect, frequency does affect
21 investment and that's what I'm trying to
22 tell you.
23 Q.      What's your basis for concluding

29 (Pages 113 to 116)

612 Lurleen Wallace Blvd., N. * Tuscaloosa, Alabama 35401 * www.legalink.com
(205) 758-4006 * (800) 844-3370 * Fax (205) 758-4371

# TUSCALOOSA COURT REPORTING
## Merrill Legal Solutions

Page 117

1  that the 2.8 million dollars was reasonable?
2  A.      I'm not concluding that the 2.8
3  million dollars was reasonable, and maybe I
4  did. If I did, I need to clarify that.
5  Q.      So what are you concluding with
6  regard to the 2.8 million dollars?
7  A.      That they invested a substantial
8  amount of money in connection with entering
9  into an Agreement that said that goods are
10 going to be shipped at 52 tons per week.
11     MR. PEARSON:  Fifty-two hundred
12 tons? Excuse me. I think it's 5200 tons.
13 A.      Fifty-two hundred tons per week.
14 And I was looking at the number and I said
15 it wrong. And that's very significant to me
16 in forming my opinions, so I'm trying to
17 tell you the basis for my opinions.
18 Q.      And what I'm trying to figure out
19 is on what basis have you concluded that
20 that is the right amount to spend based on
21 your conclusion that it's 5200 tons weekly?
22 A.      You're misunderstanding my
23 testimony. I'm not issuing an opinion right

Page 118

1  or wrong. I'm telling you that spending 2.8
2  million dollars in connection with signing
3  an Agreement that has a 5200 tons per week
4  delivery statement in it is significant as a
5  basis for my opinion for forecasting future
6  lost profit quantities.
7  Q.      In what way is it significant?
8  A.      In all the ways I've already
9  testified about; and if you have other
10 questions, you'll have to ask me because I'm
11 not sure how to explain it any more than I
12 have.
13 Q.      Well, this is kind of what I'm
14 after. You seem to use 2.8 million dollars
15 as -- and I think you've testified as
16 significant in determining some of your
17 other conclusions and opinions, but to make
18 that determination wouldn't you also have to
19 know what was typical in the sand and gravel
20 mining industry for investment in a mine?
21 A.      I'm sorry, I lost you halfway
22 through that question. You can read it back
23 or repeat it.

Page 119

1  Q.      Let me give a shot at repeating
2  it. See if I can save her some work. You
3  testified that the 2.8 million dollar
4  investment is significant in your
5  determinations or opinions about the damages
6  going forth; is that correct?
7  A.      Yes, it's a basis for my opinion.
8  Q.      And on what experience are you
9  drawing to determine that 2.8 million
10 dollars invested in a sand and gravel mine
11 was sufficient or insufficient or
12 appropriate, however you characterize it?
13 A.      I don't characterize it that way.
14 Q.      On what experience are you
15 drawing to determine that 2.8 million
16 dollars was significant in the investment of
17 a sand and mining -- excuse me, sand and
18 gravel mining operation?
19 A.      My experience is -- it's not
20 experience in the sand and mining. It's
21 numbers. It's finance. It's CPA stuff. So
22 your question the way it's phrased I'm not
23 sure I can answer it.

Page 120

1  Q.      Would you agree that 2.8 million
2  dollars invested in one industry may be
3  entirely reasonable where in another
4  industry it may prove to be
5  undercapitalized?
6  A.      You know, the question of under
7  capitalization I'm perfectly qualified to
8  talk about. I can tell you right now, based
9  on this Agreement and the amount of the
10 investment I'm already telling you that it
11 was substantial lost profits. So I don't
12 really understand any question where you're
13 asking me to assume that that investment was
14 unreasonable and I don't have to be an
15 industry expert to know that.
16 Q.      Would it effect your damage
17 calculations if the industry standard for a
18 similar mine was to invest five million
19 dollars?
20 A.      I haven't run those numbers. But
21 what you're getting to is, is at some point
22 the amount of money you put in cannot be
23 recovered plus a reasonable profit, that's

30 (Pages 117 to 120)

# TUSCALOOSA COURT REPORTING
## Merrill Legal Solutions

Page 121

1  what you're getting at, and I'm telling you
2  that this was -- at 5200 tons my report
3  speaks for itself. And it was significant
4  to me so I inquired about how much did you
5  invest, looking at the very issue that
6  you're attempting to cross-examine me on to
7  see if this was economically feasible in the
8  first place and does that make sense that
9  anybody would invest 2.8 million dollars
10 just to enter into the Supply Agreement, and
11 the economics do make sense because of the
12 nature of this mining operation, the fact
13 that you can't pull one rock out of the
14 ground without pulling out two other
15 marketable byproducts and the price for the
16 primary product that was sold under the
17 Supply Agreement that was set by the
18 Agreement and the fact that that very
19 Agreement spells out a reasonable number to
20 use to forecast lost profits as a result of
21 what occurred.
22       MR. PEARSON: One second. I need
23 to step out for a second.

Page 122

1        MR. LEEK: Yeah.
2        MR. PEARSON: Is that going to
3  interrupt you too much?
4        MR. LEEK: No.
5        (Whereupon, a short break was
6         taken.)
7  Q.      (By Mr. Leek) In your opinion
8  does it make sense to invest 2.8 million
9  dollars in Johnco if the requirement of the
10 Supply Agreement is only a hundred and fifty
11 thousand tons instead of two sixty?
12 A.      I'm not sure that I'm offering
13 opinions about what made sense. I think
14 I've already said that.
15 Q.      And correct me if I'm wrong, but
16 I think I understand your testimony is that
17 to reach the conclusions you have you looked
18 at the amount of the investment, the 5200
19 tons per week language in the Supply
20 Agreement, and you determined that 2.8
21 million based on that type of production and
22 sale is reasonable. I mean, am I fairly
23 characterizing it?

Page 123

1  A.      No, I don't think you are.
2  Q.      Okay.
3  A.      I think I looked at the factual
4  evidence of what was spent, how -- I gained
5  an understanding of the production
6  capabilities from my client. I gained an
7  understanding of the best information I have
8  on preconceived shipments and frequencies of
9  shipments from the Supply Agreements and
10 earlier versions of them as well as
11 supplemented by my client's testimony, but I
12 also know you've got your client's testimony
13 which conflicts with that, so I tried to
14 then look at all of that and make a
15 determination does the facts of forming this
16 venture say that this venture was being
17 formed to supply that contract, and the fact
18 that the venture appears to have been
19 formed -- the economics of the venture
20 appear -- the formation of this venture
21 appear to be driven by, that's the word I'm
22 searching for, driven by that Supply
23 Agreement was important to me.

Page 124

1        I'm not trying to say that any of
2  that was reasonable except to the extent the
3  contract had -- excuse me, to the extent the
4  5200 tons per week had been taken at the
5  prices specified that clearly says it was a
6  viable and profitable investment.
7  Q.      Okay. And by viable do you mean
8  it cash flowed to such an extent it made a
9  profit?
10 A.      Well, it would have had but for.
11 Q.      Would have on those numbers?
12 A.      I mean that's what my support
13 says.
14 Q.      Sure.
15 A.      It's just a math thing.
16 Q.      In doing that math thing, would
17 it have been viable under that definition at
18 a hundred and fifty thousand tons?
19 A.      You know, I've thought about that
20 but I haven't looked at it yet, and I'd like
21 to give it a little more consideration
22 before just answering off the cuff. But I
23 think I can give you an answer at the end of

31 (Pages 121 to 124)

# TUSCALOOSA COURT REPORTING
## Merrill Legal Solutions

Page 125

1   the day, but before today I haven't really
2   put much thought into that.
3   Q.       All right. I'll make a note of
4   it and come back to it. Have you had any
5   conversations with Pep or Ben Johnston?
6   A.       I don't remember. I don't think
7   so, but I don't remember.
8   Q.       Do you know whether anyone in
9   your office has had conversations with Pep
10  or Ben Johnston?
11  A.       The same. I took the collective
12  you.
13  Q.       Thank you. Do you know what the
14  value of the land is that Johnco purchased
15  today?
16  A.       No.
17  Q.       Did you do any determinations to
18  figure out whether land was appreciating in
19  that area or depreciating, remaining
20  stagnant?
21  A.       No.
22  Q.       As part of your investment
23  calculation, did you determine the value of

Page 126

1   the plant and railcar loading equipment?
2   A.       I didn't make a calculation. I
3   transferred numbers off the tax return. I
4   read the return.
5   Q.       Okay. So you used the tax return
6   to come up with those numbers; is that
7   correct?
8   A.       Correct.
9   Q.       Okay.
10  A.       Because I was trying to see how
11  much money was put into this venture.
12  Q.       And how do you deal with
13  depreciable equipment in coming up with a
14  lost profits calculation -- excuse me, an
15  investment calculation?
16  A.       Are you talking about investments
17  or talking about lost profits?
18  Q.       I think I'm talking about
19  investments.
20  A.       When I say investment, I'm
21  talking about how much money they spent to
22  get into this which doesn't have anything to
23  do with depreciation. That's the reason I'm

Page 127

1   asking you the question.
2   Q.       Forgive me ignorance here on
3   this. You've reviewed the complaint;
4   correct?
5   A.       Quite some time ago.
6   Q.       Are you aware that in the
7   complaint Johnco seeks both lost profits and
8   to recover their investment in Johnco?
9   A.       I'm not -- I am aware of that.
10  I'm not sure if I got that awareness from
11  the complaint or not.
12  Q.       Do you have an opinion on the
13  effect of receiving a damage award for both
14  lost profits, which we'll call expectation,
15  and the investment, which we'll call
16  reliance damages?
17          MR. PEARSON: Object to the form.
18  A.       Like which one legally you should
19  get?
20  Q.       Not legally. But what would
21  happen if Johnco were awarded both of those?
22  A.       Legally? I don't understand.
23  Q.       Practically?

Page 128

1   A.       They would receive a lot of
2   money.
3   Q.       Okay. And part of that --
4   A.       I really don't understand your
5   question. It's probably a question -- I
6   mean, I can assume what your question is,
7   but you're not asking me the question that I
8   probably have an answer to.
9   Q.       Okay. In your experience does a
10  party receive a windfall if they receive
11  both their lost profits from the breach of a
12  contract and their investment in the tools
13  necessary to perform that contract?
14  A.       I'm just not going to make vague
15  characterizations. Windfall, what does that
16  mean to you or me? You know, an investment
17  is an investment and then there's a return
18  on investment, and they lost their return on
19  the investment.
20  Q.       Did they lose their investment?
21  A.       Maybe, maybe not. I don't know.
22  Q.       Do you know whether Johnco is an
23  ongoing operation now?

32 (Pages 125 to 128)

# TUSCALOOSA COURT REPORTING
## Merrill Legal Solutions

Page 129

1  A.    I just have an understanding.
2  I've done no inspection of that. I was
3  asked to determine lost profit.
4  Q.    And you haven't been to the
5  property; is that correct?
6  A.    No, I haven't.
7  Q.    Let's see if we can deal with
8  this. Do you have an understanding of
9  whether the gravel in the ground, sand and
10 gravel in the ground that Johnco is a finite
11 resource?
12 A.    I would like -- I've made the
13 assumption that it's finite.
14 Q.    Right. And so --
15 A.    Of course no telling how deep you
16 can dig, but I have assumed it was finite.
17 Q.    So if Johnco mines a piece of
18 gravel for -- let's say under the Supply
19 Agreement for the purposes of Yelvington but
20 subsequently sells that piece of gravel to
21 someone else, have they lost the value of
22 that gravel?
23 A.    If they mine gravel that

Page 130

1  Yelvington was supposed to pick up but
2  didn't pick up and then they sell that
3  gravel to someone else thereby mitigating
4  that loss to the extent they -- whatever
5  they collected, their damage would be
6  reduced to the extent the damage was
7  mitigated which is what I understand your
8  question to be.
9  Q.    Right. And is it necessary to
10 consider mitigation of damages in order to
11 determine lost profit damages?
12 A.    Within the proper context
13 absolutely and I have done that.
14 Q.    Okay. So in my scenario if a
15 piece of gravel comes out of the ground,
16 Yelvington doesn't pick it up but Johnco
17 subsequently sells that piece of gravel to
18 someone else, what is the measure of damages
19 there?
20 A.    I don't -- I don't -- beyond what
21 I've said in my report I don't have any idea
22 what you've just asked me.
23 Q.    Have you accounted for Johnco

Page 131

1  selling the gravel to someone else in your
2  report?
3  A.    Yes.
4  Q.    Where?
5  A.    It's on the Appendix, reduces the
6  damages.
7  Q.    Okay. Can you show me where,
8  please?
9  A.    Appendix 1, the next to the last
10 line.
11 Q.    Is that less actual gravel and
12 sand sales?
13 A.    Yes.
14 Q.    And actual gravel and sand sales
15 refers to sales that they actually made; is
16 that correct?
17 A.    That's everything.
18 Q.    But, I mean, are you predicting
19 sales in the future of that piece of gravel
20 to someone else or is that just a review of
21 the gravel that they sold during that time
22 period?
23 A.    If I understand your question,

Page 132

1  you're asking me when I computed the lost
2  profits did I forecast future mitigating
3  events into this damage. I have taken into
4  account acts of mitigation known by me up to
5  the current date.
6  Q.    Okay.
7  A.    I'm not aware of any other event
8  that has occurred. I am aware that attempts
9  to mitigate this damage continue.
10 Q.    And if those attempts are
11 successful, that changes your damage
12 calculation; is that correct?
13 A.    If they are successful, it might
14 change my damage calculation. It might not.
15 Q.    Well, can you explain to me how
16 mitigation of damages would not affect the
17 damage calculations?
18 A.    To the extent it's legally
19 determined to be mitigation of damages, it
20 would.
21 Q.    Okay.
22 A.    And to the extent the things that
23 you're trying to say are mitigation are not,

33 (Pages 129 to 132)

# TUSCALOOSA COURT REPORTING
## Merrill Legal Solutions

Page 133

1 it wouldn't. For example, if you've lost
2 year one's profits, you've lost those
3 profits, and I don't understand how you
4 could mitigate year one in year five. Those
5 sales are gone.
6 Q.      How is that so? I mean the sale
7 of the gravel is not gone. The sale of the
8 gravel can take place at any time it's
9 pulled out of the ground; isn't that
10 correct?
11 A.      Help me with what you're assuming
12 in that question.
13 Q.      Okay.
14 A.      Because maybe -- I don't think so
15 in this case.
16 Q.      That's fine. But, you know, I'm
17 talking you take a piece of gravel out.
18 You've got a finite resource. You take a
19 piece of grave out. Someone was supposed to
20 buy it today?
21 A.      Yelvington is not exhausting this
22 resource, which is what you have to be
23 assuming by your question.

Page 134

1 Q.      Well, hold on a second. The
2 resource at some point will be exhausted;
3 correct?
4 A.      Like every resource in the world.
5 Q.      Sure.
6 A.      So there would never be lost
7 profits if you're right.
8 Q.      So this piece of gravel that was
9 attributed to Yelvington could be sold later
10 to someone else; isn't that correct?
11       MR. PEARSON: I object to the
12 form of the question.
13 A.      That's purely speculative.
14 Q.      Sure. But we're talking about
15 hypotheticals, you're predicting lost
16 profits into the future, those types of
17 things.
18 A.      Nothing that I'm doing in my
19 opinion is speculative. And I'm not going
20 to speculate about hypothetical speculative
21 things and that's what you're asking me to
22 do. I'm not here to do that. I'm here to
23 offer you a professional opinion based on my

Page 135

1 inspection of the information here and my
2 analysis.
3 Q.      Okay. In your professional
4 opinion a piece of gravel not sold today but
5 sold later in the future, what is -- how do
6 you measure the damages suffered by the
7 person because of the delay?
8       MR. PEARSON: I object to the
9 form. The foundation hasn't been laid for
10 that question properly. It assumes things
11 that aren't true.
12       MR. LEEK: And again, we're in
13 the deposition of an expert. A hypothetical
14 is perfectly okay.
15       MR. PEARSON: And I understand.
16       MR. LEEK: So that's what we're
17 doing, a hypothetical.
18       MR. PEARSON: I still object that
19 it's not a proper hypothetical question in
20 form or foundation or in any way to say that
21 this piece of gravel is going to be produced
22 later and sold later. It is not
23 foundationally sound. It's a bad

Page 136

1 hypothetical.
2 Q.      (By Mr. Leek) Do you have any way
3 to determine whether -- let me back up this
4 way. Is the gravel that Johnco was going to
5 sell to Yelvington wasted, meaning it can't
6 be sold to anybody else?
7 A.      What do you mean by wasted?
8 Q.      Can't be sold to anybody else.
9 A.      And we're talking purely
10 hypothetical?
11 Q.      Sure.
12 A.      And you're asking me to tell you
13 in my professional opinion whether I have an
14 opinion whether that gravel might be sold
15 some day in the future to an unidentified
16 future party? I have no idea, and I'm not
17 here to offer that opinion. That's
18 speculative.
19 Q.      Okay. I need you to work with me
20 on a hypothetical. What I'm doing is
21 perfectly legitimate.
22 A.      I know it is.
23 Q.      Okay.

34 (Pages 133 to 136)

# TUSCALOOSA COURT REPORTING
## Merrill Legal Solutions

Page 137

1  A.      But you're going to have to give
2  me enough information so I can answer your
3  question.
4  Q.      I'll do it. This is all the
5  information you need. A piece of gravel --
6  A.      Well, it may or may not be.
7  Q.      A piece of gravel comes out of
8  the ground that Yelvington was supposed to
9  buy, can that gravel be sold, that same
10 piece of gravel be sold to someone else?
11 A.      I don't know.
12 Q.      Do you have any reason to believe
13 that that piece of gravel can't be sold to
14 someone else?
15 A.      I haven't given the kind of
16 consideration that I would need to give nor
17 am I given enough information to answer that
18 kind of question. I'm not even sure I
19 understand it because it's so vague.
20 Q.      Well, what is vague about can it
21 be sold to someone else?
22 A.      I don't -- it's your question and
23 I've already told you it's vague. If you

Page 138

1  can give me some more information, it would
2  make it unvague.
3  Q.      I'm trying to do that, but to do
4  that I have to determine why you concluded
5  that's vague. What part of that don't you
6  understand that I can make clear?
7  A.      What time frame are you talking
8  about?
9  Q.      Any time frame. The life of the
10 mine?
11 A.      It's too vague.
12 Q.      Why?
13 A.      The life of the mine?
14 Q.      Yeah.
15 A.      What's the life of the mine?
16 Q.      We're talking about a finite
17 resource.
18 A.      I don't want to argue with you.
19 You've asked me to tell you what I don't
20 understand and then you're arguing back with
21 me. At some point I'm just going to say
22 we're done.
23 Q.      Assume the life of the mine is

Page 139

1  ten years?
2  A.      What do you mean by the life of
3  the mine?
4  Q.      By the time that that ten years
5  is up, the resource in the ground will be
6  exhausted.
7  A.      Okay. And will the compensation
8  received -- so you've asked me to assume
9  that every mineable rock will be sold?
10 Q.      Yes.
11 A.      Regardless of Yelvington's
12 actions, it's a certainty that it will be
13 sold and -- which is not the case here, and
14 it's a certainty that they will be
15 compensated for any and all losses
16 associated with that, okay, regardless of
17 the time frame it's a certainty for that;
18 okay?
19 Q.      Yes.
20 A.      And you asked me to assume that
21 Yelvington breached a contractual obligation
22 to take the rock sooner for a certain
23 amount?

Page 140

1  Q.      Yes.
2  A.      And it would have been profitable
3  if my client took that -- if your client
4  taken that rock and promptly paid my client?
5  Q.      We can assume that. We don't
6  know that, but we can assume that.
7  A.      I think we need to. Then the
8  answer is I don't know. That's a legal
9  question.
10 Q.      Okay. Did you review any mining
11 plans for Johnco?
12 A.      I don't think so, but I don't
13 remember.
14 Q.      Do you know of any mining plans
15 for Johnco?
16 A.      Do I believe mining plans exist?
17 Yes.
18 Q.      And do you believe that -- or do
19 you know of any mining plans that existed
20 prior to Johnco entering into this Supply
21 Agreement?
22 A.      I mean, it depends on what you
23 mean by mining plan. I assumed you're

35 (Pages 137 to 140)

# TUSCALOOSA COURT REPORTING
## Merrill Legal Solutions

Page 141

1  referring to ADEM reports.
2  Q.        Okay.
3  A.        And I have assumed that those
4  exist.
5  Q.        By mining plan I mean a plan by
6  the company to mine a particular part now,
7  another part later, and a specific
8  direction, a rate taking the product out of
9  the ground. Have you ever seen any plans
10 like that for Johnco?
11 A.        I have not looked at any plan as
12 you described, and that was not the
13 collective I, that was me. I don't know if
14 other people looked at it.
15 Q.        Did you review the content mix of
16 the resource at Johnco?
17 A.        Did I -- I considered it. I
18 don't know what you mean by reviewed the
19 content mix.
20 Q.        Define content mix for me, what
21 you understand it to mean?
22 A.        Well, I'll tell you what I
23 understood it to mean in your question was

Page 142

1  the mix between the gravel that Yelvington
2  was purchasing under the Supply Agreement
3  and the byproducts. That's what I
4  understood.
5  Q.        Did you form any opinions on how
6  much gravel was in the ground compared to
7  sand or oversized?
8  A.        Did I form any opinions? No.
9  Did I make any assumption? Yes. Did I
10 attempt to verify the assumptions? Yes.
11 Q.        And can you direct me to where
12 those assumptions are in your report?
13 A.        Appendix 2.
14 Q.        Are they contained in the
15 document itself or only in Appendix 2?
16 A.        Oh, I don't know. Probably. Who
17 knows. Let me see. They actually may not
18 be in the report. It looks like I probably
19 need to correct that testimony. I don't
20 see -- let me make sure I understand what
21 you're talking about. You're talking about
22 if you took a ton of dirt and put it through
23 the screens what would you get that was

Page 143

1  left?
2  Q.        (Nodded yes.)
3  A.        And I don't immediately see that,
4  but it may be in a footnote somewhere, but
5  it's part of -- it was part of my
6  consideration.
7  Q.        Do you know whether the content
8  mix changes with the first scoop of dirt out
9  of the ground as compared to the fiftieth
10 going down?
11        MR. PEARSON: I'm going to object
12 to the form again, foundation. Last scoop
13 of dirt out of the ground, I don't think
14 that that has ever been testified to as a
15 foundation of part of the mining here.
16 A.        I'm not issuing any geological
17 opinions and I'm not going to issue any
18 opinions like that.
19 Q.        The question was not asking you
20 to issue an opinion. The question was do
21 you know what the difference is in the
22 content mix for the first let's call a
23 shovel of dirt versus the fiftieth shovel of

Page 144

1  dirt digging straight down?
2        MR. PEARSON: Again, I'm going to
3  object. We had -- what was being mined here
4  was an open pit dredge mine and it was
5  not -- there was no shovel.
6        MR. LEEK: Fair enough.
7  Q.        (By Mr. Leek) You understand it
8  has to come up out of the ground some way.
9  Let's replace the word shovel with dredge.
10 A.        I mean, I have an understanding
11 about the mining operation and it's making
12 it very difficult for me to answer questions
13 about the first shovel of dirt. You know, I
14 mean, I understand it enough to know that
15 question makes no sense.
16 Q.        Okay. You know what content mix
17 means; is that correct?
18 A.        In the context of how much number
19 67 and how much sand and how much oversize
20 you get, that's what I understand you mean
21 by content mix.
22 Q.        Do you understand that the
23 content mix can change based on how deep you

36 (Pages 141 to 144)

612 Lurleen Wallace Blvd., N. * Tuscaloosa, Alabama 35401 * www.legalink.com
(205) 758-4006 * (800) 844-3370 * Fax (205) 758-4371

# TUSCALOOSA COURT REPORTING
## Merrill Legal Solutions

Page 145

1  are dredging into the ground?
2  A.      I have been informed of a lot of
3  information, but whether it's, you know, an
4  understanding or not I would probably jump
5  short of that because you're getting out of
6  my field of expertise and into the
7  geological field.
8  Q.      Is it your opinion that the
9  content mix doesn't have any affect on the
10  profits lost by Johnco?
11  A.      No. It's my opinion that my
12  consideration of whether or not it did in
13  this matter does not because of the
14  understanding I gained about the property
15  and the mining process, but it is an
16  assumption.
17  Q.      Okay. And just so I'm clear on
18  what that assumption is, your assumption is
19  the content mix does not affect lost profits
20  of Johnco?
21  A.      No, that is not my assumption.
22  Q.      I'm trying to understand what you
23  said, so help me out if you can.

Page 146

1  A.      My assumption is, is there is
2  sufficient quantity of goods to supply the
3  numbers that I had forecasted would be sold
4  based on the Supply Agreement and the
5  information contained in that and the other
6  information I've examined. I didn't have to
7  get into the rest of your question.
8  Q.      Would it affect the cost of
9  mining if the gravel were deeper as opposed
10  to shallower?
11  A.      That's a relative determination.
12  Q.      Yeah. Would it affect the cost?
13  A.      It would seem logical that it
14  could, but I don't know. Again, I have made
15  the assumption in this case that the period
16  of time they did mine that I selected for my
17  base period was a reasonable, if not
18  conservative, period to determine the cost
19  of mining.
20  Q.      But you didn't take into account
21  any specific issues regarding the depth that
22  they would have to dig or dredge to get the
23  gravel? You took a --

Page 147

1  A.      I'm aware just from some lines in
2  cross-examination reading depositions that
3  that's an issue you have raised, and I did
4  take it into consideration. But to dispose
5  of that issue, you know, technically, that
6  little technical issue, that's a geological
7  matter. What I've looked at is the actual
8  performance and the cost associated with
9  that period of time, the nature of the
10  business, how they staff it, those types of
11  things.
12  Q.      And then you've assumed that as a
13  constant for the future dredging of product;
14  is that correct?
15  A.      It is not a constant, you're
16  wrong.
17  Q.      Well, what have you assumed in
18  your calculation?
19  A.      It varies per ton.
20  Q.      And did you come up with --
21  A.      Which is conservative.
22  Q.      And did you come up with an
23  average cost to get that ton out of the

Page 148

1  ground?
2  A.      Correct.
3  Q.      And in coming up with that
4  average, do you not assume that the period
5  of time you've boked at is a
6  representative -- reasonable representative
7  sample of what it's going to take to do the
8  entire property?
9  A.      Correct.
10  Q.      And then you forecast -- using
11  that number you forecast what it's going to
12  cost to produce gravel in some area not
13  currently in production?
14  A.      Correct.
15  Q.      And that forecast may or may not
16  be realized; isn't that correct?
17  A.      You know, like all forecasts they
18  may -- you may beat them, you may do better,
19  you may do worse. The key is that the
20  forecast be reasonable and have a reasonable
21  basis upon which it's made, an actual
22  historical performance. Based on my
23  understanding of how that mine operated, how

37 (Pages 145 to 148)

# TUSCALOOSA COURT REPORTING
## Merrill Legal Solutions

Page 149

1  it was staffed, it's cost structure, I have
2  made a reasonable determination in that
3  light.
4  Q.      Do you have an understanding of
5  what effect the equipment configuration has
6  on a mine's capacity -- excuse me, a mine's
7  ability to bring product out of the ground?
8  A.      I'm not sure that I understand
9  what you mean by configuration. Like the
10 size of the screen?
11 Q.      Well, size of the screen,
12 placement of the screen, placement of the
13 dredge, choice of the dredge, those types of
14 things.
15 A.      So you kind of wrap that up in
16 the knowledge and experience in mining and
17 whether they're knowledgeable and
18 experienced miners. Is that a
19 consideration? Yeah, that's a
20 consideration.
21 Q.      And did you determine them to be
22 knowledgeable and experienced miners?
23 A.      I gave that some consideration.

Page 150

1  Q.      Do you have an opinion on whether
2  they are knowledgeable --
3  A.      No.
4  Q.      -- and experienced miners?
5  A.      No. I'll let the record speak
6  for that.
7  Q.      If they switch from a wet mining
8  process to a dry mining process, what effect
9  would that have on any damages they may have
10 suffered?
11 A.      So you're asking me to assume
12 that the process that they actually used is
13 changed to a process they never used?
14 Q.      Yes.
15 A.      Okay. And you're asking me to
16 assume that that change was not in any way
17 motivated or didn't have anything to do with
18 your client's failure to take any delivery
19 of stone?
20 Q.      Yes.
21 A.      So we're not talking about this
22 dispute. We're talking about some other
23 entity besides JMI?

Page 151

1  Q.      I'm talking about this dispute,
2  but can you assume what you need to to
3  answer the question.
4  A.      Then I can't answer your
5  question.
6  Q.      Why?
7  A.      Because we can't be talking about
8  JMI and me answer a question about JMI.
9  Q.      Is it your opinion that JMI --
10 let's start with this. Do you know that JMI
11 has switched from a wet mining operation to
12 a dry mining operation?
13 A.      I don't know where they are in
14 any of their continuing operations. I have
15 been informed of possible changes. I just
16 don't know what the status is. I don't know
17 if they switched, are going to switch,
18 thinking about switching, might switch.
19 Q.      Well, let's assume -- and I was
20 there yesterday and so was Mr. Floyd. Let's
21 assume they are in the process of switching
22 from a wet mining operation to a dry mining
23 operation, will that have an affect on their

Page 152

1  cost?
2  A.      Not for my purposes, no.
3  Q.      Why not?
4  A.      It's not relevant.
5  Q.      Why isn't that relevant, that's
6  what I'm after?
7  A.      Because I'm trying to put the
8  parties back but for failure to receive
9  regular weekly shipments.
10 Q.      Let me ask this question. Do you
11 know whether Yelvington has sued Johnco to
12 get them to start giving them the product?
13 A.      I have been informed that there
14 is a counter-complaint. I don't want to
15 characterize why it was. I'll take whatever
16 you represent it to be and assume it's true.
17 Q.      If Yelvington were willing and
18 able to take the product now and Johnco are
19 willing to give it to them, would that
20 affect Johnco's damages?
21 A.      That's just way too broad. I
22 don't know. It could. It might not. I
23 don't know.

38 (Pages 149 to 152)

# TUSCALOOSA COURT REPORTING
## Merrill Legal Solutions

Page 153

1  Q.      Do you know how the equipment at
2  Johnco was configured initially?
3  A.      I don't have that kind of detail
4  information. I've just got the numbers.
5  Q.      Do you know whether the dredge is
6  in operation now?
7  A.      At some point they -- right after
8  October 2006 it's my understanding they
9  stopped the dredging operations. I don't
10 know if they have resumed them.
11 Q.      So you don't know whether they
12 started dredging again in January of 2007?
13 A.      It's my belief -- and I just
14 don't -- I can't testify as a fact. It's my
15 belief that I've been informed or my
16 recollection that I was informed that they
17 stopped the dredging. And while they may
18 have recently started back dredging, I just
19 don't know.
20 Q.      And just to close that loop, you
21 wouldn't know if they started back in
22 January of 2007 dredging again?
23 A.      Well, no. I've got financial

Page 154

1  statements and have taken that information
2  into account in my analysis, but what I
3  don't know is were the selling off rock that
4  was there or were they continuing to dredge,
5  other than I do know they stopped dredging
6  for some period of time and they did sell
7  off a lot of the rock that was there.
8  Q.      Do you know whether they have
9  sold off any newly produced product let's
10 say after October, after October 2006?
11 A.      I don't have that kind of -- I
12 don't have the information in that level of
13 detail.
14 Q.      So they may have, they may not
15 have, you don't know?
16 A.      I've already answered that
17 question and then you keep asking me more,
18 and so, I mean, refer back to my earlier
19 answer on that one.
20 Q.      In determining Johnco's damages,
21 I know you looked at what they sold. Did
22 you look at what was actually produced and
23 perhaps not sold?

Page 155

1  A.      No. For production I looked at
2  the staffing required to produce the amount
3  that would have been produced and then
4  assumed that it would have to be produced
5  and that there was no stockpile because that
6  was conservative and lowered my damage
7  number.
8  Q.      Have you seen records that show
9  how much product came out of the ground,
10 setting aside what was sold?
11 A.      I don't understand your question.
12 Q.      Yeah. Have you seen any document
13 or heard any -- learned of any information
14 about how much product was taken out of the
15 ground as opposed to how much was sold?
16 A.      Or other than how much was sold?
17 Q.      Yeah.
18 A.      I'm not aware of any today, any
19 production records that would have told me
20 that, and that is why I made the assumption
21 that I made, which caused my damages to be
22 lower and conservative.
23 Q.      And what you're saying is you --

Page 156

1  A.      The same with my cost
2  assumptions. I used the same approach which
3  caused my cost to be higher.
4  Q.      You assumed that everything they
5  took out of the ground they sold, is that
6  correct, for purposes of determining the
7  damage number?
8  A.      Let's be real clear, because I've
9  read Dave's report. I have assumed they
10 produced based on demand but that they
11 were -- and then I have been informed and
12 inquired and done my own investigation of
13 what level they were staffed and capable of
14 producing, as opposed to Dave's assumption
15 that they were at maximum production
16 capacity, and I think that's what you're
17 getting at, although I really didn't
18 understand your question.
19 Q.      What investigation did you do to
20 determine what they could produce?
21 A.      I interviewed my client. I
22 inquired about the size of the property and
23 the amount of minerals that were there. I

39 (Pages 153 to 156)

# TUSCALOOSA COURT REPORTING
## Merrill Legal Solutions

Page 157

1  inquired about the mineral mix, content mix
2  is what you call it, the mix and the
3  minerals and then I looked at the
4  reasonableness based on my knowledge of
5  business of what they were telling me about
6  how the mining process operates and what
7  costs are incurred in operating that and
8  then what costs are incurred when you
9  increase your capacity, for example, adding
10  a shift for overtime, what are those costs,
11  and then I studied the months where my
12  client represented that they were staffed at
13  the appropriate capacity. I excluded the
14  months where my client told me, "We had
15  taken mitigating steps in those months. We
16  had laid people off." Those would not be
17  months in which we could have fulfilled the
18  Supply Agreement without adding extra costs.
19  And based on that I determined an
20  incremental per ton cost and used that
21  throughout the forecast period. Regardless
22  of whether they were step variable, I
23  treated them as absolutely unit variable,

Page 158

1  which is conservative in this case.
2  Q.      Did you get your information
3  about the production capacity of Johnco from
4  any other source than your client?
5  A.      Well, as of today, yes. Well,
6  production capacity -- as of today about
7  mining the amount of minerals in the ground,
8  I've gained additional information; but as
9  of the date of the report, it was based on
10  my client.
11  Q.      Do you know as you sit here on
12  what capacity Johnco is producing gravel
13  now?
14  A.      No.
15  Q.      Do you have any information
16  whether Johnco is producing number 67 gravel
17  now?
18  A.      I just have things I've been
19  informed that I really don't know.
20  Q.      Okay. What's your --
21  A.      So I don't want to speculate.
22  Q.      I'm not asking you to speculate
23  but tell me what your understanding opinion

Page 159

1  is based on what you found out?
2  A.      That they are not.
3  Q.      Not producing 67 gram?
4  A.      Correct.
5  Q.      Do you have an understanding what
6  they are producing?
7  A.      A different size, or they're
8  preparing -- it's my understanding they're
9  preparing to produce another size but they
10  are not producing anything, but I don't -- I
11  don't really know. And as you said, you
12  were down there yesterday. You do know.
13  Q.      Do you have any information that
14  Johnco is producing number 57 gravel, let's
15  say has in 2007 up to the present?
16  A.      I may have. I mean, it may be in
17  the depositions. I may have been informed.
18  I don't know. That doesn't sound unfamiliar
19  to me.
20  Q.      Do you know the relative
21  difference between 57 gravel and 67 gravel?
22  A.      At one time I did. I think 57 is
23  bigger.

Page 160

1  Q.      Do you have an understanding that
2  67 is a component part of 57?
3          MR. PEARSON: I think I'm going
4  to object to the form of the question,
5  component part, just because I'm not sure.
6  Q.      Do you know what I mean?
7  A.      I think I know what you're trying
8  to say, but what you asked me doesn't make
9  any sense.
10  Q.      Sixty-seven gravel is a smaller
11  size gravel than 57 gravel; --
12  A.      Right.
13  Q.      -- is that your understanding?
14  And when you produce 57 gravel, what would
15  otherwise be 67 gravel is used in 57 gravel;
16  is that correct or does that comport with
17  your understanding?
18  A.      Let me just give you my
19  understanding.
20  Q.      Great.
21  A.      You can't do both.
22  Q.      Okay.
23  A.      It's one or the other.

40 (Pages 157 to 160)

# TUSCALOOSA COURT REPORTING
## Merrill Legal Solutions

Page 161

1  Q.    Okay.
2  A.    That was easier, wasn't it?
3  Q.    Yeah. And forgive me if I've
4  asked this, but did you say you do or don't
5  know whether Johnco has produced 57 gravel
6  in 2007?
7  A.    I think I said I didn't know, but
8  the more you keep asking me about it I might
9  have been told that or I might have read it
10 in a deposition.
11 Q.    So the gravel that Johnco could
12 have produced for Yelvington is now being
13 used for another purpose; is that correct?
14 A.    I think I just said that I think,
15 I think, I think. I'm not going to
16 speculate about what could or might have
17 done about what I think I think.
18 Q.    Fair enough. Are you familiar
19 with Dunn Construction?
20 A.    I am.
21 Q.    Are you aware of any discussions
22 or negotiations between Johnco and Dunn
23 Construction regarding the purchase of

Page 162

1  gravel?
2  A.    My awareness is limited to
3  discussions with counsel.
4  Q.    And what were those discussions?
5  A.    That there's discussions going on
6  between Dunn.
7  Q.    Whereby Dunn would purchase what
8  Johnco could produce, the 57; is that
9  correct? That your understanding?
10 A.    Mr. Pearson may have said it all
11 to me, but it's not, you know, relevant to
12 what I'm doing and so I -- you know, I don't
13 really know. I don't want to characterize
14 what he told me. I listened to it. I
15 concluded that it's not going to change my
16 opinions and then I moved forward.
17 Q.    What's the basis of your
18 conclusion that that's not going to change
19 the opinions you've given in this report?
20 A.    It's not being presented to me in
21 any other way than hypotheticals and
22 speculation. That's one basis. And there
23 might be others, but until you present it to

Page 163

1  me I don't know.
2  Q.    I believe you testified that they
3  can only produce one at a time. They can't
4  do both, I think is what you said, 57 and
5  67; is that correct?
6  A.    I think that's a fair
7  characterization of what I said, you can't
8  do both.
9  Q.    So if they're producing 57, they
10 can't be producing 67; correct?
11 A.    If today they stopped producing
12 67 or changed their capabilities to produce
13 from 67 to 57, they would have to change
14 back to produce 67.
15 Q.    What familiarity do you have with
16 the transportation aspects of moving sand
17 and gravel that's been produced?
18 A.    A CPA's familiarity.
19 Q.    What is that?
20 A.    I'll characterize it this way.
21 It costs money to move heavy things, so the
22 further you want to move something the more
23 you have to get for it, and market price of

Page 164

1  things affects your geographic market
2  because of that.
3  Q.    Meaning it can limit your market
4  geographically; is that correct?
5  A.    Or it can make it unlimited. It
6  depends on what it is. You always seem to
7  look at the half empty side of it.
8  Q.    What effect did transportation
9  costs of sand and oversize have on your
10 calculations of damages with regard to the
11 sale of byproducts?
12 A.    What effect did the size?
13 Q.    No, transportation cost. What
14 effect does the transportation cost have?
15 A.    On sand and oversize?
16 Q.    Yes.
17 A.    The consideration of
18 transportation costs led me to conclude that
19 transportation cost -- and combined with
20 what I know about the market price for the
21 two learned from the actual sales in this
22 matter led me to conclude that the market
23 for sand would be negatively impacted and

41 (Pages 161 to 164)

# TUSCALOOSA COURT REPORTING
## Merrill Legal Solutions

Page 165

1  therefore smaller geographically than the
2  market -- or potential market -- there's so
3  much fewer -- so much slower amount of
4  oversize I'm not sure it's an issue,
5  particularly when you look at the price they
6  were able to get for oversize. I'm not sure
7  transportation -- it depends on the number
8  of competitors and on other stuff, but they
9  were pretty well able to sell their oversize
10  at a fairly handsome price. So what I did
11  was limit the sale assumption on the sand
12  regardless of the fact that they were just
13  in the process of implementing and -- really
14  developing and implementing plans to dispose
15  of the sand.
16  Q.      You mean sell the sand or dispose
17  of it? Because there's been some talk about
18  wasting it back into the mine, and I want to
19  make sure we're talking about the same
20  thing.
21  A.      Well, you need to assume how I
22  look at it. You know, you can't just go
23  into the ground and take out number 67 and

Page 166

1  that's fundamental to this venture. So when
2  you go into this venture, you have to
3  recognize, which my inspection shows all the
4  parties recognized there was going to be
5  oversize gravel and there was going to be
6  sand. The problem is shortly into this
7  joint venture I'm dealing with the but for
8  situation.
9       So what I did in my assumption
10  was limit the sand upside potential to the
11  proportion that was actually sold during the
12  period that they operated, which I believe
13  is a conservative assumption, and I also
14  limited the price to what they actually got
15  despite the fact that my client was telling
16  me that they had plans to sell it for more.
17  Q.      Do you know or did you come to
18  any understanding of whether it was feasible
19  to transport the sand by rail?
20  A.      I don't have an opinion about
21  whether rail transportation of sand -- and
22  again you're -- I think you're asking me
23  feasible assuming the distance is so far.

Page 167

1  It very well is feasible if you're only
2  going a certain distance. I don't know.
3  That whole feasibility issue is also wrapped
4  up in what my client is telling me they were
5  planning to do and their various options
6  open to them that they were pursuing, which
7  involved higher prices which opens up
8  feasibility of rail shipment versus what
9  they did, which was more local pick up.
10  Q.      Now, do you know of an instance
11  in which they shipped sand by rail?
12  A.      I know of one month where the
13  volumes are high and I have no idea how they
14  accomplished that if it wasn't for rail, but
15  I have not spent the time to figure out
16  whether that was rail so I'm not saying it
17  was.
18  Q.      And can we agree it's not an
19  option for Johnco to ship this by barge
20  because there's no water?
21  A.      I haven't investigated --
22  Q.      Okay.
23  A.      -- whether that would be an

Page 168

1  option or not. And I think there is a
2  navigable waterway right there.
3  Q.      Do you know were the sales of
4  sand --
5  A.      Before you get to that question,
6  since it's not pending, can we go off the
7  record?
8  Q.      Yes.
9       (Off-the-record discussion.)
10       (Whereupon, a short break was
11       taken.)
12  Q.      (By Mr. Leek) We're back on the
13  record. If you could, take a look for me at
14  Johnco page 1060, which is under Tab D.
15  A.      This is like in order?
16  Q.      Yes.
17  A.      Okay.
18  Q.      At least I hope so. And we're
19  also going to be looking at Appendix 4 of
20  the report; okay?
21  A.      I'm ready.
22  Q.      You're there. All right.
23  Specifically looking at May 2006 and looking

42 (Pages 165 to 168)

# TUSCALOOSA COURT REPORTING
## Merrill Legal Solutions

Page 169

1  at repairs, comparing Johnco 1060, which is
2  the Profit and Loss Statement January
3  through December 2006 with Appendix 4, it
4  appears that the numbers in your Appendix 4
5  vary from the Profit and Loss Statement
6  provided by Johnco. Do you know why that
7  is? Again, we're looking at repairs.
8  A.    Just repairs?
9  Q.    Yes, beginning May 2006.
10 A.    Just trying to compare it to
11 what --
12 Q.    And while you're at it, I think
13 the same is true all the way through August
14 of 2006. Yeah.
15 A.    I wish I had my glasses. And if
16 I'm looking at this right, Johnco 1060 shows
17 a repairs expense of $314.25.
18 Q.    For May 2006?
19 A.    Yes. And my Appendix 4 shows a
20 repair of $1,518, which came from a document
21 entitled "Johnco Materials Profit and Loss
22 Statement January through December 2006,"
23 faxed August 7, 2007 to my office, which

Page 170

1  shows the same amount as in my report. I
2  don't know why this document is different
3  than the one I was provided.
4  Q.    Okay.
5  A.    And you said, just to make -- if
6  you don't mind, I'm going to make a note
7  myself. You said that continues how many
8  months?
9  Q.    It continues at least for --
10 well, May through August is what you've
11 represented in your Appendix 4, but the
12 difference let's say for June in the Profit
13 and Loss Statement compared to June in the
14 Appendix 4 is roughly fifteen thousand
15 dollars.
16 A.    Before we leave it, let me just
17 look. I see the difference and I don't know
18 why there's a difference.
19 Q.    The document that you are
20 referring to as being different is the one
21 in your notebook; correct?
22 A.    It's a record provided to me by
23 Johnco and it's in my notebook. That is new

Page 171

1  information presented to me. I will find
2  out the answer, I assure you. And if my
3  report needs to be adjusted, I will make the
4  appropriate adjustment in damages down or
5  up. I did it your way that time, see.
6  Q.    On Appendix 4, again --
7  A.    Yes, sir.
8  Q.    -- looking at the, I guess we'll
9  call it heading "Escalate Variable Fuel and
10 Oil Costs," do you see that?
11 A.    Uh-huh (affirmative), I do.
12 Q.    I'm trying to figure this out.
13 I'm not challenging. I'm just trying to
14 figure it out. Have you taken into account
15 there what fuel costs are predicted to be at
16 any time in the future?
17 A.    You're talking about the price
18 per gallon of fuel.
19 Q.    Yeah, that's exactly. Does this
20 consider a price per gallon increase in fuel
21 costs? Is that the escalated variable fuel
22 we're talking about?
23 A.    It's based on the history. It

Page 172

1  has not been adjusted for price increases
2  that have occurred since then and nor has it
3  been adjusted in any speculative way about
4  what a commodity price might do in the
5  future.
6  Q.    Okay. So this assumes that
7  the -- necessarily then assumes that the
8  commodity price remains consistent with the
9  historical price?
10 A.    Any commodity prices, whether
11 they're cost related or profit related, have
12 been based on history and the effect of
13 changes in commodities have assumed to wash
14 one another out.
15 Q.    Over a five-year period?
16 A.    Are you saying over the period of
17 five years that's already occurred?
18 Q.    No. I'm saying should you expect
19 the variations in the price of a commodity
20 to wash themselves out over a five-year
21 period?
22 A.    I think it's a reasonable way to
23 do it is what I'm saying. When you're

43 (Pages 169 to 172)

# TUSCALOOSA COURT REPORTING
## Merrill Legal Solutions

Page 173

1  dealing with commodities on the revenue side
2  and commodities on the expense side and the
3  inherent speculative, in my opinion,
4  inability for anyone to reliably forecast
5  what a commodity price is going to do in the
6  future, it is reasonable to make the
7  forecast the way I have done it and it's an
8  appropriate level of precision for the
9  purposes of this calculation.
10 Q.      And the historical look back
11 you're looking at is an 18-month period, is
12 that what I understand?
13 A.      If, there's 18 months of
14 operations, on the revenue side it's based
15 on 18 months. On the cost side it's based
16 on a select number of smaller months where
17 they were staffed to operate at full
18 capacity but not mining at full capacity and
19 that's why we had to adjust the fuel.
20 Q.      And which are those months that
21 you're looking at for costs and I believe it
22 was --
23 A.      It's the months on Appendix 4.

Page 174

1  Q.      Okay. Thank you. March through
2  August of 2006 for a six-month period;
3  correct?
4  A.      Well, it's not a six-continuous-
5  month period. It's one, two, three, four,
6  five months that Johnco staffed up and did
7  not take mitigating steps to reduce its
8  staffing so that it could perform under the
9  Supply Agreement to the level of 5200 tons
10 per week. So the only thing missing out of
11 those costs would be the incremental costs
12 that were avoided because your client did
13 not take 5200 tons and my client chose not
14 to mine if your client wasn't taking the
15 gravel.
16 Q.      And so what you've shown me here
17 is if Johnco ramped up to production at
18 260,000 tons, this is the escalation in fuel
19 cost they should expect?
20 A.      If you -- yeah. Let me say it
21 more clearly the way I think of it.
22 Considering all of the costs, okay, based on
23 what was represented to me in those months

Page 175

1  they had adequate staffing to -- and all the
2  equipment in place and had proven their
3  ability to mine and could produce 5200 tons
4  per week in time for your client to receive
5  them. And the months that I've excluded are
6  months that I was told in those months they
7  took direct steps to reduce their
8  capabilities in an effort to mitigate the
9  losses they were incurring because they were
10 not receiving orders for 5200 and they had
11 reduced to such a point where they could not
12 do that and so I excluded those months from
13 my analysis. Now, in the months because
14 they were not producing, we analyzed what
15 the variable production cost would be and
16 that's the information contained on the line
17 labeled escalate variable fuel and oil.
18 Q.      So are you telling me then that
19 the only variable costs accounted for are
20 fuel and oil costs?
21 A.      No. You're misreading that and
22 so did Dave.
23 Q.      Okay. Explain it to me.

Page 176

1  A.      These are all in incremental
2  variable costs. But what you have to
3  understand is costs behave the way they are
4  incurred. And if -- let me give a very
5  simple example. If I have to have one
6  person answer my phone, okay, it doesn't
7  matter how many people are in my office I
8  have to have one person answer my phone.
9  And if I then take that person -- and they
10 get paid on the hour. So if I want them to
11 work ten hours a day, I've got to pay them
12 more money. It's variable. But if I don't
13 put anybody on that phone anymore, that cost
14 is gone and if I -- and, for example, if I
15 receive no phone calls my cost per phone
16 call can't even be calculated. And if I get
17 one phone call, my cost per phone call for
18 that one person is the whole day's pay. At
19 the point my phone is ringing so many times
20 where I need two people, okay, during
21 business hours, now my cost has gone up
22 again.
23       So these costs, some of them

44 (Pages 173 to 176)

# TUSCALOOSA COURT REPORTING
## Merrill Legal Solutions

Page 177

1  behave that way. Obviously fuel, if you're
2  driving loaders and trucks around you're
3  burning fuel, and the more you drive them
4  around, the more you carry rock back and
5  forth, the more you run your dredger, the
6  more fuel you're going to burn.
7  Q.      Have you looked at any costs
8  incurred by Johnco since -- in the
9  production of mining the property since this
10 report?
11 A.      I've looked at all financial
12 information available to me at the date of
13 the report. I'm not aware that there's
14 any -- I mean, as I said before, I believe
15 they stopped operating at some point in time
16 and I didn't believe that they had started
17 back, but I don't know. But I've looked at
18 everything that I asked for and it's my
19 belief I received everything they had and
20 I've looked at it. So I guess that's a yes,
21 but I think they stopped operating.
22 Q.      Well, if I was out there
23 yesterday and they were driving trucks

Page 178

1  around moving earth, there would be a fuel
2  cost associated with driving those trucks
3  yesterday; isn't that correct?
4  A.      Not associated with moving any
5  rock to Yelvington.
6  Q.      There would be a fuel cost
7  associated with driving those trucks;
8  correct?
9  A.      Just like there were costs during
10 the test period. If you drive a truck,
11 there's going to be cost.
12 Q.      Sure, and that's kind of what I'm
13 after. Is it your position that that's not
14 relevant to your calculation of Johnco's
15 costs to produce the gravel?
16 A.      What's not relevant?
17 Q.      Any cost that they are incurring
18 now.
19 A.      This is a calculation of the lost
20 revenue and the incremental cost associated
21 with that revenue. There is no way that the
22 truck driving today not related to that
23 revenue could in any way create an economic

Page 179

1  benefit, further the delivery, in any way
2  result to the creation of revenue two years
3  ago.
4  Q.      Could you use the cost that
5  Johnco is incurring now to help you come up
6  with a larger representative sample, let's
7  say, as to the cost of fuel?
8  A.      I mean, I understand your
9  question. And while always you could
10 continue using more information and I could
11 go and do it right now, at the date of my
12 report I looked at everything available.
13 Q.      I understand. But I'm trying to
14 figure out what's going to happen the date
15 of trial. Do you have any plans to review
16 or incorporate any of the current
17 operational costs into your numbers?
18 A.      I have a plan to consider
19 everything available to me between now and
20 trial and consider whether it changes my
21 opinions or not; and if it changes my
22 opinions, I'm going to change them. But I
23 haven't made any plan to do anything, but

Page 180

1  I'm fully reserving my right to do it; and
2  if I need to do it, I intend to do it.
3  Q.      In your experience is a
4  five-month sample sufficient to forecast
5  cost for a five-year period?
6  A.      Gee, that really depends on a
7  whole lot of things. Without more
8  information you're asking me to speculate.
9  Obviously I think it's sufficient here
10 because I did it, and I wouldn't do anything
11 if I didn't think it was sufficient.
12 Q.      Would you rather have a larger
13 sample than a five-month sample here under
14 these circumstances?
15 A.      Would it be better to have a --
16 well, I did have a larger sample than five
17 months.
18 Q.      But you narrowed it down to five
19 months, didn't you?
20 A.      Correct.
21 Q.      Okay. Would you rather have a
22 representative sample greater than five
23 months to forecast cost for --

612 Lurleen Wallace Blvd., N. * Tuscaloosa, Alabama 35401 * www.legalink.com
(205) 758-4006 * (800) 844-3370 * Fax (205) 758-4371

# TUSCALOOSA COURT REPORTING
## Merrill Legal Solutions

Page 181

1  A.      First of all, you're dealt the
2  hand of cards you're dealt.
3  Q.      I understand.
4  A.      We only have those five months.
5  Second, you have to take into consideration
6  the nature of the operation and whether or
7  not it lends itself to -- would facilitate
8  cost accounting estimations or whether it's
9  so complicated that you just have to have
10 this extensive operating period to figure it
11 out.  And we have a single mine and a single
12 location with one approach to mining at the
13 time, a rail spur, and a limited number of
14 staffing, the capabilities to run I think
15 Dave said one and a half schedules, which is
16 clearly feasible to meet the requirements in
17 the contract.  The whole thing is relatively
18 simple to forecast as long as you have all
19 the information that you need to do that,
20 which I'm not sure that Dave did.
21 Q.      I'm not sure you answered my
22 question, and let me see if I can come at it
23 from a different direction.  Do you believe

Page 182

1  you would have been -- your forecast would
2  be truer if you had a larger representative
3  sample, by truer I mean more accurate?
4  A.      So we're just -- you know, I
5  believe my forecast is -- first of all, this
6  is a cost study.  It's not a forecast.
7  Q.      You're forecasting costs in the
8  future, right?
9  A.      Some of it is in the past and
10 some of it is in the future.
11 Q.      Okay.
12 A.      Okay.  I believe the way I did my
13 cost study, for which I used to determine
14 the incremental costs in my lost profits, to
15 be reasonable.  Do I wish that the facts in
16 the case presented me with more information,
17 maybe, maybe not.  I don't know.  I believe
18 this is adequate.  This is a fairly simple
19 operation.  Hypothetically speaking, you
20 know, is more better?  Generally more is
21 better.  Of course it would have been better
22 if the supply had been -- if there had been
23 more deliveries and I could have seen more

Page 183

1  performance.
2  Q.      Did you take into account the
3  effect of the lack of use of any asset of
4  Johnco on its continued life or life
5  expectancy, excuse me?
6  A.      I considered it.  You're talking
7  about like, you know, repairs and the need
8  to replace equipment and such?
9  Q.      (Nodded yes.)
10 A.      First of all, I don't think you
11 should ever use depreciation or depletion or
12 any of that stuff that was in your expert's
13 report.  That is not an incremental cost,
14 that is not a cash expenditure and it is not
15 a reasonable approximation of what you will
16 have to spend to take the stuff out of the
17 ground.  It's an accounting method and a tax
18 method and that's all it is.
19        Now, did I consider what's it
20 going to take to keep this stuff running, do
21 they have enough equipment to do it?  Yes.
22 Are the costs that are being incurred in
23 these test periods representative of the

Page 184

1  costs that will be incurred in the future to
2  keep the equipment running in the proper
3  state of technical affairs or whatever?
4  Yes.
5  Q.      Where would I see that in this
6  report or appendix?
7  A.      It's in my numbers.
8  Q.      Okay.  So it's built into your
9  numbers?  I mean, I'm not going to look at
10 anything, any schedule or anything like that
11 that says this is where I considered the
12 life expectancy of a piece of machinery
13 that's not going to be used?
14 A.      You know, I don't understand
15 where are you going to find it in my report.
16 Are you asking me how did I do it?
17 Q.      No.  I'm asking you if there's
18 any place I could find that in the report
19 other than what's incorporated into your
20 final numbers?
21 A.      Well, I mean, I just don't know
22 how to answer that other than saying I used
23 the actual historical experience that was

46 (Pages 181 to 184)

# TUSCALOOSA COURT REPORTING
## Merrill Legal Solutions

Page 185

1 incurred during the startup period and did
2 not eliminate any of the inefficiencies of
3 startup, did not eliminate any of the
4 inefficiencies caused by laying people off,
5 experienced people, and hiring inexperienced
6 people and bringing them back in. I did not
7 eliminate any of those inefficiencies. And
8 after taking all that into consideration and
9 looking at the fact that they did, it's my
10 understanding because of laying people off
11 and bringing in they did experience
12 equipment failures, did incur repairs costs
13 that they otherwise would not have incurred
14 if they had not had the turnover in the
15 people, which they would not have likely had
16 had the people been able to keep their jobs
17 instead of having to be laid off because of
18 lack of income, because of lack of orders
19 from Yelvington, I think if you consider all
20 that what this shows you is a reasonable
21 determination what those costs are.
22 Q.    Did you consider in any way what
23 could be recouped by Johnco if they

Page 186

1 liquidated the assets that you've included
2 in your report as part of the investment?
3 A.    Isn't that what this is? Yeah,
4 that's what this whole report is about.
5 Q.    Okay.
6 A.    They could recoup but for the
7 actions of Yelvington the money on Appendix
8 1. That's what lost profits is.
9 Q.    That wasn't my question. My
10 question relates to the assets that they
11 have, setting aside the --
12 A.    My answer stands.
13 Q.    Hold on a second -- setting aside
14 the assets in the ground? I'm talking about
15 the trucks and the equipment and the like.
16 Did you consider what effect that would have
17 on Johnco's investment if they liquidated
18 those?
19 A.    Wait a minute. See if I get what
20 you're asking me. I think I understand. In
21 coming up with the impact on Johnco, in
22 other words to put Johnco back in the place
23 that they would have been but for the

Page 187

1 actions of Yelvington, did I take into
2 account proceeds from liquidating the very
3 assets that would be needed to operate --
4 Q.    Yeah.
5 A.    -- had Yelvington done -- that
6 makes absolutely no sense. That's
7 ludicrous.
8 Q.    Just answer the question.
9 A.    I just did.
10 Q.    It may be no, but if you can tell
11 me a yes or no?
12 A.    I think that's a yes and I told
13 you that's ludicrous.
14 Q.    So yes you did consider that?
15 A.    Well --
16 Q.    Let me step back a second.
17 A.    Did I consider jumping off the
18 roof? Well, no, but I'm not going to jump
19 off the roof. I mean, that doesn't make any
20 sense. How in the world can you operate --
21 they could not supply 5200 tons a week if
22 they sold their mining equipment.
23 Q.    And I think that's fair. I'm

Page 188

1 right with you. Do you contend in any way
2 that Johnco is entitled to recover from
3 Yelvington their investment in putting
4 together the operation?
5 A.    I'm not contending anything. I'm
6 an accountant.
7 Q.    Are you opining in any way that
8 they should be able to recover that? What's
9 the purpose --
10 A.    It's a legal --
11 Q.    I agree.
12 A.    It's legal questions. I'm not
13 here to offer any legal opinions. I've said
14 that over and over again.
15 Q.    And I appreciate that. I just
16 need to make sure when we get to trial
17 nothing changes. So when you get to trial,
18 it's not your intention to opine that they
19 should somehow be able to recover their
20 investment in Johnco; is that correct?
21 A.    That's a legal determination.
22 Q.    Sure.
23 A.    If I'm asked to opine about what

47 (Pages 185 to 188)

# TUSCALOOSA COURT REPORTING
## Merrill Legal Solutions

Page 189

1  their investments was, I intend to testify
2  about that. I have no -- I have no opinion
3  about why I'm going to be asked to do that
4  if -- or even if I'm going to be asked to do
5  that. I just don't know.
6  Q.      Fair enough. Looking at page 2
7  of the report prepared by you, for lack of a
8  better term I'm going to call it a heading,
9  the second heading says --
10  A.      That's what it is.
11  Q.      Okay, good. "Although sufficient
12  gravel was produced by JMI, CYDI failed to
13  purchase quantities specified in the Supply
14  Agreement." Did you draw the conclusion
15  that sufficient gravel was produced?
16  A.      Yeah. Let me clarify that. Yes,
17  in this context. Sufficient gravel was
18  being produced to meet the sales that were
19  being -- the sales orders that were being
20  presented to them. I'm not attempting -- I
21  saw that earlier today. I'm not attempting
22  to opine about production capabilities.
23  That's not my job.

Page 190

1  Q.      Would it affect your numbers if
2  Johnco could not produce 5200 tons per week
3  of number 67 gravel?
4  A.      That is not my understanding in
5  any way.
6  Q.      I understand.
7  A.      And based on my own consideration
8  of the evidence presented to me I could not
9  reach that conclusion. But hypothetically
10  if somebody couldn't produce something they
11  couldn't get any revenue from it, I agree
12  with that.
13  Q.      And the information you have
14  about whether they could produce is from
15  Johnco; is that correct? Produce at the
16  capacity of 5200 tons a week?
17  A.      Yes, the company that was
18  producing it is the people who I relied on
19  in making my determination that they could
20  produce it.
21  Q.      Are you aware of any problems
22  that Johnco may have had with the dredge or
23  other equipment during the period of March

Page 191

1  2006 through September 2006?
2  A.      I don't know that I can, you
3  know, attribute equipment failures to just
4  the dredge. I am aware, just from looking
5  at the numbers you could see, although they
6  seem to be in different periods on your
7  version and the version that I have in my
8  report and I'm going to investigate that,
9  you can see the variations in repairs and
10  maintenance. It's one of the things I
11  alluded to earlier, because we investigated
12  those and we learned that some of the
13  equipment failures were due to turnover in
14  experienced employees and replacements with
15  inexperienced employees. So we actually got
16  to see what it cost to rebuild some of that
17  equipment before it should have been rebuilt
18  and that's part of my basis for why the
19  repair number is okay.
20  Q.      You indicate in here that the --
21  that Yelvington scheduled "sporadic"
22  shipments. What's your conclusion that
23  the -- I'm sorry, during June, August and

Page 192

1  September. Do you recall as you sit here
2  today how frequently Yelvington was coming
3  to pick those shipments up during those
4  months?
5  A.      I mean, I recall that I've got a
6  schedule in my binder of exactly when they
7  happened and that we scheduled up every
8  single sale that ever occurred and every
9  date that it occurred. And I've got all
10  that information that I can't recall, but I
11  also know the answer to the question about
12  sporadic.
13  Q.      What is the answer to the
14  question?
15  A.      It's not weekly and it's not
16  regular, so that's my word for what it is
17  then.
18  Q.      Is approximately every two weeks
19  regular?
20  A.      Well, that's where that hundred
21  and fifty ton thing comes in in my mind.
22  Because if you look at the performance of
23  Yelvington and you compare it to the hundred

48 (Pages 189 to 192)

# TUSCALOOSA COURT REPORTING
## Merrill Legal Solutions

Page 193

1  and fifty ton, if it's going to be regular
2  in my judgment it would have to match up and
3  it doesn't. In other words, what they were
4  doing if they kept doing that -- and they
5  didn't do every two weeks; okay? They did
6  for isolated periods. That's sporadic. If
7  they kept doing that, they were not going to
8  get a hundred and fifty tons. So it's not
9  regular by any means and it's certainly not
10  weekly. I mean, that's obvious. So it's
11  sporadic.
12      MR. PEARSON: Can I ask for
13  clarification? Are we talking about a
14  hundred and fifty thousand tons?
15      THE WITNESS: Do I keep saying a
16  hundred and fifty?
17      MR. PEARSON: So you said a
18  hundred and fifty tons. Did you intend to
19  say a hundred and fifty tons.
20  A.    For the record, every time I say
21  a hundred and fifty tons I mean a hundred
22  and fifty thousand tons and I'm getting
23  tired. I'm tired. I'm sorry. Please

Page 194

1  correct me again if I do it.
2      MR. PEARSON: I just wanted a
3  clean record.
4  Q.    (By Mr. Leek) Just some
5  clarification here. You indicate in here
6  that you reviewed the tax returns from 2005
7  and 2006 but not 2004. Why didn't you
8  review the tax returns of 2004?
9  A.    They weren't necessary.
10  Q.    What about them made it not
11  necessary? I mean what was your thought
12  process in excluding 2004?
13  A.    It's not part of the period under
14  review. I don't understand your question.
15  Q.    Okay. The period --
16  A.    I think there's another question
17  you could ask me, but I don't understand
18  your question.
19  Q.    I'm certain there is, but I'm
20  stuck with the one I've got right now. You
21  chose not to review the tax returns of 2004,
22  is that correct, and not rely on the tax
23  returns of 2004 in formulating your opinions

Page 195

1  here in the report?
2  A.    Correct.
3  Q.    Why?
4  A.    I used the periods of time when
5  they were staffed to operate at the -- and
6  perform under the contract for the cost
7  study. I used the periods of time when they
8  actually shipped to determine price per
9  unit, and in 2004 they weren't doing either
10  one of those.
11  Q.    Were they doing either one of
12  those in 2005?
13  A.    Not to my knowledge.
14  Q.    Then why would you consider 2005?
15  A.    I don't know that I did. I mean,
16  I may have -- I mean I may have considered
17  them.
18  Q.    Well, you listed 2005 but you
19  don't list 2004, and all I'm trying to
20  figure out is why?
21  A.    When you say "I listed," are we
22  back to this it's on Appendix 8 thing that
23  you were cross-examining me about earlier?

Page 196

1  Q.    I believe so, but let me look.
2  Yes.
3  A.    That's just information we
4  received and we considered. Okay. And once
5  you -- for example, I'm at the front of the
6  case and they say, "What do you need?" And
7  I say, "Well, gee, I'm not even sure of the
8  time frame. Why don't you give the last two
9  years' tax returns, gives me the sales
10  journals, give me the contract." Okay? not
11  having any idea when they operated and when
12  they didn't operate and, "I'll let you know
13  if I need more." So once I figured out when
14  they operated and actually sold, I used that
15  period for sales. And when they were
16  staffed to meet the commitments in the
17  supply contract, I used that for cost.
18  Q.    And it's your--
19  A.    There was no need for me to go
20  back and ask for any other period where
21  those two things didn't happen.
22  Q.    Fair enough. And is it your
23  recollection then that the only tax return

49 (Pages 193 to 196)

# TUSCALOOSA COURT REPORTING
## Merrill Legal Solutions

Page 197

1   that was necessary for you to consider for
2   those purposes was 2006 --
3   A.      For those two purposes.
4   Q.      -- even though 2005 is listed?
5   A.      For those two purposes, yes. And
6   I don't know -- sitting here today I don't
7   remember whether we looked at 2005 in
8   connection with the 2.8 million dollar part
9   of the report or not. It may have been
10  easier to get that number off 2005. I don't
11  remember.
12  Q.      You mentioned Rule 26 earlier. I
13  assume you're aware of the parties mandatory
14  disclosure requirements under Rule 26 to
15  each other; is that true?
16  A.      I want to clarify. Are you
17  talking about some agreement between the
18  parties?
19  Q.      No. I'm talking about Rule 26
20  disclosures where it's required -- there's
21  leeway here, but require the parties to
22  spell out what their damages are to the
23  extent possible and give it to the other

Page 198

1   side?
2   A.      With regard to my role in that
3   process in a federal case in a variety of
4   circuits, I have some experience with that,
5   but I'm not an attorney and I will not hold
6   myself out as an expert in complying with
7   Rule 26.
8   Q.      And I don't intend to ask you any
9   questions about compliance. Did you review
10  Johnco's Rule 26 damage disclosures for
11  purposes of preparing your report?
12  A.      My report is my report. I don't
13  know when Johnco prepared their damage
14  disclosures, but I would suspect they did it
15  after I did my report and I did not review
16  them.
17  Q.      Let's assume that that's not
18  true, that they did them before your report.
19  Is that the type of information you like to
20  have in building a damages report?
21  A.      The attorney's views about what
22  the damages are am I going to use that? No,
23  I would never use the attorney's opinion

Page 199

1   about damages. I'm going to form my own
2   opinion. Is that what you just asked me?
3   Q.      No. You're calling it the
4   attorney's opinion. Rule 26 is an
5   obligation of the parties and it shows the
6   parties expectation of damages, including a
7   calculation. And my question to you, is
8   that something that you would like to review
9   in preparing a damages report?
10  A.      I don't think that it's necessary
11  for me to form my opinions to review my
12  client's opinions, no. I mean, they're my
13  opinions. You know, do I look at what my
14  client thinks the damages are? Yeah, I do.
15  Some cases I choose not to look at it until
16  I'm done. Some cases I want to see what
17  they think they're damaged right up front.
18  I mean, it just varies. It's highly
19  variable, but it really is independent of my
20  assessment of damage. This is my report and
21  my opinion. And if it's different than what
22  my client says, it's different than what my
23  client says, but it's still my opinion.

Page 200

1   Q.      In this case did you make the
2   conscious decision not to review Johnco's
3   Rule 26 damage disclosures prior to
4   preparing this report?
5   A.      I think based on my testimony you
6   know that I was not even aware they were
7   made. And I'm assuming that's the document
8   that I've already testified about I got last
9   week and just looked at it.
10  Q.      I don't know.
11          MR. PEARSON: I don't know if
12  we've given it to him yet.
13  A.      I'm assuming -- there's a Rule 26
14  document that's in this binder right here
15  that I've looked at.
16          MR. PEARSON: For the record, I
17  think there's an initial disclosure that's
18  to be done early on in the case after it's
19  filed.
20          MR. LEEK: Pursuant to Rule 26.
21          MR. PEARSON: And then later
22  there has to be, you know, an expert
23  disclosure report under Rule 26 as well, and

50 (Pages 197 to 200)

# TUSCALOOSA COURT REPORTING
## Merrill Legal Solutions

Page 201

1 I am not sure -- I don't -- I don't -- if
2 it's not in his binder, we didn't give it to
3 him. So, I mean, I don't know if it's in
4 there.
5         MR. LEEK: Okay.
6         MR. PEARSON: The early one.
7 A.      For clarity, I know I didn't get
8 anything that would have been done earlier
9 in the case before my retention, and my
10 answers before about seeing things in
11 writing I was talking about what's in this
12 binder (indicating).
13 Q.     Looking back at the report under
14 the third heading and the last sentence of
15 that first full paragraph begins, "This
16 level". Do you see that?
17 A.     Last -- which page?
18 Q.     Page 2 of 4.
19 A.     The third heading?
20 Q.     Third heading down.
21 A.     Uh-huh (affirmative). Last
22 sentence on that page above the footnote?
23 Q.     Yeah.

Page 202

1 A.      Okay.
2 Q.      Begins, "This level of gross
3 revenues is reasonable in light of the
4 substantial investment made by the owners of
5 JMI to place the mine into operation." Can
6 you explain to me what that means?
7 A.      It's what we were talking about
8 at the first of the deposition.
9 Q.      And that's what I thought. So
10 you're saying that the revenues as projected
11 at 260,000 tons is reasonable in light of
12 the investment made; is that correct?
13 A.     Or vis-a-versa. It's more of a
14 test, as opposed to my client telling me, "I
15 only paid a dollar for this and I'm going to
16 make a zillion billion dollars."
17 Q.     That sounds reasonable. Okay.
18 A.     To Steve -- I mean to Greg it
19 does.
20 Q.     And then we left a question open
21 whether you could make the same statement if
22 the required amount was 150,000 tons as
23 opposed to 260,000 tons. Have you had an

Page 203

1 opportunity to consider that?
2 A.      You know, I'm still thinking
3 about it. I would need to look at it more
4 closely. I tend to doubt -- while it would
5 reduce my lost profits, I tend to doubt
6 whether that in and of itself would make the
7 venture not feasible, but I just don't know
8 and I need to look at that.
9 Q.      Do you recall any testimony of
10 Clatus Junkin or the Johnstons regarding --
11 well, let's just say testimony that their
12 expectation going into the venture, I think
13 you called it, was that the hundred and
14 fifty thousand tons purchased by -- to be
15 purchased by Yelvington would cover their
16 costs and they expected to make a profit off
17 the sale of other things?
18         MR. PEARSON: Object to the
19 characterization of the testimony. It
20 speaks for itself, but you can answer the
21 question.
22 Q.     Do you recall anything like that?
23 A.     I recall your questioning along

Page 204

1 that line, and I recall responses that are
2 inconsistent with your characterization, and
3 I do -- you know, I don't believe that
4 testimony is inconsistent. The reason I am
5 reserving my right to -- with respect to
6 your question about feasibility is that is
7 the kind of work I do. I am a trustee in
8 four different bankruptcies and I have not
9 done the work that I would want to do before
10 I told you that it would be feasible. I am
11 capable of doing that. And the next time
12 you see me if I'm asked to, I will be
13 prepared to give you my professional opinion
14 on that, but I'm just telling you right now
15 I think it's feasible.
16 Q.     Are you aware as you sit here
17 that your calculations of damages are
18 different than the calculation of damages
19 put forth by Johnco in their complaint?
20 A.     I am aware that I have calculated
21 lost profits and it's my recollection but I
22 have no specific recollection that the
23 complaint contains either more or other

51 (Pages 201 to 204)

# TUSCALOOSA COURT REPORTING
## Merrill Legal Solutions

Page 205

1  damages.
2  Q.      Well, regardless of what the
3  complaint says or the Rule 26 disclosures
4  say, you stand by your numbers?
5  A.      Well, I think you just asked me a
6  legal question. I do stand by my numbers.
7  I have no idea whether it takes into regard
8  Rule 26 or disclosures and why those --
9  whether or not that would be relevant to my
10 opinion, and I don't think it would be. I
11 think it doesn't change my opinion at all,
12 but you put it in a question and so I have
13 to answer it that way.
14 Q.      Sure. It doesn't matter to you
15 for the purposes of your opinion what Johnco
16 says in their complaint or any other damage
17 disclosure; is that correct?
18 A.      No, that's not what I'm saying.
19 I mean, I've talked to Johnco. I've read
20 deposition testimony. I've looked at the
21 documents. Of course it matters what they
22 think. But my opinion is my opinion and
23 it's not going to change because of

Page 206

1  something written in a complaint.
2  Q.      Okay. Are you aware of what the
3  complaint says with regard to the quantity
4  of gravel to be taken by Yelvington?
5  A.      A long time ago back in August I
6  read the complaint and I haven't seen it
7  since, so I had an awareness. I don't
8  recall.
9  Q.      And to try to shortcut this, if
10 the complaint suggests a number different
11 than the number you arrived at, you would
12 use the same type of consideration analysis
13 that you used in determining the damages;
14 right? It's not dispositive of your
15 opinion, it's just a factor in there?
16       MR. PEARSON: Object to the form.
17 A.      You used a lot of big old legal
18 words. Can you rephrase that?
19 Q.      I'm sure you've heard them all
20 before.
21 A.      Yeah, but I'm not sure I know
22 what dispositive means, so --
23 Q.      Okay.

Page 207

1       MR. PEARSON: I object. Let me
2  clarify, because I think it will help you.
3  I think the question was vague in that you
4  used so you're saying the number in the
5  complaint without saying what number,
6  because I'm sure there are a bunch of
7  numbers in there. I don't know what numbers
8  we're talking about, whether we're talking
9  about volume of gravel, whether we're
10 talking about dollars. I was --
11       MR. LEEK: I specified volume and
12 quantity.
13       MR. PEARSON: But you said the
14 word "numbers," no matter what the "numbers"
15 are.
16       MR. LEEK: And I was trying to
17 circumvent a 20-minute conversation about
18 it.
19 Q.      (By Mr. Leek) But you've just
20 given me an opinion that what Johnco says in
21 the Rule 26 disclosures or what they say in
22 the complaint, while something you may
23 consider, doesn't drive your opinion of what

Page 208

1  you say the damages are?
2  A.      I really think you're getting
3  into a legal area. I believe I've answered
4  that question, --
5  Q.      I know you have.
6  A.      -- you know.
7       MR. PEARSON: Asked and answered.
8  A.      And that is not the answer that I
9  gave.
10 Q.      Okay. Oh, dear. If Johnco said
11 that the required -- if in the complaint
12 Johnco says that Yelvington was required to
13 take 150,000 tons, how does that affect your
14 opinion about the quantity of gravel that
15 you contend Yelvington was supposed to take
16 or the parties expected to be taken?
17       MR. PEARSON: Object to the form.
18 A.      I think you've asked that
19 question earlier in another way, and so
20 you're going to hear the same answer. I am
21 trying to determine what would have
22 occurred, what is the reasonable expectation
23 of what would have occurred but for the

52 (Pages 205 to 208)

# TUSCALOOSA COURT REPORTING
## Merrill Legal Solutions

Page 209

1 actions of Yelvington.
2 Q.     And I understand that.
3 A.     Well, you must not because you
4 keep asking the same question about it.
5 Q.     The question is what affect?
6 A.     And that is not the same thing as
7 what was the minimum required.
8 Q.     So the fact that Johnco said a
9 hundred and fifty thousand in the complaint
10 doesn't affect the opinion you've given
11 here; is that correct?
12      MR. PEARSON: Object to the form.
13 A.     You know, you're leaving a lot of
14 words out and you're making assumptions that
15 I remember what the complaint said, and I
16 don't. And so I'm going to have to make
17 sure that my answer is clear and not
18 misleading, which is I have determined that
19 it is reasonable to conclude that a contract
20 with a stated weekly amount and using the
21 word weekly and using the word regular is
22 a -- and having a price is a reasonable
23 place, is a reasonable source to use to

Page 210

1 forecast what would have happened and what
2 was the reasonable expectation at the time
3 as far as deliveries, price and timing of
4 those deliveries. That is what I've done.
5 Q.     I understand. How does that
6 relate to what was said in the contract if
7 at all -- not the contract, excuse me, the
8 complaint?
9      MR. PEARSON: I don't think --
10 A.     I don't remember.
11      MR. PEARSON: I don't think he
12 remembers the complaint. I don't know that
13 he can.
14 Q.     That's fine. Is it fair to say
15 that it is outside of your charge here to
16 determine whether the Supply Agreement
17 obligates Yelvington to purchase any
18 oversize gravel from Johnco?
19 A.     I think it's -- you know, the
20 issue of obligation is a legal issue, but
21 the consideration of whether or not
22 Yelvington's actions and sale of over --
23 whether the sale of oversized gravel was an

Page 211

1 incident associated with the production and
2 sale of 67 gravel is within my charge, but
3 whether there was any obligation or not is
4 outside of what I was asked to do.
5      MR. PEARSON: Are you talking
6 about -- never mind. I don't --
7 Q.     Would it also be outside your
8 charge then to determine whether the Supply
9 Agreement obligates Yelvington to sale any
10 of Johnco's oversize gravel?
11 A.     I'm getting real close to being
12 done answering legal questions. I'm not
13 here to interpret the contract. I'm here to
14 determine lost profits.
15 Q.     I appreciate that. And so that
16 tells me that the answer to the question is
17 yes, it is outside of what you're asked to
18 do. You're not opining on legal issues.
19 Obligation is a legal issue as you've told
20 me many times. I'm closing the loop here.
21 You're not telling me that Yelvington is
22 obligated to help Johnco sell that product,
23 are you?

Page 212

1 A.     I'm not offering a legal opinion
2 of any sort today.
3      MR. LEEK: Give me just a second.
4      MR. PEARSON: Do you want to take
5 a break, go off? I mean, it's up to you.
6 If it'll help you clean it up, we'll --
7      MR. LEEK: Yeah, I think that's
8 worthwhile. Let's take a break.
9      (Whereupon, a short break was
10      taken.)
11 Q.     (By Mr. Leek) Let's go back on
12 the record here. If you could take a look
13 at Appendix 5 to your report for me.
14 A.     Yes.
15 Q.     Do you have Appendix 5? Do you
16 see -- well, these are the incidental costs
17 that you say Johnco incurred due to the
18 failure to perform, or however we want to
19 say it? These are the incidental costs you
20 say Johnco incurred as damages; correct?
21 A.     That's fair enough, yes.
22 Q.     Can I assume then that the costs
23 that you've put here are March of 2006 and

53 (Pages 209 to 212)

# TUSCALOOSA COURT REPORTING
## Merrill Legal Solutions

Page 213

1 April of 2006 are inclusive of all costs
2 that Johnco incurred during those months?
3 A.    It's all the costs on the line
4 items that were shown here.
5 Q.    Okay. So if we say Johnco
6 incurred $16,913 in salaries, you've not
7 excluded some portion of salaries out there
8 to come up with that number; is that
9 correct?
10 A.    Let me check. That's my
11 recollection, but let me just go ahead and
12 check real quick.
13 Q.    Okay.
14 A.    Okay. I think your question was
15 if it's salaries for the March of 2006, does
16 that include all the salaries incurred by
17 Johnco in March of 2006?
18 Q.    (Nodded yes.)
19 A.    That is correct, it does.
20 Q.    And you were looking at a
21 document to come up with that answer. Can
22 you identify that document for the record?
23 A.    It's the same document I looked

Page 214

1 at before when the question about the repair
2 expense. It's labeled "Johnco Materials,
3 Inc. Profit and Loss Statements January
4 through December 2006."
5 Q.    And I have one labeled like that
6 too?
7 A.    Wait a minute. With a fax
8 receipt time of August 7th, 2007, 14 dot 13.
9 Q.    And just for purposes of clarity
10 for the record, I have one like that too,
11 but you're referring to the one that's in
12 your notebook, not mine; correct?
13 A.    The one in your notebook does not
14 agree to the one in my notebook in certain
15 cases. I don't know if it doesn't agree on
16 this line item.
17 Q.    Okay. What is your understanding
18 about Johnco's ability to produce at the
19 amounts set forth in your report in March of
20 2006?
21 A.    It was -- I had been informed
22 that they were ready and available staff to
23 produce beginning in March of 2006.

Page 215

1 Q.    Do you know at what point in
2 March 2006, or actually at what point in
3 March 2006 did you assume for the purposes
4 of your report?
5 A.    Well, I have used the entire
6 month of March. So inherent in that is the
7 assumption that they would have been
8 available for the entire month of March.
9 Q.    Okay.
10 A.    I have also used the entire month
11 of April, and I have excluded the portion of
12 time in May up until the first delivery
13 where they still were available but not
14 receiving orders.
15 Q.    Can you look at your version,
16 being the one in your notebook or your
17 records, not mine, of the document called
18 White Hall Set-Up Costs?
19 A.    It's somewhere in this binder.
20 I'm not exactly sure where it is. Let me
21 find it. Okay. I'm not sure it's the same
22 document. My document is not Bate stamped.
23 Q.    Does that appear to be a two-page

Page 216

1 document that you have, the set-up costs I'm
2 talking about.
3     MR. PEARSON: Where are you in
4 here (indicating)?
5     MR. LEEK: Johnco 1061.
6     MR. PEARSON: Under D?
7     MR. LEEK: Under D, yes.
8 A.    What I have appears to be a
9 two-page document. You need to understand I
10 did not use this document.
11 Q.    You didn't use this document?
12 A.    No, I did not use this document.
13 Q.    Are you familiar with this?
14 A.    I don't think I did. Let me make
15 sure. You're looking at Exhibit 5?
16 Q.    I'm looking at Appendix 5,
17 which --
18 A.    Yeah.
19 Q.    -- refers to statements of
20 operations for March 2006 and April 2006.
21 A.    Yes.
22 Q.    And that's different than the
23 White Hall Set-Up Costs; is that correct?

54 (Pages 213 to 216)

## TUSCALOOSA COURT REPORTING
### Merrill Legal Solutions

Page 217

1  A.      That's correct.
2  Q.      But you have the White Hall
3  Set-Up Costs in front of you; correct?
4  A.      I do, or I have a schedule that's
5  headed up, "White Hall Set-Up Costs, today's
6  date 3-15-06."
7  Q.      And does your copy of this
8  indicate that Johnco spent approximately
9  twenty-four thousand dollars in set-up costs
10  in the month of March 2006?
11  A.      This copy indicates set-up costs
12  of 24,667 was incurred.
13  Q.      And among those costs does your
14  copy indicate approximately seventy-five
15  hundred to eight thousand dollars in
16  salaries incurred as a result of set-up
17  costs?
18  A.      Give me that number again.
19  Q.      Yeah. I'm looking at the
20  salaries and I'm doing some rough math.
21  A.      I'm just trying to figure out
22  where that line item is. I did not study
23  this before the deposition, so. Employee

Page 218

1  labor, is that what we're talking about?
2  Q.      Yes.
3  A.      And in March it shows $4,959.15,
4  plus Social Security of $526.12, plus
5  management salaries of $2800.
6  Q.      So a little bit over $8,000; is
7  that correct?
8  A.      Five plus -- yeah, correct.
9  Q.      Is that number included in the
10  salaries you've set forth in Appendix 5?
11  A.      It would -- based on what I know
12  about accounting, it should be, but I don't
13  know whether it is or not.
14  Q.      Okay.
15  A.      It might not be.
16  Q.      If there are set-off costs as
17  indicated on the White Hall Set-Up Costs,
18  are they within what you've defined as
19  incidental costs?
20  A.      If the 41,427 on Appendix 5 for
21  March 2006 that I said incidental costs
22  would include set-up cost, it should be
23  reduced by whatever amount it is determined

Page 219

1  are set-up costs in that number.
2  Q.      Seeing the document -- and mine
3  comes from Johnco. I assume yours does too.
4  Seeing the document from Johnco showing
5  set-up costs in March, does that affect your
6  opinion in any way of whether Johnco was
7  able to produce at 5200 tons per week for
8  the entire month of March?
9  A.      I already gave you that one. Not
10  any more than I've already testified to.
11  Q.      Okay. I believe -- let me make
12  sure I understand. I believe you said that
13  your assumption is that they were ready to
14  produce at 5200 tons per week beginning --
15  or for every week in March; correct?
16  A.      In March, and I've used the --
17  not correct. They were ready in March, and
18  I've used the entire month of March from the
19  financial statements for selected line items
20  as the representative costs. And to the
21  extent there are any set-up costs in the
22  numbers that I used, my numbers should be
23  reduced for those set-up costs, and I do not

Page 220

1  know whether the twenty-four thousand eight
2  hundred and -- $24,667 of set-up costs shown
3  on the schedule labeled White Hall Set-Up
4  Costs, whether those amounts are or are not
5  included in my numbers in my report.
6  Q.      Okay. Do you know what the
7  prevailing market price for number 67 gravel
8  was in May of 2006?
9  A.      No.
10          MR. PEARSON: I'm going to object
11  to the form after the fact, but --
12  Q.      Do you know what the prevailing
13  market price for number 67 gravel has
14  since -- at any time since May of 2006 to
15  present?
16  A.      I made -- I did not make an
17  effort to determine the market price of the
18  gravel to be sold to Yelvington under the
19  Supply Agreement because the price is
20  spelled out in the Supply Agreement, but I
21  do have information that tells me what the
22  market price is. I believe they may have
23  sold some, but I would have to look at my

55 (Pages 217 to 220)

# TUSCALOOSA COURT REPORTING
## Merrill Legal Solutions

Page 221

1  sales invoice analysis to see.
2  Q.        Do you have any other sources
3  than Johnco's sales where you would go to
4  find that information?
5  A.        No. I relied on the actual
6  history of this company and its sales
7  abilities. I did not rely on any other
8  company's ability to sell and generate a
9  price.
10 Q.        Do you consider sand and gravel a
11 commodity?
12 A.        To some degree, yes. I really
13 couldn't tell you that -- I mean, there's
14 certain types of sand. I do -- I've been
15 informed certain types of sand that you
16 might not consider it to be a commodity and
17 there's certain types of stone and gravel
18 that you might not consider per se to be a
19 commodity because it disqualifies for
20 special applications. Setting all that
21 aside, you know, aggregate is generally
22 considered a commodity.
23 Q.        And what's your understanding of

Page 222

1  how the price of commodities are set from
2  time to time?
3  A.        Willing buyer, willing seller.
4  Q.        So it's whatever it's going for
5  at that time; isn't that correct?
6  A.        Well, to some degree it's
7  whatever you can get anybody to take it for.
8  I mean --
9  Q.        But it varies?
10 A.        I mean, you're asking a really
11 broad question --
12 Q.        I understand.
13 A.        -- about a really broad topic
14 that's much broader than what we're here
15 talking about, and I'm giving you the best
16 answer I'm going to give unless you give me
17 more information.
18 Q.        Okay. Now, in your report you
19 say that you have not reduced the damages to
20 present value; correct?
21 A.        That's correct.
22 Q.        And I believe you say that the
23 reason you have not done so is because you

Page 223

1  believe that pre-judgment interest would
2  offset any reduction to present value; is
3  that correct?
4  A.        Let me read what I said.
5  Q.        Yeah.
6  A.        Because I don't know -- I don't
7  remember. I don't know that that's what I
8  said.
9  Q.        It's going to be on page 3 of 4.
10 A.        Yeah, that's where I am. Yeah,
11 that's not what I said.
12 Q.        Okay. Why didn't you reduce the
13 numbers here to their net present value?
14 A.        I think I've said why, is because
15 I believe that the impact of discounting
16 would be substantially offset by statutory
17 pre-judgment interest.
18 Q.        Okay.
19 A.        Also I understand that those
20 calculations and determinations can be made
21 anytime. Also in my experience I've seen an
22 awful lot of time wasted with people arguing
23 about how to discount, when to discount.

Page 224

1  Q.        Do you agree that to give an
2  accurate statement of damages to the court
3  would require those calculations be done?
4  A.        No, I don't agree that. And to
5  the extent the court desires one it's
6  something that can be done at the time.
7  It's just math.
8  Q.        Reducing something -- a dollar to
9  the net present value reduces -- or reduces
10 that amount to some other amount. I mean,
11 it's -- I'm sorry. That's a terrible
12 question.
13 A.        That would be bad multiplication,
14 division. It's mathematical computations.
15 Q.        Sure. But if we take the dollars
16 that you've attributed here to years in the
17 future, would it be appropriate to reduce
18 that to net present value to determine what
19 the actual lost to Johnco was?
20 A.        I think I've already given my
21 opinion. That I believe it would be
22 substantially offset. And, you know, I
23 choose, I made a judgment to not spend the

56 (Pages 221 to 224)

612 Lurleen Wallace Blvd., N. * Tuscaloosa, Alabama 35401 * www.legalink.com
(205) 758-4006 * (800) 844-3370 * Fax (205) 758-4371

# TUSCALOOSA COURT REPORTING
## Merrill Legal Solutions

Page 225

1  time it would take when I already concede
2  that in my opinion it's going to be
3  substantially offset. It might go one way;
4  it might go the other way. It might reduce
5  the damages; it might increase the damages.
6  I just know it would take me quite -- take
7  me some time to do it. I know that your
8  expert is going to say whatever they're
9  going to say. And once they say it, then
10  I'm going to decide what I'm going to do.
11  Q.      But you agree that it would
12  affect the numbers that you've put in this
13  report; is that correct?
14  A.      These numbers are before
15  pre-judgment interest period. These numbers
16  are before the impact of discounting period.
17  If you were to discount these numbers and
18  apply pre-judgment interest, it is my
19  opinion it would not have a substantial
20  impact on these damages period.
21  Q.      What's the statutory pre-judgment
22  interest at this time?
23  A.      I defer to counsel.

Page 226

1  Q.      Well, you've made the
2  determination, the qualitative determination
3  that reducing something to net present value
4  is going to be set off by the statutory
5  pre-judgment interest. So the question,
6  what number did you use in making that
7  determination?
8  A.      I've already told you I made that
9  determination on a combination of
10  considering the numbers that are here, the
11  time frames that exist and my experience in
12  determining discount rates in the past and
13  my experience with pre-judgment interest
14  calculations in the past. And when I do
15  pre-judgment interest calculations, I defer
16  to counsel because sometimes they've
17  changed, and you asked me what's the rate
18  today. I defer that to counsel. I don't
19  know today.
20  Q.      Do you think it was necessary for
21  you to know what the pre-judgment interest
22  rate was before drawing the conclusion that
23  net present -- reducing the figures to net

Page 227

1  present value would be offset by it?
2  A.      Not based on my experience, no.
3  Q.      Over what period of time is
4  pre-judgment interest available in the state
5  of Alabama?
6  A.      That's a legal question.
7  Q.      I understand those are legal
8  questions, but you understand that I have to
9  explore this assertion and so I need to get
10  to what you know about statutory
11  pre-judgment interest. I'm not asking you
12  to give a legal opinion. I'm asking you to
13  give what you know.
14  A.      The questions you're asking me
15  you're asking me for legal opinions. You
16  didn't ask me the question you just asked,
17  and I'm happy to answer that one.
18  Q.      Okay. I don't remember what it
19  was. What's your understanding of how
20  statutory pre-judgment interest works in the
21  state of Alabama?
22  A.      It accrues from the point in time
23  damages can -- it's pre-judgment interest

Page 228

1  from the point of the harm, the damage, to
2  the date of trial, and it's also my
3  experience that that's not an easy
4  calculation to make pretrial.
5  Q.      Are you aware of what date the
6  case is set for trial?
7  A.      I am not. I am aware that
8  cases -- trial dates routinely and regularly
9  change.
10  Q.      In federal court that's your
11  experience?
12  A.      In all courts, and I couldn't
13  speak to the court we're in now.
14  Q.      You know we're in federal court
15  here because you reference --
16  A.      I'm a trustee in federal court
17  and my trials get changed; okay?
18  Q.      Over what period of time is it
19  generally accepted that you would apply a
20  discount rate?
21  A.      You discount future lost profits.
22  Q.      Regardless of how far that goes
23  out; isn't that correct?

612 Lurleen Wallace Blvd., N. * Tuscaloosa, Alabama 35401 * www.legalink.com
(205) 758-4006 * (800) 844-3370 * Fax (205) 758-4371

# TUSCALOOSA COURT REPORTING
## Merrill Legal Solutions

Page 229

1  A.      Well, no. I mean if it's a day,
2  I wouldn't spend the time to discount that,
3  and that's -- basically what I'm saying is
4  my consideration, the time frames involved,
5  what's past damages, what's future damages
6  and my understanding of about when the trial
7  date is, which today I couldn't even tell
8  what that is, I reached the conclusion that
9  it's not worth the sparring and the time
10 spent at depositions, the time to do it, and
11 to the extent your party is -- your expert
12 is going to disagree, then I'll have an
13 opportunity to speak on rebuttal at that
14 time. These are pre-judgment interest,
15 before prejudgment interest and before
16 discounting and it is my very firm opinion
17 the effect of the two when they are netted
18 will be diminuous.
19 Q.      And you understand that your --
20 and you're the expert for the plaintiff so
21 you're not really -- I mean, the plaintiff's
22 burden is to prove to the court and prove to
23 whoever else what the damages are; right?

Page 230

1  A.      These are the lost profits. I've
2  done that.
3  Q.      Okay. And do you believe in this
4  case to accurately account for the damages
5  that you have to at least consider net
6  present value?
7          MR. PEARSON: I'm going to object
8  to the form. That's been asked and answered
9  now about five times now.
10 Q.      You can answer the question.
11 A.      I think it's evident from page 3
12 of 4 in my report that I considered it.
13 Q.      Okay. And if you considered it,
14 what were the components of the net present
15 value that you considered in making that
16 conclusion?
17 A.      Well, by that question you're
18 assuming I used some component buildup
19 method to make the valuation.
20 Q.      However you get there. However
21 you get there.
22 A.      I get there based on my past
23 experience and knowledge and my experience

Page 231

1  in valuing companies and determining
2  discount rates. I didn't have to do what
3  you have assumed one would have to do.
4  Q.      Did you come up with any kind of
5  number?
6  A.      There is no number.
7  Q.      I understand that. That's
8  usually why I understand that people build
9  it up, but you're relying on your
10 experience?
11 A.      No, people don't usually build it
12 up. That is a method that can be used if
13 you don't have a better way to do it. The
14 best way to do it is if you have an actual
15 transaction that implies a discount rate and
16 figure out and calculate what the real
17 discount rate was. That's the best way to
18 do it. I know how to do it, and based on my
19 knowledge of how to do it I have reached the
20 opinion that I've reached. I have not
21 committed it to writing.
22 Q.      Have you gotten it to the point
23 that you could assign a range of values to

Page 232

1  it?
2  A.      Assign a range of discount rates?
3  Q.      Yes.
4  A.      I probably have the experience to
5  put a range on discount rates and then the
6  rate would fall within that range.
7  Q.      Did you do that here in making
8  this conclusion on page 3?
9  A.      That's pretty much how I
10 approached it, but I did not write it down.
11 And that's what I wrote here, that it's my
12 assessment that the discount rate that one
13 would likely come up with, combined with the
14 time frames involved, would yield -- what
15 was my word -- a result in the two that
16 would substantially offset one another. I'm
17 not saying exactly offset. I'm not saying
18 that it wouldn't raise or lower the damage
19 numbers. I'm just saying it's not going to
20 be a substantial impact. And I would
21 disagree with any expert who says, as Mr.
22 Borden did, that it will
23 Q.      You haven't given me the range

58 (Pages 229 to 232)

612 Lurleen Wallace Blvd., N. * Tuscaloosa, Alabama 35401 * www.legalink.com
(205) 758-4006 * (800) 844-3370 * Fax (205) 758-4371

# TUSCALOOSA COURT REPORTING
## Merrill Legal Solutions

Page 233

1  that you can. You told me you could do
2  that. What I don't know is whether you did
3  that in this case.
4  A.    I think I answered that question.
5  Q.    Please tell me what the answer
6  was?
7  A.    That's substantially how I
8  approached that, and considering my past
9  knowledge of discount rates, the time
10 involved in this matter, that's exactly how
11 I approached it. I just did not commit it
12 to writing.
13 Q.    Did you commit it to memory?
14 A.    Commit what? I just told you
15 what I did.
16 Q.    The range. I know. The range.
17 That you used all that to get to a range.
18 What was it?
19 A.    I did not sit down and say, gee,
20 what's the range up here, what's the high
21 end. I did think about what's the low end
22 of a range and then I considered the
23 appropriateness of adding to the low end

Page 234

1  what levels of risks you would assign. And
2  given that 95 percent of the benefit of this
3  entire venture is tied up in the shipments
4  your client's refused or did not take, it
5  would seem that the whole issue of risk is
6  tied up in this lawsuit and that that
7  directly impacts. In other words, it's very
8  risky if your customer breaches the
9  agreement. And it has occurred to me that
10 if that's the basis for raising the discount
11 rate, that that would seem to be a matter
12 that needs to be brought before either the
13 trier of fact or it may even be a legal
14 issue that seems inappropriate. And if you
15 consider that this supply contract is a --
16 if it really is a fifty-two hundred tons a
17 week arrangement and if for whatever reason
18 circumstances out of people's control
19 prevents that from happening, at a minimum
20 it's a hundred and fifty thousand tons per
21 year, that seems to be a fairly safe
22 arrangement particularly when you add on the
23 fact that as you as a byproduct generate

Page 235

1  things that can be sold that do have
2  markets, albeit the sand market has its
3  limitations. So that's my thinking on
4  discount rates.
5  Q.    Yeah, I appreciate that. What
6  was the low end that you came up with on the
7  discount rate?
8  A.    You know, working around six. I
9  mean, I didn't go figure out the risk free
10 rate, which is less than that. But I said,
11 okay -- you know, in my opinion you're
12 really hard pressed to justify any kind of
13 discount rate less than six percent. And
14 that, based on the last time I did it, was
15 real close if not the pre-judgment interest
16 rate, but I haven't looked at it in awhile.
17         And then, you know, to that then
18 you're starting to add risk premiums. And
19 that's the basis of my opinion is what risk
20 premium would you have to start adding to
21 that and what would cause you to have to add
22 that risk premium, and we're not talking
23 about valuing a business. We're talking

Page 236

1  about a very defined, limited time frame.
2  We're talking about things that are usually
3  uncertain, price being known at least for 95
4  percent of it, the biggest piece of it that
5  comes out of the ground, and quantity to be
6  taken. We're talking about is it one number
7  or another that represents the dispute. In
8  other words, it's not a nothing. There
9  seems to be an agreement that something was
10 to be taken and it's just is it a hundred --
11 based on my read of Dave Borden's report is
12 it a hundred and fifty thousand tons or is
13 it fifty-two hundred tons a week. So that
14 doesn't seem to be risky.
15         And then you've got the overall
16 question that I raised before of how
17 appropriate is it in litigation to use the
18 fact that you might get sued in the very
19 litigation you're in as the basis to
20 increase the discount rate. Those are some
21 of the factors and certainly there are
22 others.
23 Q.    Are there any others that you

59 (Pages 233 to 236)

# TUSCALOOSA COURT REPORTING
## Merrill Legal Solutions

Page 237

1   considered --
2   A.      Oh, yeah. I mean, sitting
3   here --
4   Q.      -- in coming to this conclusion?
5   A.      -- today I'm trying to redo a
6   mental process that I did back in August.
7   Q.      I appreciate that.
8   A.      Okay. So I can't tell you today
9   everything I considered, but I'm giving you
10  the best I can to redo it, but it's not
11  going to be a complete reassessment of that,
12  and I've also told you that I chose to wait.
13  Oh, one other thing that impacts a risk
14  assessment that just occurred to me, maybe
15  others will as I'm going, what reminded me
16  is the fact that the testing process was
17  complete.
18  Q.      What does that mean?
19  A.      It means it's my understanding
20  there's a period of time where tests were
21  needing to be performed to meet production
22  requirements with Yelvington. And by the
23  time you get into the March period and

Page 238

1   subsequent to what day it is in March, they
2   had reached that point where they had, for
3   lack of a better way of saying it, passed
4   their testing, so that uncertainty was not
5   present.
6   Q.      And do you know what that testing
7   consisted of?
8   A.      No.
9   Q.      So do you know whether -- the
10  testing you're referring to, are you
11  referring to just testing to see that the
12  gravel coming out of the ground meets the
13  specifications required?
14  A.      That's what I'm assuming, yes.
15  Q.      So you're not assuming testing
16  includes the ability to get it to the
17  railcar, the ability to get it out at a
18  certain rate per week or per two weeks,
19  whatever it may be, you're not including
20  those things in your definition of testing;
21  correct?
22  A.      No, I'm not referring to some
23  kind of test of ability to demonstrate --

Page 239

1   some type of demonstration of the ability to
2   mine 5200 tons a week. Although I believe
3   the facts I've seen shows that they were
4   able to do that, which is also another
5   uncertainty that doesn't seem to be present.
6   Q.      Well, do you know of any week in
7   which they produced 5200 tons?
8   A.      I know -- I remember that the
9   testimony is that they had produced several
10  loads, whatever, which I'll call weeks and
11  stopped. I don't recall how many because
12  they did not receive any orders.
13  Q.      Okay. Maybe we're saying the
14  same things but I'm not certain. Can you
15  point to anything that shows that Johnco
16  produced 5200 tons in any given week during
17  its operation --
18  A.      I don't.
19          MR. PEARSON: You mean as you sit
20  here today out of his memory?
21  Q.      Out of your memory or out of any
22  document that you've got?
23          MR. PEARSON: I mean, you've

Page 240

1   asked him to do it out of his memory.
2           MR. LEEK: Well, I mean, he's got
3   documents.
4   Q.      (By Mr. Leek) You can rely on
5   those.
6   A.      And I understand that question is
7   are there production records, that's what I
8   understand that question to be, and I'm not
9   aware of any production records, but there's
10  testimony and there's other stuff --
11  Q.      Okay.
12  A.      -- but I don't know if there's --
13  I know -- well, I'm going to stop there.
14  Let the record stand on that. I just don't
15  remember.
16  Q.      Okay.
17  A.      And earlier when I answered that
18  question I was referring to production
19  records. It's my understanding that today
20  there are not any production records.
21  Q.      Have you had a chance to review
22  completely the report of Mr. Borden?
23  A.      No.

60  (Pages 237 to 240)

# TUSCALOOSA COURT REPORTING
## Merrill Legal Solutions

Page 241

1  Q.    Have you identified any problems
2  with Mr. Borden's report based on the review
3  you have done?
4  A.    Yeah. I'm not sure I'm prepared
5  to recite them to you because I'm not done,
6  but yeah.
7  Q.    Just tell me about what you have
8  accomplished with regard to that report.
9  A.    I've read about it and focused in
10 on where he's had a difference of opinion
11 and thought about how he might have reached
12 that conclusion and thought about whether
13 there was any need for me to do more work to
14 figure out if he somehow knew something I
15 didn't know and thought about reasons why
16 he's gotten some of it wrong, --
17 Q.    Okay.
18 A.    -- figured out why he got it
19 wrong.
20 Q.    And which of those opinions are
21 you talking about specifically?
22 A.    We'll have to go through the
23 report. I'm not done yet.

Page 242

1  Q.    You've got it in front of you.
2  A.    I've got my binder in front of
3  me.
4  Q.    You've got this one too
5  (indicating). In my notebook it's under
6  Johnco 0973. I'm sorry, Tab D?
7  A.    Tab what?
8  Q.    D.
9       MR. PEARSON: D?
10 Q.    Bate stamp --
11 A.    First of all -- I've got it in
12 front of me now. Let me just say this. I
13 have not really read from the beginning on
14 page 3 called Introduction through
15 Background. I've skimmed it, but I haven't
16 read it at this time. And I have started
17 and then I've skimmed the section called
18 Analysis of Production and Sales, beginning
19 on page 8, and I have read Review of
20 Alexander Report on page 9, and I may have
21 read his Conclusion. So I can go back to
22 the Alexander section and look at it, but
23 the other stuff I don't even -- it would be

Page 243

1  a complete waste of time for us to try to go
2  through that.
3  Q.    Okay. I won't do that. Just to
4  close the loop here, have you formed any
5  opinions regarding the assertions put forth
6  by Mr. Borden in the section entitled
7  "Analysis of Production and Sales" on page
8  8? That's one you said you had looked at.
9       MR. PEARSON: What page are you
10 on?
11      MR. LEEK: It's on page 8 of the
12 report.
13      MR. PEARSON: Okay.
14 A.    What is his opinion?
15 Q.    I'm asking you if you've come to
16 the conclusion that anything you've
17 determined is an opinion in here is faulty
18 under that section?
19 A.    I'm not going to try to determine
20 what Dave's opinions are.
21 Q.    Well, you've read this.
22 A.    Right, I've read it. I'm telling
23 you I'm not going to testify as to what

Page 244

1  Dave's opinions are.
2  Q.    Okay.
3  A.    But you retained him and he
4  issued them to you and I'm asking you -- I'm
5  looking at this on page 8. I'm happy to
6  answer any questions about what you say his
7  opinions are.
8  Q.    Do you have any problem with the
9  information he's provided in the section
10 entitled "Analysis of Production and Sales"?
11 A.    I'm not at that stage.
12 Q.    Are you at the stage yet where
13 you can identify any flaw in his
14 methodology?
15 A.    I just scanned this page and I
16 could not see scanning it what his opinions
17 were and that's why I asked the question.
18 So if you see an opinion on here -- and I'm
19 not saying there's not one. I'm just saying
20 please identify it; otherwise, I'm going to
21 wait to comment on this page. I'm looking
22 at page 8.
23 Q.    I know what you're looking at.

61 (Pages 241 to 244)

612 Lurleen Wallace Blvd., N. * Tuscaloosa, Alabama 35401 * www.legalink.com
(205) 758-4006 * (800) 844-3370 * Fax (205) 758-4371

# TUSCALOOSA COURT REPORTING
## Merrill Legal Solutions

Page 245

1  Have you determined that there's any flaw in
2  the information you reviewed based on
3  anything he's put down whether you consider
4  it an opinion or not in this section?
5      MR. PEARSON: Ask --
6  A.    Now you just changed from page 8
7  to a whole section?
8  Q.    No, I referred to this section
9  before by title.
10 A.    That's an unfair question.
11     MR. PEARSON: I'm going to object
12 to the form of the question.
13 Q.    I don't understand what's unfair
14 about that question.
15     MR. PEARSON: What's unfair --
16     MR. LEEK: Hold on. I'm asking
17 him.
18     MR. PEARSON: Oh, I'm sorry. I
19 thought you were responding to my objection.
20 Excuse me. Go right ahead.
21     THE WITNESS: Read the question
22 back. There's so much chatter I couldn't --
23 I can't remember.

Page 246

1      (Whereupon, the last question was
2      read back by the Court Reporter,
3      as requested.)
4      MR. PEARSON: And I'm going to
5  object to the form of that question.
6      MR. LEEK: Okay.
7  A.    I think I just told you that's a
8  section I have not fully reviewed and in
9  that context that's completely unfair.
10 Second, he hasn't even testified yet. So I
11 don't know -- I don't in my opinion have
12 enough information in order to form fully my
13 opinions until I have an opportunity to
14 better understand what he did upon the
15 taking of his deposition.
16 Q.    Okay. So the answer to that
17 question then would simply be no?
18 A.    No, it would not.
19 Q.    Let's move onto the next section
20 I believe you said you have read, which is
21 Review of Alexander Report. Do you see that
22 section?
23 A.    I have seen that section.

Page 247

1  Q.    Have you read that section?
2  A.    I have read that section.
3  Q.    Do you take issue with any
4  assertion that Mr. Borden makes in that
5  section?
6  A.    I very well do.
7  Q.    Okay. And what are they? What
8  are the issues you have with the assertions
9  made?
10 A.    I'm not prepared to give you a
11 comprehensive recitation of the issues.
12 Q.    Okay. It doesn't have to be
13 comprehensive. Just give me what you've
14 got, what you recall.
15 A.    Let me look at it. That's how
16 I'm going to recall. The second paragraph I
17 disagree with.
18 Q.    That's the paragraph beginning,
19 "While it is my"?
20 A.    Yes.
21 Q.    And what specifically do you
22 disagree with?
23 A.    His conclusion that the

Page 248

1  calculation is lacking adequate foundation
2  and not conforming to the facts and
3  circumstances in this matter.
4  Q.    Okay. Anything else?
5  A.    There very well may be other
6  things about that paragraph but not at this
7  time.
8  Q.    How about the next paragraph?
9  A.    It's my understanding that he is
10 incorrect in his first sentence.
11 Q.    In what way?
12 A.    He's got his facts wrong.
13 Q.    Which facts specifically?
14 A.    The facts contained in that
15 sentence concerning comprehensive geological
16 assessment and testing date.
17 Q.    And so I understand it, are you
18 saying that in preparation of your report
19 you reviewed comprehensive geological
20 assessments and testing data?
21 A.    No. Read the sentence.
22 Q.    Okay. So what he's saying -- I
23 see what you're saying. What he's saying is

62 (Pages 245 to 248)

# TUSCALOOSA COURT REPORTING
## Merrill Legal Solutions

Page 249

1  it wasn't available to him --
2  A.      Right.
3  Q.      -- at the time of his report?
4  A.      So his scope is limited.
5  Q.      And so do you disagree about
6  whether that was available to him or not?
7  A.      It's available. I don't know --
8  Q.      Now.
9  A.      -- whether you made it available
10 to him or not.
11 Q.      Now. Do you know it to be
12 available at the time of that report?
13 A.      I can't tell you. I mean, if
14 we're back to the date of his report versus
15 now, we're going to have to wait until his
16 deposition before I'm going to be able to
17 answer that question.
18 Q.      Okay. Is there anything else in
19 that section, Lack of Foundation, with which
20 you have a problem?
21 A.      Oh, yeah, absolutely.
22 Q.      What else?
23 A.      I have to read it. Let's go

Page 250

1  sentence by sentence. The very next
2  sentence I disagree with.
3  Q.      Which parts?
4  A.      The entire sentence. I don't
5  know how to break it down.
6  Q.      Do you not believe that the
7  records are foundational, that part you
8  disagree with?
9  A.      First of all, whether something
10 is foundational or not I think you're asking
11 that in a legal context. But what I
12 understand Dave to be saying is that you have to
13 have a geological assessment and testing
14 data and a formal marketing plan for a
15 byproduct in order to calculate lost
16 profits. I think he's just wrong. I think
17 you don't have to have any of those formal
18 documents. While the information might
19 typically be contained, it's something one
20 would seek to know and I did seek to know
21 and I knew it when I did my calculation.
22         This represents -- if Dave knew
23 that I knew it and made this criticism, this

Page 251

1  is in the neighborhood of hyper-technical
2  form over substance, but it's probably a
3  reflection of his lack of information when
4  he issued this report.
5  Q.      Did you have any comprehensive
6  geological assessment or testing data at the
7  time that you issued your report?
8  A.      No, but I gave consideration to
9  how much rock was there and what was
10 essentially the practical capacity and were
11 they going to be able to supply that
12 contract, which is why if geological data is
13 available you would get that.
14 Q.      Any other assertion in that
15 paragraph that you have a problem with?
16 A.      Another thing about that
17 statement is it fails to recognize that
18 while Dave might need it because he's
19 working for your client that were not
20 involved in the business and were not
21 running the business, I was working for the
22 company that was doing the mining, had the
23 people that operated the mine and access to

Page 252

1  them. So there's a lot of different ways to
2  get information if you have access to the
3  people. The example is if you're auditing
4  the company, you can get a lot more
5  information from them than if you're the
6  expert witnesses working for the other side
7  that's suing that company.
8  Q.      And I believe your testimony
9  earlier was you don't recall whether you had
10 any personal discussions, you or -- let's
11 just limit it with you individually here,
12 with Ben Johnston, is that correct, prior to
13 publishing your report?
14 A.      No, but I think I got his
15 testimony. I'm pretty sure I got it. I
16 know I got his testimony on that issue, and
17 I know also I did have a conversation with
18 Clatus Junkin about the issue before -- I
19 said, "We need to get the testimony." I
20 mean, the way the process worked was I sat
21 down the first day, we talked about what the
22 issues were. I said, "This is the kind of
23 information I'm going to have to have if you

63 (Pages 249 to 252)

# TUSCALOOSA COURT REPORTING
## Merrill Legal Solutions

Page 253

1  want my expert opinion." And among that
2  information was I have to get satisfied
3  there's enough rock here that you had the
4  capabilities of mining it. All the issues
5  that I'm seeing Dave speaking to I
6  addressed.
7  Q.      Any other problems with anything
8  in that particular paragraph?
9  A.      I'm just to that sentence. I
10 haven't even read the next one yet. The
11 implication that this is a risky -- by the
12 use of the word start-up I think he's
13 implying that this is your classic risky
14 start-up business. And you really have to
15 take into account the fact that we have a
16 contract where not only the price was
17 bargained for but minimum shipping
18 quantities were bargained for and
19 specifically weekly shipping quantities were
20 actively negotiated. You can see it between
21 one draft of the agreement and the next
22 where it goes from three thousand tons,
23 which is about the hundred and fifty

Page 254

1  thousand, maybe exactly if you use a fifty
2  week year, to the 5200 week, resulting in a
3  contract that has the frequency, the amount
4  and the price specified.
5  Q.      Did you see anything else?
6  A.      I'm flipping to the top of page
7  8.
8  Q.      Top of page 8?
9  A.      Top of page 10.
10        MR. PEARSON: Ten, yeah. I was
11 going to say --
12 A.      I went the wrong way. Sorry.
13 Well, number one exists, and I don't
14 disagree that it's a good idea to have a
15 comprehensive assessment of the site and
16 that's one of the first questions I asked
17 and I was told yes, it exists and here's
18 what it says, you know.
19 Q.      But you didn't actually see it;
20 is that correct?
21 A.      Well, if that's his criticism,
22 we'll just let him tell me that when he
23 testifies.

Page 255

1  Q.      But, I mean, that's a question to
2  you?
3  A.      Because built into that is the
4  assumption that I was lied to, and there's
5  records in this case that someone else can
6  go look at and it will come out.
7  Q.      My question to you is quite
8  simple.
9  A.      I just answered it.
10 Q.      You didn't actually see a report
11 of comprehensive assessments of the geology
12 of the site. Your information comes from
13 the plaintiff in this case; is that correct?
14 A.      Well, the way you asked your
15 question that's not correct.
16 Q.      Okay. So let me break it into
17 pieces. You didn't actually see a report;
18 is that correct?
19 A.      Report --
20 Q.      Prior to --
21 A.      The way you're asking the
22 question I saw a report.
23 Q.      You saw a report, a comprehensive

Page 256

1  assessment of the geology of the site
2  report?
3  A.      Yes.
4  Q.      What is that report?
5  A.      You haven't asked me when.
6  A.      Well, actually I did earlier.
7  A.      Not in that question you didn't.
8  Q.      Prior to the report?
9  A.      No, I did not. I asked did one
10 exist and what does it say.
11 Q.      All right. Thank you. Do you
12 have any other problems with the paragraphs
13 where I think we're on paragraph one now?
14 A.      We're on the heading.
15 Q.      Okay.
16 A.      Just an observation that looks
17 like testimony of the geologist, but I guess
18 Dave has got enough oil and gas experience
19 to do that. It's interesting that he issues
20 the criticism and then acknowledges that
21 he's aware that the information is available
22 but he just didn't bother to get it.
23 Q.      Where does he say he didn't

64 (Pages 253 to 256)

# TUSCALOOSA COURT REPORTING
## Merrill Legal Solutions

Page 257

1  bother to get it?
2  A.      The last sentence of paragraph
3  one.
4  Q.      He says, "It's not available to
5  me;" right?
6  A.      I mean, that's what it says,
7  yeah. He didn't get it.
8  Q.      Yeah. Do you know why he didn't
9  get it?
10  A.      No.
11  Q.      Okay.
12  A.      Clearly I don't think the fact
13  that the production records were not
14  maintained prevent one from making
15  conservative determinations of unit costs
16  and those kinds of things, and even though
17  Dave makes this criticism he doesn't either
18  because he precedes to do it.
19  Q.      Anything else?
20  A.      He's wrong on his assumption
21  there was no marketing plan.
22  Q.      Have you seen a written marketing
23  plan?

Page 258

1  A.      There's a big difference to me in
2  a marketing plan and action, a piece of
3  paper labeled Marketing Plan. Now, if his
4  criticism is I haven't seen a piece of paper
5  labeled Marketing Plan, that's a different
6  thing. I would agree with him there's not a
7  piece of paper that says Marketing Plan.
8  But there's clearly evidence, in fact
9  there's actual sales. So if they weren't
10  marketing -- if they weren't going out and
11  marketing, how did they sell the stuff,
12  number one. Number two, if they had no plan
13  but they were still able to sell it and they
14  were formulating plans, just think how much
15  more they could have sold once they got a
16  plan in place if the stuff was selling
17  itself as they were formulating the plan.
18  Excuse me, I have to ask this question.
19  What time is it?
20  MR. PEARSON: It is 5:40 p.m.
21  A.      We're going to need to wrap this
22  up soon.
23  MR. PEARSON: I hope we can do

Page 259

1  that. We can do that, can't we?
2  MR. LEEK: Uh-huh (affirmative).
3  A.      When?
4  Q.      As soon as we get done with this,
5  going through the report here.
6  A.      This is going to take quite a bit
7  of time.
8  Q.      I'm not asking for you to look at
9  it now and evaluate it. I'm asking you to
10  tell me what, based on your review of the
11  sections you indicated, you have concluded
12  there's a problem with. Okay? So I'm not
13  asking you --
14  A.      And I've said I can only do that
15  by going through the report. So if I
16  understood what you just said, we can end
17  this. I cannot do it without going through
18  the report. And if you said can you do it
19  without going through the report, please do
20  it, the answer is no, I cannot do it without
21  going through the report.
22  Q.      Well, I recall from your
23  testimony earlier you were able to recall

Page 260

1  that you had a problem with Mr. Borden's
2  assertions regarding discount rates and
3  reducing the damages to present value.
4  That's something you recalled without
5  looking at the report; is that correct?
6  A.      You asked me a question. I
7  responded to it. You ask me another
8  question -- if you want to ask me anything
9  about this report, I may be able to respond
10  to it. If you want me to just dump
11  everything I can remember about this report,
12  I'm going to have to go through this report,
13  and I think that's very fair.
14  Q.      I'm not disagreeing with you.
15  Let's focus on those things that you
16  remembered. And right now I recall you said
17  you had a problem with his assertions
18  regarding net present value. What problem
19  was that? Have you already described that
20  to me in prior testimony?
21  A.      Yes. That's the reason I'm
22  looking at you puzzled. I don't understand.
23  You're asking me to testify about something

65 (Pages 257 to 260)

# TUSCALOOSA COURT REPORTING
## Merrill Legal Solutions

Page 261

1  we've already testified about.
2       MR. PEARSON: We spent a lot of
3  time on that and I believe that's going to
4  be objectionable to asked and answered, and
5  I don't think there's any trick to that. I
6  think he's completely said why he did what
7  he did, and that is in fact the criticism
8  you've asked of this.
9       MR. LEEK: Just so you know, the
10  only thing prolonging this line of
11  questioning right now is the fact you're
12  talking.
13       MR. PEARSON: Okay, good. Then
14  I'm going to shut up.
15  Q.     (By Mr. Leek) You indicated
16  earlier you also had -- that you felt that
17  he didn't have the information available to
18  him to make the opinions or to make the
19  assertions he was making; do you recall
20  that?
21  A.     Yeah, and that's not a
22  professional opinion. That's a feeling that
23  I have because I know him and he's -- I know

Page 262

1  of his quality and I know that he would not
2  write things that were not incorrect, and
3  he's written some things that were
4  incorrect. Just like he knows I wouldn't
5  write some things that were incorrect and
6  in -- I've always talked about the
7  twenty-four thousand in start-up costs in
8  March and I've told you what I would do with
9  them. Now, if you want me to go through the
10  report and point all that stuff out, I'm
11  really not ready to, although I can tell you
12  I recall seeing several places where that
13  happened. But for me to recall it, we're
14  going to have to go through the report.
15  Q.     Okay.
16       MR. LEEK: Why don't we go off
17  the record for a couple of minutes here and
18  let me talk to Dane and see if we're done.
19       (Whereupon, a short break was
20       taken.)
21  Q.     (By Mr. Leek) I don't have any
22  further questions. I don't believe that
23  I've been provided copies of your billing

Page 263

1  records. I would like to get a copy of
2  binder one.
3  A.     Okay.
4  Q.     And also a complete copy of your
5  correspondence files.
6  A.     That's fine.
7  Q.     Okay. And if you'll provide that
8  to Greg, who'll provide it to me, we'll be
9  good to go.
10  A.     I'm also going to give you --
11  because my correspondence file got mixed up
12  with some other loose stuff. I'm going to
13  give you everything that's loose in there,
14  which won't be much. Then I don't have to
15  make a judgment as to was this in my
16  correspondence file.
17  Q.     I appreciate that.
18       MR. PEARSON: While we're on the
19  record, we will probably need to discern in
20  some way how you and I Bate's number that
21  after it's produced, you know, which you and
22  I can discuss how we do that.
23       MR. LEEK: Do you want a Bate's

Page 264

1  number.
2       THE WITNESS: Do you want me to
3  get copies to you so you can get them Bate's
4  numbered or do you want me --
5       MR. PEARSON: I think it needs to
6  be Bate's numbered so that we -- because
7  it's going to look so similar that if it
8  doesn't have a different Bate's number on it
9  it's going to not be --
10       MR. LEEK: I appreciate that.
11  You can take them, Bate's number them and
12  give them to me.
13       THE WITNESS: Or I can send them
14  to a service and tell them what the Bate's
15  number is.
16       MR. PEARSON: We'll Bate's number
17  them down here and produce them, but I just
18  want them to have a different Bate's number.
19       THE WITNESS: Let me just give
20  them to you then instead of me taking them.
21       MR. PEARSON: All right.
22
23  FURTHER DEPONENT SAITH NOT

66 (Pages 261 to 264)

# TUSCALOOSA COURT REPORTING
## Merrill Legal Solutions

Page 265

1      C E R T I F I C A T E
2   STATE OF ALABAMA)
3   TUSCALOOSA COUNTY)
4        I hereby certify that the above
5   and foregoing proceeding was taken down by
6   me in stenotype, and the questions and
7   answers thereto were produced in transcript
8   form by computer-aided transcription under
9   my supervision, and that the foregoing
10  represents a true and correct transcript of
11  the proceedings occurring on said date at
12  said time.
13       I further certify that I am
14  neither of counsel nor of kin to the parties
15  to the action, nor am I in anywise
16  interested in the results of said cause.
17

18        DEBORAH S. RANDALL,
          COURT REPORTER & COMMISSIONER
19
20  COMMISSION EXPIRES: August 3, 2009
    LICENSE NUMBER: ACCR #: 238
21  EXPIRATION DATE: September 30, 2008
22
23

Page 267

1           SIGNATURE PAGE
2                OF
3        J. LESTER ALEXANDER, III
4
5        I HEREBY ACKNOWLEDGE THAT I HAVE
6   READ THE FOREGOING DEPOSITION AND THAT THE
7   SAME IS A TRUE AND CORRECT TRANSCRIPTION OF
8   THE ANSWERS GIVEN BY ME TO THE QUESTIONS
9   PROPOUNDED, EXCEPT FOR THE CHANGES, IF ANY,
10  NOTED ON THE ATTACHED ERRATA SHEET.
11
12  SIGNATURE:     _____
13  DATE:          _____
14
15  STATE OF _____
16  COUNTY OF _____
17  Sworn to and subscribed before me this the
18  _____ day of _____, 2007.
19                 _____
20            NOTARY PUBLIC
21                 _____
22            MY COMMISSION EXPIRES
23

Page 266

1   PAGE      LINE     EXPLANATION
2        _____
3        _____
4        _____
5        _____
6        _____
7        _____
8        _____
9        _____
10       _____
11       _____
12       _____
13       _____
14       _____
15       _____
16       _____
17       _____
18
19       _____
20    DEPONENT'S SIGNATURE
21
22       _____
23       DATE

67 (Pages 265 to 267)

# EXHIBIT
# F

**Summary Report of Accounting, Economics & Appraisal Group, LLC**

**By: J. Lester Alexander, III**

**Johnco Materials, Inc. v.
Conrad Yelvington Distributors, Inc.
As of August 8, 2007**

**CV-06-2:06cv993-ID**

This report and the attached appendices is a summary of my findings and opinions to date in the above referenced matter.

I am a Certified Public Accountant and a Certified Fraud Examiner with approximately twenty-eight years of professional experience performing audit, tax and consulting services. I am the co-founder and the Managing Principal of Accounting, Economics and Appraisal Group, LLC ("AEA"). I hold a Bachelor of Science in Accounting from the University of Alabama. I am a former partner of Pricewaterhouse Coopers, LLP and former Southeastern practice leader of one of its legacy firm's consulting practices. In recent years, I have concentrated my practice in the areas of financial investigation, forensic accounting and valuation consulting services. I have been recognized as an expert in Alabama and other state and federal courts. I reserve the right to supplement and amend my opinions for information learned up to and throughout trial. Furthermore, I intend to develop and make available prior to trial additional charts and aides designed to make the financial and economic concepts addressed in my report more understandable to lay persons.

In regard to this matter, I was assisted by members of my firm who worked under my direction. AEA's billing rates for this engagement range from $55 to $290 per hour.

## SCOPE AND METHODOLOGY

Counsel for Johnco Materials, Inc. ("JMI") retained me as expert witness to review and analyze documentary and oral evidence related to the Supply Agreement dated April 16, 2004 between JMI and Conrad Yelvington Distributors, Inc. ("CYDI") for the supply of Number 67 concrete gravel and any financial/economic facts and circumstances occurring during and after the dates covered under Supply Agreement.

In performing my work, I read and analyzed the Supply Agreement, related sales invoices, federal tax returns, financial statements and other information produced in this matter. I utilized certain case pleadings and the depositions of Ben Johnston, Pressley Morgan ("Pep") Johnston, and Clatus Junkin. I have studied industry data, financial research and industry trends regarding profits and other information. A complete listing of information considered is included as an appendix to this report. As a result of this work, I have developed the following findings and opinions.

**FINDINGS AND OPINIONS**

**JMI invested a significant amount of money in the establishment of a mining facility and the related rail siding as specified in the Supply Agreement.**

In April 2004, JMI and CYDI entered into a Supply Agreement for No. 67 concrete gravel. This Agreement called for the construction of a mining facility to mine and classify sand and gravel.[1] Upon completion of this facility, CYDI was to begin purchasing the specified size of gravel on a weekly schedule at an approximate volume of 5,200 tons per week representing an annual volume of 260,000 tons per year. The cost per tonnage price would increase after the first two years at a small percentage increment.[2]

JMI purchased land with a cost in excess of $1.6 million. JMI then proceeded to purchase depreciable plant and rail car loading equipment with a cost of over $1.2 million that would be needed in order to meet the obligations as agreed. In addition, JMI incurred other costs to prepare the mining facility to produce at least 5,200 tons per week.[3] The amount invested by JMI to meet their obligations under the Supply Agreement was more than $2.8 million.

**Although sufficient gravel was produced by JMI, CYDI failed to purchase quantities specified in the Supply Agreement.**

Although CYDI was aware that JMI commenced mining operations during March 2006, CYDI did not schedule the initial delivery until May 11, 2006, approximately 9 weeks after mining operations commenced. After the initial delivery on May 11, 2006, CYDI failed to schedule weekly deliveries and only scheduled sporadic shipments during June 2006, August 2006, and September 2006. The total amount delivered by JMI to CYDI during this seven month time frame was approximately 32,000 tons.

**JMI suffered lost profits and incidental costs attributable to the failure of CYDI to take deliveries of No. 67 concrete gravel anticipated under the Supply Agreement.**

Based on the quantities and prices as set forth in the Supply Agreement, I have determined that JMI would have generated gross revenue in excess of $7.4 million from the sale of No. 67 gravel to CYDI and an additional $3.1 million from the sale of the production by-products.[4] This level of gross revenues is reasonable in light of the substantial investment made by the owners of JMI

---

[1] Paragraph 2.1 of the Supply Agreement states: "Seller shall construct a mining facility to mine and classify sand and gravel on the Plant Site. In addition to the mining facilities to be constructed on the Plant Site, this contract is contingent on Seller's ability to construct ... sufficient rail siding to load/handle a minimum of fifty-two (52) open, or covered, hopper railcars on a regular shipment schedule.

[2] Paragraph 3.1 of the Supply Agreement states: "After Seller commences mining and grading of sand and gravel, Seller shall sell and deliver to Buyer, No. 67 concrete gravel in minimum quantities of 150,000 tons annually for a price equal to ... ($5.25) per ton, F.O.B. Buyer's rail cars loaded on the rail siding on the Plant Site, on a weekly schedule (i.e. approximately 5,200 tons per week), and buyer shall purchase an accept from Seller said Product at the price and in the quantities specified ..."

[3] Per deposition testimony of Clatus Junkin.

[4] See Appendix 2 for the calculation of expected gross revenue at 5,200 tons of No. 67 concrete gravel produced and sold per week.

to place the mine into operation. The loss of expected gross revenues through CYDI's failure to purchase the contractual quantities of No. 67 concrete gravel resulted in significant financial harm to JMI.

Using the costs from mining operations at production capacity for JMI during the period March 2006 and May 2006 through August 2006 [5], the gross revenue expected should be reduced by a cost to produce of $4.16 per ton sold. This results in a net lost profit of $4,473,873 due to the failure of CYDI to uphold their contractual obligations, before present value discounting and pre-judgment interest.[6] The lost profit amounts have not been reduced to their net present value as of the date of trial nor have they been increased for pre-judgment interest through the date of trial. It is my opinion that the impact of discounting of the net lost profits would be substantially offset by statutory pre-judgment interest considering the estimated date of trial verses the time frame of the lost profits determinations.

In addition to these costs, JMI has informed me that they had commenced mining operations and were staffed to meet the delivery requirements specified in the supply agreement as of the first week in March 2006. However, CYDI did not take the initial delivery until May 11, 2006. We have determined the incidental costs incurred by JMI during the intervening period attributable to CYDI's delay in the initial delivery to be $75,342, before pre-judgment interest.

## OTHER CONSIDERATIONS

My report is issued in accordance with the Management Consulting Standards of the American Institute of Certified Public Accountants. This report is to be used solely in connection with proceedings related to the above referenced matter and should not be used for any other purpose. Outside distribution of this report to others is not permitted without the written consent of AEA Group, LLC. The information in this report is based on information learned through August 8, 2007. Discovery in the captioned litigation is ongoing as is my review and analysis of the facts and circumstances of the case. As such, I reserve the right to consider any additional information that is presented to me. Further, I reserve the right to supplement and amend my opinions for information learned up to and throughout trial.

Very truly yours,

By: _J. Lester Alexander, III_
J. Lester Alexander, III, CPA

---

[5] Per deposition testimony of Clatus Junkin, these months are an accurate representation of costs associated with the mine running at production capacity.
[6] See Appendix 1 for the calculation of profits lost by JMI.

**INDEX OF APPENDICES**

Appendix 1 -  Lost Profits @ 5,200 Tons Per Week

Appendix 2 -  Gross Revenue @ 5,200 Tons Per Week

Appendix 3 -  Sales Volume Assumptions

Appendix 4 -  Cost Per Ton @ 5,200 Tons Per Week

Appendix 5 -  Incidental Costs

Appendix 6 -  Resume of J. Lester Alexander, III

Appendix 7 -  Trial, Deposition and Arbitration Testimony in Last Four Years

Appendix 8 -  List of Information Considered

Appendix 1

## Lost Profits @ 5,200 Tons Per Week

|  | Cumulative | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 |
|---|---|---|---|---|---|---|
| Gross Revenue (Appendix 2 and 3) | $ 10,513,500 | $ 2,051,740 | $ 2,088,140 | $ 2,124,540 | $ 2,124,540 | $ 2,124,540 |
| Incremental Costs (Appendix 4): |  |  |  |  |  |  |
| Anticipated Tons [1] |  | 260,000 | 260,000 | 260,000 | 260,000 | 260,000 |
| Cost Per Ton (Appendix 4) |  | $ 4.16 | $ 4.28 | $ 4.41 | $ 4.54 | $ 4.68 |
| Incremental Costs | $ 5,738,200 | $ 1,081,600 | $ 1,112,800 | $ 1,146,600 | $ 1,180,400 | $ 1,216,800 |
| Lost Profits | $ 4,775,300 | $ 970,140 | $ 975,340 | $ 977,940 | $ 944,140 | $ 907,740 |
| (Less): Actual Gravel and Sand Sales [2] | (301,427) | (275,668) | (25,759) |  |  |  |
| Net Lost Profits | $ 4,473,873 | $ 694,472 | $ 949,581 | $ 977,940 | $ 944,140 | $ 907,740 |

[1] Source: Section 3.1 of Supply Agreement dated April 16, 2004 between Johnco Materials, Inc. and Coastal Yelvington Distributors, Inc.

[2] Source: Johnco Materials, Inc. Profit and Loss Statements for the period May 2006 through June 2007

Appendix 2

## Gross Revenue @ 5,200 Tons Per Week

| | Cumulative | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 |
|---|---|---|---|---|---|---|
| **# 67 Concrete Gravel** | | | | | | |
| Contracted Quantity [1] | 1,300,000 | 260,000 | 260,000 | 260,000 | 260,000 | 260,000 |
| Price Per Ton [1] | | $ 5.51 | $ 5.65 | $ 5.79 | $ 5.79 | $ 5.79 |
| Gross Revenue | $ 7,417,800 | $ 1,432,600 | $ 1,469,000 | $ 1,505,400 | $ 1,505,400 | $ 1,505,400 |
| **# 4 Oversize Gravel** | | | | | | |
| Anticipated Quantity [2] | 218,000 | 43,600 | 43,600 | 43,600 | 43,600 | 43,600 |
| Price Per Ton [3] | | $ 8.50 | $ 8.50 | $ 8.50 | $ 8.50 | $ 8.50 |
| Gross Revenue | $ 1,853,000 | $ 370,600 | $ 370,600 | $ 370,600 | $ 370,600 | $ 370,600 |
| **Sand** | | | | | | |
| Anticipated Quantity [2] | 731,000 | 146,200 | 146,200 | 146,200 | 146,200 | 146,200 |
| Price Per Ton [4] | | $ 1.70 | $ 1.70 | $ 1.70 | $ 1.70 | $ 1.70 |
| Gross Revenue | $ 1,242,700 | $ 248,540 | $ 248,540 | $ 248,540 | $ 248,540 | $ 248,540 |
| Total Gross Revenue | $ 10,513,500 | $ 2,051,740 | $ 2,088,140 | $ 2,124,540 | $ 2,124,540 | $ 2,124,540 |

[1] Source: Section 3.1 of Supply Agreement dated April 16, 2004 between Jobaco Materials, Inc. and Central Yerhington Distribution, Inc. based on 50 weeks per year production.

[2] Source: Anticipated quantity for # 4 Oversize Gravel and Sand calculated based on historical relationship between tons of # 67 Concrete Gravel, # 4 Oversize Gravel, and Sand sold during the period January 2006 through June 2007 (see Appendix 3).

[3] Source: Price per ton for delivery of 3,339,866 tons to Central Yerhington Distributors, Inc. during June 2006 (Batco Jobaco Materials 08058 to 09059) and for multiple deliveries totaling ~ 3,400 tons to Maddox Stone & Gravel during the period March 2006 through October 2006, based on detailed analysis of sales invoices for the period January 2006 through June 2007.

[4] Source: Average price per ton for delivered during the period January 2006 through June 2007, based on detailed analysis of sales invoices for the period January 2006 through June 2007.

Appendix 3

## Sales Volume Assumptions

| | **Actual Sales History  January 2006 Through June 2007** | | | |
| | **# 67 Concrete Gravel** | **# 4 Oversize Gravel** | **Sand** | **Combined** |
|---|---|---|---|---|
| Tons Sold [1] | 40,028.63 | 6,729.35 | 22,505.63 | 69,263.61 |
| % of Sales | 57.8% | 9.7% | 32.5% | 100.0% |

[1] Source: Detailed analysis of sales invoices for the period January 2006 through June 2007.

| | **Anticipated Tons @ 5,200 Tons Per Week** | | | |
| | **# 67 Concrete Gravel** | **# 4 Oversize Gravel** | **Sand** | **Combined** |
|---|---|---|---|---|
| Tons Sold | 260,000 | 43,600 | 146,200 | 449,800 |
| % of Sales | 57.8% | 9.7% | 32.5% | 100.0% |

Appendix 4

## Cost Per Ton @ 5,200 Tons Per Week

| | Cumulative | Actual Operating Costs [1] | | | | |
|---|---|---|---|---|---|---|
| | | March 2006 | May 2006 | June 2006 | July 2006 | August 2006 |
| Tons # 67 Concrete Gravel Sold [2] | 21,863.12 | 135.00 | 5,953.04 | 3,241.59 | 189.13 | 12,344.36 |
| Salaries | $ 99,623 | $ 16,913 | $ 18,771 | $ 23,734 | $ 18,366 | $ 21,839 |
| Insurance-Workers' Comp. | 4,165 | - | - | - | - | 4,165 |
| Life Insurance | 6,628 | 1,657 | - | 1,657 | 1,657 | 1,657 |
| Payroll Tax | 10,219 | 1,834 | 1,409 | 2,661 | 2,030 | 2,285 |
| Contract Labor | 1,625 | - | - | 1,625 | - | - |
| Training | 150 | - | - | 150 | - | - |
| Fuel and Oil | 52,551 | 7,782 | 6,700 | 18,854 | 9,137 | 10,078 |
| Repairs | 25,040 | 8,270 | 1,518 | 5,680 | 3,305 | 6,267 |
| Equipment Rental | 19,063 | 2,044 | 5,141 | 4,098 | - | 7,780 |
| Insurance | 6,110 | 1,517 | 2,783 | 1,810 | - | - |
| Supplies | 8,893 | 395 | 1,119 | 5,545 | 980 | 854 |
| Hauling Charges | 1,830 | - | - | 180 | - | 1,650 |
| Small Tools | 1,091 | 429 | - | 454 | - | 208 |
| Miscellaneous Expenses | 769 | 74 | 695 | - | - | - |
| Utilities | 5,264 | 512 | 735 | 1,245 | 1,374 | 1,398 |
| Total Operating Costs | $ 243,021 | $ 41,427 | $ 38,871 | $ 67,693 | $ 36,849 | $ 58,181 |
| Escalate Variable Fuel and Oil Cost from Average Cost Per Actual Ton Sold to Cost for 5,200 Tons Per Week [3] | 207,844 | 44,297 | 45,379 | 33,225 | 42,942 | 42,001 |
| Total Equivalent Operating Costs | $ 450,865 | $ 85,724 | $ 84,250 | $ 100,918 | $ 79,791 | $ 100,182 |
| Anticipated Tons # 67 Concrete Gravel [4] | 108,335 | 21,667 | 21,667 | 21,667 | 21,667 | 21,667 |
| Cost Per Ton | $ 4.16 | $ 3.96 | $ 3.89 | $ 4.66 | $ 3.68 | $ 4.62 |

| | Cost Per Ton Escalated for Inflation [5] | | | | |
|---|---|---|---|---|---|
| | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 |
| Cost Per Ton | $ 4.16 | $ 4.28 | $ 4.41 | $ 4.54 | $ 4.68 |

[1] Source: Johnco Materials, Inc. Statements of Operations for the March 2006 through September 2006 period of operations under the Supply Agreement. April 2006 and September 2006 operating costs were excluded from analysis due to effect of cost avoidance reduction in work force by Johnco Materials, Inc., resulting in operating costs not comparable to months of fully-staffed production.

[2] Source: Detailed analysis of sales invoices for the period January 2006 through June 2007

[3] Source: Operating costs incurred by Johnco Materials, Inc. during the March 2006 through September 2006 period of operations under the Supply Agreement represent staffing and operating costs necessary to produce 5,200 tons of # 67 Concrete Gravel per week. Actual operating costs incurred by Johnco Materials, Inc. for operations producing less than contracted quantities delivered to Central Yellowjacket Distributors, Inc. are equivalent to costs necessary to produce 5,200 tons of # 67 Concrete Gravel per week, with the exception of Fuel and Oil, which would escalate to power equipment to load rail cars specified in the shipping method by the Supply Agreement. For analytical purposes, actual Fuel and Oil cost than been escalated to equivalent unit necessary to produce and rail car load 5,200 tons of # 67 Concrete Gravel per week.

[4] Production of # 4 Oversize Gravel and Sand are byproducts of the production of # 67 Concrete Gravel; tons of # 4 Oversize Gravel and Sand are not included in the Anticipated Tons for purposes of calculating Cost Per Ton.

[5] Cost Per Ton escalated 3.0% for inflation, comparable to 2.4% increase from June 2006 to June 2007 in Consumer Price Index published by the Bureau of Labor Statistics of the U.S. Department of Labor for comparable geographic and demographic areas, specifically for South region, Size D Nonmetropolitan area size (less than 50,000) (www.bls.gov/news.release/cpi.t03.htm)

Appendix 5

# Incidental Costs

|  | March 2006 [1] | April 2006 [1] | Combined |
|---|---|---|---|
| Salaries | $ 16,913 | $ 7,084 | $ 23,997 |
| Insurance-Workers' Comp. | - | 3,892 | 3,892 |
| Life Insurance | 1,657 | 1,657 | 3,314 |
| Payroll Tax | 1,834 | 699 | 2,533 |
| Training | - | 70 | 70 |
| Fuel and Oil | 7,782 | 5,397 | 13,179 |
| Repairs | 8,270 | 3,052 | 11,322 |
| Equipment Rental | 2,044 | 7,952 | 9,996 |
| Insurance | 1,517 | 1,822 | 3,339 |
| Supplies | 395 | 1,555 | 1,950 |
| Small Tools | 429 | 64 | 493 |
| Miscellaneous Expenses | 74 | 64 | 138 |
| Utilities | 512 | 607 | 1,119 |
|  | $ 41,427 | $ 33,915 |  |
| Incidental Costs |  |  | $ 75,342 |

[1] Source: Johnco Materials, Inc. Statements of Operations for March 2006 and April 2006.

**Resume of J. Lester Alexander, III**                                    Appendix 6

**Professional Experience**

Mr. Alexander is co-founder and the Managing Principal of Accounting Economics & Appraisal Group. He is a former partner of PricewaterhouseCoopers LLP and former southeastern practice leader of one of its legacy firm's consulting practices. Mr. Alexander has practiced for more than twenty-eight years performing audit, tax and consulting services. In recent years Mr. Alexander has concentrated his practice in the areas of fraud investigation, forensic accounting and valuation consulting services. Mr. Alexander holds a Bachelor of Science in Accounting from the University of Alabama and is a Certified Public Accountant and a Certified Fraud Examiner.

Mr. Alexander has provided services and, from time to time, expert testimony in various courts and in situations involving alternative dispute resolution. He has provided services in connection with contract disputes, security issues, insurance coverage issues, non-compete agreements, lost profits, business valuation and various other matters. He has testified in connection with class action certification hearings and class action fairness hearings. Mr. Alexander's experience includes testimony about customary practices and standards of care in auditing, operating and controlling business activities. Mr. Alexander has concentrated experience in a variety of industries including real estate, contracting, manufacturing insurance, and healthcare.

He is experienced in the areas of business valuation, acquisition due diligence, investment advisory, tax advisory and cost accounting advisory services. He has evaluated the value of ownership interests in businesses in connection with acquisitions, disposals and disputes. He has performed suitability studies in connection with investment transactions in a wide range of financial instruments. In addition, he has performed incremental cost studies, contribution margin studies and other applications of cost accounting for clients in connection with new products, acquisitions, patent valuations and evaluation of trademarks. This experience includes making projections of incremental revenues and costs in connection with profitability analysis of proposed business ventures, new products and other profitability analysis for companies.

Throughout his career Mr. Alexander has advised governing bodies, committees and members on their role in overseeing the activities of companies and senior management. His clients have included publicly-traded companies, privately-held companies, governmental entities and tax-exempt companies. He has advised governing bodies overseeing companies in the start-up/growth, mature and restructuring phases of operational development. He has performed these services for governing bodies overseeing companies operating in the insurance, reinsurance, manufacturing, healthcare, technology, financial services, real estate, contracting, and retail industries.

Mr. Alexander has performed determinations of solvency; investigated potentially fraudulent transfers made by debtors; analyzed preferential payments to creditors; analyzed the course of dealings between debtor/creditor; and valued the consideration received when a debtor transfers assets. Mr. Alexander has testified in court as an expert witness concerning solvency, fraudulent transfers, preference payments, ordinary course of business, reasonably equivalent value, cash/collateral tracing, lost profits, business valuation and records reconstruction.

Further, Mr. Alexander has been appointed Trustee of both Chapter 11 and Chapter 7 Bankruptcy Estates, where he pursued recoveries (including adversary proceedings in Federal and State courts), made solvency determinations and performed the routine duties of both a Chapter 11 and Chapter 7 Bankruptcy Trustee. Creditors and Trustees have engaged Mr. Alexander to investigate insider transactions, value businesses and to evaluate loan collateral. Mr. Alexander has served as a lead advisor for various financial institutions in connection with their underwriting and credit/investment evaluation activities. In addition, Mr. Alexander has conducted auctions and assisted others in evaluating competitive bids received in auction.

**Resume of J. Lester Alexander, III**                                    Appendix 6

## Professional/Business/Community Affiliations

Lecturer on Documentation and Demonstration of Extra Work Costs on Construction Projects - 2006, Birmingham, Alabama

Lecturer on Financial Damages - 2004 Cumberland Law School Continuing Education Seminar, Birmingham Alabama

Lecturer on Financial and Business Fraud Schemes - 2004 Corporate Counsel Seminar, Birmingham Alabama

Lecturer on Detecting Fraud Schemes - Fall Bankruptcy Seminar, 2003, Alabama Bar Continuing Education Series, Birmingham Alabama

Lecturer on Accountant's View of Sarbanes Oxley - 2003 Seminar, Alabama Bar Continuing Education Series, Birmingham Alabama

Lecturer on Online Fraud Prevention - 2002 Institute of Management Accountants, Birmingham, Alabama

Lecturer on Forensic Computer Investigation - 2001 Discovery Seminar, Alabama Bar Continuing Education Series, Birmingham , Alabama

Lecturer on Online Business & Financial Research Methods - 2001 Federation of Insurance & Corporate Counsel's Internet University, Napa, California

Lecturer on Identifying and Investigating Fraud - 2001 Institute of Management Accountants, Birmingham, Alabama

"Expert Witness Research Post Kumho Tire", presented at the American Bar Association's 2000 Annual Meeting, New York, New York

Lecturer on Online Discovery - Defense Research Institute's 2001 Annual Meeting of Young Lawyers, Miami, Florida

Lecturer on Online Expert Witness Research - 2001 Louisiana State Bar 17th Summer School for Lawyers, Destin, Florida

Panelist on Consumer Fraud Issues - Coopers & Lybrand 1997 National Banking Conference, Washington, DC

Former National Practice Leader - Coopers & Lybrand's Financial Services Consumer Dispute Resolution Practice

Former Regional Service Line Leader - Coopers & Lybrand's Litigation Consulting Services Southern Region

Former Practice Leader for Dispute Analysis and Investigations - PricewaterhouseCoopers LLP, Birmingham, Alabama

Former Member - Banking and Insurance Industry Groups - PricewaterhouseCoopers LLP

American Institute of Certified Public Accountants

Alabama Society of Certified Public Accountants

Florida Institute of Certified Public Accountants

Association of Certified Fraud Examiners

Associate Member-American Bar Association

Past Regional Director - Exchange Club of Alabama, Past President, Secretary, Director and Treasurer - Birmingham Breakfast Exchange Club

**Trial, Deposition & Arbitration Testimony in Last Four Years**          Appendix 7

Intergraph Corporation v. Bentley Software Systems, Inc (Circuit Court of Madison County, Alabama)

HydroPower Inc v. Eaton Manufacturing (Circuit Court of Jefferson County Alabama)

The Utilities Board of the City of Daphne v. City of Spanish Fort et al (Federal District Court, Southern District of Alabama)

Compass Bank v. Blitz Media, Inc., et al. (United States District Court, Northern District of Alabama, Southern Division)

Steward Machine v. White Oak, et al. (United States District Court, Connecticut)

Refrigerated Construction Services v. Coldmatic Building Systems, Inc, et al (United States District Court, Northern District of Alabama, Southern Division)

ABB Automation, Inc. v. DeVries, et al. (Circuit Court of Jefferson County)

Proliance, Inc. v. City of Huntsville (Circuit Court of Madison County, Alabama)

Steve Jamison, et al. v. Kerr-McGee Corporation, et al. (State Court, Mississippi)

Mason Dillard et al v Bellsouth Advertising et al (Circuit Court of Jefferson County, Alabama)

Terry Manufacturing Co., Inc. v. The Peoples Bank et al. (United States Bankruptcy Court, Middle District, Alabama)

Terry Manufacturing Co., Inc. v. Bonifay Manufacturing Inc. et al. (United States Bankruptcy Court, Middle District, Alabama)

Terry Manufacturing Co., Inc. v. HLC Industries (United States Bankruptcy Court, Middle District, Alabama)

Terry Manufacturing Co., Inc. v. N.D. Horton et al  (United States Bankruptcy Court, Middle District, Alabama)

Terry Manufacturing Co., Inc. v. Albright, et al (United States Bankruptcy Court, Middle District, Alabama)

Pemco World Air Services, Inc v. GE Capital Aviation Services, Inc (Circuit Court of Dale County, Alabama

Terry Manufacturing Co., Inc. v. Delong & Caldwell (United States Bankruptcy Court, Middle District, Alabama)

Terry Manufacturing Co., Inc. v. J Martin & Associates (United States Bankruptcy Court, Middle District, Alabama)

AHAT, et al v. Gen Re, et. al. (Circuit Court of Montgomery County, Alabama)

Amason and Associates, Inc.  v Silver Beach Condominium Owners Association, et. al (Circuit Court of Baldwin County, Alabama)

Campbell & Sons Oil Co. Inc, et al v. Merrill Lynch Business Services, Inc, et. al. (Circuit Court of Madison County, Alabama)

**List of Information Considered**                                                   Appendix 8

Complaint and relevant pleadings.

Depositions of Ben Johnston, Presley Morgan ("Pep") Johnston, and Clatus Junkin.

Supply agreement dated April 16, 2004 between Johnco Materials, Inc. and Conrad Yelvington Distributors, Inc.

Various documents regarding and/or related to the Supply Agreement with Conrad Yelvington Distributors, Inc.

Johnco Materials, Inc. monthly profit and loss statements for the period January 2006 through June 2007.

Johnco Materials, Inc. Schedule of Sales and Other Income for the period January 2004 through February 2006.

Johnco Materials, Inc. Invoice Registers for the period January 2006 through April 2006.

Johnco Materials, Inc. Sales and Sales Tax Registers for the period May 2006 through June 2007.

Johnco Materials, Inc. sales invoices, including invoices from Johnco Materials, Inc. to Conrad Yelvington Distributors, Inc.

Income tax returns of Johnco Materials, Inc. for the period January 1, 2005 through December 31, 2006.

Payroll records of Johnco Materials, Inc. for the period January 1, 2006 through December 31, 2006.

Johnco Materials, Inc. Schedule of White Hall Set Up Costs dated March 15, 2006.

Johnco Materials, Inc. Schedule of Loan Activity for loans identified as WABT 4471844, WABT 4471921, and WABT 4481194, for the period May 4, 2004 through February 27, 2006.

Johnco Materials, Inc. Schedule of Loan From Clatus Junkin for the period June 1, 2006 through July 31, 2007.

Bureau of Labor Statistics (www.bls.gov)

# EXHIBIT G

**Supplemental Report of Accounting, Economics & Appraisal Group, LLC**

### By: J. Lester Alexander, III

### Johnco Materials, Inc. v.
### Conrad Yelvington Distributors, Inc.
### As of February 29, 2008

### CV-06-2:06cv993-ID

This report and the attached appendices is a supplement to my report issued August 8, 2007 that contained my opinions as of that date regarding the amount of lost profits and lost future profits incurred by Johnco Materials, Inc. ("JMI"). Since that time, discovery has continued and new documentary and oral evidence has been presented to me. I have read and analyzed the new information and have given consideration to information learned as of the date of my previous report. In addition, I have considered the Memorandum Order and Opinion dated February 28, 2008, issued by Judge DeMent in this matter ("the Memorandum Order"), and related motions and briefs filed by the parties. As a result, my fundamental opinions contained in the August 8, 2007 report remain unchanged.

The following are supplements to my opinions.

*JMI's Suffered Losses as a Result of CYDI's Breach of the Supply Agreement*

True economic losses are lost incremental revenues minus the incremental cost associated with those revenues.[1] For JMI, the true economic losses incurred as a result of the alleged breach of Conrad Yelvington Distributors, Inc. ("CYDI") are the lost incremental revenue from the sales of No. 67 gravel to CYDI under the Supply Agreement, minus the incremental costs associated with those revenues.

Cost accounting principles provide different methods for the allocation of costs for a by-product or a joint product.[2] In light of the Memorandum Order, the alleged lost sales of oversize gravel and sand to third parties constitute activities that are independent of and collateral to the Supply Agreement[3]. Consequently, the application of the joint product costing method is the appropriate cost accounting method for determining the incremental costs associated with lost incremental revenue under the Supply Agreement.[2]

While not considering any lost profits from the sale of oversize gravel and sand, in my opinion it is reasonable to conclude that JMI would have been able to at least recover the cost of the joint products from the existing markets for oversize gravel and sand, which include the concrete, asphalt and other markets. My research indicates that a substantial market exists for both oversize gravel and sand and that JMI's pricing within that market is competitive. Moreover,

---

[1] Gaughan, Patrick A. (2004). Measuring Business Interruption Losses and Other Commercial Damages. Hoboken, New Jersey: John Wiley & Sons.
[2] Arnstein, William E. and Frank Gilabert. (1980). Direct Costing. New York, New York: AMACOM a division of The American Management Association.
[3] Memorandum Order and Opinion dated February 28, 2008, issued by Judge DeMent in this matter.

there is insufficient evidence to conclude the JMI would not have been able to access available markets had CYDI not breached the Supply Agreement, which caused the production of joint products (particularly the highly profitable oversize gravel) to stop. JMI's margins on sales of oversize gravel were substantial, and sand was sold at a price that substantially recovered its cost.[4]

JMI's lost profits are $4,110,179, determined in accordance with the Memorandum Order, assuming sales of only No. 67 gravel by JMI to CYDI in quantities of 5,200 tons per week (260,000 tons per year), after discounting to present value[5] and including prejudgment interest.[6]

JMI's lost profits are $2,322,122, determined in accordance with the Memorandum Order, assuming sales of only No. 67 gravel by JMI to CYDI in quantities of 3,000 tons per week (150,000 tons per year), after discounting to present value and including prejudgment interest.

In deriving these amounts I considered the above information, my report dated August 8, 2007 and the following:

> A study of the actual incremental, avoided, fixed and sunk/committed costs of JMI for March 2006 and May 2006 through September 2006.[7] Incremental costs were attributed to production, including production of joint products independent of and collateral to the Supply Agreement, based on an hourly production capacity of 120 tons of No. 67 gravel, 30 tons of oversize gravel and 183 tons of sand. Overtime premium was assessed to production levels greater than 70% of the capacity of a 40 hour shift at 50 shifts per year.

> Lost profits were reduced by the actual sales of No. 67 gravel to CYDI.

> The information contained in the appendices to this report.

### *CYDI's Expert Borden's Opinions are Flawed*

My opinions contained herein and in my report date August 8, 2007 rebut the opinions of CYDI's expert, Dave Borden. Borden's opinions are incorrect for a variety of reasons. For example, Borden incorrectly deducted from his profit determinations fixed costs, sunk costs and other costs that could not reasonably be avoided. He also failed to make a reasonable allowance for the capacity of the operation; instead he based his determinations on production levels adversely impacted by the alleged breach of CYDI.

Moreover, Borden's methodology of deducting the cost of production of joint products from the sales value of No. 67 gravel is contrary to the holding in the Memorandum Order that sales of

---

[4] JMI incremental costs of production were $1.85 per ton compared to a weighted average sales price per ton of $8.50 and $1.76 for oversize and sand, respectively.

[5] The present value rate is 5.95% based on JMI's bank line of credit agreement and prime rate per the Wall Street Journal as of February 29, 2008.

[6] The prejudgment interest rate is assumed to be 6% and is computed through March 31, 2008.

[7] The base period for projecting avoided costs includes all months studied previously by me plus all months studied by Defendant's expert Borden. In addition to the base period, I studied costs reported by JMI in its general ledger, financial statements and / or income tax returns for 2005, 2006 and 2007.

oversize gravel and sand to third parties constitutes activities that are independent of and collateral to the Supply Agreement.[3]   Consequently, Borden's methodology misstates his determinations to the detriment of JMI. It is an undisputed fact that oversize gravel and sand were produced and sold by JMI. During the limited time of production, JMI demonstrated the ability to sell oversize gravel and sand. Moreover, the ultimate profitability of the oversize gravel and sand is a separate matter with separate customers, separate marketing efforts, and the sales and ultimate profit or loss of the oversize gravel and sand is unrelated to the profit to be earned under JMI's contract to sell No. 67 gravel to CYDI.

## OTHER CONSIDERATIONS

The information in this report is based on information learned through February 29, 2008.  I reserve the right to consider any additional information that is presented to me and supplement or amend my opinions for information learned through trial.

Very truly yours,

By: _Shester Alexander, III_
     J. Lester Alexander, III, CPA

**INDEX OF APPENDICES**

Appendix A – Lost Profits at 5,200 Tons per Week (260,000 Tons per year)

Appendix B – Lost Profits at 3,000 Tons per Week (150,000 Tons per year)

Appendix C – Avoided Costs

Appendix D – Fixed, Sunk and Committed Costs

Appendix E – Actual Tons Purchased

Appendix F – Cumulative Tons Purchased

Appendix G – Alabama Market and JMI Market Share

Appendix H – Supplemental Listing of Information Considered

Appendix A

## Lost Profits at 5,200 Tons per Week
### (260,000 Tons per Year)

| | | Total | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 |
|---|---|---|---|---|---|---|---|
| Gross revenue [A] | $ | 7,241,300 | 1,256,100 | 1,469,000 | 1,505,400 | 1,505,400 | 1,505,400 |
| (Less): Cost of deposit in ground [1] $ 0.40 | | (507,200) | (91,200) | (104,000) | (104,000) | (104,000) | (104,000) |
| Lost revenue | | 6,734,100 | 1,164,900 | 1,365,000 | 1,401,400 | 1,401,400 | 1,401,400 |
| Avoided costs [1] | | | | | | | |
| Fuel per ton @ $ 0.64 | | 811,500 | 145,900 | 166,400 | 166,400 | 166,400 | 166,400 |
| Labor $ 0.56 | | 710,100 | 127,700 | 145,600 | 145,600 | 145,600 | 145,600 |
| Other costs per ton @ $ 0.40 | | 507,200 | 91,200 | 104,000 | 104,000 | 104,000 | 104,000 |
| Overtime premium $ 0.28 | | 129,000 | 25,800 | 25,800 | 25,800 | 25,800 | 25,800 |
| Other avoided costs | | 170,000 | 34,000 | 34,000 | 34,000 | 34,000 | 34,000 |
| Inflation=U.S. Dept of Labor, BLS, South Region, Size D 3.0% | | 197,600 | 6,500 | 22,400 | 38,600 | 55,800 | 74,300 |
| Total avoided costs | | 2,525,400 | 431,100 | 498,200 | 514,400 | 531,600 | 550,100 |
| Total avoided costs per ton | $ | | 1.89 | 1.92 | 1.98 | 2.04 | 2.12 |
| Gross damages | | 4,208,700 | 733,800 | 866,800 | 887,000 | 869,800 | 851,300 |
| Present value factor $1/(1+r)^n$  5.95% | | | - | - | 0.976206 | 0.921183 | 0.869940 |
| Damages, before prejudgment interest | | 4,008,237 | 733,800 | 866,800 | 865,894 | 801,419 | 740,324 |
| Prejudgment interest factor @ 6.0% | | | 0.0164318% | 0.0164318% | 0.0164318% | | |
| Prejudgment interest days | | | 577 | 212 | 15 | - | - |
| Prejudgment interest | | 101,942 | 69,600 | 30,207 | 2,135 | - | - |
| **Damages** | | **$ 4,110,179** | $ 803,400 | $ 897,007 | $ 868,029 | $ 801,419 | $ 740,324 |

*Sources:*
1 - Appendix C

*Footnotes:*
A - Yebrugton's expected purchases less actual purchases times price
B - Borden's estimate of the cost per ton of deposits in the ground was used as a measure of conservation. However, I disagree with Borden's per ton cost calculation because his estimate of reserves conflicts with oral and documentary evidence

**Appendix B**

## Lost Profits at 3,000 Tons per Week
### (150,000 Tons per Year)

| | | Total | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 |
|---|---|---|---|---|---|---|---|
| Gross revenue [A] | $ | 4,103,000 | $ 650,000 | $ 847,500 | $ 868,500 | $ 868,500 | $ 868,500 |
| (Less): Cost of deposit in ground [B] $ 0.40 | | (287,200) | (47,200) | (60,000) | (60,000) | (60,000) | (60,000) |
| Lost revenue | | 3,815,800 | 602,800 | 787,500 | 808,500 | 808,500 | 808,500 |
| Avoided costs [1] | | | | | | | |
| Fuel per ton @ $ 0.64 | | 459,500 | 75,500 | 96,000 | 96,000 | 96,000 | 96,000 |
| Labor $ 0.56 | | 402,100 | 66,100 | 84,000 | 84,000 | 84,000 | 84,000 |
| Other costs per ton @ $ 0.40 | | 287,200 | 47,200 | 60,000 | 60,000 | 60,000 | 60,000 |
| Overtime premium $ 0.24 | | - | - | - | - | - | - |
| Other avoided costs | | 170,000 | 34,000 | 34,000 | 34,000 | 34,000 | 34,000 |
| Inflation-U.S. Dept. of Labor, BLS, South Region, See D | 3.0% | 113,500 | 3,400 | 12,900 | 22,200 | 32,200 | 42,800 |
| Total avoided costs | | 1,432,300 | 226,200 | 286,900 | 296,200 | 306,200 | 316,800 |
| Total avoided costs per ton | $ | | 1.92 $ | 1.91 $ | 1.97 $ | 2.04 $ | 2.11 |
| Gross damages | | 2,383,500 | 376,600 | 500,600 | 512,300 | 502,300 | 491,700 |
| Present value factor $1/(1+r)^t$ [1] 5.95% | | | | | 0.976206 | 0.921383 | 0.869640 |
| Damages, before prejudgment interest | | 2,267,723 | 376,600 | 500,600 | 500,110 | 462,811 | 427,602 |
| Prejudgment interest factor @ 6.0% | | | 0.016518% | 0.016438% | 0.016438% | - | - |
| Prejudgment interest days | | | 577 | 212 | 15 | - | - |
| Prejudgment interest | | 54,399 | 35,720 | 17,446 | 1,233 | - | - |
| **Damages** | | **$ 2,322,122** | $ 412,320 | $ 518,046 | $ 501,343 | $ 462,811 | $ 427,602 |

*Sources:*

1 - Appendix C

*Footnotes:*

A - Yeh-caplon's expected purchases less actual purchases times price.

B - Borden's estimate of the cost per ton of deposit in the ground was used as a measure of conservatism. However, I disagree with Borden's per ton cost calculation because his estimate of reserves conflicts with oral and documentary, evidence.

The present value rate is 5.95% based on JMI's bank line of credit agreement and prime rate per the Wall Street Journal as of February 29, 2008.

The prejudgment interest rate is assumed to be 6% and is computed through March 31, 2008.

Appendix C

## Avoided Costs

| | March | May | June | July | August | September | Total | Annualized | Cost per | Basis |
|---|---|---|---|---|---|---|---|---|---|---|
| **Production costs:** | | | | | | | | | | |
| Fuel & oil | $ 7,782 | $ 6,700 | $ 18,854 | $ 9,137 | $ 10,078 | $ 18,294 | $70,845 | | $0.64 | 39,933 tons [1] / 36% / 110,925 tons |
| | | | | | | | | | | |
| **Labor costs:** | | | | | | | | | | |
| Contract labor | $ - | $ - | $ 1,625 | $ - | $ - | $ 550 | | $ 4,350 | | |
| Insurance - WC | - | - | - | - | 4,165 | - | | 8,330 | | |
| Payroll taxes | 1,834 | 1,409 | 2,661 | 2,030 | 2,285 | 1,186 | | 22,810 | | |
| Salaries and wages | 16,913 | 18,771 | 23,734 | 18,366 | 21,839 | 13,651 | | 226,548 | | |
| | $18,747 | $20,180 | $28,020 | $20,396 | $28,289 | $15,387 | | $ 262,038 | $0.56 | 466,200 tons |
| | | | | | | | | | | |
| Overtime premium | | | | | | | | | $0.28 | 0.5 times |
| | | | | | | | | | | |
| **Other costs:** | | | | | | | | | | |
| Bank charges | $ 2,044 | $ - | $ 384 | $ 299 | $ 717 | $ 1,509 | | $ 5,818 | | |
| Equipment rental | - | 5,141 | 4,098 | - | 7,780 | 4,019 | | 46,164 | | |
| Hauling charges | - | - | 180 | - | 1,650 | - | | 3,660 | | |
| Miscellaneous expense | 74 | 695 | - | - | - | - | | 1,538 | | |
| Insurance | 1,517 | 2,783 | 1,810 | 3,305 | 6,267 | 12,691 | | 12,220 | | |
| Repairs & maintenance | 8,270 | 1,518 | 5,680 | - | - | - | | 75,462 | | |
| Small tools | 429 | 454 | - | - | 208 | 290 | | 2,762 | | |
| Supplies | 395 | 1,119 | 5,545 | 980 | 854 | 4,559 | | 26,904 | | |
| Training | - | 150 | - | - | - | - | | 300 | | |
| Utilities | 512 | 735 | 1,245 | 1,374 | 1,398 | 1,466 | | 13,460 | | |
| | $13,241 | $11,991 | $19,546 | $ 5,958 | $18,874 | $24,534 | | $ 188,288 | $0.40 | 466,200 tons |
| | | | | | | | | | | |
| **Other avoided costs:** | | | | | | | | | | |
| Auto expense | $ 4,913 | $ - | $ - | $ - | $ - | $ - | | $ 9,826 | | |
| Cleaning | 125 | - | 100 | 75 | 125 | 100 | | 1,050 | | |
| Life insurance | 1,657 | - | 1,657 | 1,657 | 1,657 | 1,657 | | 16,570 | | |
| Office expense | 201 | - | 96 | 128 | 1,236 | 247 | | 3,816 | | |
| Travel | 326 | 337 | 277 | - | 146 | 111 | | 2,394 | | |
| Postage | - | - | 78 | - | 78 | 39 | | 390 | | |
| | $ 7,222 | $ 337 | $ 2,208 | $ 1,860 | $ 3,242 | $ 2,154 | | $ 34,046 | | |

*Source:*

See e.g. JOHNCO 0191 and Amended Tax Return

1 - See e.g. JMI Sales Invoices

**Appendix D**

## Fixed, Sunk and Committed Costs

| | March | May | June | July | August | September | Total | Annualized |
|---|---|---|---|---|---|---|---|---|
| **Fixed or not avoided/avoidable:** | | | | | | | | |
| Dues | - | - | - | 200 | 215 | - | 415 | 830 |
| Professional fees | 3,000 | - | 400 | 300 | 800 | 400 | 4,900 | 9,800 |
| Rents | 400 | 400 | 800 | - | 400 | 400 | 2,400 | 4,800 |
| Taxes and licenses | 110 | - | - | 826 | - | - | 936 | 1,872 |
| Telephone | 573 | - | 576 | 232 | 1,220 | 334 | 2,935 | 5,870 |
| Subtotal | 4,083 | 400 | 1,776 | 1,558 | 2,635 | 1,134 | 11,586 | 23,172 |
| **Sunk/committed costs:** | | | | | | | | |
| Amortization expense | - | - | - | - | - | - | - | - |
| Depletion | - | - | - | - | - | - | - | - |
| Depreciation | 2,658 | 2,658 | 2,658 | 2,658 | 2,658 | 2,658 | 15,948 | 31,896 |
| Interest | 7,279 | - | - | - | - | - | 7,279 | 14,558 |
| Subtotal | 9,937 | 2,658 | 2,658 | 2,658 | 2,658 | 2,658 | 23,227 | 46,454 |
| **Installment debt repayment:** | | | | | | | | |
| M&B rail spur financing [1] | - | - | 19,500 | - | - | 19,500 | 39,000 | 78,000 |
| Subtotal | - | - | 19,500 | - | - | 19,500 | 39,000 | 78,000 |
| | $ 14,020 | $ 3,058 | $ 23,934 | $ 4,216 | $ 5,293 | $ 23,292 | $ 73,813 | $ 147,626 |

*Source:*

See e.g. JOHNCO 0191 and Amended 2006 Tax Returns

1 – See e.g. M&B Rail Services Agreement



Appendix E

Actual Tons Purchased

Purchases are not Regular nor Weekly



Appendix F

Cumulative Tons Purchased
Actual vs. 5,200 Weekly vs. 150,000 Annually

Appendix G

## Alabama Market and JMI Market Share

|  | State of Alabama [1] | JMI | JMI relative to State of Alabama |
|---|---|---|---|
| Production | 20,100,000 | 466,200 | 2.3% |
| Unit Price | $ 4.78 | $ 3.72 | (1.06) |

*Source:*

1 - U.S. Department of the Interior, U.S. Geological Survey, 2006 Minerals Yearbook, Sand and Gravel, Construction, published January 2008.

*Footnote:*

JMI's market share is low and its price is competitive, therefore it is reasonable to conclude that JMI could have increased its market share based on its competitive price.

**Supplemental List of Information Considered**                    Appendix H

Expert report of Dave G. Borden, CPA, including supporting documents considered

Deposition and exhibits of Dave Borden (December 21, 2007)

Deposition and exhibits of Clatus Junkin (January 11, 2008)

Invoices for actual sales of No. 67 gravel bearing sales prices ranging from $5.51 per ton to $9.92 per ton

Invoices for actual sales of oversize gravel bearing sales prices ranging from $8.50 per ton to $9.10 per ton

Invoices for actual sales of sand bearing sales prices ranging from $1.30 per ton to $30.00 per ton

Third Party production from:
- West Alabama Bank & Trust
- McCabe and Associates
- M&B Railroad

2006 Amended income tax return of Johnco Materials, Inc.

Arnstein, William E. and Frank Gilabert. (1980). *Direct Costing*. New York, New York: AMACOM a division of The American Management Association.

Gaughan, Patrick A. (2004). *Measuring Business Interruption Losses and Other Commercial Damages*. Hoboken, New Jersey: John Wiley & Sons.

Horngren, Charles T. (1977). *Cost Accounting, A Managerial Emphasis*, 4th edition. Englewood Cliffs, New Jersey: Prentice Hall.

Garrison, Ray H. (1979). *Managerial Accounting, Concepts for Planning, Control, Decision Making*, Revised edition. Dallas, Texas: Business Publications

Financial Accounting Standards Board. (2004). Inventory. In *Current Text* (Vol. I, pp. 27519 to 27631). Norwalk, CT: Financial Accounting Standards Board.

Financial Accounting Standards Board. (2004). Accounting Research Bulletin No. 43, Chapter 4, Inventory Pricing. In *Original Pronouncements* (Vol. III, pp. ARB 43-11 to ARB 43-15). Norwalk, CT: Financial Accounting Standards Board.

U.S. Department of the Interior, U.S. Geological Survey, 2006 Minerals Yearbook, Sand and Gravel, Construction, published January 2008.

Wall Street Journal, February 29, 2008.

www.yellowpages.com

Memorandum Order and Opinion dated February 28, 2008, issued by Judge DeMent in this matter, and related motions and briefs filed by the parties.

All information referenced in Alexander report dated August 8, 2007.